**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

REBECCA TERRY,            )
                                  )
     Plaintiff,          )
                                  )
               v.           )     No. 17-cv-01112
                                  )
COUNTY OF MILWAUKEE, *et al.*,    )     Hon. J.P. Stadtmueller
                                  )
     Defendants.      )     JURY TRIAL
                                  )     DEMANDED
                                  )

**INDEX OF UNPUBLISHED DECISIONS IN SUPPORT OF PLAINTIFF'S OMNIBUS
RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR
<u>JUDGMENT ON THE PLEADINGS</u>**

*Adedeji v. Cobble*,
    10 C 0892, 2013 WL 449592 (N.D. Ill. Feb. 5, 2013)

*Arita v. Wexford Health Sources, Inc.*,
    No. 15-CV-01173, 2016 WL 6432578 (N.D. Ill. Oct. 31, 2016)

*Armour v. Country Club Hills*,
    No. 11 C 5029, 2014 WL 63850 (N.D. Ill. Jan. 8, 2014)

*Barwicks v. Dart*,
    No. 14-cv-8791, 2016 WL 3418570 (N.D. Ill. June 22, 2016)

*Brainer v. Dart*,
    No. 16 CV 6013, 2018 WL 1519154 (N.D. Ill. Mar. 28, 2018)

*Chaparro v. Powell*,
    No. 07 C 5277, 2008 WL 68683 (N.D. Ill. Jan. 2, 2008)

*Doe v. Grosch*,
    No. 17 C 1214, 2017 WL 3970515 (N.D. Ill. Sept. 8, 2017)

*Foy v. City of Chicago*,
    No. 15 C 3720, 2016 WL 2770880 (N.D. Ill. May 12, 2016)

*Karney v. City of Naperville*,
    No. 15 C 4608, 2016 WL 6082354 (N.D. Ill. Oct. 18, 2016)

*Kerlin v. Chicago Board of Elections*,

No. 16-cv-7424, 2017 WL 1208520 (N.D. Ill. Apr. 3, 2017)

***Listenbee v. City of Harvey,***
No. 11 C 03031, 2013 WL 5567552 (N.D. Ill. Oct. 9, 2013)

***Lozanovski v. City of Crown Point,***
No. 2:15-CV-454-TLS, 2017 WL 347451 (N.D. Ind. Jan. 24, 2017)

***McDonald v. Obaisi,***
No. 16-CV-5417, 2017 WL 4046351 (N.D. Ill. Sept. 13, 2017)

***Padilla v. City of Chicago,***
No. 06-C-5462, 2009 WL 4891943 (N.D. Ill. Dec. 14, 2009)

***Paroubek v. Friddle,***
No. 86 C 7534, 1987 WL 7818 (N.D. Ill. Mar. 11, 1987)

***Payne v. County of Cook,***
No. 15 C 3154, 2016 WL 1086527 (N.D. Ill. Mar. 21, 2016)

***Piercy v. Warkins,***
14 CV 7398, 2017 WL 1477959 (N.D. Ill. Apr. 25, 2017)

***Shields v. City of Chicago,***
No. 17 C 6689, 2018 WL 1138553 (N.D. Ill. Mar. 2, 2018)

***Stokes v. Ewing,***
No. 16 C 10621, 2017 WL 2224882 (N.D. Ill. May 22, 2017)

***Young Estate of Young v. Peoria County, Illinois,***
No. 1:16-CV-01367-JBM, 2017 WL 3741551 (C.D. Ill. Aug. 30, 2017)

***Zinn v. Village of Sauk Village,***
2017 WL 783001 (N.D. Ill. Mar. 1, 2017)

Respectfully submitted,

/s/ Theresa Kleinhaus

Arthur Loevy
Jon Loevy
Scott Rauscher
Theresa Kleinhaus
Aisha N. Davis
LOEVY & LOEVY
311 N. Aberdeen, Third Floor
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Theresa Kleinhaus, an attorney, certify that on April 12, 2018 I caused the foregoing

**Index of Unpublished Decisions** to be filed via the Court's CM/ECF electronic filing system,

which effected service on all counsel of record.

/s/ Theresa Kleinhaus
Theresa Kleinhaus
*One of Plaintiff's Attorneys*

2013 WL 449592
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Abayomi ADEDEJI, Plaintiff,

v.

Matthew COBBLE, sued in his individual capacity, Sheriff Tom Dart, sued in his individual
and official capacities, and Cook County, sued for purposes of indemnification, Defendants.

No. 10 C 0892.
|
Feb. 5, 2013.

**Attorneys and Law Firms**

Abayomi Adedeji, Mt. Sterling, IL, Peter Stephan Faraci, Faraci & Faraci, Park Ridge, IL, for Plaintiff.

Richard Seth Shippee, Sandra A. Navarro, Ronald Weidhuner, Chicago, IL, for Defendants.

**Opinion**

*MEMORANDUM OPINION AND ORDER*

ARLANDER KEYS, United States Magistrate Judge.

**\*1** Pro se plaintiff Abayomi Adedeji, an Illinois Department of Corrections inmate, has brought a civil rights suit pursuant to 42 U .S.C. § 1983. The parties have consented to proceed before this Court, 28 U.S.C. § 636(c). (Dkt.Nos.23–25). Pending before the Court is defendants' Rule 12(b)(6) motion to dismiss. (Dkt. No. 44). The motion is granted, in part, and denied, in part.

*BACKGROUND*

The following facts are drawn from plaintiff's amended complaint. (Dkt. No. 40). For purposes of evaluating defendants' motions to dismiss, the facts are accepted as true and all reasonable inferences are made in the light most favorable to plaintiff. *Parish v. City of Elkhart,* 614 F.3d 677, 679 (7th Cir.2010) (citing *Johnson v. Rivera,* 272 F.3d 519, 520 (7th Cir.2001)). This Court also "construe[s] pro se complaints liberally and hold[s] them to a less stringent standard than formal pleadings drafted by lawyers." *Bridges v. Gilbert,* 557 F.3d 541, 546 (7th Cir.2009) (citing *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam); *Obriecht v. Raemisch,* 417 F.3d 489, 492 n. 2 (7th Cir.2008)).

On November 16, 2009, plaintiff was assaulted by fellow inmate Georgio Gaines while they were in a bullpen area at the Cook County Jail. (Dkt. No. 40 at 5). Defendant Correctional Officer Matthew Cobble had allegedly failed to secure Gaines's handcuffs and other restraints prior to the assault. (*Id.*). Gaines removed his hands from the cuffs and used them as a weapon, repeatedly striking plaintiff on the head and side. (*Id.*). Plaintiff suffered a concussion and blood loss, requiring hospitalization. (*Id.*). Plaintiff sues Cobble, Cook County Sheriff Tom Dart, and Cook County for monetary relief.

*ANALYSIS*

Rule 12(b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To satisfy the noticepleading standard, a complaint must provide a 'short and plain statement of the claim showing that the pleader is entitled to relief,' which is sufficient to provide the defendant[s] with 'fair notice' of the claim and its basis." Bridges, 557 F.3d at 545 (quoting Erickson, 551 U.S at 89). " 'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Reger Dev., LLC v. Nat'l City Bank, 592 F.3d 759, 763 (7th Cir.2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "The complaint must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." Bridges, 557 F.3d at 546 (internal quotation marks and citations omitted) (emphasis in original).

As an initial matter, plaintiff provides additional factual allegations in his response to the motion to dismiss. (Dkt. No. 52). Defendant counters that the additional facts must be disregarded because plaintiff cannot amend his complaint through a response to a motion to dismiss. (Dkt. No. 54 at 3–4).

**\*2** Defendants are correct that a complaint cannot be amended by plaintiff's brief in opposition to a motion to dismiss. Agnew v. Nat'l Collegiate Athletic Ass'n., 683 F.3d 328, 348 (7th Cir.2012) (citing Thomason v. Nachtrieb, 888 F.2d 1202, 1205 (7th Cir.1989)). But the prohibited amendment is the adding of new claims. Wooley v. Jackson Hewitt, Inc., 540 F.Supp.2d 964, 972 (N.D.Ill.2008). A plaintiff may supplement existing claims with additional factual allegations in the response to the motion to dismiss as long as the new facts are consistent with the original claims made in the complaint. Geinosky v. City of Chicago, 675 F.3d 743, 745 n. 1 (7th Cir.2012). Plaintiff properly provides supplemental factual information in support of his claims. He is not adding any new claims. Defendants' request to strike the additional information in plaintiff's response is denied.

Turning to the merits of the motion to dismiss, defendant Cobble argues that he should be dismissed from this action with prejudice because plaintiff's complaint is untimely under the statute of limitations, and it also fails to state a claim for relief. Both arguments are rejected.

Regarding the statute of limitations, the incident occurred on November 16, 2009. (Dkt. No. 40 at 5). There is a two-year statute of limitations for the case. Wallace v. Kato, 549 U.S. 384, 387, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007); Ray v. Maher, 662 F.3d 770, 772–73 (7th Cir.2011). Plaintiff filed his original complaint in February 2010. (Dkt. No. 1). However, the original complaint did not satisfy the statute of limitations because Cobble was named as a John Doe. Hall v. Norfolk Southern R.R. Co., 469 F.3d 590, 596 (7th Cir.2006). The present amended complaint, naming Cobble as a defendant, was not filed for more than two and half years after the incident, in June 2012. Cobble argues that the complaint is therefore untimely as to him.

Plaintiff is not required to anticipate or address the statute of limitations in the complaint, but defendant may raise the defense in a motion to dismiss when the elements of the defense are set forth by the complaint. Independent Tr. Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 935 (7th Cir.2012). Unlike plaintiff, who may provide additional facts to supplement his claims, defendant's motion to dismiss is limited solely to the information presented on the face of the complaint, documents attached to the complaint, and documents subject to judicial notice. Geinosky, 675 F.3d at 745 n. 1. Defendant must bring a motion for summary judgment if he wishes to look outside the complaint.

Here, the elements of the statute of limitations defense are not conclusively established on the basis of the information on the face of the complaint. Although Cobble was first named as a defendant more than two and half years after the

incident, some of this time was presumably tolled due to plaintiff's required exhaustion of his administrative remedies. Under the Prison Litigation Reform Act, a claim must be raised through an internal grievance process (if available) before it can be brought in federal court. 42 U.S.C. § 1997e(a). The statute of limitations is tolled while plaintiff exhausts his claim through the grievance process. *Walker v. Sheahan,* 526 F.3d 973, 978 (7th Cir.2008). The grievance history is not detailed in the complaint (and understandably so because plaintiff is not required to anticipate its role to toll the limitations period when bringing the complaint). Defendant must look beyond the complaint to consider the grievance history, a step that is not allowed on a motion to dismiss. Consequently, the statute of limitations cannot be decided at the motion to dismiss stage.

**\*3** In addition, plaintiff argues that he was unable to discover defendant Cobble's identity in a timely fashion because defense counsel refused to respond to his discovery requests. (Dkt. No. 52 at 13). This alleged conduct may potentially result in equitable tolling and/or equitable estoppel. *See Shropshear v. Corp. Counsel of City of Chicago,* 275 F.3d 593, 594–99 (7th Cir.2001). Defendant counters that plaintiff cannot invoke tolling or estoppel. However, these doctrines also require the Court to look beyond the complaint to additional facts. This is an additional reason why the statute of limitations cannot be decided through the present motion to dismiss.

Thus, Cobble's statute of limitations defense is rejected at the motion to dismiss stage. Cobble is correct that he was identified more than two years after the incident. However, the defense is not so clear on the face of the complaint as to allow dismissal, as there are additional facts outside the record that must be considered in evaluating the defense. This requires the raising of the defense in a summary judgment motion if Cobble desires.

Cobble's second argument is that the complaint fails to state a claim for deliberate indifference to the risk of assault by a fellow inmate. "The Due Process Clause of the Fourteenth Amendment protects pre-trial detainees from punishment and places a duty upon jail officials to protect pre-trial detainees from violence." *Fisher v. Lovejoy,* 414 F.3d 659, 661 (7th Cir.2005) (citing *Swofford v. Mandrell,* 969 F.2d 547, 549 (7th Cir.1992)); *see also Lewis v. Richards,* 107 F.3d 549, 552–53 (7th Cir.1997) (citing *Farmer v. Brennan,* 511 U.S. 825, 831–33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Langston v. Peters,* 100 F.3d 1235, 1237 (7th Cir.1996)). However, not every act of inmate-oninmate violence results in a constitutional violation. *Borello v. Allison,* 446 F.3d 742, 747 (7th Cir.2006).

Although the claim arises under the Fourteenth Amendment because plaintiff was a pretrial detainee, the Court applies the same deliberate indifference standard that governs Eighth Amendment claims. *Minix v. Canarecci,* 597 F.3d 824, 831 (7th Cir.2010). The standard contains both an objective prong, requiring a grave risk, and a subjective prong, requiring actual knowledge of the risk. *Dale v. Poston,* 548 F.3d 563, 569 (7th Cir.2008) (citing *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir.2005)). As to the objective requirement, plaintiff must show that "(1) he suffered an objectively sufficient serious injury; and (2) he was incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citing *Farmer,* 511 U.S. at 834). A condition that poses a substantial risk of harm is one where the "risks [are] so great that they are almost certain to materialize if nothing is done ." *Brown v. Budz,* 398 F.3d 904, 911 (7th Cir.2005). This standard has been analogized to the threat posed by inherently dangerous situations such as placing a detainee in a cell with a cobra. *Id.* at 911 (citing *Billman v. Indiana Dep.'t of Corr.,* 56 F.3d 785, 788 (7th Cir.1995)).

**\*4** On the subjective side, the official is deliberately indifferent, resulting in a constitutional violation, only if he " 'effectively condones the attack by allowing it to happen.' " *Santiago v. Walls,* 599 F.3d 749, 756 (7th Cir.2010) (quoting *Lewis,* 107 F.3d at 553). "[D]efendants [must have] actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from defendants' failure to prevent it." *Santiago,* 599 F.3d at 756 (quoting *Lewis,* 107 F.3d at 553). "Mere negligence or even gross negligence does not constitute deliberate indifference." *Borello,* 446 F.3d at 749. However, "[a] prison official cannot escape liability by showing that he did not know that a plaintiff was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Dale,* 548 F.3d at 569 (citations omitted). "The ultimate measure of the adequacy of the response is therefore reasonableness in light of the surrounding circumstances." *Id.*

There is no question that plaintiff alleges that he suffered an objectively serious injury, *Lee v. Young,* 533 F.3d 505, 509 (7th Cir.2008), and so the Court shall consider the subjective prong.

A common fact pattern for liability is when a correctional officer ignores repeated detainee complaints that the detainee is under the threat of violence and there is a subsequent assault. *Borello,* 446 F.3d at 749 (citing *Velez v. Johnson,* 395 F.3d 732, 736–37 (7th Cir.2005); *Haley,* 86 F.3d 642); *see also Brown,* 398 F.3d at 914. An alternative permissible theory is that a correctional officer may not knowingly take actions that would expose a detainee to a serious injury. *See Case v. Ahitow,* 301 F.3d 605, 607 (7th Cir.2002) (explaining that a correctional official would be liable for deliberate indifference if he knowingly unleashed a hungry lion on a prisoner); *Billman,* 56 F.3d at 788 (providing example that it is deliberate indifference to knowingly placing a prisoner in a cell with a cobra or placing prisoner in cell when there is a high risk that there is a cobra in the cell).

Cobble's view is that the case raises, at most, non-cognizable negligence. Cobble allegedly failed to properly secure Gaines's handcuffs allowing him to slip out of the restraints and attack plaintiff. Plaintiff counters that there is a well known risk at Cook County Jail of inmate attacks due to correctional officers failing to properly secure restraints. (Dkt. No. 52 at 5–6). Cobble allegedly failed to follow Jail procedure when securing the handcuffs. (*Id.* at 6). Plaintiff further alleges that Cobble was wrongfully absent from his post.

Plaintiff has properly alleged a claim against Cobble. Cobble's view is that he had no indication that Gaines would attack plaintiff. Yet, plaintiff counters that the problem of inmate violence is so well known and Cobble was aware of it that by taking the wrongful steps, Cobble effectively knew that an attack would likely occur. Like the analogy to a hungry lion in *Case,* plaintiff effectively claims that fellow inmates at the Cook County Jail are so inherently dangerous that every correctional officer knows that the inmates will attack each other if given the chance. 301 F.3d at 607. An officer who fails to properly secure an inmate is deliberately indifferent to this known risk. This is sufficient at this stage of the proceedings to allow plaintiff to proceed with his claim.

**\*5** Moving to Sheriff Tom Dart, plaintiff sues Dart in both his individual and official capacity. Despite plaintiff's detailed response to the motion to dismiss, he fails to provide any additional elaboration in support of his individual capacity claim against Dart. The complaint fails to state a claim against Dart in his individual capacity.

"Section 1983 lawsuits against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim." *Palmer v. Marion County,* 327 F.3d 588, 594 (7th Cir.2003) (citing *Zimmerman v. Tribble,* 226 F.3d 568, 574 (7th Cir.2000); *Zentmyer v. Kendall County, Ill.,* 220 F.3d 805, 811 (7th Cir.2000); *Davis v. Zirkelbach,* 149 F.3d 614, 619 (7th Cir.1998)). Agency principles of *respondent superior* and vicarious liability do not apply to § 1983 claims. *Kinslow v. Pullara,* 538 F.3d 687, 692 (7th Cir.2008) (citing *Monell v. New York City Dep't Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Hosty v. Carter,* 412 F.3d 731, 733 (7th Cir.2005)); *see also Iqbal,* 556 U.S. at 676 ("[A] plaintiff must plead that each government official defendant, through the official's own individual actions, has violated the Constitution."). However, supervisors may violate the Constitution resulting in their own individual liability if they "know about the unconstitutional conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *T.E. v. Grindle,* 599 F.3d 583, 588 (7th Cir.2010) (quoting *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir.1988)).

Here, plaintiff does not allege that Dart was personally present at the incident. He also does not claim that Dart was involved in turning a blind eye to inmate violence or otherwise facilitating an environment for attacks to occur at the Jail. To the contrary, plaintiff claims that Dart has instituted a number of written policies to prevent inmate violence and bases his deliberate indifference claim against Cobble in part on him ignoring these policies. Plaintiff cannot say that Cobble ignored established policies designed to prevent violence, and then say that Dart is turning a blind eye to inmate violence.

Plaintiff also cannot proceed with an official capacity claim against Sheriff Dart. Plaintiff fails to allege that his injuries were caused by custom, policy or practice. *Waters v. City of Chicago,* 580 F.3d 575, 580 (7th Cir.2009) (citing 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "To establish an official policy or custom, plaintiff must show that his constitutional injury was caused by (1) the enforcement of an express policy, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Wragg v. Vill. of Thornton,* 604 F.3d 464, 467–68 (7th Cir.2007) (citing *Latuszkin v. City of Chicago,* 250 F.3d 502, 504 (7th Cir.2001); *McCormick v. City of Chicago,* 230 F.3d 319, 324 (7th Cir.2000)).

**\*6** Plaintiff fails to plausibly allege liability under *Monell.* He only mentions his (apparently) single random case without demonstrating how this is part of a custom or practice sufficient to establish a *Monell* claim. *See McCauley v. City of Chicago,* 671 F.3d 611, 615–19 (7th Cir.2011); *Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir.2005). (Plaintiff does not plausibly suggest how he was harmed by an express policy or decision by a final policymaker). He does raise other incidents of inmate violence but fails to plausibly suggest that they were part of a failure to secure inmate restraints. As mentioned above, plaintiff concedes that Cook County Jail has formalized regulations regarding securing inmates to prevent violence. He relies on Cobble ignoring these regulations to support his claim against him. The existence of these formalized regulations suggests that there is no policy to allow inmate-on-inmate violence.

Finally, plaintiff may proceed with a state law indemnification claim against Cook County because he has a valid claim against its employee, Cobble. 745 ILCS 10/9–102; *Yang v. City of Chicago,* 137 F.3d 522, 526 (7th Cir.1998); *Regalado v. Hayes,* No. 11 C 1472, 2011 WL 5325542, at \*7 (N.D.Ill. Nov.3, 2011).

*CONCLUSION*

Defendants' motion to dismiss (Dkt. No. 44), is granted, in part, and denied, in part. Plaintiff may proceed with his individual capacity claim against defendant Cobble. Plaintiff's individual and official capacity claims against Sheriff Dart are dismissed. Dart is dismissed from this action with prejudice. Plaintiff may proceed with his indemnification claim against Cook County. Cobble and Cook County shall answer the complaint within twenty-one days of the entry of this order. The Clerk is instructed to terminate defendant officer John Doe and alter the case caption to *Adedeji v. Cobble.*

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 449592

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 6432578
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Luis Arita, Plaintiff,

v.

Wexford Health Sources, Inc., et al., Defendants.

No. 15-cv-01173
|
Signed 10/31/2016

**Attorneys and Law Firms**

Margaux L. Steffy, Jeffery Robert Beck, Michael S. Pomerantz, Brown, Udell, Pomerantz & Delrahim, Ltd., Chicago, IL, for Plaintiff.

Robert Steven Tengesdal, Daria Ann Porta, James M. Gale, Sarah E. Schnautz, Harrison A. Cohen, Bollinger Connolly Krause LLC, Hellin Jang, Office of the Illinois Attorney General, Chicago, IL, for Defendants.

**Opinion**

### MEMORANDUM OPINION AND ORDER

Andrea R. Wood, United States District Judge

**\*1** Plaintiff Luis Arita has brought this lawsuit pursuant to 42 U.S.C. § 1983 alleging that the defendants violated his constitutional rights by denying him adequate medical care for an inguinal hernia that he suffered while incarcerated at Sheridan Correctional Center ("Sheridan"). Arita has sued Wexford Health Sources, Inc. ("Wexford"), which is the correctional health care company that provides medical services to inmates in the custody of the Illinois Department of Corrections, certain Wexford employees, and several members of the Sheridan medical staff. Before the Court is Wexford's motion to dismiss Count II of the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 36.) For the reasons explained below, the motion is granted.

### BACKGROUND

Arita's two-count amended complaint alleges that the various defendants ignored his complaints of swelling and pain in his groin area for nine months before finally examining him and ultimately discovering that he suffered from an inguinal hernia.[1] Specifically, Arita alleges that shortly after being transferred to Sheridan from another Illinois Department of Corrections facility in or around January 2014, he noticed a painful swelling in his groin area. (Am. Compl. ¶¶ 11-12, Dkt. No. 20.) Approximately one month later, in or around February 2014, Arita notified members of the Sheridan medical staff of his increasing discomfort. (*Id.* ¶ 12.) When he did not receive any treatment, Arita continued to complain about his condition to the Sheridan medical staff over a period of many months, including through written complaints and grievances directed to Defendants Nicolette Duffield (an administrator of Sheridan's medical department), Marshall James (a Wexford physician), and Chantel Sielman, Krista Torez, and Debbie McCullum (all Wexford nurses). (*Id.* ¶¶ 5-9, 13.)

After nine months of repeated treatment demands, Arita finally received a medical examination in late November 2014. (*Id.* ¶ 14.) When the examination found extreme swelling in his groin area, further tests were ordered. (*Id.* ¶¶ 14-15.) The tests revealed that Arita suffered from an inguinal hernia. (*Id.* ¶ 15.) In late January 2015, it was determined that the hernia required an operation. (*Id.* ¶ 16.) Arita underwent surgery to have the hernia repaired approximately one month later in February 2015. (*Id.*) Arita alleges that over the 12 months he waited to receive a medical examination and the necessary treatment, his hernia grew in size and caused him increasing pain. (*Id.* ¶ 17.)

In Count I of his amended complaint, Arita claims that the individual defendants were deliberately indifferent to his serious medical needs by failing to provide adequate treatment despite his complaints of swelling and pain, and that as a result he suffered extreme pain and mental anguish. Count II asserts essentially the same claim against Wexford—Arita alleges that Wexford, through its employees, systematically ignored his complaints of pain and requests for treatment. Arita further alleges that Wexford has a policy of ignoring inmates' medical needs. In its motion to dismiss, Wexford contends that Arita has failed to state a claim against it under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) and therefore Count II must be dismissed.

## DISCUSSION

**\*2** Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion, the short and plain statement must meet two threshold requirements. First, the complaint's factual allegations must give the defendant fair notice of the claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Second, the complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face. *Id.* at 570. This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Id.* at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In *Monell*, the Supreme Court established that a municipality may be liable for money damages under § 1983 only if the unconstitutional act about which the plaintiff complains was caused by (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690). Private contractors that provide medical services to prisoners are treated like municipalities for purposes of § 1983 claims. *See, e.g., Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (citing *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 n.1 (7th Cir. 2004)). *Monell* liability "is not founded on a theory of vicarious liability or *respondeat superior* that holds a municipality responsible for the misdeeds of its employees. Rather, a municipal policy or practice must be the direct cause or moving force behind the constitutional violation." *Woodward*, 368 F.3d at 927 (quoting *Estate of Novack ex rel. v. Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000)). [2] Thus, to prevail on his *Monell* claim against Wexford, Arita must show that "his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014).

"Although *Monell* claims may proceed with conclusory allegations of a policy or practice, some facts must be pleaded to put the defendant on notice of the alleged wrongdoing." *Taylor v. Wexford Health Sources, Inc.*, No. 15-cv-05190, 2016 WL 3227310, at \*4 (N.D. Ill. June 13, 2016). In addition, a plaintiff asserting a policy or practice claim ultimately "must demonstrate that there is a policy at issue rather than a random event." *Thomas*, 604 F.3d at 303. The Seventh Circuit has declined to adopt a bright-line rule defining what constitutes a widespread custom or practice, and there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability. *See id.* It is clear, however, that the conduct complained of must have occurred more than once, or even three times. *See id.* Moreover, while "it is

not impossible for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence limited to his experience[,]" it is difficult because "what is needed is evidence that there is a true municipal [or corporate] policy at issue not a random event." *Grieveson v. Anderson*, 538 F.3d. 763, 774 (7th Cir. 2008).

**\*3** Here, Arita's only *Monell*-related allegation is that "Wexford, upon information and belief, has a policy of ignoring not only [his] requests/complaints, but other inmates' medical needs as well." (Am. Comp. ¶ 27, Dkt. No. 20.) The remainder of the complaint is focused on Arita's own experience. Arita's single conclusory allegation that Wexford has policy of treating other inmates in the same fashion as he has been treated is insufficient to survive a motion to dismiss. *See, e.g., Taylor*, 2016 WL 3227310, at \*4 ("[Plaintiff's] allegations of Wexford's policies and practices are vague and broad, lacking in sufficient detail to put Wexford on notice of the claim against it."); *Velazquez v. Williams*, No. 14-cv-9121, 2015 WL 4036157, at \*4 (N.D. Ill. June 30, 2015) (the allegation that Wexford had a policy and practice of denying psychotropic medicines to mentally disabled inmates was insufficient to state a *Monell* claim); *Johansen v. Curran*, No. 15-cv-2376, 2016 WL 2644863, at \*8 (N.D. Ill. May 10, 2016) (noting that the court was bound by "the Seventh Circuit's decision in [*McCauley v. City of Chi.*, 671 F.3d 611 (7th Cir. 2011)] holding that conclusory allegations of a policy or practice in support of a *Monell* claim are not factual allegations and as such contribute nothing to the plausibility analysis under *Twombly/Iqbal.*") (internal quotation marks omitted).

Arita's allegation of a Wexford policy—made "upon information and belief"—is unsupported by any facts regarding the experiences of other inmates. *See Taylor*, 2016 WL 3227310, at \*4 ("Taylor does not allege that any other detainee suffered from similar issues, only including a conclusory reference to other prisoners' experiences at Stateville."); *Winchester v. Marketti*, No. 11-cv-9224, 2012 WL 2076375, at \*4 (N.D. Ill. June 8, 2012) ("What is fatal to the *Monell* claims, however, is that Plaintiff makes no attempt to plead a pattern of similar constitutional violations with any degree of factual specificity."). In other words, there are no facts—outside of those related to Arita's own experience—that plausibly suggest Wexford has maintained a widespread custom or practice of ignoring Sheridan inmates' medical needs. *Cf. Ford v. Wexford Health Sources, Inc.*, No. 12-cv-4558, 2013 WL 474494, at \*9 (N.D. Ill. Feb. 7, 2013) (plaintiff sufficiently alleged a widespread practice by alleging facts showing a custom or practice of delayed delivery of medical permits, failure to administer medication or administration of ineffective medication, and delayed scheduling of medical appointments). Arita does not provide any facts, general or specific, regarding the experiences of other Sheridan inmates with respect to Wexford's provision of medical care. This case thus stands apart from those involving allegations of a series of bad acts giving rise to an inference of a policy, practice, or custom of deliberate indifference.

Nor does Arita's complaint shed any light on what Wexford's alleged policy might be— that is, what specific policy might lead to the systematic disregard of inmates' medical needs. *Cf. Harper v. Wexford Health Sources, Inc.*, No. 14-cv-04879, 2016 WL 1056661, at \*3 (N.D. Ill. Mar. 17, 2016) (plaintiff's allegation of the existence of a specific policy—namely, cost-cutting measures—that resulted in his receiving inadequate medical care was sufficient to survive a motion to dismiss). *But see Echezarreta v. Kemmeren*, No. 10-cv-50092, 2013 WL 4080293, at \*3 (N.D. Ill. Aug. 13, 2013) (plaintiff's allegation that on information and belief it was defendant's custom and practice to remain deliberately indifferent to the serious medical conditions and needs of the inmate population in order to avoid spending the money necessary to diagnose and treat such conditions was nothing more than a recitation of the elements of a *Monell* claim and, without any additional facts to elucidate any customs or practices, was unsupported and speculative in nature).

While courts in this District have found conclusory allegations of a general policy of ignoring inmates' requests for medical attention sufficient to withstand a motion to dismiss, *see, e.g., Quinn v. Hardy*, No. 11-cv-1173, 2013 WL 4836262, at \*4 (N.D. Ill. Sept. 10, 2013), Arita's factually unsupported, boilerplate allegation does not allow for such a finding here. This is especially true in light of Arita's allegations regarding his own experience—essentially, one instance of delayed medical treatment. Whether the delay in treatment amounts to deliberate indifference and whether the care Arita ultimately received was adequate are questions for a later day. But the complaint fails to suggest that Arita's experience was something other than a random event. In other words, Arita has failed to allege any facts from which

the Court may reasonably infer that there is an actual policy or practice at issue here as opposed to a single incident of delayed medical treatment. Accordingly, the *Monell* claim against Wexford must be dismissed.

## CONCLUSION

**\*4** For the reasons stated above, Wexford's motion to dismiss (Dkt. No. 36) is granted. Count II of Arita's amended complaint is dismissed without prejudice.

Dated: October 31, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 6432578

Footnotes

1   For purposes of the present motion, the Court accepts as true all well-pleaded factual allegations set forth in the amended complaint and draws all reasonable inferences in Arita's favor. *See, e.g., Lavalais v. Vill. of Melrose Park,* 734 F.3d 629, 632 (7th Cir. 2013) (citing *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1027 (7th Cir. 2013)).

2   The parties disagree regarding whether Arita seeks to assert a claim against Wexford under § 1983 based on *respondeat superior* liability. But it is clear that under the current law of this Circuit, Wexford is immunized from such liability. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789-96 (7th Cir. 2014) (questioning the wisdom of the extension of *Monell* to private entities and the foreclosure of *respondeat superior* liability against private entities under § 1983, but reaffirming that those rules continue to be the law of this Circuit). For the same reason—that is, because an entity can be held liable under § 1983 only through a *Monell* policy or practice claim—the Court need not address the parties' arguments with respect to whether Wexford can be held "individually" liable for its alleged exercise of deliberate indifference to Arita's medical needs.

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 63850
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Abeid Armour, Plaintiff,

v.

Country Club Hills, Country Club Hills Officers John Silas (#857), Guiveda Francois (#108), Brian Zarnowski (#819), Joseph Williams (#814), J. Strayer (#866), Dorla Thompson (#860), Detective Dempsey, Former Country Club Hills Police Chief Regina Evans, and Unknown Country Club Hills Police Officers, Defendants.

Case No. 11 C 5029
|
January 8, 2014

Attorneys and Law Firms

Brendan Shiller, April Dominique Preyar, Mary Johanna Grieb, Shiller Preyar Law Offices, Chicago, IL, Barbara C. Long, Randall Vogt, P.C., Portland, OR, for Plaintiffs.

Thomas R. Weiler, John Anthony Masters, Kristen Ann Cemate, Langhenry, Gillen, Lundquist & Johnson, LLC, Chicago, IL, for Defendants.

Opinion

### *MEMORANDUM OPINION & ORDER*

JOAN B. GOTTSCHALL, United States District Judge

**\*1** On April 5, 2013, Abeid Armour filed a fourteen-count Third Amended Complaint against the City of Country Club Hills ("the City"), various City police officers, and former Country Club Hills Police Chief Regina Evans, [1] asserting claims pursuant to 42 U.S.C. § 1983 and state law. Armour's claims stem from an incident on July 24, 2010, during which he was shot by a police officer, then charged with attempted murder, of which he was eventually acquitted. Now before the court are two motions. Evans moves to dismiss all claims in the Third Amended Complaint against her, pursuant to Federal Rule of Civil Procedure 12(b)(6). The City and City law enforcement officers John Silas, Guiveda Francois, Brian Zarnowksi, Joseph Williams, J. Strayer, Dorla Thompson, and Detective Dempsey (collectively, "the City Defendant officers") move to dismiss Counts 13 and 14 of the Third Amended Complaint, both of which are claims against the City pursuant to *Monell v. Department of Social Services of New York,* 436 U.S. 658 (1978). For the reasons that follow, the motions are granted in part and denied in part. The court denies Evans's motion to dismiss Counts 9 and 10, but clarifies that the claims in those counts may proceed only under a *Brady* theory. Armour's claim against Evans in Count 14 is dismissed. The City's motion to dismiss Count 13 is granted, while its motion to dismiss Count 14 is denied.

### I. BACKGROUND

For purposes of the motions to dismiss, the court accepts the following facts alleged by Armour as true. *See, e.g., Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618 (7th Cir. 2007). At about 1:30 a.m. on July 24, 2010, Officer Silas fired at least six bullets at Armour, two of which struck him in the side. Officer Francois was present at the shooting.

To cover up the unjustified shooting, Officers Silas and Francois concocted false charges against Armour. Prior to the initiation of any criminal charges, City Defendant officers coerced false testimony from several eyewitnesses. The officers seized six teenagers at the scene of the shooting and held them for over sixteen hours before they were interviewed. Evans was present at the police station when the witnesses were detained. She was aware that the City officers were threatening the witnesses with criminal charges unless they gave statements consistent with Officer Silas's version of events, and she encouraged them to do so.

Armour alleges that Officers Silas and Francois conspired with Evans and the other City Defendant officers to charge and prosecute him. The officers failed to investigate the shooting, included false statements in police reports, and destroyed or hid material evidence. Officer Williams wrote false reports summarizing his interview with Officer Silas the morning after the shooting. Officer Strayer failed to properly investigate the shooting and created false reports regarding his attempts to retrieve video evidence of the shooting on July 25, 2010. Officers Thompson and Dempsey interviewed Armour at the hospital on July 24, 2010, fabricated a statement which they attributed to Armour, failed to record Armour's exculpatory statements, and created false reports regarding their interview with Armour. The officers knew that their reports would be relied upon by prosecutors.

**\*2** Officer Zarnowski detained teenage witnesses and coerced them into giving false statements about the shooting, signed the coerced statements, failed to record witness statements which exculpated Armour, created false reports regarding witness statements and exculpatory evidence, created false reports about statements given by Silas and Francois, and conducted suggestive photo arrays. Officer Zarnowski interviewed Armour at the hospital on July 25, 2010, failed to record exculpatory statements by Armour, and did not stop questioning Armour when he asked for an attorney. Officer Zarnowski created false reports concerning his interview with Armour and testified based on those false reports before the grand jury and during Armour's September 2011 criminal trial.

Armour alleges that, as the City Defendant officers' supervisor, Evans encouraged them to present false reports, testify falsely to the grand jury and at Armour's trial, hide exculpatory evidence, and fail to properly investigate the charges against Armour. She did so in order to protect the City and the City Defendant officers from liability.

Relying on the officers' reports and the written statements of the witnesses, the Cook County State's Attorney's Office approved felony charges of attempted murder against Armour. Armour was formally indicted for the attempted murder of a police officer on August 17, 2010. Armour spent nearly fourteen months as a pretrial detainee at Cook County Jail. The City Defendant officers were in possession of an investigative report prepared by the Illinois State Police Public Integrity Task Force, which contained exculpatory evidence, but they failed to turn these documents over to Armour. Armour was found not guilty of all charges against him on September 15, 2011.

Armour filed a complaint in this court on July 25, 2011. He filed a Third Amended Complaint on April 4, 2013. Based on the alleged facts summarized above, Armour asserts the following claims in the Third Amended Complaint: (1) § 1983 Excessive Force against Officer Silas; (2) § 1983 Unlawful Seizure/False Arrest against the City Defendant officers; (3) § 1983 Failure to Intervene against Officer Francois; (4) Battery against the City; (5) Assault against Officer Silas and the City; (6) Malicious Prosecution; (7) Intentional Infliction of Emotional Distress; (8) state-law Civil Conspiracy; (9) § 1983 Civil Conspiracy; (10) § 1983 Due Process; (11) Respondeat Superior Liability against the City; (12) payment of tort judgment by the City pursuant to Illinois law; (13) a *Monell* "custom and practice" claim against the City; and (14) a *Monell* "policymaker" claim against the City and Evans.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) should be granted if Plaintiffs fail to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

The factual allegations in a complaint must "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555–56; *see also Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together."). For purposes of a motion to dismiss, the court takes all facts alleged in the complaint as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald,* 664 F.3d 206, 212 (7th Cir. 2011).

### III. ANALYSIS

#### A. Evans's Motion to Dismiss

The Third Amended Complaint adds Evans as an individual defendant. She moves to dismiss all claims against her in the Third Amended Complaint. In response, Armour clarifies that he has not named Evans as a defendant in Counts 2, 4, 5, 6, 7, and 8. The claims alleged against Evans are thus the § 1983 due process and conspiracy claims in Counts 9 and 10, and the *Monell* "policymaker" claim in Count 14, which names both Evans and the City.

##### 1. *§ 1983 Conspiracy and Due Process claims (Counts 9 and 10)*

**\*3** Count 9 of the Third Amended Complaint alleges that the City Defendant officers, "among themselves, and with Defendant Evans, ... formed an agreement to falsely arrest and illegally seize Plaintiff in violation of his constitutional rights and deprive Plaintiff of his right to a fair trial." (Third Am. Compl. ¶ 85.) Count 10 alleges a violation of the Due Process Clause pursuant to § 1983. It is well-established that "conspiracy is not an independent basis of liability in § 1983 actions." *Smith v. Gomez,* 550 F.3d 613, 617 (7th Cir. 2008). Rather, a conspiracy claim depends upon an underlying constitutional violation. The court must therefore determine whether Armour has alleged an underlying violation that can support a § 1983 conspiracy claim against Evans.

The conspiracy claim against Evans is time-barred insofar as it is based on Armour's alleged false arrest. The applicable statute of limitations for a § 1983 claim in Illinois is two years. *Woods v. Ill. Dep't of Children and Family Servs.,* 710 F.3d 762, 768 (7th Cir. 2013). Armour's false arrest claim accrued when he knew of his injury and had the ability to file a lawsuit about the injury. *Savory v. Lyons,* 469 F.3d 667, 672 (7th Cir. 2006); *see also Wallace v. Kato,* 549 U.S. 384, 388 (2007) (explaining that a plaintiff "could have filed suit as soon as an allegedly wrongful arrest occurred ..., so the statute of limitations would normally commence to run from that date"). Armour was indicted by a grand jury in August 2010, but he did not file a complaint against Evans until April 5, 2013, more than two years later.

As alleged, however, the conspiracy claim is based not just on false arrest, but on due process violations. Those alleged violations also form the basis of Count 10. Armour alleges that the defendants fabricated evidence that led to his prosecution. He also alleges that the defendants suppressed exculpatory evidence material to the decision to prosecute him for first-degree murder. Those claims did not accrue at the time of Armour's arrest, but at the time of his acquittal on September 15, 2011, and are therefore timely.

Insofar as the due process and conspiracy claims in Counts 9 and 10 are based on evidence fabrication, they do not state federal due process claims. A claim of evidence fabrication may proceed only as a state-law malicious prosecution claim. The Seventh Circuit has rejected plaintiffs' arguments that evidence fabrication by police officers violates the Due Process Clause as improper attempts at "shoe-horning" Fourth Amendment and malicious prosecution claims "into the more general protections of the Fourteenth Amendment." *Fox v. Hayes,* 600 F.3d 819, 841 (7th Cir. 2010) (citing *Brooks v. City of Chi.,* 564 F.3d 830, 833 (7th Cir. 2009), and *McCann v. Mangialardi,* 337 F.3d 782, 786 (7th Cir. 2010)). And the Seventh Circuit does not recognize federal malicious prosecution claims where state tort law supplies a similar cause of action. *Newsome v. McCabe,* 256 F.3d 747, 750 (7th Cir. 2001) ("The existence of a tort claim under state law knocks out

any constitutional theory of malicious prosecution."). Thus, a plaintiff "cannot invoke the substantive due process clause where state laws provide an adequate postdeprivation remedy for the complained-of conduct." *Fox, 600 F.3d at 841.*

Armour argues that he has also pleaded a due process violation under *Brady v. Maryland,* 373 U.S. 83 (1963), based on the suppression of exculpatory and impeaching evidence material to the decision to prosecute him. Under *Brady,* the government violates the Due Process Clause when it "fails to disclose evidence materially favorable to the accused." *Mosley v. City of Chi.,* 614 F.3d 391, 397 (7th Cir. 2010) (citing *Youngblood v. West Virginia,* 547 U.S. 867, 869 (2006)). The duty to disclose "extends to the police and requires that they similarly turn over exculpatory ... evidence to the prosecutor." *Carvajal v. Dominguez,* 542 F.3d 561, 566 (7th Cir. 2008) (citing *Youngblood,* 547 U.S. at 870). The elements of a *Brady* violation are: "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, 'materiality.' " *Id.* at 566–67. Evidence is "suppressed" where it is not disclosed "in time for the defendant to make use of it," and it "was not otherwise available to the defendant through the exercise of reasonable diligence." *Id.* at 567. "[F]avorable evidence is material ... if there is a 'reasonable probability' that, had the evidence been disclosed ... the result of the proceeding would have been different." *Bielanski v. Cnty. of Kane,* 550 F.3d 632, 643–44 (7th Cir. 2008) (internal quotation marks omitted).

**\*4** Evans argues that Armour has not stated a *Brady* claim because he has not identified with the requisite specificity what exculpatory evidence was allegedly concealed by the defendants. The court concludes, however, that at this stage in the proceedings, Armour's allegations about the City Defendant officers' false testimony, coerced witness statements, and failure to provide documents are sufficient to state a *Brady* claim. Allegations that officers created false evidence, such as by creating false written reports and inducing witnesses to falsely identify a defendant, state a viable *Brady* claim when the evidence is withheld from a criminal defendant. *See, e.g., Engel v. Buchan,* 710 F.3d 698, 709–10 (7th Cir. 2013).

Evans further argues that Armour cannot, as a matter of law, allege that he was prejudiced as a result of the alleged suppression of evidence, because he was acquitted of the charges against him. Evans points out that every circuit court that has squarely decided the issue has held that a defendant who was acquitted cannot maintain a *Brady* claim. The court acknowledges this trend. *See, e.g., Morgan v. Gertz,* 166 F.3d 1307, 1310 (10th Cir. 1999) (finding no *Brady* liability because "a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial"); *Flores v. Satz,* 137 F.3d 1275, 1278 (11th Cir. 1998) ("Plaintiff, however, was never convicted and, therefore, did not suffer the effects of an unfair trial. As such, the facts of this case do not implicate the protections of *Brady.*"); *McCune v. City of Grand Rapids,* 842 F.2d 903, 907 (6th Cir. 1988) ("Because the underlying criminal proceeding terminated in appellant's favor, he has not been injured by the act of wrongful suppression of exculpatory evidence."); *cf. Taylor v. Waters,* 81 F.3d 429, 435–36 (4th Cir. 1996) (holding that no settled authority established the illegality of an officer's conduct in withholding exculpatory evidence from a plaintiff who was not convicted); *but see Smith v. Almada,* 640 F.3d 931, 940–41 (9th Cir. 2011) (Gould, J., concurring) (declining to decide whether a conviction is a prerequisite to a *Brady* claim).

Our circuit has not decided whether a *Brady* claim is viable when the plaintiff's trial resulted in an acquittal. *See Mosley,* 614 F.3d at 397–98 (reserving the question "for a later case" in which the evidence withheld "would have altered the decision to go to trial"). Recently, in *Alexander v. McKinney,* the court stated:

> [W]e have expressed doubt that an acquitted defendant can ever establish the requisite prejudice for a Brady claim. *See* [*Bielanski,* 550 F.3d at 644]. Nevertheless, we have entertained the possibility that prejudice could be established if an acquitted defendant showed that disclosure of the suppressed evidence would have altered the decision to go to trial. *See* [*Parish v. City of Chi.,* 594 F.3d 551, 554 (7th Cir. 2009) ]; *Bielanski,* 550 F.3d at 644–45.

692 F.3d 553, 556 (7th Cir. 2012); *see also Petrishe v. Tenison,* No. 10 C 7950, 2013 WL 5645689, at \*4 (N.D.Ill. Oct. 15, 2013) (Holderman, J.) (concluding that plaintiff sufficiently alleged the existence and suppression of exculpatory evidence that would have altered the decision to go to trial).

In other words, a plaintiff may have a "*Brady*-type due process claim" where favorable evidence is suppressed by the government, and " 'there is a reasonable probability that prejudice ensued.' " *Parish,* 594 F.3d at 554 (quoting *Carvajal,* 542 F.3d at 566–67). Although the Seventh Circuit has not squarely held as such, it has suggested that "prejudice" may include situations in which the government's decision to go to trial was altered by the suppression of the evidence. *Id.* Thus, at present, our circuit's case law does not foreclose Armour from arguing that the proceedings in his case were prolonged by the defendants' actions, in violation of his due process rights. In the absence of binding authority from the Seventh Circuit, this court will not dismiss the claim. The court expresses no opinion on Armour's ultimate ability to show that the prosecution would not have moved forward with the charges against him were it not for the defendants' withholding of evidence. But he has sufficiently alleged, to overcome a motion to dismiss, that the defendants' actions were material to the decision to prosecute him. The court therefore denies Evans's motion to dismiss Counts 9 and 10, but clarifies that the claims in those counts may proceed only under a *Brady* theory.

### 2. Monell "Policymaker" Claim (Count 14)

**\*5** Armour names Evans as a defendant in Count 14 of the Third Amended Complaint, which alleges that she was a "final policy maker" for the County Club Hills Police Department. (Third Am. Compl. ¶ 115.) Evans asks the court to dismiss the claim against her, arguing that a *Monell* claim may proceed only against a municipality. In his response, Armour clarifies that Count 14 names Evans in her official capacity. That, however, makes the claims against Evans and those against the City redundant, and the court therefore dismisses the claim against Evans in Count 14. *See, e.g., Jungels v. Pierce,* 825 F.2d 1127, 1129 (7th Cir. 1987) (explaining that "nothing was added" by suing a mayor in his official capacity along with the city).

## B. The City's Motion to Dismiss

The Third Amended Complaint adds two counts against the City pursuant to § 1983 and *Monell*. As a municipality, the City can be held liable under § 1983 only if the alleged constitutional violations resulted from the execution of one of its policies. *See Monell,* 436 U.S. at 694. This may be established by alleging: (1) an express policy that caused the constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled that it constitutes a policy; or (3) that the constitutional injury was caused by a person with final policymaking authority. *Lewis v. City of Chi.,* 496 F.3d 645, 656 (7th Cir. 2007). Count 13 of the Third Amended Complaint alleges that the City "had a custom and practice of encouraging Defendant officers to cover up excessive force, falsify sworn police reports, falsify testimony, and threaten witnesses." (Third Am. Compl. ¶ 111.) Count 14 alleges that the underlying constitutional violations committed by the City Defendant officers "were possible ... because of the authority of final policy maker, Defendant Evans, Chief of Police, who encouraged and directed" the City Defendant officers' conduct." (*Id.* at ¶ 115.) The City has moved to dismiss both counts.

### 1. Statute of Limitations

The City first argues that both of Armour's *Monell* claims are time-barred because they arose at the time of Armour's arrest in 2010, but were not raised until the Third Amended Complaint was filed on April 5, 2013. At least some of the allegations in Counts 13 and 14 are based on the City Defendant officers' alleged false arrest of Armour and use of excessive force. As discussed above, those claims accrued when Armour knew of his injury and had the ability to file a lawsuit about the injury. *Savory,* 469 F.3d at 672; *Wallace,* 549 U.S. at 388. Under the two-year statute of limitations for § 1983 actions in Illinois, Armour's *Monell* claims based on false arrest and excessive force are untimely.

To avoid dismissal of the claims, the amended complaint must relate back to an earlier complaint, pursuant to Federal Rule of Civil Procedure 15(c)(1). The rule requires that "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).

The court concludes that Armour's *Monell* claims relate back to the allegations in his earlier complaint, for purposes of the statute of limitations. The *Monell* claims "arose out of the conduct, transaction, or occurrence" that formed the basis for the earlier claims—Armour's arrest—and thus satisfy the plain language of the Rule. Fed. R. Civ. P. 15(c)(1)(B). The Third Amended Complaint essentially repeats the allegations presented in Armour's earlier complaints, such as the Amended Complaint filed on January 23, 2013 (i.e., within the limitations period). The City was named as a defendant in that complaint, under a theory of *respondeat superior* liability and in an indemnification count. The Amended Complaint included allegations of false arrest and excessive force against the City Defendant officers. Thus, in the operative complaint, Armour has added a new claim against the City based on the same underlying constitutional violations previously alleged.

**\*6** Furthermore, the court's research indicates that most courts presented with similar facts have concluded that a *Monell* claim relates back to a complaint alleging the same underlying constitutional injury to the plaintiff. *See, e.g., Triano v. Town of Harrison, NY,* 895 F.Supp.2d 526, 530 (S.D.N.Y.2012); *Nash v. Kressman,* No. 11 Civ. 7327(LTS)(RLE), 2013 WL 6197087, at \*8 (S.D.N.Y. Nov. 27, 2013); *Henry v. City of New York,* No. CV–07–3965, 2008 WL 906743, at \*4 (E.D.N.Y. Apr. 1, 2008) ("[T]he City is already a party to this action and on notice that plaintiff has claims against it arising from the alleged facts."); *Overton v. Se. Penn. Transp. Auth.,* No. Civ. A. 04–904, 2004 WL 1243666, at \*3 (E.D. Pa. June 3, 2004) ("Plaintiff's *Monell* claim in [an amended complaint] clearly arises out of the same incident that is the subject of the Original Complaint."); *Estate of Keys v. City of Harvey,* No. 92 C 2177, 1994 WL 687479, at \*3–4 (N.D.Ill.Dec. 8, 1994). The court therefore declines to dismiss Armour's *Monell* claims based on the alleged underlying injuries of excessive force and false arrest as barred by the statute of limitations.

B. *Sufficiency of the Pleadings*

The City further argues that the allegations in Counts 13 and 14 are insufficient to state a *Monell* claim. According to the City, Count 13 alleges only that the Country Club Hills Police Department failed to train the City Defendant officers to truthfully complete police reports and encouraged them to lie to cover up misconduct. It argues that under the pleading standards set out in *Twombly* and *Iqbal,* these conclusory allegations are too vague to state a claim based on an allegedly widespread custom or practice.

The court reads the complaint as a whole and must view it in the light most favorable to Armour. Count 13 refers to the constitutional violations allegedly committed against Armour, as set out in the rest of the complaint. The City does not contest the sufficiency of Armour's underlying false arrest and excessive force claims, and the court has already held that his allegations suffice to state a *Brady*-type due process claim. In addition to the allegations about the City Defendant officers' actions toward him, Armour alleges that the City "had a custom and practice of encouraging Defendant officers to cover up excessive force, falsify sworn police reports, falsify testimony, and threaten witnesses." (Third Am. Compl. ¶ 111.) He further alleges:

112. At all times material to this complaint, Defendant Country Club Hills's Police Department, had interrelated de facto policies, practices, and customs which included:

a. the failure to properly train Defendant Officers on truthfully completing sworn police reports, which Defendant Country Club Hills, Defendant Officers, and Defendant Evans [knew] would be used in criminal proceedings.

b. the failure to properly supervise, discipline, monitor, counsel, and otherwise control police officers in the use of firearms, particularly those who are repeatedly accused of excessive force, and the detention of witnesses who were not accused of any crime.

c. a Department-wide custom of encouraging officers and Defendant Evans to lie to cover up excessive force, false arrests, and other unconstitutional misconduct, in order to protect the City and the Defendant officers from civil and criminal liability;

d. failure to train Defendant Officers to use less means of force when attempting to arrest and restrain individuals;

(*Id.* at ¶ 112.) Armour also alleges that the City was deliberately indifferent to the consequences of these practices. (*Id.* at ¶ 114.)

The City is correct that a plaintiff must plead some specific facts supporting a claim that a municipality maintained a policy, custom or practice that caused a constitutional deprivation. *See McCauley v. City of Chi.,* 671 F.3d 611, 616 (7th Cir. 2011). Moreover, "[a] single isolated incident of wrongdoing by a nonpolicymaker is generally insufficient to establish municipal acquiescence in unconstitutional conduct." *Cornfield v. Consol. High Sch. Dist. No. 230,* 991 F.2d 1216, 1326 (7th Cir. 1993). Armour's complaint includes a great deal of conclusory language about "interrelated policies, practices, and customs." (Third Am. Compl. ¶ 113.) The court disregards these conclusory legal statements. *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir. 2009). Courts in this district, however, have allowed *Monell* claims to proceed "even with conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged wrongdoing." *Riley v. Cnty. of Cook,* 682 F.Supp.2d 856, 861 (N.D. Ill. 2010).

**\*7** Here, Armour has pleaded the facts related to his own injury and then alleged that the City failed to properly train and supervise its officers with regard to the use of force, the completion of reports, and the collection of evidence. He contends that this is sufficient to alert the City to its alleged wrongdoing. The court disagrees. The problem with Armour's allegations is that they encompass virtually all the activities of a police department and every contact it has with the public. Armour has lumped together myriad "customs" and "policies," and the scope of the discovery relevant to his claims is boundless. The allegations are in no way tailored to identify particular police training procedures or policies. In other words, discovery relevant to Armour's allegations would be the epitomy of a fishing expedition. *See Brooks,* 578 F.3d at 581 ("[S]ome factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim."). Because Armour has failed to plead a *Monell* "custom and practice" claim, the court grants the City's motion to dismiss Count 13 of the Third Amended Complaint. The dismissal is without prejudice because it is possible that the flaw in the claim can be cured. *See Bogie v. Rosenberg,* 705 F.3d 603, 608 (7th Cir. 2013) ("When a complaint fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity, at least upon request, to amend the complaint to correct the problem if possible.").

Count 14 asserts a *Monell* "policymaker" claim, based on Evans's direction of the City Defendant officers to commit the acts that allegedly caused Armour's constitutional injuries. Under such a theory, § 1983 liability attaches only where "a deliberate choice to follow a course of action is made ... by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986). Armour alleges that Evans "was the person with final policymaking authority" for the police department. (Third Am. Compl. ¶ 116.) The court, however, disregards boilerplate allegations that Evans was a "policymaker" or that she made "policy." *See McCauley,* 671 F.3d at 618. Armour further alleges that the City's Municipal Code granted Evans "authority over all personnel, policies, and direction of the members of the Country Club Hills Police Department. (Third Am. Compl. ¶ 117.)

The City argues that Evans was not a final policymaker for the City of Country Club Hills. Rather, the City Council had the authority to establish policies for the City. But the question before the court at this stage in the proceedings is not whether Evans actually was a final policymaker for the City, but only whether Armour has sufficiently alleged that she had such authority to allow him to proceed with his claim. Even if the City Council, acting through ordinances, could constrain the authority of the City's Chief of Police, it is plausible that Evans exercised at least *de facto* authority with respect to the conduct at issue. The court therefore denies the City's motion to dismiss the *Monell* "policymaker" claim in Count 14. Ultimately, to determine whether Evans was a policymaker for the City, the court will have to consider whether her decisions were constrained by policies of other officials, subject to review (by, for example, the City Council), and within the scope of her delegated authority. *See Valentino v. Vill. of S. Chi. Heights,* 575 F.3d 664, 676 (7th Cir. 2009). [2]

## IV. CONCLUSION

For the reasons stated above, the court denies Evans's motion to dismiss Counts 9 and 10, but clarifies that the claims in those counts may proceed only under a *Brady* theory. Armour's claim against Evans in Count 14 is dismissed. The City's motion to dismiss Count 13 is granted; the dismissal is without prejudice, provided that Armour files a motion to amend the complaint within 21 days of this order. The City's motion to dismiss Count 14 is denied.

**All Citations**

Not Reported in F.Supp.2d, 2014 WL 63850

Footnotes

1    Armour's claims against Cook County and Assistant State's Attorney Sylvie Manaster were previously dismissed pursuant to an agreement between the parties.

2    This claim must proceed under the third prong of *Monell.* Discovery on the claim should be limited to evidence relevant to whether Evans was vested with final policymaking authority. In other words, broad discovery intended to uncover "customs and practices" of the City is not warranted on the basis of the claim.

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3418570
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Demetrius Barwicks, Plaintiff,

v.

Thomas Dart, Sheriff of Cook County, et al. Defendants.

Case No. 14-cv-8791
|
Signed 06/22/2016

**Opinion**

**MEMORANDUM OPINION AND ORDER**

Robert M. Dow, Jr., United States District Judge

**\*1** Plaintiff, an inmate at the Cook County Department of Corrections, alleges that Defendants violated 42 U.S.C. § 1983 when twelve other inmates assaulted Plaintiff. Specifically, Plaintiff claims that three Cook County officers were deliberately indifferent to Plaintiff's safety in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution and that Thomas Dart, the Sheriff of Cook County, is liable for the incident under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Defendants move to dismiss Plaintiff's amended complaint [38] for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court grants in part and denies in part Defendants' motion to dismiss [38]. This case is set for further status hearing on 7/7/2016 at 9:00 a.m.

**I. Background**

The following facts are taken from Plaintiff's amended complaint and are accepted as true for the purposes of this motion. Plaintiff was booked and placed in the Cook County Department of Corrections ("Cook County Jail") on July 28, 2010. Plaintiff alleges that on January 26, 2013, he was physically assaulted by twelve other detainees on Tier 2F of Division 9 of the Cook County Jail. See [37] at ¶¶ 7-15. Plaintiff was watching television when he was approached by the other inmates who informed Plaintiff that he had to take his things and leave the tier. These dozen inmates began threatening Plaintiff with physical violence, causing Plaintiff to approach Defendant John Doe #1, a Cook County Corrections Officer, and notify him of the confrontation. Defendant Doe #1 walked towards Plaintiff on the other side of the tier interlock door with his radio in his hand, but the other inmates "waved [the officer] off." *Id.* at ¶ 12. Defendant Doe #1 then closed and locked the interlock door. Plaintiff was then tripped by one of the other inmates and severely beaten by the other inmates as he lay on the floor. Plaintiff was transported to Mount Sinai Hospital for treatment. *Id.* at ¶ 20. Plaintiff sustained the following injuries from the beating: his two top incisors were knocked out during the altercation, which subsequently caused an abscess to form resulting in oral surgery, he still suffers from pain and sensitivity in his mouth, and he has a persistent ringing in his ears. *Id.* at ¶¶ 22-24.

According to Plaintiff's amended complaint, Defendant Doe #1 witnessed the beating, but did nothing to stop the other inmates from beating Plaintiff. Plaintiff alleges that two other corrections officers—Defendant Doe #2, who was also assigned to Tier 2F, and Defendant Doe #3—witnessed the altercation, as well. None of the three John Doe Defendants took steps to protect Plaintiff. *Id.* at ¶¶ 16-19.

Plaintiff filed a grievance sometime between January 26, 2013 and February 26, 2013. During the grievance process, Plaintiff was informed that he was not assisted by the three Doe Defendants because "a fight was occurring elsewhere in the facility" and that those three officers "were waiting for assistance before assisting Plaintiff." *Id.* at ¶ 21.

**\*2** In Count I of the Amended Complaint, Plaintiff alleges that the three officers were deliberately indifferent to Plaintiff's safety in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution and 42 U.S.C. § 1983. See *id.* at ¶ 33. In Count II, Plaintiff alleges that Sheriff Dart was deliberately indifferent to Plaintiff's safety because the Sheriff was aware of the Jail's alleged policy of not intervening in altercations between inmates, failed to adequately staff the Cook County Jail, failed to implement policies designed to protect inmates from other inmates, and failed to adequately supervise and train Jail staff. *Id.* at ¶¶ 40-42.

## II. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, Plaintiff's complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).

## III. Analysis

Defendants move to dismiss pursuant to Rule 12(b)(6), arguing that Plaintiff fails to state a claim for which relief can be granted because (1) a single incident is not sufficient for a *Monell* claim and (2) Plaintiff's complaint is barred by the applicable statute of limitations. The Court considers those arguments in turn.

### A. Whether a Single Incident is Sufficient for a *Monell* Claim

As described above, Plaintiff has asserted a *Monell* claim against Sheriff Tom Dart. [37] at ¶¶ 34–46. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities are "persons" for purposes of 42 U.S.C. § 1983, and thus may be liable for violations of civil rights, so long as the municipality has adopted a policy or custom that violated the plaintiff's constitutional rights. Defendants insist that Plaintiff's *Monell* claim should be dismissed because Plaintiff's allegations "amount to a single incident" and that "in order to impute knowledge to policymakers of a widespread practice, a plaintiff must show a pattern of constitutional violations; not a single act of misconduct." [38] at 1. Such an argument misapprehends Plaintiff's complaint and the relevant precedent.

To state a *Monell* claim, Plaintiff must plead factual content that would allow the Court to plausibly infer that: (1) he has suffered the deprivation of a constitutional right; and (2) that an official custom or policy of Sheriff Dart caused that deprivation. See *McCauley*, 671 F.3d at 616; *Monell*, 436 U.S. at 694–95. [1] As for the latter element, Plaintiff will have to establish that his constitutional violation was "caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.' " *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011) (quoting *Darchak v. City of Chicago Bd. of Ed.*, 580 F.3d 622, 629 (7th Cir. 2009)). In order to allege a widespread policy, the Supreme Court and the Seventh Circuit have both looked for

circumstances demonstrating that municipal officials were deliberately indifferent to known or obvious consequences of the municipality's action or inaction. See *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (citing *Harris*, 489 U.S. at 389). *Monell* does not allow for liability on a theory of *respondeat superior* or vicarious liability. See, *e.g., Milestone,* 665 F.3d at 780. Instead, "units of local government are responsible only for their policies, rather than misconduct by their workers." *Lewis v. City of Chicago,* 496 F.3d 645, 656 (7th Cir. 2007) (quotation marks and citation omitted).

**\*3** Plaintiff has alleged facts sufficient to make out the first prong of a *Monell* claim. His complaint adequately alleges that he suffered a constitutional deprivation when the three officers at CCDOC were deliberately indifferent to Plaintiff's safety in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution and 42 U.S.C. § 1983. As described above, Plaintiff pleads a plausible set of facts in which the officers did not come to Plaintiff's aid when twelve other inmates attacked him.

Defendant relies heavily on *Guzman v. Sheahan*, 495 F.3d 852, 858 (7th Cir. 2007), for the proposition that an officer does not have a duty to break up a fight between inmates when doing so would put that officer in jeopardy. See [38] at 2. In *Guzman*, the Seventh Circuit considered a pre-trial detainee's appeal of summary judgment for his Section 1983 claims against the Sheriff of Cook County and Cook County Jail officers. See *Guzman*, 495 F.3d at 853. The Seventh Circuit pointed out that "the Due Process Clause protects pre-trial confinees like [ ] Guzman from deliberate indifference to his safety and welfare." *Id.* at 857 (citing *Butera v. Cottey*, 285 F.3d 601 (7th Cir. 2002)). "Prison officials who had actual awareness of a substantial risk to the health or safety of an inmate incur no liability if they 'responded reasonably to the risk, even if the harm ultimately was not averted, because in the case it cannot be said that they were deliberately indifferent.' " *Id.* (quoting *Peate*, 294 F.3d at 882).

The Seventh Circuit has addressed "what constitutes sufficient information to put an officer on notice that a specific threat exists as to a particular inmate." *Guzman*, 495 F.3d at 857. The Seventh Circuit in *Guzman* contrasted the plaintiff's circumstances with those of the plaintiff-inmate in *Peate v. McCann*, 294 F.3d 879 (7th Cir. 2002), whose first beating by other inmates was broken up by the prison guards, only to have the plaintiff-inmate suffer another beating by the same inmates using the same weapons. In *Peate*, the Seventh Circuit reversed the district court's grant of summary judgment to the defendants, in part, because the first beating gave the prison guards specific knowledge of the substantial risk to the plaintiff's safety. See *Guzman*, 495 F.3d at 858 (discussing *Peate*, 294 F.3d at 883). "A prison guard, acting alone, is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put her in significant jeopardy." *Id.* (citing *Peate*, 294 F.3d at 883).

Putting to one side the fact that *Guzman*, *Peate*, and *Butera* were all decided at summary judgment, here, the relevant allegations do not suggest that the corrections officers refused to break up the fight because they feared for their own safety, but rather because of some tacit agreement between the corrections officer and the inmates who had decided to assault Plaintiff. The complaint relates that "Defendant Doe #1 began walking towards the tier interlock door with his radio in his hand" and "Plaintiff began walking towards the interlock door *when the other individuals waved off Doe #1.*" See [37] at 2 (emphasis added). Plaintiff's complaint suggests that Defendant Doe #1 somehow acquiesced to the signal of the inmates. Of course, the evidence may show that Defendant Doe #1 feared for his own safety or that he was waiting for backup, but at this stage of the case the Court must accept the allegations in the complaint as true and it cannot consider factual assertions outside the confines of the complaint or draw inferences in Defendants' favor. Accordingly, the Court reads the complaint to allege an incident not like *Guzman*, but one that could involve actionable conduct or inaction by the Defendant officer.

**\*4** As for the second prong of the *Monell* claim, Defendants maintain that "Plaintiff cannot convert this single incident into a *Monell* claim." See [38] at 4. Defendants cite a slew of Seventh Circuit precedent for this proposition, including *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008), *Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005),

and *Jackson v. Marion Cnty., Ind.*, 66 F.3d 151, 152 (7th Cir. 1995). Those cases are not on point. *Grieveson* and *Dieter* dealt with appeals of summary judgment, not motions to dismiss, and hence fail to help the Court arrive at a decision.

And the other case that Defendants cite, *Jackson*, actually cuts in Plaintiff's favor. There, the Seventh Circuit criticized a district court for requiring a complaint to contain *more* specificity about pattern evidence. See *Jackson v. Marion Cty.*, 66 F.3d 151, 152-53 (7th Cir. 1995). Like the *pro se* litigant's claims in *Jackson*, Plaintiff will need to prove his *Monell* claim "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government * * * adopt[ed] the misconduct of subordinate officers." See *Jackson*, 66 F.3d at 152 (citation omitted). Like the litigant in *Jackson*, Plaintiff is in no position, prior to discovery, to make allegations about Sheriff Dart's investigations into other cases of inmate-on-inmate violence or the effect on other inmates on the Sheriff's alleged failure to train his officers.

Moving beyond Defendant's opening brief, Defendants are correct that at summary judgment Plaintiff's single incident cannot give rise to a *Monell* claim. While the Seventh Circuit "has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice." *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) (citing *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010)). See also *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002); *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988).

Here, Plaintiff need only *allege* a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists. Plaintiff's single incident *can* give rise to a *Monell* claim if Plaintiff pleads that that incident is representative of other intra-inmate violence at the Cook County Jail and that such violence was caused by Sheriff Dart. Plaintiff's pleadings allege that these incidents of intra-inmate violence are frequent at the Cook County Jail because "[i]t is impossible for DOC staff to protect inmate safety if there are not enough staff members on duty to do so. [37] at ¶ 39." Indeed, Plaintiff refers to multiple incidents when he pleads that "there is a policy of DOC staff not intervening in altercations between inmates, even who those incidents are witnessed by DOC staff." *Id.* at 40.

Of course, Plaintiff's pleadings must be plausible. Staying within the four corners of Plaintiff's complaint, it is certainly plausible that altercations among inmates are numerous in the largest jail in the United States. In that regard, Plaintiff's complaint is sufficient: he alleges that Sheriff Dart "is responsible for setting all policies and procedures with regard to the conduct of DOC staff and their management/operation of the DOC facilities," thus satisfying *Monell* on the grounds that Sheriff Dart has "final policymaking authority." See [37] at ¶ 38. Sheriff Dart operates the Cook County Department of Corrections. See *DeGenova v. Sheriff of DuPage Cnty.*, 209 F.3d 973, 976 (7th Cir. 2000) ("Illinois sheriffs have final policymaking authority over jail operations"); *id.* at 976 n.2 (recognizing that "the Sheriff's office has a legal existence separate from the county").

**\*5** Plaintiff also alleges that Sheriff Dart created an environment that "allowed the harm to Plaintiff to occur" by "failing to adequately supervise and train DOC staff," "failing to adequately staff DOC facilities," and "failing to implement policies and procedures designed to protect inmates from other inmates." [37] at ¶¶ 42, 41. "An unconstitutional municipal policy can take the form of an implicit policy or a gap in expressed policies." *Dixon v. Cty. of Cook*, ___ F.3d ____, 2016 WL 1393527, at *3 (7th Cir. Apr. 8, 2016) (quotation marks and citation omitted). Plaintiff alleges further that Sheriff Dart's failures have occurred in spite of the fact that the Sheriff is "aware that DOC facilities are understaffed" and that these "facilities present a significant risk to the safety of inmates because they are inadequately staffed." *Id.* at ¶¶ 38, 39.

The Sheriff's alleged failure to train and supervise his employees in this respect could constitute a policy or custom if it "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' " *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Canton*, 489 U.S. at 388). The Supreme Court in *Connick* identified two ways Plaintiff can show the Sheriff's deliberate indifference to his constitutional rights: (1) through "[a] pattern of

similar constitutional violations by untrained employees" or (2) by establishing that his false arrest and illegal detention were "highly predictable consequence[s]" of failing to train and supervise county employees on their record-keeping responsibilities. *Id.* at 62-64. At the pleading stage, Plaintiff need not choose between these two methods of proving deliberate indifference, nor must he plead a prima facie case under either framework. See *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To sum up, Plaintiff need not plead that he was assaulted on several occasions to plead a *Monell* claim. Plaintiff need only plead that the alleged incident is one of many occurring in the Cook County Jail and that a widespread practice by Sheriff Dart gave rise to those incidents. With this complaint, he has done so. The plaintiff's factual allegations, taken as true, adequately state a *Monell* claim that is plausible on its face. Thus, dismissal of Plaintiff's *Monell* claim against Sheriff Dart would be inappropriate on that basis.

### B. Whether Plaintiff's Complaint is Barred by Statute of Limitations

The Court now considers whether any or all of Plaintiff's other claims are barred by the relevant statute of limitations. Plaintiff filed his initial complaint on November 3, 2014 [1], putting forth similar allegations under Section 1983 based on the January 26, 2013 incident. Section 1983 does not provide a time limit within which a claim may be brought. The Supreme Court and the Seventh Circuit have instructed the Court to look to the law of the state in which the cause of action arose, using that state's general statute of limitations for personal injury torts. See *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Williams v. Lampe*, 399 F.3d 867 (7th Cir. 2005). For Illinois, that limit is two years. See 735 Ill. Comp. Stat. Ann. 5/13-202 (West 2016). After the Court was able to secure representation for the previously *pro se* Plaintiff, Plaintiff filed the operative amended complaint [37] on December 4, 2015—well beyond the two-year statute of limitations for an incident that occurred on January 26, 2013.

As the background of this case illustrates, identifying the individual officers who would be proper defendants in Section 1983 prisoner litigation can be a challenging and time-consuming task for all involved. In the first instance, if the plaintiff does not know the officers by name, he must provide sufficient information to defense counsel or to others at the facility where the incident occurred to enable the identification of the universe of officers who were on duty in the relevant place at the relevant time. Once that information is provided to the plaintiff, sometimes in the form of a attendance sheets or even a photo array, the plaintiff usually is able to identify the proper party and to amend his complaint to add that party as a defendant. The case law explains that this should be a cooperative process in which the Court and defense counsel assist the plaintiff at least in identifying the proper parties to the lawsuit. See, *e.g.*, *Bryant v. City of Chicago*, 746 F.3d 239, 244 (7th Cir. 2014) (reiterating the need to provide *pro se* prisoners with "assistance in seeking to identify the officers' names"); *Donald v. Cook County Sheriff's Dep't.*, 95 F.3d 548, 554 n.1 (7th Cir. 1996) (recognizing "measures which the district court could have taken, short of appointment of counsel, to assist [a *pro se* prisoner plaintiff] in identifying and naming the proper defendants in a timely fashion"); *Billman v. Indiana Dep't of Corrs*, 56 F.3d 785, 790 (7th Cir. 1995) (noting that when a *pro se* prisoner is attempting to identify defendants "it is the duty of the district court to assist him, within reason, to make the necessary investigation").

**\*6** However, it is imperative that the plaintiff also help himself by filing his lawsuit as promptly as possible and then expeditiously engaging in the give-and-take that often is necessary to identify the proper defendant officer from among the hundreds of employees who work at the facility where the plaintiff is incarcerated. As explained below, Plaintiff here waited until late in the limitations period to sue and then took no action to start the ball rolling on identifying the unknown officers—a course of inaction that may have fatally impaired his ability to maintain any claims against those potential defendants.

Cognizant of the fact that Plaintiff here had identified three "John Doe" officers in his initial complaint, and applying the "extra measure of grace" that courts often accord to incarcerated *pro se* litigants, see *Hall v. Norfolk Southern Ry. Co.*, 469 F.3d 590, 597 (7th Cir. 2006); *Donald*, 95 F.3d at 553-55, the Court included the following discussion in its initial screening order [5], which was entered one week after the complaint appeared on the docket:

When a plaintiff does not know the names of the persons who actually injured him, the law permits the court, at the pleading stage, to make an inference of responsibility on the part of the defendants' immediate supervisor. See *Duncan v. Duckworth*, 644 F.2d 653, 655-56 (7th Cir. 1981); *Billman v. Indiana Dept. of Corrections*, 56 F.3d 785, 789-90 (7th Cir. 1995). Accordingly, Sheriff Dart remains as a defendant solely so that Plaintiff may discover the identities of the proper defendants. Once an attorney has entered an appearance on Dart's behalf, Plaintiff must send defense counsel interrogatories (that is, a list of questions) eliciting information regarding the identities of the proper individuals who allegedly violated Plaintiff's constitutional rights. See Fed. R. Civ. P. 33. After Plaintiff learns their identities, he may submit an amended complaint that names them as the proper defendants. Summonses will then issue for service on these defendants, and Sheriff Dart will be dismissed as a defendant.

In addition, having observed that the incident giving rise to Plaintiff's complaint more than twenty-one months earlier, the Court advised Plaintiff in the screening order [5] that "there is a two year statute of limitations for his claims and the limitations period began running when the incident occurred" and that he "must submit a proposed amended complaint identifying the Doe [Defendant(s) ] within the statute of limitations period to proceed against him."

That advice followed from a straightforward application of long-established Seventh Circuit case law regarding the identification of the proper parties to the lawsuit and the inability of the "relation back" doctrine to salvage claims against defendants who are not identified within the limitations period. See, *e.g.*, *Jackson v. Kotter*, 541 F.3d 688, 699 (7th Cir. 2008); *Hall v. Norfolk Southern Ry. Co.*, 469 F.3d 590, 597 (7th Cir. 2006); *King v. One Unknown Fed. Corr. Officer*, 201 F.3d 910, 914 (7th Cir. 2000); *Baskin v. City of Des Plaines*, 138 F.3d 701, 704 (7th Cir. 1998); *Worthington v. Wilson*, 8 F.3d 1253, 1256 (7th Cir. 1993); *Wood v. Worachek*, 618 F.2d 1225, 1230 (7th Cir. 1980). And the Seventh Circuit has confirmed that, absent the extraordinary relief of equitable tolling, the "extra measure of grace" given to *pro se* prisoner filings does not extend to the failure to identify the proper party within the limitations period. *Jackson*, 541 F.3d at 699 (rejecting relation back argument and explaining that while *Donald* allowed relation back where the plaintiff fails to "differentiate between the proper *type* of defendant – that is, individuals as opposed to government entities" – it "did not change our stance on actions against unknown defendants"); *King*, 201 F.3d at 914 ("We have consistently held that Rule 15(c)(3) does not provide for relation back under circumstances...in which the plaintiff fails to identify the proper party"). Thus, as the Court explained, it was imperative that Plaintiff get to work on identifying the "John Doe" defendants as soon as possible, including by sending a discovery request to defense counsel as soon as one appeared on behalf of Sheriff Dart.

**\*7** Here, the record is clear that as of the date on which the statute of limitations expired, the only named Defendant was Sheriff Dart. Accordingly, under the line of cases cited above, any claims that Plaintiff may have against individual defendant officers (other than Sheriff Dart himself) would be time barred unless equitable tolling applies to save those claims. "If despite the exercise of reasonable diligence [the plaintiff] cannot discovery his injurer's (or injurers') identity within the statutory period, he can appeal to the doctrine of equitable tolling to postpone the deadline for suing until he can obtain the necessary information." *Bryant*, 746 F.3d at 243. In this case, because Illinois's statute of limitations applies, Illinois's equitable tolling principles apply as well. *Id.* "Illinois does not toll the statute of limitations for inmates" as a matter of course, "nor does it consider a lack of resources extraordinary to equitably toll the statute of limitations." *Id.* at 242. The Seventh Circuit has noted that "Illinois case law does not define 'reasonably diligent,' but our cases supply some contours of a definition." *Id.* at 243. The examples given by the court focus on motions that a *pro se* incarcerated litigant can file prior to the expiration of a statute of limitations – for instance, a motion that would help him identify the defendants or even a motion that directly affects his ability to file a claim, such as a motion for leave to proceed *in forma pauperis. Id.* (citing *Donald*, 95 F.3d at 562; *Williams-Guice v. Bd. of Educ.*, 45 F.3d 161, 164-65 (7th Cir. 1995)). In *Bryant*, the court of appeals held that equitable tolling applied where the plaintiff had written letters, filed FOIA requests, and filed a motion to compel the defendant to disclose the identities of the two unnamed police officers – all before the expiration of the limitations period for at least two of his claims. *Id.* at 242-44.

Unfortunately for Plaintiff here, the principles articulated in *Bryant* provide very little assistance. At most, the Court could find support in *Bryant* to toll the limitations period for the week between the filing of Plaintiff's initial complaint and the Court's ruling on Plaintiff's application for leave to proceed *in forma pauperis* and motion for attorney representation. But that week turns out to be of no consequence, because there is nothing in the record to indicate any of the types of diligent action that might support a longer period of equitable tolling. Despite the Court's warning as to the looming statute of limitations and suggestion to send a list of questions to defense counsel, it does not appear that Plaintiff took any action prior to (or even shortly after) the limitations period expired. To be sure, by the time counsel filed an appearance for Sheriff Dart, only a few weeks remained before the two-year limitations period lapsed. But that, too, is largely a consequence of Plaintiff's own inaction, for he (inexplicably) waited until more than seven-eighths of the limitations period had run before filing suit. Still, Plaintiff had more than two months after the Court issued its November 10, 2014 order [5], and two weeks after defense counsel appeared, see [8], [9], [10], to start looking for information about the identities of the proper defendants. Had he engaged in any (or all) of the measures undertaken by the plaintiff in *Bryant*, his argument for equitable tolling would be persuasive. Indeed, had Plaintiff even sent a letter to defense counsel, as suggested by the Court, he might have a good argument for a longer tolling period. But without any initiative on Plaintiff's part (beyond requesting counsel), the Court cannot find that Plaintiff acted in a "reasonably diligent" manner under even the most relaxed definition of that phrase. [2]

The Court recognizes (and appreciates) the work that Plaintiff's recruited counsel has performed in investigating all avenues available to Plaintiff. The Court shares counsel's frustration with the fact that it took four invitations to the Trial Bar before current counsel agreed to take the case. The Court also understands the disappointment inherent in being asked to try to resurrect claims that turn out to have been time barred long before counsel became involved in the case. It is true, as counsel points out, that it would not be a difficult task even today to serve interrogatories to identify the officers present on January 26, 2013, when Plaintiff allegedly was assaulted. But for the reasons stated above, the Seventh Circuit consistently has held that, even for incarcerated *pro se* litigants, it is too late to try to identify a proper party defendant after the limitations period has run. Nevertheless, even if those claims cannot be brought, recruited counsel has performed a valuable service in advocating on behalf of his client and assisting the Court in evaluating Defendant's arguments for dismissal of any such claims.

**\*8** The Court notes that Plaintiff's time-barred claims against the individual officers do not necessarily affect Plaintiff's *Monell* claim. The Seventh Circuit has suggested that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010).

### IV. Conclusion

For the reasons stated above, the Court grants in part and denies in part Defendants' motion to dismiss [38]. This case is set for further status hearing on 7/7/2016 at 9:00 a.m.

### All Citations

Not Reported in F.Supp.3d, 2016 WL 3418570

Footnotes

1   As discussed above, *Monell* claims are subject to the pleading standard set out by the Supreme Court in *Twombly* and *Iqbal*, see *McCauley v. City of Chicago*, 671 F.3d 611, 615 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 570).

2   Even if the Court had immediately requested that a member of the Trial Bar accept appointment as counsel in this case, that lawyer would have needed to obtain from Plaintiff the very same information that Plaintiff himself could have provided to defense counsel.

**End of Document**                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1519154
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Ronald BRAINER, Plaintiff,

v.

Thomas J. DART, in his official capacity as Sheriff of Cook County, Illinois, et al., Defendants.

No. 16 CV 6013
|
Signed 03/28/2018

**Attorneys and Law Firms**

Joseph Arthur Korn, Urban & Burt, Ltd., Oak Forest, IL, for Plaintiff.

Jordan Lane Matthis, Kathleen Anne Murphy, Anthony E. Zecchin, Cook County State's Attorney's Office, Chicago, IL, for Defendants.

**Opinion**


<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge

 **\*1** Plaintiff Ronald Brainer brings this action pursuant to 42 U.S.C. § 1983 against Cook County Jail Officers and Counselors Regina Senese, Tariq Lucas, Hubert Thompson, Jeaneane Booker, Lester Hampton, John Mueller, and Cook County Sheriff Thomas Dart (collectively, "defendants"). Plaintiff alleges deliberate indifference to substantial risk of harm and to his medical needs in violation of his Fourteenth Amendment rights following an altercation with another inmate. Defendants have moved to dismiss the second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, defendants' motion to dismiss (Dkt. 40) is denied.


**I. Background** [1]

At all relevant times, Brainer was a pre-trial detainee at the Cook County Jail. On June 24, 2014, Brainer was involved in a physical altercation with another inmate named B. Schulten that was broken up by two unknown officers. [2] After that altercation, Brainer told those officers that Schulten had threatened his life and that he feared for his safety. No action was taken to re-locate Brainer or Schulten to a different housing unit.

Later that night, while Brainer was resting in his bed, inmate Schulten stabbed him in his right temple and ear. Defendant Officer Senese was on duty at the time of the attack, but did not witness the attack. Eventually, Officer Senese removed Brainer from the housing unit for questioning by defendant Officer Lucas. Defendant Officer Thompson was also made aware of the attack at this time.

Several hours after the attack, Brainer was taken to Cermak Health Services for medical treatment, at which point it was determined that he needed to be transported to Stroger Hospital. At Stroger, Brainer's wound was stitched up. Despite complaints of hearing loss, his hearing was not tested at that time. After treatment, Brainer was transported back to Cermak Health Services, placed in the same waiting room as inmate Schulten, and subjected to further threats. After being released from Cermak, Brainer was returned to the same housing unit where Schulten continued to reside.

On June 26, 2014, Brainer prepared a grievance relating to the attack and defendants' failure to protect him from harm. The grievance was received by defendant Booker, but no action was taken. On July 10, 2014, Brainer filed another grievance, complaining of continued threats and harassment by Schulten, but again no action was taken. At some point between the attack and August 9, 2014, Brainer also wrote a letter to defendant Sheriff Dart complaining about his health and safety. He received no response from Sheriff Dart. Between July 30, 2014 and August 9, 2014, Schulten was finally moved to a different housing unit. After the attack, Brainer also continued to complain of hearing loss and repeatedly asked to see a physician or have his hearing tested. His requests were denied.

**\*2** On June 8, 2016, Brainer filed a *pro se* complaint against defendants Dart, Booker, Hampton, Hurb, Jane Does 1-5, and John Does 1-5 alleging failure to protect under 42 U.S.C. § 1983 and failure to properly address his grievances. (Dkt. 1.) The Clerk of Court quickly informed Brainer that his complaint included personal identifiers and was thus not in compliance with Federal Rule of Civil Procedure 5.2. Brainer's almost identical amended complaint (this time without personal identifiers) was received on July 11, 2016. (Dkt. 9.) Around that same time, Brainer filed a motion for attorney representation. (Dkt. 7.)

On September 8, 2016, after the initial screening required for *pro se* prisoner complaints, *see* 28 U.S.C. § 1915A(a), the District Court issued an order finding that Bainer's amended complaint did not state a cause of action for failure to address his grievances. (Dkt. 10 at 3-4.) The Court did find, however, that Brainer had stated a colorable cause of action for failure to protect against defendant Dart. (*Id.* at 3.) Further, the Court noted that Brainer "arguably may be able to state a failure to protect claim against some or all of the unknown correctional officers." (*Id.*) The Court advised Brainer, however, that he could not proceed against any unknown officers until he identified them and named them in an amended complaint. (*Id.*) Brainer was further advised that he should attempt to identify the unknown officers as soon as possible "in light of the two-year statute of limitations and applicable tolling rules." (*Id.*) In the same order, the District Court granted Brainer's motion for attorney representation, and appointed Joseph Korn to represent him. (*Id.* at 4.)

On November 2, 2016, attorney Korn filed a motion seeking relief from the appointment, arguing that he lacked the necessary competence to represent Brainer in this § 1983 case. (Dkt. 14.) The District Court denied that motion at a hearing on November 10, 2016, and granted Brainer until January 13, 2017 to file an amended complaint. (Dkt. 17.) Brainer's counsel also sought and was granted leave to issue subpoenas to the Cook County Sheriff's Office and Cook County Health and Hospital Systems seeking additional information about Brainer's allegations and the unknown officers. (Dkt. 23.) Subsequently, Brainer was granted two additional extensions of time to file his amended complaint. (Dkt. 27 & 30.)

Brainer eventually filed his second amended complaint (the operative pleading) on May 1, 2017 against defendants Senese, Lucas, Thompson, Booker, Hampton, Mueller, and Dart alleging the facts enumerated above. [3] (Dkt. 31.) Count I alleges deliberate indifference to a substantial risk of harm against defendants Senese, Lucas, Thompson, Booker, Hampton, and Mueller. Count III alleges deliberate indifference to a serious medical need against Senese, Lucas, Thompson, Booker, and Hampton. Counts II and IV allege *Monell* claims against Sheriff Dart based on the causes of action pled in Counts I and III, respectively.

Defendants now seek to dismiss certain claims under Rule 12(b)(6) arguing that plaintiff's claims are (1) barred by the two-year statute of limitations; (2) legally insufficient pursuant to *Babcock v. White*, 102 F.3d 267 (7th Cir. 1996); and (3) fail to properly allege a policy or practice against Sheriff Dart. Each issue is addressed in turn below.

## II. Standard on a Rule 12(b)(6) Motion to Dismiss
**\*3** A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir.

2009). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, it must contain enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). When ruling on a 12(b)(6) motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged and drawing all possible inferences in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

### III. Analysis

#### A. Statute of Limitations

Defendants first argue that plaintiff's § 1983 claims against Senese, Lucas, Thompson, and Mueller must be dismissed as time-barred under the applicable two-year statute of limitations. [4] According to defendants, plaintiff's cause of action began to accrue on June 24, 2014, the date of the incident with inmate Schulten. Defendants argue that because plaintiff failed to specifically name defendants Senese, Lucas, Thompson, and Mueller until May 1, 2017, well after the two-year statute of limitations had expired, his claims against those defendants must fail. Plaintiff responds that the second amended complaint filed on May 1, 2017 relates back to the original timely complaint filed on June 8, 2016. Additionally, he argues that equitable tolling is appropriate here.

As a general matter, "the statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint." *White v. City of Chicago*, No. 14 CV 3720, 2016 WL 4270152, at *11 (N.D. Ill. Aug. 15, 2016) (quoting *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993)). Nevertheless, "it is true that, if a plaintiff alleges facts sufficient to establish a statute of limitations defense, the district court may dismiss the complaint on that ground." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (quotations omitted). But the Seventh Circuit has cautioned against such an "irregular" approach. *Id.* (citing *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014)). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Sidney Hillman*, 782 F.3d at 928.

Here, it is undisputed that plaintiff did not specifically name Senese, Lucas, Thompson, and Mueller until the filing of his second amended complaint in May 2017, after the two year statute of limitations had expired. However, plaintiff did name several John/Jane Doe defendants in his initial pro se complaint, which was filed within the two year statute of limitations. [5] The issue then becomes whether plaintiff's second amended complaint relates back to date of his initial complaint.

**\*4** Rule 15 permits an amendment to a pleading to relate back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

*(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.*

Fed. R. Civ. P. 15(c)(1) (emphasis added).

Citing the "John Doe rule," defendants argue that relation back is improper under Rule 15(c)(1)(C) where, as here, plaintiff failed to identify the John Doe defendants until after the statute of limitations had run. [6] Historically, under the John Doe rule, "relation back on grounds of mistake concerning the identity of the proper party does not apply where the plaintiff simply lacks knowledge of the proper defendant." *Hall v. Norfolk S. Ry. Co.*, 469 F.3d 590, 596 (7th Cir. 2006). But what defendants fail to acknowledge is that the applicability of the John Doe rule remains unsettled following the Supreme Court's ruling in *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538 (2010). [7] In *Krupski*, the Court held that "relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading." *Id.* at 54. Though not a John Doe case, it has been said that *Krupski* "cut the ground out from under" the John Doe rule. *Williams v. City of Chicago*, No. 14 CV 6959, 2017 WL 1545772, at *3 (N.D. Ill. Apr. 28, 2017) (citing *White v. City of Chi.*, 2016 WL 4270152, at *16).

While some courts in this District continue to strictly apply the John Doe rule, others have shifted the inquiry as contemplated under *Krupski. See White*, 2016 WL 4270152, at *17 (collecting cases). This Court finds itself in the latter camp, concluding that the appropriate inquiry here is not whether plaintiff knew or should have known the identity of the proper defendants, but whether the proper defendants knew or should have known that they would have been named as defendants. *Krupski*, 560 U.S. at 548. And, like some of the other courts in that camp, the Court concludes that such an inquiry is not appropriate at the pleadings stage. *See Clair v. Cook Cty., Illinois*, No. 16 CV 1334, 2017 WL 1355879, at *4 (N.D. Ill. Apr. 13, 2017) ("Because the complaint does not speak to what the newly added defendants knew or should have known about this lawsuit, the court cannot resolve the Rule 15(c)(1)(C)(ii) issue in their favor on a motion to dismiss."); *see also Williams*, No. 2017 WL 1545772, at * *2-3 (N.D. Ill. Apr. 28, 2017). As such, on this record, defendants' motion to dismiss is denied on the statute of limitations issue. [8]

### B. *Babcock v. White*

**\*5** Next, defendants argue that plaintiff's claims against defendants Lucas, Thompson, Booker, Hampton, Mueller, and Dart are legally insufficient pursuant to *Babcock v. White*, 102 F.3d 267 (7th Cir. 1996). Defendants do not specify which counts this argument applies to, arguing only generally that *Babcock* bars plaintiff's claims against these six defendants. However, like plaintiff, the Court concludes that this argument is targeted at Count I for deliberate indifference to substantial risk of harm, and not at Count III (deliberate indifference to serious medical need).

To state a claim for deliberate indifference to substantial risk of harm, plaintiff must show that defendants had actual knowledge of a substantial risk of harm to the plaintiff's safety, and that the defendant failed to take appropriate steps to protect the plaintiff from the specific danger. *Klebanowski v. Sheahan*, 540 F.3d 633, 639 (7th Cir. 2008). According to defendants, because plaintiff has only alleged facts indicating that these six defendants were involved *after* he was stabbed by inmate Schulten, under *Babcock v. White*, they cannot be held liable for plaintiff's subsequent fears of being attacked again. Plaintiff responds that an order dismissing his claims based on *Babcock* would be premature and otherwise improper. The Court agrees.

In *Babcock v. White,* the plaintiff, an inmate at a federal prison, suffered a violent attack by members of the Mexican Mafia gang. Babcock was subsequently transferred to a different facility that was supposedly free of Mexican Mafia members. However, upon his arrival, Babcock learned that members of the gang were incarcerated at his new facility. Babcock was not attacked again, but continued to fear for his safety. He filed suit alleging the Bureau of Prisons and

certain prison officials violated his Constitutional rights by failing to properly respond to his pleas for protection. Without permitting discovery, the District Court granted summary judgment in favor of defendants.

On appeal, the Seventh Circuit addressed whether an inmate who was not assaulted by, and was no longer at risk from, fellow inmates may maintain a § 1983 claim for monetary damages "based solely on prison officials' past failure to take measures to protect the prisoner from inmates known to pose a danger to the prisoner." *Babcock*, 102 F.3d at 270. The Court answered in the negative, reasoning that "[h]owever legitimate Babcock's fears may have been, ... it is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment." *Id.* at 272. Having alleged only "a failure to prevent exposure to risk of harm," Babcock's Eighth Amendment claims fell short. [9] *Id.*

Plaintiff's allegations here can be distinguished from those in *Babcock*. Defendants seem to disregard plaintiff's claims that he had a physical altercation with inmate Schulten earlier in the day on June 24, 2014. It was after this initial altercation that he informed certain unknown officers that he feared for his safety. [10] Specifically, plaintiff has alleged that "[t]he fact that the identity of Schulten was known to Defendants John Doe and John Doe 2, and that Schulten had threatened physical harm to Plaintiff, demonstrates that Defendants John Doe 1 and John Doe 2 and the other correctional officers knew that Plaintiff faced a substantial risk of serious injury at the hands of Schulten and possibly others." (Compl. ¶ 23.) It was later on that same day, after defendants allegedly failed to take reasonable action, that Schulten stabbed plaintiff in the head in a second altercation. It remains to be seen exactly which defendants knew of plaintiff's fears and the earlier altercation, and what steps could have been taken to protect him from the second attack, if any. As such, dismissing Count I based on *Babcock* without allowing further discovery would be improper, especially where here, unlike in *Babcock*, plaintiff has alleged he suffered actual physical harm. *See Griffin v. Spiller*, No. 03 CV 061, 2007 WL 2802607, at *5 (S.D. Ill. Sept. 24, 2007) (distinguishing a plaintiff who alleged physical harm from the plaintiff in *Babcock* who alleged only psychological harm); *see also Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) (finding a triable issue of fact as to what defendant officer knew and the steps he took to prevent a second altercation between two inmates on the same day).

**\*6** At a minimum, plaintiff has stated a claim in Count I for deliberate indifference that is plausible on its face and defendants' motion to dismiss is denied on this point. [11]

### C. *Monell* Claims

Lastly, defendants argue that plaintiff has failed to plead proper *Monell* claims against Sheriff Dart. Again, in Counts II and IV, plaintiff alleges deliberate indifference to substantial risk of harm and to a serious medical need against Sheriff Dart in his official capacity. [12] As to Count II (risk of harm), plaintiff alleges that his injury was caused by, among other things, defendant Dart's widespread practices of: failing to adequately train, supervise or control officers with respect to the removal of detainees at substantial risk of a violent attack; and failing to properly staff jail dorms and housing units to prevent violent attacks from occurring. In Count IV, plaintiff alleges the widespread practices of: failing to train officers to properly assess injuries and provide access to treatment in a reasonable time frame; failing to properly review medical requests; and refusing to provide hearing devices when a detainee still has adequate hearing in the other ear. Defendants contend that these *Monell* allegations of widespread practices are conclusory, boilerplate, relate only to plaintiff's own incident and must be dismissed. Plaintiff responds that his allegations against Dart are sufficient to withstand defendants' Rule 12(b)(6) motion to dismiss. The Court agrees.

To state a valid *Monell* claim, plaintiff must plead factual content that would allow the Court to plausibly infer that: (1) he suffered the deprivation of a constitutional right; and (2) an official custom or policy caused that deprivation. *Monell v. Dep't of Social Services*, 436 U.S. 658, 694-95 (1978). With respect to the second element, a plaintiff must plead that the constitutional violation was caused by: (1) an express municipal policy; (2) a widespread, though unwritten, custom

or practice; or (3) a decision by a municipal agent with final policymaking authority. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011).

**\*7** Here, plaintiff has sufficiently pled both elements of his *Monell* claims. As discussed previously, he has stated a claim for Fourteenth Amendment violations for deliberate indifference to a substantial risk of harm. And defendants have not otherwise substantively attacked the sufficiency of Count III for deliberate indifference to his medical needs on the day of the attack and thereafter. He has also laid out the specific practices that he claims resulted in his injuries, going beyond just boilerplate language.

Defendants are correct that, as of yet, plaintiff has only included allegations related to his own incident. But the Seventh Circuit recently cautioned that courts may not apply a "heightened pleading standard" to *Monell* claims. *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016), cert. denied, 137 S. Ct. 526 (2016) (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993)). Rather, Federal Rule of Civil Procedure 8(a) (2) requires that a complaint include only a "short and plain statement of the claim showing that the pleader is entitled to relief." In *White*, the court found that a plaintiff alleging a *Monell* claim based on his own experiences satisfied the requirements of Rule 8. *White*, 829 F.3d at 844 (noting that plaintiff "was not required to identify every other *or even one other individual* who had been arrested pursuant to a warrant obtained through the complained-of process.") (emphasis added).

Post-*White* courts analyzing *Monell* claims have "scotched motions to dismiss" premised on arguments that the complaint does not contain allegations beyond those relating to the plaintiff. *Stokes v. Ewing*, 16 C 10621, 2017 WL 2224882, at \*4 (N.D. Ill. May 22, 2017) (plaintiff's allegations that he was falsely arrested pursuant to a "custom, practice, and policy" that "promoted illegal arrests of innocent individuals" sufficient to survive a motion to dismiss under *White*); *see also Zinn v. Village of Sauk Village*, 16 CV 3542, 2017 WL 783001, at \*7 (N.D. Ill. Mar. 1, 2017) (holding that plaintiffs sufficiently pled a *Monell* claim under *White* where plaintiffs alleged that they suffered a constitutional deprivation "pursuant to [defendant village's] widespread practice of illegally and unconstitutionally seizing private property" and charging monetary fees for its return); *Williams v. City of Chicago*, No. 16 CV 8271, 2017 WL 3169065, at \*8-9 (N.D. Ill. July 26, 2017) ("Under the binding precedent set by *White*, 829 F.3d at 844, Plaintiff's allegations of a pattern or practice of ignoring complaints of discrimination are enough to survive a motion to dismiss."). Defendants' motion to dismiss on this point can be similarly "scotched." This is not to say that plaintiff will prevail on the merits, only that plaintiff's *Monell* claims are sufficient to survive defendants' motion to dismiss.

## IV. Conclusion
For the foregoing reasons, defendants' motion to dismiss is denied. It is so ordered.

## All Citations

Slip Copy, 2018 WL 1519154

## Footnotes

1    The following facts are taken from Plaintiff's second amended complaint (Dkt. 31) and are accepted as true for purposes of the motion to dismiss. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

2    These unknown officers were previously named as defendants John Doe 1 and John Doe 2 in plaintiff's second amended complaint. Plaintiff has since voluntarily dismissed those unknown defendants, along with another officer, John Doe 3. (Dkt. 44.)

3    Again, Plaintiff also named John Does 1, 2, and 3, but those individuals have since been voluntarily dismissed. (Dkt. 44.) Previously named defendant Hurb was not re-named in plaintiff's second amended complaint.

4    Defendants briefly mention the one-year statute of limitations applicable under the Tort Immunity Act, seemingly implying that it should apply to the claims here. But plaintiff's claims arise under § 1983, meaning the applicable statute of limitations is two years. *See O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015) ("The limitations period for § 1983 claims is based in state law, and the statute of limitations for § 1983 actions in Illinois is two years."); *see also Jumes v. City of Chicago*, No. 94 CV 3532, 1995 WL 613137, at *3 (N.D. Ill. Oct. 17, 1995) ("The Illinois Tort Immunity Act and its one year statute of limitations does not apply to section 1983 claims.").

5    Specifically, plaintiff identified the John/Jane Does as individuals who were in charge of his housing unit, but explained that he needed discovery to properly identify the defendants.

6    To be clear, defendants have not substantively argued that plaintiff's complaint was untimely because it was initially stricken by the Clerk's Officer for including personal identifiers.

7    Not only did defendants fail to mention the state of the law post-*Krupski* in their motion to dismiss, but they also remained silent on the issue in their reply brief even after the issue was raised by plaintiff. The Court also notes that defendants waited until their reply brief to specifically argue that relation back was improper under the first prong of 15(c)(1)(C) because defendants did not receive notice of the action. *See* Fed. R. Civ. P. 15(c)(1)(C)(i). But arguments raised for the first time in a reply brief are deemed waived. *Nelson v. LaCrosse County Dist. Attorney*, 301 F.3d 820, 836 (7th Cir. 2002).

8    Notwithstanding this finding, the Court would also agree that there may be an issue of equitable tolling here. (*See* Pl.'s Resp. at 7-9.)

9    *Babcock* involved an inmate's claims under the Eighth Amendment. But here, Brainer was a pre-trial detainee at the time of defendants' alleged conduct. As such, his claims arise under the Fourteenth Amendment's due process clause instead of the Eighth Amendment. *Henderson v. Sheahan*, 196 F.3d 839, 844 n.2 (7th Cir. 1999). This distinction makes no practical difference for our analysis as it is well settled that an inmate's § 1983 claims under the Fourteenth Amendment are to be analyzed under the Eighth Amendment test. *Id.*

10   Interestingly, in his initial *pro se* complaint, plaintiff also alleged that prior to June 24, 2014, he complained to prison officials "countless times" about his problems with inmate Schulten. (Dkt. 1.) These allegations were not specifically re-pled in the operative pleading, though further discovery may bring such allegations back to light.

11   In the same section of their motion, defendants briefly argue that defendant Mueller cannot be held liable for the allegedly improper manner in which he handled plaintiff's grievance because the District Court has already ruled that there is no right to a jail grievance system. (Dkt. 10 at 3.) Plaintiff does not dispute this point, nor does this Court. But again, at this stage, the Court will not dismiss claims against Mueller raised in Count I. Following additional discovery, plaintiff is advised to consider whether voluntarily dismissing Mueller is appropriate.

12   Though there seemed to be some initial confusion as to whether Dart was also sued in an individual capacity, plaintiff has conceded that his claims against Dart are in his official capacity only. (Resp. at 15.) As such, plaintiff's claims are actually against the Cook County Sheriff's Office. *See Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) ("Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself.").

---

2008 WL 68683
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Jerry CHAPARRO, Plaintiff,

v.

Officer P.O. POWELL (Star No. 11570), Officer M.J. Butzen (Star No. 11307), Officer
A.E. Acevez (Star No. 18154), Hazel Holmes, and the City of Chicago, Defendants.

No. 07 C 5277.
|
Jan. 2, 2008.

**Attorneys and Law Firms**

Blake Wolfe Horwitz, Amanda Sunshine Yarusso, Tali K. Albukerk, Law Offices of Blake Horwitz, Chicago, IL, for Plaintiff.

Terrence Michael Burns, Daniel Matthew Noland, Paul A. Michalik, Harry N. Arger, Dykema Gossett Rooks Pitts PLLC, Chicago, IL, Kimberly D. Fahrbach, Dykema Gossett Rooks Pitts PLLC, Lisle, IL, for Defendants.

**Opinion**

### MEMORANDUM OPINION AND ORDER

SUZANNE B. CONLON, District Judge.

 **\*1**  Jerry Chaparro brings this 42 U.S.C. § 1983 action against the City of Chicago ("the city") and four individual defendants, including three Chicago Police Department ("CPD") officers. He alleges the individual defendants subjected him to an unreasonable seizure in violation of the Fourth Amendment and other constitutional injuries. In Count IX, he alleges the city is liable for these violations under *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The city moves for dismissal of Count IX under Fed.R.Civ.P. 12(b)(6).

### BACKGROUND

#### I. Chaparo's Arrest

Chaparro alleges the individual defendants arrested him without probable cause, subjecting him to an unreasonable seizure in violation of the Fourth Amendment. Cmplt. ¶¶ 6-9. He claims he was arrested because he attempted to photograph his car inside a city impound lot. *Id.* at ¶ 117. He asserts he had a right to photograph his car and committed no crime. *Id.* at ¶¶ 10, 116-20. He further alleges the defendant officers used excessive force in arresting him and conspired to cover up their misconduct. *Id.* at ¶ 17.

#### II. City Policy or Custom

Chaparro alleges a city policy or custom comprising a litany of police misconduct including: abuse of authority, use of excessive force, failure to discipline officers for misconduct, concealing police misconduct, failure to properly investigate

or remedy police misconduct, failure to provide training to prevent police misconduct, and arresting citizens who photograph cars inside city impound lots. *Id.* at ¶ 21. He alleges misconduct among CPD special operations officers, none of whom was involved in Chaparro's arrest; the Office of Professional Standards' inadequate oversight of CPD officers; the misconduct of four CPD officers, none of whom was involved in Chaparro's arrest; general "lawlessness" among CPD officers, citing allegations of torture "from the 1980's [and] the 1990's;" and the city's abandonment of a software program intended to predict misconduct among CPD officers. *Id.* at ¶¶ 24-82.

## DISCUSSION

### I. Legal Standards

#### a. Fed.R.Civ.P. 12(b)(6)

To survive a Rule 12(b)(6) motion, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.RXiv.P. 8(a)(2). To meet this requirement, (1) "the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests" and (2) the complaint's factual allegations "must plausibly suggest that the plaintiff has aright to relief, raising the possibility above a speculative level." *EEOC v. Concentra Health Services, Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007)) (ellipsis and quotation marks omitted). A complaint must provide factual support for its claims, not merely "labels and conclusions." *Bell Atl.,* 127 S .Ct. at 1965. This requirement ensures a defendant has information sufficient to prepare his defense and "allow[s] the court to determine at the outset of the litigation, before costly discovery is undertaken, whether the plaintiff has any tenable theory or basis of suit, so that if he does not the case can be got rid of immediately ...." *Ryan v. Mary Immaculate Queen Ctr.,* 188 F.3d 857, 860 (7th Cir.1999); *accord Bell Atl.,* 127 S.Ct. at 1966-67.

**\*2** In weighing a 12(b)(6) motion, the court must accept all the complaint's well pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor. *Cler v. Illinois Ed. Ass'n,* 423 F.3d 726, 729 (7th Cir.2005). A court need not draw inferences in aplaintiff s favor that are "too attenuated to be reasonable." *Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 736 (7th Cir.1994) (superseded by statute on other grounds).

#### b. Municipal Liability under *Monell*

A municipality is liable under *Monell* if its policy or custom is the "moving force" behind a constitutional violation. *Bd. of County Commissioners v. Brown,* 520 U.S. 397, 400, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). To prevail on a *Monell* claim, a plaintiff must establish (1) a violation of his constitutional rights; (2) the existence of a municipal policy or custom; and (3) "a direct causal link" between that policy or custom and his injury. *Id.* at 403-04; *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 817, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Three types of municipal policy can support a *Monell* claim: (1) an express policy, (2) a well settled, widespread practice or custom, or (3) a decision by a municipal official with final policymaking authority. *McTigue v. City of Chicago,* 60 F.3d 381, 382 (7th Cir., 1995). The standards for proving culpability and causation in this context are "rigorous ... to ensure that the municipality is not held liable solely for the actions of its employee." *Bd of County Commissioners,* 520 U.S. at 405. *Monell* does not subject municipalities to *respondeat superior* liability. *Id.* at 403.

### II. Analysis

Chaparro bases his *Monell* claim on an alleged widespread practice or custom he terms the "code of silence," which roughly equates to a city-wide acceptance of police misconduct. Response at 2. He claims the code of silence caused the individual defendants to violate his constitutional rights because it reassured them they would not be punished for malfeasance. He relies on instances of CPD misconduct spanning two decades not directly related to his arrest.

The city argues Chaparro fails to establish the existence of a cognizable municipal policy or custom that encompasses the wide spectrum of alleged misconduct. The city also argues Chaparro fails to demonstrate a causal link between the policy he alleges and his arrest. It contends Count IX does not identify a policy or custom "closely related to [Chaparro's] ultimate injury," rendering Chaparro's *Monell* theory *respondeat superior* by another name. *Id.* at ¶ 8 (quoting *City of Canton,* 489 U.S. at 391). The city points out that the bulk of Chaparro's factual allegations have, at best, a tenuous relationship to his arrest. The complaint contains numerous allegations regarding misconduct by CPD special operations officers, but none of the individual defendants is a special operations officer.

**\*3** Count IX is deficient. The factual allegations fail to plausibly suggest a policy cognizable under *Monell.* The custom or policy underlying a *Monell* claim cannot be so amorphous that it effectively exposes a municipality to *respondeat superior* liability. *See Bd. of County Commissioners,* 520 U.S. at 403. Chaparro relies on a purported "code of silence" based on numerous, tenuously related instances of police misconduct. But that misconduct is so multifarious that the allegations do not identify a discrete policy or custom. Under Chaparro's logic, any instance of police misconduct would be "caused" by the "code of silence," because any misconduct could be linked to an officer's imputed belief he could escape punishment. Chaparro's *Monell* theory collapses into *respondeat superior,* an outcome explicitly forbidden by the Supreme Court.

Nor do Chaparro's allegations plausibly suggest a direct causal link between a municipal policy and his injury. He asserts a general lawlessness among CPD officers caused the violations surrounding his arrest. But he provides no facts to show that link; and the policy he alleges is so nebulous that any connection to a particular constitutional violation is highly attenuated. Indeed, the injury Chaparro allegedly suffered is no more related to the "code of silence" than any other injury caused by any other kind of police misconduct. As the city notes, Chaparro's attorney has demonstrated this fact by including identical *Monell* allegations in at least six other § 1983 cases against the city alleging different instances of alleged police misconduct. [1]

## CONCLUSION

The motion to dismiss Count IX is granted. The city's motion to bifurcate discovery is moot.

## All Citations

Not Reported in F.Supp.2d, 2008 WL 68683

Footnotes

[1]    *See Farley v. Wilke,* No. 07 C 5254, Dkt. No. 1 (N.D.Ill. Sep. 17, 2007) (Gottschall, J.); *Martin v. Quinn,* No. 07 C 4991, Dkt. No. 1 (N.D.Ill. Sep. 5, 2007) (Guzman, J.); *Jones v. Unknown Officers,* No. 07 C 5279, Dkt. No. 1 (N.D.Ill. Sep. 18, 2007) (Norgle, J.); *Safford v. Janik,* No. 07 C 5276, Dkt. No. 1 (N.D.Ill. Sep. 18, 2007) (Coar, J.); *McComb v. Unknown Officers,* No. 07 C 5564, Dkt. No. 1 (N.D.Ill. Oct. 2, 2007) (Marovich, J.); *Moumji v. Officer* with star number 2351, 07 C 5256, Dkt. No. 1 (N.D.Ill. Sep. 17, 2007) (Lefkow, J.),

**WESTLAW** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 3970515
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

John DOE and Jane Doe, individually and as parents and next friends of Doe Child, a minor, Plaintiffs,

v.

Jenny GROSCH and Community Consolidated School District 15, Defendants.

17 C 1214
|
Signed 09/08/2017

**Attorneys and Law Firms**

Antonio Maurizio Romanucci, Bhavani Keeran Raveendran, 2016 Nicolette Anne Ward, Romanucci & Blandin, LLC, Chicago, IL, for Plaintiffs.

Babak Bakhtiari, Jessica A. Walker, Hodges, Loizzi, Eisenhammer, Rodick & Kohn LLP, Arlington Heights, IL, for Defendants.

**Opinion**

## MEMORANDUM OPINION AND ORDER

Gary Feinerman, United States District Judge

**\*1**  John Doe and Jane Doe, on their own behalf and as parents of Doe Child ("D.C."), filed this suit in the Circuit Court of Cook County, Illinois, against Community Consolidated School District 15 and Jenny Grosch, the principal of D.C.'s public elementary school, bringing federal and state law claims arising from his alleged bullying at school. Doc. 1-1. After removing the suit to federal court, Doc. 1, the Does moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint, Doc. 13. The motion is granted as to the federal claims, which are dismissed without prejudice. If the Does do not attempt to replead those claims, or if they attempt to do so and fail, the court will exercise its discretion under 28 U.S.C. § 1367(c)(3) to relinquish supplemental jurisdiction over the state law claims (over which there is no diversity jurisdiction) and remand them to state court.

## Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. See Zahn v. N. Am. Power & Gas, LLC, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in the Does' brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." Phillips v. Prudential Ins. Co. of Am., 714 F.3d 1017, 1020 (7th Cir. 2013). The facts are set forth as favorably to the Does as those materials allow. See Pierce v. Zoetis, Inc., 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. See Jay E. Hayden Found. v. First Neighbor Bank, N.A., 610 F.3d 382, 384 (7th Cir. 2010).

D.C., born in 2002, attended public elementary school in a northwest suburb of Chicago from Summer 2009 to Spring 2014. Doc. 1-1 at ¶¶ 2, 11, 14. D.C. suffers from several psychological conditions, including Mixed Receptive-Expressive Language Disorder, Predominantly Inattentive Type Disorder, and Attention Deficit Hyperactivity Disorder. *Id.* at ¶ 5. A serious manifestation of those conditions is that D.C. takes all statements literally, regardless of context or tone. *Id.* at ¶ 8.

D.C. became a target of bullying at school because of his disabilities, as Grosch and the school's other faculty and staff were aware. *Id.* at ¶¶ 9-10. Faculty and staff instructed D.C. not to "tattle" on classmates who bothered him; because of his disabilities, D.C. understood this to mean that he should never report any bullying, no matter how severe. *Id.* at ¶¶ 16-17.

During winter, the school typically maintained a large snow pile on the playground. *Id.* at ¶¶ 28-29. As the faculty and staff knew, children often played behind the snow pile, where they could not be seen from the school doors. *Id.* at ¶¶ 33-34. Although the faculty and staff were responsible for supervising students during recess, they typically remained near the doors during outdoor recess breaks in the winter. *Id.* at ¶ 34. On at least two occasions between December 2013 and February 2014, a group of students brought D.C. behind the snow pile, held him face down on the ground, and gyrated against his backside while yelling "ride the [D.C.] train" and "ride the [D.C.] horse." *Id.* at ¶ 38.

**\*2** In January 2014, the Does became increasingly concerned by changes in D.C.'s behavior, including his gyrating on others. *Id.* at ¶ 48. Apparently after discussing the bullying incidents with D.C., the Does met with Grosch on February 27 to inform her of what had happened. *Id.* at ¶ 49. The next day, Grosch questioned D.C. and other children thought to be involved, and then reported her findings to the Does, telling them that a known bully of D.C had organized a "bull-riding game" with D.C.'s consent. *Id.* at ¶¶ 50-52. Grosch told the Does that she would ensure that the offending students met with and apologized to D.C. *Id.* at ¶ 53. The Does feared that such a meeting would embarrass and distress D.C., and they asked Grosch to remedy the situation in another way, but she did not suggest an alternative. *Id.* at ¶¶ 54-55. Around the same time, a student pushed D.C. to the ground during recess. *Id.* at ¶ 57.

Fearing further abuse and concerned that the school was not taking adequate protective action, the Does removed D.C. from the school and eventually enrolled him at a private school. *Id.* at ¶¶ 60-61. D.C. continues to suffer emotional distress from the incidents. *Id.* at ¶ 62. Grosch never disciplined the students who bullied D.C. or the teachers who failed to supervise the students during recess. *Id.* at ¶¶ 63-64.

## Discussion

The Does' federal claims, which arise under 42 U.S.C. § 1983, allege violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Id.* at ¶¶ 122-142. The § 1983 claims against the District must satisfy the municipal liability standards set forth in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). The Does have clarified that the federal claims against Grosch are official capacity claims, Doc. 18, making them identical to the *Monell* claims against the District. *See Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) ("Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself."). The federal claims can survive, then, only if the Does' allegations establish a basis for municipal liability under *Monell*.

"A municipality may not be held liable under § 1983 based on a theory of respondeat superior or vicarious liability. A municipality only may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). To state a *Monell* claim, the plaintiff must allege facts sufficient to show that a municipal employee's unconstitutional act was caused by: "(1) an express [municipal] policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage

with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (citation omitted); *see also Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). In addition to showing that the municipality acted culpably in one of those three ways, the plaintiff must allege causation, meaning that the municipality, "through its deliberate conduct, ... was the 'moving force' behind the injury alleged." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

The Does seek to establish *Monell* liability in the second manner described above, arguing that three District customs caused the bullying of D.C. First, the Does claim that the teachers at D.C.'s school typically stayed close to the school doors during outdoor recess breaks in the winter, which prevented them from seeing behind the snow pile, where D.C. was assaulted. Doc. 1-1 at ¶¶ 32-36, 88. But to base *Monell* liability on a governmental custom, a plaintiff must show that an activity "was so persistent and widespread that [municipal] policymakers should have known about the behavior." *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001). In Illinois, the final policymakers for school administration are district school boards. *See Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1061 (7th Cir. 1998). The Does do not allege that Grosch or any other school employee, rather than the school board, had policymaking authority over this matter. At most, then, the Does have described a custom at D.C.'s school, not a custom of the District, and they give no reason why the District was or should have been aware that teachers at a single elementary school sometimes failed to adequately supervise outdoor recess breaks. Consequently, the Does' *Monell* claim cannot rest on this alleged custom. *See Latuszkin*, 250 F.3d at 505 ("[The plaintiff's] complaint must be dismissed ... because he claimed no more than a policy or custom of the CPD. Nowhere did he claim a policy or custom of the City."); *Classroom Teachers of Dall. v. Dall. Indep. Sch. Dist.*, 164 F. Supp. 2d 839, 849 (N.D. Tex. 2001) ("[A]llegations of specific instances of misconduct by the Principal at one school ... do not constitute allegations of a persistent, widespread practice of [District] officials.") (internal quotation marks omitted).

**\*3** Second, the Does claim that the District has a custom of failing to sufficiently investigate bullying or to discipline offenders. Doc. 1-1 at ¶ 88, 95-100. To give rise to *Monell* liability, municipal employees' conduct must occur frequently enough to give rise to a reasonable inference that the public employer "is aware that public employees engage in the practice and do so with impunity." *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988) (internal quotation marks omitted). While there is no clear consensus as to how often the offending conduct must occur to constitute a custom, "it must be more than one instance, or even three." *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) (internal quotation marks and citation omitted). The Does have pointed to only one allegedly insufficient bullying investigation: Grosch's investigation of the incidents involving D.C. It follows that this alleged custom, like the first, is not sufficiently widespread to support a *Monell* claim. *See Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) ("[T]hree incidents where vehicle owners were erroneously told that their vehicles were not at Lot 6 do not amount to a persistent and widespread practice.") (internal quotation marks omitted).

The recently decided *White v. City of Chicago*, 829 F.3d 837 (7th Cir. 2016), does not warrant a different result. The plaintiff in *White* alleged that the Chicago Police Department had a custom under which officers would submit arrest warrant applications without sufficient factual support. *Id.* at 839. As evidence of the custom, the plaintiff identified only one instance (his own case) in which an officer submitted a factually deficient application, but he also alleged that the city's standard printed form for warrant applications did not require specific factual support. *Id.* at 844. The Seventh Circuit found that, taken together, the individual allegation *plus* the standard form provided sufficient evidence of a systematic practice to make out a *Monell* claim. *Ibid.* Here, there is no equivalent to the standard form, as the Does point to nothing besides the single allegedly insufficient investigation of D.C.'s bullying.

Third, the Does claim that the District failed to adequately train staff and faculty to detect bullying and respond with appropriate discipline. Doc. 1-1 at ¶ 91, 101. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To give rise to this kind of liability, the failure to train "must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Ibid.* (internal quotation marks omitted). "A pattern of similar constitutional violations

by untrained employees is ordinarily necessary to demonstrate deliberate indifference" in the failure-to-train context. *Id.* at 62 (internal quotation marks omitted); *see also Johnson v. Cook Cnty.*, 526 Fed.Appx. 692, 696-97 (7th Cir. 2013). The Does argue that widespread violation of the District's bullying policy at D.C.'s school evidenced an obvious need for training. Doc. 1-1 at ¶¶ 91, 101. But, as noted, the Does point only to the incidents involving their son, and therefore fail to make out a sufficient pattern of constitutional violations. *See Gable*, 296 F.3d at 538.

The Supreme Court has left open the possibility that *Monell* failure-to-train liability can be shown by a single incident where constitutional violations are a "highly predictable consequence" of a failure to train; for example, if a police department failed to train recruits on the use of deadly force. *Connick*, 563 U.S. at 63-64; *see also Johnson*, 526 Fed.Appx. at 696-97. But the Does forfeited any "single-incident" argument by failing to raise it in their opposition brief. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument ... but also to a litigant's failure to advance a specific point in support of a general argument....").

**\*4** Because the Does do not state a basis for *Monell* liability, the court need not address Defendants' arguments that the Does have not alleged actual due process or equal protection violations. The federal claims are dismissed, but the dismissal is without prejudice and the Does will be given one opportunity to replead. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) (noting that "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed"). If the Does do not attempt to replead their federal claims, or if they try to do so but fail, the court will exercise its discretion to relinquish its supplemental jurisdiction, 28 U.S.C. § 1367(a), over the state law claims and remand them to state court.

"The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) [of § 1367] if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pend[e]nt state claims." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). This general rule has three exceptions: "when the [refiling] of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." *Ibid.*

None of the exceptions apply here. Plaintiffs will not have to refile their state law claims, as those claims, having arrived in federal court via removal, will be remanded to state court. Substantial federal judicial resources have not yet been committed to the state law claims. And it is not clearly apparent at this early stage how the state law claims (which allege intentional infliction of emotional distress, and willful and wanton conduct) should be resolved. It follows that relinquishing jurisdiction over the state law claims is the appropriate course under § 1367(c)(3). *See RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479-80 (7th Cir. 2012); *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251-53 (7th Cir. 1994).

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is granted as to the federal claims and denied without prejudice as to the state law claims. The federal claims are dismissed without prejudice. The Does have until September 29, 2017 to file an amended complaint. If they do not file an amended complaint, or if they do so and the federal claims continue to fail to state a viable claim, the federal claims will be dismissed with prejudice and the state law claims will be remanded to state court.

**All Citations**

Slip Copy, 2017 WL 3970515

  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2018 Thomson Reuters. No claim to original U.S. Government Works.  5

2016 WL 2770880
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Yasante Foy, Individually and as Special Administrator and Special
Representative of the estate of Mark Haynie Jr, deceased, Plaintiff,

v.

City of Chicago, et al., Defendant.

No. 15 C 3720
|
Signed 05/12/2016

**Opinion**

## MEMORANDUM OPINION AND ORDER

Chief Judge Rubén Castillo, United States District Court

**\*1** Plaintiff Yasante Foy, mother of Mark Haynie Jr. and representative of his estate, brings her sixth amended complaint against Defendants City of Chicago (the "City") and police officers Ruben Del Valle, Jeffery Friedlieb, Darryl Johnson, Tim Philbin, and Donald Banks (collectively, "Defendants"). (R. 58, Sixth Am. Compl.) Plaintiff's sixth amended complaint arises from the death of 17-year-old Mark Haynie Jr. ("Haynie") while in police custody and alleges violations of 42 U.S.C. § 1983 ("Section 1983"), the Illinois Wrongful Death Act, 740 Ill. COMP. STAT. 180/1, and the Illinois Survival Act, 755 Ill. COMP. STAT. 5/27-6, as well as claims for intentional infliction of emotional distress. (*Id.*) Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants seek to dismiss counts seven and eight, Plaintiff's Section 1983 and *Monell* claims. (R. 60, Mot. at 1-2.) For the reasons stated below, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

On July 13, 2011, Officers Del Valle and Friedlieb arrested Haynie and transported him to a police station located at 3151 W. Harrison St., Chicago, IL (the "Harrison Police Station"). (R. 58, Sixth Am. Compl. at 3-4.) Officers Johnson, Philbin, and Banks "were the lock up keepers on duty during ... [Haynie's] lock up." (*Id.* at 4.) Despite being a minor, Haynie was held with the adult population at the Harrison Police Station. (*Id.* at 5.) After being detained, Haynie's "physical condition became medically dangerous," and he complained that he was not feeling well, and he requested medical attention. (*Id.* at 4, 6.) Plaintiff claims that Haynie's calls went unheeded. In fact, Plaintiff alleges that after Haynie requested medical assistance, an unidentified police officer told him to "shut the fuck up and lie down." (*Id.* at 17.) Plaintiff also alleges that fellow detainees at the Harrison Police Station informed the on duty police officers that Haynie was having trouble breathing and that his condition was worsening. (*Id.* at 6.) Later that day, Haynie was found unconscious in his cell. (*Id.* at 6.) Haynie died the same day. [1] (*Id.*)

On July 21, 2011, Plaintiff filed suit in the Circuit Court of Cook County against the City and unknown police officers. (R. 1-2, Ex. B to Notice of Removal, Compl.) The original complaint asserted wrongful death and survival claims. (*Id.* at 1-8.) Plaintiff amended the complaint to add federal causes of action and, pursuant to 28 U.S.C. § 1441(c), Defendants removed the lawsuit to the U.S. District Court for the Northern District of Illinois. (R. 1, Notice of Removal at 1-2.)

Subsequently, Plaintiff withdrew her federal claims and the Court remanded the lawsuit. (*Id.* at 2.) On April 1, 2015, Plaintiff filed the fourth amended complaint, adding Section 1983 claims against the City and the named police officers. (*Id.*; *see also* R. 1-1, Ex. A to Notice of Removal, Fourth Am. Compl.) Nearly one month later, Defendants removed the lawsuit once again to this Court. (R. 1, Notice of Removal.) On July 17, 2015, the City filed its motion to dismiss Plaintiff's Section 1983 claim against the City. (R. 24, Mot. to Dismiss Fourth Am. Compl.) In response to the motion to dismiss, Plaintiff moved for leave to file a fifth amended complaint *instanter.* (R. 35, Mot. for Leave; R. 35-1, Fifth Am. Compl.) Following the filing of the fifth amended complaint and another motion to dismiss, (R. 44, Mot. to Dismiss Fifth Am. Compl.), the Court ordered the City to disclose to Plaintiff all of the "deaths at the same police lock-up in the last five years," (R. 50, Order). After the City provided the ordered discovery, Plaintiff filed her sixth amended complaint on December 1, 2015. (R. 58, Sixth Am. Compl.)

 **\*2** In addition to state-law claims, Plaintiff brings two causes of action for deliberate indifference under Section 1983. (*Id.* at 15-21.) Specifically, count seven alleges that—while Haynie was in police custody—the defendant officers were on notice of Haynie's worsening condition yet refused to provide him with timely medical attention. (*Id.* at 15-16.) As a result of the defendant officers' alleged actions and omissions, Haynie died. (*Id.* at 8.)

Count eight seeks to hold the City liable for the defendant officers' actions under a theory of municipal liability pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Specifically, Plaintiff alleges that the City maintains "practices, policies, procedures and an overall culture" that result in a failure "to meet its constitutional obligation to maintain and provide continuing adequate and appropriate monitoring, supervision, medical care and medical treatment of detainees." (*Id.* at 18.) Plaintiff also alleges that the City has "policies and procedures under which detainees with serious medical conditions, like [Haynie], were routinely and frequently denied proper or adequate medical care." (*Id.* at 17-18.) Plaintiff further alleges that the City inadequately trains and supervises its employees, which causes delays of medical treatment to inmates in need of urgent care. (*Id.* at 18.) In addition, Plaintiff alleges that the City "encourage[s] future abuses toward the inmates by failing to discipline or punish employee misconduct that resulted in inadequate medical treatments for inmates." (*Id.*) Plaintiff also claims that the City has widespread practice of failing "to have its cameras located in and around [the Harrison Police Station] ... in proper working order, so it could monitor ... [Haynie] and other detainees." (*Id.*; *see also id.* at 20.) As a result of these alleged policies and practices, at least four other individuals have died at the Harrison Police Station between June 2007 and February 2011. (*Id.* at 18-19.) Finally, Plaintiff alleges that the City continues to maintain these policies and procedures as evidenced by the fact that, since Haynie's death, four more individuals have died at the Harrison Police Station. (*Id.* at 20.)

On December 16, 2015, Defendants answered Plaintiff's state-law claims, (R. 59, Answer), and filed a motion to dismiss the Section 1983 claims, (R. 60, Mot.). Defendants contend that the Section 1983 claims fail under Rule 12(b)(6) and request that the Court dismiss counts seven and eight. (*Id.*) On January 22, 2016, Plaintiff filed her response, (R. 65, Resp.), and Defendants filed their reply on January 29, 2016, (R. 66, Reply).

## LEGAL STANDARD

A motion under Rule 12(b)(6) challenges the sufficiency of a claim. FED. R. CIV. P. 12(b)(6). Under federal pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A claim for relief must also be plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly*, 550 U.S. at 555. "In determining a complaint's sufficiency, [a court will] ... construe it in light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the nonmovant's] favor." *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016) (citation and internal quotation marks omitted). However, a court need

not "accept as true any legal assertions or recitals of the elements of a cause of action supported by mere conclusory statements." *Id.* (citation and internal quotation marks omitted).

## ANALYSIS

### I. Count Seven Against the Officers

**\*3** Count seven in Plaintiff's sixth amended complaint alleges that the defendant officers demonstrated deliberate indifference to Haynie's serious medical needs and failed to meet their constitutional obligations to provide adequate medical care. (R. 58, Sixth Am. Compl. at 15-16.) The parties disagree as to the nature of count seven, specifically whether it is brought against the defendant officers in their individual or official capacities and whether a cause of action even exists for "deliberate indifference." (R. 60, Mot. at 2-3; R. 65, Resp. at 5; R. 66, Reply at 2.) The Court will attempt to sort out the parties' confusing contentions.

#### A. Deliberate Indifference Against the Officers in Their Official Capacities

Plaintiff alleges that Officers Del Valle, Friedlieb, Johnson, Philbin, and Banks are "being sued individually and in their official capacity." (R. 58, Sixth Am. Compl. at 2.) Plaintiff titles count seven as "42 U.S.C. § 1983 Monell Claim for Deliberate Indifference Chicago (Chicago Police Officers)." (*Id.* at 15.) In a very brief argument, the City asserts that count seven must be dismissed because "[i]t is beyond reasonable dispute that the holding of *Monell* pertains to governmental agencies" and "there is no basis for liability for individual officers under *Monell*." (R. 60, Mot. at 3.) In response, Plaintiff states that count seven is a claim for "[d]eliberate [i]ndifference ... against the individual officers." (R. 65, Resp. at 5.)

Under Section 1983, there are two ways in which a party may sue an individual government actor: in the actor's official capacity or in his individual, or personal, capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). "When a plaintiff sues an individual officer in his official capacity, the suit is treated as if the plaintiff has sued the municipality itself." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006); *Graham*, 473 U.S. at 165-66 ("Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. ... [A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." (citation and internal quotation marks omitted)). A *Monell* claim seeks to impose civil liability on municipalities. *See Monell*, 436 U.S. at 690-94. As the United States Supreme Court has held, an official-capacity suit is "not a suit against the official personally, for the real party in interest is the entity." *Graham*, 473 U.S. at 166. Simply put, a party cannot pursue a *Monell* claim against an officer in his individual capacity. Thus, to the extent that Plaintiff is attempting to assert a *Monell* claim against the defendant officers in their individual capacities, this cause of action is not cognizable.

In addition, Plaintiff's response states that count seven was improperly titled, that the claim is intended to be a deliberate indifference claim against the individual officers, and that she only seeks to pursue a *Monell* claim against the City. (R. 65, Resp. at 5.) Thus, to the extent that count seven could ever be construed as a *Monell* claim against the officers in their official capacities, Plaintiff has disavowed the claim. [2]

#### B. Deliberate Indifference Claim Against Officers in Their Individual Capacities

**\*4** Defendants argue that even if count seven is improperly titled, "[i]t is unclear if a cause of action called 'deliberate indifference' can be made against individuals." (R. 66, Reply at 2.) The Court is uncertain if Defendants' contention is that this cause of action does not exist at all or if they are arguing that Plaintiff has failed to state a claim for deliberate indifference against the officers in their individual capacities. As discussed below, any argument that a claim for deliberate indifference does not exist ignores decades of established case law. In addition, affording Plaintiff all favorable inferences, the Court determines that Plaintiff states a claim for deliberate indifference of a serious medical need against the three

officers on duty at the Harrison Police Station on the day of Haynie's death. However, to the extent that Plaintiff is asserting a claim for failure to provide adequate medical care against the two arresting officers in their individual capacities, Plaintiff's claim fails.

### 1. Officers Johnson, Philbin, and Banks

Section 1983 provides that a person may not be deprived of any constitutional right by an individual acting under color of state law. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). "The act authorizes claimants to sue persons in their individual capacities who are alleged to have violated such rights." *Id.* at 472-73. To state a claim for personal liability under Section 1983, a plaintiff must allege that the defendant was personally involved in the deprivation of his constitutional rights. *Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008) ("A plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions." (citation and internal quotation marks omitted)). In other words, "[t]he individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (citation and internal quotation marks omitted).

The Fourteenth Amendment prohibits deliberate indifference to the serious medical needs of pretrial detainees. *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (jailers have a duty to provide adequate medical care to prisoners); *Riley v. Kolitwenzew*, 526 Fed.Appx. 653, 656 (7th Cir. 2013) (concluding pretrial detainee adequately alleged claim for deliberate indifference to a serious medical need). [3] Deliberate indifference under either the Eighth or Fourteenth Amendments has both an objective and a subjective element: an inmate must allege facts showing that he suffered from an objectively serious medical condition and that jail personnel acted with deliberate indifference to that condition. *Townsend v. Cooper*, 759 F.3d 678, 689 (7th Cir. 2014); *Estate of Gee ex rel. Beeman v. Johnson*, 365 Fed.Appx. 679, 683 (7th Cir. 2010); *see also Soto v. Jefferson*, No. 13 C 4561, 2015 WL 4478163, at *2 (N.D. Ill. July 22, 2015) ("Claims of deliberate indifference to a serious medical need of a pretrial detainee under the Fourteenth Amendment use the same standard for deliberate indifference to a serious medical need applied to Eighth Amendment claims for convicted prisoners."). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). With respect to the subjective component of the deliberate indifference test, a plaintiff must allege that the defendant was aware of and consciously disregarded his medical need. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle*, 429 U.S. at 103-04. "This subjective standard requires more than negligence, and it approaches intentional wrongdoing." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). If a plaintiff successfully pleads that a "defendant had knowledge of and consciously disregarded a serious risk," the plaintiff also "succeeds in alleging the personal involvement of the individual defendant by virtue of the fact that those elements are subjective in nature." *Crockwell v. Dart*, No. 13 C 4880, 2013 WL 6796788, at *3 (N.D. Ill. Dec. 23, 2013) (emphasis omitted).

**\*5** Thus, contrary to Defendants' unsupported contention, a plaintiff may state a cause of action pursuant to Section 1983 for deliberate indifference to a serious medical need against custodial officers in their individual capacities. *See, e.g., Riley*, 526 Fed.Appx. at 656-57 (pretrial detainee adequately alleged that defendant had notice of the detainee's medical need, delayed necessary medical treatment and, as a result, needlessly prolonged his pain); *Thomas ex rel. Smith v. Cook Cty. Sheriff*, 401 F. Supp. 2d 867, 873 (N.D. Ill. 2005) ("[Plaintiff] has sufficiently ... alleg[ed] that each individual defendant was aware of [the decedent's] serious medical needs and displayed deliberate indifference to them by failing to take adequate steps to protect him."); *Crockwell*, 2013 WL 6796788, at *3 ("A jail official may be named as a defendant in his or her individual capacity in a § 1983 claim when the official personally participated in or had knowledge of the types of acts or omissions that form the basis of the claim.").

While Defendants do not address whether Plaintiff has alleged all elements of a deliberate indifference claim, the Court will nonetheless consider whether Plaintiff has stated a cause of action for deliberate indifference against Officers

Johnson, Philbin, and Banks. First, there can be no question that Haynie suffered from an objectively serious medical condition—Haynie died within twenty-four hours of being taken into police custody. (R. 58, Sixth Am. Compl. at 6.)

Next, the Court moves to the subjective culpability inquiry. Plaintiff must allege that the defendant officers acted with deliberate indifference to Haynie's condition, i.e. that the officers failed to take reasonable measures to address the medical condition despite subjectively knowing that the inmate faced a substantial risk of serious harm. *Farmer*, 511 U.S. at 834; *Townsend*, 759 F.3d at 689. Plaintiff alleges sufficient facts to plausibly suggest that the three defendant officers who were on duty at the Harrison Police Station were aware of Haynie's medical condition and that these officers were deliberately indifferent to Haynie's medical condition. Specifically, Plaintiff alleges that Officers Johnson, Philbin, and Banks were "the lock up keepers" at the time Haynie was in custody at the Harrison Police Station. (R. 58, Sixth Am. Compl. at 4.) Plaintiff alleges that these three officers "[f]ailed to adequately screen or assess ... [Haynie's] health situation." (*Id.* at 16.) In addition, Plaintiff alleges that Haynie told these officers that he was in medical distress and needed assistance but these officers "refused to ensure that [Haynie] received timely medical attention." (*Id.* at 6, 15-16.) Plaintiff also alleges that other detainees at the Harrison Police Station told officers that Haynie was having trouble breathing, that his condition was worsening, and that he needed medical assistance. (*Id.* at 5-6, 16.) Plaintiff further alleges that not only were Haynie's calls for help ignored, but in response to a plea for assistance, he was told by an officer to "shut the fuck up and lie down." [4] (*Id.* at 17.) Thus, Plaintiff alleges more than enough specific facts to establish that the officers' conduct constituted an "unreasonable and deliberate indifference to [Haynie's] serious medical needs." (*Id.* at 16.)

**\*6** When construed in the light most favorable to Plaintiff, it is plausible that these three officers knew of Haynie's serious medical condition, disregarded the risk, and failed to assist Haynie. These allegations sufficiently put these three defendant officers on notice of Plaintiff's Section 1983 claim. Therefore, the Court denies Defendants' request to dismiss count seven of Plaintiff's sixth amended complaint as to Officers Johnson, Philbin, and Banks in their individual capacities. [5]

### 2. Officers Del Valle and Friedlieb

Plaintiff also alleges that arresting Officers Del Valle and Friedlieb failed to obtain necessary medical care for Haynie following his arrest. (*Id.* at 15.) However, this claim fails.

A claim for failure to provide medical care to an arrestee under the Fourth Amendment is governed by an objectively unreasonable standard. *Ortiz v. City of Chi.*, 656 F.3d 523, 530 (7th Cir. 2011); *Williams*, 509 F.3d at 403. "To state a claim based on an arrestee's medical needs, the plaintiff must allege facts sufficient to infer that the defendant acted unreasonably in light of the notice given to the defendant of the plaintiff's medical needs, the seriousness of those needs, the scope of the requested treatment, and the police interests at stake." *Klein v. Curran*, No. 13 CV 5191, 2014 WL 5023486, at *3 (N.D. Ill. Oct. 7, 2014); *see also Ortiz*, 656 F.3d at 530.

Aside from alleging that Officers Del Valle and Friedlieb arrested Haynie and transported him to the Harrison Police Station, (R. 58, Sixth Am. Compl. at 4), Plaintiff provides no factual content to support a claim that these two officers were involved in depriving Haynie of medical care. For example, as opposed to the pleas made by Haynie and other detainees to the officers while in detention at the Harrison Police Station, Plaintiff does not allege that Haynie requested medical assistance at the time of his arrest. In addition, as opposed to the allegations that Haynie was having trouble breathing and that his condition was deteriorating while in detention, there are no allegations that Haynie was actually suffering any medical distress at the time he was arrested and transported to the Harrison Police Station. Simply put, there are no allegations from which the Court can plausibly infer that at the time of Haynie's arrest, Officers Del Valle and Friedlieb were on notice of Haynie's medical distress or that he even had a need for medical assistance at the time of arrest.

In addition, Plaintiff oftentimes improperly lumps together all of the defendant officers with a complete disregard as to which officers were the arresting officers and which officers were on duty at the Harrison Police Station. Plaintiff explicitly states that Officers Del Valle and Friedlieb arrested and transported Haynie, and Officers Johnson, Philbin, and Banks were the "lock up keepers on duty during [Haynie's] lock up." (*Id.* at 4.) Despite this clear distinction in roles, Plaintiff repeatedly combines all of the five defendant officers together in the alleged wrongdoing. (*Id.* at 3-7.) Based on Plaintiff's own allegations, it is not plausible that Officers Del Valle and Friedlieb were at the Harrison Police Station at the time that Haynie and other pretrial detainees were requesting medical assistance while Haynie was in detention and subsequently failed to provide medical assistance. *See, e.g., Klein*, 2014 WL 5023486, at *3 (dismissing claim against arresting officers for deprivation of medical care when the complaint alleged that the plaintiff told unknown officers that he was feeling ill, but did "not allege that [the arresting officers] ... had anything to do with that aspect of [the plaintiff's] detention").

**\*7** Ultimately, Plaintiff fails to allege any factual content that establish that Officers Del Valle and Friedlieb were objectively unreasonable in failing to provide medical care for Haynie. Likewise, there are no substantive allegations sufficient to show the necessary personal involvement to establish individual liability against these two officers under Section 1983. *See Grieveson*, 538 F.3d at 776. As such, to the extent that count seven may be construed as a claim for disregard of a medical need under Section 1983 against Officers Del Valle and Friedlieb in their individual capacities, that claim is dismissed with prejudice.

## II. Count Eight Against the City

Count eight of the sixth amended complaint is a *Monell* claim against the City and alleges that the City "failed to meet its constitutional obligation to maintain and provide continuing adequate and appropriate medical care and treatment" to Haynie. (R. 58, Sixth Am. Compl. at 17.) The City moves to dismiss the Section 1983 claim arguing that Plaintiff has failed to properly allege a viable claim under *Monell*. (R. 60, Mot. at 3-8.)

Under *Monell*, "[l]ocal governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. In order for liability to attach under *Monell*, a plaintiff must allege that a local government *itself* caused or participated in the deprivation of his or her rights. *Id.* at 694. A plaintiff's *Monell* claim against a municipality is proper "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *League of Women Voters of Chi. v. City of Chi.*, 757 F.3d 722, 727 (7th Cir. 2014) (quoting *Monell*, 436 U.S. at 694). A municipality may be liable for a Section 1983 violation in one of three ways:

> (1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a wide-spread practice that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with final decision policymaking authority.

*Johnson v. Cook Cty.*, 526 Fed.Appx. 692, 695 (7th Cir. 2013) (citation and internal quotation marks omitted). While there is no heightened pleading standard for *Monell* claims, *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007), legal conclusions and conclusory allegations are not enough. *Iqbal*, 556 U.S. at 679.

Plaintiff does not allege the existence of an express policy that caused Haynie's constitutional deprivation nor does she allege that Haynie's death was directly caused by a person with final policymaking authority. Thus, the only way Plaintiff may assert a Section 1983 claim for deliberate indifference to a medical need against the City is by alleging a widespread practice "so permanent and well-settled that it constitutes a custom or practice." *Sims*, 506 F.3d at 515. The Seventh

Circuit has declined to "adopt any bright-line rules defining a 'widespread custom or practice,'" but to allege a widespread practice a plaintiff must state that the city policymakers were "deliberately indifferent as to [the] known or obvious consequences" of the alleged practice. *Thomas v. Cook Cty. Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2009) (alteration in original). In order for a plaintiff to prevail on a deliberate indifference claim in this context, the municipality or city official "must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.* In addition, a plaintiff pursuing a widespread practice claim generally must allege more than one, and sometimes more than three, instances of misconduct. *Id.* This requirement is intended to "demonstrate that there is a policy at issue rather than a random event." *Id.* Finally, a plaintiff must also allege causation—specifically, that the policy or custom was the "moving force" behind the constitutional violation. *Sims,* 506 F.3d at 514; *see also Johnson,* 526 Fed.Appx. at 695.

**\*8** While far from a model of clarity, the sixth amended complaint appears to challenge four policies or practices that result in the deliberate indifference to pretrial detainees' medical needs. First, Plaintiff alleges that the City has a widespread practice of providing inadequate medical care. (R. 58, Sixth Am. Compl. at 17-18.) Second, Plaintiff alleges that the City fails to train officers to adequately respond to "inmates in need of urgent medical treatment" and that this failure to train "cause[s] routine delays of medical treatment to inmates." (*Id.* at 18.) Third, Plaintiff alleges that the City encourages future abuses by not disciplining employees who have engaged in misconduct that resulted in inadequate medical treatment for inmates. (*Id.* at 18.) Finally, Plaintiff alleges that "despite being aware of... the seriousness of medical issue[s] faced by some detainees at its police facilities," the City has a practice of not maintaining cameras and surveillance equipment located at the Harrison Police Station. (*Id.* at 20.)

In support of her claim that the City maintained a series of widespread practices that result in the deliberate indifference to pretrial detainees' medical needs, Plaintiff cites to the fact that eight other inmates have died at the Harrison Police Station between 2007 and 2015. [6] (*Id.* at 18-20.) Plaintiff indicates that three of these deaths were the result of suicide, three deaths were attributed to drug overdoses, one death was due to cardiac dysrhythmia, and one death was due to pulmonary disease. (*Id.*) The sixth amended complaint does not include the cause of Haynie's death; however, the City indicates that Haynie died of a drug overdose. (R. 60, Mot. at 4; *see also* R. 65-1, City's Answer to Pl.'s Suppl. Interrogs. at 3.) Aside from the fact that these deaths are attributed to a wide array of causes, Plaintiff fails to allege any factual content that plausibly suggest that these deaths were the result of the City's widespread practices of officers failing to provide medical attention, failing to train officers, failing to punish officers when an inmate suffered a medical emergency, or failing to maintain operable surveillance equipment. Plaintiff alleges no factual matter to establish that the circumstances surrounding any of these inmates' deaths are similar. For example, Plaintiff alleges in conclusory terms that another detainee, Victor Flores, committed suicide by hanging following statements that he wanted to "jump off a roof and hurt himself." (R. 58, Sixth Am. Compl. at 19.) However, there is nothing in the complaint that plausibly suggests that the circumstances surrounding Haynie's death and Flores's death are comparable. In addition, for at least five of the deaths, Plaintiff merely states the name of the inmate, the date of the inmate's death, and the cause of death, with no other explanatory details. (*Id.* at 20.) The Court is left to guess as to how these deaths—which have occurred at a jail that has housed likely thousands of detainees between 2007 and 2015—can be attributed to any of the widespread practices that Plaintiff attempts to allege. Moreover, these deficiencies are even more glaring considering the fact that Plaintiff has already conducted discovery regarding inmate deaths at the Harrison Police Station.

**\*9** While these tragic deaths are unfortunate, there are no allegations that these deaths and Haynie's death share substantive similarities. Simply put, the conclusory reliance on other deaths between 2007 and 2015 at the Harrison Police Station does not establish the possibility that the City's alleged widespread practices are so well-settled that they amount to an unconstitutional custom or policy. *See, e.g., Estate of Moreland v. Dieter,* 395 F.3d 747, 760 (7th Cir. 2005) (concluding that there was nothing to indicate a violation of a jail policy and that three alleged incidents did not amount to a widespread practice that was so well-settled so as to constitute an unconstitutional custom); *Henderson v. City of Chi.,* No. 14 C 1164, 2015 WL 1954464, at \*2 (N.D. Ill. Apr. 29, 2015) (conclusory allegations about three allegedly unconstitutional incidents found insufficient to state a *Monell* claim); *Winchester v. Marketti,* No. 11 CV 9224, 2012 WL

2076375, at *4 (N.D. Ill. June 8, 2012) ("What is fatal to the *Monell* claims, however, is that Plaintiff makes no attempt to plead a pattern of similar constitutional violations with any degree of factual specificity.").

Plaintiff's failure-to-train allegations also do not pass muster because they are boilerplate and lack any supporting facts. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). This is a difficult claim to make: "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of the persons with whom the [untrained employees] come into contact." *Id.* (citation and internal quotation marks omitted). The sixth amended complaint has no allegations to this effect. At no point does Plaintiff attempt to articulate what specific training was lacking. *See Hardy v. Wexford Health Sources, Inc.*, No. 12-CV-6554, 2015 WL 1593597, at *14 (N.D. Ill. Apr. 2, 2015) ("Absent allegations of what training or staffing was lacking and how that deficiency impacted Hardy's health or that of his fellow inmates, Hardy has failed to state a claim for deliberate indifference due to a failure to train and a failure to provide adequate staffing."). The sixth amended complaint also fails to allege factual content that would support an inference that the improper conduct and constitutional deprivation was caused, at least in part, by lack of training. *See Maglaya v. Kumiga*, No. 14-CV-3619, 2015 WL 4624884, at *5 (N.D. Ill. Aug. 3, 2015) ("In addition to failing to provide any factual support to sustain this allegation, Plaintiffs also fail to plead how this alleged failure to train officers was the moving force behind Plaintiffs' constitutional harm."). The Court cannot reasonably infer that a failure to train the officers caused Haynie's constitutional injuries based upon the factual allegations in the sixth amended complaint. *See, e.g., Suber v. City of Chi.*, No. 10 C 2876, 2011 WL 1706156, at *4 (N.D. Ill. May 5, 2011) (dismissing *Monell* claim when the "complaint [was] devoid of any plausible allegations about how Defendants failed to train their police officers despite foreseeable consequences and/or repeated complaints of constitutional violations").

Plaintiff's allegations of a failure to discipline are also boilerplate and lacking in detail. The sixth amended complaint contains no allegations that could plausibly demonstrate that the City has a widespread practice of failing to discipline officers when a pretrial detainee suffers a medical emergency and it is determined that the officers did not adequately respond. Plaintiff never articulates what the City's actual practice is for disciplining officers that engage in the misconduct that allegedly occurred at the Harrison Police Station. In addition, Plaintiff does not allege a single instance in which the City condoned similar behavior by officers at the Harrison Police Station by either promoting an officer or not disciplining the officer despite punishment being warranted. *See, e.g., Starks v. City of Waukegan*, No. 09 C 348, 2013 WL 5874563, at *2 (N.D. Ill. Oct. 31, 2013) (allowing failure to train claim to proceed where plaintiff alleged pattern of nine similar constitutional violations that small municipality exacerbated by promoting instead of disciplining officers who were responsible for violations). Plaintiff succeeds in repeating all of the trigger words required of a *Monell* claim but absolutely no factual content to demonstrate a widespread practice of failing to adequately punish prior instances of similar misconduct. *See, e.g., Harris v. Kruger*, No. 13-CV-8584, 2015 WL 300497, at *5 (N.D. Ill. Jan. 22, 2015) (dismissing *Monell* claim when plaintiff alleged that "as a matter of... practice, the CPD facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instance[s] of similar misconduct, thereby leading CPD officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses" but "nowhere allege[d] what is the policy or practice, only that the policy results in misconduct").

**\*10** Finally, Plaintiff's allegation that the City maintained a widespread practice of failing to have functioning cameras located in and around the Harrison Police Station also fails. Critically, Plaintiff does not allege that the widespread practice of not repairing surveillance equipment was the proximate cause of Haynie's constitutional deprivation. While Plaintiff conclusively states that the City knew that the cameras at the Harrison Police Station "were inoperable" and that the failure to have working cameras resulted in inadequate monitoring of detainees and employees alike, (R. 58, Sixth Am. Compl. at 19), this is not the same as an allegation that the widespread practice of having inoperable cameras was what caused the deliberate indifference to Haynie's medical needs. Notably, Plaintiff explicitly alleges that the officers were told numerous times by multiple detainees that Haynie needed assistance but that these officers ignored the pleas.

(*Id.* at 5, 6, 17.) There are no allegations that Haynie's condition was ignored and not attended to because of inoperable surveillance cameras. Ultimately, even if Plaintiff alleged sufficient facts to demonstrate a widespread practice of failing to maintain surveillance cameras, Plaintiff has stated no facts or allegations to support an inference that such a practice could have been the "moving force" behind Haynie's death. *Sims,* 506 F.3d at 514; *Johnson v. Cook Cty.,* No. 11 CV 3203, 2011 WL 6009614, at *2 (N.D. Ill. Nov. 29, 2011) ("Plaintiff has failed, however, to allege the causation element of his *Monell* claim. ... Nothing in the complaint permits the court to draw a reasonable inference that defendant caused plaintiff to be ... assaulted.").

In light of the above, the Court grants Defendants' motion to dismiss count eight of the sixth amended complaint. Because Plaintiff has already taken discovery on this claim and after six iterations of her claims has yet to sufficiently state a *Monell* claim, Plaintiff's *Monell* claim against the City is dismissed with prejudice.

### III. State-Law Claims

The sixth amended complaint also alleges an array of state-law claims against the City. (R. 58, Sixth Am. Compl. at 10-12, 13, 14.) The City states that "[t]o the extent that Plaintiff intends these claims to be read as some form of either *respondeat superior* or indemnification, the City concedes these counts are sufficiently pled for the purpose of this motion." (R. 60, Mot. at 2; *see also id.* at 8.) However, the City argues that if Plaintiff is "implying that the City by its own actions might be liable, ... Plaintiff fails to state any basis for such claims anywhere in the Complaint." (*Id.* at 8.) Plaintiff does not respond to the City's contention and thus waives her claims to the extent that they seek to hold the City liable for its own actions. *See Citizens for Appropriate Rural Roads v. Foxx,* 815 F.3d 1068, 1078 (7th Cir. 2016) ("[B]y failing to respond in any way to any of the arguments advanced by Defendants ..., Plaintiffs have waived their claims."); *Green v. Charter One Bank, N.A.,* 640 F. Supp.2d 998 (N.D. Ill. 2009) (dismissing count from complaint where the plaintiff did not address the defendant's argument in its opposition, reasoning that "failure to respond permits an inference of acquiescence and 'acquiescence operates as a waiver.'") (quoting *Wojtas v. Capital Guardian Tr., Co.*, 477 F.3d 924, 929 (7th Cir. 2007)). Therefore, as this lawsuit continues, the Court will construe the state–law claims against the City as claims for indemnification and *respondeat superior* only.

### CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART AND DENIES IN PART Defendants' motion to dismiss (R. 60, Mot.). As to count seven, any *Monell* claim against the individual officers is DISMISSED with prejudice. In addition, count seven against arresting officers Del Valle and Friedlieb is DISMISSED with prejudice. As to count eight, the *Monell* claim against the City is DISMISSED with prejudice. The motion is denied in all other respects.

The parties shall appear for a status hearing on June 22, 2016, at 9:45 a.m. and shall be prepared to set firm deadlines in this long-pending lawsuit. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the status hearing.

**ENTERED:**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 2770880

Footnotes

1     While the sixth amended complaint is short on details surrounding Haynie's untimely passing and, specifically, the cause of his death, the City contends that Haynie died of a drug overdose. (*See* R. 60, Mot. at 4 ("Several of the deaths referenced are

not like Decedent's drug overdose."); R. 65-1, City's Answer to Pl.'s Suppl. Interrogs. at 3 ("Mark Haynie died at Mt. Sinai Hospital of an overdose after having been held at the 11th District lockup on July 13, 2011.").)

2      Plaintiff requests leave to amend the complaint "to more appropriately reflect" Plaintiff's position and "correct the section heading." (R. 65, Resp. at 5.) However, it is not necessary for Plaintiff to file a seventh amended complaint because the Court construes the current claim as a claim for deliberate indifference pursuant to Section 1983 against the defendant officers in their individual capacities.

3      The sixth amended complaint does not indicate whether the defendant officers' conduct at the Harrison Police Station occurred before Haynie was given a probable cause hearing pursuant to *Gerstein v. Pugh*, 420 U.S. 103 (1975). If Haynie's arrest was warrantless and the alleged events took place before Haynie was given a probable cause hearing, then Plaintiff's allegations of failure to provide medical care must be analyzed under the Fourth Amendment. "[T]he protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, [the Fourteenth Amendment's] due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction." *Lopez v. City of Chi.*, 464 F.3d 711, 719 (7th Cir. 2006). A claim for failure to provide medical care to an arrestee that is brought under the Fourth Amendment is governed by an "objectively unreasonable standard." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). The standard for establishing a Fourth Amendment medical-care claim is lower than that needed to establish deliberate indifference under either the Eighth or Fourteenth Amendments. *Id.* Because the sixth amended complaint gives no indication as to whether Haynie was arrested pursuant to a warrant or had received a *Gerstein* hearing, it is unclear whether the Fourth Amendment or Fourteenth Amendment governs count seven. However, because Plaintiff's claim against Officers Johnson, Philbin, and Banks is sufficient under the Fourteenth Amendment's more stringent deliberate indifference standard, Plaintiff's claim also passes muster under the Fourth Amendment's objectively unreasonable standard. *See id.* ("[T]he deliberate indifference standard under the Eighth and Fourteenth Amendments requires a higher showing on a plaintiff's part than is necessary to prove an officer's conduct was objectively unreasonable under the circumstances." (citation and internal quotation marks omitted)).

4      Plaintiff alleges that this remark was made by "an unidentified officer on duty" at the Harrison Police Station and does not specifically link Officers Johnson, Philbin, or Banks to this statement, (*id.* at 17); however, at the motion to dismiss stage, Plaintiff does not need to allege that level of detail. *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009); *see, e.g.*, *Warren ex rel. Warren v. Dart*, No. 09-cv-3512, 2010 WL 4883923, at *7 (N.D. Ill. Nov. 24, 2010) ("Although it is true that Plaintiffs' complaint does not explicitly parse which of the named Defendants were responsible for which of the above acts or omissions, that level of specificity is not required under federal notice pleading standards.").

5      Defendants also argue that count seven should be dismissed because it is "cumulative of the other claims in the complaint." (R. 66, Reply at 2.) Plaintiff asserts one other Section 1983 claim and that is against the City and not the individual officers. (R. 58, Sixth Am. Compl. at 17-22.) In addition, Plaintiff's other claims are based on Illinois common and statutory law. (*Id.* at 7-14.) Contrary to Defendants' contention, count seven against the individual officers is not duplicative of other claims in the complaint.

6      With no citation to authority, Defendants argue that the Court cannot consider any deaths that occurred after Haynie's death because they "are not probative as to what policies may have been in place prior to Decedent's death." (R. 60, Mot. at 4.) However, Plaintiff cites to these additional deaths to support her allegation that the City's practices "have remained consistent" through the recent years. (R. 58, Sixth Am. Compl. at 20.) In light of Plaintiff's allegations of an ongoing practice and Defendants failure to point to case law to the contrary, the Court will consider the deaths that occurred after Haynie's when determining whether Plaintiff has sufficiently alleged a widespread practice in support of her *Monell* claim.

---

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 6082354
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Patrick Karney, Plaintiff,

v.

City of Naperville; T.J. Boogerd; Matt Fletcher; and John Doe Officer #3, Defendant.

Case No: 15 C 4608
|
Signed 10/18/2016

**Attorneys and Law Firms**

Andre Paul Gaston, The Law Offices of Andre P. Gaston, Oakbrook, IL, for Plaintiff.

Robert R. Wilder, City of Naperville, Naperville, IL, for Defendant.

**Opinion**

### MEMORANDUM OPINION AND ORDER

Thomas M. Durkin, United States District Judge

**\*1** Plaintiff Patrick Karney fell asleep in his car in the parking lot of a McDonald's restaurant in the City of Naperville sometime before midnight on May 25, 2013. He alleges that his constitutional rights were violated in connection with his arrest in the early morning hours of May 26, 2013, after he was awakened and questioned by Naperville police officers T.J. Boogerd and Matt Fletcher. Karney filed the Original Complaint, R. 1, on May 26, 2015, and the First Amended Complaint, R. 10-1, on August 6, 2015. By memorandum opinion and order dated October 22, 2015, the Court substituted the City of Naperville as the defendant in place of the Naperville Police Department, and then granted in part and denied in part with leave to replead the "Rule 12(b)(6) Motion to Dismiss," R. 13, filed by the City on September 4, 2015. *See* R. 23 (*Karney v. City of Naperville,* 2015 WL 6407759 (N.D. Ill. Oct. 22, 2015)) (the "October 22, 2015 Order"). Plaintiff filed the Second Amended Complaint on November 20, 2015. R. 46. On December 4, 2015, the City filed a "Rule 12(b)(6) Motion to Dismiss and Rule 12(f) Motion to Strike." R. 29. On December 18, 2015, Officer Boogerd filed a "Rule 12(b)(5) and 12(b)(6) Motion to Dismiss," R. 32, and, on December 21, 2015, Officer Fletcher filed an "Amended Rule 12(b)(6) Motion to Dismiss," R. 33. By docket entry dated September 30, 2016, the Court denied Defendants' motions. R. 47. By docket entry dated the same day as this memorandum opinion and order, the Court has vacated the September 30 docket entry insofar as it denied Officer Boogerd's motion to dismiss Count Four of the Second Amended Complaint and in its place has granted dismissal as to Count Four instead. The Court now sets forth in this memorandum opinion and order the reasons for the September 30 order and the order entered today that partially vacates the September 30 order.

### BACKGROUND

The facts as alleged in the Second Amended Complaint will not be repeated here as they are nearly identical to the facts alleged in the First Amended Complaint. Those facts are set forth in the Court's October 22, 2015 Order. The only

exception are two additional factual allegations in support of Plaintiff's *Monell* claim against the City, which the Court will discuss when addressing the City's motion to dismiss.

## DISCUSSION

### A. OFFICER BOOGERD'S MOTION TO DISMISS

Officer Boogerd raises a number of issues in his motion to dismiss. The Court will address each of these in turn.

### 1. SERVICE OF PROCESS

Officer Boogerd first argues that Plaintiff's claims against him should be dismissed pursuant to Fed. R. Civ. P. 12(b)(5) for failure to serve process within 120 days after the complaint was filed. *See* Fed. R. Civ. P. 4(m). [1] Plaintiff filed this suit on May 26, 2015. Therefore, Officer Boogerd argues, Plaintiff should have served him on or before September 23, 2015, which he failed to do. Boogerd contends that Plaintiff cannot show good cause for his failure to effect timely service on him, and that Plaintiff's claims against him therefore should be dismissed.

**\*2** The Court rejects Officer Boogerd's service of process argument for two reasons. First, Officer Boogerd uses the date on which this action was filed, May 26, 2015, for the date on which the 120-day period was triggered. But Officer Boogerd was not named as a defendant in the Original Complaint. Instead, Officer Boogerd was first named as a defendant on August 6, 2015, when Plaintiff filed the First Amended Complaint. [2] Pursuant to Rule 4(m), Plaintiff had 120 days from August 6, 2015 to serve Officer Boogerd, which means he had until December 4, 2015. Plaintiff served Officer Boogerd with a waiver of service of summons, Fed. R. Civ. P. 4(d), on October 23, 2015. *See* R. 32-1 at 3. Boogerd's attorney executed the waiver of service on November 3, 2015, and Plaintiff filed it with the Court on November 4, 2015. *See* R. 25. Plaintiff thus obtained service of process over Officer Boogerd on November 4, 2015. *See* Fed. R. Civ. P. 4(d)(4) ("When the plaintiff files a waiver, proof of service is not required and these rules apply as if a summons and complaint had been served at the time of filing the waiver."). As a result, Plaintiff obtained service over Officer Boogerd prior to the December 4, 2015 deadline. [3]

Second, even if the time for service expired before Plaintiff served Officer Boogerd, the Court still would reject Boogerd's service of process argument. The pre-amendment version of Rule 4(m) states:

> If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Boogerd argues that Plaintiff cannot establish "good cause" for an extension under Rule 4(m), and contends that the Seventh Circuit has "counseled against retroactive extensions of time where a plaintiff's failure to serve a defendant is caused by his lack of diligence." R. 32-1 at 4 (citing *Dumas v. Decker,* 556 Fed.Appx. 514, 515 (7th Cir. 2014)). But the Court need not decide whether Plaintiff can show good cause for failing to effect service within the 120-day period because Rule 4(m) preserves the Court's discretion to extend the deadline for service of process even without a showing of good cause. *See* *Troxell v. Fedders of N. Am., Inc.,* 160 F.3d 381, 383 (7th Cir. 1998) ("Even if a plaintiff does not establish good cause, the district court may in its discretion grant an extension of time for service."). As the advisory notes explain, Rule 4(m) "authorizes the court to relieve a plaintiff of the consequences of an application of this subdivision even if there is no good cause shown. Such relief ...may be justified, for example, if the applicable statute of limitations would

bar the refiled action, or if the defendant is evading service or conceals a defect in attempted service." Fed. R. Civ. P. 4, advisory committee notes, 1993 amendment, *Subdivision (m)*. [4]

**\*3** "[D]istrict courts are permitted to take factors like a statute of limitations bar, prejudice to the defendant, actual notice of a lawsuit, and eventual service into account" in deciding whether to exercise discretion to allow relief from the 120-day rule. *Troxell*, 160 F.3d at 383**f**; *see United States v. McLaughlin*, 470 F.3d 698, 701 (7th Cir. 2006) (noting the "wisdom of Rule 4(m) in allowing a judge to excuse a delay in service even if the plaintiff has no excuse at all"). Officer Boogerd argues that the only factor the Court should consider is whether Plaintiff exercised due diligence in attempting to serve him. But even if the Court were to resolve in favor of Boogerd all factual disputes presented by the parties in their briefing concerning Plaintiff's counsel's diligence (or, in Boogerd's view, lack thereof), the Court still can exercise its discretion to grant an extension in Plaintiff's favor. Although a district court is not required to excuse untimely service, the Seventh Circuit expects most district courts to consider the balance of hardships when determining whether to dismiss a complaint for lack of timely service. As the Seventh Circuit has explained:

> Where as in this case the defendant does not show any actual harm to its ability to defend the suit as a consequence of the delay in service, where indeed it is quite likely that the defendant received actual notice of the suit within a short time after the attempted service, and where moreover dismissal without prejudice has the effect of dismissal with prejudice because the statute of limitations has run since the filing of the suit * * * most district judges probably would exercise lenity and allow a late service, deeming the plaintiff's failure to make timely service excusable by virtue of the balance of hardships.

*Coleman v. Milwaukee Bd. of Sch. Directors*, 290 F.3d 932, 934 (7th Cir. 2002).

The Court concludes that the balance of hardships in this case tips in favor of excusing late service, even if Plaintiff's counsel acted less than diligently (which the Court does not decide here). Plaintiff's delay in serving Boogerd was not so great that the Court can infer any actual harm to his ability to defend this suit, and in fact Boogerd has not argued that he suffered any prejudice. "When delay in service causes zero prejudice to the defendant or third parties (or the court itself), the granting of extensions of time for service, whether before or after the 120–day period has expired, cannot be an abuse of discretion." *McLaughlin*, 470 F.3d at 701. Moreover, it is likely that Officer Boogerd received actual notice of the suit within a short time after the case was filed because Plaintiff served the Naperville Police Department [5] and the same attorney representing the City (originally named as the Naperville Police Department) also is representing Officer Boogerd. The service issue will not cause any further delay in the case because Plaintiff successfully obtained service over Boogerd a little over a month after the 120-day deadline. Finally, dismissal without prejudice pursuant to Rule 4(m) in this case would have the effect of dismissal with prejudice because the statute of limitations ran after Plaintiff filed suit and before Plaintiff served Boogerd. The consequences for Plaintiff if the Court does not allow an extension far outweigh the prejudice to Officer Boogerd if an extension is granted. Given the judicial preference for adjudication on the merits rather than a procedural default, the Court will exercise its discretion to allow the late service (as an alternative to finding that service was timely).

## 2. FALSE ARREST CLAIM

Officer Boogerd next argues that Plaintiff's § 1983 claim predicated on a false arrest (Count One) should be dismissed because Plaintiff has failed to plausibly allege he was arrested without probable cause. "Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). Plaintiff alleges facts that would support a claim that Officer Boogerd lacked probable cause to arrest him for driving under the influence of alcohol, and Officer Boogerd appears to concede as much. *See* R. 32-1 at 6 ("Plaintiff's allegations might support a claim that an arrest for DUI-Alcohol was without probable cause"). But

Boogerd also says that while it is "true" that "there was no probable cause to arrest Plaintiff for driving while impaired by alcohol," it "is also completely irrelevant," R. 41 at 6, because Plaintiff was not arrested for driving under the influence of alcohol. Instead, Boogerd claims, Plaintiff was arrested for driving while under the influence of drugs and for driving on a suspended driver's license. *Id.*

**\*4**  The complaint alleges that the police officers told Plaintiff he was under arrest for suspicion of driving while under the influence of alcohol. R. 46 at 5 (¶ 34). [6]  Boogerd asks the Court to make a factual finding contrary to this allegation, namely, that the reasons for Plaintiff's arrest was suspicion of driving while under the influence of drugs and driving with a suspended license. He attaches to his motion to dismiss certain documents to prove that Plaintiff was charged with these two offenses, which he asks the Court to judicially notice. The documents include state court documents showing that Plaintiff was charged with driving under the influence of drugs and driving without a valid license. In addition, Boogerd attaches a copy of Plaintiff's driving record generated by the Illinois Secretary of State, which Boogerd contends shows that Plaintiff did not have a valid license or permit at the time of his arrest.

It may very well be, as Officer Boogerd contends, that the documents in question establish what Boogerd say they do and that the Court can in fact take judicial notice of them. But even so, the documents do not definitively establish the reasons for which Plaintiff was arrested, and, more to the point, they do not establish as a matter of law that Boogerd had probable cause to arrest Plaintiff.

To begin with, Officer Boogerd does not explain why it makes any difference that Plaintiff might have been arrested for driving while under the influence of drugs rather than for driving while under the influence of alcohol. The complaint alleges that the only facts known to the arresting officers on which they based their belief that Plaintiff had operated a motor vehicle while under the influence were the facts that he was sleeping in his car and sweating. R. 35 at 4. If Boogerd concedes, as he does, that these facts are insufficient to establish probable cause for an arrest for driving under the influence of alcohol, then he also must concede that these facts are insufficient to establish probable cause for an arrest for driving under the influence of drugs. Plaintiff's allegations plausibly suggest that there was nothing about his demeanor, behavior, or conduct that would have given the officers probable cause to conclude that Plaintiff was under the influence of anything, whether alcohol or drugs, on the night of his arrest.

Boogerd also ignores facts alleged in the complaint that support the conclusion that he lacked probable cause to arrest Plaintiff for driving without a valid drivers license, even if one assumes that Plaintiff in fact did not have a valid drivers license. The complaint alleges that the arresting officers asked Plaintiff for his drivers license, that Plaintiff heard one of the officers "run" his name over the radio to validate information, and that Plaintiff overheard a voice on the other end of the radio state "he's clear." R. 46 at 4-5. Even if, as Boogerd contends, Plaintiff did not have a valid drivers license, that fact would not be relevant to the probable cause issue if Boogerd believed otherwise at the time. *See Williams v. Rodriguez*, 509 F.3d 392, 399 (7th Cir. 2007) (probable cause determination turns on the information known to the arresting officer at the time of the arrest). Indeed, the very case cited by Officer Boogerd (R. 32-1 at 7)—*Dyson v. Village of Midlothian*, 2014 WL 584900 (N.D. Ill. Feb. 14, 2014)—makes this point. In *Dyson*, the plaintiff alleged that the arresting officer pulled his car over though the officer had no reason to believe that the plaintiff had committed or was committing a crime, that the officer asked the plaintiff for his driver's license, which the plaintiff provided, and that the officer then handcuffed the plaintiff and took him to the police station where he was issued tickets for, among other things, driving without a license. *Id.* at *1. The plaintiff brought suit under § 1983 alleging false arrest. The officer argued on a motion to dismiss that the plaintiff could not allege that the officer lacked probable cause to arrest him "because records from the Illinois Secretary of State establish that [the] plaintiff's driver's license was suspended on the day he was arrested for driving without a license." *Id.* The court rejected this argument because "[t]he records do not...establish that [the officer] *knew* [the] plaintiff's license was suspended, the touchstone of probable cause." *Id.* (emphasis added). Moreover, the court said, "though [the] plaintiff alleges that he gave [the arresting officer] his driver's license, he does not allege that [the arresting officer] took the license back to his squad car or any other fact from which we can infer that [the arresting officer] checked whether [the] plaintiff's license was valid." *Id.* (citation omitted).

**\*5**  Here, like in *Dyson*, the documents attached to Officer Boogerd's motion to dismiss do not establish that Officer Boogerd *knew* that Plaintiff's license was invalid at the time he arrested Plaintiff in the McDonald's parking lot. Having cited *Dyson* in support of his argument for dismissal, Officer Boogerd then attempts to distinguish that case by arguing that, unlike the allegations there, this case includes the allegation that Plaintiff gave Officer Boogerd his license *and* that Officer Boogerd " 'r[a]n[ ] Plaintiff's name over the radio to validate [the] information.' " R. 32-1 at 7 (quoting paragraph 24 of Second Amended Complaint). While this is true, Officer Boogerd ignores the further allegation that Plaintiff "overhear[d] a lady on the other end of the radio state, 'he's clear.' " R. 27-1 at 5 (¶ 25). This allegation raises a disputed issue of fact as to what Officer Boogerd knew about Plaintiff's license at the time the arrest took place in the McDonald's parking lot. The Court cannot resolve that factual issue on a motion to dismiss.

### 3. UNLAWFUL *TERRY* STOP CLAIM

Officer Boogerd next argues that Plaintiff's § 1983 claim predicated on an unconstitutional investigatory stop (Count Two) should be dismissed because Plaintiff has failed to plausibly allege he was detained without reasonable suspicion. An "investigatory," also known as a *Terry*,[7] stop

> complies with the Fourth Amendment if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime. The officers initiating the investigatory stop must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, suggest criminal activity. [I]narticulate hunches will not suffice. However, [r]easonable suspicion is a lower threshold than probable cause and considerably less than preponderance of the evidence....This is an objective standard, based upon the facts available to the officers at the moment of the seizure.

*United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (internal quotations and citations omitted).

Officer Boogerd argues that Plaintiff's § 1983 claim based on lack of reasonable suspicion to conduct an investigatory stop is not plausible because Plaintiff was found in the parking lot of a McDonald's restaurant at 3:30 a.m. sleeping behind the wheel of a running motor vehicle. R. 41 at 7. But the two cases cited by Boogerd demonstrate that these facts establish no more than that it was reasonable for the police officers, acting in their community caretaking function, to wake Plaintiff up to check on his status. *See People v. Robinson*, 859 N.E.2d 232, 243 (Ill. App. 2006) (police officer "was acting as a 'community caretaker' by awakening defendant and then asking defendant to produce identification outside of defendant's vehicle"); *People v. Carlson*, 716 N.E.2d 1249, 1251-52 (Ill. App. 1999) (defendant's initial encounter with police officer who approached his parked car, awoke him from sleep, and requested that he step outside and show his driver's license, did not rise to the level of a *Terry* stop but instead was within the officer's community caretaking function).

While *Robinson* and *Carlson* establish that the police officers' initial interaction with Plaintiff might not have violated the Fourth Amendment,[8] the validity of that initial interaction does not insulate the officers' conduct thereafter from further constitutional scrutiny. The question is whether the interaction, though lawfully initiated under the community caretaking doctrine, later "exceeded its lawful purpose and ripened into a de facto" (*Ruiz*, 785 F.3d at 1143) unconstitutional *Terry* stop. *See Best v. Berard*, 837 F. Supp. 2d 933, 939 (N.D. Ill. 2011) (" '[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.' A 'detention following a traffic stop, like any seizure, must satisfy the Fourth Amendment's requirement of reasonableness.' ") (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), and *United States v. McBride*, 635 F.3d 879, 882 (7th Cir. 2011)).

 **\*6**  Thus, Boogerd is not entirely correct when he argues that there is no Fourth Amendment violation if an encounter lawfully initiated "yields information that a crime has been committed." R. 41 at 8. That may be an accurate statement if the facts are similar to the two cases cited by Boogerd. In *Robinson*, the police officer testified that, upon waking the defendant up, he observed that the defendant's eyes were dilated, his speech was slurred and mumbled, and a very strong odor of an alcoholic beverage was on his breath. 859 N.E.2d at 244. In *Carlson*, the officer testified that when the defendant rolled down his car window, the officer immediately detected a strong odor of alcohol and saw that the defendant "had trouble locating his license; [ ] had bloodshot eyes; [ ] was unsteady and confused; and [ ] appeared to have wet himself." 716 N.E.2d at 1251. In contrast, the facts as alleged by Plaintiff here plausibly suggest that, upon wakening Plaintiff, the police officers did *not* observe any facts that would make a reasonable person suspicious that Plaintiff was under the influence of any substance. Crediting these allegations, as the Court must, the police officers did not have any basis to go beyond their community caretaking function by subjecting Plaintiff to a field sobriety test. Such a test would be justified only if the police officers' initial interaction with Plaintiff yielded information that aroused reasonable suspicion of a crime. *See Best*, 837 F. Supp. 2d at 940 (citing case law discussing when the facts are sufficient to justify the administration of a field sobriety test). Indeed, Boogerd's argument that nothing more is needed to establish reasonable suspicion of criminal activity other than discovering a driver at 3:30 a.m., in a McDonald's parking lot asleep in a car with the engine running (and sweating), is exactly the sort of argument recently rejected by the Seventh Circuit in *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014-15 (7th Cir. 2016). In that case, the Seventh Circuit chided the government for "appear[ing] to recognize no limit to the grounds on which police may stop a driver." [9] Accordingly, Boogerd has not presented a sufficient basis for dismissal of Count Two of the Second Amended Complaint. [10]

## 4. GROUP PLEADING ISSUE

Boogerd next argues that Plaintiff improperly pleads group conduct against himself and Officer Karney such that he has not been given fair notice of the alleged wrongful conduct in which he allegedly personally engaged. *See* R. 32-1 at 9 (citing *Carter v. Dolan*, 2009 WL 1809917 (N.D. Ill. June 25, 2009), and *Liera v. City of Chicago*, 2014 WL 3921359, at *3 (N.D. Ill. Aug. 5, 2014)). To sustain a § 1983 claim, " 'a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.' " *Johnson v. Snyder,* 444 F.3d 579, 583 (7th Cir. 2006) (citation omitted). In some cases, this principal may require dismissal of a complaint that relies on group pleading. *E.g., Liera*, 2014 WL 3921359, at *3 (dismissing claims "against an additional thirty-five police officers without alleging which officers were at which location or which officers participated in the alleged wrongful conduct" because "the Unspecified Defendants are not on notice of which actions they are alleged to have committed"); *Carter*, 2009 WL 1809917, at *3-4 (where plaintiff alleged that only three of the defendants actually entered her apartment, complaint failed to provide adequate notice to the other six defendants of their allegedly unconstitutional conduct).

 **\*7**  But in cases involving complaints against only a few defendants where the alleged facts plausibly suggest a basis for holding each of the defendants personally liable, motions to dismiss based on the group pleading argument have been rejected:

> We do not find it fatal to plaintiffs' complaint that they have failed to identify at this time the particular defendant or defendants who hit and kicked Rodriguez, pushed Gonzalez or carried out the other acts described in the complaint. Although this Court has in the past required plaintiffs to match incidents and defendants, we do not find the requirement appropriate in these circumstances when we can imagine that plaintiffs had no opportunity at the time of the incident to get to know the individual defendants.

> In addition, a defendant may not be able to escape liability for certain conduct simply because he did not physically act himself. Under certain circumstances, liability in a civil rights action can stem from the failure to intervene.

We are required to construe pleadings liberally and will not dismiss for vagueness or lack of detail....Although it may be that, as defendants argue, not all of the defendants were involved in every act, such as handcuffing Rodriguez, or that some of the defendants may avoid liability based on qualified immunity, these details are more appropriately addressed at a later proceeding.

*Gonzalez v. Babasa*, 2003 WL 21196245, at *2 (N.D. Ill. May 19, 2003) (citations omitted) (citing, among other cases, *Okoro v. Bohman*, 2001 WL 1098041, at *2 (N.D. Ill. Sept. 14, 2001) (allowing case against Chicago police officers and federal DEA agents to go to trial even though plaintiffs could not identify which defendant specifically engaged in which act and plaintiffs learned the names of the defendants only through discovery efforts)).

This case only involves two police officer defendants, both of whom appear from the allegations to have been present and involved in the conduct of which Plaintiff complains. Under these circumstances, it is at least plausible that both officers participated in and therefore may be held liable for the events that transpired in the McDonald's parking lot such that it would not be appropriate to dismiss the complaint for failure to identify the specific actions of each officer. *See Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179, 1199 (N.D. Ill. 2013) (distinguishing *Carter* because the plaintiff in that case " 'was given the opportunity to identify the individual conduct of each Defendant Officer and failed to do so' " (quoting *Carter,* 2009 WL 1809917, at *3*), and holding that "it would be unreasonable for this Court to expect more specific allegations until the parties have conducted discovery"); *Evans v. Tavares*, 2009 WL 3187282, at *2 (N.D. Ill. Sept. 30, 2009) (same).

## 5. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED")

Officer Boogerd adopts the argument previously made by the City in its first motion to dismiss that Plaintiff's claim for IIED (Count Four) should be dismissed based on Illinois' one-year statute of limitations. The Court declined to rule on this issue when it was presented on the first motion to dismiss because the City was not named as a defendant in Count Four. While Plaintiff does not respond to Boogerd's argument for dismissal of his IIED count, in response to the City's first motion to dismiss, Plaintiff argued that the two-year statute of limitations pertaining to actions "arising out of patient care," 745 ILCS 10/8-101(b), applied to his IIED claim. That argument was frivolous because Plaintiff does not allege any facts to support a claim that he was a patient receiving medical care from the arresting police officers or the City of Naperville. *See Kaufmann v. Schroeder*, 946 N.E.2d 345, 349 (Ill. 2011) (an injury arises out of patient care "if the injury is causally connected to the patient's medical care and treatment"). The Court therefore agrees with Boogerd, [11] and will dismiss Count Four of the Second Amended Complaint. [12]

## 6. FALSE IMPRISONMENT CLAIM

**\*8** Boogerd next raises an argument previously addressed by the Court in its October 22, 2015 Order, which is that Plaintiff's § 1983 claim predicated on false imprisonment (Count Five) is duplicative of his § 1983 claims predicated on false arrest (Count One) and unlawful *Terry* stop (Count Two). But Boogerd does not cite any case law in support of his argument for dismissal of this Count. The Court therefore declines to rule on the issue at this time. *See Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006) (perfunctory and undeveloped arguments not supported by pertinent authority are waived). [13]

## 7. INJUNCTIVE RELIEF

Officer Boogerd's final argument is that Plaintiff lacks standing to seek prospective inunctive relief. R. 32-1 at 13 (citing *Cadiz v. Kruger*, 2007 WL 4293976, at \*10 n.9 (N.D. Ill. Nov. 29, 2007)) (stating that, "in the typical excessive force case ...a plaintiff would lack standing to seek prospective injunctive relief for a past event that (as to that plaintiff) has no foreseeable likelihood of recurring" (citing *City of Los Angeles v. Lyon*, 461 U.S. 95, 111 (1983))). The standing issue regarding injunctive relief is one that requires more analysis than a single citation to dicta in a 2007 district court case, which itself relies on a Supreme Court case from almost twenty years ago. Therefore, the Court declines to decide this issue at this time. *See Davis, supra,* 452 F.3d at 691-92.

## B. OFFICER FLETCHER'S MOTION TO DISMISS

The only issue raised by Officer Fletcher in his motion to dismiss is whether Plaintiff's § 1983 claims against him are barred by the statute of limitations. "The statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint." *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993). "A complainant can plead himself out of court by including factual allegations that establish that the plaintiff is not entitled to relief as a matter of law. Thus, although a plaintiff need not anticipate or overcome affirmative defenses such as those based on the statute of limitations, if a plaintiff alleges facts sufficient to establish a statute of limitations defense, the district court may dismiss the complaint on that ground." *O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015) (citations omitted).

**\*9** "The limitations period for § 1983 claims is based on state law, and the statute of limitations for § 1983 actions in Illinois is two years." *Id.* (citations omitted). The events giving rise to Plaintiff's claims took place on May 26, 2013. Plaintiff filed this lawsuit on May 26, 2015, the same day on which the two-year statute of limitations was due to expire. But neither the Original nor the subsequently filed First Amended Complaint named Officer Fletcher as a defendant. Instead, the Original Complaint named "Naperville" as the only defendant, R. 1, and the First Amended Complaint named (1) the Naperville Police Department, [14] (2) Officer Boogerd, and (3) "John Doe Officers # 2 and #3," R. 10-1. Plaintiff did not identify Officer Fletcher by name until he filed the Second Amended Complaint on November 20, 2015. *See* R. 46. By this time, the statute of limitations had run. Therefore, Plaintiff's § 1983 claims against Fletcher are time-barred unless they can be saved through application of either the relation-back rule of Fed. R. Civ. P. 15(c) or equitable principles of tolling.

Fletcher argues that Plaintiff's § 1983 claims against him do not relate back under Rule 15(c) because of the "John Doe" relation-back rule in this circuit. This Court recently addressed a similar argument in *White v. City of Chicago*, 2016 WL 4270152 (N.D. Ill. Aug. 15, 2016). Interpreting the "mistake" language of Rule 15(c)(1), [15] this Court rejected the traditional John Doe-application of that language pursuant to which a plaintiff's lack of knowledge regarding a defendant's identity is not considered to be a "mistake" such that relation-back applies. *See, e.g., Jackson v. Kotter*, 541 F.3d 688, 696 (7th Cir. 2008). Instead, this Court held that, after *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538 (2010), the traditional John Doe rule should not be applied to prevent relation-back if a plaintiff seeks to determine the identity of the John Doe defendant before the statute of limitations expires but is unable to do so, provided that the newly identified defendant either knew or should have known that but for the plaintiff's inability to discover his identity he would have been named in place of the John Doe defendant. *See White*, 2016 WL 4270152, at \*20. Moreover, this Court also held that even if relation-back under Rule 15(c) was not available to the plaintiff, factual questions may still be raised regarding whether the doctrine of equitable tolling applies to prevent the running of the statute of limitations. *Id,* at \*21-22.

This Court's ruling in *White* interpreting and applying the *Krupski* Court's analysis of relation back under Rule 15(c), and the doctrine of equitable tolling, requires the Court to deny Fletcher's motion to dismiss. The Court cannot conclude that Plaintiff has pled himself out of court on the statute of limitations. There are no factual allegations in the Second Amended Complaint demonstrating that Plaintiff knew Fletcher's identity prior to naming him as a defendant. Nor can the Court conclude based on the factual allegations of the complaint that Fletcher did not know *and* should not have known that but for Plaintiff's inability to discover his identity he would have been named as a defendant. In addition,

numerous courts in this district have applied equitable tolling when a plaintiff has been unable to obtain the identity of the city official who harmed him and his claims otherwise would be barred. *See, e.g., Brown v. Deleon*, 2013 WL 3812093, at *7 (N.D. Ill. July 18, 2013). The Court notes that Officer Fletcher has not argued he was prejudiced by Plaintiff's failure to identify him any earlier than in the Second Amended Complaint. Nor can the Court determine based on the pleadings whether Plaintiff was or was not diligent in seeking Officer Fletcher's identity. For these reasons, a ruling on the issue of relation-back under Rule 15(c) and equitable estoppel would be premature. Accordingly, Officer Fletcher's motion to dismiss based on the statute of limitations is denied without prejudice to raising the issue later in the proceedings after discovery has shed further light on the factual matters determinative of that issue.

## C. THE CITY'S MOTION TO DISMISS AND MOTION TO STRIKE

### 1. PLEADING *MONELL* CLAIM

**\*10** Under *Monell v. Department of Social Services of the City of N.Y.,* 436 U.S. 658 (1978), a municipality "may be liable under § 1983 for constitutional violations caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with final policymaking authority." *Kristofek v. Vill. of Orland Hills*, 2016 WL 4245494, at *9 (7th Cir. Aug. 11, 2016) (internal quotation marks and citation omitted). Plaintiff implicitly advances his *Monell* claim under the second approach—an unofficial practice or custom that is widespread and well settled. The Court dismissed Plaintiff's *Monell* claim in the First Amended Complaint because Plaintiff had alleged in only a conclusory fashion that an unofficial practice or custom existed. Following fairly well established law in this circuit, the Court held that Plaintiff must allege facts from which an unofficial practice or custom plausibly might be inferred. Plaintiff has attempted to do so in the Second Amended Complaint. In re-pleading his *Monell* claim, Plaintiff has alleged, in addition to his conclusory assertions regarding the existence of an unofficial practice or custom, [16] the existence of at least two other allegedly similar incidents, which Plaintiff argues suggest the existence of an unofficial practice or custom sanctioned by the Naperville Police Department:

> In Case 1:15-cv-05052, filed in this very court the Naperville Police Department was sued for allegedly illegally searching and seizure of a home. In this complaint, Stephen Tracy has alleged similarly that the officer had no warrant, no consent to search and the occupant of the home had committed no crime.

> In case #2014CF1512, currently in the DuPage County Circuit Court, the Naperville Police has been accused again of illegal search and seizure. In this case, Mr. Anthony Giannone, a criminal defendant, in a motion to suppress hearing, has accused the Naperville Police of not only illegal search and seizure but also unlawfully confiscating items from a vehicle and requiring him to produce a receipt.

R. 46 at 11-12 (¶¶ 75-76).

The City argues that these additional allegations are insufficient to overcome the pleading deficiencies identified by the Court in its earlier opinion for a number of reasons. To begin with, the City argues, the alleged misconduct in the two other incidents occurred after the incident involving Plaintiff and therefore are insufficient "to show the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the deprivation of constitutional rights." R. 29-1 at 5 (quoting *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012)). The City asks the Court to look outside the complaint to make a factual finding that the other incidents occurred after the incident involving Plaintiff, which the Court declines to do. In any event, the City has not cited any relevant case law holding that to be legally sufficient for pleading purposes it is necessary that the other incidents have occurred prior to the incident of which the plaintiff complains. Instead, the City cites two district court cases that refer only generally to "prior patterns of similar misconduct," *Paroubek v. Friddle*, 1987 WL 7818, at *2 (N.D. Ill. Mar. 11, 1987), and "prior incidents similar in nature," *McBride v. Lindsay,* 1989 WL 234032, at *1 (N.D. Ill. Nov. 17, 1989). In neither case did the district court consider or decide whether allegations of later-occurring incidents were sufficient to *allege* an unofficial

practice or custom, and, in fact, a sentence in *Paroubek* (which the City does not acknowledge) actually refers more broadly to "*previous or* similar incidents involving the plaintiff or others with similar experiences." 1987 WL 7818, at *2 (emphasis added).

**\*11** While the *practice or custom* constituting an unofficial policy must have existed prior to the incident involving the plaintiff for it to have been a moving force behind the plaintiff's incident, that does not mean later occurring incidents can never be indicative of the existence of a pre-existing practice or custom. For instance, in *Hoskin v. City of Milwaukee,* 994 F. Supp. 2d 972 (E.D. Wis. 2014), the court rejected a similar argument that the plaintiff "has failed to plead facts which establish that the complaints of other unlawful searches occurred before the subject incident." *Id.* at 981 (internal quotation marks and citation omitted). The court held that it was not "necessary for the plaintiff to have pled specifics like the time, place, or identity of the other complaints," and that "[g]eneral allegations that the City and MPD received complaints is enough to give rise to an inference that its officials had knowledge that other, similar illegal searches were occurring. *Id.* The Court agrees with these conclusions. The later timing of the other incidents in question does not necessarily negate the relevancy of those incidents to the question of whether an unofficial practice or custom existed prior to those incidents. The allegation that such later occurring incidents took place may contribute to the plausibility of Plaintiff's allegation that a practice or custom existed. Just how convincing the evidence might be as a matter of proof is an issue for later in the case.

The City next contends that Plaintiff's allegations of two other incidents are insufficient to state a *Monell* claim because they are unproven allegations against the City. The Court is not persuaded by this argument either. "Certainly, plaintiffs are allowed to bring § 1983 actions on the basis of complaints and allegations of police misconduct, if all other pleading requirements are met." *Markey v. City of Chicago*, 1991 WL 101639, at *2 (N.D. Ill. June 4, 1991) (citing *Williams v. City of Chicago*, 658 F. Supp. 147 (N.D. Ill. 1987), wherein the plaintiff survived the City's motion to dismiss a § 1983 claim with seven citizen complaints against police officer); *see also Hoskin*, 994 F. Supp. 2d at 982 n.3 (rejecting the defendants' argument "that the plaintiff has not sufficiently pled facts to establish the City's knowledge because there were only complaints of unlawful searches, rather than final adjudications that the searches were unlawful," stating that "[t]his argument hardly justifies a discussion" because "[a] lack of formal adjudications would be a logical symptom of" the alleged policy of ignoring complaints about unlawful searches); *Alphabet v. City of Cleveland*, 2006 WL 3241785, at *15 (N.D. Ohio Nov. 7, 2006) ("To simply assume that the sustainment of a complaint by the City's Office of Professional Standards is necessary to render a complaint relevant, in light of Plaintiff's allegations, lacks reasonableness.").

In *Markey,* the district court distinguished *Strauss v. City of Chicago*, 760 F.2d 765 (7th Cir. 1985), wherein the Seventh Circuit rejected as improperly pled a *Monell* claim that depended on "general, unspecific, allegations of frequent 'illegal arrests.' " 1991 WL 101639, at *2 (quoting *Strauss*, 760 F.2d at 769). The *Strauss* court rejected the other allegations primarily because they were too general and unspecific, not because they were unproven. The City cites to *Torres v. Dart*, 2015 WL 4379890 (N.D. Ill. July 16, 2015), but that case is similar to *Strauss* in that the allegations rejected were too vague and unspecific. The *Torres* court deemed the allegations of other complaints "sketch[y]" not because the complaints alleged were unproven but because the plaintiff had not identified "[w]hat cases and what is alleged," concluding "[s]urely a reasonable inquiry would have uncovered maybe 'one or even three' names of the cases the plaintiff's complaint alludes." *Id.* at *4. Although the information Plaintiff provides here about the two other cases is limited, he has at least identified the cases and what is alleged. His allegations of other incidents, therefore, survives the "sketchy" test in *Torres.*

The City's third and fourth arguments are that the allegations of the other two incidents as alleged by Plaintiff are not sufficiently similar to the alleged constitutional violation here, and that, in any event, two other incidents are not sufficient to establish an unofficial practice of custom or practice that is widespread and well settled. These arguments have a bit more force than the City's first two arguments. Nevertheless, given the stage in the proceedings at which these arguments are presented, the Court concludes that the City's arguments are not dispositive, and, as discussed below, will err on the side of allowing limited discovery on Plaintiff's *Monell* claim before ruling definitively on whether that claim may go forward.

**\*12** The law in this area is a mixture of settled rules regarding the standard for finding municipal liability and unsettled views regarding what is required to get to the point where potential liability may even be considered. It is clear that a *Monell* claim cannot be based on a random event. Instead, it must be based on "a series of violations to lay the premise of deliberate indifference." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995)). "The Seventh Circuit has not adopted any bright-line rules for how many violations are required to lay the premise of deliberate indifference, "except that it must be more than one instance, or even three. The general principle, however, is that the plaintiff must demonstrate that there is a policy at issue rather than a random event." *Karney,* 2015 WL 6407759, at \*3 (internal quotation marks and citations omitted) (quoting *inter alia Thomas*, 604 F.3d at 303). But the Seventh Circuit's indication in *Thomas* of a possible threshold requirement of "more than...three" violations refers to a threshold for a finding of liability. *See Thomas*, 604 F.3d at 303 ("Beyond these threshold requirements, the jury must make a factual determination as to whether the evidence demonstrates that the [City] had a widespread practice that [caused] the alleged constitutional harm."). The question presently before the Court is whether the same threshold applies to the *pleading* of a *Monell* claim.

While the general rules of pleading are well established, their application to *Monell* claims is less so. In *McCormick v. City of Chicago*, 230 F.3d 319 (7th Cir. 2000), the Seventh Circuit noted that "[p]laintiffs' counsel, the defense bar, and district courts continue to struggle with this and other courts' pronouncements as to exactly what a plaintiff bringing a municipal liability suit must plead to survive a motion to dismiss—and with reason." *Id.* at 324. On the one hand, certain pre-*McCormick* cases held that a plaintiff cannot state a claim "by simply attaching a bare conclusion to the facts he narrates." *Id.* (quoting *Kyle v. Morton High School*, 144 F.3d 448, 455 (7th Cir. 1998)). On the other hand, other pre-*McCormick* cases held that a plaintiff "need not plead any facts; he can plead conclusions." *McCormick,* 230 F.3d at 324 (quoting *Jackson*, 66 F.3d at 153-54). The *McCormick* court attempted to provide clarity on this issue by adopting the latter view. *McCormick*, 230 F.3d at 325. That view, the court said, was dictated by *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993), in which the Supreme Court "made it very clear that federal courts must not apply a heightened pleading standard in civil rights cases alleging § 1983 municipal liability." *McCormick*, 230 F.3d at 323; *see also Jackson*, 66 F.3d at 153 (district court overlooked *Leatherman* in requiring greater specificity in pleading of *Monell* claim). Thus, the *McCormick* court concluded, the plaintiff could allege the factual basis of his or her *Monell* claim through an allegation of a widespread custom or practice, because "[s]uch an allegation, while conclusory, is sufficient to put the City on notice of [the plaintiff's] claim against it." *Id.* at 325.

Despite the Seventh Circuit's attempt in *McCormick* to clarify the standards for pleading a *Monell* claim, uncertainty to this area of the law resurfaced after the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Some district courts in this circuit continue to cite to *McCormick* as the proper pleading standard for a *Monell* claim, notwithstanding *Twombly* and *Iqbal*. *See, e.g., Howard v. Sheriff of Cook Cnty.*, 2016 WL 4366598, at \*3 (N.D. Ill. Aug. 16, 2016) (Zagel, J.); *Wade v. Rizzuto*, 2016 WL 1247472, at \*6 (N.D. Ill. Mar. 30, 2016) (Lefkow, J.); *Othman v. City of Chicago*, 2012 WL 5246898, at \*4 (N.D. Ill. Oct. 23, 2012) (Dow, J.); *Sanders v. Sheehan*, 2010 WL 2990121, at \*2 n.1 (N.D. Ill. July 26, 2010) (Gottschall, J.); *see also Ohlrich v. Village of Wonder Lake*, 22 F. Supp. 3d 874, 877-78 (N.D. Ill. 2014) (Reinhard, J.) (not citing *McCormick* but declining to dismiss complaint with only conclusory allegation of custom or practice). But the Seventh Circuit's decision in *McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011), seems to suggests otherwise. In *McCauley,* the Seventh Circuit held that to properly plead a *Monell* claim, a plaintiff must "plead factual content that allows the court to draw the reasonable inference that the [defendant] maintained a policy, custom, or practice" that contributed to the alleged violation. *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 678). This Court applied *McCauley* in its ruling on the City's first motion to dismiss. *Karney*, 2015 WL 6407759, at \*3-4. Nevertheless, at issue on the City's first motion to dismiss was the adequacy of conclusory *Monell* allegations without any attempt to support those allegations with specific facts. At issue here is whether the two other incidents alleged in the Second Amended Complaint are sufficient to get Plaintiff over the *Iqbal* and *Twombly* pleading threshold.

**\*13** While *Iqbal* and *Twombly* direct the Court to disregard a naked allegation of a policy, practice or custom, nothing in those cases requires the Court to adopt a numerical rule for *Monell* claims. Instead, on a Rule 12(b)(6) motion to dismiss, the inquiry is limited to whether the plaintiff has pled sufficient factual content— whether it is other complaints or incidents, the specific facts of the plaintiff's case, some other evidence, or a combination of some or all of those things —that renders plausible the plaintiff's conclusion that there is an informal practice or custom for which the municipality may be held liable. In assessing plausibility, moreover, it seems appropriate to keep in mind that it is unlikely Plaintiff would have access to information about other incidents without discovery. *See Chambers v. City of S. Beloit*, 1990 WL 32659, at \*3 (N.D. Ill. Feb. 5, 1990) ("Often plaintiffs lack even the information necessary to meet the minimal pleading requirements of § 1983 until they are allowed the opportunity for some discovery."); *Means v. City of Chicago*, 535 F. Supp. 455, 460 (N.D. Ill. 1982) ("We are at a loss as to how any plaintiff, including a civil rights plaintiff, is supposed to allege with specificity prior to discovery acts to which he or she personally was not exposed, but which provide evidence necessary to sustain the plaintiff's claim, i.e., that there was an official policy or a de facto custom which violated the Constitution."). In *Leatherman,* the Supreme Court held that "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." 507 U.S. at 168-69. The Seventh Circuit noted in *McCormick* that the *Leatherman* approach to pleading a *Monell* claim was consistent with its own circuit law, which holds that a plaintiff "need not allege all, or any of the facts logically entailed by the claim," that a plaintiff "does not have to plead evidence," and that a complaint does not "fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing." *McCormick,* 230 F.3d at 323 (internal quotation marks and citations omitted).

The Court finds that it is a close question whether Plaintiff's *Monell* allegations are sufficient in this case. On the one hand, Plaintiff has attempted to rise above a "formulaic, bare-bones" *Monell* claim of the type that is "routinely dismiss[ed]" in this circuit. *Foster v. Land*, 2016 WL 3971699, at \*3 (N.D. Ind. July 25, 2016) (citing cases). On the other hand, of the two other incidents alleged in the Second Amended Complaint, at least one appears to be only marginally similar in that it involves an unlawful search of an apartment as opposed to a motor vehicle. If Plaintiff's *Monell* claim is that the City is liable because it does not adequately train its police officers to conform their behavior to the requirements of the Fourth Amendment, the Court does not find that claim to be very plausible based on the current allegations. As the City points out, such a *Monell* claim would require a larger number of similar constitutional violations before deliberate indifference based on failure to train could be inferred. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.").

But in addition to conclusory failure-to-train allegations, Plaintiff also alleges an unofficial practice or custom of condoning "impermissible searches and seizures, without reasonable suspicion or probable cause and without sufficient legal basis, ...based on hostility by law enforcement toward residents and non-residents of Naperville." R. 46 at 11 (¶ 73). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. On balance, the Court concludes that the allegations of the factual circumstances surrounding Plaintiff's encounter with the arresting officer when he was found by them asleep at 3:30 a.m. in the parking lot of a local McDonald's restaurant, together with the additional allegations of two other lawsuits alleging unreasonable search and seizures against City police officers, are barely enough for Plaintiff's *Monell* claim of condoning illegal search and seizures based on hostility by law enforcement towards individuals, in circumstances similar to Plaintiff's, to survive dismissal. *See, e.g., Wade*, 2016 WL 1247472, at \*6 n.8; *Ohlich,* 22 F. Supp. at 878.

This is not to say that the door is completely open on the matter of the City's role, if any, in what happened to Plaintiff. Given the weak allegations in support of *Monell* liability, the Court will limit Plaintiff's discovery on his *Monell* claim to records kept by the City (or the Naperville Police Department) of lawsuits, complaints, reports, or investigations (internal or external) made to, filed with, or concerning Naperville police officers and/or the Naperville Police Department which allege unlawful searches or seizures made without probable cause for a period going back three years prior to the incident

in question. *See* *Foy v. City of Chicago*, 2016 WL 2770880, at *1 (N.D. Ill. May 12, 2016) (ordering limited discovery on other similar incidents prior to considering adequacy of plaintiff's latest attempt to plead a *Monell* claim). Should this discovery provide additional support for Plaintiff's *Monell* claim, then he may bring that additional support before the Court by way of a motion to pursue his *Monell* claim through further discovery.

## 2. MOTION TO STRIKE PLAINTIFF'S PRAYER FOR RELIEF

**\*14** The City moves to strike portions of Plaintiff's prayer for relief on the ground that it cannot be held liable for punitive damages or attorney's fees, and that injunctive relief would be inappropriate in this case. The Court addressed the issue of injunctive relief in the context of Officer Boogerd's motion to dismiss, and adopts the same ruling here. Insofar as punitive damages and attorney's fees are concerned, the Court declines to strike Plaintiff's prayer for those forms of relief to which Plaintiff may be entitled as against one or more of the other defendants in this case. The City's arguments that it (as opposed to either of the officer defendants) cannot be held liable for punitive damages or attorney's fees are preserved for later proceedings in the case.

## CONCLUSION

For the foregoing reasons, (1) the City's Motion to Dismiss and Motion to Strike, R 29, is denied; (2) Officer Fletcher's motion to dismiss, R. 33, is denied; and (3) Officer Boogerd's motion to dismiss, R. 32, is granted as to Count Four of the Second Amended Complaint and denied in all other respects. Defendants are directed to file a joint status report on or before October 28, 2016. A status hearing is set for November 1, 2016 at 9:00 a.m.

Dated: October 18, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 6082354

Footnotes

1   Rule 4(m) was amended effective December 1, 2015 to shorten the time period for service of process from 120 days to 90 days. The amendment "govern[s] in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." Order (U.S. Apr. 29, 2015) (available at http://www.supremecourt.gov/orders/courtorders/frcv15%28update%29 1823.pdf). This case was pending when the amendment took effect. It would not be just and practicable, however, to apply the shortened time period of amended Rule 4(m) because the period in which service of process was supposed to have taken and in fact did take place was before the amendment took effect. Therefore, the 120-day period of the pre-amended Rule 4(m) should apply. Neither party contests the applicability of the pre-amended rule.

2   August 6, 2015 is the date on which Plaintiff filed a motion seeking leave to amend, with the proposed First Amended Complaint attached as an exhibit to that motion. *See* R. 9; R. 10. This Court granted Plaintiff's motion to amend on August 20, 2015. *See* R. 12. But because Plaintiff sought to amend prior to the filing of any responsive pleading or motion to dismiss, he did not need leave of court to file the First Amended Complaint. *See* Fed. R. Civ. P. 15(a)(1)(B). Therefore, the Court considers the effective date of filing to be the date on which Plaintiff filed the motion to amend with the First Amended Complaint attached thereto.

3   Officer Boogerd suggests that, notwithstanding his execution and filing of a waiver of service, Plaintiff's service of process on him was defective because Plaintiff never obtained the issuance of a summons. Because Officer Boogerd executed a waiver of service, however, a summons was not required. *See* Fed. R. Civ. P. 4, advisory committee notes, 1993 amendment, *The Caption of the Rule* ("Unless service of the summons is waived, a summons must be served whenever a person is joined as a party against whom a claim is made."); Fed. R. Civ. P. 4, advisory committee notes, 1993 amendment, *Subdividsion (d)* ("It is hoped that, since transmission of the notice and waiver forms is a private nonjudicial act, does not purport to effect service, and

*is not accompanied by any summons* or directive from a court, use of the procedure will not offend foreign sovereignties....") (emphasis added).

4       Citing to *McDonald v. United States*, 898 F.2d 466, 468 (5th Cir. 1990), and *In re Cooper*, 971 F.2d 640, 641 (11th Cir. 1992), Boogerd argues that "[d]ismissal for delayed service or process is not left to the general discretion of the district court but, rather, is mandatory unless good cause is shown." R. 32-1 at 4. That argument is incorrect. *See Stanley v. Martin*, 2013 WL 331267, at *3 (N.D. Ill. Jan. 29, 2013) (noting that the *McDonald* and *Cooper* cases were decided prior to the 1993 amendments to the federal rules, "which resulted in current Rule 4(m)," under which the district court "has the discretion to grant an extension, even in the absence of good cause").

5       The City has not contested the adequacy of Plaintiff's service of process on the Naperville Police Department.

6       The complaint uses the term "DUI," which can mean driving under the influence of either alcohol or some other drug. But the allegations make clear that Plaintiff understood the officers to mean he was under arrest for driving while under the influence of alcohol.

7       *Terry v. Ohio*, 392 U.S. 1 (1968).

8       The Court says "might not have" because of the factual allegation that Plaintiff woke up to find his car blocked in by the police officers. As noted later in a footnote in this opinion, that allegation, if true, could possibly invalidate what would otherwise have been a lawful community caretaking encounter.

9       In *Paniagua-Garcia*, a police officer was passing a car driven by the defendant and saw the defendant holding a cellphone in his right hand with his head bent toward the phone. 813 F.3d at 1014. The officer stopped the defendant because, he said, the defendant "appeared to be texting" in violation of a state statute that prohibits texting (but not any other uses of cellphones) while operating a motor vehicle. *Id.* The police officer questioned the defendant at length, eventually asked and received his permission to search the car, and discovered in the search five pounds of heroin concealed in the spare tire in the car's trunk. In the criminal prosecution, the district court upheld the search, ruling that the officer had reasonably believed that the defendant was texting when he initiated the traffic stop. The Seventh Circuit reversed, noting that the government conceded that the defendant was not texting and the police officer "has never explained what created the appearance of texting as distinct from any one of the multiple other—lawful—uses of a cellphone by a driver." *Id.* The court held that the government had failed to establish that the officer had probable cause or a reasonable suspicion that the defendant was violating the no-texting law, explaining that "a mere possibility of unlawful use [of a cell phone] is [not] enough to create a reasonable suspicion of a criminal act," and that "[a] suspicion so broad that [it] would permit the police to stop a substantial portion of the lawfully driving public is not reasonable." *Id.* at 1014-15 (internal quotation marks and citation omitted).

10      Boogerd also makes the same argument he made in moving to dismiss Count One that the Court must credit "the public record" over Plaintiff's allegations regarding what the arresting officers knew or observed on the night of his arrest, and, in particular, that the documents attached to his motion to dismiss prove that Plaintiff had a suspended driver's license. According to Boogerd, the suspended license also gave the police officers reasonable suspicion for a *Terry* stop. The Court again rejects this argument because it cannot say from the allegations of the complaint whether Boogerd knew about the suspended license at the time of the stop or only discovered it after he subjected Plaintiff to a field sobriety test, arrested him, and took him to the police station for charging. The Court also notes that while an invalid license might constitute probable cause to arrest Plaintiff, the Court does not see how it would provide reasonable suspicion for the *Terry* stop during which Plaintiff was administered a field sobriety test.

11      Although Officer Fletcher has not made this argument in his motion to dismiss, the Court will dismiss Count Four as to both of the individual police officer defendants named in that count.

12      Even if Plaintiff's IIED claim were not time barred, Plaintiff still fails to allege sufficient facts to support that claim. *See, e.g., Douglas v. Lofton*, 2013 WL 2156053, at *10 (N.D. Ill. May 17, 2013) (citing cases where IIED claims were dismissed at pleadings stage for failure to allege sufficiently extreme and outrageous conduct); *S.J. v. Perspectives Charter Sch.*, 685 F. Supp. 2d 847, 860 (N.D. Ill. 2010) (dismissing IIED claim where plaintiff failed to allege any specific facts demonstrating elements of IIED claim, especially the egregious conduct required).

13      The Court also observes that Boogerd's argument that his initial encounter with Plaintiff was justified by the community caretaking rule lends further support to the view that the false imprisonment claim is not duplicative of the false arrest and/or *Terry* stop claims. The Illinois Appellate Court has held that "the police may question a citizen without triggering fourth amendment protections during a 'community caretaking' encounter, so long as the officer does not convey by use of force or show of authority that compliance with his inquiry is required." *Robinson*, 859 N.E.2d at 243. " 'Compelled compliance may be shown by: (1) the presence of several police officers; (2) the display of a weapon; (3) an officer's physical contact with the citizen; and (4) an officer's use of language or tone of voice commanding compliance." *Id.* (internal quotation marks and citation omitted). Plaintiff has alleged facts that plausibly suggest "compelled compliance," in violation of the community

caretaking justification for the police officers' actions. Accordingly, Plaintiff's false imprisonment claim could be read as challenging this aspect of the police officers' encounter with Plaintiff. *See Carey v. K–Way, Inc.,* 728 N.E.2d 743, 747 (2000) (false imprisonment claim under Illinois law only requires that the plaintiff's liberty be restrained, not necessarily that the plaintiff actually be placed under arrest; this element is met if a person is compelled to go where he or she does not wish to go or to remain where he or she does not wish to remain).

14    As noted, the Court later substituted the City of Naperville in place of the Naperville Police Department. *See* R. 23 at 2.

15    *See* Fed. R. Civ. P. 15(c)(1) ("An amendment to a pleading relates back to the date of the original pleading when...the amendment changes the party or the naming of the party against whom a claim is asserted, if [among other things] the party to be brought in by amendment...knew or should have known that the action would have been brought against it, *but for a mistake* concerning the proper party's identity.") (emphasis added).

16    Plaintiff's conclusory assertions of the existence of an unofficial practice of custom include allegations that: (1) the defendant police officers were acting under color of law when they fabricated a story to create probable cause to arrest him and seize his belongings in the McDonald's parking lot, R. 46 at 10 (¶ 70); (2) the City had a duty to properly supervise its employees and agents, and the City breached that duty by "[i]mproperly training, authorizing, encouraging or directing officers [ ] to engage in impermissible searches and seizures, without reasonable suspicion or probable cause and without sufficient legal basis, and/or condoning such actions, based on hostility by law enforcement toward residents and specifically non-residents of Naperville," *id.* (¶ 71); (3) the defendant police officers "acted consistent with this training and in an unconstitutional manner when they continued to detain Plaintiff after they had verified Plaintiff's identity," and, "[i]nstead of releasing Plaintiff, searched [him], accused him of suspicion of DUI, arrested him, seized his property illegally and brought him to the Naperville Police Station," *id.* at 11 (¶ 72); and (4) the defendant police officers' conduct was done "pursuant to an unwritten policy, custom or pattern of practice to engage in indiscriminately stopping, detaining and citing individuals without probable cause by officers of the Naperville Police Department," *id.* (¶ 74).

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1208520
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Rebecca A. KERLIN, et al., Plaintiffs,

v.

CHICAGO BOARD OF ELECTIONS and James M. Scanlon, Defendants.

Case No. 16-cv-7424
|
Signed 04/03/2017

**Attorneys and Law Firms**

Gregory E. Kulis, Brian M. Orozco, Joshua S. Patrick, Gregory E. Kulis and Associates, Ltd., Chicago, IL, for Plaintiffs.

Terrence Michael Burns, Daniel Matthew Noland, Dykema Gossett PLLC, Chicago, IL, for Defendants.

**Opinion**

<u>**MEMORANDUM OPINION AND ORDER**</u>

John Robert Blakey, United States District Judge

 **\*1** Plaintiffs Rebecca Kerlin, William Shipley, Michelle Gale, Katherine Wuthrich, and Claire Tobin (collectively, the "Plaintiff Monitors") served as election monitors in Chicago during the March 15, 2016 Illinois primary election. Plaintiff Nina Marie cast an electronic ballot in downtown Chicago during the election's early voting program.

On July 21, 2016, Plaintiffs filed suit in this Court seeking declaratory and injunctive relief against the Chicago Board of Elections ("BOE") and its General Counsel, James Scanlon ("Scanlon") (collectively, "Defendants"). Plaintiffs allege that Defendants' actions both during and after the election violated their right to vote (Count I) and their rights to freedom of association and to petition the government (Count II). On November 8, 2016, Defendants jointly moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' Amended Complaint for failure to state a claim. Defs.' Mot. Dismiss [18]. For the reasons explained below, Defendants' motion is granted in part and denied in part.

**I. Background**

 **A. The Illinois Election Code and Direct Recording Electronic Voting Systems**
The Illinois Election Code authorizes election precincts to use Direct Recording Electronic Voting Systems ("Electronic Voting Systems") during both regular and early voting. 10 ILCS § 5/24C-1. When an Electronic Voting System is utilized, voters cast votes via an electronic ballot display "with mechanical or electro-optical devices that can be activated by the voters to mark their choices for the candidates of their preference and for or against public questions." *Id.* These voting devices are ostensibly capable of: (1) electronically recording and storing ballots; (2) tabulating votes; and (3) producing a permanent paper record for each ballot cast. *Id.*

After each voter completes his or her electronic ballot, the Electronic Voting System records an image of the completed ballot, and, upon request, prints the permanent paper record, which shows the votes cast in readable form. *Id.* at §§ 5/24C-2, 5/24C-12. The permanent paper record for each respective ballot contains a unique, randomly assigned

identifying number that corresponds to the number randomly assigned by the voting system to each ballot as it is electronically recorded. *Id.* Permanent paper records are preserved and secured by election officials in the same manner as traditional paper ballots, and are available as an official record for any recount, redundant count, or verification or retabulation of the vote count. *Id.* at § 5/24C-12.

In addition to creating the permanent paper record, the Electronic Voting System also independently records each vote cast for or against any candidate and for or against any public question. *Id.* at § 5/24C-11(u). Upon the close of voting, these vote totals are tabulated by the Electronic Voting System and an "In-Precinct Totals Report" is generated for return to the election authority. *Id.* at § 5/24C-12. This report includes the total number of ballots cast for each candidate and public question and constitutes the official return of each precinct. *Id.* at § 5/24C-15.

**\*2** To ensure the accuracy of the automatic counts generated by Electronic Voting Systems, the Illinois Election Code requires each election authority to, *inter alia*, test the voting devices and equipment in five percent of the precincts within each election jurisdiction, as well as five percent of the voting devices used in early voting. *Id.* These tests are conducted after Election Day, but prior to the proclamation of election results. *Id.*

The tests consist of counting individual votes recorded on the permanent paper record of each ballot and comparing the totals with the results tabulated by the Electronic Voting System. *Id.* If any error is detected, the Illinois Election Code requires the cause to be "determined and corrected," and an errorless count to be made before election results are officially canvassed and proclaimed. *Id.* Furthermore, if either: (1) an error is detected and corrected; or (2) an errorless count cannot be conducted because there continues to be a discrepancy between the count from the permanent paper records and the results produced by the Electronic Voting System, the election authority must "immediately prepare and forward to the appropriate canvassing board a written report explaining the results of the test and any errors encountered." *Id.* This report must be made available for public inspection. *Id.*

By statute, advance written notice of the time and place of these tests must be provided to the State Board of Elections, the State's Attorney, appropriate law enforcement agencies, the county chairman of each established political party, and, of particular relevance here, "qualified civic organizations." *Id.* Representatives of these institutions are permitted to attend the tests. *Id.*

### B. Testing for the March 15, 2016 Illinois Primary Election

From March 23, 2016 through March 29, 2016, the Chicago BOE tested the required five percent of the Electronic Voting Systems used in the March 15, 2016 primary. Am. Compl. [17] ¶ 18. One or more of the Plaintiff Monitors were credentialed by a qualified civic organization to attend each test performed. *Id.* ¶ 19.

According to Plaintiffs, the BOE conducted the tests by having one BOE employee read aloud votes from the permanent paper record of individual ballots. *Id.* ¶ 20. Meanwhile, another BOE employee created a written tally sheet of the oral vote count. *Id.* Plaintiffs contend, however, that the total vote counts tabulated by the Electronic Voting System were printed on these tally sheets before the test count began. *Id.* Moreover, BOE employees tallied the oral vote count in pencil, allowing for erasures. *Id.* Plaintiffs allege that the combination of the pre-printed vote totals and the use of pencils allowed BOE employees to alter tallies from the oral vote count so that they matched vote totals tabulated by the Electronic Voting System. *Id.*

Plaintiffs allege that, throughout the testing process, multiple BOE employees tallied oral vote totals that departed significantly from the results generated by the Electronic Voting Systems. *Id.* ¶ 22. BOE employees did not, however, undertake the steps required by statute (i.e. determine, correct, and report the error encountered). *Id.* ¶ 23. Instead, BOE employees intentionally altered tally numbers to match the results that had been placed on the tally sheets, regardless of the oral vote count from the permanent paper record. *Id.* Specifically, BOE employees changed votes from one candidate to another, added or subtracted votes from candidates, and stopped counting votes once they reached

the result that was pre-printed on the tally sheet. *Id.* ¶ 31. BOE employees then falsely reported that no inconsistencies were discovered. *Id.* Plaintiffs claim that these improprieties were pervasive throughout the "test counts" for Electronic Voting Systems from the March 15, 2016 primary election. *Id.* ¶ 24.

**\*3** Additionally, Plaintiffs allege that BOE employees took active measures to "hinder or outright prevent" the Plaintiff Monitors from monitoring and recording the improprieties as they occurred. *Id.* ¶ 25. Plaintiffs claim, for example, that BOE employees physically obstructed the Plaintiff Monitors from observing employees perform the tests and prevented Plaintiffs from photographing or documenting the results of the tallies until any discrepancies were fraudulently "resolved." *Id.* Plaintiffs claim that when they challenged these actions, BOE employees and their supervisors—including Scanlon—refused to acknowledge or correct any of the discrepancies. *Id.* ¶ 26.

Following the testing process, several of the Plaintiff Monitors attended an April 5, 2016 BOE meeting in order to notify BOE commissioners of Plaintiffs' observations before election results were certified. *Id.* ¶ 27. Plaintiffs claim that the gathering was supposed to be an open meeting subject to public comment. *Id.* Plaintiffs allege, however, that the BOE commissioners prevented the Plaintiff Monitors from presenting evidence of their observed irregularities. *Id.* Instead, the BOE immediately closed public comment, certified the election results, and adjourned the meeting in less than two minutes. *Id.*

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). A motion to dismiss tests the sufficiency of a complaint, not the merits of a case. *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). To survive a motion to dismiss, a complaint must first provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice" of what the claim is "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Second, the complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That is, the allegations must raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs. Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). A claim has facial plausibility "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The "amount of factual allegations required to state a plausible claim for relief depends on the complexity of the legal theory alleged," but "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. Of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). In evaluating the complaint, the Court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of Plaintiff. *Iqbal*, 556 U.S. at 678.

## III. Analysis

### A. Count I: Violation of the Right to Vote

#### 1. Count I States a Claim under 42 U.S.C. § 1983

In Count I, Plaintiffs allege under 42 U.S.C. § 1983 that Defendants' actions deprived voters of their fundamental right to vote. Am. Compl. [17] ¶¶ 34, 44. A plaintiff who seeks relief under § 1983 must establish that: (1) the alleged conduct was committed by a person acting under color of state law; and (2) this conduct deprived the plaintiff of rights, privileges,

or immunities secured by the Constitution or laws of the United States. *Griffin v. Roupas*, No. 02-cv-5270, 2003 WL 22232839, at *3 (N.D. Ill. Sept. 22, 2003), *aff'd*, 385 F.3d 1128 (7th Cir. 2004). Defendants assert that Plaintiffs' Amended Complaint fails the second prong of this test. *See* Defs.' Mot. Dismiss [18] 4-5. The Court disagrees.

**\*4** The Supreme Court has long held that voting "is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). The "starting point" for the Court's analysis, therefore, "is a recognition that the Constitution protects the right of all qualified citizens to vote in state and federal elections, and to have their votes counted without debasement or dilution." *Hennings v. Grafton*, 523 F.2d 861, 863-64 (7th Cir. 1975) (citing *Reynolds v. Sims*, 377 U.S. 533, 554 (1964); *Hadley v. Junior College District of Metropolitan Kansas City*, 397 U.S. 50, 52 (1970)).

At the same time, the "very nature of the federal union contemplates separate functions for the states." *Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986). The Constitution "was intended to preserve to the States" the power to "establish and maintain their own separate and independent governments, except insofar as the Constitution itself commands otherwise." *Oregon v. Mitchell*, 400 U.S. 112, 124 (1970).

Thus, when a plaintiff "invokes § 1983 in federal court to challenge the conduct of a state or local election," courts "must balance the protection of the right to vote enshrined in the First and Fourteenth Amendments with the avoidance of excessive entanglement of federal courts in state and local matters." *Parra v. Neal*, 614 F.3d 635, 637 (7th Cir. 2010), *as revised* (July 19, 2010). If "every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a section 1983 gloss." *Bodine*, 788 F.2d at 1272.

In addition to harmonizing this principled tension, courts must remember the practical truth that elections "are generally conducted by volunteers, rather than trained professionals." *Id.* For these volunteers, "whose experience and intelligence vary widely," and for whom the work of conducting elections "is at most an avocation," some "errors and irregularities" are inevitable. *Id.* Many such anomalies, which exhibit "widely differing degrees of severity," afford no constitutional recourse. *Bodine*, 788 F.2d at 1272; *Hennings*, 523 F.2d at 865. Rather, "state election laws must be relied upon to provide the proper remedy." *Hennings*, 523 F.2d at 865.

Accordingly, "not every election irregularity" will "give rise to a constitutional claim and an action under section 1983." *Id.* at 864; *Barr v. Chatman*, 397 F.2d 515, 516 (7th Cir. 1968) ("[A] complaint brought under 42 U.S.C. § 1983, which alleges any voting irregularity, however slight, does not thereby automatically state a claim for relief."). Rather, election irregularities implicate § 1983 "only when defendants have engaged in *willful* conduct which undermines the organic processes by which candidates are elected." *Parra*, 614 F.3d at 637 (internal quotations omitted) (emphasis in original); *see also Kozuszek v. Brewer*, 546 F.3d 485, 488 (7th Cir. 2008); *Dieckhoff v. Severson*, 915 F.2d 1145, 1148 (7th Cir. 1990); *Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 343 (7th Cir. 1987); *Bodine*, 788 F.2d at 1272. "Willful conduct" means, "at a minimum, that the defendants acted with the intent of subverting the electoral process or impairing a citizen's right to vote." *Parra*, 614 F.3d at 637.

**\*5** The seminal Seventh Circuit cases on this issue best illustrate the above standard in light of the particular facts presented here. In *Hennings*, voters in Coles County, Illinois, alleged that malfunctioning electronic voting devices at multiple precincts inaccurately tabulated votes in the 1974 election for county offices. 523 F.2d at 862-63. In addition, the plaintiffs alleged that election officials failed to provide paper ballots as a substitute; failed to exercise proper supervisory oversight in checking access to the machines and preserving the results of the election; and refused to conduct a statutory retabulation to determine the cause of the discrepancies. *Id.* at 863. The plaintiffs claimed that, as a result of the misfeasance, they were deprived of their right to vote.

The Seventh Circuit affirmed judgment in favor of the defendants. The court found that, at most, the record showed "irregularities caused by mechanical or human error." *Id.* at 864. Equally important, such evidence lacked "invidious or fraudulent intent." *Id.* According to the court, "absent aggravating circumstances" of fraud or other willful conduct, mere "[v]oting device malfunction, the failure of election officials to take statutorily prescribed steps to diminish what was at most a theoretical possibility that the devices might be tampered with, and the refusal of those officials after the election to conduct a retabulation," fell "far short of constitutional infractions." *Id.*

Over a decade after *Hennings*, the Seventh Circuit encountered a similar fact pattern in *Bodine*. *Bodine* challenged the use of a computerized voting system for the 1982 general election that electronically tabulated vote counts. *Id.* at 1271. Prior to the election, the clerk of the county election board did not verify the accuracy of computer program control cards or perform any tests to ensure the proper functioning of the system. *Id.* When election officials started the actual tabulation of votes, errors began to appear. *Id.* Multiple patchwork repairs (such as changing control cards) were conducted to correct the problems, but no comprehensive tests or evaluations were performed. *Id.* The plaintiffs, candidates for state and federal offices that ultimately lost their respective races, sued the clerk and the county election board, arguing that the absence of error-free computer testing undermined the legitimacy of the computerized vote count. *Id.* The district court granted summary judgment to the defendants, and the Seventh Circuit affirmed.

The Seventh Circuit stated that the plaintiffs "alleged nothing more than garden variety election irregularities that could have been adequately dealt with through the procedures set forth in Indiana law." *Id.* at 1272. At bottom, the plaintiffs alleged that the defendants failed to "test, count, and certify in accord with Indiana law." *Id.* at 1273. Notably absent from the plaintiffs' theory was "any allegation that the computer control cards were somehow manipulated by the defendants" to alter vote totals and thus undermine the election. *Id.* at 1272-73. Rather, under the plaintiffs' facts, the defendants merely placed the control cards into the computerized voting system "with no knowledge of whether the program would produce error," and if so, "whether that error would be helpful to Republicans or helpful to Democrats." *Id.* According to the court, such evidence was "virtually indistinguishable from the facts of *Hennings*" and showed, at most, "incompetence," or "willful neglect." *Id.* Under § 1983, this is not enough.

Plaintiffs here allege, however, what those in *Hennings* and *Bodine* did not. Plaintiffs not only claim that the Electronic Voting System used during the March 15, 2016 primary election inaccurately tabulated votes, but that BOE employees affirmatively altered tally numbers derived from the permanent paper record so that the recount totals would match the electronic results. Am. Compl. [17] ¶ 30. This manipulation included adding or subtracting tallies from individual candidates, changing votes from one candidate to another, or stopping the recount process once the results matched the electronically tabulated vote totals, regardless of whether uncounted permanent paper record ballots remained. *Id.* ¶ 31. In addition, Plaintiffs allege that the same BOE employees took active measures to obstruct Plaintiff Monitors from monitoring and recording the improprieties as they occurred. *Id.* ¶ 25. Combined, such allegations go beyond the simple voting device malfunction theories alleged in *Hennings*, or the "incompetence" and "willful neglect" shown in *Bodine*. Rather, Plaintiffs plausibly assert the very "invidious or fraudulent intent" and "manipulation" of vote totals deemed necessary by those decisions. As a result, Plaintiffs have sufficiently pled a cause of action under § 1983 at this early stage of the proceedings.

**\*6** In response, Defendants claim that Plaintiffs' allegations stem from the Illinois state Election Code, and a violation of a state law does not state a claim under § 1983. Defs.' Mem. Supp. Mot. Dismiss [18] 4-5. Of course, "to invoke the jurisdiction of the federal courts and to be entitled to relief therefrom," Plaintiffs "must allege more than the mere failure of state officials to follow state law"; they must allege that Defendants "violated some federally protected or constitutionally guaranteed right." *Moore v. Kusper*, 465 F.2d 256, 258 (7th Cir. 1972). The two concepts, however, are not mutually exclusive; Plaintiffs may plausibly allege a violation of *both* state and federal regimes. So long as the latter is properly pled, it "is no answer" that "state law could provide the relief sought." *Hennings*, 523 F.2d at 864. As discussed above, Plaintiffs have adequately pled, in addition to violations of the Illinois Election Code, infringements of the right to vote under § 1983. Defendants' argument, therefore, is unpersuasive.

### 2. Count I States a *Monell* Claim

Defendants alternatively argue that Count I fails to allege the existence of a policy or custom necessary to support municipal liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). Defs.' Mot. Dismiss [18] 7-9. Although *Monell* subjects local governmental units to suit under 42 U.S.C. § 1983, *respondeat superior* will not suffice to impose liability. *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). The municipality's *policy*, not employees, must be the source of the discrimination. *Id.*; *Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir. 1992) ("Municipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents."). Consequently, a § 1983 complaint against a municipality "must plead the existence of a custom or policy that was the direct cause of the deprivation of a federal right." *Caldwell v. City of Elmwood, Ind.*, 959 F.2d 670, 673 (7th Cir. 1992). Specifically, Plaintiffs must plead factual content that would allow the Court to plausibly infer that: (1) they suffered the deprivation of a constitutional right; and (2) an official custom or policy caused that deprivation. *Barwicks v. Dart*, No. 14-cv-8791, 2016 WL 3418570, at *2 (N.D. Ill. June 22, 2016). Regarding the second element, Plaintiffs must plead that the constitutional violation was caused by: (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with final policymaking authority. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011).

Once again, Defendants' argument fails. A § 1983 municipal liability claim "need not meet any heightened pleading standard, but rather must simply set forth sufficient allegations to place the court and defendants on notice of the gravamen of the complaint." *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993). The Seventh Circuit explored the limits of this principle in *White v. City of Chicago*, 829 F.3d 837, 839 (7th Cir. 2016), *cert. denied sub nom.*, 137 S. Ct. 526 (2016). In *White*, following a two-year narcotics investigation, the defendant police officer applied for dozens of arrest warrants, including one for the plaintiff. *Id.* In a later civil suit, the plaintiff claimed that the officer failed to present the judge who issued the warrant with enough information to establish probable cause for the arrest. *Id.* The plaintiff also alleged a *Monell* claim against the City of Chicago for its supposed widespread practice of seeking arrest warrants upon the basis of conclusory complaint forms. *Id.* at 841. The district court originally held that the plaintiff failed to state a *Monell* claim because his complaint only stated that the officer who arrested him "acted in accordance with a widespread practice of the police department of the City of Chicago when seeking a warrant." *Id.* at 843. According to the district court, this conclusory statement was not enough "to draw the reasonable inference that the City maintained a policy, custom, or practice that deprived [the plaintiff] of his constitutional rights." *Id.*

**\*7** The Seventh Circuit found the district court's ruling to be in error. *Id.* Citing *Leatherman*, the court held that the plaintiff's complaint—which cited his individual claim against the officer and further alleged that the officer's conduct was "in accordance with a widespread practice"—"was enough to satisfy the 'short and plain statement of the claim' requirement of Rule 8(a)(2)." *Id.* at 844. According to the court, the plaintiff "was not required to identify every other *or even one other individual* who had been arrested pursuant to a warrant obtained through the complained-of process." *Id.* (citing *Jackson v. Marion County*, 66 F.3d 151, 152-53 (7th Cir. 1995)) (emphasis added).

Here, Plaintiffs have sufficiently pled a *Monell* claim at this point in the proceedings. As discussed above, the Amended Complaint [17] adequately alleges that Plaintiffs suffered a constitutional deprivation of their right to vote during the March 15, 2016 Illinois primary election. Plaintiffs further allege that such deprivations are part "of a broader trend of inconsistencies in 'official' results generated by Direct Recording Electronic Voting Systems, in this election and previous elections." Am. Compl. [17] ¶ 32. In Plaintiffs' view, Defendants conduct was "pervasive and widespread," and the result of the BOE's "*de facto* policy, practice, and procedure of willfully disregarding citizens' right to vote." *Id.* Under *White*, this is sufficient for the purposes of Rule 12(b)(6).

At summary judgment, of course, impropriety from a single incident may not give rise to a *Monell* claim. *See Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014) (stating that although the Seventh Circuit "has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice."). At this stage, however, Plaintiffs "need only *allege* a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists." *Barwicks*, 2016 WL 3418570, at \*4. In other words, Plaintiffs "need only plead that the alleged incident is one of many" occurring in Chicago and "that a widespread practice" gave rise to those incidents. *Id.* at \*5. Plaintiffs have done so. Although Plaintiffs' claim, "like many § 1983 claims, may not have merit," this does not justify the "granting of a motion to dismiss in advance of giving [Plaintiffs] a chance to prove [their] allegations." *Hampton v. City of Chicago*, No. 96-cv-3480, 1997 WL 790590, at \*5 (N.D. Ill. Dec. 17, 1997).

For the reasons stated above, Defendants' Motion to Dismiss [18] Count I is denied. The remaining objections raised in Defendants' motion are best addressed by a more developed record. Defendants argue, for example, that it was "impossible for any irregularities that occurred during the audit to affect the previously decided and announced election results." Defs.' Mot. Dismiss [18] 5. Defendants, however, neglect to develop the state law on this issue, and at this preliminary stage, the Court must generally confine its inquiry "to the factual allegations set forth within the four corners of the operative complaint." *Hakim v. Accenture United States Pension Plan*, 656 F. Supp. 2d 801, 809 (N.D. Ill. 2009). [1] The Court's ruling, of course, takes no position regarding the strength of Plaintiffs' cause of action. At present, it is enough to say that Plaintiffs have sufficiently pled a plausible claim for relief under § 1983.

### B. Count II: Violation of Right to Freedom of Association and to Petition the Government

**\*8** Count II alleges that Defendants' infringed upon Plaintiffs' rights to freedom of association and to petition the government "in one or more of the following ways":

a. Physically obstructing the Plaintiff Monitors from viewing the individual performing the tallies[;] b. Preventing the Plaintiff Monitors from photographing or otherwise documenting the results of the tally sheets[;]

c. [B]ending or obscuring ... tally sheets in a manner to shield them from the Plaintiff Monitors' view[;]

d. Making hostile comments when the Plaintiff Monitors requested that they cease the foregoing activities and refusing to acknowledge or correct any of the aforementioned improprieties and discrepancies;

e. Deliberately misleading the Plaintiff Monitors [who] appeared at the April 5, 2016 BOE meeting ... and preventing the Plaintiff Monitors from commenting prior to [certifying] the returns;

f. Swiftly bringing the certification of the results to a vote ... without permitting the Plaintiff Monitors the opportunity to object to, or publically comment on, the procedures at the 5% "test counts"—despite the fact that they knew these Plaintiffs had attended the public meeting for this very purpose ...; and

g. Otherwise attempt[ing] to hinder or impede the Plaintiff Monitors' ability to monitor the 5% "test counts" as authorized by statute.

Am. Compl. [17] ¶ 48.

#### 1. Count II Fails to State a Freedom of Association Claim

Count II fails to state a proper freedom of association claim against either Defendant. The Constitution "protects two distinct forms of free association." *Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005). The first, freedom of *intimate* association, "protects the right 'to enter into and maintain certain intimate human relationships,' " *id.* (quoting

*Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984)), including marriage, procreation, education of one's children, and cohabitation with one's relatives. *Marshall v. Allen*, 984 F.2d 787, 799 (7th Cir. 1993). The freedom of intimate association "receives protection as a fundamental element of personal liberty, and as such is protected by the due process clauses." *Montgomery*, 410 F.3d at 937 (internal citations and quotations omitted). The second form of free association, freedom of *expressive* association, "arises from the First Amendment and ensures the right to associate for the purpose of engaging in activities protected by the First Amendment," *id.*, including speech, assembly, exercise of religion, and the petition for redress of grievances. *Marshall*, 984 F.2d at 799.

Here, although Count II is clearly based solely upon expressive association, the Court fails to see how Defendants' purported conduct infringed upon that right. Of course, excessive government encroachments "can take a number of forms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The government may, for example, seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group, *see Healy v. James*, 408 U.S. 169, 180-184 (1972); require disclosure of membership in a group seeking anonymity, *see Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87, 91-92 (1982); compel membership of one who significantly affects the group's ability to advocate its viewpoint, *see Christian Legal Soc'y. v. Walker*, 453 F.3d 853, 862 (7th Cir. 2006); or interfere with the internal organization or affairs of the group. *See Cousins v. Wigoda*, 419 U.S. 477, 487-88 (1975). No such actions, however, are alleged here, and the Court is unaware of any case that recognizes a similar freedom of association claim based upon analogous facts. Indeed, from the face of the Amended Complaint, it is not even clear *with whom* Plaintiffs believe they were prevented from associating. Without more (and there is no more here), Plaintiffs' freedom of association claim fails to satisfy Rule 8's pleading standards.

### 2. Count II Fails to State a Petition the Government Claim

**\*9** The First Amendment creates a right to petition the government—including state and local government—for a redress of grievances. *Ogurek v. Gabor*, 827 F.3d 567, 568 (7th Cir. 2016). This right "is cut from the same cloth" as the other guarantees of the First Amendment, *McDonald v. Smith*, 472 U.S. 479, 482 (1985), and thus, "is similar to the right of free speech." *Gray v. Lacke*, 885 F.2d 399, 412 (7th Cir. 1989). As a result, courts analyze an alleged violation of the petition clause "in the same manner as any other alleged violation of the right to engage in free speech." *Id.* (quoting *Phares v. Gustafsson*, 856 F.2d 1003, 1009 (7th Cir. 1988)).

In broad terms, Plaintiffs allege that Defendants infringed upon their right to petition the government: (1) during the testing process itself; and (2) during the April 5, 2016 BOE meeting. Am. Compl. [17] ¶ 48. Plaintiffs' allegations regarding the former do not support a claim. Plaintiffs specifically allege that BOE employees (including Scanlon): (1) physically obstructed the Plaintiff Monitors from viewing the Electronic Voting Systems audit; (2) prevented the Plaintiff Monitors from photographing or otherwise documenting the results of tally sheets; (3) bent or obscured tally sheets in a manner to shield them from the Plaintiff Monitors' view; and (4) made hostile comments when the Plaintiff Monitors requested that BOE employees cease the foregoing activities. *Id.* The first three allegations do not describe "petitioning" activity; they merely relate to Plaintiffs' attempts to observe and document the testing process. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (stating that the First Amendment protects the freedom of *speech* and *expressive conduct*). The fourth allegation *does* assert petitioning activity, but it also acknowledges that BOE employees *received* Plaintiffs' complaints; Plaintiffs' objection stems from the employees' refusal to correct any of the discrepancies. As such, the asserted claim is without merit. Although the government "may not interfere with the right to petition," it "need not grant the petition, no matter how meritorious it is." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000).

Plaintiffs' allegations as they relate to the April 5, 2016 BOE meeting are also deficient. To the extent Plaintiffs sue Scanlon in his individual capacity, Plaintiffs make no allegation that Scanlon was personally involved in preventing the Plaintiff Monitors from speaking prior to the certification of election results. *See Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an

alleged constitutional deprivation.") (emphasis in original). To the extent Plaintiffs sue Scanlon in his official capacity, such claims are redundant with Plaintiffs claim against the BOE. *See Schmidling v. City of Chicago*, 1 F.3d 494, 495 n.1 (7th Cir. 1993) ("A lawsuit against Mayor Daley in his official capacity is the same as a lawsuit against the City of Chicago."); *Williams v. City of Chicago*, No. 94-cv-3350, 1994 WL 594674, at *4 (N.D. Ill. Oct. 29, 1994) ("A suit against a local government official in his or her official capacity is redundant and unnecessary when the municipality is also being sued."). That claim, however, is also flawed, because the Amended Complaint is void of *any* assertion that the BOE's suppression of public comment constituted a widespread practice rather than an isolated occurrence. Under *Monell*, this is not enough. *See Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014).

**\*10** In sum, the above pleading defects, considered collectively, require dismissal of Count II. As it relates to both Defendants, Count II does not allege a cognizable freedom of association claim, nor a government petition claim for Defendants' actions during the testing process. As to Plaintiffs' allegations regarding the April 5, 2016 BOE meeting, Count II likewise fails to allege personal involvement by Scanlon, or a widespread practice by the Chicago BOE. Accordingly, Defendants' Motion to Dismiss [18] Count II is granted.

### C. Count III: Declaratory Judgment and Injunctive Relief

Apart from claiming that Count III depends upon the survival of Counts I and II, Defendants make no other argument as to why Count III should be dismissed. Because Count I remains, Defendants' Motion to Dismiss [18] Count III is denied.

### IV. Conclusion

For the reasons discussed above, Defendants' Motion to Dismiss [18] is granted as to Count II and denied as to Counts I and III.

### All Citations

Slip Copy, 2017 WL 1208520

### Footnotes

1    For the same reasons, the Court must decline to rule on Scanlon's qualified immunity claim. *See* Defs.' Mot. Dismiss [18] 13-14.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5567552
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division

Richard Listenbee, Plaintiff,

v.

City of Harvey, et al., Defendants.

No. 11 C 03031
|
Filed October 9, 2013

**Attorneys and Law Firms**

Sarah R. Wolff, Reed Smith LLP, Chicago, IL, for Plaintiff.

Johner Taylor Wilson, III, Julie P. Sieracki, Daley Mohan Groble, P.C., Chicago, IL, for Defendants.

**Opinion**

### *MEMORANDUM OPINION AND ORDER*

John J. Tharp, Jr., United States District Judge

**\*1**  Richard Listenbee alleges that a City of Harvey police officer, defendant Steven Kelley, attacked him without provocation and savagely beat him. He also asserts that after he received treatment at the hospital for his injuries, he was confined at the jail and denied access to his prescribed medication and all medical care for 30 hours, until he was transported to court and, ultimately, to the Cook County jail. In his Third Amended Complaint (Dkt.96), Listenbee brings claims under 42 U.S.C. § 1983 for excessive force and deliberate indifference, in violation of the Fourth and Fourteenth Amendments, respectively. These claims are brought against individual officers as well as the City of Harvey, which, according to Listenbee, is liable because its *de facto* policies caused and failed to prevent his injuries. *See Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690 (1978). Listenbee also brings state-law claims of assault, battery, and intentional infliction of emotional distress against Officer Kelley and, under the theory of *respondeat superior,* the City of Harvey. The City now moves to dismiss the *Monell* claims and the allegation of liability via respondeat superior to the extent it applies to the constitutional claims. The motion is denied for the reasons set forth below.

### FACTS

For purposes of this Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts alleged in the complaint and draws all possible inferences in favor of the plaintiff. *See Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir.2008). Therefore the Court recounts the following events as set forth in the complaint.

In the early evening on September 16, 2010, Listenbee went to the Harvey Police Department headquarters to speak to a detective, Derrick Muhammed, and was informed that Detective Muhammed was not there. Listenbee left a message for him and left the building to return to his car. On his way to the parking lot, he heard someone yelling; he turned to see Officer Steven Kelley approaching him, screaming and "yelling something that [Listenbee] did not understand." Listenbee began to ask Kelley "what was the problem," and, without warning, Kelley removed a metal baton from his belt and struck Listenbee across the head with it. Listenbee put up his hands to protect his head and face and backed

away from Kelley, who "by then began striking [Listenbee] multiple times on his head and body with his metal baton." Listenbee felt a sharp pain in his left forearm, near his wrist. Now "fearing for his life," Listenbee "took off running" but ultimately surrendered by lying down on his stomach. By then, he was bleeding profusely from his head.

Kelley brought Listenbee to the booking area of the police station. Listenbee was then taken by ambulance to the emergency room of a local hospital. Listenbee received 21 staples in his head to stop the bleeding. An X–Ray revealed that his arm was severely broken, and it was placed into a splint and a sling. Kelley, who had accompanied Listenbee to the hospital, was present until his shift ended and he was relieved by an Officer Curtwood.

**\*2** When the hospital discharged Listenbee, his discharge paperwork was given to Officer Curtwood. The discharge papers contained specific instructions for follow-up care and prescriptions for an antibiotic and a pain reliever. Officer Curtwood transported Listenbee back to the police station and gave the discharge papers to the on-duty booking officer. Listenbee was held in the jail at the police station for the next 30 hours without receiving his medication or any further medical attention.

During his 30–hour detention, Listenbee repeatedly complained to any police officer who came within hearing distance that he was in severe pain. He also informed officers (as yet unidentified) that he was in need of medication he had been prescribed at the emergency room. Listenbee's complaints were ignored. One officer told Listenbee that nothing could be done for him without the approval of a shift supervisor, who was not present at the station. Listenbee was in extreme and constant pain as a result of his broken arm and head injuries. However, when Listenbee was brought to the Cook County jail after his court appearance, the Harvey officers told him to lie to the intake personnel at the jail about his condition, lest the jail refuse to take him and he be returned to the Harvey jail. Listenbee complied, in the hope that he would be processed there and given medical care instead of being returned to the Harvey jail.

In addition to setting forth these allegations in his complaint, Listenbee asserts that these events occurred as result of what can be deemed official City of Harvey policies under the *Monell* doctrine. Listenbee alleges that the excessive force used by Officer Kelley can be attributed to the City's widespread practice, and *de facto* policy, of: (1) "failing to adequately train, supervise, and control its officers"; (2) "failing to adequately punish and discipline prior instances of similar misconduct, including excessive force, thereby leading Harvey police officers to believe their actions will not be scrutinized and ... encourage[ing] future abuses"; (3) and allowing "systemic deficiencies in its administrative investigations of use of force and citizen's complaints alleging improper use of force" such that officers "would feel comfortable that field misconduct, particularly use of excessive and unreasonable force, would not be discovered or would not result in any sanction." With respect to the denial of medical care, Listenbee alleges that the City routinely denied pretrial detainees access to proper or sufficient medication and medical treatment, and instituted practices that: (1) allowed police department staff "to not accurately document medication(s), treatments, and observations of the health status of its pretrial detainees"; (2) allowed staff "to ignore a physician's orders for prescribed medication and continuing medical treatment": (3) prevented staff from "adequately assessing, monitoring, observing, documenting, or providing or obtaining needed medical services," and (4) prevented "an adequate plan for emergency medical needs," "a system in place so that medical requests of detainees would be reviewed promptly," and "a system in place whereby a pretrial detainee's prescribed medication would be properly administered."

## DISCUSSION

The City of Harvey moves to dismiss the claims against it that allege *Monell* liability for excessive force and denial of medical care. "In a civil rights case alleging municipal liability, a federal court may not apply a heightened pleading standard more stringent than the usual Rule 8(a) pleading requirements." *Estate of Sims ex rel. Sims v. County of Bureau,* 506 F.3d 509, 514 (7th Cir.2007) (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 165 (1993)). At this point it is well settled that, in order to survive a motion to dismiss, a complaint must

contain allegations that state a claim to relief that is plausible on its face. *McCauley v. City of Chicago,* 671 F.3d 611, 615 (7th Cir.2011) (citing *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The plaintiff must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**\*3** A claim of liability pursuant to the *Monell* doctrine requires the plaintiff to plead facts allowing the inference that the plaintiff's injuries resulted from "official municipal policy," which can take three forms: "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson,* 131 S.Ct. 1350, 1359 (2011). The plaintiff cannot simply hold a municipality vicariously liable for the actions of its employees. *Id.*

Here, the plaintiff alleges an official municipal policy in the form of widespread practices that amount to *de facto* policy. The Seventh Circuit has declined to adopt "any bright-line rules defining a 'widespread custom or practice.' " *See Thomas v. Cook County Sheriff's Dept.* 604 F.3d 293, 303 (7th Cir.2010). To adequately claim that "there is a policy at issue rather than a random event," as required, the plaintiff might allege "an implicit policy or a gap in expressed policies," or "a series of violations." *Id.* (internal quotation marks and citations omitted). Although there is no clear consensus as to how frequently the misconduct must occur to support *Monell* liability, it must be more than one or even three instances. *Id.* (citing examples).

It is primarily this last point that drives the City's argument that Listenbee fails to state a claim for municipal liability. The City contends that Listenbee fails to plead any facts that support the conclusion that his injuries resulted from some widespread practice, and specifically that he "has not alleged any other instances similar to his, and has not cited any other cases which would support" the existence of some policy in the City of Harvey. As to the excessive force claim, the City argues that Listenbee's factual allegations relate only to the one-time conduct of Officer Kelley, and are therefore inadequate to render a *Monell* claim plausible. Regarding the denial of medical care, the City argues that Listenbee simply pleads legal conclusions and does not support his assertion that the City "routinely denied" proper medical care to pretrial detainees. In response, Listenbee argues that he met his modest burden at the pleading stage and that the City is attempting to hold him to a heightened pleading standard. Although the Court agrees that Listenbee's *Monell*-specific allegations are general and conclusory, [1] the balance of his factual assertions about his experience are sufficient to nudge his *Monell* claims across the plausibility threshold.

With respect to the excessive-force claim, although the Court does not credit those of Listenbee's allegations that amount to legal conclusions that his injuries resulted from an official policy, *see Iqbal,* 556 U.S. at 678, it finds that the complaint sufficiently alleges facts that make plausible an inference that this incident was not purely a "random event" but rather the product of the City's adoption of a *de facto* policy of tolerating the use of excessive force. Listenbee alleges that Harvey police officers do not receive adequate use-of-force training and that they operate in a culture where the use of force is not documented or investigated in a meaningful way, and further where the use of excessive force is not punished. It is settled that a failure to train can form the basis of *Monell* liability when it results from deliberate indifference to rights of persons with whom the police come into contact. [2] *City of Canton v. Harris,* 489 U.S. 378, 388 (1989); *see Thomas,* 604 F.3d at 303 ("[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable."). Here, Listenbee's factual allegations support the inference that the violence he experienced was not an isolated incident and could have resulted from a policy or practice of the police department. Listenbee alleges a brutal, unprovoked attack that began just outside the police headquarters, suggesting that Kelley made no attempt to avoid detection and had no expectation of negative reaction by superiors or other police officers. Likewise, the severity and readily observable placement of Listenbee's injuries—particularly the profuse bleeding from his head—permit an inference, at this stage, that Kelley had nothing to fear by severely injuring an individual who was not even an arrestee at the time of the attack.

**\*4**  There is more. Despite disclaiming any responsibility to provide evidence at the pleading stage, Listenbee attaches to his response brief a 2012 report from the Civil Rights Division of the Department of Justice, which investigated the use of force by Harvey police officers and made findings and recommendations to improve "serious deficiencies" that "create an unreasonable risk that constitutional violations will occur." *See* 1/18/2012 DOJ Letter, Dkt. # 106–2. This letter is properly considered in support of Listenbee's claims at the motion-to-dismiss stage. In opposing a Rule 12(b)(6) motion, a plaintiff may elaborate on his factual allegations, so long as the new elaborations are consistent with the pleadings, and may submit materials outside the pleadings to illustrate the facts he expects to be able to prove. *Geinosky v. Chicago,* 675 F.3d 743, 746 n.1 (7th Cir.2012) (citing numerous cases). Indeed, the Seventh Circuit has advised that, in the wake of *Twombly* and *Iqbal,* a plaintiff "who can provide such illustration may find it prudent to do so." *Id.* Here, the DOJ letter lends plausibility to Listenbee's allegations that his beating was not an isolated incident but the product of systemic shortcomings. [3]

The same is true for the denial of medical care claim, here governed by the Fourteenth Amendment's due process guarantee, rather than the Eighth Amendment, although the "deliberate indifference" standard applies either way. [4] *See King v. Kramer,* 680 F.3d 1013, 1017 (7th Cir.2012). Listenbee contends that the detainees at the Harvey jail are "routinely" denied medical care. According to the complaint this routine practice is attributable to the absence of an appropriate system for accurately documenting and administering medical and medication needs, observing the health status of detainees, and promptly reviewing medical requests from detainees, among other shortcomings. *See Harris,* 489 U.S. at 390 ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."). The DOJ letter suggests that Harvey officers routinely fail to state whether arrestees "sustained any injuries or received medical care," which lends plausibility to Listenbee's allegations that Harvey lacks systems for appropriately acknowledging and documenting arrestee's injuries, let alone providing access to medical care for them. The DOJ letter also recommends that the Harvey police department make it a policy to have supervisors report to the scene of any arrest involving the use of force that caused serious injury, "to ensure that all injured are provided care." Again, this bolsters Listenbee's allegation that in 2010, the Harvey police did not have policies that ensured all injured arrestees were provided care.

Listenbee's deliberate indifference claim is also rendered plausible by the allegations regarding his own experience while locked up in the Harvey jail. For instance, he alleges that multiple police officers or staff saw his condition and failed to provide any help or relief. He alleges that he complained to anyone within hearing distance that he was in severe pain, and he was either ignored or told that nothing could be done for him. These allegations permit the inference that, rather than being an isolated incident, Listenbee's experience at the jail was the product of a policy of indifference to the health of detainees.

**\*5**  Finally, the City argues that it cannot be held liable on a *respondeat superior* theory for the constitutional claims, and that those claims must be dismissed against it to the extent plaintiff relies on that theory. The Court does not see in the complaint any attempt to assert *respondeat superior* liability for the constitutional claims; Count IV alleges that the City of Harvey is liable under *respondeat superior* for "all torts committed by its agent," Officer Kelley. The Complaint alleges assault, battery, and intentional infliction of emotional distress by Kelley, and it follows that those are the "torts" referred to in Count IV. Of course, the *Monell* doctrine precludes *respondeat superior* liability for municipalities for the constitutional violations of its employees, *see Monell,* 436 U.S. at 691, but the Court sees nothing in the complaint that runs afoul of that settled rule.

\* \* \*

Because the complaint plausibly alleges that *de facto* policies of the City caused his injuries arising from the use of excessive force and subsequent denial of medical care, the City of Harvey's motion to dismiss the plaintiff's *Monell* claims is denied.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5567552

Footnotes

1    The Court does not endorse the practice of simply listing the elements of a *Monell* claim in conclusory fashion. *See McCauley v. City of Chicago,* 671 F.3d 611 (7th Cir.2011); *Strauss v. City of Chicago,* 760 F.2d 765 (7th Cir.1985) In addition to alleging a municipal policy, the plaintiff must allege "facts to suggest that the policies of which he complains *actually exist.*" *Strauss,* 760 F.2d at 767 (emphasis added). Here, beyond his generic *Monell* allegations, the plaintiff pleads other facts which make it sufficiently plausible that this was not an isolated incident. It is not his bare allegations of an official policy that allow the claim to proceed.

2    It is fairly obvious what discovery would be needed to uncover how, as of 2010, the City trained its police officers on the use of force and handled use-of-force incidents—contrary to the City's alarmist statement that Listenbee's allegations "cannot be reasonably investigated or defended in any fashion." Mem., Dkt. 102 at 4.

3    In noting that the DOJ letter lends plausibility to the plaintiff's allegations, the Court makes no findings that information set forth in the report is accurate or admissible; those questions remain fully open as the case moves forward. Rather, the Court simply notes that the existence of this recent critical and independent review of the City's policies and procedures lends permissible support to the plaintiff's allegations at the pleading stage.

4    Despite the parallel standard, as a pretrial detainee, Listenbee was entitled to "at least—and probably more" protection than a convicted criminal. *See Belbachir v. County of McHenry,* 726 F.3d 975, 979 (7th Cit.2013) (quotation marks omitted).

---

**End of Document**      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 347451
Only the Westlaw citation is currently available.
United States District Court,
N.D. Indiana.

Craig A. Lozanovski, Plaintiff,

v.

City of Crown Point, et al., Defendants.

CAUSE NO.: 2:15-CV-454-TLS
|
Signed 01/24/2017

**Attorneys and Law Firms**

Richard P. Busse, Valparaiso, IN, for Plaintiff.

John V. Maurovich, Matthew L. Hinkle, Coots Henke & Wheeler PC, Carmel, IN, for Defendants.

**Opinion**

## OPINION AND ORDER

THERESA L. SPRINGMANN, UNITED STATES DISTRICT COURT JUDGE

**\*1** This matter comes before the Court on Defendants Scott Bourrell, Derrell Joslyn, Robert Ballas, Mille Knezevic (collectively "the Defendant Officers"), and City of Crown Point, Indiana's Motion to Dismiss [ECF No. 26] the Amended Complaint [ECF No. 25] of Plaintiff Craig Lozanovski. The City of Crown Point moved to dismiss pursuant to Rule 12(b)(6), asserting that the Amended Complaint fails to state a claim upon which relief can be granted, and all Defendants moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(5), asserting that they received insufficient service of process. On August 29, 2016, the Plaintiff filed his Response [ECF No. 30] to the Motion. The Defendants' Reply [ECF No. 31] was entered September 8, 2016. This matter is now ripe for the Court's review.

## COMPLAINT ALLEGATIONS

At about 6:30 p.m. on December 17, 2013, "Officer Bourrell came to the Crown Point Theater ... to investigate an alleged harassment complaint against the Plaintiff." (Am. Compl. ¶ 9, ECF No. 25.) Finding the Theater locked, Officer Bourrell knocked on the ticket booth window, at which point the Plaintiff opened the window and said "Hello, how can I help you?" (*Id.* ¶¶ 9–10.) Officer Bourrell said "Open the door I need to talk to you," so the Plaintiff opened the main entrance door and met Officer Bourrell "about four feet into the theater." (*Id.* ¶¶ 11–13.) The Plaintiff once more asked if he could help Officer Bourrell while placing his hands in his jacket pockets, to which Officer Bourrell said, "Take your hands out of your pocket[s]." (*Id.* ¶¶ 13–14.) He did not immediately take his hands out of his pockets, so Officer Bourrell "put his hand on his service revolver." (*Id.* ¶¶ 15–16.) In response, the Plaintiff removed his hands from his pockets, raised them into the air, and stated "I have no weapons." (*Id.* ¶ 17.)

Officer Bourrell ordered the Plaintiff outside, he grabbed the "Plaintiff by the jacket and pulled him through the doorway and began punching Plaintiff in the face," twelve or fifteen times. (*Id.* ¶¶ 18–21.) Once outside, Officer Bourrell ordered

the Plaintiff to "[g]et to the ground" while still punching him, but the Plaintiff hesitated because there was "ice and snow on the ground." (*Id.* ¶¶ 22, 24.) "At that point, Officer Ballas put Plaintiff in a choke hold and wrestled him to the ground" and, while "laying face down on the ground with his hands at his side," Officer Josleyn used his Taser on the Plaintiff's right shoulder twice. (*Id.* ¶¶ 26–28.) [1] Officer Knezevic eventually arrived on the scene, "did nothing to stop the beating and abuse of the Plaintiff," and instead joined in. (*Id.* ¶ 29.) Finally, the "Plaintiff was handcuffed and taken to the Crown Point Police station." (*Id.* ¶ 30.) [2]

**\*2** The "Plaintiff was treated at the hospital and then released to his father," "never returned to work," and in May 2014 "was awarded social security disability ... and is traumatized when he goes into the public." (*Id.* ¶¶ 32–33.) The Plaintiff alleges claims under 42 U.S.C. § 1983 against the City of Crown Point for violation of his Fourth and Fourteenth Amendment rights, and against the Defendant Officers for use of excessive force in violation of his Fourth and Fourteenth Amendment rights. (*Id.* ¶¶ 46–48.)

## STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint and not the merits of the suit. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). The court presumes all well-pleaded allegations to be true, views them in the light most favorable to the plaintiff, and accepts as true all reasonable inferences to be drawn from the allegations. *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995).

The Supreme Court has articulated the following standard regarding factual allegations that are required to survive dismissal:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks, ellipsis, citations, and footnote omitted). A complaint must contain sufficient factual matter to "state a claim that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Although the court must accept as true all well-pleaded facts and draw all permissible inferences in the plaintiff's favor, it need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly* at 555). Legal conclusions can provide a complaint's framework, but unless well-pleaded factual allegations move the claims from conceivable to plausible, they are insufficient to state a claim. *Id.* at 680. A plaintiff can also plead himself out of court if he pleads facts that preclude relief. *See Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011);*Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007); *McCready v. Ebay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006). Finally, determining whether a complaint states a plausible claim for relief requires a reviewing court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## ANALYSIS

This Court's subject-matter jurisdiction over the § 1983 claims arises under 28 U.S.C. § 1331. The Court first analyzes the sufficiency of the Plaintiff's § 1983 claim against the City of Crown Point and then analyzes whether there was insufficient service of process.

### A. Rule 12(b)(6): Failure to State a Claim Upon Which Relief Can Be Granted

The Plaintiff alleges a 42 U.S.C. § 1983 claim, premised on the Fourth and Fourteenth Amendments, against the City of Crown Point. When public officers violate the constitutional rights of citizens, § 1983 provides the vehicle for a legal claim. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). Section 1983 imposes liability on any "person" who, while acting under color of state law, deprives an individual of federally protected rights. 42 U.S.C. § 1983; *see Gomez v. Toledo*, 446 U.S. 635, 640 (1980). A municipality is a "person" under the law. *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, "Section 1983 does not establish a system of vicarious responsibility." *Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009). Instead, "[l]iability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Id.* at 594; *see also Monell*, 436 U.S. at 694 (holding that a "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents"). Therefore, a government entity can be held liable under § 1983 for its own acts, as opposed to those of its employees, as long as those acts are the moving force behind the constitutional violation. *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 514–15 (7th Cir. 2007).

**\*3** A government entity acts through its official policy or custom, which can be demonstrated by the following:

> (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) the constitutional injury was caused by a person with final policymaking authority.

*Id.* at 515; *Baxter v. Vigo Cty. Sch. Corp.*, 26 F.3d 728, 735 (7th Cir. 1994). Liability based upon a widespread practice requires a showing that a number of similar incidents establish an unconstitutional pattern of conduct. *Palmer v. Marion Cty.*, 327 F.3d 588, 595–96 (7th Cir. 2003).

Here, only two sets of allegations in the Amended Complaint could support § 1983 liability: the incidents of December 17, 2013, and the four separate lawsuits against the City of Crown Point involving alleged constitutional violations. The Plaintiff argues that these allegations demonstrate a widespread practice sufficient to survive a Rule 12(b)(6) motion in accordance with *White v. City of Chicago*, 829 F.3d 837 (7th Cir. 2016). In *White*, an arrestee brought a § 1983 claim against the City of Chicago and one of its police officers for seeking a warrant to arrest him for a narcotics offense without probable cause. *Id.* at 840–41. The complaint alleged that the police officer asked a judge for a warrant without any evidence of a drug-related offense and included the police department's "standard printed form that does not require specific factual support for an application for an arrest warrant." *Id.* at 844. These allegations met the "short and plain statement of the claim" requirement of Rule 8(a)(2), as the printed form was direct evidence that tended to show that the municipality was liable under § 1983. *Id.* (citing *Jackson v. Marion Cty.*, 66 F.3d 151, 152–53 (7th Cir. 1995)). [3]

The Plaintiff's reliance on *White* is misplaced. The allegations in *White* included direct evidence that would have raised the right to relief above the speculative level. By contrast, the four cases filed against the City of Crown Point are not direct evidence that the City has a custom or policy that violates the Constitution. Further, those cases do not create an inference of liability for a *Monell* claim, for "the number of complaints filed, without more, indicates nothing." *See Strauss v. City of Chi.*, 760 F.2d 765, 768–69 (7th Cir. 1985) ("People may file a complaint for many reasons, or for no reason at all. That they filed complaints does not indicate that the policies that [plaintiff] alleges exist do in fact exist and did contribute to his injury."); *Rikas v. Babusch*, No. 13 CV 2069, 2014 WL 960788, at \*3 (N.D. Ill. Mar. 12, 2014) (noting that prior lawsuits, which were "ultimately settled ... w[ith] no finding of liability," did not "evidence a widespread municipal practice" under *Monell*).

**\*4** All that remains for consideration on the Motion to Dismiss the Amended Complaint are the allegations about the incident on December 17, 2013. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Okla. City v. Tuttle,* 471 U.S. 808, 823–24 (1985). The Plaintiff does not argue that the incident of December 17, 2013, was the result of such a policy, nor does he argue that any of the named Defendants had final policymaking authority. Accordingly, the Amended Complaint fails to state a claim that there was a widespread practice or custom within the City of Crown Point authorizing the use of excessive force. Accordingly, the Defendant's Motion to Dismiss pursuant to Rule 12(b)(6) is granted as to the claims against the City of Crown Point.

**B. Rule 12(b)(5): Insufficient Service of Process**

The Defendants argue that the Plaintiff's service of process was insufficient, which the Plaintiff disputes. In the event service of process was insufficient, the Plaintiff seeks leave from the Court to correct process. The sufficiency of the service of process is analyzed for the Defendant Officers only because the Court previously dismissed the claims against the City of Crown Point.

"After commencing a federal suit, the plaintiff must ensure that each defendant receives a summons and a copy of the complaint against it." *Cardenas v. City of Chi.,* 646 F.3d 1001, 1004 (7th Cir. 2011). A Rule 12(b)(5) motion is a dismissal based upon insufficient service of process, the requirements for which are set out in Rule 4(m):

> If a defendant is not served within 90 days after the complaint is filed, the court— on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period....

Furthermore, a party may serve an individual within a judicial district of the United States by either:

(1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

(2) doing any of the following:

(A) delivering a copy of the summons and of the complaint to the individual personally;

(B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

(C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e). Under Indiana law, a party may serve an individual via certified mail "with return receipt requested and returned showing receipt of the letter." Ind. Trial Rule 4.1(a)(1). Here, the Plaintiff attempted to serve process upon the Defendant Officers via certified mail. None of the Defendant Officers received the certified mail, [4] as Travis Thomas signed for all of the mailings that the Plaintiff sent to the Defendant Officers. [5] An individual's agent is one of "those persons having the authority to accept service" on behalf of a party via certified mail under Indiana law. *LaPalme v. Romero,* 621 N.E.2d 1102, 1106 (Ind. 1993) (citing Ind. Trial Rule 4.1(A)(3)); *see also* Ind. Trial Rule 4.16 (enumerating duties of "[a]nyone accepting service for another person"). "In order for a court to find that a person acted as a party's agent by appointment or agreement, there must be evidence of that appointment or agreement." *Goodman v. Clark,* No. 2:09-CV-355, 2010 WL 2838396, at \*8 (N.D. Ind. July 12, 2010) (citing *Schultz v. Schultz,* 436 F.2d 635, 638–39 (7th Cir. 1971)).

**\*5** Here, there are no allegations and no evidence to enable the Court to find that Thomas was the Defendant Officers' agent. He stated that he had "never been expressly authorized or expressly appointed by [the Defendant Officers] to accept service of process on their behalf." (Thomas Aff. ¶ 2, ECF No. 27-2.) The Plaintiff offers no evidence in rebuttal, stating only that, "If Mr. Thomas did not have representative capacity, he should not have signed" at the time of delivery. (Resp. 4.) Whatever the merits of this statement, it does not render the form of service effected in this case sufficient under the Indiana or federal laws. Therefore, insufficient service of process was executed upon the Defendant Officers. Pursuant to Rule 4(m), the Court orders the Plaintiff to perfect service within 30 days of the issuance of this Order.

### CONCLUSION

For the reasons stated above, the Motion to Dismiss [ECF No. 26] is GRANTED IN PART and DENIED IN PART. The Court GRANTS the Motion to Dismiss pursuant to Rule 12(b)(6) the claims against Defendant City of Crown Point, Indiana. The Court ORDERS the Plaintiff to perfect service upon the Defendant Officers by February 23, 2017. If service is not perfected by February 23, 2017, this action will be dismissed without prejudice against the unserved Defendant Officers.

SO ORDERED on January 24, 2017.

### All Citations

Slip Copy, 2017 WL 347451

### Footnotes

1   The Amended Complaint does not allege at what point Officers Josleyn or Ballas arrived on the scene or that either Officer arrived with Officer Bourrell.

2   The Amended Complaint alleges that he "was not booked until December 21, 2015," but the Court thinks it is more likely that the Plaintiff's attorney meant to state that he was not booked for four days, until December 21, *2013.* (Am. Compl. ¶ 30 (emphasis added).)

3   *White* was nevertheless dismissed on other grounds, which are inapplicable to the present case. 829 F.3d at 844 (finding that the police officer's sworn testimony "provided sufficient evidence to establish probable cause," which in turn "establishe[d] that [arrestee] did not suffer a constitutional injury, ... a necessary element of a *Monell* claim.").

4   The parties briefly discussed whether some of the Defendant Officers had actual notice of the lawsuit, but that is immaterial to determining whether service of process was sufficient under both Indiana and federal law.

5   Neither the Amended Complaint, the parties' briefings on this Motion, or Travis Thomas's Affidavit [ECF No. 27-2] allege what Thomas's employment status was or what his relationship was to the Defendant Officers. The parties' briefings appear to treat Thomas as an employee within the police department.

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4046351
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Donald Lee MCDONALD, Plaintiff,

v.

Saleh OBAISI and Wexford Health Sources Inc., Defendants.

Case No. 16-CV-5417
|
Signed 09/13/2017

**Attorneys and Law Firms**

Benjamin Isaac Friedman, Lucas Thor Rael, Patrick Edward Croke, Charles William Douglas, Sidley Austin LLP, Chicago, IL, for Plaintiff.

Matthew H. Weller, Joseph Jack Lombardo, Cassiday Schade LLP, Chicago, IL, for Defendants.

**Opinion**

## <u>MEMORANDUM OPINION & ORDER</u>

Joan B. Gottschall, United States District Judge

**\*1** The plaintiff, Donald Lee McDonald ("McDonald"), is a prisoner at Stateville Correctional Center ("Stateville") in Joliet, Illinois. 1st Am. Compl. ("FAC") ¶ 4, ECF No. 19. This litigation concerns his medical care. McDonald alleges that he has suffered from spinal stenosis for years. Spinal stenosis "is a narrowing of the open spaces in the spine, which can put pressure on the spinal cord and the nerves that travel through the spine to the arms and legs." FAC at 3 n.1 (citation omitted). McDonald has complained of severe, chronic lower back pain for years, but, he alleges, Stateville medical personnel have provided, and continue to provide, inadequate care. *See* FAC ¶¶ 7–14. As a result, McDonald claims that he has needlessly suffered agonizing pain and that he still needs surgery. FAC at 1. In his amended complaint, which the court refers to simply as the complaint, McDonald brings claims under 42 U.S.C. § 1983, the Eighth Amendment, and Illinois law. Defendants move to dismiss three counts for failure to state a claim upon which relief can be granted. For the following reasons, the court grants the motion in part and denies it in part.

### I. BACKGROUND

This case is a partial sequel to *McDonald v. Wexford Health Sources, Inc.*, No. 1:09-cv-04196 (N.D. Ill.). *See generally McDonald v. Wexford Health Sources, Inc.*, No. 09 C 4196, 2015 WL 3896929, at \*1–4 (N.D. Ill. June 23, 2015) (summarizing claims and evidence at summary judgment). McDonald names two defendants in this case: Wexford Health Sources, Inc. ("Wexford") and Dr. Saleh Obaisi ("Obaisi"). Under contract with the Illinois Department of Corrections, Wexford provides medical care to Stateville prisoners, FAC ¶ 5, and Obaisi "is responsible for implementing, overseeing, and supervising medical care at Stateville," FAC ¶ 6. McDonald sues Obaisi in his individual capacity. FAC ¶ 6. The prior McDonald case concerned McDonald's medical care during an earlier period in which Dr. Parthasarathi Ghosh served as Stateville's medical director. *See* FAC at 4 n.2.

The court takes the following facts from the complaint and accepts them as true for purposes of deciding defendants' motion. McDonald suffered severe lower back pain for years before 2013. He "consistently requested medical attention from Wexford staff to reduce or eliminate the pain." FAC ¶ 7. By April 2013, the pain had begun to spread to his extremities. FAC ¶ 8. Obaisi considered ordering two diagnostic tests, an MRI (magnetic resonance imaging) and EMG (electromyography), to diagnose McDonald but decided not to do so. FAC ¶ 8. Another Wexford employee whose identity is unknown reevaluated McDonald on August 30, 2013. FAC ¶ 9. The unknown doctor recommended that Obaisi reevaluate McDonald and scheduled an appointment with Obaisi, but the reevaluation never took place. FAC ¶ 9. Almost two years later, on July 28, 2015, Obaisi ordered an MRI and EMG. FAC ¶ 10. The findings in the report on the MRI, which Wexford received in September 2015, were "significant," prompting Wexford doctors "to "suspect surgery will be necessary sooner rather than later." FAC ¶ 11 (quoting unspecified source). Another unknown Stateville doctor recommended that McDonald receive a neurosurgical consultation. FAC ¶ 11.

**\*2** McDonald alleges that Wexford staff provided improper and inadequate care before and after he was diagnosed with spinal stenosis. FAC ¶¶ 12–14. For instance, Obaisi and other Wexford doctors sometimes prescribed pain medication for McDonald, but Wexford employees, such as nurses, refused to distribute it to him. FAC ¶ 13. McDonald asked them why, but he got no answer. FAC ¶ 13. He had yet to receive surgery when he filed his first amended complaint. FAC at 1.

## II. LEGAL STANDARD

A Rule 12(b)(6) motion "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). A complaint need only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together."). For purposes of a motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

## III. § 1983 CLAIMS

In 42 U.S.C. § 1983, Congress created a damages remedy for violations of federal law by a person acting "under color of" state law. *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017); *Brown v. Randle*, 847 F.3d 861, 865 (7th Cir. 2017). In count seven, McDonald seeks to impose § 1983 liability on Wexford, a private corporation which has been contracted by the Illinois Department of Corrections to provide medical services at Stateville, under the doctrine of respondeat superior. Count three aims to hold Wexford and Obaisi liable under a "supervisory liability" theory.

### A. Respondeat Superior For Wexford (Count Seven)

The well-established doctrine of respondeat superior "makes employers liable for their employees' actions within the scope of their employment." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793 (7th Cir. 2014) (citing Restatement (3d) of Agency § 2.04 (2006)) (other citations omitted). McDonald asserts that Wexford is vicariously liable for its employees' actions, including Obaisi's, under Illinois law. FAC ¶¶ 56–57. Defendants do not take issue with McDonald's use of respondeat superior for his claims under Illinois law. But, Wexford contends, McDonald cannot use respondeat superior

to impose vicarious liability on it under § 1983. *See* FAC ¶ 58 (alleging that "Wexford, as a private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees acting within the scope of their employment").

As McDonald concedes, Wexford wins this argument under binding Seventh Circuit precedent. FAC at 15 n.4; Resp. to Mot. to Dismiss 15 ("Resp."), ECF No. 36. The Seventh Circuit explained in *Shields*, *supra*, that its "controlling precedents" hold that "a private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. Respondeat superior liability does not apply to private corporations under § 1983." *Shields*, 746 F.3d at 789 (citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). *Shields* upheld the dismissal of a § 1983 claim against Wexford for this very reason. *Id.* But the *Shields* court opined that this rule "deserve[s] fresh consideration, though it would take a decision by [the Seventh Circuit] sitting en banc or pursuant to Circuit Rule 40(e), or a decision by the Supreme Court to overrule" controlling Seventh Circuit precedent. *Id.*; *see also id.* at 789–96; *id.* at 801 (Tinder, J., concurring in the judgment). Based on this language, McDonald says that he pleaded his § 1983 respondeat superior theory to preserve it for possible appeal. Resp. 15. Because this court must follow binding Seventh Circuit precedent until the Seventh Circuit or Supreme Court tells it to do otherwise, this court dismisses the FAC's § 1983 respondeat superior allegations. *See Collins v. Al-Shami*, 851 F.3d 727, 734 (7th Cir. 2017) (citations omitted) (reaffirming rule that "[u]nder existing precedent, neither public nor private entities may be held vicariously liable under § 1983"); *Shields*, 746 F.3d at 789.

### B. The "Supervisory Liability" of Both Defendants (Count Three)

**\*3** McDonald titled count three as a § 1983 claim against all defendants premised on "failure to train or supervise." FAC at 9. He alleges that Wexford and Obaisi "were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding medical care to inmates." FAC ¶ 30. They "had notice of widespread policies and practices by healthcare and correctional employees at Stateville pursuant to which prisoners like Mr. McDonald with serious medical needs were routinely denied medical care and access to medical care." FAC ¶ 31; *see also id.* ¶¶ 24–25 (alleging nine specific policies or customs and describing report from which defendants obtained knowledge of policies and practices). By "fail[ing] to provide adequate training and supervision," defendants allegedly "allowed [these widespread policies and practices] to flourish." *Id.* ¶ 33.

In their briefing, the parties cite a mix of supervisory-liability cases and cases applying the rules for imposing liability on a municipality stemming from *Monell v. Department of Social Services*, 436 U.S. 658 (1978). "There is a difference between supervisory liability and municipal liability for failure to train or supervise." *Lessley v. City of Madison*, 654 F. Supp. 2d 877, 910 (S.D. Ind. 2009); *accord Almaraz v. Haleas*, 602 F. Supp. 2d 920, 925 (N.D. Ill. 2008). For what is referred to as supervisory liability to attach, a defendant acting under color of state law, "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (quoting *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)) (alteration in original); *accord Lessley*, 654 F. Supp. 2d at 910 (quoting *Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997)); *Almaraz*, 602 F. Supp. 2d at 925 (citation omitted). A supervisor cannot be held individually liable under § 1983 for a constitutional violation unless the plaintiff can show that the supervisor was "personally involved" in the violation in this way. *Gill*, 850 F.3d at 344 (quoting *Matthews*, 675 F.3d at 708). In contrast, supervisory liability for a constitutional violation under *Monell* "is not limited to the Supervisory Defendants' personal knowledge and participation." *Almaraz*, 602 F. Supp. 2d at 926. The *Monell* inquiry focuses not so much on personal involvement as on the relationship between an official custom or policy and the constitutional deprivation; it asks whether the deprivation was "caused by an express policy, a widespread practice or custom, or the deliberate act of a policymaking official." *Id.* (quoting *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002)); *see also Daniel v. Cook Cnty.*, 833 F.3d 728, 736 (7th Cir. 2016); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010), *as am. on denial of pet. for reh'g en banc* May 3, 2010. The two inquiries can and do lead to supervisory liability for individual defendants without *Monell* liability and vice versa. *See Lessley*, 654 F. Supp. 2d at 909–10 (granting officers summary judgment on supervisory liability and denying city summary judgment on *Monell* theory); *Almaraz*, 602 F. Supp. 2d at 926 (concluding that "any liability of the City based

on the act of a policymaking official would be distinct from the Supervisory Defendants' liability" because supervisors were not policymakers).

Because plaintiff brings count three against both defendants, the court analyzes it under both theories. While the complaint states a *Monell* claim against Wexford, it fails to allege Obaisi's personal involvement in his subordinates' alleged misconduct.

## 1. The *Monell* Theory

**\*4** Defendants rely principally on a *Monell* case, *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir. 1985), to argue that McDonald needs to plead more specific facts in support of count three. Several judges sitting in the Seventh Circuit have recognized that the Supreme Court disapproved *Strauss* when it rejected a heightened pleading standard for § 1983 claims against a municipality in its unanimous opinion in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993). *E.g.*, *Marcavage v. City of Chicago,* 467 F. Supp. 2d 823, 828 (N.D. Ill. 2006), *rev'd in part on other grounds*, 659 F.3d 626 (7th Cir. 2011); *Brogan v. Bd. of Educ. of City of Chicago,* 152 F. Supp. 2d 1082, 1083–84 (N.D. Ill. 2001); *Wolf v. City of Chi. Heights,* 828 F. Supp. 520, 524 (N.D. Ill. 1993); *see also* *McCormick v. City of Chicago,* 230 F.3d 319, 323–25 (7th Cir. 2000) (repudiating fact pleading after *Leatherman*).

Defendants cite a pair of cases to show that district courts in the Seventh Circuit "routinely extend" *Strauss*. Mot. to Dismiss 4, ECF No. 33. But neither cites *Strauss* or a case endorsing it. *See* *Carter v. Elyea,* No. 11 C 2914, 2012 WL 3779064, at *5 (N.D. Ill. Aug. 31, 2012); *Coe v. Sloan,* No. 3:10-cv-311-GPM-DGW, 2011 WL 5967261, at *7-8 (S.D. Ill. Oct. 11, 2011), *report and recommendation adopted* 2011 WL 5980348 (S.D. Ill. Nov. 29, 2011). Instead, both cases apply Rule 8(a) pleading standards to supervisory-liability and failure-to-train allegations. *See* *Coe,* 2011 WL 5967261, at *7-8 (citing and applying *Twombly,* 550 U.S. at 555–56); *Carter,* 2012 WL 3779064, at *5 (quoting *Bissessur v. Ind. Univ. Bd. of Trs.,* 581 F.3d 599, 602 (7th Cir. 2009) and *EEOC v. Concentra Health Servs.,* 496 F.3d 773, 776 (7th Cir. 2007)). Thus, the analytical framework *Coe* and *Carter* employed accords not with *Strauss* but with *Leatherman* and Rule 8(a) as it was interpreted in *Twombly* and *Iqbal. See* *White v. City of Chicago,* 829 F.3d 837, 844 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 526 (2016).

More importantly for purposes of burying *Strauss*, the Seventh Circuit has held that "[t]he *Leatherman* holding has survived the Court's later civil pleading decisions in *Iqbal* and *Twombly*, which require the pleader to allege a 'plausible' claim." *White,* 829 F.3d at 844 (citations omitted). *White* clarified how much factual material must be pleaded to make the existence of a widespread custom or practice plausible. The complaint in *White* stated that:

> In accordance with a widespread practice of the police department of the City of Chicago: [a police officer] requested the judge to issue a warrant on the basis of [the officer]'s conclusory allegation that other law enforcement officers claimed or believed plaintiff had committed an offense, and [the officer] did not present the judge with an affidavit setting out any affirmative allegation of facts that would indicate that plaintiff had committed an offense.

*White,* 829 F.3d at 844. That allegation "[t]ogether with the individual claim against [the officer]" sufficed to allege the existence of a widespread custom or practice. *Id.* The court held that "White was not required to identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process." *Id.* (citing *Jackson v. Marion Cnty.,* 66 F.3d 151, 152–53 (7th Cir. 1995)).

After *White*'s clarification of what a § 1983 plaintiff must plead, count three's allegations, viewed as a *Monell* claim, satisfy Rule 8(a). As Judge Dow, who authored *Carter*, *supra*, recently observed, district courts have relied on *White* to "scotch[ ] motions to dismiss" premised on arguments that the complaint does not contain allegations beyond those relating to the plaintiff." *Williams v. City of Chicago,* No 16-cv-8271, 2017 WL 3169065, at *9 (July 26, 2017) (quoting *Stokes v. Ewing,* No. 16 C 10621, 2017 WL 2224882, at *4 (N.D. Ill. May 22, 2017)) (collecting cases). By citing *Strauss*,

defendants demand a holding that the complaint detail more incidents to support the alleged customs listed in count three. As it happens, McDonald's complaint references a 2010 report describing more incidents of alleged inadequate care, supervision, and training at Stateville. *See* FAC ¶ 24 (citing *id.* App. A). McDonald might get extra credit for identifying additional incidents supporting his alleged policies and custom, but his complaint passes the Rule 8(a) test without them under *White*. *See White*, 829 F.3d at 844. McDonald alleges that he repeatedly sought medical care for his back pain over a seven-year period, and Wexford employees provided him constitutionally inadequate care. *See* FAC ¶¶ 13–14. He gives three examples (depending on how they are counted). *See* FAC ¶¶ 7–14. He then pleads that Wexford had nine widespread customs and practices of subpar supervision and training—the report he cites called it a "leadership vacuum"—at Stateville which led to his alleged constitutional deprivations. *See id.* ¶¶ 24, 31–34. Together, these allegations provide enough factual detail to give Wexford fair notice of the grounds on which McDonald's efforts to impose *Monell* liability in count three rest. *See White*, 829 F.3d at 843; *Williams*, 2017 WL 3169065, at *9 ("Under the binding precedent set by *White*, Plaintiff's allegations of a pattern or practice of ignoring complaints of discrimination are enough to survive a motion to dismiss." (internal citation omitted)).

### 2. Supervisory Liability

**\*5** Though it states a *Monell* claim, the complaint does not raise a plausible inference that Obaisi was personally involved in his subordinates' alleged constitutional violations. For prisoners, the supervisory-liability test means that "to hold an individual defendant liable under § 1983 for a violation of an inmate's constitutional rights, the inmate must show that the defendant was personally responsible for that violation." *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) (citing *Childress v. Walker*, 787 F.3d 433, 439 (7th Cir. 2015)) (other citation omitted).

The Seventh Circuit most recently considered the sufficiency of a complaint's allegations of personal liability in *Gill, supra. See also McCauley v. City of Chicago*, 671 F.3d 611, 617–18 (7th Cir. 2011) (applying *Twombly* and *Iqbal* to *Monell* allegations). As the Seventh Circuit described it, the complaint in *Gill* contained a bald allegation that a city police chief "failed to train the detectives [allegedly involved in the underlying constitutional violation] adequately and that [the chief] was 'deliberately and recklessly indifferent' to the detectives' actions." *Gill*, 850 F.3d at 344. Those allegations, the court held, were too conclusory to raise the plausible inference that the chief "knew about or was personally involved in the specific conduct" about which the plaintiff complained, so the complaint failed to state a claim that the chief should be held liable under a supervisory or failure-to-train theory. *Id.* McDonald's supervisory-liability allegations fail for similar reasons.

To be clear, McDonald alleges that Obaisi personally made certain decisions. They include (without limitation) the decision not to seek a diagnostic test in 2013, his decision not to reevaluate McDonald in August–September 2013, the delay in surgery, and the decision in 2015 not to seek a surgical consult. *See* FAC ¶¶ 8–9, 12. The court does not understand Obaisi to be asking for dismissal of McDonald's claims against him stemming from those decisions or any other decision in which he was personally involved. Nor could he. *See Heard v. Tilden*, 809 F.3d 974, 981 (7th Cir. 2016) (per curiam) (holding that "allegation that [prison medical director who was also doctor] was involved directly in the choice to stall necessary surgery and prolong [the plaintiff's] pain is enough to state a claim" for individual liability (citing *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) and *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011))); *see also McDonald v. Wexford Health Sources, Inc.*, 2015 WL 3896929, at *9 (N.D. Ill. June 23, 2015) (finding fact issue precluded summary judgment on previous Stateville medical director's personal involvement in McDonald's care). So Obaisi is on the hook for his own alleged conduct and conduct in which he was personally involved.

Nevertheless, the court can find nothing in the complaint raising the inference that Obaisi was aware of or involved in the particular misconduct in which his subordinates allegedly engaged. McDonald pleads, for instance, that Wexford employees refused for no reason to give him prescribed pain medication. FAC ¶ 13. But no well-pleaded facts support the inference that Obaisi was specifically aware of the problem. *See id.* (alleging that McDonald asked "Wexford personnel" why he wasn't receiving medication and got no answer but omitting mention of Obaisi). McDonald does not allege, for instance, that he spoke to Obaisi or sent him a letter about any of the incidents of inadequate care described in the

complaint. *Cf., McDonald*, 2015 WL 3896929, at *9 (N.D. Ill., June 23, 2015) (finding fact issue precluded summary judgment based in part on evidence that McDonald complained to Stateville's medical director when they met in a hallway); *Rendon v. Wexford Health Sources, Inc.*, No. 10-cv-1410, 2011 WL 2669211, at *12 (C.D. Ill. July 7, 2011) (finding allegations that prisoner addressed letter to psychiatrist insufficient to state claim for supervisory liability because plaintiff did not allege that she had any other contact with psychiatrist and did not allege that letter was received or read). In sum, the complaint includes "no allegation or plausible inference that [Obaisi] knew about or was personally involved in the specific conduct" of his subordinates about which McDonald complains. *Gill*, 850 F.3d at 344; *see also Rasho*, 856 F.3d at 469 (affirming entry of summary judgment for prison officials where prisoner produced no evidence that two supervisors, "realized that something was amiss" with treating doctor's medical decision).

## IV. CLAIMS UNDER ILLINOIS LAW

**\*6** McDonald brings a claim for intentional infliction of emotional distress against Obaisi in count four. Counts five and six plead negligence claims against him.

Obaisi moves to dismiss count six because McDonald did not attach an affidavit and a physician's report or certificate to his complaint as he contends § 2-622 of the Illinois Code of Civil Procedure required. *See* 735 Ill. Comp. Stat. 5/2-622(a) (West 2017). That section requires an affidavit and a report or certificate to be attached to the complaint "[i]n any action, whether in tort, contract or otherwise, in which the plaintiff seeks damages for injuries or death by reason of medical, hospital, or other healing art malpractice." *Id.* McDonald and Obaisi dispute whether count six is a malpractice claim covered by § 2-622(a). McDonald maintains that he seeks to hold Obaisi liable as a supervisor for failing to follow the prescriptions, orders, and advice of medical providers rather than for his own medical malpractice. *See* Resp. 12–13.

The Seventh Circuit applied the requirements of § 2-622 to claims for medical malpractice against a prison doctor who served as a prison's medical director in *Sherrod v. Lingle*, 223 F.3d 605 (7th Cir. 2000). The prisoner in that case received medical care from the director and three nurses for abdominal pain and other symptoms of what turned out to be appendicitis. *See id.* at 608–09. He attached a § 2-622(a) certificate to his complaint, but the district court found the certificate insufficient and dismissed his malpractice claim with prejudice. *Id.* at 613. The Seventh Circuit held that dismissing without leave to amend was an abuse of discretion. *Id.* at 613–14. It reasoned that the certificate at least approached the "borderline" of sufficiency and explained that "when the certificate was filed but failed in some technical or minor respect, sound discretion also requires [the court to give the plaintiff] an opportunity to amend." *Id.* at 614 (citing *Apa v. Rotman*, 680 N.E.2d 801, 804 (Ill. App. Ct. 1997)). So even if the court finds that a § 2-622(a) certificate is required for count six, McDonald must be given an opportunity to amend his complaint.

*Sherrod* proves instructive because McDonald alternatively requests leave to add a § 2-622(a) certificate to his complaint. *See* Resp. 12; Proposed certificate, ECF No. 36-1. The defendants reply that they intend to challenge the certificate's sufficiency if McDonald is allowed to file it. Reply 8 n.3, ECF No. 37. *Sherrod* teaches that if § 2-622 applies to count six, McDonald should receive leave to file his proposed certificate.

The proposed certificate has the potential to moot the question of whether a § 2-622(a) certificate is required for count six, leaving the court on the horns of a dilemma. If the court later rules that § 2-622(a) did not require a certificate for count six, litigating the certificate's sufficiency will have been a waste of effort. If, on the other hand, McDonald's proposed certificate passes muster under § 2-622(a), determining whether it was required will have been unnecessary. Had McDonald not filed a proposed certificate, deciding whether one is required would be the first order of business. But since McDonald has already gone to the trouble of obtaining a certificate, litigating its sufficiency may yield a fringe benefit. The process may produce more specifics about what care McDonald contends he should have received— something that is at issue anyway in McDonald's Eighth Amendment claims. *Cf.* § 2-622(a)(1); *Sherrod*, 203 F.3d at 614 (criticizing certificate as "not a model of specificity" and holding that district court should have granted leave to amend it).

**\*7** Because it is the option more likely to advance this litigation overall, the court will grant McDonald leave to amend his complaint to add his proposed certificate. Defendants may of course litigate the certificate's sufficiency, and if the certificate contains a technical defect, McDonald will get a chance to try to fix it, as *Sherrod* requires. If the amended certificatge still misses the mark under § 2-622(a), the court will return to the question of whether it was required.

**V. CONCLUSION**

For the reasons stated, defendants' motion to dismiss, ECF No. 33, is granted in part and denied in part. The court partially dismisses count three of the FAC, ECF No. 19, to the extent it alleges that Obaisi is liable under a theory of supervisory liability. The court also partially dismisses count seven to the extent it seeks to impose liability under § 1983 based on respondeat superior. McDonald may amend his complaint to attach his proposed § 2-622(a) certificate, ECF No. 36-1. The amended complaint is due on or before September 27, 2017.

**All Citations**

Slip Copy, 2017 WL 4046351

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 4891943
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. Illinois,
Eastern Division.

Noel PADILLA, et al., Plaintiffs,
v.
CITY OF CHICAGO, et al., Defendants.

No. 06-C-5462.
|
Dec. 14, 2009.

**Attorneys and Law Firms**

Christopher Rudolf Smith, Amanda C. Antholt, James M. Baranyk, Smith, Johnson & Antholt LLC, Craig Benson Futterman, Mandel Legal Aid Clinic, Chicago, IL, for Plaintiffs.

Penelope Moutoussamy George, City Of Chicago, Department of Law, Terrence Michael Burns, Daniel Matthew Noland, Harry N. Arger, Molly E. Thompson, Paul A. Michalik, Dykema Gossett Rooks Pitts PLLC, Jonathan Clark Green, Chicago Corporation Counsel, Tiffany Yvette Harris, City of Chicago Law Department, Edith K. D. Holland, Law Offices of Joseph V. Roddy, Joel G. Sandoval City of Chicago, Brian Alan Sher, Bryan Cave, Chicago, IL, for Defendants.

Geri Lynn Yanow, City of Chicago, Department of Law Individual Defense Litigation, Chicago, IL.

Joseph Vincent Roddy, Law Office of Joseph V. Roddy, Chicago, IL.

Phillip John Oliver, Law Office of Robert D. Kuzas, Chicago, IL, for Intervenor.

**Opinion**

### *MEMORANDUM OPINION AND ORDER*

ARLANDER, KEYS, United States Magistrate Judge.

**\*1** This case is before the Court on Plaintiffs' Motions to Compel Interrogatory Responses and Document Production from Defendant City of Chicago, Plaintiffs sued Defendants, alleging that several Chicago Police Officers (the "Individual Defendants") falsely imprisoned Noel Padilla, and illegally searched his family members' homes. Plaintiff also brings a *Monell* claim [1] against the City of Chicago ("the City"), alleging that the Individual Defendants' misconduct was a result of the execution of the City's policy or custom. The parties dispute the reasonable parameters of discovery with regard to the claims against the City and the Individual Defendants. For the reasons set forth below, the Plaintiffs' Motion to Compel Discovery is granted in part and denied in part.

## BACKGROUND FACTS

Plaintiffs allege that in 2005, several Chicago Police Officers falsely arrested Noel Padilla; illegally searched his family's homes; and stole his money. (Pls.' Second Mot. Compel Disc. ¶ 2.) Plaintiffs filed suit under 42 U.S.C. § 1983 against the City and the Individual Defendants for the alleged violation of their Fourth Amendment rights.

During the course of this litigation, Plaintiffs have served Defendants with written discovery requests calling for the production of voluminous documents. Although the City has produced many of the documents and agreed to produce others, Plaintiffs have complained that Defendants have been slow to comply with the discovery requests. The parties have been unable to reach an accord on the appropriate scope and timeframe of discovery, and Plaintiffs filed two Motions to Compel; the first on March 30, 2009 and the second on September 10, 2009. Those Motions are the subject of this Opinion and Order.

## DISCUSSION

Under the Federal Rules of Civil Procedure, courts should permit "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1). Relevant information sought to be discovered need not be admissible at trial; rather, it is enough that "the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* With these standards in mind, the Court analyzes Plaintiffs' Motion to Compel Discovery.

### I. Privileges

Rule 26's presumption in favor of discovery may be overcome by the existence of a privilege. In response to Plaintiffs' Motion to Compel, Defendants argue that the withheld information is protected by the following privileges: law enforcement investigative information; grand jury secrecy; and work product. The Court will discuss each privilege, and the allegedly privileged information, in turn.

### A. The Law Enforcement Investigative Privilege

#### 1. The CR. Files

The City has produced over 200 CR files in this case, but has withheld three CR investigation files that remain open. Notably, the city argues that these three files are protected under the law enforcement investigative privilege, incorporated under Fed.R.Civ.P. 26(b). The law enforcement investigative privilege is a "qualified privilege." *Kampinen v. Individuals of Chicago Police Dep't,* No. 00 C 5867, 2002 WL 238443 at *4 (N.D.Ill. Feb.19, 2002). Its purpose "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Lewis v. City of Chicago,* No. 04 C 3904, 2004 WL 2608302 at *1 (N.D.Ill. Nov.16, 2004) (quoting *In re Dept. of Investigation of New York,* 856 F.2d 481, 485 (2d Cir.1988)). Courts analyzing this privilege balance "the need of the litigant who is seeking privileged investigative materials-against the harm to the government if the privilege is lifted." *Id.* at ----1-2.

**\*2** First, however, "[t]he party claiming the privilege ... bears the burden of justifying application of [it]." *Doe v. Hudgins,* 175 F.R.D. 511, 514 (N.D.Ill.1997). Before the Court applies the balancing test, " 'the responsible official in the [governmental] department [asserting the privilege] must lodge a formal claim of privilege, after actual personal consideration, specifying with particularity the information for which protection is sought, and explain why the information falls within the scope of the privilege.' " *Lewis,* 2004 WL 2608302, at *2 (quoting *Ponturelli Limousine, Inc. v. City of Chicago,* 652 F.Supp. 1428, 1431 (N.D.Ill.1987)).

In this case, the Defendants have not met that burden. The Defendants allege this privilege for the first time in their response to Plaintiffs' Motion to Compel. In *Lewis,* the court addressed a similar set of facts. There, the plaintiff sought to compel production of a C.R. file that was part of an underlying criminal investigation. *Id.* at 2. The defendants raised the law enforcement investigatory privilege for the first time in their opposition brief. *Id.* The court concluded that the defendant's failure to provide "evidence indicating that a 'responsible official' ha[d] determined that the privilege [wa]s applicable" or "an explanation from such an official about why the information in the CR file falls within the scope of the privilege," barred the defendant from asserting the privilege. *Id.*

This case poses a similar problem. The Defendants asserted the privilege in their oppositional brief without providing any evidence that a "responsible official" had ever assessed the C.R.s in question. Thus, the Defendants' failure to properly assert the privilege establishes a procedural bar to their asserted privilege.

The Court instructed Defendants to submit the C.R.s for *in camera* review, to enable the Court to balance the Defendants' need to maintain the confidentiality of its ongoing investigations against the Plaintiffs' entitlement to relevant materials. Had the Defendants complied with the privilege's procedural requirements, the balance between the Plaintiffs' need for the material and the potential harm to the City would tilt in favor of Defendants at least with respect to some portions of the CRs.

Defendants claim that disclosing the information would taint the integrity of ongoing investigations. By withholding the production of these C.R.s, Defendants argue, the Court will prevent the witnesses, complainants, or the accused who are not involved in this lawsuit-from accessing the C.R.s while they are under investigation.

After reviewing the materials, the Court agrees that some sections of the submitted C.R.s, particularly the Summary Report Digests, arguably fall within the protections of the privilege. Unlike the C.R. this Court examined in *Bond v. Uteras,* No. 04 C 2617, 2006 WL 1343666, at *2 (N.D.Ill. May 12, 2006),* which "contain[ed] purely factual information that is largely known to all involved parties," the Summary Reports in the C.R.s submitted in the instant case describe how the investigation was launched and conducted. They disclose the identify of witnesses who were contacted and interviewed, as well as the investigators' assessments of whether criminal charges might be filed against some of the officers under investigation. In short, they reveal more than simply the arrestees' and the officers' statements.

**\*3** The Court acknowledges that the C.R.s may be relevant to Plaintiffs' claims against the Defendants, since the claims detailed in the CRs, like Plaintiff's claims, involve allegations that officers allegedly abused their authority. *Accord, Vodak v. City of Chicago,* 2004 WL 1381043 at *5 (N.D.Ill.2004)* ("Numerous courts have held that the ... complaint histories of defendant officers are relevant in § 1983 actions involving police misconduct, particularly where, as here, plaintiffs allege a *Monell* ... claim against the municipality. Moreover, disciplinary records containing any similar factual allegations may be relevant, and admissible under Rule 404(b) to prove motive, intent, and/or modus operandi.") (citations omitted). However, the Court will give the City the opportunity to demonstrate whether portions of the three submitted C.R.s are entitled to protection under the law enforcement investigative privilege, by complying with the privilege's procedural requirements and detailing why portions of the submitted C.R.s should be protected on or before December 28, 2009.

## 2. The SOS Documents and Recordings

The same procedural bar prevents Defendants from asserting the law enforcement investigatory privilege in response to Plaintiffs' interrogatory asking what steps the Chicago Police Department has taken to preserve documents and recordings [2] that would demonstrate the activity of the Special Operations Sections ("S.O.S .") from 2003 through 2006. Again, Defendants failed to provide any evidence that a responsible official assessed the evidence in question and determined that it fell within the scope of the privilege. As such, Defendants are procedurally barred from raising the privilege with respect to the S.O.S. Recordings. *See Lewis,* 2004 WL 2608302, at *2.

Discovery into this issue is permissible only if Plaintiffs can demonstrate that it is "reasonably calculated to lead to the discovery of admissible evidence." *Fed. R. Civ. Pro. 26(b).* Plaintiffs asked for any recordings or documents "that would demonstrate or reflect the activity and communications of the" SOS officers. (Pl. Santiago's First Set Interrogs., No. 1.) Plaintiffs argue that the requested information would have provided strong evidence against the officers on the criminal charges. As such, the Plaintiffs contend that these recordings, coupled with the City's inaction, would support Plaintiffs' claims of deliberate indifference in this case.

"A finding of deliberate indifference requires a showing that the officials were aware of a substantial risk of serious injury ... but nevertheless failed to take appropriate steps to protect [an individual] from a known danger." *Frake v. City of Chicago,* 210 F.3d 779, 782 (7th Cir.2000). The discovery requested here has the potential to support this finding, since the recordings may provide examples of officers abusing their authority. The City's preservation of such information would indicate its knowledge of the problem, which may also prove useful in the Plaintiffs' *Monell* claims against the City.

 **\*4** In conclusion, because Defendants have failed to identify any legitimate basis for refusing to produce the S.O.S, recordings, and because the recordings could lead to the discovery of admissible evidence, the Court accepts Defendants' offer to amend its answer to respond to this request. Plaintiffs' Motion to Compel the Production of the S.O.S. recordings is granted.

### B. The Grand Jury Secrecy Privilege

"Rule 6(e)(2) imposes a general rule of secrecy on grand jury proceedings. By its terms, it applies only to 'matters occurring before the grand jury.' Matters occurring before the grand jury constitute any items that are sufficiently 'grand jury related,' such as documents which are akin to grand jury testimony." *Pontarelli Limousine,* 652 F.Supp. at 1430. Moreover, "when testimony or data is sought for its own sake for its intrinsic value in furtherance of a lawful investigation rather than to learn what took place before the grand jury, it is not a valid defense to disclosure that the same documents had been, or were presently being, examined by a grand jury," *U.S. v. Stanford,* 589 F.2d 285, 291 (7th Cir.1978). Thus, documents that have appeared before the grand jury may be released so long as "[their] release will not seriously compromise the secrecy of the grand jury's deliberations." *In re Special March 1981 Grand Jury,* 753 F.2d 575, 578 (7th Cir.1985).

Here, Plaintiffs seek to compel production of documents relating to the criminal cases against the SOS officers. The Defendants assert that disclosing the documents might "reveal the scope and focus of the federal and state grand juries for the SOS criminal matters." (Defs.' Resp. Opp'n Pls.' Mot. Compel 6.) The Plaintiffs counter that the protective order already in place is sufficient to maintain confidentiality.

The Defendants have not indicated with specificity how the documents requested relate to grand jury proceedings. There is no discussion of grand jury transcripts or anything requested having appeared before the grand jury. This lack of connection is integral to deciding whether the privilege applies, because the grand jury secrecy privilege does not apply if the information requested was "generated apart from the grand jury process, even though it might ultimately be used there." *Pontarelli Limousine,* 652 F.Supp. at 1430.

Moreover, because Plaintiffs seek the documents for their own sake-for their intrinsic value in furtherance of their lawful investigation-rather than to learn what took place before the grand jury, the Defendants' grand jury secrecy defense fails. The practices at issue in the criminal cases against the SOS officers are the same as those at issue in Plaintiffs' *Monell* and RICO claims. Therefore, the documents relating to the criminal cases may lead to the discovery of admissible evidence that supports those claims.

The City has already produced some of the documents in response to this request. The City has failed, however, to identify any legitimate basis for refusing to produce the remaining documents relating to the more than two-year-old

criminal cases against the SOS officers. Because the documents are sufficiently protected by the current protective order and are being requested for their intrinsic value to Plaintiffs' investigation, the Court accepts Defendants' offer to amend its answer to respond to this request. Plaintiffs' Motion to Compel the Production of the S.O.S. recordings is granted.

### C. The Work Product Privilege

**\*5** The work product doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative," Fed. R, Civ. P. 26(b)(3). "While 'the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation1, are protected by the work product doctrine, the disclosure of facts cannot be precluded simply because the facts were learned by an attorney." *Southern Illinois Laborers' and Employers Health and Welfare Fund v. Pfizer,* No. 06 C 1818, 2007 WL 4557100, at \*2 (N.D.Ill.2007) (quoting Fed.R.Civ.P. 26(b)(3)).

Interrogatory number two of Plaintiffs' Second Motion to Compel asks if Defendants have reviewed all databases and sources of information regarding C.R.s. Defendants assert that answering this question would reveal information protected by the work product privilege. Plaintiffs counter that they are seeking factual information regarding whether both databases that contain C.R.s have been searched.

Defendants do not explain how answering this question would reveal work product, and the court finds that it would not. Here, the Plaintiffs have inquired into whether all sources for the documents have been examined. In *Southern Illinois Laborers,* the court explained that "[i]dentifying the source of specific documents will not reveal the mental processes or litigation strategy of ... counsel." 2007 WL 4557100, at \*3. Similarly, in the instant case, the Defendants can inform the Plaintiffs as to which sources they examined to provide the C.R. files, without providing any insight into their litigation strategy.

Moreover, Plaintiffs have shown that the interrogatory seeks information reasonably calculated to lead to admissible evidence. The secondary database potentially contains additional C.R. files. Thus, determining whether all databases have been searched is relevant to the subject matter of the case and to the development, of the Plaintiffs' claims. Therefore, this Court accepts Defendants' agreement to amend its interrogatory answer and answer this request. Plaintiffs' motion to compel a response to interrogatory number two regarding the production of C.R. files is granted.

### III. Additional Discovery

### A. BrainMaker Discovery

Plaintiffs seek production of "all Documents relating to the decision to no longer utilize and/or dismantle the BrainMaker [3] program in Chicago Police Department." (Pls.' Second Mot. Compel Disc. at 6.) In *Craft v. Flagg,* the Plaintiffs requested discovery into the BrainMaker program. No. 06 C 1451, 200S WL 5339052, at \*3 (N.D.Ill, Dec. 16, 2008). Plaintiffs claim that "the City's failure to utilize this program is evidence of their deliberate indifference," *Id.* This Court rejected this argument, explaining that "evidence concerning BrainMaker, which was merely considered by the City over a decade ago, sheds little light on the failings of the City's current system," *Id.* at \*4.

**\*6** Plaintiffs attempt to distinguish Craft by arguing that their focus is "the City *decision* to no longer conduct pattern analysis" by using BrainMaker, rather than regarding "the program itself." (Pls.' Second Mot. Compel Disc. 6.) This distinction is unavailing. At their core, Plaintiffs' argument and the argument advanced by the Craft plaintiffs are the same–that the City's failure to use BrainMaker is evidence of the City's deliberate indifference. Moreover, just as in Craft, Plaintiffs are seeking discovery regarding a program that was merely considered by the City over a decade ago. Discovery regarding this program "is simply too speculative and too remote to justify requiring the City to expend the considerable amount of time and money necessary to comply with such a request." *Id.* at \*4; *see also, Almaraz v. Haleas,*

602 F.Supp.2d 920, 926 (N.D.Ill.2008) (positing that "[i]t is ... doubtful that a program [BrainMaker] phased out in 1996 is relevant to an arrest in 2007.")

### B. General History Printouts

The Plaintiffs have requested that the General History Printouts ("histories") for all officers who were members of the S.O.S. in 2005 be produced (approximately 280 officers). Histories are documents that "are run by officer and show when the officers were hired and the dates of each of their assignments within the CPD." (Defs.' Resp. Opp'n Pls.' Mot. Compel at 4.) Because these printouts are only two pages long, printing even 300 of them would not be unduly burdensome.

This Court is particularly concerned, however, by the fact that the histories reveal what unit the officers are assigned to, since release of this information could threaten the safety of officers in investigative units. The Court acknowledges that Plaintiffs must demonstrate the associations of the S.O.S. members through time in order to establish their RICO claim. However, establishing this claim should not be done at the cost of the safety of officers who are not parties to this litigation.

For the above reasons, the production of general history printouts will be limited to those that have already been provided. Therefore, the Court denies Plaintiff's motion to compel production of the general history printouts for all officers who were members of the S.O.S. in 2005.

### C. Other Outstanding Documents

*Request Number 8* seeks "any criminal histories of the unindicted Defendant Officers." (Pls.' Mot. Compel 6) Defendants have affirmatively stated that they possess no responsive documents to Request Number 8; therefore, that request is denied.

*Request Number 23* seeks "documents relating to any audit or inspection of the S.O.S. by the Department." *Id.* Defendants indicate that the Department's Auditing & Internal Control section is currently searching for responsive documents. Based on the Defendants' representation that they do not currently have any responsive documents, this portion of the Plaintiffs' Motion is denied. However, if the Defendants uncover responsive documents, they must produce those documents.

**\*7** *Request Number 24* seeks "documents relating to a system of rating the S.O.S. officers' job performance." *Id.* Based on the Defendants' representation that they do not currently have any responsive documents, this portion of the Plaintiffs' Motion is denied. If the Defendants uncover responsive documents, they must produce those documents.

*Request Number 25* seeks "documents relating to accountability sessions described by Deputy Superintendent Starks in his deposition." *Id.* Defendants assert that they will produce responsive documents to the Plaintiffs. If the Defendants uncover additional responsive documents, they must produce those documents as well.

*Request Number 27* seeks "documents relating to any press releases issued or press conferences held by the City regarding the S.O.S." *Id.* Defendants assert that they have produced responsive documents to this request. The Defendants must affirmatively state that they possess no additional responsive documents.

*Request Number 29* seeks "documents relating to the program implemented by the Department to monitor officers with numerous C.R. files." *Id.* Defendants argue that this evidence is not discoverable, noting that the program referenced here was "implemented two years after the incident at issue in plaintiffs' complaint." (Defs.' Resp. Opp'n Pls.' Mot. Compel at 11-12.) Defendants cite *Calusinski v. Kruger,* 24 F.3d 931, 936 (7th Cir.1994, for the proposition that "subsequent conduct is irrelevant to determining the [municipality's] liability for the conduct of its employees on [the date of the

underlying incident]." *Id.* In that case, however, the subsequent conduct was a single alleged incident that was similar in nature to the alleged incident in the case. *Calusinski,* 24 F.3d at 936.

Here, however, the Plaintiffs request information pertaining to a program implemented by the Defendants. The Seventh Circuit has recognized that "subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy," *Sherrod v. Berry,* 827 F.2d 195, 205 (7th Cir.1987), vacated on other grounds, 835 F.2d 1222 (7th Cir.1988). More recently, in *Keys v. City of Harvey,* the court denied the defendant's request to exclude evidence of the city's failure to enact any policies or procedures in response to an underlying incident. No. 92 C 2177, 1996 WL 34422, at *4 (N.D.Ill. Jan, 26, 1996). The Keys court cited with approval *Foley v. City of Lowell,* 948 F.2d 10 (1st Cir.1991), which "affirmed the trial judge's admission of post-event evidence to prove a policy or custom of ignoring complaints of excessive force." *Id.*

This Court agrees with the First Circuit's persuasive reasoning. The standard for discovery is not whether the information is in fact admissible, but whether it may lead to admissible evidence. The Court rejects the Defendants' contention that the evidence is de facto irrelevant to determining municipal liability, and Request Number 29 is granted.

**\*8** *Request Numbers 35 and 36* seek "records relating to settlements of cases involving the S.O.S." (Pls.' Mot. Compel 6) Defendants argue that investigating the existence-as opposed to merely the contents of such settlements would be unduly burdensome, without explaining why such a task would be so arduous. This Court finds it unlikely that it would be unduly burdensome to determine whether, and how many, settlements have occurred in cases involving the S.O.S.

However, regarding the settlement agreements themselves, the Court agrees with Defendants that examining and producing all of the settlement agreements involving the S.O.S, officers would be unduly burdensome. Therefore, production of settlement agreements, like the general history printouts, will be limited to only those involving the Defendant Officers.

Defendants note that the settlement agreements may not lead to admissible evidence. While that is a possibility, the discovery rules do not require certainty-only a reasonable possibility that the requested documents may lead to admissible evidence. Therefore, Plaintiffs' request numbers 35 and 36 are granted, with discovery limited to agreements involving the Defendant individual officers.

*Request Number 37* seeks "documents relating to any audits of the OPS or Internal Affairs division by the City." *Id.* Based on the Defendants' representation that they do not currently have any responsive documents, this portion of the plaintiff's motion is denied. If the Defendants uncover responsive documents, they must produce those documents.

This Court accepts Defendants' offer to amend their response to Request Numbers *1, 9, and 10,* as requested by the Plaintiffs. Therefore, Request Numbers 1, 9 and 10 are granted.

## CONCLUSION

For the reasons set forth above, Plaintiffs' First and Second Motions to Compel are granted in part and denied in part Therefore, Defendants shall produce the granted discovery in accordance with this Opinion and Order.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 4891943

Footnotes

| | |
|---|---|
| 1 | *See Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). |
| 2 | Plaintiffs assert that "if the city was in fact actually investigation [sic] SOS, then (among other things) it would have preserved the recordings at issue in this request (which would have likely generated the strongest evidence available against the officers on the criminal charges.) Unless a specific request is made to preserve the recordings, they are destroyed within thirty days pursuant to the Department's retention policy." Pls' 9/10/2009 Mot. To Compel at p. 7. |
| 3 | "BrainMaker is a software program, considered at some time in the 1990's by the Chicago Police Department, which would purportedly identify characteristics of individuals that are found in the already existing database for the City of Chicago and "red flag" those individuals as being potentially problematic officers." *Craft v. Flagg,* No. 06 C 1451, 2008 WL 5339052 at *3 (N.D.Ill.Dec.16, 2008). |

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Paroubek v. Friddle, Not Reported in F.Supp. (1987)

1987 WL 7818

1987 WL 7818
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

BRIAN PAROUBEK, Plaintiff,

v.

THOMAS L. FRIDDLE, et al., Defendants.

March 11, 1987.
|
March 11, 1987.

**Opinion**

MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

**\*1** Plaintiff Brian Paroubek has brought this action under 42 U.S.C. §§ 1983, 1985 against two individual police officers and against Will County Sheriff John Shelley in his official capacity for failure to discipline the officers. Currently before this Court is Shelley's motion to dismiss for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6). For the reasons noted below, we grant that motion.

FACTS [1]

On April 12, 1985, Brian Paroubek was present at the home of Aron Aversa when a search warrant for that address was executed (¶¶11 & 13). Although the police had no warrant for Paroubek, he was arrested for possession of a controlled substance and later indicted on the same charges. (¶¶14, 15, 18). A police report prepared by one of the arresting officers, Deputy Thomas L. Friddle, indicated that he had seen Paroubek with a mirror on which cocaine was found. (¶16). In a supplemental report and during certain pretrial motions, Friddle stated that he had observed Paroubek through a window in the front door of the premises picking up a mirror and moving hurriedly to the kitchen. (¶¶19 & 20). Further investigation by the County's Assistant State's Attorney revealed that this door was in fact a solid wooden door. (¶21). The trial judge found the deputy to have perjured himself and expressed outrage at a law officer fabricating the truth. (¶22). Soon thereafter, the criminal charges were dropped on a motion by the state. (¶12). Paroubek who had spent a total of eight months in jail brought a suit against the arresting officers and also against Sheriff Shelley in his official capacity, seeking damages for violations of 42 U.S.C. § 1983. (¶50). The count directed against the Sheriff alleges that his failure to reprimand or suspend the deputies for their perjury indicates that there was at all times a policy which condoned, and thus promoted, the violation of Paroubek's and other citizen's constitutional rights. (¶¶72, 73).

Motion to Dismiss

In a motion to dismiss, the court will assume the truth of all facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. The complaint should not be dismissed 'unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102 (1957).

**Paroubek v. Friddle, Not Reported in F.Supp. (1987)**

1987 WL 7818

The complaint will withstand a dismissal if the facts alleged, together with reasonable inferences to be drawn therefrom, could lead a jury to believe that the actions were the product of some policy or custom of the Sheriff's Office. Powe v. City of Chicago, 664 F.2d 639 (7th Cir. 1981).

Paroubek has brought this claim against John Shelley in his official capacity as Sheriff for violation of 42 U.S.C. § 1983. Therefore, he can recover damages only if they would be recoverable against the governmental entity. [2] Wolf-Lillie v. Sonquist, 699 F.2d 864 (7th Cir. 1983). This cause of action is to be distinguished from one brought against Shelley individually. [3] It is well established that under § 1983, Paroubek cannot recover against the Sheriff under the theory of respondeat superior, for a municipality is not liable for the isolated torts of its employees under the statute. However, since the municipality works through its employees, actions performed by them in the course of their duties may cause liability. Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018 (1978). To recover damages against a municipality, a plaintiff must plead and prove the requirements first enunciated in Monell. The complaint must allege that at the time of the deprivation, a municipal policy or custom was in existence, and that this policy or custom was the 'affirmative link' or 'moving force' behind the constitutional violation. Monell, 436 U.S. at 692, 98 S.Ct. at 2036; Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 604 (1976).

**\*2** The complaint contains allegations against the Sheriff for his inaction in failing to reprimand or suspend his deputies for perjury. A policy or custom under Monell includes improper inaction taken by superiors in the wake of reoccurring deprivations of constitutional rights by its employees. Lenard v. Argento, 699 F.2d 874, 886 (7th Cir. 1983), cert. denied, 464 U.S. 815, 104 S.Ct. 69. Liability can extend to a supervisor's policy which includes implied approval, authorization or encouragement of misconduct. Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir. 1980), cert. denied, 449 U.S. 1016, 101 S.Ct. 577. Also, 'edicts or acts' of the policymaker can represent an official custom. Monell, 436 U.S. at 694, 98 S.Ct. at 2037–38. In the past, some complaints alleging failure to train, discipline and supervise police officers have been sufficient to withstand dismissal. However, sufficiently alleging improper municipality inaction is more difficult than alleging affirmative acts or misdeeds. Generally, a single incident of inaction will not be enough. City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427 (1985). Paroubek must establish a link between the deputies' actions of perjury to him and the Sheriff's alleged policy of improper inaction.

Since Paroubek does not allege that his deprivation was the result of an executed policy, regulation or ordinance, he must show that a de facto policy encouraging perjury existed. A de facto policy can be evidenced by the allegation of a series of acts illustrating a policy or a reckless inaction 'which has created a substantial probability that undesirable subordinate behavior will manifest itself in increased amounts.' Spriggs v. City of Chicago, 523 F.Supp. 138, 143 (N.D. Ill. 1981). More simply put, a policy may be inferred from acquiescence to prior patterns of similar misconduct.

It is at this point that the specific pleading requirements make a difference in the motion to dismiss. Within the Northern District there is divergence as to what will satisfy a § 1983 complaint based on an alleged de facto policy. Judge Grady explained in Zwarton v. City of Chicago, 625 F.Supp. 1211 (N.D. Ill. 1985), that requiring plaintiffs to allege more specific facts was fair due to the great expense the City otherwise has to pay to defend frivolous claims. On the other hand, Judge Marshall expressed an opposing view in Means v. City of Chicago, 535 F.Supp. 455 (N.D. Ill. 1982). He indicated that a strict factual requirement is a catch-22 situation for a plaintiff with a valid claim who is unable to state particulars before discovery allows him access to the necessary information. Judge Shadur echoed this belief and thought that this requirement was greater than that found in the Federal Rules of Civil Procedure. The fact that this would make a § 1983 claim easy to allege is irrelevant. Hill v. Marinelli, 555 F.Supp. 413 (N.D. Ill. 1982). This Court and Judge Getzendanner have taken a modified approach to both these views requiring a plaintiff to allege in addition to the facts of his own incident, facts showing the existence of previous or similar incidents involving the plaintiff or others with similar experiences. Hamrick v. Lewis, 515 F.Supp. 983, 986 (N.D. Ill. 1981). This type of pleading format is to give notice to the other party as to charges to be pursued and indicates where to initiate discovery. Rivera v. Farrell, 538 F.Supp. 291, 294 (N.D. Ill. 1982).

Paroubek v. Friddle, Not Reported in F.Supp. (1987)

1987 WL 7818

**\*3** This Court has decided many § 1983 cases and has addressed several motions to dismiss based upon insufficient pleadings. Little v. City of Chicago, slip op. No. 86 C 1107 (N.D. Ill. May 23, 1986), involved allegations of an unjustified police beating of a retarded black man by two officers. Citizen complaints at the police station provoked comments from the supervisor indicating similar problems had previously occurred. That statement by the supervisor provided facts indicating that a policy could exist, and was enough to clear the pleading threshold.

Rivera v. Farrell, 538 F.Supp. 291 (N.D. Ill. 1982), was based on allegations of illegal police searches, beatings and arrests of Rivera and his family one evening by several officers. Plaintiff claimed that the department and City's failure to discipline the officers and compensate plaintiffs was a result of a discriminatory and systematic pattern of conduct. This Court disagreed. The complaint contained facts of only this incident with no 'allegations that envision proof of a pattern of similar incidents of wrongdoing.' Id. at 294. Several different allegations concerning the same incident were not the equivalent of allegations of a series of unconstitutional acts. In contrast, the complaint filed in Gomez v. City of West Chicago, 506 F.Supp. 1241 (N.D. Ill. 1981), clearly met the requirements by specifying seven separate incidents of police harassment directed at Hispanic community members.

Paroubek has alleged a de facto policy of improper inaction by the Sheriff by failing to discipline his deputies for committing perjury. By the standard adopted by this Court, he must allege additional facts apart from this incident and show a causal link between the policy and the deputies' actions. A review of the facts shows that Paroubek has alleged in detail the facts surrounding Friddle's misconduct and Paroubek's arrest, the stipulation by the Assistant State's Attorney that the door was in fact a wooden one and the reaction of the trial judge to the revelation of these facts. The series of events culminated in Paroubek's release from custody and the dismissal of the pending charges.

In his memorandum in opposition, Paroubek believes he has stated a claim based on Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir. 1985). His reliance on this case is misplaced because it is analogous neither in fact nor degree. Grandstaff involved a catastrophic chase and shoot-out conducted by an entire sheriff's department in response to a misdemeanor which resulted in the shooting death of an innocent rancher. After this tragic incident, the sheriff's office went to lengths to deny responsibility and any liability. The court found that such radical and dangerous action taken by every member of that force over a relatively minor infraction indicated the existence of a policy in that department. Furthermore, the failure to discipline or change policy regulation emphasized that the incident was business as usual. Plaintiff's allegations of two deputies fabricating circumstances does not illustrate the same degree of use or acceptance of any corresponding policy.

**\*4** The plaintiff's complaint fails similarly to rise to the alternate pleading requirements of this Court. First, the plaintiff has only alleged this isolated incident of police misconduct and tacked on Monell boilerplate language about the existence of a policy of inaction which led to his deprivation. The complaint is void of additional facts which would evidence the existence of this policy such as prior incidents, the frequency of § 1983 claims brought against the sheriff, similar infractions committed by his deputies, complaints or statistics. The stipulation by the State's Attorney and reaction by the trial judge do not serve to illustrate a policy, but merely corroborates the different components of this single incident.

Second, Paroubek has shown no link between the actions by the deputies and this alleged policy of the Sheriff. The allegations do not say that there was any reason the Sheriff knew or should have known that the door which the deputy claimed to view the events was in fact solid. Thus, there was no way to realize that the police report and testimony of Deputy Friddle was false. After these facts came to light, there is no allegation by Paroubek that the incident was not investigated internally or that the reviewing system was somehow inadequate. Paroubek maintains that the Sheriff did not reprimand or suspend the deputies, but the facts seem to indicate that the deputies were not disciplined to the plaintiff's satisfaction.

Certainly, encouraging, permitting and defending the deputies for perjury is a serious allegation. The propensity to fabricate facts to arrest citizens is a danger to all citizen's constitutional rights. While the potential for this abuse is serious, this alone cannot save the claim from its deficiencies. Paroubek's bare allegation of official inaction absent a casual link

**Paroubek v. Friddle, Not Reported in F.Supp. (1987)**

1987 WL 7818

or additional specified facts implicating the Sheriff falls short of the minimal pleading requirements.[4] Therefore, we must dismiss Paroubek's claim against Shelley for violation of § 1983.

For the foregoing reasons, we grant Shelley's motion to dismiss. It is so ordered.

**All Citations**

Not Reported in F.Supp., 1987 WL 7818

Footnotes

1    As in all motions to dismiss, we view the allegations of the complaint as true.

2    <u>Monell</u> established that municipalities were capable of being sued as 'persons' under § 1983.

3    The analysis for individual or personal liability is different from that for municipal liability, those standards are set forth in Crowder v. Lash, 687 F.2d 996 (7th Cir. 1982). An official will be liable under § 1983 'if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitution deprivation occurs at her direction or with her knowledge or consent.' <u>Crowder, 687 F.2d at 1005</u>.

4    A suit has been brought against both deputies for their misconduct, and these charges remain. We note that discovery will close in this case on April 7, 1987, so we will grant plaintiff leave to amend his complaint to state the necessary allegations within ten days of the date discovery closes. It is the general policy of this court not to stay discovery pending our resolution of motions to dismiss. We think this policy adequately avoids Judge Marshall's 'catch-22' and yet terminates unsupportable claims at an early stage of the litigation.

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1086527
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Orangelo Payne, Plaintiff,

v.

County of Cook, et al., Defendants.

Case No. 15 C 3154
|
Signed 03/21/2016

Opinion

### MEMORANDUM OPINION AND ORDER

Joan B. Gottschall, United States District Judge

 **\*1**  Plaintiff Orangelo Payne alleges that while he was on intensive probation in April 2013 for a state drug possession offense, an FBI agent and probation officers found a shotgun during an illegal search of his home, which caused the Chicago police to arrest and imprison him in violation of federal and state law. More broadly, he contends that the search occurred because the Cook County probation office improperly partnered with other law enforcement agencies "to illegally go into probationers' homes without warrants to perform illegal searches and seizures, in an effort to persuade probationers[ ] to become informants and to obtain evidence unlawfully." (Am. Compl., Dkt. 8, ¶ 41.)

Payne filed a 22-count complaint against five defendants/groups of defendants, all of whom filed motions to dismiss: (1) the Chicago police officer defendants (Dkt. 48); (2) the Cook County defendants (Dkt. 64); (3) Jesus Reyes, the former Chief Probation Officer for the Cook County Adult Probation Department (Dkt. 66); (4) the City of Chicago (Dkt. 68); and (5) Christopher Weismantel, a special agent with the Federal Bureau of Investigation (Dkt. 70). For the following reasons, the motions to dismiss are granted in part and denied in part. [1]

## I. BACKGROUND [2]

### A. The Parties
 **\*2**  Plaintiff Orangelo Payne resides in Chicago, Illinois. Defendant Cook County is a municipal corporation that, among other things, oversees the Cook County Adult Probation Department. Defendant Lavone Haywood is the Chief Probation Officer for the Cook County Adult Probation Department. Defendant Jesus Reyes is the former Chief Probation Officer for the Cook County Adult Probation Department, and was the Chief Officer during the relevant time period. Defendant Phillippe Loizon is the Deputy Chief of the Cook County Adult Probation Department. Defendants Marty Jahn, Mark Dovin, and Tom Diabiase are Probation Officers with the Cook County Adult Probation Department. Defendant Timothy Evans is the Chief Judge of the Circuit Court of Cook County. Payne has also sued the City of Chicago, Chicago Police Sergeant Chris Papaioannou, and Chicago Police Officers Marvin Coleman, Angelo Panagiotopoulos, (unknown first name) Taylor, John Kennedy, Benny Williams, BJ Doherty, Stevan Vidljinoic, and (unknown first name) Dorin. FBI Special Agent Christopher Weismantel is the final defendant.

## B. Payne's Arrest

On April 21, 2013, Payne and Erica Lewis shared an apartment in Chicago's Grand Boulevard neighborhood. At the time, Payne was in the process of serving a two-year period of intensive state probation for drug possession and was required to be home every evening by 7:00 p.m. [3] Probation Officer Wayne Harris (not a defendant in this case) was Payne's assigned Probation Officer. Harris (or another probation officer) typically performed a weekly curfew check by calling Payne on the phone while parked outside Payne's apartment and asking Payne to come to a window to prove he was there.

Prior to April 21, 2013, no probation officer had entered Payne's apartment to conduct a curfew check. On the evening of April 21, 2013, however, three probation officers (defendants Marty Jahn, Mark Dovin, and Tom Dibiase) arrived at Payne's apartment, along with FBI Special Agent Christopher Weismantel. A probation officer called Payne on the telephone and told him to come to the door. Payne let the probation officers and Special Agent Weismantel into his apartment, and one of the probation officers immediately handcuffed Payne.

Special Agent Weismantel showed Payne a picture of Paris Poe, a suspect in the shooting death of an FBI informant. After Payne denied knowledge of Poe's whereabouts, Special Agent Weismantel ordered the probation officers to search Payne's apartment. One of the probation officers found a vintage 12-gauge shotgun from 1905 in a closet in Lewis' bedroom. The probation officer called the Chicago Police Department, who sent police officers to arrest Payne. Payne alleges that he did not receive *Miranda* warnings and that no one told him why he was being arrested.

"The Adult Probation Department Defendants [Cook County, Timothy Evans, Lavone Haywood, Jesus Reyes, Phillippe Loizon, Marty Jahn, Mark Dovin, and Tom Dibiase] never documented [Special Agent Weismantel's] presence in [Payne's] file; such details were purposefully left out...so as to conceal [Special Agent Weismantel's] presence at [Payne's] home." (Am. Compl., Dkt. 8, ¶ 34.) When Payne arrived at the police station, he was placed into an interrogation room with Special Agent Weismantel and Chicago police sergeant Papaioannou (a defendant in this case). Special Agent Weismantel and Sergeant Papaioannou questioned Payne "on matters unrelated to his arrest, including interrogating him for information or intelligence regarding gang violence; specifically, knowledge of an alleged gang member by the name of Paris Poe." (*Id.* ¶ 35.) When Payne could not provide information about Poe, he was charged with unlawful possession of a firearm and as an armed habitual criminal. He spent 16 months in custody at the Cook County Jail before the State dropped the charges in July of 2014 and he was released. [4]

## C. Payne's Claims

**\*3** Payne alleges that the Cook County Adult Probation Department, under the direction of Chief Judge Timothy Evans and through its then Chief Probation Officer Jesus Reyes, "created and effectuated a policy, custom, or practice in which the Adult Probation Department would team up with other law enforcement agencies, creating a joint task force which included the Chicago Police Department and the FBI, to illegally go into probationers' homes without warrants to perform illegal searches and seizures, in an effort to persuade probationers' [sic] to become informants and to obtain evidence unlawfully." (Am. Compl., Dkt. 8, ¶ 40.) According to Payne, the Chicago Police Department regularly visited probationers' homes as part of the joint task force. Payne alleges that in 2011 and 2012, the Adult Probation Department conducted two operations with the Chicago Police Department which included stops at more than 100 probationers' homes in the city of Chicago.

Deputy Chief Philippe Loizon is a probation officer who supervises the specialized weapons unit. Loizon and then Chief Probation Officer Jesus Reyes "buil[t] alliances with the Chicago Police Department and the FBI" so law enforcement officers could routinely search probationers' homes and attempt to obtain statements and evidence which would otherwise require the issuance of a warrant. After probation officers searched probationers' homes, they "would assist the Chicago Police Department and/or FBI in interrogating the probationer regarding individuals the Chicago Police

Department, and/or the FBI sought information on. The Chicago Police Department and/or the FBI would then offer to suppress the evidence found during the illegal search in exchange for the probationer's information and/or agreement to become an informant." (*Id.* ¶ 46.)

The Adult Probation Defendants (defined by Payne as Cook County, Timothy Evans, Lavone Haywood, Jesus Reyes, Phillippe Loizon, Marty Jahn, Mark Dovin, and Tom Dibiase) "promised special treatment and threatened to disrupt the probationers' lives if they refused to cooperate as informants." [5] (*Id.* ¶ 47.) "Members of the Adult Probation Department, together with the task forces including the Chicago Police Department and the FBI, planted drugs, money, firearms and other paraphernalia in probationers' homes if they refused to become informants." (*Id.* ¶ 48.) Under the "task force" system, the Adult Probation Department "cultivat[ed] probationers to become informants, encouraging them to engage in illegal activity or to be close to illegal activities, when the purpose of the probationary program is to assist the probationer in improving their lives and reducing the chance they will reengage in criminal activity." (*Id.* ¶ 49.) "The Circuit Court of Cook County, through the Adult Probation Department and Jesus Reyes, deliberately failed to adequately keep records of misconduct to prevent patterns of misconduct from being established" and to conceal the misconduct of adult probation officers. (*Id.* ¶ 51.)

The amended complaint repeats these allegations but directs them at the City of Chicago and the Chicago police officers named as defendants in this case. Payne alleges that the City of Chicago did not investigate the police officer defendants' involvement with the task force and "deliberately failed to adequately keep records of misconduct, including failing to keep records of search and seizures performed in connection with 'curfew checks' of probationers' to conceal police misconduct." (*Id.* ¶¶ 65-66.) Payne further alleges that the City of Chicago "has a practice of condoning police misconduct and not disciplining officers who engage in misconduct. (*Id.* ¶ 67.)

**\*4** As noted above, Payne elected not to proceed with most of the state law claims raised in his amended complaint. The allegations in the remaining counts do not necessarily track the count's title (for example, Count I is directed at the Adult Probation Department Defendants but contains allegations of purported wrongdoing by FBI Special Agent Weismantel). The court will not consider allegations about defendants who are not the named subjects of any given count. Similarly, the court will not consider allegations that are unrelated to each count's stated purpose (for example, allegations about a purportedly illegal search in a count labeled as an excessive force claim). This leaves the following claims:

1. Excessive Force – Use of Handcuffs

   a. Count I — § 1983 excessive force against the Adult Probation Department Defendants based on the use of handcuffs on Payne on the night his apartment was searched and an alleged policy, custom, and practice of creating and participating in the "task force." Payne also alleges that the individual probation office defendants are individually liable for restraining him.

   b. Count II – § 1983 excessive force against the City of Chicago Police Department Defendants (defined by plaintiff as the City of Chicago, Sergeant Chris Papaioannou, Officer Marvin Coleman, Officer Angelo Panagiotopoulous, Officer Taylor, Officer John Kennedy, Officer Benny Williams, Officer BJ Doherty, Officer Stevan Vidljinovic, and Officer Dorin) based on the facts underlying Count I and an alleged policy, custom, and practice of participating in the "task force." Payne also alleges that the individual Chicago police officers are individually liable for restraining him. [6]

   c. Count III – § 1983 excessive force against FBI Special Agent Weismantel based on his "order" to unspecified persons (presumably the probation officers) to detain Payne and search his person and apartment. (*Id.* ¶ 91.) In Count III, Payne also alleges that the FBI had a policy, custom, or practice of using excessive force and conducting illegal searches, which Payne describes as Weismantel's alleged use of force and involvement in the search of Payne's apartment, as well as a regime of encouraging FBI agents to "commit wrongful acts against [Payne]." (*Id.*

¶ 95.) Payne asserts that Count III is "brought pursuant to *Bivens v. Six Unknown Federal Agents*, 403 U.S. 388 (1971)." (*Id.* ¶ 97.)

2. Unreasonable Seizure – Search of Payne's Person [7]

    a. Count IV — § 1983 unreasonable seizure against the Adult Probation Department Defendants based on the defendant probation officers' search of Payne's person pursuant to a custom, policy, or practice of the Adult Probation Department.

    b. Count V — This is a § 1983 unreasonable seizure against the Chicago Police Department Defendants that tracks Count IV, except it is directed at the City defendants and names the City as the purported author of the "task force" policy, custom, or practice.

    c. Count VI – Another count that tracks Count IV, except it is directed at Weismantel. The alleged policy, custom, or practice in this count is carried out by "[t]he Defendant Circuit Court of Cook County, through the establishment of the Adult Probation Department, and as a policymaker for the Adult Probation Department, in conjunction with Defendant Jesus Reyes, also a policymaker for the Adult Probation Department." (*Id.* ¶ 119.)

3. Unreasonable Seizure – Search of Payne's Apartment [8]

    **\*5**  a. Count VII repeats Count IV against the Adult Probation Department Defendants but is based on the search of Payne's apartment as opposed to his person.

    b. Count VIII repeats Count V against the Chicago Police Department Defendants but is based on the search of Payne's apartment as opposed to his person.

    c. Count IX repeats Count VI against FBI Special Agent Weismantel but is based on the search of Payne's apartment as opposed to his person.

4. § 1983 Conspiracy (Count X) – Against all defendants "jointly in concert, as co-conspirators, to create and effectuate the policies [the task force] which resulted in Defendants performing illegal searches, seizures, and interrogations of probationers, including Plaintiff Orangelo Payne." (*Id.* ¶ 164)

5. State law indemnification claims against the Adult Probation Department Defendants (presumably, the individual defendants) (Count XXI) and the Chicago Police Department Defendants (again, presumably, the individual defendants) (Count XXII).

## II. DISCUSSION

The court begins with Reyes' contention that Payne failed to effect service of process on him in a timely manner. It then will turn to the multiple motions to dismiss Payne's § 1983 claims.

### A. Official and Individual Capacity Claims Against Reyes

#### 1. Service of Process

Reyes seeks to dismiss the official and individual capacity claims against him pursuant to Rule 12(b)(5) based on untimely service of process. The version of Rule 4(m) in effect when Payne filed suit provided that if a plaintiff fails to effectuate service of process within 120 days after the complaint is filed, "the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a

specified time." Fed. R. Civ. P. 4(m). "But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." *Id.*

A court may, in an exercise of its discretion, find that good cause exists if the plaintiff has exercised "reasonable diligence" in attempting to effect service. *United States v. Veluchamy*, No. 11-CV-4458, 2015 WL 7351677, at *2 (N.D. Ill. Nov. 20, 2015); *see also Conwell v. Cook Cty.*, No. 12 C 10062, 2015 WL 4973086, at *6 (N.D. Ill. Aug. 18, 2015). Even if the court does not find good cause, it can dismiss the action without prejudice or in an exercise of its discretion, find that a permissive extension is warranted and order that service be made within a specified time. *Mikesell v. Taco Bell Corp.*, 300 F.R.D. 329, 331 (S.D. Ind. 2014) (citing *United States v. Ligas*, 549 F.3d 497, 501 (7th Cir. 2008)). When exercising its discretion, the court should "pay particular attention to a critical factor such as the running of a statute of limitations," as well as whether the defendant evaded service, whether the defendant's ability to defend would be prejudiced by an extension, whether the defendant had actual notice of the lawsuit, and whether the defendant was eventually served. *Id.* (citing *Cardenas v. City of Chicago*, 646 F.3d 1001, 1007 (7th Cir. 2011)).

Payne contends that the "general appearances" filed on behalf of Reyes and the other Cook County defendants by attorneys with the Cook County State's Attorney's Office mean that Reyes "accepted service" of process. (Pl.'s Resp., Dkt. 89, at 48.) This is incorrect as "[n]either the filing of an appearance nor a Motion for Extension of Time to Answer waives the defense of insufficient service of process so long as the defendant raises the defense in the first responsive pleading or in a pre-pleading motion." *Martin v. United States*, No. 3:13-CV-03130, 2014 WL 3493233, at *3 (C.D. Ill. July 14, 2014). Thus, a defendant waives the defense of insufficient service of process by failing to raise it in its first responsive pleading or in a pre-pleading motion. *See* Fed. R. Civ. P. 12(h); *see also Swanson v. City of Hammond, Ind.*, 411 Fed. Appx. 913, 915 (7th Cir. 2011). As Reyes raised the defense of insufficient service of process in a Rule 12(b)(5) motion to dismiss, the filing of an appearance on his behalf does not result in waiver.

 **\*6** Next, Payne's counsel contends that Reyes' current counsel filed a separate appearance for Reyes before the 120-day period expired and did not advise her that he believed that his client had not been served. Payne's counsel may have felt lulled by the failure to bring the service issue to her attention but she has not provided any authority suggesting that defense counsel waives service by not reminding plaintiff's counsel that service has not been effected.

Nevertheless, a finding that a plaintiff "mistakenly believed the service of process was correct" can "weigh[ ] towards granting a permissive extension." *Goodman v. Clark*, No. 2:09 CV 355, 2010 WL 2838396, at *11 (N.D. Ind. July 12, 2010) (collecting cases). This is especially true when the plaintiff, as here, immediately attempts to rectify a service problem after realizing that she made a mistake. *See id.* Reyes does not dispute that he has been aware of this suit for a substantial period of time. The statute of limitations ran before Payne's counsel realized that she had not served Reyes properly. Reyes' claim that he will not be able to defend due to the late service is conclusory and belied by the fact that his private counsel contacted Payne's counsel before the 120-day period expired. Accordingly, in an exercise of its discretion, the court declines to dismiss the claims against Reyes based on Payne's counsel's error. The time to effect service is extended retroactively to October 26, 2015, when an affidavit of service indicates that Reyes was served at his home. [9] (Dkt. 88.)

### 2. Official Capacity Claims Against Reyes

Payne sued Reyes in his capacity as the "prior Chief Probation Officer for the Cook County Adult Probation Department...acting as Chief Officer during the relevant time period alleged in the instant complaint." (Am. Comp... Dkt. 8, ¶ 6.) Payne has also sued the current holder of that office, Levonne Haywood. Reyes moves to dismiss the official capacity claims against him, arguing that he ceased serving as Chief Probation Officer almost a year before this lawsuit was filed in April 2015.

A public officer's successor is automatically substituted when that officer ceases to hold office while an action is pending. Fed. R. Civ. P. 25(d). Reyes, however, was never the Chief Probation Officer while this action was pending. Thus, Rule

17 ("Plaintiff and Defendant; Capacity; Public Officers"), rather than Rule 25 ("Substitution of Parties"), governs. *See* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7C Federal Practice & Procedure § 1958 (3d ed. 2010). Rule 17 allows suits against public official defendants to proceed against either the official's title or his name. Fed. R. Civ. P. 25(d). The court has been unable to locate any authority suggesting that it is possible to sue a former public official in his official capacity, and Payne does not address this point.

An action against a defendant in his official capacity is, in essence, an action against the governmental entity of which the official is an agent. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690 n. 55 (1978). To the extent that a plaintiff sues a former public officer based on his actions taken while holding his former office, at best, it appears that this would be an individual capacity claim. The official capacity claims against Reyes are dismissed. The court will discuss the individual capacity claims against Reyes below.

### B. Motion to Dismiss Based on Multiple Immunity Doctrines

**\*7** The Probation Department Defendants contend that all of their immunity arguments, if accepted, would divest this court of jurisdiction. Dismissal of a claim based on sovereign immunity is based on the failure to state a claim for relief, not the absence of jurisdiction. *Abdulqader v. United States*, 596 F. App'x 515, 516 (7th Cir. 2015). As to the other immunity defenses, the result is the same under Rule 12(b)(1) (jurisdiction) and Rule 12(b)(6) (failure to state a claim), as when considering both types of motions, the court accepts the plaintiff's allegations as true and views all facts and reasonable inferences in the light most favorable to the plaintiff. *Ocean Tomo, LLC v. Barney*, No. 12 C 8450, 2014 WL 2619505, at \*3 (N.D. Ill. June 12, 2014) (citing *Scott Air Force Base Props. v. Cnty. of St. Clair, Ill.*, 548 F.3d 516, 519 (7th Cir. 2008)). "The standard for a Rule 12(b)(1) motion to dismiss differs from that governing a Rule 12(b)(6) motion only in that the court 'may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Id.* (quoting *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009)).

#### 1. Judicial Immunity

The defendants assert that Timothy Evans (the Chief Judge of the Circuit Court of Cook County) is entitled to absolute judicial immunity and Jesus Reyes (former Chief Probation Officer for the Cook County Adult Probation Department), Lavone Haywood (Chief Probation Officer for the Cook County Adult Probation Department), Phillippe Loizon (Deputy Chief of the Cook County Adult Probation Department), and Marty Jahn, Mark Dovin, and Tom Dibiase (Probation Officers with the Cook County Adult Probation Department) are entitled to quasi-judicial immunity.

#### a. Absolute Judicial Immunity

"The doctrine of judicial immunity has been embraced 'for centuries.'" *Dawson v. Newman*, 419 F.3d 656, 660 (7th Cir. 2005) (quoting *Lowe v. Letsinger*, 772 F.2d 308, 311 (7th Cir. 1985)). "It confers complete immunity from suit, not just a mere defense to liability," and is available in actions seeking relief under § 1983. *Id.* Judges enjoy absolute judicial immunity in civil rights actions for damages when (1) the challenged act is judicial in nature, as opposed to ministerial or administrative and (2) the judge had subject matter jurisdiction over the case in which he took the challenged act. *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991); *Stump v. Sparkman*, 435 U.S. 349, 360-64 (1978).

#### i. Chief Judge Evans — Official Capacity

When a defendant is sued in his official capacity, "the only immunities available...are those that may be asserted by the governmental entity itself (*e.g.*, Eleventh Amendment immunity or sovereign immunity)." *Novak v. Hall*, No. 14 C 801,

2015 WL 5768569, at *5 (N.D. Ill. Sept. 30, 2015) (quoting *DeVito v. Chicago Park Dist.*, 83 F.3d 878, 881 (7th Cir. 1996)). "This is due to the fact that official capacity suits against government officers or public officials are actually claims against the government entity for which the officers work." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)); *see also Prakel v. Indiana*, 100 F. Supp. 3d 661, 677 (S.D. Ind. 2015) ("judicial immunity is a personal defense reserved for individuals"). Thus, the court declines to find that absolute judicial immunity bars Payne's § 1983 official capacity claims against Chief Judge Evans. [10]

### ii. Chief Judge Evans — Individual Capacity

As noted above, non-judicial actions are not entitled to the protection of absolute judicial immunity. *Mireles*, 502 U.S. at 11-12. "[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Id.* (citing *Stump*, 435 U.S. at 362); *Forrester v. White*, 484 U.S. 219, 223-24 (1988) (" Running through our cases, with fair consistency, is a 'functional' approach to immunity questions" that requires the court to "examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted" and "evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions").

**\*8** "[A] judge, and particularly a chief judge, has many administrative duties that which are part of his normal function, and no less judicial than the act of presiding over a courtroom." *Primm v. Cty. of Dupage*, No. 92 C 3726, 1993 WL 338762, at *6 (N.D. Ill. Sept. 2, 1993) (quoting *Illinois Traffic Court v. Peoria Journal Star*, 494 N.E.2d 939, 941-42 (Ill. App. Ct.1986)). Payne has sued Chief Judge Evans because "he oversees the Adult Probation Department." [11] (Am. Compl., Dkt. 8, ¶ 9.) This oversight function flows from Chief Judge Evans' status as Chief Judge; it is not an "administrative, legislative, or executive function[ ] that judges may on occasion be assigned by law to perform," such as a decision to terminate a staff member's employment. *See Mireles*, 502 U.S. at 13; *see also Forrester*, 484 U.S. at 544. Chief Judge Evans is entitled to absolute immunity against the claims brought against him in his individual capacity.

### b. Quasi-Judicial Immunity

The Adult Probation Defendants next argue that the three probation officers who went to Payne's apartment on April 21, 2013 (Marty Jahn, Mark Dovin, and Tom Dibiase) and their supervisors, Jesus Reyes (former Chief Probation Officer for the Cook County Adult Probation Department), Phillippe Loizon (Deputy Chief of the Cook County Adult Probation Department), and Lavone Haywood (Chief Probation Officer for the Cook County Adult Probation Department), are entitled to quasi-judicial immunity. Payne concedes that probation officers are "judicial employees" under Illinois law. *See People v. Keller*, 926 N.E.2d 890, 895 (Ill. App. Ct. 2010) (citing 730 Ill. Comp. Stat. § 110/9b(3)). He nevertheless contends that the probation officer defendants and their supervisors are not entitled to quasi-judicial immunity.

### i. The Three Probation Officers

Payne's claims against the three probation officers are based on the in-home curfew check (presumably as opposed to a check where an officer would instruct Payne to present himself at a window), their use of handcuffs, the search of his person and apartment, and the seizure of the gun found in a closet. He contends that quasi-judicial immunity does not protect the probation officers' performance of these acts. With respect to the curfew checks, Payne does not dispute that curfew checks were a condition of his probation or that probation officers perform curfew checks regularly "in the course of their everyday duties." (Pl.'s Resp., Dkt. 80, at 17.) However, he argues that curfew checks are not

"intimately associated with the judicial process" because "performing a curfew check does not involve decision-making that is 'adjudicative' or 'judicial' in nature." (*Id.*)

"[O]fficials whose functions are further removed from the core dispute resolution function of judges, but are taken pursuant to the explicit direction of a judicial officer," are entitled to quasi-judicial immunity. *Bernegger v. Morrissette,* No. 08-C-977, 2009 WL 911394, at *5 (E.D. Wis. Mar. 31, 2009). Since it is undisputed that the probation officers performed the curfew check as a condition of Payne's probation, their actions appear to be protected by quasi-judicial immunity. On the other hand, the Seventh Circuit has cautioned that probation officers are not "entitled to absolute immunity for performing their day-to-day duties in the supervision of a parolee" because "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Dawson v. Newman,* 419 F.3d 656, 662 (7th Cir. 2005) (internal quotations omitted).

 **\*9**  Thus, a parole officer who fails to investigate a parolee's claim that he is entitled to termination of his parole is not entitled to quasi-judicial immunity, but an officer who makes a decision about granting, revoking, or denying parole or signing an arrest warrant is covered because those actions are judicial in nature. *Id.* The authority cited by the Adult Probation Defendants (Cook County Resp., Dkt. 64, at 11-12) all relates to the former types of actions. Moreover, conducting curfew checks is more analogous to the day-to-day duty of responding to inquires from supervisees than making decisions about parole or arrest warrants. Thus, the court finds that the three probation officers are not entitled to quasi-judicial immunity based on their performance of a curfew check on Payne on April 21, 2013.

The court next turns to the probation officers' use of handcuffs, search of Payne's person and apartment, and the seizure of the gun. When probation officers engage in "investigative or administrative functions" that are "akin to duties performed by police officers, [they] are entitled only to qualified, not absolute, immunity." *Johnson v. Root,* 812 F. Supp. 2d 914, 922 (N.D. Ill. 2011) (citing *Wilson v. Kelkhoff,* 86 F.3d 1438, 1446 (7th Cir. 1996)); *Copus v. City of Edgerton,* 151 F.3d 646, 649 (7th Cir. 1998) ("A parole officer enjoys absolute immunity for issuing an arrest warrant against a parolee so long as she does not participate in gathering the evidence forming the basis of the warrant."). Using handcuffs, conducting a search and seizing a gun are evidence-gathering functions similar to functions performed by police. Absolute quasi-judicial immunity does not bar Payne's claims against the three probation officers based on the search of his apartment and the seizure of the gun.

### ii. The Supervisory Probation Officers

Supervisory probation employees Jesus Reyes, Lavone Haywood, and Phillippe Loizon also contend that they are entitled to quasi-judicial immunity. The court disposes of the claims against them on alternative grounds; its ruling applies equally to Chief Judge Evans.

Haywood is a defendant because she stepped into Reyes' shoes when he left his position as Chief Probation Officer for the Cook County Adult Probation Department. Payne alleges generally (in a variety of repetitive and substantively similar ways) that Loizon supervised the specialized weapons unit and, along with Reyes, "effectuated the Adult Probation Department Department's policy, custom, or practice, by building alliances with the Chicago Police Department and the FBI and routinely performing warrantless unlawful searches and seizures into probationers' homes." (Am. Compl., Dkt. 8, ¶¶ 43-45, 49.) "As a result of the policy, custom, or practice created by Loizon and Reyes [*i.e.*, not due to their personal actions], the Adult Probation Department obtained several confidential informants for the FBI and the Chicago Police Department." (*Id.* ¶ 49.)

It is unclear if Payne intended to allege that Loizon and Reyes—who are supervisors— routinely performed searches and seizures themselves. In any event, the allegations against the supervisors are all legal conclusions that are not supported by any specific factual allegations. "While legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To state a claim against the supervisory probation defendants, Payne must "provide some factual content to make these conclusory allegations both relevant and plausible." *Karney v. City of Naperville*, No. 15 C 4608, 2015 WL 6407759, at \*4 (N.D. Ill. Oct. 22, 2015). He has not done so.

The lack of specifics makes it impossible to analyze whether the supervisory probation defendants are entitled to immunity. It is true that "the facts required to defeat immunity are not required at the pleading stage." *Estate of McIntosh v. City of Chicago*, No. 15 C 1920, 2015 WL 5164080, at \*5 (N.D. Ill. Sept. 2, 2015). However, this rule does not insulate a plaintiff from the requirement that he provide a framework of basic facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. Payne has failed to do so. Accordingly, while recognizing that "questions of immunity should be decided at the earliest possible stage," *Wagner v. Evans*, No. 15-CV-6165, 2016 WL 397444, at \*4 (N.D. Ill. Feb. 2, 2016), the court dismisses the claims against the supervisory probation defendants with leave to replead. In re-pleading, Payne should be cognizant of the fact that the length of an amended complaint is not necessarily indicative of the quantity or quality of the factual allegations in that document. Repeating conclusory allegations multiple times is unhelpful.

### 2. Sovereign Immunity Pursuant to the Eleventh Amendment

\*10 Under the Eleventh Amendment, a state, its agencies, and its officials acting in their official capacities are immune from federal lawsuits unless the state consents to the suit or Congress abrogates the state's immunity. *Tucker v. Williams*, 682 F.3d 654, 658 (7th Cir. 2012) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996)). There is no exception to state sovereign immunity for § 1983 claims. *Quern v. Jordan*, 440 U.S. 332 (1979). Nevertheless, "a suit for prospective injunctive relief (though not money damages) may proceed against state officials in limited circumstances, as outlined in *Ex Parte Young*, 209 U.S. 124 (1908)." *Meyers v. S. Illinois Univ.-Carbondale ex rel. Koropchak*, No. 08-CV-0556-MJR, 2009 WL 2046061, at \*2 (S.D. Ill. July 10, 2009). In addition, a plaintiff may pursue claims for money damages "against a state official sued in his individual capacity (as opposed to his official capacity) for wrongful conduct attributable to the official himself, 'so long as the relief is sought, not from the state treasury but from the officer personally.'" *Id.* (quoting *Alden v. Maine*, 527 U.S. 706, 757 (1999)).

### a. Sovereign Immunity — Cook County

Payne's definition of the "Adult Probation Department Defendants" includes Cook County. The federal counts against the "Adult Probation Department Defendants" (Counts I, IV, and VII), however, seem to be directed at individuals, not Cook County. States and their departments are not "persons" within the meaning of § 1983 and thus cannot be held liable under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Alden*, 527 U.S. at 736. Thus, the court will assume that Payne is not attempting to assert § 1983 claims against Cook County.

### b. Sovereign Immunity – Individual Cook County Defendants

Payne has sued the individual Cook County defendants in their official and individual capacities.

### i. Official Capacity Claims

"Official capacity suits are a way of suing the governmental entity of which the defendant official is an agent." *Kaszuba v. Godinez*, No. 14-CV-00952-JPG, 2015 WL 5935216, at \*2 (S.D. Ill. Oct. 13, 2015) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Liability in an official capacity action flows from the execution of an official policy, practice or custom

by a government official. [12] *Id.* Payne concedes that he cannot recover monetary damages from County employees sued in their official capacities. *See, e.g., Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012) (sovereign immunity bars claims for money damages sought from state officials in their official capacities). He also concedes that the Division of Probation Services, established by the Illinois Supreme Court, reimburses Cook County for the cost of Cook County probation officers' salaries and does not appear to dispute that Chief Judge Evans is a state employee. He nevertheless argues that the individual Adult Probation Department Defendants are employed by Cook County –not the State of Illinois – and thus are not state officials who can take advantage of Eleventh Amendment sovereign immunity.

In response, the probation defendants argue that they are state officers because they serve in the state court system and are appointed by and under the control of the Chief Judge of each county in Illinois. Although probation officer-specific authority is sparse, one court has held that "[f]or state law purposes judicial branch employees (presumably including probation officers) are not subject to claims that the chief judges and the counties are their joint employers" as the State of Illinois employs judicial branch employees. *Cobb v. Cty. of Cook*, 179 F.R.D. 222, 223-24 (N.D. Ill. 1998) (citing *Orenic v. Illinois State Labor Relations Bd.*, 455, 537 N.E.2d 784, 794-800 (Ill. 1989)).

**\*11** Payne does not provide any analysis of whether Cook County probation staff acts on behalf of the State versus Cook County. (Pl.'s Resp., Dkt. 89, at 8.) The court will not develop and research arguments for him. *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) (the court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel"). Given the authority cited above indicating that Cook County probation officers are state employees, sovereign immunity is available to them. This bars Payne's claims for money damages against the probation officers.

Payne contends that he may still proceed with official capacity claims to "challenge the constitutionality of the Department's policies and seek injunctive relief." (Pl.'s Resp., Dkt. 89, at 8-9.) The Probation Department Defendants do not appear to challenge this point in their reply. [13] The court may award injunctive relief against state officials sued in their official capacities. *Ex Parte Young*, 209 U.S. 123, 159-60 (1908); *Luder v. Endicott*, 253 F.3d 1020, 1024 (7th Cir. 2001) (under the *Ex Parte Young* doctrine, "state officials may be sued in their official capacity for injunctive relief against violations of federal law, including of course nonconstitutional as well as constitutional violations"); *Rasche v. Lane*, No. 15 C 7918, 2015 WL 8493994, at \*5 (N.D. Ill. Dec. 8, 2015) ("while the Eleventh Amendment bars damages claims against the state, its agencies, and its officials acting in their official capacities, it does not preclude claims against state officials for injunctive relief requiring them to comply with federal law"). Thus, the Eleventh Amendment does not bar Payne's request for injunctive relief.

### ii. Individual Capacity Claims

The Probation Department Defendants contend briefly that "claims against individual office holders are considered claims against the state, even when the officials are sued in the [sic] individual capacities." (Defs.' Memo., Dkt. 64, at 7.) Payne (understandably) interprets this as an argument that there is no such thing as a claim against a state actor in her individual capacity and disagrees with that argument. In reply, the Probation Department Defendants defend their request to dismiss the individual capacity claims against Deputy Chief of the Cook County Adult Probation Department Liozon and do not mention the individual capacity claims against the three probation officers who visited Payne's apartment. (Defs.' Reply, Dkt. 108, at 9.)

It appears that the Probation Department Defendants do not seek to dismiss the individual capacity claims against the probation officers based on sovereign immunity. Instead, they seem to be challenging the individual capacity claims against supervisory employees in the Probation Department. A § 1983 suit against an individual state actor sued in her personal capacity based on allegations of personal involvement in the denial of a constitutional right is not subject to the state sovereign immunity bar. *See, e.g., Parker v. Illinois Human Rights Comm'n*, No. 12 C 8275, 2013 WL 5799125, at \*7

(N.D. Ill. Oct. 25, 2013) (citing *Thomas v. Illinois*, 697 F.3d 612, 613 (7th Cir. 2012)). Based on this principle and because the Probation Department Defendants have not mounted an understandable challenge to the individual capacity § 1983 claims against them, the Eleventh Amendment does not bar those claims.

### 3. Qualified Immunity

**\*12** The court next considers if qualified immunity bars Payne's surviving claims against the Cook County defendants. Special Agent Weismantel has adopted the Cook County defendants' arguments about qualified immunity and also moves to dismiss on grounds that are specific to him.

#### a. Legal Standard for Qualified Immunity

"Qualified immunity protects government officials from civil liability when performing discretionary functions so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, —, 131 S.Ct. 2074, 2085 (2011)). When evaluating whether qualified immunity applies, the court must ask "two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Alvarado*, 267 F.3d at 652; *see also Lane*, 134 S.Ct. at 3281.

#### b. Qualified Immunity — Cook County Defendants and Special Agent Weismantel

Citing to *Johnson v. Root*, the Cook County defendants contend that probation officers are entitled to qualified immunity when they perform "investigative or administrative functions ...akin to duties performed by police officers." [14] 812 F. Supp. 2d at 922. This argument rests on a misreading of *Johnson*, which holds that "qualified, not absolute, immunity" is *available* in that situation. *Id*. Johnson does not hold that qualified immunity automatically applies. *Id*.

Thus, the court considers if qualified immunity protects the probation officers who went to Payne's apartment on April 21, 2013. [15] The probation officers agree that the conditions of Payne's probation required them to have reasonable suspicion to perform warrantless searches of Payne's person and apartment. (Defs.' Memo., Dkt. 89, at 22.) For the purpose of its qualified immunity analysis at the motion to dismiss stage, the court must accept Payne's allegation that the officers, who were at the apartment solely to conduct a curfew check, had no justification whatsoever for immediately handcuffing Payne and searching his person and the apartment and, instead, used the curfew check to gain access to the apartment to conduct an unlawful search. Payne's allegation that there was no basis for reasonable suspicion appears to doom the request for qualified immunity.

**\*13** The probation officers, however, assert that "the doctrine of qualified immunity leaves ample room for mistaken judgments," *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006), so "in grey areas where probable cause (or reasonable suspicion) may be questionable, the benefit falls to the law enforcement agent," *Colbert v. Willingham*, No. 13-CV-2397, 2015 WL 3397035, at \*7 (N.D. Ill. May 26, 2015); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and... in such cases those officials—like other officials who act in ways they reasonably believe to be lawful — should not be personally liable."). "Reasonable suspicion is less demanding than probable cause (which itself is a quantum of proof less than a preponderance of the evidence)." *Pike v. Foster*, No. 12 CV 00094, 2016 WL 537940, at \*4 (N.D. Ill. Feb. 11, 2016) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

The probation officers assert that a state court judge found that the defendant officers had probable cause to arrest Payne after seizing the gun in his apartment and that Payne was found in violation of the terms of his probation the day before the curfew check at issue. They suggest that this makes the existence of reasonable suspicion at least questionable. [16] The court disagrees.

To evaluate the parties' arguments about the existence of reasonable suspicion, the court turns to analogous cases addressing probable cause. "[A]n officer is entitled to qualified immunity if a reasonable officer could have mistakenly believed that probable cause existed based on the clearly established law at the time of his actions." *Burritt v. Ditlefsen*, 807 F.3d 239, 250 (7th Cir. 2015) (internal quotations omitted). This is sometimes referred to as "arguable probable cause," the determination of which should be made separately and distinctly from a determination of actual probable cause. *Id.* If an officer "reasonably, albeit possibly mistakenly, believed that probable cause existed," he is entitled to qualified immunity. *Id.*

"Police ordinarily have probable cause if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge...are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Wagner v. Wash. Cnty.*, 493 F.3d 833, 836 (7th Cir. 2007) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). The court assesses probable cause objectively, considering the facts as they reasonably appeared to the arresting officer, "seeing what he saw, hearing what he heard, and so forth." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). Probable cause requires more than a bare suspicion of criminal activity, but it does not require evidence sufficient to support a conviction. *Id.* "Based as it is on probabilities rather than hard certainties, the probable-cause standard inherently allows room for reasonable mistakes." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). When facts sufficient to create probable cause are undisputed, probable cause is a question of law. *Cervantes v. Jones*, 188 F.3d 805, 811 (7th Cir. 1999), overruled on other grounds by *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 1999).

**\*14** The probation officers' argument about reasonable suspicion/probable cause, in essence, is that a court determined that probable cause supported Payne's arrest based on the gun found in his apartment. (Defs.' Memo., Dkt. 64, at 16.) This does not engage with the authority discussed above as it is based on post-search developments and is at odds with the Seventh Circuit's mandate to consider "arguable probable cause" separately and distinctly from actual probable cause. *See Burritt*, 807 F.3d at 250. Moreover, at the motion to dismiss stage, the court must accept Payne's allegations about the probation officers' motivation for entering his apartment and, as discussed above, cannot consider materials from the state court criminal case for the truth of the matter therein. The parties agree that the conditions of Payne's probation allowed the probation officers to search Payne's person and apartment if a reasonable suspicion justified the search. Payne alleges that the probation officers could not have had a reasonable suspicion that he had violated the terms of his probation because they were there solely to conduct a curfew check and his presence demonstrated he was in compliance.

At the motion to dismiss stage, the court cannot make factual findings about the officers' reasons for entering Payne's apartment. Instead, it is bound by Payne's allegations. So for now, the probation officers are not entitled to qualified immunity. This is not a final ruling as a more fully developed record may show that the probation officers had a different reason for searching Payne's person and apartment.

### c. Qualified Immunity — Special Agent Weismantel

The court next considers qualified immunity arguments that are specific to Special Agent Weismantel. "*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), authorizes the filing of constitutional tort suits against federal officers in much the same way that 42 U.S.C. § 1983 authorizes such suits against state officers." *King v. Federal Bureau of Prisons*, 415 F.3d 634, 636 (7th Cir. 2005); *see also Bush v. Lucas*, 462 U.S. 367, 374 (1983) ( *Bivens* is the federal

counterpart to a § 1983 claim against a state official). Because § 1983 actions and *Bivens* claims "are conceptually identical and further the same policies, courts have frequently looked to [§ 1983] and [its] decisional gloss for guidance in construing the scope of the *Bivens* remedy." *Reynolds v. United States*, No. 15-CV-00262-NJR, 2016 WL 51389, at *3 (S.D. Ill. Jan. 5, 2016) (quoting *Green v. Carlson*, 581 F.2d 669, 673 (7th Cir. 1978)).

As noted above, Payne alleges that the probation officers acted pursuant to an agreement between the Cook County Adult Probation Department, the Chicago police, and the FBI. According to Payne, Special Agent Weismantel entered his apartment with three Cook County probation officers. Special Agent Weismantel showed Payne a picture of Paris Poe, an alleged gang member who was a suspect in the shooting death of an FBI informant. After Payne denied knowledge of Poe's whereabouts, Special Agent Weismantel "then illegally authorized the Probation Officers to 'search the place'" and the probation officers searched Payne's apartment. (Am. Compl., Dkt. 8, ¶ 28.) Payne also alleges that Special Agent Weismantel and Chicago Police Sergeant Chris Papaioannou "interrogated" him after he arrived at the police station and contends that he was charged only after he could not provide information about Poe. (*Id.* ¶¶ 35-36.) Special Agent Weismantel seeks to dismiss Counts III (excessive force), VI (search of Payne's person), and IX (search of Payne's apartment) pursuant to the doctrine of qualified immunity.

### i. Special Agent Weismantel — Excessive Force (Count III)

Payne's 246-paragraph amended complaint does not appear to allege that Special Agent Weismantel ever touched him. In the background section of his amended complaint, Payne alleges that "one of the Probation Officers" handcuffed him immediately after the officers and Special Agent Weismantel entered Payne's apartment. (Am. Compl., Dkt. 8, ¶ 26.) In his excessive force count against Special Agent Weismantel, Payne adds that Special Agent Weismantel "ordered the detention of Orangelo Payne [*i.e.*, ordered a probation officer to apply handcuffs]." (*Id.* ¶ 91.) It is unclear how a probation officer could have simultaneously decided to handcuff Payne immediately upon entering the apartment *and* waited for Special Agent Weismantel to provide directions. Payne may not proceed based on these inconsistent and confusing allegations. *See Karney*, 2015 WL 6407759, at *4. Thus, Count III is dismissed. Because Payne at this point has not stated a colorable excessive force constitutional claim, the court will not consider Special Agent Weismantel's qualified immunity defense. *See Alvarado*, 267 F.3d at 652.

### ii. Special Agent Weismantel — Search of Payne's Person (Count VI)

**\*15** In Count VI, Payne does not allege that Special Agent Weismantel participated in the search of Payne's person or in any other way was directly involved. The closest allegation regarding Special Agent Weismantel's involvement in a search is his purported command for the probation officers to "search the place," which focuses on Payne's apartment, not his person. Payne has pointed to no authority suggesting that Special Agent Weismantel can be vicariously liable for a search of Payne's person performed by Cook County probation officers based on Special Agent Weismantel's presence in Payne's apartment. Count VI is dismissed; as with Count III, this means that the court need not reach Special Agent Weismantel's contention that he is entitled to qualified immunity as to this count.

### iii. Special Agent Weismantel — Search of Payne's Apartment (Count IX)

With respect to Payne's claim against Special Agent Weismantel based on the search of Payne's apartment (Count IX), Special Agent Weismantel asserts that he lacks authority to order a Cook County probation officer to conduct a search incident to a curfew check so he cannot be held responsible for the probation officers' search of Payne's apartment. Special Agent Weismantel also contends that Payne is attempting to impose liability on him merely because he was present at Payne's apartment on the night at issue.

The court, as it must at this stage of the proceedings, accepts Payne's allegations as true. Regardless of Special Agent Weismantel's authority to issue orders to Cook County probation officers, Payne has alleged that Special Agent Weismantel gave a command that the probation officers obeyed. In other words, Payne alleges that the search of his apartment happened because Special Agent Weismantel ordered the probation officers to "search the place." This allegation, coupled with Payne's allegations about the agreement between County, City, and federal law enforcement, supports an inference that the probation officers searched Payne's apartment at Special Agent Weismantel's behest. Thus, while discovery may belie Payne's allegations, Count IX states a claim for which relief may be granted.

Because Payne has stated a colorable claim against Special Agent Weismantel, the court considers if he is entitled to qualified immunity. As Special Agent Weismantel notes, the "right question is whether the officers could have reasonably believed that their actions were lawful." (Weismantel Reply, Dkt. 105, at 4.) Special Agent Weismantel argues that given Payne's status as a probationer and the fact that Special Agent Weismantel was not involved with monitoring Payne's probation, it would not be immediately apparent that Payne had consented to a search of his apartment only if reasonable suspicion existed, since probation agreements commonly include blanket waivers that allow inspection of a residence at any time for any reason.

Payne's response does not engage with this argument. However, Special Agent Weismantel's qualified immunity argument fails for two reasons. First, even accepting Special Agent Weismantel's contention that he reasonably believed that Payne had signed a blanket consent-to-search, Special Agent Weismantel does not assert that he had a reasonable albeit mistaken belief that Payne consented to a search that was purportedly initiated by an FBI agent, as opposed to a Cook County Adult Probation officer.

Second, Special Agent Weismantel was in the apartment solely because he accompanied the probation officers. The court is not aware of any authority suggesting that law enforcement officer X can enter and then search a residence because law enforcement officer Y had a colorable basis for gaining access to the residence and X accompanied Y. That is precisely what Payne has alleged. Special Agent Weismantel has not explained why he had a reasonable but mistaken belief that he could use the probation officers to gain entry into Payne's apartment so he could question Payne about Poe and then (accepting Payne's allegations), order a search of the apartment after Payne disclaimed knowledge of Poe. This is not a grey area of the law. *See Gutierrez*, 722 F.3d at 1008. Special Agent Weismantel's motion to dismiss Count IX based on the doctrine of qualified immunity is denied.

**C. Conspiracy (Count X)**

**\*16** "A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means.'" *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (citing *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). To state a claim for conspiracy claim pursuant to § 1983, a plaintiff "must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Id.*

**1. Cook County Defendants & Chicago Police Defendants**

A plaintiff may attach materials to a response to a motion to dismiss that illustrate the facts that he expects to be able to prove. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). In response to the Cook County defendants' motion to dismiss Payne's conspiracy claim (which the Chicago police defendants adopted), Payne submitted a group of exhibits that he expressly states are illustrative, including a May 21, 2014 Cook County Court press release announcing that Chief Judge Evans hired an independent law firm to conduct an internal investigation to address "allegations that high ranking officials in the Adult Probation Department improperly cooperated in searches of probationers' homes with local and federal law enforcement agencies" (Dkt. 89-1) and various newspaper articles that are consistent with the allegations in the amended complaint regarding an alleged agreement between Cook County, the City of Chicago,

and the FBI. (Dkt. 89-2 to 89-5). For example, the articles assert that Loizon "built alliances with police and the FBI, at times over his bosses' objections," probation officers regularly visit probationers' homes with Chicago police officers and FBI agents, Loizon had personal ties to probationers acting as informants, and that the Cook County Probation Department lacks guidelines for engaging in the type of search and seizure at issue in this case. (Dkt. 89-2.)

The Cook County defendants (and, by adoption, the Chicago police defendants) do not address the substance of these materials. Instead, they merely repeat the well-established rule that a plaintiff may not amend his complaint in response to a motion to dismiss. Payne has not attempted to do so. His allegations about the alleged civil conspiracy (like many of his allegations) are sweeping, but the illustrative materials provide color and support and, as such, may be considered as exemplars of the types of evidence he believes supports his conspiracy claim. He may proceed with this claim against the Cook County and Chicago police defendants.

### 2. Special Agent Weismantel

"[I]t is well settled that conspiracy does not provide an independent basis of liability." *Ellis v. City of Chicago*, No. 13 CV 2382, 2016 WL 212489, at *10 (N.D. Ill. Jan. 19, 2016). Thus, a conspiracy claim must rest on a colorable claim of an underlying constitutional violation. *Id.* (quoting *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996)) ("For liability under § 1983 to attach to a conspiracy claim, defendants must conspire to deny plaintiffs their constitutional rights," as "there is no constitutional violation in conspiring to cover up an action which does not itself violate the constitution"). Special Agent Weismantel adopts the Cook County defendants' arguments about § 1983 conspiracy, which are discussed above. He also adds that the conspiracy claim against him should be dismissed because Payne has not stated a colorable underlying constitutional claim against him. As the court has denied the motion to dismiss Count IX (search of Payne's apartment as to Special Agent Weismantel), this argument is unavailing.

### 3. The City of Chicago

**\*17** An entity is not a person and thus cannot conspire with others to violate a citizen's constitutional rights. *Briggs v. N. Shore Sanitary Dist.*, 914 F. Supp. 245, 251 (N.D. Ill. 1996). The conspiracy claim against the City of Chicago is, therefore, dismissed with prejudice.

## D. Motion to Dismiss Payne's *Monell* Claims [17]

### 1. *Monell* Claims – Custom, Policy, and Practice

Payne contends that Cook County and the City of Chicago "created and effectuated a policy, custom, or practice in which the Adult Probation Department [and the City] would team up...creating a joint task force" consisting of the Adult Probation Department, the Chicago Police Department, and the FBI, "to illegally go into probationers' homes without warrants to perform illegal searches and seizures, in an effort to persuade probationers [ ] to become informants and to obtain evidence unlawfully." (Am. Compl., Dkt. 8, ¶¶ 40, 56.) *See Monell*, 436 U.S. at 694. The Cook County supervisory officials sued in their official capacities and the City of Chicago challenge Payne's *Monell* claims, arguing that Payne's allegations about the existence of a purported County and City custom, policy, and practice relating to Cook County probationers fail to support an inference that a widespread practice exists and are impermissibly conclusory.

Section 1983 provides a cause of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. A municipality is liable under § 1983 "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. 658, at 694. Municipal liability can rest on: (1) an express policy that caused the constitutional deprivation; (2) a widespread practice that, although not authorized by written law

or express municipal policy, is so permanent and well settled that it constitutes a policy; or (3) a constitutional injury caused by a person with final policymaking authority. *Lewis v. City of Chi.*, 496 F.3d 645, 656 (7th Cir. 2007).

First, the defendants argue that the allegations supporting Payne's *Monell* claims are focused on his own personal experiences and thus fail to support an inference that a widespread practice exists. To survive a motion to dismiss a *Monell* claim, a plaintiff must "plead facts that show 'that there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." *Liska v. Dart*, No. 13 C 1991, 2014 WL 3704635 at *10 (N.D. Ill. July 23, 2014). Here, the factual allegations that alert the defendants to the contours of Payne's *Monell* claims overwhelmingly relate to Payne's personal experiences. Payne, however, also alleges that "the Adult Probation Department obtained several confidential informants for the FBI and the Chicago Police Department" and that in 2011 and 2012, the Adult Probation Department and the City of Chicago conducted two "operations... which included stops at more than 100 probationers' homes in the city of Chicago." (Am. Compl., Dkt. 8, ¶¶ 42, 49.)

**\*18** There is no bright-line rule for determining when conduct rises to the level of policy or practice but "it is clear that a single incident—or even three incidents—do not suffice." *Wilson v. Cook Cnty.,* 742 F.3d 775, 780 (7th Cir. 2014); *see also Nettles-Bey v. Burke,* No. 11 C 8022, 2015 WL 4638068, at *12 (N.D. Ill. Aug. 4, 2015) ("Isolated incidents of allegedly unconstitutional conduct are insufficient to establish a widespread practice."). Payne has alleged that more than 100 probationers had experiences with the Cook County Adult Probation Department and City of Chicago police officers that are similar to his experience. This is enough to state a colorable claim of a widespread practice. *See Barrios v. City of Chicago*, No. 15 C 2648, 2016 WL 164414, at *13 (N.D. Ill. Jan. 14, 2016) (denying motion to dismiss a *Monell* claim because the plaintiffs alleged that they believed that the potential number of individuals affected by the alleged policy exceeds 1,000 annually).

Second, the defendants argues that Payne's *Monell* claims are impermissibly conclusory. A plaintiff may proceed with a *Monell* claim "'even with conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged wrongdoing." *Armour v. Country Club Hills*, No. 11 C 5029, 2014 WL 63850, at *6 (N.D. Ill. Jan. 8, 2014) (quoting *Riley v. Cnty. of Cook*, 682 F. Supp. 2d 856, 861 (N.D. Ill. 2010)). Boilerplate allegations about the existence of a custom, policy, and practice, however, do not satisfy this standard. *See Armour*, 2014 WL 63850, at *7; *see also Maglaya v. Kumiga*, No. 14-CV-3619, 2015 WL 4624884, at *3 (N.D. Ill. Aug. 3, 2015) (collecting cases). For example, courts have held that allegations that a defendant "maintains a policy by which officers use excessive force to arrest individuals with no probable cause or reasonable suspicion warranting such" or that a defendant discriminated against the plaintiff on the basis of her sex and race "pursuant to wide-spread practice" fail to state an actionable *Monell* claim. *Annan v. Vill. of Romeoville*, 2013 WL 673484, at *6 (N.D. Ill. Feb. 25, 2013); *Sheppard v. Vill. of Glendale Heights*, 2011 WL 6102012, at *4 (N.D. Ill. Dec. 5, 2011).

Payne alleges the existence of an express policy and asserts that paragraphs 40-67 of his amended complaint contain "extremely specific facts" about that policy. (Pl.'s Resp., Dkt. 89, at 24.) In these paragraphs, Payne alleges, without elaboration, that various defendants created various policies. He further alleges that pursuant to the various policies, "several" people became confidential informants for the FBI and the Chicago Police Department, that probation officers, police, and FBI agents planted drugs, money, guns, and other items on probationers' homes if they refused to become informants, and that the FBI and Chicago police officers gained access to probationers' homes without warrants that they otherwise would have needed. In addition, he alleges that the Adult Probation Department and the City of Chicago deliberately failed to "keep records of misconduct" to conceal their actions. (Am. Compl., Dkt..8, ¶¶ 51, 66.) Finally, he includes broadly worded allegations of wrongdoing, such as "[t]he City of Chicago has a practice of condoning police misconduct and not disciplining officers who engage in misconduct." (*Id.* ¶ 67.)

The court can easily dispose of the broadly worded allegations. Policy, custom, and practice claims that are not specifically tied into Payne's core allegations about the purported task force consisting of the employees of the Cook

County Adult Probation Department, the City of Chicago, and the FBI are impermissibly conclusory. *See Smith v. Hartmann*, No. 12-CV-09915, 2014 WL 2134574, at *5 (N.D. Ill. May 22, 2014) (dismissing a *Monell* claim based on conclusory allegations that defendants had a policy and practice of concealing police misconduct); *see also Armour*, 2014 WL 63850, at *6 (a *Monell* claim must be supported by facts sufficient to give the defendants notice of the alleged wrongdoing).

**\*19** Payne's other *Monell* claims, however, are supported by allegations of consequences that occurred repeatedly as a result of the purported policies adopted by the Adult Probation Department, Chicago police department, and FBI. As discussed above, factual allegations suggesting that the same situation has arisen many times and the defendant has acquiesced in the outcome can support an inference that a policy exists. *See Liska*, 2014 WL 3704635 at *10. Moreover, the court considers the materials discussed above that Payne submitted in further support of his conspiracy claim. While these documents are not admissible for the truth of the matter therein, they provide additional information about the gist of Payne's *Monell* claims. Discovery may belie Payne's allegations but for now, he has sufficiently alleged the existence of a policy. Payne may proceed with his *Monell* claims. Given this conclusion, the court will not address the parties' arguments regarding the sufficiency of Payne's efforts to allege *Monell* claims against the defendants based on a widespread practice or actions taken by a person with final policymaking authority.

### 2. *Monell* Claims – Respondeat Superior

Payne alleges that Cook County and the City of Chicago are "liable for all torts committed by [their] employees/agents... pursuant to the doctrine of respondeat superior." (Am. Compl., Dkt. 8, ¶¶ 5, 7, 12.) Vicarious liability cannot support liability under § 1983. *See, e.g., Monell*, 436 U.S. at 694. Thus, a municipality "cannot be held liable solely because it employs a tortfeasor." *Id.* at 691. Payne's *Monell* claims based on respondeat superior are dismissed with prejudice.

### E. Motion to Dismiss Search and Seizure Claims Based on The Existence of Probable Cause

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)). A warrantless search of a probationer's person and home is proper only when reasonable suspicion exists that the probationer committed a crime. *See United States v. Knight*, 554 U.S. 112 (2001).

Payne argues that a state court's finding that there was probable cause to believe that he violated the terms of his probation by possessing a gun does not create a reasonable suspicion that retroactively justified the earlier use of handcuffs and a search of his person and apartment as part of a curfew check. In support, he stresses that he personally answered the door and thus demonstrated that he was in his apartment and had not violated his curfew. He then asks how reasonable suspicion to handcuff him and search his person and apartment could exist based on a violation of probation due to failure to comply with his curfew.

The court has discussed reasonable suspicion and probable cause above in the context of qualified immunity. In sum, Payne has alleged that (1) the probation officers had no basis for their actions since he clearly was at home during curfew hours since he opened the door and (2) the discovery of the shotgun in the closet does not make the probation officers' earlier search of his apartment constitutional. In their reply memorandum, the defendants assert that Payne previously failed to complete a community service assignment and did not comply with a curfew shortly before the curfew check at issue in this case (facts which the court has already held are not properly before it at this point in the proceedings) but state that they reserve challenges to Payne's claims based on the search of his person and apartment until the close of discovery. Thus, the motion to dismiss the search claims based on the purported existence of probable cause is denied.

### F. Payne's Excessive Force Claims — Use of Handcuffs (Counts I, II, and III)

The court interprets Payne's excessive force claim as a contention that the decision to restrain him with handcuffs violated his right to be free from an unreasonable seizure. As such, the Fourth Amendment's objective reasonableness standard governs Payne's excessive force claims. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). Under this standard, the court must examine the "totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government interests at stake." *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000). "[T]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" are specific factors for courts to consider." *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (internal quotations omitted).

**\*20** As with their reasonable suspicion/probable cause argument, the defendants contend that they were entitled to handcuff Payne because they had a legally justified reason to search his person and apartment. Once again, however, Payne has alleged that the sole purpose of the probation officers' visit was to perform a curfew check and that he personally answered the door, thereby demonstrating (at least this time) that he had complied with his curfew. If the point of the curfew check was to determine if Payne was in his apartment, as Payne alleges, it is unclear why it would be necessary to handcuff Payne immediately after he opened the door or conduct a search of his person and apartment. Thus, the defendants' authority about restraining an individual to facilitate the orderly completion of a search is inapposite.

As with Payne's other constitutional claims, a more fully developed record may result in a different outcome but at the motion to dismiss stage, the court is bound by Payne's allegations. Payne may continue with his excessive force claim as to the probation officer(s) who applied the handcuffs. Excessive force claims against defendants who did not apply the handcuffs are dismissed. Any amended complaint should clarify who applied the handcuffs.

### III. CONCLUSION

Payne has agreed to the dismissal of his state law counts (excluding Counts XXI and XXII, which seek indemnification under state law): Count XI (state law civil conspiracy – all defendants), Count XII (state law false imprisonment –adult probation department), Count XIII (state law false imprisonment), Count XIV (state law false imprisonment – FBI), Count XV (state law malicious prosecution – adult probation department), Count XVI (state law malicious prosecution – Chicago Police Department), Count XVII (state law malicious prosecution – FBI), Count XVIII (state law IIED – adult probation department), Count XVIX (state law IIED – Chicago Police Department), and Count XX (state law IIED – FBI). In addition, Payne's request to dismiss his claims against Dorothy Brown, Clerk of the Circuit Court of Cook County, is granted.

The Chicago Police Officers' motion to dismiss [48] is denied as moot as Payne dismissed the state law claims that were the subject of that motion. The other motions to dismiss filed by the Cook County defendants [64], Jesus Reyes [66], the City of Chicago [68], and Special Agent Weismantel [70] are granted in part and denied in part as detailed above. Unless the court specified that a claim is dismissed with prejudice, it is dismissed with leave to replead. Any amended complaint must be filed by April 12, 2016. The defendants shall answer or otherwise plead by May 3, 2016. A status hearing is set for May 6, 2016 at 9:30 a.m.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 1086527

**Footnotes**

1    In Payne's consolidated response to the motions to dismiss, he indicates that he does not wish to pursue Counts XI – XX (excluding Counts XXI and XXII, which seek indemnification under state law). Thus, Count XI (state law civil conspiracy

– all defendants), Count XII (state law false imprisonment – adult probation department), Count XIII (state law false imprisonment), Count XIV (state law false imprisonment – FBI), Count XV (state law malicious prosecution – adult probation department), Count XVI (state law malicious prosecution – Chicago Police Department), Count XVII (state law malicious prosecution – FBI), Count XVIII (state law intentional infliction of emotional distress ("IIED") – adult probation department), Count XVIX (state law IIED – Chicago Police Department), and Count XX (state law IIED – FBI) are dismissed. In addition, Payne's request to dismiss his claims against Dorothy Brown, Clerk of the Circuit Court of Cook County, is granted.

2   The following facts are drawn from the plaintiffs' 53-page amended complaint (Dkt. 8) and are accepted as true for the purpose of the defendants' motion to dismiss. *See Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013). The court also notes that to resolve the various pending Rule 12(b)(6) motions, it has confined its attention to "allegations made within the four corners of the complaint" and will not consider additional factual allegations that the defendants have provided in the background sections of their motions. *See, e.g., Sumling v. Vill. of E. Dundee*, No. 14 C 3794, 2015 WL 5545294, at *5 (N.D. Ill. Sept. 18, 2015). In addition, the court will not consider the numerous legal conclusions that are alleged as "facts" in the second amended complaint.

3   The Cook County defendants ask the court to take judicial notice of state court documents indicating that the conditions of Payne's probation required him to submit to searches of his person, home, and car when requested by a probation officer based on reasonable suspicion and to refrain from possession of firearms. They also ask the court to take judicial notice of the contents of a range of state court documents relating to Payne's performance while on probation, for the truth of the matters therein. The court, however, may only take "judicial notice of other judicial proceedings to establish the fact of such litigation or to recognize the outcome." *Lopez v. Pastrick*, No. 2:05-CV-452 PPS-APR, 2011 WL 2357829, at *4 (N.D. Ind. June 8, 2011). The court will take judicial notice of the state court documents for this limited purpose.

4   Payne alleges that he was released on July 28, 2013. (Am. Compl., Dkt. 8, ¶ 38.) The court assumes that this is a typographical error and that Payne means July 28, 2014, as he alleges he spent sixteen months in custody beginning on April 21, 2013.

5   Payne includes numerous allegations about groups of defendants. It is unclear how Cook County – an entity – could itself threaten probationers. The court also questions whether Payne intended to allege that Cook County Chief Judge Evans directly interacted with individual probationers as part of his monitoring. This issue will be discussed more fully below.

6   The court has summarized Payne's allegations as they appear. It notes that despite Payne's contention in the "factual allegation" portion of the complaint that a single probation officer handcuffed him, Counts I and II assert that the three defendant probation officers and the nine defendant Chicago police officers are each liable for violating Payne's constitutional rights by handcuffing him.

7   As with Payne's excessive force counts, the unreasonable search counts include numerous allegations that relate to other constitutional theories, such as the alleged use of excessive force on the night that Payne was taken into custody. In future iterations of the complaint, Payne should refrain from this practice.

8   As with the other groups of counts, the counts based on the allegedly unreasonable search of Payne's apartment contain allegations based on other constitutional theories.

9   Given the affidavit of service, it is unclear why Reyes contends that "[t]o date, service has not been effected on Jesus Reyes individually." (Reyes' Mot. to Dismiss, Dkt. 66, at 3.)

10  This ruling applies equally to Payne's official capacity claims against the individual probation officers and their supervisors, all of whom contend that they are entitled to quasi-judicial immunity.

11  Payne also contends that Chief Judge Evans "created and effectuated" the de facto policy. (Am. Comp., Dkt. 8, ¶ 40.) This allegation is conclusory as it is unaccompanied by any supporting factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Similar conclusory allegations directed at Loizon and Haywood are discussed below.

12  The Probation Department Defendants contend that Payne has failed to allege facts sufficient to show that a policy, practice or custom existed. This argument is discussed below.

13  Confusingly, the Probation Department Defendants state that they "recognize that the Eleventh Amendment does not bar injunctive suits against states which challenge the constitutionality of a state official's action; however, Plaintiff fails to state a claim against Defendants Haywood, and Loizon in their official capacities." (Defs.' Reply, Dkt. 108, at 6.) The Probation Department Defendants then engage in a lengthy discussion that appears to correspond to the *Monell* liability section of their opening brief (Defs.' Memo, Dkt. 64, at 19-21). Thus, the defendants do not appear to challenge the availability of injunctive relief sought against probation employees sued in their official capacities.

14  Special Agent Weismentel adopted the Cook County defendants' qualified immunity arguments. Thus, in this section, references to the Cook County defendants also encompass Special Agent Weismantel.

15    The remaining Cook County defendants (Chief Judge Evans, Haywood, and Loizon) assert that they "were not present during the April 21, 2013 occurrence and are only identified in their supervisory and/or elected roles related to the Cook County Adult Probation Department." (Defs.' Memo., Dkt. 64, at 17.) They appear to be claiming the protection of qualified immunity based on their lack of personal involvement with the search. *See Thompson v. Holm*, 809 F.3d 376, 380 (7th Cir. 2016) (liability can attach only if a defendant is personally involved in the constitutional deprivation). However, Payne's theory as to these defendants is that they were personally involved in the creation and implementation of a custom, policy, and practice that deprived him of his constitutional rights. This subset of the Cook County defendants does not appear to be claiming qualified immunity based on this theory.

16    As noted above, at the motion to dismiss stage, the court cannot accept the contents of the state court materials submitted by the defendants for the truth of the matter therein. Nevertheless, in the interests of completeness, the court will address the defendants' argument.

17    The parties' briefs contain numerous ad hominem attacks on opposing counsel. For example, in his submissions addressing the *Monell* issue, Payne calls opposing counsel "impudent" and asserts that he is "dumbfounded" by the County's arguments. The County ripostes with its own pejorative remarks, such as characterizing all of Payne's arguments as "feeble." This does nothing to advance the parties' cause. This is especially true given that the parties filed literally hundreds of pages of submissions in connection with the defendants' multiple motions to dismiss. This type of "advocacy" in oversize briefs is a waste of words.

---

**End of Document**                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1477959
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Aaron PIERCY, as Administrator of the Estate of Dale Piercy, Plaintiff

v.

Julie WARKINS, Dan Williams, and Advanced Correctional Healthcare, Inc., Defendants.

No. 14 CV 7398
|
Signed 04/25/2017

**Attorneys and Law Firms**

Michael I. Kanovitz, Sarah Copeland Grady, Scott R. Rauscher, Vincenzo Field, Gretchen Elizabeth Helfrich, Loevy & Loevy, Chicago, IL, for Plaintiff.

Lyle Kevin Henretty, Jennifer Marie Lutzke, Office of the Illinois Attorney General, Kevin George Mikulaninec, Walker Wilcox Matousek LLP, Ryan M. Henderson, Bates Carey LLP, Chicago, IL, Peter Robert Jennetten, Christina Elizabeth Cullom, Quinn, Johnston, Henderson, Pretorius & Cerulo, Peoria, IL, for Defendants.

**Opinion**

## MEMORANDUM OPINION AND ORDER

REBECCA R. PALLMEYER, United States District Judge

**\*1** Plaintiff Aaron Piercy brings this suit as the administrator of the estate of his father, Dale Piercy (*see* Defs.' Statement of Undisputed Material Facts ("DSOF") [346] ¶ 2.), who died in the custody of the Illinois Department of Corrections ("IDOC") on October 19, 2013 at the age of 54 [1] . (Coroner Report, Ex. 3 to Mot. for Summ. J. [345-3] at P000032.) Piercy entered the Whiteside County Jail ("WCJ") in late September and was later transferred to Stateville Correctional Center, Northern Reception and Classification Center ("Stateville NRC"). While at WCJ, Plaintiff claims, Piercy complained that he was vomiting blood. Plaintiff claims Piercy made these complaints to Defendant Julie Warkins, a nurse employed by Defendant Advanced Correctional Healthcare ("ACH"), which provided medical care at WCJ. Warkins conferred with Defendant Dan Williams, a physician assistant with ACH who worked offsite. Warkins and Williams gave Piercy medication for acid reflux, and did not tell staff at Stateville NRC about Piercy's complaints when he was transferred there. Two weeks after the transfer, Piercy died from gastrointestinal bleeding.

Plaintiff alleges several causes of action against Warkins and Williams. Some are complaints under 42 U.S.C. § 1983: deliberate indifference, conspiracy, and failure to intervene. Plaintiff also alleges state law claims of medical malpractice, and intentional infliction of emotional distress. Plaintiff further seeks to hold ACH liable for the constitutional violations and the state law claims.

Defendants have moved to bar certain of Plaintiff's expert testimony, and have moved for summary judgment. For the reasons stated below, the motion to bar the expert testimony is denied and the motion for summary judgment is granted in part and denied in part.

# BACKGROUND

## I. Factual Background

### A. Piercy's Incarceration

Aaron Piercy brings this survival action as the administrator of Dale Piercy's estate. Dale Piercy entered WCJ on September 25, 2013. (Pl.'s Resp. to DSOF [365] ¶ 9. [2]) At WCJ, a correctional officer performed an intake medical screening, where Piercy reported that he had acid reflux and took Pepcid, a medication, but that he did not bring any medications with him and was "not under the care of any physician." [3] (DSOF ¶ 10; Ex. 1 to Mot. for Summ. J. [345-1] at Whiteside 6–7.)

**\*2** ACH had a contract with Whiteside County to provide medical care to detainees at WCJ. [4] (*Id.* at ¶ 1.) As part of its contract, ACH hired Julie Warkins, a licensed practical nurse ("LPN"), to work at the jail for 35 hours per week. (Pl.'s Resp. to DSOF ¶ 1; *see* Ex. 49 to Pl.'s Statement of Additional Facts ("PSOAF") [367-50]; *see also* 225 ILCS 65/55-30 (defining licensed practical nurse).) ACH also hired Dan Williams, a physician assistant, to visit the jail once every other week and to be available for phone consultation 24 hours per day. (*See* Pl.'s Resp. to DSOF ¶ 1; Ex. 45 to PSOAF [367-46] at ACH0425; Ex. 48 to PSOAF [367-49].)

Before Piercy was transferred to Stateville NRC, Warkins filled out a Health Status Summary form, a form that WCJ used to give IDOC information on an inmate's medical condition. [5] (Pl.'s Resp. to DSOF ¶ 11.) Warkins used the information from Piercy's intake medical screening to fill out the form (*id.*); Warkins wrote on the Health Status Summary that (1) Piercy had acid reflux problems, (2) he took Pepcid, and (3) he needed medical follow-up care; she did not specify what kind of care he needed. (Ex. 24 to PSOAF [367-25].)

The parties dispute what Piercy told Warkins about his medical condition while at WCJ. Another inmate, Brandon Simester, testified that he heard Piercy tell Warkins that he had been vomiting and coughing up blood on September 26, the day after he entered the jail. (Dep. of Brandon Simester, Ex. 6 to PSOAF ("Simester Dep.") [367-7] 74:3–75:12.) Simester claims that Piercy also asked for some antacid to help him eat. (*Id.* at 75:5–19.) According to Simester, Warkins wrote Piercy's name on her hand and told him she would get back to him. (*Id.* at 74:5–18, 131:8–16.) Simester and another inmate, William Elder, claim that Piercy spoke to Warkins several more times, as well. (*Id.* at 77:11–78:1; Dep. of William Elder, Ex. 7 to PSOAF [367-8] 34:24–35:14.) Simester testified that during one of these encounters, Piercy repeated that he was vomiting blood and was in pain; Simester claims that Warkins said she would "see what she could do." (Simester Dep. 78:8–79:15.) Warkins also apparently told Piercy to drink water. (*Id.* at 152:4–10.) One correctional officer, John Willhite, claims that Piercy told him he was spitting blood at some point during his stay at WCJ, but when Willhite offered to take him "up front" (presumably to the nurse), Piercy declined. (Dep. of John Willhite, Ex. 10 to PSOAF ("Willhite Dep.") [367-11] 6:7–24, 63:1–14.) Willhite claims that Piercy said that "it wasn't a big deal." (*Id.* at 63:1–14)

Warkins claims she spoke to Piercy briefly on September 27, while she gave medication to other detainees. (DSOF ¶ 14.) She contends that Piercy told her that the jail food "didn't agree with him," said he took antacid for acid reflux, and requested medication. (*Id.*; Dep. of Julie Warkins, Ex. 11 to PSOAF ("Warkins Dep.") [367-12] 78:3–80:23.) According to Warkins, Piercy did not know the name of the medication—he called it only "the purple pill" [6] (*id.* at 118:18–120:13), but he did specifically request Mylanta.

**\*3** Warkins claims that she took Piercy's vital signs (DSOF ¶ 15), and recalls that she recorded them and Piercy's request for medication on a Protocol Medication Verification Form. [7] (Warkins Dep. 103:3–105:20.) This form is dated September 27, 2013, and is signed by both Warkins and Williams. (Ex. 1 to Mot. for Summ. J. at Whiteside 2.) On this form, which Defendants have submitted as an exhibit, she wrote that he requested Omeprazole, a drug used to treat

acid reflux, rather than Mylanta. (*Id.*); *Omeprazole*, DORLAND'S MEDICAL DICTIONARY, https://dorlands.com/def.jsp?id=100074776 (last visited Apr. 11, 2017). Though Warkins admits that she did not document precisely what Piercy said, she confirmed that she recorded his vital signs and his request for medication. (Pl.'s Resp. to DSOF ¶ 15; Warkins Dep. 104:17–22.) Defendant Dan Williams explained that the form lists both medications that an inmate requests or is taking and medications that health care professionals provide or recommend. (Dep. of Dan Williams, Ex. 19 to PSOAF ("Williams Dep.") [367-20] 118:3–119:18.) Given that Williams later did prescribe Omeprazole to Piercy, it may be that the medication notes on this form were filled in *after* Warkins's conversation with Williams (see below), rather than based on Piercy's request.

After her contact with Piercy, Warkins called Williams;[8] Defendants claim that she relayed her version of Piercy's complaint (the request for medicine and that the food did not agree with him). (DSOF ¶ 16.) Plaintiff asserts that Warkins "conveyed to Williams everything that Piercy had told her" (Pl.'s Resp. to DSOF ¶ 16–17), but the evidence does not support this: Warkins testified specifically to what she told Williams—that Piercy requested antacid and said the food did not agree with him—she did not testify that she told Williams "everything that Piercy had told her." Warkins also testified that if a patient told her that he was vomiting blood, this would be an "emergency," and she would call a doctor. (Warkins Dep. 200:5–16.) Williams, too, agreed that vomiting blood is a "life-threatening condition" that cannot "be ignored." (Williams Dep. 150:15–22.) At his deposition, however, Williams did not recall prescribing Omeprazole, though Defendants admit that he did.[9] (Williams Dep. 122:4–124:13, 128:6–130:7; Defs.' Resp. to PSOAF [372] ¶ 20.) Before Defendants made this admission, Williams testified that if he knew that a patient was taking Omeprazole, he would have wanted to know whether the patient had bloody vomit. (Williams Dep. 141:14–142:18.)

Williams ordered that Piercy receive 20 mg of Omeprazole daily, and that he be given Mylanta until the Omeprazole arrived.[10] The parties dispute whether Piercy received Mylanta on September 27, but it is undisputed that he began receiving Omeprazole on the evening of September 28. (Pl.'s Resp. to DSOF ¶ 18–19; *see* Ex. 1 to Mot. for Summ. J. at Whiteside 3.) Piercy's medication log has no entry for October 2 and 3, so it is unclear whether he received Omeprazole on those dates.[11] (Ex. 1 to Mot. for Summ. J. at Whiteside 4.)

**\*4** On October 4, 2013, Piercy was transferred to Stateville NRC. (DSOF ¶ 21.) The parties have many disputes concerning the intake process at Stateville NRC and Piercy's medical care there, none of which are relevant for these motions. It is undisputed, however, that the only medication Piercy received at Stateville NRC was "a few" Tums. (*Id.* at ¶ 27.) Plaintiff contends that neither Williams nor Warkins contacted Stateville NRC to inform them of Piercy's complaints or Williams's prescription for Omeprazole. (Pl.'s Resp. to DSOF ¶ 27.) Warkins admits that she filled out Piercy's Health Status Summary form for IDOC before she saw Piercy and before Williams prescribed Omeprazole. (DSOF ¶ 11.) She admits, further, that she did not update it (*id.*), though the form is neither dated nor signed. (Ex. 24 to PSOAF.) The record is silent as to whether WCJ transmitted the Protocol Medication Verification Form—the form recording that Williams ordered Omeprazole—to Stateville NRC.

The parties agree that over the next several days, Piercy began vomiting with escalating frequency, including bloody vomit. (DSOF ¶ 29–31.) Piercy was unable to stand in the shower on October 18 (Pl.'s Resp. to DSOF ¶ 33), and fell from his bunk on October 19. (DSOF ¶ 34.) Stateville NRC staff brought Piercy to the medical unit, and called an ambulance after Piercy became unresponsive. (*Id.* at ¶ 34–35.) At some point later, Piercy died from gastrointestinal bleeding. (*Id.* at ¶ 36.)

Dr. Michel Humilier, a forensic pathologist, performed a post-mortem examination of Piercy on October 21. (Coroner Report, Ex. 3 to Mot. for Summ. J. at P000031–32.) Dr. Humilier listed the immediate cause of death as "gastrointestinal hemorrhage." (*Id.* at P000031.) Dr. Humilier was unable to identify the cause of the gastrointestinal bleeding. (Dep. of Michel Humilier, Ex. 57 to PSOAF [367-58] 20:4–21.)

**B. ACH Policies and Practices**

Plaintiff retained an expert, Dr. Evans, who prepared a report on ACH's practices at WCJ. Dr. Evans reviewed 455 charts of inmates who had been incarcerated in WCJ. [12] (Report of Dr. Nathaniel Evans, Ex. 28 to PSOAF ("Evans Rep.") 5; Dep. of Dr. Nathaniel Evans, Ex. 29 to PSOAF ("Evans Dep.") [367-30] 127:22–128:6.) Dr. Evans opines that the medical records of 107 of those inmates "showed clear evidence of inadequate medical care or no medical care at all." (Evans Rep. 5.) According to Dr. Evans, some of these inmates were not given timely assessments to determine whether they needed care, and a "substantial number of detainees who expressed need for medical attention" apparently did not receive any medical care at all while at WCJ. (*Id.*)

Dr. Evans also reviewed the sworn statements of 20 inmates who were incarcerated in WCJ in 2013 or, in two cases, 2014 and 2015. (*Id.* at 5; Inmate Affidavits, Ex. 30 to PSOAF [367-31] at P017004, P017010.) Dr. Evans does not specify whether he also reviewed the medical records of these inmates. Dr. Evans specifically describes thirteen cases of what he calls inadequate medical care among these inmates (the names of these inmates have been redacted from his report):

• One inmate told a nurse that he took three medications, but was told he would have to wait to see a psychiatrist before he could have those medications. (Evans Rep. 9.) Months passed before he actually saw a psychiatrist. (*Id.*)

• One inmate made sick call requests for a toothache for more than a month before he received aspirin; he never saw a doctor or dentist. (*Id.*)

**\*5** • One inmate told a correctional officer that he needed blood pressure medication, but more than two weeks pass before he received the medication, despite back pain, chest pain, and swollen feet. (*Id.*)

• One inmate was denied hypertension and mental health medications for several days. (*Id.* at 10.)

• Another inmate was also denied blood pressure medication. (*Id.*) This inmate also requested a lice examination, which ACH did not perform. (*Id.*)

• One inmate was deprived of medication for restless leg syndrome and depression, and had a urinary tract infection that went untreated for a week. (*Id.*)

• Another inmate complained that she had a cold for two months, but was never examined. (*Id.*)

• One inmate had an ingrown toenail that was treated with antibiotics, which did not help, and ACH never removed the toenail (it was removed after he was transferred to IDOC)—he does not state how long this persisted. (*Id.*; Inmate Affidavits, Ex. 30 to PSOAF at P017006–7.)

• One inmate's complaint of a toothache was not addressed for a month, until he threatened to contact a lawyer. (Evans Rep. 10; Inmate Affidavits, Ex. 30 to PSOAF at P017011.)

• One inmate had a boil that went untreated for a week, after which the inmate had to be hospitalized for several days. (Evans Rep. 10.)

• One inmate had a staph infection for more than a week, but was not treated. (*Id.* at 11.)

• Two inmates also observed other inmates who were denied medications or given what they believed were the wrong medications. (*Id.* at 9, 11.)

**C. Medical Protocols for WCJ Correctional Officers**

Correctional officers used "protocols" as "guidelines for treatment" of certain conditions. Though it appears the protocols were kept in book form, they also included forms for completion by correctional officers and health care professionals. The record is silent on where these materials were kept or how accessible they were.

An exemplary protocol, and the main one at issue in this case, is Protocol 06-05, titled "Nausea and Vomiting." (Ex. 41 to PSOAF [367-42] at ACH0316–7.) The protocol has several sections. First, there is a space to record the detainee's name, date of birth, allergies, and the date and time. (*Id.*) Second, there is a section called "Ask the Detainee," which lists three questions to be asked of the detainee: (1) "How long have you had symptoms?"; (2) "Nauseating or Vomiting?"; and (3) "Injury to area?". (*Id.*) After the questions, the protocol says "CALL PHYSICIAN IMMEDIATELY for presence of a large amount of blood, extreme pain or life threatening symptoms[.]" (*Id.* (emphasis in original.)) The third heading directs: "Examine the detainee" and contains a space to record the detainee's vital signs and record if there is "[d]iscomfort in the upper abdomen and/or chest area[.]" (*Id.*) Fourth is a list of treatment instructions and recommended medications. Fifth, there is a place for "Physician's orders" with a large blank section that can be filled in. (*Id.*) Finally, each protocol states:

> These Protocols are designed to assist the staff in the gathering of information to be communicated to the medical staff. The Protocols are not intended to establish a standard of medical care and are not standing orders. All treatments must be ordered and approved be a Nurse Practitioner, Physician Assistant or Physician.

**\*6** (*Id.*)

These protocols appear to be the method for correctional officers and ACH to pass along information about a detainee while recording all relevant facts in a single record. In the first, second, and third sections, correctional officers (who are constantly present at the jail and able to observe the detainee) record information to pass on to the ACH medical professional. The fourth section guides the medical professional in the appropriate treatment. The fifth section enables the medical professional to document his or her treatment order, and communicate it to the correctional officers on the same form, who can then implement the treatment. The protocol is thus a guide for ACH medical staff, but requires input from correctional officers to be used properly. In the terminology of the parties, the correctional officers "complete" the protocol (that is, fill out the information requested in the first, second, and third sections), but it is ACH medical staff who actually use them to guide decisions.

There is another protocol at issue in this case, however: Protocol 00-02, titled "Automatic Physician Contact." (Ex. 5 to Dep. of Curtis Ebersohl ("Ebersohl Dep."), Ex. 9 to Mot. for Summ. J. [345-9] at ACH0231.) This protocol has only one section, which has the heading: "[t]he physician will be automatically contacted for detainees with the following problems[.]" (*Id.*) The protocol then lists several conditions, one of which is "Vomiting Blood: **See Protocol 06-05**[.]" (*Id.* (emphasis in original).) This protocol, presumably, also guides the correctional officers themselves in deciding whether to contact the ACH medical staff.

The parties dispute who established the protocols: Plaintiff contends that ACH required jail staff to use them, but Defendants claim that while ACH recommended the protocols, "[t]he Sheriff has to approve and implement them." (DSOF ¶ 43; Pl.'s Resp. to DSOF ¶ 42–43.) The jail administrator, Tim Erickson, testified "[w]e have a protocol book that ACH gave us with certain protocols that we have to follow." (Dep. of Tim Erickson, Ex. 25 to PSOAF ("Erickson Dep.") [367-26] 6:19–7:8, 44:23–24.) The parties agree that ACH provided some training about when and how to consult the protocols, though it is unclear how much or what the training entails. (Defs.' Resp. to PSOAF [372] ¶ 50; Pl.'s Resp. to DSOF ¶ 48–49.) Defendants contend that "[t]he officers were taught to call the provider every time a protocol was completed" (DSOF ¶ 50), but Plaintiff disputes this; he asserts that "officers expected the protocols to inform them as to whether a call to the provider was necessary." In fact, Tim Erickson, the jail administrator, testified:

The thing about contacting the physician, the protocols themselves will tell you on there whether you're suppose[d] to contact the physician or not.

So even without looking at that page, if you look up extreme bleeding, it's going to tell you in that protocol, call the doctor.

(Erickson Dep. 104:11–16.) Curtis Ebersohl, another correctional officer, testified that it was a "judgment call" about whether to call a physician after completing the first section of the protocol. (Ebersohl Dep. 5:15–6:3, 109:20–110:5.) Whatever the preferred practice may have been, it is undisputed that "no protocol form was ever used in connection with Piercy." (PSOAF [367] ¶ 56.) The court concludes that no correctional officer ever consulted the relevant protocol forms for bloody vomit, performed the preliminary inquiries, or consulted an ACH employee for the part of the form that requires physician input.

### D. Supervision of Physician Assistant Dan Williams

**\*7** Illinois requires a physician assistant to be supervised by a physician. 225 ILCS 95/7. Illinois law also requires a written supervision agreement that "shall describe the working relationship of the physician assistant with the supervising physician[.]" 225 ILCS 95/7.5(a). This agreement "must be available to the [Illinois Department of Financial and Professional Regulation] upon request from both the physician assistant and the supervising physician." *Id.* Plaintiff complains that no agreement with Williams's supervising physician was produced in discovery, but Defendants claim that the law does not require that the parties "retain[ ] [the agreement] for any period of time." (Defs.' Resp. to PSOAF ¶ 59.) In 2005, Williams was involved in the treatment of a patient, for which he was sued for malpractice (the court does not know when the suit commenced); in 2009, he settled the suit, and in 2011 he was reprimanded and fined by the Illinois Department of Financial and Professional Regulation. [13] (PSOAF ¶ 58.)

At WCJ, Williams was originally supervised by Dr. Gregory Rakestraw, and later by Dr. Karen Butler, but he does not recall when the supervisor change occurred or whether it was before, during, or after September 2013. (Defs.' Resp. to PSOAF ¶ 60; Williams Dep. 74:22–75:12.) Williams testified that he did not have regularly scheduled phone calls or meetings with his supervising physician, nor did he receive performance reviews. (Williams Dep. 75:13–15, 76:2–77:2.) He would, however, contact the physician with questions or to get suggestions about how to handle a patient's medical problems. (*Id.* at 74:12–21, 77:3–11.) Williams testified that it was "rare" for his supervising physician to call him. (*Id.* at 77:3–11.)

Williams prepared charts to document the conditions of individual patients and the treatment he provided; Dr. Rakestraw reviewed some of them, and, according to Williams, would typically review five to ten charts per month. [14] (*Id.* at 77:12–80:3.) Williams received feedback on the documentation in his charts from time to time. (*Id.* at 78:18–79:21.) He recalled notations such as "excellent documentation," "thorough," and "make sure you complete a full mental status." (*Id.* at 79:3–21) He testified that he never received feedback that caused him to "change [his] practices." (*Id.*) According to Norman Johnson, the CEO of ACH, no one from ACH ever "shadow[ed]" Williams at WCJ. (Johnson Dep. 14:2–9, 212:1–2.)

### II. Procedural Background

On September 23, 2014, Plaintiff filed this lawsuit, naming fifteen defendants, many of whom were unknown. (*See generally* Compl. [1].) Plaintiff's most recent complaint, the fourth amended complaint, names more than one hundred defendants associated with Whiteside County, IDOC, and the medical contractors that operate at WCJ and Stateville NRC (ACH and Wexford Health Services, respectively). (*See generally* Fourth Am. Compl. [250].) Plaintiff has settled with all defendants other than ACH, Warkins, and Williams. (Defs.' Mot. for Summ. J. [345] 1.)

Against Warkins and Williams, Plaintiff asserts the following causes of action: deliberate indifference in violation of 42 U.S.C. § 1983, conspiracy to violate 42 U.S.C. § 1983, failure to intervene in violation of 42 U.S.C. § 1983, and intentional infliction of emotional distress. Plaintiff also pleads "wrongful death," in which Plaintiff complains of Defendants' "negligence and/or willful and wanton conduct." With respect to an earlier amended complaint, the court construed the "wrongful death" claim as one for medical malpractice, and required that Plaintiff file the appropriate affidavit required for medical malpractice claims under Illinois law. (Minute Order [69], Jan. 23, 2015); 735 ILCS 5/2-622. Both parties have accordingly considered this claim as one for medical malpractice, and the court will continue to do so as well. Plaintiff alleges that ACH is liable for the § 1983 claims because it had policies or practices that were the moving force behind the deliberate indifference, and for the state law claims under *respondeat superior.* Plaintiff also seeks punitive damages.

### III. Plaintiff's Proposed Expert Testimony

**\*8** Plaintiff initially disclosed two experts: Dr. David Shapiro and Dr. Nathaniel Evans. (Ex. 1 to Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions [341-1].) As described above, Dr. Evans reviewed medical records and sworn statements of other inmates; he intends to testify regarding ACH's policies and practices. Dr. Shapiro opines that both Williams and Warkins fell below their respective standards of care while treating Piercy. (Report of Dr. David Shapiro ("Shapiro Rep."), Ex. 1 to Pl.'s Resp. to Mot. to Strike Rebuttal Experts [351-1] 9.) According to Dr. Shapiro, Warkins and Williams should have acted promptly to determine the cause of Piercy's bleeding, including "an urgent referral to a gastroenterologist." (*Id.* at 4–6.) Dr. Shapiro also opined that "Omeprazole is necessary but insufficient as the only treatment in the management of upper of GI bleeding. Furthermore, as there is the potential to mask symptoms despite ongoing bleeding, the administration of omeprazole in the absence of the appropriate evaluation is a dangerous combination." (*Id.* at 7.)

Defendants then disclosed at least five [15] experts and provided their respective reports: Dr. Stephen Bolesta, Dr. Michel Uzer, Dr. Randall Stoltz, Physician Assistant Janet Furman, and Nurse Betty Rogers. (Pl.'s Resp. to Mot. to Strike Rebuttal Experts ("Pl.'s Expert Resp.") [351] 2.) Dr. Bolesta and Dr. Uzer both opined on the cause of Piercy's death. Dr. Bolesta opines that the cause of death listed in the autopsy report is "incomplete," and that his review of the medical records leads him to conclude that Piercy "suffered from an acute event resulting in significant blood loss in and around the time of his death[.]" (Report of Dr. E. Stephen Bolesta, Ex. 4 to Pl.'s Expert Resp [351-4] 2.) Dr. Uzer opined first that Warkins's and Williams's treatment of Piercy met the standard of care. (Report of Dr. Michael Uzer, Ex. 3 to Pl.'s Expert Resp. [351-3] 2.) Second, he opined that Piercy did not experience a hemorrhage until after he arrived at Stateville NRC. (*Id.* at 4.) Finally, he concludes that the cause of Piercy's bleeding was a Dieulafoy lesion. [16] (*Id.*) Rogers opined that "the nursing standard of care required Nurse Warkins to 'collect' information from the Dale Piercy [sic] then 'collaborate' with PA Dan Williams so a decision could be made and his orders carried out[,]" and that Warkins met this standard of care. (Report of Betty Rogers, Ex. 5 to Pl.'s Expert Resp. ("Rogers Rep.") [351-5] 2–3.)

Plaintiff disclosed four experts in rebuttal: Dr. Shapiro, Dr. James Filkins, nurse Sylvia Speller, and Dr. Michael Humilier, who performed Piercy's autopsy. (Ex. 2 to Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions [341-2].) Dr. Shapiro provided a new rebuttal report, for which he reviewed Dr. Uzer's and Dr. Bolesta's reports, and opined that Piercy's medical records contained evidence "strongly suggestive of a gastric ulcer." (Rebuttal Report of Dr. David Shapiro, Ex. 6 to Pl.'s Expert Resp. [351-6] 1.) He added that he disagreed with Dr. Uzer's "characterization of the bleeding pattern of these lesions" as indicating a Dieulafoy lesion, and that the "[t]he clinical presentation is most consistent with gastrointestinal bleeding from a gastric ulcer." (*Id.* at 2.)

**\*9** Dr. Filkins also reviewed Dr. Uzer's and Dr. Bolesta's reports. (Report of Dr. James Filkins, Ex. 7 to Pl.'s Expert Resp. ("Filkins Rep." [351-7] 1)) He stated that he "[could not] endorse Dr. Uzer's opinion that the gastrointestinal hemorrhage that killed Dale Piercy was necessarily from an arterial source" (a Dieulafoy lesion). (*Id.* at 2.) Contrary to Dr. Uzer, Dr. Filkins's opinion "as a forensic pathologist, to a reasonable degree of medical certainty, is that bleeding from a venous source—a vein or veins—could also result in the large amount of blood that was found in Dale Piercy's

digestive tract at autopsy." (*Id.*) He pointed out that "Dr. Uzer himself concedes [that] an erosive lesion, such as an ulcer, could wear away the lining of the stomach, ultimately compromising an artery and causing the bleeding observed in Dale Piercy." (*Id.*) According to Dr. Filkins, "an ulcer cannot be ruled out as the source of the bleeding, and in fact is far more likely to be the source of a GI bleed than the very rare Dieulafoy's Lesion[.]" (*Id.* at 3.)

Plaintiff retained Nurse Speller to opine on the nursing standard of care. Nurse Speller asserted that Warkins fell short of that standard. (Report of Sylvia Speller, Ex. 8 to Pl.'s Expert Resp. ("Speller Rep.") [351-8] 1.) First, Nurse Speller opines, if Warkins knew Piercy was vomiting blood, she should have arranged for "immediate clinical evaluation" by a physician or phyisician assistant. (*Id.* at 1–2.) Even if Warkins only knew that Piercy complained about the food and wanted medication, the standard of care required a follow-up assessment, according to Speller. (*Id.* at 2.) Finally, she opines that Warkins fell short of the standard of care by failing to document her encounter with Piercy in his medical records. (*Id.*) Dr. Humilier, who performed Piercy's autopsy, did not provide a written report for trial, but his postmortem report is in the record. (Ex. 2 to Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions; Coroner Report, Ex. 3 to Mot. for Summ. J. at P000031.)

Defendants have moved to strike Dr. Shapiro's rebuttal report, Dr. Filkins's report, and Nurse Speller's report, and to bar them from testifying as rebuttal experts. (Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions ("Defs.' Mot. to Strike") [341].) Defendants have also moved for summary judgment on all claims except for the claim that Warkins was deliberately indifferent. For the reasons stated below, the court denies the motion to strike the expert reports and bar the rebuttal expert witnesses, and grants the motion for summary judgment in part and denies it in part.

### DISCUSSION

### I. Motion to Strike Expert Reports and Bar Expert Witnesses

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) (quoting *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001)). "Testimony offered only as additional support to an argument made in a case in chief, if not offered 'to contradict, impeach or defuse the impact of the evidence offered by an adverse party,' is improper on rebuttal." *Id.* (quoting *Grintjes*, 237 F.3d at 879). Defendants have moved to strike the rebuttal reports of Dr. Shapiro, Dr. Filkins, and Nurse Speller as improper rebuttal and prejudicial. The court addresses Dr. Shapiro's and Dr. Filkins's rebuttal reports here, but reserves discussion of Nurse Speller's report for the section of the opinion addressing Plaintiff's state law malpractice claim.

Defendants claim that Dr. Shapiro's and Dr. Filkins's rebuttal reports are not truly rebuttal, but are instead intended to strengthen Plaintiff's case-in-chief because they both purport to identify the source of Piercy's bleeding as an ulcer. (Defs.' Mot. to Strike 4–7.) No part of Plaintiff's case could identify the source of the bleeding before the rebuttal reports, and Dr. Shapiro in fact testified initially that he could not determine the cause of Piercy's bleeding and could not say whether it was an ulcer. (Dep. of Dr. David Shapiro, Ex. 4 to Defs.' Mot. to Strike [341-4] 86:21–88:22.)

**\*10** Defendants analogize to *Bowman v. International Business Machine Corp.*, No. 1:11-CV-0593-RLY-TAB, 2012 WL 6596933, at \*6 (S.D. Ind. Dec. 18, 2012), *objections overruled*, No. 1:11-CV-0593-RLY-TAB, 2013 WL 1857192 (S.D. Ind. May 2, 2013). There, the plaintiffs disclosed two expert witnesses, and after the defendants disclosed their expert reports, the plaintiffs provided two "reply" reports from the same witnesses, using different methodologies for their calculations than the initial reports. *Id.* at \*1, 6. The court struck the reports, holding that "[a]lthough [the experts'] replies cover the same topics and to some extent respond to Defendants' experts," the change in methodology was improper for a rebuttal report. *Id.* at \*6–7.

In the court's view, Defendants have mischaracterized Dr. Shapiro's rebuttal report and Dr. Filkins's report. Neither Dr. Shapiro nor Dr. Filkins opine with reasonable medical certainty that the cause was in fact an ulcer. Instead, they rebut Dr. Uzer's opinion that the cause was a Dieulafoy lesion. They point to an ulcer as a potential cause that is supported by enough evidence to contradict Dr. Uzer's opinion that another cause can be confirmed. To accomplish this, both of Plaintiff's experts muster the evidence that the cause of the bleeding could be an ulcer. Dr. Shapiro asserts that there is evidence "strongly suggestive of" and "most consistent with" an ulcer, though he does not offer an opinion with reasonable medical certainty that an ulcer did cause the bleeding. He then critiques Dr. Uzer's opinion. Dr. Filkins similarly criticizes Dr. Uzer's conclusion, precisely because he finds that an ulcer was sufficiently likely that Dr. Uzer's endorsement of a different cause appears inaccurate. Dr. Filkins does not say it was definitely an ulcer—he states it "could also" be an ulcer. (Filkins Rep. 2.) They both conclude that there are too many possible causes to identify one with reasonable medical certainty. [17]

The court concludes this is proper rebuttal expert testimony. Both opinions bolster Dr. Shapiro's initial opinion that the cause of the bleeding cannot be identified with reasonable medical certainty based on the medical records. Moreover, they explicitly contradict Dr. Uzer's opinion that he can identify the source. Defendants' citation to *Bowman* is misplaced —Dr. Shapiro did not change his methodology nor did he "abandon[ ] his earlier opinion." (*See* Defs.' Mot. to Strike 8.) In his initial report, Dr. Shapiro pointed to a number of tests that were not performed on Piercy while he was still alive to determine the source of the bleeding (Shapiro Rep. 6–7); as a result, he does not identify any such cause. True, Dr. Shapiro's rebuttal report describes Piercy's records in detail, which he had not done in his initial report. But again, this description is aimed directly at Dr. Uzer's report and does not change Dr. Shapiro's initial conclusion that the source of the bleeding could not be identified. Dr. Filkins's report is a similar rebuttal to Dr. Uzer's conclusion. Dr. Filkins describes the evidence supporting an ulcer as the cause, concluding that "an ulcer cannot be ruled out." (Filkins Rep. 3.) This rebuts Dr. Uzer's opinion identifying a Dieulafoy lesion as the cause with reasonable medical certainty.

## II. Motion for Summary Judgment

### A. Deliberate Indifference

**\*11** Defendants move for summary judgment on the deliberate indifference claim against Williams, but not Warkins. A plaintiff may recover for deliberate indifference if he suffered from a sufficiently serious medical condition, and if the defendant was deliberately indifferent to the condition, which requires the defendant to "*actually* kn[o]w of and disregard[ ] a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), *as amended* (Aug. 25, 2016) (emphasis in original). Defendants agree that it is disputed whether Piercy's condition was sufficiently serious; their sole argument is that it is undisputed that *Williams* knew only that Piercy complained about the food and requested an antacid, not that Piercy was vomiting blood.

Defendants concede that it is disputed whether Warkins knew that Piercy was vomiting blood. (Defs.' Reply in Supp. of Summ. J. ("Summ. J. Reply") [371] 2.) Yet they claim that it remains undisputed that she did not tell Williams about any bloody vomit, because she testified that she did not, and there is no direct evidence contradicting this testimony. (*Id.*) According to Defendants, "that inference [that Warkins told Williams about the bloody vomit if she knew about it] cannot be made where there is direct testimony that the statements did not occur." (*Id.*) Defendants contend that this inference would be "speculation." (*Id.*)

This is incorrect. Circumstantial evidence may always be considered, and in some circumstances has more weight than direct evidence. *DW Data, Inc. v. C. Coakley Relocation Sys., Inc.*, 951 F. Supp. 2d 1037, 1053 (N.D. Ill. 2013). "[T]he finder of fact can use common sense to evaluate what reasonably may be inferred from circumstantial evidence." *Id.* (internal citation and quotation marks omitted). A reasonable jury could (1) believe the evidence that Warkins knew that Piercy was vomiting blood, (2) observe that Warkins called Williams, after which Williams prescribed medication for Piercy (medication that he admits would cause him to ask about blood in vomit), and (3) infer that Warkins told Williams everything she knew about his condition, including that he was vomiting blood.

In *Petties*, a prisoner alleged that two doctors employed by a private medical care contractor were deliberately indifferent to his need for treatment of a ruptured Achilles tendon. 836 F.3d at 726. The doctor denied knowing that he exposed plaintiff to harm by failing to immobilize his foot, and the district court granted summary judgment in favor of the doctor. *Id.* Reversing, the Seventh Circuit concluded that a reasonable jury could have inferred from circumstantial evidence that the doctor was aware of the need for mobilization—indeed, that need was reflected in the prison medical protocols that the doctor implemented—but chose not to provide plaintiff with a splint or boot. *Id.* at 731. The Court of Appeals identified circumstantial evidence from which a jury could infer that the doctor knew that failing to immobilize the plaintiff's foot would cause severe pain, as well: (1) the doctor's testimony about normal treatment for a ruptured tendon, (2) the doctor's failure to provide a boot until "an outside doctor documented the importance of immobilization in writing[,]" and (3) the doctor's comment that surgery (recommended by an outside specialist) would be too expensive, suggesting that treatment decisions were "dictated by cost ... rather than medical judgment." *Id.* at 732–33.

Defendants attempt to distinguish *Petties* by asserting that whether Williams was told that Piercy was vomiting blood is "an objective fact," where the issue in *Petties* was the doctors' belief about the plaintiff's injury. The court does not find this distinction compelling; in both cases, the question is whether the medical professional was aware of the danger to the patient. A jury can draw any inference reasonably supported by the evidence. A reasonable jury could find Williams knew of a serious risk to Piercy and was deliberately indifferent.

**\*12** Defendants then argue that Williams is entitled to qualified immunity. Defendants acknowledge that the Seventh Circuit "has, at least in dicta, foreclosed the qualified immunity defense for jail medical contractors," but they believe that courts have not "conclusively addressed this issue." (Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Summ. J. Mem.") [347] 4.) Even if it is dicta, the court finds the Seventh Circuit's statement "qualified immunity does not apply to private medical personnel in prisons[,]" *Petties*, 836 F.3d at 734, to be perfectly clear. Defendants also argue that Williams should be entitled to good faith immunity, but they acknowledge that the Supreme Court has not addressed whether such a defense exists. (*See* Defs.' Summ. J. Mem. 4.) Given the clear Seventh Circuit guidance against qualified immunity for private medical contractors, the court will not apply a good faith defense on speculation. Defendants have preserved the issue, but summary judgment is denied on the deliberate indifference claim.

## B. *Monell* Claim Against ACH

Defendants argue that they are entitled to summary judgment on the *Monell* claim against ACH. [18] A corporation, such as ACH, can be liable for constitutional violations caused by (1) an express policy, (2) a widespread custom or practice, or (3) a decision by someone with final policy-making authority. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Pittman ex rel. Hamilton v. Cty. of Madison*, 746 F.3d 766, 780 (7th Cir. 2014); *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009). Courts use the words "moving force" to describe this causation. *Monell*, 436 U.S. at 694; *Valentino*, 575 F.3d at 674. Plaintiff argues that ACH is liable under *Monell* because it (1) had a widespread practice of providing constitutionally inadequate medical care, (2) failed to train correctional officers to handle inmates' dire medical needs, and (3) failed to supervise Williams.

### 1. Widespread Practice of Inadequate Medical Care

Plaintiff alleges that ACH had a widespread practice of providing inadequate medical care to WCJ inmates—in essence, Plaintiff claims that ACH would cut corners in all aspects of providing care. Plaintiff points to two types of evidence of this alleged practice: (1) expert testimony that many inmates at WCJ received inadequate care, and (2) individual policies and practices at ACH that Plaintiff claims suggest that ACH routinely "cut corners and took improper steps to maximize its profits at the expense of patient safety." (Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Summ. J. Resp.") [364] 9.)

### a. Dr. Evans's Testimony

Plaintiff refers to the thirteen inmates at WCJ that Dr. Evans specifically identified as having received inadequate care, as well as his opinion (without specifics) that 107 inmates (out of 455) received inadequate care. Plaintiff cites to *Awalt v. Marketti*, 74 F. Supp. 3d 909, 925 (N.D. Ill. 2014), *supplemented*, 75 F. Supp. 3d 777 (N.D. Ill. 2014), where the plaintiff's expert reviewed the files of inmates who had entered the jail in the three months prior to the plaintiff's incarceration. Twenty-four of these inmates identified medical problems. *Id.* According to the expert, "seven detainees ... were denied timely access to care or received care that fell far below the standard for correctional health care." In the expert's view, those numbers reflect "a high rate of substandard care that suggested systemic failures in the policies and practices" of the defendant corporation. *Id.*

The plaintiff in *Awalt* argued that the corporate defendant "had an implicit policy of deliberate indifference to the medical care provided to detainees." *Id.* at 939. The court found that a reasonable jury could find such a policy, both because of the expert's findings and because the plaintiff "identified six other detainees who did not receive the medical care or medication they needed" while at the jail. *Id.* at 938–39. These same conditions are present here: Dr. Evans has identified specific inmates that he claims received inadequate care, and has opined that a high percentage of inmates also received untimely or inadequate care.

**\*13** Defendants argue that the examples of deficient care here are not as serious as those in *Awalt*. (Summ. J. Reply 8.) But Dr. Evans specifically identifies several inmates whose sick call requests were ignored, who were denied medications, or who waited weeks for medical care. These deficiencies are serious and comparable to the problems that the plaintiff's expert identified in *Awalt*, even if not every case is as serious as Piercy's or those in *Awalt*.

Defendants nevertheless minimize the evidence of other episodes of inadequate care. They point out that many of the examples of inadequate medical care that Dr. Evans identified were (1) ACH's failure to assess inmates within three days, which they claim is not required in Illinois, or (2) "related to assessment and following of blood." (*Id.* at 9.) But these circumstances do not blunt the force of Dr. Evans's opinions. Dr. Evans concludes that "allow [ing] detainees to stay in a correctional facility more than three days with no medical evaluation ... created a situation in which some individuals' medical needs were unmet." (Evans Rep. 5.) According to Dr. Evans, the problem with the delay in assessment is not simply that the assessment is delayed, but that it causes a delay in actual medical treatment. This is borne out in many of his examples, where inmates did not receive critical medications. The fact that no state law requires a prompt medical evaluation does not require the conclusion that delayed treatment does not violate the Constitution.

As for the "assessment and following of blood" (Summ. J. Reply 9), the court assumes that this refers to Dr. Evans's opinion that many of the failures at WCJ occurred when "inmates with high blood pressure ... were given no medication for their blood pressure during their incarceration." (Evans Rep. 5.) Defendants do not explain why withholding blood pressure medication is somehow not serious. *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (affirming denial of judgment as a matter of law when "a reasonable jury could have concluded from the medical records that the delay [in providing medication] unnecessarily prolonged and exacerbated [the plaintiff's] pain and unnecessarily prolonged his high blood pressure").

Dr. Evans has identified enough deficiencies in the medical care at WCJ that a reasonable jury could conclude that it had a practice of ignoring inmates' medical problems and providing substandard care.

### b. Other ACH Practices

Plaintiff also identifies a number of other practices by ACH that it claims are further evidence of its widespread practice of inadequate care. (Pl.'s Summ. J. Resp. 9–10.) For example, Plaintiff asserts that Warkins, an LPN, improperly conducted assessments and evaluated patients. Defendants respond that Warkins did not directly evaluate patients, but worked under the direction of a Regional Nurse Manager. Defendants also contend that Williams regularly visited WCJ, and other ACH medical professionals were available by phone. There appears to a factual dispute over precisely how Warkins operated and how much supervision she had. This evidence may not be sufficient on its own, but could bolster Plaintiff's contention that ACH's policies resulted in constitutional violations.

### c. Causation

Yet identifying a widespread practice of inadequate care is not enough; Plaintiff must also prove that the practice was the "moving force" behind Piercy's inadequate care. Defendants argue that Dr. Evans's testimony about the alleged widespread practice of inadequate care is not sufficient to establish causation. Defendants cite *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000), where a jail inmate had committed suicide. Although the plaintiff's expert testified to "numerous flaws in the [jail] policies for treating mentally ill inmates[,]" the court held that there was insufficient evidence that the jail personnel would have been aware of the risk if the policies were different— that is, there was no evidence that the policies were the moving force behind any deprivation of rights. *Id.* at 532.

**\*14** Four years after *Novack*, however, the Seventh Circuit decided *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 919–20, 928 (7th Cir. 2004), affirming the district court's refusal to overturn the jury verdict for the plaintiff. There, as in *Novack*, an inmate had committed suicide. *Id.* at 928. Employees of the medical contractor defendant, CMS, knew that the plaintiff had a history of suicidal thoughts and violent behavior, and CMS's own policies thus required them to put the plaintiff on suicide watch and check him frequently. *Id.* The court recognized that CMS had these policies but noted evidence that CMS had a widespread practice of disregarding these same policies, which supported the jury's finding. *Id.* at 927–28. Had medical personnel followed these policies, they would have acted differently—putting the inmate on suicide watch and checking on him frequently—likely preventing his suicide. *Id.* The court distinguished *Novack* because the plaintiff was able to show that following the policies—taking those specific actions—would have made a difference. *Id.* at 928–29.

This case is more analogous to *Woodward* than to *Novack*. Warkins, Williams, and several correctional officers agreed that vomiting blood was a serious condition that required medical attention. (DSOF ¶ 56; Warkins Dep. 200:5–7; Williams Dep. 150:15–22.) A jury can therefore infer that, if either of them were aware that Piercy was vomiting blood, they were also aware of the need for prompt action. If ACH did have a widespread practice of minimizing the need for care or delaying care, that practice might have resulted in the individual Defendants' failure to (1) perform more thorough assessments, (2) seek evaluation from a specialist, or (3) report Piercy's condition and his need for prompt treatment to staff at Stateville NRC. If they had taken any of these steps, a doctor may have found the source of Piercy's bleeding and been able to treat it.

For the same reason, Defendants' efforts to distinguish *Dixon v. County of Cook*, 819 F.3d 343 (7th Cir. 2016) also fall short. There, the plaintiff, the representative of a deceased inmate, claimed that the defendant county jail's policies caused significant pain to the inmate, who received no care for a tumor that took his life only months after it was discovered. *Id.* at 347. The jail had a paper medical system, to which access was "haphazard," as well as an electronic records system, which was uncoordinated with the paper records system. *Id.* at 348. The district court granted summary judgment for the county, but the Court of Appeals reversed, noting evidence that "pervasive systemic deficiencies" in the county jail's healthcare record-keeping could be the "moving force" behind the failure to treat the inmate. *Id.* at 347–49. Defendants contend that in *Dixon*, unlike this case, the practice of poor record-keeping was "directly related" to the failure to provide care to the inmate (Summ. J. Reply 10), but the court does not see how that distinguishes *Dixon*. If a jail has a widespread practice of providing inadequate care, it is a highly predictable consequence that, faced with a possibly serious medical

condition, medical personnel would fail to inquire further, provide necessary medications, or seek the assistance of a specialist.

ACH notes that its policies direct medical personnel to take action when faced with bloody vomit. This establishes that any failure to provide care was the result of failure to follow policies, [19] ACH argues, not that ACH's policies or practices were deficient. (Defs.' Summ. J. Mem. 7.) But the mere fact that such policies existed does not preclude a finding that there was a widespread practice of ignoring those policies, as happened in *Woodward*. Plaintiffs can argue that the evidence supports a conclusion that the correctional officers, Warkins, or Williams were comfortable in failing to comply with policies because they did not fear repercussions.

**\*15** Finally, Defendants argue that Plaintiff has not shown evidence that ACH was on notice of unconstitutional practices. Plaintiff, however, points out that a jury can infer that ACH "encouraged" or "condoned" an unconstitutional practice, if it is sufficiently widespread. *Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995). Plaintiff can survive summary judgment on the issue of notice from that argument alone. [20] There is thus enough evidence for a reasonable jury to conclude that ACH had a widespread practice of providing substandard medical care at WCJ, which caused Piercy's death. Summary judgment is denied on this issue.

### 2. Failure to Train Correctional Officers

Next, Plaintiff argues that ACH failed to adequately train the correctional officers "regarding the appropriate response to prisoner medical needs [.]" (Pl.'s Summ. J. Resp. 12.) In a failure-to-train claim, the plaintiff's injury must be a "highly predictable consequence" of inadequate training. *See Connick v. Thompson*, 563 U.S. 51, 64 (2011) (internal citation omitted). ACH argues that Plaintiff has waived this argument because the Fourth Amended Complaint alleges only that ACH failed to train medical staff, not correctional officers. Defendants see this as an example of a plaintiff advancing an entirely new theory or cause of action at summary judgment. In the court's view, the change of focus merely reflects Plaintiff's having conducted discovery and having a better understanding of who first responded to medical complaints at WCJ. Second, ACH argues that it cannot be held liable for failing to train the correctional officers, because ACH is only responsible for training its own employees. But courts in this district have allowed a private corporation to be liable for failing to train correctional officers on matters relating to the private corporation's responsibilities. *See Awalt*, 74 F. Supp. 3d at 938 ("[T]here is sufficient evidence for a reasonable jury to find that ... CHC/HPL's failure to train the correctional officers caused Awalt's death[.]"). Correctional officers would provide ACH employees with information about inmates' health, so ACH had a contractual interest in the officers' practice for obtaining and communicating that information. Indeed, there is evidence that correctional officers did give ACH employees information about inmates' medical conditions. (*See* Willhite Dep. 21:6–13, 21:19–25:15 (describing the log correctional officers make when distributing medications), 64:14–20; Simester Dep. 24:8–25:3, 129:6–8.)

There is enough evidence to create a dispute about whether correctional officers knew Piercy was vomiting blood, but failed to tell medical staff. Had they been adequately trained on how to use the protocols, Plaintiff contends, they would have known what to do about Piercy's bloody vomit—specifically, they would have known to contact the ACH medical providers. Assuming that ACH required jail officials to use these protocols (which the court must do on Defendants' summary judgment motion), Plaintiff claims that ACH did not train the officers on (1) when to consult the protocols that were intended to govern how the officers treated inmates when medical personnel were not present, and (2) how to reconcile allegedly conflicting protocols.

**\*16** Defendants claim that Plaintiff's argument that officers were not adequately trained about whether to consult the protocols at all is a "red herring because the officers never consulted the protocols regarding Piercy." (Summ. J. Reply 11.) ACH seems to argue that if the officers had consulted the protocols, then they would have called the provider (*id.* at 12), implying the fault lies, at most, with the officers, not ACH. But that is beside the point—when faced with an inmate

who was vomiting blood, which the protocols clearly treat as a dire situation requiring immediate medical attention, officers did not consult them. The evidence of how much training officers received, moreover, is sufficiently vague that a reasonable jury could conclude that it was inadequate.

Defendants also argue that more training on when to consult the protocols would not have "affected the outcome" for Piercy. (*Id.* at 13–14.) Defendants again try to distinguish *Awalt*, where the court concluded that there was sufficient evidence for a jury to find that the failure to give the officers general training about when to consult medical professionals caused an inmate's death, after officers did not alert medical staff that he was having a seizure. 74 F. Supp. 3d at 938. Here, contrary to Defendants' argument, the evidence of causation is even clearer: Defendants themselves acknowledge that if the officers had consulted the protocols, they probably would have alerted medical staff to Piercy's condition.

Plaintiff's second argument, however, is a stretch. Plaintiff asserts that Protocol 06-05, which directs officers to "call [the] physician immediately" for a "large amount of blood" (Ex. 41 to PSOAF at ACH0316), is "conflicting and internally inconsistent" with Protocol 00-02, which directs officers to "automatically contact[ ]" a physician when an inmate is vomiting blood. (Ex. 5 to Ebersohl Dep., Ex. 9 to Mot. for Summ. J. at ACH0231.) These are not inconsistent instructions—Protocol 06-05 simply imparts a greater sense of urgency for a large amount of blood. More importantly, Protocol 00-02 explicitly directs the officer to "see Protocol 06-05." (*Id.*) There is no inconsistency: officers are directed to call a physician if an inmate is vomiting blood, and both protocols direct them to the same assessment questions in Protocol 06-05.

Although the second argument fails, a reasonable jury could conclude that the officers were inadequately trained about when to consult and use the protocols, which caused Piercy's death. Summary judgment is therefore denied on the failure to train claim.

### 3. Failure to Supervise Williams

Plaintiff claims that ACH did not adequately supervise Williams, resulting in Piercy's injury. As Plaintiff sees things, the need for additional supervision was obvious. In support, however, Plaintiff notes a single reprimand in the past and a generally low level of supervision—infrequent phone calls and chart reviews—which Plaintiff considers to be "*carte blanche* [for Williams] to act as he saw fit." (Pl.'s Summ. J. Resp. 15.) For several reasons, Plaintiff's "failure to supervise" theory is not sufficient on its own to establish *Monell* liability. First, the single prior reprimand is insufficient to put ACH on notice that Williams was providing constitutionally inadequate care. Moreover, physician assistants have substantial discretion, so even with additional supervision, it is likely that Williams would have been operating on his own much of the time. ACH's failure to maintain a copy of Williams's supervision agreement may have been sloppy, but there is no reason to believe the agreement was not in place.

Most importantly, the alleged poor supervision has no obvious relationship to the deliberate indifference alleged in this case. Williams acknowledged that bloody vomit is a serious symptom for which prompt treatment is required. The dispute in this case concerns not whether Williams was properly supervised, but whether he knew about Piercy's symptoms and failed to take appropriate action. Summary judgment is granted on the issue of ACH's failure to supervise Williams.

### C. Malpractice

**\*17** Defendants claim that they are entitled to summary judgment on the medical malpractice claims because Plaintiff did not disclose an appropriate expert witness to support medical malpractice under Illinois law. For an Illinois malpractice claim, "expert medical testimony is required to establish the standard of care and the [defendant's] deviation from that standard." *Purtill v. Hess*, 111 Ill. 2d 229, 242, 489 N.E.2d 867, 872 (1986). Moreover, "the expert [must be] a licensed member of the school of medicine about which he proposes to express an opinion[.]" *Id.* at 243, 489 N.E.2d at

872. Defendants contend that Plaintiff did not disclose a witness from the proper school of medical practice for either Warkins or Williams.

### 1. Malpractice Claim Against Warkins

Defendants argue that Nurse Speller's rebuttal report, which in which she opines on the nursing standard of care, should be stricken because it is not proper rebuttal. Defendants point out that the report does not mention the report of Nurse Rogers, Defendants' nursing expert, nor did Speller even review Rogers's report. (*See* Speller Rep. 1.) This argument has considerable merit, because Plaintiff offered no expert on the nursing standard of care in their initial expert disclosures, and Plaintiff's failure to provide such a report earlier is disappointing. The court nevertheless declines to strike the report, as explained here.

Federal Rule of Civil Procedure 37 requires exclusion of Speller's opinion unless the failure to disclose her report and opinion earlier is justified or harmless. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); FED. R. CIV. P. 37 ("If a party fails to ... identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness ... at a trial, unless the failure was substantially justified or is harmless."). To determine whether such a failure is harmless, courts are guided by four factors: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012), *as amended* (Feb. 2, 2012) (quoting *David*, 324 F.3d at 857).

Defendants claim to be surprised by the disclosure of Speller, and the fact that "Defendants have long been aware that Plaintiff believes Warkins fell below the relevant standard of care" (Pl.'s Expert Resp. 13), does not adequately address this concern. Nevertheless, the prejudice Defendants would suffer as a result of the late disclosure does not justify barring Speller as a witness. Plaintiff offered to schedule a deposition of Speller just a few days after disclosing her as an expert. (Ex. 9 to Pl.'s Expert Resp. [351-9].) Defendants claim that this is not sufficient to cure the prejudice because "Defendants' experts will need time to review the reports and testimony" and "may need to supplement their reports[;]" Defendants may even need to disclose their own rebuttal experts. (Reply to Pl.'s Resp. to Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions [358] 6.) Plaintiff offered to schedule this deposition as early as December, however; trial was originally scheduled for April and now will begin at the end of June, leaving Defendants sufficient time to make these preparations. Nor does the court agree that consideration of Speller's report justifies an additional round of summary judgment briefing.

Third, because this disclosure happened months before trial, there is minimal likelihood of disruption of the trial. Finally, though the court is puzzled by Plaintiff's failure to disclose Speller earlier, the court is not prepared to conclude that counsel acted in bad faith.

**\*18** The cases that Defendants cite are distinguishable. In *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 616 (7th Cir. 2002), the Court of Appeals affirmed the district court's barring a witness because "to have reopened discovery ... would have extended the litigation [.]" As explained above, that is not the case here. In *Bowman*, 2012 WL 6596933, at \*4, the court found that "reopening discovery to redepose Plaintiffs' experts would create significant costs and would delay the resolution of the motion for class certification." In *Stuhlmacher v. Home Depot USA, Inc.*, No. 2:10 CV 467, 2012 WL 5866297, at \*4 (N.D. Ind. Nov. 19, 2012), the court barred testimony because it determined that conducting additional discovery would cause a delay. Finally, in *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 WL 1300763, at \*2 (N.D. Ill. Feb. 22, 2005), the defendant included new arguments that plaintiff had not expected in its expert rebuttal reports. None of these scenarios are present here. Speller's report covers limited subject matter within this case and Defendants have had ample time to take her deposition, and will continue to have time for the next two months. The motion to strike Speller's report and bar her testimony is denied.

Defendants' argument for summary judgment on this claim is premised on the assumption that Nurse Speller's expert testimony as to the nursing standard of care would be barred. But Nurse Speller's opinion provides a genuine dispute of material fact as to whether Warkins met the nursing standard of care, when combined with the disputes around what Warkins knew with respect to Piercy's condition. Defendants' expert, Nurse Rogers, opines that Warkins met the nursing standard of care because she "collected" information and "collaborated" with Dan Williams. (Rogers Rep. 2–3.) Speller, on the other hand, opines that the nursing standard of care "required [Warkins] to ask Dale Piercy follow-up questions and conduct a follow-up assessment," and to maintain "accurate and complete medical records." (*See* Speller Rep. 2.) She concludes that Warkins's failure to (1) have Piercy evaluated by a doctor or physician assistant, (2) ask questions and conduct an assessment, and (3) fully document her encounter with Piercy violated this standard of care. (*Id.* at 1–2.) This presents a genuine dispute of material facts.

## 2. Malpractice Claim Against Williams

Defendants argue that summary judgment should be granted for Williams on the medical malpractice claim because Plaintiff has not disclosed any physician assistant expert who would testify to the physician assistant standard of care. Illinois law requires such testimony to support a malpractice claim. The purpose of requirement of testimony from a member of the same "school of medicine" is "to prevent a higher standard of care being imposed upon the defendant and to ensure that the testifying expert has expertise in dealing with the patient's medical problem and treatment and that the allegations of negligence are within the expert's knowledge and observation." *Wingo by Wingo v. Rockford Mem'l Hosp.*, 292 Ill. App. 3d 896, 906, 686 N.E.2d 722, 729 (2d Dist. 1997).

Plaintiff nevertheless suggests that a physician may testify to the standard of care for a physician assistant. Plaintiff points out that under Illinois law, physician assistants are supervised by physicians and "physicians are expressly charged with reviewing and supervising the work of physician assistants, including recommendations regarding discipline[,]" which Plaintiff characterizes as "synonymous with the physician assistant's standard of care." (Pl.'s Summ. J. Resp. 20.) Illinois courts have expressly rejected this reasoning, however. In *Smith v. Pavlovich*, 394 Ill. App. 3d 458, 461, 914 N.E.2d 1258, 1262 (5th Dist. 2009), the proposed expert was an advanced practice nurse ("APN"), a license that "required [her] to work under a written collaborative agreement with a collaborating physician which, among other things, authorizes the categories of care, treatment, or procedures to be performed by the advanced practice nurse." The court found that a physician was not competent to testify for the standard of care for an APN, even though the physician effectively supervised the APN. *Id.* at 464, 914 N.E.2d at 1264–65. Similarly, here, the fact that a physician must supervise a physician assistant does not mean that the physician's opinion is admissible on the issue of Williams's compliance with the standard of care.

**\*19** But Plaintiff also points out that Defendants themselves disclosed an expert witness who can testify to the physician assistant standard of care: Janet Furman. Furman testified that if the facts were as Plaintiff believes, Williams violated the standard of care:

Q: If Dan Williams had been told that Dale Piercy was complaining of vomiting blood, the standard of care required him to do something more than prescribe omeprazole, correct?

A: Correct.

(Dep. of Janet Furman, Ex. 18 to PSOAF [367-19] 99:24–100:4.) "A witness identified as a testimonial expert is available to either side[.]" *S.E.C. v. Koenig*, 557 F.3d 736, 744 (7th Cir. 2009); *see also Novey v. Kishwaukee Cmty. Health Servs. Ctr.*, 176 Ill. App. 3d 674, 679, 531 N.E.2d 427, 430 (2d. Dist. 1988) ("The testimony of the defendant medical practitioner or the defendants' own expert may be sufficient to establish the standard of care applicable to a defendant practitioner.").

The fact that Defendants initially identified Furman as their expert does not prevent Plaintiff from relying on this testimony to prove his case..

Defendants also argue that there is no genuine dispute that Williams met the standard of care, but Furman's testimony belies that claim, as well. It is disputed whether Williams knew that Piercy was vomiting blood. According to Furman, it is therefore also disputed whether Williams met the standard of care. Summary judgment is denied on the medical malpractice claim with respect to Williams. Because medical malpractice is a state law claim and subject to respondeat superior, summary judgment on this claim is also denied with respect to ACH.

### D. Conspiracy

Defendants argue that the conspiracy claim should be barred by the intracorporate conspiracy doctrine, which states that "a conspiracy cannot exist solely between members of the same entity." *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999). Plaintiff responds that the doctrine "does not apply to a section 1983 claim." (Pl.'s Summ. J. Resp. 25.) The Seventh Circuit has held that the intracorporate conspiracy doctrine does claims of conspiracy by employees of the same corporation under § 1985, *Payton*, 184 F.3d at 632, which specifically contemplates conspiracy to deprive a person of civil rights. The Seventh Circuit has not explicitly addressed whether the doctrine also applies to § 1983; it has allowed conspiracy claims against employees of the same municipality, but in those cases, the parties did not raise the intracorporate conspiracy doctrine. *See Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012).

Recently, district courts have been disinclined to apply the doctrine in § 1983 cases. In *Reitz v. Creighton*, No. 15-CV-01854, 2015 WL 5081485, at *5 (N.D. Ill. Aug. 26, 2015), "Plaintiff allege[d] that Defendants conspired to file false and incomplete reports to cover up her illegal detention, the use of excessive force against her, the failure of officers to intervene, and to prevent disclosure of their misconduct." The court concluded that the intracorporate conspiracy doctrine did not bar the case against the defendants, officers of the same police department. *Id.* In *Cannon v. Burge*, No. 05 C 2192, 2006 WL 273544, at *15 (N.D. Ill. Feb. 2, 2006), *aff'd*, 752 F.3d 1079 (7th Cir. 2014), "Plaintiff allege[d] that the City Defendants conspired to: (1) falsely arrest and imprison Plaintiff; (2) torture and physically abuse Plaintiff; (3) coercively interrogate Plaintiff; and (4) cause the wrongful charging, prosecution and conviction of Plaintiff." There too, the district court refused to apply the doctrine and allowed the plaintiff's conspiracy claim to proceed. *Id.* Both cases relied on certain language in *Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000), on which similar cases have relied:

> **\*20** The intracorporate conspiracy doctrine was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory. The conduct plaintiff challenges here does not fit that mold. The decision to frame plaintiff for Cohen's murder, as plaintiff alleges it, is not the product of routine police department decision-making.

The reasoning of this line of cases is that "[t]he deprivation of civil rights is unlawful and the intra-corporate doctrine only applies when members of a corporation are jointly pursuing the corporation's 'lawful business.' " *Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810, 821 (N.D. Ill. 2006) (quoting *Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994)). The court is not certain that this distinguishes § 1983 cases from § 1985 cases. This court nevertheless adheres to the conclusions of its colleagues, as well as the implicit direction from the Seventh Circuit, and declines to enforce the doctrine.

Assuming that the intracorporate conspiracy doctrine does not bar the claim, the court concludes that there is a genuine dispute about whether Warkins and Williams reached an agreement, facilitated by ACH's policies. Defendants are correct that an agreement is a necessary element of a conspiracy claim, but the agreement need not be express. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir. 1979)). Indeed, evidence of the agreement may be circumstantial. Here, there is evidence that Warkins and Williams discussed Piercy's care and

agreed on a course of action for his care, while potentially knowing that he was vomiting blood. This is sufficient to create a genuine dispute about whether Warkins and Williams reached an agreement concerning Piercy's treatment. Summary judgment on the conspiracy claim is denied.

### E. Failure to Intervene

A defendant can be liable for failure to intervene if he or she knew a constitutional violation was occurring and had a "realistic opportunity to intervene" to prevent it. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Defendants argue that summary judgment should be granted on the failure to intervene claim, but that argument is premised entirely on one assumption: that Williams was unaware that Piercy was vomiting blood.

Defendants argue that Williams could not intervene in a constitutional violation committed by Warkins, because he did not know that Piercy was vomiting blood. Defendants also claim that Warkins could not intervene in a constitutional violation by Williams because Williams himself committed no constitutional violation. [21] But, as the court noted above, whether Williams knew that Piercy was vomiting blood is disputed. This dispute precludes summary judgment on the failure to intervene claim for both Warkins and Williams.

### F. Intentional Infliction of Emotional Distress

To recover for intentional infliction of emotional distress in Illinois, a plaintiff must prove "(1) that the conduct was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional distress." *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 200 (2015) (citing *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 446, 828 N.E.2d 323, 333 (2d Dist. 2005)). Defendants argue that Plaintiff's IIED claim fails on all three elements, but they focus on the first element.

**\*21** First, it is disputed whether Warkins knew that Piercy was vomiting blood and whether she reported this to Williams. It is therefore disputed whether Warkins and Williams chose not to (1) communicate this to Stateville NRC, (2) give him medication other than 20 mg of omeprazole, (3) examine him more thoroughly, or (4) seek more specialized care for him. Taking the facts in the light most favorable to Piercy, the question is whether such conduct is extreme and outrageous.

Defendants cite to *Bailey*, 779 F.3d at 692–93, where the plaintiff had been detained in a police interview room for just under 48 hours, and was handcuffed to a wall while detectives were not questioning him. The plaintiff was then charged and denied bail, but the prosecutor dismissed the charges less than a month later. *Id.* at 693. Plaintiff brought a claim of intentional infliction of emotional distress against the police officers, but the district court granted summary judgment, and the Seventh Circuit affirmed. *Id.* at 697. The court noted that the summary judgment record was "largely silent" on the conditions plaintiff suffered during his confinement: The court knew only that plaintiff was handcuffed to the wall, which the City claimed (1) was standard procedure when police were not present, (2) did not prevent the plaintiff from sleeping or moving around, and (3) did not interfere with plaintiff's ability to speak with police and to use the restroom whenever he wanted. *Id.*

The record here, by contrast, contains more information. If what Piercy claims is true, Warkins and Williams did not meet Piercy's basic needs, unlike the officers in *Bailey*. Piercy's vomiting blood reflects significantly more distress than being handcuffed in a room, so ignoring such distress is more extreme than the conduct in *Bailey*.

*Doe v. Calumet City*, 161 Ill. 2d 374, 641 N.E.2d 498 (1994), *overruled on other grounds by In re Chicago Flood Litig.*, 176 Ill. 2d 179, 196, 680 N.E.2d 265, 273 (1997), also does not defeat this claim. There, the court concluded that plaintiff stated a claim of extreme and outrageous conduct by a police officer who refused to break down an apartment door to rescue children alone with someone who had just tried to sexually assault their mother. *Id.* at 394–95, 641 N.E.2d at 507–

08. The court found the allegations were insufficient as against other officers on the scene who merely followed the first officer's orders. *Id.* at 395, 641 N.E.2d at 508. *Doe* effectively recognizes a distinction between a defendant who actively refuses to help someone in severe distress, and one who simply goes along with another's determination about what to do in the situation. Because it is unclear in this case what Warkins and Williams knew about Piercy's condition, the court cannot determine whether either of them actively decided not to help him.

Defendants also cite *Estate of Gomes v. County of Lake*, 178 F. Supp. 3d 687, 694–95, 701 (N.D. Ill. 2016), where a prisoner did not see a doctor until six days into her hunger strike and was not transported to a hospital until several days later. The court granted summary judgment on the prisoner's claim of intentional infliction of emotional distress, but not because the defendants' conduct was not extreme or outrageous, as Defendants here contend. (Summ. J. Reply 23.) Instead, the court noted that "[t]he standard for extreme and outrageous conduct is higher than what is required for deliberate indifference[,]" but addressed only the third element of IIED: that there was no evidence that the plaintiff actually suffered emotional distress. *Id.* at 702.

**\*22** In *Awalt*, 74 F. Supp. 3d at 942, there was evidence that correctional officers knew that the plaintiff was having seizures, but took no action. Denying summary judgment, the district court found that "a reasonable juror could find that ignoring a patently severe medical condition such as a seizure is 'extreme and outrageous' conduct[.]" *Id.* This court is uncertain that vomiting blood is as severe a medical condition as a seizure, but the precise nature of Piercy's condition is sufficiently disputed that it cannot be resolved on summary judgment.

The severity of the medical condition in *Awalt* also implicated the second element; the court found that correctional officers knew "that there was a high probability that ignoring a seizure would cause severe emotional distress." *Id.* Finally, the court addressed the third element: "there is no question that their conduct caused Awalt severe emotional distress, since he in fact died." *Id.* In the case before the court, the jury could find that Piercy's several complaints to his cellmates and to Warkins about his bloody vomit evidenced emotional distress.

Defendants attempt to distinguish *Awalt* because there "all of the misconduct occurred at one facility," while Piercy continued to deteriorate after he left WCJ. (Summ. J. Reply 24.) Defendants add that Warkins did not have constant contact with Piercy, nor complete authority over him. But she and ACH did have authority over his medical care. And the fact that Piercy may not have been vomiting blood at the time he was transferred to Stateville NRC does not make ignoring a serious medical condition any less serious—*Awalt* teaches that ignoring seizures, for example, can be extreme and outrageous, even if the seizures were only periodic and not continuous.

Summary judgment is therefore denied on Plaintiff's IIED claims (as with the malpractice claim, this also applies to ACH because of respondeat superior). Defendants will be free to raise the issue again in connection with jury instructions.

### G. Punitive Damages

Defendants also move for summary judgment on the punitive damages request against Williams and ACH.[22] Plaintiff concedes that punitive damages are not available for his intentional infliction of emotional distress claim. On the other claims, however, Defendants acknowledge that punitive damages require an assessment of Defendants' motive, and that "evaluations of motive and intent are generally inappropriate on a motion for summary judgment [.]" (Defs.' Summ. J. Mem. 14 (quoting *Kyle v. Patterson*, 196 F.3d 695, 698 (7th Cir. 1999)).) The mental state for punitive damages, furthermore, is the same for § 1983 liability for deliberate indifference. *Woodward*, 368 F.3d at 930.

Because it is disputed whether Warkins and Williams are liable for deliberate indifference under § 1983, it is also disputed whether punitive damages are warranted. It is similarly disputed whether ACH had unconstitutional policies or practices in place. The Seventh Circuit has held that even a corporation can be liable for punitive damages when its policies

demonstrate "little regard for the inmates whose care it was charged with." *Id.* Summary judgment on the claim for punitive damages is denied.


## CONCLUSION

Defendants' motion to strike certain rebuttal expert reports and bar the corresponding expert testimony [341] is denied. Defendants' motion for summary judgment [345] is granted on the failure to supervise claim and punitive damages for the IIED claim, and otherwise denied. Defendants' statement of facts [346] and memorandum of law [347], erroneously docketed as motions, are terminated.


**All Citations**

Slip Copy, 2017 WL 1477959


Footnotes

1   The court refers to Aaron Piercy as "Plaintiff," and Dale Piercy as "Piercy."

2   Defendants submitted a "reply" to Plaintiff's responses to Defendants' Local Rule 56.1 statement of facts with a general complaint about some forty of Plaintiff's responses as not contradictory, containing legal arguments, adding additional facts, or lacking citation, as well as specific complaints about four facts. Defendants do not, however, request any specific relief for these alleged violations. None of the complaints about the four specific responses are relevant to this opinion. The court will exercise its discretion to consider Plaintiff's other responses that are cited here, and need not address Defendants' complaints about the other statements.

3   Piercy had previously been detained at WCJ from July 13 to July 15, 2013. (Pl.'s Resp. to DSOF ¶ 6.) Defendants apparently consider this earlier WCJ stay relevant because when Piercy arrived at the jail on July 13, a correctional officer performed a medical screening, during which Piercy reported that he had a "seasonal ulcer," but was not currently taking medications or "under a doctor's care." (*Id.* at ¶ 7.)

4   In 2013, WCJ had an average daily population of 74 detainees. (Dep. of Tim Erickson, Ex. 25 to PSOAF [367-26] 14:3–10.)

5   Though Plaintiff denies all but a portion of this statement, he cites to no evidence contradicting Defendants' statement that the Health Status Summary form was used to give IDOC information on an inmate's medical condition.

6   Warkins testified that she does not know what this pill was (Warkins Dep. 82:9–11), though an Internet search suggests the "purple pill" is Nexium, a heartburn medication. NEXIUM, https://www.purplepill.com/ (last visited Apr. 24, 2017.)

7   Plaintiff disputes that Warkins took Piercy's vital signs, citing Warkins's testimony that she was not permitted to question inmates about their health in the cellblock, and inmate Simester's testimony that Piercy never left the cellblock. (Pl.'s Resp. to DSOF ¶ 15.) Plaintiff does not address, however, the fact that vital signs were recorded on the Protocol Medication Verification Form and presents no evidence that the vital signs may have been recorded later.

8   Williams does not recall this phone call, and he testified that he was on vacation at the time. (Williams Dep. 122:4–124:13.) The jail phone records, however, show a two-and-a-half-minute call between the jail and Williams's home phone number on September 28, just after 10:00 AM (Ex. 14 to PSOAF [367-15] at Whiteside 1026; Ex. 15 to PSOAF [367-16] at 3), and Defendants admit that Williams "did speak to Warkins and prescribe Omeprazole." (Defs.' Resp. to PSOAF [372] ¶ 20.)

9   All Defendants are represented by the same counsel in this case, which is acceptable so long as their interests are consistently aligned. *Compare Coleman v. Smith,* 814 F.2d 1142, 1147–48 (7th Cir. 1987) (no conflict of interest where "the claims against the Village and the individual defendants were completely different") *with Ross v. United States,* 910 F.2d 1422, 1432 (7th Cir. 1990) (noting that conflicts between individual defendants and *Monell* defendants can arise and remanding to the district court to examine whether a conflict existed). The court presumes that counsel has evaluated this issue.

10  This statement appears in a paragraph with several other factual statements in Defendants' Statement of Facts. Plaintiff admits to one fact in this paragraph (not this one), and says nothing about the remaining facts. As Plaintiff cites to no evidence contradicting this fact, the court considers it admitted. Williams testified that he would not give such a low dose (20 mg daily) of Omeprazole (Williams Dep. 128:6–130:7), but Defendants admit that he did so, and that dosage is reflected on the Protocol Medication Verification Form. (Ex. 1 to Mot. for Summ. J. at Whiteside 2.)

11    Defendants claim that the medication log is blank for October 3 and 4, but the court assumes this is a typographical error given that the medication log itself is in the record and is blank for October 2 and 3. (Ex. 1 to Mot. for Summ. J. at Whiteside 4.)

12    The record is silent on precisely when these inmates were incarcerated:

> Q: All right. Let's talk a little bit about the review of the inmate charts. You were provided with medical charts for all of the inmates who were seen at the Whiteside County Jail in 2013, correct?
>
> A: I was provided with the medical charts. Whether that consisted of all the inmates seen in 2013, I don't know. I got a stack of about 450 charts. I didn't choose the charts. They came to me in boxes.
>
> (Evans Dep. 127:22–128:6.)

13    Defendants object to this statement but do not deny it (Defs.' Resp. to PSOAF ¶ 58), so the court deems it admitted.

14    These charts do not appear in the record.

15    In their motion, Defendants assert that they disclosed ten other experts, in addition to the five listed in Plaintiff's brief. (Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions 1–2.) The court does not have a copy of Defendants' Rule 26(a)(2) disclosures, and only has copies of the reports from Dr. Uzer (Ex. 3 to Pl.'s Resp. to Mot. to Strike Rebuttal Experts [351-3] ), Dr. Bolesta (Ex. 4 to Pl.'s Resp. to Mot. to Strike Rebuttal Experts [351-4] ), and Nurse Rogers (Ex. 5 to Pl.'s Resp. to Mot. to Strike Rebuttal Experts). More importantly, none of Plaintiff's rebuttal experts appear to have reviewed any of Defendants' expert reports other than those of Dr. Uzer and Dr. Bolesta. The court therefore assumes that any of these other ten expert reports, if they exist, would not be relevant for this motion.

16    A Dieulafoy lesion is "an abnormally large submucosal artery [.]" *Dieulafoy Lesion*, DORLAND'S MEDICAL DICTIONARY, https://dorlands.com/def.jsp?id=120853780 (last visited Apr. 11, 2017).

17    The parties do not explain why it matters whether the cause of Piercy's death was a Dieulafoy lesion. The court can only speculate that a Dieulafoy lesion either would not have been present or detectable while Piercy was still at WCJ, or would have been untreatable.

18    Though Plaintiff has not raised the issue, there is an open question about whether the *Monell* doctrine applies to private corporations. *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 790–96 (7th Cir. 2014); *Pindak v. Dart*, 125 F. Supp. 3d 720, 764–65 (N.D. Ill. 2015).

19    Defendants are not explicit whether they mean that the correctional officers failed to follow the policies, or that Warkins and Williams did. To the extent that ACH argues that it was the individual Defendants who failed to follow the policies, the court again notes a concern about the joint representation.

20    Plaintiff also argues that several prior lawsuits and a letter from the Department of Justice about another facility put ACH on notice of its inadequate medical care, which Defendants object to as irrelevant. (Pl.'s Summ. J. Resp. 11 n.5; Defs.' Resp. to PSOAF ¶ 47.) Because the court denies summary judgment without considering this evidence, it need not reach these arguments.

21    The complaint itself alleges that the individual Defendants acted pursuant to ACH policies when failing to intervene (Fourth Am. Compl. ¶ 94), but all parties treat this as a claim against the individual Defendants alone.

22    Defendants' memorandum does not address the punitive damages claim against Warkins, so the court assumes that she does not seek summary judgment on this issue.

**End of Document**      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1138553
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Alan SHIELDS, Plaintiff,

v.

CITY OF CHICAGO, et al., Defendants.

Case No. 17 C 6689
|
Signed 03/02/2018

**Attorneys and Law Firms**

Patrick William Morrissey, Thomas Gerard Morrissey, Thomas G. Morrissey, Ltd., Chicago, IL, for Plaintiff.

Devlin Joseph Schoop, Iris Chavira, Jessica Gomez-Feie, C. Ester Choi, Caroline Jane Fronczak, City of Chicago Department of Law, Jessica D. Ziswa, City of Chicago, Federal Civil Rights Litigation, Chicago, IL, for Defendants.

**Opinion**

## ORDER

AMY J. ST. EVE, United States District Court Judge

**\*1** The Court denies Defendant City of Chicago's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss Plaintiff's *Monell* claim as alleged in Count V of the Complaint. [31]. Status hearing set for March 21, 2018 is stricken and reset to March 12, 2018 at 8:30 a.m.

## STATEMENT

On December 20, 2017, Plaintiff Alan Shields filed the present five-count Amended Complaint against the City of Chicago and individual Chicago Police Officers bringing constitutional claims, along with a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* Before the Court is the City's motion to dismiss Plaintiff's *Monell* claim alleged in Count V pursuant to Rule 12(b)(6). For the following reasons, the Court denies Defendant's motion.

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 736 (7th Cir. 2014); *see also Hill v. Serv. Emp. Int'l Union,* 850 F.3d 861, 863 (7th Cir. 2017). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pursuant to the federal pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed. 2d 929 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed. 2d 868 (2009)

(quoting *Twombly,* 550 U.S. at 570). When determining the sufficiency of a complaint under the plausibility standard, courts accept all well-pleaded facts as true and draw reasonable inferences in the plaintiff's favor. *See Forgue v. City of Chicago,* 873 F.3d 962, 966 (7th Cir. 2017); *Roberts v. City of Chicago,* 817 F.3d 561, 564 (7th Cir. 2016).

## BACKGROUND

Plaintiff alleges that he is disabled and substantially limited in the ability to move, and that during the relevant time period he required ambulatory aids because of his paraplegia. (R. 28, Compl. ¶ 5.) At 11 p.m. on June 6, 2016, Chicago Police Officers stopped Plaintiff, who was using crutches to ambulate. (*Id.* ¶ 6.) Defendant Officer Shane Coleman approached Plaintiff and ordered him to place his hands on the police vehicle. (*Id.* ¶ 7.) Plaintiff objected because he could not put down his crutches to walk. (*Id.* ¶ 8.) Defendant Coleman nonetheless searched Plaintiff, which caused him to lose balance and fall. (*Id.* ¶ 9.) While he was on the ground, Defendant Coleman handcuffed Plaintiff and then Defendant Officers Coleman and Michael McAuliffe gave him commands to stand up. (*Id.* ¶ 10.) Plaintiff repeatedly told Defendant Officers that he was paraplegic and could not stand. (*Id.*) Plaintiff alleges that Defendants Coleman and McAuliffe nonetheless dragged him to the door of the police vehicle and threw him in the backseat. (*Id.* ¶ 11.) Defendant Officers then transported Plaintiff to the Seventh District Police Station. (*Id.*)

**\*2** After arriving at the Seventh District, Defendants McAuliffe and Coleman ordered Plaintiff to ambulate from the police vehicle to the station without any aid, after which Plaintiff told them he could not ambulate without his crutches. (*Id.* ¶¶ 13, 14.) Defendants Coleman and McAuliffe then summoned the attention of Defendant Sergeant Patrick Josephs and other officers, after which these officers started to drag Plaintiff into the police station. (*Id.* ¶ 15.) Immediately prior to entering the station, police removed Plaintiff's handcuffs and allowed him to use crutches to ambulate. (*Id.*)

Once in the processing room, Plaintiff asserts that Defendant Officers Coleman, McAullife, Josephs, Raul Nava, Robert Bandola, Wayne Wiberg, and Jacob Wojtaczka used unreasonable force on him. (*Id.* ¶ 16.) Plaintiff contends that the officers then handcuffed him and dragged him on the floor, which was captured on surveillance video. (*Id.* ¶ 17.) Plaintiff states that at all relevant times, Defendant Officers knew he was unable to walk without crutches. (*Id.* ¶ 18.) He also maintains that he requested medical attention due to the injuries caused by Defendant Officers' use of unreasonable force. (*Id.*) According to Plaintiff, the officers nevertheless placed him into a cell and left him on the floor without crutches. (*Id.* ¶ 19.) Thereafter, Plaintiff made numerous requests for medical attention, yet Defendant Officers failed to respond. (*Id.* ¶ 20.) Plaintiff then started a fire in his cell. (*Id.*) Plaintiff alleges that thereafter Defendant Officers took him out of the cell and "stomped" on him. (*Id.* ¶ 21.)

Subsequently, Plaintiff was transferred to Mt. Sinai Hospital where he was intubated due to a crushed larynx. (*Id.* ¶ 22.) Shortly thereafter, Defendant Officers completed paperwork, including a Tactical Response Report ("TRR"), and Defendant Lieutenant Wiberg approved the amount of force Defendant Officers used when arresting and detaining Plaintiff. (*Id.* ¶¶ 23-25.) According to Plaintiff, the Commander of the Seventh District also approved this use of force. (*Id.* ¶ 26.)

At some point later, Plaintiff requested that the Independent Police Authority ("IPRA") investigate Defendant Officers' use of force. (*Id.* ¶ 27.) To that end, the IPRA took Plaintiff's statement, obtained the police department records relating to Plaintiff's arrest, including the surveillance video, and interviewed two members of the Chicago Fire Department. (*Id.* ¶ 28.) The IPRA, however, did not interview any member of the CPD regarding Plaintiff's allegations of misconduct. (*Id.*) The IPRA did not recommend disciple for any of the individual Defendant Officers. (*Id.* ¶ 29.)

In Count V, Plaintiff brings a claim against the City based on *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658 (1978). Specifically, Plaintiff alleges that at all relevant times, the CPD engaged in a custom or practice of using excessive force due, in part, to deficiencies in training, supervision, and accountability. (*Id.* ¶ 44.) Plaintiff maintains that the City has

delegated complete responsibility to the IPRA to investigate and recommend discipline for CPD officers accused of use of excessive force and that the IPRA is understaffed and limited by the Chicago Police Officers' collective bargaining agreements ("CBAs"). (*Id.* ¶¶ 45, 46.) In particular, Plaintiff explains that the CBA with the Fraternal Order of Police bars the IPRA from interviewing accused police officers until all other investigative steps are completed and that this agreement substantially impairs the IPRA's ability to investigate police misconduct resulting in no disciple for officers who use excessive force. (*Id.* ¶ 46.)

**\*3** In addition, Plaintiff states that it is common knowledge among the CPD that misconduct complaints reviewed by the IPRA do not result in immediate discipline. (*Id.* ¶ 50.) Plaintiff further asserts that when he was detained on June 6, 2016, Defendant Officers knew the City had a policy or practice that did not hold officers accountable for their use of excessive force. (*Id.* ¶¶ 52, 53.) Also, Plaintiff states that Defendant Officers Josephs and Wiberg knew from their past experience with IPRA complaints that it was highly unlikely that the IPRA would recommend discipline for the alleged misconduct. (*Id.* ¶¶ 51, 54.) Further adding to this custom or practice, the IPRA did not request statements from the Defendant Officers (as barred by their CBAs). (*Id.* ¶ 55.) Plaintiff also highlights the United States Justice Department's ("DOJ") January 2017 Report concluding that the CPD has engaged in a custom or practice of unreasonable force, due in part, to deficiencies in training, supervision, and accountability. (*Id.* ¶ 57.) Further, Plaintiff points to the existence of a "code of silence" where Chicago Police Officers conceal police misconduct such as excessive force, including that a Police Accountability Task Force Report found that the CBAs between the police unions and the City have essentially turned the code of silence into an official policy. (*Id.* ¶¶ 47, 56.) According to Plaintiff, the above widespread custom or practice was deliberately indifferent to his rights secured by the United States Constitution and was the moving force behind his constitutional injuries. (*Id.* ¶ 58.)

## ANALYSIS

To recover under *Monell*, Plaintiff must eventually show that (1) he suffered a deprivation of a constitutional right; (2) as a result of an express policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that was; (3) the cause of his constitutional injury. *See Glisson v. Indiana Dep't of Corr., 849 F.3d 372, 379 (7th Cir. 2017).* As to the causation element, Plaintiff must offer evidence that the unconstitutional custom, policy, or practice was the "moving force" behind his constitutional injury. *See Daniel v. Cook Cnty., 833 F.3d 728, 736 (7th Cir. 2016).* At this procedural posture, however, the Court need only determine whether Plaintiff has sufficiently alleged his *Monell* claim against the City under the dictates of *Iqbal* and *Twombly. See White v. City of Chicago, 829 F.3d 837, 844 (7th Cir. 2016)* (federal courts may not apply a "heightened pleading standard" to *Monell* claims).

In the present motion, the City argues that Plaintiff has failed to adequately allege his *Monell* claim because he only mentions a single incident, namely, the alleged excessive force surrounding his arrest and detention on June 6, 2016. In response, Plaintiff asserts that he can allege a failure to train claim based on his own experience without alleging other, similar violations. Indeed, the Supreme Court has left open the possibility that in a narrow range of failure to train cases, a plaintiff need not prove a pattern of similar violations to establish deliberate indifference. *See Connick v. Thompson, 563 U.S. 51, 63 (2011); Bd. Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 409 (1997); Canton v. Harris, 489 U.S. 378, 390 n.10 (1989); see also Woodward v. Corr. Med. Servs. of Ill., Inc., 368 F.3d 917, 929 (7th Cir. 2004)* ("The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act."). Outside of this exception, "*Monell* claims based on allegations of an unconstitutional municipal practice or custom—as distinct from an official policy—normally require evidence that the identified practice or custom caused multiple injuries." *Chatham v. Davis, 839 F.3d 679, 685 (7th Cir. 2016).*

That being said, the Supreme Court's discussions in *Connick*, *Brown*, *Canton,* and the Seventh Circuit's decision in *Chatham* concern proving a failure to train *Monell* claim, not pleading one. *See White, 829 F.3d at 844.* In *White*, the

Seventh Circuit recognized the difference in the standards for pleading a *Monell* claim based on a widespread practice or custom and proving one. In doing so, the Seventh Circuit clarified that *Monell* claims are not subject to a heightened pleading standard in the context of allegations that the CPD has a custom or practice where police officers submit arrest warrant applications without enough information to establish probable cause for arrest. *Id.* at 839. In his complaint, the plaintiff in *White* alleged his own experience in which the officers submitted an inadequate application for his arrest warrant and also included the standard CPD form used for arrest warrants, which on its face did not require specific factual support. *Id.* at 844. Under these circumstances, the Seventh Circuit concluded that the plaintiff had sufficiently alleged a *Monell* custom or practice claim because he alleged more than his own constitutional injury based on the attached form. *Id.*; *see also Doe v. Grosch*, No. 17 C 1214, 2017 WL 3970515, at *3 (N.D. Ill. Sept. 8, 2017).

**\*4** Here, Plaintiff has sufficiently alleged his *Monell* claim against the City by alleging factual details concerning the CPD's alleged widespread practice or custom of covering-up police officers' unconstitutional use of excessive force and that this practice was the moving force behind his constitutional injuries. In particular, not only has Plaintiff alleged his own Fourth Amendment excessive force injury, but he has also alleged that the Police Accountability Task Force Report and January 2017 DOJ Report highlight the deficiencies in relation to the CPD's use of excessive force that are sufficiently similar to Plaintiff's excessive force allegations—raising a reasonable inference that he is not alone in suffering constitutional injuries resulting from this alleged practice or custom. *See Iqbal,* 556 U.S. at 678 (a complaint is plausible on its face when plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *see also Catinella v. Cnty. of Cook, Ill.*, 881 F.3d 514, 517 (7th Cir. 2018) ("the complaint 'must give enough details about the subject-matter of the case to present a story that holds together.' ") (citation omitted).

Moreover, despite the City's argument to the contrary, Plaintiff's allegations—read as a whole—include more than mere legal conclusions and boilerplate language. *See Catinella,* 881 F.3d at 517-18 ("[L]egal conclusions can provide the framework of a complaint so long as they are supported by factual allegations.") (internal quotation marks omitted, citation omitted). In particular, Plaintiff gives context to his *Monell* claim by explaining that Chicago Police Officers' CBAs prohibit the IPRA from properly investigating complaints of excessive force and that by delegating responsibility to the IPRA to investigate and recommend discipline of Chicago Police Officers, the City enables the "code of silence" of covering-up police misconduct involving the use of excessive force. In addition, the City's arguments that Plaintiff's allegations do not "establish" the existence of a widespread policy are misplaced because at this stage of the proceedings, the Court must determine whether Plaintiff has stated a plausible claim for relief, not that he has "established" or "proven" his claims. *See Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). For these reasons, the Court denies the City's motion to dismiss Plaintiff's *Monell* claim as alleged in Count V of the Amended Complaint.

**All Citations**

Slip Copy, 2018 WL 1138553

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2224882
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Charles STOKES, Plaintiff,

v.

P.O. EWING #8653, P.O. Ortiz #9748, and the City of Chicago, a Municipal Corporation, Defendants.

Case No. 16 C 10621
|
Signed 05/22/2017

**Attorneys and Law Firms**

Gregory E. Kulis, Brian M. Orozco, Joshua S. Patrick, Gregory E. Kulis and Associates, Ltd., Chicago, IL, for Plaintiff.

Arlene Esther Martin, Iris Chavira, Mark David Winistorfer, City of Chicago Department of Law, Jason Fay Cunningham, Federal Civil Rights Division, Department of Law, Chicago, IL, for Defendants.

**Opinion**

## MEMORANDUM OPINION AND ORDER

Harry D. Leinenweber, Judge

**\*1** Before the Court is Defendant City of Chicago's Motion to Dismiss Plaintiff's *Monell* claim [ECF No. 16]. For the reasons stated herein, the Motion is denied.

## I. BACKGROUND

Plaintiff Charles Stokes ("Stokes") filed this lawsuit under 42 U.S.C. §§ 1983 and 1988 to address alleged constitutional violations visited upon him by Chicago Police Officers Ewing and Ortiz (the "Defendant Officers"). The following facts are drawn from Stokes' Complaint and are, for purposes of this Motion, accepted as true, with all inferences drawn in his favor. *See, e.g., Adams v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir. 2015).

On September 2, 2015, Stokes was leaving the home of his mother-in-law when Defendant Officers searched his car without cause and falsely arrested him for possessing a firearm. (ECF No. 1 ("Compl.") ¶¶ 5-10.) Stokes claims that they and Defendant City of Chicago (the "City") proceeded with baseless charges, which were ultimately resolved in his favor. (*Id.* ¶¶ 14-17.) On November 21, 2015, Stokes was again leaving his mother-in-law's home when Defendant Officers stopped him without cause. (*Id.*, Count III, ¶¶ 5-7.) They searched his person, took his car keys, and then searched his car. (*Id.*, Count III, ¶¶ 9-10.) Despite finding nothing in his car, Defendant Officers claimed they had discovered "some weed/marijuana somewhere near the house," and subsequently arrested Stokes. (*Id.*, Count III, ¶¶ 11-12.)

After arresting Stokes, Defendant Officers informed him and a co-arrestee that they were going to jail for narcotics possession "unless they came up with a gun." (Compl., Count VI, ¶ 13.) Both Stokes and his companion-in-misfortune told Defendant Officers that they did not have or own a gun. (*Id.*, Count VI, ¶ 14.) At that point, "[o]ne or both" of Defendant Officers told them that they could only avoid jail by furnishing the police with a gun. (*Id.*, Count VI, ¶ 15.)

Because neither of them had a gun, Stokes' co-arrestee "arranged to obtain a gun." (*Id.*, Count VI, ¶¶ 16-17.) Once "a gun was tendered" to Defendant Officers, Stokes was released and requested that the other individual be released as well. (*Id.*, Count VI, ¶¶ 18-19.) Defendant Officers replied that Stokes' co-arrestee would be released only if Stokes found them another gun. (*Id.*) Because he did not have a gun, "Stokes was ordered to hit the streets and obtain or buy an illegal gun and turn it over." (*Id.*, Count VI, ¶¶ 20-22.) Both were released once this second gun was found and presented to Defendant Officers. (*Id.*, Count VI, ¶ 27.)

With respect to the City, Stokes alleges that both Defendant Officers were acting within the scope of their employment and pursuant to "a custom practice and policy to arrest people on false charges and then in turn, have them conduct illegal felonious acts for the Chicago Police." (Compl., Count VI, ¶¶ 22-23.) This "unwritten practice, customs *[sic]* and policy was done to keep a point/score for police officers in certain districts and reward officers accordingly for bringing in illegal guns off the street(s)." (*Id.*, Count VI, ¶ 24.) Ultimately, Stokes attributes his false arrest to this "custom, practice and policy," which "promoted illegal arrests of innocent individuals." (*Id.*, Count VI, ¶¶ 25-26.)

**\*2** The City now seeks to dismiss Stokes' *Monell* claim under FED. R. CIV. P. 12(b)(6) for failure to state a claim on which relief can be granted.

## II. <u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must state a claim that is plausible on its face." *Adams,* 742 F.3d at 728 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim enjoys "facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Adams,* 742 F.3d at 728 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). A plaintiff must allege that all elements of his claim are satisfied, but cannot survive a Rule 12(b)(6) motion to dismiss by alleging only legal conclusions. *Reynolds v. CB Sports Bar, Inc.,* 623 F.3d 1143, 1147 (7th Cir. 2010). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

Specific to *Monell* claims for municipal liability, the plaintiff must allege "that an official policy or custom not only caused the constitutional violation, but was the moving force behind it." *Estate of Sims ex rel. Sims v. Cnty. of Bureau,* 506 F.3d 509, 514 (7th Cir. 2008) (internal quotation marks omitted); *accord, Teesdale v. City of Chicago,* 690 F.3d 829, 833 (7th Cir. 2012). To state such a claim, the plaintiff must allege that: (1) he suffered a deprivation of a federal right (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the city, which (3) was the proximate cause of his injury. *See, Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 690-91 (1978); *accord, Gonzalez v. Vill. of West Milwaukee,* 671 F.3d 649, 664 (7th Cir. 2012). The plaintiff must also plausibly point to the existence of an underlying constitutional violation. *Houskins v. Sheahan,* 549 F.3d 480, 493-94 (7th Cir. 2008).

## III. <u>ANALYSIS</u>

In essence, Stokes is suing the City for instituting an implicit policy, custom, or practice that rewards officers in proportion to the number of guns confiscated and licenses the arrest of individuals on false charges unless they can obtain and turn over a gun. (ECF No. 23 ("Pl.'s Br.") at 3-4.) This policy, as applied to him, allegedly violated his rights under the Fourth and Fourteenth Amendments. (Compl. ¶ 28.)

The City contends that Stokes' Complaint fatally lacks the requisite specificity to allege a plausible *Monell* claim. Conclusory and boilerplate allegations, the City points out, leave a complaint stranded. Further, the City argues that Stokes has not provided facts permitting an inference that the alleged policy was the driving force behind his injury –

"that a widespread reward system directed or even influenced the Defendant Officers' actions" – or that the City was deliberately indifferent to the effects of its policy. (ECF No. 24 ("Reply") at 5-6.) In addition, the City maintains that the Complaint fails to elevate what happened to Stokes and his co-arrestee above a "random event," because it does not identify other instances of the conduct claimed to be "widespread." (*Id.* at 3-4.) (The City does not claim that Stokes fails to allege an underlying constitutional violation.) Stokes, on the other hand, warns against applying a heightened pleading standard to *Monell* claims and notes that his Complaint sufficiently puts the City on notice of the factual basis for his suit.

**\*3** Three of the City's arguments can be quickly put to the sword. First, the Complaint does not make merely conclusory or boilerplate allegations, but instead pleads specific factual content sufficient to put the City on notice. Rather than reciting by rote the elements of a *Monell* cause of action, Stokes' Complaint details both the nature of the alleged unconstitutional policy and the circumstances of its application to him and his co-arrestee. *Cf., e.g., Brooks v. Ross,* 578 F.3d 574, 582 (7th Cir. 2009) (holding that a "formulaic recitation of the cause of action and nothing more" fails to "put the defendants on notice of what exactly they might have done to violate [the plaintiff's] rights"); *Annan v. Village of Romeoville,* No. 12 C 3577, 2013 WL 673484, at \*6 (N.D. Ill. Feb. 25, 2013) (finding allegations conclusory where they alleged only that the municipality was liable under *Monell* for officers' excessive force because it "maintain[ed] a policy by which officers use excessive force to arrest individuals with no probable cause or reasonable suspicion warranting such"); *Travis v. City of Chicago,* No. 10 C 3011, 2012 WL 2565826, at \*5 (N.D. Ill. June 29, 2012) ("The court thus disregards the allegations of 'customs or policies of deliberate indifference' and 'inadequate supervision and training,' as this is mere boilerplate *Monell* language."); *Sheppard v. Village of Glendale Heights,* No. 11 C 1044, 2011 WL 6102012, at \*4 (N.D. Ill. Dec. 5, 2011) (finding allegations insufficient boilerplate where they claimed sex and race discrimination "pursuant to a wide-spread practice at the Village of Glendale Heights which was so permanent and well-settled as to constitute custom or practice"). Regardless of Stokes' prospects for success, his Complaint is not so replete with boilerplate or short on unique facts that the City can be said to lack notice of its alleged unconstitutional conduct.

Second, Stokes sufficiently pleads facts that, when viewed in the light most favorable to him, make it plausible that the challenged policy was the "driving force" behind his injury. It is a clear enough inference to draw at this stage that, absent the City's policy, Stokes and his co-arrestee would not have been forced to choose between procuring guns off the streets and getting "arrested on false charges." (Compl. ¶¶ 22, 25.) Rather than positing misconduct divorced from any specific City policy or supported only by generic *Monell* language, Stokes' Complaint links the alleged policy to an unambiguous incentive for Defendant Officers to engage in precisely the sort of egregious acts with which he charges them. Taken together with the Complaint's further allegations as to Defendant Officers—for example, that they released Stokes and his co-arrestee once two guns were tendered—Stokes' story "holds together." *McCauley v. City of Chicago,* 671 F.3d 611, 616 (7th Cir. 2011). There is no good reason to flunk the Complaint based on the "driving force" requirement.

Third, the Complaint need not plead facts concerning "deliberate indifference." Contrary to the City's facile assertion, "deliberate indifference" is not an absolute pleading requirement for *Monell* claims. Rather, the Seventh Circuit has typically regarded it as an *alternative* to an implicit policy of the sort alleged here. *See, e.g., Thomas v. Cook County Sheriff's Dept.,* 604 F.3d 293, 303 (7th Cir. 2010) ("[T]he plaintiff must demonstrate that there is a policy at issue rather than a random event. This may take the form of an implicit policy or a gap in expressed policies, or 'a series of violations to lay the premise of deliberate indifference.' ") (quotation and internal citations omitted). This jibes with the treatment of "deliberate indifference" in other situations, such as claims of inadequate police training. *See, e.g., Connick v. Thompson,* 563 U.S. 51, 61 (2011) ("To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of the persons with whom the [untrained employees] come into contact.") (internal quotation marks omitted); *accord, Matthews v. City of E. St. Louis,* 675 F.3d 703, 709 (7th Cir. 2012). Here, by contrast, Stokes charges the City with active participation in maintaining a policy that itself licenses unconstitutional conduct. As such, "deliberate indifference" is conceptually superfluous to the implicit policy alleged here, and Rule 8(a) does not require corresponding allegations in Stokes' Complaint.

The City's most substantial attack on the Complaint concerns the absence of allegations beyond those relating to Stokes (and, ostensibly, his co-arrestee). This argument merits more consideration but is ultimately rejected in view of *White v. City of Chicago,* 829 F.3d 837 (7th Cir. 2016). In *White,* the plaintiff alleged that the City's widespread practice of securing arrest warrants on the basis of conclusory complaint forms resulted in one Officer O'Donnell falsely arresting him without probable cause. The district court dismissed the *Monell* claim under Rule 12(b)(6), faulting it for being "based upon the sole allegation that O'Donnell acted in accordance with a widespread practice of the police department of the City of Chicago when seeking a warrant." *White,* 829 F.3d at 843. Brandishing *Leatherman v. Tarrant County Narcotics,* 507 U.S. 163, 164 (1993), which survives the *Twombly* line of cases intact, the Seventh Circuit rejected the district court's analysis on the grounds that federal courts may not apply a heightened pleading standard in cases alleging municipal liability under 42 U.S.C. § 1983. *Ibid.* The following allegations sufficed to satisfy the "short and plain statement of the claim" required by Rule 8(a):

> **\*4** In accordance with a widespread practice of the police department of the City of Chicago: O'Donnell requested the judge to issue a warrant on the basis of O'Donnell's conclusory allegation that other law enforcement officers claimed or believed plaintiff had committed an offense, and O'Donnell did not present the judge with an affidavit setting out any affirmative allegation of facts that would indicate that plaintiff had committed an offense.

*Id.* at 844. White was not required to "identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process." *Ibid.* To be sure, at summary judgment, impropriety from a single incident may not give rise to liability on the sort of *Monell* claim at issue. *See, e.g., Wilson v. Cook Cnty.,* 742 F.3d 775, 780 (7th Cir. 2014). But that was not the procedural posture in *White,* and it is not the situation presented here.

Post-*White* courts analyzing *Monell* suits have scotched motions to dismiss premised on the same arguments as the City's. For example, in *Kerlin v. Chicago Board of Elections,* No. 16 C 7424, 2017 WL 1208520, (N.D. Ill. Apr. 3, 2017), the court held that *White* mandated denial of the defendants' motion to dismiss where the plaintiffs identified a specific constitutional deprivation of their right to vote on March 15, 2016 and alleged a "pervasive and widespread *de facto* policy, practice, and procedure of willfully disregarding citizens' right to vote." *Id.* at \*6-7. At the pleading stage, plaintiffs " 'need only plead that the alleged incident is one of many' occurring in Chicago and 'that a widespread practice' gave rise to those incidents." *Id.* at \*7 (quoting *Barwicks v. Dart,* No. 14 C 8791, 2016 WL 3418570, at \*4 (N.D. Ill. June 22, 2016)). Similarly, in *Zinn v. Village of Sauk Village,* No. 16 C 3542, 2017 WL 783001 (N.D. Ill. Mar. 1, 2017), the court applied *White* to deny a motion to dismiss where the plaintiff alleged a Fourth Amendment violation arising out of a single automobile seizure " 'pursuant to [Sauk Village's] widespread practice of illegally and unconstitutionally seizing private property' and charging monetary fees for its return 'in an effort to raise money for the Village.' " *Id.* at \*7 (quoting the complaint). Apart from applying *White* in relevant fashion, *Kerlin* and *Zinn* involved factual allegations plainly apposite to those at the heart of this lawsuit.

And if *White* and its progeny leave any doubt, cases of more mature vintage, such as *Jackson v. Marion County,* 66 F.3d 151 (7th Cir. 1995), should dispel it. There, the plaintiff brought a *Monell* claim arising out of two distinct policies or practices: first, a policy or custom of failing to prevent misconduct by subordinate officers; and second, a policy or custom of conspiring with officers "to cover up and/or slant the facts to achieve an outcome not consistent with the duties of said office." *Jackson v. Marion County,* 66 F.3d at 152. The district court dismissed the complaint on the basis that "there was no explicit allegation of a custom or policy, but only an allegation of an isolated instance of misconduct." *Ibid.* The Seventh Circuit's review of the dismissal was bifurcated. With respect to the county's alleged failure to prevent misconduct, the court noted that "proof of a single act of misconduct will not suffice" when the government entity is alleged to have notice of "what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Ibid.* (citations omitted). However, when a complaint charges a municipality "with having engaged in improper conduct directly ... [such as] made the county complicit with the officers, then the drawing of an inference from a series of bad acts by subordinate officers is not required." *Id.* at 152-53 (citations omitted). In this case, Stokes alleges the City's complicity not in failing to train,

supervise, or prevent misconduct, but in establishing a widespread custom or implicit policy that licenses unconstitutional conduct. A "series of bad acts" is not required to state such a claim. *Ibid.*

 **\*5**  Thus, Seventh Circuit precedent clearly maps the proper course here. Pursuant to *White* and *Jackson,* Stokes need not plead the factual circumstances of additional instances of misconduct pursuant to the alleged policy. Of course, the Court does not opine on Stokes' chances on the merits, but is merely content that Stokes' Complaint adequately meets the pleading requirements of Rule 8(a). Presented with no sound basis for dismissing Stokes' *Monell* claim, the Court denies the City's Motion to Dismiss.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Defendant City of Chicago's Motion to Dismiss Plaintiff's *Monell* Claim is denied. [ECF No. 16].

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 2224882

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 3741551
Only the Westlaw citation is currently available.
United States District Court,
C.D. Illinois,
Peoria Division.

Jason YOUNG, as Administrator of the ESTATE OF Tyler. D. YOUNG, Deceased, Plaintiff,

v.

PEORIA COUNTY, ILLINOIS, Micheal McCoy, Peoria County Sheriff, Brian Asbell, Corrections
Superintendent, Morgan Hanse, Alec Michel, Michael Smith, Stan Kester, Olivia Radclifftish,
Correctional Healthcare Companies (CHC), Correct Care Solutions, LLC, Respondent.

Case No. 1:16–cv–01367–JBM
|
Signed 08/30/2017

**Attorneys and Law Firms**

Jason Bryant McGary, Strong Law Offices, Peoria, IL, for Plaintiff.

Benedict G. Ciravolo, Jennifer L. Morris, Peoria County States Attorney, John P. Heil, Jr., Nathan Bach, Syed E. Ahmad, Heyl Royster Voelker & Allen, Peoria, IL, for Respondent.

**Opinion**

## ORDER & OPINION

JOE BILLY McDADE, United States Senior District Judge

 **\*1** The matter is before the Court on Defendants' Motions to Dismiss. (Docs. 23 and 25). For the reasons explained below, Defendants Radcliff–Tish, Correctional Healthcare Companies, and Correct Care Solutions, LLC's Motion to Dismiss (Doc. 23) is granted. Defendants Peoria County, Peoria County Sheriff, McCoy, Asbell, Sheriff Officers Hanse, Michel, Smith, and Kester's Motion to Dismiss (Doc. 25) is granted in part and denied in part. Plaintiff has twenty-one days to file a second amended complaint to cure the deficiencies as noted.

## BACKGROUND [1]

Tylor Young was a twenty-two year old prisoner at the Peoria County Jail in Peoria, Illinois from October 6, 2014 until October 12, 2014, when Mr. Young committed suicide in his cell. [2] At the time, Mr. Young was a serious drug addict, who was participating in an active methadone treatment program and/or a narcotic treatment program ("NTP") for his heroin and opioid addiction.

This was not Mr. Young's first visit to the Peoria County Jail, as he had cycled in and out of it for several years before his death. During prior visits, Mr. Young was placed on suicide watch.

During his last booking on October 6th, 2014, Defendants performed physical, mental, and psychiatric examinations of Mr. Young which indicated that he was an opioid addict, was actively engaged in NTP and/or a methadone program, and

was suffering from a mental health disability and drug addiction. Despite this, Mr. Young was placed into the general population, in the F–Pod unit, which was not suicide-proof.

On October 12, 2014, Mr. Young hanged himself in his cell by looping his bedsheet through a metal fixture.

On September 30, 2016, Plaintiff, Mr. Young's estate, filed suit against Defendants. On December 7, 2016, Plaintiff was granted leave to file an Amended Complaint. (Doc. 19). Plaintiff alleges three counts against all Defendants: a claim under 42 U.S.C. § 1983 for failure to protect in violation of the Fourteenth Amendment; a violation of the Americans with Disabilities Act ("ADA"), pursuant to 42 U.S.C. § 12132; and a wrongful death claim under Illinois law. Additionally, Plaintiff alleged a claim of *respondeat superior* against Peoria County and the Peoria County Sheriff.

**\*2** On January 25, 2017, Defendants Radcliff–Tish, Correctional Healthcare Companies, and Correct Care Solutions (collectively the "Medical Defendants") filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted. (Doc. 23). The Medical Defendants argue that Plaintiff failed to state a claim because he alleged generic allegations against all of the defendants and gave no indication which individual acts or omissions he alleged that the Medical Defendants committed. The Medical Defendants also argue that there is no personal liability under Title II of the ADA. Lastly, the Medical Defendants argue that Plaintiff's wrongful death claim was too general to meet pleading standards.

On January 25, 2017, Defendants Peoria County, Peoria County Sheriff Michael McCoy, [3] Corrections Superintendent Brian Asbell, Officer Morgan Hanse, Officer Alec Michel, Officer Michael Smith, and Officer Stan Kester (collectively the "Correctional Defendants") filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted. (Doc. 25). The Correctional Defendants argue that Plaintiff failed to state a claim because he alleged generic allegations against all of the defendants and gave no indication which individual acts or omissions he alleged that the Correctional Defendants committed. The Correctional Defendants also argue that there is no personal liability under Title II of the ADA. The Correctional Defendants argue that Plaintiff's wrongful death claim was too general to meet pleading standards. The Correctional Defendants also argue that Plaintiff has failed to state a claim via *respondeat superior.* Additionally, the Correctional Defendants argue that Illinois's Tort Immunity Act provides tort immunity. Lastly, the Correctional Defendants argue that an applicable Illinois statute of limitations makes Plaintiff's claim untimely.

Plaintiff has responded to each motion and they are ready for a decision. [4] Because the first three issues of each Motion to Dismiss are identical, the Court will address them together. Then, the Court will also address the Correctional Defendants' final arguments.

## II. LEGAL STANDARD

**\*3** In ruling on a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), "the court must treat all well-pleaded allegations as true and draw all inferences in favor of the non-moving party." *In re marchFIRST Inc.*, 589 F.3d 901, 904 (7th Cir. 2009). The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Furthermore, the complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient detail to give notice of the claim, and the allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir 2007) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). The plausibility standard requires enough facts to "present a story that holds together," but does not require a determination of probability. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Though detailed

factual allegations are not needed, a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

## III. DISCUSSION

Defendants' motions to dismiss are granted in part, denied in part. Because they address numerous issues, the Court will identify each and briefly discuss them. First, Plaintiff has improperly pled claims against Peoria County. Plaintiff cannot bring claims directly against Peoria County; rather, Peoria County may only be maintained as a necessary party because it must indemnify the Peoria County Sheriff for any monetary damages imposed against Peoria County Sheriff. Second, Plaintiff has not sufficiently pled facts in order to provide any of the individual defendants (Medical or Correctional) notice of what action or inaction they personally performed that resulted in a constitutional violation under 42 U.S.C. § 1983. Third, Plaintiff cannot maintain an ADA claim against an individual defendant or a private company; therefore, all ADA claims, except for that against Peoria County Sheriff, must be dismissed. Fourth, Plaintiff has sufficiently pled an ADA claim against Peoria County Sheriff; therefore, that claim survives. Fifth, Plaintiff's claims under Illinois's Wrongful Death Act against Peoria County Sheriff and his employees (Defendants McCoy, Asbell, Hanse, Michel, Smith, and Kester) are untimely and must be dismissed. Sixth, Plaintiff's claims under Illinois's Wrongful Death Act are insufficiently pled to give notice to Defendants Radcliff–Tish, Correctional Healthcare Companies, and Correct Care Solutions, LLC, of their action or inaction. Finally, because Plaintiff's § 1983 claims are insufficiently pled, the Court will not address the Correctional Defendants' argument that Plaintiff's claims are barred by qualified immunity. These seven issues are discussed in further detail below.

### A. PLAINTIFF IMPROPERLY PLED CLAIMS AGAINST PEORIA COUNTY

Plaintiff has improperly pled claims against Peoria County. Under Illinois law, county sheriffs are agents of the county sheriff's department, not the county. *Franklin*, 150 F.3d at 685–86; *see also Moy v. Cty. of Cook*, 159 Ill.2d 519, 203 Ill.Dec. 776, 640 N.E.2d 926, 929–31 (Ill. 1994); *Dawson v. Carter*, No. 15-C-4321, 2016 WL 4151035, 2016 U.S. Dist. LEXIS 102922 (N.D. Ill. Aug. 5, 2016). Therefore, Peoria County cannot be held liable for actions of the Peoria County Sheriff under § 1983 or a *respondeat superior* theory. *See Franklin*, 150 F.3d at 685–86; *Ryan v. Cty. of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995); *Wallace v. Masterson*, 345 F.Supp.2d 917, 921–22 (N.D. Ill. 2004).

**\*4** However, Peoria County is a necessary party in any suit seeking damages from an independently elected county officer in an official capacity. *Carver v. Sheriff of LaSalle Cty.*, 324 F.3d 947, 948 (7th Cir. 2003). This is because Illinois state law requires the county to pay for any judgment entered against the county sheriff in an official capacity. *Id.* (citing *Carver v. Sheriff of LaSalle Cty.*, 203 Ill.2d 497, 272 Ill.Dec. 312, 787 N.E.2d 127 (Ill. 2003)). Therefore, Plaintiff should bring suit against Peoria County as an indemnifier of the Peoria County Sheriff; however, Plaintiff may not bring suit directly against Peoria County for the Sheriff's policies and procedures under a § 1983 claim or a *respondeat superior* theory of liability. *See, e.g., Brandon v. Smith*, No. 06-1316, 2008 WL 879444, 2008 U.S. Dist. LEXIS 24885 (C.D. Ill. Mar. 28, 2008) ("These six claims go well beyond what *Carver* requires, asserting various civil rights claims directly against the County based, for example on jail policy, for which the County has no authority."). To the extent that Plaintiff is attempting to bring these claims against Peoria County directly, they are dismissed. Plaintiff has twenty-one days to file a second amended complaint and properly plead Peoria County as a defendant for indemnification purposes only.

### B. PLAINTIFF FAILED TO PLEAD ENOUGH INFORMATION TO STATE A § 1983 CLAIM

Plaintiff has failed to plead enough information to provide each Defendant notice of a claim under 42 U.S.C. § 1983. Section 1983 provides that:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation

of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....”

42 U.S.C. § 1983. The United States Supreme Court expanded § 1983 to apply to municipalities, if the violation resulted from the execution of one of its policies. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to allege a *Monell* claim, a plaintiff must allege: 1) an express policy that caused the constitutional deprivation; 2) a widespread practice that, although not authorized by written law or express municipal policy, is so well settled and permanent; or 3) that the constitutional injury was caused by a person with final policymaking authority. *Lewis v. City of Chi.*, 496 F.3d 645, 656 (7th Cir. 2007). Medical providers, who contract with jails to perform the public function of providing medical services, like mental health services, to inmates are treated the same as municipalities for the liability purposes of a § 1983 claim. *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010).

Plaintiff has failed to state a § 1983 claim against the individual named Defendants McCoy, Asbell, Hanse, Michel, Smith, Kester, and Radcliff–Tish. Furthermore, plaintiff must plead that a defendant personally participated or caused the unconstitutional action in order to bring a § 1983 claim against an individual. *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003); *see also Marshall v. Buckley*, 644 F.Supp.2d 1075, 1080 (N.D. Ill. 2009); *Brown v. State Dep't of Pub. Aid*, 318 F.Supp.2d 696, 700 (N.D. Ill. 2004). Plaintiff only alleges, both generically and collectively, that “Defendants each” performed actions like: failed to properly supervise Mr. Young, failed to monitor Mr. Young, failed to remove reasonably foreseeable dangerous items from Mr. Young's cell, failed to handle and screen prisoners who were known to pose a risk of committing suicide, failed to have sufficiently staff the jail, failed to properly screen opioid-addicted inmates, and were deliberately indifferent to the health, life, safety, and welfare of Mr. Young. (Doc. 19 at 8–11). Although Plaintiff must only plead a “short and plain statement,” it is clear that it must be more detailed than this in order to provide proper notice to Defendants.

**\*5** Plaintiff fails to plead when each of these individuals may have interacted with Mr. Young or how each individually participated or caused the unconstitutional action. Mr. Young was booked on October 6th, but did not commit suicide until October 12th. That is a span of seven days and countless time for interactions with the individual defendants. Plaintiff has not provided any facts that touch upon how the individual Defendants' actions, or inactions, would give rise to his § 1983 claim. Furthermore, Plaintiff's Amended Complaint is self-contradictory because he brings these allegations against the Defendants as a collective but tries to identify each Defendant as part of the collective by saying “Defendants each.” For example, the Court doubts that Nurse Radcliff–Tish, a contract nurse, was involved in the failure to “have adequate, proper, and sufficient jail officer staffing levels so as to provide adequate and proper monitoring and supervision of prisoners and inmates.” (Doc. 19 at 10). Yet, by stating “Defendants each,” Plaintiff is making that allegation against all Defendants, including Defendant Radcliff–Tish. While pleading generally “Defendants each” might be simpler for the Plaintiff to do, it is insufficient to give each Defendant notice of their personal actions or inactions. Therefore, it is clear that Plaintiff has not provided enough notice to each individual defendant as to their individual action or inaction to state a § 1983 claim. Therefore, the § 1983 claims against the individual Defendants McCoy, Asbell, Hanse, Michel, Smith, Kester, and Radcliff–Tish are dismissed without prejudice. Because these are flaws that can be cured by adequate factual pleading, Plaintiff is given twenty–one days to file a second amended complaint to cure them.

Plaintiff has also failed to state a § 1983 claim under *Monell* against the Peoria County Sheriff, Correctional Healthcare Companies or Correct Care Solutions. Plaintiff does not identify what practices, policies, and procedures the Peoria County Sheriff is responsible for compared to what is the responsibility of the private contract medical companies. Plaintiff's allegations are a myriad of conclusory statements about the “policies, practices, procedures, and rules” for handling, screening evaluating, examining, identifying, supervising, monitoring, and treating inmates. (Doc. 19 at 9–11). However, these allegations are a formulaic recitation of the elements of a *Monell* claim followed by virtually all the activities that a local jail performs and most of its contact with inmates. These broad allegations, coupled with not identifying which particular defendant is responsible for which policies, practices, procedures, or rules, fail to provide sufficient notice of a § 1983 *Monell* claim. *See, e.g., Brooks v. Ross*, 578 F.3d 574, 581–82 (7th Cir. 2009); *Dennis v. Curran*, No. 16-C-6014, 2017 WL 264497, 2017 U.S. Dist. LEXIS 7978 (N.D. Ill. Jan. 20, 2017); *Armour v. County Club Hills*,

No. 11–C–5029, 2014 WL 63850, at *6–7, 2014 U.S. Dist. LEXIS 1849, at *20–24 (N.D. Ill. Jan. 8, 2014). Plaintiff must provide allegations that are specific and sufficient for the Office of the Peoria County Sheriff and each of the medical companies to be put on notice as to the policies or customs personal to them that Plaintiff claims a § 1983 violation under *Monell.* Because Plaintiff has failed to do so, Plaintiff's remaining § 1983 claims against them must be dismissed. Because these deficiencies may be cured, this dismissal is without prejudice. Plaintiff will have twenty-one days to file an amended complaint curing these deficiencies. [5]

### C. PLAINTIFF CANNOT BRING A CLAIM OF DISCRIMINATION UNDER TITLE II OF THE ADA AGAINST INDIVIDUAL DEFENDANTS.

Plaintiff cannot bring a claim of Discrimination under Title II of the ADA against Individual Defendants or any of the Medical Defendants. Title II provides that:

> "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132. Furthermore, Title II defines a "public entity" as:

"a) any State or local government;

b) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

**\*6** c) the National Railroad Passenger Corporation, and any commuter authority"

42 U.S.C. § 12131. The United States Court of Appeals for the Seventh Circuit has explained that because the ADA forbids discrimination by a public entity that the proper defendant is the public entity. *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000) (abrogated on other grounds by *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (allowing claims for prospective *injunctive* relief against individuals in their official capacity)).

Because a Title II discrimination claim must be brought against a public entity, a claim seeking damages against an individual cannot be maintained. *Id.*; *see also Boston v. Dart*, No. 14–cv–8680, 2015 WL 4638044, at *2, 2015 U.S. Dist. LEXIS 101348, at *4–5 (N.D. Ill. Aug. 4, 2015) (citing *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015)); *Sallenger v. City of Springfield*, No. 03-3093, 2005 WL 2001502, 2005 U.S. Dist. LEXIS 18202 (C.D. Ill. Aug. 4, 2005); *Doe v. Bd. of Trs. of the Univ. of Ill.*, 429 F.Supp.2d 930, 940 (N.D. Ill. 2006); *Novak v. Bd. of Trs. of S. Ill. Univ.*, No. 12-cv-7-JPG, 2012 WL 5077649 at *8, 2012 U.S. Dist. LEXIS 149697 at *22 (S.D. Ill. Oct. 18, 2012). Therefore, as Plaintiff ultimately admitted, the ADA claim against Defendants McCoy, Asbell, Hanse, Michel, Smith, Kester, and Radcliff–Tish in their individual capacities must be dismissed with prejudice.

Likewise, based on the statute, a Title II ADA discrimination claim cannot be maintained against the Medical Defendants, because they do not meet the statutory definition of a "public entity." Although the Seventh Circuit has not addressed this issue, several other circuits courts and district courts—including one of our sister courts in this circuit—have found that "a private company does not become a public entity for Title II purposes merely because it has a business or contractual relationship with a public entity." *Maxwell v. South Bend Work Release Ctr.*, 787 F.Supp.2d 819, 822 (N.D. Ind. 2011); *see also Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010) ("[a] private contractor does not, ... become liable under Title II merely by contracting with the States to provide governmental services, essential or otherwise"); *Phillips v. Tiona*, 508 Fed.Appx. 737, 748–49 & 754 (10th Cir. 2013) (collecting case and joining "the overwhelming majority of other courts that have spoken directly on the issue, and hold[ing] that Title II of the ADA does not generally apply to private corporations that operate prisons."). Furthermore, Plaintiff does not contest this.

Therefore, Plaintiff's ADA claims against the Medical Defendants, as well as all of the individual Defendants, must be dismissed with prejudice.

#### D. PLAINTIFF'S ADA CLAIM AGAINST THE PEORIA COUNTY SHERIFF SURVIVES

Plaintiff has sufficiently pled an ADA claim against the Peoria County Sheriff. [6] In order to plead a failure to accommodate claim, Plaintiff need only to allege: 1) that Mr. Young was a qualified individual with a disability, 2) that Defendant was aware of his disability, and 3) that Defendant failed to reasonable accommodate Mr. Young's disability. *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 852 (7th Cir. 2015) (citing *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014)). Plaintiff's Amended Complaint sufficiently pleads an ADA claim. [7] *See, e.g., Brandon*, 2008 WL 879444, at *3–4, 2008 U.S. Dist. LEXIS 24885, at *10–11.

#### E. PLAINTIFF'S WRONGFUL DEATH CLAIM AGAINST THE CORRECTIONAL DEFENDANTS IS UNTIMELY

**\*7** Plaintiff's Illinois Wrongful Death claim against Peoria County Sheriff and his employees is untimely. Under Illinois law, [8] "[n]o civil action ... may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received of the cause of action accrued." 745 Ill. Comp. Stat. 10/8–101(a). [9] A local public entity includes a county sheriff. *Carver v. Sheriff of La Salle Cty.*, 203 Ill.2d 497, 272 Ill.Dec. 312, 787 N.E.2d 127, 136 (Ill. 2003). Therefore, Plaintiff had one year to file any Illinois tort cause of action against the Peoria County Sheriff or his employees from Mr. Young's suicide on October 12, 2014. *See Long v. Williams*, 155 F.Supp.2d 938, 943 (N.D. Ill. 2001) (applying a two-year statute of limitations to plaintiff's § 1983 claims and the one year statute of limitations under § 10/8–101(a) to plaintiff's state tort claims); *Am. Nat'l Bank & Trust Co. v. Town of Cicero*, No. 01-C-1395, 2001 WL 1631871, 2001 U.S. Dist. LEXIS 21469 (N.D. Ill. Dec. 14, 2001) (finding similarly); *Jackson v. City of Joliet*, No. 03–C–4088, 2005 WL 1272937, at *3–4, 2005 U.S. Dist. LEXIS 12007, at *10–12 (N.D. Ill. May, 19, 2005) (finding similarly).

However, Plaintiff's Complaint was not filed until September 30, 2016. (See Doc. 1). Therefore, Plaintiff's Illinois Wrongful Death claims against the Peoria County Sheriff, directly, and Defendants McCoy, Asbell, Hanse, Michel, Kester, and Smith, individually, [10] are untimely and must be dismissed. *See Holliman v. Cook Cty.*, No. 15-C-9050, 2016 WL 4678312 at *2, 2016 U.S. Dist. LEXIS 120279 at *6 (N.D. Ill. Sept. 6, 2016) ("Although affirmative defenses, such as the statute of limitations, are not usually resolved through a motion to dismiss, if the plaintiff's complaint contains facts that on their face demonstrate the suit is time-barred, it may be disposed of under [Federal Rule of Civil Procedure] 12(b)(6)" (citing *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995)).

Plaintiff's § 1983 and ADA claims were not time-barred. The Correctional Defendants also appear to argue that Plaintiff's § 1983 claim and ADA claim are time-barred. However, Plaintiff's § 1983 claims are governed by the two-year statute of limitations, which is equivalent to the general statute of limitations for personal injury claims in Illinois pursuant to 735 Illinois Compiled Statutes § 5/13-202. *Ashafa v. City of Chi.*, 146 F.3d 459, 461 (7th Cir. 1998) ("This circuit has consistently held that the appropriate statute of limitations for § 1983 cases filed in Illinois is two years as set forth in 735 [Illinois Compiled Statutes] § 5/13–202.") (citations omitted). Likewise, because the ADA does not have its own statute of limitations, it uses Illinois's two year personal injury limitation. *Winfrey v. City of Chi.*, 957 F.Supp. 1014, 1023 (N.D. Ill. 1997) (citing *Cheeney v. Highland Cmty. Coll.*, 15 F.3d 79, 81–82 (7th Cir. 1994)). Therefore, because Plaintiff's Complaint was filed on September 30, 2016, his § 1983 and ADA were not time-barred.

#### F. PLAINTIFF FAILED TO PLEAD ENOUGH INFORMATION TO STATE A WRONGFUL DEATH CLAIM

**\*8** Like Plaintiffs § 1983 claim deficiencies, Plaintiff fails to plead enough facts to give Defendants notice of what the actions or inactions allegedly support his wrongful death claim. Plaintiff alleges an Illinois wrongful death claim

against all Defendants pursuant to 740 Ill. Comp. Stat. 180/1 (2012). Under Illinois law, a plaintiff must show: 1) that defendant owed a duty to the deceased; 2) that defendant breached the duty; 3) that the breach caused the decedent's death; and 4) that monetary damages resulted to persons designated under the Act. *Lough v. BNSF Ry. Co.*, 370 Ill.Dec. 734, 988 N.E.2d 1090, 1094 (Ill. Ct. App. 2013). Just as in his § 1983 claim, Plaintiff uses generic "Defendants each" language throughout the allegations relation to the wrongful death claims. Such language is not sufficient to put the individual Medical Defendants on notice of what duties they each allegedly breached and how their individual actions caused Plaintiff's death.

### G. ILLINOIS'S SUICIDE RULE DOES NOT DEFEAT PLAINTIFF'S ILLINOIS WRONGFUL DEATH ACT

The Medical Defendants argue that based on Illinois's "suicide rule," Plaintiff cannot recover under the Wrongful Death Act because "[i]t is well established under Illinois law that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee." *Crumpton v. Walgreen Co.*, 375 Ill.App.3d 73, 313 Ill.Dec. 178, 871 N.E.2d 905, 910 (Ill. Ct. App. 2007). However, several courts, including this Court, have noted that "a 'jailer owes a general duty of due care to his prisoner' " and that "the Illinois Supreme Court has never determined whether this general duty of care nullifies the suicide rule." *Perks v. Cty. of Shelby*, No. 09-3154, 2009 WL 2777882 at *5, 2009 U.S. Dist. LEXIS 77575 at *13 (C.D. Ill. Aug. 31, 2009) (quoting *Dezort v. Vill. of Hinsdale*, 35 Ill.App.3d 703, 342 N.E.2d 468, 472–73 (Ill. Ct. App. 1976)). Additionally, the "suicide rule" has not been recognized in situations where the defendant had a duty to the decedent to prevent the suicide. *Turcois v. DeBruler*, 392 Ill.Dec. 541, 32 N.E.3d 1117, 1124 (Ill. 2015) (citations omitted). This is because "[w]here the duty of care breached is the duty to protect against what would otherwise be an unforeseeable consequence, that consequence becomes foreseeable to the defendant, and the breach of the duty to protect against it can result in negligence liability. So, for example, 'a hospital that fails to maintain a careful watch over patients known to be suicidal is not excused by the doctrine of supervening cause from liability for suicide.' " *White v. Watson*, No. 16-cv-560-JPG-DGW, 2016 WL 6277601, 2016 U.S. Dist. LEXIS 149111 (S.D. Ill. Oct. 27, 2016) (quoting *Jutzi–Johnson v. United States*, 263 F.3d 753, 756 (7th Cir. 2001)). Therefore, it is clear that the applicability is determined by whether Defendant owed Plaintiff a duty of care and whether the consequences were foreseeable. Given the inadequate pleadings and the early stage of these proceedings, the Court cannot currently declare that Illinois's Suicide Rule prevents Plaintiff from bringing a Wrongful Death Claim. The Medical Defendants are entitled to renew this argument if Plaintiff files a second amended complaint alleging Wrongful Death Claims against them.

### H. THE COURT CANNOT ADDRESS THE CORRECTIONAL DEFENDANTS' TORT IMMUNITY ARGUMENT

Because of the deficiencies in Plaintiff's § 1983 pleadings, the Court cannot, and will not, address the Correctional Defendants' tort immunity claim. The Correctional Defendants argue that Plaintiff's claims are barred by qualified immunity. [11] Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In order to determine qualified immunity, the Court considers: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at [that] time." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (citing *Pearson*, 555 U.S. at 232, 129 S.Ct. 808)).

**\*9** In order to analyze the first component of qualified immunity, the Court must determine whether Plaintiff has shown that Mr. Young had a serious medical condition that posed a substantial risk and that the Correctional Defendants knew about the risk and acted or failed to act in disregard of that risk. *See Estate of Ryan L. Clark*, 865 F.3d at 544 (citing *Farmer v. Brennan*, 511 U.S. 825, 843, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). However, as discussed in the analysis of Plaintiff's § 1983 claims in § III.B, Plaintiff has not pled facts as to what an individual defendant knew or did. Therefore,

the Court cannot perform a qualified immunity analysis. If the Plaintiff files amended § 1983 claims, then Defendants are entitled to reassert this argument.

### IV. CONCLUSION

In summary:

1) Plaintiff has incorrectly pled claims against Peoria County. All claims made directly against Peoria County are dismissed. Peoria County may be repleaded as a necessary party as an indemnifier of the Peoria County Sheriff, the proper defendant.

2) Plaintiff has failed to sufficiently pled a § 1983 claim against any Defendant; therefore, all claims are dismissed. Plaintiff has twenty-one days to file a second amended complaint curing his deficiencies.

3) Plaintiff has sufficiently pled an ADA claim against the Peoria County Sheriff. Plaintiff's ADA claims against all other defendants are dismissed with prejudice.

4) Plaintiff's claim under Illinois's Wrongful Death Act against Peoria County Sheriff and Defendants McCoy, Asbell, Hanse, Michel, Smith, and Kester are dismissed as untimely and may not be repleaded.

5) Plaintiff has failed to sufficiently pled a claim under Illinois's Wrongful Death Act against Defendants Radcliff–Tish, Correctional Healthcare Companies, and Correct Care, Solutions, LLC. Plaintiff has twenty-one days to file a second amended complaint curing his deficiencies.

Therefore, the Medical Defendants' Motion to Dismiss (Doc. 23) is granted. Plaintiff has twenty-one days to file a second amended complaint curing his § 1983 and Wrongful Death Act claims against Defendants Radcliff–Tish, Correctional Healthcare Companies, and Correct Care, Solutions, LLC.

The Correctional Defendants' Motion to Dismiss (Doc. 25) is granted in part, denied in part. Defendants' motion to dismiss Plaintiff's § 1983 claims is granted. Plaintiff has twenty-one days to file a second amended complaint curing his § 1983 deficiencies against Defendants Peoria County Sheriff, McCoy, Asbell, Hanse, Michel, Smith, and Kester. Defendants' motion to dismiss Plaintiff's ADA claims is granted in part and the ADA claims against Defendants McCoy, Asbell, Hanse, Michel, Smith, and Kester are dismissed. Defendants' motion to dismiss Plaintiff's ADA claim is denied in part as to Defendant Peoria County Sheriff; this claims survives. Lastly, Defendants' motion to dismiss Plaintiff's Illinois Wrongful Death claims is granted; Plaintiff's Illinois Wrongful Death claims against Defendants Peoria County Sheriff, McCoy, Asbell, Hanse, Michel, Smith, and Kester are dismissed.

### All Citations

Slip Copy, 2017 WL 3741551

### Footnotes

1  For purposes of the Motions to Dismiss, the Court accepts the following facts alleged by Plaintiff as true. *See Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). All facts come from Plaintiff's Amended Complaint. (Doc. 19).

2  Plaintiff does not identify Mr. Young's status for incarceration whether it be as a convicted prisoner, a pretrial detainee, or a hybrid form. The status of Mr. Young's incarceration determines which Constitutional Rights Mr. Young had. The Eighth Amendment applies to convicted prisoners. *See Estate of Clark v. Walker*, 865 F.3d 544, 544 n.1 (7th Cir. 2017) (citing *Kingsley v. Hendrickson*, ––– U.S. ––––, 135 S.Ct. 2466, 2475, 192 L.Ed.2d 416 (2015)). The Fourteenth Amendment applies to pretrial detainees. *Id.* Because the language of the Clauses differs, the nature of the claims often differs. *Id.* It appears based on Plaintiff's Amended Complaint, which alleges a violation of Mr. Young's Fourteenth Amendment rights, that Mr. Young was a pretrial detainee. (Doc. 19 at 1.) None of the Defendants argues otherwise.

3    Although Plaintiff does not explicitly name the Peoria County Sheriff as a Defendant, he does name Peoria County Sheriff McCoy in what appears to be his official capacity. (Doc. 19 at 3). "[Section] 1983 suits against sheriffs in their official capacities are in reality suits against the county sheriff's department rather than the county board." *Franklin v. Zaruba*, 150 F.3d 682, 686 (7th Cir. 1998). Therefore, the Court presumes that Plaintiff's allegations against Sheriff McCoy in his official capacity are actually allegations against the Peoria County Sheriff.

In order to be able to distinguish between claims against Sheriff McCoy in his official and individual capacities, the Court will use "Peoria County Sheriff" for claims brought against the Peoria County Sheriff in his official capacity and "Defendant McCoy" for claims brought against Defendant Sheriff McCoy in his individual capacity. If Plaintiff chooses to file a second amended complaint, the Court advises Plaintiff to clearly identify whether he is bringing claims against the Peoria County Sheriff in his official capacity, individual capacity, or both.

4    The Court notes that both of Plaintiff's Responses (Docs. 27 and 28) are in violation of the 15 page limit of Local Rule 7.1(B) (4)(a). See CDIL–7.1(B)(4)(a). It appears that neither of Plaintiff's memorandums violate the Local Rule's type volume limit of 7,000 words (although Plaintiff's response to the Correctional Defendants' Motion to Dismiss (Doc. 28) is only a couple words shy of that limit). However, the Local Rules require Plaintiff's Counsel to submit a certificate of compliance with the type volume limitations. CDIL–7.1(B)(4)(c). Plaintiff's Counsel has not done so. The Court admonishes Plaintiff's Counsel to consult the Local Rules and be in compliance with all of them before filing any future material with the Court.

5    Because the Court has dismissed all of Plaintiff's § 1983 claims for failing to plead with enough particularity to provide notice, the Court will not address the Medical Defendants' and the Correctional Defendants' second argument: that Plaintiff failed to plead actual knowledge and intentional disregard. However, Plaintiff should use his opportunity to amend to cure all deficiencies that he is made aware of, even if the Court does not address them.

6    In his Response to the Medical Defendant's Motion to Dismiss (Doc. 27), Plaintiff states that he is asserting his ADA claim against Peoria County Sheriff in his official capacity, the Corrections Superintendent in his official capacity, and Peoria County. Additionally, because the Correctional Superintendent is hired and fired by the Peoria County Sheriff, suing the Correctional Superintendent in his official capacity is equivalent to bringing a suit against the Peoria County Sheriff. *See Moy*, 203 Ill.Dec. 776, 640 N.E.2d at 929. Likewise, as previously discussed, Plaintiff cannot bring a claim directly against Peoria County for the denial of access to a program or activity at the Peoria County jail; rather the proper defendant is the Peoria County Sheriff.

7    However, if Plaintiff choses to file a Second Amended Complaint to cure the deficiencies in his § 1983 claims, he should correct his ADA pleading to clearly indicate that the ADA claim is being brought against the Peoria County Sheriff in his official capacity.

8    A federal court applies the same statute of limitations to state law claims as a state court would. *See, e.g., Harrell v. Sheahan*, 937 F.Supp. 754 (N.D. Ill. 1996); *Ellis v. City of Chi.*, No. 2000-C-2457, 2000 U.S. Dist. LEXIS 17827, 2000 WL 1774084 (N.D. Ill. Nov. 30, 2000).

9    An Illinois statute does provide a two year limit for claims arising from "patient care." 745 Ill. Comp. Stat. 10/8–101(b). However, that subsection does not apply because Plaintiff has not alleged any injuries arising from patient care.

10    Because Plaintiff's claims against the individual Correctional Defendants are all untimely, there is no *respondeat superior* liability that can be asserted against the Peoria County Sheriff.

11    The Correctional Defendants also assert that the Local Governmental and Government Employees Tort Immunity Act provides immunity for failing to furnish medical care for a prisoner unless the employee acts with willful and wanton conduct. *See* 745 Ill. Comp. Stat. § 10/4–105. However, State tort law immunity is only applicable to state tort law claims and the Court has already found that Plaintiff's state tort law claims against the Correctional Defendants are untimely. Therefore, this argument is moot and the Court need not address it.

---

**End of Document**          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 783001
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Sheila P. ZINN and Bianca S. Gilmore, Plaintiffs,

v.

The VILLAGE OF SAUK VILLAGE and Sauk Village Police Officer Richard Aguayo, Defendants.

Case No. 16-cv-3542
|
Signed 03/01/2017

**Attorneys and Law Firms**

Daniel B. Nixa, The Nixa Law Firm, LLC, Jeanette Samuels, Samuels & Associates, Ltd., Chicago, IL, for Plaintiffs.

Matthew J. Byrne, Odelson & Sterk, Ltd., Evergreen Park, IL, for Defendants.

**Opinion**

<u>**MEMORANDUM OPINION AND ORDER**</u>

John Robert Blakey, Judge

**\*1** This case involves a dispute between Plaintiffs Sheila Zinn ("Zinn") and Bianca Gilmore ("Gilmore") and Defendants the Village of Sauk Village ("Sauk Village") and one of its police officers, Richard Aguayo ("Aguayo"), regarding the impoundment of Zinn's automobile on March 24, 2014. Plaintiffs bring five causes of action in their Amended Complaint [19]. Plaintiffs allege that Aguayo illegally seized Gilmore (Count I); illegally searched and seized Zinn's automobile (Count II); and unlawfully retaliated against Plaintiffs' exercise of their First Amendment rights (Count III) in violation of 42 U.S.C. § 1983. Plaintiffs further assert a § 1983 *Monell* claim against Sauk Village for its alleged widespread practice of unconstitutionally seizing private property in order to raise revenue (Count IV). Finally, Plaintiffs bring a state law indemnification claim against Sauk Village under 745 ILCS 10/9-102 for Aguayo's misconduct (Count V). On November 17, 2016, Defendants jointly moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' Amended Complaint for failure to state a claim. Defs.' Mot. Dismiss [23]. For the reasons explained below, Defendants' motion is granted in part and denied in part.

**I. Background**

Plaintiffs' Amended Complaint [19] sets forth the following relevant facts, which the Court accepts as true for the purposes of Defendants' motion. On the morning of March 24, 2014, Plaintiff Bianca Gilmore was involved in a traffic accident while driving a vehicle owned by her mother, Plaintiff Sheila Zinn. Am. Compl. [19] ¶ 7. Shortly thereafter, Defendant Richard Aguayo, a Village of Sauk Village Police Officer, arrived on the scene and issued accident reports to Gilmore and the other driver. *Id.* ¶ 8. Plaintiffs allege that Aguayo then ordered Gilmore, without probable cause, to follow him to the Sauk Village police station. *Id.* ¶¶ 8, 10. After requiring Gilmore to wait at the police station for an hour and a half, Aguayo advised her to contact someone who could come to the station and pay a $350 bond. *Id.* Gilmore contends that, at this point, she had not been issued a ticket nor informed that charges were being brought against her. *Id.* ¶ 13.

Gilmore contacted her mother via telephone. *Id.* ¶ 14. Plaintiffs allege that, during the call, Aguayo notified Zinn that Gilmore had been arrested, but refused to provide further information. *Id.* ¶ 15. Instead, Aguayo told Zinn that her daughter would be "going into a cage" if Zinn did not pay the $350 bond, and hung up on her. *Id.*

After Aguayo hung up the phone, Zinn called the Sauk Village Police Department to obtain more information. *Id.* ¶ 16. A different Sauk Village police officer assured her that, contrary to Aguayo's claims, Gilmore had not been taken into custody. *Id.* ¶ 18. Nevertheless, Gilmore remained at the Sauk Village Police Station.

Later that day, Aguayo once again told Gilmore to contact her mother, this time to determine why Zinn "was taking so long" to pay Gilmore's bond. *Id.* Aguayo again threatened to put Gilmore "in a cell" if Zinn did not show up with $350 in cash. *Id.* ¶ 19. After Gilmore made contact with her mother, Zinn questioned the legality of Aguayo's actions. *Id.* ¶ 21. In response, Aguayo "got angry" and stated that Zinn's questioning had "made things bad for her." *Id.* According to Plaintiffs, Aguayo then "caused false charges to be made" against Gilmore, processed her, and placed her in a cell. [1] *Id.* ¶ 22. Plaintiffs also allege that at this point, Aguayo reached into Gilmore's pocket and seized the car keys to Zinn's automobile. *Id.* ¶ 23.

**\*2** Eventually, Zinn travelled to the Sauk Village Police Station in person. Upon arrival, she asked to speak with the Chief of Police in order to file a complaint. *Id.* ¶¶ 24-25. In response, Aguayo falsely told Zinn that he was the Chief of Police and that Zinn should speak with him in his office about paying Gilmore's bond. *Id.* ¶ 25.

Aguayo finally released Gilmore later that day, [2] but retained possession of Zinn's automobile. *Id.* ¶¶ 23-26. Upon her release, Aguayo provided Gilmore with a "Notification of Vehicle Impoundment" that identified "aiding and abetting the commission of a crime" as justification for the vehicle's seizure. *Id.* ¶ 28. Plaintiffs allege, however, that the notice did not specify the crime Gilmore had allegedly aided and abetted, a date for an administrative hearing, or Gilmore's right to such a hearing. *Id.* ¶¶ 28-29.

Plaintiffs also allege that, while Zinn's vehicle was impounded, the Sauk Village Police Department rejected or obstructed multiple attempts to file official complaints regarding Aguayo's conduct. *Id.* ¶ 48. Specifically, Zinn tried to file a notarized complaint against Aguayo three times on March 31, 2014, but was told that no one was present to accept her grievance. *Id.* ¶ 49. Plaintiffs maintain that when a complaint was finally submitted, it was never investigated by Sauk Village and Aguayo was never punished for his actions. *Id.* ¶ 53.

On April 1, 2014, Plaintiffs requested a preliminary hearing regarding the impoundment of Zinn's vehicle. *Id.* ¶¶ 30-31. Plaintiffs allege that, under the Sauk Village Municipal Code, the owner of an impounded vehicle may request a preliminary hearing within fifteen days of impoundment, and, once such a request is made, a preliminary hearing must be held within forty-eight hours. *Id.* ¶ 31. Nevertheless, Plaintiffs were not given a timely preliminary hearing. *Id.* ¶ 32. Instead, a final administrative hearing was held without notice on April 17, 2014, at which time default judgment was entered against Plaintiffs. *Id.* ¶¶ 33-34.

Despite the default judgment, Plaintiffs were granted a preliminary hearing in August 2014. *Id.* ¶ 58. Plaintiffs allege that when Gilmore appeared at the hearing, however, a neutral arbiter was not present. *Id.* Instead, an attorney for Sauk Village informed Gilmore that Zinn's car would be released to her custody if she signed a settlement agreement and a release of all potential claims against the Village. *Id.* ¶ 59. Gilmore refused. *Id.* ¶ 60.

On October 1, 2015, Sauk Village's Public Safety Administrator reviewed the evidence that Plaintiffs initially provided in their April 1, 2014 request for a preliminary hearing. *Id.* After reviewing the evidence, the Public Safety Administrator waived all fines and ordered that Zinn's vehicle be released. *Id.* In the end, Zinn's vehicle was impounded for nineteen months, during which time Plaintiffs incurred various expenses for rental cars, taxi services, and public transportation. *Id.* ¶¶ 55, 57.

Plaintiffs claim that Zinn's vehicle was initially seized pursuant to Sauk Village's Vehicle Impoundment Ordinance ("the Ordinance"). *Id.* ¶¶ 35-36. Plaintiffs allege that, since 2011, Sauk Village police officers have routinely seized and impounded vehicles under the auspice of the Ordinance "without a warrant and when no valid exception to the warrant requirement applies" in order to raise revenue for the Village. *Id.* ¶¶ 35-37, 41, 46. Plaintiffs assert that, as a result of this unlawful practice, tow release fees collected by the Village have substantially increased in recent years. [3] *Id.* ¶¶ 42-44.

## II. Legal Standard

**\*3** A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). A motion to dismiss tests the sufficiency of a complaint, not the merits of a case. *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). To survive a motion to dismiss, the claim must first comply with Rule 8 of the Federal Rules of Civil Procedure by providing a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice" of what the claim is "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Second, the complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That is, the allegations must raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs. Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). A claim has facial plausibility "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The "amount of factual allegations required to state a plausible claim for relief depends on the complexity of the legal theory alleged," but "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. Of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). In evaluating the complaint, the Court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of Plaintiff. *Iqbal*, 556 U.S. at 678.

## III. Discussion

The Court begins with two preliminary matters. First, in response to Defendants' motion, Plaintiffs' agree to voluntarily dismiss their claim for unlawful seizure of Gilmore on March 24, 2014. Pls.' Resp. Defs.' Mot. Dismiss [28] n.1. Therefore, Defendants' Motion to Dismiss [23] as it relates to Count I is granted. Second, Defendants' pleadings omit any discussion of Plaintiffs' indemnification claim. Therefore, Defendants' Motion to Dismiss [23] as it relates to Count V is denied. Plaintiffs' remaining claims (Counts II-IV) will be discussed in turn.

### A. Count II: Illegal Search and Seizure of Zinn's Automobile

The Fourth Amendment protects the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To state a § 1983 claim for a Fourth Amendment violation, Plaintiffs must plausibly allege that: (1) there was a search or seizure; and (2) the search or seizure was unreasonable. *Angara v. City of Chicago*, 897 F. Supp. 355, 358 (N.D. Ill. 1995). Generally, searches and seizures are unreasonable when conducted without a warrant and without satisfying one of the exceptions to the warrant requirement. *Ivy v. Powers*, No. 08-cv-3826, 2009 WL 230542, at \*3 (N.D. Ill. Jan. 30, 2009). Here, Plaintiffs claim that Aguayo initially seized Zinn's automobile without probable cause, after Aguayo "caused false charges to be made" against Gilmore. Am. Compl. [19] ¶¶ 10, 22. This is sufficient to state a Fourth Amendment claim under § 1983. [4]

**\*4** In response, Defendants assert that Aguayo's initial seizure *was* supported by probable cause because Zinn's vehicle registration was suspended. Defs.' Mem. Supp. Mot. Dismiss [24] 4-5. In support of their claim, Defendants submitted a

Sauk Village Police Department "Vehicle History Abstract" which indicates Zinn's registration expired on May 20, 2013. *Id.* Ex. A. At this preliminary stage, however, the Court is generally confined to the facts alleged in Plaintiffs' Amended Complaint, which states that Aguayo seized Gilmore "without probable cause or any other lawful basis." Am. Compl. [19] ¶ 10; *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006). Of course, under Rule 10(c), a "copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes," including "a limited class of attachments to Rule 12(b)(6) motions." *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). This "limited class," however, only includes documents that "are referred to" in Plaintiffs' complaint and "are central" to their claim, such as a contract. *Id.* Such an exception does not apply here. Defendants' argument, therefore, is premature.

Citing *Lee v. City of Chicago*, 330 F.3d 456 (7th Cir. 2003), Defendants also argue that the Fourth Amendment does not apply to Sauk Village's administrative hearing process that followed Aguayo's initial seizure of Zinn's vehicle. Defs.' Mem. Supp. Mot. Dismiss [24] 8. In *Lee*, the Seventh Circuit held that the Fourth Amendment is limited "to an individual's interest in *retaining* his property." 330 F.3d at 466 (emphasis in original). Thus, once an individual "has been meaningfully dispossessed," the "seizure of the property is complete," and the Fourth Amendment "cannot be invoked by the dispossessed owner to regain his property." *Id.* Here, however, complaints about Sauk Village's impoundment practices notwithstanding, Plaintiffs claim that Aguayo's *initial* seizure of Zinn's vehicle was unreasonable. Thus, even under *Lee*, Plaintiffs' Fourth Amendment claim remains viable.

Defendants' further contend that, under *Lee*, Plaintiffs cannot bring a Fourth Amendment claim due to their failure to exhaust administrative remedies. Defs.' Mem. Supp. Mot. Dismiss [24] 9. The *Lee* court required a showing that state-law remedies were inadequate, however, because the plaintiff brought a substantive due process claim that only implicated the deprivation of a property interest, not a fundamental right. 330 F.3d at 467. Here, Plaintiffs allege an independent constitutional violation under the Fourth Amendment. Under this theory, Plaintiffs need not exhaust state remedies before filing in federal court. *See Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982) ("[W]e conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983.").

Finally, Defendants argue that Aguayo is entitled to qualified immunity. Defs.' Mem. Supp. Mot. Dismiss [24] 12. Government officials performing discretionary functions are protected from liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When considering a qualified immunity defense, the Court contemplates: (1) whether Plaintiffs' allegations establish that Defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of Defendant's conduct. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011) (citing *Siliven v. Ind. Dep't. of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011)).

Here, accepting all well-pleaded allegations as true, as we must, Defendants' qualified immunity claim fails. Plaintiffs assert that Aguayo possessed neither a warrant nor probable cause to seize Zinn's vehicle. Am. Compl. [19] ¶ 55. Indeed, Plaintiffs allege that Aguayo went so far as to *falsify* charges against Gilmore in order to effectuate the vehicle's impoundment. Am. Compl. [19] ¶ 22. Even under the exacting standards for denial of qualified immunity, *see White v. Pauly*, 137 S. Ct. 548, 552 (2017) (reiterating that "clearly established law" should not be defined "at a high level of generality" and must be "particularized" to the facts of the case), freedom from seizure under such circumstances was clearly established at the time of Aguayo's conduct. *See Washington v. Haupert*, 481 F.3d 543, 551 (7th Cir. 2007) ("According to the plaintiffs, the police officers fabricated a police report in order to justify their arrests. A reasonable officer would have understood that what he was doing violated their right to be free from unreasonable seizure."); *Garcia v. City of Chicago*, No. 09-cv-5598, 2012 WL 601844, at *7 (N.D. Ill. Feb. 23, 2012) ("It was clearly established in December 2007 that the Fourth Amendment prohibits a law enforcement officer from knowingly leveling false charges in a case report or criminal complaint."); *Treece v. City of Naperville*, No. 94-cv-5548, 1998 WL 142391, at *11 (N.D. Ill. Mar. 25, 1998) ("[F]alsifying police reports and fabricating charges violated Treece's rights under the Fourth Amendment."). Aguayo is therefore not entitled to qualified immunity, at least at this stage of the proceedings.

**\*5**  For the reasons stated above, Defendants' motion as it relates to Count II is denied.

### B. Count III: First Amendment Retaliation

In Count III, Plaintiffs claim that the seizure and extended impoundment of Zinn's automobile constituted punitive retaliation for Plaintiffs' grievances against Aguayo. Am. Compl. [19] ¶¶ 56, 71-73. To adequately plead a First Amendment retaliation claim, Plaintiffs must allege that: (1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech was at least a motivating factor in Defendants' actions. *Spalding v. City of Chicago*, 24 F. Supp. 3d 765, 775 (N.D. Ill. 2014).

Defendants argue that Plaintiffs have "not suffered deprivation of a constitutional right." Defs.' Reply [32] 9. It is well settled, however, that the First Amendment creates a right to petition the government—including state and local government—for a redress of grievances. *Ogurek v. Gabor*, 827 F.3d 567, 568 (7th Cir. 2016); *Belk v. Town of Minocqua*, 858 F.2d 1258, 1261 (7th Cir. 1988) ("[T]he freedom to petition the government for redress of grievances is but one of several fundamental freedoms protected by the [F]irst [A]mendment."). Moreover, in identifying the kind of deprivation that would deter speech, the test is "whether a person of 'ordinary firmness' would be deterred from exercising his or her First Amendment rights." *Sneed v. City of Harvey*, 6 F. Supp. 3d 817, 840 (N.D. Ill. 2013), *aff'd sub nom.*, 598 Fed.Appx. 442 (7th Cir. 2015) (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). The Court applies "an objective test to determine whether an action is materially adverse," but whether it meets that standard "depends on the context and circumstances of the particular case." *Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 916 (N.D. Ill. 2010). The extended impoundment of Zinn's automobile satisfies this standard. *See DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) ("[R]etaliation need not be monstrous to be actionable under the First Amendment[.]"); *Kafka v. Grady*, No. 12-cv-50123, 2014 WL 4725399, at \*7 (N.D. Ill. Sept. 23, 2014) (citing this circuit's "liberal interpretation of what an actionable constitutional deprivation can be for First Amendment retaliation claims under [§ 1983]").

Defendants also argue that the impoundment of Plaintiffs' vehicle "precede[d] any speech made by Plaintiffs in opposition to [the] Village's tow and impound policy," thus precluding a finding of retaliatory motive. Defs.' Mem. Supp. Mot. Dismiss [24] 9 ("[I]t is not clear how there could be any relationship between the Plaintiffs' speech and the prior tow and impoundment of their vehicle."); Defs.' Reply [32] 7 ("All of Plaintiff's allegedly protected speech occurred after the tow and impoundment of Plaintiff's vehicle.").

Defendants' characterization of the alleged facts, however, is inaccurate. According to Plaintiffs, Zinn first questioned the legality of Aguayo's actions via telephone, *before* Gilmore was falsely charged and placed in a cell. Am. Compl. [19] ¶¶ 19, 21-23. It was only *after* Zinn's oral complaint that Aguayo told Gilmore that Zinn's challenge had "made things bad for her" and proceeded to seize Zinn's vehicle keys. *Id.* ¶¶ 21-23. Plaintiffs further allege that Aguayo provided Gilmore with a Notification of Vehicle Impoundment *after* Zinn physically arrived at the Sauk Village Police Station and requested to file a complaint with the Chief of Police. *Id.* ¶¶ 25, 28. Finally, Plaintiffs claim that they attempted to file multiple official complaints regarding Aguayo's conduct throughout 2014 and 2015. *Id.* ¶ 48. Despite—or perhaps because of—these complaints, Zinn's vehicle remained impounded for nineteen months, until its release in October 2015. *Id.* ¶ 55. With these facts, it is plausible that both the initial seizure and continued impoundment of Zinn's vehicle were retaliation for Zinn's repeated objections. Therefore, Defendants' motion as it relates to Count III is denied. [5]

### C. Count IV: *Monell* Claim

**\*6**  In Count IV, Plaintiffs bring a municipal liability claim against Sauk Village under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). [6] Although *Monell* subjects local governmental units to suit under 42 U.S.C. § 1983, *respondeat superior* will not suffice to impose liability. *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). The municipality's *policy*, not employees, must be the source of the discrimination. *Id.*; *Auriemma v. Rice*, 957

F.2d 397, 399 (7th Cir. 1992) ("Municipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents."). Consequently, a § 1983 complaint against a municipality "must plead the existence of a custom or policy that was the direct cause of the deprivation of a federal right." *Caldwell v. City of Elmwood, Ind.*, 959 F.2d 670, 673 (7th Cir. 1992). Specifically, Plaintiffs must plead factual content that would allow the Court to plausibly infer that: (1) they suffered the deprivation of a constitutional right; and (2) an official custom or policy caused that deprivation. *Barwicks v. Dart*, No. 14-cv-8791, 2016 WL 3418570, at *2 (N.D. Ill. June 22, 2016). Regarding the second element, Plaintiffs must plead that the constitutional violation was caused by: (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with final policymaking authority. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011).

A § 1983 municipal liability claim "need not meet any heightened pleading standard, but rather must simply set forth sufficient allegations to place the court and defendants on notice of the gravamen of the complaint." *Latuszek v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993). In *White v. City of Chicago*, the Seventh Circuit explored the limits of this principle. 829 F.3d 837, 839 (7th Cir. 2016), *cert. denied sub nom.*, 137 S. Ct. 526 (2016). In *White*, following a two-year narcotics investigation, the defendant police officer applied for dozens of arrest warrants, including one for the plaintiff. *Id.* In a later civil suit, the plaintiff claimed that the officer failed to present the judge who issued the warrant with enough information to establish probable cause for the arrest. *Id.* The plaintiff also alleged a *Monell* claim against the City of Chicago for its supposed widespread practice of seeking arrest warrants upon the basis of conclusory complaint forms. *Id.* at 841. The district court originally held that the plaintiff failed to state a *Monell* claim because his complaint solely stated that the officer who arrested the plaintiff "acted in accordance with a widespread practice of the police department of the City of Chicago when seeking a warrant." *Id.* at 843. According to the district court, this conclusory statement was not enough "to draw the reasonable inference that the City maintained a policy, custom, or practice that deprived [the plaintiff] of his constitutional rights." *Id.*

**\*7** The Seventh Circuit found the district court's ruling to be in error. *Id.* The court stated that the plaintiff's complaint cited his individual claim against the officer, and further claimed that the officer's conduct was "[i]n accordance with a widespread practice of the police department of the City of Chicago." *Id.* at 844. Citing *Leatherman,* the court held that this "was enough to satisfy the 'short and plain statement of the claim' requirement of Rule 8(a)(2)." *Id.* According to the court, the plaintiff "was not required to identify every other *or even one other individual* who had been arrested pursuant to a warrant obtained through the complained-of process." *Id.* (citing *Jackson v. Marion County*, 66 F.3d 151, 152-53 (7th Cir. 1995)) (emphasis added).

Here, Plaintiffs have sufficiently pled both *Monell* elements at this early stage of the proceedings. As discussed above, the Amended Complaint [19] adequately alleges that Plaintiffs suffered a constitutional deprivation when Aguayo unreasonably seized Gilmore's vehicle in violation of the Fourth Amendment. The Amended Complaint further alleges that Aguayo's seizure occurred "pursuant to [Sauk Village's] widespread practice of illegally and unconstitutionally seizing private property" and charging monetary fees for its return "in an effort to raise money for the Village." Am. Compl. [19] ¶ 35. Under *White*, this is sufficient for the purposes of Rule 12(b)(6).

At summary judgment, of course, Plaintiffs' single incident would not give rise to a *Monell* claim. *See Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014) (stating that although the Seventh Circuit "has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents— do not suffice."). At this stage, however, Plaintiffs "need only *allege* a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists." *Barwicks*, 2016 WL 3418570, at *4. In other words, Plaintiffs "need only plead that the alleged incident is one of many" occurring in Sauk Village and "that a widespread practice" gave rise to those incidents. *Id.* at *5. Plaintiffs have done so. Although Plaintiffs' claim, "like many § 1983 claims, may not have merit," this does not justify the Court "granting of a motion to dismiss in advance of

giving [Plaintiffs] a chance to prove [their] allegations." *Hampton v. City of Chicago*, No. 96 C 3480, 1997 WL 790590, at *5 (N.D. Ill. Dec. 17, 1997). Therefore, Defendants' motion as it relates to Count IV is denied.

## IV. Conclusion

For the reasons discussed above, Defendants' Motion to Dismiss for Failure to State a Claim [23] is granted as to Count I and denied as to Counts II-V. The status hearing previously set for March 21, 2017 stands. At that time, the parties shall be prepared to discuss additional case management dates.

## All Citations

Slip Copy, 2017 WL 783001

## Footnotes

1    Plaintiffs' Amended Complaint [19] does not specify the particular charges filed.

2    Plaintiffs' Amended Complaint [19] does not specify whether Zinn paid Gilmore's bond prior to her release.

3    For example, Plaintiffs allege that during fiscal year 2012, Sauk Village collected $106,195 in tow release funds. Am. Compl. [19] ¶ 44. For a six-month period of fiscal year 2013, Sauk Village raised $76,670. *Id.* For the fiscal year ending on April 30, 2015, Sauk Village raised $170,675. *Id.*

4    In their motion, Defendants attack Plaintiffs' seizure claim by defending the *facial* constitutionality of Sauk Village's Vehicle Impoundment Ordinance. Defs.' Mem. Supp. Mot. Dismiss [23] 6-8. Given the circumstances alleged in *Plaintiffs'* specific case, however, this Defendants' argument is unavailing.

5    Defendants additionally argue that Plaintiffs' retaliation claim is flawed for the same reason as Plaintiffs' unlawful seizure claim: the tow and impoundment of Zinn's vehicle was supported by probable cause. Defs.' Mem. Supp. Mot. Dismiss [24] 10; Defs.' Reply [32] 7-8. The Court rejects this argument for the same reasons discussed above.

6    Plaintiffs' *Monell* claim is not without flaws as currently drafted. Plaintiffs devote inordinate focus to Sauk Village's Vehicle Impoundment Ordinance itself, claiming that it is "unconstitutional" because it "authorizes" and "encourages" violations of the Fourth Amendment. Am. Compl. [19] ¶¶ 76-81. From this, Defendants' motion reasonably interpreted Count IV as a facial challenge to the Ordinance's constitutionality rather than a *Monell* claim against an implemented policy. *See* Defs.' Mem. Supp. Mot. Dismiss [24] 10-11. Plaintiffs' response clarified, however, that they are *not* mounting a facial challenge to the Ordinance. Pls.' Resp. Defs.' Mot. Dismiss [28] 3. Rather, Plaintiffs theorize that Sauk Village "encourages its officers"— under the auspice of the Ordinance— to impound "lawfully parked cars that are not evidence of a crime" for the purpose of "offsetting the Village's massive budget shortfalls." *Id.* 4-5. While the Amended Complaint [19] is imprecise, the Court finds that this theory can nonetheless be reasonably inferred from the language of the complaint. *See* Am. Compl. [19] ¶ 35 (stating that Sauk Village, "in an effort to raise money for the Village," engaged in a "widespread practice of illegally and unconstitutionally seizing private property" and charging monetary fees for its return).