# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

REBECCA TERRY,

              Plaintiff,

v.

COUNTY OF MILWAUKEE, DAVID
A. CLARKE, JR., OFFICER BRIAN
WENZEL, UNKNOWN EMPLOYEES
OF MILWAUKEE COUNTY JAIL,
UNKNOWN JAIL SUPERVISORS,
ARMOR CORRECTIONAL HEALTH
SERVICES, CAROLYN EXUM,
MORGAN BEVENUE, MARGARET
HOOVER, UNKNOWN EMPLOYEES
OF ARMOR CORRECTIONAL
HEALTH SERVICES, and
UNKNOWN ARMOR
HEALTHCARE SUPERVISORS,

              Defendants.

Case No. 17-CV-1112-JPS

**ORDER**

      Plaintiff Rebecca Terry ("Terry") filed this action pursuant to 42 U.S.C. § 1983, complaining that her constitutional rights were violated when she was ignored while she gave birth in a cell at the Milwaukee County Jail (the "Jail"). *See* (Docket #1). Defendants include Milwaukee County (the "County"), several County and Jail officials, including former Milwaukee County Sheriff David Clarke ("Clarke"), and Armor Correctional Health Services ("Armor"), a private corporation that provides healthcare services to inmates at the Jail.

      Against both the County and Armor, Terry asserts claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Monell* holds that

a municipal entity or a related corporate entity like Armor can be liable under Section 1983, but not simply because its employees violate the plaintiff's constitutional rights. *Id.* at 694.[1] Instead, a municipality can be liable for a constitutional violation only when the violation is brought about by (1) its express policy, (2) a widespread, though unwritten, custom or practice, or (3) a decision by an agent with "final policymaking authority." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009).

In this case, Terry advances a theory that the County and Armor had a widespread custom or practice of ignoring inmates' serious medical needs.[2] The County and Armor have each filed motions for judgment on the pleadings, asserting that Terry's *Monell* claim is overbroad and unworkable. The motions are fully briefed and, for the reasons stated below, they will be granted.[3]

---

[1]*Monell* liability can be imposed upon private corporations sued under Section 1983 when they contract with the state to provide essential services to state prisoners, as Armor does. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). Thus, references to "municipal" liability in this Order encompass both the County and Armor; there is no legal distinction between them for purposes of *Monell.*

[2]Terry sometimes phrases the practice as ignoring an "obvious" need for medical care rather than a "serious" need, but the two terms are functionally equivalent here. *See Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (a serious medical need for constitutional purposes is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention").

[3]Terry also alleges a separate *Monell* claim against the County based on its express policy of shackling pregnant inmates during transport and treatment, which she believes exposed her to an unreasonable risk of harm. (Docket #1 ¶¶ 95–101). That *Monell* claim is not at issue in the present motions.

1.    **LEGAL STANDARD**

Federal Rule of Civil Procedure Rule 12(c) permits a party to move for judgment after the complaint and answer have been filed. *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014). To survive a challenge under Rule 12(c) or 12(b)(6), a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (citation omitted); *Ashcroft v. Iqbal*, 555 U.S. 662, 679 (2009). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak*, 810 F.3d at 480–81.

2.    **RELEVANT FACTS**

The following facts are drawn from Terry's complaint. (Docket #1). The Court first recounts Terry's allegations regarding her childbirth at the Jail, then her explanation as to how that episode fits into an alleged larger pattern of medical mistreatment at the Jail.

2.1    **Terry's Childbirth at the Jail**

On March 9, 2014, Terry was arrested in Franklin, Wisconsin and taken to the Jail. She was nine months pregnant, due to give birth the next day. During booking, she began to experience labor pains and was taken to

Froedtert Hospital. Two sheriff's deputies accompanied her. Hospital staff told the deputies that Terry was in labor, but that she could return to the Jail.

The deputies returned her to the Jail and she was placed in the infirmary. Terry informed the correctional officer who was escorting her to the infirmary that, based on her prior experiences in childbirth, she believed delivery would occur that evening. Defendant Brian Wenzel ("Wenzel"), a Jail correctional officer, was working in the infirmary at that time.

Wenzel placed Terry in an infirmary cell. The cell was extremely dirty, including a filthy sink, toilet, and floor. Soon after entering her cell, Terry began experiencing more labor pains, much more intensely and closer together than before. Terry pushed the emergency button in her cell to ask for assistance. Defendants, including Wenzel and Armor nursing staff, ignored her. This occurred despite that fact that Wenzel was at his post just yards from Terry's cell.

Terry's condition continued to worsen, her labor pains increased, and she repeatedly cried out for help and hit the emergency button in her cell. Wenzel ignored her, and no Armor staff ever made rounds to check on her. After more than three hours in labor, alone in her cell screaming for help, Terry finally birthed her son, who emerged from the birth canal making choking sounds and blue in the face. She was terrified that her son could not breathe, and in her desperation, she reached into his throat to clear his airway herself. At this time, Wenzel finally looked into Terry's cell and called for help.

Some Armor employees arrived. They then called emergency medical staff, who transported Terry to Sinai Hospital where she and her child received post-partum care. Eventually, Terry was returned to the Jail.

## 2.2    Terry's *Monell* Allegations

Terry claims that her own instance of mistreatment during childbirth fits into a larger practice whereby Jail and Armor staff routinely ignore inmates' requests for medical care or their obvious need for care. To flesh out this claim, she details in her complaint several other instances of medical mistreatment at the Jail.

