UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

_____

REBECCA TERRY,

                    Plaintiff,

v.

COUNTY OF MILWAUKEE, DAVID A.
CLARKE, JR., in his personal and official
capacities, OFFICER BRIAN WENZEL, JANE
AND JOHN DOE, UNKNOWN EMPLOYEES
OF MILWAUKEE COUNTY JAIL, JANE AND
JOHN DOE, UNKNOWN JAIL
SUPERVISORS, ARMOR CORRECTIONAL
HEALTH SERVICES, CAROLYN EXUM,
MORGAN BEVENUE, MARGARET
HOOVER, JANE AND JOHN DOE,
UNKNOWN EMPLOYEES OF ARMOR
CORRECTIONAL HEALTH SERVICES,
JANE AND JOHN DOE, UNKNOWN ARMOR
HEALTHCARE SUPERVISORS,

                    Defendants.

Case No.:  17-cv-1112-JPS

_____

**INDEX OF UNPUBLISHED CASES FOR DEFENDANT ARMOR CORRECTIONAL
HEALTH SERVICES' RULE 79(D) MOTION TO SEAL EXHIBIT F OF
DECLARATION OF PAIGE MCCREARY AND EXHIBITS A AND C OF
DECLARATION OF JOHN MAY, M.D., FILED JULY 2, 2018**

_____

*Ratajczak v. Beazley Solutions Ltd.*,
    No. 13-C-045, 2013 U.S. Dist. LEXIS 180988 (E.D. Wis. Dec., 23, 2013)

*Chapman v. Raemisch*,
    No. 05-C-1254, 2009 U.S. Dist. LEXIS 13276 (E.D. Wis. Feb. 20, 2009)

*EEOC v. Orion Energy Sys.*,
    No. 14-CV-619, 2015 U.S. Dist. LEXIS 86428 (E.D. Wis. July 2, 2015)

*Severson v. Heartland Woodcraft, Inc.*,
    No. 14-C-1141, 2015 U.S. Dist. LEXIS 153872 (E.D. Wis. Nov. 12. 2015)

*FTC v. OSF Healthcare Sys.*,
    No. 11 C 50344, 2012 U.S. Dist. LEXIS 48068 (N.D. Ill. 2012)

***Bayer Healthcare, LLC v. Norbrook Labs., Ltd.***,

No. 08-C-0953, 2009 U.S. Dist. LEXIS 105078 (E.D. Wis. Oct. 22, 2009)

Dated this 31st day of August, 2018.

*/s/ Paige L. McCreary*

Michael P. Russart
State Bar No. 1023128
Mollie T. Kugler
State Bar No. 1093318
Paige L. McCreary
State Bar No. 1114252
Attorneys for Defendant Armor Correctional
Health Services
**HINSHAW & CULBERTSON LLP**
100 E. Wisconsin Avenue
Suite 2600
Milwaukee, WI 53202
Phone No. 414-276-6464
Fax No. 414-276-9220
E-mail Address(es):
mrussart@hinshawlaw.com
mkugler@hinshawlaw.com
pmccreary@hinshawlaw.com

302454739v1 1003420


# Ratajczak v. Beazley Solutions Ltd.

United States District Court for the Eastern District of Wisconsin

December 23, 2013, Decided; December 23, 2013, Filed

Case No. 13-C-045

**Reporter**

2013 U.S. Dist. LEXIS 180988 *; 2013 WL 6817308

DANIEL J. RATAJCZAK, JR., ANGELA RATAJCZAK, SCOTT A. RATAJCZAK, and ELIZABETH RATAJCZAK, Plaintiffs, v. BEAZLEY SOLUTIONS LIMITED, R-T SPECIALTY, LLC, and MESIROW FINANCIAL, INC., Defendants.

**Prior History:** *Ratajczak v. Beazley Solutions Ltd., 2013 U.S. Dist. LEXIS 69192 (E.D. Wis., May 15, 2013)*

## Core Terms

seal, allegations, good cause, documents, coverage, portions, parties, denial letter, lawsuit, first amended complaint, public record, third party, confidential, Settlements, patients, redacted, motions

**Counsel:** **[*1]** For Daniel J Ratajczak, Jr, Scott A Ratajczak, Angela Ratajczak, Elizabeth Ratajczak, Plaintiffs: Christopher J Krawczyk, Jon E Fredrickson, LEAD ATTORNEYS, Benjamin R Prinsen, Stephen E Kravit, Kravit Hovel & Krawczyk SC, Milwaukee, WI; Mark M Leitner, Pia Anderson Dorius Reynard & Moss, Milwaukee, WI.

For Beazley Solutions Limited, Defendant: Jonathan C Medow, Michael J Gill, Mayer Brown LLP, Chicago, IL; Jonathan T Smies, Winston A Ostrow, Godfrey & Kahn SC, Green Bay, WI.

**Judges:** William C. Griesbach, Chief United States District Judge.

**Opinion by:** William C. Griesbach

## Opinion

### ORDER

Plaintiffs have filed motions to seal two documents pursuant to the Protective Order issued in this case.

(ECF Nos. 36 & 45.) Plaintiffs filed this action seeking relief in part for defendant Beazley's alleged breach of an insurance policy. On or about May 15, 2012, Beazley issued Plaintiffs a policy ("the Policy") covering aspects of the sale of Plaintiffs' interests in Packerland Whey Products, Inc. (Packerland Whey) to Packerland Whey Intermediary Holding Group, Inc. (Packerland Holding). (Second Am. Compl., ¶ 29, ECF No. 51.) Approximately seven months after the sale, Packerland Holding terminated the employment of Angela and Daniel **[*2]** Ratajczak and accused plaintiffs of wrongdoing in connection with the business activities of Packerland Whey. (*Id.* ¶ 46.) Packerland Holding sent a draft complaint to Plaintiffs asserting potential claims against them, and Plaintiffs settled these claims with Packerland Holding in December 2012. (*Id.* ¶¶ 47, 64.) Plaintiffs subsequently sought indemnification from Beazley under the Policy, and Beazley issued a letter denying coverage on March 5, 2013. (*Id.* ¶ 67.)

Plaintiffs seek to seal two documents: (1) the Acquisition Agreement between Plaintiffs and Packerland Holding, and (2) portions of Beazley's coverage denial letter. Parties seeking to file documents under seal must show "good cause" for withholding the material from the public record. *Civil L.R. 79(d)(4)*. In order to show good cause to file a document or a portion under seal, the party requesting protection must "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations." *Baxter Int'l, Inc. v. Abbott Labs., 297 F.3d 544, 548 (7th Cir. 2002)*. The mere fact that a party would prefer to keep information confidential is not a sufficient reason for sealing it once it is entered into **[*3]** the public record, *Union Oil Co. of California v. Leavell, 220 F.3d 562, 567 (7th Cir. 2000)*, and similarly, agreement by the parties does not suffice to maintain information under seal, *see Union Oil Co. of Cal. v. Leavell, 220 F.3d 562, 567 (7th Cir. 2000)* (". . . the tradition that litigation is open to the public is of very long standing."). Provided good cause is shown, parties may seal documents to protect their own interests or

interests of third parties. *See, e.g, Bank of Am., N.A. v. First Mut. Bancorp of Ill., No. 09-5108, 2010 U.S. Dist. LEXIS 73973, 2010 WL 2921845, at *1 (N.D. Ill. July 22, 2010)* ("The court will protect financial information about 'third party borrowers,' that is, people and entities who are not parties to this case."); *U.S. ex rel. Tucker v. Nayak, No. 06-662, 2008 U.S. Dist. LEXIS 26422, 2008 WL 907432, at *2 (S.D. Ill. Apr. 2, 2008)* (granting plaintiff's motion to seal the names of physician defendant's patients to maintain the patients' privacy).

First, in conjunction with Plaintiffs' first amended complaint, Plaintiffs sought to seal the "Acquisition Agreement," which memorializes Daniel and Scott Ratajczak's sale of their interests in Packerland Whey. (ECF No. 36.) Plaintiffs filed under seal a full unredacted **[*4]** version of the Policy, which included the Acquisition Agreement labeled as Appendix C. (ECF Nos. 39 & 39-1.) Since the second amended complaint is now the operative complaint in this action, Plaintiffs' motion to seal the Acquisition Agreement (ECF No. 36) now refers to a document that is no longer operative. Accordingly, the Policy containing the Acquisition Agreement filed with the first amended complaint (ECF Nos. 39 & 39-1) will be kept under seal, but if Plaintiffs seek to file any portion of the Policy under seal in the future, they will be required to show good cause.

Second, Plaintiffs seek to seal redacted portions of Beazley's coverage denial letter. (ECF Nos. 45 & 47.) Specifically, Plaintiffs seek to seal (1) the price Packerland Holding paid to acquire Packerland Whey, and (2) specific descriptions of fraud allegedly perpetrated by various plaintiffs in connection with the operation and sale of Packerland Whey. Plaintiffs assert that the redacted portions of the letter contain "unsubstantiated and disputed allegations made in a threatened, but non-filed complaint," and that these allegations "have the potential to cause irreparable damage to the ongoing business of Packerland **[*5]** Whey Products, Inc. if allowed to enter the public domain." (Pl's Mot. to Seal at 3, ECF No. 45.) Defendants take no position at this time with respect to Plaintiffs' request.

The court will grant Plaintiffs' motion to seal portions of the coverage denial letter, at least for now. It appears clear that part of the reason Plaintiffs agreed to settle the threatened lawsuit prior to filing was to keep the potentially damaging allegations from becoming public. To unnecessarily make the allegations public would discourage similar settlements in the future. Settlements serve the public interest by avoiding the costs of litigation. While it is doubtful that the allegations in the underlying threatened lawsuit can ultimately be kept confidential in light of the allegations of Plaintiffs' lawsuit against the defendants, there is no need for disclosure at this time. Based on these considerations, Plaintiffs' motions are granted.

**SO ORDERED** this 23rd day of December, 2013.

/s/ William C. Griesbach

William C. Griesbach, Chief Judge

United States District Court

---

**End of Document**

⚠ Caution
As of: August 31, 2018 4:04 PM Z

# *Chapman v. Raemisch*

United States District Court for the Eastern District of Wisconsin

February 20, 2009, Decided; February 20, 2009, Filed

Case No. 05-C-1254

**Reporter**
2009 U.S. Dist. LEXIS 13276 *; 2009 WL 425813

WILLIAM B. CHAPMAN, Plaintiff, v. RICK RAEMISCH, Defendant.

**Prior History:** *Chapman v. Raemisch, 2008 U.S. Dist. LEXIS 57875 (E.D. Wis., July 31, 2008)*

## Core Terms

inmate, urinalysis, paruesis, tests, summary judgment, accommodation, alternate, recommended, deliberate indifference, urine sample, staff, seal, defense motion, diagnosed, medical condition, testing procedures, medical record, psychological, parties, random, drug testing, confidential, alleviate, documents, services

**Counsel:** **[*1]** William B Chapman, Plaintiff, Pro se, Redgranite, WI.

For Rick Raemisch, Defendant: Mary E Sheehan, LEAD ATTORNEY, Wisconsin Department of Justice, Office of the Attorney General, Madison, WI.

**Judges:** LYNN ADELMAN, District Judge.

**Opinion by:** LYNN ADELMAN

## Opinion

### *ORDER*

Plaintiff, William B. Chapman, filed this pro se civil rights action under *42 U.S.C. § 1983*. In an order dated July 21, 2006, I allowed plaintiff to proceed in forma pauperis on an official capacity claim against the Secretary of the Wisconsin Department of Corrections (DOC) for a violation of his *Eighth Amendment* rights. Specifically, plaintiff, who has been diagnosed with paruesis, contends that any DOC policy that requires him to provide a urine sample constitutes deliberate indifference to his serious medical condition. Before me

now are defendant's motion for summary judgment, plaintiff's motion opposing defendant's motion for summary judgment, and plaintiff's request that his medical records be kept confidential.

## I. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Preliminary Matters

Plaintiff filed a motion opposing defendant's motion for summary judgment. Plaintiff's motion was filed without proposed findings of fact or any supporting affidavits and, **[*2]** consequently, is not a proper motion for summary judgment. Moreover, plaintiff has not filed a separate document purporting to respond to the claims advanced by defendant in support of his motion for summary judgment. Thus, I will construe plaintiff's motion as a response to defendant's motion and I will consider the arguments set forth in plaintiff's filing when addressing defendant's motion for summary judgment. Plaintiff's motion will be terminated.

### B. Summary Judgment Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (emphasis deleted). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must

relate to [*3] a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*, courts should act with caution in granting summary judgment, *Anderson, 477 U.S. at 255.* When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id. at 248.*

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp., 477 U.S. at 323.* Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the non-moving party's case, the moving party may satisfy his initial burden simply by pointing out the absence of evidence. *Id. at 325.* Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id. at 322-23.* Neither party may rest on mere allegations or denials in the pleadings, *Anderson, 477 U.S. at 248,* or upon conclusory [*4] statements in affidavits, *Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1572 (7th Cir. 1989).*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* However, it is "not required to draw every conceivable inference from the record -- only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).*

## C. Facts [1]

Defendant is the Secretary of the Wisconsin Department of Corrections (DOC). Plaintiff is a state prisoner who is currently incarcerated at Redgranite Correctional Institution (RGCI).

RGCI maintains an ongoing drug testing program that includes random testing of no less than [*5] 5% (approximately 46 to 47 inmates) of the inmate population based on a computer-generated selection process. RGCI uses urinalysis for its random drug testing. When an inmate is selected for random testing, a staff member pat searches the inmate and then escorts him to the restroom or cell to utilize the toilet. The staff member collecting the sample must accompany the inmate and observe the sample being taken to make sure it is provided directly from the inmate and is not altered in any way.

If an inmate refuses to provide a urine sample or is unable to provide at least 30 milliliters, he is informed that his refusal constitutes a violation of Wis. Admin. Code § DOC 309.59 and that he will be subject to disciplinary action for the use of intoxicants. If an inmate is unable to provide a sample immediately, he is informed that he has two hours to provide a sample. Staff will strip search and seat the inmate in an interview room where he can be observed at all times. The inmate is given no more than eight ounces of water per hour upon request during the two-hour period. If, after two hours have elapsed, the inmate still will not produce a sample, the inmate is then considered to have [*6] refused and he is issued a conduct report, which may result in the same penalty as if he tested positive. [2]

On January 18, 2005, plaintiff wrote a letter to the RGCI psychiatrist and said he had "a very embarrassing problem" and requested psychiatric assistance for his problem. (DPFOF PP 43, 44; Marcellino Aff., Ex. 1002, pp. 45-47.) Plaintiff explained that he had "a very serious problem giving UA [urinalysis] samples" and that he had this problem even before he came to prison. (DPFOF P 43.) In his letter, plaintiff requested an alternate test, such as blood or hair samples, and even offered to pay for the alternate testing. Plaintiff wrote that he could provide "no logical reason" why he had this problem. (DPFOF P 44.) He explained [*7] that he would be in prison for a few more years and he did not want to end up in segregation in the future because he could not provide a urine sample within the two hour

---

[1] The facts are taken from Defendant's Proposed Finding of Fact and the supporting affidavits and exhibits. Plaintiff has not filed a response to defendant's proposed findings of fact, and his response to defendant's motion for summary judgment is not sworn. However, plaintiff's complaint is sworn, and I will construe it as an affidavit at the summary judgment stage. *Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996).*

[2] For example, on January 8, 2005, plaintiff was unable to timely provide a urinalysis sample. As a result, he was issued a conduct report and sentenced to disciplinary separation. Plaintiff appealed, and the warden reduced his disciplinary separation from 60 days to 30 days; he was released to the general population on January 27, 2005. This conduct report was later removed from plaintiff's record on the recommendation of the Psychological Services Unit.

time limit.

On February 9, 2005, plaintiff met with Dr. Marcellino, a psychologist at RGCI. Plaintiff described the feeling he gets when having to urinate in the presence of others as "anxiety, it's like doing a test you haven't studied for." (DPFOF P 48.) Dr. Marcellino diagnosed plaintiff as suffering from paruesis, a form of social anxiety disorder that is defined as difficulty or inability to urinate due to anxiety associated with factors such as time pressure, being observed, others being close by, or when traveling on a moving vehicle. [3] (DPFOF P 49). Plaintiff averred in his complaint that his medical condition causes him "physical and mental pain during these urinalysis tests." (Compl. at 6.) Dr. Marcellino developed a treatment plan for plaintiff that included a recommendation that plaintiff implement visualization and systematic desensitization approaches to alleviate his paruesis. Dr. Marcellino met with plaintiff again on March 3, 2005, and he recommended that plaintiff check out and read a self-help book [*8] on paruesis that had recently been ordered for the RGCI library. [4]

During the summer of 2005, RGCI developed an alternate urinalysis procedure with input from security personnel and psychological services to accommodate selected inmates who have been diagnosed with a mental condition that is relevant to this accommodation. Under the alternate urinalysis procedure, the inmate will be given two hours to produce a urine sample and will be offered fluids consistent with the present policy. An officer will accompany the inmate to the bathroom where the inmate is strip searched. However, the inmate is permitted to use the bathroom stall, with the door closed, in order to produce a urine sample. The officer will stand outside the stall while the inmate produces the urine sample, and the officer will not engage in unnecessary conversation so as to maximize the inmate's subjective impression that he is not [*9] being observed. If the inmate is unable to produce a urine sample with these accommodations, RGCI's present policy will prevail. The Psychological Services Unit (PSU) provides the names of inmates who require accommodation to the security director, and the security director ensures that the appropriate staff is told of these accommodations and the appropriate action to follow.

