UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

REBECCA TERRY,

        Plaintiff,

v.

COUNTY OF MILWAUKEE, DAVID A.
CLARKE, JR., in his personal and official
capacities, OFFICER BRIAN WENZEL, JANE
AND JOHN DOE, UNKNOWN EMPLOYEES
OF MILWAUKEE COUNTY JAIL, JANE AND
JOHN DOE, UNKNOWN JAIL
SUPERVISORS, ARMOR CORRECTIONAL
HEALTH SERVICES, CAROLYN EXUM,
MORGAN BEVENUE, MARGARET
HOOVER,

        Defendants.

Case No.:  17-cv-1112-JPS

---

**MEMORANDUM IN SUPPORT OF DEFENDANT ARMOR CORRECTIONAL
HEALTH SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Rebecca Terry ("Ms. Terry") arrived at the Milwaukee County Jail ("MCJ") March

9, 2014, around 6:00 p.m. An immediate assessment discovered Ms. Terry was in late stage

pregnancy, had received no prenatal care and complained of feeling contractions. Concerned about

potential labor, a medical decision to send her for medical clearance at Froedtert Memorial Lutheran

Hospital ("Froedtert") was made around 6:30 p.m. Milwaukee County deputies eventually

transferred her to Froedtert.

Ms. Terry returned to MCJ on March 10, 2014 around 1:00 a.m. During two subsequent

nursing assessments an MCJ nurse consulted the MCJ Medical Director. The MCJ nurse obtained

information from a Froedtert nurse about the medical treatment provided to Ms. Terry, including

assurance that Ms. Terry was not in labor. By 1:45 a.m., she was booked into MCJ and housed in the Special Medical Unit ("SMU") where the highest level of inmate observation is provided.

Without notice to the medical staff, Ms. Terry delivered her baby in the SMU three hours later. Upon learning of the birth, a medical emergency was called and MCJ medical staff immediately attended to Ms. Terry. Ms. Terry was in transport to a hospital with emergency medical services ("EMS") in less than 30 minutes. The only physical injury to Ms. Terry was a peritoneal tear, which commonly occurs during delivery. Her baby suffered no injury.

No reasonable jury could find the conduct of the health care staff or Armor Correctional Health Services, Inc. ("Armor") constitutes deliberate indifference. Accordingly, defendant Armor, by its attorneys, Hinshaw & Culbertson LLP, seeks summary judgment to dismiss Ms. Terry's *Monell* claim against it, which consequently dismisses Armor.

## PROCEDURAL HISTORY

Ms. Terry filed her lawsuit August 10, 2017. (ECF No. 1). Armor timely filed an Answer, then twice moved for judgment on the pleadings. (ECF Nos. 20, 36, 82.) Both motions were granted. (ECF Nos. 41, 127.) Ms. Terry filed an Amended Complaint. (ECF No. 129.) Ms. Terry asserted three new and substantially different *Monell* theories, removed all references to specific "other incidents" and no longer claims that she received no medical care. (ECF Nos. 1, 129.) Ms. Terry continues to claim damages of "extreme distress and fear during childbirth," asserting she "has suffered and continues to suffer nightmares, flashbacks, extreme distress, fear, humiliation, sadness and anger." (ECF No. 129, ¶¶ 54-55.) Armor timely answered. (ECF No. 142.)

## FACTUAL BACKGROUND

Armor's contract to provide health care services at MCJ began May 11, 2013. (PFOF ¶ 4.)

Ms. Terry was arrested and taken for booking at MCJ on March 9, 2014. (PFOF ¶ 5.) Ms. Terry was first examined at MCJ around 6:00 p.m. (PFOF ¶ 6.) The MCJ booking nurse noted:

302453807v1 1003420

> Inmate states she is pregnant[.] She is due 3-11-14[.] She has had no prenatal care since leaving Milwaukee County Jail in 11/2013[.] This is her 13th pregnancy[.] She has had several miscarriages and 1 abortion[.] Inmate states she is currently living in a motel and has been using IV heroin off and on for the last 4 years[.] The last year she has been using daily[.] Inmate states she has a [history] of mood disorder and anxiety[.] She has not taken psych [medication] in over a year[.]

(PFOF ¶ 7.) After learning this, and that Ms. Terry believed she felt labor pains, an advanced practice provider was consulted and ordered Ms. Terry transferred to Froedtert for clearance at 6:30 p.m. (PFOF ¶¶ 8, 10.) Armor requires that patients in labor be transferred to a hospital for delivery. (PFOF ¶ 9.) No inmate is housed at MCJ if she is in labor. (Id.) Ms. Terry was evaluated at Froedtert and then returned to MCJ around 1:00 a.m. on March 10, 2014.[1] (PFOF ¶ 10.)

When she returned, the night shift booking nurse, Ms. Carolyn Exum, reviewed Froedtert's generic documents, stating "no new orders" with instructions to follow up with an obstetrician. (PFOF ¶¶ 12-14.) There was no description of Ms. Terry's treatment or Froedtert's conclusions. (Id.)

Inmates' return from hospital visits without substantive paperwork was a recurrent issue. (PFOF ¶ 15.) Armor had taken measures before Ms. Terry was incarcerated to encourage Froedtert, and other area hospitals, to send discharge summaries and instructions with inmates cleared to return to MCJ, through meetings and tours of MCJ with hospital representatives. (Id.)

Ms. Exum performed the first of two assessments, the "prebooking" examination of Ms. Terry, promptly upon her return from Froedtert. (PFOF ¶ 16.) She found Ms. Terry's vitals stable, not indicative of active labor. (Id.) She asked Ms. Terry how she felt, whether she felt any contractions and checked her abdomen for contractions. (PFOF ¶¶ 17, 20.) Ms. Exum had been trained how to detect contractions and did not detect any. (PFOF ¶¶ 18-19.) Ms. Terry denied

---

[1] Froedtert is one of the best hospitals in the Milwaukee area, and is nationally recognized for its quality. (PFOF ¶ 11.)

302453807v1 1003420

having contractions. (PFOF ¶ 21.) She told Ms. Exum of "pressure at the bottom," nothing more. (PFOF ¶ 22.) Ms. Terry had no complaint of abdominal pain. (Id.)

Ms. Exum asked Ms. Terry about the tests Froedtert performed and the results. (PFOF ¶ 23.) Ms. Terry said Froedtert "put her on the machine, and then … they told her she was in labor." (PFOF ¶ 24.) Ms. Exum asked her why Froedtert sent her back if she was in labor; she said, "Because they just sent [me] back." (PFOF ¶ 25.) Ms. Exum had no further discussion about Froedtert's care with Ms. Terry because Ms. Exum "knew the hospital would not have sent [Ms. Terry] back if she was in labor, because that would be negligent." (PFOF ¶¶ 26-27.)

Around 1:15 a.m., Ms. Exum called Armor's MCJ Medical Director, Dr. Gina Buono, for direction on Ms. Terry. (PFOF ¶ 28.) Dr. Buono instructed Ms. Exum to call Froedtert for an oral report on the tests and care provided to Ms. Terry. (PFOF ¶ 29.)

Ms. Exum spoke with a Froedtert labor and delivery nurse at 1:20 a.m., who explained Froedtert believed Ms. Terry was sent to rule out labor. (PFOF ¶ 30.) "The machine" was attached to monitor her and the baby. After concluding Ms. Terry was not in labor, they sent Ms. Terry back to MCJ. (Id.) The nurse also said Ms. Terry's medical records were not ready, but the doctor would be asked to complete and fax them to MCJ. (Id.) Although MCJ medical staff did not have access to Ms. Terry's Froedtert medical records at the time, they confirm Froedtert concluded Ms. Terry was not in labor.[2] (PFOF ¶ 31.)

