UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

_____

REBECCA TERRY,

              Plaintiff,

v.

COUNTY OF MILWAUKEE, DAVID A.
CLARKE, JR., in his personal and official
capacities, OFFICER BRIAN WENZEL, JANE
AND JOHN DOE, UNKNOWN EMPLOYEES
OF MILWAUKEE COUNTY JAIL, JANE AND
JOHN DOE, UNKNOWN JAIL
SUPERVISORS, ARMOR CORRECTIONAL
HEALTH SERVICES, CAROLYN EXUM,
MORGAN BEVENUE, MARGARET
HOOVER, JANE AND JOHN DOE,
UNKNOWN EMPLOYEES OF ARMOR
CORRECTIONAL HEALTH SERVICES,
JANE AND JOHN DOE, UNKNOWN ARMOR
HEALTHCARE SUPERVISORS,

              Defendants.

Case No.: 17-cv-1112-JPS

_____

## INDEX OF UNPUBLISHED CASES FOR DEFENDANT ARMOR CORRECTIONAL HEALTH SERVICES' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Gaughan v. Crawford*,
    No. 05-C-4664, 2008 U.S. Dist. LEXIS 107910 (N.D. Ill. July 24, 2008)

*Braun v. Abele*,
    No. 15-CV-252-JPS, 2015 U.S. Dist. LEXIS 82574 (E.D. Wis. June 25, 2015)

*Orlowski v. Milwaukee Cty.*,
    No. 13-CV-1318-PP, 2016 U.S. Dist. LEXIS 53537 (E.D. Wis. Apr. 21, 2016)

*Foy v. City of Chicago*,
    No. 15 C 3720, 2016 U.S. Dist. LEXIS 63346 (N.D. Ill. May 12, 2016)

*Moore v. Kankakee Cnty.*,
    No. 12-CV-2002, 2013 U.S. Dist. LEXIS 170568 (C.D. Ill. Dec. 4, 2013)

Dated this 31st day of August, 2018.

/s/ Paige L. McCreary
Michael P. Russart
State Bar No. 1023128
Mollie T. Kugler
State Bar No. 1093318
Paige L. McCreary
State Bar No. 1114252
Attorneys for Defendant Armor Correctional
Health Services
**HINSHAW & CULBERTSON LLP**
100 E. Wisconsin Avenue
Suite 2600
Milwaukee, WI 53202
Phone No.  414-276-6464
Fax No.  414-276-9220
E-mail Address(es):
mrussart@hinshawlaw.com
mkugler@hinshawlaw.com
pmccreary@hinshawlaw.com

302455165v1 1003420



**User Name:** Paige McCreary
**Date and Time:** Monday, April 30, 2018 2:10:00 PM CDT
**Job Number:** 65882291

## Document (1)

1. _Gaughan v. Crawford, 2008 U.S. Dist. LEXIS 107910_

   **Client/Matter:** 1003420
   **Search Terms:** 2008 u.s. dist. lexis 107910
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

LexisNexis® | About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2018 LexisNexis

⚠ Caution
As of: April 30, 2018 7:10 PM Z

# *Gaughan v. Crawford*

United States District Court for the Northern District of Illinois

July 24, 2008, Decided; July 24, 2008, Filed

05 C 4664

**Reporter**

2008 U.S. Dist. LEXIS 107910 *

Gaughan, et al. vs. Crawford, et al.

**Subsequent History:** Stay granted by *Gaughan v. Crawford, 2009 U.S. Dist. LEXIS 18047 (N.D. Ill., Mar. 10, 2009)*

## Core Terms

discovery, plaintiffs', consolidation, constitutional right, bifurcation, custom, constitutional violation, amended complaint, arresting, compensatory damages, used excessive force, motion to bifurcate, occurrences, state-law, cases, sever, motion to consolidate, proposed stipulation, judicial economy, convenience, question of law, municipality, non-Gaughan, violations, officer's, issues

**Counsel:** **[*1]** For Brian Gaughan, Kevin Gaughan, Plaintiffs: Kevin E. O'Reilly, LEAD ATTORNEY, Law Offices of Kevin E. O'Reilly, Chicago, IL; Melissa K. Ventrone, Law Offices Of Kevin E. Oreilly, Chicago, IL; Saul R. Wexler, Attorney, Chicago, IL.

For Scott Crawford, Officer, Kelly Given, Officer, The City of Marengo, Sargeant Rodney Riley, Defendants: William W. Kurnik, LEAD ATTORNEY, Kristen Diane Alkire, Knight, Hoppe, Kurnik & Knight LLC, Rosemont, IL.

For Non-Party, William Kroncke, Special Agent, Virgil Shroeder, Special Agent, Defendants: Peter Chadwell Koch, LEAD ATTORNEY, Office of the Attorney General, Chicago, IL; Rachel Jana Fleischmann, Illinois Attorney General's Office, Chicago, IL.

**Judges:** Frederick J. Kapala, Magistrate Judge.

**Opinion by:** Frederick J. Kapala

## Opinion

**DOCKET ENTRY TEXT:**

Defendants' motion to bifurcate and to bar discovery and trial on the causation and custom, policy, or practice elements of the *Monell* claims [72] is granted. Plaintiffs' motion to consolidate [67] is denied. The clerk is ordered to sever the claims of the following four plaintiffs: Melissa Kelly, as Parent of Nichole Surber; Paul Beisner, as Parent of Steven Beisner; Penny Osborn, as Parent of Cassandra Craft; and Tamara McMackin, **[*2]** as Parent of Zachary McMackin (counts XIX (mislabeled as "IXX") through XLIV and applicable portions of count XLVI) and treat the claims of each of these plaintiffs as separate actions and to assign separate docket numbers to each of those actions. These four plaintiffs are each given leave to file separate amended complaints and pay the $ 350 filing fees by August 31, 2008. Failure to file an amended complaint or to pay the filing fee will result in dismissal. Brian and Kevin Gaughan are also ordered to file an amended complaint by August 31, 2008, containing only their claims.

. [For further details see text below.]

/s/ Frederick J. Kapala

Docketing to mail notices.

## STATEMENT

This 51-count lawsuit involves multiple occurrences of alleged police misconduct by Marengo Officers Scott Crawford and Kelly Given occurring over an 18-month period of time, as well as misconduct by other officers during an alleged cover-up. Plaintiffs have sued individual officers and the City of Marengo alleging violations of their constitutional rights under *42 U.S.C. § 1983*, as well as various state-law claims. Before the court are (1) defendants' motion to bifurcate and bar

discovery and trial on the causation **[*3]** and "custom, policy or practice" elements of the claims brought against the City of Marengo pursuant to *Monell v. Department of Social Services of New York, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*, and (2) plaintiffs' motion to consolidate this case with another case pending before this court entitled *Hedio v. Mahlke, et al.,* No. 06 C 50184.

## I. BACKGROUND

In this case, six plaintiffs, Brian Gaughan; Kevin Gaughan; Melissa Kelly, as Parent of Nichole Surber; Paul Beisner, as Parent of Steven Beisner; Penny Osborn, as Parent of Cassandra Craft; and Tamara McMackin, as Parent of Zachary McMackin, have sued seven defendants, Officer Scott Crawford, Police Chief Larry Mason, Officer Kelly Given, The City of Marengo, Illinois State Police Special Agent William Kroncke, Illinois State Police Investigator Virgil Schroeder, and Sergeant Rodney Riley, alleging violations of their constitutional rights and various state-law torts. The following six instances of alleged constitutional violations are contained in the second amended complaint: (1) on June 9, 2003, Crawford used excessive force in arresting Steven Beisner; (2) on November 22, 2003, Crawford used excessive force in arresting Zachary McMackin; (3) on June **[*4]** 6, 2004, Crawford used excessive force in falsely arresting Cassandra Craft; (4) on September 24, 2004, Crawford and Givens used excessive force in arresting Nichole Surber; (5) on October 8, 2004, Crawford used excessive force in arresting Brian Gaughan, and falsely arrested and maliciously prosecuted Brian and Kevin Gaughan; and (6) on November 9, 2004, Kroncke, Schroeder, and Riley falsely arrested Kevin Gaughan, and Kroncke used excessive force. With regard to the November 9, 2004 incident, it is alleged that Kroncke and Schroeder, in an attempt to force Kevin Gaughan to recant his earlier statements about Crawford's abuse, struck Kevin Gaughan twice and knocked Orest Heido unconscious in Kevin Gaughan's presence. In their *Monell* claims, plaintiffs allege that Marengo caused the constitutional violations they suffered by failing to take appropriate action, conducting inadequate investigations, creating a custom and policy of such behavior, and accepting, encouraging and ratifying the officers' misconduct. All plaintiffs further allege that Marengo, Mason, Crawford, Given, and other Marengo police officers conspired to violate their constitutional rights. Various state-law torts **[*5]** are also pleaded in connection with the these alleged incidents.

In Case No. 06 C 50184, plaintiff, Orest Hedio, has sued five defendants, Officer David Mahlke, Chief Mason, Marengo, Kroncke, and Schroeder, alleging violations of his constitutional rights and various state-law torts. Specifically, Hedio alleges that after he was arrested on November 9, 2004, and handcuffed behind his back, he was taken to the Marengo Police Department where Mahlke slammed him into a holding cell door and Kroncke struck him about the head and shoulders in the presence of Kevin Gaughan. Hedio alleges that his constitutional rights were violated through the excessive use of force, deliberate indifference to his medical condition, failure to intervene, and conspiracy to violate his constitutional rights. In his *Monell* claim, Hedio alleges that the City of Marengo caused the constitutional violations he suffered by failing to take appropriate action, conducting inadequate investigations, creating a custom and policy of such behavior, and accepting, encouraging and ratifying the officers' misconduct. Various state-law torts are also pleaded in connection with the these alleged incidents.

## II. ANALYSIS

### A. Motion **[*6]** to Bifurcate and Bar Discovery and Trial

A plaintiff may maintain an action against a municipality under *42 U.S.C. § 1983* only if he can show that his constitutional rights were violated and that the violation was directly caused by a "custom, policy or practice" of the defendant municipality. *Monell, 436 U.S. at 690-92*. Thus, the elements of a *Monell* claim are (1) the deprivation of a constitutional right; (2) that action was taken pursuant to a custom, policy or pracitce of the local government unit; and (3) that such action was the cause of the deprivation. *Id. at 692*. If a plaintiff cannot prove a violation of his or her constitutional rights, his or her *Monell* claim against a local government will fail as a matter of law. *See City of L.A. v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986)* (stating that "neither [*Monell*] nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm").

If plaintiffs are successful in proving one or more violations of their constitutional rights by one or more of the individual Marengo officers and that the **[*7]** violations were the result of Marengo's custom, policy or practice, Marengo (as well as the individual officer) would be directly liable to plaintiffs for compensatory damages. However, plaintiffs will not be entitled to recover any additional compensatory damages if they were to succeed on their *Monell* claims

against Marengo. *See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981)* (holding that a municipality is immune from punitive damages under *§ 1983*); *Spanish Action Comm. of Chi. v. City of Chi., 766 F.2d 315, 321 (7th Cir. 1985)*. On the other hand, even if plaintiffs were unsuccessful in proving their *Monell* claims, under Illinois law, a local government like Marengo is required to pay tort judgments for compensatory damages for which its employees are liable for acts within the scope of their employment. *745 ILCS 10/9-102*. Consequently, regardless of whether the second and third elements of *Monell* are satisfied, Marengo would be required to pay any individual judgments secured against its officers for the constitutional torts they committed within the scope of their employment.

It is against this legal landscape that Marengo moves to bifurcate and to bar discovery **[*8]** and trial on the second and third elements of plaintiffs' *Monell* claims pursuant to a stipulation that Marengo has presented to the court, waiving its right to demand proof of the "custom, policy, or practice" and "causation" elements of the *Monell* claims. Pursuant to the proposed stipulation:

> The City agrees to entry of judgment against it for compensatory damages for an amount against an individual Defendant Officer if, an[d] only if, the finder of fact in this case finds that the individual Defendant Officer violated each individual Plaintiff's constitutional rights as alleged in Plaintiffs' Second Amended Complaint. For this purpose and in this case only, The City of Marengo specifically waives its rights under *Monell, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611*, not to be held liable for damages under *§ 1983* without proof that the City, by its policy custom or practice, and with the requisite degree of culpability, caused the alleged constitutional violation. If such a constitutional violation is found, The City agrees to entry of a judgment against it for compensatory damages based on the constitutional violation alone, not upon any alleged "custom, policy or practice."

*Federal Rule of Civil Procedure 42(b)* **[*9]** provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial." *Fed. R. Civ. P. 42(b)*. It is within the district court's discretion to order bifurcation of a plaintiff's claims and its decision will stand absent a

clear showing of abuse. *Treece v. Hochstetler, 213 F.3d 360, 364 (7th Cir. 1994)*. Judges in this district have granted bifurcation motions similar to Marengo's on multiple occasions. *See, e.g., Ojeda-Beltran v. Lucio, No 07 C 6667, 2008 U.S. Dist. LEXIS 54116, 2008 WL 2782815 (N.D. Ill. July 16, 2008)* (Aspen, J.); *McKnight v. City of Harvey,* No. 05 C 1970 (N.D. Ill. May 2, 2008) (oral ruling Shadur, J.); *Elrod v. City of Chi.,* Nos. 06 C 2505 & 07 C 203, U.S. Dist. LEXIS 80941, 2007 WL 3241352 (N.D. Ill. Nov. 1, 2007) (Soat Brown, M.J.); *Kunz v. City of Chi.,* No. 01 C 1753, 2003 WL 21960360 (N.D. Ill. Aug. 13, 2003) (granting motion to bar discovery and trial of policy issues) (Zagel, J.); *Wawryniuk v. City of Chi.,* No. 03 C 4291, doc. 34 (N.D. Ill. Apr. 30, 2004) (granting motion to bar discovery **[*10]** of policy issues where City had stipulated that the officer's conduct was the result of municipal policy and to a causal link between the conduct and the plaintiff's injury, leaving only the question whether the officer's conduct had been unconstitutional) (St. Eve, J.); *Lopez v. City of Chi.,* No. 01 C 1823, doc. 160 (N.D. Ill. Oct. 27, 2004) (barring trial on *Monell* claim where City, without admitting unconstitutional policy or practice, consented to judgment based on the officer's unconstitutional conduct) (Der-Yeghiayan, J.); *Jones v. City of Chi., No. 98 C 5418, 1999 U.S. Dist. LEXIS 3358, 1999 WL 160228 (N.D. Ill. Mar. 10, 1999)* (granting motion to bifurcate *Monell* claim because convenience, expedition and economy are served, and the likelihood of prejudice to officers would be avoided) (Kocoras, J.).

Marengo argues that granting its motion serves judicial economy interests including the elimination of any justiciable case or controversy as to the second and third *Monell* elements. In response, plaintiffs argue that (1) granting Marengo's motion would not maximize judicial efficiencies; (2) there remains a case or controversy and they have a right to proceed against all wrongdoers who caused their injuries, **[*11]** including Marengo; and (3) Marengo's immunity defense weighs against granting their motion.

Plaintiffs argue that granting Marengo's motion will delay this litigation and consume valuable resources because the parties will be faced with two trials which will encompass much of the same evidence. This argument, however, misconstrues Marengo's motion. Marengo does not seek bifurcation in order to have separate trials on the claims against the individual officers and the claims against Marengo. Rather, Marengo seeks to bifurcate and bar trial and discovery on the second and third *Monell* elements. Marengo is asking the court to

accept its waiver of proof on the second and third elements of the *Monell* claims such that if the trier of fact determines that the remaining element is proven, judgment will be entered against Marengo and there will be no need for a second trial. If plaintiffs fail to prove a constitutional violation, their *Monell* claims against Marengo will necessarily fail. *See Heller, 475 U.S. at 799*. On the other hand, if a constitutional violation on the part of any Marengo officer is proven, Marengo's proposed stipulation contemplates that a judgment against Marengo will be **[*12]** entered in an amount equal to the compensatory damages assessed against any Marengo officer individually. Either way, a trial on the second and third *Monell* elements will be unnecessary. *See Wawryniuk,* No. 03 C 4291 (noting "there will not be a need for a second trial regardless of the outcome of the first trial").

Plaintiffs further argue that Marengo has utterly failed to make a showing that bifurcation will be in furtherance of convenience or will be conducive to expedition and economy. The court disagrees. Discovery on plaintiffs' *Monell* claims has not begun and will be extensive. Granting Marengo's motion would avoid such discovery altogether. Additionally, a trial where the jury does not consider two of the three *Monell* elements will undoubtedly be more concise than a trial where those elements are considered, and the shorter trial will conserve judicial resources as well as those of the parties. *See Hochstetler, 213 F.3d at 365* (holding that bifurcation under similar circumstances was not an abuse of discretion because it avoided an unnecessary second trial in light of the fact that the City agreed to a judgment against itself should the jury find the officer liable). Thus, bifurcating **[*13]** out and barring trial and discovery on the two additional *Monell* elements would promote the goals of judicial economy, expediency, and convenience.

Plaintiffs also maintain that they have a right to proceed against all the wrongdoers that caused their injuries and granting Marengo's motion deprives them of that right. In the court's view, however, granting Marengo's motion will do no such thing. At trial, plaintiffs will proceed against Marengo while relieved of proving two of the three elements necessary to sustain their *Monell* claims, making it easier for plaintiffs to secure a judgment against Marengo. It is also true, as plaintiffs contend, that there remains an actual case and controversy between the plaintiffs and Marengo. That case and controversy, however, has been reduced by Marengo's waiver of proof as to the second and third elements of the *Monell* claims.

Next, plaintiffs argue that Marengo's affirmative defense of immunity precludes bifurcation and that it is possible that, post-verdict, Marengo would take the position that the indemnification statute is not applicable because the officers were not acting within the scope of their employment or were acting willfully and wantonly. **[*14]** The simple answer to this argument is that the proposed stipulation will bind Marengo to pay plaintiff compensatory damages in the amount assessed against any individual Marengo officer if the jury determines that plaintiffs have proven a constitutional violation by any individual Marengo officer. Marengo will be so obligated whether or not it believes now or in the future that it is immune, or that the officers were acting willfully and wantonly or outside the scope of their employment.

Because bifurcation will promote the goals of judicial economy, expediency, and convenience, and having rejected plaintiffs' arguments in opposition, the court grants Marengo's motion to bifurcate and bar discovery and trial on the second and third elements of the *Monell* claims against Marengo with the following modification to the proposed stipulation in order to effectuate the intent of the stipulation. Because Marengo is agreeing to the entry of a judgment against it for any and all amounts of compensatory damages awarded to any and all plaintiffs against any Marengo officer individually, the word "each" in line four of paragraph 5 of the proposed stipulation will be replaced with the word "any." **[*15]** [1] As modified the stipulation is accepted and the motion is granted.

B. Motion to Consolidate

Plaintiffs move pursuant to *Federal Rule of Civil Procedure 42(a)* to consolidate this action with Case No. 06 C 50184 on the ground that the cases involve common questions of law and fact and that consolidation will avoid unnecessary costs and delay, and foster judicial economy. Plaintiffs argue that consolidation is appropriate because (1) the cases arise out of the same actions taken by defendants; (2) the cases present common factual issues and consolidation will facilitate resolution of the issues by adjudicating all claims relating to the actions taken by defendants; (3) transfer of the actions to a single forum will prevent duplication of discovery; and (4) consolidation before one judge will achieve judicial economy. Defendants Mason, Crawford, Given, City of Marengo, and Riley

---

[1] The court will entertain objection to this modification if it does not reflect the intent of the proposed stipulation.

object to the motion to consolidate.

*Federal Rule of Civil Procedure 42(a)* provides:

(a) Consolidation. If actions before the court involve a common question of law or fact, the court may:

(1) join **[*16]** for hearing or trial any or all matters at issue in the actions;

(2) consolidate the actions; or

(3) issue any other orders to avoid unnecessary cost or delay.

*Fed. R. Civ. P. 42(a)*. The court has broad discretion to order consolidation of actions where there are common questions of law or fact. *United States v. Knauer, 149 F.2d 519, 520 (7th Cir. 1945)*; *Sage Prods. Inc. v. Devon Indus., Inc., 148 F.R.D. 213, 215 (N.D. Ill. 1993)*. The moving party has the burden of proving that consolidation is appropriate. *In re Repetitive Stress Injury Litig., 11 F.3d 368, 373 (2d Cir. 1993)*; *Schissel v. Wells, No. 06 C 0722, 2007 U.S. Dist. LEXIS 85470, 2007 WL 4143223, at *3 (E.D. Wis. Nov. 19, 2007)*. Plaintiffs do not specify the subsection of *Rule 42(a)* under which they seek relief, but they do ask the court to consolidate the actions into one. Therefore, the court assumes that plaintiffs' motion is made pursuant to *Rule 42(a)(2)*.

In applying the discretion afforded by *Rule 42(a)*, the court concludes that consolidation of the actions is not appropriate. The constitutional and state-law torts allegedly visited upon Hedio occurred in an incident completely independent of the constitutional and state-law torts allegedly visited **[*17]** on the plaintiffs in this case. The only place the cases slightly overlap are in the claims of Kevin Gaughan regarding the events of November 9, 2004. Hedio and the Gaughans allege that on November 9, 2004, Kroncke and Mahlke battered Hedio at the Marengo police department in Kevin Gaughan's presence in an effort to intimidate Kevin Gaughan into recanting the police brutality complaint he had lodged regarding Crawford's use of excessive force on October 8, 2004. The issue of whether Hedio was battered is a central issue in Hedio's case. However, whether such battery occurred for the purpose of intimidating Brian Gaughan is not a central issue in this case. First, that issue has nothing to do with the claims of the four non-Gaughan plaintiffs in this case. Second, the issue is only peripherally related to the claims of the Gaughans. In fact, the battering of Hedio in Kevin Gaughan's presence is just one of eight alleged acts of intimidation visited upon Kevin Gaughan on November 9, 2004, and is not essential to proving that Kevin

Gaughan was falsely arrested, maliciously prosecuted, or had excessive force used upon him on that date. The court does not mean to suggest that evidence of **[*18]** the alleged Hedio beating could not be relevant in a trial of the Gaughans' claims, just that it is not a central issue to the resolution of this case. *See* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2383 (3d ed. 2008) ("[A] motion under *Rule 42(a)* may be denied if the common issue is not central to the resolution of the cases"). Consequently, plaintiffs have failed to establish a sufficient common question of law or fact with regard to the cases.

Plaintiffs also have failed to establish that consolidating these suits into a single action at this stage of the litigation would promote convenience or judicial economy. Also, any duplicity of discovery is significantly reduced if not eliminated by the court's ruling on Marengo's motion to bifurcate and to bar discovery and trial on two of the three *Monell* elements. Therefore plaintiffs' motion to consolidate is denied.

The court now considers *sua sponte* whether the claims of the plaintiffs, Melissa Kelly, as Parent of Nichole Surber; Paul Beisner, as Parent of Steven Beisner; Penny Osborn, as Parent of Cassandra Craft; and Tamara McMackin, as Parent of Zachary McMackin (hereafter non-Gaughan plaintiffs), should **[*19]** be severed pursuant to *Federal Rule of Civil Procedure 21*, because of misjoinder. *Rule 20(a)* allows permissive joinder of plaintiffs if (1) "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction or occurrence, or series of transactions or occurrences," and (2) "any question of law or fact common to all plaintiffs will arise in the action." *Fed. R. Civ. P. 20(a)(1)*. *Rule 21* authorizes the court to *sua sponte* sever the claims of any misjoined party at any stage of a lawsuit. [2] *Fed. R. Civ. P. 21*. "Misjoinder occurs when parties fail to satisfy either of the two requirements set forth in *Rule 20(a)*." *Smith v. Ne. Ill. Univ., No. 98 C 3555, 2002 U.S. Dist. LEXIS 3883, 2002 WL 377725, at *1 (N.D. Ill. 2002)* (citing *Bailey v. N. Trust Co., 196 F.R.D. 513, 515 (N.D. Ill. 2000))*.

Factors to consider in determining whether the first

---

[2] *Rule 21* also permits the court to drop a party from the case. The court, however, is duty bound to sever claims rather that dismiss a party without prejudice to prevent barring of claims under an applicable statute of limitations. *See* *Elmore v. Henderson, 227 F.3d 1009, 1012 (7th Cir. 2000)*.

requirement of *Rule 20(a)* **[*20]** is met are when the alleged conduct occurred, who was involved, whether the conduct was similar, and whether it implicated a system of decision making or widely held policy. *See Wilson v. Peslak, No. 04 C 2345, 2005 U.S. Dist. LEXIS 10365, 2005 WL 1227316, at *2 (N.D. Ill. May 12, 2005)*. Upon review of plaintiffs' 95-page second amended complaint, it is apparent that the non-Gaughan plaintiffs' claims of do not arise out of the same transaction or occurrence, or series of transactions or occurrences. Rather these four plaintiffs' claims arise out of unrelated incidents occurring on September 24, 2004, June 6, 2004, November 22, 2003, and June 9, 2003, respectively. With regard to the people involved and similarity of the alleged conduct, with the exception of the allegation that Crawford used excessive force against each of them, these four plaintiffs' claims are factually unrelated and unrelated to the claims brought by the Gaughans. With regard to the last factor, in light of the court's disposition on the motion to bifurcate and bar discovery and trial on two of the three *Monell* elements, the *Monell* claims do not provide a basis to conclude that these four plaintiffs' claims arise out of the same transaction **[*21]** or occurrence, or series of transactions or occurrences. In addition, the Court finds that it would be confusing and unfairly prejudicial to defendants for a single jury to hear evidence and make factual determinations concerning six separate incidents in one trial. Accordingly, pursuant to *Rule 21* and *42(b)*, the claims of the non-Gaughan plaintiffs are severed from the claims of the Gaughans as improperly joined. These four plaintiffs may proceed in separate suits.

## III. CONCLUSION

For the foregoing reasons, defendants' motion to bifurcate and to bar discovery and trial of the causation and custom, policy, or practice elements of the *Monell* claims is granted. Plaintiffs' motion to consolidate is denied and the claims of the non-Gaughan plaintiffs (counts XIX through XLIV and applicable portions of count XLVI) are severed from those of Brian and Kevin Gaughan. These four plaintiffs are given leave to file amended complaints under the new case numbers, along with the required filing fees, by August 31, 2008. Failure to file an amended complaint or pay the filing fee will result in dismissal. Brian and Kevin Gaughan are also ordered to file an amended complaint containing only their claims **[*22]** by August 31, 2008.

Paige McCreary

 Neutral

As of: August 31, 2018 5:25 PM Z

# Braun v. Abele

United States District Court for the Eastern District of Wisconsin

June 25, 2015, Decided; June 25, 2015, Filed

Case No. 15-CV-252-JPS

**Reporter**

2015 U.S. Dist. LEXIS 82574 *; 2015 WL 3904960

ROBERT C. BRAUN, Plaintiff, v. CHRIS ABELE, DAVID A. CLARKE, JR., BYRON TERRY, MILWAUKEE COUNTY, REYNALDO HERRERA, and CASEY PERINE, JR., Defendants.

**Subsequent History:** Judgment entered by, Summary judgment granted by, Dismissed by, Motion denied by, As moot *Braun v. Terry, 2015 U.S. Dist. LEXIS 160063 (E.D. Wis., Nov. 30, 2015)*

## Core Terms

alleges, Sheriff, pleadings, movants, courthouse, same-sex, marriage, couples, plaintiff's claim, violations, train, argues, marriage license, protesters, Wisconsin, religious, entitled to judgment, partial judgment, Misconduct, amended complaint, give rise, rights, motion for judgment, qualified immunity, married, reasons

**Counsel:** [*1] Robert C Braun, Plaintiff, Pro se, West Allis, WI.

For Chris Abele, David A Clarke, Jr, Byron Terry, Defendants: Andrew A Jones, Charles H Bohl, LEAD ATTORNEYS, Whyte Hirschboeck Dudek SC, Milwaukee, WI.

For Milwaukee County, Defendant: Charles H Bohl, Whyte Hirschboeck Dudek SC, Milwaukee, WI.

**Judges:** J.P. Stadtmueller, United States District Judge.

**Opinion by:** J.P. Stadtmueller

## Opinion

### ORDER

## 1. BACKGROUND

On Friday, June 6, 2014, Judge Barbara Crabb held that "the Wisconsin laws banning marriage between same-sex couples are unconstitutional." *Wolf v. Walker, 986 F.Supp.2d 982, 1028 (W.D. Wis. 2014)*.[1] The next day (Saturday, that is), the Milwaukee County Courthouse "was officially opened (outside of its normal business hours) in order to allow any same-sex couples wishing to do so to apply for marriage licenses and get married at the Courthouse." (Docket #16 at 1). The funding to open the courthouse on Saturday was provided, in whole or in part, by Milwaukee County Executive Chris Abele ("Mr. Abele"). (*See* Docket #19 at 5).

