UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| REBECCA TERRY,<br><br>        Plaintiff,<br><br>v.<br><br>COUNTY OF MILWAUKEE, DAVID A. CLARKE, JR., in his personal and official capacities, OFFICER BRIAN WENZEL, JANE AND JOHN DOE, UNKNOWN EMPLOYEES OF MILWAUKEE COUNTY JAIL, JANE AND JOHN DOE, UNKNOWN JAIL SUPERVISORS, ARMOR CORRECTIONAL HEALTH SERVICES, CAROLYN EXUM, MORGAN BEVENUE, MARGARET HOOVER,<br><br>        Defendants. | Case No.: 17-cv-1112-JPS |

## DEFENDANT ARMOR CORRECTIONAL HEALTH SERVICES' PROPOSED FINDINGS OF FACT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to the Court's procedure for motions for summary judgment, Defendant Armor Correctional Health Services ("Armor") hereby submits the following proposed findings of fact in support of Armor's motion for summary judgment.

### JURISIDICTION AND VENUE

1. The Court has subject matter jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 (federal question), 42 U.S.C. § 1983, and the Eighth Amendment.

2. Venue is proper in the Eastern District of Wisconsin as a substantial portion of the events occurred in Wisconsin and the plaintiff is a resident of Wisconsin. (ECF Nos. 1, 129.)

## IDENTITY OF THE PARTIES

3. The identity of the parties is as alleged in Ms. Terry's Complaint, ECF No. 129 ¶¶ 5-17, except those still denominated as Jane and John Doe, ECF No. 129, ¶¶ 9-10, 15-16.

## PROPOSED FINDINGS OF FACT

4. Armor has been under contract with Milwaukee County Jail ("MCJ") to provide health care services for inmates at the jail from May 11, 2013, through the present. (McCreary Decl. Ex. H at ARMOR 00063-89.) Thus, Armor first took over the health care services at MCJ on May 11, 2013. (Id.)

5. Ms. Terry was arrested and taken for booking at MCJ on March 9, 2014. (ECF No. 129, ¶¶ 18-19.)

6. Ms. Terry was first examined at MCJ around 6:00 p.m. that night by Ms. Burton, RN, the evening shift booking nurse. (May Decl. Ex. A at ARMOR 00029; McCreary Decl. Ex. B, Exum Dep. at 26:2-3.)

7. Ms. Burton noted in Ms. Terry's medical record: "Inmate states she is pregnant[.] She is due 3-11-14[.] She has had no prenatal care since leaving Milwaukee County Jail in 11/2013[.] This is her 13th pregnancy[.] She has had several miscarriages and 1 abortion[.] Inmate states she is currently living in a motel and has been using IV heroin off and on for the last 4 years[.] The last year she has been using daily[.] Inmate states she has a [history] of mood disorder and anxiety[.] She has not taken psych [medication] in over a year[.]" (May Decl. Ex. A at ARMOR 00029.)

8. Ms. Terry alleges she began to experience labor pains during her booking procedures at MCJ and informed the staff. (ECF No. 129, ¶ 19.) After obtaining all of this information, Ms. Burton consulted an advanced practice provider and received authorization to

send Ms. Terry to Froedtert to be cleared for booking. (May Decl. Ex. A at ARMOR 00029; McCreary Decl. Ex. A, Buono Dep. at 58:4-62:5; McCreary Decl. Ex. B, Exum Dep. at 79:5-9.)

9. Armor requires that patients in labor be transferred to a hospital for delivery. (McCreary Decl. Ex. A. at Buono Dep. 36:15-19; McCreary Decl. Ex. B, Exum Dep. at 67:16-68:3, 79:5-9, 110:7-10, 151:16-152:12; McCreary Decl. Ex. C Strehlow Dep. at 69:1-4.) No inmate is housed at MCJ if she is in labor. (Id.)

10. MCJ medical staff requested Ms. Terry be transported to Froedtert at around 6:30 p.m. (May Decl. Ex. A at ARMOR 00029.) Ms. Terry was evaluated at Froedtert and then returned to MCJ around 1:00 a.m. on March 10, 2014. (May Decl. Ex. A at ARMOR 00020-21, 00029; McCreary Decl. Ex. G, MKE County 176.)

