Rebecca Terry v. County of Milwaukee, et al.

17CV1112

Transcript of the Testimony of:

# Gina Buono, M.D.

April 25, 2018





EXHIBIT A

```
 1            IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF WISCONSIN
 2   ---------------------------------------------------------

 3   REBECCA TERRY,

 4            Plaintiff,

 5            vs.                    Case No. 17-CV-1112

 6   COUNTY OF MILWAUKEE, et al.,

 7            Defendants.

 8   ---------------------------------------------------------

 9


10

             Deposition of GINA BUONO, M.D.
11
              Wednesday, April 25th, 2018
12

13                    10:45 a.m.

14                       at

15            HINSHAW & CULBERTSON, LLP
          100 East Wisconsin Avenue, Suite 2600
16                 Milwaukee, Wisconsin

17

18

19

20

21

22

23

24        Reported by Kealoha A. Schupp, RPR

25
```

```
 1                    Deposition of GINA BUONO, M.D., a

 2          witness in the above-entitled action, taken at the

 3          instance of the Plaintiff, pursuant to the Federal

 4          Rules of Civil Procedure, pursuant to notice,

 5          before Kealoha A. Schupp, RPR and Notary Public,

 6          State of Wisconsin, at HINSHAW & CULBERTSON, LLP,

 7          100 East Wisconsin Avenue, Suite 2600, Milwaukee,

 8          Wisconsin, on the 25th day of April, 2018,

 9          commencing at 10:45 a.m. and concluding at

10          12:57 p.m.

11   A P P E A R A N C E S:

12               LOEVY & LOEVY, by
                    Ms. Theresa Kleinhaus
13                  311 North Aberdeen Street, Third Floor
                    Chicago, Illinois 60607
14                  Appeared on behalf of Plaintiff.

15               LEIB, KNOTT, GAYNOR, LLC, by
                    Mr. Douglas S. Knott and
16                  Mr. Randal N. Arnold
                    219 North Milwaukee Street, Suite 710
17                  Milwaukee, Wisconsin 53202
                    Appeared on behalf of County of Milwaukee
18                  Defendants.

19               HINSHAW & CULBERTSON, LLP, by
                    Mr. Michael P. Russart
20                  100 East Wisconsin Avenue, Suite 2600
                    Milwaukee, Wisconsin 53202
21                  Appeared on behalf of Armor Correctional
                    Health Services Defendants.
22

23

24

25
```

```
 1                    ** I N D E X **

 2                 E X A M I N A T I O N

 3

 4   BY MS. KLEINHAUS............................   4
     BY MR. KNOTT...............................  91
 5   BY MR. RUSSART.............................  94

 6

 7

 8                   E X H I B I T S

 9   EXHIBIT NO.                      PAGE IDENTIFIED

10   Exh. 1   Communication on Patients' Health    39
                 Needs
11   Exh. 2   Emergency Services Policy            56
     Exh. 3   3/10/14 Correctional Health Services 69
12                 Report
     Exh. 4   3/14/14 Correctional Health Services 79
13                 Report
     Exh. 5   3/18/14 Correctional Health Services 85
14                 Report

15

16       (Original exhibits retained by court reporter and

17          attached to original transcript.  Copies provided

18                  with additional transcripts.)

19

20

21                   R E Q U E S T S

22   ITEM REQUESTED                              PAGE

23

24                    (None.)

25
```

Page 4

1     TRANSCRIPT OF PROCEEDINGS
2          GINA BUONO, M.D., called as a witness
3     herein, having been first duly sworn on oath, was
4     examined and testified as follows:
5               EXAMINATION
6  BY MS. KLEINHAUS:
7  Q    Good morning, Dr. Buono.
8  A    Good morning.
9  Q    As I told you before we got on the record, my name
10     is Tess Kleinhaus.  I represent Rebecca Terry.
11     She's the plaintiff in this case.
12          Have you ever given deposition
13     testimony before?
14  A    Yes.
15  Q    Okay.  How many times have you done that?
16  A    Twice.
17  Q    Okay.  And was that in the last couple of years or
18     pretty recently?
19  A    Ten years ago.
20  Q    Okay.  Well, just to make it more efficient for
21     both of us, I'll just ask that if you don't
22     understand my question, if I ask a bad question,
23     just tell me that and I'll rephrase it.
24          If you answer the question, I'm
25     going to assume you understood what I was asking.

Page 5

1     Is that fair?
2  A    That's fair.
3  Q    Are you on any medication, do you have any medical
4     condition, that would prevent you from being able
5     to answer accurately today?
6  A    No.
7  Q    Great.
8  A    Nothing would prevent me from answering
9     accurately.  I do have a medical condition, and I
10     am on medication.
11  Q    Got it.
12          And I'm going to try my best not to
13     talk over you, not to interrupt you.  If you can
14     do the same for me, that will make it easier for
15     our court reporter.  Is that fair?
16  A    Yes.
17  Q    And the other piece of that is we both have to
18     remember to answer out loud so she has something
19     she can take down instead of gestures.  So I'll
20     try and remind you and you can try and remind me
21     and make it more efficient.
22          Okay.  What is -- who's your
23     current employer?
24  A    The Department of Corrections for the State of
25     Wisconsin.

Page 6

1  Q    How long have you been working for Wisconsin DOC?
2  A    About three years.
3  Q    And what is your position there?
4  A    I'm one of the associate medical doctors for the
5     Bureau of Health Services for the Department of
6     Corrections.
7  Q    Okay.  And what do your duties in that role
8     consist of?
9  A    I see patients, and I also have administrative
10     duties, which include evaluation of employees,
11     helping to write policy, committee work.  Whatever
12     they tell me to do.
13  Q    Got it.
14          And what was your position or
15     employer before that?
16  A    Armor Correctional -- in between
17     Armor Correctional and the Milwaukee County -- and
18     Department of Corrections, I worked for a
19     locums -- Maxim.
20  Q    Can you say that again?
21  A    Maxim, M-A-X-I-M.
22  Q    What is that?
23  A    A temp service.
24  Q    Okay.
25  A    But they put me in with the Department of

Page 7

1     Corrections, so I worked there first before I got
2     a permanent position.
3  Q    I see.  And when you were temping with the
4     Department of Corrections, what type of work were
5     you doing for them?
6  A    Staff physician.
7  Q    And were you assigned to a specific facility or
8     were you floating?
9  A    I started at Dodge Correctional, which is kind of
10     where they do the training, and then I was
11     assigned to Racine Correctional.
12  Q    Got it.
13          And about how long were you working
14     for DOC through Maxim before you were hired on
15     full-time?
16  A    I don't recall.
17  Q    What were the dates of your employment with
18     Armor Correctional?
19  A    I don't recall.
20  Q    How about, in general, the years?
21  A    2014-2015.
22  Q    So you think a total of about two years?
23  A    I don't even think it was two years.
24  Q    Not even.  Okay.
25          Prior to being employed by

**Page 8**

1   Armor Correctional, where did you work?

2   A   Aurora Lakeshore Medical.

3   Q   And what type of work were you doing for Aurora?

4   A   I was an occupational environmental medicine

5   physician, I was the chairman of their

6   occupational medicine department, and I did

7   internal medicine.

8   Q   And how long did you practice at Aurora?

9   A   About five years.

10   Q   Okay. Other than the work for Wisconsin DOC and

11   Armor Correctional, have you ever done any other

12   work in a corrections environment? I'm including

13   prisons, jails --

14   A   No.

15   Q   -- mental -- okay.

16      So we've talked about all the

17   corrections work that you've done, right?

18   A   Correct.

19   Q   Okay. What's the highest level of education that

20   you have?

21   A   Well, does the M.D. trump the master's --

22   Q   Maybe tell me about both.

23   A   -- or does the master's trump the M.D.?

24      So I -- do you want a rundown of my

25   CV kind of thing?

**Page 9**

1   Q   Sure. Yeah. We can start with either one.

2   A   All right. So I graduated St. Joseph's College

3   with a bachelor's in chemistry. I went to Albany

4   Medical College, graduated in 1985 with an M.D.

5   Did a year of pediatrics, four years of internal

6   medicine.

7      I worked for the United States

8   Public Health Service as a general medical

9   officer. I worked -- I then went back and got a

10   master's and a fellowship in occupational medicine

11   and in public health. In 1996, then I took a job

12   here in occupational medicine for like 13 years.

13      Waited till my kids grew up,

14   returned to internal medicine. That's when I took

15   the job with Aurora.

16   Q   Got it. And who did you do the occupational

17   medicine for for 13 years?

18   A   I did that with several employers. One of them

19   was Work Injury Care Center/Sensia. They changed

20   their name. And then I was with Medical

21   Associates in Menomonee Falls. And then I was

22   with Aurora Lakeshore.

23      Every place I went got bought out.

24   I think it's me.

25   Q   I think it's the industry you're in, if I'm not

**Page 10**

1   mistaken.

2      Tell me where Albany Medical

3   College is located, please.

4   A   Albany, New York.

5   Q   Stands to reason.

6      Did you -- are you board-certified

7   in any areas?

8   A   I'm board-certified in occupational environmental

9   medicine and in internal medicine and public

10   health preventative medicine.

11      I'm not sure if I'm still

12   board-certified in public health preventative

13   medicine. You had to do that before you got

14   occupational medicine.

15   Q   Okay. And do you know how often you have to renew

16   the internal medicine certification?

17   A   It has changed. You have to maintain your

18   certification now, and then I think you have to

19   actually take the test every ten years.

20   Q   Okay. All right. Am I correct that you never

21   practiced in the area of OB/GYN or midwifery or

22   reproductive health?

23   A   Never willingly.

24   Q   Okay. Tell me about when you did it unwillingly.

25   A   I worked as a general medical officer in

**Page 11**

1   Yukon-Kuskokwim Delta Hospital. When I was on

2   call, I was responsible to deliver babies.

3   Q   And about how long ago was it that you had that

4   responsibility?

5   A   Thirty years.

6   Q   Okay. And --

7   A   Prior to that I had no training.

8   Q   No wonder it was unwilling.

9   A   Yeah.

10   Q   How many deliveries were you part of?

11   A   Forty. I did not do their OB care, however.

12   Basically I'm on call, and they would call me and

13   say, "Dr. Buono, guess what."

14   Q   That's rough.

15      All right. Don't be offended by

16   this. I ask everybody, every professional witness

17   about this, but have you ever had any discipline

18   related to your license --

19   A   No.

20   Q   -- to practice?

21      Have you ever had any kind of

22   investigation related to your license?

23   A   I had one lady who said that I was -- it was a

24   case with carpal tunnel, when I was in

25   occupational medicine. My opinion was that her

**Page 12**

1 carpal tunnel was not related to her job.
2     She put a complaint into the
3 medical board. The medical board reviewed it, and
4 they found in my favor.
5 Q Got it.
6 A Also, when I worked in this current job, a young
7 man said that I -- what was it he said?
8     The way the prison system works, if
9 an inmate has a complaint, they have to bring it
10 through a complaint system.
11     He complained that I did not treat
12 his hand appropriately because I wouldn't give him
13 the medication that he asked for for his pain.
14 Q Okay.
15 A The case was investigated and found in my favor
16 again.
17 Q Got it.
18     Were you ever an employee of
19 Milwaukee County Jail -- or I'm sorry. Let me
20 rephrase that to make it better.
21     Were you ever an employee of
22 Milwaukee County?
23 A No.
24 Q Okay. So -- and I -- it's not a trick question,
25 and maybe I'm not asking it well.

**Page 13**

1     The whole time that you were
2 practicing through Armor at Milwaukee County Jail,
3 you were an employee of Armor, correct?
4 A Correct.
5 Q Okay. And how did you first learn of the position
6 at Armor or become interested in applying for that
7 position?
8 A I went on Indeed.
9 Q And that's a job search website, right?
10 A Correct.
11 Q Okay. Were you familiar with Armor Correctional
12 prior to that?
13 A No.
14 Q Okay. And I apologize if I asked you this
15 already.
16     You started with them around 2014
17 sometime. Is that about right?
18 A We're taking a guess.
19 Q All right. Do you have any knowledge of when
20 Armor got the contract with Milwaukee County Jail?
21 A No.
22 Q Okay. Did you apply with Armor just one time and
23 go through the interview process, or did you apply
24 more than once?
25 A One time.

**Page 14**

1 Q Was there anything in particular about doing
2 correctional medicine through Armor that
3 interested you or drew you to that position?
4 A A paycheck interested me a lot.
5 Q Got it. We can all agree on that.
6     Anything else?
7 A It looked like it had pretty good benefits. The
8 job looked good.
9 Q Okay.
10 A And that it was also a position as a medical
11 director, which is a step up for me.
12 Q From where you were?
13 A Yes.
14 Q Okay. And the entire time that you were at Armor
15 in the 2014-2015 period, did you hold the "medical
16 director" title?
17 A Yes.
18 Q And were your job duties consistent throughout
19 that time period, or did they like change? Was
20 there a point where job duties were added or taken
21 away from that role?
22 A I was ramped up to the role. So initially, you
23 know, I was working with Dr. Gable, who was there
24 at the time, and then he explained the duties.
25 Q Okay.

**Page 15**

1 A And then eventually they became my duties.
2 Q Okay. So there was sort of a training period, but
3 in terms of what was expected of you, it was the
4 same role throughout; you didn't --
5 A Yes.
6 Q -- change your responsibilities?
7 A Not really.
8 Q Okay. That will make it quicker for us.
9     What was Dr. Gable's role when you
10 started working for Armor?
11 A He was the acting medical director for both the
12 HOC and for Milwaukee County Jail.
13 Q And "HOC" is House of Corrections?
14 A Yes.
15 Q Okay. Do you know how long he had been in the
16 role of medical director at Milwaukee County Jail?
17 A No.
18 Q Is Dr. Gable the person who decided to hire you?
19 A I was interviewed by Dr. Gable and several other
20 people, whose names I don't recall, but they were
21 the executive team.
22 Q Got it.
23     You described being ramped up into
24 that role.
25     What was the training that you were

Page 16

1  provided to be the medical director at
2  Milwaukee County Jail?
3        MR. RUSSART: Objection. Broad.
4          Go ahead and answer, if you can.
5        THE WITNESS: Kind of, you know, what he
6  did during the day, I would basically -- he showed
7  me what he did, and I kind of would do it.
8  BY MS. KLEINHAUS:
9  Q  So you shadowed him?
10 A  Pretty much.
11 Q  Okay. About how long did you shadow him in that
12   role?
13 A  I can't remember.
14 Q  Okay. Were you provided any training by -- other
15   than Dr. Gable, were you provided any other
16   training by any Armor employee or by Armor?
17 A  I don't actually recall.
18 Q  Okay. Can you explain to me how the medical
19   director position worked? Was it like a
20   nine-to-five gig, or were you on call? How did
21   your shift work -- how did that work? Excuse me.
22 A  I was always on call, 24 hours a day/seven days a
23   week. I was second call to the nurse
24   practitioners, who took primary call. If the
25   nurses couldn't reach the nurse practitioners,

Page 17

1  they called me. If they thought it was a
2  medical-director-level thing, they called me.
3  They called me for the intake orders, to cosign
4  them, for medications, things like that.
5  Basically the buck stopped here.
6  Q  Okay. When you say "the buck stopped here," you
7  mean you were ultimately responsible for the
8  medical care that was being provided at the jail?
9        MR. RUSSART: Objection. Calls for a
10 legal conclusion.
11       Answer if you can.
12       THE WITNESS: I was not ultimately
13 responsible. I was responsible for --
14       MS. KLEINHAUS: I can rephrase it.
15       THE WITNESS: -- support. Yeah.
16 BY MS. KLEINHAUS:
17 Q  I don't mean ultimately responsible in a legal or
18   a liability sense. I mean, in terms of someone
19   with substantive medical knowledge, were you the
20   highest level person?
21 A  I was not, actually.
22       MR. RUSSART: I have an objection
23 because I don't think you can separate legal from
24 medical.
25       But go ahead and answer.

Page 18

1        MR. KNOTT: Join the objection.
2  BY MS. KLEINHAUS:
3  Q  Go ahead.
4  A  Everybody's objecting. Should I answer?
5        MR. RUSSART: Yes.
6        MS. KLEINHAUS: You still answer. Yeah.
7  They're just --
8        MR. RUSSART: Unless I say don't answer.
9        THE WITNESS: Okay. All right.
10       MR. RUSSART: Might not happen.
11       THE WITNESS: So I was this level of
12 care here (gesturing), so the nurse practitioners
13 and nurses could call me first. And if there was
14 an issue I couldn't resolve, I could call
15 Dr. Gable or Dr. Mays.
16 BY MS. KLEINHAUS:
17 Q  Okay. That helps. So --
18       MR. RUSSART: Just for correction, it's
19 Dr. May, M-A-Y.
20       THE WITNESS: Sorry.
21       MR. RUSSART: That's all right.
22 BY MS. KLEINHAUS:
23 Q  So what was Dr. Gable's job title?
24 A  I don't recall.
25 Q  But he was -- for lack of a better term, he was

Page 19

1  superior to you in the hierarchy; is that right?
2  A  Yes.
3  Q  And what about Dr. May?
4  A  Also superior to me. He's the medical director
5  of, I think, everything.
6        MR. RUSSART: Yeah. He's the chief
7  medical officer for Armor. I can stipulate to
8  that.
9  BY MS. KLEINHAUS:
10 Q  You mentioned being on call 24 hours a day/seven
11   days per week.
12 A  Unless I was on vacation and someone was covering
13   for me.
14 Q  Okay. Was there any other physician that was
15   also -- had that similar responsibility of being
16   on call 24 hours a day/seven days per week?
17 A  Dr. Gable was always available, and Dr. May was
18   also available.
19 Q  But they were calls after you in the phone chain;
20   is that right?
21 A  Right.
22 Q  Okay.
23 A  So if I couldn't answer the question, either I
24   would call Dr. Gable or Dr. May, or whoever would
25   call Dr. Gable or Dr. May.

## Page 20

1  Q   Okay.  You mentioned that you would cosign intake
2      orders.  Tell me what you mean by that.
3  A   When an individual would come into the facility,
4      if they were on medications that could be verified
5      by nursing, we would try and continue their
6      medications.  So we would -- I would cosign the
7      orders to continue their medications that were
8      verified.
9  Q   Okay.  In addition to being on call all the time,
10     were you responsible for making -- for doing
11     patient visits at the jail -- or appointments?
12     Sorry.
13 A   I didn't have set appointments.  I would cover the
14     special medical unit, make rounds there.  I would
15     see any patients that the nurse practitioners had
16     issues with that they wanted to consult me on.
17 Q   So is it correct for me to say you didn't have
18     regular hours in the clinic?
19 A   Correct.
20 Q   And how often would you make rounds in the SMU?
21 A   Daily.
22 Q   And was there a specific time of day that you did
23     that?
24 A   Usually in the morning.
25         On weekends we had nurse

## Page 21

1      practitioner coverage, so they would round on the
2      weekends.
3  Q   And when you mentioned you would see anyone that
4      the nurse practitioners had questions about, would
5      that be specific to people in the SMU, or could
6      that be any patient at the jail?
7  A   Anywhere.
8  Q   Okay.  And when you would do rounds at the SMU in
9      the morning, what did that consist of?
10 A   Just like hospital rounds: making rounds on the
11     patients, reading their charts, checking their
12     labs, ordering what they needed.
13 Q   And would you go to the SMU to do that?
14 A   Yes.
15 Q   And would you go cell by cell, or could they come
16     out to a medical area?  How would that work?
17 A   In general, you like them to be in their cells for
18     privacy.
19 Q   Okay.  In your role as medical director, did you
20     have a responsibility to decide who would be
21     sent out to the hospital from booking?
22 A   Yes.
23 Q   Did anyone else have that responsibility?
24 A   The nurse practitioner, who would be on call or
25     who would be the person covering during the day

## Page 22

1      I believe this is what we used to do.
2          So for each day during the day,
3      someone -- one of the nurse practitioners would be
4      covering booking, and I'd be covering usually at
5      night.  Not always, though.  I'm usually like the
6      second call.  So there'd be someone for nighttime,
7      and then there'd be me.
8  Q   Okay.
9  A   So during the day, if they had a question about
10     something, they would talk to me, or the nurses
11     would call me and say, hey, we have concerns about
12     this patient, and I'd say send them out.
13 Q   How did you make the decision of who should be
14     sent out to the hospital?
15         Did Armor provide you any
16     information about who they wanted sent out or --
17 A   No.  That's a medical decision.
18 Q   Did you, in your role as medical director, have
19     any decision-making role in whether an inmate was
20     sent to the SMU versus being sent to a regular
21     housing pod?
22 A   Armor has some policies that were automatic, and I
23     had some discretionary ability to have them put in
24     the SMU.
25 Q   And would that -- when you mention the Armor

## Page 23

1      policies that would designate certain categories
2      of inmates who needed to go to SMU, would that be
3      like the infirmary policy?
4  A   Infirmary and SMU are not the same.  The jail did
5      not have a true infirmary.  That was an old
6      designation.  Infirmary implies a certain level of
7      staffing, and that was not the case.  It
8      functioned more like a special medical
9      unit/observation unit.
10 Q   I understand that.  My question was a little bit
11     different, which is just what Armor policy was it
12     that designated the categories of patients or
13     inmates who needed to go to the SMU?
14 A   I don't recall.
15         MR. KNOTT:  I'm sorry.  What was the
16     answer?
17         MR. RUSSART:  "I don't recall."
18         THE WITNESS:  I don't recall.
19         MR. KNOTT:  Thanks.
20         THE WITNESS:  I don't recall policy
21     numbers and things.
22 BY MS. KLEINHAUS:
23 Q   I understand.  If you think of it, like the name
24     of it or something close, will you let me know?
25 A   Yeah.

Page 24

1  Q   Okay.  During the time that you were employed by
2      Armor working at the Milwaukee County Jail, did
3      you become familiar with the Christensen consent
4      decree?
5  A   Yes.
6  Q   Tell me what you learned about that.
7  A   That the jail was under consent decree related to
8      the death of an individual, I believe, in booking.
9      The family sued, and part of the settlement was to
10     have the jail supervised by a -- I don't know what
11     his title is.
12 Q   Like a medical monitor, something like that?
13 A   A medical monitor.  And that was Dr. Shansky.
14 Q   Did you have any interactions with Dr. Shansky
15     during the time that --
16 A   Oh, yeah.
17 Q   -- you were working at Armor?  Okay.
18             What did that consist of?
19 A   He would come several times a -- in the year -- I
20     forget how often he was supposed to come -- and
21     just see how things were going as far as meeting
22     standards.
23             We were trying to get NCHC --
24             THE WITNESS:  NCHCC?
25             MR. RUSSART:  NCCHC.