First, in 2001, Milwaukee County entered into a consent decree governing medical care at the Jail in *Christensen v. Sullivan*, Milwaukee County Circuit Court Case No. 1996-CV-1835. The consent decree identified several requirements for the Jail, including requirements related to women's health and medical emergencies.[4] Under the consent decree, Dr. Ronald Shansky ("Shansky") was appointed as the Medical Monitor of the Jail and has published reports documenting deficiencies in medical care at the Jail.

In the years leading up to Terry's experience, Shansky has repeatedly reported inadequate medical and correctional staffing at the Jail. He frequently explained that as a result of inadequate staffing and inadequate monitoring of inmate medical needs, inmates do not receive the care they need and suffer severe delays in receiving care. Shansky has also opined that correctional officers choose to ignore symptoms reported by inmates, causing a further breakdown in the provision of medical care.

Despite his admonitions, the Jail has failed to comply with Shansky's recommendations. According to Terry, Shansky's reports put Defendants on notice about a pattern of inadequate care and staffing at the Jail. Sixteen

---

[4]A copy of the consent decree has not been provided, and the complaint gives no more detail than this one sentence regarding its provisions.

years after it was originally entered, the consent decree remains in force because, according to Terry, the Jail is not in substantial compliance with its provisions.

In addition to Shansky's findings, a pattern of medical emergencies and deaths at the Jail also demonstrates, in Terry's view, Defendants' indifference to inmate medical needs. On March 3, 2009, Virgilio Jimenez ("Jimenez") died in his cell at the Milwaukee House of Correction, which was then under the supervision of Clarke. According to the policy in place at the time, correctional officers were required to check on inmates every thirty minutes. However, despite the fact that Jimenez missed breakfast and did not get out of bed earlier that morning during a search, correctional officers failed to conduct the required check-ins. Jimenez's body was discovered in his cell later that morning, more than six hours after he was last seen alive.

Terry's other cited instances of alleged neglect occurred at the Jail itself. In April 2009, Corey Kleser, an inmate at the Jail and a Type I diabetic, was denied proper medical care, including insulin, for a period of more than three months. In October 2009, Robert Schmidt was detained at the Jail and denied medical care, including his prescribed medication for a blood disorder, for more than ten days, causing a severe and painful blood clot.

In January 2011, Antonio Cowser ("Cowser") was booked into the Jail and told correctional officers he was suicidal. Despite his clear medical needs, Cowser received no treatment for his suicidal ideation. Over the course of thirteen days, he committed suicide by starving and dehydrating himself, and no correctional officer or medical staff intervened. Also in 2011, Paul Heytens ("Heytens") committed suicide in his cell at the Jail after he was denied his prescribed psychotropic medication and correctional

officers failed to monitor his activities. Despite rules requiring correctional officers to conduct thirty-minute checks on inmates, Heytens' body was not found for more than eleven hours after he hanged himself.[5]

Terry then turns to instances of claimed mistreatment occurring after her experience in March 2014. In October of that year, inmate Kwame Moore ("Moore") suffered intense sudden pain in his groin, consistent with testicular torsion. Moore complained to Jail and Armor staff about the debilitating pain. They refused his requests for medical care. By the time Moore received care the following day, it was necessary to remove the affected testicle.

In April 2016, Terrill Thomas ("Thomas") was detained at the Jail. He suffered from bipolar disorder. For reasons Terry does not explain, correctional officers shut off water to Thomas' cell. He died in his cell seven days later as a result of dehydration.

In July 2016, Shade Swayzer ("Swayzer") was detained at the Jail at a time when she was nearly nine months pregnant. Like Terry, Swayzer went into labor at the Jail and was denied medical care. Swayzer's daughter did not survive the ordeal and died shortly after her birth at the Jail.

In August 2016, Kristin Fiebrink ("Fiebrink") was detained at the Jail having recently used heroin and alcohol. On the night of August 27, 2016, Fiebrink screamed for help in her cell, but correctional officers ignored her pleas. She was found dead the following morning, but Terry does not give the cause of death. Presumably, it resulted from withdrawal symptoms.

---

[5]Armor did not begin to provide medical care at the Jail until March 2013. *See* (Docket #108 at 6). However, Terry alleges, and the Court must accept as true, that Armor knew of the healthcare incidents at the Jail and House of Correction prior to 2013. *See* (Docket #1 ¶ 77–79).

Finally, in October 2016, Michael Madden ("Madden") was detained at the Jail. He suffered from a heart condition and heroin addiction. While in custody, he suffered a seizure that rendered him unconscious, but correctional officers failed to provide him medical care. They instead picked Madden up and dropped him on his head. He died later that evening.

In Terry's view, these injuries and deaths "did not occur in isolation from each other. The County of Milwaukee and Armor Correctional Health Services have consistently failed to provide adequate medical care for the detainees at the jail." (Docket #1 ¶ 68). Terry claims that each occurrence, coupled with Shansky's repeated pleas for reform of Jail medical practices, put Defendants on notice of an ongoing, serious problem with medical care at the Jail. Specifically,

> [b]y March 2014, Defendant Clarke was on notice of a widespread practice at the Milwaukee County Jail of ignoring the serious medical needs of detainees like [Terry], thereby exposing them to unreasonable risks of harm. In the Milwaukee County Jail detainees with clear symptoms of serious medical illness, injury, or conditions who ask for medical care or to see a doctor are routinely delayed or completely ignored.

*Id.* ¶ 74. Similarly, Terry alleges that

> there exists a widespread practice at [the] Jail under which Jail employees, including correctional officers and medical personnel, commonly fail or refuse to: (1) properly examine a detainee with a serious medical condition; (2) provide proper medication to a detainee with a serious medical condition; (3) respond to detainees who have requested medical attention or medication or asked to see a doctor; (4) respond to detainees who exhibit obvious signs of a serious medical condition or illness; or (5) adequately staff the Jail with correctional and medical personnel necessary to respond to detainee needs.