On September 14, 2005, plaintiff wrote to Dr. Marcellino indicating that he had received a letter informing him that RGCI had a new testing policy for inmates diagnosed with paruesis. (DPFOF P 57; Marcellino Aff., Ex. 1002, pp. 32-34.) Plaintiff stated that his understanding of the letter was that inmates are still required to provide a UA sample with "an officer standing right in back of us." (DPFOF P 57.) Plaintiff questioned "why anyone in your department would authorize this, knowing someone has a condition that PREVENTS him from providing a UA sample with someone watching??" (DPFOF P 57.) Plaintiff also questioned why the PSU would not tell security to provide alternate tests for those inmates with paruesis. Plaintiff stated, "I just can't do these tests at all." (DPFOF P 57.)

On October 17, 2005, plaintiff [*10] wrote to PSU supervisor Barbara Seldin. (DPFOF PP 24, 60.) Plaintiff's letter stated, in part:

> On September 9, 2005, I received a letter … informing me that RGCI now has implemented a new urinalysis testing procedure for those of us with SAD-P.
>
> …
>
> As I asked Dr. Marcellino, please *REMOVE* my name from this "list", and please let me know, in writing, that my name is off the list. I do not wish to be part of this new RGCI urinalysis testing procedure.
> This new procedure is more like punishment for having SAD-P.
> In my opinion, it will only INCREASE the psychological symptoms of SAD-P, and in addition, cause those of us here with this condition, embarrassment and ridicule from staff and other inmates. This, alone with strip searches, is not what I call treatment, or help, for this condition I have.

(Marcellino Aff, Ex. 1002, p. 30 (emphasis in original).) Seldin wrote to plaintiff on October 18, 2005. She stated that he had received plaintiff's October 17, 2005 letter requesting that his name be removed from the list of inmates who require special accommodations for random urinalysis as directed by the PSU. (DPFOF P 61.) Seldin assured plaintiff that no specific diagnostic information had been [*11] communicated about inmates on the special accommodations list, but she advised plaintiff that she would remove his name from

---

[3] Paruesis is defined as "inhibited urination, especially in the presence of others." *Stedman's Medical Dictionary* 1329 (27th ed. 2000).

[4] On September 22, 2005, Dr. Marcellino checked with the RGCI librarian and learned that plaintiff had not yet checked out the recommended book. (DPFOF P 59.)

the list. (DPFOF P 61.) Seldin also encouraged plaintiff to work with Dr. Marcellino because paruesis is "eminently treatable." (Marcellino Aff., Ex. 1002, p. 29.)

On October 20, 2005, plaintiff again wrote to Seldin. Plaintiff's letter stated, in part:

> I asked the Warden and you and your staff for help regarding this problem I have (to authorize an alternate form of drug testing for me such as blood, hair or saliva tests) (these tests WOULD alleviate the psychological symptoms of SAD-P), I even offered to pay for these alternate tests myself.
>
> Your "treatment" for me consisted of a two line statement from Dr. Marcellino stating "Mr. Chapman should implement the visualization and systematic desensitization approaches to alleviating his Paruesis." The second step of your "treatment" for me was the new RGCI urinalysis testing procedure which, without going through its specifics, only INCREASES the psychological symptoms of my condition.
>
> You diagnosed me with a legitimate medical condition called SAD-P, which prevents me from completing these urinalysis tests, AND causes [*12] both physical and mental discomfort when taking these urinalysis tests, YET you STILL force me to take these same urinalysis tests that CAUSE the symptoms of the condition YOU diagnosed me with ???? What kind of sense does that make?

(Marcellino Aff., Ex. 1002, p. 27)(emphasis in original). Plaintiff's letter later argues: "Your letter makes it look like I'm refusing treatment. You've offered me NO treatment; PSU's actions towards me are like punishment for having this condition." (Marcellino Aff., Ex. 1002, p. 28.)

On November 1, 2005, Seldin responded to plaintiff's October 20 letter. She wrote:

> Your 10/20/05 letter to me indicates that you do not have a complete and accurate understanding of the treatment options available to you.
>
> On 2/9/05 Dr. Marcellino reviewed with you certain visualization and systematic desensitization approaches to alleviating your condition. He recommended that you practice these procedures in addition to reading a self-help book entitled, "The Shy Bladder Syndrome: Your Step-by-Step Guide to Overcoming Paruesis." He indicated that you should submit an Interview Request to follow up with him after you followed these recommendations.

> Dr. Marcellino saw you again [*13] for an interview on 3/3/05. He again encouraged you to read "The Shy Bladder Syndrome" and told you that the library had obtained a copy of the book. You indicated to him that you found some relief in knowing that others suffer from this disorder, that it has a name, and that it can be treated.
>
> On 9/23/05 Dr. Marcellino followed up with the librarian and was informed that you had not checked out the recommended book as of that date. Also you have not requested any further help from Dr. Marcellino.
>
> Contrary to your assertion that you have not received treatment for your condition, it is rather easy to see that in fact treatment opportunities have been provided to you. You have not followed up on any of the recommendations. You need to make a more serious effort to follow the recommended treatment as it is the best option available to you at this time.
>
> The special accommodations which were offered are still available to you should you change your mind.

(DPFOF P 63; Marcellino Aff., Ex. 1002, p. 26.)

Plaintiff met with Dr. Marcellino on November 29, 2005 and informed Dr. Marcellino that he did not want to be on clinical monitoring. Dr. Marcellino recommended a change in plaintiff's classification [*14] to MH-0 based on plaintiff's request and his refusal of offered services. Dr. Marcellino told plaintiff he still has access to PSU services even if he is not on clinical monitoring. He also showed plaintiff the Paruesis self-help book, reminded plaintiff it is in the RGCI library, and advised plaintiff that he is welcome to contact PSU for assistance in addressing his paruesis.

Plaintiff is not currently identified on RGCI security's "selected inmates" list by the PSU as an inmate diagnosed with a mental condition that would require the alternate random urinalysis procedure that is used to accommodate selected inmates. Since December 2005, plaintiff has been randomly drug tested seven times; he has provided a urine sample each time.

## D. Analysis

Defendant argues that RGCI has not been deliberately indifferent to plaintiff's needs, either in its treatment of plaintiff's paruesis or its development of the alternate urinalysis procedure. Rather, defendant contends that plaintiff has rejected every accommodation attempt

because plaintiff wants a different type of accommodation, one that does not involve the provision of a urine sample. Defendant asserts that just as "a mere disagreement with the **[\*15]** course of the inmate's medical treatment does not constitute an *Eighth Amendment* claim of deliberate indifference," *Snipes v. DeTella, 95 F.3d 586, 591 (7th Cir. 1996),* nor does a mere disagreement with the reasonable accommodation made in RGCI's drug testing policy constitute an *Eighth Amendment* claim of deliberate indifference.

Deliberate indifference to serious medical needs of prisoners violates the *Eighth Amendment*, which applies to the states through the *Fourteenth Amendment. Lee v. Young, 533 F.3d 505, 509 (7th Cir. 2008)* (citation omitted). The *Eighth Amendment* prohibits punishments that are incompatible with "evolving standards of decency that mark the progress of a maturing society." *Id.* (quoting *Trop v. Dulles, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958)).* In order to prevail on a deliberate indifference claim, plaintiff must show (1) that his condition was "objectively, sufficiently serious" and (2) that the "prison officials acted with a sufficiently culpable state of mind." *Lee, 533 F.3d at 509* (quoting *Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)).* A medical condition is serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even **[\*16]** a lay person would perceive the need for a doctor's attention." *Greeno, 414 F.3d at 653.* "With respect to the culpable state of mind, negligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense." *Lee, 533 F.3d at 509.*

In this case, it is undisputed that plaintiff has been diagnosed with a serious medical condition, paruesis. Therefore, this case boils down to a determination of whether "prison officials acted with a sufficiently culpable state of mind" that constitutes deliberate indifference. *See id.* (quoting *Greeno, 414 F.3d at 652*).

Plaintiff concedes that the DOC has responded to his concerns by implementing a modified urinalysis testing procedure. However, he asserts that the modified test is still a urinalysis testing procedure and he "just can't do these tests at all." (Marcellino Aff., Ex. 1002, p. 33.) Plaintiff repeatedly argues that there are alternate forms of drug testing available, including tests of the blood, hair, sweat and saliva. He is not challenging the DOC's "right to drug test him," nor is he refusing to be drug tested; he is "simply requesting an alternate form of drug test due to his medical condition." (Compl. at 6.)

Defendant's **[\*17]** reliance on *Snipes* is appropriate because plaintiff wants to choose the type of drug test to which he is subjected and disagrees with the accommodations provided to him. *See 95 F.3d at 591.* In effect, the accommodation offered to plaintiff during RGCI's random drug testing is part of the treatment for plaintiff's medical condition. Although RGCI's alternate test procedure still requires a urine sample, neither the RGCI policy, nor its implementation, are deliberately indifferent to the needs of inmates with paruesis. In fact, the alternate test was developed with PSU staff with paruesis in mind. Even if plaintiff would prefer a form of testing that did not include urinalysis, it does not follow that any urinalysis test constitutes deliberate indifference to his paruesis.

The PSU staff also gave plaintiff a number of treatment options to help him alleviate or overcome his medical condition, including visualization and desensitization techniques, counseling and access to a self-help book about paruesis. The record is replete with efforts to treat plaintiff's paruesis and correspondence between plaintiff and PSU staff. Plaintiff repeatedly argues his conclusion that it is deliberate indifference **[\*18]** to subject a person with paruesis to any urinalysis test, but he has submitted no admissible evidence showing defendant's deliberate indifference. In a letter to the PSU, plaintiff argued: "Your letter makes it look like I'm refusing treatment. You've offered me NO treatment; PSU's actions towards me are like punishment for having this condition." (Marcellino Aff., Ex. 1002, p. 28.) That is only argument, though, not evidence, and it simply reflects plaintiff's disagreement with the treatment and accommodation RGCI provided. In contrast, defendant has shown that RGCI staff responded promptly to plaintiff's initial inquiry about his problem, provided him with ongoing treatment, even when plaintiff refused to follow treatment recommendations, and went so far as to create an alternate urinalysis testing procedure to accommodate inmates with paruesis. This is not deliberate indifference, "but a deliberate decision by a doctor to treat a medical need in a particular manner." *Snipes, 95 F.3d at 591.*

## II. PLAINTIFF'S REQUEST

Plaintiff filed a request asking that his medical records be kept confidential. Before sealing any part of the record of a case, I must make a determination of good cause. **[\*19]** *See Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co., 178 F.3d 943, 944 (7th Cir. 1999).* Although defendant has not opposed plaintiff's request,

it is improper to delegate the decision to seal portions of a record to the parties by giving them a virtual carte blanche to seal whatever portions of the record they want to seal. *See id.* "The parties to a lawsuit are not the only people who have a legitimate interest in the record compiled in a legal proceeding." *Id.*

Plaintiff's certified medical and mental health records were filed on August 7, 2008, as Exhibit 1002, Part 1 and Exhibit 1002, Part 2 to Docket # 80, the Affidavit of Robert L. Marcellino, Psy.D. As such, the plaintiff's medical records have been available through CM/ECF and PACER since that time. I note that plaintiff has put his health at issue in this litigation and thereby waived physician-patient privilege. *Wis. Stat. § 905.04(4)(c)*. However, I recognize plaintiff's concerns regarding the availability of his sensitive medical and mental health information in a public forum. I conclude that there is good cause to place plaintiff's certified medical records under seal, but the good cause does not extend to those **[*20]** portions of the records so relevant to plaintiff's claim that they have been cited or quoted by the parties or the court in other documents.

Therefore, I will fashion a hybrid remedy. To the extent that information from the medical records is incorporated into other documents filed by the parties or orders issued by this court, that information will remain visible to the public. I will place the source documents themselves under seal, though. I will order the Clerk of Court to make the exhibits to docket # 80 unavailable on-line. The Clerk of Court shall take the paper copies of these documents in the court's file and seal them in an envelope conspicuously marked "SEALED" and treat them as confidential. *See General L.R. 79.4(b) (E.D.Wis.)*.

## III. CONCLUSION

**For the foregoing reasons,**

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Docket # 77) is **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiff's motion opposing defendant's motion for summary judgment (Docket # 85) is **TERMINATED.**

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

**IT IS ALSO ORDERED** that plaintiff's request for

medical records to be kept confidential (Docket # 84) is **GRANTED** as **[*21]** discussed above.

**IT IS FURTHER ORDERED** that the Clerk of Court shall make the exhibits to docket # 80 unavailable on-line. The Clerk of Court also shall take the paper copies of these documents in the court's file and seal them in an envelope conspicuously marked "SEALED" and treat them as confidential.

Dated at Milwaukee, Wisconsin, this 20 day of February, 2009.

/s/

LYNN ADELMAN

District Judge

---

**End of Document**

 Positive

As of: August 31, 2018 4:05 PM Z

# *EEOC v. Orion Energy Sys.*

United States District Court for the Eastern District of Wisconsin

July 2, 2015, Decided; July 2, 2015, Filed

Case No. 14-CV-619

**Reporter**

2015 U.S. Dist. LEXIS 86428 *; 31 Am. Disabilities Cas. (BNA) 1371; 16 Accom. Disabilities Dec. (CCH) P16-157; 2015 WL 4067776

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, v. ORION ENERGY SYSTEMS, INC., Defendant.

**Subsequent History:** Motion denied by *EEOC v. Orion Energy Sys., 145 F. Supp. 3d 841, 2015 U.S. Dist. LEXIS 153216 (E.D. Wis., 2015)*

Summary judgment granted, in part, summary judgment denied, in part by, Motion granted by *EEOC v. Orion Energy Sys., 2016 U.S. Dist. LEXIS 127292 (E.D. Wis., Sept. 19, 2016)*

## Core Terms

disability, door, accommodate, summary judgment, impairment, wheelchair, diagnosis, permanent, lesions

**Counsel:** **[*1]** For Equal Employment Opportunity Commission, Plaintiff: Camille A Monahan, United States Equal Employment Opportunity Commission, Milwaukee District Office, Milwaukee, WI; Laurie A Vasichek, United States Equal Employment Opportunity Commission, Minneapolis, MN.

For Orion Energy Systems Inc, Defendant: Brian M Radloff, Kevin J Kinney, Ogletree Deakins Nash Smoak & Stewart PC, Milwaukee, WI.

**Judges:** William C. Griesbach, Chief United States District Judge.

**Opinion by:** William C. Griesbach

## Opinion

**DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Equal Employment Opportunity Commission (EEOC) filed this action against Defendant Orion Energy Systems, Inc. (Orion) alleging Orion discriminated against its employee, Scott Conant, on the basis of a disability. Specifically, EEOC claims Orion failed to provide a reasonable accommodation for Conant, who has predominantly used a wheelchair for mobility since October 2009. The complaint also alleges that Orion illegally discharged Conant in January 2010 because of his disability and in retaliation for requesting an accommodation all in violation of the Americans with Disabilities Act (ADA), *42 U.S.C. § 12101 et seq.* Orion has moved for partial summary judgment. **[*2]** (ECF No. 17.) Orion seeks dismissal of the failure-to-accommodate claim, but not the claims arising out of the alleged discharge because of disability or retaliation. For the reasons below, the motion will be denied.

### BACKGROUND

Scott Conant started working in information technology (IT) at Orion, a commercial lighting manufacturer, on June 8, 2009. On Friday, September 25, 2009, Conant suffered an injury while exercising on a range of motion machine in the company fitness room. Conant experienced a sudden weakness in his legs and later spasms in his right hand. Because the rest of the Orion work force had left the building for the weekend, Conant did not report the incident right after it happened. He went home, where his symptoms persisted. He did report the incident to Lisa Storm in Orion's Human Resources Department on Monday, September 28, 2009. Storm suggested Conant talk to Orion's fitness coordinator, who in turn took Conant to see Physician's Assistant Heather James, who worked on Orion's premises. James performed tests and called a spinal surgeon at Holy Family Hospital and arranged a medical consultation and same-day MRI of Conant's lumbar spine. Conant met with Dr. Ronald **[*3]** Manning on

September 30, 2009, but the doctor could not explain Conant's symptoms based on the MRI.