Ms. Exum called Dr. Buono again and relayed the information from Froedtert's labor and delivery nurse: Ms. Terry was cleared for return to MCJ and "not in labor." (PFOF ¶ 33.) Based upon Ms. Exum's examination of and history from Ms. Terry and the information from Froedtert,

---

[2] Additionally, Ms. Terry's Froedtert medical records document how she was "relaxed" and even sleeping while being monitored for three hours to determine if she was in labor. (PFOF ¶ 32.) They show she was instructed at discharge about the signs of early labor, given time to ask questions when she verbalized her understanding and denied any further concerns. (Id.)

302453807v1 1003420

Dr. Buono allowed Ms. Terry to be booked into MCJ. (PFOF ¶ 34.) In making her decision, Dr. Buono understood Froedtert would not "clear" a patient who needed to be admitted to the hospital, including a patient in active labor. (PFOF ¶ 35.) In addition, Dr. Buono ordered Ms. Exum to continue following up to obtain Ms. Terry's written medical records from Froedtert. (PFOF ¶ 36.)

If a patient returned to MCJ for booking without proper hospital paperwork and was medically stable, Dr. Buono preferred to have the patient booked into MCJ and housed in SMU where the inmate could be monitored to ensure patient safety and be provided with good care while MCJ's medical staff located the records. (PFOF ¶ 37.) In her professional experience, Dr. Buono found that inmates may end up being transported back and forth multiple times between the hospital and MCJ if they were not booked due to a lack of proper hospital paperwork. (PFOF ¶ 38.) The hospital does not have to accept the inmate again without a new medical concern, and Dr. Buono lacked authority to simply release the inmate. (Id.) Dr. Buono also concluded, based upon her professional knowledge and experience, that sending an inmate back and forth to the hospital for lack of paperwork is not in the best medical interest of the patient. (PFOF ¶ 39.) Rather, it is better to have the patient where MCJ medical staff is available as opposed to a transport vehicle. (PFOF ¶ 40.)

While Ms. Exum made the phone calls, Ms. Terry sat in the prebook area with a correctional officer present, across a counter from Ms. Exum. (PFOF ¶ 41.) Once Dr. Buono ordered Ms. Terry booked into MCJ, Ms. Exum performed the "booking" assessment of Ms. Terry. (PFOF ¶ 42.)

The "booking" assessment includes taking the height, weight, another set of vitals, a head to toe assessment of an inmate and responses to a series of questions, which can take about 20 minutes. (PFOF ¶ 43.) For Ms. Terry, the examination also included monitoring to ensure she was not having contractions. (PFOF ¶ 44.) From her return to MCJ through completion of her booking, Ms. Terry never complained to Ms. Exum about abdominal pain and Ms. Exum never observed her

302453807v1 1003420

experiencing abdominal pain. (PFOF ¶ 45.) Ms. Terry has no memory of the booking process after returning from Froedtert, or of speaking with Ms. Exum, the MCJ booking nurse. (PFOF ¶ 46.)

Ms. Terry was escorted to SMU and arrived around 1:45 a.m. (PFOF ¶ 55.) Ms. Terry was placed in SMU pursuant to Armor's policy of placing women in late stages of pregnancy initially in SMU. (PFOF ¶ 47.) Furthermore, Dr. Buono considered Ms. Terry a high risk patient because she was in her 13th pregnancy, received no prenatal care, her due date was in about a week, she abused IV heroin and she complained of a pressure sensation when she first arrived at MCJ. (PFOF ¶ 48.)

SMU was and is the highest level of inmate observation at MCJ. (PFOF ¶ 49.) The nursing station was located in the clinic across the hall from SMU. (PFOF ¶ 50.) The nurse assigned to SMU usually checked on patients at the beginning of the shift and then determined, based upon their conditions, how often to check on them for the duration of the shift. (PFOF ¶ 51.) In addition, as the Medical Director, Dr. Buono made rounds in SMU on a daily basis, usually in the morning. (PFOF ¶ 52.) The SMU correctional officer wrote down every time anyone entered SMU, including MCJ medical staff. (PFOF ¶ 53.) If an inmate in SMU needed care, the inmate could activate a call light, which lit up outside the cell, allowing the SMU correctional officer to answer the call light and contact the nurse at the clinic. (PFOF ¶ 54.)

Inspections were made of the SMU inmates, including Ms. Terry, by the SMU correctional officer, Officer Wenzel, on March 10, 2014, at 1:57 a.m., 2:27 a.m., 2:57 a.m., 3:11 a.m., 3:41 a.m., 3:57 a.m. and 4:27 a.m. (PFOF ¶ 56.) An inspection of the SMU inmates was conducted by another correctional officer, who remembers it was very quiet, at 3:27 a.m. (Id.) A further inspection of the SMU inmates was conducted at 4:40 a.m., by Lt. Montano. (Id.)

At approximately 4:46 a.m. on March 10, 2014, an MCJ nurse answered a call from Officer Wenzel, informing her that Ms. Terry "had delivered the baby," "the baby was out" and medical

staff was needed. (PFOF ¶ 57.)[3] Officer Wenzel called for help as soon as he became aware of her medical emergency. (PFOF ¶ 58.)

Ms. Terry, on the other hand, claims her symptoms changed approximately 45 minutes after arriving in SMU and she began pushing the emergency light with no response from the correctional officer. (PFOF ¶ 59.) She claims pounding on the window of the door to her cell at least three times. (Id.) She claims repeatedly screaming for help. (Id.) She claims her water broke in the cell. (Id.) She claims the SMU correctional officer simply ignored her yells, pounding and screams, waving her off with the shake of his hand. (Id.)

Within minutes of Officer Wenzel's call, a medical emergency was initiated, 911 was called and MCJ nurses responded to provide medical care for Ms. Terry and her baby. (PFOF ¶ 61.) At approximately 4:50 a.m., Ms. Exum responded with MCJ Nursing Supervisor Ms. Hoover, running from the first floor to the second floor, entering SMU and Ms. Terry's unit, and finding Ms. Terry with her baby. (PFOF ¶ 62.)

Upon entering Ms. Terry's unit, Ms. Exum observed Ms. Terry was responsive, and her baby was covered in blood and meconium and experiencing mild respiratory distress. (PFOF ¶ 63.) Ms. Exum immediately retrieved the OB kit and suctioned the baby nasally and orally. (Id.) She applied the OB clamp to the umbilical cord. (Id.) She and others moved the baby to Ms. Terry's stomach and applied oxygen to the baby. (Id.) Ms. Terry and her baby were covered with extra sheets. (Id.) Ms. Terry's vitals were taken. (Id.) Ms. Exum explained to Ms. Terry that no doctor was available to pull out her afterbirth, but that EMS was on the way. (Id.) At approximately 4:59 a.m., EMS arrived and shortly thereafter left with Ms. Terry and her baby. (PFOF ¶ 64.) Ms. Exum called Aurora Sinai Medical Center's Labor and Delivery unit ("Aurora Sinai") so they could

---

[3] Ms. Terry delivered her baby within three hours of arriving in SMU. (PFOF ¶ 60.)

302453807v1 1003420

prepare for Ms. Terry's arrival. (PFOF ¶ 65.) At Aurora Sinai, Ms. Terry was treated for a peritoneal tear from the delivery. (PFOF ¶ 66.)