While same-sex couples were being married inside the courthouse, the plaintiff—along with others—was there to oppose and protest the **[*2]** same-sex marriage licenses being issued (Docket #19 at 5). The plaintiff alleges that Milwaukee County Sheriff's Deputy Byron Terry ("Deputy Terry") interfered with his ability to express his opposition to these marriages and that those in support of same-sex marriage were not similarly curtailed in their efforts to support these marriages. *Id.*

On February 25, 2015, the plaintiff filed suit against Deputy Terry, Mr. Abele, and Milwaukee County Sheriff David A. Clarke ("Sheriff Clarke") in Milwaukee County Circuit Court, alleging that those individuals: (1) violated the plaintiff's constitutional rights under the *First* and *Fourteenth Amendments*; (2) violated the Religious Freedom Restoration Act, *42 U.S.C. § 2000bb, et seq.*; and (3) are guilty of Misconduct in Public Office, under *Wisconsin Statute § 946.12*. (Docket #1, Ex. 1). The

---

[1] The Seventh Circuit affirmed Judge Crabb in *Baskin v. Bogan, 766 F.3d 648 (7th Cir. 2014)* (a consolidated appeal), and the Supreme Court denied certiorari, *see **Baskin v. Bogan, 135 S. Ct. 316, 190 L. Ed. 2d 142 (2014)** and **Walker v. Wolf, 135 S. Ct. 316, 190 L. Ed. 2d 142 (2014)**.*

defendants removed the case to this Court on March 5, 2015. *See 28 U.S.C. §§ 1441* and *1446*.

Since removal of this case, the plaintiff has twice amended his complaint (*see* Docket #8, #19), and the defendants have twice answered those amended complaints (*see* Docket #12, #23). Of note, the plaintiff added three defendants in his first amended complaint: Milwaukee County (hereinafter "the County") and two John Doe Milwaukee County Deputy Sheriffs. (*See [\*3]* Docket #8). Those deputy sheriffs were later identified in the plaintiff's second amended complaint as Reynaldo Herrera ("Deputy Herrera") and Casey Perine, Jr. ("Deputy Perine"). (Docket #19).

On May 11, 2015, Mr. Abele, Sheriff Clarke, the County, and Deputy Terry (collectively "the movants") filed a motion for partial judgment on the pleadings (Docket #15) and a motion to stay discovery pending resolution of their motion for partial judgment on the pleadings (Docket #17). Mr. Abele, Sheriff Clarke, and the County argue that they are entitled to prevail on all of the claims against them because the plaintiff has failed to allege any personal involvement by Sheriff Clarke or Mr. Abele, and has failed to allege a policy, custom, or practice subjecting the County to *Monell* liability for the actions of Deputy Terry. (*See* Docket #15). The movants also argue that they are entitled to judgment on the pleadings on the plaintiff's RFRA and *Wis. Stat. § 946.12* claims because the plaintiff's allegations fail to state a claim under either of those statutes. *See id.*

The Court will grant the movants' motion for partial judgment on the pleadings, and deny as moot their motion to stay discovery, for the reasons stated **[\*4]** below.

## 2. LEGAL STANDARD—RULE 12(C) MOTIONS

Rule 12(c) "permits a party to move for judgment after the complaint and answer have been filed by the parties." *Buchanan-Moore v. Cnty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)*. "A motion for judgment on the pleadings is governed by the same standard[] as a motion to dismiss for failure to state a claim under Rule 12(b)(6)," *Adams v. City of Indianapolis, 742 F.3d 720, 727-28 (7th Cir. 2014)*; specifically, both require that "the complaint state a claim that is plausible on its face," *Vinson v. Vermilion Cnty., Ill., 776 F.3d 924, 928 (7th Cir. 2015)*; *see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937,*

*173 L. Ed. 2d 868 (2009)*; *Adams, 742 F.3d at 728*.

"Factual allegations are accepted as true at the pleading stage, but 'allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6)'" or Rule 12(c) motion. *Adams, 742 F.3d at 728* (quoting *McReynolds v. Merrill Lynch & Co., 694 F.3d 873, 885 (7th Cir. 2012))*; *see Buchanan-Moore, 570 F.3d at 827* ("We view the facts in the complaint in the light most favorable to the nonmoving party.... However, we need not ignore facts set forth in the complaint that undermine the plaintiff's claim or give weight to unsupported conclusions of law."). While the plaintiff need not plead "extremely specific facts," *Hoskin v. City of Milwaukee, 994 F. Supp. 2d 972, 976 (E.D. Wis. 2014)*, "[a] complaint must allege facts to support a cause of action's basic elements; the plaintiff is required to do at least that much." *Adams, 742 F.3d at 728*.

## 3. FACTS AND ALLEGATIONS

On Saturday, June 7, 2014, the day after Judge Crabb overturned Wisconsin's state ban on same-sex marriage, over seventy couples were married at the Milwaukee County Courthouse. **[\*5]** *See* Karen Herzog, *Same-sex Weddings Continue in Wisconsin After Judge Strikes Down Ban*, Milwaukee Journal Sentinel (June 7, 2014), *http://www.jsonline.com/news/wisconsin/37535973-mjs_gaymarriage08p1jpg-b99286470z1-262240081.html*. The use of the courthouse on a non-business day to conduct the same-sex marriage ceremonies was made possible, in part, by Mr. Abele personally funding the Saturday business hours. (*See* Docket #19 at 5); (Docket #23 at 4) (admitting that "Defendant Chris Abele personally paid for some of the costs associated with keeping the Courthouse open that day"); *see also Herzog*, supra ("Milwaukee County Executive Chris Abele...personally footed the bill for employee overtime at the courthouse.").

While the marriage ceremonies were taking place inside the courthouse, protesters—including the plaintiff—"were picketing on the south side of the [courthouse] near the water fountain." (Docket #19 at 8). The protesters' purpose "was to promote what the Bible says about gay marriage being a sin and against God's law." *Id.* Deputy Terry allegedly ordered the protesters to leave the area by the fountain and "move to the sidewalk," threatening to arrest them if they failed to do so. In addition, Deputy Terry allegedly would not allow the protesters to enter the courthouse. *Id.*

According **[\*6]** to the plaintiff, Deputy Terry did not treat the same-sex marriage supporters in a similar fashion; namely, "[t]here were same-sex supporters holding signs near the Plaintiff and his group, and they were not told to move or threatened with arrest." (Docket #19 at 5); *id.* at 2 (stating that "those picketing in favor of same-sex marriage did not receive any threats"); *id.* at 8. It is unclear, however, whether same-sex supporters—as opposed to same-sex couples—were allowed in the courthouse, or were denied access like the plaintiff and those that were with him (*see* Docket #19 at 2) ("Deputy Terry blocked Plaintiff as he attempted to enter the courthouse to see whether opposite sex couples were also being married.").

From the foregoing, the plaintiff alleges *Fourteenth Amendment* due process and equal protection violations and *First Amendment* violations against Deputy Terry. The plaintiff further alleges that Sheriff Clarke is liable for the conduct of Deputy Terry because he "failed to train [him] to do his sworn duty to treat all people equally when demonstrating for a political cause on June 7, 2014." (Docket #19 at 2). The plaintiff also alleges that Deputies Perine and Herrera, who were present at the courthouse (presumably), "should have **[\*7]** done more to stop [Deputy] Terry's repeated threats to Plaintiff" than simply telling "Deputy Terry to calm down," *id.*; the Court construes this as a failure to intervene claim against Deputies Perine and Herrera.

In addition, the plaintiff alleges *First* and *Fourteenth Amendment* violations against Mr. Abele for Deputy Terry's interference with the plaintiff's protest, and for "act[ing] without lawful authority when he issued marriage licenses to same-sex couples," *id.* at 4; *see id.* at 7 ("...Judge Crabb made it clear that Defendant Abele had no authority to issue marriage licenses to same-sex couples, as she had given no order that they be issued..."). Similarly, the plaintiff avers that Mr. Abele lacked the authority to "keep open the Milwaukee County Courthouse, a public building, solely to accommodate same-sex couples [seeking] marriage licenses on June 7, 2014." *Id.* According to the plaintiff, Mr. Abele's conduct "violated the [p]laintiff's religious beliefs and voided [his] vote in the referendum in 2006 that struck down gay marriage." *Id.*

Rounding out the plaintiff's constitutional claims, he alleges—as best the Court can tell—that the County is on the hook for the actions of the defendants because all of the defendants "acted in concert **[\*8]** to trample state and federal rights secured by the constitution concerning free speech and freedom to practice religious beliefs." *Id.* at 3. And this allegation, taken together with the plaintiff's allegation that Sheriff Clarke failed to properly train Deputy Terry, presumably means that the plaintiff is alleging a *Monell* claim against Milwaukee County.

Finally, the plaintiff alleges violations of federal and state statutes. Namely, he alleges that: (1) the "named [d]efendants acted in concert with Milwaukee County Sheriff's Department and Milwaukee County Executive Chris Abele and are in violation of *Wis. Stats. 946.12*, Misconduct in Public Office," *id.* at 3; and, (2) Deputies Terry, Perine, and Herrera, Sheriff Clarke, and Mr. Abele "violated the 1993 Religious Freedom Restoration Act, which is the [f]ederal statute protecting religious freedoms," by interfering with the plaintiff's right to express his "deeply held religious objections to same-sex couples getting married and violating the Bible scriptures that condemn their conduct," *id.* at 4.

## 4. DISCUSSION

The Court will now turn to analyzing the movants' motion for partial judgment on the pleadings. The Court will first discuss the RFRA and *Wis. Stat. § 946.12* claims collectively, turn next to the *Monell* claim **[\*9]** against the County, and conclude by discussing the constitutional claims against Sheriff Clarke and Mr. Abele.

## 4.1 The Plaintiff Fails to State a Claim Under the RFRA and *Wis. Stat. § 946.12*

The movants argue that they are entitled to dismissal of all of the plaintiff's claims under the RFRA "because he has plead no facts to support such a claim." (Docket #16 at 4). That sentence is the universe of the movants' argument on this claim. Similarly, the movants argue—this time in a footnote—that they are entitled to dismissal of the plaintiff's claims under *Wis. Stat. § 946.12* because that statute "is a criminal statute that is not applicable in this case." *Id.* at 4 n.4. The plaintiff offers even less in his response in opposition to the movants' motion, failing to address the movants' request for judgment on the pleadings on his RFRA and *Wis. Stat. § 946.12* claims. (*See* Docket #21).

To start, the Seventh Circuit has stated that *it is not* the "responsibility [of the Court] to research and construct the parties' arguments." *United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991)*. That is especially true,

here, since the movants are the parties seeking judgment in their favor. *See id.* ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, **[\*10]** are waived..."). So too is a Court under no obligation to research and construct a plaintiff's claims from whole cloth, nor formulate opposition to a properly brought motion, even if a plaintiff is *pro se* and his or her pleadings must be construed liberally, *see Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)* (citing *Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)).*

Notwithstanding the perfunctory nature of the movants' arguments in support of its motion, the Court finds that the movants are entitled to judgment on the pleadings on the plaintiff's RFRA claim, for two reasons. To begin, the movants are correct that the plaintiff has failed to allege any facts to support a RFRA claim against them. It is eminently *unclear* what actions the plaintiff believes constitute a violation of the RFRA; nor does the plaintiff's second amended complaint plead the basic elements required to sustain an RFRA claim. *See Adams, 742 F.3d at 728.*

Which brings the Court to its second—and more important—point, which is that the plaintiff *would not ever be able to* meet the statutory requirements under the RFRA against the movants because the *RFRA does not apply* to state governments or state actors. *See City of Boerne v. Flores, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997)*; *see also O'Bryan v. Bureau of Prisons, 349 F.3d 399, 400-01 (7th Cir. 2003)* (explaining *City of Boerne*). In *City of Boerne*, the Supreme Court held that "application of the RFRA to the states **[\*11]** is unconstitutional." *Olsen v. Mukasey, 541 F.3d 827, 830 (8th Cir. 2008)* (citing *City of Boerne, 521 U.S. at 511*); *Cutter v. Wilkinson, 544 U.S. 709, 715, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005)* ("In *City of Boerne*, this Court invalidated RFRA as applied to States and their subdivisions, holding that the Act exceeded Congress' remedial powers under the *Fourteenth Amendment*.").

If that were not enough, Congress later amended the RFRA's definition of "government" to exclude state governments (and thus state actors) altogether. *Olsen, 541 F.3d at 830* (citing Pub. L. No. 106-274, § 7(a)(1), 114 Stat. 806 (2000) (codified at *42 U.S.C. § 2000bb-2*)). Thus, actions against state governments, state actors, etc., are not cognizable under the RFRA. *Id.; see Hutchinson v. Maine, 641 F. Supp. 2d 40, 47 (D. Me.*

*2009)* (noting that a plaintiff "cannot seek a civil remedy under the RFRA" against state defendants). Consequently, the movants are entitled to judgment on the pleadings on this claim.

Turning to the Misconduct in Public Office claim, *see Wis. Stat. § 946.12*, the Court finds — despite the movants' irksome choice to request dismissal of this claim in a footnote (*see* Docket #16 at 4)—that the movants are entitled to judgment on the pleadings on this claim, as well. The movants are correct that the statute is a criminal statute and does not, as far as the Court can tell, give rise to a private cause of action. *See Mosay v. Wall, No. 13-CV-841, 2015 U.S. Dist. LEXIS 2102, 2015 WL 128076, at \*8 (W.D. Wis. Jan. 8, 2015)* (noting that *§ 946.12* describes a criminal offense and there is nothing to suggest that the statute gives rise to a private cause of **[\*12]** action).

## 4.2 The Plaintiff's *Monell* Claim Against the County Cannot Proceed

"A local governing body may be liable for monetary damages under *§ 1983* if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dept., 604 F.3d 293, 303 (7th Cir. 2009)* (citing *Monell v. Dept. of Social Svcs. Of N.Y., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978))*; *Justice v. Town of Cicero, 577 F.3d 768, 773 (7th Cir. 2009).*

While *Monell* permits municipalities to be held liable under *§ 1983*, "it does not allow for liability under *§ 1983* on a theory of *respondeat superior* or vicarious liability." *Hoskin, 994 F. Supp. 2d at 979* (collecting cases). "In other words, '[m]isbehaving employees are responsible for their own conduct,'" *id.* (quoting *Lewis v. City of Chi., 496 F.3d 645, 656 (7th Cir. 2007))*, and "units of local government are responsible only for their policies, rather than misconduct by their workers," *Fairley v. Fermaint, 482 F.3d 897, 904 (7th Cir. 2007).*

This Court recently noted—when addressing a similar Rule 12(c) motion—that "*Monell* claims are subject to the pleading standard set out by the Supreme Court in...*Twombly and Iqbal*," and "boilerplate allegations" or legal conclusions are insufficient to survive a Rule 12(c) motion. *Hoskin, 994 F. Supp. 2d at 977* (citing

*McCauley v. City of Chi., 671 F.3d 611, 615 (7th Cir. 2011))*. Because a *Monell* claim is complex, more factual specificity is required to sustain a *Monell* claim. *See McCauley, 671 F.3d at 616-617* ("The **[*13]** required level of factual specificity rises with the complexity of the claim.") (citing *Swanson v. Citibank, N.A., 614 F.3d 400, 405 (7th Cir. 2010))*. This specificity is necessary to "satisfy the 'rigorous standards of culpability and causation' required for municipal liability." *McTernan v. City of York, PA, 564 F.3d 636, 658 (3d Cir. 2009)* (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 405, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997))*.

The County argues that the plaintiff has failed to allege facts sufficient to support a *Monell* claim; instead, according to the County, the plaintiff's claims "are a series of conclusory statements devoid of facts that do no more than assert *respondeat superior* liability." (Docket #16 at 7). Specifically, the County argues that (1) the plaintiff has failed to allege *or even imply* there is a County policy that was the driving force behind the alleged constitutional violations, *id.* at 8; (2) the plaintiff's claims all arise from the events of June 7, 2014, and thus, whatever their merit, are not "sufficient to show a pattern of misconduct, let alone a widespread practice with the force of law," *id.* at 10; and (3) even assuming Sheriff Clarke or Mr. Abele are policymakers for the purposes of The County argues that the liability, the plaintiff fails to allege any facts against either individual to support *Monell* liability, instead "assert[ing] nothing beyond the fact that Mr. Clarke is **[*14]** the Sheriff...and Mr. Abele is the County Executive that paid to keep the Courthouse open on Saturday," *id.* at 11.

The Court agrees with the County that the plaintiff has failed to allege a *Monell* claim, and thus the County is entitled to judgment on the pleadings on this claim. This is so for a number of reasons. First, it is not even clear that the plaintiff is alleging a *Monell* claim in his disjointed second amended complaint. The County assumes as much—as far as the Court can tell—because the County was added as a defendant in this action, the plaintiff alleges that *all of the defendants* "acted in concert" (Docket #19 at 3), and the plaintiff alleges that Sheriff Clarke failed to train Deputy Terry, *id.* at 5. However, the plaintiff never alleges an express policy, a widespread practice, or actually makes a single allegation against the County that is not couched in general terms—*i.e.* "the named defendants did X."

Second, assuming, *arguendo*, that the plaintiff is alleging a *Monell* claim, the County is correct that the plaintiff's second amended complaint falls woefully short. To wit, and as noted above, the plaintiff's allegations "give[] no notice as to the Defendants' improper conduct" and "fail[] **[*15]** to specify the relevant 'custom' or 'policy'" that would sustain a *Monell* claim. The County argues that the, *564 F.3d at 658*; *see also Town of Cicero, 577 F.3d at 773*. Moreover, while there is no "bright-line rule[] defining a widespread custom or practice," *Thomas, 604 F.3d at 303*, nor a "clear consensus as to how frequently conduct must occur to impose *Monell* liability," *id.*, it is clear that "it must be more than one instance," *Cosby v. Ward, 843 F.2d 967, 983 (7th Cir. 1988)*, or even three, *Thomas, 604 F.3d at 303* (citing *Gable v. City of Chi., 296 F.3d 531, 537 (7th Cir. 2002))*. And, here, the plaintiff alleges only a single incident on June 7, 2014. This alone cannot sustain a *Monell* claim.[2]

Third, to the extent that the plaintiff alleges a *Monell* claim based on the conclusory statement that Sheriff Clarke failed to train Deputy Terry to treat people equally, this too is insufficient to sustain a *Monell* claim for failure to train. As the County argues, there are no supporting facts to shore up this claim, nor facts evidencing a "pattern of similar constitutional **[*16]** violations by untrained employees" which is "'ordinarily necessary'" for a *Monell* claim under that theory. *Connick v. Thompson, 563 U.S. 51, 131 S. Ct. 1350, 1354, 179 L. Ed. 2d 417 (2011)* (quoting *Bryan Cnty., 520 U.S. at 410*); *see Matthews v. City of East St. Louis, 675 F.3d 703, 709 (2012)* ("[A]n inadequacy in police training can serve as a basis for liability under *Section 1983*, but only where the failure to train amounts to deliberate indifference to the citizens the officers encounter.") (citing *Hollins v. City of Milwaukee, 574 F.3d 822, 827 (7th Cir. 2009)*; *City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989))*; *cf. Thomas, 604 F.3d at 306* ("In § 1983 actions, the Supreme Court has been especially concerned with the broad application of causation principles in a way that would render municipalities vicariously liable for their officers' actions.").

Fourth, to the extent that the plaintiff alleges a *Monell* claim based on the actions of policymakers, and

---

[2] True, the plaintiff alleges some later events concerning the Wisconsin State Attorney General's Office, a Milwaukee County Judge, and employees of the City of Milwaukee, (*see* Docket #19 at 3), but these events are only tangentially related—if related at all—to the constitutional violations alleged by the plaintiff.

assuming Mr. Abele and Sheriff Clarke fit that description for purposes of *Monell*, there are simply no allegations that Mr. Abele or Sheriff Clarke directed the conduct of Deputy Terry, were aware of his conduct (or similar conduct) and failed to rectify it, or were even present at the courthouse on June 7, 2014. Again, without more, a *Monell* claim on such bare bones allegations cannot proceed. *See McTernan, 564 F.3d at 659*.

At bottom, the plaintiff's *Monell* claim against the County does not allege enough "by way of factual content to 'nudg[e]' his claim of purposeful discrimination **[*17]** 'across the line from conceivable to plausible.'" *Iqbal, 556 U.S. at 683* (quoting *Twombly, 550 U.S. at 570*). Indeed, the Court is unconvinced the plaintiff's allegations are even conceivable.

Thus, for all of the reasons noted above, the County is entitled to judgment on the pleadings regarding the plaintiff's *Monell* claim.

### 4.3 The Plaintiff's § 1983 Claims Against Sheriff Clarke and Mr. Abele Cannot Proceed

Liability under *§ 1983* "is premised on the wrongdoer's personal responsibility," *Kuhn v. Goodlow, 678 F.3d 552, 555-56 (7th Cir. 2012)*, and thus "[a]n *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983)*; *see Chavez, 251 F.3d at 651*; *Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)*.

"The doctrine of *respondeat superior* cannot be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights." *Chavez, 251 F.3d at 651*. A supervisor will be found liable, however, "if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it." *Lanigan v. Vill. of E. Hazel Crest, Ill., 110 F.3d 467, 477 (7th Cir. 1997)*. This, once again, requires some personal involvement in the constitutional deprivation, *see Chavez, 251 F.3d at 651*, but does not require that the defendant "participate directly in the deprivation." *Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001)* (emphasis added). "[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable.... The **[*18]** supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chi., 856 F.2d 985, 992 (7th Cir. 1988)* (citations omitted); *accord Matthews, 675 F.3d at 708*; *Backes v. Vill. of Peoria Heights, Ill., 662 F.3d 866, 869-870 (7th Cir. 2011)*; *Chavez, 251 F.3d at 651*.

Sheriff Clarke and Mr. Abele argue that the plaintiff has failed to allege their personal involvement in the events on June 7, 2014—*i.e.* Deputy Terry's alleged interference with the plaintiff's protest—that give rise to the plaintiff's claims against them—namely, violations of the *First* and *Fourteenth Amendment*. (*See* Docket #16 at 12). Stated another way, the two defendants argue that because the plaintiff has not alleged they were present at the courthouse on June 7, 2014, or were aware of (condoned, or turned a blind eye to) Deputy Terry's actions, the plaintiff's allegations "are insufficient to sustain his claims against Sheriff Clarke and Mr. Abele on either a theory of personal liability or on a theory of supervisory liability." *Id.* The Court agrees.

The plaintiff has failed to allege any facts giving rise to personal or supervisory liability on the part of Sheriff Clarke or Mr. Abele for Deputy Terry's actions. Even the affidavits the plaintiff submitted from other protesters that were with him at the courthouse (*see* Docket #8-1), describe **[*19]** events that implicate Deputy Terry alone. And, to the extent that the plaintiff alleges an amorphous conspiracy by all of those involved to violate his rights (*see* Docket #19 at 3), bare allegations made up of legal conclusions, without further factual support, cannot give rise to § 1983 liability. *See Iqbal, 556 U.S. at 678* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Adams, 742 F.3d at 729* (noting that *Iqbal* and *Twombly* "obviously require more than mere notice," and thus "[a]n inadequate complaint will not survive a motion to dismiss simply because the defendants managed to figure out the basic factual or legal grounds for the claims").

That is not the end of the story, however. The plaintiff also alleges a violation of his constitutional rights by Mr. Abele for "issuing marriage licenses to same-sex couples and by using his personal funds to keep the Courthouse open outside its normal business hours." (Docket #16 at 12). Mr. Abele also moves for judgment on the pleadings on this portion of the plaintiff's claim against him, arguing that the plaintiff's allegations fail as a matter of law. *Id.* at 12-13. They fail, that is, because "[t]he *Equal Protection Clause* does not, as a matter of law, prohibit **[*20]** the issuance of marriage licenses to same-sex couples," but even if it did, the County Clerk issued the marriage licenses, and not Mr. Abele. *Id.* at

12. Similarly, Abele argues that there is no provision in the constitution—and the plaintiff has not identified one—"that prohibited Mr. Abele from keeping the Courthouse open over the weekend" for same-sex marriages. *Id.* at 13.

Mr. Abele is entitled to judgment on the pleadings on this portion of the plaintiff's claim, as well. This is so because the plaintiff has not alleged that Mr. Abele's conduct "violated [his] rights, privileges, or immunities secured by the Constitution or laws of the United States." *Lanigan, 110 F.3d at 471*. By that, the Court means that the plaintiff has not alleged that Mr. Abele's actions *actually caused him harm*, other than personal offense. Nor has the plaintiff, as far as the Court can tell, identified a law, provision of the Constitution, or legal precedent which supports his view that Mr. Abele's conduct was unlawful.

True, the plaintiff alleges that Mr. Abele's conduct "violated [his] religious beliefs and voided [the plaintiff's] vote in the referendum in 2006 that struck down gay marriages." (Docket #19 at 7). And Mr. Abele's conduct may very **[*21]** well have violated his religious beliefs, but that does not give rise to a constitutional claim under *Section 1983*. And it strains credulity to allege that Mr. Abele's conduct "voided" the plaintiff's vote in the 2006 referendum. Indeed, if anyone's conduct did so—and the Court is not saying anyone's did—it was that of Judge Crabb, who struck down Wisconsin's ban on gay marriage. But, she is not a defendant in this case, *nor could she be*, given that she is entitled to absolute judicial immunity. *See Dawson v. Newman, 419 F.3d 656, 661 (7th Cir. 2005)*; *Dellenbach v. Letsinger, 889 F.2d 755, 759-60 (7th Cir. 1989)*. And, it is questionable whether what the plaintiff alleges states a constitutional claim, anyhow. As such, the Court is obliged to grant Mr. Abele's motion for judgment on the pleadings on this portion of the plaintiff's claim.

Finally, Sheriff Clarke argues that if the plaintiff is alleging personal or supervisory liability against him for Deputy Terry's actions, due to his alleged failure to train Deputy Terry, this portion of the claim against him should also be dismissed for the same reasons the Court dismissed the plaintiff's failure to train *Monell* claim. (Docket #16 at 13). The Court concurs; thus, for the same reasons discussed above concerning the portion of the plaintiff's *Monell* claim **[*22]** alleging a failure to train, the Court will grant Sheriff Clarke judgment on the pleadings here.

## 4. CONCLUSION

Consistent with the foregoing, the Court will grant the movants' motion for judgment on the pleadings on the following: (1) the RFRA claim against the movants; (2) the Misconduct in Public Office claim, *see Wis. Stat. § 946.12*, against the movants; (3) the *Monell* claim against the County; and (4) the Section 1983 claims—for violations of the *First* and *Fourteenth Amendment*—against Sheriff Clarke and Mr. Abele.

Because Sheriff Clarke and Mr. Abele will be dismissed from this action, the Court finds it unnecessary to delve into their argument, offered in the alternative, that they are entitled to qualified immunity on the plaintiff's claims against them. (*See* Docket #16 at 13-15).[3]

Lastly, and as noted above, the movants filed a motion to stay discovery pending resolution of the their motion for judgment on the pleadings. (Docket #17). The Court will deny this motion as moot, given that the Court has granted the movants' motion for partial judgment on the pleadings.

Accordingly,

**IT IS ORDERED** that Mr. Abele, Sheriff Clarke, the County, and Deputy Terry's motion for partial judgment on the pleadings (Docket #15) be and the same is hereby **GRANTED**; Sheriff David A. Clarke, Milwaukee County Executive Chris Abele, and Milwaukee County be and the same are hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that Mr. Abele, Sheriff Clarke, the County, and Deputy Terry's motion to stay discovery pending resolution of their motion for partial judgment on the pleadings (Docket #17) be and the same is hereby **DENIED as moot**.

Dated at Milwaukee, Wisconsin, this 25th day of June, 2015.

---

[3] The plaintiff offered no opposition to the defendants' motion for judgment on the pleadings, *except* on the issue of qualified immunity. (*See* Docket #21 at 2). In that regard, the plaintiff argues that the defendants are "not entitled to qualified immunity because...this case [was moved] from state court to federal court," and "there is no mention of [qualified immunity] in the Constitution." Id. Because the Court need not reach the issue of qualified immunity, **[*23]** the Court will shelve explaining—at length, or otherwise—the fallacy of this argument.

BY THE COURT:

/s/ J.P. Stadtmueller

J.P. Stadtmueller

U.S. District Judge

---

End of Document


# *Orlowski v. Milwaukee Cty.*

United States District Court for the Eastern District of Wisconsin

April 21, 2016, Decided; April 21, 2016, Filed

Case No. 13-cv-1318-PP

**Reporter**

2016 U.S. Dist. LEXIS 53537 *

GARY ORLOWSKI, individually, and ESTATE OF ALEXANDER L. ORLOWSKI, by Special Administrator Gary Orlowski, Plaintiffs, v. MILWAUKEE COUNTY, IRBY ALEXANDER, and ANTHONY MANNS, Defendants.

**Subsequent History:** Affirmed in part and reversed in part by, Remanded by *Orlowski v. Milwaukee Cty., 2017 U.S. App. LEXIS 17991 (7th Cir. Wis., Sept. 18, 2017)*

## Core Terms

inmates, medication, methadone, summary judgment, breathing, cheeking, mouth, sleep apnea, defendants', sleeping, dorm, overdose, staff, medical condition, corrections officer, municipality, medical attention, deliberate indifference, grant summary judgment, prison official, drug overdose, pills, conditions of confinement, summary judgment motion, serious medical needs, swallowed, alleges, parties, custom

**Counsel:** [*1] For Gary Orlowski, Individually, Estate of Alexander L Orlowski, by Special Administrator Gary Orlowski, Plaintiffs: Jeffrey D Patza, Jerome A Konkel, LEAD ATTORNEYS, Jonathan S Safran, Samster Konkel & Safran LLC, Milwaukee, WI.