11. Froedtert is one of the best hospitals in the Milwaukee area, and is nationally recognized for its quality.[1]

12. When Ms. Terry returned to MCJ, Ms. Carolyn Exum, RN, was working as the night shift booking nurse. (May Decl. Ex. A at ARMOR 00020-21; McCreary Decl. Ex. B, Exum Dep. at 8:22-9:8, 21:18-22:13, 75:23-77:2, 79:10-25.)

13. Ms. Exum had received notice of Ms. Terry's status from the evening nursing shift. (McCreary Decl. Ex. B, Exum Dep. at 78:23-79:9.)

14. Ms. Exum reviewed the documents sent by Froedtert staff back with Ms. Terry upon her discharge, which were generic documents stating "no new orders" and included instructions to follow up with an obstetrician. (May Decl. Ex. A at ARMOR 00020-21; McCreary Decl. Ex. A, Buono Dep. at 71:1-18; McCreary Decl. Ex. B, Exum Dep. at 76:5-12,

---

[1] Armor respectfully requests this Court take judicial notice of this fact pursuant to Fed. R. Evid. 201(b)(1).

85:9-10.) There was no description of Ms. Terry's treatment or Froedtert staff's conclusions. (Id.)

15. Inmates returning to MCJ from a hospital without substantive paperwork was a recurrent issue. (McCreary Decl. Ex. A, Buono Dep. 62:17-63:15; McCreary Decl. Ex. C, Strehlow Dep. 117:23-123:25.) Armor personnel had taken measures before Ms. Terry was incarcerated to encourage Froedtert, and other area hospitals, to send discharge summaries and instructions with inmates cleared to return to MCJ, through meetings and tours with hospital representatives to educate the hospital personnel about Armor's need for proper substantive medical records. (McCreary Decl. Ex. A, Buono Dep. 62:17-67:3; McCreary Decl. Ex. C, Strehlow Dep. 119:11-123:25.)

16. Next, Ms. Exum performed the "prebooking" examination of Ms. Terry promptly upon her return from Froedtert, which included checking her vitals, listening to her heart and lungs and asking specific questions. (May Decl. Ex. A at ARMOR 00021, 00024; McCreary Decl. Ex. B, Exum Dep. at 55:25-56:17, 80:15-18.) She found Ms. Terry's vitals stable and not indicative of active labor. (Id.; McCreary Decl. Ex. E, Armor Correctional Health Services Resp. to Pl.'s First Set of Interrog., No. 8.)

17. Ms. Exum asked Ms. Terry how she felt and checked Ms. Terry's abdomen for contractions. (McCreary Decl. Ex. B, Exum Dep. at 80:15-24.)

18. Ms. Exum had been trained in treating pregnant inmates, including how to detect contractions. (McCreary Decl. Ex. B, Exum Dep. at 42:2-43:14.)

19. Ms. Exum did not detect any contractions. (McCreary Decl. Ex. B, Exum Dep. at 80:25-81:1.)

4

301964512v1 1003420

20. Ms. Exum also asked Ms. Terry whether she had any contractions. (McCreary Decl. Ex. B, Exum Dep. at 88:18-20.)

21. During Ms. Exum's assessment, Ms. Terry denied having contractions. (May Decl. Ex. A at ARMOR 00021; McCreary Decl. Ex. B, Exum Dep. at 88:18-20.)

22. Ms. Terry told Ms. Exum she had "pressure at the bottom," nothing more. (Id.) Ms. Terry did not complain about abdominal pain at all. (Id.)

23. Ms. Exum asked Ms. Terry about the tests Froedtert performed and the results. (McCreary Decl. Ex. B, Exum Dep. at 81:2-5.)

24. Ms. Terry responded that Froedtert "put her on the machine, and then … they told her she was in labor." (McCreary Decl. Ex. B, Exum Dep. at 81:7-9.)