Page 25

1             THE WITNESS:  -- NCCHC certified.
2  BY MS. KLEINHAUS:
3  Q   And that's an accreditation organization for --
4  A   For prisons --
5  Q   -- correctional facilities?
6  A   -- and jails.  Yeah.
7  Q   Okay.  Did Dr. Shansky collect any data or
8      information from you in order to fulfill his role
9      as medical monitor?
10 A   From me specifically, no.  He would just generally
11     talk to me.  But he did collect data, I'm fairly
12     certain, from the staff, I believe from the
13     nursing supervisor or the DON, and the HSU
14     administrator.  And I'm not sure if that's the
15     correct title for that individual.
16 Q   Sure.  When Dr. Shansky would talk with you, would
17     he do like an interview and ask you questions and
18     try and find out what was happening at the jail,
19     or what would that discussion consist of?
20 A   How are things going, my concerns or questions.
21 Q   And -- you mean yours or Dr. Shansky's?
22 A   My concerns, do I have any concerns.
23 Q   Okay.
24 A   But, in general, I didn't interact at that level
25     with him.

Page 26

1  Q   Okay.  Did you ever share any concerns with him?
2  A   I don't recall.
3  Q   I know in this case we've heard people use the
4      term "correctional healthcare."
5             Were you ever given any training
6      related to correctional healthcare versus any
7      other kind of healthcare?
8             MR. RUSSART:  Object to the premise of
9      the question.
10            MS. KLEINHAUS:  That's not a proper
11     objection.
12 BY MS. KLEINHAUS:
13 Q   But go ahead.
14            MR. RUSSART:  Object to the form of the
15     question.
16 BY MS. KLEINHAUS:
17 Q   Go ahead.
18            MR. RUSSART:  Is that better?
19            THE WITNESS:  Can you explain the
20     question?
21 BY MS. KLEINHAUS:
22 Q   Sure.  I've heard the phrase "correctional
23     healthcare," and I will confess to you that it
24     doesn't actually make sense to me because it -- I
25     am not able to make a distinction between

Page 27

1      healthcare and correctional healthcare.  So I was
2      asking you, as someone who's in that profession,
3      if you can explain that to me, please.
4             MR. RUSSART:  Object to the form of the
5      question.
6             MR. KNOTT:  Join the objection.
7  BY MS. KLEINHAUS:
8  Q   Go ahead.
9  A   Okay.  Initially I had -- it was just healthcare
10     in a correctional facility.  Healthcare is
11     healthcare.  And then I did take the -- I always
12     get this wrong -- NCCHC course so that I better
13     understood what was -- what is expected in a
14     correctional facility.
15            There are certain limitations in
16     the facility and certain expectations.  So I took
17     that course.
18 Q   Okay.  That helps.
19 A   Does that make sense?
20 Q   Yep.  I understand.
21 A   Okay.
22 Q   So was that course like an Internet course, or did
23     you go somewhere --
24 A   It's a book.
25 Q   It's a book.  Okay.

Page 28

1　A　Read a book, take a test.

2　Q　And is that something offered through NCCHC that

3　　　you could, for example, order from them --

4　A　Yes.

5　Q　-- and take a look at?  Okay.

6　　　　　　So is it fair to say that during

7　　　your time working at the jail, Dr. Gable was your

8　　　supervisor?

9　A　Yes.

10　Q　Did he ever conduct any evaluations of your

11　　　performance while you were there?

12　A　I don't recall.

13　Q　When you read the book on -- from NCCHC, was that

14　　　at the beginning of your time working at the jail,

15　　　or do you recall when that was?

16　A　More toward the end.

17　Q　Towards the end?  Okay.

18　A　We were getting closer to being NCCHC certified,

19　　　and they wanted us all to get that certification.

20　Q　Okay.  Do you know if -- or I'm sorry.  Strike

21　　　that, please.

22　　　　　　When did the Milwaukee County Jail

23　　　get the NCCHC certification?

24　A　I don't recall.

25　Q　Do you know if it had when you started working

Page 29

1　　　in the jail?

2　A　It did not.

3　Q　Do you know if it had when you left or stopped

4　　　working there?

5　A　I don't recall.

6　Q　Were you ever given any kind of employee handbook

7　　　by Armor?

8　A　I don't recall.

9　Q　Were you ever required to attend any

10　　　in-service-type training, by which I mean, a

11　　　periodic day-long training or a few hours of

12　　　training, through Armor?

13　A　We went to something down in Florida, but I don't

14　　　think that was an in-service.  I think that was

15　　　more of a -- I don't actually recall what it was.

16　　　It was not so much training as a meeting, where we

17　　　all got together and discussed -- or they

18　　　presented to us different things in Armor, but I

19　　　don't recall what it was all about.  It was a

20　　　while ago.  But it wasn't a training-type thing.

21　Q　Okay.  What types of topics did they go over in

22　　　the presentation?

23　A　The only one I remember vividly is just the

24　　　pharmacy.

25　Q　Okay.  Any particular reason that sticks in your

Page 30

1　　　mind?

2　A　It was very cool.

3　Q　What was cool about it?

4　A　The woman who presented it was just very on

5　　　target.

6　Q　So I'm not in your industry, so it's less familiar

7　　　to me.

8　　　　　　So would that be a presentation

9　　　like on new medications you could prescribe or --

10　　　　　MR. RUSSART:  Object to the form of the

11　　　question.

12　　　　　　And I have to make a comment, all

13　　　right?  Because Ms. Kleinhaus is representing

14　　　herself as someone who's naive about correctional

15　　　care, and as a lawyer who does a lot of civil

16　　　rights work, she's not, okay?

17　　　　　THE WITNESS:  Anyway, so, I'm sorry.

18　　　What was your question?

19　BY MS. KLEINHAUS:

20　Q　My question was:  What was presented in the

21　　　pharmacy presentation in Florida that struck you?

22　A　The -- our formulary.

23　Q　And what's the formulary?

24　A　The formulary is what medications we have

25　　　available.

Page 31

1　Q　And was it cool because there were things

2　　　available that you weren't familiar with before

3　　　that?

4　A　No.  Just the woman who presented it was just

5　　　really cool.

6　Q　Oh.  Like her presentation was just --

7　A　Her presentation was cool --

8　Q　You liked it.

9　A　-- it was a good presentation.  Right.

10　Q　Okay.  I got it now.

11　A　I mean, I would like her to give every

12　　　presentation.  She was that good.

13　Q　Okay.  Were you given any information during that

14　　　presentation about, you know, utilization of

15　　　resources or resource management --

16　A　I don't recall.

17　Q　-- that type of thing?  Okay.

18　　　　　　In the book that you got from

19　　　NCCHC, was there any discussion about the needs of

20　　　pregnant inmates?

21　A　I don't recall.  I've not since read that book

22　　　again.

23　Q　Do you recall the name of it?

24　A　It's the NCCHC standards for jails and prisons.

25　　　You can get it on the Internet.

## Page 32

1  Q   Okay.  I've read about the term "quality
2      improvement" in some of the Armor materials.
3              Were you part of any quality
4      improvement efforts when you were at
5      Milwaukee County Jail?
6  A   I was not on the CQI committee, per se.  My job
7      was to take care of people in the appropriate way.
8      In doing that, I would suspect I would improve the
9      quality of care they got.
10 Q   Sure.  And I was sort of using it in like the
11     trademarked version.
12 A   Right.
13 Q   I understand that you were, I'm sure, as a
14     professional, trying to improve the quality of
15     your care.  So I didn't -- don't take any offense.
16             But what -- so what was the CQI
17     committee?
18 A   The committee who dealt with quality improvement
19     for the jail.
20 Q   Okay.  How did they try to accomplish that?
21         MR. RUSSART:  Foundation.
22             If you know, you can answer.
23         THE WITNESS:  I can't really answer.
24 BY MS. KLEINHAUS:
25 Q   Who was on that committee?

## Page 33

1  A   Don't recall.
2  Q   Do you know if Dr. Gable was on it?
3  A   I do not recall if he was on the committee.
4  Q   Do you know if the committee would ever do any
5      audits of patient files to determine -- you know,
6      try to identify any patterns?
7          MR. KNOTT:  Object.  Foundation.
8          THE WITNESS:  I don't know.
9  BY MS. KLEINHAUS:
10 Q   Other than the rounds in the SMU that you would do
11     each morning at the beginning of the day, did you
12     have any role in determining -- I'm sorry.  Strike
13     that, please.  I can ask it better.
14             Other than the rounds in the
15     morning at the SMU, was there any requirement that
16     any healthcare person do regular check-ins with
17     the people in the infirmary?
18         MR. RUSSART:  Object to the form.
19         MR. KNOTT:  Join.
20         THE WITNESS:  I don't recall what -- the
21     policy for rounding in the SMU for not me, but for
22     other individuals.  I also think I actually
23     rounded in the SMU quite regularly.
24 BY MS. KLEINHAUS:
25 Q   Sure.  All right.

## Page 34

1  A   More so than was required.
2  Q   I understand.
3  A   But I don't recall what the policy was for nursing
4      staff, if that's your question.
5  Q   Right.  So, for example, if a nurse was assigned
6      to the infirmary first shift, the infirmary's part
7      of her possibilities --
8  A   I don't recall at all.
9  Q   You don't know how often she would need to go
10     check on the inmates?
11         MR. RUSSART:  Object to the form of the
12     question insofar as it infers there was an
13     infirmary.
14         MR. KNOTT:  Also vague as to time.
15     Join.
16 BY MS. KLEINHAUS:
17 Q   Okay.  You should know if I say "infirmary," I'm
18     doing -- I'm using it interchangeably with the
19     SMU, because I've had other cases at
20     Milwaukee County Jail, and the corrections staff
21     there use those terms interchangeably.  So I'm not
22     trying to confuse you.  You know there's nothing
23     that you considered an infirmary.  So if I say
24     that, I just mean the SMU.
25 A   Okay.

## Page 35

1  Q   Okay?
2  A   But I still don't recall what their policy for
3      rounding in the SMU was.
4  Q   Got it.
5              Who was the health services
6      administrator when you worked for Armor at the
7      Milwaukee County Jail?
8  A   I don't recall.
9  Q   Did you have to report to that person in any way?
10 A   I reported to -- so I don't recall -- I don't
11     recall the titles.
12             The person I reported to most often
13     was Rusty Perry.
14 Q   Okay.  Do you know what Mr. Perry's
15     responsibilities were in a general sense?
16 A   I don't recall.  I'm sure they were more than just
17     my reporting to him.
18 Q   Do you know if he had like a business role or a
19     medical role?
20 A   Business role.
21 Q   Okay.  Do you know anybody that he supervised at
22     the jail?
23 A   As far as?
24 Q   Anything.  Anybody who worked for him.
25 A   I don't recall who he supervised.

Page 36

1  Q   Were you ever part of making any policies,
2      healthcare policies, for --
3  A   No.
4  Q   -- the jail?
5          What was the practice in terms of
6      discussing medical issues with correctional staff?
7      Is that something that you could do, if necessary?
8  A   Without violating HIPAA, only if there was a need
9      to know.  And, in general, we did not discuss
10     medical issues with the correctional staff.
11 Q   So, for example, an inmate who was in labor going
12     to the SMU, would you be able to tell the
13     correctional officer in the SMU, this inmate is in
14     labor, so that he would know that?
15 A   I would not describe a patient in labor to a
16     correctional staff member because "in labor"
17     requires medical understanding, nor would I have a
18     patient in labor in the SMU.  That individual
19     would be in the hospital.
20 Q   Okay.  What about a person who is nine months
21     pregnant and their due date is in the next week
22     and they're complaining of abdominal pain on a
23     interval basis?  Would you --
24          MR. KNOTT:  Object to the form of the
25     question.

Page 37

1          MR. RUSSART:  Join.
2          MS. KLEINHAUS:  Let me finish the
3      question before you object, please.
4  BY MS. KLEINHAUS:
5  Q   -- would you be able to describe those symptoms to
6      the correctional officer?
7          MR. RUSSART:  Object to the --
8          MR. KNOTT:  Form.
9          MR. RUSSART:  -- form.
10         THE WITNESS:  Are you asking did I, or
11     are you asking would I?
12 BY MS. KLEINHAUS:
13 Q   Could you.  Within policy, were you allowed to
14     tell this person --
15 A   A, I don't know --
16 Q   -- here's what's going on.
17 A   -- the policy regarding that.
18         B, I would -- I did not talk to any
19     correctional person.
20         C, if I had a concern regarding a
21     patient, I may say to the nurse to observe this
22     patient.
23 Q   Okay.  So if I'm understanding your --
24 A   If there was another concern, and there was a
25     correctional staff member in the SMU, which there

Page 38

1      always was, I am sure they are instructed to call
2      for help if they feel a patient needs it for
3      whatever reason.
4  Q   Okay.  So I just want to make sure I understand
5      that.
6          So you don't know if there was a
7      policy about conversations with correctional
8      officers about those types of symptoms?
9  A   I am not --
10         MR. RUSSART:  Object to the --
11         THE WITNESS:  -- aware.
12         MR. RUSSART:  -- form of the question.
13 BY MS. KLEINHAUS:
14 Q   And in your experience, did you ever talk to a
15     correctional officer in the SMU about a patient's
16     symptoms?
17 A   I don't recall.
18 Q   You mentioned you're sure that the correctional
19     officers are trained to call for help?
20 A   I am supposing they are trained to call for help.
21 Q   Okay.
22 A   I do not know what training they actually receive
23     since I am not responsible for their training.
24 Q   Do you know if Armor ever provided any training --
25 A   I do --

Page 39

1  Q   Sorry.
2          -- to correctional officers?
3  A   I do not.
4  Q   Okay.  I'm going to show you what we'll mark as
5      Exhibit 1.
6          (Exhibit 1 marked for identification.)
7  BY MS. KLEINHAUS:
8  Q   Take a moment just to review Exhibit 1.  And I'll
9      represent to you that that page I've X'd out
10     because it doesn't relate to this.
11         And my question for you is just
12     whether you ever received this Armor policy.
13 A   I don't recall.
14 Q   Okay.  Please just take a moment to review it, and
15     let me know if you were ever made familiar with
16     it.
17 A   (Reviewing document.)
18         MR. KNOTT:  We don't have a copy?
19         MS. KLEINHAUS:  I'm sorry.  You can take
20     a look at my copy for a second if you want.
21         MR. KNOTT:  Thank you.
22         MR. ARNOLD:  Is there a Bates number or
23     something --
24         MS. KLEINHAUS:  Sure.  Yeah.  The Bates
25     is ARMOR 142 through ARMOR 149.

Page 40

1          THE WITNESS: Okay.

2 BY MS. KLEINHAUS:

3 Q   Okay. Is this something that was ever given to

4    you by Armor?

5 A   I don't recall.

6 Q   Is the -- even if you're not sure if this specific

7    policy was given to you, is the content that's

8    contained here something that was ever conveyed to

9    you about conversations or communications you

10    could have with correctional staff about patient

11    needs?

12 A   I don't recall.

13 Q   Okay. So you don't remember anything about this

14    policy at all; is that fair to say?

15 A   Pretty much. I mean, it would stand to reason

16    that reasonable people do reasonable things. So

17    if the patient was ill, I would expect that some

18    type of information would have been conveyed to

19    the staff, especially if the patient is being

20    transported, since the patient needs to be

21    transported to the hospital.

22 Q   Okay. And so --

23 A   And that -- that's my mindset.

24 Q   Okay. And so your mindset is sort of going from

25    a -- you know, common sense perspective, you're

Page 41

1    thinking there must be some conversation that

2    happens. Fair to say?

3 A   Correct.

4 Q   And that's the basis of it more so than any

5    specific training. Is that fair?

6 A   Correct.

7 Q   Okay. You can put that to the side.

8         Was there a specific location in

9    the jail where Armor policies were stored or

10    maintained?

11 A   I do not know.

12 Q   Do you recall ever going to consult any Armor

13    policies while you were at the jail?

14 A   I don't recall.

15 Q   Did Dr. Gable ever direct you to consult any Armor

16    policies at the jail?

17 A   I don't recall.

18 Q   Is there any reason for having such a limited

19    recollection about that?

20         MR. RUSSART: Well, object to the form

21    of the question.

22         THE WITNESS: Yeah. It was three years

23    ago. I am now employed by another company that

24    has plenty of policies.

25    I do not recall any specifics.

Page 42

1    incident. I would suspect I may have, but you are

2    asking me specifically, and I cannot recall

3    specifically.

4 BY MS. KLEINHAUS:

5 Q   Okay. Do you have any general recollection of

6    where the policies were, or if you consulted them?

7         MR. RUSSART: Object to the form of the

8    question.

9         THE WITNESS: I don't recall if they

10    were in a binder or if they were on the computer.

11         Currently my policies are all on a

12    computer.

13 BY MS. KLEINHAUS:

14 Q   In your role as a medical director, who did you

15    supervise, if anyone?

16 A   The nurse practitioners and any other medical

17    provider.

18 Q   And how many nurse practitioners were on staff

19    during that time that you worked there?

20 A   Oh, you're killin' me. I can't recall.

21 Q   I'm sorry. And if you want to estimate, like more

22    than five? Less than five?

23 A   Let's see. I currently supervise a lot of people,

24    so I can't recall what I did in those days.

25         At least -- let's see -- at least

Page 43

1    five.

2 Q   Okay. There would have been at least one per

3    shift? Does that sound right?

4 A   Nurse practitioners -- I don't recall this

5    specifically, but I don't believe that a nurse

6    practitioner was there 24 hours a day/seven days a

7    week.

8 Q   Okay.

9 A   So they didn't work like one per shift.

10 Q   Okay.

11 A   And I may be confusing that with where I am now.

12 Q   Okay.

13 A   But I don't think they covered in that way.

14         The person who was on call was not

15    in the building.

16 Q   And by that, you mean people were either assigned

17    to that shift and working that shift, or they're

18    at home and on-call. There's no like on-call room

19    where somebody's taking a nap.

20 A   No. There is no on-call room where they're taking

21    a nap.

22 Q   Got it.

23         Would you have supervised the

24    nursing supervisor?

25 A   No.

Page 44

1  Q  Okay.  So she -- she or he, would have reported
2     to --
3  A  Parallel roles.
4  Q  Okay.
5  A  I don't supervise the nursing supervisor.
6  Q  Okay.  So the nursing supervisor would report to
7     Dr. Gable?
8  A  I'm not sure --
9        MR. RUSSART:  Foundation.
10       THE WITNESS:  I'm not sure who the
11    nursing supervisor reported to.
12 BY MS. KLEINHAUS:
13 Q  Okay.  So besides the nurse practitioners, is
14    there anyone else that you were responsible for
15    supervising?
16 A  If there was a physician on staff.
17 Q  And was there ever a physician on staff during the
18    time you were there?
19 A  I recall one.
20 Q  And what is that person's name, if you recall?
21 A  I don't recall.
22 Q  Okay.  Would that physician have been assigned to
23    the clinic?
24 A  Yes.
25 Q  And would that be to do --

Page 45

1  A  Medical care.
2  Q  -- medical care --
3  A  Yes.
4  Q  -- at the clinic?  Okay.
5        During the time that you were
6     working for Armor at Milwaukee County Jail, was
7     there ever a time that Armor conducted a review of
8     a particular incident, for example, some serious
9     medical incident occurred and Armor decided to
10    conduct a review or investigation of what had
11    transpired?
12 A  I do not recall any specific review.
13 Q  And when you say that, do you mean you recall some
14    sort of general review, or...
15 A  I don't actually recall a review.
16 Q  Okay.
17 A  Again, I don't want to mix up with what I'm doing
18    now with what I did then.
19 Q  Sure.  If you don't remember --
20 A  I don't remember.
21 Q  -- you don't remember.  Okay.
22       Were you required to attend any
23    medical administrative committee meetings?
24       MR. RUSSART:  Could you read the
25    question back again?

Page 46

1        (Previous question read back by court reporter.)
2        MR. RUSSART:  Okay.  Thank you.
3        THE WITNESS:  What exactly do you mean
4     by "medical administrative committee meetings"?
5  BY MS. KLEINHAUS:
6  Q  Maybe I can make it better if I make it -- making
7     it a little broader.
8        Were there any meetings that you
9     were required to attend?
10 A  Yes.
11 Q  Okay.  Can you just tell me what they were by
12    category?  And it may be that we don't have to go
13    into --
14 A  The one I specifically remember on a routine basis
15    was -- and I don't remember the frequency, but it
16    was on a regular basis -- was with the provider
17    staff and the nursing staff.
18 Q  How often would that occur?
19 A  I don't remember the specific periodicity, but it
20    was a regular basis.
21 Q  Okay.  Was any particular person --
22 A  And the jail staff was also there.  It was kind of
23    like a whole staff meeting.
24 Q  Okay.  Was there any particular person who would
25    call those meetings or run those meetings?

Page 47

1  A  Initially Dr. Gable would do it, and then Rusty
2     Perry would do it, then I finally took it over.
3  Q  Would there be an agenda for the meeting?
4  A  Yes.
5  Q  And would someone take minutes of the meeting?
6  A  Yes.
7  Q  Was there a particular name for this type of
8     meeting that you recall?
9  A  I don't remember what we called it, but it was a
10    regular meeting, and it generally involved
11    everybody.
12 Q  Okay.  Outside of that routine meeting with the
13    provider staff and the jail staff, were there any
14    other meetings that you were required to attend?
15 A  I can't recall.
16 Q  During the time that you were employed by Armor at
17    the jail, were there any deaths of inmates at the
18    jail that you recall?
19 A  I do not recall any deaths when I was there.
20 Q  Okay.  I'll represent to you that there's some
21    information in plaintiff's complaint related to an
22    inmate named Kwame Moore, who plaintiff alleges
23    suffered some intense pain, and ultimately he was
24    suffering from testicular torsion and had to lose
25    one testicle as a result of not receiving medical

Case 2:17-cv-01112-JPS   Filed 08/31/18   Page 15 of 38   Document 167-1

Page 48

1 care.
2      Do you recall any discussion of
3 Mr. Moore's case while you were employed by Armor?
4 A   I don't recall a formal meeting.  I do recall
5 hearing of the case.
6 Q   How did you hear about it?
7 A   The next morning when I came in, it was the buzz.
8 Q   Okay.  So it was like informal conversation?
9 A   Pretty much.
10 Q   Not like an official review, correct?
11 A   Correct.
12 Q   Did you have any role in Mr. Moore's care at all?
13 A   No.
14 Q   You mentioned earlier the national commission on
15 correctional healthcare for -- correctional
16 healthcare, or the acronym we were using before.
17 You know what I mean, right?
18 A   Yeah.
19 Q   Were you ever part of the process of trying to
20 obtain accreditation for Milwaukee County Jail?
21 A   My role in the process of obtaining it was
22 basically doing my job.  Armor was the one who was
23 putting that in place.
24 Q   Okay.  Do you --
25 A   So that was kind of up here (gesturing), and I was

Page 49

1 more down here (gesturing).
2 Q   Right.  You had the -- you're in the trenches
3 caring for patients, and they're getting the next
4 credential for the institution --
5 A   Right.
6 Q   -- is that fair?
7 A   Right.  They were putting in those other things.
8 Q   Do you know what things they did in order to try
9 to qualify for accreditation?
10 A   I believe they put in electronic medical record.
11 They were trying to get the staff up to par, get
12 enough staff to properly staff the entire place.
13 Those are the two major things I remember.
14      I know there was many things that
15 they had to meet.
16 Q   Okay.
17 A   The reason I would be so unfamiliar with it is
18 because the Department of Corrections is not NCCHC
19 certified, nor are we obtaining that.  So whatever
20 the details are that involved getting that
21 certification are not at my fingertips.
22 Q   Got it.
23      What would be the reason that a
24 facility wouldn't want to get that accreditation?
25 A   It's expensive.