*Id.* ¶ 75. "This widespread practice is allowed to flourish," says Terry, "because Defendant Clarke, as Sheriff, directly encourages and is thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control correctional officers and medical personnel, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting [Terry]." *Id.* ¶ 76. Likewise, Armor promoted these practices by "encourag[ing] the very type of misconduct at issue in this case, fail[ing] to provide adequate training and supervision of healthcare and correctional employees, and fail[ing] to adequately punish and discipline prior instances of similar misconduct." *Id.* ¶ 81.

**3.     ANALYSIS**

As noted above, *Monell* allows governmental entities to be held liable under Section 1983, but not on a theory of *respondeat superior. Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011); *City of Okla. City v. Tuttle*, 471 U.S. 808, 810 (1985). Instead, "[m]isbehaving employees are responsible for their own conduct," and "'units of local government are responsible only for their policies, rather than misconduct by their workers.'" *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007)). For municipal liability to attach, a constitutional violation must be brought about by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." *Darchak*, 580 F.3d at 629.

The parties agree that Terry is proceeding solely under the second of these three species of *Monell* liability. *See* (Docket #78 at 11); (Docket #82 at

5); (Docket #103 at 6). To establish municipal liability under a "custom" theory, Terry must plead facts allowing the reasonable inference that Defendants were deliberately indifferent to their subordinates' widespread practice of ignoring the serious medical needs of Jail inmates. *Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003); *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997). Only if Defendants consciously ignored a need for action can it be said that they adopted a *de facto* policy of violating inmates' constitutional rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) ("If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work."). Put differently, Defendants must have had notice of an ongoing problem such that allowing the problem to endure was akin to a conscious choice among alternatives. *Harris*, 498 U.S. at 389; *Tuttle*, 471 U.S. at 823.

This can be demonstrated "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995). It can also arise from a failure to provide adequate training in light of an obvious danger of constitutional violations in the absence of training, *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029–30 (7th Cir. 2006), although Terry's theory is not about failure to train in view of an obvious need but instead failure to train in response to a pattern of misconduct, *see Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 646 (7th Cir. 2003); (Docket #103 at 14); *infra* Part 3.1.

In addition to showing sufficient culpability on the part of the governmental entity, a *Monell* plaintiff must allege facts allowing the inference that the challenged policy, practice, or custom was the "moving force" behind her injury. *Harris*, 489 U.S. at 388. Simple but-for causation is not enough. *See Wilson v. Cook Cnty.*, 742 F.3d 775, 784 (7th Cir. 2014) (citing *Brown*, 520 U.S. at 410). Instead, the challenged practice "must be closely related to the ultimate injury" that the plaintiff suffered. *Harris*, 489 U.S. at 391; *Estate of Sims ex rel. Sims v. Cnty. of Barbeau*, 506 F.3d 509, 515 (7th Cir. 2009) (there must be a "direct causal link" between a custom and the alleged constitutional violations). The Seventh Circuit has said that a "moving force" is the "catalyst" for the injury in question, not merely a "contributing factor." *Johnson v. Cook Cnty.*, 526 F. App'x 692, 696 (7th Cir. 2013); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (training or policy changes that "might" have had an effect on plaintiff's treatment did not satisfy causation requirement).

Terry's allegations fall short of establishing that a cohesive practice of ignoring medical needs exists or that such a practice directly caused her injury. Thus, she has not pleaded the essential culpability and causation elements of her *Monell* claim. The Court will address each of these problems in turn below. First, however, it must address an argument hinted at in Terry's brief: that her *Monell* claim can proceed on a "single-incident" theory under *Harris*, without proof of a pattern of misconduct.

### 3.1    Terry Does Not Allege a Single-Incident *Monell* Theory

The focus of Terry's complaint is that a widespread practice of ignoring inmate medical needs arose from a failure to train, supervise, and discipline after repeated instances of misconduct. She does not allege that there was such an obvious need for training that no prior pattern of

misconduct was required to first put Defendants on notice of a problem. That is a theory of *Monell* liability recognized in *Harris*, where the Court held that even a single constitutional violation, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Brown*, 520 U.S. at 409 (citing *Harris*, 489 U.S. at 390). This extremely limited class of *Monell* liability applies only to situations where "a violation of federal rights may be a highly predictable consequence of a failure to equip [officials] with specific tools to handle recurring situations." *Id.* The Supreme Court has recently explained that in *Harris*, "[t]he Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 64 (2011).

In her brief in opposition to Defendants' motions, Terry consistently opines that her *Monell* theory arises from Defendants' failure to respond to a pattern of misconduct. Only once does she allude to an "obvious need" for training, stating that "even in the absence of exactly analogous prior incidents, a municipality can be liable for the obvious consequences of its inaction. This case meets that standard as well." (Docket #103 at 17) (internal citation omitted). She does not develop this argument further, nor does she grapple with the significant constraints on this type of *Monell* theory. In the absence of meaningful argument on the question, the Court finds that Terry has waived reliance on a single-incident *Monell* theory. *See Anderson v. Hardman*, 241 F.3d 544, 545–46 (7th Cir. 2001); *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1335 (7th Cir. 1995).