On October 2, 2009, Conant had a neurological consultation with Dr. Krishna Bhatt, who explained based on additional MRIs taken the day before that Conant had a lesion in the spinal cord, possibly caused by multiple sclerosis (MS). She explained that he may have additional lesions on the thoracic spine. Dr. Bhatt told Conant the lesions were causing his mobility problems. In a meeting at Orion later in the first week of October, Physician's Assistant James explained to Conant and his wife that regardless of the final diagnosis, the lesions causing the partial paralysis would remain and Conant should not expect any major improvement of mobility. For the next several months, medical professionals did not reach an official diagnosis as to the cause of Conant's condition. Conant could not walk more than 10-15 feet, however, and he was prescribed a wheelchair that he uses to this day.

Conant began using the wheelchair at work shortly, if not immediately, after the incident. After he started using the wheelchair, Conant's manager, Tom Mrotek, relocated Conant's workspace from the IT bullpen **[*4]** in the production center to the Tech Center in the main office building at Orion. The Tech Center had two elevators whereas the IT bullpen required workers to walk up stairs. The Tech Center was accessible via an employee entrance adjacent to a surface parking lot with three disabled parking stalls.

On October 15, 2009, Conant wrote a memo to Mrotek requesting additional accommodations. Conant proposed that he work part-time from home. In a meeting with Mrotek the next day, Conant also described his difficulties getting in the building and bathrooms and requested that power assisted doors be installed. Conant did not provide any specific medical diagnosis or prognosis because he had not yet been given any himself. In another meeting on October 28, Mrotek approved a flexible working schedule that would allow Conant to have time in the afternoon to attend medical appointments and also approved a special phone for Conant's home that would facilitate his working from home on occasion. Conant asked whether anything could be done about the doors, such as lowering the door pull tension, delaying the closure of the door, or installing door openers or assists. Mrotek relayed the request to Human **[*5]** Resources Director Kari Tylke, who wrote the following email to Mrotek and Conant on October 29:

Hi Tom and Scott,

Thank you for the outline and I agree with the arrangements. . . .

I will discuss accessibility issues with [Mike Potts, Orion's Executive Vice President] and let you know how we can accommodate the entrance and exit difficulties as soon as possible. In the meantime, it is possible for one of your coworkers to assist you in coming and going from the building? I will work on this immediately.

Thank you,

-Kari

(ECF No. 22-2 at 1.) Conant responded to the email right away that he could probably find someone to open the door for him. (*Id.*)

After a meeting between Tylke and Potts, Orion decided not to install any automatic door openers. EEOC submits that Tylke made that decision around the first week of November 2009, but that she never informed Conant that his accommodation request had been denied. Orion disputes this and says Tylke decided to take a "wait-and-see approach" on the automatic door request to see if Conant's medical condition improved. (Def.'s Resp. to Pl.'s Prop. Findings of Fact ¶ 56, ECF No. 31.) In other words, Orion submits that Tylke did not really deny the request, **[*6]** but only decided not to take immediate action based on the limited information Orion had about Conant's condition. Orion's understanding was that Conant was being driven to work and that whoever was driving him to work could open the employee door for him, as was discussed in the Tylke-Conant email exchange. (Def.'s Prop. Findings of Fact ¶ 45, ECF No. 18.) In fact, Conant began driving himself to work at some point after making his requests for accommodations, but Orion did not know that. According to EEOC, Conant believed based on her email that Tylke was working on the door openers so he simply parked his car as close to the entrance as he could and waited at the door for someone to let him in or he tried to open the door himself. He says he injured his thumb while trying to get in on one such occasion. He also states that he had to wheel himself across a snow-packed parking lot to the door because he could not use the disabled parking spaces in the employee parking lot. This was because he did not have a handicapped parking permit for his vehicle and because Orion never consented for him to park there. Conant also never asked for Orion's consent to use the handicapped parking spaces, **[*7]** however, and as noted above, Orion did not even know Conant was driving himself to work.

Orion states that Tylke suggested to Conant that he use his company-provided cell phone to call the receptionist at the on-site medical clinic to open the door, and Orion also asserts that if Conant's driver or a receptionist was not available to open the door, Conant could have called another Orion employee, including Tylke. Conant never called for assistance, however. When asked why he never called anyone at Orion to open the door, Conant testified in his deposition that he figured everyone was busy. (*Id.* ¶ 50.)

In late December 2009 or early January 2010, after Conant complained to his new supervisor, Kyle Frost, that he was isolated from his team, EEOC states that Frost told Conant to start attending meetings back in the IT bullpen. Conant claims he agreed to do so if the accessibility issues could be worked out (because the IT bullpen required climbing stairs), but he was fired the next day on January 14, 2010. He was told that his position was being outsourced. (Pl.'s Prop. Findings of Fact ¶ 72.)

## ANALYSIS

Summary judgment must be entered when "there is no genuine dispute as to any material fact **[*8]** and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a)*. A failure-to-accommodate claim under the ADA requires a prima facie showing that (1) the individual is a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability. *Cloe v. City of Indianapolis, 712 F.3d 1171, 1176 (7th Cir. 2013)*. For purposes of the present motion, Orion does not dispute Conant's evidence that he was a qualified individual with a disability. Orion asserts that it is entitled to summary judgment on the failure-to-accommodate claim because EEOC cannot establish the second and third elements.

Orion concedes, as it must, that it knew Conant was in a wheel chair, but argues that it did not know whether his condition was permanent or only temporary due to an injury he suffered while exercising. As the EEOC points out, however, the ADA does not require that a limitation be permanent or long-term before it is considered a disability that must be accommodated. Under the 2008 ADA Amendments Act (ADAAA), a person with an impairment that substantially limits a major life activity, or a record of one, is disabled, even if the impairment is "transitory and minor" (defined as lasting six months or less). **[*9]** *42 U.S.C. § 12102(3)(B)* (Only paragraph

(1)(C) of the definition of disability "shall not apply to impairments that are transitory and minor."); *29 C.F.R. § 1630.2(j)(1)(ix)*. Likewise, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *42 U.S.C. § 12102(4)(D)*. *Gogos v. AMS Mechanical Systems, Inc., 737 F.3d 1170, 1172 (7th Cir. 2013)*. Thus, the fact that Orion did not know that Conant's limitation was permanent does not mean it was unaware of his disability.

It is likewise immaterial that Orion did not know the precise nature of Conant's disability. Precise knowledge of the cause of the disability is not required to establish a failure to accommodate claim. Here, Orion was aware that Conant needed a wheel chair for more than a month. *See Hedberg v. Indiana Bell Telephone Co., Inc., 47 F.3d 928, 932 (7th Cir. 1995)* ("It is true that an employer will automatically know of many disabilities. For example, an employer would know that a person in a wheelchair, or with some other obvious physical limitation, had a disability."). The company knew he did not fracture a bone or injured a knee or ankle. Most sports or exercise injuries of a temporary nature would require use of crutches, not a wheel chair for more than a month. Here, Conant suffered significant muscle weakness and an MRI taken early on showed lesions on his spinal cord. A reasonable jury **[*10]** could infer from these facts that Orion knew that Conant was disabled notwithstanding the absence of a definitive diagnosis.

The same is true of the third element—whether Orion failed to reasonably accommodate Conant. Orion argues that it was waiting for a definitive diagnosis so that it could decide if it was economically reasonable to incur the expense of installing door assists so that Conant could enter and leave the building where he worked without needing assistance of others. Orion's argument seems to be that at the time it fired Conant, it was still not clear whether his condition was permanent. As noted above, permanent impairment is not required. Whether Orion's delay was reasonable would likewise appear to be a jury question, dependent upon the totality of the facts and circumstances. But even if Orion's delay was reasonable, it does not follow that it is entitled to summary judgment. If the jury finds, as the EEOC has alleged, that Orion terminated Conant's employment rather than retain him as an employee and provide the door assists, it would constitute both a failure to accommodate and wrongful discrimination and retaliation. In other words, it would appear that all three **[*11]** of the EEOC's claims rise or fall together.

For all of these reasons, Orion's motion for partial summary judgment is denied. EEOC's motion to seal (ECF No. 23) is granted because the materials subject to the seal request contain personal, confidential information regarding Conant's medical condition.

SO ORDERED this 2nd day of July, 2015.

/s/ William C. Griesbach

William C. Griesbach, Chief Judge

United States District Court

◆ Positive

As of: August 31, 2018 4:05 PM Z

## *Severson v. Heartland Woodcraft, Inc.*

United States District Court for the Eastern District of Wisconsin

November 12, 2015, Decided; November 12, 2015, Filed

Case No. 14-C-1141

**Reporter**

2015 U.S. Dist. LEXIS 153872 *; 32 Am. Disabilities Cas. (BNA) 552; 2015 WL 7113390

RAYMOND SEVERSON, Plaintiff, v. HEARTLAND WOODCRAFT, INC., Defendant.

**Subsequent History:** Affirmed by *Severson v. Heartland Woodcraft, Inc., 2017 U.S. App. LEXIS 18197 (7th Cir. Wis., Sept. 20, 2017)*

## Core Terms

lifting, second-shift, essential function, positions, accommodation, employees, surgery, reasonable accommodation, light-duty, summary judgment, disability, withdraw, summary judgment motion, return to work, pounds, vacant, sanctions, duties, terminated, contends, qualified individual, discovery, defense motion, amend, shop, seal, reallocating, performing, requires, defense counsel

**Counsel:** **[*1]** For Raymond Severson, Plaintiff: James A Walcheske, Jesse R Dill, LEAD ATTORNEYS, Kelly L Temeyer, Scott S Luzi, Walcheske & Luzi LLC, Brookfield, WI.

For Heartland Woodcraft Inc, Defendant: David A McClurg, Petrie & Stocking SC, Milwaukee, WI.

**Judges:** LYNN ADELMAN, District Judge.

**Opinion by:** LYNN ADELMAN

## Opinion

### DECISION AND ORDER

Plaintiff Raymond Severson filed a complaint alleging claims under the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA"). Before me now are several motions: (1) the defendant's motion for summary judgment on plaintiff's ADA claims; (2) the

defendant's separate motion for summary judgment on plaintiff's FMLA claims; (3) the defendant's motion for sanctions under *Federal Rule of Civil Procedure 11* against plaintiff's counsel, and (4) the plaintiff's motion to amend his complaint to withdraw the FMLA claims and amend certain other allegations in the complaint.

### I. BACKGROUND

Severson has been suffering from back issues since 2005. In 2006, he began working for the defendant, Heartland Woodcraft, Inc. Heartland manufactures shelves, tables, cabinets, and other fixtures used by retail stores to display merchandise, such as apparel. Severson was initially hired as a supervisor and was later promoted **[*2]** to "shop superintendent." In 2010, Severson was promoted to "operations manager," which was a position that involved more supervisory and administrative responsibilities than his prior positions.

By the middle of 2013, Severson's supervisors had decided that he was not meeting expectations as an operations manager. At a meeting on June 5, 2013, Patrick Koness, the president of Heartland, and Douglas Lawrence, the general manager of Heartland, informed Severson and that they were relieving him of the operations-manager position. However, at that same time, Heartland was in the process of expanding its second-shift operations to accommodate a significant increase in orders, and it wanted to find a new "second shift lead." In Heartland's view, the person who currently held that position, Curtis Strnad, was not performing well enough to handle the expanded operation. Heartland thought that Severson would be a good fit for the second-shift lead, and it offered him the job at the June 5th meeting. That job represented a demotion from the operations-manager position.

Also at the June 5th meeting, Severson informed Koness and Lawrence that he was experiencing severe back pain. The pain was not **[*3]** caused by a

workplace injury. At Koness's suggestion, Severson went home for the day.

A few days later, on June 9th, Severson informed Heartland that he would accept the job as second-shift lead. However, Severson was still at home with back pain at that time, and thus he did not report to work to begin performing the job. On June 10th, Severson began submitting notes from his doctor indicating that he would be unable to report for work due his back pain. Over the course of the next month or two, it became apparent that Severson had a serious back problem. In early July, Severson notified Heartland that he was exercising his right to take a leave of absence under the FMLA. Severson asked Heartland to record that his FMLA leave began on June 5, 2013, and Heartland did so. Severson remained on leave for the full twelve-week period allowed under the FMLA.

In mid-August, Severson notified Heartland that he was scheduled to have back surgery on August 27, 2013, the same day on which his FMLA leave would expire. He asked that Heartland provide him with an additional two months of medical leave following his surgery. Severson also informed Heartland that there was some chance he would need [*4] a second surgery, and that if he did need it, he would have to take an additional month's leave.

Severson made his request for additional leave to Jennifer Schroeder, Heartland's human-resources manager. After discussing Severson's request with a human-resources consultant, Schroeder presented it to Koness. Koness, in turn, decided that Heartland could not extend Severson's leave of absence by an additional two or three months. According to Koness, he made this decision because Heartland could not afford to have Strnad, who was performing poorly, remain in the second-shift lead position during Severson's extended leave, and that therefore Heartland could not hold that position open for Severson. Rather, Heartland needed to find someone to replace Strnad as soon as possible. Koness states that he gave some thought to hiring a temporary replacement for Strnad pending Severson's return but ultimately decided not to do so because it would have been hard to find a qualified candidate to fill the job temporarily, and because he did not want to train a temporary employee. Koness decided that Severson's employment would be terminated at the end of his FMLA leave, but that he would be invited [*5] to reapply for a job at Heartland once his doctors released him to return to work.

On August 26, 2013, Schroeder and Lawrence called Severson and informed him that he was being terminated as of August 28, 2013. Schroeder followed up with a letter containing the same information and inviting Severson to reapply at Heartland after his doctor released him to return to work. Severson did not accept that invitation. He commenced this action, alleging that Heartland failed to reasonably accommodate his back issues and therefore terminated him in violation of the ADA. Heartland has moved for summary judgment on this claim.

In his original complaint, Severson also alleged that Heartland intentionally interfered with his rights under the FMLA and terminated him in retaliation for exercising his FMLA rights. About halfway through discovery in this case, Heartland's counsel drafted a motion for Rule 11 sanctions and served it on Severson's counsel. In compliance with the safe-harbor provision of *Rule 11(c)(2)*, Heartland's counsel did not at that time file the motion with the court. In the motion, Heartland's counsel argued that Severson's FMLA claims lacked reasonable evidentiary and legal support and therefore were [*6] filed in violation of *Rule 11(b)*. Heartland also argued that several of the complaint's factual allegations lacked evidentiary support: its allegation that Severson could have returned to work "immediately" after his surgery in some capacity, and its allegation that Severson had told Heartland prior to the surgery that he could return to work immediately after the surgery in some capacity.

Within 21 days of service of the Rule 11 motion, plaintiff's counsel sent a letter to defendant's counsel in which she stated that the plaintiff would agree to amend his complaint, in part. The plaintiff agreed to withdraw his allegations that he could have returned to work immediately after the surgery and that he had told Heartland he could have returned to work immediately after the surgery. The plaintiff also agreed to withdraw his claim for FMLA interference. As to the claim for FMLA retaliation, counsel stated that the plaintiff would reassess the claim following the completion of discovery. Plaintiff's counsel proposed to file, at the close of discovery, an amended complaint making the changes stated in the letter.

Defendant's counsel did not respond to plaintiff's counsel's letter, and the parties continued [*7] with discovery. A few weeks before the close of discovery, and about two months before the deadline for filing dispositive motions, the defendant filed a motion for summary judgment on the plaintiff's FMLA claims and

also the motion for Rule 11 sanctions that it had previously served on plaintiff's counsel. Plaintiff's counsel then sent defendant's counsel an email reminding him that the plaintiff had agreed to withdraw most of the claims and allegations addressed in those motions. In addition, plaintiff's counsel stated that the plaintiff was now prepared to withdraw the FMLA retaliation claim. She attached a proposed stipulation of dismissal in which both of the FMLA claims would be dismissed with prejudice. Defendant's counsel refused to stipulate to the dismissal of the FMLA claims unless plaintiff agreed that the dismissal would not prevent the defendant from pursuing its motion for sanctions. The plaintiff would not so agree, and thus the parties did not execute the stipulation. Instead, the plaintiff filed a motion for leave to amend his complaint to withdraw the FMLA claims. The defendant opposes the motion to amend.