The medical care provided to Ms. Terry on March 9, 2014 through March 10, 2014 by MCJ medical staff was in compliance with Armor's policies, procedures and practices pertaining to pregnant inmates. (PFOF ¶ 67.) Had Ms. Terry not delivered within her first three hours in SMU on March 10, 2014, she would have been seen by MCJ advanced medical care personnel within her first 24-48 hours to determine her plan of care, pursuant to Armor policy. (PFOF ¶ 68.) She also would have been seen by the SMU nurse, Ms. Bevenue, before the end of her shift. (PFOF ¶ 51.)

In addition, correctional officers were trained to identify and respond to medical emergencies through a combined effort by both Milwaukee County and Armor. (PFOF ¶ 69.) Milwaukee County provided general training on identifying and responding to medical emergencies during its Academy, annual training and occasionally in roll call, while Armor often provided separate and more focused training on suicidal and mentally ill inmates. (Id.) In fact, Officer Wenzel received training on March 7, 2013, which covered "KEY POINT: Never ignore an inmate's request to be seen during sick call, or take it upon yourself to determine that any request is invalid or that the inmate need not be seen." (Id.) If a correctional officer ignored an inmate's screaming and pounding on a cell door over an extended period of time, those acts or omissions were not a matter of training, but a failure to perform. (PFOF ¶ 70.)

## LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Best Wood Judge Firewood & Tree Serv. v. U.S. Dept. of Transp.*, 784 F. Supp. 2d 1059, 1062 (E.D. Wis. 2011) (citing Fed. R. Civ. P. 56 and *Celotex Corp. v. Catrett*,

302453807v1 1003420

477 U.S. 317, 322 (1986)). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Id.* Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, establishing a genuine issue for trial. *Id.* In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Id.* (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986)). However, the court is not required to draw every conceivable inference from the record and those inferences that are supported only by speculation and conjecture will not defeat summary judgment. *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Best Wood*, 784 F. Supp. 2d at 1062 (citing *Anderson*, 477 U.S. at 247–48). "Material" requires the factual dispute be outcome-determinative under governing law. *Id.* (citing *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997)). To show a question of fact is "genuine," "the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor." *Id.* (citing Fed. R. Civ. P. 56(e) and *Anderson*, 477 U.S. at 249). Thus, the judge's inquiry is whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient"). The court will determine whether there is a triable issue of fact in light of the "actual quantum and quality of proof" the parties must meet at trial. *Id.* at 252–54. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

9

## ARGUMENT

*Monell* holds that governmental entities can be held liable under § 1983, but not on a theory of respondeat superior. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011); *City of Okla. City v. Tuttle*, 471 U.S. 808, 810 (1985). The elements of a *Monell* claim are "(1) the deprivation of a constitutional right; (2) that action was taken pursuant to a custom, policy or practice of the local government unit; and (3) that such action was the cause of the deprivation." *Gaughan v. Crawford*, No. 05-C-4664, 2008 U.S. Dist. LEXIS 107910, at *5 (N.D. Ill. July 24, 2008) (emphasis added) (citing *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 690–95 (1978)). Thus, Armor can be liable for a *Monell* claim only if there is a determination that Ms. Terry's constitutional rights were deprived by an unconstitutional act.

In her Amended Complaint, Ms. Terry's *Monell* claim against Armor focuses on three broad theories: (1) a widespread practice of admitting inmates into the jail without receiving adequate paperwork/information from hospitals about the patient; (2) failure to train correctional officers to identify and respond to medical emergencies, in light of an obvious need; and (3) failure to develop a nursing protocol for inmates in late term pregnancy and labor. (ECF No. 129, pp. 12-14)

Ms. Terry's *Monell* claims against Armor fail as a matter of law for two overarching reasons. First, her Amended Complaint sets forth inadequate *Monell* claims against Armor, making dismissal on the basis of pleading deficiencies again appropriate.[4] Second, the undisputed material facts provide no basis for a reasonable jury to find Ms. Terry proved her *Monell* claims against Armor.

---

[4] Armor did not file a motion to dismiss or motion for judgment on the pleadings to address the pleading deficiencies in the Amended Complaint because the Court required pleading deficiencies for an amended *Monell* claim be raised in a motion for summary judgment. (ECF No. 127, p. 29.)

302453807v1 1003420

# I.  MS. TERRY FAILS TO STATE A *MONELL* CLAIM AGAINST ARMOR.[5]

To state a *Monell* claim for relief which is plausible on its face, Ms. Terry must provide "some specific facts" to support the basic elements of her claim; boilerplate allegations and legal conclusions are disregarded in determining the sufficiency of a *Monell* claim. *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011); *see also Braun v. Abele*, No. 15-CV-252-JPS, 2015 U.S. Dist. LEXIS 82574, at **4, 12 (E.D. Wis. June 25, 2015). Enough "factual heft" is required to "bind … together" the plaintiff's *Monell* theory and allow the court to "draw the reasonable inference" the municipality maintained a policy, custom or practice that deprived the plaintiff of his or her constitutional rights. (ECF No. 127, pp. 23-24 (*citing Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2014); *McCauley*, 671 F.3d at 616)) While *Monell* claims are not subject to a heightened pleading standard, they are inherently complex and may require greater factual support at the pleading stage. *See Braun*, 2015 U.S. Dist. LEXIS 82574, at **12-13 (citations omitted), *McCauley*, 671 F.3d at 616–17. (ECF No. 127, pp. 23-24.)

Each of Ms. Terry's three *Monell* claims against Armor is fatally pled. In particular, the claims both exceed the scope of amendment authorized by the Court and lack specific facts to support the basic elements of a *Monell* claim.

## 1.  The new claims exceed the scope of amendment authorized by the Court.

In her original *Monell* claim against Armor, Ms. Terry alleged she was ignored and suffered a "complete lack of medical care." (ECF No. 1, ¶ 46.) When the Court dismissed Ms. Terry's original *Monell* claim against Armor, it afforded her the opportunity to craft an amended complaint "curing the deficiencies the Court ha[d] identified." (ECF No. 127, p. 28) (emphasis added). For example, the Court suggested, while withholding judgment on the merits of such a claim, Ms. Terry

---

[5] Armor references the full discussion for properly pleading *Monell* claims set forth in its motion for judgment on the pleadings and in the Court's Order granting Armor's motion. (ECF Nos. 82, 108, 127.) Due to page limitations, a brief version of the legal standards is described here.

302453807v1 1003420

could attempt to "craft a narrower *Monell* claim based on [an alleged] intake procedure" at MCJ. (Id., p. 28 n. 10) However, because Ms. Terry added new allegations that are not consistent with her previous allegations, Ms. Terry's amended Monell claims exceed the scope of the Court's Order in numerous ways.[6]

First, one of Ms. Terry's new claims is based on an Armor policy requiring hospital documentation before admitting an inmate back to MCJ. This allegation directly contradicts and is not derivative of Ms. Terry's previous allegations of a "complete lack of medical care." The transfer of inmates for medical treatment or consultation outside the jail is, in fact, medical care. The decision to transfer inmates or admit them after clearance at a hospital demonstrates Armor's exercise of medical judgment and is therefore inconsistent with Ms. Terry's previous claims.

Second, Ms. Terry now explicitly alleges an "obvious need" existed to train correctional officers. This contradicts her previous *Monell* claim, which was based on "widespread practice" and is contrary to the law of the case. Significantly, the Court already found that Ms. Terry waived the "obvious need" theory. (ECF No. 127, p. 12.) Ms. Terry should not be allowed to invoke a claim already waived. Her new, inconsistent, and waived claim should be barred.