For Milwaukee County, Irby E Alexander, Anthony Manns, Ronald K Malone, Defendants: Andrew A Jones, James C Remington, LEAD ATTORNEYS, Charles H Bohl, Thomas Gonzalez, Whyte Hirschboeck Dudek SC, Milwaukee, WI; Kurt M Simatic, LEAD ATTORNEY, Whyte Hirschboeck Dudek SC, Waukesha, WI.

**Judges:** HON. PAMELA PEPPER, United States District Judge.

**Opinion by:** PAMELA PEPPER

## Opinion

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 45) AND DENYING AS MOOT PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' IMPROPER PLEADING (DKT. NO. 64)

Gary Orlowski, individually and as the special administrator of the estate of his deceased son, Alexander Orlowski, filed a civil rights action under *42 U.S.C. §1983* against Milwaukee County and three individuals who were employed as correctional officers at the Milwaukee County House of Correction ("the HOC")—Irby Alexander, Anthony Manns and Ronald Malone. Dkt. No. 1. The plaintiff's claims arise out of the death of his son, Alexander Orlowski ("Mr. Orlowski"). Mr. Orlowski [*2] died from a fatal methadone overdose on November 22, 2007, while incarcerated at the HOC. The plaintiff pleaded *§1983* claims based on the conditions of Mr. Orlowski's confinement, failure to provide medical care, and loss of familial relationship, society and companionship. He pleaded *§1983* claims against the County under *Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*, as well as a state law indemnification claim.

The defendants have moved for summary judgment as to all of the plaintiff's claims. In response to the defendants' motion, the plaintiff dismissed "all claims against [defendant Ronald Malone], because there is no evidence [he] was individually involved in the events" preceding Orlowski's death. Dkt. No. 51 at 1. Otherwise, the plaintiff opposed the defendants' motion. Invoking *Rule 56(f)(1)*, the plaintiff's opposing brief argued that the court ought to deny the defendants' motion for summary judgment, and instead award summary judgment in his favor. Dkt. No. 51 at 3-4. The plaintiff contended that, even though he had not moved for summary judgment on or before the December 18, 2015

deadline the court had set in the scheduling order, he could ask the court to award summary judgment under *Rule 56(f)* because he notified the defendants in a motion for leave **[*3]** to file statements of additional fact that he planned to request summary judgment in his response to the defendants' motion for summary judgment. Id. at 2-3. The plaintiff also moved to strike the defendants' reply to the plaintiff's responses to the defendants' statements of fact. Dkt. No. 64.

For the reasons explained below, the court will grant the defendants' motion for summary judgment as to all of the plaintiff's claims, decline the plaintiff's request that it award summary judgment in his favor, and deny the plaintiff's motion to strike the defendants' reply to the plaintiff's responses to the defendants' proposed statements of fact.

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Undisputed Facts

Mr. Orlowski was incarcerated at the HOC from July 8, 2007 to November 22, 2007, serving a sentence for violating the terms of his probation related to a conviction for burglary of a building or dwelling. Dkt. No. 52 at 14, ¶¶42-43 (Pl's Resp. to Def's Stm. of Facts).

On the morning of November 22, 2007, Mr. Orlowski was asleep in his bed (bed 14) in the Zebra-2 dorm. Id. at ¶44. Defendant Alexander, a corrections officer, began his shift as the dorm supervisor for the Zebra-2 dorm at 12:05 A.M. on **[*4]** that day. Id. at 15, ¶45. At that time, the inmates in Zebra-2 dorm already were in their beds. Id. at ¶46. The Zebra-2 dorm log book reflects that, around 12:28 A.M. and again at 1:36 A.M., Alexander conducted security checks of the dorm. Id. at 16, ¶¶49-52. Also around 1:36 A.M., defendant Manns, a corrections officer and Alexander's supervisor, toured the dorm. Id. at 17, ¶54. Neither Alexander nor Manns made an entry in the log book pertaining to Mr. Orlowski at those times. Id. at 16-17, ¶¶51-55.

At approximately 4:00 A.M., Alexander noted in the Zebra-2 dorm log book:

> Z²14 Orlowski #719775403 appears to have a severe sleeping disorder. Inmate appears not to be breathing at times. Inmate makes a lot of noise while trying to breath [sic] and or when he is breathing. Inmate appears to have a lot of difficulties sleeping. Sgt Manns Notified about Z²14 Orlow[ski].

Id. at 19, ¶60; Dkt. No. 47-7 at 3. Alexander testified at his deposition that he had not encountered Mr. Orlowski before January 22, 2007. Dkt. No. 48-2 at 208. Alexander's 4:00 A.M. log book entry reflects the first time Alexander had noticed that Mr. Orlowski was having any problems. Id. At that time, Alexander contacted Manns via his radio to discuss his observations of Mr. Orlowski. **[*5]** Id. at 208-09. Alexander testified that he told Manns that he was concerned about Mr. Orlowski, and Manns replied that either Alexander could talk to Orlowski at breakfast, or both of them could talk to Orlowski in the morning, to "ask him if he, you know, knew that—how he was sleeping." Id. at 209. Alexander testified that he was concerned that Mr. Orlowski might have a sleep disorder, such as sleep apnea, and was concerned that the loud noises Mr. Orlowski was making during his sleep would affect other inmates in the dorm or potentially lead to a fight. Id. at 208-18.

In response to the plaintiff's counsel's questions regarding what caused Alexander to believe Mr. Orlowski had a severe sleeping disorder, Alexander testified that "[t]he loud snoring was the key. This intermittent-type breathing type thing was, you know, another kind of indicator that, you know, there was some type of thing—issue going." Id. at 210. Alexander explained that "[i]t seemed like he stopped breathing . . . And then all of a sudden a loud roar come out. And, you know, seemed to be some agitation at times that—that he had." Id. at 210.

At some time on November 22, 2007 (the exact time is not clear from the record), Alexander tried to rouse Mr. Orlowski by shaking his bed **[*6]** and calling his name. Id. at 210, 238. Alexander testified that Mr. Orlowski made a load roar, which startled him and made him jump. Id. at 211. He indicated that some other inmates laughed at his response to the roar, saying, "Oh, he sleeps like that all the time." Id. In response to Alexander shaking his bed and calling his name, Mr. Orlowski would or change his breathing pattern from hard to soft, as if Alexander was disturbing his sleep, but Mr. Orlowski did not wake up. Id. Alexander testified that Mr. Orlowski's sleep disturbances reminded him of sleep apnea, and that he was aware of inmates who suffered from sleep apnea and who displayed symptoms such as trembling and "all kind of, like, activities." Id. at 217. Alexander indicated that there wasn't anything officers could do when they saw those inmates behave in that fashion, other than to think, "Man, these guys need a CPAP;" he testified that there were other inmates who had CPAP machines. Id. at

217-218. The record does not reflect that Alexander made any other attempts to wake up Mr. Orlowski.

Manns prepared an incident report after Mr. Orlowski had died in which he described his discussion with Alexander. Dkt. 48-4 at 151. Manns testified that he wrote that Alexander [*7] reported "that inmates in Z dorm was complaining about Inmate Orlowski. Alexander with his number, Z14 sleeping behavior that he was snoring too loud." Id. Manns further testified that he wrote that Alexander "went to Orlowski . . . and observed this inmate's chest and stomach go up and down and at times his body would make sudden moves but he was breathing okay." Id. at 152. Based on the information Manns received from Alexander, he testified that, at that time, he did not believe that Alexander had any concerns about Mr. Orlowski's "health or breathing conditions or intermittent breathing or anything like that." Id. at 167. Manns further testified that he did not believe that Mr. Orlowski had "any type of sleeping or medical condition," based on the information provided to him by Alexander. Id. at 178; see also, id. at 162-65. Manns advised Alexander "to keep a close watch on him and . . . And if [Orlowski] gets up for breakfast, you should talk to him. And if he don't get up for breakfast, you should wake him up this morning and ask him if he is aware of the way he sleeps." Id. at 152. Manns expected that Alexander would ask Mr. Orlowski if he had any sleeping disorders or if Mr. Orlowski was aware that he snored very loudly when [*8] he slept. Id. at 179-80.

Manns denied that Alexander told him that Mr. Orlowski appeared not to be breathing. Id. at 181-82. Manns testified that if Alexander "would've said the inmate was not breathing, we would've called a medical emergency." Id. at 181. Manns expanded on that testimony by explaining that "[i]f Alexander would've told me that an inmate is not breathing, I would've told him to call a medical emergency. Simple as that. And I would've ran down to the area immediately to assist." Id. at 184. Bonnie Crissey, Milwaukee County's corporate representative, testified in her deposition testimony that a correctional officer has the discretion to call a medical emergency "[i]f a correctional officer can't wake someone up without knowing why[.]" Dkt. No. 48-7 at 140-41. Alexander did not contact Manns again, and Manns was not present again in the Zebra-2 dorm until after Mr. Orlowski was found to be unresponsive at about 6:10 A.M. Dkt. No. 52 at 24, ¶73; 28, ¶96.

The log book indicates that breakfast was announced at 4:05 A.M., and seventeen Zebra-2 dorm inmates went to breakfast at 4:20 A.M. Dkt. No. 48-2 at 211. The defendants do not dispute that the HOC's written policy required Mr. Orlowski to wake up and go to breakfast. Dkt. [*9] No. 59 at 6, ¶22. Mr. Orlowski had been assigned to work in the kitchen that morning, but Alexander did not wake him for breakfast because there were more inmates who were assigned or volunteered to work than were needed. Id. Larry Green, an HOC inmate housed in the Zebra-2 dorm who was assigned as the head cook in the HOC kitchen, stated in his affidavit that he tried to wake Mr. Orlowski up for his shift as a morning kitchen worker, but that Mr. Orlowski would not wake up. Dkt. No. 56 at ¶16-17. Green further stated that it was unusual for Mr. Orlowski not to wake for his shift, and that he repeatedly "told an HOC correctional officer that something was wrong with Alex." Id. at ¶¶18-20. The defendants dispute that Green made these statements to Alexander, but they do not dispute that Green made these statements to some HOC corrections officer. Dkt. No. 59 at 5, ¶¶18-19.

At 4:35 A.M., Corrections Manager Virginia Ertman, the highest ranking correctional officer on duty that night, toured the dorm and read Alexander's 4:00 A.M. log entry regarding Mr. Orlowski. Dkt. No. 52 at 25, ¶¶78-80. Alexander and Ertman went to observe Mr. Orlowski, and at that time, he was breathing and sleeping. [*10] Id. at ¶82; Dkt. No. 48-6 at 145-46. Ertman testified that she could tell Mr. Orlowski was breathing "[b]ecause his chest was going up and down." Dkt. No. 48-6 at 144. According to the log book and his deposition testimony, Alexander conducted security checks on the inmates of Zebra-2 dorm at approximately 4:45 A.M, 4:55 A.M., and 5:48 A.M. Dkt. No. 52 at 26-27, ¶¶84-85, 88. During that period of time, Alexander "didn't see anything" that would have given him reason to believe "that [Mr. Orlowski] could've been in any physical distress." Dkt. No. 48-2 at 255.

At about 6:10 A.M., as the inmates were returning from breakfast, Alexander heard several inmates call out, "Man down, man down." Id. at 251; Dkt. No. 52 at 27, ¶¶90-91. Alexander testified that he didn't understand what that phrase meant, and he interpreted it literally to mean that a person had fallen out of his bunk. Dkt. No. 48-2 at 255-56. When Alexander reached Mr. Orlowski's bunk, he observed that Mr. Orlowski's face was "stiff" and "solid," and "so still that something was wrong. And it just made me just call out for help." Id. at 258. Alexander testified that at 6:12 A.M., he called a medical emergency and added "an enhancement" to the urgency of [*11] the situation by stating that those responding should "step to," as in "come here right away." Dkt. No. 52 at 28, ¶95; Dkt. No. 48-2 at 259-60.

Resuscitation efforts were unsuccessful, and at 6:54 A.M., Mr. Orlowski was pronounced dead. Dkt. No. 52 at 28, ¶99. An investigation into Mr. Orlowski's death determined that he had obtained methadone and Seroquel from another inmate or inmates prior to his death. Dkt. No. 52 at 29, ¶101 and Response No. 101. The parties agree that Mr. Orlowski "died as a result of a drug overdose." Dkt. No. 52 at 30, ¶102. The Milwaukee County Medical Examiner determined that methadone toxicity caused Mr. Orlowski's death. Dkt. No. 53-1 at 42.

In 2007, the HOC had a written policy and procedure for medication distribution, which required "that only licensed health care staff could administer medication to inmates." Dkt. No. 52 at 6-7, ¶¶20-21. Under that policy, the "health care staff were stationed just outside the entrance to the dormitory," where the inmates received their medication, and corrections staff "were stationed in the threshold of the entrance so that they could monitor the dormitory and the inmate receiving medication." Id. at 7, ¶24. After an inmate [*12] received medication, the inmate was to open his mouth "after swallowing oral medication to allow a visual inspection of the mouth by health care staff and correctional staff to ensure the inmate has swallowed the medication." Id. at 8, ¶26 (alterations omitted).

Samuel Pelkey, a Zebra-2 dorm inmate during the time period relevant to this case, stated in his affidavit that another Zebra-2 dorm inmate, Samuel Fitzpatrick, was able to "cheek" his methadone pills (by hiding them in his mouth instead of swallowing them) because the HOC employees failed to adequately check Fitzpatrick's mouth. Dkt. No. 59 at 8-9, ¶¶35, 37-38. Henry Delgado, another Zebra-2 dorm inmate during the time period relevant to this case, stated in his affidavit that "[a]t times when HOC nurses administered methadone pills to Fitzpatrick," he saw Fitzpatrick "take the pills out of his mouth and put them in his hand." Id. at 10, ¶40. Pelkey stated that over at least a two-day period of time, between November 19 and November 21, 2007, Fitzpatrick sold his methadone pills to Mr. Orlowski. Id. at 11, ¶46. One of the defendants' experts, Dr. Chad Zawitz, testified "that it would have been standard practice for a correctional facility such as the HOC [*13] to house an inmate who was receiving methadone in a medical unit instead of the general population, to prevent diversion of methadone to other inmates." Id. at 13, ¶54.

Kristen Babe, an HOC nurse, told Ertman after Mr. Orlowski had died that she knew Mr. Fitzpatrick had "a

history of selling his meds." Dkt. No. 59 at 12, ¶50. Nurse Babe testified in her deposition that she could not recall how she learned that Mr. Fitzpatrick had previously sold his medications, and she was unaware of whether any other correctional officers or supervisors were aware of that before Mr. Orlowski died. Dkt. No. 48-8 at 98-100. She further testified that it was "a classic thing" for inmates to horde medication and sell it in the dorm for canteen. Id. at 97. Amy Lynn Hazen, a former nurse at HOC, testified that, in 2007, "[a]t least 90 percent of our officers [in 2007] never checked" the mouths of inmates when medication was distributed, but she did not recall complaining about that practice to a supervisor in 2007. Dkt. No. 53-1 at 176.

On April 1, 2008, Fitzpatrick later was charged in Milwaukee County Circuit Court with one count of first degree reckless homicide, a felony, based on allegations that he supplied Mr. Orlowski [*14] with methadone prior to his death. Id. at 152-54. While the criminal investigation revealed that Mr. Orlowski had not been prescribed methadone, an inmate told investigating officers that he had seen Mr. Orlowski in possession of four or five methadone pills the day before his death, and another inmate told an officer that an inmate (whom police identified as Fitzpatrick) had been supplying Mr. Orlowski with methadone in exchange for bags of chips. Id.

B. Standards of Review

1. *Summary Judgment*

A court must grant summary judgment when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A court appropriately grants summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (internal quotation marks omitted) (citation omitted). "A party will be successful in opposing summary judgment only when that party presents definite, competent evidence [*15] to rebut the motion." *EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 437 (7th Cir. 2000)*.

Material facts are those "facts that might affect the

outcome of the suit under the governing law," and a dispute about a material fact is genuine if a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The party opposing summary judgment cannot simply rest on allegations or denials in its pleadings; it must also "introduce affidavits or other evidence setting forth specific facts showing a genuine issue for trial." *Anders v. Waste Mgm't of Wis., 463 F.3d 670, 675 (7th Cir. 2006)*. The court views all facts and draws all reasonable inferences in favor of the nonmoving party, but "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Herzog v. Graphic Packaging Int'l, Inc., 742 F.3d 802, 806 (7th Cir. 2014)* (quoting *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc., 517 F.3d 470, 473 (7th Cir. 2008))*.

### 2. *Section 1983 Claims*

To state a claim for relief under *42 U.S.C. §1983*, a plaintiff must allege that: 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) the deprivation was visited upon him by a person or persons acting under color of state law. *Buchanan-Moore v. Cnty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)* (citing *Kramer v. Vill. of N. Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004))*; see also *Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980)*.

### C. Discussion

1. Defendants Alexander and Manns Are Entitled To Summary Judgment on Claims One Through Five.

To survive summary judgment on his *§ 1983* claims against the individual defendants, the plaintiff must produce evidence that on November 22, **[*16]** 2007, Alexander or Manns violated Mr. Orlowski's constitutional rights.

a. *Eighth Amendment* Conditions of Confinement Claim[1]

The first *§1983* claim in the complaint is entitled "Prison/Jail Conditions of Confinement," and alleges that the defendants violated the *Eighth Amendment*[2] by housing the plaintiff under conditions that posed a substantial risk of serious harm to his health and safety. Dkt. No. 1 at 28-29. "The burden is on the prisoner to demonstrate that prison officials violated the *Eighth Amendment*, and that burden is a heavy one." *Pyles v. Fahim, 771 F.3d 403, 408-09 (7th Cir. 2014)* (citing *Whitley v. Albers, 475 U.S. 312, 325, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986))*.

"Confinement in a prison . . . is a form of punishment subject to scrutiny under the *Eighth Amendment* standards." *Rhodes v. Chapman, 452 U.S. 337, 345, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)* (quoting *Hutto v. Finney, 437 U.S. 678, 685, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978))*. While the "Constitution 'does not mandate comfortable prisons,'" *Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)* (quoting *Rhodes, 452 U.S. at 349*), it does impose on prison officials the duty to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates,'" *id.* (quoting *Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984))*. The *Eighth Amendment* also imposes on prison officials a duty "to protect prisoners from violence at the hands of other prisoners." *Id. at 833* (internal quote omitted).

In order for a plaintiff to prove that a prison official has violated the *Eighth Amendment*, the plaintiff must meet two requirements. "First, the [constitutional] deprivation alleged must be, objectively, 'sufficiently serious.'" Id. (quotation omitted). **[*18]** The official's "act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Id. at 834* (quoting *Rhodes, 452 U.S. at 347*). If the inmate alleges that prison officials failed to protect him from harm, he must

---

[1] The plaintiff argues that the defendants "waived any argument regarding the Plaintiff's conditions of confinement claim by failing to develop any such argument in" their initial brief. Dkt. No. 51 at 27. The court rejects this argument. In their initial brief, the defendants addressed the plaintiff's conditions of confinement claim, and argued that the court should grant summary judgment in their favor on both the plaintiff's conditions of confinement claim and his failure to provide adequate medical care claim (both of which are governed by the deliberate indifference standard). Dkt. No. 49

at 3-5, 23-27.

[2] While the complaint categorized the plaintiff's first two constitutional claims under the **[*17]** "*Eighth* and *Fourteenth Amendments*," and then listed the particular type of violation alleged, the court must analyze Mr. Orlowski's first and second claims under the *Eighth Amendment*. In *Lewis v. Downey, 581 F.3d 467, 473 (7th Cir. 2009)*, the court noted that it is the *Eighth Amendment* that protects sentenced prisoners "from the infliction of cruel and unusual punishment," while prisoners who are awaiting sentencing and judgment find protection under the *Fourteenth Amendment's due process clause*.

"show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* Second, the prison official "must have a 'sufficiently culpable state of mind.'" *Id.* (quotation omitted). In cases challenging an inmate's conditions of confinement, that state of mind "is one of 'deliberate indifference' to inmate health or safety." *Id.* (quotation omitted).

Nothing in the record supports a conditions of confinement claim against defendants Alexander or Mann. The evidence indicates that these two defendants interacted with Mr. Orlowski over a period of approximately six hours on November 22, 2007. There are no allegations that during that time, either of them deprived Mr. Orlowski of food, clothing or shelter, or that they failed to protect him from violence at the hands of other inmates. Nor does the record contain evidence that Alexander or Manns showed, in that six-hour time span, deliberate indifference to conditions that exposed Mr. Orlowski to a substantial **[*19]** risk of serious harm. The plaintiff's conditions of confinement claim as to Alexander and Manns is misplaced, and the court will grant summary judgment in their favor on the first claim.

b. Failure to Provide Medical Attention Claim

The second *Eighth Amendment* claim in the complaint is entitled "Failure to Provide Medical Attention." Dkt. No. 1 at 30. The complaint alleges that the plaintiff had a serious medical need, to which the defendants were deliberately indifferent. Id. In order to prove that a prison official violated an inmate's *Eighth Amendment* rights by failing to treat a medical condition, the inmate must show that he had a serious medical need and that the defendant was deliberately indifferent to it. *Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Garvin v. Armstrong, 236 F.3d 896, 898 (7th Cir. 2001).*

i. **Serious medical condition**

A "serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder, 546 F.3d 516, 522 (7th Cir. 2008)* (quoting *Greeno v. Daley, 414 F.3d 645, 652 (7th Cir. 2005)).* A medical need is serious when "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* (quoting *Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997)).* A prisoner's circumstances indicate a serious medical need with "[t]he existence of an injury **[*20]** that a reasonable doctor or patient would

find important and worth of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.*

During the six-hour period in which the individual defendants were involved with Mr. Orlowski, they believed that Mr. Orlowski was suffering from sleep apnea. After Mr. Orlowski's death, investigation revealed that he had died of a methadone overdose. There is no dispute that, before he died, Mr. Orlowski had not been diagnosed with sleep apnea, a drug overdose or any other serious medical condition. In order to determine the "serious medical condition" prong of the plaintiff's claim, then, the court must determine whether Mr. Orlowski's condition was sufficiently obvious that a layperson would have perceived the need for medical attention. As the Seventh Circuit has put it, the court must look at whether "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Steele v. Choi, 82 F.3d 175, 179 (7th Cir. 1996)* (quoting *Farmer, 511 U.S. at 842*)). A serious medical condition may not be *per se* obvious to a layperson, even when it results in death. *Jones v. Minn. Dep't of Corrs., 512 F.3d 478, 483 (8th Cir. 2008)* (citing **[*21]** *Grayson v. Ross, 454 F.3d 802, 809-10 (8th Cir. 2005)* (no objectively serious medical need because it would not have been obvious to a layperson that an inmate required immediate medical attention even though intoxication resulted in death)). But an inmate has a right to prompt medical attention "in life and death situations." *Mathison v. Moats, 812 F.3d 594, 597 (7th Cir. 2016).*

Relying on *Dortch v. Davis, No. 11-cv-841, 2014 U.S. Dist. LEXIS 37216, 2014 WL 1125588 (S.D. Ill. Mar 21, 2013),* the plaintiff argues the court should find that sleep apnea is a serious medical condition. Dkt. No. 51 at 6. More than one court has found that sleep apnea is, in fact, a serious medical condition. See *Dortch, 2014 U.S. Dist. LEXIS 37216, 2014 WL 1125588 at *5* (finding that plaintiff who had been diagnosed by a doctor with sleep apnea suffered from a serious medical condition); *Meloy v. Schuetzle, 230 F.3d 1363 (7th Cir. 2000)* ("obstructive" sleep apnea found to be a serious medical condition). This court agrees that sleep apnea may constitute a serious medical condition.

At least one district court in the Seventh Circuit has implied that a drug overdose, such as the one Mr. Orlowski suffered, constitutes a serious medical condition. In *Estate of Crouch v. Madison County, 682 F. Supp. 2d 862, 872 (S.D. Ind. 2010),* an inmate died of

a drug overdose. The record indicated that the inmate had shown signs of being under the influence of drugs prior to his death, but Judge Sarah Evans Barker stated that the record failed to reflect "signs that he was suffering **[*22]** from a more serious drug-related condition, such as an overdose . . . ." This statement implies that a court might consider a drug overdose to be a serious medical condition. Certainly failure to treat a drug overdose could result in pain, more serious injury, or death. Thus, this court concludes that a drug overdose is a serious medical condition, and that an inmate suffering from an overdose has a serious medical need.

ii. **Deliberate indifference**

It is the second prong of the failure-to-provide-medical-treatment test which causes the plaintiff's claims against the individual defendants to fail. A prison official is deliberately indifferent to an inmate's serious medical need "when he knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837*. Deliberate indifference requires more than a showing of mere negligence: "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id. at 838*. The **[*23]** Supreme Court has interpreted the deliberate indifference standard to require a "reckless[] disregard[]" of "a substantial risk of serious harm to a prisoner . . . ." *Id. at 836*.

> [I]t is not enough for a plaintiff to show that the official acted negligently or that he . . . should have known about the risk. Instead, the [plaintiff] must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference.

*Townsend v. Fuchs, 522 F.3d 765, 773 (7th Cir. 2008)* (internal citations omitted); see also *Whiting v. Marathon County Sheriff's Dep't, 382 F.3d 700, 704 (7th Cir. 2004)* ("*Farmer*, since it requires the defendant-official to have actual knowledge of the risk, foreclosed imputed knowledge as the basis for an *Eighth Amendment* claim of deliberate indifference.").

At or about 4:00 A.M. on November 22, 2007, Alexander observed that Mr. Orlowski was having a lot of difficulty sleeping, that he was making loud noises while sleeping, and that he was not breathing at times. Alexander testified at his deposition that he thought Mr. Orlowski's sleep difficulties were attributable to sleep apnea, that inmates with sleep apnea needed a CPAP mask to help them breathe while asleep, and that he was concerned that Mr. Orlowski's sleep disturbances would wake up **[*24]** other inmates in the dorm.

The parties do not dispute that Mr. Orlowski's symptoms were consistent with sleep apnea. And it is undisputed that Alexander responded to Mr. Orlowski's apparent sleep difficulties. Because he was concerned about the noises that Mr. Orlowski was making, and the intermittent nature of his breathing pattern, shook Mr. Orlowski and called his name, causing Mr. Orlowski to change his sleeping position and breathing pattern. Alexander contacted Manns, explained his observations, and asked for advice. After speaking with Manns, Officer Alexander continued to monitor Mr. Orlowski. At about 4:35, A.M., Alexander visited Mr. Orlowski's bunk with Ertman. At that time, Mr. Orlowski appeared to be sleeping; the officers noticed his chest moving up and down. And, at that time, Mr. Orlowski was not exhibiting signs or symptoms suggesting that he was in medical distress. After that visit, Alexander checked on Mr. Orlowski repeatedly; the log book reflects that Alexander checked on Mr. Orlowski at about 4:45 A.M, 4:55 A.M., and 5:48 A.M. Alexander testified that, at those times, Mr. Orlowski did not exhibit any other signs or symptoms showing that he was in distress or that **[*25]** he obviously needed immediate medical attention. At some point between 5:48 A.M. and 6:12 A.M., Mr. Orlowski stopped breathing and died.

This record contains no evidence that the officers had reason to believe that Mr. Orlowski was suffering from a serious medical need between 4:00 a.m. and 6:10 a.m., or that they intentionally or recklessly disregarded that need. From the moment Alexander noticed that Mr. Orlowski was breathing oddly, he took action. He noted the fact in the log book. He consulted with his supervisor, Manns, and they discussed a plan of action (monitoring Mr. Orlowski until breakfast, and then discussing with Mr. Orlowski whether he was aware of the symptoms he was exhibiting). He both shook Mr. Orlowski and called his name; the fact that Mr. Orlowski moved and changed his breathing patterns in response gave Alexander no reason to believe that Mr. Orlowski was suffering from a serious medical need at that time. Every time Alexander checked in on Mr. Orlowski— including the occasion on which he took Ertman with him—Mr. Orlowski was breathing, and appeared to be

sleeping.[3]

The record shows that Alexander had discretion in these circumstances to determine whether to call a medical emergency. Dkt. No. 48-7 at 140-41. But as the evidence indicates, while Alexander had reason to believe that Mr. Orlowski might be suffering from sleep apnea, he did not have reason to believe that Mr. Orlowski suffered from a medical emergency, particularly when Mr. Orlowski responded to Alexander shaking him and calling his name. Indeed, Manns testified that he believed Alexander contacted him to discuss Mr. Orlowski because other inmates were complaining about his snoring or loud sleeping, not to report a medical problem. Dkt. No. 48-4 at 164-80.