25. Ms. Exum asked Ms. Terry why Froedtert sent her back if she was in labor, to which she responded, "Because they just sent [me] back." (McCreary Decl. Ex. B, Exum Dep. at 81:9-11.)

26. Ms. Exum did not discuss Froedtert's care with Ms. Terry after that, because Ms. Exum "knew the hospital would not have sent [Ms. Terry] back if she was in labor, because that would be negligent." (McCreary Decl. Ex. B, Exum Dep. at 81:12-25.)

27. Dr. Buono agreed that if Ms. Terry had been in active labor at Froedtert, then Froedtert should have kept her. (McCreary Decl. Ex. A, Buono Dep. at 84:7-19.)

28. Ms. Exum then called the MCJ Medical Director employed by Armor, Dr. Buono, at approximately 1:15 a.m. after performing the pre-booking examination, and requested direction on how to proceed with Ms. Terry. (May Decl. Ex. A at ARMOR 00021, 00024; McCreary Decl. Ex. A, Buono Dep. at 14:10-17; McCreary Decl. Ex. B, Exum Dep. at 81:14-18, 136:24-137:7.)

301964512v1 1003420

29. Dr. Buono instructed Ms. Exum to call Froedtert for an oral report on the tests and care provided to Ms. Terry and follow up with written records later. (May Decl. Ex. A at ARMOR 00021, 00024.)

30. Ms. Exum spoke with a Froedtert labor and delivery nurse at approximately 1:20 a.m., who informed her that Froedtert believed Ms. Terry was there for clearance to rule out labor, they put Ms. Terry on "the machine" to monitor her and the baby, and they found Ms. Terry was not in labor, which was why they sent Ms. Terry back to MCJ. (May Decl. Ex. A at ARMOR 00021, 00024; McCreary Decl. Ex. B, Exum Dep. at 83:14-84:9.) The Froedtert nurse also informed Ms. Exum that Ms. Terry's medical records were not ready, but the doctor would be asked to complete and fax them to MCJ. (Id.)

31. Although MCJ medical staff did not have access to Ms. Terry's Froedtert medical records at the time, they confirmed Froedtert concluded Ms. Terry was not in labor. (McCreary Decl. Ex. F at TERRY 000318.)

32. Ms. Terry's Froedtert medical records document how she was "relaxed" and even sleeping while being monitored for three hours to determine if she was in labor. (McCreary Decl. Ex. F, at TERRY 000308-313.) The records also document she was instructed at discharge about the signs of early labor, given time to ask questions when she verbalized her understanding and denied any further concerns. (Id.)

33. Ms. Exum called Dr. Buono again and relayed the information from her call with Froedtert's labor and delivery nurse: Ms. Terry was cleared for return to MCJ and "not in labor." (McCreary Decl. Ex. A, Buono Dep. at 71:5-75:11; McCreary Decl. Ex. B, Exum Dep. at 90:18-91:16.)

301964512v1 1003420

34. Based upon Ms. Exum's examination of and history from Ms. Terry and the information from Froedtert, Dr. Buono allowed Ms. Terry to be booked into MCJ. (McCreary Decl. Ex. A, Buono Dep. at 73:18-75:22.)

35. In making her decision, Dr. Buono understood Froedtert personnel would not "clear" a patient who needed to be admitted to the hospital, including a patient in active labor. (McCreary Decl. Ex. A, Buono Dep. at 84:14-85:9.)

36. In addition, Dr. Buono ordered Ms. Exum to continue following up with Froedtert to obtain Ms. Terry's written medical records. (McCreary Decl. Ex. A, Buono Dep. at 64:4-67:3, 72:1-75:11.)

37. If a patient returned to MCJ for booking without proper paperwork from a hospital and was medically stable, Dr. Buono preferred the patient be booked into MCJ and placed in the Special Medical Unit ("SMU") where the inmate could be monitored to ensure patient safety and good care while the MCJ medical staff located the inmate's medical records. (McCreary Decl. Ex. A, Buono Dep. at 64:4-65:1, 92:12-95:7.)