Page 50

1 Q   And what are the reasons they would want to get
2 it?
3      MR. RUSSART:  Foundation.
4      MR. KNOTT:  Object to form.
5 BY MS. KLEINHAUS:
6 Q   You can answer.
7      MR. RUSSART:  If you know.
8      THE WITNESS:  This is an opinion.
9 BY MS. KLEINHAUS:
10 Q   Sure.
11 A   It's some certifying body that shows you have met
12 a certain standard of care.
13 Q   In your experience, was Milwaukee County Jail
14 adequately staffed on the medical side when you
15 worked there?
16 A   It would come and go.  It is often in corrections
17 a huge issue.  You get the staff/you lose the
18 staff, you get the staff/you lose the staff.  It's
19 a big turnover.  Just when you think everything is
20 going well, you lose staff, and you have to start
21 all over again.  Very annoying.
22 Q   Sure.  Is there a reason for more turnover in that
23 area versus other areas?
24 A   Seriously?
25 Q   Yes.

Page 51

1 A   It's working in a jail.  Very difficult
2 population.
3 Q   Were you ever part of creating a staffing plan or
4 staffing matrix at the Milwaukee County Jail?
5      MR. RUSSART:  Object to the form.
6      THE WITNESS:  No.  Not that I can
7 recall.
8 BY MS. KLEINHAUS:
9 Q   Do you know whether the Christensen consent decree
10 was any obstacle to accreditation?
11 A   An obstacle to accreditation?  I think accred-- --
12      MR. KNOTT:  Form and foundation.
13      Go ahead.
14      THE WITNESS:  I think accreditation was
15 more an attempt to help to get out from under the
16 decree, to meet the standards that the decree
17 wanted us to meet, and that was a roadmap to
18 getting there.
19 BY MS. KLEINHAUS:
20 Q   Got it.
21      Are you familiar with the criminal
22 charges that have been lodged against Armor?
23 A   In a vague way.
24 Q   Okay.  How are you familiar with it in -- how did
25 you become familiar with it in a vague way?

Page 52

1  A   People talk, and the newspapers.
2  Q   Okay.
3  A   I do live in Milwaukee, after all.
4  Q   Fair enough.
5      MR. RUSSART:  Object to the commentary.
6      MS. KLEINHAUS:  That is not a proper
7  objection.
8      MR. RUSSART:  Neither was your
9  statement, if we're going to have this little
10 debate on the record.
11     MS. KLEINHAUS:  Well, you're starting a
12 debate with me.  I'm just trying to get through
13 the testimony.
14         This is so inefficient.  I don't
15 know why you would do this.
16     MR. RUSSART:  Why I would object to your
17 questions?
18     MS. KLEINHAUS:  You didn't object.
19     MR. RUSSART:  I just objected to your
20 commentary.  If you're going to --
21     MS. KLEINHAUS:  That's not a proper
22 objection, and you know that.
23     MR. RUSSART:  No.  It is absolutely a
24 proper objection.
25     MS. KLEINHAUS:  Okay.  Well, if you

Page 53

1  don't mind, please send me the authority for your
2  position that that is an objection that you can
3  make.
4      MR. RUSSART:  Yeah, form.  It's a form
5  objection.
6      MS. KLEINHAUS:  Then say "form" --
7      MR. RUSSART:  I don't have to.
8      MS. KLEINHAUS:  -- and let me move on.
9  I mean, this is ridiculous.
10         Let's go off the record.
11     (Discussion was held off the record.)
12 BY MS. KLEINHAUS:
13 Q   To your knowledge, is the Milwaukee County Jail
14 still under the Christensen consent decree?
15 A   I have no idea.
16 Q   Were they under the decree the entire time that
17 you were working at the jail?
18 A   I'm not sure if they had gotten out just toward
19 the end or if they were still under it -- the end
20 of my employment I meant.
21 Q   Okay.  Which would have been 2015; is that
22 right --
23 A   Again --
24 Q   -- ish?
25 A   -- I don't really exact when I got out.

Page 54

1  Q   What was the reason for leaving your position with
2  Armor?
3  A   I got a better offer.
4  Q   And what was that?
5  A   Department of Corrections.
6  Q   And did you start out with that better offer
7  through matrix -- is that right?
8      MR. RUSSART:  Maxim.
9      THE WITNESS:  Maxim.
10 BY MS. KLEINHAUS:
11 Q   I'm sorry, Maxim.  Did you start out --
12 A   Actually, no.  I actually went online, and I was
13 looking for positions, and I saw that.  And then
14 in order to get me on board quickly -- Department
15 of Corrections usually uses Maxim as a temp
16 service, and so you start with Maxim as a temp
17 service.  They try you out, and then they'll offer
18 you a position.
19 Q   So when you saw the position advertised, it was a
20 Department of Corrections position?
21 A   Yeah.  For the Wisconsin government.
22 Q   Okay.
23 A   State of Wisconsin.
24 Q   And then you got funneled through the Maxim system
25 because that's faster?

Page 55

1  A   Yes.
2  Q   Okay.  At the time that you left Armor, were you
3  required to do any kind of exit interview?
4  A   No.
5  Q   And were you required to explain -- actually,
6  strike that.
7         Were you ever given copies of any
8  of Dr. Shansky's reports?
9  A   No.
10 Q   And were Dr. Shansky's findings ever discussed at
11 the routine meeting that you described?
12 A   No.  Only -- let me take that back.
13         Only in as far as what we needed to
14 improve, so for staffing issues, we need to
15 improve staff or -- that -- in that way.  Not
16 specific things.
17 Q   Okay.  So -- but you were told some of the
18 staffing changes you needed to make were part of
19 fulfilling the decree; is that right?
20 A   Yes.
21 Q   I want to talk to you about the Armor emergency
22 services policy.
23     MS. KLEINHAUS:  I'm going to mark this
24 as Exhibit 2.
25     (Exhibit 2 marked for identification.)

Page 56

1  (Recess taken from 11:53 a.m. to 12:01 p.m.)
2  BY MS. KLEINHAUS:
3  Q  All right.  Dr. Buono, I see during the break you
4  took a look at Exhibit 2, which is titled
5  "Emergency Services."
6  A  Mm-hmm.
7  Q  Have you seen this policy before?
8  A  No.
9  Q  Were you given any training by Armor about sending
10  people out to the emergency room?
11  A  Not specifically.  It's kind of a passed-down,
12  learned thing.
13  Q  Sure.  And when you say that, do you mean -- tell
14  me what you mean by that, please.
15  A  Dr. Gable, when I first came on, gave me the
16  verbal.
17  The nurses also teach you, and they
18  tell you this is what we do when we send people
19  out.
20  Q  Okay.  You can put Exhibit 2 to the side.
21  I want to turn your attention to
22  events of March 2014, involving my client, Rebecca
23  Terry.
24  Do you have any -- well, strike
25  that, please.

Page 57

1  Do you have any independent
2  recollection of Ms. Terry?
3  A  What do you mean?
4  Q  Other than any review of documents you may have
5  done to prepare for your deposition, in your own
6  memory bank, do you have a memory of this
7  incident?
8  A  Vaguely.
9  Q  Okay.  Tell me what you remember about it.
10  A  Coming in and hearing this lady delivered in the
11  bed at 5:30 in the morning when I got a call
12  back -- actually not coming in.  Let me rephrase
13  that.
14  Getting a phone call in the morning
15  saying that she had delivered.  Coming in the next
16  morning and hearing that she had delivered.
17  Q  Were you surprised to hear that she had delivered
18  a baby at the SMU?
19  A  Oh, yes.
20  Q  And did you review any documents to prepare for
21  your deposition today?
22  A  I did.
23  Q  What did you review ahead of time?
24  A  I reviewed some records that Mr. Russart sent to
25  me.  It was out of the EHR system, the old

Page 58

1  electronic medical record.
2  Q  Okay.  Related to Ms. Terry, I take it?
3  A  Yes.
4  Q  Okay.  And so am I correct that if you were
5  assigned to work 24 hours a day/seven days a week
6  on-call, you would have been on-call the night
7  that she -- that Ms. Terry was brought to
8  Milwaukee County Jail in March of 2014?
9  A  Yes.  But I am also second call.
10  Q  Okay.  And by that, you mean a nurse practitioner
11  would have been called first?
12  A  First.
13  Q  Okay.  Were you -- strike that.
14  I'll represent to you that when
15  Ms. Terry first came to booking, she was sent out
16  to Froedtert.
17  A  Yes.
18  Q  Were you part of the decision to send her out to
19  Froedtert?
20  A  As I reviewed the chart, yes, but it would make
21  sense that, yes, I would be part of that decision.
22  Q  So you -- are you saying you know that from
23  reviewing the chart or --
24  A  No.  I have a vague recollection of being involved
25  in that.

Page 59

1  Q  Did someone call you about whether to send her
2  out?
3  A  Yes.
4  Q  Who called you?
5  A  I don't recall.
6  Q  What documents or forms, if any, were you required
7  to create if you wanted to send a patient out to
8  the emergency room?
9  A  I don't recall for Armor.
10  Q  Do you recall if there were forms or documents you
11  had to fill out?
12  A  I don't recall for Armor.
13  My recollection of her is that she
14  was in intake -- and this is vague -- and the
15  nurses had concerns about her, and so I said send
16  her out.
17  Q  What concerns did they have, if you recall?
18  A  She was a multip.  She had multiple pregnancies,
19  gravida 13.  She had had no prenatal care.  She
20  was due in about a week.  She was an IV heroin
21  abuser.  She was complaining of a pressure
22  sensation.
23  Even if she had been complaining of
24  nothing, I still would have sent her out.
25  Q  Okay.  And the symptoms that you just described,

Page 60

1   do you have an independent recollection of that or
2   you're relying on the documents that you reviewed?
3  A   The only part I have the independent recollection
4   of is that she was a multip, heroin abuser,
5   pregnant, due.
6          The part about the pressure, I
7   don't recall. That's from the documents.
8  Q   Got it. Thank you.
9          So -- and when you said you would
10   have sent her out anyway, tell me what you mean by
11   that, please.
12  A   For medical clearance before coming into the jail.
13  Q   And why would you have wanted to get medical
14   clearance?
15  A   Because she was a gravida 13, heroin abuser, no
16   prenatal care, due shortly.
17  Q   Okay. So maybe I misunderstood. So --
18  A   She was a high-risk patient.
19  Q   If I understand your distinction you're making, is
20   even if she wasn't complaining of a pressure
21   sensation, all those other factors would have
22   caused you to send her out.
23  A   Yeah. And the nurses -- if the nurses would have
24   called me and told me that, that's what I would
25   have done.

Page 61

1  Q   Okay. Is any form sent with the patient to the
2   hospital explaining what they're being sent there
3   for?
4  A   I don't recall for Armor. I don't want to say yes
5   or no because I know for DOC we do, but I don't
6   recall for Armor.
7  Q   May have been or may not have been; you just don't
8   know?
9  A   I just don't recall.
10  Q   Okay. If the nurses on staff that night had
11   reached the nurse practitioner first, since you
12   were the second call, could the nurse practitioner
13   have authorized for her to go out to the hospital?
14  A   Yes.
15  Q   So you were making the call because they must not
16   have gotten through to that person; is that fair
17   to say?
18         MR. RUSSART: Object to the form,
19   foundation.
20         THE WITNESS: It could be.
21  BY MS. KLEINHAUS:
22  Q   Okay.
23  A   It could be, or they could have skipped her
24   because they thought they wanted to talk to me.
25  Q   Got it.

Page 62

1         And they had the discretion to
2   decide that they considered something serious
3   enough that they wanted to talk to you; is that what
4   you mean?
5  A   Yes.
6  Q   Got it.
7         When patients come back from the
8   emergency department, is there any form they're
9   supposed to bring back with them to the jail?
10  A   I don't recall a form, but I usually ask for the
11   dictated physician's note.
12         Again, at the DOC we do have one,
13   but I don't want to confuse Armor's and the
14   DOC's --
15  Q   Sure.
16  A   -- forms.
17  Q   Sure. And in your field is it customary that the
18   physicians at the hospital know to send back the
19   dictated physician's note to the jail?
20  A   No. And this was a huge issue I had with almost
21   every provider in this area.
22  Q   Tell me what that issue was. Can you explain it?
23  A   And it's still a common issue.
24         We send patients out to the
25   emergency room through the jail, and they don't

Page 63

1   send us back actual information. What they send
2   us back is the patient care information, like when
3   you go to the ER or the urgent care and they give
4   you that --
5  Q   Like a sheet that says put ice on it or something?
6  A   Yeah, yeah, or follow-up with your doctor or come
7   back if this gets worse or blah, blah, blah. But
8   that doesn't tell me anything medically.
9         And so I have encountered that
10   problem multiple times with multiple cases and
11   still do.
12         And just so you know, we do have a
13   form in the DOC which goes in an envelope to the
14   provider, and the physician still doesn't fill it
15   out and will come back to me blank.
16  Q   I would empathize, but I'm sure I'll catch an
17   objection, so...
18         When you had people who were sent
19   out to the emergency department and they came back
20   with just those patient care sheets without any
21   actual medical information from the physician that
22   they saw, would they then be admitted to the jail
23   while you waited on that medical information?
24         MR. RUSSART: Object to the form.
25         MR. KNOTT: Vague, overly broad, form.

Case 2:17-cv-01112-JPS   Filed 08/31/18   Page 19 of 38   Document 107-1

Page 64

1    MR. RUSSART:  Join.
2  BY MS. KLEINHAUS:
3  Q   Go ahead.
4  A   Okay.  So, yes, they would be because I really
5      don't have the right to turn them away.
6          I have -- when I first was working
7      there, I would send the patient back and forth,
8      but actually what would end up happening is that
9      when the patient was, you know, being transported
10     back and forth, that's not necessarily good for
11     the patient.  So rather than getting into a
12     pissing contest over paperwork -- I still have to
13     take that patient.  I have no authority to release
14     an inmate.
15         So, yes, we would take them back,
16     and then oftentimes we'd be on the phone the next
17     morning demanding the paperwork or asking the
18     nurses to get the paperwork so I had some idea of
19     what went on.  I'm assuming, since you were
20     cleared by the emergency room and sent back, that
21     you have been cleared by the emergency room.  If
22     you had not been cleared, you would have been
23     admitted.  If you're not admitted, I have to take
24     you back, with paperwork or without paperwork.
25 Q   I see.

Page 65

1  A   My job, though, is to hunt down that paperwork.
2  Q   Was this problem something you ever discussed with
3      Dr. Gable?
4  A   I have discussed it with everybody.
5  Q   During the time that you worked at Armor in the
6      Milwaukee County Jail, did you ever see any
7      improvement in solving that problem?
8  A   It would improve and then get worse and improve
9      and get worse.
10         We had actually had a meeting, I
11     think with Aurora, though, about the paperwork.
12     We had also had a meeting with someone from the ER
13     at Froedtert to make them understand what the SMU
14     is and where they are sending a patient back to.
15     We actually had them come into the SMU, and I
16     showed them, this is the SMU.  You're thinking
17     that we have a hospital in here.  We don't.  This
18     is a jail, not a hospital.
19 Q   Around when in your time at Armor did you have the
20     Froedtert folks come for the on-site visit?
21 A   I don't recall exactly but it was before this
22     case.
23 Q   Before this incident with Ms. Terry?
24 A   Yes.
25 Q   Okay.

Page 66

1  A   And I have, on behalf of many patients, gotten on
2      the phone with the medical provider and said,
3      "Okay.  What's going on?"
4  Q   When patients would come back without the proper
5      medical documentation, did you ever issue any
6      orders on rounding because of that, for example,
7      we don't know anything about why this person was
8      cleared, the medical staff should check on this
9      person more frequently till we know what's going
10     on, something like that?
11         MR. RUSSART:  Object to the form of the
12     question.
13         MR. KNOTT:  Join.
14         THE WITNESS:  I'm not sure what you're
15     asking me.
16 BY MS. KLEINHAUS:
17 Q   Yeah.  Let me see if I can make it better.
18 A   I mean, I instructed staff to get the paperwork.
19 Q   Right.  You would instruct the --
20 A   Is that your question?
21 Q   -- staff to get the paperwork.
22         If I'm understanding correctly, the
23     hunt for the paperwork could take some time.
24     During that period of time of hunting down the
25     paperwork, were there ever medical orders given to

Page 67

1      increase observation because we don't have all the
2      information that we need?
3  A   I don't recall a specific order.
4  Q   Were you adequately staffed at the jail to be able
5      to order additional observation if you wanted to?
6  A   I don't recall.  However, I will tell you that she
7      was put in the special medical unit, as were other
8      patients.  The special medical unit is on the same
9      floor as the nursing station.  So they were very
10     close.  There's a guard there all the time, as
11     opposed to being up in the tiers where you really
12     didn't have enough contact.
13 Q   So from a medical perspective, the SMU was the
14     highest level of observation, as compared to the
15     housing pods.  It was --
16 A   Yes.  It was --
17 Q   -- a higher level of observation?
18 A   -- a much higher level than the housing pod.
19         Housing pod would -- no one's going
20     to come knocking on your door.
21 Q   Right.  And your expectation was that the officer
22     assigned to the SMU was knocking on doors or
23     checking in some fashion?
24 A   I don't know what his --
25         MR. KNOTT:  Object.  Form, foundation.

Page 68

1         THE WITNESS:  Yeah, I don't know what
2    his rounding is.  I know they have rounds, but I
3    don't know what the format is.
4    BY MS. KLEINHAUS:
5    Q    Okay.  And the medical station you described, is
6         that the same as the clinic across the hall from
7         the SMU?
8    A    No.  Here's the medical station.  The SMU is
9         sitting in -- oh, you mean the nurses' station or
10        the station where the guard is sitting?
11   Q    Maybe I misunderstood.
12            I thought you were saying that --
13   A    No.  Here's --
14   Q    -- the SMU has a nurse --
15   A    -- the SMU -- here's the SMU.  It's a locked unit.
16        There's a guard in the unit.  If you walk right
17        down the hall and go out the locked door, the
18        nurses' station is here with the exam and clinic
19        rooms.  So the nurses' station is literally not
20        even a minute away from the SMU.
21   Q    Okay.  Was it your understanding that there was a
22        nurse assigned, even if it wasn't her exclusive
23        assignment, but there was a nurse assigned to the
24        SMU every shift?
25            MR. KNOTT:  Object to form.

Page 69

1         THE WITNESS:  I am not certain.  I
2    believe so, but again, I don't want to confuse
3    that with my current policies.
4         MS. KLEINHAUS:  Okay.
5         MR. KNOTT:  So I would add an objection
6    on foundation based on the answer.
7    BY MS. KLEINHAUS:
8    Q    When you were on call all the time that you
9         weren't on vacation, was that like a pager, or
10        would they call a cell phone?  How did that work?
11   A    I had them call my cell phone.
12   Q    Okay.  I'm going to show you what we'll mark as
13        Exhibit 3.
14            MS. KLEINHAUS:  And, Doug, if you have
15        the documents on your machine, I can give you the
16        Bates number, or you can take a look at this copy
17        first.
18            (Exhibit 3 marked for identification.)
19   BY MS. KLEINHAUS:
20   Q    Dr. Buono, are you familiar with this document?
21   A    Yes.
22   Q    And is this one of the ones that you reviewed
23        before your deposition today?
24   A    Yes.
25   Q    Okay.  Look with me, please, on the page that's

Page 70

1    marked ARMOR 20.  If you go about two-thirds of
2    the way down, it's -- well, strike that.
3         On the page marked ARMOR 20, it's
4    marked at the top as "3/10/2014."
5    A    Yes.
6    Q    And if you go two-thirds of the way down, it
7         notes -- I believe these notes are from
8         Margaret Hoover.  And it says, "Dr. Buono notified
9         at 4:55.  Message left."
10            Do you see that part?
11   A    Yes.
12   Q    Do you recall if that was the message you got that
13        Ms. Terry had delivered?
14   A    I don't recall.
15   Q    Okay.
16   A    I'm assuming it is because --
17   Q    Sure.
18   A    -- that's what it says.
19   Q    Turn with me, please, to ARMOR 21.  And I'll
20        represent to you I believe this is a note by
21        Nurse Exum.
22            And on 21 there's a section
23        about -- right towards the top, called
24        "Objective."  Do you see that part?
25   A    Yes.

Page 71

1    Q    It says:  "Writer called Dr. Buono at 1:15 a.m.
2         and informed of return from hospital with no new
3         orders."
4            Am I correct -- is your
5         understanding this means the patient came back and
6         that the hospital didn't include any new orders?
7    A    Correct.
8    Q    And then the next portion says:  "Dr. Buono asked
9         writer to call FMLH and ask for an official
10        discharge summary, one that has information on
11        what was done with the patient at the hospital."
12   A    Yes.
13   Q    And is that consistent with the problem you were
14        just describing --
15   A    Oh, yes.
16   Q    -- where the patients come back and you don't have
17        the necessary information?
18   A    Yes.
19   Q    Okay.  Look a little farther down under "Plan."
20        It describes information that Nurse Exum obtained
21        by phone from a nurse at Froedtert.
22   A    Mm-hmm.
23   Q    After you've had a chance to review that to
24        yourself, do you know if you were ever given that
25        information by Nurse Exum?