Moreover, even were the argument not waived, Terry provides no support for the idea that her childbirth was a specific type of recurring situation that would predictably give rise to a constitutional violation absent some specific training. Instead, her case is about drawing together a diverse set of medical incidents under the broad theme of "ignoring medical needs." In *Harris*, the Court gave an example of an actionable "obvious need":

> city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Harris*, 489 U.S. at 390 n.10 (internal citation omitted).

Terry's case lacks comparable clarity. What is the missing training? Telling Armor and Jail staff not to "ignore" inmates' medical needs? Given that the practice of "ignoring" medical needs arises in myriad contexts—inmate monitoring, medication distribution, care for injuries or addiction, and care during childbirth—it cannot be said that some specific training was obviously needed to forestall a highly predictable constitutional violation in Terry's case. *Connick*, 563 U.S. at 67 (noting that in light of significant legal training for prosecutors regarding *Brady* obligations, it could not be said that recurring violations of that constitutional right would obviously flow from a failure to provide additional in-house training); *Johnson*, 526 F. App'x at 697 (sexual assault by medical staff member was not a "patently obvious" consequence of governmental policy or lack of a

policy). As a result, Terry cannot proceed on a single-incident *Monell* theory under *Harris*.

### 3.2 Terry Does Not Identify a Cognizable Practice

Having dispensed with Terry's single-incident *Monell* theory, the Court next considers whether she has alleged sufficient facts to show that a widespread municipal custom or practice led to her injuries. She has not, as the incidents she has identified do not bind into a recognizable practice to which Defendants were deliberately indifferent. Only a few facts link the incidents alleged in the complaint: all the persons who received inadequate care were in state custody and, save the House of Correction incident, the inadequate care occurred in the Jail.

Beyond these spare connections, there is such an array of differences as to make the incidents totally distinct. The episodes occurred over a period of eight years. None are alleged to have involved the same Jail or Armor staff members. None involved similar medical conditions or ailments except one other instance of childbirth at the Jail involving Swayzer. Two incidents of childbirth-related mistreatment within the space of two years would not be enough to sustain a *Monell* claim on their own, *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006), and Terry does not argue otherwise.[6]

_____

[6] The parties disagree whether the Swayzer incident, which occurred in 2016, is pertinent to whether Defendants were on notice of a preexisting problem on the day of Terry's ordeal two years earlier. *Compare Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994), with *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir. 1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir. 1988). The Court need not wade into that dispute, as two incidents do not a custom make under these circumstances. *Thomas*, 604 F.3d at 303 (a custom theory requires, at a minimum, more than three supporting instances of the challenged practice).

Terry tries to unite the incidents through the refrain that they all involve medical needs being "simply ignored." (Docket #103 at 16). It is indeed hard to say what connects these occurrences except the 10,000-foot observation that they concerned inmates' medical needs being "ignored," though one instance of being "ignored" appears to mean something vastly different from the next—sometimes it is being denied medication, other times it is a failure to appreciate suicidal ideation or monitor inmate behavior, and still other times it is failing to respond properly to an injury or an inmate hunger strike.

This is not how *Monell* liability is supposed to work. The function of a *Monell* claim is to hold a municipality liable for bad practices "so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 60. To assert that a custom is "so entrenched and well-known as to carry the force of policy," one should at a minimum be able to describe the offending conduct with some precision. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012). In other words, to accuse a municipality of acting with deliberate indifference toward a problem, one must be able to articulate what the problem is; otherwise, it cannot be said that tolerating the problem amounted to a conscious choice. *Harris*, 498 U.S. at 389; *Tuttle*, 471 U.S. at 823. Crucially, "[t]he custom or policy underlying a *Monell* claim cannot be so amorphous that it effectively exposes a municipality to *respondeat superior* liability." *Chaparro v. Powell*, No. 07 C 5277, 2008 WL 68683, at *3 (N.D. Ill. Jan. 2, 2008).

To be capable of identification, the challenged practice must be comprised of incidents that share common features. *Connick*, 563 U.S. at 60 ("[a] pattern of similar constitutional violations" is ordinarily required to support a finding of deliberate indifference); *Gill v. City of Milwaukee*, 850

F.3d 335, 344 (7th Cir. 2017) (faulting the plaintiff for failing to allege examples of misconduct similar to that undertaken by the defendants). For instance, a *Monell* claim could be premised on a prison's longstanding practice of failing to timely review inmate medical requests, *Thomas*, 604 F.3d at 303, or systemic problems in scheduling inmate medical appointments and maintaining medical records, *Daniel v. Cook Cnty.*, 833 F.3d 728, 736 (7th Cir. 2016), or where "the same instruments and methods" of torture are used "on more than two dozen [detainees] in similar circumstances," *Tillman v. Burge*, 813 F. Supp. 2d 946, 978 (N.D. Ill. 2011). These theories hold together because they focus on some logically related incidents or series of acts which the governmental entity should have noticed as a unified whole.

The incidents Terry has cataloged do not exhibit the same meaningful commonalities. Rather, they are no more than isolated instances of reprehensible misconduct. *Gill*, 850 F.3d at 344 ("To succeed on [a] *de facto* custom theory, the plaintiff must demonstrate that the practice is widespread and that the specific violations complained of were not isolated incidents."). If the Supreme Court distinguished the factual bases for different types of *Brady* violations in *Connick*, finding them too dissimilar to form a practice of which the municipality could be on notice, *Connick*, 563 U.S. at 62–63, then here, the specific types of medical care that were not provided in varied contexts cannot be fused together by the content-free phrase "ignoring medical needs," *Phelan*, 463 F.3d at 790 (plaintiff's allegations of harassment and discrimination did not make a *Monell* claim because she "failed to weave these separate incidents together into a cognizable policy").