## II. DISCUSSION

I will first address the defendant's motion for summary **[*8]** judgment on the ADA claim. I will then address the defendant's motion for summary judgment on the FMLA claim, its motion for sanctions, and the plaintiff's motion to amend his complaint.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

### A. ADA Claim

The ADA provides that a covered employer shall not "discriminate against a qualified individual on the basis of disability." *42 U.S.C. § 12112(a)*. "Discrimination," for the purposes of *§ 12112(a)*, includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." *42 U.S.C. § 12112(b)(5)(A)*. To establish a claim for failure to accommodate, a plaintiff must show that he is a "qualified individual with a disability." *EEOC v. Sears,*

*Roebuck & Co., 417 F.3d 789, 797 (7th Cir.2005)*. A qualified individual is defined as "an individual who, with or without reasonable **[*9]** accommodation, can perform the essential functions of the employment position." *42 U.S.C. § 12111(8)*. The plaintiff has the burden of proving that he was a "qualified individual" at the time of his termination. *Stern v. St. Anthony's Health Ctr., 788 F.3d 276, 285 (7th Cir. 2015)*.

Heartland does not dispute that Severson was disabled within the meaning of the ADA, or that he satisfied the basic prerequisites for the second-shift lead position, "such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Id. However, Heartland contends that no reasonable jury could find that Severson could have performed the essential functions of the second-shift lead position (or any other vacant position at Heartland) at the time of his termination, with or without reasonable accommodation. In this regard, Heartland contends that an essential function of the second-shift lead position was the ability to lift heavy items, which was something that Severson would not have been able to do for approximately two months after his surgery.

Severson concedes that, as things looked prior to his surgery, he would not have been able to do much of the lifting associated with the second-shift lead position for some time after his back surgery. He also **[*10]** concedes that the second-shift lead is generally required to lift heavy items. Severson Dep. at 84:19-22, ECF No. 54-1. However, Severson contends that lifting was only a marginal function of the position, not an essential function, and that Heartland could, as a reasonable accommodation, have reallocated his lifting duties to other employees until his lifting restrictions were lifted. See *Stern, 788 F.3d at 290-91* (explaining that reallocating marginal functions can be a reasonable accommodation but that reallocating essential functions is not). Severson contends that with this reasonable accommodation he could have performed all of the essential functions of the second-shift lead position "shortly after [his] back surgery." Severson Decl. ¶ 29, ECF No. 52.

Under the ADA, the factors a court should consider to determine whether a particular duty is an essential function include the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences." *Stern, 788 F.3d at 285* (quoting *Gratzl v. Office of the Chief Judges, 601 F.3d 674, 679 (7th*

Cir.2010)); see 29 C.F.R. § 1630.2(n)(3). The employer's judgment is an important factor, but it is not controlling; the court also looks to [*11] evidence of the employer's actual practices in the workplace. Id. (quoting Miller v. Ill. Dep't of Transp., 643 F.3d 190, 198 (7th Cir.2011)).

According to Heartland's written job description, the second-shift lead "performs manual labor in the production area," "operates and troubleshoots machinery," "perform[s] minor repairs as necessary," and "maintains the building." ECF No. 46-2. The job description also states that the position involves various administrative and supervisory duties, such as "convey[ing] all production priorities to second shift personnel," "assur[ing] that productivity expectations are met on 2nd shift," and "complet[ing] daily production logs." Id. Under a section entitled "working conditions," the job description states:

> Working conditions are normal for a manufacturing environment. Work may involve frequent lifting of materials and product of 50 pounds, or occasionally more. Occasional physical exertion is required. Assisting in the loading of trucks, moving materials, or generally helping others will be required from time to time.

Id.

Koness and Lawrence describe the second-shift lead as being a "working lead" position, by which they mean that the person holding the job has "general responsibility for ensuring that production and quality expectations are met on the [*12] 2nd shift" but also must assist subordinates with manufacturing tasks. See Koness Aff. ¶ 17, ECF No. 25; Lawrence Aff. ¶ 7, ECF No. 46. Koness and Lawrence identify several lifting tasks for which the second-shift lead is responsible. One of the duties of this position is to "stage" the production projects that will be performed during the shift. Koness Aff. ¶ 18. This involves identifying the work that will be performed during the shift and the raw materials and other inputs that will be needed for the production associates to perform their tasks, and then retrieving those materials and inputs from other parts of the facility and transporting them to the production area. In the course of staging, the second-shift lead will have to pull raw materials, including sheets of particle board weighing up to 170 pounds and stacks of pre-cut panels, to the production area. In addition to staging, the second-shift lead works directly with assemblers and machine operators to set up and operate equipment, and to fabricate and assemble materials into finished

products. This work regularly involves lifting equipment, raw materials, fixture components, and finished fixtures weighing from 30 pounds [*13] to over 50 pounds, and assisting in lifting fixture components and completed fixtures weighing from 100 to over 300 pounds. Koness Aff. ¶ 19; see also Lawrence Aff. ¶¶ 8-12. Koness states that "[a] Lead subject to a 20 pound lifting restriction would constantly have to pull associates from their own jobs in distant parts of the plant to assist with the routine lifting that is an integral part of the 2nd Shift Lead's duties, and this would severely disrupt production." Koness Aff. ¶ 20.[1]

If the written job description, Koness's and Lawrence's descriptions of the second-shift lead position, and Koness's description of the consequences of employing a lead who was unable to lift more than 20 pounds are accurate, then lifting would be an essential function of the lead position. Cf. Majors v. Gen. Elec. Co., 714 F.3d 527, 534 (7th Cir. 2013); Peters v. City of Mauston, 311 F.3d 835, 845 (7th Cir. 2002); Basith v. Cook County, 241 F.3d 919, 928-29 (7th Cir. 2001).

Severson does not dispute that the second-shift lead is expected to perform the tasks described in the job description, and he does not point to any evidence in the record that contradicts Koness's and Lawrence's descriptions of the second-shift lead's [*15] duties.

---

[1] In addition to the evidence described in the text, Heartland submits affidavits from two individuals, Samuel Barbercheck and Donald Enders, who held the second-shift lead position in 2015. These individuals largely concur with Koness's and Lawrence's descriptions of the job, and they add that they each spent about 90% of their time engaged in physical work involving repeated bending, twisting, and lifting, including the lifting of items weighing between 30 and 100 pounds. See generally ECF Nos. 47 & 48. The plaintiff argues that Heartland cannot use these affidavits to support its motion for summary judgment because it failed to disclose Barbercheck and Enders under **Federal Rule of Civil Procedure 26(a)** and **(e)** until after the close of discovery, [*14] which prevented the plaintiff from deposing them. See Fed. R. Civ. P. 37(c)(1). I agree that the defendant's failure to timely disclose Barbercheck and Enders means that the defendant cannot use information supplied by them in support of its motion for summary judgment. However, because nearly all of the information contained in the affidavits of Barbercheck and Enders is also in the affidavits of Koness and Lawrence, and because the plaintiff does not argue that Koness and Lawrence lack personal knowledge of the aspects of the second-shift lead position they describe in their affidavits, the exclusion of Barbercheck's and Enders's affidavits is inconsequential.

Severson does point to information that Heartland submitted to an insurance company in connection with Severson's application for long-term disability benefits in August 2013. In that application, Heartland stated that lifting building products and transporting materials weighing "50+" pounds were "occasional" functions of the second-shift lead position. ECF No. 54-3 at p. 22 of 37. The form defined "occasionally" as meaning "the person does the activity up to 33% of the time." Id. Severson contends that this information is inconsistent with Heartland's claim that the second-shift lead performed "physical activity" on a regular basis. However, if a person performs a function as much as 33% of the time while on the job, one could fairly say that the person performs the function regularly. Moreover, on the disability form, Heartland identified a number of other physical activities that the second-shift lead performed up to 33% of the time, including pushing, pulling, carrying, climbing, stooping, crouching, and working overhead. When all of these separate tasks are added together, one could easily conclude that the second-shift lead performed physical work more than 33% of the **[*16]** time. Also, the form does not identify how often the second-shift lead lifted less than 50 pounds. Presumably, lifting less than 50 pounds would be a more frequent task. Thus, the insurance form is consistent with Heartland's claim that lifting was an essential function of the second-shift lead position.

Severson does not point to any "evidence of the employer's actual practices in the workplace," *Stern, 788 F.3d at 285*, that suggests lifting is not an essential function of the second-shift lead position. Although Severson was offered that position on June 5, 2013, he never actually performed the job, and there is no evidence in the record that Severson worked on second shift prior to his leave of absence and observed the work performed by the second-shift lead during that time. Thus, Severson has not shown that he has personal knowledge of the amount of lifting the position required in practice or the consequences of requiring other employees to perform the lifting normally done by the second-shift lead.[2] See *Fed. R. Civ. P. 56(c)(4)*. Nor has Severson submitted declarations or deposition testimony from others who worked on second shift that

contradicts Koness's and Lawrence's descriptions of the amount of lifting the lead performed **[*17]** or Koness's statement that reallocating the lead's lifting duties would disrupt production.[3]

In his declaration, Severson **[*18]** contends that his duties as shop superintendent were similar to those of the second-shift lead, and that he was able to perform the essential functions of the superintendent position with a fifteen-pound lifting restriction between November 2010 and January 2011. Severson Decl. ¶¶ 33-36. However, as just discussed, Severson has not shown that he has personal knowledge of the duties of the second-shift lead, and thus his assertion that the duties of the lead were similar to those he performed as shop superintendent is inadmissible on summary judgment. *Fed. R. Civ. P. 56(c)(4)*. Koness and Lawrence have submitted their own affidavits in which they explain that the duties of the two positions are not similar and that the second-shift lead performs much more physical activity than the shop superintendent. Supp. Koness Aff. ¶¶ 8-15, ECF No. 59; Supp. Lawrence Aff. ¶¶ 4-11, ECF No. 62. And in their affidavits, Koness and Lawrence explain that they have personal knowledge of the day-to-day activities performed by both the second-shift lead and the shop superintendent. Supp. Koness Aff. ¶ 3; Supp. Lawrence Aff. ¶¶ 3-4.[4] Thus, Severson's

---

[2] Of course, because Severson was offered and accepted the job as second-shift lead, he likely had a general idea of what the position entailed. But the important point is that, so far as the record reveals, Severson has not observed the "actual practices" performed by the second-shift lead in the workplace. *Stern, 788 F.3d at 285*.

---

[3] Severson notes that Heartland does not submit declarations or other evidence from persons either holding or directly supervising the second-shift lead in 2013 as evidence of the amount of lifting performed by the lead at that time. See Pl.'s Br. at 7 n. 11, ECF No. 49. But if Severson thinks that those persons would contradict Koness's or Lawrence's descriptions of the job, then it would be his burden to submit such evidence in opposition to Heartland's motion for summary judgment. The plaintiff does not contend that Lawrence or Koness lack personal knowledge of the essential functions performed by the second-shift lead in 2013, and their affidavits lay a foundation showing that, in fact, they have such personal knowledge. See Koness Aff. ¶ 16, Lawrence Aff. ¶ 6.

[4] Some of Lawrence's statements in his supplemental affidavit appear to be based on hearsay—i.e., based on reports he received from other employees rather than his own observations, see Supp. Lawrence Aff. ¶¶ 3 & 6, and thus those statements may be inadmissible for lack of personal knowledge. But see *Fed. R. Evid. 803(6)* (hearsay exception for records of regularly conducted activity). However, Koness's affidavit is based on his own observations, see Supp. Koness Aff. ¶ 9 ("it has been my expectation and observation . . ."), and thus it is admissible. Even if Lawrence's supplemental affidavit were excluded, Koness's supplemental affidavit would be sufficient to support the conclusion that the second-shift lead

assertion that the second-shift lead position required no more lifting than the **[\*19]** shop superintendent position does not create a genuine factual dispute over whether lifting was an essential function of the lead position.

Severson also offers an affidavit from a former operations manager, Roy Desimone, who worked with Severson while he was the shop superintendent. ECF No. 56-11. Desimone states that, during that time, Severson "worked as an administrator, rather than a 'worker bee.'" ¶ 6. Again, however, the position of second-shift **[\*20]** lead is different than shop superintendent, and as discussed above, the admissible evidence establishes that the lead position involved more manual labor than the shop superintendent position. Thus, Desimone's observations concerning the amount of physical activity Severson performed while he was a shop superintendent do not create a genuine factual dispute.

Accordingly, Heartland is entitled to summary judgment on the issue of whether lifting was an essential function of the second-shift lead position. Because lifting was an essential function, requiring Heartland to reallocate Severson's lifting duties to other employees would not have been a reasonable accommodation. See _Majors, 714 F.3d at 535-35_ (having another person perform an essential function of the job is, as a matter of law, not a reasonable accommodation); _Peters, 311 F.3d at 845-46_ (reallocating lifting duties to other employees is not a reasonable accommodation when lifting is an essential function of the job); _Basith, 241 F.3d at 929-30_ (ADA does not require employer to reallocate the essential functions of the job).

Severson next contends that he was a qualified individual because he could have _eventually_ performed the essential functions of the second-shift lead position, including lifting, if **[\*21]** Heartland would have allowed him to continue his leave of absence for an additional two or three months after surgery. However, the case law in the Seventh Circuit provides that a person is not a "qualified individual" if his disability prevents him from performing the essential functions of his job for months at a time. _Byrne v. Avon Prods., Inc., 328 F.3d 379, 380-81 (7th Cir. 2003)_ ("Inability to work for a multi-month period removes a person from the class protected by the ADA."); see also _Basden v. Prof'l Transp., Inc., 714 F.3d 1034, 1037 (7th Cir. 2013)_ ("A plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and

---

performed more lifting than the shop superintendent.

thus cannot be a qualified individual for ADA purposes."). To be sure, the cases recognize that if a disability involves an "intermittent condition" that requires occasional time off for "brief periods," such as a few days or a couple of weeks, then a person may be a qualified individual, and granting the person brief periods of leave may be a reasonable accommodation. _Byrne, 328 F.3d at 380-81; Haschmann v. Time Warner Entm't Co., 151 F.3d 591, 599-601 (7th Cir. 1998)._ But at the time Heartland terminated Severson's employment, he had been unable to perform any of the essential functions of the second-shift lead position for three months, and he would remain unable to perform some of the essential functions of the position **[\*22]** for an additional two or three months. Thus, at the time of his termination, which is the time that matters, see _Basden, 714 F.3d at 1037_ (whether person is a qualified individual is examined as of the time of the adverse employment decision at issue), Severson was not a qualified individual, and the ADA did not require Heartland to grant him an additional two or three months off as a reasonable accommodation.[5]

Severson next contends that the ADA required Heartland to provide him with temporary, light-duty work—such as supervising and training employees, bagging screws, and assembling lighter-weight fixtures—until he was able to perform the essential functions of the second-shift lead position. Heartland does not maintain any full- or part-time light-duty positions at its facility, and the plaintiff concedes that Heartland would have had to create a light-duty position for him by temporarily reallocating various functions normally performed by other employees. Pl.'s **[\*23]** Br. at 24, ECF No. 49. But the plaintiff contends that Heartland has in the past created such temporary light-duty positions for other employees, especially those who were recovering from workplace injuries, and he argues that the ADA required Heartland to treat him just as favorably as it treated those other employees.

Severson's argument that the ADA requires an employer to provide a disabled employee with any accommodation it has provided to other employees in the past is off the mark. An employer may provide an employee with an accommodation not required by the ADA without thereby becoming obligated to provide all

---

[5] Because I conclude that an additional two- or three-month leave of absence would not have been a reasonable accommodation, I do not consider Heartland's argument that granting Severson such leave would have caused it to suffer an undue hardship.

similarly situated employees with the same accommodation. See *Basith, 241 F.3d at 930* (stating that employer should not be "punish[ed] . . . for going beyond the ADA's requirements"); *Sieberns v. Wal-Mart Stores, Inc., 125 F.3d 1019, 1023 (7th Cir. 1997)* ("[e]mployers should not be discouraged from doing more than the ADA requires"); *Vande Zande v. State of Wisconsin, 44 F.3d 538, 545 (7th Cir. 1995)* ("if the employer . . . bends over backwards to accommodate a disabled worker—goes further than the law requires—it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation. That would hurt rather than help disabled workers."). Moreover, the ADA does not require an employer to create **[*24]** "new" positions for disabled employees. *Stern, 788 F.3d at 291*; *Sieberns, 125 F.3d at 1023*; *Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996)*. Thus, assuming that the plaintiff is correct and that Heartland has created temporary light-duty positions for some employees, the ADA did not require Heartland to create such a position for Severson.