Third, Ms. Terry now claims Armor failed to develop a specific type of policy: a nursing protocol regarding inmates in late pregnancy and labor. Despite the broad scope of her previous *Monell* claim, the failure to develop a policy was simply not one of them. (ECF No. 127, 8.)

_____

[6] Armor recognizes that, under Fed. R. Civ. P. 15(a)(2), amendment is permitted with the court's leave and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. Proc. 15(a). Typically, leave to amend is not restricted to curing deficiencies in pleading or alleging narrower claims. *See id.* However, this is a different situation for two reasons. First, Ms. Terry did not request leave to amend her complaint to bring new *Monell* claims, she requested leave to amend only if necessary to fix her deficient pleading. (ECF No. 103, p. 12 n. 3) On that basis, Ms. Terry's leave to amend was limited by the Court. (ECF No. 127, p. 28.) Second, it is highly prejudicial to Armor to allow Ms. Terry to bring new, different *Monell* claims given the stage of litigation. Even though the Court allowed for additional discovery, the claims are entirely new. *See Ferguson v. Roberts*, 11 F.3d 696, 706–07 (7th Cir. 1993) (denying leave to amend complaint because it contained new claims that prejudiced responding party).

302453807v1 1003420

Ms. Terry's amended *Monell* claims are neither consistent with nor a narrower version of her original claims. Rather, she has advanced three altogether new *Monell* claims. Consequently, her amended *Monell* claims against Armor (Count I) must be dismissed for failing to cure the original complaint's deficiencies and exceeding the scope of the Court's Order.

      **2.**      **Ms. Terry's *Monell* claims against Armor lack necessary factual allegations.**

          a.      ***No facts alleged support causation or notice of a widespread unconstitutional practice admitting inmates into MCJ with inadequate paperwork from hospitals.***

Ms. Terry's *Monell* claim alleging a widespread practice of admitting inmates into the jail with inadequate paperwork from hospitals fails due to lack of causation. A proper *Monell* complaint must allege specific causation, that is, an official policy or custom "not only caused the constitutional violation, but was 'the moving force' behind it." *Estate of Sims v. Cty. of Bureau*, 506 F.3d 509, 514-15 (7th Cir. 2007); *see also Arlotta v. Bradley Ctr.*, 349 F.3d 517, 522 (7th Cir. 2003). Ms. Terry must allege facts allowing the inference that the challenged policy, practice, or custom was the "moving force behind her injury, not merely the "but for" cause. *See Orlowski v. Milwaukee Cty.*, No. 13-CV-1318-PP, 2016 U.S. Dist. LEXIS 53537, at *56 (E.D. Wis. Apr. 21, 2016); *see Wilson v. Cook Cnty.*, 742 F.3d 775, 784 (7th Cir. 2014) (*citing Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)).

Ms. Terry claims this practice caused her alleged constitutional injury because it prevented MCJ's Medical Director from having information needed to make an adequate treatment plan, which would have led to Ms. Terry being taken to the hospital to give birth. (ECF No. 129, ¶ 63.) However, this conclusory argument fails in light of the plan made by MCJ's Medical Director: admit her into the SMU where she will be closely observed instead of ping-ponging her back and forth between the hospital and MCJ until her paperwork is completed. The plan enacted demonstrates constitutional care. Thus, Ms. Terry's lack of proper paperwork *Monell* claim fails

13

because she suffered no constitutional violation and, therefore, the decision was not the "moving force" behind any alleged constitutional injury. Notably, Ms. Terry claims the SMU correctional officer ignored her screams for help during at least two hours of labor prior to delivery. (Id. ¶ 39.) This alleged unconstitutional conduct is the "moving force" behind her alleged constitutional injury and cannot be attributed to or tied in any way to any alleged unconstitutional admittance practice.[7]

Ms. Terry also fatally fails to allege Armor had notice. To state a widespread practice *Monell* claim, Ms. Terry must allege facts tending to show the alleged activity was so persistent and widespread the responsible policymakers should have known about the behavior <u>and</u> the practice was "so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *See Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001); *Calhoun*, 408 F.3d at 379. Facts must be pled to allow the inference defendants must have had notice of an ongoing problem such that allowing the problem to endure was akin to a conscious choice among alternatives. *Canton v. Harris*, 498 U.S. 378, 389 (1989); *Tuttle*, 471 U.S. at 823. Only allegations of similar incidents are sufficient to support a widespread practice *Monell* claim because the defendant must have had notice that some kind of change is necessary to avoid constitutional violations. *Connick v. Thompson*, 563 U.S. 51, 54 (2011); *Gill*, 850 F.3d at 344; *see also Ekergen v. Chicago*, 538 F. Supp. 770, 773 (N.D. Ill. 1982) ("General, unspecific allegations of frequent 'illegal arrests' or 'illegal searches and seizures,' however, fail to establish any pattern.").

Ms. Terry ineffectively relies on the Shansky reports to allege notice to Armor. (ECF No. 129, ¶¶ 27-31.) As this Court has already explained, the Shansky reports do not fill the prior notice

---

[7] Moreover, as set forth above, the undisputed evidence shows MCJ's medical staff received all the information they needed from Froedtert by phone, that is, the information which would have been contained in her discharge paperwork. (PFOF ¶¶ 30-31.) Thus, the undisputed evidence shows MCJ medical staff did in fact have the information about Ms. Terry's condition which the amended complaint alleges was never received. Remarkably, Ms. Terry knew months before she filed her Amended Complaint through Dr. Buono's April 25, 2018 and Nurse Exum's March 19, 2018 depositions that MCJ medical staff obtained the information about Ms. Terry's hospital care by phone from the Froedtert nurse; yet, she made this specious allegation. (PFOF ¶¶ 30, 33, 71-72; ECF No. 129.)

gap. (ECF No. 127, pp. 8-9, 19-20.) Furthermore, although Ms. Terry also references deposition testimony from MCJ's medical director and nursing director acknowledging the practice occurs, she fails to allege examples of other incidents of constitutional harm to inmates due to this alleged improper admittance practice.[8] As a result, Ms. Terry fails to allege Armor had notice of this alleged *Monell* widespread practice claim. Consequently, the claim must be dismissed.

> b. ***No facts alleged support a failure to train correctional officers to identify and respond to obvious medical emergencies in light of an "obvious need," or that such a failure caused Ms. Terry's injury.***

In the event this Court finds Ms. Terry can amend her complaint to incorporate a theory of an "obvious need" to train, she has still failed to do so adequately. An "obvious need" applies to situations where "a violation of federal rights may be a highly predictable consequence of a failure to equip [officials] with specific tools to handle recurring situations." *Bd. Of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997) (citing *Canton*, 489 U.S. at 390). Boilerplate "failure to train" allegations that lack supporting facts have been rejected by district courts in the Seventh Circuit. *See Foy v. City of Chicago*, No. 15 C 3720, 2016 U.S. Dist. LEXIS 63346, at *28-29 (N.D. Ill. May 12, 2016). Plaintiffs must come forward with "enough factual heft to unite the cited incidents and support the reasonable inference that they amount to a pervasive governmental practice that was the catalyst for her injury. (ECF No. 127, p. 24) (citing *Gill*, 850 F.3d at 344; *McCauley*, 671 F.3d at 616).