Inmate Larry Green declared in an affidavit that he told a corrections officer (who the court will infer was Alexander for the purposes of this motion **[*27]** (see Dkt. No. 59 at 5, ¶19)) that "something was wrong" with Mr. Orlowski. That evidence does not demonstrate that Alexander was deliberately indifferent to a known medical risk. Clearly Alexander inferred that something was indeed "wrong" with Mr. Orlowski; the inference that Alexander drew was that Mr. Orlowski had sleep apnea, and he took action once he drew that inference. This is the inverse of deliberate indifference.

The plaintiff asks the court to find deliberate indifference by looking at the facts in _Dortch_. On the date that Dorch arrived at the jail, he told the defendants that he had been diagnosed with sleep apnea. The plaintiff did not have his CPAP machine when he first arrived at the jail. Upon learning of the plaintiff's diagnosis, one of the medical defendants asked the jail's health care center to obtain the plaintiff's medical records to confirm his past treatment and his need for a CPAP machine. _Dortch, 2014 U.S. Dist. LEXIS 37216, 2014 WL 1125588, at *5_. The plaintiff's family subsequently located his CPAP machine and sent it to the prison, where it was issued to the plaintiff. Thereafter, health care staff took appropriate follow-up steps, such as issuing a low bunk permit and supplying replacement parts for the

CPAP. **[*28]** _Id._

In _Dortch_, the plaintiff claimed that the defendants were deliberately indifferent to his medical needs by causing a three-month delay between the date he arrived at the jail and the date on which he received his CPAP machine. _2014 U.S. Dist. LEXIS 37216, [WL] at *2_. Dortch based his _§1983_ claims on the ensuing delay before he received his CPAP mask; the defendants knew that Dortch had sleep apnea and had requested a particular treatment for that condition.

_Dortch_ does not support the plaintiff's claim. First, the Dortch court granted the defendants' motion for summary judgment, finding that defendants were not deliberately indifferent to the plaintiff's sleep apnea. In other words, the _Dortch_ court did not find deliberate indifference even after a three-month delay in treatment for a condition the defendants knew that the plaintiff had. In the present case, Mr. Orlowski had not been diagnosed with sleep apnea, and neither Alexander nor Manns knew for certain that he was suffering from sleep apnea. They believed, however, based on the plaintiff's behavior, that he might be suffering from sleep apnea, and rather than waiting three months to take action, they took the actions described above right away.

Nor is there any evidence **[*29]** in the record showing that either Alexander or Manns interacted with or knew Mr. Orlowski before the date of his death, or knew that he had used drugs at some point in the week preceding November 22, 2007. While there were inmates who told investigating officers that Fitzpatrick had sold his methadone to Mr. Orlowski, and that Mr. Orlowski was hoarding as many as four or five tablets the day prior to his death, it is undisputed that the inmates did not provide this information to prison officials. Some inmates told investigating officers that prior to November 22, Mr. Orlowski had been acting "high" or "dizzy." Dkt. No. 53-1 at 152-54. Again, there is no evidence that the inmates reported this to prison officials. By the time Alexander had his first contact with Mr. Orlowski, Mr. Orlowski was in bed, asleep. While the record is replete with evidence indicating that Mr. Orlowski was breathing strangely, there is no information in the record to indicate that either Alexander or Manns knew or had reason to know, during the two-hour period that Alexander observed the strange breathing patterns, that Mr. Orlowski might be suffering from a drug overdose.

As discussed earlier, Judge Barker **[*30]** faced somewhat similar facts in _Estate of Crouch_. That case involved an inmate who was found unresponsive by

---

[3] Alexander testified that on one occasion, other inmates told Alexander (when he reacted to one "roar" **[*26]** by Mr. Orlowski) that Mr. Orlowski slept that way all the time. Dkt. No. 48-2 at 211. In his response to the defendants' proposed findings of fact, the plaintiff objected that there was no contemporaneous evidence supporting this fact, that it was self-serving, and that other inmates had told Alexander that "something was wrong" with Mr. Orlowski. Dkt. No. 52 at 20-21, Response No. 63.

prison officials at 3:00 a.m. *Estate of Crouch, 682 F. Supp. 2d at 867-68*. Judge Barker considered whether "Mr. Crouch showed signs of an objectively serious need for medical attention at some point prior to 3:00 a.m. in response to which the named defendants were deliberately indifferent." *Id. at 871*. Officers had observed behaviors such as slurred speech, unsteady balance, and glassy eyes, from which they inferred that the plaintiff was under the influence of drugs and sleep-deprived. *Id.* Judge Barker noted, however, that "the mere fact that an individual is exhibiting signs of having taken drugs does not necessarily mean he presents an objectively serious need for medical attention." *Id.* She went on to review observations of third parties, and to question whether the defendant officers "had sufficient awareness of the third parties' observations" to allow a conclusion that the officers knew of a serious medical need but were deliberately indifferent or reckless. After an exhaustive review of the evidence in the record, she concluded that the officers did not have sufficient facts to allow them to draw the inference of a serious [*31] medical need prior to the time they found him unresponsive, and she granted summary judgment in favor of the officers. *Id. at 876-77*.

The facts here more strongly weigh in favor of granting summary judgment in favor of the defendants. As already discussed, the officers' direct observations of Mr. Orlowski's behavior gave them no reason to believe that he was in the midst of a drug overdose. Alexander arguably was privy to only two third-party observations—Ertman's and the inmates who, according to his deposition testimony, laughed at him when he was startled by Mr. Orlowski's "roar." Ertman observed Mr. Orlowski's chest moving up and down, and concluded that he was breathing. The plaintiff disputes Alexander's testimony that the inmates who laughed at Alexander commented that Mr. Orlowski breathed that way all the time; if the court discounts that third-party observation, then the single third-party observation supports the defendants' observations. While an official may not escape liability by "refus[ing] to verify underlying facts that he strongly suspect[s] to be true or declin[ing] to confirm inferences of risk that he strongly suspected to exist," *Farmer, 511 U.S. at 843 n. 8*, these observations were insufficient to provide Alexander or Manns with [*32] reason to "strongly suspect" that Mr. Orlowski was suffering from a drug overdose.

In sum, Alexander and Manns are entitled to summary judgment because (1) the evidence is insufficient to establish that they knew or should have known that Mr. Orlowski required immediate medical attention for either sleep apnea or a drug overdose; and (2) the evidence is insufficient to demonstrate that Mr. Orlowski had an obvious need for medical attention that the defendants recognized and to which they were deliberately indifferent, or that they recklessly disregarded. The plaintiff has not shown that a genuine dispute of material fact exists on these issues. Consequently, the court will grant summary judgment in favor of Alexander and Manns on the plaintiff's *§1983* claims based on the officers' alleged failure to provide medical attention to Mr. Orlowski.

### c. Loss of Familial Relationship, Society and Companionship Claim

The third claim in the complaint cites to the *First* and *Fourteenth Amendments*, and states only that the defendants' actions deprived the plaintiff of the familial relationship, society and companionship of his son. Dkt. No. 1 at 38. The *First Amendment* prohibits Congress from among other things, making laws abridging the right [*33] of the people to peaceably assemble. It is true that in 1989, then-district court judge Ann C. Williams held that that right, as applied to the states through the *Fourteenth Amendment*, protected children's relationships with their siblings form "unjustified interference by the State." *Aristotle P. v. Johnson, 721 F. Supp. 1002, 1005 (N.D. Ill. 1989)* (quotation omitted).

In 2005, however, the Seventh Circuit held that parents do not have "a constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an incidental result of state action." *Russ v. Watts, 414 F.3d 783, 791 (7th Cir. 2005)*. In order for a parent to recover on a loss of companionship claim, that parent needs to show that the loss of companionship was caused by a state actor's *intentional* interference with the familial relationship. See *Young v. City of Chicago, No. 13-C-5651, 2014 U.S. Dist. LEXIS 174686, 2014 WL 7205585 at *2 (N.D. Ill., Dec. 18, 2014)* ((quoting *Russ, 414 F.3d at 790* for the proposition that the state action must have been "[f]or the specific purpose of terminating [the decedent's] relationship with his family.") There is no evidence in the record showing that the defendant's actions constituted an intentional effort to interfere with the plaintiff's relationship with Mr. Orlowski.

The court has no doubt that the plaintiff's father has suffered deep, traumatic loss as a result of the death of his son, he has no constitutional [*34] right to recover for the loss of relationship and companionship absent

evidence of intentional interference with that relationship by the state, and thus the court must grant summary judgment in favor of the defendants as a matter of law on this claim.

d. Liability of Supervisor

The fourth claim in the complaint does not mention any constitutional provision. It asserts that Alexander failed to provide Mr. Orlowski with medical attention, and that Manns "approved, assisted, condoned and/or purposely ignored" Alexander's failure to provide that medical attention. Dkt. No. 1 at 32. Manns was Alexander's supervisor. "The doctrine of *respondeat superior* cannot be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights." *Chavez v. Illinois State Police, 251 F.3d 612, 651 (7th Cir. 2001)*. "Supervisory liability will be found, however, if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it." *Lanigan v. Vill. of E. Hazel Crest, Ill., 110 F.3d 467, 477 (7th Cir. 1977)* (citations omitted). In other words, "to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct." *Id.* (citations omitted). It is not enough for a supervisor to be "merely negligent in failing to detect and prevent subordinates' **[*35]** misconduct . . . The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago, 856 F.2d 985, 992-93 (7th Cir. 1988)* (citations omitted).

As discussed above, Alexander did not violate Mr. Orlowski's *Eighth Amendment* rights. While Manns was involved in Alexander's conduct—Alexander consulted with him about Mr. Orlowski's strange breathing, and together the two formulated a plan for dealing with it— the conduct in which he was involved did not violate the constitution. Accordingly, there is no legal basis for imposing supervisory liability, and the court will grant summary judgment in favor of the individual defendants on this claim.

2. Milwaukee County Is Entitled To Summary Judgment As To The Plaintiff's *Monell* Claims

The plaintiff also named Milwaukee County as a defendant. A municipality can be sued directly under *§1983* only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." *Monell v. Dept of Soc. Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. To succeed in

recovering against the County, the plaintiff must show that he "(1) suffered a deprivation of a federal right; (2) as a result of either **[*36]** an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury." *King v. Kramer, 763 F.3d 635, 649 (7th Cir. 2014)* (quoting *Ienco v. City of Chicago, 286 F.3d 994, 998 (7th Cir. 2002)*. Liability under *Monell* "is not founded on a theory of vicarious liability or *respondeat superior* that holds a municipality responsible for the misdeeds of its employees. Rather, a municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Ill., Inc., 368 F. 3d 917, 927 (7th Cir. 2004)* (internal citations omitted). It is only "when execution of a government's policy or custom inflicts the injury that the government as an entity is responsible under *§ 1983.*" *Id.* (internal quotation marks and alteration omitted) (citation omitted).

"The existence of a policy or custom can be established in a number of ways: the plaintiff may point to an express municipal policy responsible for the alleged constitutional injury, or demonstrate that there is a practice that is so widespread that it rises to the level of a custom that can fairly be attributed to the municipality." *King, 763 F.3d at 649* (citing *Estate of Sims v. Cnty. of Bureau, 506 F.3d 509, 515 (7th Cir. 2007))*.

The plaintiff pleaded five separate <u>Monell</u> separate claims against the County, but he is proceeding at this stage only as **[*37]** to three: failure to train, failure to supervise, and the custom of condoning unsafe conditions of confinement. Dkt. No. 51 at 31.[4] The plaintiff did not bring any of these claims against the individual officers, and the court has found that the individual officers are not liable on the claims he did bring against them. Given that, the court first must determine whether it even possible to impose <u>Monell</u> liability on the County in the absence of a finding of liability as to the individual officers.

In *Thomas v. Cook County Sheriff's Department, 588 F.3d 445, 449 (7th Cir. 2009)*, opinion amended and

---

[4] In his memorandum of law opposing the defendants' motion for summary judgment, the plaintiff agreed to dismiss his <u>Monell</u> claims for failure to discipline and for the custom of failing to provide medical attention. Dkt. No. 51 at 31, n.7. That leaves for resolution only the three claims described above.

superseded on denial of reh'g, *604 F.3d 293 (7th Cir. 2010)*, the Seventh Circuit answered that question as follows:

> a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict. So, to determine whether the County's liability is dependent on its officers, we look to the nature of the constitutional violation, the theory **[*38]** of municipal liability, and the defenses set forth.

(citing *Heller, 475 U.S. 796, 798-99, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986))*.

a. Failure to Train/Failure to Supervise Claims

Two of the three claims the plaintiff brought against the County are dependent on the liability of the officers. The failure to train claim assumes that the officers violated the plaintiff's constitutional rights because of the County's failure to train them. The failure to supervise claim assumes that the officers violated the plaintiff's constitutional rights because the County failed to supervise them.

The Supreme Court has held that the circumstances under a municipality may be held liable for failure to train are "limited." *City of Canton, Ohio v. Harris, 489 U.S. 378, 387, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)*. "Inadequacy in police training can serve as a basis for liability under *Section 1983*, but only where the failure to train amounts to deliberate indifference to the citizens the officers encounter." *Matthews v. City of East St. Louis, 675 F.3d 703, 709 (7th Cir. 2012)*. The same is true for failure to supervise claims. *Alexander v. City of South Bend, 433 F.3d 550, 557 (7th Cir. 2006)* (a municipality may not be held liable under *Monell* for failure to train adequately or supervise its officers if the plaintiff fails to demonstrate any constitutional violation by a municipal employee). In a situation in which the employee whom the municipality allegedly failed to train is not liable, even those "limited" **[*39]** circumstances disappear. The Seventh Circuit has stated unequivocally that "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield, Ill., 630 F.3d 499, 504 (7th Cir. 2010)*.

Because this court has found that the individual officers did not violate Mr. Orlowski's constitutional rights, the court need not reach the question of whether there was a failure to train or to supervise those officers. The court will grant summary judgment in favor of the County as to

the failure to train and failure to supervise claims.

b. Condoning Unsafe Conditions of Confinement Claim

The plaintiff has pleaded one *Monell* claim, however, that does not depend on the success of his claims against Alexander or Manns: his claim that the County's alleged custom or widespread practice of condoning unsafe conditions of confinement caused Mr. Orlowski's death. This claim rests on the plaintiff's allegations that there was a custom or practice among HOC nurses and correctional officers of failing to properly conduct mouth inspections of inmates receiving medication, which led to a widespread practice of inmates "cheeking" or "palming" medication—hiding a pill in the mouth or hand instead of **[*40]** consuming it—and selling it to other inmates. The plaintiff argues that this practice resulted in Mr. Orlowski's death by methadone overdose. Recognizing that the plaintiff has the burden to prove that the County's alleged custom or practice caused a constitutional violation, the plaintiff argues that the County's custom of condoning the inmates' drug trade was the moving force that caused Mr. Orlowski's death. If the evidence supported this claim, there would be no inconsistency between a finding that the individual defendants are not liable, but that the County is.

In opposition to the defendants' argument that the evidence is not sufficient to establish *Monell* liability (or withstand their motion for summary judgment), the plaintiff relies on the exhibits attached to the affidavit of the plaintiff's counsel, Jonathan Safran; the affidavits of HOC inmates Samuel Pelkey and Henry Delgado; a January 9, 2008 Operational Review of the Milwaukee House of Correction (which was prepared by the National Institute of Corrections and is a comprehensive review of the operations of HOC, with a particular priority on security issues (the "NIC Report")); portions of the defendants' witnesses' deposition **[*41]** testimony; and a "To The Superintendent" report written by Ertman following Mr. Orlowski's death. Dkt. No. 51 at 37-42.

As discussed in the facts, in 2007 the HOC had a policy which stated that after an inmate received medication, the inmate was to open his mouth "after swallowing oral medication to allow a visual inspection of the mouth by health care staff and correctional staff to ensure the inmate has swallowed the medication." Dkt. No. 52 at 8, ¶26 (alterations omitted). Former nurse Hazan testified that "[w]e have to watch to make sure [the inmates] swallow their pills." Dkt. No. 53-1 at 176. The policy further stated that "[i]f cheeking or palming medications is suspected, inmate opens both hands, spreads

fingers, and a more thorough exam of the mouth is completed." Dkt. No. 47-4 at 2. The HOC's stated reasons for having such a policy included the fact that "[c]ontrolled substance abuse in a correctional setting is disruptive and criminal," and that such substance abuse " in the close confines of a secure facility can lead to serious discipline and safety problems." Dkt. No. 47-5 at 1.

According to the plaintiff, the evidence shows that HOC inmates manipulated the HOC's medication distribution program **[*42]** by "cheeking" and "palming" pills, aided by the staff's alleged failure to adequately ensure that an inmate had ingested his medication, and then sold or traded those pills to other inmates. The evidence in the record, viewed in the light most favorable to the plaintiff, shows the following with regard to a custom or practice of nurses failing to check inmates' mouths:

Former HOC nurse Hazan testified that in 2007, "[a]t least 90 percent of our officers [in 2007] never checked" the mouths of inmates when medication was distributed, but that she did not recall complaining about that practice to a supervisor in 2007. Dkt. No. 53-1 at 176. Former inmate Pelkey submitted an affidavit in which he indicated that "HOC inmates were able to hide medication in their mouths, a technique known as 'cheeking,' because HOC nurses did not adequately check to make sure that inmates swallowed their medication." Dkt. No. 55 at 2. Pelkey stated that he, himself, had sometimes "cheeked" his medication (Seroquel). Id. at 3. Former inmate Delgado submitted an affidavit stating that "HOC inmates were able to hide medication in the cheeks and/or under their tongues in their mouths, because some HOC nurses and correctional **[*43]** officers did not always check properly to ensure that inmates swallowed their medication at the time they were given." Dkt. No. 57 at 2. Former inmate Green's affidavit stated that "during med pass, the HOC nurses and correctional officers often would not check inmates' mouths to make sure that the inmates swallowed the medication and were not 'cheeking' medication." Dkt. No. 56 at 2.

The record also contains evidence regarding the plaintiff's allegation that inmates who "cheeked" medication were selling it to other inmates. Former inmate Pelkey stated in his affidavit that he would sometimes trade the Seroquel he "cheeked" with other inmates. Dkt. No. 55 at 2. Green's affidavit stated that he saw an inmate sell methadone to Mr. Orlowski at least once, and was aware that that inmate was selling methadone to Mr. Orlowski on other occasions. Dkt. No. 56 at 2. In his affidavit, Delgado stated that "it was a regular practice for HOC inmates to sell and trade medications for canteen items," Dkt. No. 57 at 4, and he stated that he was aware that Fitzpatrick was offering to sell his methadone to other inmates for commissary items, id. at 2. HOC Nurse Babe testified in her deposition that it was "a **[*44]** classic thing" for inmates to horde medication and sell it in the dorm for canteen. Dkt. No. 48-8 at 97. She also told Ertman after Mr. Orlowski died that she knew Fitzpatrick had "a history of selling his meds." Dkt. No. 59 at 12, ¶50.

Thus, combined evidence from five witnesses supports the plaintiff's claim that there were nurses and inmates who did not check inmates' mouths after giving them medication, that this at least assisted inmates in "cheeking" their medications rather than swallowing them, and that inmates would sell or trade those "cheeked" medications to other inmates. To establish Monell liability, the plaintiff must demonstrate that this evidence proves a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' within the force of law." *Lewis v. City of Chicago, 496 F.3d 645, 656 (7th Cir. 2007)*. The plaintiff's argument rests on the assumption that there was a collection of widespread, well-settled customs or practices. First, it assumes that there was a widespread custom or practice of HOC staff failing to conduct mouth checks after administering medication. Second, it assumes this practice enabled a widespread practice **[*45]** of inmates "cheeking" medication. Third, it assumes that the combination of these two practices allowed inmates to sell and trade medication to other inmates.

At summary judgment, the court does not consider whether the evidence the plaintiff has submitted would be enough to convince a jury that those three practices existed, were widespread, and were well-settled.[5] It is the court's duty only to determine only if the plaintiff has presented sufficient facts to raise a genuine issue at trial. For the purposes of summary judgment, the court finds that the plaintiff has presented facts which support the above assumptions.

---

[5] The Seventh Circuit has no bright-line rule defining a "widespread custom or practice"—how many occurrences are necessary, for example. *Thomas v. Cook Cnt'y Sheriff's Dept., 604 F.3d 293, 303 (7th Cir. 2009)*. Rather, the court has held that "the plaintiff must demonstrate that there is a policy at issue rather than a random event." *Id.*

Those assumptions, however, are not enough to defeat the summary judgment motion. The first assumption is that a practice existed whereby HOC staff members ignored or disobeyed the mouth-check policy. Even assuming this to be the case, the record is devoid of evidence that the policymaking level of the County [*46] had knowledge of the practice and either ignored it, acquiesced to it or condoned it. None of the former inmate witnesses indicate that they reported the practice to supervisory staff, or complained about it. While Hazen testified that she told supervisors about the failures to conduct mouth checks, she did not do so in 2007, at the time of the events in this case. There is no evidence that prior to Mr. Orlowski's death, there had been publicized or reported inmate deaths or illnesses resulting from drug overdoses. Without such evidence, the argument that the County bears Monell liability for the practice amounts to an argument that the County should be held vicariously liable, or liable under a *respondeat superior* theory, for the misconduct of its employees. The Seventh Circuit has held that courts cannot impose Monell liability under such a theory. *Woodward, 368 F.3d at 927* (quoting *Estate of Novack ex rel. v. Cnt'y of Wood, 226 F.3d 525, 530 (7th Cir. 2000))*. If the County cannot be held liable for its employees' failure to follow the mouth-check policy, then it follows that the County cannot be held liable for the fact that that failure may allow inmates to "cheek" medication, and then to sell it to other inmates.

The plaintiff argues, however—and one of the former inmate witnesses [*47] opined[6]—that the County had to have known what was going on at the HOC, given that it was generally known that inmates were "cheeking" and selling meds. The plaintiff seeks to prove Monell liability by, as the Seventh Circuit has worded it, "showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Id.* (internal citation omitted). The evidence does not support this argument. Hazen testified that it was a "classic thing" that inmates would "cheek," hoard and sell medication, but conceded that she didn't tell her supervisors about it in 2007. Inmates

testified that "cheeking," hoarding and selling was happening, but appear not to have reported the practice to staff. This makes sense; inmates selling drugs likely wished to have the freedom to continue to do so, and inmates buying drugs likely wished to have that same freedom.

The plaintiff did not submit evidence that multiple HOC staff members employed there in 2007 were aware of the practices described and that they reported it to supervisors. Again, there is no evidence that there was a history of drug overdoses or deaths in the inmate population which should have put the policymaking authorities on alert. The plaintiff's argument is that because some—perhaps many—inmates were "cheeking" and selling drugs, the policymaking authorities had to have known. The evidence is insufficient to support that leap.

The plaintiff makes similar arguments with the evidence surrounding the days before, and the day of, Mr. Orlowski's death. All three former inmates either had seen Fitzpatrick "cheeking" or selling medication, or attested that they knew he was doing so. At least one of the former inmates knew that Fitzpatrick was selling to Mr. Orlowski. At least one inmate testified that Mr. Orlowski had begun taking methadone after Fitzpatrick came on to the unit, and one was aware that Mr. Orlowski had been hoarding methadone and had taken it in the [*49] days leading up to his death, including the day before. One inmate attested to the fact that Mr. Orlowski's behavior indicated that he had been using drugs in the days immediately preceding his death.

Again, this argument rests on the assumption that one or more HOC employees failed to conduct mouth checks of Fitzpatrick, that that failure allowed him to "cheek" his methadone, which led to his ability to sell it to Mr. Orlowski, who then hoarded and overdosed on it, and then exhibited symptoms of sleep apnea which misled correctional officers as to the nature of his medical condition. The argument asks the court to hold the County liable for the misconduct of that employee (or those employees), which requires the court to assume that because at least four inmates (including Mr. Orlowski) were aware that Fitzpatrick was "cheeking" and selling his meds, the policymaking authorities with the County had to have known. This assumption requires more of a leap; it requires the court to assume that the activities of a single inmate, who was on the unit for a relatively short period of time, were so widespread and well known that word of his activities must have filtered up to those who formulate [*50]

---

[6] Former inmate Green stated in his affidavit that "the HOC correctional officers should have known that an inmate was selling [*48] Methadone to [Mr. Orlowski], because the sales took place near the bunks of the Zebra Two dormitory." Dkt. No. 56 at 2.

policy at the HOC. Again, the evidence does not support this assumption. There is insufficient evidence in the record to establish that the policymakers in the County had reason to know of the failure to conduct mouth checks, and the inmate practice of "cheeking" and drug trading.

There is another problem with the plaintiff's argument, and it goes to the requirement that in order for the court to impose Monell liability, the plaintiff must submit evidence of a causal link between the custom or practice and the harm—in this case, Mr. Orlowski's death. The Seventh Circuit has held that

> [a] governmental body's policies must be the *moving* force behind the constitutional violation before we can impose liability under *Monell*. In *§ 1983* actions, the Supreme Court has been especially concerned with the broad application of causation principles in a way that would render municipalities vicariously liable for their officers' actions. That is why some courts distinguish between the acts that caused the injury and those that were merely contributing factors.

*Thomas, 604 F.3d at 306* (internal citations omitted). In order to prevail on the *Monell* claim, the plaintiff must show that the failure to conduct mouth checks, or the failure **[*51]** to prevent inmate drug trafficking—even if policymakers had been aware of those failures—was the *moving force* behind the County's violation of an inmate's right.

The plaintiff argues that staff failure to conduct mouth checks and failure to halt inmate drug trafficking caused Mr. Orlowski's death, because he would not have had the opportunity to obtain and ingest a fatal overdose of methadone if the County had been ensuring that HOC inmates swallowed their methadone pills. Stated differently, the plaintiff contends that the manner in which HOC nurses and officers administered the HOC's medication distribution program caused a constitutionally deficient condition of confinement.

This claim sounds in the nature of an *Eighth Amendment* claim that the HOC failed to protect Mr. Orlowski and other inmates against possible self-inflicted harm caused by an overdose of drugs obtained from another inmate. The Seventh Circuit considered a somewhat similar claim in *Grieveson v. Anderson, 538 F.3d 763 (7th Cir. 2008)*. In *Grieveson*, the plaintiff claimed that the Marion County, Indiana, Jail followed an unconstitutional practice of dispensing "an inmate's entire prescription at one time, in full view of other

prisoners, placing in harm's way the prisoner with the **[*52]** prescription." *Id. at 773*. The district court granted summary judgment in favor of the county, and the Seventh Circuit affirmed. The panel in *Grieveson* explained:

> A practice of dispensing full bottles of prescription medicine to inmates may be an impermissible manner of operating under the Constitution—though Grieveson did not present expert evidence or caselaw addressing the effects of dispensing entire drug prescriptions at once. From the little we know, the alleged practice provides inmates with quantities of medicine that could potentially allow them to overdose and that could place them at risk for having their needed medication stolen. But we need not decide whether the practice is unconstitutional, because Grieveson has not put forth adequate evidence showing that the alleged practice was widespread and reflective of a policy choice by the Marion County Sheriff, which is the pivotal requirement of a *§ 1983* official capacity claim.

*Id. at 774*.

The court did not hold that the jail's practice of dispensing entire prescriptions at once was unconstitutional—it hazarded that it might be. The practice the plaintiff alleges here is proximally steps removed from the practice described in *Grieveson*. In *Grieveson* **[*53]** , the court speculated that inmates who saw someone receive a full bottle of pills might harm him to get some, or that the inmate might take more than the prescribed amount and overdose. One might argue that the jail's action in handing out the full prescription in full view of other inmates was the "moving force" that exposed inmates to both of those risks. Here, the plaintiff argues that the County caused Mr. Orlowski's death in the following way:

(1) One or more members of the staff provided methadone to Fitzpatrick. (2) At least one, and possibly more than one, of those staff members failed to conduct a mouth check. (3) Because the staff member or members failed to conduct a mouth check, Fitzpatrick was able to "cheek" methadone. (4) Fitzpatrick was able to sell the methadone he "cheeked" to other inmates. (5) Fitzpatrick was able to "cheek" enough methadone to sell multiple tablets to Mr. Orlowski. (6) Mr. Orlowski was able to trade for enough methadone, and hoard enough of the methadone he traded for, to take enough pills to cause a fatal overdose. (7) Mr. Orlowski's physical reactions appeared to staff like symptoms of

sleep apnea, rather than symptoms of an overdose, which meant **[\*54]** that the staff did not react as they would to someone in the throes of an overdose.

This string of connections resembles the "litany" of interacting policy failures the plaintiff alleged in *Thomas*. In that case, the plaintiff (the mother of a deceased inmate) argued that the court should affirm the jury's verdict against the sheriff under *Monell* because the sheriff's alleged policy or practice of "severely understaffing correctional officers" caused the plaintiff's son to die from pneumococcal meningitis. *Thomas, 604 F.3d at 297, 302*. The Seventh Circuit explained that *§ 1983* explicitly requires "plaintiffs to show that their injuries were caused by the policies or practices complained of," which is "an uncontroversial application of basic tort law." Id. While the court found that the evidence supported the jury's verdict that the individual officers were liable because they failed to respond to the plaintiff's serious medical needs, it counseled that, "in cases such as this, where individual defendants are commingled with governmental bodies, and the plaintiff alleges a litany of policy failures that interact to create some constitutional harm, it is sometimes easier to obscure the causal links between different actors." **[\*55]** *Id.* The Thomas court found no evidence to support the jury's verdict that a policy of understaffing caused the plaintiff's son's death, as opposed to the failures of the individual officers, and remanded the case to the district court with instructions to enter judgment in the sheriff's favor.