38. In her professional experience, Dr. Buono found that inmates may end up being transported back and forth multiple times between the hospital and MCJ if they were not booked for lack of proper paperwork. The hospital does not have to accept the inmate again without a new medical concern, and Dr. Buono lacked authority to simply release the inmate. (Id.)

39. Dr. Buono also concluded, based upon her professional knowledge and experience, that sending an inmate back and forth to the hospital due to lack of paperwork is not in the best medical interest of the patient. (Id.)

40. Dr. Buono has found, in her professional experience, it is better to have the patient in the jail where MCJ medical staff are available, rather than in a transport vehicle. (Id.)

7

41. While Ms. Exum made the phone calls, Ms. Terry sat in the prebook area with a correctional officer present, across a counter from Ms. Exum. (McCreary Decl. Ex. B, Exum Dep. at 85:19-86:7.)

42. Once Dr. Buono ordered Ms. Terry booked into MCJ, Ms. Exum performed the "booking" assessment of Ms. Terry. (McCreary Decl. Ex. B, Exum Dep. at 86:8-23.)

43. After an inmate is accepted from the "prebook" assessment, the booking nurse conducts a full "booking" assessment, including the height, weight, another set of vitals, a head to toe assessment of an inmate. (McCreary Decl. Ex. B, Exum Dep. at 104:16-105:5.) The nurse also asks the inmate a series of questions, which can take about 20 minutes. (Id.)

44. For Ms. Terry, the examination also included monitoring to ensure she was not having contractions. (McCreary Decl. Ex. B, Exum Dep. at 104:23-25.)

45. From her return to MCJ through completion of her booking, Ms. Terry never complained to Ms. Exum about abdominal pain and Ms. Exum never observed Ms. Terry experiencing abdominal pain. (McCreary Decl. Ex. B, Exum Dep. 88:1-20.)

46. Ms. Terry has no memory of the booking process after returning from Froedtert, or of speaking with Ms. Exum, the MCJ booking nurse. (ECF No. 135-1, Terry Dep. 103:17-24, 136:24-137:8, 139:14-23, 143:14-145:7.)

47. After booking, Ms. Terry was placed in SMU pursuant to Armor's policy of placing women in late stages of pregnancy initially in SMU. (McCreary Decl. Ex. A, Buono Dep. at 75:14-76:1; McCreary Decl. Ex. B, Exum Dep. at 91:10-14; May Decl. ¶¶ 8-9, 11; May Decl. Ex. C.)

48. Dr. Buono considered Ms. Terry a high risk patient because she was in her 13th pregnancy, received no prenatal care during this pregnancy, she was due in about a week, she

abused IV heroin and she complained of a pressure sensation when she first arrived. (McCreary Decl. Ex. A, Buono Dep. at 59:13-60:25.)

49. SMU was and is the highest level of inmate observation at MCJ. (McCreary Decl. Ex. A, Buono Dep. 67:13-20.)

50. The nursing station was located in the clinic across the hall from SMU. (McCreary Decl. Ex. A, Buono Dep. at 68:8-20; McCreary Decl. Ex. B, Exum Dep. at 25:1-11.)

51. The nurse assigned to SMU usually checked on patients at the beginning of the shift and then determined, based upon their conditions, how often to check on them for the duration of the shift. (McCreary Decl. Ex. B, Exum Dep. at 33:10-35:4.) The SMU nurse would also check on patients before the end of the shift. (McCreary Decl. Ex. N, at Bevenue Dep. 16:1-25.) Accordingly, Ms. Terry would have been seen by the SMU nurse working the third shift, Nurse Bevenue, before the end of her shift at 7:00 a.m. on March 10, 2014, if she had not gone into labor before the end of Ms. Bevenue's shift. (Id.)

52. As the Medical Director, Dr. Buono made rounds in SMU on a daily basis, usually in the morning. (McCreary Decl. Ex. A, Buono Dep. 20:13-24.)

53. The SMU correctional officer wrote down every time anyone entered SMU, including MCJ medical staff. (McCreary Decl. Ex. B, Exum Dep. at 35:14-20.)