Page 72

1  A   I don't recall at this point, but if she called
2  me -- and this is my standard thing:  Get the
3  notes for the patient, what happened.  And the
4  reason I want the notes is because I want to make
5  sure that the doctor looked at the things that he
6  should have looked at.
7         So one of the things that would
8  have been done on the physical was did the doctor
9  check her cervix.  If her cervix was wide and
10 dilated, why didn't he keep her?
11        Now, she comes back.  She says no
12 contractions, if you noticed on the first page, on
13 the top here.
14        Okay.  So patient comes back, no
15 contractions.  So she is not in labor at present.
16 She was seen by L&D.  I'm assuming that they did
17 what they're supposed to do, which is you put your
18 fingers in there and you check the cervical os to
19 see if it's open.  If it was open, then I would
20 have argued, send her back.
21 Q   Is it fair to say you never -- never did find out
22 to what degree she was experiencing contractions
23 or to what degree she -- strike that.  That's a
24 compound question.  I'll do it better.
25        Were you ever informed by Froedtert

Page 73

1  how dilated she was during that visit?
2  A   I had no notes at all from Froedtert.  The only
3  thing we had from Froedtert was the goofy
4  paperwork that they sent back.
5  Q   Did you ever, at any point, subsequent to this
6  time period we're talking about here in this
7  document, find out how dilated she was at
8  Froedtert?
9  A   I never saw any other paperwork after this.
10 Q   Okay.
11 A   I never even saw this paperwork.
12 Q   Okay.  And fair to say you were also never
13 informed by Froedtert of any contractions or
14 pressure that she experienced at Froedtert,
15 correct?
16 A   Nothing.
17 Q   Okay.
18 A   I'm assuming, since they sent her back -- again,
19 we sent her for an evaluation at the L&D.
20 Q   Labor and delivery?
21 A   Right.  And the labor and delivery person said
22 she's not in labor.  And I would assume that the
23 provider there asked her how pregnant were you or
24 how many times have you been pregnant -- and she's
25 a gravida 13 -- and didn't feel that this person

Page 74

1  needed to stay, just on the basis of having 13
2  pregnancies.
3  Q   Let me make sure I --
4  A   So here's the history that an L&D doctor would
5  have gotten --
6  Q   Sure.  I understand the patient history.  I think
7  I'm just trying to understand, you never actually
8  found out why they sent her back, correct?
9  A   They sent her back because she cleared.  She
10 wasn't in labor.
11 Q   How do you know that?
12 A   Patient has no contractions.  She was seen in the
13 labor and delivery suite.  Evaluated by the
14 OB/GYN, and told, "You're not in labor.  Come back
15 when you're in labor."
16 Q   Okay.  I follow your logic.  I want to make sure I
17 understand.
18        You're making the assumption if
19 she's at the jail and the jail record says she
20 denies contractions that --
21 A   No.  The nurse called me and said, "They sent her
22 back.  They said" -- and I remember this -- "'She
23 is not in labor.  Come back when you're in
24 labor.'"
25 Q   Okay.

Page 75

1  A   I said, "Get the notes."
2  Q   I see.
3  A   Because I wanted to make sure that the evaluation
4  that was done was appropriate.
5  Q   Okay.  Now I get it.
6         Do you know the source of the
7  nurse's comment, "She's not in labor," the source
8  of that information?  I don't mean in the
9  document.  I just mean how did she know that she
10 wasn't or she was?
11 A   I don't know the source of her information.
12 Q   Okay.  All right.  You can put Exhibit 3 to the
13 side.
14        Was it your decision that Ms. Terry
15 should go to the SMU versus the regular housing
16 pod?
17 A   I don't recall.  I would have done that.  That
18 would be logical for me to do.  However, we also
19 have protocols, because she is so many -- so many
20 weeks pregnant, and I don't remember if it was my
21 order, because I don't have my orders, or if that
22 was the protocol for her to go to the SMU.
23 Q   Okay.  It could have been either one of those?
24 A   It could have been either one of those.  But I'm
25 meticulous enough that I would have said, no, keep

eserved.

Page 76

1  her there and keep an eye on her.
2  Q  Got it.
3  Did you have any role in deciding
4  to put her in the isolation unit in the SMU versus
5  a non-isolation cell?
6  A  No.
7  Q  Would there be any reason that you would order
8  someone in their third trimester to be in an
9  isolation unit?
10  A  Absolutely not, unless they had some horrible
11  infectious disease.
12  Q  Okay.
13  A  But in that case they would be in the hospital.
14  Q  Right.
15  What is the purpose of the
16  isolation units in the SMU?
17  A  Years ago --
18  MR. KNOTT:  Object.  Vague, overly
19  broad.
20  MR. RUSSART:  Foundation.
21  MR. KNOTT:  Join.
22  BY MS. KLEINHAUS:
23  Q  Go ahead.
24  A  Okay.  Basically, if you have somebody who has an
25  infectious disease that could be communicable.

Page 77

1  Mostly tuberculosis would be the main one.
2  Q  I see.  So the idea was to separate that patient
3  to prevent spread of a disease?
4  A  Correct.
5  Q  So I think we've discussed already that you were
6  left a message sometime in the morning hours of
7  March 10th about Ms. Terry.  And then you would
8  have called back to the staff, the healthcare
9  staff, at the jail, correct?
10  A  I may have.  I don't recall.
11  Q  Okay.
12  A  It's not documented.
13  Q  Okay.
14  A  And I got hundreds of phone calls in my tenure.
15  Q  Sure.  So you have no recollection of any
16  additional -- I'm sorry.  Strike that, please.
17  So there's the conversation that
18  you have where you say, yeah, send her out, and
19  then there's the message left for you --
20  A  Three hours later that she had delivered.
21  Q  Okay.  And I suppose there's one in between that,
22  that she's back from the hospital and she doesn't
23  have any papers.
24  A  Yes.
25  Q  So there's a total of three communications then

Page 78

1  third of which is just a --
2  A  Yes.  And, now, I don't see --
3  Q  -- message.
4  A  Where's the order that I said -- where is the
5  order that said I sent her out?  I don't recall
6  that.  I'm assuming I did, but it says here,
7  "Writer called Dr. Buono and informed of return of
8  patient."
9  Do you have one that says I --
10  Q  I will --
11  A  -- that they asked me to send it out.
12  Q  I will check and see if I have anything.
13  A  I'm assuming I sent her out, but I may not have.
14  I may have just gotten the call that she came
15  back.
16  Q  I see.  Okay.  Well, fair enough.
17  It may have been you; it may have
18  been the nurse practitioner.  Someone sent her
19  out.
20  A  Right.
21  Q  Okay.  So that means we're sure of two
22  communications:  One is she's back from the
23  hospital, she doesn't have any papers, and the
24  second is a message saying she delivered.
25  MR. RUSSART:  Object to the form of the

Page 79

1  question.
2  BY MS. KLEINHAUS:
3  Q  You can go ahead.
4  A  Yes.
5  Q  Okay.  Do you remember any other communications
6  during that nighttime period about her?
7  A  No.
8  Q  Okay.  Did you have discussions about this
9  incident subsequent to that, you know, like the
10  next day or the next few weeks?
11  A  No.  Not that I can recall.
12  Q  Was there ever any kind of debriefing of the
13  incident --
14  A  Not that I can recall.
15  Q  Okay.  I'm going to show you what we'll mark as
16  Exhibit 4.
17  MS. KLEINHAUS:  And this is ARMOR 10.
18  And if you want to take a look,
19  Doug, I'll pass you my copy.
20  (Exhibit 4 marked for identification.)
21  BY MS. KLEINHAUS:
22  Q  Have you had a chance to familiarize yourself with
23  this?
24  A  I have now.
25  Q  Great.  So this appears to be a medical record

Page 80

1  from a few days --
2  A   After.
3  Q   -- after the delivery, March 14th of 2014.
4         Am I reading this right, that you
5  would have seen Ms. Terry -- or I'm sorry.  Strike
6  that, please.
7         Does this represent that you
8  actually --
9  A   Reviewed the --
10 Q   -- met with her --
11 A   No.
12 Q   -- or you reviewed the chart?
13 A   Reviewed the chart.
14 Q   Okay.  What would be the reason for reviewing the
15 chart?
16 A   To review whether or not she needs to go to
17 general population for her placement.
18 Q   I see.  So to decide when she comes back from the
19 hospital where is she going; is that right?
20 A   Yes.
21 Q   Okay.  Under the -- in the SOAP note under
22 "Subjective," you have:  "She was placed in the
23 SMU for obs s/p."
24 A   Yeah.
25 Q   Can you tell me what that means?

Page 81

1  A   In English.  I'll tell you in English.
2  Q   Thank you.  Please.
3  A   "She was placed in SMU for obs status/post a
4  percipitous [sic] delivery into the bed."
5  Q   I see.
6  A   This is after she delivered.
7  Q   Okay.
8  A   I think I have a typo here.
9         "She had opiate addiction.  She
10 went through withdrawal at the hospital.  She was
11 placed on a clonidine patch.  Was also given
12 Ativan for anxiety.  She is currently out to
13 court," which means she's not available to
14 evaluate, physically put my hands on her.  "The
15 nurse reports no problems with her currently."
16        She had some vital signs done that
17 morning.  Status, patient -- "Assessment" was
18 "Patient status/post percipitous [sic] delivery.
19 History of opiate abuse."
20        "Plan: DC to general population" --
21        MR. RUSSART:  Slow down a little bit --
22        THE WITNESS:  Sorry.
23        MR. RUSSART:  -- if you would.  Thanks.
24        THE WITNESS:  "d/c clonidine patch;
25 put on opiate and benzo withdrawal protocol" --

Page 82

1  "monitor; infirmary protocol for withdrawal; d/c
2  Ativan" -- "d/c" means to stop -- "follow up with
3  healthcare provider" -- "women's health provider
4  on 3/17."
5  Q   Okay.  Am I understanding correctly in the note
6  that the clonidine patch and the Ativan were
7  prescribed at the hospital and it's being
8  discontinued at the SMU?
9  A   Yes.
10 Q   Okay.  Do you know what the clonidine patch was
11 prescribed for?
12 A   It's for D -- it's for withdrawal, opiate
13 withdrawal.
14 Q   Okay.  In your note you use the term "percipitous
15 [sic] delivery."
16        What does that mean?
17 A   Well, were you -- yeah -- well, first of all, were
18 you intending to use it with a specific medical
19 meaning?
20 A   Yes.
21 Q   Okay.  And what was the medical meaning you wanted
22 to assign?
23 A   The medical meaning of a "precipitous delivery" is
24 one that was unexpected and very rapid.
25 Q   And was your determination that it was -- well,

Page 83

1  strike that, please.
2         At the point that you made these
3  notes, you hadn't seen anything from Froedtert or
4  from Aurora about her care outside of the SMU,
5  correct?
6  A   I couldn't say that.  I mean, if I'm writing this
7  note, I reviewed her chart, which means I probably
8  did have some paperwork for her at that point.
9  Q   Okay.  Would you have known at the time that you
10 made this note how many hours she was in labor
11 before she delivered?
12        MR. RUSSART:  Object to the form of the
13 question.
14        THE WITNESS:  I'm not sure what you're
15 asking me.
16        MR. KNOTT:  Object to form.
17 BY MS. KLEINHAUS:
18 Q   My understanding, when you say it was an
19 unexpected and very rapid delivery, is that
20 there's some evaluation of how fast or slow it
21 was.  And my question is whether at the time that
22 you characterized it as a "precipitous delivery,"
23 if you knew how long the labor had taken.
24 A   It was under three hours because she was evaluated
25 in the emergency room and labor and delivery at

Page 84

1　　Froedtert and delivered in a period of three hours
2　　into the bed.
3　Q　And that, again, is based on whatever information
4　　the nurse had --
5　A　Yes.
6　Q　-- about her status coming back?
7　A　Right. And also if she had been in labor in the
8　　hospital, they would have kept her.
9　Q　Okay. So it kind of -- it goes back to the
10　　subjects we covered before: We don't know the
11　　specific source of the nurse's information, but
12　　your assumption is they would have kept her if she
13　　was in labor?
14　A　If she was in active labor, which means a certain
15　　number of contractions per period of time -- and I
16　　think it's -- what is it, one contraction every
17　　two minutes?
18　Q　You believe they would have kept her?
19　A　Then they would have kept her.
20　　　　　When she came back, she was also
21　　not complaining of contractions.
22　Q　According to the nurse's note, right.
23　A　Well, the nurse asked the patient. Subjective.
24　　At present, patient was complaining of some
25　　pressure at the bottom. She denied contractions

Page 85

1　　at present.
2　Q　Got it.
3　A　Okay. So that came directly from the patient,
4　　which means at the time she came back, she wasn't
5　　having contractions every two minutes, which would
6　　have been active labor. And then, in a period of
7　　three hours, delivered a baby.
8　Q　Okay.
9　A　That is considered precipitous.
10　Q　Okay. I'm going to show you what we'll mark as
11　　Exhibit 5.
12　A　Can I just check my phone for a second?
13　　　　　MS. KLEINHAUS: Oh, sure. Let's go off
14　　the record for a second.
15　　　　　(Exhibit 5 marked for identification.)
16　　　　　(Discussion was held off the record.)
17　BY MS. KLEINHAUS:
18　Q　Have you had a chance to review Exhibit 5?
19　A　Mm-hmm.
20　Q　Okay. If I'm reading it correctly, I believe it
21　　documents a visit that Dr. Boyd Organ had with
22　　Ms. Terry.
23　　　　　Is that how you read it?
24　A　You mean this is Dr. Organ's note?
25　Q　I believe so.

Page 86

1　A　Okay. Mm-hmm.
2　Q　Can you -- first of all, hopefully a simple
3　　question: Can you tell me what Dr. Boyd Organ's
4　　role was at the jail?
5　A　She was an OB doctor who came to the jail to do
6　　women's health.
7　Q　Was she --
8　A　She's an OB doc.
9　Q　Got it. Not employed by Armor but an outside
10　　specialist coming in. Is that fair to say?
11　A　Yeah. In the -- I'm not sure how she was paid or
12　　who she was subcontracted with, when you said not
13　　"employed by Armor."
14　Q　Sure. She may have been a subcontractor. So
15　　maybe my question was unclear.
16　　　　　At any rate, no matter what her
17　　employment status was, I wanted to turn, please,
18　　to the page that's marked "ARMOR 6" at the bottom.
19　A　ARMOR 6.
20　Q　About halfway down that page there's a section
21　　called "Plan." Do you see that?
22　A　Mm-hmm.
23　Q　And it says: "I discussed patient concerns with
24　　Dr. Buono and Gable regarding emergency delivery
25　　in jail." Do you see that part?

Page 87

1　A　Yep.
2　Q　Do you recall having a conversation with Dr. Organ
3　　about the emergency delivery and the patient's
4　　concerns?
5　A　No.
6　Q　Okay. So fair to say, you don't know what those
7　　concerns were; is that right?
8　A　That would be fair.
9　Q　Okey-dokey. You can put that to the side.
10　　　　　MS. KLEINHAUS: Okay. I think I'm about
11　　through. I want to go off the record for two
12　　minutes and check my notes and then I think I'm
13　　done.
14　　　　　MR. RUSSART: Okay. Let's take a break,
15　　and I may have some questions.
16　　　　　(Recess taken from 12:42 p.m. to 12:47 p.m.)
17　BY MS. KLEINHAUS:
18　Q　Just a couple other questions for you.
19　　　　　Is it fair to say you never had any
20　　discussion about whether any of the nursing staff
21　　could have or should have done anything to prevent
22　　Ms. Terry from giving birth alone in the isolation
23　　unit?
24　A　I had no discussion with them. I did not feel,
25　　and even today I don't feel, that that really was

Page 88

1  their fault.
2 Q  Sorry.  Is your answer complete or --
3 A  No.  I'm going to add something else.
4 Q  Go ahead.
5 A  You know, having a baby is a difficult thing, and
6    it occurs all over the world, and it occurs in all
7    kinds of situations, and it's one of the most
8    unpredictable things, especially when someone
9    who's had so many pregnancies.  So women have
10   given birth in fields.  They've given birth in
11   cars.  They've given birth in toilets.  In the
12   most unexpected ways.
13           I don't think it could have been
14   predicted that this would have happened.  If the
15   labor and delivery specialist didn't think that
16   this person was in labor, I think it was
17   reasonable to assume then that it was unlikely she
18   was going to suddenly deliver.  But it's possible.
19           Just like, you know, you have a
20   stress test, you pass the stress test, you walk
21   off the treadmill, and you drop dead.
22 Q  The opinion that you're providing about the number
23   of pregnancies, would that be at all different if
24   you knew that ten of those are spontaneous
25   miscarriages; in other words, perhaps three

Page 89

1  previous deliveries, not 13.
2           Does that change your opinion at
3    all?
4 A  Three is still -- you know, some women will give
5    birth after the first one very quickly the second
6    time.  After three -- again, very quickly after
7    the third one.
8 Q  So if I understand you correctly, you're saying
9    it's --
10 A  It's an unpredictable thing.  It's different for
11   each woman.  Some women will labor for hours and
12   hours and some women will not.
13 Q  But everyone labors for some period of time before
14   they --
15 A  Not necessarily.
16 Q  -- pop out a baby.
17 A  Very quickly.  It can happen very, very quickly.
18   Minutes.
19           If the cervix is used to dilating,
20   it dilates quickly.  I am not an expert in the
21   field, but that's just from experience.
22 Q  Okay.  Do you believe that there's anything that
23   any correctional staff could have done to prevent
24   her from giving birth by herself in a jail cell --
25           MR. KNOTT:  Form.

Page 90

1           MS. KLEINHAUS:  And I'm sorry --
2           MR. KNOTT:  Form, foundation.
3           MS. KLEINHAUS:  I'll fix it.
4 BY MS. KLEINHAUS:
5 Q  Do you believe there's anything that any
6    correctional staff could have done to prevent her
7    from giving birth in the isolation unit?
8           MR. KNOTT:  Well, form, foundation.
9 BY MS. KLEINHAUS:
10 Q  Go ahead.
11 A  I can't answer that question.
12 Q  You don't know?
13 A  I don't know.
14 Q  Okay.
15           MS. KLEINHAUS:  I think that's all I
16   have.
17           THE WITNESS:  I do have a comment,
18   though.
19           MR. RUSSART:  No.  I have one question
20   for you.
21           Do you want to go?
22           MR. KNOTT:  I have just a couple
23   questions.
24           MR. RUSSART:  Okay.  Go ahead.
25           EXAMINATION

Page 91

1 BY MR. KNOTT:
2 Q  Doctor, I introduced myself.  I'm Doug Knott.  I
3    represent the Milwaukee County defendants.
4           You understand that?
5 A  Okay.
6 Q  Yes.  I'm just -- I introduced myself before the
7    deposition.
8           First of all, just -- a consent
9    decree, as you understand it, was a voluntary
10   settlement and a commitment by the county to meet
11   certain standards; is that correct?
12 A  Correct.
13 Q  And the NCCHC accreditation process was a
14   mechanism to meet those standards, true?
15 A  Correct.
16 Q  And while you were medical director of the
17   Milwaukee County Jail, in your opinion, did the
18   county, in good faith, strive to meet NCCHC
19   accreditation?
20 A  Yes.
21 Q  Briefly, the concern about lack of documentation
22   when an inmate comes back from a hospital, that
23   was not your preference that they come back
24   without documentation, true?
25 A  Explain that, please.