Indeed, Terry has alleged no more than that Defendants failed in their general constitutional duty to provide adequate medical care to those in their custody. This is not permissible. *Carter v. Morris*, 164 F.3d 215, 218–19 (4th Cir. 1999) ("The challenged policy or custom cannot merely be the abstract one of violating citizens' constitutional rights."). The district court in *Tillman* put it well when it said, "[i]n establishing the existence of [] a policy or practice, it is insufficient to 'splatter-paint a picture of scattered violations' through 'collateral accusations of marginally related incidents.'" *Tillman*, 813 F. Supp. 2d at 978 (quoting *Carter*, 164 F.3d at 218–19). As a result, Terry's cited incidents cannot collectively be laid at the feet of the County and Armor under the *Monell* banner.

Terry counters that the incidents cited in the complaint are workable comparators because they involve similar conduct—ignoring requests or obvious needs for medical care—even though the resulting injuries were different. (Docket #103 at 13). The Court agrees that defining a challenged practice does not depend on the quality or severity of the injury suffered. But what *is* important is that the *conduct* in each instance alleged to support the existence of the practice be sufficiently similar to place municipal policymakers on notice of the existence of the practice and the risk of harm. *Strauss v. City of Chicago*, 760 F.2d 765, 769–70 (7th Cir. 1985) (holding that the plaintiff must allege facts showing a "systemic" problem based on prior, similar instances of misconduct); *Thomas v. City of Markham, Ill.*, No. 16 CV 08107, 2017 WL 4340182, at *4 (N.D. Ill. Sept. 29, 2017) ("[A]llegations of general past misconduct or allegations of dissimilar incidents are not sufficient to allege a pervasive practice and a defendant's deliberate indifference to its consequences."). Terry concedes this, stating that she must "allege incidents that are caused by *the same or similar unconstitutional*

*conduct* and which give rise to an inference that a larger custom or practice existed." (Docket #103 at 13) (emphasis added). Yet she cannot describe the series of acts that she believes constitute the challenged practice except at the highest level of generality. If a practice is too expansively defined, as Terry's is, it becomes nonsensical to charge a municipal entity with notice of such a practice. *Freeman v. City of Crown Point*, No. 2:13–CV–059 JD, 2014 WL 545511, at *10 (N.D. Ind. Feb. 11, 2014) (a plaintiff cannot tie together disparate instances of misconduct that "would encompass nearly every activity of the [police] department," as it "deprives the [municipality] of the notice to which it is entitled as to what policies it maintains that deprived [the plaintiff] of his rights").

Terry's citations to *Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006), and *King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012), help demonstrate the deficiency in her pleading. In *Davis*, the plaintiff alleged harm arising from a practice of failing to provide timely methadone treatment for inmates who needed it. *Davis*, 452 F.3d at 693. The Seventh Circuit found that she was not required to prove specifics about each instance of neglect, such as the length of delay. *Id.* at 694. Instead, she adequately proved, through testimony of institution officials, that delay was part of the routine practice. *Id.* at 695. In *King*, the Court of Appeals allowed a *Monell* claim based on a county's decision to delegate medical care to a private provider despite having notice that the provider was taking prisoners off medications without physician oversight. *King*, 680 F.3d at 1020–21. By contrast, even

when viewed favorably, Terry's allegations here do not establish any sort of recognizable routine conduct that led to harm.[7]

The consent decree and Shansky's reports fail to fill the gap. Terry does not describe what types of medical mistreatment led to Shansky being engaged as Medical Monitor for the Jail. She does not say when or how often he produced reports, or what specific problems he identified. He appears to have expressed concerns about inadequate staffing which led to delays in care or insufficient care. But Terry's case concerns much more than staffing problems; it also purports to cover instances where available staff were on notice of a need for care and willfully ignored it. Indeed, that is precisely the problem that occurred during Terry's own ordeal.

Shansky's reports are unlike the governmental reports leveraged in *Shields v. City of Chicago*, No. 17 C 6689, 2018 WL 1138553, at *4 (N.D. Ill. Mar. 2, 2018), and *Listenbee v. City of Harvey*, No. 11 C 03031, 2013 WL 5567552, at *4 (N.D. Ill. Oct. 9, 2013), which documented specific allegations of misconduct closely related to those suffered by the plaintiffs. The fact that the Jail is under general scrutiny concerning the provision of medical care cannot serve as the hook for any later *Monell* claim also touching on medical treatment. *See Carmona v. City of Chicago*, Case No. 15-CV-462, 2018

---

[7]Terry comes closest to a helpful analogue in *Piercy v. Warkins*, 14 CV 7398, 2017 WL 1477959, at *12 (N.D. Ill. Apr. 25, 2017), where the district court permitted a broad *Monell* theory that a prison medical care provider would "cut corners in all aspects of providing care." Yet *Piercy* is distinguishable on its facts. There, although the plaintiff drew on many dissimilar instances of medical mistreatment to support his view that there existed a pattern of cutting corners, the incidents in question were numerous, forming a high percentage of the overall cases of inmate medical care, and they occurred within the span of a few years. *See id.* at *4–5. Here, Terry proffers fewer incidents—despite attacking a far larger detention facility than that in *Piercy*—over more than double the time span.

WL 306664, at *3 (N.D. Ill. Jan. 5, 2018) ("Plaintiff's broad citation to [a] 160-page [Department of Justice] report, without any discussion of the specific findings of the report or any allegations connecting the report findings to the misconduct alleged in his Complaint, is insufficient to support his *Monell* claim."). As a result, Terry has not identified a cognizable practice that can be challenged through a *Monell* claim.