Severson cites my decision in *Gibson v. Milwaukee County, 95 F. Supp. 3d 1061 (E.D. Wis. 2015)*, in support of his argument that because Heartland has created light-duty positions for other employees, the ADA required it to also create one for him. In *Gibson*, I found that an employer failed to reasonably accommodate the plaintiff's disability when it refused to temporarily transfer her to a vacant light-duty position that the employer reserved for workers recovering from workplace injuries. *Id. at 1071-73*. I concluded that the employer's wanting to reserve its light-duty program for those recovering from workplace injuries was not a sufficient reason for refusing to allow the plaintiff to occupy a vacant position. Id. But the key to this holding was that the light-duty position at issue existed and was vacant at the time when the employee needed the accommodation. The holding was based on the principle that the ADA requires an employer to consider, as a reasonable accommodation for a disabled employee, transferring or **[*25]** reassigning that employee to a vacant position for which he or she is qualified. See, e.g., *Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 677-79 (7th Cir. 1998)*. Thus, if the employer has a vacant light-duty position available, and the disabled employee is qualified for that position, the employer must consider transferring the employee to the position, even if the position is normally reserved for employees recovering from workplace injuries. *Gibson, 95 F. Supp. 3d at 1071-72*.

Unlike the employer in Gibson, Heartland does not maintain dedicated light-duty positions. Rather, according to the plaintiff, Heartland creates such positions as needed as part of its "return to work" program, which is designed to ensure that Heartland complies with its obligations under the state's worker's compensation law and minimizes its worker's compensation insurance costs. Pl.'s Br. at 19-24, ECF No. 49. As already discussed, the ADA does not require an employer to create a new position for a disabled employee as a reasonable accommodation. Thus, Heartland may voluntarily create light-duty positions for employees recovering from workplace injuries without becoming compelled to create such positions for employees who are protected by the ADA. Indeed, the same EEOC Guidance that I cited in Gibson makes **[*26]** that very point: "An employer need not create a light duty position for a non-occupationally injured employee with a disability as a reasonable accommodation. The principle that the ADA does not require employers to create positions as a form of reasonable accommodation applies equally to the creation of light duty positions." EEOC Enforcement Guidance: Workers' Compensation and the ADA, 1996 WL 33161342, at *12 (September 1996). The EEOC provides the following example of this principle:

> R creates light duty positions for employees when they are occupationally injured if they are unable to perform one or more of their regular job duties. CP can no longer perform functions of her position because of a disability caused by an off-the-job accident. She requests that R create a light duty position for her as a reasonable accommodation. R denies CP's request because she has not been injured on the job. R has not violated the ADA.

Id. at *13.[6] In short, although the ADA requires

_____

[6] The EEOC Guidance also states that an employer, to offset **[*27]** worker's compensation costs, may make modifications to job duties for occupationally injured employees that would not be reasonable accommodations under the ADA without also making those same accommodations for non-occupationally injured employees. See 1996 WL 33161342, at *12 ("Nothing in the ADA prohibits an employer from making a workplace modification that is not a required form of reasonable accommodation under the ADA for an employee with an occupational injury in order to offset workers' compensation costs. For example, the ADA does not require employers to lower production standards to accommodate individuals with disabilities. However, an employer is clearly permitted to lower production standards for an occupationally injured employee as a way of returning

employers to consider transferring disabled employees to vacant light-duty positions, it does not require employers to consider creating light-duty positions for disabled employees, even if the employer creates light-duty positions for employees who are injured on the job.

Severson next contends that even if Heartland did not have an obligation to create a light-duty position for him, it could have transferred him to another vacant position for which he was qualified and for which lifting was not an essential function. He notes that between the date of his surgery and the date on which his work restrictions were lifted, Heartland had a number of vacancies for production-level positions, **[*28]** such as assemblers and machine operators. All of these positions would have represented demotions from the second-shift lead position, and would have been three steps below the position of operations manager, which Severson held prior to his demotion to second-shift lead. However, the employer's duty to accommodate under the ADA requires it to consider transferring the employee to jobs that would represent a demotion. _Dalton, 141 F.3d at 678_. Thus, if Severson was qualified for the vacant production-level positions, Heartland would have been required to consider transferring him to one of those positions as a reasonable accommodation.

Heartland concedes that Severson possessed the basic background qualifications for the vacant production-level positions. But it contends that, as with the second-shift lead, lifting was an essential function of those positions, and thus transferring Severson to one of them would not have been a reasonable accommodation. The written description for each of the vacant jobs supports this contention. See Supp. Koness Aff. Exs. H—L (stating that positions require ability to lift between 30 and 75 pounds, and occasionally more). In his affidavit, Koness explains that, in actual practice, **[*29]** the employees who hold these positions frequently lift heavy items and that it would be impractical to reallocate the lifting associated with the positions to other employees. Id. ¶ 18.

Although Severson concedes that lifting was generally a function of each of the vacant production positions, he argues that lifting was not an essential function because another employee, Wade Plautz, was able to work as an assembler even though he had a lifting restriction. In 2015, as a result of a non-workplace injury, Plautz was restricted to lifting no more than 30 pounds. Pl. Prop. Finding of Fact ¶ 85, ECF No. 50. Heartland was able to

---

him/her to work more quickly.").

accommodate this restriction by assigning him sub-assembly jobs that were smaller and did not require him to lift more than 30 pounds. Id.

The most Heartland's accommodation of Plautz's lifting restriction shows is that lifting more than 30 pounds was not an essential function of the assembly position that Plautz held; it does not show that lifting in general was not an essential function of the various production positions that were vacant during the period following Severson's surgery. Indeed, Plautz was still required to lift the items he was working on and did **[*30]** not rely on other employees to do his lifting for him, as Severson would have had to do during the months following his surgery. See Supp. Koness Aff. ¶ 20. Rather, Heartland was able to identify the lightest tasks it had available and allocate them to Plautz. This would not have been a possible accommodation for Severson, as even the lightest tasks required the ability to lift in excess of Severson's restrictions. Id. Thus, Heartland's accommodation of Plautz's restriction does not support the conclusion that lifting was not an essential function of the vacant production-level positions.

Severson also points out that Heartland accommodated another production-level employee, Ed Kurzynski, with a lifting restriction. In February 2013, Kurzynski's hand was crushed in a work-related accident. See Temeyer Decl. Ex. K, ECF No. 55-4; Supp. Koness Aff. ¶ 25. He was completely absent from work for a prolonged period and was receiving treatment from a psychologist for stress caused by the accident. During his recovery period, Kurzynski's psychologist directed Kurzynski to report to Heartland for a few hours at a time to observe the production area. The purpose of this was to determine whether **[*31]** Kurzynski could tolerate being in the environment where he suffered his injury. During this period, Heartland assigned Kurzynski some work that he could perform within the restrictions associated with his hand injury. However, such work was not regularly available, and Kurzynski spent most of his time simply observing the production area. Eventually, the psychologist determined that Kurzynski would be unable to return to work at Heartland in any capacity. Heartland then terminated Kurzynski's employment. See Supp. Koness Aff. ¶¶ 25-28.

The evidence pertaining to Kurzynski does not support the conclusion that lifting was not an essential function of the vacant production-level positions. The work Kurzynski performed after his accident was not the work of a typical production-level employee. Rather, Heartland essentially created a special position for him

to facilitate his recovery from a workplace injury. And as discussed above, Heartland could create a special position for an employee recovering from a workplace injury—could provide that employee with an accommodation not required by the ADA—without thereby becoming obligated by the ADA to provide all similarly situated employees with **[*32]** the same accommodation. See _Basith, 241 F.3d at 930_; _Siebers, 125 F.3d at 1023_; _Vande Zande, 44 F.3d at 545_; EEOC Enforcement Guidance, 1996 WL 33161342, at *12-13. Thus, the evidence pertaining to Kurzynski does not create a genuine issue of fact.

Finally, Severson argues that Heartland failed to engage in the interactive accommodation-exploration process required by the ADA. When an employee asks for an accommodation because of a disability, the employer must engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances. See, e.g., _Kauffman v. Petersen Health Care VII, LLC, 769 F.3d 958, 963 (7th Cir. 2014)_. Here, Severson asked Heartland for an accommodation because of a disability when he asked Heartland to extend his leave of absence for an additional two or three months. Heartland likely breached its duty to engage in the interactive process when it denied his request for leave and terminated him without further discussion as to whether some other accommodation would be reasonable. See _Basden, 714 F.3d at 1038-39_ (finding that employer breached duty to engage in interactive process when, in response to employee's request for leave, employer terminated the employee without engaging employee in further discussion). However, "the failure to engage in the interactive process required by the ADA is not an independent basis for liability under the statute, **[*33]** and that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual." _Id. at 1039_. "Even if an employer fails to engage in the required process, that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." Id. As discussed above, Severson has failed to present evidence from which a jury could reasonably conclude that he could have performed the essential functions of his job with a reasonable accommodation. Thus, Heartland's likely failure to engage in the interactive process is not an independent basis for liability. Heartland's motion for summary judgment on the ADA claim will be granted.

## B. FMLA Motion for Summary Judgment, Motion to Amend, and Motion for Sanctions

As discussed in the background section, above, the plaintiff has sought leave to amend his complaint to withdraw his FMLA claims, yet the defendant insists that leave should not be granted and that instead summary judgment should be entered on those claims. The only reason to enter summary judgment rather than grant the plaintiff's **[*34]** request for leave to withdraw the claims would be to make clear that the FMLA claims are dismissed on the merits and therefore cannot be re-filed in a separate suit. But I do not understand the plaintiff to be asking to withdraw the FMLA claims without prejudice to their being re-filed in a separate suit. To the contrary, the plaintiff asked the defendant to stipulate to a dismissal of the claims with prejudice. Moreover, because the FMLA claims arose out of the same transaction as the ADA claim, a final judgment on the ADA claim would preclude a future suit on the FMLA claims. See, e.g., _Cannon v. Burge, 752 F.3d 1079, 1101 (7th Cir. 2014)_. Thus, it makes no practical difference whether the FMLA claims are dismissed by way of plaintiff's motion to amend or defendant's motion for summary judgment. I will grant the motion to amend and deny the motion for summary judgment.

That leaves the defendant's motion for Rule 11 sanctions. The purpose of _Rule 11_ is to deter baseless filings in the district court. _Cooney v. Casady, 735 F.3d 514, 523 (7th Cir. 2013)_. The rule is not a fee-shifting measure—it provides only that a court may impose an "appropriate sanction" for a violation of _Rule 11(b)_. Id.; _Fed. R. Civ. P. 11(c)(1)_. When a district court determines that _Rule 11(b)_ has been violated, it "may," but is not required to, impose a sanction. See **[*35]** _Cunningham v. Waters Tan & Co., 65 F.3d 1351, 1360-61 (1995)_; 2 James Wm. Moore, Federal Practice and Procedure § 11.23[2] (3d ed. 2015). As is relevant here, _Rule 11(b)_ provides that "[b]y presenting to the court a pleading . . . an attorney . . . certifies that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances . . . (2) the claims . . . are warranted by existing law . . . [and] (3) the factual allegations have evidentiary support." _Fed. R. Civ. P. 11(b)(2)—(3)_.

As discussed in the background section, the defendant contends that the plaintiff's FMLA claims were baseless and that the factual allegation that the plaintiff could have returned to work "immediately" after his surgery in some capacity, and the allegation that he told this to Heartland, were also baseless. Starting with the factual

allegations, I conclude that they were not baseless. The allegation that the plaintiff could have returned to work immediately in some capacity is supported by the plaintiff's own assessment of his abilities. At his deposition, he testified that as soon as the day after his surgery, he was able to walk and could engage in some physical activity. Severson Dep. at 77. He testified that he believed could have performed light-duty work and **[*36]** could have done some of the work associated with the second-shift lead position, just not the lifting, within a matter of days after the surgery. Id. at 79, 84. Although it is likely that the plaintiff could not have returned to work the day of his discharge from the hospital, the word "immediately" is a relative term, and it is unreasonable to interpret the allegations of the complaint as meaning that the plaintiff could have walked out of the hospital and straight to Heartland's facilities to perform light-duty work. A more reasonable interpretation of the complaint is that the plaintiff was alleging that he could have returned to work in a light-duty capacity within a few days after the surgery. Given the plaintiff's own description of how he felt after his surgery, that allegation was not baseless. Therefore, plaintiff's counsel did not violate _Rule 11(b)_ by alleging that the plaintiff could have returned to work "immediately" after his surgery in some capacity.

Likewise, the allegation that Severson told Heartland that he would be able to return to work immediately after his surgery in a light-duty capacity is not baseless. The defendant takes issue with the complaint's allegation that Severson told **[*37]** Heartland's human-resources manager, Jennifer Schroeder, during a phone conversation on August 13, 2013, that he could return to work immediately after his August 27 surgery in a restricted or light-duty capacity. The defendant contends that Severson knew that such a conversation did not take place, and that therefore counsel had no basis for including the allegation in the complaint. But the record indicates that Severson thought he had such a conversation with Schroeder sometime between June and mid-August, and that he had trouble remembering the exact date. Severson Decl. ¶ 16, ECF No. 52. Thus, counsel had a reasonable basis for alleging that Severson had such a conversation with Schroeder on August 13th, and counsel did not violate _Rule 11(b)_ in making the allegation.

Turning to the FMLA claims, it is hard to find a reasonable basis for the FMLA interference claim. Severson received the full twelve weeks of leave to which he was entitled, and plaintiff's counsel has not explained why she (or her colleague who signed the complaint) included it in the complaint. However, I do not think that including such a claim in the complaint warrants sanctions. The claim itself consists of four conclusory **[*38]** paragraphs, see Compl. ¶¶ 117-20, and the defendant could not have spent any significant time or resources defending against it. See Advisory Committee Notes to 1993 Amendment to _Rule 11_ ("Rule 11 motions should not be made or threatened for minor, inconsequential violations of the standards prescribed by subdivision (b)."). Although the defendant filed a motion for summary judgment on the claim, it did so only after plaintiff's counsel stated in writing that the plaintiff had agreed to withdraw that very claim and that she would do so by filing an amended complaint at the close of discovery. It is true that by the time the defendant filed its motion for summary judgment, the plaintiff had not yet filed a formal pleading withdrawing the claim, but I do not see why that matters. Defendant's counsel did not respond to plaintiff's counsel's letter stating that she would withdraw the claim at the end of discovery, and thus plaintiff's counsel had no reason to think that defendant's counsel was not satisfied with the proposal to wait until then to formally amend the complaint. Moreover, the deadline for dispositive motions would not run for more than a month after the close of discovery, so if for some reason plaintiff's counsel did not follow through on her **[*39]** promise to withdraw the claim at the end of discovery, the defendant could have filed its motion for summary judgment at that time. The defendant's decision to expend resources in moving for summary judgment on a claim that the plaintiff had already agreed to withdraw thus does not support sanctioning plaintiff's counsel for including the claim in the complaint.

Moreover, the defendant's brief in support of its motion for summary judgment on the FMLA claims does not contain any substantial argument on those claims—the brief does not cite _Rule 56_ or discuss the legal principles applicable to FMLA claims. Rather, the brief argues that plaintiff's counsel should be sanctioned for filing the claims and requests that the claims be dismissed. In light of this, I doubt that defendant's counsel expended substantial resources preparing its motion for summary judgment on the FMLA claims. Really all counsel did was prepare a brief in support of the motion for sanctions.

As for the FMLA retaliation claim, it was not baseless. Heartland terminated Severson as soon as he had exhausted his FMLA leave. Cases recognize that when an adverse employment action occurs on the heels of protected activity, an inference **[*40]** of causation may

be sensible. See, e.g., _Loudermilk v. Best Pallet Co., 636 F.3d 312, 315 (7th Cir. 2011)_. True, the timing of the termination would not, by itself, have been sufficient to survive summary judgment on an FMLA retaliation claim, and it may not even have been sufficient to survive a motion to dismiss for failure to state a claim on which relief can be granted. But it was enough to prevent the claim from being completely baseless.

In any event, even if plaintiff's counsel committed a technical violation of _Rule 11(b)_ by including the FMLA retaliation claim in the complaint, it was a minor and inconsequential violation. The FMLA retaliation claim was made up of three conclusory allegations, see Compl. ¶¶ 121-23, and the defendant could not have spent a significant amount of time or resources defending against it. As discussed, even though the defendant filed a motion for summary judgment on the claim, its brief in support of that motion is devoid of any substantive argument on the FMLA claims and is instead a brief in support of the motion for sanctions. Moreover, before defendant's counsel filed the motion for summary judgment, plaintiff's counsel told him that the plaintiff would consider withdrawing the claim at the close of discovery. The **[*41]** deadline for filing dispositive motions would not run until more than a month after the close of discovery, and the defendant waited until that deadline to file its summary judgment motion on the plaintiff's ADA claim. It is not clear why the defendant did not simply wait until after the plaintiff decided whether it would withdraw the claim before filing its separate motion for summary judgment on that claim. Given this sequence of events, I can see no reason to sanction plaintiff's counsel.