To support her failure to train claim, Ms. Terry references requirements in Armor's contract with Milwaukee County and the National Commission on Correctional Health Care ("NCCHC")

---

[8] Moreover, Ms. Terry's reference to this deposition testimony conveniently omits the full context, in which Dr. Buono and Ms. Strehlow both explain Armor was actively working with local hospitals to prevent inmates from being sent back to MCJ without the proper paperwork. (PFOF ¶ 15.) Thus, their undisputed testimony demonstrates this type of situation was not being ignored, precluding a finding of deliberate indifference. The undisputed testimony also shows the medical staff involved with Ms. Terry's care prudently exercised their professional medical judgment not to enforce the policy in this particular instance, also precluding a finding of deliberate indifference. (PFOF ¶¶ 34-40.)

302453807v1 1003420

related to training correctional officers.[9] (ECF No. 129, ¶¶ 65-66.) These references do not show that training was deficient, necessarily led to constitutional deprivations, or can be connected in any way to Ms. Terry. Ms. Terry has not pled any factual support to show what training was missing, that, in fact, the training was not done, or how it led to her particular alleged constitutional deprivation.[10] As to the last point, the Court rejected Ms. Terry's original complaint, explaining she provided "no support for the idea that her childbirth was a specific type of recurring situation that would predictably give rise to a constitutional violation absent some specific training." (ECF No. 127, p. 13.) The Court's reasoning rejecting her original allegations still applies: "it cannot be said that some specific training was obviously needed to forestall a highly predictable constitutional violation in Terry's case." (Id.) (citing *Connick*, 563 U.S. at 67); *Johnson*, 526 F. App'x at 697.

Furthermore, the alleged deliberate indifference by the correctional officer assigned to the SMU cannot be attributed to any failure to train by Armor. (*See* PFOF ¶ 70.) Common sense suggests that a correctional officer would call for help or at least look in on an inmate to assess whether an emergency existed if an inmate was, over the course of two hours, screaming and yelling during painful labor, screaming and yelling when her water broke, screaming in pain during delivery, and pounding on the cell window on at least three occasions. No reasonable jury could conclude some amount of <u>additional</u> training could impact the conduct of the correctional officer if the events unfolded as alleged by Ms. Terry. This is not a case where Officer Wenzel looked in on

_____

[9] In a footnote to her allegation regarding NCCHC accreditation standards, Ms. Terry also references an article from the Milwaukee Journal Sentinel discussing alleged errors surrounding the inmate Terrill Thomas, who was housed at MCJ two years after Ms. Terry. She does not explain the relevance of her citation as it relates to her claims. In the event she seeks to rely on it as a separate incident to establish a pattern for a widespread practice, her reliance is insufficient because (1) it is not sufficiently similar to Ms. Terry's situation, (2) one other incident does not establish a pattern, and (3) subsequent incidents do not establish a pattern as it concerns Ms. Terry's medical care. *Gill*, 850 F.3d at 344; *Thomas v. Cook Cnty. Sheriff's Dept*, 604 F.3d 293, 303, (7th Cir. 2009); *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994).

[10] Moreover, like the specious alleged improper booking admission claim, Ms. Terry knew at the time of filing her Amended Complaint Officer Wenzel received training by Milwaukee County on responding to medical emergencies. Officer Wenzel's training documents were produced April 16, 2018, two months before the Amended Complaint was filed. (PFOF ¶ 69, ECF No. 129.)

302453807v1 1003420

Ms. Terry but, due to a lack of training, failed to appreciate the emergent nature of her condition. Ms. Terry's failure to train *Monell* claim is a desperate red herring in an attempt to forge a *Monell* claim against Armor.

Ms. Terry has not and cannot plausibly allege Armor's failure to train caused, or was the "moving force behind her injury." *See Orlowski*, 2016 U.S. Dist. LEXIS 53537, at *56; *Wilson*, 742 F.3d 775, 784.

On these bases, the claim is insufficiently pled and must be dismissed.

      c.    ***No facts alleged support notice for a failure to develop a nursing protocol for inmates in late term pregnancy and labor.***

Finally, Ms. Terry's *Monell* claim of a failure to develop a nursing protocol for inmates in late term pregnancy and labor lacks any specific facts showing Armor had notice of this alleged need. *See Latuszkin*, 250 F.3d at 505; *Calhoun*, 408 F.3d at 379; *Connick*, 563 U.S. at 54; *Gill* , 850 F.3d at 344.

The amended complaint includes no allegations of other similar preceding incidents—or any preceding incidents—to support the notice element of Ms. Terry's new *Monell* claim. Ms. Terry also does not declare the need as obvious or allege facts that would establish it as obvious. Consequently, the claim is insufficiently pled and must be dismissed.[11]

As a result, Ms. Terry's three new *Monell* claims against Armor are insufficient and fatally pled. For this reason alone, dismissal with prejudice is appropriate.

## II.    MS. TERRY'S *MONELL* CLAIMS AGAINST ARMOR MUST BE DISMISSED BECAUSE THEY ARE NOT SUPPORTED BY EVIDENCE.

---

[11] Moreover, as set forth in the evidentiary section of this brief, *infra*, the undisputed testimony of the medical professionals is that inmates in labor are sent to the hospital and not housed in MCJ. (PFOF ¶ 9.) To that end, Ms. Terry cannot establish the need for her purported policy. Furthermore, in Ms. Terry's case, when MCJ staff suspected labor, Ms. Terry was sent to Froedtert to be evaluated. (PFOF ¶ 8.) The hospital then sent Ms. Terry back to the MCJ having ruled out labor. (PFOF ¶¶ 30-31.) Ms. Terry was not experiencing contractions when she was assessed by Ms. Exum, back at the MCJ, from 1:00 am through 1:30 am. (PFOF ¶¶ 10, 12-22.) Although Ms. Terry eventually went into labor, the medical staff had no notice her condition changed until after the birth.

302453807v1 1003420

To prove a *Monell* claim against Armor, Ms. Terry must first establish she suffered a deprivation of a constitutional right—here, medical deliberate indifference to her serious medical needs—as her constitutional injury, which she cannot. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994). Even if she could establish the requisite constitutional injury, Ms. Terry is unable to demonstrate the allegedly unconstitutional act was caused by a widespread practice for which Armor was responsible, which was the "moving force" behind her constitutional injury. *Thomas*, 604 F.3d at 303; *Daniel v. Cook Cnty.*, 833 F.3d 728, 736 (7th Cir. 2016). Thus, Ms. Terry has no material evidence for her *Monell* claims against Armor to survive summary judgment.

1.     **MCJ medical staff provided constitutional medical care to Ms. Terry.**

The Eighth Amendment protects against "deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This standard imposes two high hurdles. *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590–91 (7th Cir. 1999). First, a plaintiff must show a state official acted with the requisite culpable state of mind, deliberate indifference, which is evaluated by a subjective standard. *Id.* Second, a plaintiff must show her condition was serious.[12] *Id.* "The denial of medical treatment satisfies the deliberate indifference standard only if significant harm or injury is shown." *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005).

Deliberate indifference requires more than negligence, gross negligence, or even recklessness; the care or lack of care must amount to the criminally reckless or deliberate infliction of suffering. *See Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998). A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v.*

---

[12] Armor admits Ms. Terry's condition on March 9-10, 2014 constituted a serious medical need. Notwithstanding, Armor disputes Ms. Terry suffered significant physical injury as a consequence of any constitutional violation. Although Ms. Terry only claims pain and suffering damages (ECF No. 129, ¶¶ 54-55), to the extent she contends her peritoneal tear was a physical injury resulting from the alleged constitutional violation, she has no evidence to move beyond speculation that her peritoneal tear occurred only because she gave birth at the jail.