The theory that the plaintiff urges this court to adopt makes it even more difficult to tease out the causal links between actors. There are the nurses and HOC officers who fail to perform mouth checks. There are inmates—who do not act under color of law—who take advantage of that opportunity to "cheek" their medication. Some, if not all, of those inmates decide to sell their medications to other inmates. There are inmates who trade for those medications. There was at least one inmate who traded for enough of those medications to ingest a fatal overdose, and who did so. And that inmate exhibited physical responses to the overdose that appeared to the staff like the symptoms of sleep apnea.

The court can infer, for purposes of summary judgment, that the "litany of policy failures" the plaintiff alleges were factors that contributed to Mr. Orlowski's ability to obtain methadone, and to his ability **[\*56]** to overdose. While the County's policy failures might have facilitated Mr. Orlowski's access to methadone, however, Mr. Orlowski's overdose followed multiple events that took place *after* Fitzpatrick received methadone from the HOC staff: Fitzpatrick cheeked his methadone pills, then sold them Mr. Orlowski, who ingested a sufficient amount of methadone to cause a fatal overdose, which produced symptoms that were consistent with sleep apnea and did not indicate the need for immediate medical attention until a time when Mr. Orlowski could not be resuscitated. In other words, the plaintiff argues that the County is liable for Mr. Orlowski's death, but his causation theory does not adequately account for the difference between a "but for" cause, which is not sufficient to impose liability under *Monell*, and a "moving force" or proximate cause of a constitutional violation.

In light of the Supreme Court's concern, reiterated in *Thomas*, that courts should not impose Monell liability based on "broad causation principles," the court cannot allow a *Monell* claim to proceed under a theory that the *County* violated Mr. Orlowski's constitutional right to "humane conditions of confinement," *Farmer, 511 U.S. at 832*, or failed **[\*57]** to protect him from self-inflicted injury, based on allegations that unidentified HOC staff members did not adequately enforce the HOC's written medication distribution policy, which made it possible for Mr. Orlowski to acquire an ingest a fatal dose of methadone from another inmate. The court finds that, at most, this alleged practice amounts to negligence, not deliberate indifference, and negligence is insufficient to establish liability under the deliberate indifference standard. *Farmer, 511 U.S. at 835-36, n.4* (the deliberate indifference standard requires more than "mere negligence," gross negligence or recklessness). For that reason, the court cannot find that the County's alleged practice of failing to enforce mouth inspections was the "moving force" behind a constitutional violation that caused Mr. Orlowski's death.

3. The Plaintiff Did Not Timely Move for Summary Judgment, and the Court Declines The Plaintiff's Untimely Request to Do So.

The court's scheduling order required the parties to file their summary judgment motions on or before December 18, 2015; the plaintiff did not do so. Instead, after the defendants had timely filed their motion, the plaintiff declared in his opposition brief that he was seeking **[\*58]** summary judgment under *Rule 56(f)(1)*. Dkt. No. 51 at 4. The plaintiff construes *Rule 56(f)* to allow him to avoid complying with the court-ordered deadline, then later move for summary judgment, effectively granting himself a thirty-day extension in which to file his motion. That is not how *Rule 56(f)* works.

Rule 56(f) is captioned "Judgment Independent of the Motion," and it grants the court the authority to enter summary judgment *on its own motion. Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund, 778 F.3d 593, 603 (7th Cir. 2015)*. Under *Rule 56(f)*, the court may enter summary judgment in favor of a non-moving party, grant summary judgment on grounds that the parties did not raise, or consider summary judgment on its own, even if no party has moved for summary judgment. *Fed. R. Civ. P. 56(f)*. The court, however, must give the party against whom judgment might be entered notice of that possibility, and provide reasonable time for response. *Hotel 71, 778 F.3d at 603; see also Lalowski v. City of Des Plaines, 789 F.3d 784, 794 (7th Cir. 2015)* ("Because no party moved for it, the district court could grant summary judgment on Lalowski's administrative review claim only [a]fter giving notice and a reasonable time to respond.").

*Rule 56(f)* addresses the *court's* authority to consider *sua sponte* whether summary judgment is appropriate. It does *not* enable a party to do what the plaintiff in this case has done: ignore a dispositive motion deadline **[*59]** set in a scheduling order and then announce at some later time of its own choosing that it is moving for summary judgment. See *Fed. R. Civ. P. 56(b)* (Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.). The court construes the plaintiff's invocation of *Rule 56(f)* as a late request for an extension of time to file his own motion for summary judgment. The court declines that request.[7]

---

[7] The court also rejects the plaintiff's conclusory argument that the defendants should be sanctioned (either by the denial of their motion as to the plaintiff's conditions of confinement claim or through entry of judgment in the plaintiff's favor) because the Zebra-2 log book for the week of November 15-21, 2007 and employee schedules from November 2007 were destroyed. Dkt. No. 51 at 27-30. Courts conduct a two-part inquiry to determine whether a sanction is warranted for spoliation of evidence: the court must find that the party had a duty to preserve evidence because it knew or should have known that litigation was imminent, and the court must find that the evidence was destroyed in bad faith. See *Trask-Morton v. Motel 6 Operation L.P., 534 F.3d 672, 681 (7th Cir. 2008)*. **[*60]** Even if the defendants knew or should have known that litigation would ensue after Mr. Orlowski's death, the plaintiffs have made no showing that the defendants acted in bad faith in disposing of the log book or work schedules.

## II. PLAINTIFF'S MOTION TO STRIKE

Invoking Civil *Local Rule 56(b)*, the defendants filed a reply to the plaintiff's responses to the defendants' proposed findings of fact. Dkt. No. 60. The plaintiff moved to strike that document as an improper pleading, because Civil *Local Rule 56(b)* allows a reply to *additional facts* submitted by the non-moving party, but not a reply to the non-moving party's *responses* to the moving party's statements of fact. Dkt. No. 64. The language of Civil *Local Rule 56(b)* does not appear to contemplate a reply to a non-moving party's responses to the moving party's findings of fact. Because the court's summary judgment determination is based on the materials that properly were submitted by the defendants, the court did not rely upon Dkt. No. 60. Accordingly, the court will deny the plaintiff's motion to strike as moot.

## II. CONCLUSION

The court concludes that there is no dispute as to any genuine issue of material fact, and that the defendants are entitled to judgment as a matter of law. **[*61]** Accordingly, the court **GRANTS** the defendants' Motion for Summary Judgment, Dkt. No. 45, **DISMISSES** the plaintiff's complaint in its entirety, and **DENIES AS MOOT** the plaintiff's motion to strike the defendants' improper pleading. Dkt. No. 64. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 21st day of April, 2016.

**BY THE COURT:**

/s/ Pamela Pepper

**HON. PAMELA PEPPER**

**United States District Judge**

---


# *Foy v. City of Chi.*

United States District Court for the Northern District of Illinois, Eastern Division

May 12, 2016, Decided; May 12, 2016, Filed

No. 15 C 3720

**Reporter**
2016 U.S. Dist. LEXIS 63346 *

YASANTE FOY, Individually and as Special Administrator and Special Representative of the estate of Mark Haynie Jr, deceased, Plaintiff, v. CITY OF CHICAGO, et al., Defendant.

## Core Terms

alleges, deliberate indifference, police station, amended complaint, widespread practice, detainees, inmates, medical care, individual capacity, arrest, notice, serious medical needs, motion to dismiss, cause of action, fail to provide, fail to train, municipality, official quotation marks, discipline, misconduct, cameras, custom, individual officer, medical condition, medical treatment, police officer, Amendment's, medical assistance, arresting officer, official capacity

**Counsel:** [*1] For Yasante Foy, Individually and as Special Administrator and Special Representative of the estate of Mark Haynie Jr, deceased, Plaintiff: Jesse R. Tyler, Timothy R. Tyler, Tyler Law Offices, Chicago, IL.

For City of Chicago, A Municipal Corporation, Defendant: Raoul Vertick Mowatt, City of Chicago Department of Law, Chicago, IL.

For Officer Ruben Delvalle, Jeffery Friedlieb, Darryl Johnson, Tim Philbin, Donald Banks, Individually and as agents, servants, and or/employees of the city of Chicago, Defendants: Caroline Jane Fronczak, LEAD ATTORNEY, City of Chicago, Department of Law, Chicago, IL; Tiffany Yvette Harris, LEAD ATTORNEY, City of Chicago Law Department, Federal Civil Rights Litigation Division, Chicago, IL; Thomas Jon Aumann, Tennessee Department of Law, Office of General Counsel, Nashville, TN.

**Judges:** Rubén Castillo, Chief United States District Judge.

**Opinion by:** Rubén Castillo

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff Yasante Foy, mother of Mark Haynie Jr. and representative of his estate, brings her sixth amended complaint against Defendants City of Chicago (the "City") and police officers Ruben Del Valle, Jeffery Friedlieb, Darryl Johnson, Tim Philbin, and Donald Banks (collectively, "Defendants"). [*2] (R. 58, Sixth Am. Compl.) Plaintiff's sixth amended complaint arises from the death of 17-year-old Mark Haynie Jr. ("Haynie") while in police custody and alleges violations of *42 U.S.C. § 1983* ("*Section 1983*"), the Illinois Wrongful Death Act, *740 ILL. COMP. STAT. 180/1*, and the Illinois Survival Act, *755 Ill. Comp. Stat. 5/27-6*, as well as claims for intentional infliction of emotional distress. (*Id.*) Pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, Defendants seek to dismiss counts seven and eight, Plaintiff's *Section 1983* and *Monell* claims. (R. 60, Mot. at 1-2.) For the reasons stated below, the motion to dismiss is granted in part and denied in part.

### BACKGROUND

On July 13, 2011, Officers Del Valle and Friedlieb arrested Haynie and transported him to a police station located at 3151 W. Harrison St., Chicago, IL (the "Harrison Police Station"). (R. 58, Sixth Am. Compl. at 3-4.) Officers Johnson, Philbin, and Banks were the lock up keepers on duty during . . . [Haynie's] lock up." (*Id.* at 4.) Despite being a minor, Haynie was held with the adult population at the Harrison Police Station. (*Id.* at 5.) After being detained, Haynie's "physical condition became medically dangerous," he complained that he was not feeling well, and he requested medical attention. (*Id.* at 4, 6.) Plaintiff claims that Haynie's calls went unheeded. In fact, Plaintiff [*3] alleges that after

Haynie requested medical assistance, an unidentified police officer told him to "shut the fuck up and lie down." (*Id.* at 17.) Plaintiff also alleges that fellow detainees at the Harrison Police Station informed the on duty police officers that Haynie was having trouble breathing and that his condition was worsening. (*Id.* at 6.) Later that day, Haynie was found unconscious in his cell. (*Id.* at 6.) Haynie died the same day.[1] (*Id.*)

On July 21, 2011, Plaintiff filed suit in the Circuit Court of Cook County against the City and unknown police officers. (R. 1-2, Ex. B to Notice of Removal, Compl.) The original complaint asserted wrongful death and survival claims. (*Id.* at 1-8.) Plaintiff amended the complaint to add federal causes of action and, **[*4]** pursuant to *28 U.S.C. § 1441(c)*, Defendants removed the lawsuit to the U.S. District Court for the Northern District of Illinois. (R. 1, Notice of Removal at 1-2.) Subsequently, Plaintiff withdrew her federal claims and the Court remanded the lawsuit. (*Id.* at 2.) On April 1, 2015, Plaintiff filed the fourth amended complaint, adding *Section 1983* claims against the City and the named police officers. (*Id.*; *see also* R. 1-1, Ex. A to Notice of Removal, Fourth Am. Compl.) Nearly one month later, Defendants removed the lawsuit once again to this Court. (R. 1, Notice of Removal.) On July 17, 2015, the City filed its motion to dismiss Plaintiff s *Section 1983* claim against the City. (R. 24, Mot. to Dismiss Fourth Am. Compl.) In response to the motion to dismiss, Plaintiff moved for leave to file a fifth amended complaint *instanter*. (R. 35, Mot. for Leave; R. 35-1, Fifth Am. Compl.) Following the filing of the fifth amended complaint and another motion to dismiss, (R. 44, Mot. to Dismiss Fifth Am. Compl.), the Court ordered the City to disclose to Plaintiff all of the "deaths at the same police lock-up in the last five years," (R. 50, Order). After the City provided the ordered discovery, Plaintiff filed her sixth amended complaint on December 1, 2015. (R. 58, Sixth **[*5]** Am. Compl.)

In addition to state-law claims, Plaintiff brings two causes of action for deliberate indifference under *Section 1983*. (*Id.* at 15-21.) Specifically, count seven alleges that—while Haynie was in police custody—the defendant officers were on notice of Haynie's worsening condition yet refused to provide him with timely medical attention. (*Id.* at 15-16.) As a result of the defendant officers' alleged actions and omissions, Haynie died. (*Id.* at 8.)

Count eight seeks to hold the City liable for the defendant officers' actions under a theory of municipal liability pursuant to *Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. Specifically, Plaintiff alleges that the City maintains "practices, policies, procedures and an overall culture" that result in a failure "to meet its constitutional obligation to maintain and provide continuing adequate and appropriate monitoring, supervision, medical care and medical treatment of detainees." (*Id.* at 18.) Plaintiff also alleges that the City has "policies and procedures under which detainees with serious medical conditions, like [Haynie], were routinely and frequently denied proper or adequate medical care." (*Id.* at 17-18.) Plaintiff further alleges that the City inadequately trains and supervises its employees, which causes delays of medical treatment **[*6]** to inmates in need of urgent care. (*Id.* at 18.) In addition, Plaintiff alleges that the City "encourage[s] future abuses toward the inmates by failing to discipline or punish employee misconduct that resulted in inadequate medical treatments for inmates." (*Id.*) Plaintiff also claims that the City has widespread practice of failing "to have its cameras located in and around [the Harrison Police Station] . . . in proper working order, so it could monitor . . . [Haynie] and other detainees." (*Id.*; *see also id.* at 20.) As a result of these alleged policies and practices, at least four other individuals have died at the Harrison Police Station between June 2007 and February 2011. (*Id.* at 18-19.) Finally, Plaintiff alleges that the City continues to maintain these policies and procedures as evidenced by the fact that, since Haynie's death, four more individuals have died at the Harrison Police Station. (*Id.* at 20.)

On December 16, 2015, Defendants answered Plaintiffs state-law claims, (R. 59, Answer), and filed a motion to dismiss the *Section 1983* claims, (R. 60, Mot.). Defendants contend that the *Section 1983* claims fail under *Rule 12(b)(6)* and request that the Court dismiss counts seven and eight. (*Id.*) On January 22, 2016, Plaintiff filed her response, (R. 65, Resp.), and **[*7]** Defendants filed their reply on January 29, 2016, (R. 66, Reply).

**LEGAL STANDARD**

---

[1] While the sixth amended complaint is short on details surrounding Haynie's untimely passing and, specifically, the cause of his death, the City contends that Haynie died of a drug overdose. (*See* R. 60, Mot. at 4 ("Several of the deaths referenced are not like Decedent's drug overdose."); R. 65-1, City's Answer to Pl.'s Suppl. Interrogs. at 3 ("Mark Haynie died at Mt. Sinai Hospital of an overdose after having been held at the 11th District lockup on July 13, 2011.").)

A motion under *Rule 12(b)(6)* challenges the sufficiency of a claim. *Fed. R. Civ. P. 12(b)(6)*. Under federal pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. A claim for relief must also be plausible on its face. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*; *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly, 550 U.S. at 555*. "In determining a complaint's sufficiency, [a court will] . . . construe it in light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the nonmovant's] favor." *Zahn v. N. Am. Power & Gas, LLC, 815 F.3d 1082, 1087 (7th Cir. 2016)* (citation and internal quotation marks omitted). However, a court need not "accept as true any legal assertions or recitals of the elements of a cause of action supported by mere conclusory statements." *Id.* (citation and internal quotation marks omitted).

## ANALYSIS

## I. Count Seven Against the Officers

Count seven in Plaintiff's sixth amended complaint alleges that the defendant officers demonstrated deliberate indifference to Haynie's serious medical needs and failed to meet their **[*8]** constitutional obligations to provide adequate medical care. (R. 58, Sixth Am. Compl. at 15-16.) The parties disagree as to the nature of count seven, specifically whether it is brought against the defendant officers in their individual or official capacities and whether a cause of action even exists for "deliberate indifference." (R. 60, Mot. at 2-3; R. 65, Resp. at 5; R. 66, Reply at 2.) The Court will attempt to sort out the parties' confusing contentions.

## A. Deliberate Indifference Against the Officers in Their Official Capacities

Plaintiff alleges that Officers Del Valle, Friedlieb, Johnson, Philbin, and Banks are "being sued individually and in their official capacity." (R. 58, Sixth Am. Compl. at 2.) Plaintiff titles count seven as "*42 U.S.C. § 1983* Monell Claim for Deliberate Indifference Chicago (Chicago Police Officers)." (*Id.* at 15.) In a very

brief argument, the City asserts that count seven must be dismissed because "[i]t is beyond reasonable dispute that the holding of *Monell* pertains to governmental agencies" and "there is no basis for liability for individual officers under *Monell*." (R. 60, Mot. at 3.) In response, Plaintiff states that count seven is a claim for "[d]eliberate [i]ndifference . . . against the individual officers." **[*9]** (R. 65, Resp. at 5.)

Under *Section 1983*, there are two ways in which a party may sue an individual government actor: in the actor's official capacity or in his individual, or personal, capacity. *See Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)*. "When a plaintiff sues an individual officer in his official capacity, the suit is treated as if the plaintiff has sued the municipality itself." *Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 765 (7th Cir. 2006)*; *Graham, 473 U.S. at 165-66* ("Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. . . . [A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." (citation and internal quotation marks omitted)). A *Monell* claim seeks to impose civil liability on municipalities. *See Monell, 436 U.S. at 690-94*. As the United States Supreme Court has held, an official-capacity suit is "*not* a suit against the official personally, for the real party in interest is the entity." *Graham, 473 U.S. at 166*. Simply put, a party cannot pursue a *Monell* claim against an officer in his individual capacity. Thus, to the extent that Plaintiff is attempting to assert a *Monell* claim against the defendant officers in their individual capacities, this cause of action is not cognizable.

In addition, Plaintiff's response states **[*10]** that count seven was improperly titled, that the claim is intended to be a deliberate indifference claim against the individual officers, and that she only seeks to pursue a *Monell* claim against the City. (R. 65, Resp. at 5.) Thus, to the extent that count seven could ever be construed as a *Monell* claim against the officers in their official capacities, Plaintiff has disavowed the claim.[2]

---

[2] Plaintiff requests leave to amend the complaint "to more appropriately reflect" Plaintiff's position and "correct the section heading." (R. 65, Resp. at 5.) However, it is not necessary for Plaintiff to file a seventh amended complaint because the Court construes the current claim as a claim for deliberate indifference pursuant to **Section 1983** against the defendant officers in their individual capacities.

## B. Deliberate Indifference Claim Against Officers in Their Individual Capacities

Defendants argue that even if count seven is improperly titled, "[i]t is unclear if a cause of action called 'deliberate indifference' can be made against individuals." (R. 66, Reply at 2.) The Court is uncertain if Defendants' contention is that this cause of action does not exist at all or if they are arguing that Plaintiff has failed [*11] to state a claim for deliberate indifference against the officers in their individual capacities. As discussed below, any argument that a claim for deliberate indifference does not exist ignores decades of established case law. In addition, affording Plaintiff all favorable inferences, the Court determines that Plaintiff states a claim for deliberate indifference of a serious medical need against the three officers on duty at the Harrison Police Station on the day of Haynie's death. However, to the extent that Plaintiff is asserting a claim for failure to provide adequate medical care against the two arresting officers in their individual capacities, Plaintiff's claim fails.

### 1. Officers Johnson, Philbin, and Banks

*Section 1983* provides that a person may not be deprived of any constitutional right by an individual acting under color of state law. *Lewis v. Downey, 581 F.3d 467, 472 (7th Cir. 2009)*. "The act authorizes claimants to sue persons in their individual capacities who are alleged to have violated such rights." *Id. at 472-73*. To state a claim for personal liability under *Section 1983*, a plaintiff must allege that the defendant was personally involved in the deprivation of his constitutional rights. *Grieveson v. Anderson, 538 F.3d 763 (7th Cir. 2008)* ("A plaintiff bringing a civil rights action must prove that the [*12] defendant personally participated in or caused the unconstitutional actions." (citation and internal quotation marks omitted)). In other words, "[t]e individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park, 430 F.3d 805, 810 (7th Cir. 2005)* (citation and internal quotation marks omitted).

The *Fourteenth Amendment* prohibits deliberate indifference to the serious medical needs of pretrial detainees. *Burton v. Downey, 805 F.3d 776, 784 (7th Cir. 2015)*; *see also Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)* (jailers have a duty to provide adequate medical care to prisoners); *Riley v. Kolitwenzew, 526 F. App'x 653, 656 (7th Cir. 2013)* (concluding pretrial detainee adequately alleged

claim for deliberate indifference to a serious medical need).[3] Deliberate indifference under either the *Eighth* or *Fourteenth Amendments* has both an objective and a subjective element: an inmate must allege facts showing that he suffered from an objectively serious medical condition and that jail personnel acted with deliberate indifference to that condition. *Townsend v. Cooper, 759 F.3d 678, 689 (7th Cir. 2014)*; *Estate of Gee ex rel. Beeman v. Johnson, 365 F. App'x 679, 683 (7th Cir. 2010)*; *see also Soto v. Jefferson, No. 13 C 4561, 2015 U.S. Dist. LEXIS 95247, 2015 WL 4478163, at *2 (N.D. Ill. July 22, 2015)* ("Claims of deliberate indifference to a serious medical need of a pretrial detainee under the *Fourteenth Amendment* use the same standard for deliberate indifference to a serious medical need applied to *Eighth Amendment* claims for convicted prisoners."). "A medical condition is objectively serious if

---

[3] The sixth amended complaint does not indicate whether the defendant officers' conduct at the Harrison Police Station occurred before Haynie was given a probable cause hearing pursuant to *Gerstein v. Pugh, 420 U.S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975)*. If Haynie's arrest was warrantless and the alleged events took place before Haynie was given a probable cause hearing, then Plaintiff's allegations of failure to provide medical care must be analyzed under the **Fourth Amendment**. "[T]he protections of the **Fourth Amendment** apply at arrest and through the *Gerstein* probable cause hearing, [the **Fourteenth Amendment's**] due process principles govern a pretrial detainee's conditions of confinement after the [*14] judicial determination of probable cause, and the **Eighth Amendment** applies following conviction." *Lopez v. City of Chi., 464 F.3d 711, 719 (7th Cir. 2006)*. A claim for failure to provide medical care to an arrestee that is brought under the **Fourth Amendment** is governed by an "objectively unreasonable standard." *Williams v. Rodriguez, 509 F.3d 392, 403 (7th Cir. 2007)*. The standard for establishing a **Fourth Amendment** medical-care claim is lower than that needed to establish deliberate indifference under either the **Eighth** or **Fourteenth Amendments**. *Id.* Because the sixth amended complaint gives no indication as to whether Haynie was arrested pursuant to a warrant or had received a *Gerstein* hearing, it is unclear whether the **Fourth Amendment** or **Fourteenth Amendment** governs count seven. However, because Plaintiff's claim against Officers Johnson, Philbin, and Banks is sufficient under the **Fourteenth Amendment's** more stringent deliberate indifference standard, Plaintiff's claim also passes muster under the **Fourth Amendment's** objectively unreasonable standard. *See id.* ("[T]he deliberate indifference standard under the **Eighth** and **Fourteenth Amendments** requires a higher showing on a plaintiff's part than is necessary to prove an officer's conduct was objectively unreasonable under the circumstances." (citation and internal quotation marks omitted)).

a physician has diagnosed it as requiring treatment, or the need for treatment would **[*13]** be obvious to a layperson." *Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014)*. With respect to the subjective component of the deliberate indifference test, a plaintiff must allege that the defendant was aware of and consciously disregarded his medical need. *See Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*; *Estelle, 429 U.S. at 103-04*. "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware Cty. Sheriff, 700 F.3d 1063, 1073 (7th Cir. 2012)*. If a plaintiff successfully pleads that a "defendant had knowledge of and consciously disregarded a serious risk," the plaintiff also "succeeds in alleging the personal involvement of the individual defendant by virtue of the fact that those elements are subjective in nature." *Crockwell v. Dart, No. 13 C 4880, 2013 U.S. Dist. LEXIS 179523, 2013 WL 6796788, at *3 (N.D. Ill. Dec. 23, 2013)* (emphasis omitted).

Thus, contrary to Defendants' unsupported contention, a plaintiff may state a cause of action pursuant to *Section 1983* for deliberate indifference **[*15]** to a serious medical need against custodial officers in their individual capacities. *See, e.g., Riley, 526 F. App'x at 656-57* (pretrial detainee adequately alleged that defendant had notice of the detainee's medical need, delayed necessary medical treatment and, as a result, needlessly prolonged his pain); *Thomas ex rel. Smith v. Cook Cty. Sheriff; 401 F. Supp. 2d 867, 873 (N.D. Ill. 2005)* ("[Plaintiff] has sufficiently . . . alleg[ed] that each individual defendant was aware of [the decedent's] serious medical needs and displayed deliberate indifference to them by failing to take adequate steps to protect him."); *Crockwell, 2013 U.S. Dist. LEXIS 179523, 2013 WL 6796788, at *3* ("A jail official may be named as a defendant in his or her individual capacity in a *§ 1983* claim when the official personally participated in *or* had knowledge of the types of acts or omissions that form the basis of the claim.").

While Defendants do not address whether Plaintiff has alleged all elements of a deliberate indifference claim, the Court will nonetheless consider whether Plaintiff has stated a cause of action for deliberate indifference against Officers Johnson, Philbin, and Banks. First, there can be no question that Haynie suffered from an objectively serious medical condition—Haynie died within twenty-four hours of being taken into police custody. (R. 58, Sixth Am. Compl. at 6.)

Next, **[*16]** the Court moves to the subjective culpability

inquiry. Plaintiff must allege that the defendant officers acted with deliberate indifference to Haynie's condition, *i.e.* that the officers failed to take reasonable measures to address the medical condition despite subjectively knowing that the inmate faced a substantial risk of serious harm. *Farmer, 511 U.S. at 834*; *Townsend, 759 F.3d at 689*. Plaintiff alleges sufficient facts to plausibly suggest that the three defendant officers who were on duty at the Harrison Police Station were aware of Haynie's medical condition and that these officers were deliberately indifferent to Haynie's medical condition. Specifically, Plaintiff alleges that Officers Johnson, Philbin, and Banks were "the lock up keepers" at the time Haynie was in custody at the Harrison Police Station. (R. 58, Sixth Am. Compl. at 4.) Plaintiff alleges that these three officers "[f]ailed to adequately screen or assess . . . [Haynie's] health situation." (*Id.* at 16.) In addition, Plaintiff alleges that Haynie told these officers that he was in medical distress and needed assistance but these officers "refused to ensure that [Haynie] received timely medical attention." (*Id.* at 6, 15-16.) Plaintiff also alleges that other detainees at the Harrison Police **[*17]** Station told officers that Haynie was having trouble breathing, that his condition was worsening, and that he needed medical assistance. (*Id.* at 5-6, 16.) Plaintiff further alleges that not only were Haynie's calls for help ignored, but in response to a plea for assistance, he was told by an officer to "shut the fuck up and lie down."[4] (*Id.* at 17.) Thus, Plaintiff alleges more than enough specific facts to establish that the officers' conduct constituted an "unreasonable and deliberate indifference to [Haynie's] serious medical needs."(*Id.* at 16.)

When construed in the light most favorable to Plaintiff, it is plausible **[*18]** that these three officers knew of Haynie's serious medical condition, disregarded the risk, and failed to assist Haynie. These allegations sufficiently put these three defendant officers on notice

---

4 Plaintiff alleges that this remark was made by "an unidentified officer on duty" at the Harrison Police Station and does not specifically link Officers Johnson, Philbin, or Banks to this statement, (*id.* at 17); however, at the motion to dismiss stage, Plaintiff need not allege that level of detail. *Burks v. Raemisch, 555 F.3d 592, 594 (7th Cir. 2009)*; *see, e.g., Warren ex rel. Warren v. Dart, No. 09-cv-3512, 2010 U.S. Dist. LEXIS 124671, 2010 WL 4883923, at *7 (N.D. Ill. Nov. 24, 2010)* ("Although it is true that Plaintiffs' complaint does not explicitly parse which of the named Defendants were responsible for which of the above acts or omissions, that level of specificity is not required under federal notice pleading standards.").

of Plaintiff's *Section 1983* claim. Therefore, the Court denies Defendants' request to dismiss count seven of Plaintiff's sixth amended complaint as to Officers Johnson, Philbin, and Banks in their individual capacities.[5]

### 2. Officers Del Valle and Friedlieb

Plaintiff also alleges that arresting Officers Del Valle and Friedlieb failed to obtain necessary medical care for Haynie following his arrest. (*Id.* at 15.) However, this claim fails.