54. If an inmate in SMU needed care, the inmate could activate a call light, which lit up outside the cell, allowing the SMU correctional officer to answer the call light and contact the nurse at the clinic. (McCreary Decl. Ex. B, Exum Dep. at 36:10-37:9.)

55. Ms. Terry was escorted to SMU and arrived around 1:45 a.m. (McCreary Decl. Ex. D, Wenzel Dep. at 53:5-8.)

9

56. Inspections were made of the SMU inmates, including Ms. Terry, by the SMU correctional officer, Officer Wenzel, on March 10, 2014, at 1:57 a.m., 2:27 a.m., 2:57 a.m., 3:11 a.m., 3:41 a.m., 3:57 a.m. and 4:27 a.m. (McCreary Decl. Ex. G, at MKE County 179.) An inspection of the SMU inmates was conducted by another correctional officer, who remembers it was very quiet, at 3:27 a.m. (Id.; McCreary Decl. Ex. I, Smith Dep. at 11:1-13:21.) A further inspection of the SMU inmates was conducted at 4:40 a.m., by Lt. Montano. (Id.)

57. At approximately 4:46 a.m. on March 10, 2014, an MCJ nurse answered a call from Officer Wenzel, informing her that Ms. Terry "had delivered the baby," "the baby was out" and medical staff was needed. (May Decl. Ex. A at ARMOR 00022; McCreary Decl. Ex. B, Exum Dep. at 144:12-145:7.)

58. Officer Wenzel called for help as soon as he became aware of her medical emergency. (McCreary Decl. Ex. D, Wenzel Dep. at 94:7-96:5, 101:4-8.)

59. Ms. Terry claims her symptoms changed approximately 45 minutes after arriving in SMU and she began pushing the emergency light with no response from the CO. (ECF No. 135-1, Terry Dep. 152:4-168:1.) She claims pounding on the window of the door to her cell at least three times. (Id.) She claims repeatedly screaming for help. (Id.) She claims her water broke in the cell. (Id.) She claims the correctional officer in the SMU ignored her yells, pounding and screams, waving her off with the shake of his hand. (Id.)

60. Ms. Terry delivered her baby within three hours of arriving in SMU. (McCreary Decl. Ex. A, Buono Dep. at 83:24-85:7.)

61. Within minutes of Officer Wenzel's call, a medical emergency was initiated, 911 was called and MCJ nurses responded to provide medical care for Ms. Terry and her baby. (May Decl. Ex. A at ARMOR 00020, 00022.)

10

62. At approximately 4:50 a.m., Ms. Exum responded to SMU with MCJ Nursing Supervisor Ms. Hoover, running from the first floor to the second floor, entering SMU and Ms. Terry's unit, and finding Ms. Terry with her baby. (May Decl. Ex. A at ARMOR 00022; McCreary Decl. Ex. B, Exum Dep. at 105:17-108:9.)

63. Upon entering Ms. Terry's unit, Ms. Exum observed Ms. Terry was responsive, and her baby was covered in blood and meconium and experiencing mild respiratory distress. (May Decl. Ex. A at ARMOR 00022; McCreary Decl. Ex. B, Exum Dep. at 107:2-109:25.) Ms. Exum immediately retrieved the OB kit and suctioned the baby nasally and orally. (Id.) She applied the OB clamp to the umbilical cord. (Id.) She and others moved the baby to Ms. Terry's stomach and applied oxygen to the baby. (May Decl. Ex. A at ARMOR 00021-00022.) Ms. Terry and her baby were covered with extra sheets. (Id.) Ms. Terry's vitals were taken. (Id.) Ms. Exum explained to Ms. Terry that no doctor was available to pull out her afterbirth, but that EMS was on the way. (Id.)

64. At approximately 4:59 a.m., EMS arrived and shortly thereafter left with Ms. Terry and her baby. (May Decl. Ex. A at ARMOR 00023.)

65. Ms. Exum called Aurora Sinai Medical Center's Labor and Delivery unit ("Aurora Sinai") so they could prepare for Ms. Terry's arrival. (Id.)