Page 92

1   Q   I think I'm saying something that's obvious.
2           It was not your preference, as
3   medical director, that inmates sent to a hospital
4   come back to the jail without appropriate
5   documentation.  Is that a fair statement?  That
6   would not be what you would want to have happen?
7   A   Absolutely.
8   Q   That is a fair statement?
9   A   It is a fair statement that I would prefer the
10  patient to always come back with the information
11  from the evaluation I sent them out to get.
12  Q   And you felt, as medical director, that the jail
13  was not in a position of rejecting those patients
14  if they did not have adequate documentation?
15  A   We absolutely could not reject them.
16  Q   Okay.  So it was not a policy of the jail to
17  willingly accept people without documentation.
18  That was not their policy.  That was not their
19  preference, true?
20  A   I do not know --
21          MS. KLEINHAUS:  Object to the form.
22          Go ahead.
23          THE WITNESS:  I do not know if it is a
24  policy or not of the jail.  I know that, medically
25  speaking, it is prudent to get the information in

Page 93

1   order to continue to care for the patient.
2           However, you cannot -- as far as I
3   understood it, I could not not accept a patient
4   back into the jail, and it would sometimes be to
5   the patient's detriment to play ping pong with
6   them sending them back to the hospital, because
7   the hospital did not have to accept the patient at
8   all.  They would end up -- I had had this on
9   multiple occasions where I sent them back to the
10  hospital, and they sent them back again.
11          And so I have an uncomfortable
12  patient, and I have some security people, who are
13  not medical people, who are then put in the
14  position of having to monitor a patient,
15  basically, as they're transported back and forth.
16  BY MR. KNOTT:
17  Q   So that --
18  A   It's not in the best interest of the patient to
19  play ping pong with them.
20  Q   And so the decision was made, in the best interest
21  of the patient, to admit them to the jail?
22  A   To take them back to the jail.  They had been
23  cleared.  That individual then could be monitored
24  correctly, and we can get the paperwork.
25          And that paperwork would

Page 94

1   sometimes -- because, remember, on the other side,
2   the provider on the other side is now seeing
3   multiple patients, doing multiple dictations, so
4   it may take a little bit of a lag time, but I
5   still could not, in good faith, leave this patient
6   in a car going back and forth.
7   Q   That would be a frustrating situation for you as
8   the medical director.
9   A   Very much so.
10          MR. KNOTT:  All right.  That's it.
11  Thank you.
12          MR. RUSSART:  Just a follow-up on the
13  questions that Mr. Knott had.
14          EXAMINATION
15  BY MR. RUSSART:
16  Q   What steps were taken to ensure patient safety and
17  good patient care when a patient came back to the
18  jail without the proper paperwork?
19  A   They would -- well, I would request the nursing
20  staff to get the paperwork, or if I was there, I
21  would call for that paperwork, and then we would
22  put them in a place, basically, where we could
23  monitor them better, if it was something that was
24  very concerning to me.
25  Q   Was there ever a circumstance where you would try

Page 95

1   to get an oral report about what happened at the
2   jail -- I mean, at the hospital?
3   A   Yes.
4   Q   Okay.  Explain how that would happen.
5   A   Usually nursing would call and actually talk to
6   someone, or if I'm on that -- if I'm there that
7   day, I would also call and actually get a report.
8   Q   I want to point to you on Exhibit 3, on ARMOR 21,
9   is there any evidence on this exhibit that there
10  was an oral report obtained about Ms. Terry?
11          MS. KLEINHAUS:  Objection to form.
12          MR. RUSSART:  What's wrong with the form
13  so I can correct it?
14          MS. KLEINHAUS:  The document speaks for
15  itself.
16          MR. RUSSART:  Oh.  Okay.
17  BY MR. RUSSART:
18  Q   Go ahead.
19  A   Do I answer the question?
20  Q   Yes.
21  A   Okay.  "The writer placed a call to Froedtert and
22  was transferred to ED and to L&D.  Writer spoke
23  with nurse and asked if we could get a discharge
24  paper that listed what was done.  Writer was
25  informed that they thought patient was there to

Page 96

```
 1    rule out labor, not because of heroin abuse.
 2    Writer was informed that she was going to be" --
 3    going to page the doctor."
 4            So the nurse spoke to the nurse in
 5    the L&D.
 6  Q   Okay.
 7  A   So she attempted to reach him.
 8  Q   All right.  And then earlier in the deposition you
 9    were asked a question about whether you were
10    surprised that Ms. Terry delivered in the SMU, and
11    I believe your answer was, "oh, yes."  Do you
12    remember that?
13  A   Oh, yes.
14  Q   You were never asked why you had the reaction of
15    why you were surprised.
16            Can you tell me why you were
17    surprised?
18  A   It was unexpected.  She went to L&D.  She was
19    evaluated in OB at Froedtert.  They sent her back,
20    I'm assuming stable.  That's why they sent her
21    back.  She delivered in the bed.
22            There was no other evaluation.
23    Nothing happened in the interim.  She came back
24    stable.  Delivered in the bed.
25            MR. RUSSART:  Okay.  That's all.
```

Page 97

```
 1            THE WITNESS:  Pretty -- pretty shocking
 2    to me.
 3            MS. KLEINHAUS:  Okay.  Thanks very much.
 4    It was nice meeting you.
 5            * * * *
 6            (Deposition concluded at 12:57 p.m.)
 7    (Original exhibits retained by court reporter and
 8    attached to original transcript.  Copies provided
 9            with additional transcripts.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 98