### 3.3    Terry's *Monell* Theory Fails to Establish Causation

Terry's *Monell* theory falters not only on cohesion but also on causation. Her primary retort to Defendants' motions shows why. She says that Defendants cannot avoid *Monell* liability by providing such uniformly abysmal medical care at the Jail that it becomes difficult to define the problematic conduct with specificity. (Docket #103 at 9–10). But whether Defendants provide poor medical care to all inmates is not a relevant consideration; Terry must allege that an identifiable practice directly caused *her* injury, which arose during childbirth. *Harris*, 489 U.S. at 391. It does not matter if other inmates, harmed in other ways, might bring successful *Monell* claims tethered to their mistreatment. Terry's belief that all Jail inmates receive constitutionally inadequate medical care does not mean that she can sue to remedy all of it at once. *Brown*, 520 U.S. at 404 (a *Monell* plaintiff must show "a direct causal link between the municipal action and the deprivation of federal rights" visited upon him).

The Supreme Court addressed this very problem decades ago in *Tuttle* when it said:

> [s]ome limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter. Obviously, if one retreats far enough from a constitutional violation some municipal "policy" can be

> identified behind almost any such harm inflicted by a municipal official; for example, Rotramel would never have killed Tuttle if Oklahoma City did not have a "policy" of establishing a police force. But *Monell* must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was "caused" by the municipal "policy." At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged.

*Tuttle*, 471 U.S. at 823. Terry's claim that there is a policy of ignoring inmate medical needs in diverse, truly unrelated circumstances amounts to no more than the policy of "establishing a police force" that *Tuttle* forbade. As the County aptly notes, "'[i]nadequate care'—alleged in the broadest sense, encompassing all medical conditions, and spanning decades—is simply not a plausible policy on which to base a *Monell* claim." (Docket #109 at 5). In Terry's case in particular, there is no reasonable basis on which to infer that such an ill-defined policy directly caused her injury.

Terry's *Monell* theory is comparable to that rejected in *Chaparro*. There, the plaintiff challenged his arrest under the Fourth Amendment. *Chaparro*, 2008 WL 68683, at *2. He further alleged that the police misconduct surrounding his arrest was enabled by a "code of silence" in the department whereby officers would not suffer discipline for misconduct. *Id.* He cited two decades' worth of alleged police misconduct covering a variety of situations having nothing to do the arrest conduct in his case, including misconduct allegations against officers not involved in his arrest, inadequate oversight of officers, allegations of torture, and abandonment of a software program intended to predict misconduct by officers. *Id.*

The court found that this *Monell* claim failed both in terms of definition and causation. *Id.* First, the alleged practice was based on "tenuously related instances of police misconduct" that were "so multifarious that the allegations do not identify a discrete policy or custom." *Id.* at *3. Indeed, "[u]nder [plaintiff's] logic, any instance of police misconduct would be 'caused' by the 'code of silence,' because any misconduct could be linked to an officer's imputed belief he could escape punishment." *Id.* The alleged custom was so overbroad that it "collapse[d] into *respondeat superior*, an outcome explicitly forbidden by the Supreme Court." *Id.* Second, the plaintiff's wide-ranging *Monell* theory did not plausibly suggest a link between the municipal policy and his injury. *Id.* The policy of "lawlessness" among police officers was "so nebulous that any connection to a particular constitutional violation [was] highly attenuated." *Id.*

Terry's *Monell* claim fails for similar reasons. First, it proves too much: nearly any medical mistreatment at the Jail could emanate from a practice of ignoring medical needs. Indeed, according to Terry, Defendants' practice can be expressed in such disparate circumstances as: (1) failing to properly examine an inmate with a serious medical condition; (2) failing to provide proper medication to an inmate with a serious medical condition; (3) failing to respond to inmates who have requested medical attention or medication; (4) failing to respond to inmates who exhibit obvious signs of a serious medical condition; and (5) failing to adequately staff the Jail with correctional and medical personnel necessary to respond to inmate medical needs. (Docket #1 ¶ 75). Because of its massive breadth, Terry's *Monell* theory strays too close to being the functional equivalent of *respondeat superior*. *Chaparro*, 2008 WL 68683, at *3.

Additionally, the connection between Terry's injury during childbirth and the challenged practice of ignoring inmates' medical needs is too highly attenuated, since ignoring medical needs also includes failure to observe suicidal ideation, failure to medicate or treat a variety of ailments, and failure to monitor inmates. Like the code of silence in *Chaparro*, the link between a practice of ignoring medical needs and any particular instance of medical mistreatment—including Terry's own ordeal—is too nebulous to say that such a practice was the "moving force" behind the mistreatment. *Id.*

It must be remembered that *Monell* does not authorize "a roving commission to root out and correct whatever municipal transgressions [the court] might discover—[the court's] role is to decide concrete cases." *Carter*, 164 F.3d at 218. No matter how horrendous the state of healthcare may be at the Jail, Defendants cannot be haled into court by Rebecca Terry to answer for every one of their alleged bad practices. Her recovery is limited to particular practices that were the moving force behind her injury. *Tuttle*, 471 U.S. at 817. A referendum on the overall quality of medical care at the Jail is a question for another day.

### 3.4 *White* Does Not Lower Terry's Pleading Standard

The Court well appreciates that it is assessing this case from the posture of a motion for judgment on the pleadings, where Terry's allegations enjoy an assumption of truth and the benefit of all reasonable inferences therefrom. It further understands that *Monell* claims, despite being inherently complex, are not subject to a heightened pleading burden. *White*, 829 F.3d at 843–44; *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000); *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination*

*Unit*, 507 U.S. 163, 164 (1993). But even so, the Court cannot say that Terry has alleged a plausible *Monell* claim.