Accordingly, the defendant's motion for Rule 11 sanctions will be denied.

## C. Motion to Seal

Before concluding, I must address an administrative matter. In connection with his opposition to the defendant's motion for summary judgment on the ADA claim, the plaintiff filed several documents under seal, along with a motion to seal. In the motion to seal, the plaintiff does not provide any grounds for removing the documents from the public record, other than to note that someone marked the documents "confidential" pursuant to the protective order entered in this case. But the protective order requires a party filing a confidential document with the court to provide the court with a statement of reasons why the **[*42]** material is confidential. See ECF No. 41 at 8-9.

In any event, three of the documents, Exhibits K, L, and M to the Declaration of Kelly Temeyer, reveal medical information about nonparties. For this reason, I conclude that there is good cause for keeping the documents under seal. The remaining two documents will not remain sealed. The first, Exhibit N to Temeyer's declaration, is entitled "employee change form" and does not contain any information that could conceivably be considered confidential. The second, Exhibit EE to Temeyer's declaration, is the Affidavit of Roy Desimone, which I discussed in connection with the ADA claim, above. Plaintiff also filed an identical copy of that same affidavit as Exhibit XX, yet Exhibit XX was not filed under seal. Because the affidavit is already available to the public as Exhibit XX, there is no reason to seal Exhibit EE.

## II. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendant's motion for summary judgment on the plaintiff's ADA claim (ECF No. 43) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for leave to file an amended complaint withdrawing his FMLA claims (ECF No. 29) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendant's **[*43]** motion for summary judgment on the FMLA claims (ECF No. 22) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendant's motion for sanctions (ECF No. 23) is **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion to seal (ECF No. 53) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that Exhibits K, L, and M to the Declaration of Kelly Temeyer may remain sealed. The motion is denied as to Exhibits N and EE.

**FINALLY, IT IS ORDERED** that the Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 12th day of November, 2015.

/s/ Lynn Adelman

LYNN ADELMAN

District Judge

2015 U.S. Dist. LEXIS 153872, *43

---

**End of Document**

# *FTC v. OSF Healthcare Sys.*

United States District Court for the Northern District of Illinois

April 5, 2012, Decided; April 5, 2012, Filed

11 C 50344

**Reporter**

2012 U.S. Dist. LEXIS 48068 *; 2012-1 Trade Cas. (CCH) P77,850

Federal Trade Commission vs. OSF Healthcare System, et al.

**Prior History:** *FTC v. OSF Healthcare Sys., 2012 U.S. Dist. LEXIS 48069 (N.D. Ill., Apr. 5, 2012)*

## Core Terms

confidential, negotiating, seal, contracts, trade secret, exhibits, competitors, price information, terms of the contract, strategies, competitive, disclosure, redacted, providers, confidential information, competitive advantage, economic value, managed care, documents, hospitals, unearned, good cause, declaration, secrecy, commercial information, prices, terms and conditions, requests, parties, qualify

**Counsel:** **[*1]** For Federal Trade Commission, Plaintiff: Matthew J. Reilly, LEAD ATTORNEY, PRO HAC VICE, Andrea Elisa Zach, Jeremy Morrison, Kajetan Rozga, Kenneth W. Field, Nancy Park, Paul Nolan, Peter Clemens Herrick, Richard Cunningham, Sarah Swain, Stephanie Lynn Reynolds, PRO HAC VICE, U.S. Federal Trade Commission, Washington, DC; Jeffrey H. Perry, PRO HAC VICE, Federal Trade Commission, Washington, DC; Katherine Amy Ambrogi, PRO HAC VICE, U. S. Federal Trade Commission, Washington, DC.

For OSF Healthcare System, Defendant: Alan I. Greene, LEAD ATTORNEY, Kristin Mary Kurczewski, Matthew John O'Hara, Nabil G. Foster, Hinshaw & Culbertson LLP, Chicago, IL; Ambrose V. McCall, Hinshaw & Culbertson LLP, Peoria, IL; Michael F Iasparro, Hinshaw & Culbertson, Rockford, IL.

For Rockford Health System, Defendant: David Marx, William Paul Schuman, LEAD ATTORNEYS, Amy J Carletti, McDermott, Will & Emery LLP (Chicago), Chicago, IL; Carla A. R. Hine, James B. Camden, Jeffrey W. Brennan, Nicole L. Castle, Rachael V Lewis;, PRO HAC VICE, McDermott Will & Emery LLP, Washington, DC; Daniel Gerard Powers, PRO HAC VICE, Mcdermott Will & Emery, Washington, DC.

For Aetna, Inc., Respondent: Michael J. Gaertner, LEAD **[*2]** ATTORNEY, Locke Lord LLP, Chicago, IL.

For Humana Inc., Intervenor Plaintiff: Brent Robert Baughman, LEAD ATTORNEY, Daniel W. Redding, PRO HAC VICE, Greenebaum Doll & McDonald PLLC, Louisville, KY; David Adam Neiman, LEAD ATTORNEY, Wilson Elser Moskowitz Edelman & Dicker LLP, Chicago, IL; Christie A Moore, PRO HAC VICE, Greenebaum Doll & McDonald, PLLC, Louisville, KY.

For Coventry Health Care Inc., Intervenor Plaintiff: Jeffrey C. Clark, LEAD ATTORNEY, McGuireWoods LLP, Chicago, IL; Art Lerner, PRO HAC VICE, Crowell & Moring, Washington, DC; David Jordan Pivnick, McGuire Woods LLP, Chicago, IL; kerry Mustico, PRO HAC VICE, Crowell & Moring Llp, Washington, DC.

For Service List, Intervenor Plaintiff: Monica V Mallory, United States Attorney's Office, Rockford, IL.

For SwedishAmerican Health System Corporation, Intervenor: Patricia Wagner, LEAD ATTORNEY, PRO HAC VICE, Epstein Becker & Green, P.c., Washington, DC; Kim Marie Casey, Roberta L. Holzwarth, Holmstrom & Kennedy, Rockford, IL.

For UnitedHealth Group, Inc., Intervenor: James K. Gardner, LEAD ATTORNEY, Athanasios Papadopoulos, Eric Y. Choi, Neal, Gerber & Eisenberg, Chicago, IL.

For Health Care Service Corporation, Intervenor: Helen E. Witt **[*3]** , LEAD ATTORNEY, Charles James Kalil, II, James H. Mutchnik, Kirkland & Ellis LLP, Chicago, IL.

For Employers Coaliation on Health, Intervenor: James F. McCluskey, LEAD ATTORNEY, Momkus McCluskey, LLC, Lisle, IL.

For CIGNA Corporation, Connecticut General Life Insurance Company, Intervenors: Jason Michael Kuzniar, LEAD ATTORNEY, Wilson, Elser, Moskowitz,

Edelman & Dicker, LLP, Chicago, IL.

**Judges:** Frederick J. Kapala, Magistrate Judge.

**Opinion by:** Frederick J. Kapala

# Opinion

The Federal Trade Commission ("FTC") has filed a motion for preliminary injunction pursuant to *15 U.S.C. § 53(b)*, seeking to enjoin defendants, OSF Healthcare System ("OSF") and Rockford Health System ("RHS"), from consummating their affiliation agreement. On January 6, 2012, during the expedited discovery permitted prior to the hearing on the motion for preliminary injunction, the Magistrate Judge entered an amended protective order governing the handling of confidential discovery material. The order provided, among other things, that after notice of intent to use any document or transcript at the hearing on the motion for preliminary injunction, the producing party may file a motion requesting that the document or transcript remain under **[*4]** seal.

Prior to and following the hearing on the motion for preliminary injunction, the parties and intervenors filed motions requesting that various hearing exhibits, as well as pre- and post-hearing briefs, and proposed findings of fact, remain under seal. The court preliminarily granted the motions subject to further review and modification and ordered that the movants file statements of good cause for sealing these documents. As explained below, the motions, with certain modifications, are now granted.

## I. LEGAL STANDARD

The law requires this court to make a determination of good cause to seal any part of the record of a case. *Citizens First Nat'l Bank v. Cincinnati Ins. Co., 178 F.3d 943, 944 (7th Cir. 1999)*. This is because, "[t]he parties to a lawsuit are not the only people who have a legitimate interest in the record compiled in a legal proceeding." *Id.* "Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht, 622 F.3d 697, 701 (7th Cir. 2010)*; see also *United States v. Foster, 564 F.3d 852, 854 (7th Cir. 2009)* ("[T]hose **[*5]** documents, usually a small subset of all discovery, that influence or underpin the judicial

decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality."); *Baxter Int'l, Inc. v. Abbott Labs., 297 F.3d 544, 545 (7th Cir. 2002)*. The party seeking to seal items has the burden of showing good cause, *Baxter Int'l., 297 F.3d at 548*, but the burden is less demanding on non-parties, *In re Northshore Univ. HealthSystem, 254 F.R.D. 338, 342 (N.D. Ill. 2008)*.

## II. MOTION TO INTERVENE FOR PURPOSE OF CHALLENGING SEALING ORDER

Cecile Kohrs, pro se, a journalist with Mlex US, has filed a motion to intervene for the limited purpose of seeking to unseal documents relating to OSF's and RHS' post-merger plans. Specifically, Kohrs seeks (1) any and all documents used as part of any party's proposed findings of fact that were considered as part of the court's opinion, and (2) the "FTI Study." A motion to intervene is the proper vehicle by which to challenge a district court's sealing order. *Jessup v. Luther, 227 F.3d 993, 997 (7th Cir. 2000)*. Therefore, Kohrs' motion to intervene is granted.

With regard to Kohr's specific requests, **[*6]** her request for access to the parties' proposed findings of fact is granted. As explained in section IV below, the parties will file redacted copies of these documents. As for the "FTI Study," PX0001 is a "Business Efficiencies Report for the RHS-OSF Affiliation" prepared for defendants by FTI Healthcare. The court notes, however, that it is not directly relying on this report, but instead has reviewed the expert reports and testimony of Dr. Susan Manning, the defendants' economics expert, who evaluated the claimed efficiencies in the FTI report within the framework of the U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines (2010), see DX0012 ¶ 4; DX0366 ¶ 3; Tr. at 811. Consequently, like many of the over 2,000 exhibits which the parties moved the admission of at the conclusion of the hearing on the motion for preliminary injunction, PX0001 was never admitted into evidence. Thus, PX0001 remains covered by the amended protective order as confidential discovery. See *Baxter Int'l, 297 F.3d at 545* ("Secrecy is fine at the discovery stage, before the material enters the judicial record. But those documents, usually a small subset of all discovery, that **[*7]** influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." (citation omitted)).

Consequently, PX0001 remains under seal.

## III. INTERVENORS' MOTIONS TO MAINTAIN HEARING EXHIBITS UNDER SEAL

### A. Health Care Service Corporation ("HCSC") [163]

Blue Cross Blue Shield of Illinois ("BCBSIL") is a division of intervenor HCSC and it requests that PX0252, PX1025 and PX4005/DX0699 be maintained under seal. PX0252 is the declaration of HCSC's Vice President Joseph Arango which includes specific information about BCBSIL's competitive position in the Rockford metropolitan area, its hospital reimbursement methodologies, its business practices with respect to incentives designed to steer patients to particular hospitals, and the terms of its current contracts with the three Rockford hospitals. PX1025 consists of amendments to BCBSIL's contract with OSF including specific rates for certain services, negotiated rate increases, and bonus provisions. PX4005 and DX0699 are both the transcript of Arango's deposition which includes highly sensitive competitive trade secret information such **[*8]** as: recitations of portions of current hospital contracts, and testimony about those contracts and the negotiations that led to them; specific hospital rates; BCBSIL's negotiating strategies and techniques; the number of subscribers to various BCBSIL products in Rockford; the possible competitive effects of the proposed merger on the financial interests of BCBSIL; and BCBSIL's use of pricing models and the terms of its contract with a hospital in Bloomington, Illinois.

As for good cause to seal, HCSC maintains that BCBSIL's contracts with hospitals and information that reveals its negotiating strategies, hospital rates, financial arrangements, and terms and conditions of contracts are all trade secrets subject to protection. HCSC argues that allowing this information to become public would give other hospitals, including the hospitals in Rockford, an unfair advantage in negotiating with BCBSIL because they would have knowledge of the terms of BCBSIL's contracts with other hospitals (and the negotiating process it used to arrive at those terms) that they would not otherwise have and to which they are not entitled. HCSC also argues that BCBSIL's hospital rates, bonus structures and other **[*9]** contract terms would be useful information to its competitors in the health insurance market. HCSC states that BCBSIL treats its hospital contracts, and information about their terms and conditions, confidential in the normal course of its business and argues that it would be unduly prejudiced if its confidential information were to become publically available.

*Federal Rule of Civil Procedure 26(c)(1)(G)* provides that, upon a showing of good cause, the court may enter an order "requiring that a trade secret or other confidential research, development, or underlined commercial information not be revealed or be revealed only in a specified way." *Fed. R. Civ. P. 26(c)(1)(G)* (emphasis added). Highly confidential commercial information such as pricing information and the process involved in creating a "pricing architecture" can qualify as a trade secret. See *Baxter Int'l, 297 F.3d at 547* (holding that competitive business information constitutes a trade secret where its "economic value depends on its secrecy"); *PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1270 (7th Cir. 1995)* (holding that information regarding pricing, distribution and marketing constituted trade secret material); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc., 784 F.2d 1325, 1345-46 (7th Cir. 1986)* **[*10]** (finding information related to bids and evaluating bids was "unquestionably sensitive trade secrets" and warranted protection from unnecessary disclosure, as counterparties "could use it to advantage in the next round of negotiations"); *Johnson v. Allstate Ins. Co., No. 07-cv-0781-MJR, 2008 U.S. Dist. LEXIS 85735, 2008 WL 4279992, at *3 (S.D. Ill. Sept. 17, 2008)* (finding that insurance company's pricing information involves trade secrets). Moreover, where contract terms have economic value and are not generally known in the industry they may qualify as a trade secrets. See *SmithKline Beecham Corp. v. Pentech Pharms., Inc., 261 F. Supp. 2d 1002, 1008 (N.D. Ill. 2003)* (holding that information about terms and conditions of contracts "that might give other firms an unearned competitive advantage" is legitimately confidential information that competitors should not have and the public does not need to know to evaluate the judiciary's handling of the litigation); *Delta Med. Sys. v. Mid-Am Med. Sys., Inc., 331 Ill. App. 3d 777, 794, 772 N.E.2d 768, 265 Ill. Dec. 397 (2002)* (holding that contract terms with economic value that are not generally known in the industry are protectable trade secrets).

In order for this type of information to qualify as a **[*11]** trade secret, plaintiff must show that (1) the information was sufficiently secret to give it a competitive advantage, and (2) it took affirmative measures to prevent others from acquiring or using the information. *Stenstrom Petrol. Servs. Grp., Inc. v. Mesch, 375 Ill. App. 3d 1077, 1090, 874 N.E.2d 959,*

*314 Ill. Dec. 594 (2007)*. Illinois law specifically provides that "[t]he fee schedule, the capitation schedule, and the network provider administration manual [of a health care professional or health care/insurer contract] constitute confidential, proprietary, and trade secret information and are subject to the provisions of the Illinois Trade Secrets Act." *215 ILCS 5/368b(b)*.

The court has reviewed PX0252, PX1025 and PX4005/DX0699 and is satisfied that they contain confidential commercial information and trade secrets in the form of contract terms, contract negotiations and strategies, and pricing information. HBSC has established that public dissemination –most notably, to other hospitals or one of its competitors– of the trade secrets and confidential commercial information in the exhibits would subject BCBSIL and HCSC to suffer great economic harm. It appears that the information in these exhibits is unknown outside **[*12]** of BCBSIL's business and it employs reasonable efforts to maintain the secrecy of the information in the ordinary course of its business. HCSC has also explained why these documents are important to its business and why disclosure of the information would give BCBSIL a competitive disadvantage and permit competitors to utilize the information for improper purposes. In sum, the potential dangers BCBSIL would face if a competitor gained access to its trade secrets and confidential commercial information outweigh the public's interest in access to these documents. As a result, the court finds that HCSC has set forth good cause for sealing PX0252, PX1025 and PX4005/DX0699.