302453807v1 1003420

*Brennan*, 511 U.S. 825, 837 (1994).  A finding of deliberate indifference requires evidence that "the official was aware of the risk and consciously disregarded it nonetheless."  *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) (citing *Farmer*, 511 U.S. at 840-41).

      a.    ***MCJ's medical staff provided reasonable medical care to Ms. Terry.***

For her *Monell* claims, Ms. Terry must establish the predicate deliberate indifference by showing that the treatment she received was "blatantly inappropriate," such that it "calls into question whether the medical professional was actually exercising his professional judgment." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). This is a high standard. *Id.* A medical professional may only be liable for deliberate indifference if her decision is such a substantial departure from accepted professional judgment, practice or standards, that it demonstrates she did not base the decision on such a judgment. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citing *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 843). Even medical malpractice does not violate the Eighth Amendment. *See Estelle*, 429 U.S. at 106; *Abdul-Wadood v. Nathan*, 91 F.3d 1023, 1024-25 (7th Cir. 1996); *Meriwether v. Faulkner*, 821 F.2d 408, 411 (7th Cir. 1987). Courts must "examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Dunigan*, 165 F.3d at 591 (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997)).

An inmate's disagreement with medical professionals about treatment needs is not a cognizable Eighth Amendment claim under the deliberate indifference standard. *Pyles*, 771 F.3d at 409; *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (noting whether a plaintiff believes one course of treatment is preferable to another is not deliberate indifference). Furthermore,

"'prisoner[s] [are] not entitled to receive 'unqualified access to healthcare.'" *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "Instead, prisoners are entitled only to 'adequate medical care.'" *Id.* (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)); *see also Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Notably, it is well established by the Seventh Circuit that a failure to follow a protocol or policy does not establish a deliberate indifference claim. *Lewis v. Downey*, 581 F.3d 467, 553 n. 5 (7th Cir. 2009); *Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996).

In *Moore v. Kankakee Cnty.*, a court found medical staff did not act with deliberate indifference where a plaintiff went into labor at a jail because she was medically examined, her vitals were checked, her answers to questions were evaluated, a consultation occurred, her water never broke and a nurse was contacted at the first sign of blood. No. 12-CV-2002, 2013 U.S. Dist. LEXIS 170568, at **36–38, 43–44 (C.D. Ill. Dec. 4, 2013) (<u>explaining the medical staff acted based on the facts known to them</u> and their observations of the plaintiff that day). In contrast, in *Doe v. Gustavus*, a court found a genuine dispute of material fact on deliberate indifference where a plaintiff was in labor at a jail for over 24 hours, had been examined by nurses multiple times, was repeatedly informed she was in false labor and was otherwise denied appropriate medical care for her delivery. 294 F. Supp. 2d 1003, 1005–07, 1009 (E.D. Wis. 2003) (finding it reasonable to infer intentional or reckless conduct because the medical treatment was so far beyond acceptable medical standards of care). As shown, this case is akin to *Moore*, rather than *Gustavus*.

MCJ medical staff sent Ms. Terry to Froedtert during her initial examination at MCJ and upon her first complaint of abdominal discomfort and concerns of potential labor. (PFOF ¶¶ 8, 10.) Ms. Terry was monitored and cleared by Froedtert's labor and delivery medical staff, and arrived back at MCJ around 1:00 a.m. on March 10, 2014. (PFOF ¶¶ 10, 30-33.)

20

When Ms. Terry returned from Froedtert, Ms. Exum performed a thorough nursing examination. (PFOF ¶¶ 16-26, 28.) Ms. Exum was trained how to check for contractions and felt none. (PFOF ¶¶ 17-19.) Ms. Exum asked Ms. Terry if she felt pain or contractions and Ms. Terry denied having either. (PFOF ¶¶ 20-22.) Ms. Exum consulted the MCJ Medical Director about Ms. Terry's care. (PFOF ¶¶ 28-29.) Then, Ms. Exum spoke with a Froedtert nurse to obtain an oral report on which tests were performed and what conclusions Froedtert's staff reached. (PFOF ¶ 30.) Ms. Exum relayed the information to the MCJ Medical Director. (PFOF ¶ 33.) The MCJ Medical Director ordered Ms. Terry to be booked into MCJ, despite no written medical records from Froedtert, based on the nursing examination of and history from Ms. Terry, and the information from Froedtert: Ms. Terry was cleared and not in labor. (PFOF ¶¶ 34-35.) In the MCJ Medical Director's professional judgment, being booked and monitored in SMU was in Ms. Terry's and her baby's best medical interest, rather than being transported back and forth between the jail and hospital until the paperwork was prepared. (PFOF ¶¶ 37-40.) Ms. Exum performed a second examination of Ms. Terry, monitoring for contractions again. (PFOF ¶¶ 42-44.) Ms. Terry denied having pain or contractions over the course of her 30 minutes with Ms. Exum. (PFOF ¶ 45.)

Ms. Terry was placed in SMU, the unit with the highest level of observation in MCJ. (PFOF ¶¶ 47-49.) She was observed at least nine times by a correctional officer over the course of the next three hours. (PFOF ¶ 56.)

As soon as MCJ medical staff learned of Ms. Terry's delivery, which occurred three hours after her arrival in SMU, they engaged in immediate and professionally appropriate treatment.[13] (PFOF ¶¶ 57-68.) Within minutes, a medical emergency was called, 911 was contacted and several nurses arrived in Ms. Terry's cell with an OB kit. (PFOF ¶¶ 61-63.) MCJ medical staff rushed to

---

[13] No evidence exists for the *Monell* predicate of deliberate indifference by Armor, or the MCJ medical staff, regardless of the factual dispute over the events as described by Ms. Terry or Correctional Officer Wenzel. In either instance, the medical staff had no notice of a change in Ms. Terry's medical condition until after the birth.

302453807v1 1003420

provide medical care for Ms. Terry and her baby. (Id.) EMS arrived shortly after and transported Ms. Terry and her baby to a hospital. (PFOF ¶ 64.) MCJ medical staff called the receiving hospital, Aurora Sinai, to ensure they were ready to appropriately treat Ms. Terry and her baby. (PFOF ¶ 65.)

Viewing the totality of Ms. Terry's medical care to determine whether it evidences deliberate indifference to her serious medical needs by Armor or any medical staff," *Dunigan*, 165 F.3d at 591, no reasonable jury could conclude Armor or MCJ medical staff failed to provide adequate medical care to Ms. Terry. The evidence supports only one conclusion: MCJ medical staff performed multiple reasonable examinations of Ms. Terry and provided medically reasonable treatment to Ms. Terry based on the symptoms she reported, their own observations and their professional knowledge and experience. They did not admit her to MCJ until they obtained the necessary information from Froedtert, and she remained in the vicinity of Ms. Exum while that information was obtained. (PFOF ¶¶ 8, 10, 12, 16, 28-30, 34, 41.) MCJ medical staff followed the appropriate Armor policies and practices in the health care and treatment provided to Ms. Terry. (PFOF ¶¶ 9, 37-40, 47, 49, 67-68.) However, even if the Court were to determine there was any policy violation, such a determination would not be sufficient to establish Ms. Terry's deliberate indifference claim. *See Lewis*, 107 F.3d at 553 n. 5; *Langston*, 100 F.3d at 1238.

The undisputed material evidence shows Ms. Terry's medical treatment at MCJ was determined utilizing the professional judgments of the MCJ medical professionals, based upon what they knew and observed, and those decisions were not so inadequate as to demonstrate an absence of professional judgment. MCJ medical staff responded reasonably to the risks associated with Ms. Terry's medical condition, even though the ultimate alleged harm—delivery in MCJ—was not avoided. Ms. Terry received constitutional medical treatment.