A claim for failure to provide medical care to an arrestee under the *Fourth Amendment* is governed by an [*19] objectively unreasonable standard. *Ortiz v. City of Chi., 656 F.3d 523, 530 (7th Cir. 2011)*; *Williams, 509 F.3d at 403.* "To state a claim based on an arrestee's medical needs, the plaintiff must allege facts sufficient to infer that the defendant acted unreasonably in light of the notice given to the defendant of the plaintiff's medical needs, the seriousness of those needs, the scope of the requested treatment, and the police interests at stake." *Klein v. Curran, No. 13 CV 5191, 2014 U.S. Dist. LEXIS 142322, 2014 WL 5023486, at *3 (N.D. Ill. Oct. 7, 2014)*; *see also Ortiz, 656 F.3d at 530.*

Aside from alleging that Officers Del Valle and Friedlieb arrested Haynie and transported him to the Harrison Police Station, (R. 58, Sixth Am. Compl. at 4), Plaintiff provides no factual content to support a claim that these two officers were involved in depriving Haynie of medical care. For example, as opposed to the pleas made by Haynie and other detainees to the officers while in detention at the Harrison Police Station, Plaintiff does not allege that Haynie requested medical assistance at the time of his arrest. In addition, as opposed to the allegations that Haynie was having trouble breathing and that his condition was deteriorating while in detention, there are no allegations that Haynie was actually suffering any medical distress at the time he was arrested and transported to the

Harrison Police Station. [*20] Simply put, there are no allegations from which the Court can plausibly infer that at the time of Haynie's arrest, Officers Del Valle and Friedlieb were on notice of Haynie's medical distress or that he even had a need for medical assistance at the time of arrest.

In addition, Plaintiff oftentimes improperly lumps together all of the defendant officers with a complete disregard as to which officers were the arresting officers and which officers were on duty at the Harrison Police Station. Plaintiff explicitly states that Officers Del Valle and Friedlieb arrested and transported Haynie, and Officers Johnson, Philbin, and Banks were the "lock up keepers on duty during [Haynie's] lock up." (*Id.* at 4.) Despite this clear distinction in roles, Plaintiff repeatedly combines all of the five defendant officers together in the alleged wrongdoing. (*Id.* at 3-7.) Based on Plaintiffs own allegations, it is not plausible that Officers Del Valle and Friedlieb were at the Harrison Police Station at the time that Haynie and other pretrial detainees were requesting medical assistance while Haynie was in detention and subsequently failed to provide medical assistance. *See, e.g., Klein, 2014 U.S. Dist. LEXIS 142322, 2014 WL 5023486, at *3* (dismissing claim against arresting officers [*21] for deprivation of medical care when the complaint alleged that the plaintiff told unknown officers that he was feeling ill, but did "not allege that [the arresting officers] . . . had anything to do with that aspect of [the plaintiff's] detention").

Ultimately, Plaintiff fails to allege any factual content that establish that Officers Del Valle and Friedlieb were objectively unreasonable in failing to provide medical care for Haynie. Likewise, there are no substantive allegations sufficient to show the necessary personal involvement to establish individual liability against these two officers under *Section 1983*. *See Grieveson, 538 F.3d at 776.* As such, to the extent that count seven may be construed as a claim for disregard of a medical need under *Section 1983* against Officers Del Valle and Friedlieb in their individual capacities, that claim is dismissed with prejudice.

### II. Count Eight Against the City

Count eight of the sixth amended complaint is a *Monell* claim against the City and alleges that the City "failed to meet its constitutional obligation to maintain and provide continuing adequate and appropriate medical care and treatment" to Haynie. (R. 58, Sixth Am. Compl. at 17.)

---

[5] Defendants also argue that count seven should be dismissed because it is "cumulative of the other claims in the complaint." (R. 66, Reply at 2.) Plaintiff asserts one other **Section 1983** claim and that is against the City and not the individual officers. (R. 58, Sixth Am. Compl. at 17-22.) In addition, Plaintiff's other claims are based on Illinois common and statutory law. (*Id.* at 7-14.) Contrary to Defendants' contention, count seven against the individual officers is not duplicative of other claims in the complaint.

The City moves to dismiss the *Section 1983* claim arguing that Plaintiff [*22] has failed to properly allege a viable claim under *Monell*. (R. 60, Mot. at 3-8.)

Under *Monell*, "[l]ocal governing bodies . . . can be sued directly under *§ 1983* for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell, 436 U.S. at 690*. In order for liability to attach under *Monell*, a plaintiff must allege that a local government *itself* caused or participated in the deprivation of his or her rights. *Id. at 694*. A plaintiff's *Monell* claim against a municipality is proper "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *League of Women Voters of Chi. v. City of Chi., 757 F.3d 722, 727 (7th Cir. 2014)* (quoting *Monell, 436 U.S. at 694*). A municipality may be liable for a *Section 1983* violation in one of three ways:

(1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a wide-spread practice that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) through an allegation that [*23] the constitutional injury was caused by a person with final decision policymaking authority.

*Johnson v. Cook Cty., 526 F. App'x 692, 695 (7th Cir. 2013)* (citation and internal quotation marks omitted). While there is no heightened pleading standard for *Monell* claims, *Estate of Sims ex rel. Sims v. Cty. of Bureau, 506 F.3d 509, 514 (7th Cir. 2007)*, legal conclusions and conclusory allegations are not enough. *Iqbal, 556 U.S. at 679*.

Plaintiff does not allege the existence of an express policy that caused Haynie's constitutional deprivation nor does she allege that Haynie's death was directly caused by a person with final policymaking authority. Thus, the only way Plaintiff may assert a *Section 1983* claim for deliberate indifference to a medical need against the City is by alleging a widespread practice "so permanent and well-settled that it constitutes a custom or practice." *Sims, 506 F.3d at 515*. The Seventh Circuit has declined to "adopt any bright-line rules defining a 'widespread custom or practice,'" but to allege a widespread practice a plaintiff must state that the city policymakers were "deliberately indifferent as to [the]

known or obvious consequences" of the alleged practice. *Thomas v. Cook Cty. Sheriff's Dep't, 604 F.3d 293, 303 (7th Cir. 2009)* (alteration in original). In order for a plaintiff to prevail on a deliberate indifference claim in this context, the municipality or city official "must have been aware of the risk created by [*24] the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id*. In addition, a plaintiff pursuing a widespread practice claim generally must allege more than one, and sometimes more than three, instances of misconduct. *Id*. This requirement is intended to "demonstrate that there is a policy at issue rather than a random event." *Id*. Finally, a plaintiff must also allege causation—specifically, that the policy or custom was the "moving force" behind the constitutional violation. *Sims, 506 F.3d at 514*; *see also Johnson, 526 F. App'x at 695*.

While far from a model of clarity, the sixth amended complaint appears to challenge four policies or practices that result in the deliberate indifference to pretrial detainees' medical needs. First, Plaintiff alleges that the City has a widespread practice of providing inadequate medical care. (R. 58, Sixth Am. Compl. at 17-18.) Second, Plaintiff alleges that the City fails to train officers to adequately respond to "inmates in need of urgent medical treatment" and that this failure to train "cause[s] routine delays of medical treatment to inmates." (*Id*. at 18.) Third, Plaintiff alleges that the City encourages future abuses by not disciplining employees who have engaged in misconduct [*25] that resulted in inadequate medical treatment for inmates. (*Id*. at 18.) Finally, Plaintiff alleges that "despite being aware of . . . the seriousness of medical issue[s] faced by some detainees at its police facilities," the City has a practice of not maintaining cameras and surveillance equipment located at the Harrison Police Station. (*Id*. at 20.)

In support of her claim that the City maintained a series of widespread practices that result in the deliberate indifference to pretrial detainees' medical needs, Plaintiff cites to the fact that eight other inmates have died at the Harrison Police Station between 2007 and 2015.[6] (*Id*. at

---

[6] With no citation to authority, Defendants argue that the Court cannot consider any deaths that occurred after Haynie's death because they "are not probative as to what policies may have been in place prior to Decedent's death." (R. 60, Mot. at 4.) However, Plaintiff cites to these additional deaths to support her allegation that the City's practices "have remained consistent" through the recent years. (R. 58, Sixth Am. Compl. at 20.) In light of Plaintiff's allegations of an ongoing practice and Defendants failure to point to case law to the contrary, the

18-20.) Plaintiff indicates that three of these deaths were the result of suicide, three deaths were attributed to drug overdoses, one death was due to cardiac dysrhythmia, and one death was due to pulmonary disease. (*Id.*) The sixth amended complaint does not include the cause of Haynie's death; however, the City indicates that Haynie died of a drug overdose. (R. 60, Mot. at 4; *see also* R. 65-1, City's Answer to Pl.'s Suppl. Interrogs. at 3.) Aside from the fact that these deaths are attributed to a wide array of causes, Plaintiff fails to allege any factual content that plausibly suggest that **[\*26]** these deaths were the result of the City's widespread practices of officers failing to provide medical attention, failing to train officers, failing to punish officers when an inmate suffered a medical emergency, or failing to maintain operable surveillance equipment. Plaintiff alleges no factual matter to establish that the circumstances surrounding any of these inmates' deaths are similar. For example, Plaintiff alleges in conclusory terms that another detainee, Victor Flores, committed suicide by hanging following statements that he wanted to "jump off a roof and hurt himself." (R. 58, Sixth Am. Compl. at 19.) However, there is nothing in the complaint that plausibly suggests that the circumstances surrounding Haynie's death and Flores's death are comparable. In addition, for at least five of the deaths, Plaintiff merely states the name of the inmate, the date of the inmate's death, and the cause of death, with no other explanatory details. (*Id.* at 20.) The Court is left to guess as to how these deaths—which have occurred at a jail that has housed likely thousands of detainees between 2007 and 2015—can be attributed to any of the widespread practices that Plaintiff attempts to allege. Moreover, **[\*27]** these deficiencies are even more glaring considering the fact that Plaintiff has already conducted discovery regarding inmate deaths at the Harrison Police Station.

While these tragic deaths are unfortunate, there are no allegations that these deaths and Haynie's death share substantive similarities. Simply put, the conclusory reliance on other deaths between 2007 and 2015 at the Harrison Police Station does not establish the possibility that the City's alleged **[\*28]** widespread practices are so well-settled that they amount to an unconstitutional custom or policy. *See, e.g.,* *Estate of Moreland v. Dieter, 395 F.3d 747, 760 (7th Cir. 2005)* (concluding that there was nothing to indicate a violation of a jail policy and that three alleged incidents did not amount to

a widespread practice that was so well-settled so as to constitute an unconstitutional custom); *Henderson v. City of Chi., No. 14 C 1164, 2015 U.S. Dist. LEXIS 55866, 2015 WL 1954464, at \*2 (N.D. Ill. Apr. 29, 2015)* (conclusory allegations about three allegedly unconstitutional incidents found insufficient to state a *Monell* claim); *Winchester v. Marketti, No. 11 CV 9224, 2012 U.S. Dist. LEXIS 82761, 2012 WL 2076375, at \*4 (N.D. Ill. June 8, 2012)* ("What is fatal to the *Monell* claims, however, is that Plaintiff makes no attempt to plead a pattern of similar constitutional violations with any degree of factual specificity.").

Plaintiff's failure-to-train allegations also do not pass muster because they are boilerplate and lack any supporting facts. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of *§ 1983.*" *Connick v. Thompson, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)*. This is a difficult claim to make: "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. To satisfy the statute, a municipality's failure to train its **[\*29]** employees in a relevant respect must amount to deliberate indifference to the rights of the persons with whom the [untrained employees] come into contact." *Id.* (citation and internal quotation marks omitted). The sixth amended complaint has no allegations to this effect. At no point does Plaintiff attempt to articulate what specific training was lacking. *See Hardy v. Wexford Health Sources, Inc., No. 12-CV-6554, 2015 U.S. Dist. LEXIS 43411, 2015 WL 1593597, at \*14 (N.D. Ill. Apr. 2, 2015)* ("Absent allegations of what training or staffing was lacking and how that deficiency impacted Hardy's health or that of his fellow inmates, Hardy has failed to state a claim for deliberate indifference due to a failure to train and a failure to provide adequate staffing."). The sixth amended complaint also fails to allege factual content that would support an inference that the improper conduct and constitutional deprivation was caused, at least in part, by lack of training. *See Maglaya v. Kumiga, No. 14-CV-3619, 2015 U.S. Dist. LEXIS 101217, 2015 WL 4624884, at \*5 (N.D. Ill. Aug. 3, 2015)* ("In addition to failing to provide any factual support to sustain this allegation, Plaintiffs also fail to plead how this alleged failure to train officers was the moving force behind Plaintiffs' constitutional harm."). The Court cannot reasonably infer that a failure to train the officers caused Haynie's constitutional injuries based upon the factual **[\*30]** allegations in the sixth amended complaint. *See, e.g., Suber v. City of Chi., No. 10 C*

---

Court will consider the deaths that occurred after Haynie's when determining whether Plaintiff has sufficiently alleged a widespread practice in support of her *Monell* claim.

*2876, 2011 U.S. Dist. LEXIS 48335, 2011 WL 1706156, at \*4 (N.D. Ill. May 5, 2011)* (dismissing *Monell* claim when the "complaint [was] devoid of any plausible allegations about how Defendants failed to train their police officers despite foreseeable consequences and/or repeated complaints of constitutional violations").

Plaintiff's allegations of a failure to discipline are also boilerplate and lacking in detail. The sixth amended complaint contains no allegations that could plausibly demonstrate that the City has a widespread practice of failing to discipline officers when a pretrial detainee suffers a medical emergency and it is determined that the officers did not adequately respond. Plaintiff never articulates what the City's actual practice is for disciplining officers that engage in the misconduct that allegedly occurred at the Harrison Police Station. In addition, Plaintiff does not allege a single instance in which the City condoned similar behavior by officers at the Harrison Police Station by either promoting an officer or not disciplining the officer despite punishment being warranted. *See, e.g., Starks v. City of Waukegan, No. 09 C 348, 2013 U.S. Dist. LEXIS 156545, 2013 WL 5874563, at \*2 (N.D. Ill. Oct. 31, 2013)* (allowing failure to train claim to proceed where plaintiff alleged pattern of nine similar constitutional **[\*31]** violations that small municipality exacerbated by promoting instead of disciplining officers who were responsible for violations). Plaintiff succeeds in repeating all of the trigger words required of a *Monell* claim but absolutely no factual content to demonstrate a widespread practice of failing to adequately punish prior instances of similar misconduct. *See, e.g., Harris v. Kruger, No. 13-CV-8584, 2015 U.S. Dist. LEXIS 6977, 2015 WL 300497, at \*5 (N.D. Ill. Jan. 22, 2015)* (dismissing *Monell* claim when plaintiff alleged that "as a matter of . . . practice, the CPD facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instance[s] of similar misconduct, thereby leading CPD officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses" but "nowhere allege[d] what is the policy or practice, only that the policy results in misconduct").

Finally, Plaintiff's allegation that the City maintained a widespread practice of failing to have functioning cameras located in and around the Harrison Police Station also fails. Critically, Plaintiff does not allege that the widespread practice of not repairing surveillance equipment was the proximate cause of Haynie's constitutional deprivation. While Plaintiff conclusively states **[\*32]** that the City knew that the cameras at the Harrison Police Station "were inoperable" and that the

failure to have working cameras resulted in inadequate monitoring of detainees and employees alike, (R. 58, Sixth Am. Compl. at 19), this is not the same as an allegation that the widespread practice of having inoperable cameras was what caused the deliberate indifference to Haynie's medical needs. Notably, Plaintiff explicitly alleges that the officers were told numerous times by multiple detainees that Haynie needed assistance but that these officers ignored the pleas. (*Id.* at 5, 6, 17.) There are no allegations that Haynie's condition was ignored and not attended to because of inoperable surveillance cameras. Ultimately, even if Plaintiff alleged sufficient facts to demonstrate a widespread practice of failing to maintain surveillance cameras, Plaintiff has stated no facts or allegations to support an inference that such a practice could have been the "moving force" behind Haynie's death. *Sims, 506 F.3d at 514*; *Johnson v. Cook Cty., No. 11 CV 3203, 2011 U.S. Dist. LEXIS 137872, 2011 WL 6009614, at \*2 (N.D. Ill. Nov. 29, 2011)* ("Plaintiff has failed, however, to allege the causation element of his *Monell* claim. . . . Nothing in the complaint permits the court to draw a reasonable inference that defendant caused plaintiff to be . . . **[\*33]** assaulted.").

In light of the above, the Court grants Defendants' motion to dismiss count eight of the sixth amended complaint. Because Plaintiff has already taken discovery on this claim and after six iterations of her claims has yet to sufficiently state a *Monell* claim, Plaintiff's *Monell* claim against the City is dismissed with prejudice.

## III. State-Law Claims

The sixth amended complaint also alleges an array of state-law claims against the City. (R. 58, Sixth Am. Compl. at 10-12, 13, 14.) The City states that "[t]o the extent that Plaintiff intends these claims to be read as some form of either *respondeat superior* or indemnification, the City concedes these counts are sufficiently pled for the purpose of this motion." (R. 60, Mot. at 2; *see also id.* at 8.) However, the City argues that if Plaintiff is "implying that the City by its own actions might be liable, . . . Plaintiff fails to state any basis for such claims anywhere in the Complaint." (*Id.* at 8.) Plaintiff does not respond to the City's contention and thus waives her claims to the extent that they seek to hold the City liable for its own actions. *See Citizens for Appropriate Rural Roads v. Foxx, 815 F.3d 1068, 1078 (7th Cir. 2016)* ("[B]y failing to respond in any way to any of the arguments advanced by Defendants . . . , Plaintiffs **[\*34]** have waived their claims."); *Green v.*

*Charter One Bank, N.A., 640 F. Supp.2d 998 (N.D. Ill. 2009)* (dismissing count from complaint where the plaintiff did not address the defendant's argument in its opposition, reasoning that "failure to respond permits an inference of acquiescence and 'acquiescence operates as a waiver.'" (quoting *Wojtas v. Capital Guardian Tr., Co., 477 F.3d 924, 926 (7th Cir. 2007))*. Therefore, as this lawsuit continues, the Court will construe the state-law claims against the City as claims for indemnification and *respondeat superior* only.

**CONCLUSION**

For the foregoing reasons, the Court hereby GRANTS IN PART AND DENIES IN PART Defendants' motion to dismiss (R. 60, Mot.). As to count seven, any *Monell* claim against the individual officers is DISMISSED with prejudice. In addition, count seven against arresting officers Del Valle and Friedlieb is DISMISSED with prejudice. As to count eight, the *Monell* claim against the City is DISMISSED with prejudice. The motion is denied in all other respects.

The parties shall appear for a status hearing on June 22, 2016, at 9:45 a.m. and shall be prepared to set firm deadlines in this long-pending lawsuit. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the status hearing. **[*35]**

**ENTERED:** /s/ Rubén Castillo

**Chief Judge Rubén Castillo**

**United States District Court**

**Dated: May 12, 2016**

No *Shepard's* Signal™
As of: August 31, 2018 5:26 PM Z

# *Moore v. Kankakee County*

United States District Court for the Central District of Illinois, Urbana Division

December 4, 2013, Decided; December 4, 2013, Filed

Case No. 12-CV-2002

**Reporter**
2013 U.S. Dist. LEXIS 170568 *; 2013 WL 6283718

KRYSTAL MOORE on behalf of herself, on behalf of JA'QUAN TERRELL SMITH (a minor, deceased), JA'QUAY TERRENCE SMITH (a minor, deceased), and TERRENCE SMITH, Plaintiffs, v. KANKAKEE COUNTY; JACQUELINE D. HARCAR; DAVID SHULTZ; IVETTA CHAREE SANGSTER; MARTY CALLOWAY, JR.; DEAN DYER; SABRINA FLOWERS; DR. CLYDE DAYHOFF; DR. JEFF LONG and SHERIFF OF KANKAKEE COUNTY TIMOTHY F. BUKOWSKI, Defendants.

## Core Terms

corrections officer, inmate, training, deliberate indifference, pain, pregnant, on-call, complaints, cell, twins, Counts, summary judgment, indifferent, distress, policies, jail, deliberately, pregnancy, responder, custom, constitutional violation, deposition, prison, contractions, bleeding, morning, argues, assess, entitled to summary judgment, serious medical needs

**Counsel:** **[*1]** For Krystal Moore, on behalf of herself, on behalf Ja'Quan Terrell Smith (a minor, deceased), Ja'Quay Terrence Smith (a minor deceased), Terrence Smith, Plaintiffs: J Nicolas Albukerk, LEAD ATTORNEY, ALBUKERK & ASSOCIATES, Chicago, IL.

For Timothy F Bukowski, Sheriff of Kankakee County, Jacqueline D. Harcar, David Shultz, Marty Calloway, Jr, Ivetta Charee Sangster, Dean Dyer, Kankakee County, Sabrina Flowers, Dr Clyde Dayhoff, Dr Jeff Long, Defendants: Michael W Condon, LEAD ATTORNEY, Matthew J Hafeli, Yordana Sawyer, Zrinka R Davis, HERVAS CONDON & BERSANI PC, Itasca, IL.

**Judges:** COLIN S. BRUCE, U.S. DISTRICT JUDGE.

**Opinion by:** COLIN S. BRUCE

## Opinion

Defendants filed this Partial Motion for Summary Judgment (#97) on July 1, 2013. Plaintiffs filed their Response (#101) to the motion on August 8, 2013. Defendants filed their Amended Reply (#122) on September 12, 2013. The motion is now fully briefed and ready for judgment. For the following reasons, Defendants' Partial Motion for Summary Judgment (#97) is GRANTED in full.

BACKGROUND

*Factual Background*

<u>The Parties</u>

Plaintiff Krystal Moore, at all relevant times in this case, was detained in the Flex Housing Unit at the Jerome Combs Detention Center (JCDC) in Kankakee, Illinois. **[*2]** Plaintiff Terrence Smith [1] was the father of the twins that Plaintiff Moore was carrying. Defendant Sheriff Timothy Bukowski was responsible for the operation of the JCDC. Defendants Dr. Clyde Dayhoff and Dr. Jeffrey Long were two of the Medical Directors at the JCDC. Defendant Ivetta Charee Sangster was a Licensed Practical Nurse (LPN) employed by the JCDC. Defendant Cpl. Sabrina Flowers was the supervising correctional officer assigned to booking at JCDC. Defendants Jacqueline Harcar, David Schultz, Marty Calloway, and Dean Dyer were correctional officers at the JCDC. Additionally, Calloway was assigned to booking and Dyer was a "first responder."

---

[1] For simplicity's sake, Krystal Moore will be referred to as "Plaintiff" from this point forward. Although Terrence Smith, Ja'Quan Terrell Smith (deceased), and Ja'Quay Terrence Smith (deceased) are all named plaintiffs in this matter, any further use of "Plaintiff" in this Opinion exclusively refers to Krystal Moore.

The Incident

On September 11, 2011, Plaintiff was 22 to 24 months pregnant with twins. This was Plaintiff's first pregnancy. Plaintiff testified during her deposition that she had begun experiencing pain through her back and **[*3]** stomach during the early morning hours of September 11 and complained to cellmate Kenyatta Williams of the pain. Alicia Hunter was housed in the cell next to Plaintiff and heard Plaintiff requesting aid early in the morning of September 11 by pushing the intercom button. The intercoms connect inmates to the correctional officers working in the housing units. At five or six o'clock that morning Plaintiff told Hunter that she was still in pain. Hunter pressed the intercom in her cell to summon aid, but a male correctional officer (unidentified) on the other end of the intercom told her to mind her own business. After the cell doors opened at 8:00 a.m., Hunter took a shower and then went to Plaintiff's cell to look in on her. Hunter saw Plaintiff balled up on the bed.

Defendant Officer Harcar stated that she first became aware of Plaintiff's complaints of stomach pain sometime after 9:30 in the morning.[2] Plaintiff disputes Harcar's claim, arguing that, due to visual inspections conducted by the correctional officers, Harcar would have become aware of Plaintiff's situation before 9:30. Harcar was on shift in Flex from 6:45 a.m. to 3:15 p.m. and was obliged to report to her housing unit **[*4]** by 7:15. Harcar had previously interacted with Plaintiff while Plaintiff was in the JCDC. Harcar was not aware of Plaintiff having a bad reputation at JCDC before September 11, 2011. Plaintiff claimed that she told Harcar that she thought she was in labor and needed to go to the hospital. Harcar denied that Plaintiff told her she thought she was in labor. Kenyatta Williams told Harcar

_____

[2] This issue is disputed by the parties. Plaintiff claims, based on the cell housing history attached to her Response (#101) as Exhibit O, that she was housed in Cell A1 on September 11, 2011, and thus Defendants Harcar and Schultz would have seen her during their checks from 7 a.m. to 9:30 a.m., and would have been aware of her condition long before 9:30. Defendants dispute this assertion, noting that, based on the deposition testimony of Williams and Hunter, Plaintiff was moved from A1 (a lower tier cell) to the upper tier, where she was housed on September 11, 2011, in a cell with Kenyatta Williams. Defendants also dispute Plaintiff's assertion **[*5]** that the Flex pods layout allowed guards at the officers' station to see into Plaintiff's cell when sitting at the station. Harcar testified that guards could not see into Plaintiff's cell from the station.

that morning that Plantiff was having contractions. Harcar knew that Plaintiff was pregnant with twins and believed Plaintiff to be five to six months in to her pregnancy.

Harcar asked Defendant Officer Schultz to contact Defendant Cpl. Flowers about Plaintiff's complaints. Schultz was also on shift in Flex from 6:45 a.m. to 3:15 p.m., during which he was supposed to perform a check every 30 minutes. During the check officers must hit an electromagnetic sensor with a wand and do a visual scan of each cell. Kenyatta Williams claims she saw Schultz standing in Plaintiff's doorway between 8:00 and 8:30 a.m. At this time she could also see Plaintiff. Schultz knew that Plaintiff was pregnant, but did not himself know how far along Plaintiff was in her pregnancy. Schultz had been told that Plaintiff was "probably" six months pregnant. Schultz admitted that Plaintiff asked to go to the hospital. At around 9:36 a.m. Schultz contacted booking and informed Defendant Officer Dyer, a first responder, that a pregnant inmate was complaining about stomach pain. A first responder is a correctional officer who has been trained to take vitals, including pulse, blood **[*6]** pressure, and temperature and to recognize and assess some kinds of emergency situations.

Dyer informed Flowers about Plaintiff's complaint. Flowers instructed Schultz to call the nurse because Flowers knew Defendant Nurse Sangster was at the JCDC that morning. Sangster was at the JCDC that morning for a few hours and was on-call along with Registered Nurse Heather Gill for the remainder of the day. Sangster was on call 24 hours a day, seven days a week, and if officers had a medical issue, she was contacted. Schultz called the medical department as instructed, but Sangster was not there. He called around to other housing units and was eventually able to speak to Sangster about Plaintiff's complaints. Schultz did not recall the specifics of his conversation with Sangster, but the nurse did not inform him that this was an emergency situation. Schultz saw Plaintiff walking around the housing unit throughout his shift and she did not appear, to Schultz at least, to be in any distress. Flowers spoke with Sangster face to face while she was still in the jail that morning. Sangster told Flowers that she was aware of Plaintiff's situation, that there was nothing wrong, and that Plaintiff would **[*7]** be seen the following day by the doctor. Flowers did not see or speak with Plaintiff at all on September 11, 2011.

At some point during the morning, before 11:30, Plaintiff asked Williams to call her mother. Williams called Julie

Moore, Plaintiff's mother, and asked her to call the prison because Plaintiff was having pains and wanted to go to the hospital. Julie Moore called the prison and spoke with Dyer. Moore informed Dyer that Plaintiff was having pains, that it could be contractions, and that she probably needed to go to the hospital because it was too early to have the children. Dyer told Moore that he had a call in to the nurse and they were supposed to be coming out. Moore asked if a nurse was on her way to see Plaintiff, and Dyer answered in the affirmative.

Shortly before 11:30 am, Plaintiff complained to Harcar about continued pain. Harcar then contacted Flowers and informed her that she needed a first responder to come to Flex because Plaintiff was complaining about stomach pain. Flowers told Harcar that Sangster said nothing was wrong with Plaintiff. Flowers told Harcar to tell Plaintiff that "she can stop calling her mama because her mama can't do nothing up in here." Flowers **[*8]** knew that Julie Moore had called in to the facility and said that Plaintiff was having stomach pains and needed to go to the hospital. Harcar told Flowers that Plaintiff did not appear to be in any distress. Harcar told Plaintiff to try and relax. Harcar related to Plaintiff that she (Harcar) had previously been pregnant with twins and knew that at times it could be uncomfortable.[3] Harcar told Plaintiff that her body was going to go through some changes and pain while carrying two babies. Harcar allowed Plaintiff to stay out of her cell so she could try to get comfortable.[4] Harcar also allowed inmates Kenyatta Williams and Alicia Hunter to stay with Plaintiff.