66. At Aurora Sinai, Ms. Terry was treated for a peritoneal tear from the delivery. (McCreary Decl. Ex. F TERRY 103.)

67. The medical care provided to Ms. Terry on March 9, 2014 through March 10, 2014 by MCJ medical staff was in compliance with Armor's policies, procedures and practices pertaining to pregnant inmates, including Policy No. J-G-07 "Pregnancy Management." (May Decl. ¶¶ 8-11; May Decl. Ex. C at ARMOR 001112-001115.) Armor's Policy No. J-G-07

"Pregnancy Management," pertaining to pregnant inmates was produced in discovery on May 10, 2018. (McCreary Decl. Ex. H at 1 "(Letter to Attorney Kleinhaus regarding production of Armor Policy".)

68. Had Ms. Terry not delivered within her first three hours in SMU on March 10, 2014, she would have been seen by MCJ advanced medical care personnel for her initial pregnancy observation status within her first 24-48 hours of SMU placement to determine her plan of care, pursuant to Armor policy. (May Decl. ¶ 12.)

69. Correctional officers were trained to identify and respond to medical emergencies through a combined effort by both Milwaukee County and Armor. (McCreary Decl. Ex. I, Smith Dep. at 19:23-21:18; McCreary Decl. Ex. J, Elliott Dep. at 9:14-24, 24:21-38:25; McCreary Decl. Ex. K, Green Dep. at 6:7-8:6; McCreary Decl. Ex. L, Poetz Dep. at 9:1-17; McCreary Decl. Ex. G, at MKE County 1264, 1272, 1275, 1277, 1281-1289, 1293-1299, 1315-1317, 1372, 2131-2132, 2135-2138, 2672-2673, 2700-2703.) The correctional officers received training by Milwaukee County at the Academy upon being hired, which provided general training for jail health care, communicating with medical staff, identifying inmate distress, supervising special needs inmates, crisis intervention. (McCreary Decl. Ex. J, Elliott Dep. at 9:14-24, 24:21-38:25.) The correctional officers also received annual training and training via roll call reminders. (Id.) Armor provided training on suicidal inmates, suicide prevention and special management (mentally ill patients), mental health and psych social workers. (McCreary Decl. Ex. I, Smith Dep. at 19:23-21:18; McCreary Decl. Ex. J, Elliott Dep. at 9:14-24, 24:21-38:25; McCreary Decl. Ex. K, Green Dep. at 6:7-8:6; McCreary Decl. Ex. L, Poetz Dep. at 9:1-17.) In fact, Officer Wenzel received training on March 7, 2013, which covered "KEY POINT: Never ignore an inmate's request to be seen during sick call, or take it upon yourself to determine that any request

12

is invalid or that the inmate need not be seen." (McCreary Decl. Ex. G, at MKE County 1275). Officer Wenzel's training documents were produced in discovery on April 16, 2018. (McCreary Decl. Ex. G, at 1-12, Request No. 5 "Milwaukee County's Third Supplemental Responses".)

70. If a correctional officer had ignored an inmate's screaming and pounding on a cell door over an extended period of time, those acts or omissions were not a matter of training, but a failure to perform. (McCreary Decl. Ex. M, Retired Milwaukee County Sheriff's Office Inspector Bailey Dep. 4:23-5:19.)

71. Dr. Buono was deposed in this lawsuit on April 25, 2018.( McCreary Decl. Ex. A, Buono Dep. at 1.)

72. Ms. Exum was deposed in this lawsuit on March 19, 2018. (McCreary Decl. Ex. B, Exum Dep. at 1.)

Dated this 31st day of August, 2018.

*/s/ Paige L. McCreary*
Michael P. Russart
State Bar No. 1023128
Mollie T. Kugler
State Bar No. 1093318
Paige L. McCreary
State Bar No. 1114252
Attorneys for Defendant Armor Correctional Health Services
**HINSHAW & CULBERTSON LLP**
100 E. Wisconsin Avenue
Suite 2600
Milwaukee, WI 53202
Phone No. 414-276-6464
Fax No. 414-276-9220
E-mail Address(es):
mrussart@hinshawlaw.com
mkugler@hinshawlaw.com
pmccreary@hinshawlaw.com