```
 1    STATE OF WISCONSIN )
 2                       ) SS:
 2    MILWAUKEE COUNTY   )
 3
 4            I, Kealoha A. Schupp, RPR and
 5    Notary Public in and for the State of Wisconsin,
 6    do hereby certify that the preceding deposition
 7    was recorded by me and reduced to writing under my
 8    personal direction.
 9            I further certify that said
10    deposition was taken at HINSHAW & CULBERTSON, LLP,
11    100 East Wisconsin Avenue, Suite 2600, Milwaukee,
12    Wisconsin, on the 25th day of April, 2018,
13    commencing at 10:45 a.m.
14            I further certify that I am not a
15    relative or employee or attorney or counsel of any
16    of the parties, or a relative or employee of such
17    attorney or counsel, or financially interested
18    directly or indirectly in this action.
19            In witness whereof, I have hereunto
20    set my hand and affixed my seal of office on this
21    2nd day of May, 2018.
22
23            _____
23            Kealoha A. Schupp, RPR
24            Notary Public
25    My commission expires January 19th, 2020.
```

**WORD INDEX**

**< 1 >**
**1** *3:10* 39:5, *6, 8*
**1:15** 71:*1*
**10** 3:*11* 70:*4* 79:*17*
**10:45** 1:*13* 2:*9* 98:*13*
**100** 1:*15* 2:*7, 20* 98:*11*
**10th** 77:*7*
**11:53** 56:*1*
**12:01** 56:*1*
**12:42** 87:*16*
**12:47** 87:*16*
**12:57** 2:*10* 97:6
**13** 9:*12, 17* 59:*19*
  60:*15* 73:*25* 74:*1* 89:*1*
**14** 3:*11, 12, 12, 13*
**147** 39:*25*
**149** 39:*25*
**14th** 80:*3*
**17** 82:*4*
**17-CV-1112** 1:*5*
**18** 3:*13*
**1985** 9:*4*
**1996** 9:*11*
**19th** 98:*25*

**< 2 >**
**2** 3:*11* 55:*24, 25* 56:*4,
20*
**20** 70:*1, 3*
**2014** 13:*16* 56:22 58:*8*
  70:*4* 80:*3*
**2014-2015** 7:*21* 14:*15*
**2015** 53:*21*
**2018** 1:*8* 2:*8* 98:*12, 21*
**2020** 98:*25*
**21** 70:*19, 22* 95:*8*
**219** 2:*16*
**24** 16:22 19:*10, 16*
  43:*6* 58:*5*
**25th** 1:*8* 2:*8* 98:*12*
**2600** 1:*15* 2:*7, 20* 98:*11*
**2nd** 98:*21*

**< 3 >**
**3** 3:*11, 11, 12, 13* 69:*13,
18* 70:*4* 75:*12* 82:*4*
  95:*8*
**311** 2:*13*
**39** 3:*10*

**< 4 >**
**4** 3:*4, 12* 79:*16, 20*
**4:55** 70:*9*

**< 5 >**
**5** 3:*13* 85:*11, 15, 18*
**5:30** 57:*11*
**53202** 2:*17, 20*
**56** 3:*11*

**< 6 >**
**6** 86:*18, 19*
**60607** 2:*13*
**69** 3:*11*

**< 7 >**
**710** 2:*16*
**79** 3:*12*

**< 8 >**
**85** 3:*13*

**< 9 >**
**91** 3:*4*
**94** 3:*5*

**< A >**
**a.m** 1:*13* 2:*9* 56:*1*
  71:*1* 98:*13*
**abdominal** 36:22
**Aberdeen** 2:*13*
**ability** 22:*23*
**able** 5:*4* 26:*25* 36:*12*
  37:*5* 67:*4*
**above-entitled** 2:*2*
**absolutely** 52:*23* 76:*10*
  92:*7, 15*
**abuse** 81:*19* 96:*1*
**abuser** 59:*21* 60:*4, 15*
**accept** 92:*17* 93:*3, 7*
**accomplish** 32:*20*
**accred** 51:*11*
**accreditation** 25:*3*
  48:*20* 49:*9, 24* 51:*10,
11, 14* 91:*13, 19*
**accurately** 5:*5, 9*
**acronym** 48:*16*
**acting** 15:*11*
**action** 2:*2* 98:*18*
**active** 84:*14* 85:*6*
**actual** 63:*1, 21*
**add** 69:*5* 88:*3*
**added** 14:*20*
**addiction** 81:*9*
**addition** 20:*9*
**additional** 3:*18* 67:*5*
  77:*16* 97:*9*
**adequate** 92:*14*
**adequately** 50:*14* 67:*4*
**administrative** 6:*9*
  45:*23* 46:*4*
**administrator** 25:*14*
  35:*6*
**admit** 93:*21*
**admitted** 63:22 64:*23,
23*
**advertised** 54:*19*
**affixed** 98:*20*
**agenda** 47:*3*
**ago** 4:*19* 11:*3* 29:20
  41:*23* 76:*17*
**agree** 14:*5*

**ahead** 16:*4* 17:25 18:*3*
  26:*13, 17* 27:8 51:*13*
  57:*23* 64:*3* 76:*23* 79:*3*
  88:*4* 90:*10, 24* 92:22
  95:*18*
**al** 1:*6*
**Albany** 9:*3* 10:*2, 4*
**alleges** 47:*22*
**allowed** 37:*13*
**annoying** 50:*21*
**answer** 4:*24* 5:*5, 18*
  16:*4* 17:*11, 25* 18:*4, 6,
8* 19:*23* 23:*16* 32:22,
23* 50:*6* 69:*6* 88:*2*
  90:*11* 95:*19* 96:*11*
**answering** 5:*8*
**anxiety** 81:*12*
**anybody** 35:*21, 24*
**Anyway** 30:*17* 60:*10*
**apologize** 13:*14*
**Appeared** 2:*14, 17, 21*
**appears** 79:*25*
**apply** 13:22, 23*
**applying** 13:*6*
**appointments** 20:*11, 13*
**appropriate** 32:*7* 75:*4*
  92:*4*
**appropriately** 12:*12*
**April** 1:*8* 2:*8* 98:*12*
**area** 10:*21* 21:16 50:*23*
  62:*21*
**areas** 10:*7* 50:*23*
**argued** 72:*20*
**Armor** 2:*21* 6:*16, 17*
  7:*18* 8:*1, 11* 13:*2, 3, 6,
11, 20, 22* 14:*2, 14*
  15:*10* 16:*16, 16* 19:*7*
  22:*15, 22, 25* 23:*11*
  24:*2, 17* 29:*7, 12, 18*
  32:*2* 35:*6* 38:24* 39:*12,
25, 25* 40:*4* 41:*9, 12, 15*
  45:*6, 7, 9* 47:*16* 48:*3,
22* 51:22 54:*2* 55:*2, 21*
  56:*9* 59:*9, 12* 61:*4, 6*
  65:*5, 19* 70:*1, 3, 19*
  79:*17* 86:*9, 13, 18, 19*
  95:*8*
**Armor's** 62:*13*
**Arnold** 2:*16* 39:22*
**asked** 12:*13* 13:*14* 71:*8*
  73:23* 78:*11* 84:*23*
  95:*23* 96:*9, 14*
**asking** 4:*25* 12:*25* 27:*2*
  37:*10, 11* 42:*2* 64:*17*
  66:*15* 83:*15*
**Assessment** 81:*17*
**assign** 82:*22*
**assigned** 7:*7, 11* 34:*5*
  43:*16* 44:22* 58:*5*
  67:22* 68:*22, 23*
**assignment** 68:*23*
**associate** 6:*4*
**Associates** 9:*21*

**assume** 4:*25* 73:22
  88:*17*
**assuming** 64:*19* 70:*16*
  72:*16* 73:*18* 78:*6, 13*
  96:*20*
**assumption** 74:*18* 84:*12*
**Ativan** 81:*12* 82:*2, 6*
**attached** 3:*17* 97:*8*
**attempt** 51:*15*
**attempted** 96:*7*
**attend** 29:*9* 45:22* 46:*9*
  47:*14*
**attention** 56:*21*
**attorney** 98:*15, 17*
**audits** 33:*5*
**Aurora** 8:*2, 3, 8* 9:*15,
22* 65:*11* 83:*4*
**authority** 53:*1* 64:*13*
**authorized** 61:*13*
**automatic** 22:22*
**available** 19:*17, 18*
  30:*25* 31:*2* 81:*13*
**Avenue** 1:*15* 2:*7, 20*
  98:*11*
**aware** 38:*11*

**< B >**
**babies** 11:*2*
**baby** 57:*18* 85:*7* 88:*5*
  89:*16*
**bachelor's** 9:*3*
**back** 9:*9* 45:*25* 46:*1*
  55:*12* 57:*12* 62:*7, 9, 18*
  63:*1, 2, 7, 15, 19* 64:*7,
10, 15, 20, 24* 65:*14*
  66:*4* 71:*5, 16* 72:*11, 14,
20* 73:*4, 18* 74:*8, 9, 14,
22, 23* 77:*8, 22* 78:*15,
22* 80:*18* 84:*6, 9, 20*
  85:*4* 91:*22, 23* 92:*4, 10*
  93:*4, 6, 9, 10, 15, 22*
  94:*6, 17* 96:*19, 21, 23*
**bad** 4:22*
**bank** 57:*6*
**based** 69:*6* 84:*3*
**Basically** 11:*12* 16:*6*
  17:*5* 48:22* 76:*24*
  93:*15* 94:22*
**basis** 36:*23* 41:*4* 46:*14,
16, 20* 74:*1*
**Bates** 39:22, 24* 69:*16*
**bed** 57:*11* 81:*4* 84:*2*
  96:*21, 24*
**beginning** 28:*14* 33:*11*
**behalf** 2:*14, 17, 21* 66:*1*
**believe** 22:*1* 24:*23* 25:*12*
  43:*5* 49:*10* 69:*2* 70:*7,
20* 84:*18* 85:*20, 25*
  89:22* 90:*5* 96:*11*
**benefits** 14:*7*
**benzo** 81:*25*
**best** 5:*12* 93:*18, 20*

**better** 12:*20* 18:*25* 26:*18* 27:*12* 33:*13* 46:*6* 54:*3, 6* 66:*17* 72:*24* 94:*23*
**big** 50:*19*
**binder** 42:*10*
**birth** 87:*22* 88:*10, 10, 11* 89:*5, 24* 90:*7*
**bit** 23:*10* 81:*21* 94:*4*
**blah** 63:*7, 7, 7*
**blank** 63:*15*
**board** 12:*3, 3* 54:*14*
**board-certified** 10:*6, 8, 12*
**body** 50:*11*
**book** 27:*24, 25* 28:*1, 13* 31:*18, 21*
**booking** 21:*21* 22:*4* 24:*8* 58:*15*
**bottom** 84:*25* 86:*18*
**bought** 9:*23*
**Boyd** 85:*21* 86:*3*
**break** 56:*3* 87:*14*
**Briefly** 91:*21*
**bring** 12:*9* 62:*9*
**Broad** 16:*3* 63:*25* 76:*19*
**broader** 46:*7*
**brought** 58:*7*
**buck** 17:*5, 6*
**building** 43:*15*
**BUONO** 1:*8* 2:*1* 4:*2, 7* 11:*13* 56:*3* 69:*20* 70:*8* 71:*1, 8* 78:*7* 86:*24*
**Bureau** 6:*5*
**business** 35:*18, 20*
**buzz** 48:*7*

**< C >**
**call** 11:*2, 12, 12* 16:*20, 22, 23, 24* 18:*13, 14* 19:*10, 16, 24, 25* 20:*9* 21:*24* 22:*6, 11* 38:*1, 19, 20* 43:*14* 46:*25* 57:*11, 14* 58:*9* 59:*1* 61:*12, 15* 69:*8, 10, 11* 71:*9* 78:*14* 94:*21* 95:*5, 7, 21*
**called** 4:*2* 17:*1, 2, 3* 47:*9* 58:*11* 59:*4* 60:*24* 70:*23* 71:*1* 72:*1* 74:*21* 77:*8* 78:*7* 86:*21*
**Calls** 17:*9* 19:*19* 77:*14*
**car** 94:*6*
**Care** 9:*19* 11:*11* 17:*8* 18:*12* 30:*15* 32:*7, 9, 15* 45:*1, 2* 48:*1, 12* 50:*12* 59:*19* 60:*16* 63:*2, 3, 20* 83:*4* 93:*1* 94:*17*
**caring** 49:*3*
**carpal** 11:*24* 12:*1*
**cars** 88:*11*
**Case** 1:*5* 4:*11* 11:*24* 12:*15* 23:*7* 26:*3* 48:*3,*

*5* 65:*22* 76:*13*
**cases** 34:*19* 63:*10*
**catch** 63:*16*
**categories** 23:*1, 12*
**category** 46:*12*
**caused** 60:*22*
**cell** 21:*15, 15* 69:*10, 11* 76:*5* 89:*24*
**cells** 21:*17*
**Center** 9:*19*
**certain** 23:*1, 6* 25:*12* 27:*15, 16* 50:*12* 69:*1* 84:*14* 91:*11*
**certification** 10:*16, 18* 28:*19, 23* 49:*21*
**certified** 25:*1* 28:*18* 49:*19*
**certify** 98:*6, 9, 14*
**certifying** 50:*11*
**cervical** 72:*18*
**cervix** 72:*9, 9* 89:*19*
**chain** 19:*19*
**chairman** 8:*5*
**chance** 71:*23* 79:*22* 85:*18*
**change** 14:*19* 15:*6* 89:*2*
**changed** 9:*19* 10:*17*
**changes** 55:*18*
**characterized** 83:*22*
**charges** 51:*22*
**chart** 58:*20, 23* 80:*12, 13, 15* 83:*7*
**charts** 21:*11*
**check** 34:*10* 66:*8* 72:*9, 18* 78:*12* 85:*12* 87:*12*
**checking** 21:*11* 67:*23*
**check-ins** 33:*16*
**chemistry** 9:*3*
**Chicago** 2:*13*
**chief** 19:*6*
**Christensen** 24:*3* 51:*9* 53:*14*
**circumstance** 94:*25*
**Civil** 2:*4* 30:*15*
**clearance** 60:*12, 14*
**cleared** 64:*20, 21, 22* 66:*8* 74:*9* 93:*23*
**client** 56:*22*
**clinic** 20:*18* 44:*23* 45:*4* 68:*6, 18*
**clonidine** 81:*11, 24* 82:*6, 10*
**close** 23:*24* 67:*10*
**closer** 28:*18*
**collect** 25:*7, 11*
**College** 9:*2, 4* 10:*3*
**come** 20:*3* 21:*15* 24:*19, 20* 50:*16* 62:*7* 63:*6, 15* 65:*15, 20* 66:*4* 67:*20* 71:*16* 74:*14, 23* 91:*23* 92:*4, 10*
**comes** 72:*11, 14* 80:*18* 91:*22*

**Coming** 57:*10, 12, 15* 60:*12* 84:*6* 86:*10*
**commencing** 2:*9* 98:*13*
**comment** 30:*12* 75:*7* 90:*17*
**commentary** 52:*5, 20*
**commission** 48:*14* 98:*25*
**commitment** 91:*10*
**committee** 6:*11* 32:*6, 17, 18, 25* 33:*3, 4* 45:*23* 46:*4*
**common** 40:*25* 62:*23*
**communicable** 76:*25*
**Communication** 3:*10*
**communications** 40:*9* 77:*25* 78:*22* 79:*5*
**company** 41:*23*
**compared** 67:*14*
**complained** 12:*11*
**complaining** 36:*22* 59:*21, 23* 60:*20* 84:*21, 24*
**complaint** 12:*2, 9, 10* 47:*21*
**complete** 88:*2*
**compound** 72:*24*
**computer** 42:*10, 12*
**concern** 37:*20, 24* 91:*21*
**concerning** 94:*24*
**concerns** 22:*11* 25:*20, 22, 22* 26:*1* 59:*15, 17* 86:*23* 87:*4, 7*
**concluded** 97:*6*
**concluding** 2:*9*
**conclusion** 17:*10*
**condition** 5:*4, 9*
**conduct** 28:*10* 45:*10*
**conducted** 45:*7*
**confess** 26:*23*
**confuse** 34:*22* 62:*13* 69:*2*
**confusing** 43:*11*
**consent** 24:*3, 7* 51:*9* 53:*14* 91:*8*
**considered** 34:*23* 62:*2* 85:*9*
**consist** 6:*8* 21:*9* 24:*18* 25:*19*
**consistent** 14:*18* 71:*13*
**consult** 20:*16* 41:*12, 15*
**consulted** 42:*6*
**contact** 67:*12*
**contained** 40:*8*
**content** 40:*7*
**contest** 64:*12*
**continue** 20:*5, 7* 93:*1*
**contract** 13:*20*
**contraction** 84:*16*
**contractions** 72:*12, 15, 22* 73:*13* 74:*12, 20* 84:*15, 21, 25* 85:*5*
**conversation** 41:*1* 48:*8*

77:*17* 87:*2*
**conversations** 38:*7* 40:*9*
**conveyed** 40:*8, 18*
**cool** 30:*2, 3* 31:*1, 5, 7*
**Copies** 3:*17* 55:*7* 97:*8*
**copy** 39:*18, 20* 69:*16* 79:*19*
**Correct** 8:*18* 10:*20* 13:*3, 4, 10* 20:*17, 19* 25:*15* 41:*3, 6* 48:*10, 11* 58:*4* 71:*4, 7* 73:*15* 74:*8* 77:*4, 9* 83:*5* 91:*11, 12, 15* 95:*13*
**correction** 18:*18*
**Correctional** 2:*21* 3:*11, 12, 13* 6:*16, 17* 7:*9, 11, 18* 8:*1, 11* 13:*11* 14:*2* 25:*5* 26:*4, 6, 22* 27:*1, 10, 14* 30:*14* 36:*6, 10, 13, 16* 37:*6, 19, 25* 38:*7, 15, 18* 39:*2* 40:*10* 48:*15, 15* 89:*23* 90:*6*
**Corrections** 5:*24* 6:*6, 18* 7:*1, 4* 8:*12, 17* 15:*13* 34:*20* 49:*18* 50:*16* 54:*5, 15, 20*
**correctly** 66:*22* 82:*5* 85:*20* 89:*8* 93:*24*
**cosign** 17:*3* 20:*1, 6*
**counsel** 98:*15, 17*
**COUNTY** 1:*6* 2:*17* 6:*17* 12:*19, 22* 13:*2, 20* 15:*12, 16* 16:*2* 24:*2* 28:*22* 32:*5* 34:*20* 35:*7* 45:*6* 48:*20* 50:*13* 51:*4* 53:*13* 58:*8* 65:*6* 91:*3, 10, 17, 18* 98:*2*
**couple** 4:*17* 87:*18* 90:*22*
**course** 27:*12, 17, 22, 22*
**COURT** 1:*1* 3:*16* 5:*15* 46:*1* 97:*7*
**court,** 81:*13*
**cover** 20:*13*
**coverage** 21:*1*
**covered** 43:*13* 84:*10*
**covering** 19:*12* 21:*25* 22:*4, 4*
**CQI** 32:*6, 16*
**create** 59:*7*
**creating** 51:*3*
**credential** 49:*4*
**criminal** 51:*21*
**CULBERTSON** 1:*15* 2:*6, 19* 98:*10*
**current** 5:*23* 12:*6* 69:*3*
**Currently** 42:*11, 23* 81:*12, 15*
**customary** 62:*17*
**CV** 8:*25*

**< D >**

**Daily** 20:*21*
**data** 25:7, *11*
**date** 36:*21*
**dates** 7:*17*
**day** 2:*8* 16:*6, 22* 19:*10, 16* 20:22 21:25 22:2, *2, 9* 33:*11* 43:6 58:5 79:*10* 95:7 98:*12, 21*
**day-long** 29:*11*
**days** 16:*22* 19:*11, 16* 42:*24* 43:6 58:5 80:*1*
**DC** 81:*20*
**dead** 88:*21*
**dealt** 32:*18*
**death** 24:*8*
**deaths** 47:*17, 19*
**debate** 52:*10, 12*
**debriefing** 79:*12*
**decide** 21:*20* 62:2 80:*18*
**decided** 15:*18* 45:*9*
**deciding** 76:*3*
**decision** 22:*13, 17* 58:*18, 21* 75:*14* 93:*20*
**decision-making** 22:*19*
**decree** 24:*4, 7* 51:*9, 16, 16* 53:*14, 16* 55:*19* 91:*9*
**Defendants** 1:7 2:*18, 21* 91:*3*
**degree** 72:22, *23*
**deliver** 11:2 88:*18*
**delivered** 57:*10, 15, 16, 17* 70:*13* 77:20 78:*24* 81:6 83:*11* 84:*1* 85:7 96:*10, 21, 24*
**deliveries** 11:*10* 89:*1*
**delivery** 73:20, *21* 74:*13* 80:*3* 81:*4, 18* 82:*15, 23* 83:*19, 25* 86:*24* 87:*3* 88:*15*
**delivery,** 83:*22*
**Delta** 11:*1*
**demanding** 64:*17*
**denied** 84:*25*
**denies** 74:*20*
**Department** 5:*24* 6:5, *18, 25* 7:4 8:6 49:*18* 54:5, *14, 20* 62:8 63:*19*
**Deposition** 1:8 2:*1* 4:*12* 57:5, *21* 69:*23* 91:7 96:8 97:6 98:6, *10*
**describe** 36:*15* 37:5
**described** 15:*23* 55:*11* 59:*25* 68:5
**describes** 71:*20*
**describing** 71:*14*
**designate** 23:*1*
**designated** 23:*12*
**designation** 23:6
**details** 49:*20*
**determination** 82:*25*
**determine** 33:5

**determining** 33:*12*
**detriment** 93:5
**dictated** 62:*11, 19*
**dictations** 94:3
**different** 23:*11* 29:*18* 88:23 89:*10*
**difficult** 51:*1* 88:5
**dilated** 72:*10* 73:*1, 7*
**dilates** 89:*20*
**dilating** 89:*19*
**direct** 41:*15*
**direction** 98:8
**directly** 85:3 98:*18*
**director** 14:*11, 16* 15:*11, 16* 16:*1, 19* 19:4 21:*19* 22:*18* 42:*14* 91:*16* 92:*3, 12* 94:8
**discharge** 71:*10* 95:*23*
**discipline** 11:*17*
**discontinued** 82:8
**discretion** 62:*1*
**discretionary** 22:*23*
**discuss** 36:9
**discussed** 29:*17* 55:*10* 65:2, *4* 77:5 86:*23*
**discussing** 36:6
**discussion** 25:*19* 31:*19* 48:2 53:*11* 85:*16* 87:20, *24*
**discussions** 79:8
**disease** 76:*11, 25* 77:*3*
**distinction** 26:*25* 60:*19*
**DISTRICT** 1:*1, 1*
**DOC** 6:*1* 7:*14* 8:*10* 61:5 62:*12* 63:*13* 86:8
**DOC's** 62:*14*
**doctor** 63:6 72:5, *8* 74:*4* 86:5 91:*2* 96:*3*
**doctors** 6:*4*
**document** 39:*17* 69:20 73:7 75:*9* 95:*14*
**documentation** 66:5 91:*21, 24* 92:5, *14, 17*
**documented** 77:*12*
**documents** 57:*4, 20* 59:6, *10* 60:2, 7 69:*15* 85:*21*
**Dodge** 7:*9*
**doing** 7:*5* 8:*3* 14:*1* 20:*10* 32:8 34:*18* 45:*17* 48:22 94:*3*
**DON** 25:*13*
**door** 67:20 68:*17*
**doors** 67:*22*
**Doug** 69:*14* 79:*19* 91:*2*
**Douglas** 2:*15*
**Dr** 4:7 11:*13* 14:*23* 15:*9, 18, 19* 16:*15* 18:*15, 15, 19, 23* 19:*3, 17, 17, 24, 24, 25, 25* 24:*13, 14* 25:7, *16, 21* 28:7 33:2 41:*15* 44:7 47:*1* 55:*8, 10* 56:*3, 15*

65:*3* 69:20 70:8 71:*1, 8* 78:7 85:*21, 24* 86:*3, 24* 87:*2*
**drew** 14:*3*
**drop** 88:*21*
**due** 36:*21* 59:*20* 60:5, *16*
**duly** 4:*3*
**duties** 6:*7, 10* 14:*18, 20, 24* 15:*1*

**< E >**
**earlier** 48:*14* 96:8
**easier** 5:*14*
**East** 1:*15* 2:*7, 20* 98:*11*
**EASTERN** 1:*1*
**ED** 95:*22*
**education** 8:*19*
**efficient** 4:20 5:*21*
**efforts** 52:*1*
**either** 9:*1* 19:*23* 43:*16* 75:*23, 24*
**electronic** 49:*10* 58:*1*
**Emergency** 3:*11* 55:*21* 56:5, *10* 59:8 62:8, *25* 63:*19* 64:20, *21* 83:*25* 86:*24* 87:*3*
**empathize** 63:*16*
**employed** 7:*25* 24:*1* 41:*23* 47:*16* 48:*3* 86:9, *13*
**employee** 12:*18, 21* 13:*3* 16:*16* 29:6 98:*15, 16*
**employees** 6:*10*
**employer** 5:*23* 6:*15*
**employers** 9:*18*
**employment** 7:*17* 53:*20* 86:*17*
**encountered** 63:9
**English** 81:*1, 1*
**ensure** 94:*16*
**entire** 14:*14* 49:*12* 53:*16*
**envelope** 63:*13*
**environment** 8:*12*
**environmental** 8:*4* 10:8
**ER** 63:*3* 65:*12*
**especially** 40:*19* 88:8
**estimate** 42:*21*
**et** 1:*6*
**evaluate** 81:*14*
**Evaluated** 74:*13* 83:*24* 96:*19*
**evaluation** 6:*10* 73:*19* 75:*3* 83:20 92:*11* 96:22
**evaluations** 28:*10*
**events** 56:*22*
**eventually** 15:*1*
**everybody** 11:*16* 47:*11* 65:*4*
**Everybody's** 18:*4*

**evidence** 95:*9*
**exact** 53:*25*
**exactly** 46:*3* 65:*21*
**exam** 68:*18*
**EXAMINATION** 4:*5* 90:25 94:*14*
**examined** 4:*4*
**example** 28:*3* 34:5 36:*11* 45:*8* 66:6
**exclusive** 68:*22*
**Excuse** 16:*21*
**executive** 15:*21*
**Exh** 3:*10, 11, 11, 12, 13*
**EXHIBIT** 3:*9* 39:5, *6, 8* 55:*24, 25* 56:*4, 20* 69:*13, 18* 75:*12* 79:*16, 20* 85:*11, 15, 18* 95:*8, 9*
**exhibits** 3:*16* 97:7
**exit** 55:*3*
**expect** 40:*17*
**expectation** 67:*21*
**expectations** 27:*16*
**expected** 15:*3* 27:*13*
**expensive** 49:*25*
**experience** 38:*14* 50:*13* 89:*21*
**experienced** 73:*14*
**experiencing** 72:*22*
**expert** 89:*20*
**expires** 98:*25*
**explain** 16:*18* 26:*19* 27:*3* 55:*5* 62:22 91:*25* 95:*4*
**explained** 14:*24*
**explaining** 61:*2*
**Exum** 70:*21* 71:*20, 25*
**eye** 76:*1*

**< F >**
**facilities** 25:5
**facility** 7:*7* 20:*3* 27:*10, 14, 16* 49:*24*
**factors** 60:*21*
**fair** 5:*1, 2, 15* 28:*6* 40:*14* 41:2, 5* 49:6 52:*4* 61:*16* 72:*21* 73:*12* 78:*16* 86:*10* 87:*6, 8, 19* 92:5, *8, 9*
**fairly** 25:*11*
**faith** 91:*18* 94:5
**Falls** 9:*21*
**familiar** 13:*11* 24:*3* 30:6 31:2 39:*15* 51:*21, 24, 25* 69:*20*
**familiarize** 79:*22*
**family** 2:*17*
**far** 24:*21* 35:*23* 55:*13* 93:*2*
**farther** 71:*19*
**fashion** 67:*23*
**fast** 83:*20*
**faster** 54:*25*

**fault** 88:*1*
**favor** 12:*4, 15*
**Federal** 2:*3*
**feel** 38:2 73:*25* 87:*24*, *25*
**fellowship** 9:*10*
**felt** 92:*12*