Determining the plausibility of a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Like the equal-protection *Monell* claim in *McCauley*, which required greater supporting factual content because it was "complicated and counterintuitive," here Terry advances a uniquely expansive *Monell* theory without factual allegations binding the theory together. *McCauley*, 671 F.3d at 619. Given the scope of her *Monell* claim, Terry should have come forward with enough factual heft to unite the cited incidents and support the reasonable inference that they amount to a pervasive governmental practice that was the catalyst for her injury. *Gill*, 850 F.3d at 344; *McCauley*, 671 F.3d at 616 (to state a *Monell* claim, a plaintiff is required to "'plead[] factual content that allows the court to draw the reasonable inference' that the [municipality] maintained a policy, custom, or practice" that deprived her of her constitutional rights) (quoting *Iqbal*, 556 U.S. at 678). She did not, and so her claim cannot survive even the generous review afforded at the pleading stage. *Foy v. City of Chicago*, No. 15 C 3720, 2016 WL 2770880, at *9 (N.D. Ill. May 12, 2016) (dismissing *Monell* claim based on series of deaths at a police station where the circumstances of the deaths did not "share substantive similarities" and thus could not rise to the level of a "well-settled" practice).

*White v. City of Chicago*, 829 F.3d 837 (7th Cir. 2016), a case heavily relied upon by Terry, does not suggest a different result. There, the plaintiff, White, was arrested pursuant to a warrant. *Id.* at 840. The warrant was obtained by Chicago police officers, who submitted a criminal complaint to a state judge. *Id.* The complaint form contained spaces for personal details

of the offender and a brief description of the alleged offense, but the common practice in the department was to simply identify the offense rather than provide factual details about the offense conduct. *Id.* This practice was followed by O'Donnell, the attesting officer in White's case. *Id.* White alleged that the information O'Donnell submitted in the form was insufficient, standing alone, to support a probable cause finding, and by extension the department's practice of filling out the form in this way gave rise to a *Monell* claim. *Id.* at 841 ("White also alleges a *Monell* claim against the city for the allegedly widespread practice of seeking arrest warrants on the basis of the conclusory complaint forms.").

The district court dismissed the *Monell* claim because it was "based upon the sole allegation that [the attesting officer] acted in accordance with a widespread practice of the police department of the City of Chicago when seeking a warrant." *Id.* at 843. The Seventh Circuit disagreed that this was too conclusory a statement under the circumstances. *Id.* at 844. The Court of Appeals explained:

> White alleged in his amended complaint: "In accordance with a widespread practice of the police department of the City of Chicago: O'Donnell requested the judge to issue a warrant on the basis of O'Donnell's conclusory allegation that other law enforcement officers claimed or believed plaintiff had committed an offense, and O'Donnell did not present the judge with an affidavit setting out any affirmative allegation of facts that would indicate that plaintiff had committed an offense." Together with the individual claim against O'Donnell and the standard printed form that does not require specific factual support for an application for an arrest warrant, this allegation was enough to satisfy the "short and plain statement of the claim" requirement of Rule 8(a)(2). White was not required to identify every other or even one other individual who had been arrested pursuant to a warrant

> obtained through the complained-of process. *See, e.g., Jackson v. Marion County*, 66 F.3d 151, 152–53 (7th Cir. 1995).

*Id.* Thus, in the Seventh Circuit's view, the otherwise conclusory statement in White's complaint sufficed under Rule 8 because a practice could be inferred from O'Donnell's conduct with respect to White, coupled with the allegation that the department regularly used a standard complaint form that did not demand a constitutionally sufficient amount of information. *Id.*

Terry relies on *White* in an effort to set her pleading bar very low. *See* (Docket #103 at 7–8). She argues that "[a]fter *White*," she need only "allege that the constitutional violation she suffered was one of a larger pattern" in order to survive review under Rule 8. *Id.* Terry's point seems to be that she does not need to give any examples of similar misconduct to plead her *Monell* claim, or that her examples do not need to be comparable.

She is mistaken. To the extent the line of district court decisions Terry cites hold that plaintiffs may proceed on a *Monell* custom theory after *White* if they simply allege the existence of a practice, this Court declines to follow them. *See* (Docket #103 at 7–8). That flies in the face of longstanding precedent that a *Monell* custom theory is not legally sufficient without evidence of a pattern of misconduct. *See Gill*, 850 F.3d at 344.[8]

---

[8]If one could properly plead a *Monell* custom theory by simply offering the talismanic phrase "widespread practice or custom," then *Monell* liability is not the narrowly confined species of liability the Supreme Court intended it to be. Indeed, it is even less fact-bound than many ordinary legal claims. The cost of such an approach is high; as Defendants in this case have several times complained, the volume of discovery dedicated to Terry's *Monell* claim dwarfs that attributable to her individual claim, and the *Monell* claim is so broad it essentially will require production of every record of every instance of medical care at the Jail during the requisite time frame. *See Armour v. Country Club Hills*, Case No. 11 C 5029, 2014 WL 63850, at *7 (N.D. Ill. Jan. 8, 2014) (rejecting *Monell* claim premised on "virtually all the activities of a police department and every contact it has with the

More to the point, it appears those courts and Terry simply misunderstand *White*. The allegations in that case, though brief, were not conclusory. The "practice" challenged in *White* involved not only a practice—officers offering conclusory assertions regarding the subject offense—but also an express policy—Chicago's adoption of a standard criminal complaint form that required insufficient information for a probable cause determination. Utilizing a constitutionally deficient standard form amounted to an affirmative act of wrongdoing by the municipality that did not need to be implemented in order to be challenged. *See Tuttle*, 471 U.S. at 822 ("Obviously, it requires only one application of a[n] [unconstitutional express] policy. . .to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy."). Stated another way, the municipality in *White* could be culpable because it engaged in its own affirmative misconduct coupled with its indifference to the misconduct of its officers.