Having so concluded, however, it is likewise clear that these exhibits also contain information that is not confidential. Ordinarily, in order to protect the public's interest in the judicial process, the court would order that the confidential material within these exhibits be redacted. See *Citizens First Nat'l Bank, 178 F.3d at 945* ("[A] document that contains [sensitive information] may also contain material that is not [sensitive], in which case all that would be required to protect a party's interest in . . . secrecy **[*13]** would be redaction of portions of the document."). However, because exhibits presented at trial or a hearing are not filed with the clerk, see *Local Rule 79.1*, redaction serves no purpose unless and until access to these exhibits is sought. Upon motion, the court would, without committing itself to granting or denying the request, consider ordering that a redacted copy of the exhibits be produced.[1] To

the extent that the court references information from a sealed exhibit in its opinion on the motion for preliminary injunction, it has carefully examined the information and either determined that it is not confidential or limited the reference so that the confidential information is not disclosed.

## B. CIGNA Corporation and Connecticut General Life Insurance Company [167]

CIGNA Corporation and Connecticut General Life (collectively, "CIGNA") request that PX0235, the Declaration of Thomas Golias of CIGNA, and PX4008, Golias' deposition, remain sealed because these exhibits contain confidential **[*14]** business and financial information, the public disclosure of which would unfairly prejudice CIGNA's business interests and competitive position, and would cause them economic injury. In particular, CIGNA maintains that the declaration and deposition testimony of Golias relied upon by the parties in their post-hearing submissions contain confidential, proprietary and trade secret information concerning: CIGNA's contracts, provider network, business plans, products and pricing, market share, negotiations, strategies, and the possible effect of the proposed merger on CIGNA's interests. CIGNA states that it treats this information as confidential, and public disclosure of the information would significantly harm CIGNA by giving an undue advantage to both its competitors –other health plans and the hospital systems– and the providers with whom CIGNA has or may enter into service agreements.

The court has reviewed PX0235 and PX4008 and is satisfied that they contain CIGNA's contract negotiations and strategies, contract terms, and pricing information, which qualify as confidential commercial information and trade secrets based on the rationale and case law cited in § III.A of this order. See **[*15]** *Baxter Int'l, 297 F.3d at 547* (holding that competitive business information constitutes a trade secret where its "economic value depends on its secrecy"); *PepsiCo., 54 F.3d at 1270* (pricing information); *Ball Mem'l Hosp., 784 F.2d at 1345-46* (bids during negotiations); *SmithKline Beecham, 261 F. Supp. 2d at 1008* (terms and conditions of contracts "that might give other firms an unearned competitive advantage"); *Delta Med. Sys., 331 Ill. App. 3d at 794* (contract terms). The court finds

---

[1] This ruling is applicable to all the hearing exhibits that remain

sealed at the requests of the intervenors' and parties because all of the exhibits contain both confidential and non-confidential information.

further that CIGNA has shown good cause to keep PX0235 and PX4008 sealed because disclosure of this confidential information would harm CIGNA while giving its competitors an unfair advantage. Therefore, CIGNA's motion that these exhibits remain under seal is granted.

## C. Humana, Inc. ("Humana") [205]

Humana requests that PX0255, PX4002, PX4260; PX4258-001, PX4258-004, PX4258-002; and PX4258-006 and 007 remain under seal. PX0255 and PX4002 are the declaration and deposition of Rob Hitchcock. Humana states that these exhibits contain the number of Humana insureds in Winnebago County, the amount of money spent by Humana for primary care in Winnebago and Boone Counties, the percentage of Humana's "spend" on **[*16]** primary care services that was paid to SwedishAmerican Hospital, its internal strategies, its view of the market, and its pricing and reimbursement information. The information is highly sensitive and not available to the general public or Humana's competitors and there is no legitimate reason as to why the public needs or is entitled to this business information.

PX4260 is an internal email regarding the amount of Humana's claims and insured lives in the Rockford area. Humana states that it contains highly confidential and proprietary information related to the number of Humana's self-insured lives in the Rockford area as well as the total amount spent by Humana on claims related to care provided by Primary Care Physicians in Humana's network. This information is not available to the public or to Humana's competitors, is information that is not available to those outside Humana, and is maintained as a private communication within Humana.

PX4258-001, PX4258-004, PX4258-002 are part of the competitive information and research titled "Implications of OSF purchasing Rockford Memorial – Humana's View." Humana states that these exhibits contain commercially sensitive information, including **[*17]** specific contract terms that are not public, descriptions of market advantages, as well as Humana's commercial and Medicare utilization for Rockford Memorial, OSF and SwedishAmerican hospitals. The table in PX4258-002 specifically identifies the amount of claims made, the amount allowed, the amount paid by Humana and the discount applied with respect to Humana's insureds in Winnebago County. The documents also set forth Humana's market share as it related to each of the three hospital providers. This

information is not available to anyone outside Humana, especially competitors, and if it were available to competitors, it would allow them use that information to Humana's disadvantage in the marketplace.

PX4258-006 and 007 are internal emails containing Humana's competitive information. Humana states that these exhibits outline premiums paid by Humana insureds as well as strategies for renewing the contracts for employers in Winnebago County. This information was not intended for public disclosure, is maintained solely for Humana's use, is not available to anyone outside Humana, and would put Humana at a competitive disadvantage if the information were made public.

The court has reviewed **[*18]** PX0255, PX4002, PX4260, PX4258-001, PX4258-004, PX4258-002, and PX4258-006 and 007 and is satisfied that they contain Humana's pricing information, contract terms, and negotiation strategies, which qualify as confidential commercial information and trade secrets based on the rationale and case law cited in § III.A of this order. See _Baxter Int'l, 297 F.3d at 547_ (holding that competitive business information constitutes a trade secret where its "economic value depends on its secrecy"); _PepsiCo., 54 F.3d at 1270_ (pricing information); _Ball Mem'l Hosp., 784 F.2d at 1345-46_ (bids during negotiations); _SmithKline Beecham, 261 F. Supp. 2d at 1008_ (terms and conditions of contracts "that might give other firms an unearned competitive advantage"); _Delta Med. Sys., 331 Ill. App. 3d at 794_ (contract terms). The court finds further that Humana has shown good cause to keep PX0255, PX4002, PX4260, PX4258-001, PX4258-004, PX4258-002, and PX4258-006 and 007 sealed because disclosure of the confidential information therein would harm Humana while giving its competitors an unfair advantage. Therefore, Humana's motion that these exhibits remain under seal is granted.

## D. Employers Coalition on Health **[*19]** ("ECOH") [164]

ECOH requests that PX0254, DX0376, DX0377, DX0379 and DX0712 remain under seal. ECOH states that PX0254, the declaration of William J. Pocklington, Director of Provider Services at ECOH, contains information on ECOH's competitive position in the Rockford metropolitan area, ECOH's approach to business in the Rockford Market and relative position, its business practices in that market, its business practices with respect to contract negotiation, and

sensitive information concerning ECOH's internal processes that would undermine its ability to effectively operate in the marketplace should such information be made public. ECOH states that DX0376, DX0377, and DX0379 are executive and board meeting minutes that include internal discussion of ongoing contract negotiations, network configurations, contract information, member company issues, network management, personal opinions of board members that reflect the internal deliberations and business decisions of ECOH, claim management issues and long term strategic planning, as well as ECOH contract information currently in effect, and thereby represent proprietary and trade secret information never intended to be made public. **[*20]** ECOH states that DX0712 is the transcript of the deposition of Pocklington which includes highly sensitive trade secret information and personal processes that Pocklington relies on in negotiating contracts, maintaining business relationships within the Rockford market and the process he follows.

The court has reviewed PX0254, DX0376, DX0377, DX0379 and DX0712 and is satisfied that they contain ECOH's pricing information, contract terms, and negotiation strategies, which qualify as confidential commercial information and trade secrets based on the rationale and case law cited in § III.A of this order. See *Baxter Int'l, 297 F.3d at 547* (holding that competitive business information constitutes a trade secret where its "economic value depends on its secrecy"); *PepsiCo., 54 F.3d at 1270* (pricing information); *Ball Mem'l Hosp., 784 F.2d at 1345-46* (bids during negotiations); *SmithKline Beecham, 261 F. Supp. 2d at 1008* (terms and conditions of contracts "that might give other firms an unearned competitive advantage"); *Delta Med. Sys., 331 Ill. App. 3d at 794* (contract terms). The court finds further that ECOH has shown good cause to keep these exhibits sealed because disclosure of the confidential **[*21]** information therein would hinder ECOH's ability to effectively function in the marketplace while giving its competitors an unfair advantage. Therefore, ECOH's motion that PX0254, DX0376, DX0377, DX0379 and DX0712 remain under seal is granted.

## E. UnitedHealth Group, Inc. ("UnitedHealth") [157]

UnitedHealth requests that PX4001, the deposition transcript of UnitedHealth's Regional Vice President Michelle Lobe, remain under seal. UnitedHealth states that the exhibit contains, among other things, the terms of UnitedHealth's contracts with hospitals in the Rockford area, its contracting strategy with those hospitals, its product offerings, and its internal data regarding its performance in the Rockford area. UnitedHealth states further that the release of this information to the public would impact its commercial position with respect to its competitors, including BCBSIL, Aetna, and CIGNA, and those hospitals with which UnitedHealth seeks to contract, specifically, OSF, RHS, and Swedish American. In addition, UnitedHealth states that disclosure of this information would harm its business, particularly as it relates to contract negotiations with health care providers and the management and **[*22]** development of its network products and offerings. The public would not otherwise have access to this information which has substantial economic value and UnitedHealth treats it as confidential in the normal course of its business.

The court has reviewed PX4001 and is satisfied that it contains UnitedHealth's pricing information, contract terms, and negotiation strategies, which qualify as confidential commercial information and trade secrets based on the rationale and case law cited in § III.A of this order. See *Baxter Int'l, 297 F.3d at 547* (holding that competitive business information constitutes a trade secret where its "economic value depends on its secrecy"); *PepsiCo., 54 F.3d at 1270* (pricing information); *Ball Mem'l Hosp., 784 F.2d at 1345-46* (bids during negotiations); *SmithKline Beecham, 261 F. Supp. 2d at 1008* (terms and conditions of contracts "that might give other firms an unearned competitive advantage"); *Delta Med. Sys., 331 Ill. App. 3d at 794* (contract terms). The court finds further that UnitedHealth has shown good cause to keep this exhibit sealed because disclosure of the confidential information therein would harm its business while giving its competitors an unfair **[*23]** advantage. Therefore, UnitedHealth's motion that PX4001 remain under seal is granted.

## F. Coventry Health Care, Inc. ("Coventry") [165] [166]

Coventry requests that PX0256, PX0287, PX1102, DX0719, and DX0944 remain under seal. PX0256 and PX0287 are the declaration and supplemental declaration of Todd Petersen, CEO of Coventry's Illinois affiliate, Coventry Health Care of Illinois, Inc. The declarations contain Coventry's competitive position in the relevant market, negotiating strategies with and among providers in the Rockford area, Coventry's annual expenditures with providers in the Rockford

area, the proposed merger's potential competitive effects on Coventry if consummated, and the results of Coventry's proprietary market analysis including desired and/or optimal contract rates and discounts. PX1102 is an email chain among Coventry personnel involved in negotiating contracts with providers containing highly confidential and competitively sensitive information including Coventry's contract terms with RHS and SwedishAmerican Health System, as well as Coventry's negotiating strategy and contract discounts. DX0719 and DX0944 are transcripts of the depositions of Petersen containing contract **[*24]** negotiation strategy, contract rates and discounts, product offering, and the potential competitive effects of the proposed merger on Coventry.

Coventry states that these exhibits contain highly confidential and competitively sensitive information including details about contractual provisions relating to pricing, volumes, exclusivity, financial data, and strategic plans. Disclosure of Coventry's confidential materials would severely undermine Coventry's ability to negotiate competitively in Rockford and in broader markets. Specifically, if placed in the public domain, this information would give the very business people at OSF and RHS with whom Coventry negotiates access to Coventry's highly sensitive financial information, including contract rates and terms with other providers, as well as Coventry's negotiating strategies. The public would not otherwise have access to this information which has substantial economic value and Coventry treats it as confidential in the normal course of its business.

The court has reviewed PX0256, PX0287, PX1102, DX0719, and DX0944 and is satisfied that they contain Coventry's pricing information, contract terms, and negotiation strategies, which qualify **[*25]** as confidential commercial information and trade secrets based on the rationale and case law cited in § III.A of this order. See *Baxter Int'l, 297 F.3d at 547* (holding that competitive business information constitutes a trade secret where its "economic value depends on its secrecy"); *PepsiCo., 54 F.3d at 1270* (pricing information); *Ball Mem'l Hosp., 784 F.2d at 1345-46* (bids during negotiations); *SmithKline Beecham, 261 F. Supp. 2d at 1008* (terms and conditions of contracts "that might give other firms an unearned competitive advantage"); *Delta Med. Sys., 331 Ill. App. 3d at 794* (contract terms). The court finds further that Coventry has shown good cause to keep these exhibits sealed because disclosure of the confidential information therein would harm its business while giving its

competitors an unfair advantage. Therefore, Coventry's motion that PX0256, PX0287, PX1102, DX0719, and DX0944 remain under seal is granted.

## G. Aetna, Inc. ("Aetna")

Aetna requests that DX0382, DX0383, DX0386 DX0388, DX0703, and PX0251 remain under seal. DX0382, DX0383, DX0386 DX0388 are emails with attachments containing confidential Aetna financial data and analysis regarding costs and prices, and the methodologies **[*26]** to calculate costs and prices broken down by specific provider and services provided. Aetna utilizes this financial data and methodologies in calculating costs and prices that it uses in negotiating contracts with providers. DX0703 is a transcript of the deposition of Suzanne Hall, Aetna's Vice President of Network Management, and PX0251 is her declaration. These documents contain strategies utilized by Aetna when negotiating with specific providers as well as Aetna's consideration of new products.

Aetna states that these exhibits contain confidential financial data and analysis regarding costs and prices, and the methodologies to calculate costs and prices broken down by specific provider and services provided. Aetna utilizes this financial data and methodologies in calculating costs and prices that it uses in negotiating contracts with providers. Aetna derives economic value from this information not being known to other persons. Disclosure of Aetna's confidential materials would allow the providers to obtain economic value as they would gain access to Aetna's own pricing information and negotiating strategies. Similarly, Aetna's competitors would obtain economic value from the disclosure **[*27]** of Aetna's pricing information and negotiation strategies as they could use this information to obtain an improper competitive advantage over Aetna. The confidential financial data, negotiating strategies and new product plans in these documents and testimony are not made available to the public and are available only to those Aetna employees whose responsibility involves negotiating the contracts at issue. Each Aetna employee who has access to this information signs an agreement to adhere to Aetna's policy to hold this information confidential and to guard against disclosure to others.

The court has reviewed DX0382, DX0383, DX0386, DX0388, DX0703, and PX0251 and is satisfied that they contain Aetna's pricing information, contract terms, and negotiation strategies, which qualify as confidential

commercial information and trade secrets based on the rationale and case law cited in § III.A of this order. See _Baxter Int'l, 297 F.3d at 547_ (holding that competitive business information constitutes a trade secret where its "economic value depends on its secrecy"); _PepsiCo., 54 F.3d at 1270_ (pricing information); _Ball Mem'l Hosp., 784 F.2d at 1345-46_ (bids during negotiations); _SmithKline Beecham, 261 F. Supp. 2d at 1008_ **[*28]** (terms and conditions of contracts "that might give other firms an unearned competitive advantage"); _Delta Med. Sys., 331 Ill. App. 3d at 794_ (contract terms). The court finds further that Aetna has shown good cause to keep these exhibits sealed because disclosure of the confidential information therein would harm its business while giving its competitors an unfair advantage. Therefore, Aetna's motion that DX0382, DX0383, DX0386, DX0388, DX0703, and PX0251 remain under seal is granted.

## H. SwedishAmerican Health System ("SwedishAmerican")

SwedishAmerican requests that PX0289, PX4000, DX0240, and DX0244 remain under seal. PX0289 is the declaration of William Gorski, M.D., a former Chief Operating Officer for SwedishAmerican. PX4000 is the deposition of Richard Walsh, Executive Vice President and Chief Operating Officer for SwedishAmerican. According to SwedishAmerican, these exhibits contain trade secrets falling into three categories: managed care contracting, strategic plans, and costs. SwedishAmerican treats the information in these categories as highly confidential and it is not shared with anyone other than those individuals at SwedishAmerican who need access to the information to **[*29]** perform their jobs. If the managed care contracting information were made public, it would provide managed care payors with information they could use to their advantage in future negotiations, it would decrease SwedishAmerican's ability to negotiate with payors and increase the ability of competitors to negotiate against them in seeking payor contracts giving them an unearned competitive advantage. If the strategic planning information were made public, it would give SwedishAmerican's competitors insights that would allow them to undercut or replicate those plans, place SwedishAmerican at a competitive disadvantage, and give competitors an unearned competitive advantage. If the cost information were made public, it would give managed care payors information that they could use to their advantage in future negotiations with SwedishAmerican and would constitute an unearned competitive advantage.

DX0240 is an overview of SwedishAmerican's affiliation agreement with the University of Wisconsin that discloses key terms and strategic objectives which both entities have taken steps to preserve the secrecy of through a confidentiality clause and limiting access within each organization. DX0244 **[*30]** is a study performed by Navigant Consulting commissioned by SwedishAmerican which contains interviews with senior management and board members about the strategic direction of SwedishAmerican. SwedishAmerican has restricted the use of this document to senior management and employees charged with strategy implementation. If these documents were made public, competitors would gain insights that would enable them to undercut or replicate SwedishAmerican's plans and strategies giving them an unearned competitive advantage.

The court has reviewed PX0289, PX4000, DX0240, and DX0244 and is satisfied that they contain SwedishAmerican's pricing information, contract terms, and negotiation strategies, which qualify as confidential commercial information and trade secrets based on the rationale and case law cited in § III.A of this order. See _Baxter Int'l, 297 F.3d at 547_ (holding that competitive business information constitutes a trade secret where its "economic value depends on its secrecy"); _PepsiCo., 54 F.3d at 1270_ (pricing information); _Ball Mem'l Hosp., 784 F.2d at 1345-46_ (bids during negotiations); _SmithKline Beecham, 261 F. Supp. 2d at 1008_ (terms and conditions of contracts "that might **[*31]** give other firms an unearned competitive advantage"); _Delta Med. Sys., 331 Ill. App. 3d at 794_ (contract terms). The court finds further that SwedishAmerican has shown good cause to keep these exhibits sealed because disclosure of the confidential information therein would harm its business while giving its competitors an unearned advantage. Therefore, SwedishAmerican's motion that PX0289, PX4000, DX0240, and DX0244 remain under seal is granted.

## IV. PARTIES' MOTIONS TO MAINTAIN HEARING EXHIBITS, PRE- AND POST-HEARING BRIEFS, AND FINDINGS OF FACT UNDER SEAL

### A. Defendants OSF and RHS

Defendants have requested that portions of their pre-hearing, post-hearing, and reply briefs, as well as their proposed findings of fact, remain under seal and have submitted proposed redacted versions of those briefs to

be filed in the public record. The court has reviewed the redacted versions of these documents and concludes that the prosed redactions of references to confidential information are appropriate. However, the court notes that it is not necessary to redact the exhibit number itself of a sealed exhibit, as opposed to the content of a sealed exhibit, because citation to an exhibit number does not **[*32]** reveal any confidential information. Therefore, with this modification, un-sealed redacted copies of these documents are to be filed with the clerk within 14 days of this order.

Defendants also collectively request that 133 hearing exhibits remain under seal. In support of their request, defendants have submitted the declarations of Henry Seybold Jr., Senior Vice-President and Chief Financial Officer for RHS, and Robert Sehring, Chief Executive Officer, Ambulatory Services and Accountable Care Division of OSF. Seybold declares that 80 hearing exhibits[2] contain competitively sensitive information regarding: RHS' operations and potential affiliations; perceived benefits of the RHS/OSF affiliation; competitor hospitals' or managed care organizations' information; managed care contracting; internal analysis of RHS' strengths, weaknesses, and future opportunities; analysis reflecting RHS' views of competitor hospitals; budgeting and forecasting information; confidential discussions regarding recruitment, clinical development, and market assessments; contracting and negotiating information; RHS' confidential contracting communications with BCBSIL, Coventry, Aetna, Alliance, Choice Care Network, **[*33]** and ECOH; reports of independent auditors; contracts between RHS and Coventry; the Affiliation Agreement; post-affiliation strategic plans; confidential financial and operating data; discussions of future goals and strategies; confidential performance and operation statistics; confidential content of Board of Directors' and finance committee meetings; projected Medicare payments; confidential discussions regarding healthcare reform legislation; confidential communications regarding legal counsels' retention of FTI to perform a study; expert reports containing information regarding the parties' and non-parties' (including competitor hospitals and managed care organizations) managed care contracting; operating and capital budget reports; and transcripts of the depositions of Paula Dillon, Henry Seybold, Susan Schrieber, Kevin Ruggles, Gary Kaatz, and Monica Noether which contain confidential information pertaining to RHS, OSF, and non-parties including managed care contracting, terms of RHS/OSF affiliation, and strategic plans. Seybold further declares that public disclosure of the confidential information within these 80 exhibits would cause a clearly defined, serious competitive injury **[*34]** to RHS and to various managed care organizations.

Sehring declares that 53 hearing exhibits[3] contain competitively sensitive information regarding: payor mix figures; financial status and operations of St. Anthony Medical Center ("SAMC"); OSF's operation data; confidential contract rates of various services hired by OSF; analysis of OSF and SAMC negotiation and contract strategy; the process and evaluation of the FTI Efficiencies Study; analysis of OSF's and SAMC's negotiation and contract strategy with managed care organizations; SAMC's views **[*35]** on its competitors; the negotiation process regarding the proposed affiliation; SAMC's market position and business strategy; financial analysis of potential reconfiguration of SAMC's facility; analysis of OSF's market position and business strategy; OSF's business strategy regarding managed care organizations contracting; OSF's quality status and improvement strategy; specific rates and negotiations of managed care organizations contracts; managed care contracting portfolios of OFS and RHS; pricing information relating to managed care contracts between OSF and managed care organizations; and profitability information.

---

[2] Specifically, DX0004, DX0005, DX0007, DX0026, DX0028, DX0032, DX0034, DX0035, DX0036, DX0038, DX0039, DX0040, DX0041, DX0047, DX0050, DX0056, DX0059, DX0066, DX0080, DX0095, DX0098, DX0101, DX0122, DX0145, DX0163, DX0170, DX0183, DX0184, DX0185, DX0186, DX0355, DX0397, DX0698, DX0706, DX0710, DX0716, DX0898, PX0004, PX0034, PX0037, PX0041, PX0168, PX0174, PX0175, PX0210, PX0215, PX0216, PX0220, PX0226, PX0301, PX0556, PX0563, PX0566, PX0568, PX0576, PX0580, PX0592, PX0623, PX0630, PX0681, PX0690, PX0696, PX0704, PX0715, PX2000, PX2263, PX2269, PX3546, PX3590, PX3620, PX3683, PX3684, PX4021, PX4025, PX4626, PX4691, PX4711, PX4712, PX4763, PX4764.

---

[3] Specifically, DX0003, DX0012, DX0189, DX0190, DX0191, DX0193, DX0194, DX0195, DX0196, DX0197, DX0394, DX0561, DX0572, DX0700, DX0708, DX0709, PX0005, PX0211, PX0213, PX0225, PX0227, PX0229, PX0318, PX0321, PX0322, PX0329, PX0340, PX0345, PX0371, PX0375, PX0376, PX0388, PX0452, PX0458, PX0465, PX0482, PX0485, PX2001, PX2262, PX2264, PX2268, PX3049, PX3069, PX3090, PX4020, PX4023, PX4515, PX4573, PX4595, PX4596, PX4603, PX4604, PX4726.

The court finds that the 133 hearing exhibits which defendants request remain sealed contain defendants' pricing information, contract terms, **[*36]** and negotiation strategies, which qualify as confidential commercial information and trade secrets based on the rationale and case law cited in § III.A of this order. See *Baxter Int'l, 297 F.3d at 547* (holding that competitive business information constitutes a trade secret where its "economic value depends on its secrecy"); *PepsiCo., 54 F.3d at 1270* (pricing information); *Ball Mem'l Hosp., 784 F.2d at 1345-46* (bids during negotiations); *SmithKline Beecham, 261 F. Supp. 2d at 1008* (terms and conditions of contracts "that might give other firms an unearned competitive advantage"); *Delta Med. Sys., 331 Ill. App. 3d at 794* (contract terms). The court finds further that defendants have shown good cause to keep these exhibits sealed because disclosure of the confidential information therein would harm their businesses while giving their competitors an unearned advantage. Therefore, defendants' request to maintain these exhibits under seal is granted.

## B. Plaintiff FTC

The FTC has requested that portions of its pre-hearing, post-hearing, and reply briefs, as well as its proposed findings of fact remain under seal and has submitted proposed redacted versions of those briefs to be filed in the **[*37]** public record. The FTC states that it has conferred with defendants and they agree with the FTC's proposed redactions with the exception of the following three instances, which the FTC has not redacted and defendants believe should be redacted: (1) references on page 8 of the FTC's pre-hearing brief to three instances of coordination between the three Rockford hospitals in 2005, 2007, and 2008; (2) the chart on page 9 of the FTC's post-hearing brief titled "Notable Coordinated Activity" summarizing instances of coordination among the three Rockford Hospitals between 2005 and 2011; and (3) a reference on page 9 of the FTC's post-hearing reply brief to an email between OSF executives discussing cost savings projections generated by FTI. The court agrees with the FTC that these portions of the FTC's briefs do not contain any specific confidential business information and should not be redacted. More specifically, these portions of the FTC's briefs do not reveal any pricing information, bids during negotiations, or contract terms that could give other firms an unearned competitive advantage. The court has also reviewed the balance of the redacted versions of these documents and concludes **[*38]** that the proposed redactions of

references to confidential information are appropriate. However, the court notes that it is not necessary to redact the exhibit number itself of a sealed exhibit, as opposed to the content of a sealed exhibit, because citation to an exhibit number does not reveal any confidential information. Therefore, with this modification, un-sealed redacted copies of these documents are to be filed with the clerk within 14 days of this order.

**End of Document**


# Bayer Healthcare, LLC v. Norbrook Labs., Ltd.

United States District Court for the Eastern District of Wisconsin

October 22, 2009, Decided; October 23, 2009, Filed

Case No. 08-C-0953; Case No. 09-C-0108)

**Reporter**
2009 U.S. Dist. LEXIS 105078 *; 2009 WL 3444938

BAYER HEALTHCARE, LLC, Plaintiff-Counterclaim Defendant, v. NORBROOK LABORATORIES, LTD., and, NORBROOK, INC. USA, Defendants-Counterclaimants.

**Subsequent History:** Later proceeding at *Bayer Healthcare, LLC v. Norbrook Labs., Ltd., 2010 U.S. Dist. LEXIS 4805 (E.D. Wis., Jan. 20, 2010)*

**Prior History:** *Bayer Healthcare, LLC v. Norbrook Labs., Ltd., 2009 U.S. Dist. LEXIS 126929 (E.D. Wis., Sept. 23, 2009)*

## Core Terms

sealing, Exhibits, motion to compel, good cause, confidential, commercial information, reply brief, regulations, expedited, materials, excerpts, parties, specific information, interested members, statement of facts, file a statement, non-dispositive, proprietary, designated, portions, provides, redacted, animal, papers

**Counsel:** **[*1]** For Bayer Healthcare LLC, Plaintiff: Jamie L Simpson, LEAD ATTORNEY, Aaron P Maurer, Bruce R Genderson, David I Berl, Stanley E Fisher, Williams & Connolly LLP, Washington, DC; Katherine W Schill, Paul E Benson, LEAD ATTORNEYS, Michael Best & Friedrich LLP, Milwaukee, WI.

For Norbrook Laboratories Ltd, Norbrook Inc USA, Defendants: Dillon Kim, Eric J Lobenfeld, Lyndon M Tretter, LEAD ATTORNEYS, Hogan & Hartson LLP, New York, NY; Donald A Daugherty, Jr, Lisa M Arent, LEAD ATTORNEYS, Kenneth R Nowakowski, Whyte Hirschboeck Dudek SC, Milwaukee, WI.

**Judges:** Hon. Rudolph T. Randa, U.S. District Judge.

**Opinion by:** Rudolph T. Randa

## Opinion

### DECISION AND ORDER

This Decision and Order addresses the Civil Local Rule 7.4 expedited non-dispositive motions to seal filed by Plaintiff Bayer Healthcare, LLC's ("Bayer") on August 28, 2009, and October 5, 2009. Bayer seeks permission to file under seal portions of its brief in support of its motion to compel discovery from Defendants Norbrook Laboratories, Ltd. and Norbrook, Inc., USA ("Norbrook"); Exhibits B, C, D, E, G, and J to the Declaration of Jamie L. Simpson ("Simpson") filed on August 28, 2009; Exhibit D to the Simpson Certification; portions of Bayer's reply brief in support **[*2]** of its motion to compel that cite or discuss evidence designated as confidential by Norbrook; and, Exhibits P and Q to the Simpson Declaration filed on October 5, 2009. Bayer has filed redacted versions of its initial and reply briefs in support of its motion to compel.

On September 15, 2009, Norbrook filed a statement in support of sealing the August 28, 2009, materials relying upon the policy of confidentiality reflected by *21 C.F.R. § 20.61* and *§ 314.430*, United States Food and Drug Administration ("FDA") regulations, which govern the disclosure of the existence of abbreviated new animal drug applications ("ANADAs") and data and information in ANADAs. Norbrook also provides specific information regarding Exhibits B, C, D, E, G, and J to the Simpson Declaration filed on August 28, 2009, and Exhibit D to the Simpson Certification filed on August 28, 2009.

Norbrook has not established that the exhibits proffered with the sealing request were filed with the FDA, nor has it provided any case law or similar authority for extending the scope of the regulations beyond FDA filings. Thus, the Court will not rely upon the FDA regulations or the policy underlying those regulations as providing **[*3]** "good cause" to seal the materials.

However, based on the specific information provided by Norbrook, the Court concludes that "good cause" exists to seal Exhibit B to the Simpson Declaration, which is an excerpt from the Rule 30(b)(6) deposition of Norbrook witness William G. Zollers ("Zollers") whose testimony relates to proprietary Norbrook commercial information related to the filing of the ANADA with the FDA, and Exhibits C, D, E, and G to the Simpson Declaration which are internal proprietary emails from Norbrook containing commercial information and strategy related to the filing of the ANADA with the FDA. Good cause also exists for sealing Exhibit J to the Simpson Declaration, which is the same as Exhibit D to the Simpson Certification. That Exhibit is a letter from Norbrook's counsel to Bayer's counsel which contains Norbrook confidential development and commercial information including a list of distributors that Norbrook has used to distribute some of its products other than the generic version of the injectable animal drug product BAYTRIL(R) 100 at issue in this litigation. The Court further finds that the redaction of Bayer's brief in support of its motion to compel is limited **[*4]** to confidential material and that, therefore, good cause exists for sealing that brief. Thus, the Court will grant Bayer's motion to seal Exhibits B, C, D, E, G, and J to the Simpson Declaration filed on August 28, 2009, Exhibit D to the Simpson Certification filed on August 28, 2009, and the brief in support of Bayer's motion to compel. However, the sealing order will expressly provide that any party and any interested member of the public may challenge the sealing of those papers. *See County Materials Corp. v. Allan Block Corp., 502 F.3d 730, 740 (7th Cir. 2007).*

As to Bayer's motion to seal filed October 5, 2009, no facts are provided other than Norbrook has designated Exhibits Q and P as confidential. Review of Exhibit P discloses that it contains confidential development and commercial information which provides good cause for its sealing. However, as to Exhibit Q, good cause for sealing is not disclosed from the Court's review of that document. *See id.* Thus, the Court will allow the parties to file a brief statement of any facts which they believe establish good cause to seal Exhibit Q, and excerpts of, or discussions of it in Bayer's reply brief in support of its motion to compel. **[*5]** The parties may file that statement of facts by November 5, 2009. After that date, the Court will decide the expedited motion to seal filed on October 5, 2009.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Bayer's Civil Local Rule 7.4 expedited non-dispositive motion to seal filed on August 28, 2009, (Docket No. 78) is **GRANTED.**

Exhibits B, C, D, E, G, and J to the Simpson Declaration filed on August 28, 2009, (Docket No. 83), Exhibit D to the Simpson Certification filed on August 28, 2009, (Docket No. 84); and, Bayer's brief in support of its motion to compel (Docket No. 82) are **SEALED.**

Any party or interested member of the public may challenge the sealing of any or all of the following papers: Exhibits B, C, D, E, G, and J to the Simpson Declaration filed on August 28, 2009 (Docket No. 83); Exhibit D to the Simpson Certification filed on August 28, 2009, (Docket No. 84); and, Bayer's brief in support of its motion to compel (Docket No. 82).

**No later than November 5, 2009,** the parties may file a statement of any facts that they believe provide the basis for sealing Exhibit Q to the Simpson Declaration filed on October 5, 2009, and, excerpts or discussions of it in Bayer's **[*6]** reply brief in support of its motion to compel.

Dated at Milwaukee, Wisconsin this 22nd day of October 2009.

**BY THE COURT**

*/s/ Rudolph T. Randa*

**Hon. Rudolph T. Randa**

**U.S. District Judge**