To the extent Ms. Terry alleges other treatment should have been provided, such as more frequent monitoring by medical staff within her mere three hours in SMU, her claims constitute a

disagreement about treatment and are not a basis for an Eighth Amendment violation. *See Pyles*, 771 F.3d at 409. The evidence shows medical staff placed her in SMU because they believed it was in her best interest as it afforded the highest level of observation in the MCJ, and it complied with Armor's observation policy for inmates in late-term pregnancy. They would not have placed her in SMU if they believed she was in labor upon re-booking. Instead, the undisputed evidence establishes she would have been sent back to the hospital for delivery. Their decision was not such a substantial departure from accepted practices or standards as would demonstrate no medical judgment was exercised, nor is it a route by which "no minimally competent professional would have [ ] responded." *Collignon*, 163 F.3d at 988–89. Significantly, Froedtert's personnel had also cleared Ms. Terry of labor and discharged her from its care to be returned to MCJ, finding it safe for her to be booked into jail, which affirms the reasoned medical decision made by medical staff. Ms. Terry is not entitled to unqualified access to healthcare, *Holloway*, 700 F.3d at 1073, and she has not shown that her constitutional rights were violated.

Deliberate indifference requires a showing of "blatantly inappropriate" conduct, which is more egregious than negligence. In this instance, the MCJ medical staff acted reasonably and, thus, constitutionally. Ms. Terry is unable to establish she suffered the *Monell* predicate of a violation of the Eighth Amendment related to her medical care.[14] As a result, Armor's Motion for Summary Judgment should be granted.

      b.    ***No MCJ medical staff member had the requisite culpable state of mind.***

---

[14] There exists a significant distinction between the alleged unconstitutional medical care and the alleged unconstitutional custodial care by the corrections officer, Officer Wenzel. Ms. Terry attempts to smear the medical staff and Armor with the alleged unconstitutional conduct of Officer Wenzel. However, the medical staff and Armor share no liability for the conduct of the corrections officer as alleged by Ms. Terry. If he ignored Ms. Terry's hours of yelling, pounding and screaming, it is not the fault or consequence of the medical staff or Armor. As set forth, both above and below, no reasonable jury could conclude Officer Wenzel's allegedly outrageous conduct would have been influenced or caused by training allegedly owed by Armor.

In the context of prisoner litigation, the U.S. Supreme Court has said the subjective "deliberate indifference" element is satisfied when an official (1) was aware of facts which could lead to the conclusion that a prisoner was at substantial risk of serious harm and (2) actually came to the conclusion that the prisoner was at substantial risk of serious harm. *Farmer*, 511 U.S. at 837. A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Under this legal standard, it is not enough that an official "should have known" of a risk to the prisoner. Rather, the official must actually know of a risk and consciously choose to disregard it. *Higgins v. Corr. Med. Servs. of Ill.*, 178 F.3d 508, 511 (7th Cir.1999).

"[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Farnham*, 394 F.3d at 478 (quotation omitted). It is not enough to show that a defendant merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). The official must act with "a sufficiently culpable state of mind." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). Deliberate indifference requires more than negligence, gross negligence, or even recklessness; the care or lack of care must amount to the criminally reckless or deliberate infliction of suffering. *Collignon*, 163 F.3d at 988.

MCJ medical staff knew of Ms. Terry's medical condition and responded reasonably and appropriately to her complaints and symptoms. Based on all the information available, neither MCJ's examining nurse nor MCJ's Medical Director concluded Ms. Terry was in labor when she was booked. She was not denied treatment, nor was her condition ignored. MCJ medical staff was concerned about her potential to have the baby and had her evaluated at a local hospital, which ruled out labor. (PFOF ¶¶ 8, 10.) When she was cleared by the hospital and returned, they placed

her in the area with the highest level of observation in MCJ. (PFOF ¶¶ 9, 49-55.) Ms. Terry's placement, pursuant to Armor's policy, afforded the ability to see or be notified of when she went into labor so they could have her transferred to a hospital for delivery. (Id.) In the MCJ Medical Director's professional opinion, booking Ms. Terry was better for her health than transporting her back and forth until her medical record was transferred. (PFOF ¶¶ 37-40.) No evidence demonstrates MCJ medical staff ignored Ms. Terry or refused to provide her with medical care.

The undisputed evidence shows MCJ medical staff lacked the requisite culpable state of mind for a deliberate indifference claim. They did not act in an intentional or criminally reckless manner. Quite the opposite, MCJ medical staff acted reasonably, appropriately and in what they believed was the best interest of Ms. Terry and her baby, based on the information they had at the time and their observations of Ms. Terry, including her denials of having contractions. Ms. Terry has not and will not be able to raise a genuine issue of material fact establishing deliberate indifference to her serious medical needs, a predicate for her *Monell* claim against Armor. Therefore, Armor's motion should be granted.

> **2.      No evidence establishes the notice element of Ms. Terry's *Monell* claim against Armor or that the unconstitutional conduct was the "moving force" behind the alleged constitutional injury.**

> a.      *Notice legal standard.*

To prevail in showing a widespread practice of deliberate indifference, Ms. Terry must "introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Ms. Terry must prove Armor had notice that an act or omission was likely to result in constitutional violations. *Canton*, 498 U.S. at 389. Evidence is required of more than one incident to establish liability, *Calhoun*, 408 F.3d at 380, sufficiently similar bad acts, *Connick*, 563 U.S. at 62, and incidents prior to the act at issue, *Calusinksi*, 24 F.3d at 936. For her

failure to train in light of an "obvious need" *Monell* claim, Ms. Terry must prove Armor was on notice that, absent additional specified training, it was "highly predictable" that the subordinate government officials would be confounded and make incorrect decisions as a result—it was so predictable that failing to train amounted to conscious disregard for those constitutional rights. *Bryan Cnty.*, 520 U.S. at 409 (citing *Harris* 489 U.S. at 390).

      b.    ***Causation legal standard.***

Ms. Terry must also show the alleged unconstitutional act was <u>the cause</u> of the constitutional deprivation, specifically, the "moving force." *Gaughan*, 2008 U.S. Dist. LEXIS 107910, at *5; *Orlowski*, 2016 U.S. Dist. LEXIS 53537, at *56. The Eastern District of Wisconsin rejected a failure to train *Monell* claim against nurses at a jail where there was no evidence "of a pattern of deliveries by women at [the correctional center] in segregated confinement or evidence of nurses frequently missing the signs of labor," that the event was "[c]learly, [ ] a highly unusual occurrence," and it was "difficult to say that it would have been obvious to [the nursing supervisor] that more nurse training was required." *Doe v. Gustavus*, 294 F. Supp. 2d 1003, 1011 (E.D. Wis. 2003) (granting motion for summary judgment on *Monell* claim).

      c.    ***No evidence admitting inmates into MCJ without adequate information was pervasive, unconstitutional and known to Armor.***

Ms. Terry's *Monell* claim alleging a widespread practice of admitting inmates into MCJ with inadequate paperwork fails because she lacks evidence showing either notice or causation. She has no evidence of similar instances, nor is she able to prove the causal connection to her alleged injuries. Instead, she relies on a quotation from an uncited report issued by Mr. Shansky in 2013, which does not "fill the gap" for Ms. Terry's claim and is insufficient evidence from which a reasonable jury could find for Ms. Terry on this claim. (ECF No. 127, pp. 8-9, 19-20.) Additionally, she relies on deposition testimony from MCJ's Medical Director and Nursing Director, which when

viewed in the full undisputed context, illuminates Armor's active efforts with local hospitals to prevent inmates from being sent back to MCJ without the proper paperwork. (PFOF ¶ 15.)

Instead, evidence shows this practice occurred when in the best interest of patients. (PFOF ¶¶ 37-40.) Dr. Buono's undisputed testimony explains it would have been poor medical judgment to have enforced Armor's and MCJ's policies directing that inmates not be allowed into the jail without proper documentation from the hospital. (Id.) Dr. Buono decided to admit Ms. Terry because, based upon her medical education, training and experience, it was not in Ms. Terry's best interest to send her back to the hospital just to get paperwork. (PFOF ¶¶ 34, 37-40.) To provide appropriate medical treatment for Ms. Terry's condition, Dr. Buono instead ordered Nurse Exum to call the hospital and obtain an oral report on Ms. Terry's and her baby's condition, and the details of what was done. (PFOF ¶¶ 28-29.) After Ms. Exum obtained and relayed the information to Dr. Buono, Dr. Buono made the proper professional medical judgment to bring Ms. Terry into the jail, recommending SMU housing affording the highest level of observation. (PFOF ¶¶ 30-36, 49-55.)

d. ***No evidence admitting inmates into MCJ without adequate information caused Ms. Terry's constitutional injury.***

Turning to causation, Ms. Terry has no supporting evidence to establish being admitted without the proper paperwork prevented MCJ from establishing an adequate treatment plan or would have led to her being transferred to the hospital for delivery. (PFOF ¶¶ 31-32.) Ms. Terry's Froedtert medical records state that she was cleared of labor. (PFOF ¶ 31.) Thus, even if MCJ medical staff had obtained her medical records, there are no facts from which a reasonable jury could conclude getting the records would have changed the ultimate outcome. Moreover, no reasonable jury could conclude this admission protocol was the "moving force" for the alleged constitutional injury, an in-cell birth. If taken as true, her claim that the correctional officer assigned to the SMU ignored her screams for help during hours of labor prior to and during delivery is the "moving force" behind her alleged constitutional injury.

There simply is no evidence of deliberate indifference in the admission practice as to Ms. Terry in particular, let alone a widespread accepted practice which was the moving force behind constitutional injuries to inmates. Consequently, this *Monell* claim fails.

      e.    ***No evidence Officer Wenzel was not properly trained concerning response to medical emergencies or that Armor knew of such a failure and allowed such an unconstitutional deficiency to continue.***

Next, Ms. Terry's *Monell* claim of failure to train in light of an obvious need also fails because no evidence demonstrates Armor's notice or causation. Ms. Terry's references to the contract between Armor and MCJ and to NCCHC simply do not provide the necessary support for this *Monell* claim. *See supra*. No other evidence is cited or exists. In contrast, the evidence demonstrates that correctional officers did receive training to identify and respond to medical emergencies through a combined effort by both Milwaukee County and Armor. (PFOF ¶ 69.) In fact, Officer Wenzel received training from Milwaukee County on March 7, 2013, which covered

> KEY POINT: Never ignore an inmate's request to be seen during sick call, or take it upon yourself to determine that any request is invalid or that the inmate need not be seen.

(Id.). There is no evidence suggesting Armor knew of and ignored deficient, or owed, training for correctional officer emergency medical responses.

      f.    ***No evidence a failure to train correctional officers on emergency medical response was the moving force behind Ms. Terry's alleged constitutional injury.***

No amount of training for correctional officers to recognize medical emergencies would have had any impact on what occurred to Ms. Terry, if, as Ms. Terry alleges, Officer Wenzel outrageously ignored her repeated cries for help. (ECF No. 129.) Retired Milwaukee County Sheriff's Office Inspector Bailey illustrates this concept by his testimony: if a correctional officer had ignored an inmate's screaming and pounding on a cell door over an extended period of time, those actions or omissions were not a matter of training, but a failure to perform. (PFOF ¶ 70.) And,

28

contrary to Ms. Terry's allegations, Officer Wenzel had indeed been trained in identifying and responding to medical emergencies. (PFOF ¶ 69.) There is no evidence that additional training from Armor would have cured his alleged conduct. Or, if Officer Wenzel conducted himself as he testified, Ms. Terry never made a sound and there were no concerns until Officer Wenzel heard Ms. Terry's baby cry, then no additional training on medical emergencies from Armor would have prevented Ms. Terry's delivery at MCJ. (PFOF ¶ 58.) No matter which side of the story is true, this claim is the proverbial red herring. It was not the result of an obvious gap in training which Armor owed and consciously and deliberately ignored, nor is it the result of a widespread practice to which Armor was deliberately indifferent.

> g. ***No evidence Armor had notice a nursing policy was needed for late term pregnant or laboring inmates to avoid unconstitutional care.***

Finally, Ms. Terry's *Monell* claim alleging a need for nursing protocol regarding inmates in late term pregnancy and labor fails for a complete dearth of evidence supporting this claim. As discussed above, Ms. Terry did not reference and has no evidence of any prior similar incidents which would give Armor notice of this need, and she makes no attempt to show and has no evidence that such a need was the moving force for her alleged constitutional deprivation. Instead, the evidence shows that Armor did and does have a policy related to late stage pregnancies.[15] Women in late stages of pregnancy are to be assigned to the SMU. (PFOF ¶ 47.) These patients are to be assessed by an advanced care provider within 48 hours or sooner. (PFOF ¶ 68.) The policy for inmates in labor was to have them taken to the hospital to deliver. (PFOF ¶ 9.) Thus, the decision to place Ms. Terry in SMU was in compliance with Armor's observation policy for pregnant inmates. Ms. Terry would have been assessed by an advanced care provider if she had not given birth in the

---

[15] Ms. Terry knew Armor had a written policy addressing pregnant inmates, including late term pregnancies before she filed her Amended Complaint. She also knew Armor's policy was to send any inmate in labor to the hospital before she filed her Amended Complaint. Nonetheless, she made another specious claim. (PFOF ¶¶ 9, 47; ECF No. 129.)

302453807v1 1003420

mere three hours she was in SMU. (PFOF ¶ 68.) Armor had no notice that this policy was in any way deficient, and no evidence suggests otherwise. *Monell* claims are only effective in circumstances where policymakers fail to respond to repeated deficiencies, and here, Ms. Terry fails to show, and has no evidence to demonstrate, even one prior instance where Armor had notice of a "need for a nursing protocol regarding inmates in labor."

As a result, Ms. Terry has failed to raise a genuine issue of material fact as to whether Armor maintained a widespread practice of deliberate indifference to inmates' serious medical needs under *Monell*. Therefore, Armor's Motion for Summary Judgment should be granted.

## CONCLUSION

For all the above reasons, this Court should grant summary judgment to Armor, dismissing Ms. Terry's claims against Armor with prejudice.

Dated this 31st day of August, 2018.

/s/ Paige L. McCreary
Michael P. Russart
State Bar No. 1023128
Mollie T. Kugler
State Bar No. 1093318
Paige L. McCreary
State Bar No. 1114252
Attorneys for Defendant Armor Correctional
Health Services
**HINSHAW & CULBERTSON LLP**
100 E. Wisconsin Avenue
Suite 2600
Milwaukee, WI 53202
Phone No.  414-276-6464
Fax No.  414-276-9220
E-mail Address(es):
mrussart@hinshawlaw.com
mkugler@hinshawlaw.com
pmccreary@hinshawlaw.com

302453807v1 1003420