Flowers directed Dyer to go to the Flex Housing Unit and provide first responder services to Plaintiff. However, before going to the housing unit Dyer called Sangster, who was no longer at JCDC. Dyer, who had just spoken to Plaintiff's mother, informed Sangster that Plaintiff **[*9]** was complaining about stomach pain. Their conversation was as follows:

> "Dyer: Okay. And the next thing I have is a female down in Flex, pregnant, states she's having stomach pains. Her mom called here, said she called home, said we wouldn't do nothing about it, and she thinks she's having contractions.
> Sangster: She's not having any bleeding or anything; is she?
> Dyer: I'm going down to first respond her now.
> Sangster: Yeah, they called me when I was out there actually about her. Krystal Moore, she's — in my opinion, a lot of times she's full of shit. She don't even want to take her prenatal vitamins for the baby.[5] You know what I'm saying?
> Dyer: Okay.
> Sangster: And now you talking about she having stomach cramps. You can go eyeball her and call me back if you want. She's probably full of shit. But you can let her know that she can see the doctor tomorrow if she'd like. Actually, she was scheduled to see him, but refused. So if she doesn't— take her blood pressure. If she doesn't appear to be in any serious distress, she's going to wait until tomorrow.
> Dyer: Okay.
> Sangster: All right. Thanks.
> Dyer: Uh-huh.
> Sangster: All right. Bye."

Dyer then went to the Flex Housing Unit with Calloway. Kenyatta Williams was with Plaintiff while Dyer and Calloway were in the Flex unit. Dyer took Plaintiff's vitals, which were all within the normal range. Dyer asked Plaintiff if she was bleeding and she told him that she was not. Plaintiff claims that she told Dyer that she thought she was in labor. Plaintiff did not ask to speak with Calloway. Plaintiff did not look to be in distress to either Dyer or Calloway while they were in the Flex Housing Unit with her [6]. Neither Dyer nor Calloway had

---

[3] Both Harcar and Flowers had experienced childbirth.

[4] The inmates of the upper and lower tiers of Flex Pod A alternate being allowed to leave their cells and use the dayroom. Normally, each tier is allowed out for two hours and then the inmates are locked up.

[5] Plaintiff had her own prenatal vitamins prescribed for her by **[*10]** Dr. Renuka Ramakrishna.

[6] This version of events is disputed by Hunter and Williams in their affidavits filed with Plaintiff's Response (#101, Exhibits I and B). Williams avers that Dyer seemed rushed and that he ignored Plaintiff when she told him that she thought **[*11]** she was in labor and needed to go to the hospital. Dyer also ignored Plaintiff's complaints that the blood pressure cuff he was using on her did not work properly. When Dyer and Calloway were in Flex, Williams avers Plaintiff was rocking back and forth crying and Dyer never asked if she was having contractions. Further, during lunchtime, Plaintiff was in the dayroom with Williams and in full view of Hunter, who saw Plaintiff crying and twisting around to get more comfortable. Around noon, according to Hunter, Harcar ordered Hunter to stay with Plaintiff, whom she was with until approximately 2:40. Hunter, as an inmate, is familiar with the layout of the Flex Pods and JCDC, and avers that Plaintiff would have been in full view of the guard station where Schultz and Harcar would have been sitting while Plaintiff was in the dayroom.

any further contact with Plaintiff that day. Dyer informed Harcar that Plaintiff's vitals were all within the normal range and that she did not look to him to be in any distress. Williams testified that Dyer and Plaintiff had a disagreement about the blood pressure cuff, but she did not remember the nature of the disagreement. Dyer also informed Flowers that Plaintiff's vitals were fine.

After this incident, Plaintiff called her mother Julie Moore and told her she was in pain and was afraid she was in labor. Plaintiff told her mother she knew it was contractions and that the pain was going down to her private parts. Plaintiff was in tears while speaking to her mother. No nursing staff or doctors came to visit with Plaintiff that day. Dyer was in contact with Sangster throughout the day and he was the only first responder that went to see Plaintiff. Schultz had no training on how to assess whether a woman was in labor, but he was trained to contact a first responder or medical staff member, as were the other correctional officers. The correctional officer Defendants did not have training on how to assess a pregnant inmate. Harcar was aware

---

Defendants dispute this, pointing to the deposition testimony of Williams that she could not recall the nature of the blood pressure disagreement, nor did Williams or Hunter mention that Plaintiff was "rocking back and forth" in front of Dyer. Williams further testified that she did not remember any conversation that Plaintiff had with Dyer, besides the blood **[*12]** pressure disagreement. Further, Defendant acknowledges that while Plaintiff was in the dayroom with Williams in full view of Hunter when lunch came, it notes that, in Hunter's deposition, Hunter made no mention of Plaintiff rocking back and forth and crying or twisting around to get more comfortable. Defendants also note that Williams testified that there was nothing else that she told Plaintiff's attorney or a reporter that she had not mentioned during the deposition. Defendants also note that there is no evidence that Harcar and Schultz were in the guard station at the time Hunter alleges, and that Hunter's affidavit statement also assumes, without personal knowledge, that Harcar and Schultz would have been sitting in the station at all times.

Under Seventh Circuit case law, "'[w]here a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.'" *Amadio v. Ford Motor Company, 238 F.3d 919, 926 (7th Cir. 2001)*, quoting *Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995)*. **[*13]** Therefore, as Plaintiff has not shown how the statements in the deposition were mistaken, the court will not consider those statements in the affidavits in conflict with deposition testimony.

that Sangster was only a LPN and stated, in her deposition, that "I know an LPN can only do so much...an LPN is pretty much...the RN's little flunky basically [the RN] tells [the LPN] what to do."

Sangster testified as follows about her training **[*14]** with regard to pregnancy:

> "Attorney: Okay. When you were trained as an LPN, what sort of training did you receive regarding assessing pregnancy?
>
> Sangster: Just like you would assess anyone else, other than asking them about their last period, if they've had any problems with the pregnancy, if they're currently having issues.
>
> Other than that, you assess them as you would anybody else.
>
> Attorney: So, am I correct to say that when you received your LPN training you didn't receive any other training regarding a person in labor?
>
> Sangster: Specific training? Just assessing someone as far as if they appear to be in distress, checking their vitals, any nausea, vomiting, things of that nature.
>
> Attorney: Uh huh.
>
> Sangster: Any bleeding.
>
> Attorney: Okay. So as an LPN, in your training, you didn't — strike that. As an LPN, you were not trained to assess whether or not a person was actually experiencing contractions or not?
>
> Sangster: That — whether or not a person is experiencing contractions, I have to go by what they tell me. I mean, that's all I can go by, is how they appear to be to me.
>
> Attorney: Well, meaning if you had personally — if you say put your hand on the stomach of a woman who is experiencing **[*15]** contractions, you know, it is a possibility to feel a hardening of the stomach area, isn't it?
>
> Sangster: It's possible.
>
> Attorney: If I might ask, have you ever experienced pregnancy yourself?
>
> Sangster: Yes, I have."

Between noon and 2:40, Hunter told Harcar and Schultz that Plaintiff was in pain and needed to go to the hospital. Hunter told Schultz that Plaintiff was saying her butt was hurting. Schultz told Hunter that Plaintiff was "not going to have the baby out of her ass." Hunter told Schultz that when she was in labor she could not always tell where she was hurting. Schultz ignored her by doing something on the computer. In her affidavit, Hunter averred that every time she tried to speak with Harcar or

Schultz about Plaintiff they seemed to be preoccupied and bored, and they did not want to take any action to help her.[7]

Between 2 and 2:45 p.m. Hunter went with Plaintiff back to her cell because Plaintiff needed **[*16]** to use the restroom. Hunter saw Plaintiff sit on the toilet and then start screaming. Hunter saw Plaintiff pass a lot of blood, which was collected on a sanitary pad. Hunter began telling Plaintiff not to push. Sometime after 2:30 an inmate yelled out to Harcar that Plaintiff was bleeding. Harcar ran to Plaintiff's cell and observed her sitting on the toilet. Plaintiff showed Harcar a sanitary pad with blood on it. Harcar told Schultz to contact booking to advise Flowers that Plaintiff was bleeding. Schultz contacted booking, reaching Dyer, and informed him that Plaintiff was bleeding. At about 2:47 p.m. Dyer contacted Sangster by telephone and advised her that Plaintiff was now bleeding. Sangster instructed Dyer that Plaintiff needed to be taken to the hospital. Dyer told Flowers that Sangster directed them to take Plaintiff to the hospital. Officers from the next shift (not Defendant correctional officers) were assigned to take Plaintiff to the hospital. The transport officers did not bring a wheelchair with them. Plaintiff was required to walk herself down the stairs and out of the cell. Plaintiff was fully dilated when she arrived at Provena St. Mary's hospital, which was located **[*17]** approximately ten miles from JCDC. Plaintiff was subsequently transported to a Kankakee hospital, where Dr. Renuka Ramakrishna, Plaintiff's obstetrician, delivered the twins around 5:20 p.m. The twins later died in a Chicago hospital.[8]

County Procedures and Policy

The Kankakee County Detention Center Policy and

---

[7] Defendants dispute this, noting that, in her deposition, Hunter did not testify that Harcar and Schultz seemed to be preoccupied or bored, but that, in fact, Harcar did try to help and show Plaintiff different ways to sit and little things to make herself more comfortable.

[8] Plaintiff has included, as Exhibits V and Y to her Response (#101), the expert reports of Drs. Mark Loafman and Jonathan K. Muraskas concerning the reasons for the twins' deaths and commenting on the actions of Defendants. However, while both reports are signed, the expert reports were introduced into the record without any supporting affidavit verifying their authenticity and are therefore inadmissible and cannot be considered for purposes of summary judgment. *Scott v. Edinburg, 346 F.3d 752, 759-60 (7th Cir. 2003).*

Procedure Manual ("Policy Manual") Section 601 (Medical Services Administration) provides that all medical personnel, including nurses, must be licensed, registered, or certified in their respective fields and only perform duties within the scope of their particular license. Policy Manual Section 617 (Pregnancy/Prenatal Policy) provides that in case of an emergency **[*18]** with a pregnant inmate, correctional officers are to notify their shift supervisors and the on-call nurse if medical personnel are not present at the jail. The medical department will determine whether the inmate should be sent to a local hospital. Policy Manual Section 625 (Nurse On-Call) provides that health staff will be on site at the jail on Saturdays, Sundays, and holidays, as needed. Otherwise, on-call nurses are available at that time. It further requires an on-call nurse to contact a Physician Assistant or physician with any questions or guidance, as needed. An on-call nurse is also required to contact the on-call physician to discuss inmate needs and medical decision making, as needed. A supervisor may send an inmate to the hospital in case of an obvious, immediate emergency. As part of the JCDC "Standing Orders," JCDC policy is to call 911 in cases of imminent delivery of a baby.

Plaintiff's expert Dr. Jacqueline Moore, an expert in the field of prison nursing and healthcare, averred that because JCDC utilized an "on-call" system, where medical personnel were usually only available by telephone on the weekends, it was imperative to have at least one guard on duty, immediately **[*19]** available and trained to assess whether Plaintiff was in labor. Dr. Moore further averred that the training in question for guards regarding pregnancy should have, at a minimum, included: the timing of contractions, knowledge of the typical pattern of contractions, feeling the pregnant woman's stomach to see if it is hardening and knowing what questions to ask. Examples of such questions are "where exactly does it hurt?," "does the pain ever stop or get better?" and "does moving around walking or repositioning stop the pain?"

Defendants, in regard to the on-call system, note that Dr. Moore testified in her deposition that she did not read the Illinois County Jail Standards under the Illinois Administrative Code in preparation for this case, although she had read them before. Further, Defendants note that in her deposition Dr. Moore took issue not with JCDC's policy regarding treatment of pregnant inmates and medical personnel authority, but rather with how those policies were carried out in this particular case. She also testified that she did not have a problem with the JCDC's policy of contacting the on-

call nurse, but rather with Sangster's decision. Dr. Moore also did not review **[*20]** any of the correctional officer Defendants' depositions, but that it was her "understanding" from Sangster's and Nurse Gill's depositions "that the officers received no training in the care of pregnant women."

Plaintiff's Complaint

Plaintiff filed her Fourth Amended Complaint (#92) on May 23, 2013. The complaint contained eight counts. Count I, against the correctional officer Defendants and Nurse Sangster, alleged failure to provide adequate medical care under the *Fourteenth Amendment to the United States Constitution* and *42 U.S.C. § 1983*. Count II, a claim pursuant to *Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* under the Constitution and *§ 1983*, against Defendants Bukowski, Dayhoff, and Long, alleged that the JCDC's customs, practices, or policies permitted or encouraged the misconduct complained of in this case. Counts III and IV alleged claims of wrongful death regarding Ja'Quay and Ja'Quan Smith against the correctional officer Defendants and Sangster. Counts V and VI allege "loss of society" of the decedent twin Plaintiffs due to the inadequate medical care received by Plaintiff. Those counts do not specifically list who they are alleged against. Count VII is a **[*21]** "pendent state law claim for medical malpractice" against Sangster. Count VIII is an indemnification count seeking, in the event that any individual Defendant is found liable for his or her actions performed in the course of his or her employment, that Kankakee County indemnify the employee for the verdict.

Defendants filed this Partial Motion for Summary Judgment (#97) on July 1, 2013. Plaintiffs filed their Response (#101) to the motion on August 8, 2013. Defendants filed their Amended Reply (#122) on September 12, 2013. The motion is now fully briefed and ready for judgment.

ANALYSIS

Defendants make five arguments in their Motion for Partial Summary Judgment (#97): (1) the correctional officer Defendants are entitled to qualified immunity on Plaintiff's *§ 1983 Fourteenth Amendment* claim as alleged in Count I of the Fourth Amended Complaint; (2) Defendants Sheriff Bukowski and Drs. Dayhoff and Long are entitled to summary judgment on Plaintiff's municipal policy (*Monell*) claim as alleged in Count II of the Complaint; (3) the correctional officer Defendants

are entitled to summary judgment on Plaintiff's wrongful death claims as alleged in Counts III and IV of the Complaint; (4) all **[*22]** Defendants are entitled to summary judgment on Plaintiff's loss of society claims as alleged in Counts V and VI of the Complaint; and (5) the correctional officer Defendants are entitled to summary judgment on Plaintiff's medical malpractice claim as alleged in Count VII of the Complaint. Each of these arguments will be addressed in turn.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; see also *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994)*. In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Singer v. Raemisch, 593 F.3d 529, 533 (7th Cir. 2010)*. However, **[*23]** a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer, 593 F.3d at 533*. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258, 688 F. Supp. 2d 815, 835 (C.D. 2010)* (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge, 24 F.3d at 920*. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004)*. Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004)*, quoting *Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003)*. Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at **[*24]** trial." *Kampmier v. Emeritus*

*Corp., 472 F.3d 930, 936 (7th Cir. 2007)*, citing *Celotex Corp., 477 U.S. at 322-23*.

I. *Whether the Correctional Officer Defendants Had Qualified Immunity*

Count I of Plaintiff's Fourth Amended Complaint (#92) alleges that the correctional officer Defendants and Nurse Sangster "deliberately, recklessly, willfully, and wantonly ignored the obvious serious medical needs and requests for medical treatment" of Plaintiff and the "substantial risk of serious injury and death, and failed to take appropriate steps to protect" Plaintiff, constituting a violation of Plaintiff's *Fourteenth* and *Eighth Amendment* rights. The Complaint also alleges that correctional officer Defendants were "deliberately indifferent" to Plaintiff's medical needs by allowing Sangster to make treatment decisions regarding her pregnancy. Defendants move for summary judgment on Count I for the correctional officer Defendants, arguing that they are entitled to qualified immunity.

"Governmental actors performing discretionary functions are entitled to qualified immunity from suits for damages 'insofar as their conduct does not violate clearly established constitutional or statutory rights of which **[*25]** a reasonable person would have known.'" *Abbott v. Sangamon County, Ill., 705 F.3d 706, 713 (7th Cir. 2013)*, quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. "'Qualified immunity balances two important interests- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Abbott, 705 F.3d at 713*, quoting *Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. Qualified immunity protects all but the plainly incompetent, and if officers of reasonable competence could disagree on the issue of whether or not the act in question was constitutional, immunity should be recognized. *Gruenberg v. Gempeler, 697 F.3d 573, 578 (7th Cir. 2012)*. "To overcome the defendant's invocation of qualified immunity, the plaintiff must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott, 705 F.3d at 713*. Once the qualified immunity defense is raised, the burden is on the plaintiff to defeat the defense and show that she had clearly established **[*26]** rights that the defendant violated. *Estate of Escobedo v. Martin, 702 F.3d 388, 404 (7th Cir. 2012)*.

The court will first address whether the correctional officer Defendants violated Plaintiff's constitutional rights. Plaintiff argues that correctional officer Defendants violated her *Eighth Amendment* right to be free from cruel and unusual punishment, via the *Fourteenth Amendment's* application to pretrial detainees and incarcerated individuals, when they "all contributed to, or knowingly failed to prevent, the violation of [Plaintiff]'s constitutional rights, when [Plaintiff was] repeatedly denied access to proper medical attention and pain relief, potentially endangering" Plaintiff's life and causing the death of her twin infants. "[P]rison officials have a duty to 'ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Estate of Miller, ex rel. Bertram v. Tobiasz, 680 F.3d 984, 989 (7th Cir. 2012)*, quoting *Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. In determining whether an inmate's rights were violated by a deprivation, the court must examine the alleged violation both objectively and subjectively, in that: (1) the deprivation must be objectively, sufficiently **[*27]** serious; and (2) the mental state of the prison official must have been one of deliberate indifference to inmate safety. *Miller, 680 F.3d at 989*. Under the first prong, when a claim is based on a failure to prevent harm, the plaintiff must show that the inmate was incarcerated under conditions posing a serious risk of substantial harm. *Miller, 680 F.3d at 989*. Under the second prong, "deliberate indifference," "'a prison official cannot be found liable under the *Eighth Amendment* for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Miller, 680 F.3d at 989*, quoting *Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001)*, quoting *Farmer, 511 U.S. at 837*.

A. Was Plaintiff's Condition Objectively, Sufficiently Serious

The court must first determine whether Plaintiff's condition was "sufficiently serious" enough to qualify as a serious medical need, which is an objective standard. *Miller, 680 F.3d at 989*; *Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997)* **[*28]** ("In the medical care context, the objective element requires that the inmates medical need be sufficiently serious."). In *Gutierrez*, the Seventh Circuit noted:

"A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment

or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. [citations omitted]

Similarly, the Ninth Circuit regards a medical condition to be 'serious' where 'the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,' *McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992)* [], and considers the following to be indications that a prisoner has a serious medical need: 'The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." [*McGuckin, 974 F.2d] at 1059-60*." *Gutierrez, 111 F.3d at 1373*.

Here, Plaintiff was around six months pregnant with twins. A woman who is pregnant with twins is inherently at a greater [*29] risk for complications. Defendants did not address the objective prong in either their Partial Motion for Summary Judgment or their Reply. Based on the factors elucidated by the Seventh Circuit in *Gutierrez*, the court finds that the objective prong has been met, and that being in the third trimester of a pregnancy with twins constitutes "a serious medical need," in that it is a medical condition that significantly affects an individual's daily activities and is a condition that a reasonable doctor or patient would find important and worthy of comment or treatment. See *Gutierrez, 111 F.3d at 1373*.

B. Whether the Correctional Officer Defendants Were Deliberately Indifferent to Plaintiff's Safety

The court must decide whether Plaintiff has presented sufficient evidence of deliberate indifference on the part of the correctional officer Defendants to survive a motion for summary judgment. "To demonstrate that a defendant acted with a 'sufficiently culpable state of mind,' a plaintiff must put forth evidence to establish that the defendant knew of a serious risk to the prisoner's health and consciously disregarded that risk." *Holloway v. Delaware County Sheriff, 700 F.3d 1063, 1073 (7th Cir. 2012)*, [*30] quoting *Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir. 2006)*. "This subjective standard requires more than negligence and it approaches intentional wrongdoing. [citation omitted] The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness." *Holloway, 700 F.3d at 1073*, citing *Farmer, 511 U.S. at 837*. The

Seventh Circuit has "characterized the standard as imposing a high hurdle on plaintiffs because it requires a 'showing of something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rosario v. Brawn, 670 F.3d 816, 821 (7th Cir. 2012)*, quoting *Collins v. Seeman, 462 F.3d 757, 762 (7th Cir. 2006)*. Even if officials are aware of a substantial risk of serious harm, they are not liable if they "responded reasonably to the risk, even if the harm ultimately was not averted." *Jackson v. Ill. Medi-Car, Inc., 300 F.3d 760, 765 (7th Cir. 2002)*, quoting *Farmer, 511 U.S. at 843*.

The Seventh Circuit has held that non-medical defendants may rely on the expertise of medical personnel and that if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that [*31] the prisoner is in capable hands. *Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011)*. However, non-medical officials can be charged with deliberate indifference where they have a reason to believe that prison doctors or their assistants are mistreating (or not treating) a prisoner, and non-medical personnel cannot simply ignore an inmate's plight. *Arnett, 658 F.3d at 755*. Mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient, however, and the plaintiff must demonstrate that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety. *Arnett, 658 F.3d at 755*; See *Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2005)* (finding that non-medical defendant may have been deliberately indifferent if he had ignored inmate's complaint entirely, but deliberate indifference not shown where defendant investigated the complaints and referred them to the medical providers who could be expected to address the inmate's concerns); see also *Earl v. Racine County Jail, 718 F.3d 689, 692 (7th Cir. 2013)* (correctional officer defendants were not deliberately [*32] indifferent where, even if plaintiff had a serious medical condition, the officer's prompt call to the nurse undermined "any suggestion that he acted with the reckless or malicious intent required to sustain a deliberate-indifference claim[]" and the nurse herself informed the officers that because she did not find any evidence of a rash or bump, the plaintiff did not need different garments, and the officers appropriately deferred to that medical decision.).

The court will address each correctional officer Defendant in turn.

1. Actions of Harcar and Schultz

Examining the evidence of record, the court cannot say that there is a genuine issue of material fact regarding whether Defendants Harcar and Schultz were deliberately indifferent. Harcar first became aware of Plaintiff's complaints of pain around 9:30 in the morning. Plaintiff argues that Harcar would have become aware much earlier, due to Harcar's shift time and the view the correctional officers' would have had of the inmates' cells. However, such an inference is refuted by direct evidence from the record, via Harcar's deposition testimony, that she did not become aware of Plaintiff's complaints of stomach pain until 9:30. The **[\*33]** court is not required to draw every conceivable inference from the record, and those inferences that are supported only by speculation and conjecture will not defeat summary judgment. See *McDonald v. Village of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004)*. The record also reveals that Harcar exhibited great care for Plaintiff's condition. Harcar, who had previously been pregnant with twins, took time to advise Plaintiff on her condition and relate her experiences to help Plaintiff. Harcar took actions to make sure Plaintiff was comfortable. Harcar herself, based on her observations, did not believe Plaintiff to be in any great distress, yet when informed of Plaintiff's complaints, at both 9:30 and 11:30, Harcar contacted booking to advise them of Plaintiff's condition and receive instruction on how to proceed. In fact, at 11:30, Harcar requested a first responder for Plaintiff, despite not thinking (again, based on her observations) that Plaintiff was in any distress and despite being told by Flowers that Nurse Sangster said nothing was wrong with Plaintiff. When, at 2:40, Harcar saw that Plaintiff had passed blood, she immediately instructed Schultz to contact booking and advise them **[\*34]** that Plaintiff was bleeding. While Hunter did aver that Harcar seemed "preoccupied or bored," that is completely belied by Harcar's actions as revealed in the deposition testimony. Harcar did not ignore Plaintiff's complaints. The record does not demonstrate that Harcar consciously disregarded a serious risk to Plaintiff's health, as her actions towards Plaintiff were not negligent, and certainly did not rise to the level of intentional wrongdoing or criminal recklessness necessary to establish deliberate indifference. See *Holloway, 700 F.3d at 1073*.

Schultz's actions, similarly, do not constitute deliberate indifference. Although he was informed early on September 11 that Plaintiff was in pain, Schultz himself did not observe or believe Plaintiff to be in any distress. Once informed by Harcar about Plaintiff's complaints, however, Schultz attempted to reach Nurse Sangster and, despite not being able to reach the nurse on his first attempt, called around to the other housing units until he was able to speak with her, whereupon Sangster informed him that Plaintiff's condition was not serious. When, at 2:40, he was informed by Harcar that Plaintiff was bleeding Schultz immediately called **[\*35]** booking to report the situation. Schultz's comment to Hunter that Plaintiff was "not going to have the baby out of her ass" was deeply inappropriate. His actions in that regard were offensive and display a level of callousness. However, this statement was apparently made after he had spoken with Nurse Sangster, who assured him that Plaintiff's situation was not serious. The court does not find that Schultz's reliance on Sangster's medical judgment was unreasonable under the circumstances. The record reveals that Schultz contacted booking several times regarding Plaintiff's complaints, and even tracked down Nurse Sangster by calling other units before finally reaching her. Schultz did not completely ignore Plaintiff's plight, and the record does not demonstrate that Schultz had a reason to believe Sangster was mistreating (or not treating) Plaintiff, as Schultz himself, based on his observations, did not believe Plaintiff to be in medical distress. See *Arnett, 658 F.3d at 755*. The record evidence does not show that Schultz knew of the serious medical risk to Plaintiff and consciously disregarded that risk. Schultz's statement to Hunter about Plaintiff was callous, and if Hunter's averment **[\*36]** that Schultz ignored her and worked on his computer is taken as true, it is arguable that Schultz's behavior qualifies as mere negligence. However, when viewed in conjunction with the entirety of the record, Schultz's actions do not rise to the level of intentional wrongdoing or criminal recklessness needed for deliberate indifference at the summary judgment stage. See *Holloway, 700 F.3d at 1073*.

2. Actions of Dyer and Calloway

The court further finds that the actions of Defendant Officers Dyer and Calloway were not deliberately indifferent to Plaintiff's serious medical needs. Dyer, a trained first responder, had his first real interaction with Plaintiff's situation on September 11 when he spoke with Plaintiff's mother, Julia Moore. Julia Moore did inform Dyer that Plaintiff was having pains, that it could be contractions, and that Plaintiff should probably go to the hospital. At 11:30, Flowers instructed Dyer to go to Plaintiff's cell and provide first responder services to Plaintiff. Before doing so, however, Dyer called Nurse Sangster, and informed her of Plaintiff's situation and his phone conversation with Julia Moore. During the phone call with Sangster, Sangster informed Dyer **[\*37]** that she did not believe Plaintiff's complaints, saying Plaintiff

was "full of shit" a lot of times. Nurse Sangster told Dyer that, if Plaintiff did not appear to be in any serious distress, she could wait to see the doctor until the next day. Dyer provided first responder services to Plaintiff and found all of Plaintiff's vitals to be in the normal range. Plaintiff did not appear to either Dyer or Calloway to be in any serious distress. According to Kenyatta Williams there was a disagreement between Dyer and Plaintiff while he was taking her blood pressure, but Williams did not recall the nature of the disagreement. The evidence from the exhibits reveals that Dyer (and Calloway, whose interaction with Plaintiff was minimal): (1) apprised Sangster of the reports of Plaintiff's condition, and was told by Sangster the condition did not appear serious, but that he was to check on Plaintiff himself and call her back if he felt there was a problem; (2) took Plaintiff's blood pressure and checked her vitals, all of which appeared normal; and (3) did not observe Plaintiff to be in any serious distress. Further, Dyer, following medical direction from Sangster, asked Plaintiff if she had noticed **[*38]** any bleeding, which she had not. The court cannot say that Dyer and Calloway knew of and disregarded an excessive risk to inmate safety based on the facts known to them and their observations of Plaintiff that day. Similar to Harcar and Schultz, taking the admissible evidence in the light most favorable to Plaintiff arguably could create a question of negligence on the part of Dyer and Calloway, but certainly does not indicate intentional wrongdoing or criminal recklessness. See *Holloway, 700 F.3d at 1073*.

### 3. Actions of Flowers

Defendant Corporal Flowers' actions on September 11, 2011, did not constitute deliberate indifference. Flowers never met or spoke with Plaintiff on that date. Plaintiff cites to Flowers' knowledge that Julie Moore had called JCDC and told officers that Plaintiff was experiencing stomach pains and needed to go to the hospital, along with Flowers' intemperate language when she told Harcar that Plaintiff "can stop calling her mama because her mama can't do nothing up in here." Those facts, however, do not establish deliberate indifference when compared to the other actions Flowers' took on September 11. The record shows that around 9:30, when Flowers was first made **[*39]** aware of Plaintiff's complaint, Flowers instructed Schultz to call the nurse. Flowers later spoke with Sangster face to face about Plaintiff and Sangster informed Flowers that she was aware of Plaintiff's condition, there was nothing wrong, and that Plaintiff would be seen the following day by the doctor. On both occasions when informed by officers

that Plaintiff was complaining of pain, Flowers took action. In the first instance she instructed Schultz to contact the nurse. In the second, after telling Harcar that Sangster said nothing was wrong with Plaintiff, Flowers did direct first-responder Dyer to go to Plaintiff's cell and attend to her. Flowers' actions indicate that she relied on the medical opinion of Nurse Sangster and was not aware of an excessive risk to Plaintiff's safety. It was not unreasonable for her to rely on Sangster's opinion. Further, her actions in directing officers to either contact the nurse or attend to Plaintiff indicate that Flowers did not ignore or disregard any risk to Plaintiff's safety, but rather was responsive and attentive to Plaintiff's complaints. Flowers' actions were not criminally reckless and did not amount to intentional wrongdoing, and **[*40]** thus were not deliberately indifferent. See *Holloway, 700 F.3d at 1073*.

### 4. Correctional Officer Defendants' Reliance on Nurse Sangster- Harcar's statement about how an LPN was an RN's little flunky

Plaintiff argues that the correctional officer Defendants' reliance on the judgment of Nurse Sangster was unreasonable. Plaintiff argues that because Sangster did not see Plaintiff in person, there was no actual assessment upon which correctional officer Defendants could rely. Plaintiff also points to the "obvious animus" Sangster had towards Plaintiff and Harcar's statement that an LPN was basically a "flunky" for the RN. Seventh Circuit precedent, however, holds that correctional officer defendants are "'entitled to defer to the judgment of jail health professionals so long as [they] did not ignore [the prisoner].'" *King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012)*, quoting *Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010)*. The only exception to this rule is that nonmedical officers may be found to be deliberately indifferent if they know or have reason to believe that the medical staff are mistreating (or not treating) a prisoner. *King, 680 F.3d at 1018*. Here, as established above, **[*41]** correctional officer Defendants did not ignore Plaintiff. Further, they did not have reason to believe that Sangster was mistreating or failing to treat Plaintiff. The correctional officer Defendants were not trained medical personnel, nor were they specifically trained to determine the difference between normal pregnancy pains and labor, so they lacked the capacity to judge whether Plaintiff was genuinely experiencing labor as opposed to normal pregnancy pains. See *King, 680 F.3d at 1018*. While Sangster may have displayed skepticism of Plaintiff's complaints, Sangster advised that Plaintiff would see the doctor the next day. She also directed Dyer to attend to Plaintiff and report back to her

if he felt she was in serious distress. Sangster also inquired of Dyer whether Plaintiff was bleeding. The actions of the correctional officer Defendants indicate they were deferential to, and responsive to, the decisions, orders and opinions of Nurse Sangster, and the record does not show that they had reason to believe Sangster was mistreating, or failing to treat Plaintiff. See *King, 680 F.3d at 1018*. Thus, correctional officer Defendants were entitled to defer to Nurse Sangster's judgment. **[*42]** See *Earl, 718 F.3d at 692*.

5. Plaintiff's Case Law and *Townsend*

In support of her argument of deliberate indifference on the part of Defendant Officers Harcar, Schultz, Calloway, and Dyer, Plaintiff cites to *Cobige v. City of Chicago, 2009 U.S. Dist. LEXIS 68614, 2009 WL 2413798 (N.D. Ill. Aug. 6, 2009)* and *Doe v .Gustavus, 294 F.Supp.2d 1003 (W.D. Wis. 2003)*. Both cases are distinguishable from the instant case. First, in *Cobige*, the defendant officers did nothing to respond, in any way, to the deceased plaintiff's complaints of severe abdominal pain. The court in *Cobige* noted that the officers were repeatedly informed of the plaintiff's condition, "yet never checked on how she was doing and decided not to send her to a hospital." *Cobige, 2009 U.S. Dist. LEXIS 68614, 2009 WL 2413798, at *9*. The only action taken was to tell other officers that the plaintiff was sick and to note it on the lockup log, which the court found "'so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded [the plaintiff's] needs.'" *Cobige, 2009 U.S. Dist. LEXIS 68614, 2009 WL 2413798, at *9*, quoting *Hayes v. Snyder, 546 F.3d 516, 524 (7th Cir. 2008)*. Here, in contrast, the correctional officer Defendants were responsive to Plaintiff's complaints. **[*43]** They contacted superiors to report the complaints, consulted the jail nurse on duty and relied on her opinion, and provided first responder treatment to Plaintiff.

In *Doe*, the plaintiff alleged deliberate indifference and argued that the staff at the prison ignored her cries for help and medical needs while she went into labor. The plaintiff was placed into a segregation unit, called a "dumb bitch" after she had a vomiting spell in segregation (which the defendant officer threatened to make her clean up if she did it again), and her requests for nursing assistance and pain medication were refused. *Doe, 294 F.Supp.2d at 1010*. The plaintiff was also refused sanitary pads and ice following her delivery. Another correctional officer defendant was alleged to have ignored the plaintiff's frequent cries of pain, minimized the situation, and to have allowed four hours to pass between the time the plaintiff's water

broke and the time the nurse came to test for amniotic fluid. Further, there was an allegation in *Doe* that a correctional officer defendant actually engineered the plaintiff's placement in segregation, which led to inadequate medical care. *Doe, 294 F.Supp.2d at 1010*. The facts in **[*44]** the instant case are nowhere near as egregious. Here, Plaintiff was not only not placed in segregation, but was allowed out of her cell at times by Harcar and allowed to be accompanied by Hunter and Williams. Plaintiff's cries of pain did not go ignored, but were responded to by officers. Dyer checked Plaintiff's vitals and consulted with the nurse. Plaintiff was provided sanitary pads. Plaintiff's water never broke, but at the first sign of blood, the nurse was immediately contacted and the order was given for Plaintiff to be taken to the hospital. Both *Doe* and *Cobige* are distinguishable from the facts of the instant case.

Plaintiff also cites to *Egebergh v. Nicholson, 272 F.3d 925 (7th Cir. 2001)* to support her argument that Defendant Flowers was deliberately indifferent. In *Egebergh*, the deceased plaintiff informed the officers at his booking that he was an insulin-dependent diabetic. The police had his insulin brought to the station, where he was given a shot the night before his bond hearing. The next morning the supervising officer ordered the plaintiff to be taken to his bond hearing. The plaintiff informed the transporting officer that he needed another insulin shot. The transporting **[*45]** officer relayed the request to the supervisor, who denied the request. The plaintiff's condition deteriorated throughout the day and he died that night as a result of missing his shot. The supervisor knew that diabetics could be seriously harmed by being deprived of insulin. The court found that a jury could infer the supervisor's actions qualified as deliberate indifference. *Egebergh, 272 F.3d at 928*. Unlike the situation in *Egebergh*, Flowers only knew that a pregnant inmate was experiencing pain and that the nurse was aware of the complaint. In *Egebergh*, the supervisor directly refused to administer insulin to the plaintiff, all the time knowing the importance of regular injections to diabetics. *Egebergh, 272 F.3d at 927-28*. Here, Flowers was apprised by her subordinate officers and the on-call nurse that Plaintiff was not in any distress and that Plaintiff's condition was not serious. Flowers did not direct any conduct that caused or resulted in a constitutional violation.

Defendants cite to an Eleventh Circuit case, *Townsend v. Jefferson County, 601 F.3d 1152 (11th Cir. 2010)*, in support of their argument they were not deliberately indifferent to Plaintiff's serious medical needs. **[*46]** In *Townsend*, the plaintiff jail detainee suffered a

miscarriage and alleged deliberate indifference to her serious medical need against two jail deputies. The Eleventh Circuit concluded that no reasonable jury could conclude the deputies knew that plaintiff's situation was an emergency because they had been told by a medical professional, the nurse on duty, that the plaintiff was not presenting an emergency. *Townsend, 601 F.3d at 1159*. The court noted that while the plaintiff had not been treated by a medical professional, she had seen and spoken with the nurse. The deputies were aware that the nurse had determined the plaintiff's condition was not an emergency and the nurse would consult a doctor. *Townsend, 601 F.3d at 1158-59*. The court concluded that the plaintiff "ha[d] not presented evidence that her situation was so obviously dire that two lay deputies must have known that a medical professional had grossly misjudged [plaintiff's] condition." *Townsend, 601 F.3d at 1159*. Although in this case Sangster never actually met and spoke with Plaintiff on September 11, 2011, we do find the *Townsend* court's reasoning persuasive. Here, correctional officer Defendants' relied on Nurse Sangster's **[*47]** evaluation of Plaintiff's situation based on the facts she had been told. Plaintiff has not presented evidence that her situation was so obviously dire that the lay deputies must have known that Sangster, a medical professional, had grossly misjudged Plaintiff's condition. See *Townsend, 601 F.3d at 1159*.

In sum, the court concludes that Plaintiff has not met her burden in showing that a genuine issue of material fact exists as to whether the correctional officer Defendants were deliberately indifferent to her serious medical needs. Plaintiff has not shown that Defendants' conduct rises to the level of intentional wrongdoing or criminal negligence. The actions of the correctional officer Defendants did not show "total unconcern" for Plaintiff's welfare in the face of serious risks. See *Rosario, 670 F.3d at 821*. The correctional officer Defendants were responsive to Plaintiff's complaints and reasonably relied on the judgment of a medical professional. See *Earl, 718 F.3d at 692*. They were not plainly incompetent, and the court believes that officers of reasonable competence could disagree on whether or not their actions were constitutional, thus immunity should be recognized. See *Gruenberg, 697 F.3d at 578*. **[*48]** Plaintiff has not shown that the facts make out a constitutional violation, therefore qualified immunity applies to the correctional officer Defendants. See *Abbott, 705 F.3d at 713*. Summary judgment is GRANTED in favor of Defendants Harcar, Schultz, Dyer, Calloway, and Flowers on Count I of Plaintiff's Fourth Amended Complaint.

## II. *Whether Defendants Bukowski, Dayhoff, and Long Are Entitled to Summary Judgment on Plaintiff's Municipal Policy Claim*

Plaintiff claims, in Count II of the Fourth Amended Complaint, that the policies, customs, or practices of the JCDC amounted to deliberate indifference to Plaintiff's *Fourteenth Amendment* Due Process rights. Plaintiff claims that Defendants Sheriff Bukowski and Drs. Dayhoff and Long, as administrators of the JCDC, failed to hire or properly train medical staff and correctional officers on handling or treating pregnant inmates. Plaintiff also alleges that the JCDC had various other policies that contributed to the deaths of her twins. Defendants argue that: (1) Defendant Drs. Dayhoff and Long are entitled to summary judgment because they are not the final decisionmakers for the JCDC; and (2) Defendant Sheriff Bukowski is entitled to summary **[*49]** judgment because Plaintiff has failed to establish municipal liability.

## A. Whether Defendant Drs. Dayhoff and Long Are Liable Under *Monell*

Defendants argue that Drs. Dayhoff and Long are entitled to summary judgment on Plaintiff's *Monell* claim because they are not final decisionmakers for the JCDC, and thus municipal liability could not apply to them under *Monell. Valentino v. Village of South Chicago Heights, 575 F.3d 664, 676 (7th Cir. 2009)* (Under *Monell*, the question is whether an official is a policymaker in a particular area or issue, and officials with final decisionmaking authority are deemed policymakers for *Monell* purposes). Plaintiff, on page 52 of her Response (#101), concedes that summary judgment should be granted for Defendants Drs. Dayhoff and Long. Therefore the court GRANTS the motion for summary judgment on Count II with respect to Drs. Dayhoff and Long.

## B. Whether Plaintiff Has Established Municipal Liability for Defendant Bukowski

Plaintiff argues that Defendant Sheriff Bukowski, as the final decisionmaker for the policies employed at JCDC, was deliberately indifferent in failing to train the correctional officer Defendants to recognize prenatal emergencies, while **[*50]** giving them responsibility for making emergency medical decisions, which exacerbated the situation and contributed to their failure to timely transport Plaintiff to the hospital, which lead directly to the death of her twin infants. Defendants argue that Bukowski is entitled to summary judgment because there was no express policy at JCDC that

caused the alleged constitutional violation when enforced and there was no widespread practice that was so permanent and well settled so as to constitute a custom with the force of law that caused the alleged violation.

Under *42 U.S.C. § 1983* municipal liability may not be established for an injury solely through the actions of municipal employees or agents, but rather the injury must be the result of the execution of a local government's policy or custom, whether made by the municipality's lawmakers or by those whose edicts or acts may be fairly said to represent official policy. *Monell v. Department of Social Services of City of New York, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. "To establish municipal liability, a plaintiff must show the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the **[*51]** deprivation of constitutional rights." *Teesdale v. City of Chicago, 690 F.3d 829, 833 (7th Cir. 2012)*, quoting *Estate of Sims v. County of Bureau, 506 F.3d 509, 514 (7th Cir. 2007)*. "A plaintiff can establish an official policy through '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final decisionmaking authority.'" *Teesdale, 690 F.3d at 834*, quoting *Sims, 506 F.3d at 515*. In the instant case, Plaintiff argues that an official policy has been established through the first two methods, and the court will address each method in turn.

1. Whether the JCDC Had an Express Policy

Plaintiff does not state explicitly in her Fourth Amended Complaint what "express policy" Defendant Bukowski employed at JCDC that led to the alleged constitutional violation. Rather, Plaintiff lists ten separate "policies, customs, and/or practices" that "were the moving force behind [the alleged] Constitutional violations." Most of the listed "practices or policies" are alleged failures by Bukowski to **[*52]** have a certain practice or policy in place that would have prevented the alleged constitutional injury. "The express policy theory applies, as the name suggests, where a policy explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey, 408 F.3d 375, 379 (7th Cir. 2005)*. Under that type of claim, one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability. *Calhoun, 408 F.3d at 379-80*. However, another way of complaining about an

express policy is to object to omissions in the policy, but the Seventh Circuit has noted that "it is more confusing than useful to distinguish between claims about express policies that fail to address certain issues, and claims about widespread practices that are not tethered to a particular written policy." *Calhoun, 408 F.3d at 380*. Both of those types of claims require more evidence than a single incident to establish liability. *Calhoun, 408 F.3d at 380*. Therefore, in this subsection, the court will only address Plaintiff's claims that an express policy of the JCDC, when enforced, explicitly violated her constitutional rights.

The court agrees with Defendants that, upon **[*53]** a reading of Count II of the Fourth Amended Complaint, the only allegations that fit an "express policy" claim are the policies that do not not have medical staff physically present at JCDC on the weekends and evenings but instead relying on an LPN to make treatment decisions by phone and the policy that gives decision-making authority to an LPN like Defendant Nurse Sangster. The court further agrees that the policies, when enforced, do not explicitly violate Plaintiff's constitutional rights. Policy Manual Section 625 (Nurse On-Call) provides that health staff will be on site at the jail on Saturdays, Sundays, and holidays, as needed. Otherwise, on-call nurses are available at that time. Therefore, Plaintiff has not provided any evidence that there is an express JCDC policy providing that medical staff not be physically present on the weekends. Otherwise, the policy provides that on-call nurses be available at that time. While there does not seem to be an express policy requiring physical presence during the evenings, Plaintiffs have cited to no case law to suggest that such a policy would violate the *Eighth Amendment* if enforced. Further, the incident at issue did not take place during **[*54]** the evening.

Plaintiff also takes issue with the "practice or policy which gives decision-making authority to [Nurse Sangster], a licensed practical nurse (LPN)[.]" Plaintiff argues that an LPN only has the training to work under the direct supervision of a registered nurse or doctor, and that Sangster's training and experience did not qualify her to make decisions regarding a person's medical treatment without consulting a doctor or registered nurse. However, the JCDC policies provide for just that. Section 625 requires an on-call nurse to contact a Physician Assistant or physician with any questions or guidance, as needed. An on-call nurse is also required to contact the on-call physician to discuss inmate needs and medical decision making, as needed. Further, Section 601 (Medical Services Administration)

provides that all medical personnel must be licensed, registered, or certified in their respective fields and only perform duties within the scope of their particular license. In this case, there is no evidence Sangster consulted a doctor regarding Defendant's medical treatment, however the policy at issue requires the on-call nurse to contact a doctor or registered nurse, as needed, [*55] and further the on-call nurse is required to contact the on-call doctor to discuss inmate needs and medical decision-making. Plaintiff's dispute is not with the policy itself, but rather with the actions of Defendant Sangster. Further, again, Plaintiff has not cited to any case law to support her claim that the policy provisions at issue explicitly violated her constitutional rights when enforced. Finally, the court would note that Plaintiff, in her Response (#101), did not respond to Defendant's argument on this point and the general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession. *MCI Worldcom Network Services, Inc. v. Atlas Excavating, Inc., 2006 U.S. Dist. LEXIS 88956, 2006 WL 3542332, *3 (N.D. Ill. Dec. 6, 2006)*; See *Keri v. Board of Trustees of Purdue University, 458 F.3d 620, 643, n.7 (7th Cir. 2006)*, reversed on other grounds by *Hill v. Tangherlini, 724 F.3d 965 (7th Cir. 2013)*. The court finds that JCDC's express policies did not explicitly violate a constitutional right when enforced.

2. Whether Defendant Bukowski Had a Practice or Custom Constituting An Official Policy That Resulted In a Constitutional Violation

Plaintiff argues that [*56] Defendant Bukowski failed to properly train JCDC employees on how to properly manage, treat, or respond to pregnant, or high-risk pregnant, inmates and their serious medical needs, including a practice of failing to promptly transport pregnant inmates to the hospital when they show signs of labor. Plaintiff alleges these customs or practices amount to deliberate indifference of her *Fourteenth Amendment* Due Process rights. Defendants have moved for summary judgment, arguing that Plaintiff has failed to produce any evidence from which a jury could conclude that there was a widespread practice or custom of inadequate management of pregnant inmates, failure to respond in a proper and timely fashion to their serious medical needs, or a failure to promptly transport them to the hospital when they are in labor. Defendants also argue that there is no indication in the record that Bukowski was aware of any previous incidents of inadequate treatment of pregnant inmates (assuming there were any) or that he failed to respond appropriately to such incidents.

"When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts [*57] of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion County, 327 F.3d 588, 596 (7th Cir. 2003)*. Similarly, if a plaintiff is alleging that an "omission" in an express policy caused the constitutional violation, the claim requires more evidence than a single incident to establish liability. *Calhoun, 408 F.3d at 380*. The Seventh Circuit has noted:

"Both in the 'widespread practice' implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not the kind of isolated incident that *Brown* [*Board of the County Commissioners of Bryan County v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)]* held cannot support municipal liability." *Calhoun, 408 F.3d at 380*.

Here, Plaintiff cannot cite to more than the current incident as evidence of a widespread practice or custom or omission in policy. Plaintiff, in her Response (#101), does not dispute Defendants' [*58] argument. Plaintiff's failure to address that point may be interpreted as an implicit concession. Therefore, because Plaintiff cannot produce evidence of more than a single incident, she cannot establish liability under the omission or widespread custom or practice theory of municipal liability based on deliberate indifference. See *Calhoun, 408 F.3d at 380*; *Palmer, 327 F.3d at 596*.

Plaintiff, however, argues that her alleged constitutional violation falls under the narrow exception to the single incident rule most recently articulated by the U.S. Supreme Court in *Connick v. Thompson, 131 S.Ct. 1350, 179 L. Ed. 2d 417 (2011)*, where it stated:

"In *Canton* [*City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)]*, the Court left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference. [citation omitted] The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture the fleeing felons

without training the officers in the constitutional limitation on the use of deadly force. [citation omitted] Given the known frequency with which police attempt **[\*59]** to arrest fleeing felons and the 'predictability that an officer lacking specific tools to handle that situation will violate citizens' rights,' the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights. [citation omitted] The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under *§ 1983* without proof of a pre-existing pattern of violations." *Connick, 131 S.Ct. at 1361*.

The court disagrees with Plaintiff's assertion that "the need to train correctional officers to recognize emergency situations involving pregnant inmates can be said to be so obvious" that the JCDC's failure to do so constituted deliberate indifference. As noted above, the U.S. Supreme Court in *Canton* discussed a situation where the consequences from a municipality's failure to train would be so obvious that a pattern of indifference would not be required. *Canton, 489 U.S. at 390, n.10*. Here, however, **[\*60]** the risk here of a constitutional violation from any possible failure to train is not the same as a city arming its police force with firearms and deploying the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force, and thus, nothing about this case's alleged constitutional violation or the resulting harm to Plaintiff was "patently obvious" or "predictable." See *Johnson v. Cook County, 526 Fed.Appx. 692, 2013 WL 2005236, \*4 (7th Cir. 2013)*. In this instance, the JCDC had policies in place for handling pregnant inmates and emergency medical situations. *Section 617* provides that in case of an emergency with a pregnant inmate, correctional officers are to notify their shift supervisors and the on-call nurse if medical personnel are not present at the jail, and the medical department will determine whether the inmate should be sent to the hospital. Plaintiff argues that the correctional officers should be trained to recognize such emergencies. However, the correctional officers are not medical professionals, and not capable of making such medical judgments. Rather, using their own training, life **[\*61]** experience, and common sense, the policy requires officers to use their best judgment on whether an inmate is having a problem, without requiring the officers to use any sort of "medical discretion" which

could require them to overrule medical professionals on medical grounds. Here, the officers repeatedly informed their supervisors and the medical professional on-call of Plaintiff's complaints. The court finds that the policies in place at JCDC were reasonable and sensible, and that the consequences of any failure to further train correctional officers, as alleged in the Fourth Amended Complaint, were not so "patently obvious" that Defendant Bukowski could be liable under *§ 1983* without proof of a pre-existing pattern of violations. See *Connick, 131 S.Ct. at 1361*. The court is not persuaded by Plaintiff's citation to *Wallace v. Hounshel, 2009 U.S. Dist. LEXIS 22484, 2009 WL 734714 (S.D. Ind. March 19, 2009)*. In *Wallace*, the court found that the defendant county did not have a sound training program for its jail officers regarding handling of inmate medical issues. Specifically, the court found that officers did not receive any specific training regarding the proper use of the Chest Pain Protocol, but rather received **[\*62]** "general" instructions regarding the use of protocols. The court found that "general training may well have been appropriate if the protocols were self-explanatory and did not require the exercise of any medical discretion." *Wallace, 2009 U.S. Dist. LEXIS 22484, 2009 WL 734714, at \*11*. The Chest Pain Protocol, however, did require the exercise of discretion in that it required the officer to determine whether an inmate was experiencing cardiac chest pain, which required physician referral, or chest pain related to an injury or muscle strain, which did not. The court found no evidence that the jail had a policy in place that required its officers to be trained on how to make that type of determination. The court concluded that "[a] reasonable jury could find that the need to train jail officers with regard to handling an inmate's complaints of chest pain was obvious and that the County disregarded that obvious need in deliberate indifference to a substantial risk to its inmates." *Wallace, 2009 U.S. Dist. LEXIS 22484, 2009 WL 734714, at \*11*.

In contrast, in the instant case, *Section 617* did not require the use of medical discretion. If a pregnant inmate was having an emergency, the officers were required to notify their shift-supervisor and **[\*63]** the on-call nurse if medical personnel were not present at the jail, which is what happened in this case. The officers are not required to assess between the different types of pregnancy pains in the same way that the officers in *Wallace* had to assess different types of chest pains without specific training on how to recognize those pains. Further, Plaintiff again is arguing that correctional officers be given medical training on how to handle pregnant inmates, so that they may use medical

discretion, while at the same time arguing that Defendant correctional officers should not have relied on the medical discretion of Nurse Sangster, a medical professional who was "only" an LPN.

The Supreme Court has cautioned that the single incident exception is "rare." *Connick, 131 S.Ct. at 1361*. The risk from Defendant Bukowski's alleged failure to train, in light of the JCDC policy at issue here, was not so "patently obvious" or "predictable" that a pattern of indifference would not be necessary to show deliberate indifference. *Connick, 131 S.Ct. at 1361*. Thus, to demonstrate deliberate indifference based on a widespread practice or custom or omission in policy, Plaintiff must provide the court **[*64]** with more than a single incident. See *Calhoun, 408 F.3d at 380*. Because Plaintiff can not do that, summary judgment must be granted in favor of Defendant Bukowski on Count II.

III. *Plaintiff's Wrongful Death (Counts III-IV) and Loss of Society (V-VI) Claims*

Plaintiff has raised four state law counts alleging wrongful death and loss of society. Defendants argue that they are entitled to summary judgment on the wrongful death counts because deliberate indifference and wanton and willful conduct, which is required to overcome governmental immunity in wrongful death claims, are treated the same and have not been proven in this case. Defendant also argues that judgment should be granted on the loss of society claims because those claims are not a cause of action in and of themselves in Illinois, but are rather an element of damages in wrongful death claims.

Plaintiff alleges, under Illinois state law, that Defendants caused the wrongful death of her infant twins by failing to take her to a hospital in a timely manner due to Defendants' deliberate indifference of medical needs. However, in her Response (#101) Plaintiff admits that "Defendants correctly state that *Section 4-105* of the Illinois **[*65]** Tort Immunity Act limits the liability of public employees for injuries proximately caused by the failure to obtain medical care for inmates in their custody." *Section 4-105* states:

"Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care. Nothing in this section requires the periodic inspection of prisoners." *745 ILCS 10/4-105* (2012).

Willful and wanton conduct is defined in Illinois as "a course of action which shows actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." *745 ILCS 10/1-210* (2012). The Seventh Circuit has noted that the willful and wanton standard is "remarkably similar" to the deliberate indifference standard. *Williams v. Rodriguez, 509 F.3d 392, 405 (7th Cir. 2007)*. **[*66]** Plaintiff, in her Response (#101, p. 51), admits "Seventh Circuit courts addressing *Section 4-105* immunity first address the plaintiff's deliberate indifference claim and then grant or deny such immunity in conformity with their deliberate indifference ruling." See *Williams, 509 F.3d at 405*. This court has already concluded that Defendant correctional officers did not act with deliberate indifference toward Plaintiff. Therefore, for the reasons discussed in Section I of this Opinion, judgment is granted in favor of Defendant correctional officers on Counts III and IV of Plaintiff's Fourth Amended Complaint.

Plaintiff also alleges loss of society. However, as noted in Defendant's Partial Motion for Summary Judgment (#97), loss of society in Illinois is not a cause of action in and of itself, but rather is an element of damages in a wrongful death claim. See *Bullard v. Barnes, 102 Ill. 2d 505, 468 N.E.2d 1228, 82 Ill. Dec. 448 (Ill. 1984)*. Plaintiff did not respond to this argument in her Response. Plaintiff did not mention the loss of society counts at all in her argument in the Response. Judgment has already been entered in correctional officer Defendants' favor on the wrongful death counts. Therefore, as loss of society **[*67]** is not a cause of action in and of itself, judgment must be entered in favor of all Defendants on Counts V and VI.

IV. *Plaintiff's Medical Malpractice Claim (Count VII) Against Correctional Officer Defendants*

Plaintiff, in Count VII, appears to allege an Illinois medical malpractice claim against both Defendant Nurse Sangster and the correctional officer Defendants. Defendants move for summary judgment in favor of the correctional officer Defendants, arguing that the correctional officer Defendants are not medical professionals and are thus not liable for medical malpractice. Plaintiff did not respond to this argument in her Response (#101). The Illinois Supreme Court has described medical malpractice, or "healing art"

malpractice, as "a broad category that is not confined to actions against physicians and hospitals but rather, [] may also include actions against other health professionals such as dentists or psychologists." *Bernier v. Burris, 113 Ill. 2d 219, 497 N.E.2d 763, 767, 100 Ill. Dec. 585 (Ill. 1986)*. That broad description does not include correctional officers with no professional medical training. The correctional officers are not "health professionals." Plaintiff has offered no rebuttal argument on this issue. **[*68]** Judgment is entered on Defendant correctional officers on this count.

CONCLUSION

The court recognizes that this is a tragic case, and it is likely that everyone involved in the incident on September 11, 2011, at the JCDC regrets the deaths of Plaintiff's twin infants later that day at Provena St. Mary's Hospital. But the facts of this case, with regard to the correctional officer Defendants, Sheriff Bukowski and Drs. Dayhoff and Long, do not support liability under the Constitution based on Seventh Circuit and Supreme Court case law. Accordingly, Defendant's Partial Motion for Summary Judgment (#97) is GRANTED in full.

IT IS THEREFORE ORDERED:

(1) Defendants' Partial Motion for Summary Judgment (#97) is GRANTED in full.

(2) Judgment is entered in favor of Defendants Dayhoff, Long, and Bukowski on Count II. Judgment is entered in favor of Defendants Harcar, Schultz, Calloway, Dyer, and Flowers on Counts I, III, IV, V, VI, and VII. Judgment is entered in favor of Defendant Sangster on Counts V and VI.

(3) Counts I, III, IV, VII, and VIII remain pending against Defendants Sangster and Kankakee County.

(4) Defendants Bukowski, Dayhoff, Long, Harcar, Schultz, Dyer, Calloway, and Flowers are terminated **[*69]** from this case.

(4) This case remains set for a jury trial on Tuesday, April 29, 2014, at 9:00 am in Courtroom A. The final pretrial conference remains set for April 4, 2014, at 1:30 pm in Courtroom B. Pretrial motions are due to the court by March 14, 2014.

ENTERED this 4th day of December, 2013

/s/ COLIN S. BRUCE

U.S. DISTRICT JUDGE

**End of Document**