**field** 62:*17* 89:*21*
**fields** 88:*10*
**files** 33:*5*
**fill** 59:*11* 63:*14*
**finally** 47:2
**financially** 98:*17*
**find** 25:*18* 72:*21* 73:7
**findings** 55:*10*
**fingers** 72:*18*
**fingertips** 49:*21*
**finish** 37:2
**first** 4:*3* 7:*1* 13:5 18:*13* 34:6 56:*15* 58:*11, 12, 15* 61:*11* 64:6 69:*17* 72:*12* 82:*17* 86:2 89:5 91:8
**five** 8:9 42:22, *22* 43:*1*
**fix** 90:*3*
**floating** 7:8
**Floor** 2:*13* 67:9
**Florida** 29:*13* 30:*21*
**FMLH** 71:9
**folks** 65:*20*
**follow** 74:*16* 82:2
**follows** 4:*4*
**follow-up** 63:6 94:*12*
**forget** 24:*20*
**form** 26:*14* 27:4 30:*10* 33:*18* 34:*11* 36:*24* 37:8, *9* 38:*12* 41:*20* 42:7 50:4 51:*5, 12* 53:*4, 4, 6* 61:*1, 18* 62:8, *10* 63:*13, 24, 25* 66:*11* 67:*25* 68:*25* 78:*25* 83:*12, 16* 89:*25* 90:2, *8* 92:*21* 95:*11, 12*
**formal** 48:*4*
**format** 68:*3*
**forms** 59:6, *10* 62:*16*
**formulary** 30:22, *23, 24*
**forth** 64:7, *10* 93:*15* 94:6
**Forty** 11:*11*
**found** 12:*4, 15* 74:8
**Foundation** 32:*21* 33:7 44:9 50:*3* 51:*12* 61:*19* 67:*25* 69:6 76:*20* 90:2, *8*
**four** 9:*5*
**frequency** 46:*15*
**frequently** 66:9
**Froedtert** 58:*16, 19* 65:*13, 20* 71:*21* 72:*25* 73:2, *3, 8, 13, 14* 83:*3* 84:*1* 95:*21* 96:*19*

**frustrating** 94:*7*
**fulfill** 25:*8*
**fulfilling** 55:*19*
**full-time** 7:*15*
**functioned** 23:*8*
**funneled** 54:*24*
**further** 98:*9, 14*

**< G >**
**Gable** 14:*23* 15:*18, 19* 16:*15* 18:*15* 19:*17, 24, 25* 28:7 33:2 41:*15* 44:7 47:*1* 56:*15* 65:*3* 86:*24*
**Gable's** 15:*9* 18:*23*
**GAYNOR** 2:*15*
**general** 7:*20* 9:*8* 10:*25* 21:*17* 25:*24* 35:*15* 36:9 42:*5* 45:*14* 80:*17* 81:*20*
**generally** 25:*10* 47:*10*
**gestures** 5:*19*
**gesturing** 18:*12* 48:*25* 49:*1*
**getting** 28:*18* 49:*3, 20* 51:*18* 57:*14* 64:*11*
**gig** 16:*20*
**GINA** 1:8 2:*1* 4:2
**give** 12:*12* 31:*11* 63:*3* 69:*15* 89:*4*
**given** 4:*12* 26:5 29:6 31:*13* 40:*3, 7* 55:*7* 56:9 66:*25* 71:*24* 81:*11* 88:*10, 10, 11*
**giving** 87:*22* 89:*24* 90:7
**go** 13:*23* 16:4 17:*25* 18:*3* 21:*13, 15* 23:2, *13* 26:*13, 17* 27:8, *23* 29:*21* 34:9 46:*12* 50:*16* 51:*13* 53:*10* 61:*13* 63:*3* 64:*3* 68:*17* 70:*1, 6* 75:*15, 22* 76:*23* 79:*3* 80:*16* 85:*13* 87:*11* 88:*4* 90:*10, 21, 24* 92:*22* 95:*18*
**goes** 63:*13* 84:*9*
**going** 4:*25* 5:*12* 24:*21* 25:*20* 36:*11* 37:*16* 39:*4* 40:*24* 41:*12* 50:*20* 52:9, *20* 53:*25* 66:*3, 9* 67:*19* 69:*12* 79:*15* 80:*19* 85:*10* 88:*3, 18* 94:6 96:*2, 3*
**Good** 4:*7, 8* 14:*7, 8* 31:*9, 12* 64:*10* 91:*18* 94:*5, 17*
**goofy** 73:*3*
**gotten** 53:*18* 61:*16* 66:*1* 74:5 78:*14*
**government** 54:*21*
**graduated** 9:*2, 4*
**gravida** 59:*19* 60:*15*

73:*25*
**Great** 5:7 79:*25*
**grew** 9:*13*
**guard** 67:*10* 68:*10, 16*
**guess** 11:*13* 13:*18*
**GYN** 10:*21* 74:*14*

**< H >**
**halfway** 86:*20*
**hall** 68:6, *17*
**hand** 12:*12* 98:*20*
**handbook** 29:6
**hands** 81:*14*
**happen** 18:*10* 89:*17* 92:6 95:*4*
**happened** 72:*3* 88:*14* 95:*1* 96:*23*
**happening** 25:*18* 64:8
**happens** 41:2
**Health** 2:*21* 3:*10, 11, 12, 13* 6:5 9:8, *11* 10:*10, 12, 22* 35:5 82:*3* 86:6
**healthcare** 26:*4, 6, 7* 27:*1, 1, 9, 10, 11* 33:*16* 36:2 48:*15, 16* 77:*8* 82:*3*
**healthcare,** 26:*23*
**hear** 46:5 57:*17*
**heard** 26:*3, 22*
**hearing** 48:5 57:*10, 16*
**held** 53:*11* 85:*16*
**help** 38:2, *19, 20* 51:*15*
**helping** 6:*11*
**helps** 18:*17* 27:*18*
**here,** 17:6
**hereunto** 98:*19*
**heroin** 59:*20* 60:*4, 15* 96:*1*
**hey** 22:*17*
**hierarchy** 19:*1*
**higher** 67:*17, 18*
**highest** 8:*19* 17:*20* 67:*14*
**high-risk** 60:*18*
**HINSHAW** 1:*15* 2:6, *19* 98:*10*
**HIPAA** 36:*8*
**hire** 15:*18*
**hired** 7:*14*
**history** 74:*4, 6* 81:*19*
**HOC** 15:*12, 13*
**hold** 14:*15*
**home** 43:*18*
**Hoover** 70:*8*
**hopefully** 86:*2*
**horrible** 76:*10*
**Hospital** 11:*1* 21:*10, 21* 22:*14* 36:*19* 40:*21* 61:2, *13* 62:*18* 65:*17, 18* 71:2, *6, 11* 76:*13* 77:*22* 78:*23* 80:*19* 81:*10* 82:*7* 84:8 91:*22* 92:*3* 93:6, *7, 10* 95:*2*

**hours** 16:*22* 19:*10, 16* 20:*18* 29:*11* 43:6 58:5 77:6, *20* 83:*10, 24* 84:*1* 85:7 89:*11, 12*
**House** 15:*13*
**housing** 22:*21* 67:*15, 18, 19* 75:*15*
**HSU** 25:*13*
**huge** 50:*17* 62:*20*
**hundreds** 77:*14*
**hunt** 65:*1* 66:*23*
**hunting** 66:*24*

**< I >**
**ice** 63:*5*
**idea** 53:*15* 64:*18* 77:2
**identification** 39:6 55:*25* 69:*18* 79:*20* 85:*15*
**IDENTIFIED** 3:9
**identify** 33:6
**ill** 40:*17*
**Illinois** 2:*13*
**implies** 23:6
**improve** 32:8, *14* 55:*14, 15* 65:8, *8*
**improvement** 32:2, *4, 18* 65:7
**incident** 42:*1* 45:8, *9* 57:7 65:*23* 79:*9, 13*
**include** 6:*10* 71:6
**including** 8:*12*
**increase** 67:*1*
**independent** 57:*1* 60:*1, 3*
**indirectly** 98:*18*
**individual** 20:*3* 24:8 25:*15* 36:*18* 93:*23*
**individuals** 33:22
**industry** 9:*25* 30:6
**inefficient** 52:*14*
**infectious** 76:*11, 25*
**infers** 34:*12*
**infirmary** 23:*3, 4, 5, 6* 33:*17* 34:6, *13, 23* 82:*1*
**infirmary,** 34:*17*
**infirmary's** 34:6
**informal** 48:8
**information** 22:*16* 25:8 31:*13* 40:*18* 47:*21* 63:*1, 2, 21, 23* 67:2 71:*10, 17, 20, 25* 75:8, *11* 84:*3, 11* 92:*10, 25*
**informed** 71:2 72:*25* 73:*13* 78:7 95:*25* 96:2
**initially** 14:*22* 27:9 47:*1*
**Injury** 9:*19*
**inmate** 12:9 22:*19* 36:*11, 13* 47:*22* 64:*14* 91:*22*
**inmates** 23:2, *13* 31:*20*

34:*10* 47:*17* 92:*3*
**in-service** 29:*14*
**in-service-type** 29:*10*
**insofar** 34:*12*
**instance** 2:*3*
**institution** 49:*4*
**instruct** 66:*19*
**instructed** 38:*1* 66:*18*
**intake** 17:*3* 20:*1* 59:*14*
**intending** 82:*18*
**intense** 47:*23*
**interact** 25:*24*
**interactions** 24:*14*
**interchangeably** 34:*18,
21*
**interest** 93:*18, 20*
**interested** 13:*6* 14:*3, 4*
98:*17*
**interim** 96:*23*
**internal** 8:*7* 9:*5, 14*
10:*9, 16*
**Internet** 27:*22* 31:*25*
**interrupt** 5:*13*
**interval** 36:*23*
**interview** 13:*23* 25:*17*
55:*3*
**interviewed** 15:*19*
**introduced** 91:*2, 6*
**investigated** 12:*15*
**investigation** 11:*22*
45:*10*
**involved** 47:*10* 49:*20*
58:*24*
**involving** 56:*22*
**ish** 53:*24*
**isolation** 76:*4, 9, 16*
87:*22* 90:*7*
**issue** 18:*14* 50:*17*
62:*20, 22, 23* 66:*5*
**issues** 20:*16* 36:*6, 10*
55:*14*
**ITEM** 3:*22*
**IV** 59:*20*

**< J >**
**Jail** 12:*19* 13:*2, 20*
15:*12, 16* 16:*2* 17:*8*
20:*11* 21:*6* 23:*4* 24:*2,
7, 10* 25:*18* 28:*7, 14, 22*
29:*1* 32:*5, 19* 34:*20*
35:*7, 22* 36:*4* 41:*9, 13,
16* 45:*6* 46:*22* 47:*13,
17, 18* 48:*20* 50:*13*
51:*1, 4* 53:*13, 17* 58:*8*
60:*12* 62:*9, 19, 25*
63:*22* 65:*6, 18* 67:*4*
74:*19, 19* 77:*9* 86:*4, 5,
25* 89:*24* 91:*17* 92:*4,
12, 16, 24* 93:*4, 21, 22*
94:*18* 95:*2*
**jails** 8:*13* 25:*6* 31:*24*
**January** 98:*25*

**job** 9:*11, 15* 12:*1, 6*
13:*9* 14:*8, 18, 20* 18:*23*
32:*6* 48:*22* 65:*1*
**Join** 18:*1* 27:*6* 33:*19*
34:*15* 37:*1* 64:*1* 66:*13*
76:*21*
**Joseph's** 9:*2*

**< K >**
**Kealoha** 1:*24* 2:*5* 98:*4,
23*
**keep** 72:*10* 75:*25* 76:*1*
**kept** 84:*8, 12, 18, 19*
**kids** 9:*13*
**killin** 42:*20*
**kind** 7:*9* 8:*25* 11:*21*
16:*5, 7* 26:*7* 29:*6*
46:*22* 48:*25* 55:*3*
56:*11* 79:*12* 84:*9*
**kinds** 88:*7*
**Kleinhaus** 2:*12* 3:*4* 4:*6,
10* 16:*8* 17:*14, 16* 18:*2,
6, 16, 22* 19:*9* 23:*22*
25:*2* 26:*10, 12, 16, 21*
27:*7* 30:*13, 19* 32:*24*
33:*9, 24* 34:*16* 37:*2, 4,
12* 38:*13* 39:*7, 19, 24*
40:*2* 42:*4, 13* 44:*12*
46:*5* 50:*5, 9* 51:*8, 19*
52:*6, 11, 18, 21, 25* 53:*6,
8, 12* 54:*10* 55:*23* 56:*2*
61:*21* 64:*2* 66:*16* 68:*4*
69:*4, 7, 14, 19* 76:*22*
79:*2, 17, 21* 83:*17*
85:*13, 17* 87:*10, 17*
90:*1, 3, 4, 9, 15* 92:*21*
95:*11, 14* 97:*3*
**knew** 83:*23* 88:*24*
**knocking** 67:*20, 22*
**Knott** 2:*15, 15* 3:*4*
18:*1* 23:*15, 19* 27:*6*
33:*7, 19* 34:*14* 36:*24*
37:*8* 39:*18, 21* 50:*4*
51:*12* 63:*25* 66:*13*
67:*25* 68:*25* 69:*5*
76:*18, 21* 83:*16* 89:*25*
90:*2, 8, 22* 91:*1, 2*
93:*16* 94:*10, 13*
**know** 10:*15* 14:*23*
15:*15* 16:*5* 23:*24*
24:*10* 26:*3* 28:*20, 25*
29:*3* 31:*14* 32:*22* 33:*2,
4, 5, 8* 34:*9, 17, 22*
35:*14, 18, 21* 36:*9, 14*
37:*15* 38:*6, 22, 24*
39:*15* 40:*25* 41:*11*
48:*17* 49:*8, 14* 50:*7*
51:*9* 52:*15, 22* 58:*22*
61:*5, 8* 62:*18* 63:*12*
64:*9* 66:*7, 9* 67:*24*
68:*1, 2, 3* 71:*24* 74:*11*
75:*6, 9, 11* 79:*9* 82:*10*
84:*10* 87:*6* 88:*5, 19*

89:*4* 90:*12, 13* 92:*20,
23, 24*
**knowledge** 13:*19* 17:*19*
53:*13*
**known** 83:*9*
**Kwame** 47:*22*

**< L >**
**labor** 36:*11, 14, 15, 16,
18* 72:*15* 73:*20, 21, 22*
74:*10, 13, 14, 15, 23*
83:*10, 23, 25* 84:*7, 13,
14* 85:*6* 88:*15, 16*
89:*11* 96:*1*
**labor,** 75:*7*
**labor.'** 74:*24*
**labors** 89:*13*
**labs** 21:*12*
**lack** 18:*25* 91:*21*
**lady** 11:*23* 57:*10*
**lag** 94:*4*
**Lakeshore** 8:*2* 9:*22*
**lawyer** 30:*15*
**learn** 13:*5*
**learned** 24:*6* 56:*12*
**leave** 94:*5*
**leaving** 54:*1*
**left** 29:*3* 55:*2* 70:*9*
77:*6, 19*
**legal** 17:*10, 17, 23*
**LEIB** 2:*15*
**level** 8:*19* 17:*20* 18:*11*
23:*6* 25:*24* 67:*14, 17, 18*
**liability** 17:*18*
**license** 11:*18, 22*
**liked** 31:*8*
**limitations** 27:*15*
**limited** 41:*18*
**listed** 95:*24*
**literally** 68:*19*
**little** 23:*10* 46:*7* 52:*9*
71:*19* 81:*21* 94:*4*
**live** 52:*3*
**LLC** 2:*15*
**LLP** 1:*15* 2:*6, 19* 98:*10*
**located** 10:*3*
**location** 41:*8*
**locked** 68:*15, 17*
**locums** 6:*19*
**lodged** 51:*22*
**LOEVY** 2:*12, 12*
**logic** 74:*16*
**logical** 75:*18*
**long** 6:*1* 7:*13* 8:*8* 11:*3*
15:*15* 16:*11* 83:*23*
**look** 28:*5* 39:*20* 56:*4*
69:*16, 25* 71:*19* 79:*18*
**looked** 14:*7, 8* 72:*5, 6*
**looking** 54:*13*
**lose** 47:*24* 50:*17, 18, 20*
**lot** 14:*4* 30:*15* 42:*23*
**loud** 5:*18*

**< M >**
**M.D** 1:*8* 2:*1* 4:*2* 8:*21*
9:*4*
**M.D.** 8:*23*
**machine** 69:*15*
**main** 77:*1*
**maintain** 10:*17*
**maintained** 41:*10*
**major** 49:*13*
**making** 20:*10* 21:*10*
36:*1* 46:*6* 60:*19* 61:*15*
74:*18*
**man** 12:*7*
**management** 31:*15*
**March** 56:*22* 58:*8* 77:*7*
80:*3*
**Margaret** 70:*8*
**mark** 39:*4* 55:*23* 69:*12*
79:*15* 85:*10*
**marked** 39:*6* 55:*25*
69:*18* 70:*1, 3, 4* 79:*20*
85:*15* 86:*18*
**master's** 8:*21, 23* 9:*10*
**materials** 32:*2*
**matrix** 51:*4* 54:*7*
**matter** 86:*16*
**Maxim** 6:*19, 21* 7:*14*
54:*8, 9, 11, 15, 16, 24*
**M-A-X-I-M** 6:*21*
**M-A-Y** 18:*19*
**Mays** 18:*15*
**mean** 17:*7, 17, 18* 20:*2*
25:*21* 29:*10* 31:*11*
34:*24* 40:*15* 43:*16*
45:*13* 46:*3* 48:*17* 53:*9*
56:*13, 14* 57:*3* 58:*10*
60:*10* 62:*4* 66:*18* 68:*9*
75:*8, 9* 82:*16* 83:*6*
85:*24* 95:*2*
**meaning** 82:*19, 21, 23*
**means** 71:*5* 78:*21*
80:*25* 81:*13* 82:*2* 83:*7*
84:*14* 85:*4*
**meant** 53:*20*
**mechanism** 91:*14*
**medical** 5:*3, 9* 6:*4* 8:*2*
9:*4, 8, 20* 10:*2, 25* 12:*3,
3* 14:*10, 15* 15:*11, 16*
16:*1, 18* 17:*8, 19, 24*
19:*4, 7* 20:*14* 21:*16, 19*
22:*17, 18* 23:*8* 24:*12,
13* 25:*9* 35:*19* 36:*6, 10,
17* 42:*14, 16* 45:*1, 2, 9,
23* 46:*4* 47:*25* 49:*10*
50:*14* 58:*1* 60:*12, 13*
63:*21, 23* 66:*2, 5, 8, 25*
67:*7, 8, 13* 68:*5, 8*
79:*25* 82:*18, 21, 23*
91:*16* 92:*3, 12* 93:*13*
94:*8*
**medical-director-level**

17:2
**medically** 63:8 92:24
**medication** 5:3, 10 12:13
**medications** 17:4 20:4, 6, 7 30:9, 24
**medicine** 8:4, 6, 7 9:6, 10, 12, 14, 17 10:9, 9, 10, 13, 14, 16 11:25 14:2
**meet** 49:15 51:16, 17 91:10, 14, 18
**meeting** 24:21 29:16 46:23 47:3, 5, 8, 10, 12 48:4 55:11 65:10, 12 97:4
**meetings** 45:23 46:4, 8, 25, 25 47:14
**member** 36:16 37:25
**memory** 57:6, 6
**Menomonee** 9:21
**mental** 8:15
**mention** 22:25
**mentioned** 19:10 20:1 21:3 38:18 48:14
**Message** 70:9, 12 77:6, 19 78:3, 24
**met** 50:11 80:10
**meticulous** 75:25
**Michael** 2:19
**midwifery** 10:21
**MILWAUKEE** 1:6, 16 2:7, 16, 17, 17, 20 6:17 12:19, 22 13:2, 20 15:12, 16 16:2 24:2 28:22 32:5 34:20 35:7 45:6 48:20 50:13 51:4 52:3 53:13 58:8 65:6 91:3, 17 98:2, 11
**mind** 30:1 53:1
**mindset** 40:23, 24
**minute** 68:20
**minutes** 47:5 84:17 85:5 87:12 89:18
**miscarriages** 88:25
**mistaken** 10:1
**misunderstood** 60:17 68:11
**mix** 45:17
**Mm-hmm** 56:6 71:22 85:19 86:1, 22
**moment** 39:8, 14
**monitor** 24:12, 13 25:9 82:1 93:14 94:23
**monitored** 93:23
**months** 36:20
**Moore** 47:22
**Moore's** 48:3, 12
**morning** 4:7, 8 20:24 21:9 33:11, 15 48:7 57:11, 14, 16 64:17 77:6 81:17
**move** 53:8
**multip** 59:18 60:4

**multiple** 59:18 63:10, 10 93:9 94:3, 3

**< N >**
**naive** 30:14
**name** 4:9 9:20 23:23 31:23 44:20 47:7
**named** 47:22
**names** 15:20
**nap** 43:19, 21
**national** 48:14
**NCCHC** 24:25 25:1 27:12 28:2, 13, 18, 23 31:19, 24 49:18 91:13, 18
**NCHC** 24:23
**NCHCC** 24:24
**necessarily** 64:10 89:15
**necessary** 36:7 71:17
**need** 34:9 36:8 55:14 67:2
**needed** 21:12 23:2, 13 55:13, 18 74:1
**Needs** 3:10 31:19 38:2 40:11, 20 80:16
**Neither** 52:8
**never** 10:20, 23 72:21, 21 73:9, 11, 12 74:7 87:19 96:14
**New** 10:4 30:9 71:2, 6
**newspapers** 52:1
**nice** 97:4
**night** 22:5 58:6 61:10
**nighttime** 22:6 79:6
**nine** 36:20
**nine-to-five** 16:20
**non-isolation** 76:5
**North** 2:13, 16
**Notary** 2:5 98:5, 24
**note** 62:11, 19 70:20 80:21 82:5, 14 83:7, 10 84:22 85:24
**notes** 70:7, 7 72:3, 4 73:2 75:1 83:3 87:12
**notice** 2:4
**noticed** 72:12
**notified** 70:8
**number** 39:22 69:16 84:15 88:22
**numbers** 23:21
**nurse** 16:23, 25 18:12 20:15, 25 21:4, 24 22:3 34:5 37:21 42:16, 18 43:4, 5 44:13 58:10 61:11, 12 68:14, 22, 23 70:21 71:20, 21, 25 74:21 78:18 81:15 84:4, 23 95:23 96:4, 4
**nurses** 16:25 18:13 22:10 56:17 59:15 60:23, 23 61:10 64:18 68:9, 18, 19
**nurse's** 75:7 84:11, 22

**nursing** 20:5 25:13 34:3 43:24 44:5, 6, 11 46:17 67:9 87:20 94:19 95:5

**< O >**
**oath** 4:3
**OB** 10:21 11:11 74:14 86:5, 8 96:19
**Object** 26:8, 14 27:4 30:10 33:7, 18 34:11 36:24 37:3, 7 38:10 41:20 42:7 50:4 51:5 52:5, 16, 18 61:18 63:24 66:11 67:25 68:25 76:18 78:25 83:12, 16 92:21
**objected** 52:19
**objecting** 18:4
**Objection** 16:3 17:9, 22 18:1 26:11 27:6 52:7, 22, 24 53:2, 5 63:17 69:5 95:11
**Objective** 70:24
**obs** 80:23 81:3
**observation** 23:9 67:1, 5, 14, 17
**observe** 37:21
**obstacle** 51:10, 11
**obtain** 48:20
**obtained** 71:20 95:10
**obtaining** 48:21 49:19
**obvious** 92:1
**occasions** 93:9
**occupational** 8:4, 6 9:10, 12, 16 10:8, 14 11:25
**occur** 46:18
**occurred** 45:9
**occurs** 88:6, 6
**offended** 11:15
**offense** 32:15
**offer** 54:3, 6, 17
**offered** 28:2
**office** 98:20
**officer** 9:9 10:25 19:7 36:13 37:6 38:15 67:21
**officers** 38:8, 19 39:2
**official** 48:10 71:9
**oftentimes** 64:16
**Oh** 24:16 31:6 42:20 57:19 68:9 71:15 85:13 95:16 96:11, 13
**Okay** 4:15, 17, 20 5:22 6:7, 24 7:24 8:10, 15, 19 10:15, 20, 24 11:6 12:14, 24 13:5, 11, 14, 22 14:9, 14, 25 15:2, 8, 15 16:11, 14, 18 17:6 18:9, 17 19:14, 22 20:1, 9 21:8, 19 22:8 24:1, 17 25:7, 23 26:1 27:9, 18, 21, 25 28:5, 17, 20 29:21, 25 30:16 31:10,

13, 17 32:1, 20 34:17, 25 35:1, 14, 21 36:20 37:23 38:4, 21 39:4, 14 40:1, 3, 13, 22, 24 41:7 42:5 43:2, 8, 10, 12 44:1, 4, 6, 13, 22 45:4, 16, 21 46:2, 11, 21, 24 47:12, 20 48:8, 24 49:16 51:24 52:2, 25 53:21 54:22 55:2, 17 56:20 57:9 58:2, 4, 10, 13 59:25 60:17 61:1, 10, 22 64:4 65:25 66:3 68:5, 21 69:4, 12, 25 70:15 71:19 72:14 73:10, 12, 17 74:16, 25 75:5, 12, 23 76:12, 24 77:11, 13, 21 78:16, 21 79:5, 8, 15 80:14, 21 81:7 82:5, 10, 14, 21 83:9 84:9 85:3, 8, 10, 20 86:1 87:6, 10, 14 89:22 90:14, 24 91:5 92:16 94:4, 16, 21 96:6, 25 97:3
**Okey-dokey** 87:9
**old** 23:5 57:25
**on-call** 43:18, 18, 20 58:6, 6
**once** 13:24
**ones** 69:22
**one's** 67:19
**online** 54:12
**on-site** 65:20
**open** 72:19, 19
**opiate** 81:9, 19, 25 82:12
**opinion** 11:25 50:8 88:22 89:2 91:17
**opposed** 67:11
**oral** 95:1, 10
**order** 25:8 28:3 49:8 54:14 67:3, 5 75:21 76:7 78:4, 5 93:1
**ordering** 21:12
**orders** 17:3 20:2, 7 66:6, 25 71:3, 6 75:21
**Organ** 85:21 87:2
**organization** 25:3
**Organ's** 85:24 86:3
**Original** 3:16, 17 97:7, 8
**os** 72:18
**Outside** 47:12 83:4 86:9
**overly** 63:25 76:18

**< P >**
**p.m** 2:10 56:1 87:16, 16 97:6
**PAGE** 3:9, 22 39:9 69:25 70:3 72:12 86:18, 20 96:3
**pager** 69:9

**paid** 86:*11*
**pain** 12:*13* 36:*22* 47:*23*
**paper** 95:*24*
**papers** 77:*23* 78:*23*
**paperwork** 64:*12, 17, 18, 24, 24* 65:*1, 11* 66:*18, 21, 23, 25* 73:*4, 9, 11* 83:*8* 93:*24, 25* 94:*18, 20, 21*
**par** 49:*11*
**Parallel** 44:*3*
**part** 11:*10* 24:*9* 32:*3* 34:*6* 36:*1* 48:*19* 51:*3* 55:*18* 58:*18, 21* 60:*3, 6* 70:*10, 24* 86:*25*
**particular** 14:*1* 29:*25* 45:*8* 46:*21, 24* 47:*7*
**parties** 98:*16*
**pass** 79:*19* 88:*20*
**passed-down** 56:*11*
**patch** 81:*11, 24* 82:*6, 10*
**patient** 20:*11* 21:*6* 22:*12* 33:*5* 36:*15, 18* 37:*21, 22* 38:*2* 40:*10, 17, 19, 20* 59:*7* 60:*18* 61:*1* 63:*2, 20* 64:*7, 9, 11, 13* 65:*14* 71:*5, 11* 72:*3, 14* 74:*6, 12* 77:*2* 78:*8* 81:*17, 18* 84:*23, 24* 85:*3* 86:*23* 92:*10* 93:*1, 3, 7, 12, 14, 18, 21* 94:*5, 16, 17, 17* 95:*25*
**Patients** 3:*10* 6:*9* 20:*15* 21:*11* 23:*12* 49:*3* 62:*7, 24* 66:*1, 4* 67:*8* 71:*16* 92:*13* 94:*3*
**patient's** 38:*15* 87:*3* 93:*5*
**patterns** 33:*6*
**paycheck** 14:*4*
**pediatrics** 9:*5*
**people** 15:*20* 21:*5* 26:*3* 32:*7* 33:*17* 40:*16* 42:*23* 43:*16* 52:*1* 56:*10, 18* 63:*18* 92:*17* 93:*12, 13*
**percipitous** 81:*4, 18* 82:*14*
**performance** 28:*11*
**period** 14:*15, 19* 15:*2* 66:*24* 73:*6* 79:*6* 84:*1, 15* 85:*6* 89:*13*
**periodic** 29:*11*
**periodicity** 46:*19*
**permanent** 7:*2*
**Perry** 35:*13* 47:*2*
**Perry's** 35:*14*
**person** 15:*18* 17:*20* 21:*25* 33:*16* 35:*9, 12* 36:*20* 37:*14, 19* 43:*14* 46:*21, 24* 61:*16* 66:*7, 9* 73:*21, 25* 98:*16*

**personal** 98:*8*
**person's** 44:*20*
**perspective** 40:*25* 67:*13*
**pharmacy** 29:*24* 30:*21*
**phone** 19:*19* 57:*14* 64:*16* 66:*2* 69:*10, 11* 71:*21* 77:*14* 85:*12*
**phrase** 26:*22*
**physical** 72:*8*
**physically** 81:*14*
**physician** 7:*6* 8:*5* 19:*14* 44:*16, 17, 22* 63:*14, 21*
**physicians** 62:*18*
**physician's** 62:*11, 19*
**piece** 5:*17*
**ping** 93:*5, 19*
**pissing** 64:*12*
**place** 9:*23* 48:*23* 49:*12* 94:*22*
**placed** 80:*22* 81:*3, 11* 95:*21*
**placement** 80:*17*
**Plaintiff** 1:*4* 2:*3, 14* 4:*11* 47:*22*
**plaintiff's** 47:*21*
**plan** 51:*3* 71:*19* 81:*20* 86:*21*
**play** 93:*5, 19*
**please** 10:*3* 27:*3* 28:*21* 33:*13* 37:*3* 39:*14* 53:*1* 56:*14, 25* 60:*11* 69:*25* 70:*19* 77:*16* 80:*6* 81:*2* 83:*1* 86:*17* 91:*25*
**plenty** 41:*24*
**pod** 22:*21* 67:*18, 19* 75:*16*
**pods** 67:*15*
**point** 14:*20* 72:*1* 73:*5* 83:*2, 8* 95:*8*
**policies** 22:*22* 23:*1* 36:*1, 2* 41:*9, 13, 16, 24* 42:*6, 11* 69:*3*
**Policy** 3:*11* 6:*11* 23:*3, 11, 20* 33:*21* 34:*3* 35:*2* 37:*13, 17* 38:*7* 39:*12* 40:*7, 14* 55:*22* 56:*7* 92:*16, 18, 24*
**pong** 93:*5, 19*
**pop** 89:*16*
**population** 51:*2* 80:*17* 81:*20*
**portion** 71:*8*
**position** 6:*3, 14* 7:*2* 13:*5, 7* 14:*3, 10* 16:*19* 53:*2* 54:*1, 18, 19, 20* 92:*13* 93:*14*
**positions** 54:*13*
**possibilities** 34:*7*
**possible** 88:*18*
**post** 81:*3, 18*
**practice** 8:*8* 11:*20* 36:*5*

**practiced** 10:*21*
**practicing** 13:*2*
**practitioner** 21:*1, 24* 43:*6* 58:*10* 61:*11, 12* 78:*18*
**practitioners** 16:*24, 25* 18:*12* 20:*15* 21:*4* 22:*3* 42:*16, 18* 43:*4* 44:*13*
**preceding** 98:*6*
**precipitous** 82:*23* 83:*22* 85:*9*
**predicted** 88:*14*
**prefer** 92:*9*
**preference** 91:*23* 92:*2, 19*
**pregnancies** 59:*18* 74:*2* 88:*9, 23*
**pregnant** 31:*20* 36:*21* 60:*5* 73:*23, 24* 75:*20*
**premise** 26:*8*
**prenatal** 59:*19* 60:*16*
**prepare** 57:*5, 20*
**prescribe** 30:*9*
**prescribed** 82:*7, 11*
**present** 72:*15* 84:*24* 85:*1*
**presentation** 29:*22* 30:*8, 21* 31:*6, 7, 9, 12, 14*
**presented** 29:*18* 30:*4, 20* 31:*4*
**pressure** 59:*21* 60:*6, 20* 73:*14* 84:*25*
**pretty** 4:*18* 14:*7* 16:*10* 40:*15* 48:*9* 97:*1, 1*
**prevent** 5:*4, 8* 77:*3* 87:*21* 89:*23* 90:*6*
**preventative** 10:*10, 12*
**Previous** 46:*1* 89:*1*
**primary** 16:*24*
**Prior** 7:*25* 11:*7* 13:*12*
**prison** 12:*8*
**prisons** 8:*13* 25:*4* 31:*24*
**privacy** 21:*18*
**probably** 83:*7*
**problem** 63:*10* 65:*2, 7* 71:*13*
**problems** 81:*15*
**Procedure** 4:*1*
**PROCEEDINGS** 4:*1*
**process** 13:*23* 48:*19, 21* 91:*13*
**profession** 27:*2*
**professional** 11:*16* 32:*14*
**proper** 26:*10* 52:*6, 21, 24* 66:*4* 94:*18*
**properly** 49:*12*
**protocol** 75:*22* 81:*25* 82:*1*
**protocols** 75:*19*
**provide** 22:*15*
**provided** 3:*17* 16:*1, 14, 15* 17:*8* 38:*24* 97:*8*

**provider** 42:*17* 46:*16* 47:*13* 62:*21* 63:*14* 66:*2* 73:*23* 82:*3, 3* 94:*2*
**providing** 88:*22*
**prudent** 92:*25*
**Public** 2:*5* 9:*8, 11* 10:*9, 12* 98:*5, 24*
**purpose** 76:*15*
**pursuant** 2:*3, 4*
**put** 6:*25* 12:*2* 22:*23* 41:*7* 49:*10* 56:*20* 63:*5* 67:*7* 72:*17* 75:*12* 76:*4* 81:*14, 25* 87:*9* 93:*13* 94:*22*
**putting** 48:*23* 49:*7*

**< Q >**
**qualify** 49:*9*
**quality** 32:*1, 3, 9, 14, 18*
**question** 4:*22, 22, 24* 12:*24* 19:*23* 22:*9* 23:*10* 26:*9, 15, 20* 27:*5* 30:*11, 18, 20* 34:*4, 12* 36:*25* 37:*3* 38:*12* 39:*11* 41:*21* 42:*8* 45:*25* 46:*1* 66:*12, 20* 72:*24* 79:*1* 83:*13, 21* 86:*3, 15* 90:*11, 19* 95:*19* 96:*9*
**questions** 21:*4* 25:*17, 20* 52:*17* 87:*15, 18* 90:*23* 94:*13*
**quicker** 15:*8*
**quickly** 54:*14* 89:*5, 6, 17, 17, 20*
**quite** 33:*23*

**< R >**
**Racine** 7:*11*
**ramped** 14:*22* 15:*23*
**Randal** 2:*16*
**rapid** 82:*24* 83:*19*
**rate** 86:*16*
**reach** 16:*25* 96:*7*
**reached** 61:*11*
**reaction** 96:*14*
**Read** 28:*1, 13* 31:*21* 32:*1* 45:*24* 46:*1* 85:*23*
**reading** 21:*11* 80:*4* 85:*20*
**really** 15:*7* 31:*5* 32:*23* 64:*4* 67:*11* 87:*25*
**reason** 10:*5* 29:*25* 38:*3* 40:*15* 41:*18* 49:*17, 23* 50:*22* 54:*1* 72:*4* 76:*7* 80:*14*
**reasonable** 40:*16, 16* 88:*17*
**reasons** 50:*1*
**REBECCA** 1:*3* 4:*10* 56:*22*
**recall** 7:*16, 19* 15:*20* 16:*17* 18:*24* 23:*14, 17,*

*18, 20* 26:2 28:*12, 15, 24* 29:*5, 8, 15, 19* 31:*16, 21, 23* 33:*1, 3, 20* 34:*3, 8* 35:*2, 8, 10, 11, 16, 25* 38:*17* 39:*13* 40:*5, 12* 41:*12, 14, 17, 25* 42:*2, 9, 20, 24* 43:*4* 44:*19, 20, 21* 45:*12, 13, 15* 47:*8, 15, 18, 19* 48:*2, 4, 4* 51:*7* 53:*25* 59:*5, 9, 10, 12, 17* 60:*7* 61:*4, 6, 9* 62:*10* 65:*21* 67:*3, 6* 70:*12, 14* 72:*1* 75:*17* 77:*10* 78:*5* 79:*11, 14* 87:*2*
**receive** 38:*22*
**received** 39:*12*
**receiving** 47:*25*
**Recess** 56:*1* 87:*16*
**recollection** 41:*19* 42:*5* 57:*2* 58:*24* 59:*13* 60:*1, 3* 77:*15*
**record** 4:*9* 49:*10* 52:*10* 53:*10, 11* 58:*1* 74:*19* 79:*25* 85:*14, 16* 87:*11*
**recorded** 98:*7*
**records** 57:*24*
**reduced** 98:*7*
**regarding** 37:*17, 20* 86:*24*
**regular** 20:*18* 22:*20* 33:*16* 46:*16, 20* 47:*10* 75:*15*
**regularly** 33:*23*
**reject** 92:*15*
**rejecting** 92:*13*
**relate** 39:*10*
**related** 11:*18, 22* 12:*1* 24:*7* 26:*6* 47:*21* 58:*2*
**relative** 98:*15, 16*
**release** 64:*13*
**relying** 60:*2*
**remember** 5:*18* 16:*13* 29:*23* 40:*13* 45:*19, 20, 21* 46:*14, 15, 19* 47:*9* 49:*13* 57:*9* 74:*22* 75:*20* 79:*5* 94:*1* 96:*12*
**remind** 5:*20, 20*
**renew** 10:*15*
**rephrase** 4:*23* 12:*20* 17:*14* 57:*12*
**Report** 3:*12, 13, 14* 35:*9* 44:*6* 95:*1, 7, 10*
**Reported** 1:*24* 35:*10, 12* 44:*1, 11*
**reporter** 3:*16* 5:*15* 46:*1* 97:*7*
**reporting** 35:*17*
**reports** 55:*8* 81:*15*
**represent** 4:*10* 39:*9* 47:*20* 58:*14* 70:*20* 80:*7* 91:*3*

**representing** 30:*13*
**reproductive** 10:*22*
**request** 94:*19*
**REQUESTED** 3:*22*
**required** 29:*9* 34:*1* 45:*22* 46:*9* 47:*14* 55:*3, 5* 59:*6*
**requirement** 33:*15*
**requires** 36:*17*
**resolve** 18:*14*
**resource** 31:*15*
**resources** 31:*15*
**responsibilities** 15:*6* 35:*15*
**responsibility** 11:*4* 19:*15* 21:*20, 23*
**responsible** 11:*2* 17:*7, 13, 13, 17* 20:*10* 38:*23* 44:*14*
**result** 47:*25*
**retained** 3:*16* 97:*7*
**return** 71:*2* 78:*7*
**returned** 9:*14*
**review** 39:*8, 14* 45:*7, 10, 12, 14, 15* 48:*10* 57:*4, 20, 23* 71:*23* 80:*16* 85:*18*
**reviewed** 12:*3* 57:*24* 58:*20* 60:*2* 69:*22* 80:*9, 12, 13* 83:*7*
**Reviewing** 39:*17* 58:*23* 80:*14*
**ridiculous** 53:*9*
**right** 8:*17* 9:*2* 10:*20* 11:*15* 13:*9, 17, 19* 18:*9, 21* 19:*1, 20, 21* 30:*13* 31:*9* 32:*12* 33:*25* 34:*5* 43:*3* 48:*17* 49:*2, 5, 7* 53:*22* 54:*7* 55:*19* 56:*3* 64:*5* 66:*19* 67:*21* 68:*16* 70:*23* 73:*21* 75:*12* 76:*14* 78:*20* 80:*4, 19* 84:*7, 22* 87:*7* 94:*10* 96:*8*
**rights** 30:*16*
**roadmap** 51:*17*
**role** 6:*7* 14:*21, 22* 15:*4, 9, 16, 24* 16:*12* 21:*19* 22:*18, 19* 25:*8* 33:*12* 35:*18, 19, 20* 42:*14* 48:*12, 21* 76:*3* 86:*4*
**roles** 44:*3*
**room** 43:*18, 20* 56:*10* 59:*8* 62:*25* 64:*20, 21* 83:*25*
**rooms** 68:*19*
**rough** 11:*14*
**round** 21:*1*
**rounded** 33:*23*
**rounding** 33:*21* 35:*3* 66:*6* 68:*2*
**rounds** 20:*14, 20* 21:*8, 10, 10* 33:*10, 14* 68:*2*

**routine** 46:*14* 47:*12* 55:*11*
**RPR** 1:*24* 2:*5* 98:*4, 23*
**rule** 96:*1*
**Rules** 2:*4*
**run** 46:*25*
**rundown** 8:*24*
**Russart** 2:*19* 3:*5* 16:*3* 17:*9, 22* 18:*5, 8, 10, 18, 21* 19:*6* 23:*17* 24:*25* 26:*8, 14, 18* 27:*4* 30:*10* 32:*21* 33:*18* 34:*11* 37:*1, 7, 9* 38:*10, 12* 41:*20* 42:*7* 44:*9* 45:*24* 46:*2* 50:*3, 7* 51:*5* 52:*5, 8, 16, 19, 23* 53:*4, 7* 54:*8* 57:*24* 61:*18* 63:*24* 64:*1* 66:*11* 76:*20* 78:*25* 81:*21, 23* 83:*12* 87:*14* 90:*19, 24* 94:*12, 15* 95:*12, 16, 17* 96:*25*
**Rusty** 35:*13* 47:*1*

**< S >**
**safety** 94:*16*
**saw** 54:*13, 19* 63:*22* 73:*9, 11*
**saying** 57:*15* 58:*22* 68:*12* 78:*24* 89:*8* 92:*1*
**says** 63:*5* 70:*8, 18* 71:*1, 8* 72:*11* 74:*19* 78:*6, 9* 86:*23*
**Schupp** 1:*24* 2:*5* 98:*4, 23*
**se** 32:*6*
**seal** 98:*20*
**search** 13:*9*
**second** 16:*23* 22:*6* 39:*20* 58:*9* 61:*12* 78:*24* 85:*12, 14* 89:*5*
**section** 70:*22* 86:*20*
**security** 93:*12*
**see** 6:*9* 7:*3* 20:*15* 21:*3* 24:*21* 42:*23, 25* 56:*3* 64:*25* 65:*6* 66:*17* 70:*10, 24* 72:*19* 75:*2* 77:*2* 78:*2, 12, 16* 80:*18* 81:*5* 86:*21, 25*
**seeing** 94:*2*
**seen** 56:*7* 72:*16* 74:*12* 80:*5* 83:*3*
**send** 22:*12* 53:*1* 56:*18* 58:*18* 59:*1, 7, 15* 60:*22* 62:*18, 24* 63:*1, 1* 64:*7* 72:*20* 77:*18* 78:*11*
**sending** 56:*9* 65:*14* 93:*6*
**sensation** 59:*22* 60:*21*
**sense** 17:*18* 26:*24* 27:*19* 35:*15* 40:*25* 58:*21*
**Sensia** 9:*19*

**sent** 21:*21* 22:*14, 16, 20, 20* 57:*24* 58:*15* 59:*24* 60:*10* 61:*1, 2* 63:*18* 64:*20* 73:*4, 18, 19* 74:*8, 9, 21* 78:*5, 13, 18* 92:*3, 11* 93:*9, 10* 96:*9, 12*
**separate** 17:*23* 77:*2*
**serious** 45:*8* 62:*2*
**Seriously** 50:*24*
**service** 6:*23* 9:*8* 54:*16, 17*
**Services** 2:*21* 3:*11, 11, 12, 13* 6:*5* 35:*5* 55:*22* 56:*5*
**set** 20:*13* 98:*20*
**settlement** 24:*9* 91:*10*
**seven** 16:*22* 19:*10, 16* 43:*6* 58:*5*
**shadow** 16:*11*
**shadowed** 16:*9*
**Shansky** 24:*13, 14* 25:*7, 16*
**Shansky's** 25:*21* 55:*8, 10*
**share** 26:*1*

**< ' >**
**'She** 74:*22*

**< S >**
**sheet** 63:*5*
**sheets** 63:*20*
**shift** 16:*21* 34:*6* 43:*3, 9, 17, 17* 68:*24*
**shocking** 97:*1*
**shortly** 60:*16*
**show** 39:*4* 69:*12* 79:*15* 85:*10*
**showed** 16:*6* 65:*16*
**shows** 50:*11*
**sic** 81:*4, 18* 82:*15*
**side** 41:*7* 50:*14* 56:*20* 75:*13* 87:*9* 94:*1, 2*
**signs** 81:*16*
**similar** 19:*15*
**simple** 86:*2*
**sitting** 68:*9, 10*
**situation** 94:*7*
**situations** 88:*7*
**skipped** 41:*3*
**Slow** 81:*21* 83:*20*
**SMU** 20:*20* 21:*5, 8, 13* 22:*20, 24* 23:*2, 4, 13* 33:*10, 15, 21, 23* 34:*19, 24* 35:*3* 36:*12, 13, 18* 37:*25* 38:*15* 57:*18* 65:*13, 15, 16* 67:*13, 22* 68:*7, 8, 14, 15, 15, 20, 24* 75:*15, 22* 76:*4, 16* 80:*23* 81:*3* 82:*8* 83:*4* 96:*1*
**SOAP** 80:*21*

**solving** 65:7
**somebody** 76:24
**somebody's** 43:19
**sorry** 12:19 18:20
20:12 23:15 28:20
30:17 33:12 39:1, 19
42:21 54:11 77:16
80:5 81:22 88:2 90:1
**sort** 15:2 32:10 40:24
45:14
**sound** 43:3
**source** 75:6, 7, 11 84:11
**speaking** 92:25
**speaks** 95:14
**special** 20:14 23:8 67:7,
8
**specialist** 86:10 88:15
**specific** 7:7 20:22 21:5
40:6 41:5, 8, 25 45:12
46:19 55:16 67:3
82:18 84:11
**specifically** 25:10 42:2,
3 43:5 46:14 56:11
**spoke** 95:22 96:4
**spontaneous** 88:24
**spread** 77:3
**SS** 98:1
**St** 9:2
**stable** 96:20, 24
**Staff** 7:6 25:12 34:4,
20 36:6, 10, 16 37:25
40:10, 19 42:18 44:16,
17 46:17, 17, 22, 23
47:13, 13 49:11, 12, 12
50:17, 18, 18, 18, 20
55:15 61:10 66:8, 18,
21 77:8, 9 87:20 89:23
90:6 94:20
**staffed** 50:14 67:4
**staffing** 23:7 51:3, 4
55:14, 18
**stand** 40:15
**standard** 50:12 72:2
**standards** 24:22 31:24
51:16 91:11, 14
**Stands** 10:5
**start** 9:1 50:20 54:6,
11, 16
**started** 7:9 13:16
15:10 28:25
**starting** 52:11
**State** 2:6 5:24 54:23
98:1, 5
**statement** 52:9 92:5, 8, 9
**STATES** 1:1 9:7
**station** 67:9 68:5, 8, 9,
10, 18, 19
**status** 81:3, 17, 18 84:6
86:17
**stay** 74:1
**step** 14:11
**steps** 94:16

**sticks** 29:25
**stipulate** 19:7
**stop** 82:2
**stopped** 17:5, 6 29:3
**stored** 41:9
**Street** 2:13, 16
**stress** 88:20, 20
**Strike** 28:20 33:12
55:6 56:24 58:13 70:2
72:23 77:16 80:5 83:1
**strive** 91:18
**struck** 30:21
**subcontracted** 86:12
**subcontractor** 86:14
**Subjective** 84:23
**Subjective,** 80:22
**subjects** 84:10
**subsequent** 73:5 79:9
**substantive** 17:19
**suddenly** 88:18
**sued** 24:9
**suffered** 47:23
**suffering** 47:24
**Suite** 1:15 2:7, 16, 20
74:13 98:11
**summary** 71:10
**superior** 19:1, 4
**supervise** 42:15, 23 44:5
**supervised** 24:10 35:21,
25 43:23
**supervising** 44:15
**supervisor** 25:13 28:8
43:24 44:5, 6, 11
**support** 17:15
**suppose** 77:21
**supposed** 24:20 62:9
72:17
**supposing** 38:20
**Sure** 9:1 10:11 25:14,
16 26:22 32:10, 13
33:25 35:16 38:1, 4, 18
39:24 40:6 44:8, 10
45:19 50:10, 22 53:18
56:13 62:15, 17 63:16
66:14 70:17 72:5 74:3,
6, 16 75:3 77:15 78:21
83:14 85:13 86:11, 14
**surprised** 57:17 96:10,
15, 17
**suspect** 32:8 42:1
**sworn** 4:3
**symptoms** 37:5 38:8, 16
59:25
**system** 12:8, 10 54:24
57:25

**< T >**
**take** 5:19 10:19 27:11
28:1, 5 32:7, 15 39:8,
14, 19 47:5 55:12 58:2
64:13, 15, 23 66:23
69:16 79:18 87:14
93:22 94:4

**taken** 2:2 14:20 56:1
83:23 87:16 94:16
98:10
**talk** 5:13 22:10 25:11,
16 37:18 38:14 52:1
55:21 61:24 62:3 95:5
**talked** 8:16
**talking** 73:6
**target** 30:5
**teach** 56:17
**team** 15:21
**tell** 4:23 6:12 8:22
10:2, 24 20:2 24:6
36:12 37:14 46:11
56:13, 18 57:9 60:10
62:22 63:8 67:6 80:25
81:1 86:3 96:16
**temp** 6:23 54:15, 16
**temping** 7:3
**Ten** 4:19 10:19 88:24
**tenure** 77:14
**term** 18:25 26:4 32:1
82:14
**terms** 15:3 17:18 34:21
36:5
**TERRY** 1:3 4:10
56:23 57:2 58:2, 7, 15
65:23 70:13 75:14
77:7 80:5 85:22 87:22
95:10 96:10
**Tess** 4:10
**test** 10:19 28:1 88:20,
20
**testicle** 47:25
**testicular** 47:24
**testified** 4:4
**testimony** 4:13 52:13
**Thank** 39:21 46:2 60:8
81:2 94:11
**Thanks** 23:19 81:23
97:3
**Theresa** 2:12
**thing** 8:25 17:2 29:20
31:17 56:12 72:2 73:3
88:5 89:10
**things** 17:4 23:21
24:21 25:20 29:18
31:1 40:16 49:7, 8, 13,
14 55:16 72:5, 7 88:8
**think** 7:22, 23 9:24, 25
10:18 17:23 19:5
23:23 29:14, 14 33:22
43:13 50:19 51:11, 14
65:11 74:6 77:5 81:8
84:16 87:10, 12 88:13,
15, 16 90:15 92:1
**thinking** 41:1 65:16
**Third** 2:13 76:8 78:1
89:7
**Thirty** 11:5
**thought** 17:1 61:24
68:12 95:25

**three** 6:2 41:22 77:20,
25 83:24 84:1 85:7
88:25 89:4, 6
**TIER** 57:25
**tiers** 67:11
**till** 9:13 66:9
**time** 13:1, 22, 25 14:14,
19, 24 20:9, 22 24:1, 15
28:7, 14 34:14 42:19
44:18 45:5, 7 47:16
53:16 55:2 57:23 65:5,
19 66:23, 24 67:10
69:8 73:6 83:9, 21
84:15 85:4 89:6, 13
94:4
**times** 4:15 24:19 63:10
73:24
**title** 14:16 18:23 24:11
25:15
**titled** 56:4
**titles** 35:11
**today** 5:5 57:21 69:23
87:25
**toilets** 88:11
**told** 4:9 55:17 60:24
74:14
**top** 70:4, 23 72:13
**topics** 29:21
**torsion** 47:24
**total** 7:22 77:25
**trademarked** 32:11
**trained** 38:19, 20
**training** 7:10 11:7 15:2,
25 16:14, 16 26:5
29:10, 11, 12, 16 38:22,
23, 24 41:5 56:9
**training-type** 29:20
**transcript** 3:17 4:1
97:8
**transcripts** 3:18 97:9
**transferred** 95:22
**transpired** 45:11
**transported** 40:20, 21
64:9 93:15
**treadmill** 88:21
**treat** 12:11
**trenches** 49:2
**trick** 12:24
**trimester** 76:8
**true** 23:5 91:14, 24
92:19
**trump** 8:21, 23
**try** 5:12, 20, 20 20:5
25:18 32:20 33:6 49:8
54:17 94:25
**trying** 24:23 32:14
34:22 48:19 49:11
52:12 74:7
**tuberculosis** 77:1
**tunnel** 11:24 12:1
**turn** 56:21 64:5 70:19
86:17

turnover 50:*19, 22*
Twice 4:*16*
two 7:22, *23* 49:*13* 78:21 84:17 85:5 87:*11*
two-thirds 70:*1, 6*
type 7:*4* 8:*3* 31:*17* 40:*18* 47:7
types 29:*21* 38:8
typo 81:*8*

< U >
ultimately 17:7, *12, 17* 47:*23*
unclear 86:*15*
uncomfortable 93:*11*
understand 4:22 23:*10, 23* 27:20 32:*13* 34:2 38:*4* 60:*19* 65:*13* 74:*6, 7, 17* 89:8 91:*4, 9*
understanding 36:*17* 37:*23* 66:22 68:*21* 71:5 82:5 83:*18*
understood 4:*25* 27:*13* 93:*3*
unexpected 82:24 83:*19* 88:*12* 96:*18*
unfamiliar 49:*17*
unit 20:*14* 23:*9, 9* 67:7, *8* 68:*15, 16* 76:*4, 9* 87:*23* 90:7
UNITED 1:*1* 9:7
units 76:*16*
unpredictable 88:8 89:*10*
unwilling 11:*8*
unwillingly 10:*24*
urgent 63:*3*
use 26:*3* 34:*21* 82:*14, 18*
uses 54:*15*
Usually 20:24 22:*4, 5* 54:*15* 62:*10* 95:5
utilization 31:*14*

< V >
vacation 19:*12* 69:*9*
vague 34:*14* 51:*23, 25* 58:24 59:*14* 63:*25* 76:*18*
Vaguely 57:*8*
verbal 56:*16*
verified 20:*4, 8*
version 32:*11*
versus 22:*20* 26:6 50:*23* 75:15 76:*4*
violating 36:*8*
visit 65:*20* 73:*1* 85:*21*
visits 20:*11*
vital 81:*16*
vividly 29:*23*
voluntary 91:*9*
vs 1:*5*

< W >
Waited 9:*13* 63:*23*
walk 68:*16* 88:*20*
want 8:24 38:*4* 39:*20* 42:*21* 45:*17* 49:24 50:*1* 55:*21* 56:*21* 61:*4* 62:*13* 69:*2* 72:*4, 4* 74:*16* 79:*18* 87:*11* 90:*21* 92:*6* 95:*8*
wanted 20:*16* 22:*16* 28:*19* 51:*17* 59:*7* 60:*13* 61:*24* 62:*3* 67:*5* 75:*3* 82:*21* 86:*17*
way 12:*8* 32:*7* 35:*9* 43:*13* 51:*23, 25* 55:*15* 70:*2, 6*
ways 88:*12*
website 13:*9*
Wednesday 1:*8*
week 16:*23* 19:*11, 16* 36:*21* 43:*7* 58:*5* 59:*20*
weekends 20:*25* 21:*2*
weeks 75:*20* 79:*10*
Well 4:*20* 8:*21* 12:25 41:*20* 50:*20* 52:*11, 25* 56:*24* 70:*2* 78:*16* 82:*17, 17, 25* 84:*23* 90:*8* 94:*19*
went 9:*3, 9, 23* 13:*8* 29:*13* 54:*12* 64:*19* 81:*10* 96:*18*
We're 13:*18* 52:*9* 73:*6* 78:*21*
we've 8:*16* 26:*3* 77:*5*
whereof 98:*19*
wide 72:*9*
willingly 10:*23* 92:*17*
WISCONSIN 1:*1, 15, 16* 2:*6, 7, 8, 17, 20, 20* 5:*25* 6:*1* 8:*10* 54:*21, 23* 98:*1, 5, 11, 12*
withdrawal 81:*10, 25* 82:*1, 12, 13*
witness 2:*2* 4:*2* 11:*16* 16:*5* 17:*12, 15* 18:*9, 11, 20* 23:*18, 20* 24:*24* 25:*1* 26:*19* 30:*17* 32:*23* 33:*8, 20* 37:*10* 38:*11* 40:*1* 41:*22* 42:*9* 44:*10* 46:*3* 50:*8* 51:*6, 14* 54:*9* 61:*20* 66:*14* 68:*1* 69:*1* 81:*22, 24* 83:*14* 90:*17* 92:*23* 97:*1* 98:*19*
woman 30:*4* 31:*4* 89:*11*
women 88:*9* 89:*4, 11, 12*
women's 82:*3* 86:*6*
wonder 11:*8*
words 88:*25*
work 6:*11* 7:*4* 8:*1, 3, 10, 12, 17* 9:*19* 16:*21,*

21 21:*16* 30:*16* 43:*9* 58:*5* 69:*10*
worked 6:*18* 7:*1* 9:*7, 9* 10:*25* 12:*6* 16:*19* 35:*6, 24* 42:*19* 50:*15* 65:*5*
working 6:*1* 7:*13* 14:*23* 15:*10* 24:*2, 17* 28:*7, 14, 25* 29:*4* 43:*17* 45:*6* 51:*1* 53:*17* 64:*6*
works 12:*8*
world 88:*6*
worse 63:*7* 65:*8, 9*
write 6:*11*
Writer 71:*1, 9* 78:*7* 95:*21, 22, 24* 96:*2*
writing 83:*6* 98:*7*
wrong 27:*12* 95:*12*

< X >
X'd 39:*9*

< Y >
Yeah 9:*1* 11:*9* 17:*15* 18:*6* 19:*6* 23:*25* 24:*16* 25:*6* 39:*24* 41:22 48:*18* 53:*4* 54:*21* 60:*23* 63:*6, 6* 66:*17* 68:*1* 77:*18* 80:*24* 82:*17* 86:*11*
year 9:*5* 24:*19*
years 4:*17, 19* 6:*2* 7:*20, 22, 23* 8:*9* 9:*5, 12, 17* 10:*19* 11:*5* 41:*22* 76:*17*
Yep 27:*20* 87:*1*
York 10:*4*
young 12:*6*
Yukon-Kuskokwim 11:*1*

Gramann Reporting, Ltd. | U.S. Legal Support     (800) 899-7222