This made *White* unique, and it helps explain why the otherwise conclusory *Monell* allegations worked in that instance. *White* does not condone conclusory *Monell* allegations, nor is it *carte blanche* for plaintiffs to attribute every constitutional violation they suffer to a municipal practice without corroborating factual allegations.[9]

---

public," amounting to a "boundless" claim that was "the epitome of a fishing expedition").

[9]The limited reach of the holding in *White* is confirmed by its citation to *Jackson*. In *Jackson*, the plaintiff brought a *Monell* claim arising out the municipal entity's efforts to cover up misconduct by its employees. *Jackson*, 66 F.3d at 152. The Seventh Circuit noted that "proof of a single act of misconduct will not suffice" when the governmental entity is alleged to have notice of an ongoing problem and

### 4.    CONCLUSION

For the reasons stated above, Terry's *Monell* claims against the County and Armor based on a practice of ignoring inmate medical needs must be dismissed. However, Terry correctly observes that, upon request, a plaintiff must usually be given one chance to amend deficient allegations before they are dismissed with prejudice. (Docket #103 at 12 n.3); *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013). Accordingly, the Court will afford Terry **ten (10) days** to craft an amended complaint curing the deficiencies the Court has identified.[10]

---

failed to rectify it. *Id.* However, when a complaint charges a municipality "with having engaged in improper conduct directly," as the *Jackson* plaintiff alleged, "then the drawing of an inference from a series of bad acts by subordinate officers is not required." *Id.* at 152–53. Because of this, when the court in *White* said that "White was not required to identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process," that statement could only be referring to instances of affirmative misconduct by the municipal entity, as was the case in *Jackson*. *White*, 829 F.3d at 844. In *White* itself, that misconduct was Chicago's choice to use an obviously inappropriate standard criminal complaint form.

Terry's case undoubtedly falls within the first category of *Jackson*; she claims that Armor and the County should have noticed the repeated failure to provide medical care and should have done something to remedy it. Nowhere does she claim that Defendants directly engaged in a cover-up or other misconduct related to medical care at the Jail. Thus, Terry's reliance on *White*'s holding, when properly considered in the context of *White*'s own cited authority, is misplaced.

[10]Terry alleges that she has learned in discovery of a Jail practice of allowing inmates to return to the Jail from a hospital without proper documentation of their condition or required follow-up care. (Docket #103 at 5). Terry believes this occurred to her in 2014. *Id.* Such an allegation may form an alternative *Monell* claim that inmates who return from a hospital are not adequately cared for, but for reasons adequately covered above, Terry's *Monell* claim about ignoring inmate medical needs ranges well beyond that circumstance. If she desires to craft a narrower *Monell* claim based on this intake procedure, she may attempt to do so. The Court expresses no opinion on the merit of such a theory.

To the extent there remain deficiencies with any amended *Monell* claims, Defendants may raise those challenges in a motion for summary judgment. To accommodate Defendants' need to receive and review an amended complaint prior to filing a motion for summary judgment, the Court will push back the dispositive motion deadline in this case to **July 2, 2018**. In order to ensure that the Court has sufficient time to consider any such motions prior to trial, any response to a motion for summary judgment must be filed no later than **twenty-one (21) days** after the motion is filed, and any reply may be filed no later than **seven (7) days** after the filing of the response.

Also addressed in the parties' briefs is the posture of Defendant David Clarke, the former Milwaukee County Sheriff. For claims against Clarke in his official capacity, the acting Milwaukee County Sheriff, Richard R. Schmidt ("Schmidt"), has been substituted in his place by operation of law, *see* Fed. R. Civ. P. 25(d), and Terry has agreed to dismiss her claims against Clarke in his personal capacity, (Docket #103 at 19). Thus, the Court will dismiss Clarke from the case and direct that Schmidt be added to the case caption.

Accordingly,

**IT IS ORDERED** that Defendant Armor Correctional Health Services' motion for judgment on the pleadings (Docket #81) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Milwaukee County's motion for judgment on the pleadings (Docket #77) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's *Monell* claim against Defendants Milwaukee County and Armor Correctional Health Services

based on a widespread custom or practice of ignoring inmates' serious medical needs be and the same is hereby **DISMISSED**;

IT IS FURTHER ORDERED that Plaintiff may file an amended complaint addressing the deficiencies the Court identified herein no later than **ten (10) days** from the date of this Order;

IT IS FURTHER ORDERED that any dispositive motions must be filed no later than **July 2, 2018**. Any response to such a motion must be filed no later than **twenty-one (21) days** after the motion is filed, and any reply may be filed no later **seven (7) days** after the filing of the response. No extensions of these deadlines will be considered; and

IT IS FURTHER ORDERED that Defendant David A. Clarke, Jr. be and the same is hereby **DISMISSED** from this action. Pursuant to Plaintiff's agreement, Plaintiff's personal capacity claims against Clarke be and the same are hereby **DISMISSED**; the Clerk of the Court shall substitute Richard R. Schmidt in place of Clarke on the Court's docket as to Plaintiff's official capacity claims.

Dated at Milwaukee, Wisconsin, this 4th day of June, 2018.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge