Rebecca Terry v. County of Milwaukee, et al.

17CV1112

Transcript of the Testimony of:

# Carolyn Exum

March 19, 2018





EXHIBIT B

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF WISCONSIN
     ----------------------------------------------------------
 3
     REBECCA TERRY,
 4
                        Plaintiff,
 5
             vs.                        Case No. 17-CV-01112
 6
     COUNTY OF MILWAUKEE, et al.,
 7
                        Defendants.
 8
     ----------------------------------------------------------
 9

10            **CONTAINS CONFIDENTIAL PORTIONS**

11            Deposition of CAROLYN EXUM

12                   March 19, 2018

13                    10:00 a.m.

14                        at

15            Hinshaw & Culbertson LLP
              100 East Wisconsin Avenue
16             Milwaukee, Wisconsin

17
           Reported by Carla J. Van Roo, RPR, CRR
18

19

20

21

22

23

24

25
```

```
1                    Deposition of CAROLYN EXUM, a witness in

2          the above-entitled action, at the instance of the

3          Plaintiff, pursuant to the rules of Federal

4          Procedure, before Carla J. Van Roo, Registered

5          Professional Reporter and Certified Realtime

6          Reporter, in and for the State of Wisconsin, at the

7          aforementioned location noted on previous page, held

8          on March 19, 2018, commencing at 10:00 a.m. and

9          concluding at 3:47 p.m.

10

11    A P P E A R A N C E S:

12

                   LOEVY & LOEVY
13                   MS. THERESA KLEINHAUS
                     311 North Aberdeen, Third Floor
14                   Chicago, Illinois, 60607
                     Appeared on behalf of the Plaintiffs
15
                   LEIB KNOTT GAYNOR, LLC, by
16                   MR. DOUGLAS KNOTT and
                     MR. RANDAL N. ARNOLD
17                   219 North Milwaukee Street, Suite 710
                     Milwaukee, Wisconsin, 53202
18                   Appeared on behalf of the County of
                     Milwaukee
19
                   HINSHAW & CULBERTSON LLP, by
20                   MR. MICHAEL RUSSART
                     100 East Wisconsin Avenue, Suite 2600
21                   Milwaukee, Wisconsin, 53202
                     Appeared on behalf of Armor Correctional
22

23

24

25
```

```
 1                       I N D E X

 2    EXAMINATION                                    PAGE

 3    BY MS. KLEINHAUS                                  4
          MR. KNOTT                                   173
 4        MS. KLEINHAUS                               174

 5

 6                    E X H I B I T S

 7    EXHIBIT NO.                        PAGE IDENTIFIED

 8    Exh. 1 - Answers to Interrogatories           112

 9    Exh. 2 - Armor policy on Infirmary Care        113

10    Exh. 3 - Assignment sheet                      123

11    Exh. 4 - Milwaukee County Sheriff's Office
              Correctional Health Services Report   127
12

13                (Exhibits filed with original
                   transcript, copies to counsel.)
14

15
                     CONFIDENTIAL TESTIMONY
16
              Page 167-Line 4 through Page 170, Line 20
17

18

19

20

21

22

23

24

25
```

**Gramann Reporting, Ltd. | U.S. Legal Support**                **(800) 899-7222**

Page 4

1    T R A N S C R I P T  O F  P R O C E E D I N G S
2         CAROLYN EXUM, called as a witness herein,
3    having been first duly sworn on oath, was examined
4    and testified as follows:
5         E X A M I N A T I O N
6    BY MS. KLEINHAUS:
7    Q   Good morning, Ms. Exum.
8    A   Good morning.
9    Q   As I told you before, we're on the record, my name is
10   Theresa Kleinhaus. I'm the attorney for the
11   plaintiff, Rebecca Terry.
12        Before we get started, why don't we do the
13   appearances by counsel on the record.
14        MR. KNOTT:  I'm Doug Knott, and I'm
15   represent the Milwaukee County defendants.
16        MR. RUSSART:  And I'm Mike Russart, and I
17   represent Armor.
18        MR. ARNOLD:  I'm Randal Arnold, and I
19   represent the witness, affiliated with Mr. Knott's
20   office.
21        MS. KLEINHAUS:  Do you have an appearance
22   on file already?
23        MR. ARNOLD:  I might not.
24        MS. KLEINHAUS:  Okay.  Do you represent her
25   in any different capacity than Mr. Knott?

Page 5

1         MR. ARNOLD:  No.
2         MS. KLEINHAUS:  Do you represent the other
3    Milwaukee County defendants as well?
4         MR. ARNOLD:  Yes.
5         MS. KLEINHAUS:  Okay.  That includes the
6    individual defendants as well as the County; right?
7         MR. ARNOLD:  It does.
8         MS. KLEINHAUS:  Okay, great.
9    BY MS. KLEINHAUS:
10   Q   Ms. Exum, have you been deposed before?
11   A   Have I been what?
12   Q   Have you done a deposition like this before ever?
13   A   No.
14   Q   Okay.  Have you ever testified under oath in a court
15   proceeding at all?
16   A   Yes.
17   Q   And on how many occasions have you done that?
18   A   Probably twice.
19   Q   Okay.  And we will get to that a little bit later on.
20   But for purposes of today's deposition, if you answer
21   one of my questions, I will assume that you
22   understood it; is that fair?
23   A   That's fair.
24   Q   Do you have any medical conditions or are you on any
25   medication right now that would make it difficult for

Page 6

1    you to answer my questions?
2    A   Like what?
3    Q   Well, do you have anything that would impair your
4    memory or your ability to give accurate information?
5    A   No.
6    Q   Okay.  What did you do to prepare for today's
7    deposition?
8    A   To prepare?  I was called -- I received a letter, and
9    then I was called to meet with the attorney so he
10   could get my side of the story --
11   Q   Okay.
12   A   -- of what I remember.
13   Q   Was that Mr. Knott?
14   A   Yes.
15   Q   Was anyone else present when you met with Mr. Knott?
16   A   No.
17   Q   And how many times did you meet with him?
18   A   Once.
19   Q   And when was that?
20   A   I forgot the date.  Was it --
21        MR. KNOTT:  Just to the best of your
22   memory.
23        THE WITNESS:  The best of my memory, I
24   would say it was not last Thursday, the Thursday
25   before.

Page 7

1    BY MS. KLEINHAUS:
2    Q   Okay.  And had you ever met Mr. Knott prior to that?
3    A   No.
4         MR. KNOTT:  Object --
5         THE WITNESS:  Oh, it wasn't that Thursday?
6         MR. KNOTT:  Object -- no.
7         You can ask about her preparation for
8    deposition.  You're not entitled to ask about other
9    meetings or how we work together outside the context
10   of preparation for a deposition.  So I instruct the
11   witness not to answer.
12        MS. KLEINHAUS:  Okay.  We will certify that
13   one.
14   BY MS. KLEINHAUS:
15   Q   Ms. Exum, what is -- are you working right now?
16   A   Yes.
17   Q   Who is your current employment?
18   A   RN supervisor at Rivershore Comprehensive Treatment
19   Center.
20   Q   Can you say the name of it again?
21   A   Rivershore Comprehensive Treatment Center.
22   Q   And what type of care does Rivershore Comprehensive
23   Treatment Center provide?
24   A   It's a Methadone outpatient program.
25   Q   You said Methadone?

Page 8

1  A  Uh-huh.

2  Q  How long have you been the RN supervisor at

3     Rivershore?

4  A  One year.

5  Q  And what did you do prior to that?

6  A  I was in Mississippi, and I worked at an inpatient

7     hospice facility.

8  Q  And what was the name of that facility?

9  A  North Delta Hospice.

10  Q  North Delta?

11  A  Uh-huh.

12  Q  Where is that located?

13  A  It's in South Haven, Mississippi.

14  Q  How long did you work at North Delta?

15  A  It was from April of '15 until January of '17.

16  Q  Okay.  And what was your position immediately prior

17     to your position at North Delta?

18  A  Prior to North Delta, I was at Milwaukee County Jail.

19  Q  Okay.  And obviously we will be talking about that a

20     lot.  What caused you to move to Mississippi?

21  A  Because my mom needed help.

22  Q  What is the highest level of education that you have?

23  A  Associate's degree.

24  Q  And where did you receive that?

25  A  MATC.

Page 9

1  Q  When was that?

2  A  I graduated June of 2000.

3  Q  Where did you study nursing?

4  A  MATC.

5  Q  And is that where you got your RN?

6  A  Yes.

7  Q  And that was in 2000?

8  A  Uh-huh, yes.

9  Q  What year did you begin working at Milwaukee County

10     Jail?

11  A  2005.

12  Q  Okay.  And why don't you take me through the work

13     that you did between 2000 and 2005.

14  A  I did -- I did some dialysis for about 10 months.  I

15     did nursing home supervision and management for a

16     couple years.  I did some agency pool work.  I think

17     I floated in almost every hospital in the city of

18     Milwaukee.

19  Q  Tell me how you obtained the position with Milwaukee

20     County Jail.  Did you have to make an application?

21  A  Yes, ma'am.

22  Q  And why were you interested in that position?

23  A  Why did I come to the jail?  Because I was doing

24     management in a nursing home and I was getting kind

25     of burnt out because never enough staff, so I was

Page 10

1     looking for a change.

2  Q  Were you hired the first time that you applied at

3     Milwaukee County Jail?

4  A  It took about maybe six months after I applied.  I

5     wasn't hired like the next day or anything like that.

6  Q  Okay.  And did you make your application in response

7     to a specific job posting?

8  A  Yeah.

9  Q  Okay.  What was that position that was advertised?

10  A  Registered nurse, full time.

11  Q  During that six-month period, did you ever interview

12     and not get the job?

13  A  Uh-uh.  I wasn't really interviewing.  I was just

14     working at the nursing home.  I was doing like 60

15     hours a week, and it was getting to be too much.

16  Q  Sure.  You mentioned earlier that you have testified

17     under oath on two occasions.

18        Have you ever been the plaintiff in a

19     lawsuit?

20  A  Uh-uh, no.

21  Q  Have you ever been sued before this lawsuit?

22  A  No.

23  Q  What were the occasions when you provided testimony

24     under oath?

25  A  There was a guy who was seeing -- he was at the jail,

Page 11

1     and there was some discrepancies about his weight at

2     the time that he came to the jail, and I had to go

3     over and testify that I did the intake.

4        Then I had another guy with some mental

5     health issues, and I was called to testify there too,

6     but then he decided to do voluntary inpatient, so I

7     ended up not testifying.

8  Q  Okay.  The first one that you mentioned related to

9     the inmate's weight.  Around what year was it that

10     you testified in that matter?

11  A  It probably was -- it may have been 2013 or '14

12     maybe.  I'm not sure.

13  Q  Do you recall that inmate's name?

14  A  No, I don't.

15  Q  What was the issue or the controversy related to his

16     weight?  Why was there testimony about that subject?

17  A  I think his lawyer may have been trying to say that

18     they had the wrong person or something.  I'm not

19     sure.  I was just basically asked did I remember what

20     his weight was on the day of intake and if the weight

21     I put on the intake form was what I got; and I told

22     him yes, because we weigh them, and I got his weight.

23  Q  Got it.  So that was a criminal matter that you were

24     testifying in?

25  A  Uh-huh.

**Page 12**

1 Q I'm sorry, if you can make sure you answer yes or no,
2    it's easier for her to take down.
3 A Yes. Yes.
4      MR. KNOTT: I'm not sure what you're
5    telling her, but obviously her answers don't have to
6    be yes or no. I --
7      MS. KLEINHAUS: She said "uh-huh," so I was
8    just helping the court reporter.
9      MR. KNOTT: Try to make sure that you
10    answer out loud as opposed to shaking your head or
11    that sort of thing.
12 BY MS. KLEINHAUS:
13 Q The second case that you mentioned you said was a
14    mental health intake; is that right?
15 A Yes.
16 Q And what was the issue or controversy in that matter?
17 A The patient had some obvious mental health issues,
18    and I asked the officers to take him to mental health
19    to get cleared. And because I was the one that
20    refused him and asked him to go get cleared, the day
21    of his court case I had to come out in case he
22    decided not to do voluntary, because then they were
23    going to do Chapter 51 or something. I don't know,
24    whatever it's called.
25 Q Okay. So it had to do with an involuntary

**Page 13**

1    commitment?
2 A Yes.
3 Q When you first began working at Milwaukee County
4    Jail, were you an employee of Milwaukee County?
5 A No.
6 Q Okay.
7 A Oh, yeah, I was. Yeah, we were County in '05 when I
8    first started.
9 Q Were you provided with any orientation or training
10    when you began working at Milwaukee County Jail?
11 A Yes.
12 Q What did that consist of?
13 A Probably charting systems, how they charted, how they
14    did their med pass, how they did intake. It was like
15    six or eight weeks of training. So I spent a week
16    like in each area. The RNs did charge desk, which is
17    the clinic, so you spend a week in the clinic. You
18    do intake. You spend a week to ten days in intake.
19    You do infirmary. You spend a week there. You do
20    med pass if there is not enough LPNs, so you do a
21    week with the med pass nurse.
22      You spend about a week with the charting
23    and the educator with learning different infectious
24    diseases and what to do and different things and what
25    do you report and what do you not. What do you have

**Page 14**

1    to report as far as calling the doctor immediately
2    versus putting in just a pink slip.
3 Q And what is a pink slip?
4 A A pink slip is something that the patients fill out
5    if they want to see the doctor.
6 Q Could it also be called a sick call slip? Is that
7    the same thing?
8 A Yeah, that's the same thing.
9 Q Okay. What items were you -- or what types of
10    conditions were you taught required calling the
11    doctor immediately?
12 A Anything that's life threatening. Different medical
13    situations. I mean, you know, if someone is having a
14    seizure, you're going to call. If you come across
15    someone that hung themself, you're going to call. If
16    you come across somebody that you suspect is in
17    labor, you're going to call. If you come across
18    somebody that would warrant being seen that night
19    versus the next morning.
20 Q And when you first began working at the jail in 2005,
21    what shift were you working?
22 A Day shift.
23 Q Okay. What is day shift -- what was day shift, I
24    suppose, at that time?
25 A I think it was 6:45 to 3:15.

**Page 15**

1 Q And when you began working at Milwaukee County Jail
2    in 2005, how many people were on the nursing staff
3    there?
4 A I don't remember.
5 Q Okay. Would it have been more than twenty, less than
6    twenty?
7      MR. RUSSART: Foundation.
8      MR. KNOTT: Foundation. You can go ahead.
9 BY MS. KLEINHAUS:
10 Q They are allowed to make objections, but you still
11    have to answer. So the question is whether they
12    are --
13 A I'm adding them up. I'm trying to add them up.
14 Q Oh, sorry, excuse me.
15      MR. KNOTT: So what's the time frame? It's
16    when you started in 2005?
17      THE WITNESS: Uh-huh.
18      MR. KNOTT: And the question is on staff.
19    Does that mean on a particular shift or does that
20    mean employees who are considered nursing staff?
21 BY MS. KLEINHAUS:
22 Q Did you understand the question?
23 A I guess.
24      MR. KNOTT: I'm going to object to the form
25    of the question. It's vague.

Case 2:17-cv-01112-JPS   Filed 08/31/18   Page 7 of 63   Document 167-2

Page 16

1    THE WITNESS:  I need to know, do you want
2  to know like all the staff or how many nurses worked
3  my shift?  What --
4  BY MS. KLEINHAUS:
5  Q  Everybody.  Let's start with everybody.  Was it more
6     than twenty or less than twenty?
7  A  It was --
8         MR. KNOTT:  That doesn't clarify the
9     question.  I object, it's vague.
10 BY MS. KLEINHAUS:
11 Q  Please answer the question.
12 A  More than twenty.
13 Q  And who was your supervisor when you began working at
14    Milwaukee County Jail?
15 A  That's going to be -- I cannot think of her name.
16 Q  Okay.  Do you recall who the director of nursing was
17    at the time that you --
18 A  Monica Pope-Wright.
19 Q  Who was it who actually hired you and offered you the
20    job as an RN?
21 A  Monica Pope-Wright.
22 Q  Okay.  So looking at six to eight weeks of training
23    at the start of your position at Milwaukee County
24    Jail, what was your first position there?  What were
25    you assigned to do?

Page 17

1  A  After the training was over with?
2  Q  Yes, ma'am.  And maybe I can back up.  Did it change
3     every shift, or did you have one regular set of
4     responsibilities that you did every shift?
5  A  It changed depending on where you worked.  If I was
6     at the desk in the clinic doing charge, that was
7     totally different than what I would do if I was in
8     intake.
9  Q  So how often would it shift between -- just as an
10    example, being at the charge desk versus intake.
11    Every shift?  Or would you be assigned to one every
12    week or two weeks?  How would that work?
13 A  I don't think it was a set rule on it.  The
14    supervisors would plug us in.
15 Q  So sometimes you might be in the same role for
16    several weeks at a time?
17 A  They try not to do that.  They try to have us rotate
18    depending on what staffing looked like.  We would try
19    to rotate at least once a week.
20 Q  Okay.
21 A  The goal was for us to have one assignment for a
22    week.
23 Q  Okay.  How many nurses were assigned per shift?
24 A  What shift?
25 Q  You told me you started out working the first shift

Page 18

1     or morning shift.
2  A  Uh-huh, right.
3  Q  How many nurses would be assigned to that shift?
4         MR. KNOTT:  Objection; foundation, and it's
5     vague.
6  BY MS. KLEINHAUS:
7  Q  Go ahead.
8  A  We would have four floors, so that's a nurse per
9     floor.  Then we would have two or three nurses in
10    intake, one or two nurses doing sick call, and one
11    nurse for SMU.  Did I say the clinic?  One for the
12    clinic.  And then there was nurse for the special
13    needs area.
14 Q  And is special needs different than SMU?
15 A  Yes.
16 Q  And is SMU the same as infirmary?
17 A  Yes.
18         MR. RUSSART:  Objection; foundation.
19         MR. KNOTT:  Foundation, vague as to time.
20 BY MS. KLEINHAUS:
21 Q  Okay.  In 2005 when you first started working at
22    Milwaukee County Jail, was the special medical unit
23    the same as the infirmary?
24         MR. RUSSART:  Objection; foundation, vague.
25         MR. KNOTT:  Join.

Page 19

1  BY MS. KLEINHAUS:
2  Q  Go ahead.
3  A  Yes.
4  Q  Okay.  Was there a time during your tenure at
5     Milwaukee County Jail where the word "infirmary" and
6     the words "special medical unit" didn't refer to the
7     same thing?
8  A  No.
9  Q  Okay.  You spoke a little bit about the nurse at the
10    charge desk in the clinic.  Can you tell me what that
11    person's responsibilities were when you began in
12    2005?
13 A  For day shift?  Because it changed according to what
14    shift you were on.
15 Q  I would like to go through each shift.  But if you
16    could start with day shift, that would be helpful.
17    Thank you.
18 A  Day shift nurses was the -- she was the coordinator.
19    If anything was happening on the floor, the nurses
20    would call down to the charge desk.  If they needed
21    an RN to come up and do an assessment or anything
22    like that, if the officers called and needed a nurse,
23    that's who they would call, the charge nurse.  She
24    was the hub of the clinic area.  She also assisted
25    the doctors in the clinic with assessments and exams

Page 20

1     and shots and stuff like that.

2   Q   And was there someone assigned to that role during

3     the night shift?

4          MR. RUSSART:  Objection; vague.

5          THE WITNESS:  At nighttime there is no

6     doctors there, so the clinic basically is closed.

7  BY MS. KLEINHAUS:

8   Q   So then there wouldn't be a charge nurse during that

9     time frame?

10         MR. KNOTT:  Vague.

11         THE WITNESS:  No.

12  BY MS. KLEINHAUS:

13  Q   When you were first trained at Milwaukee County Jail

14     during that first six- or eight-week training when

15     you started, what were you -- were you trained about

16     the role of the screening or booking nurse?

17  A   Yes, that was intake.  When I said we spent a week in

18     intake, the booking nurse is intake.  They are the

19     same.

20  Q   And what are the duties of the or what were the

21     duties of the intake nurse when you were first

22     starting at Milwaukee County Jail?

23  A   We did assessments on everybody that came in the door

24     to make sure they were safe to come into the jail.

25  Q   And what do you mean "make sure they were safe to

Page 21

1     come in"?

2   A   That there was no injuries.  There was no reason for

3     us not to accept the person based on their medical.

4   Q   Okay.  During your time at Milwaukee County Jail, so

5     spanning from when you started until you left in

6     2015, were there any changes in the duties assigned

7     to that intake nurse role?

8   A   No.

9          MR. RUSSART:  Foundation.

10  BY MS. KLEINHAUS:

11  Q   Was there any reason when you came back from

12     Mississippi that you didn't try to go back to working

13     at Milwaukee County Jail?

14  A   No.

15  Q   Did you ever apply after you returned from

16     Mississippi?

17  A   No.

18  Q   At any point were you an employee of Armor

19     Correctional Health Services?

20  A   Yes.

21  Q   When did that happen?

22  A   I think they switched over -- they switched the

23     County employees over to Armor I think -- I want to

24     say it may have been 2014 or '13.

25  Q   And how did you first learn that County employees

Page 22

1     were going to become Armor employees?

2   A   They had a meeting and told us.

3   Q   Okay.  And then from the time that that took effect

4     in either 2013 or 2014, did you remain an Armor

5     employee until -- until you left the Milwaukee area

6     in 2015?

7   A   Yes.

8   Q   When Armor took over healthcare at the jail, did your

9     supervisor change?

10  A   I think it did.  I think the County supervisor

11     retired.

12  Q   And I will represent to you that I believe Armor

13     started its contract with the jail in May of 2013.

14     Do you know who was your supervisor for the remainder

15     of 2013?  So May 2013 until the end of that year.

16  A   There were other county supervisors who I think were

17     picking up for the day shift full time when they

18     retire, so it was different ones.

19  Q   What about in the early part of -- I'm sorry, strike

20     that, please.

21          Do you remember any of your supervisors

22     from 2014?

23  A   Felicia Jackson, Margaret Hoover.  That's about it.

24     That's all I remember.  Those are the only two names

25     that I remember.

Page 23

1   Q   The first name that you said, was that Felicia

2     Jackson?

3   A   Uh-huh.

4   Q   And would Ms. Jackson and Ms. Hoover be a supervisor

5     for you for one shift, or were they supervisors over

6     longer periods of time than that?

7   A   They did one shift at first.  Then I think towards

8     the end of my stay they had switched the supervisors

9     to 12-hour shifts, I think.

10  Q   After Armor took over healthcare at the jail, did you

11     ever have any evaluations of your job performance?

12         MR. RUSSART:  Could you repeat the

13     question, please?

14         (Requested portion of record read by the

15     reporter.)

16         MR. RUSSART:  Vague.

17         THE WITNESS:  I'm going to say no.

18  BY MS. KLEINHAUS:

19  Q   And before Armor took over healthcare at the jail,

20     did you ever have any evaluations of your job

21     performance?

22  A   No.

23  Q   Did anyone ever, whether they called it a job

24     evaluation or not, go over expectations of the job

25     and whether you were meeting those expectations?

Page 24

1   A   Your supervisor would. Like if there was an issue,
2      then the supervisor would go over it with you.
3   Q   And when you say if there was an issue, meaning if
4      something didn't go the way they wanted it to go,
5      they may go over it with you; is that right?
6   A   Yes.
7   Q   Was there ever any kind of formal process, you know,
8      either annually or quarterly where they would go over
9      areas of job responsibilities with you and tell you
10      how you were doing in those areas?
11   A   Only if an issue came up.
12   Q   You described earlier that you would be rotated --
13      when you first started at Milwaukee County Jail in
14      2005 you would be rotated through different
15      positions. For example, intake or charge.
16         Did that remain the same for the remainder
17      of your time working at the jail?
18   A   Yes.
19   Q   Did you ever receive any kind of promotion or
20      demotion during your time working at the jail?
21   A   No.
22   Q   Were you ever given any sort of merit raise while you
23      were working at the jail? Meaning a raise that
24      wasn't cost of living increase.
25   A   No, they were all cost of living.

Page 25

1   Q   Okay. I want to talk to you a little bit about the
2      infirmity or SMU area. If I refer to it as "SMU," do
3      you know what I'm talking about?
4   A   Yes.
5   Q   Okay. Where is the SMU located within Milwaukee
6      County Jail?
7   A   There is a clinic area here, and the area you're
8      talking about would be straight across from it.
9   Q   So it's on the same floor as the clinic; is that
10      right?
11   A   Yes, uh-huh.
12   Q   And when you first began working at the jail in 2005,
13      was a nurse ever assigned to work inside that SMU
14      area?
15   A   No.
16   Q   At any point during the time that you worked at
17      Milwaukee County Jail, was a nurse ever assigned to
18      work inside the SMU?
19         MR. KNOTT: I object to the form of the
20      question, but you can answer.
21         THE WITNESS: I think it was, but I'm not
22      sure when. So yes, there was a time when there was a
23      nurse assigned specifically to that area for first
24      and second shift, but I'm not sure what part of my
25      time there that happened.

Page 26

1   BY MS. KLEINHAUS:
2   Q   Okay. And I apologize if I asked you this already,
3      but can you tell me the hours for second shift?
4   A   Second shift was 2:45 or 2:30 to 11:00, 11:15.
5   Q   And then how about the third shift?
6   A   There was always a half an hour overlap, so nights
7      would have been 10:30, 10:45 to 7:15.
8   Q   During that overlap at the end and beginning of a
9      shift, what did you have to do during that time
10      period?
11   A   Report off to the next nurse that was taking over the
12      assignment you had. Count the narcotics in your
13      area.
14   Q   Anything else?
15   A   That's it.
16   Q   During the time that you worked at Milwaukee County
17      Jail, was there ever a nurse whose job duties were
18      during third shift to attend to the infirmary or to
19      be the infirmary nurse during the third shift?
20   A   I mean, I don't know if someone actually sat in there
21      on third shift or if -- I mean, every night there had
22      to be someone cover the area, because you could have
23      problems in there. But I couldn't say -- I was not a
24      night shift worker, so I couldn't say actually what
25      all the assignments were.

Page 27

1   Q   Got it. Did you ever work night shift as a matter of
2      overtime or --
3   A   Yes.
4   Q   Did that happen often?
5   A   Uh-uh. Not often, but sometimes.
6   Q   Were you ever required -- or, I'm sorry, strike that,
7      please.
8         I know you told me that when you first
9      started working Milwaukee County, you were working
10      first shift. Did you ever start regularly working
11      second or third shift?
12   A   Yes, I -- in 2008 I had a stroke, so when I came back
13      to County three months later I had to go PMs for a
14      couple of months until a spot opened back up on days.
15   Q   When you say "PMs," you mean second shift?
16   A   Second shift, yes.
17   Q   Did you ever regularly work third shift?
18   A   No.
19   Q   Focusing on the 2013 and 2014 time period, if there
20      was a nurse assigned as the infirmary or SMU nurse,
21      where would that person be physically within the
22      jail?
23   A   Either clinic, or there was like a little medical
24      room in there where we did treatments and stuff,
25      so

Page 28

1　Q　When you say there is a medical room in there, you
2　　　mean there is a small medical room within the SMU?
3　A　Right, with the -- little bed thing in there for
4　　　the patients to get on for us to do treatments and
5　　　stuff.
6　Q　Did you -- were you assigned to the role of infirmary
7　　　or SMU nurse during the 2013/2014 period?
8　A　Yes.
9　Q　And to your knowledge, did the duties or
10　　responsibilities of that role change at all during
11　　the time that you worked for Milwaukee -- or worked
12　　at Milwaukee County Jail?  So from 2005 until 2015,
13　　did the duties of the infirmary nurse change?
14　　　　　MR. RUSSART:  Foundation, vague.  Go ahead
15　　and answer.
16　　　　　THE WITNESS:  No.
17　BY MS. KLEINHAUS:
18　Q　During the occasions that you worked as the infirmary
19　　nurse, you said sometimes that person would be in the
20　　medical room in the SMU.  Would you remain in that
21　　room throughout the entire shift or just go in there
22　　to do the treatments?
23　A　It kind of depends on what your assignment was and
24　　what the staffing was for that day, that shift.
25　Q　Okay.  Tell me what you mean by it depends on what

Page 29

1　　your assignment was.
2　A　If there was enough staff, then yes, the nurse would
3　　stay in the SMU.
4　Q　And for first shift, I think you described for me
5　　earlier all the nursing roles on the first shift.
6　A　Uh-huh.
7　Q　I'm sorry that I don't have that count in my mind.
8　　　　That would be somewhere around eight nurses
9　　assigned to the first shift; is that about right?
10　　　　　MR. KNOTT:  Foundation, it's vague.
11　　　　　MR. RUSSART:  Object to the form.
12　　　　　THE WITNESS:  No.
13　BY MS. KLEINHAUS:
14　Q　About -- I'm sorry, strike that, please.
15　　　　How many nurses would be a fully staffed
16　　first shift?
17　　　　　MR. RUSSART:  Foundation.
18　　　　　MR. KNOTT:  Foundation.
19　BY MS. KLEINHAUS:
20　Q　Go ahead.
21　　　　　MR. KNOTT:  What period of time are we
22　　talking about?
23　BY MS. KLEINHAUS:
24　Q　Go ahead.
25　　　　　MR. RUSSART:  Object to the form.

Page 30

1　　　　　MS. KLEINHAUS:  You have already objected.
2　BY MS. KLEINHAUS:
3　Q　Why don't you go ahead and answer.
4　A　I thought he asked you a question, though.
5　Q　So they are entitled to object.  They are not
6　　actually entitled to ask me questions.  So I'm going
7　　to ask questions and you're going to answer it.  If
8　　you don't understand the question, just let me know
9　　and I can explain; okay?
10　A　Okay.
11　　　　　MR. KNOTT:  Just so you understand, Ms.
12　　Kleinhaus, that sort of thing is just asking if you
13　　would like to clarify, and if it's not, then it's an
14　　objection, so I mean no offense by asking you a
15　　question.
16　BY MS. KLEINHAUS:
17　Q　Okay.  So the question is:  What is a fully staffed
18　　first shift?  And if that changed over the time that
19　　you were working at Milwaukee County Jail, just tell
20　　me that and I will break it down by era.  But in --
21　　I'm just going to start generally, during the 10
22　　years you were there, what would a fully staffed
23　　first shift have been?
24　　　　　MR. RUSSART:  Objection; foundation.
25　　　　　THE WITNESS:  Ten to eleven.

Page 31

1　BY MS. KLEINHAUS:
2　Q　Ten to eleven.  Did that change at any point during
3　　your time working there or was that consistent?
4　　　　　MR. RUSSART:  Objection; foundation.
5　　　　　THE WITNESS:  Consistent.
6　BY MS. KLEINHAUS:
7　Q　Okay.  Moving on to the second shift, what would a
8　　fully staffed second shift have been?
9　　　　　MR. RUSSART:  Objection; foundation.
10　　　　　MR. KNOTT:  Join.
11　　　　　THE WITNESS:  Second shift was about eight
12　　to ten.
13　BY MS. KLEINHAUS:
14　Q　Okay.  And did that remain consistent during your
15　　time that you were --
16　A　Yes.
17　Q　-- working there?
18　　　　　And moving on to the third shift, what was
19　　a fully staffed third shift?
20　　　　　MR. RUSSART:  Objection; foundation.
21　　　　　MR. KNOTT:  Join.
22　　　　　THE WITNESS:  Three to five.
23　BY MS. KLEINHAUS:
24　Q　And did that remain consistent during your time
25　　working there?

Case 2:17-cv-01112-JPS   Filed 08/31/18   Page 11 of 63   Document 167-2

Page 32

1   A   Yes.

2   Q   Okay. You mentioned earlier that if it was a fully

3    staffed shift, then the infirmary nurse could remain

4    potentially in that medical room in the infirmary.

5    If it wasn't a fully staffed shift, where would that

6    person be?

7   A   Clinic.

8   Q   And why is that?

9   A   Because it's right across from there.

10   Q   And could the infirmary nurse be in the clinic on the

11    third shift?

12   A   Yes.

13   Q   Okay. And I'm sorry if I just don't have the basis

14    for this, but the clinic isn't open during the third

15    shift; correct?

16   A   No.

17   Q   I'm sorry, let me ask it better. Is the clinic open

18    during the third shift?

19   A   I guess -- it's not open per se. We don't have

20    doctors working in the clinic at nighttime. But at

21    any time when there is someone upstairs that needs to

22    be brought down to the clinic for us to observe, then

23    it's open.

24   Q   I see.

25   A   If someone needs an IV infusion, they can't stay on

Page 33

1    the floor, so they would come to the clinic area.

2   Q   I see.

3   A   And the SMU, or infirmary nurse, there was no

4    computer working in there. So if she did her

5    assessment, she would have to come out at some point

6    to chart.

7   Q   And she would chart in the clinic?

8   A   Yes.

9   Q   Got it.

10      What were the duties of the infirmary or

11    SMU nurse? What was she supposed to be doing?

12   A   What shift?

13   Q   Let's start with third shift.

14      MR. KNOTT: I'm sorry, what --

15      MS. KLEINHAUS: Would you like me to repeat

16    that?

17      MR. KNOTT: Yes, please.

18   BY MS. KLEINHAUS:

19   Q   The question is: The duties of the infirmary nurse

20    during the third shift.

21      MR. KNOTT: Object to the form.

22      THE WITNESS: The third shift nurse, or all

23    the nurses -- all the shift nurses would do an

24    assessment at the beginning of their shift. Check

25    the med book and treatment book to make sure there is

Page 34

1    no meds or treatment due for that shift.

2   BY MS. KLEINHAUS:

3   Q   What else?

4   A   Assess all the new people and get patients out of

5    there that didn't need to be in there, send them back

6    upstairs, call the doctor and get orders for someone

7    who was stable enough to go upstairs.

8   Q   And the SMU area is a housing area with cells in it;

9    right?

10   A   Yes.

11   Q   About how many cells are there?

12   A   I think it was eleven.

13   Q   Are those sort of in like a semicircle?

14   A   Yes.

15   Q   Okay. Did the infirmary nurse have any

16    responsibility to do rounds through that semicircle

17    to check on patients?

18      MR. KNOTT: Foundation.

19      MR. RUSSART: Form.

20      THE WITNESS: Each shift, the nurse would

21    check the patients at the beginning to see what they

22    needed for that shift. And if there was someone that

23    needed to be watched more often, then that would be

24    her responsibility to do that.

25

Page 35

1   BY MS. KLEINHAUS:

2   Q   So she would determine how often she needed to check

3    on them based on their condition?

4   A   Right.

5   Q   Did the infirmary nurse have any responsibility to

6    document how often she was checking on patients?

7   A   What are you saying?

8   Q   When you said before you know a nurse at the

9    beginning of the shift would look at someone's

10    medical condition and determine how often they need

11    to be checked on, was there any kind of log where she

12    would mark off how often she was going to check on a

13    patient or all of the patients?

14   A   I mean, she would do her charting for her

15    assessments. As far as how often she came into the

16    unit, the officer writes down every time the nurse

17    comes into the unit.

18   Q   I see. So there is a correctional officer assigned

19    to the SMU every shift; right?

20   A   Yes, you can't get in there unless he lets you in.

21   Q   Got it. Could the nurse assigned to the infirmary

22    stay in that area after doing assessments?

23      MR. RUSSART: Objection; vague.

24      THE WITNESS: Well, there is no computer.

25    There was no computer there, so if you did --

Case 2:17-cv-01112-JPS   Filed 08/31/18   Page 12 of 63   Document 167-2

Page 36

1　assessments you need to go out at some point to do
2　charting.
3　BY MS. KLEINHAUS:
4　Q　Okay.  So there wasn't a desk for the infirmary nurse
5　　　inside the SMU; is that right?
6　A　No.
7　Q　How could -- if I say "inmate" or "patient," you know
8　　　I'm talking about the same person?
9　A　Yes.
10　Q　If a patient needed to let the infirmary nurse know
11　　　that he needed care, how could he do that?  What are
12　　　the methods for communicating to the infirmary nurse?
13　A　Through the correctional officer.
14　Q　How would a patient do that?
15　A　They had call lights in the cells, and the officer
16　　　would answer the call light.  And if they said they
17　　　needed medical, they would call the clinic and tell
18　　　us.
19　Q　Can you describe a call light for me?
20　A　A call light is a little button, it has a light on
21　　　the door.  They push the button, the light shows up.
22　　　The officer picks up the intercom and asks them what
23　　　their need is.
24　Q　I'm sorry, are you -- is that complete?
25　A　Yeah, uh-huh.

Page 37

1　Q　How does the correctional officer communicate to the
2　　　infirmary nurse?
3　A　By telephone.
4　Q　And where can he call her at?
5　A　The clinic.  He can call the charge nurse at the
6　　　clinic, and then she'll -- if the nurse that is
7　　　working over there is out doing something else, he
8　　　can call her.  The clinic nurse can call her by
9　　　radio.
10　Q　Are all the nurses on a particular shift equipped
11　　　with radios?
12　A　Equipped with what?
13　Q　Radios.
14　A　Yes.
15　Q　And are they on the same channel or different channel
16　　　than the correctional staff?
17　A　I think they were on separate channels, but I'm not
18　　　sure.
19　Q　Do you recall whether you could hear correctional
20　　　staff communicating with one another on your radio?
21　A　At times, but not always.
22　Q　Was there any requirement during the time that you
23　　　worked at Milwaukee County Jail that the charge nurse
24　　　be like a more experienced nurse or a supervising
25　　　nurse?

Page 38

1　A　No, because the charge nurse wasn't a supervisor.
2　Q　Okay.
3　A　There was a supervisor on every shift, so no.
4　Q　Okay.  Where was the supervisor located?
5　A　Across from the charge desk.
6　Q　And is that an office or a desk or --
7　A　It's an office.
8　Q　And you said earlier if a correctional officer
9　　　telephoned the clinic and the infirmary nurse wasn't
10　　　there, then the charge nurse could reach the
11　　　infirmary nurse?
12　A　Or she could go over there herself.
13　Q　Got it.  Where would the infirmary nurse be besides
14　　　the infirmary or the clinic.  Where else could she
15　　　be?
16　A　On another emergency.
17　Q　And is it fair to say that could be anywhere in the
18　　　jail?
19　A　Yes.
20　Q　Or at least any housing unit in the jail?
21　A　Yes.
22　Q　You mentioned earlier there are fewer nurses assigned
23　　　to the third shift than the first and second shift?
24　A　Yes.
25　Q　Why is that?

Page 39

1　A　There is no med passes.
2　Q　Any other reason?
3　A　That --
4　　　　　　MR. KNOTT:  Objection --
5　BY MS. KLEINHAUS:
6　Q　Sorry, go ahead.
7　A　That knocks off four nurses there.
8　Q　So that's the whole reason.
9　　　　　　MR. KNOTT:  Foundation.
10　BY MS. KLEINHAUS:
11　Q　Were there times when you were working at Milwaukee
12　　　County Jail where you were short-staffed in terms of
13　　　nurses?
14　　　　　　MR. RUSSART:  Objection; form, foundation.
15　　　　　　MR. KNOTT:  Join.
16　BY MS. KLEINHAUS:
17　Q　Go ahead.
18　A　Nursing is short-staffed everywhere.
19　Q　I hear that.  My mom is a public health nurse, so I
20　　　actually hear about that all the time, but my
21　　　question is a little more specific.
22　　　　　　When you were working at Milwaukee County
23　　　Jail, were there times that nurses were
24　　　short-staffed?
25　　　　　　MR. RUSSART:  Object to the form --

Case 2:17-cv-01112-JPS   Filed 08/31/18   Page 13 of 63   Document 167-2

Page 40

1      MR. KNOTT: Join.

2      THE WITNESS: Call-ins are going to be

3 short.

4 BY MS. KLEINHAUS:

5 Q   So if someone calls in sick or FMLA or something like

6    that, you're not going to have enough people; right?

7      MR. KNOTT: Foundation.

8      THE WITNESS: Yes.

9 BY MS. KLEINHAUS:

10 Q   Okay. What about circumstances where there were not

11    enough nurses employed, there wasn't enough people to

12    assign. Did you ever come across that during the

13    time that you worked at Milwaukee County Jail?

14 A   No.

15 Q   Was it your experience that ten to eleven nurses on

16    the first shift was sufficient to meet all the

17    nursing needs at the jail?

18      MR. KNOTT: Foundation.

19      MR. RUSSART: Join.

20      THE WITNESS: Yes.

21 BY MS. KLEINHAUS:

22 Q   And eight to ten on the second shift, was that

23    sufficient to meet the nursing needs?

24      MR. KNOTT: Same objection.

25      MR. RUSSART: Foundation.

Page 41

1      THE WITNESS: Yes.

2 BY MS. KLEINHAUS:

3 Q   And what about three to five on the third shift. Was

4    that sufficient to meet -- I'm sorry, strike that,

5    please.

6      Yeah, three to five on the third shift, was

7    that sufficient to meet the nursing needs?

8 A   Yes.

9      MR. RUSSART: Foundation.

10 BY MS. KLEINHAUS:

11 Q   Did you ever work as the infirmary nurse on the third

12    shift?

13 A   No.

14 Q   Were you ever required to stay past the first shift

15    and work into the second shift because of short

16    staffing?

17 A   Yes.

18 Q   About how often would that happen?

19 A   Maybe once a month, because we rotated, so ...

20 Q   Were you ever required to work the third shift

21    because of short staffing?

22 A   Yes.

23 Q   Was that at about the same frequency, once a month?

24 A   Yes.

25 Q   During the initial orientation that you had at

Page 42

1    Milwaukee County Jail that you said was six to eight

2    weeks, were you given any training related to

3    pregnancy or pregnant inmates?

4 A   Yes, we spent time with the female nurse practitioner

5    during that six to eight weeks. We spent time with

6    her.

7 Q   And what training did you receive from her?

8 A   Just when to call, what to do, where the OB kit was,

9    if you thought someone was in labor, how to count

10    contractions and stuff like that.

11 Q   When Armor took over health care at the jail in 2013,

12    were you required to do any training because of that?

13 A   I think we were already in the middle of training

14    because we had a new computer system.

15 Q   You were in the middle of training related to the

16    medical records; is that right?

17 A   Correct.

18 Q   Apart from training as to medical records, did you

19    receive any other additional training when Armor took

20    over?

21 A   Yes, we did.

22 Q   And what was that?

23 A   They took us through the computer system and we had

24    like maybe six days that we had to go train with some

25    Armor staff.

Page 43

1 Q   Where did that training take place?

2 A   Most of it was at the House of Corrections. They

3    have like an education building out there.

4 Q   Was that all training on the computer system?

5 A   Some of it. And then it was like, you know, the way

6    Armor do things and their assessments.

7 Q   Did you receive any training from Armor related to

8    pregnancy or pregnant inmates?

9 A   Yes.

10 Q   And what did that consist of?

11 A   Just basically what you do if you think somebody is

12    in labor.

13 Q   What were you taught to do if someone was in labor?

14 A   Call 911.

15 Q   You mentioned the switch in the medical records when

16    Armor took over. What was the system in place before

17    Armor took over?

18 A   Ceridian.

19 Q   And was that an electronic medical record system?

20 A   Yes.

21 Q   And what was the system after Armor took over?

22 A   I don't recall the name.

23 Q   Okay. Focusing on the time period before Armor took

24    over, if an inmate had a complaint about their

25    medical care, they thought they needed something they

Page 44

1   didn't get or something like that, how could they
2   communicate that to the medical staff?
3 A   Sick call.
4 Q   And sick call could be a request for care or a slip
5   saying they didn't get something they needed; is that
6   fair to say?
7 A   Yes.
8 Q   Was there any grievance system in place related to
9   medical care for medical -- grievances about medical
10   care before Armor took over?
11 A   Yes.
12 Q   Can you describe what that system was for me?
13 A   Either the patient would do a sick call slip or
14   either the lieutenant or sergeant would bring down a
15   grievance form that they had filled out that goes to
16   the supervisor.  She looks into it, investigates it,
17   and gives the person a response.
18 Q   When you say "the supervisor," you mean the nursing
19   supervisor?
20 A   Yes, nursing supervisor.
21 Q   Okay.  So at that time, was it the same grievance
22   system for grievances about what the correctional
23   staff was doing and what the medical care staff was
24   doing?
25 A   Not about correctional.  We didn't deal with

Page 45

1   correctional.
2 Q   Okay.  Do you know if the system was the same for
3   both?
4 A   Don't know.
5 Q   What about after Armor took over.  Was there a system
6   in place for grievances?
7 A   The same.
8 Q   Under the system before Armor took over, where were
9   the grievances stored or kept?
10 A   With the supervisors -- the RN supervisors.
11 Q   And that would be in the office across from the
12   charge desk?
13 A   Yes.
14 Q   Do you know how they were organized.  Like by inmate
15   or by complaint or --
16 A   No, I don't know.
17 Q   Okay.  If I wanted to go look at grievances from a
18   particular time period, for example, look at all the
19   grievances about medical care in 2012, do you know
20   where those were kept?
21 A   No.
22      MR. KNOTT:  Foundation.
23      THE WITNESS:  No.
24 BY MS. KLEINHAUS:
25 Q   What about after Armor took over.  Do you know where

Page 46

1   the grievances are kept?
2      MR. KNOTT:  Foundation.
3      THE WITNESS:  No.
4 BY MS. KLEINHAUS:
5 Q   Under either grievance system, before or after Armor,
6   is there any electronic copy of the grievances?
7 A   I don't know.
8      MR. KNOTT:  We have been at it a little
9   more than an hour.  Can we take a break when you are
10   in a transition?
11      MS. KLEINHAUS:  We can take a break.  Let's
12   go off the record.
13      (Off the record.)
14 BY MS. KLEINHAUS:
15 Q   Before the break, we were talking about grievances.
16   Were you aware of any grievances about medical care
17   that you provided or failed to provide for any inmate
18   at Milwaukee County Jail?
19 A   Are you talking about grievances against me?
20 Q   Right.
21 A   Oh, yes.
22 Q   Okay.  Tell me about the grievances you're aware of.
23      MR. KNOTT:  Just -- Ms. Exum, I just have
24   to counsel you not to use any identifiers.
25

Page 47

1 BY MS. KLEINHAUS:
2 Q   Yeah, don't use anyone's name.  You can just tell me
3   the subject matter of the grievance.
4 A   Okay.  There was a patient who said he lost weight,
5   but when we checked he didn't.  He asked for a
6   specific diet.  And when I assessed him, I made him
7   an appointment.  He was seen by the NP or the doctor,
8   I'm not sure, and they decided not to give him a
9   special diet because there was no weight loss.
10 Q   What other grievances are you aware of about your --
11   the care you provided or failed to provide?
12 A   I think that's the only one that I was aware of.
13 Q   If you recall any others in the course of our
14   questions today, just let me know; okay?
15 A   Okay.
16 Q   Were you an independent contractor for either Armor
17   or Milwaukee County at any point?
18 A   No.
19 Q   When you were working at Milwaukee County Jail, what
20   was the role of the nursing supervisor?  What was
21   that person responsible for doing?
22 A   I really don't know their role, per se.  I know they
23   did the assignments.  I know if there were ever any
24   issues, that's who handled them.  But as far as like
25   a job description for them or something, I don't

Case 2:17-cv-01112-JPS   Filed 08/31/18   Page 15 of 63   Document 167-2

Page 48

1  know.

2  Q  Okay. The only job duties you're aware of is making

3    assignments or dealing with personnel issues?

4  A  Right.

5  Q  Okay. What about the director of nursing's role.

6    What was that person responsible for doing?

7  A  Man, she had a lot of roles, but I couldn't tell you

8    exactly what they were.

9  Q  You said when you started it was Ms. Poke; is that

10  right?

11  A  Uh-huh.

12  Q  Did that ever change during the time that you were

13    there?

14  A  Yes.

15  Q  Who was the next person after that that you recall

16    was the director of nursing?

17  A  Gina Strehlow. And there was one before Gina, but I

18    don't know her name. I can't remember her name.

19  Q  Anybody after Strehlow that you recall?

20  A  No.

21  Q  At any time during your work at Milwaukee County

22    Jail, did you -- were you aware of fluctuations in

23    the number of inmates housed there? For example, a

24    huge increase or a huge decrease in the number of

25    inmates housed there?

Page 49

1  A  We didn't really get that information. That was not

2    privy to us. The supervisors may have known; but the

3    staff nurses, that was not our information.

4  Q  How was information about the nursing policies

5    communicated to you? Would there have been like a

6    roll call at the beginning of your shift or memos?

7    How would you receive information about how your

8    employer expected the work to be completed?

9  A  Policies and procedures were in books and then they

10    were on the computer too.

11  Q  Got it.

12      When you started at Milwaukee County Jail,

13    were you given like an employee handbook?

14  A  Yes.

15  Q  Were you ever given anything like that by Armor?

16  A  Yes.

17  Q  Did you retain copies of either of those?

18  A  I think the Armor one was online. The County one was

19    on paper.

20  Q  At any point during the time that you were working at

21    Milwaukee County Jail, was there a nurse assigned to

22    quality improvement?

23  A  Yes.

24  Q  And who was that?

25  A  When it was County, it was the educator who did the

Page 50

1  quality improvement. And when it became Armor there

2    was a specific nurse for that, and I cannot think of

3    her name right now.

4  Q  Were you required to do anything to participate in

5    any quality improvement initiatives?

6  A  Yeah, they would ask us our input.

7  Q  And what was the format for that? Would there be

8    like a meeting or would they tell you to submit

9    something in writing?

10  A  There was a meeting. They would assign a couple of

11    nurses on each shift to bring input to the meeting.

12  Q  Were you ever assigned to go to one of those

13    meetings?

14  A  No.

15  Q  Do you know if there's a written agenda for those

16    meetings?

17  A  Not sure.

18  Q  What were the subjects that were covered for quality

19    improvement? What areas were they working on

20    improving?

21  A  Since I wasn't a part of those meetings, I can't

22    really say.

23  Q  Were you ever aware of any kind of audit of medical

24    records or files that was being done as part of

25    quality improvement?

Page 51

1  A  Yes.

2  Q  What did that consist of?

3  A  That was the quality nurse's job, so I don't know

4    what she did, but I do know that she did audits.

5  Q  Were you ever informed that your files specifically

6    were going to be audited?

7  A  No.

8  Q  Or your records would be specifically observed?

9  A  No.

10  Q  Who would the nursing -- or I'm sorry, strike that,

11    please.

12      How many nursing supervisors would there be

13    at one time?

14      MR. RUSSART: Object to the form.

15      THE WITNESS: One supervisor.

16  BY MS. KLEINHAUS:

17  Q  And is that per shift or --

18  A  Yes.

19  Q  Who did the nursing supervisors report to?

20  A  The director of nursing.

21  Q  And who did the director of nursing report to?

22  A  I think the sheriff, Clark. The County -- I think

23    Armor had a -- what's the guy. I think he was like

24    a -- there was another title with Armor that the

25    director went to before Clark, I think.

Case 2:17-cv-01112-JPS    Filed 08/31/18    Page 16 of 63    Document 167-2

**Page 52**

1 Q   Are you familiar with Wade Daley?

2 A   Yes.

3 Q   What was his role?

4 A   He was that person that --

5 Q   Okay. The head Armor person?

6 A   Yeah, he was the Armor person.

7 Q   Was he --

8 A   I forgot their titles. I don't know what their title

9     was.

10 Q   Sure. Was he located on site at Milwaukee County

11     Jail?

12 A   Yes.

13 Q   Where was his office?

14 A   Next to the director of nursing.

15 Q   And as far as you know, was he there full time?

16 A   Yes.

17 Q   How many physicians were assigned at Milwaukee County

18     Jail during the time that you worked there?

19 A   Can you clarify?

20 Q   Sure. I assume there are some physicians assigned to

21     work at the jail or on call for the jail; is that

22     correct?

23 A   Yes.

24 Q   How many physicians were either employed or on call?

25     And if it changed during the time you were there,

**Page 53**

1     just let me know that and we will break it up by time

2     period.

3 A   There was nurse practitioners who worked in the

4     clinic area, and then there was also a doctor on site

5     in the clinic area, and then there was always a

6     doctor on call.

7 Q   So the doctor was on site in the clinic area during

8     the first and -- during what periods of the day?

9 A   First shift and part of second.

10 Q   During the portions of the day where there was no

11     physician on site and there was a physician on call,

12     could any nurse call that physician, or was there an

13     assigned person who was communicating with the

14     physician?

15 A   Any RN could call.

16 Q   And during the 2014 period, what physicians were

17     working at Milwaukee County Jail or on call for

18     Milwaukee County Jail?

19 A   I don't know all their names. Dr. Buono was there.

20 Q   Okay. Anybody else?

21 A   There were some more, but I don't know their names.

22 Q   If you think of any, just let me know; okay?

23 A   Okay.

24 Q   Earlier you were discussing grievances. Do you know

25     how inmates could obtain a grievance form?

**Page 54**

1 A   They either get it from the correctional officer or

2     one of the sergeants or lieutenants.

3 Q   Did any of the nursing staff have them available to

4     give to inmates?

5 A   No. If they asked us for a sick call slip, those

6     were on the med carts. So if they said "I need a

7     sick call slip because, you know, I want to write

8     something down that happened," they would get those

9     from the nurses, but actual grievance forms came from

10     the officers.

11 Q   Okay. Where was the screening or booking nurse

12     assigned within the jail? Again, for all these

13     questions, if it changed over time, just let me know

14     that and I will do it in smaller chunks; okay?

15 A   The intake or booking nurse?

16 Q   Right.

17 A   You were in booking, in intake.

18 Q   Can you describe for me physically what the setup is

19     like in booking for where the medical staff are

20     versus the correctional staff?

21 A   Booking is -- there is prebooking and general

22     booking. Prebooking is a small area -- when the

23     officers first bring them in, there is a bench on one

24     side for males, a bench on the other side for

25     females. There is also a bench in front of where we

**Page 55**

1     stand. The nurses have three like boxed-off corners

2     so for privacy for the patients. There was also a

3     bench back there. So that's preintake. That's where

4     you decide if we're going to accept them or send them

5     to the hospital.

6          Then booking also had a room that was --

7     the nurses also had a room that was right off the

8     preintake area where we kept our medications and

9     different things for down in that area. And then on

10     the other side of that, the room next to that was in

11     general booking and that's where we would finish

12     their assessments and their intake paperwork.

13 Q   After you decided that you're accepting them?

14 A   Uh-huh.

15 Q   How many intake nurses would be assigned per shift?

16 A   Mostly two. Day shift sometimes had three.

17 Q   And how would the -- assuming those two nurses, how

18     would those two people divide up their work?

19 A   It depends on how they worked together. Most of the

20     time, both nurses would go to preintake and check

21     people in, unless it was just one or two people, then

22     one nurse would go out, and then we would come back

23     and finish the other part on the other side so that

24     one nurse isn't doing everything.

25 Q   How does a nurse doing the preintake? How does she

Case 2:17-cv-01112-JPS   Filed 08/31/18   Page 17 of 63   Document 187-2

Page 56

1 do that process? What is that process?

2 A  Vitals. All females did a urine for pregnancy.

3 There was a small part of the assessment

4 questionnaire that you would ask on that side just to

5 make sure that they were safe to take in, and then

6 the full assessment would be done on the other side.

7 Q  And how could the intake nurse access the assessment

8 questionnaire? Was it on a computer or written out,

9 hard copy?

10 A  We had a hard copy in writing, and we also have -- at

11 the end it was in the computer.

12 Q  And what did that initial prebooking questionnaire

13 assess? What was it looking at?

14 A  Were they suicidal or homicidal. Were they having

15 hallucinations, audio/visual or tactile. Were

16 they -- did they have an injury that wasn't treated,

17 and if they was in pain.

18 Q  If a person had any of those characteristics, for

19 example, an injury or in pain, what would happen

20 next?

21 A  Call the doctor that's covering to see if they would

22 accept them or not.

23 Q  So is it correct to say that the prebooking nurse

24 doesn't -- can't decide on her own whether to accept

25 or not?

Page 57

1 A  Not unless it's -- no, she still has to call the

2 doctor regardless. They make the final decision.

3 Q  If the doctor decides not to accept the patient or

4 the inmate, what happens next?

5 A  You inform the officers that brought them in that

6 they need to take them and get them cleared.

7 Q  And when you say "cleared," is that the same as

8 medically cleared?

9 A  Yeah, it could be mental health.

10 Q  And what are the officers expected to do?

11 A  Take them to the hospital and get them cleared.

12 Q  Who decides what hospital the inmate's going to?

13 A  The officers or the ambulance.

14 Q  Does the prescreen nurse call the ambulance?

15 A  Yeah. If it's a 911 situation, yes, we do.

16 Q  What about a non-emergency?

17 A  A non-emergency, that would be the officer's

18 decision. If they didn't want to transport them in

19 the car, sometimes they would call an ambulance for

20 them.

21 Q  Are the officers given any written information about

22 the reason that medical clearance is necessary?

23 A  The officers aren't given any information, per se.

24 We put information in an envelope for them to give to

25 the hospital. We do send a report to the hospital

Page 58

1 and also call the hospital.

2 Q  And where -- how is that report generated? Is there

3 a form in the computer?

4 A  Yes.

5 Q  What is that form called?

6 A  It's the pretake form. You fill it out and at the

7 bottom of it you say accepted or not accepted. And

8 if it's not accepted, then you have to fill in the

9 vitals and why the person wasn't accepted and you

10 print it off and send it to the hospital.

11 Q  Then that's placed in the envelope and given to the

12 officer?

13 A  Yes.

14 Q  Is a copy given to the inmate or patient?

15 A  No.

16 Q  Is the inmate or patient told why he or she is being

17 sent out to the hospital?

18 A  Yes.

19 Q  And the intake form that explains why a person is

20 being accepted or not accepted is then retained in

21 the database; is that right?

22 A  Yes.

23 Q  Okay. What documents or information, if any, are the

24 officers expect to obtain at the hospital to bring

25 back to the jail?

Page 59

1      MR. KNOTT: Object to form, vague, overly

2 broad.

3      MR. RUSSART: And foundation.

4 BY MS. KLEINHAUS:

5 Q  Go ahead.

6 A  We expect to get back a discharge summary, something

7 that tells us what the hospital did, what they did or

8 didn't do, and what they found and didn't find.

9 Q  Who's responsible for obtaining that at the hospital?

10 A  Usually the officers get it from the hospital.

11 Q  And is that information, the discharge summary from

12 the hospital, put into the screening system somehow?

13 A  It is. I think at some point it did get scanned into

14 the record. But when we're in prebook, we don't have

15 no way of scanning it into the record. We just have

16 it for calling the doctor. So when we call the

17 doctor and say this person is back, we can explain to

18 them what the hospital did or didn't do before they

19 decide to keep them.

20 Q  Who is responsible for scanning in those discharge

21 papers if the prescreen person can't do it because

22 they don't have a scanner? Who does it?

23 A  Right, I don't know.

24 Q  Does the prescreen nurse have any conversation with

25 the patient about what was done at the hospital?

Page 60

1   A   Usually, yes.

2   Q   Is there any requirement that the prescreen nurse

3     have a conversation with the patient about what

4     happened at the hospital?

5   A   Yes.

6   Q   She is expected to do that; is that right?

7   A   Correct.

8   Q   What about conversation with the correctional officer

9     or the deputy about what -- or whoever law

10     enforcement about what happened at the hospital?

11       MR. KNOTT: Object; vague --

12       THE WITNESS: No.

13       MR. KNOTT: -- overly broad.

14 BY MS. KLEINHAUS:

15   Q   Are there times when a pregnant inmate would not be

16     medically cleared to enter the jail?

17   A   What do you mean?

18   Q   Would there be times when the prescreening nurse

19     would send a pregnant inmate out to the hospital?

20   A   Of course.

21   Q   What are those circumstances -- strike that, please.

22       What was your training about when to send a

23     pregnant inmate out to the hospital?

24       MR. RUSSART: Objection; vague.

25       THE WITNESS: If they are having active

Page 61

1     contractions. If they say they are having

2     contractions, you can call the doctor and then it's

3     up to the doctor to say yes, send them out, or keep

4     them and watch them.

5 BY MS. KLEINHAUS:

6   Q   Other than contractions or reports of contractions,

7     are there any other circumstances when you were

8     taught to call the doctor to see if the pregnant

9     inmate should be sent out?

10       MR. KNOTT: Vague.

11       THE WITNESS: If someone is in distress,

12   obvious distress, and after your assessment you think

13   they are in distress, yes, you would call the doctor

14   and say "this is what I found," and then the doctor

15   would say: Keep them, watch them, or send them out.

16 BY MS. KLEINHAUS:

17   Q   Got it.

18       So if I'm understanding correctly, either

19   active contractions or reports of contractions or

20   someone who after assessing them it's clear to you is

21   in obvious distress?

22   A   Correct.

23   Q   Any other circumstances besides that?

24   A   A pregnant person you're talking about?

25   Q   Yes, ma'am.

Page 62

1   A   No. If a patient is requesting to go to the

2     hospital, you always call the doctor and say: This

3     is what they are saying, this is what I assessed,

4     this is what I found, and then the doctor decides.

5   Q   Got it. Who does the prescreening nurse report to?

6   A   The supervisor -- nursing supervisor.

7   Q   Did you ever experience being short staffed in the

8     prescreening or booking area? For example, only one

9     nurse being there instead of two?

10   A   No.

11   Q   Are you familiar with the term intake referral log?

12     Do you know what that is?

13   A   Intake referral log? Are you talking about a list of

14     peoples names that we put down for them to see a

15     certain doctor? Is that what you're talking about?

16   Q   I was just curious whether you are familiar with that

17     term. It sounds like that's not a term that you used

18     at Milwaukee County Jail?

19   A   It probably is used, but maybe not called that.

20   Q   I see. Other than the discharge papers that you

21     described, is there any other form that you would

22     expect to see when someone comes back from the

23     hospital?

24   A   Only if there was referrals.

25   Q   Tell me what you mean by that.

Page 63

1   A   Like if the person comes back and they need to go

2     back out for another appointment, that's a referral.

3   Q   Got it.

4       Are you aware of what information is given

5     to an inmate who's being placed in the infirmary, for

6     example, here is what you should do if you're in

7     medical distress or anything like that?

8   A   Yeah, they are all informed of the call light system.

9     If they are having problems they need to push that

10     call light button.

11   Q   Who's responsible for informing them of that?

12   A   I'm sure the correctional officer does, but I can't

13     say 100 percent because I'm not correctional staff,

14     but medical also informs them that there is a call

15     light in that cell.

16   Q   Is any written information given to inmates in

17     booking about medical care at the jail?

18   A   Not sure.

19   Q   Are the nurses assigned to booking required to

20     provide any information to inmates about medical

21     care?

22   A   No.

23   Q   Who decides whether to place an inmate in the

24     infirmary versus in a regular housing unit?

25   A   The nurse and the doctor, whoever you call. The

## Page 64

1   nurse practitioner. If you talk to a nurse

2   practitioner, they make the decision or the doctor.

3   Q   Okay. And if the doctor or nurse practitioner

4   decides that an inmate is going to the SMU, is that

5   decision documented somewhere?

6   A   Yeah.

7   Q   Where is that?

8   A   In your chart.

9   Q   In the medical chart?

10   A   Uh-huh.

11   Q   Is the reason for a person being sent to SMU included

12   as well?

13   A   Usually, I would say.

14   Q   And is it the responsibility of the booking nurse to

15   include that information?

16   A   Yes.

17   Q   How would the infirmary nurse learn or find out why

18   someone has been assigned to the infirmary?

19   A   The booking nurse would call report to her.

20   Q   Call who? I'm sorry.

21   A   Call report either to her, or if she wasn't available

22   they would give it to the supervisor.

23   Q   Is there any kind of treatment plan created for

24   someone who's entering the infirmary, like: Here is

25   what we plan to do for this patient while they are at

## Page 65

1   the infirmary?

2   A   Yes.

3   Q   Who's responsible for creating that treatment plan?

4   A   The nurse practitioner or the doctor, whoever admits

5   them.

6   Q   And who's responsible for putting that information in

7   the treatment plan into the medical chart?

8   A   Whoever makes it out, the practitioner or the doctor.

9   Q   Okay. Is someone responsible for telling the

10   correctional officer in the infirmary the medical

11   reason that someone is being placed in the infirmary?

12   A   No.

13   Q   Do you know how a correctional officer could find out

14   if someone was placed in the infirmary?

15   A   They can't. That's a HIPAA violation.

16   Q   So hypothetically if there was someone placed in the

17   infirmary, for example, because they recently had a

18   seizure, is it fair to say no one tells the

19   correctional officer that that's why that person is

20   there?

21        MR. KNOTT: Incomplete hypothetical, vague.

22        THE WITNESS: If that person had a seizure,

23   the officer would know because the officer is -- who

24   seen them have the seizure is going to inform medical

25   staff that the patient had a seizure.

## Page 66

1        So in that case, the officer in that area,

2   in the infirmary, would know that that person had a

3   seizure because this was witnessed by officers before

4   it was witnessed by nurses. So that's different than

5   saying I got put in SMU because I had a gunshot wound

6   or whatever. That's not information that's privy to

7   everybody.

8   BY MS. KLEINHAUS:

9   Q   Okay. And just so I make sure I understand, moving

10   away from a situation where the officer sees it

11   happen, like let's say you're the screening nurse and

12   someone has a seizure in front of you. They get sent

13   to the hospital, they come back. Does anyone tell

14   the officer: Hey, this guy had a seizure an hour ago

15   right in front of me?

16   A   Officers tell each other, because they're going to

17   see it.

18   Q   Okay.

19   A   If someone has a seizure in prebook, there is an

20   officer in the tower, there is an officer floating

21   around in prebook. If they have it in general

22   booking, that room is full of officers.

23   Q   What about, for example, someone who's placed in SMU

24   because they are going through withdrawal. Would any

25   medical staff inform the officer: This person is

## Page 67

1   here because they are going through withdrawal?

2   A   They don't go to SMU because of withdrawals. They

3   have to be really, really bad withdrawals for them to

4   go to SMU. That's not where they standardly go.

5   Standardly they go upstairs on a regular pod, lower

6   bunk. Withdrawals do not qualify for SMU unless that

7   person's number is so high.

8   Q   Let's take the last example that you gave, someone

9   going through an extreme withdrawal with a high

10   number.

11   A   Uh-huh.

12   Q   Is any medical staff responsible for telling the

13   correctional officer in the SMU: This person is in

14   here for extreme withdrawal symptoms?

15   A   Uh-uh, no.

16   Q   What about if a woman is placed in the SMU because

17   she is in labor. Is any -- anyone, medical staff or

18   correctional staff, responsible for telling the CO

19   that she is being placed there because she is in

20   labor?

21        MR. RUSSART: Object to the form.

22        THE WITNESS: We don't put anybody in there

23   in labor. That is not where they go if they're in

24   labor.

Page 68

1 BY MS. KLEINHAUS:
2 Q   Where do you go if they're in labor?
3 A   If they're in labor, they go to the hospital.
4 Q   Okay.  And what if a pregnant woman is being placed
5     in the SMU because of complications in her pregnancy.
6     Does anyone inform the correctional officer that the
7     reason she is being placed there is complications in
8     her pregnancy?
9         MR. KNOTT:  Form, hypothetical, vague.
10        MR. RUSSART:  Join.
11        THE WITNESS:  I don't know if that -- the
12    specific officer knows, is informed, by anyone.  I
13    can't say.
14 BY MS. KLEINHAUS:
15 Q   Were you ever told or trained that you're not
16    permitted to tell the correctional officer in SMU the
17    reason someone is in SMU?
18 A   That would be a HIPAA violation.
19 Q   Were you taught that, that that was a HIPAA
20    violation?
21 A   Yeah.
22 Q   If there was a medical condition that would impact
23    someone's behavior, let's say a medication or a
24    condition that would cause them to act out, for
25    example, or be manic or something like that, is that

Page 69

1     type of information something that you would have
2     been permitted to tell the correctional officer?
3         MR. RUSSART:  Object to the form.
4         MR. KNOTT:  Join.
5         THE WITNESS:  They wouldn't be in SMU.
6 BY MS. KLEINHAUS:
7 Q   Okay.  Is there any medical information that could be
8     provided to the correctional officer in SMU?
9 A   No, nothing that wouldn't violate their HIPAA.  I
10    mean, officers do know some things about patients and
11    that's because they are at the hospital with the
12    patient, they're -- an injury occurred in booking so
13    they're aware of it, they were at the medical
14    emergency.  They are aware of what happened at the
15    medical emergency, because they are there.
16        So there are times that they do know; but
17    that would be a violation for a nurse to say:  Hey,
18    so and so in Room 10 is here because of this.  That's
19    not an option.
20 Q   Okay.  And if there is a medical concern that would
21    require someone to be checked on frequently -- and
22    you know medicine and I don't, so choose whatever
23    medical condition would require someone to be checked
24    on frequently -- could the infirmary nurse ever say
25    to the correctional officer:  Make sure you check on

Page 70

1     the person in Cell 3 often, he or she has this
2     condition?
3 A   No.  Officers have their own time frame when they
4     check people.  If it's -- if there is a medical
5     reason for that person to be checked, then it would
6     be a nurse coming over there checking him, not the
7     officer.
8 Q   What's your understanding of what the -- you said a
9     nurse should be checking for a medical reason.  What
10    is the correctional officer checking for in the SMU?
11 A   I think they are just checking to make sure everybody
12    is alive and breathing when they do their rounds.
13 Q   Do you know how often they do that in the SMU?
14 A   No.
15 Q   And I know you mentioned training on HIPAA.  Aside
16    from that training on HIPAA, are you aware of any
17    policies that exist about communication between the
18    correctional officers and the medical staff?
19        MR. RUSSART:  Vague.
20        THE WITNESS:  Training?  What do you mean
21    "training"?
22 BY MS. KLEINHAUS:
23 Q   I'm just trying to find out if there are any policies
24    that explain to medical staff:  Here is how you
25    should communicate with correctional officers, here

Page 71

1     is what you can communicate and can't communicate,
2     that type of thing.
3 A   The HIPAA training tells you all of that, what you
4     can and can't say.
5 Q   Okay.  Anything else besides HIPAA in terms of
6     policies that you were taught?
7 A   No.
8 Q   If the infirmary nurse is doing some assessment or
9     providing some care in the infirmary, for example,
10    like taking vitals, where would that happen?  Inside
11    the infirmary?
12 A   Yes.
13 Q   Okay.  Would that be in the medical room that you
14    described?
15 A   Yes, or in the patient's room.
16 Q   Nurses can go in the cells in the SMU; right?
17 A   Yes, uh-huh.
18 Q   And how often is the infirmary nurse taking vitals in
19    the --
20 A   Whatever the doctor orders.
21 Q   And is that different from patient to patient?
22 A   Yes.
23 Q   How does the infirmary nurse receive information from
24    the screening or intake nurse?
25 A   When you call report to her.

**Page 72**

1  Q  What's the last word that you're saying?

2  A  Report.

3  Q  Report?

4  A  Yeah.

5  Q  When you call and report to her?

6  A  Yeah, call her and report what she is getting, what's

7      wrong with the patient, and why they are coming to

8      SMU.

9  Q  Okay.  So when the intake nurse is sending someone

10     out from booking into SMU, a phone call happens?

11  A  Yes.

12  Q  And is that information also written down somewhere?

13  A  On the report board.

14  Q  What's the report board?

15  A  That's how we communicate between shift to shift so

16     that the next shift will know what patients went into

17     SMU and what patients left and went back to a general

18     pod.

19  Q  Where is the report board located?

20  A  In the -- for SMU it's with the SMU nurse.  She keeps

21     that with her.

22  Q  And is it like a physical board up on the wall?

23  A  No, it's a clipboard with a report sheet with each

24     patient name that's in the SMU.

25  Q  And when a patient leaves SMU, where does their

**Page 73**

1     report sheet go?

2  A  It stays with the board.  They just take the

3     patient's name off if they are no longer in that room

4     so they can get another person in there.

5  Q  Is an electronic copy of the report board maintained

6     somewhere?

7  A  I don't think so.

8  Q  Okay.

9  A  Maybe it is, though.  It might be.

10  Q  Is there a medical housing unit at Milwaukee County

11     Jail separate -- that's different than the Special

12     Medical Unit?

13  A  No.

14  Q  Are you familiar with my client, Rebecca Terry?

15  A  Yes.

16  Q  And today we're going to talk about events from March

17     of 2014.

18         Did you have any familiarity with her prior

19     to March of 2014?

20  A  No.

21  Q  Okay.  Have you, to your knowledge, seen her,

22     interacted with her at all since March of 2014?

23  A  No.

24  Q  So to the best of your knowledge, all those

25     interactions would have been on March 9th and 10th of

**Page 74**

1     2014 that you had with Rebecca Terry?

2  A  Yes.

3  Q  Are you familiar with Correctional Officer Wenzel?

4  A  Not familiar.  I've heard the name.

5  Q  Okay.  Do you have any memory of ever interacting

6     with Officer Wenzel?

7  A  No, not really.  I mean, at some point maybe, but I

8     don't have it like in my memory like, yeah, this is

9     him or her or whoever.

10  Q  Do you have a picture in your mind like you could

11     recognize him, you know what he looks like?

12  A  No.

13  Q  Do you know anything about him?

14  A  No.

15  Q  What about Nurse Bevenue.  Do you know who that is?

16  A  Yes.

17  Q  And how did you first come to know Nurse Bevenue?

18  A  At the county jail.

19  Q  And did she start there after you or before you?

20  A  After.

21  Q  Okay.  Do you remember around when she started?

22  A  No.

23  Q  Did she work on the first shift with you often?

24  A  No, she was night shift.

25  Q  Were you friends with her at all socially outside of

**Page 75**

1     work?

2  A  No.

3  Q  Did you form any opinion about her abilities as a

4     nurse?

5  A  No.

6  Q  What about Supervisor Hoover.  When did you first get

7     to know her?

8  A  County jail.

9  Q  And was she there before you started?

10  A  Yes.

11  Q  And did she supervise you on the first shift?

12  A  No.

13  Q  Was she ever your supervisor on your shift?

14  A  Night shift.

15  Q  Did you ever form an opinion either positive or

16     negative about her abilities as a nurse?

17  A  No.

18  Q  Did you ever have any social relationship with her

19     outside of work?

20  A  No.

21  Q  Okay.  Turning your attention to the events of

22     March 2014 when Rebecca Terry was at Milwaukee County

23     Jail, what was your first encounter with Ms. Terry?

24  A  When she came back from the hospital.

25  Q  And what hospital was she coming back from?

Page 76

1  A  That I don't know.  I don't remember, I should say.
2      I should say I don't remember.
3  Q  Tell me what happened when she came back from the
4      hospital.
5  A  When she initially came back, she didn't have
6      paperwork that we needed, the discharge paperwork,
7      saying what they did and didn't do.  She had a
8      generic form that just said that she was discharged
9      and she needed to follow up with her OB.
10  Q  And was that on March 10th of 2014?
11  A  Yeah, I guess so, because it was 1:00 o'clock in the
12      morning, so yeah.
13  Q  And what shift were you assigned to work on the 10th?
14  A  I was -- I had picked up night shift.
15  Q  Why did you do that?
16  A  I think I just picked up some extra hours.
17  Q  Any reason -- any particular reason for doing that?
18  A  Uh-uh.
19  Q  Had you worked at the jail on March 10th?
20  A  That night?
21  Q  I'm sorry, excuse me.  Had you worked at the jail on
22      March 9th?
23  A  I don't remember if I was there second shift and
24      third shift or if I was just there third shift.
25  Q  What was -- what was your assignment during that

Page 77

1      third shift?  What was your role?
2  A  Booking, intake.
3  Q  And when you -- did you have some overlap with the
4      nurse who had been working booking the shift before?
5  A  Yes.
6  Q  Who was that?
7  A  I think it was Margie Burton and someone else.  I'm
8      not sure who the other nurse was.
9  Q  Did you have any discussion with Margie Burton or the
10      other nurse about inmates who had been sent out to
11      the hospital?
12  A  Yes, report is done in that 30-minute overlap.
13  Q  Tell me what you mean by "report is done"?
14  A  They tell us what happened on their shift, who they
15      refused.  They might say this patient got refused
16      because of this reason, so they may be coming back.
17      It's put on the report board in intake.
18      So it may say: John Jones got sent to the
19      hospital for gunshot wound or Bob Smith got sent for
20      mental clearance.  It would be on the report board.
21  Q  And tell me what information is included on the
22      report board form.
23  A  Why they went to the hospital, whatever doctor
24      refused them and why, and if there were specific
25      instructions about who to call when they got back for

Page 78

1      orders.
2  Q  Got it.
3      Did you review any report boards in
4      preparation for your deposition today?
5  A  No.
6  Q  Did you review any documents in preparation for your
7      deposition today?
8  A  I think I looked at my charting.
9  Q  At the -- the medical chart?
10  A  Yeah, to make sure -- because I really don't remember
11      this case, but I think I looked at my charting.
12  Q  When was the last time that you looked at your
13      charting?
14  A  A week to ten days ago.
15  Q  And other than reviewing your charting, did you
16      review any other documents to prepare for your
17      deposition?
18  A  No.
19  Q  When you say you don't really remember this case, do
20      you have a memory of interactions you had with
21      Rebecca Terry?
22  A  Yes.
23  Q  Okay.  Did you have conversation with Ms. Burton or
24      the other nurse regarding Ms. Terry during that
25      period of overlap between the second and third shift?

Page 79

1  A  Yes, because she was sent out on PMs, so yeah, there
2      was a report given that she had got sent to the
3      hospital and might be coming back and before we met
4      her we had to call the doctor.
5  Q  And what was the reason given that she was sent out
6      to the hospital?
7  A  That the patient said that she was in labor and that
8      she was due the next day or the next week.  I'm not
9      sure.
10  Q  And you said earlier, at some point in your third
11      shift Ms. Terry came back to the jail from the
12      hospital; is that right?
13  A  Correct.
14  Q  And do you recall from your own memory around what
15      time that would have been?
16  A  It was the beginning of night shift, so I would say
17      it would have to have been around 1:00 or 12:00
18      something.  1:00 o'clock, somewhere around there.
19  Q  And where was it that you encountered her when she
20      came back?
21  A  In prebook.
22  Q  And is that usually the procedure when somebody comes
23      back from the hospital, they come back to the prebook
24      area?
25  A  Yes.

**Page 80**

1  Q   Does the screening nurse -- I'm sorry, strike that,
2      please.
3          I think you said this before, but the
4      screening nurse has a computer available there in the
5      prebook area; is that right?
6  A   Yes.  Yes.
7  Q   Okay.  And what did you do when Ms. Terry came
8      back -- or I'm sorry, strike that, please.
9          Was she accompanied by anyone when she came
10     back to the prebook area?
11 A   There are always officers in the prebook.
12 Q   Does the prebook nurse make any notes about what
13     officers are with the patient?
14 A   No.
15 Q   What happened when she came back to the prebook area?
16 A   I did a set of vitals.  I asked her how she was
17     feeling.  Checked her abdomen, listened to her heart
18     and her lungs.  And her paperwork was not with her,
19     so she stayed in prebook until I could call the
20     doctor and the hospital and find out why they didn't
21     send paperwork.
22 Q   When you were checking her abdomen, what were you
23     checking for?
24 A   Contractions.
25 Q   And did you detect contractions?

**Page 81**

1  A   No.
2  Q   Did you have conversation with Ms. Terry about what
3      they did at the hospital?  What the medical staff at
4      the hospital did?
5  A   Yes.
6  Q   What did you learn from her?
7  A   She said they put her on the machine, and then she
8      said they told her she was in labor.  That's what she
9      said, they told her she was in labor.  And I asked
10     why did they send her back if she was in labor, and
11     she said because they just sent her back.
12 Q   Did you have any other conversation with Ms. Terry
13     about what had happened at the hospital?
14 A   No, because after that I called the doctor, and then
15     the doctor had me call the hospital and have them fax
16     over paperwork so we could know what they did and
17     what they didn't do and what they found and what they
18     didn't find.
19 Q   Did you ask Ms. Terry how far she was dilated?
20 A   I think I did, but I'm not sure.  I think I waited to
21     ask the hospital, because when she said they told her
22     she was in labor, I knew the hospital would not have
23     sent her back if she was in labor, so ...
24 Q   How did you know that?
25 A   Because that would be negligent.

**Page 82**

1  Q   Why would that be negligent?
2  A   To send somebody out of the hospital when they're in
3      labor?
4  Q   Right.
5  A   That baby could drop out at any point if she is in
6      labor.  I don't think a hospital would be negligent
7      like that.
8  Q   So other than Ms. Terry's report, is it fair to say
9      you'd never heard of a hospital sending someone out
10     because they weren't far enough along?
11 A   They are not in labor.  They're not actively
12     laboring.  If the hospital sends you home it's
13     because you're not actively laboring.  Either you're
14     having Braxton-Hicks or you are in early stage labor.
15 Q   So you could be in early stage labor and get sent
16     home; right?
17         MR. KNOTT:  Object; form.  Are we talking
18     about a private patient or talking about a jail?
19         MR. RUSSART:  Foundation.
20         MR. KNOTT:  Vague.  Overly broad.
21 BY MS. KLEINHAUS:
22 Q   Okay.  Do you understand the question?  Do you want
23     me to repeat it?
24 A   I guess someone who is early stage labor could be
25     sent home.  Could they be sent back to the jail?

**Page 83**

1      That may be a different story.
2  Q   Why would that be a different story?
3  A   Because they are coming to a jail.  You know, they
4      are not -- they can't pick up a phone and say "I'm in
5      labor" in jail, versus at home you can pick up a
6      phone and call 911.  So I guess you would have to ask
7      the hospital would they send somebody back in early
8      labor.
9  Q   At some point that night did you receive the
10     discharge papers from the hospital?
11 A   I didn't receive them, no.
12 Q   As you sit here today, do you know what they
13     determined at the hospital about her labor?
14 A   No, I don't know.  I talked to the nurse, and what
15     the nurse said to me was that she was not in labor
16     and that's why they sent her back.  They put her on
17     the machine to monitor her and the baby and she was
18     not in labor, so that's why they sent her back.
19 Q   Are those the words she used, she's not in labor?
20 A   Yes, the patient was not in labor and was sent back
21     to the jail.
22 Q   Who did you talk to at the hospital?  Who was the
23     nurse that said she is not in labor?
24 A   I don't know who exactly.  I don't remember her name.
25 Q   Do you know if it was someone you had talked to

Page 84

1  before?
2  A  No.
3  Q  Okay.  It was a female person?
4  A  Yeah, it was a female.
5  Q  Do you remember anything else about the person that
6  you talked to at the hospital?
7  A  Other than she said that she had to get the discharge
8  summary after the doctor signed it and then they
9  would be faxing it over to us.
10 Q  Was that unusual, in your experience, for a patient
11 to come back to the booking area without any
12 discharge information?
13 A  Not really unusual.  Sometimes they send us the
14 correct information, and sometimes they don't.  So
15 sometimes they would have to call, like I did that
16 night, and say this is what I need.
17 Q  And am I correct that it was the responsibility of
18 the correctional staff with the patient at the
19 hospital to obtain those documents at the hospital?
20    MR. KNOTT:  Foundation, speculation.
21    THE WITNESS:  It's not their
22 responsibility.  The hospital should give them
23 paperwork in an envelope just like we did when we
24 sent them there.  They don't know what's in that
25 envelope when the hospital give it back to them.

Page 85

1  They don't know if that's the correct paperwork for
2  us or not, so ...
3  BY MS. KLEINHAUS:
4  Q  Sure.  I don't mean the contents of the paperwork,
5  but is it the responsibilities of the correctional
6  staff to say:  Hey, I don't have an envelope or
7  anything to bring them?
8  A  But they did.  They did.  There was paperwork.
9  Q  Okay.  Describe the paperwork that was there.
10 A  Follow up with your OB.
11 Q  And would that paperwork that you described earlier
12 as generic paperwork, would that have been made part
13 of Ms. Terry's medical record at the jail at some
14 point?
15 A  I think I may have put that back in her property
16 because that's not what we wanted.  So those forms
17 probably went back to her property.  It probably
18 wasn't in the jail records.
19 Q  You said you kept Ms. Terry with you in the booking
20 area while you called the hospital?
21 A  Not with me, she was in prebook.
22 Q  I'm sorry if I'm misunderstanding the geography of
23 that part of the jail, but where were you and where
24 was she?
25 A  She would have been in prebook on the bench with the

Page 86

1  officer.  And I was inside that -- remember when I
2  told you that booking had prebook, then there was a
3  room connected to prebook?
4  Q  Uh-huh.
5  A  That's the one that has the telephone and the phone
6  numbers for me to make the phone call.  So there was
7  a counter between us.
8  Q  Okay.  Other than Ms. Terry's description of what had
9  happened at the hospital, that she was in labor at
10 the hospital, did you have any other conversation
11 with her in that booking area, either prebook or
12 general booking?
13 A  We had to do our assessment.  We had to finish her --
14 you know, once the doctor said "take her," we had to
15 finish that assessment up.
16    MR. ARNOLD:  Could I just hear the question
17 back.
18    (Requested portion of record read by the
19 reporter.)
20 BY MS. KLEINHAUS:
21 Q  And finishing her assessment up consisted of going
22 through the rest of the screening questionnaire?
23 A  Yes.
24 Q  When you were looking at -- sorry, strike that,
25 please.

Page 87

1     When the intake nurse is filling out the
2  screening questionnaire, is there a way to tell which
3  questions were filled out at one time?  For example,
4  to show these questions were filled out on March 9th,
5  these questions were filled out on March 10th?
6  A  Yeah.  There is a time on each form you do.  So there
7  was a time on her prebook intake that was done on PMs
8  on second shift; and then there would be a time for
9  the screening that was done, her actual intake
10 screening when we accepted her when she came back.
11 Q  And is that a time stamp that's like automatically
12 filled in by the software?
13 A  Yes.
14 Q  In your experience, is that time stamp accurate?
15 A  I'm not sure if it's -- I think it's accurate.  Could
16 it be five or ten minutes different than regular
17 time?  Yes.
18 Q  From the time that Ms. Terry arrived in the booking
19 area, I'm including prebook and general booking from
20 the hospital --
21 A  Uh-huh.
22 Q  -- until she left there and was, I assume, sent to
23 the -- until she left there, what was the total
24 amount of time she was there in the booking area with
25 you?

Page 88

1  A   She was probably with me maybe a total of -- the
2      assessment takes about 20 minutes, so she was
3      probably with me a total of 20 to 30 minutes.
4  Q   And would there have been other things she had to
5      complete in booking outside of your assessment? For
6      example, something with the correctional staff?
7  A   I don't know. I don't know what they do with them
8      down there.
9  Q   Do you know where she went after you were finished
10     with your assessment of her?
11 A   I don't know what they -- how they change them over
12     or whatever or how they take them upstairs. I'm not
13     sure.
14 Q   During the time that she was with you, was she
15     complaining of abdominal pain at all?
16 A   No. When she first got there, when I first talked to
17     her, she told me she had pressure at the bottom, and
18     that was it. I asked her was she having
19     contractions. She said no, just pressure at the
20     bottom.
21 Q   Okay. Got it.
22         Did you have any other observations about
23     her demeanor, her health, or anything else?
24 A   Can you clarify?
25 Q   Sure. Did you observe anything else? Did she seem

Page 89

1      like she was cooperative? Did she answer your
2      questions? Did she seem like she understood your
3      questions?
4  A   She was somewhat cooperative. She wasn't clear
5      because she had been on a binge, so she wasn't quite
6      clear about some things, but --
7  Q   Did you believe she was intoxicated at all at the
8      time that you were seeing her?
9  A   Yeah, she definitely had been using something.
10 Q   And how could you tell that?
11 A   She was listless. She was antsy. She wasn't able to
12     sit still. She would move around throughout the
13     assessment, and I would have to keep saying: I need
14     you to stay here, we're almost done. And she
15     admitted that she had been out on a binge and that
16     she had been doing what she had been doing, so --
17 Q   And --
18 A   Pupils were slightly dilated. She definitely had
19     been using something.
20 Q   Did you document anywhere that you believed that she
21     was listless or antsy?
22 A   I would have to look at my charting again.
23 Q   Would it have been your practice to document if
24     someone was having trouble sitting still or was being
25     listless?

Page 90

1  A   Yes.
2  Q   Okay. And would it have been your practice to note
3      if someone's pupils were dilated if you observed
4      that?
5  A   Yes.
6  Q   After you called the nurse and asked for the
7      discharge paperwork, what did you do next?
8  A   I think I started her -- I probably was taking care
9      of some other people, because that was intake, so I
10     probably was taking care of some other patient and
11     waiting on the form to come back so I could call the
12     doctor back.
13 Q   And I believe you testified earlier you never got a
14     form from the hospital; right?
15 A   No, I didn't.
16 Q   Okay. So after you were taking care of other
17     patients, what did you do next?
18 A   I just kept working until -- I think I still hadn't
19     got them and I called the doctor back, and she said:
20     Go ahead and accept her. I told the doctor what the
21     nurse said on the phone, that they believed she was
22     not on labor, and the doctor accepted her on that and
23     said to keep calling them trying to get that
24     paperwork, so that's what I did.
25 Q   And at some point did the doctor tell you whether Ms.

Page 91

1      Terry should go to SMU versus regular housing?
2  A   Yes.
3  Q   And which doctor was it that you spoke with?
4  A   Dr. Buono.
5  Q   And did the doctor give you a reason why Ms. Terry
6      would go to SMU?
7  A   She didn't have to, because all pregnant females
8      after they got to a certain point went to SMU.
9  Q   And do you mean after a certain --
10 A   That was policy. That -- I don't know if it was 32
11     or 36 weeks, but it was policy that females that were
12     pregnant would leave general housing and come to SMU
13     after they got to 32 or 36 weeks. I'm not sure which
14     one it was. So I knew where she was going. The
15     question was getting orders to put her in there and
16     what to do with her when she got in there.
17 Q   I understand. So when she was sent to SMU, you knew
18     how far along she was in her pregnancy; right?
19 A   Yes.
20 Q   And you knew that that was the reason she had to be
21     placed there?
22 A   Correct.
23 Q   Okay. And you knew she had been to the hospital
24     complaining of labor pains; correct?
25 A   Correct.

Page 92

1　Q　Did you have any conversation about Ms. Terry with
2　　　the infirmary nurse before Ms. Terry left the booking
3　　　area?
4　A　I don't know if I talked to her or if I talked to the
5　　　supervisor. I'm not sure which one I talked to.
6　Q　You believe you talked to one of them?
7　A　Yes.
8　Q　And what did that conversation consist of?
9　A　The report that I got from second shift that they
10　　　sent her out because she said she was in labor, and
11　　　the report I got from the nurse at the hospital
12　　　saying that they didn't think she was in labor, and
13　　　the fact that I was still waiting on paperwork from
14　　　the hospital and that the doctor said house her in
15　　　SMU until -- that we were still waiting on the
16　　　paperwork from the hospital.
17　Q　Got it.
18　　　　　Did you have any conversation with Ms.
19　　　Terry about whether she had given birth before?
20　A　Yes, that's part of our assessment.
21　Q　And so you knew that she had given birth before;
22　　　right?
23　A　Yes.
24　Q　Who was the assigned infirmary nurse for that shift?
25　A　I'm not sure. I was working in intake.

Page 93

1　Q　And who was the assigned supervising nurse?
2　A　Margaret Hoover was on that night.
3　Q　When you say you know you talked to either the
4　　　infirmary nurse or the supervising nurse --
5　A　Yeah.
6　Q　-- how is it that you know you talked to one of them?
7　A　Because that's what we have to do. You have to call
8　　　and give report for anybody that's coming up on
9　　　booking.
10　Q　Do you have -- I know that's your regular practice.
11　　　Do you have an independent recollection of having
12　　　this phone call of what you said, what the other
13　　　person said?
14　A　I don't.
15　Q　Okay. Is it fair to say you're assuming you called
16　　　and made that report because you believe that would
17　　　have been your practice?
18　A　It's fair to say that I did it because I did it.
19　Q　My question is whether you're making the assumption
20　　　you did it because that was your general practice.
21　A　I don't make assumptions. I will say I don't know.
22　Q　Okay.
23　　　　　MR. KNOTT: I don't think that answer was
24　　　clear. Are you --
25

Page 94

1　BY MS. KLEINHAUS:
2　Q　Did you have any --
3　　　　　MR. KNOTT: I'm sorry, I think there is a
4　　　miscommunication there.
5　　　　　MS. KLEINHAUS: Well, you are welcome when
6　　　it's your turn to ask any questions you want to ask
7　　　about it, but you're actually not allowed to come in
8　　　and ask questions during my questioning.
9　　　　　MR. KNOTT: Ms. Exum, is the answer to your
10　　　question --
11　　　　　MS. KLEINHAUS: Excuse me, no, this is not
12　　　how depositions work under Rule 30. You don't get to
13　　　jump in and ask your own questions. It proceeds the
14　　　same way as trial. So when it's time for your cross,
15　　　it's your turn, you can do what you want.
16　　　　　MR. KNOTT: Ms. Court reporter, could you
17　　　mark that we can go back to it to clarify what's
18　　　clearly misunderstood.
19　BY MS. KLEINHAUS:
20　Q　Did you have any interactions with Correctional
21　　　Officer Wenzel during the shift on March 10?
22　A　If he was the officer in SMU that night, yes, I did.
23　Q　And what -- I took it from your answer you don't have
24　　　an independent recollection of talking with him that
25　　　night, but it would have been your practice to talk

Page 95

1　　　with him; is that fair?
2　A　Well, he has to open the door to let us in, so I have
3　　　to say something to him because he's opening up the
4　　　door, where is the emergency, who needs help.
5　Q　I got you. Did you escort Ms. Terry to the SMU or
6　　　the infirmary?
7　A　No.
8　Q　Did you go to the SMU or the infirmary at any point
9　　　in that shift prior to finding out that Ms. Terry had
10　　　given birth?
11　A　When the emergency was called.
12　Q　Which emergency? Something other than her giving
13　　　birth?
14　A　No.
15　Q　Are you aware of any other medical emergencies that
16　　　happened on that shift?
17　A　Am I aware of them?
18　Q　Right.
19　A　No. That don't mean they didn't happen, because I
20　　　was in intake.
21　Q　Okay. How does the intake nurse find out if there is
22　　　a medical emergency going on or not?
23　A　If the sergeant in booking tells me or if the
24　　　supervisor called down and say: I need you to go to
25　　　this emergency because the nurse up here is at

Case 2:17-cv-01112-JPS　Filed 08/31/18　Page 27 of 63　Document 107-2

Page 96

1   another emergency.

2 Q   Is there someone assigned every shift to deal with

3    medical emergencies?

4 A   First and second shift, the sick call nurses are

5    assigned to medical emergencies. On night shift,

6    it's between the supervisor and the nurses that are

7    working upstairs. If they are busy, then the booking

8    nurses kick in and they help out.

9      MR. KNOTT: We have been at it another hour

10   and a half. Could we take a break soon?

11      MS. KLEINHAUS: Yeah. Let's go off the

12   record.

13      (Off the record for a lunch break.)

14 BY MS. KLEINHAUS:

15 Q   Let's go back on the record, please.

16      Ms. Exum, before the break, we talked about

17    the time frame when Armor took over healthcare at the

18    jail.

19      When that happened, did you have to apply

20    in order to have a job with Armor, or were you

21    automatically made an employee of Armor?

22 A   I think we were grandfathered in, those who wanted to

23    stay. Some people retired.

24 Q   So you never had to apply to have that job with

25    Armor. You could keep your same job with the new

Page 97

1   employer; is that fair to say?

2      MR. RUSSART: Objection; foundation.

3      THE WITNESS: I think we did have to fill

4    out applications, but it was more of a format than it

5    was -- I think they did their own background checks.

6    And even though County had did extensive background

7    checks, I think they did make us do applications and

8    they did background checks and all the above, but I

9    can't recall anyone that they did not keep.

10 BY MS. KLEINHAUS:

11 Q   Got it. Were there any changes at this time in terms

12    of the -- your salary or benefits that you received?

13 A   Salary did not change. County benefits were

14    different than a lot of places, so benefits changed,

15    but they still had health insurance, dental and all

16    that other stuff that --

17 Q   Did the employer on your paycheck change? I mean,

18    was the check from Armor instead of from Milwaukee

19    County?

20 A   It was direct deposit so -- but yeah, I couldn't say

21    if it was still County or Armor.

22 Q   What changes did you notice when that transition took

23    place, if any?

24 A   None.

25 Q   Going back to the shift on March 10th when you

Page 98

1   encountered Rebecca Terry. Other than noticing that

2    she seemed listless or antsy to you, did you have any

3    other information about any drug abuse in her

4    history?

5 A   What she told me.

6 Q   What did you tell you?

7 A   That she had been on a binge.

8 Q   Did she tell you what drug she had used?

9 A   I think she said heroin.

10 Q   Anything else?

11 A   No.

12 Q   Okay. Did you receive any information about any drug

13    abuse by Ms. Terry from any other source? I mean,

14    from another medical professional or from law

15    enforcement?

16 A   When they gave us report they said that she had come

17    in, had told them she was pregnant, had been using

18    drugs but she hadn't had any prenatal care.

19 Q   So you're describing when the second shift gave you

20    its report --

21 A   Right.

22 Q   -- when you came on on third shift?

23 A   Right.

24 Q   Had you received any training at any point about the

25    effect of opiate use on pregnancy?

Page 99

1 A   Yes.

2 Q   And what was that?

3 A   We were trained by the female NP on the fact that if

4    they don't have opiate substitute, that they could go

5    in labor, so the pregnant females were put on

6    Methadone. They were sent out to a clinic to get

7    Methadone, I should say.

8 Q   To like a Methadone clinic?

9 A   Yes.

10 Q   Okay. And who would make the decision to put an

11    inmate on a plan to go out to a Methadone clinic?

12 A   Most of the hospitals would set them up. And if the

13    hospitals didn't set them up, then the female

14    practitioner, the next -- like if they came during

15    the night she would set it up for her to go out the

16    next morning.

17 Q   And when you say the female nurse practitioner, you

18    mean the nurse practitioner who is doing all the

19    OB/GYN?

20 A   Yes, the OB/GYN.

21 Q   Who was that in March of 2014?

22 A   I think it might have still been Pam Prince. I think

23    it was Pam Prince.

24 Q   Okay. Did you have any conversation with the nurse

25    practitioner, either Pam Prince or whoever else it

Page 100

1 may have been on March 10th of 2014, with regard to
2 Rebecca Terry.
3 A No, because she was gone before day shift got there.
4 Q Okay. What -- typically when would Nurse
5 Practitioner Prince, what would her shift have been?
6 A It fluctuated. Sometimes she went to the House of
7 Correction, so it just depended. If she would have
8 been at the House of Correction, then we would have
9 given her report over the phone and she would have
10 set something up and called us back. So it depended
11 on what our schedule was, and Ms. Terry was already
12 gone before the day shift got there.
13 Q Okay. I'm sorry if I'm just misunderstanding, would
14 Ms. Prince have come on with day shift at the same
15 time?
16 A Yes.
17 Q Okay. Got it.
18 So the expectation would be you would tell
19 her the next morning when she got there when you were
20 leaving?
21 A Not me, the day shift staff would let her know that
22 there is a patient over here and this is what's going
23 on with her and --
24 Q Okay.
25 A And so that she can go do her own assessment and send

Page 101

1 her to the clinic.
2 Q When Ms. Terry came back from the hospital and you
3 encountered her in booking, did you have any
4 conversation with her about opiate withdrawal or the
5 possibility of the Methadone clinic?
6 A I didn't have a conversation about the Methadone
7 clinic, because I didn't know what the hospital had
8 set up. I didn't have any paperwork. So no, that
9 was not my conversation to have about Methadone.
10 Q Okay.
11 A She did say she was going to go in withdrawals
12 because she hadn't had her drugs, and we started an
13 assessment form on her for the opiates.
14 Q Did you have any conversation with Buono about Ms.
15 Terry experiencing any withdrawal or anticipating
16 that she was going to experience withdrawal?
17 A Yeah, she gives -- the doctor gives us the order for
18 the withdrawal protocol, so you have to give that
19 assessment. That's part of the assessment that you
20 give.
21 Q So your -- am I right, your belief is that you would
22 have told Buono about that; right?
23 A Not would have, I did tell Buono, in order to get
24 orders. I could not have started her on the opiate
25 protocol if I didn't talk to the doctor.

Page 102

1 Q And what opiate protocol did you put her on?
2 A We do a form that's called COWS, which is the
3 Clinical Opiate Withdrawal System. We start that
4 form. There are certain medications that we give for
5 certain problems that the person that's withdrawing
6 have, like we will treat her symptoms. And then the
7 doctor was informed that she was late pregnant and
8 then she is going to follow up the next day to make
9 sure that we get her out to a Methadone clinic.
10 Q And where would the COWS form be found? Like where
11 would I find that in the medical record? Is that
12 part of booking, or where would I look for that?
13 A It is a part of booking. We do do one in booking,
14 but that's like -- people be on regular floors with
15 those assessments too, so it is a part of the
16 charting. It is in there.
17 Q I'm sorry, I'm just not very familiar with the
18 database, so if you wanted to -- like if you were
19 facing the screen and you wanted to figure out where
20 to enter this information, is there a specific tab or
21 something that it would be called for where you would
22 put that information?
23 A No.
24 Q Okay. If you wanted to start a COWS sheet for
25 someone, what would you have to do in the database in

Page 103

1 order to start one?
2 A It's part of the assessment form that we do on
3 everybody. That question is asked for everybody that
4 comes in, are you using any illicit drugs. Is there
5 anything we need to be concerned about you having
6 withdrawals for.
7 Q I see. Are any of the treatments or protocols
8 prescribed in COWS related to pregnancy?
9 A COWS is a general assessment that's done on anybody
10 who does withdrawing from opiates, so there wouldn't
11 be a specific thing that would trigger because she's
12 pregnant.
13 Q Prior to dealing with Ms. Terry, had you ever
14 encountered a woman who was pregnant and had a
15 history of opiate abuse before?
16 A Yes.
17 Q Okay. And you're smiling. So is that something that
18 happened commonly?
19 A Yes.
20 Q And had you frequently encountered women who recently
21 used opiates who were in the late stages of
22 pregnancy?
23 A Yes.
24 Q I just want to make sure I understand the steps that
25 you took when Rebecca came back from the hospital.

Page 104

1     Am I right that the first conversation you would have
2     had with her would have been in that prebooking area?
3 A   Correct.
4 Q   And you would have been trying to find out some
5     information from the hospital?
6 A   Correct.
7 Q   Would you have filled out any portion of a
8     questionnaire during that time period?
9 A   We have to do prebook before they can bring her
10    across, but I think at that point I was trying to
11    reach the hospital to even accept her until I reached
12    a doctor. Once I reached a doctor and she said go
13    ahead and keep her, just get the paperwork, then yes,
14    we do a prebook.
15 Q  When you say you do a prebook, do you mean --
16 A   The preintake assessment.
17 Q  And then what was the next step that happened after
18    that?
19 A   Then they search her, take her across to the general
20    booking area, and then that's when we will call her
21    up to our area where we can do a full assessment.
22 Q  Okay. And then a full assessment consists of what?
23 A   Height, weight, vitals, head to toe. But her it was
24    monitoring to make sure she wasn't having
25    contractions.

Page 105

1 Q  Are there a series of questions that you did at that
2    time?
3 A   Huh?
4 Q  There is a series of questions you do then?
5 A   Yes, yes. That assessment takes about 20 minutes.
6 Q  Okay. And what is the next thing that happened with
7    her, then, after that series of questions?
8 A   After that, then we have to inform the sergeant or
9    lieutenant, whoever is in charge in booking, that she
10    needs to go to SMU, and she waits until they take
11    her.
12 Q  After she -- do you have any idea how long she waited
13    after she was finished with you before she went?
14 A   No, I don't.
15 Q  What's the next time that you encountered Ms. Terry
16    during that shift?
17 A   When they called and said she was having a baby. It
18    was an emergency.
19 Q  And who called you?
20 A   I received a call from the sergeant in booking. No,
21    I take that back. I did not receive a call. The
22    other nurse I was working with in booking got the
23    call and they said -- she said that it's a medical
24    emergency in SMU and the nurse upstairs is already on
25    an emergency, can one of us go up. So I went up. I

Page 106

1    did not receive the call.
2 Q  Okay.
3 A   Cheryl did.
4 Q  Did you know what the -- it's Cheryl who was the
5    other booking nurse?
6 A   Uh-huh.
7 Q  What is Cheryl's last name?
8 A   I do not know Cheryl's last name.
9 Q  And did you know when -- so I'm sorry. If I
10    understand you correctly, you got the information
11    from Cheryl who got it from --
12 A   I don't know who she was talking to.
13 Q  Did you know what the medical emergency was?
14 A   Yeah, she said someone in SMU was having a baby.
15 Q  Okay. And what did you do next?
16 A   I ran upstairs.
17 Q  Okay. And if I remember correctly, the booking area
18    is like on the first floor, the equivalent?
19 A   Yeah. It would be equivalent to first floor and they
20    were on second floor.
21 Q  When you say they were on the second floor, you mean
22    the SMUs?
23 A   Yes.
24 Q  Okay. What happened -- did you have any conversation
25    or encounter anybody on your way to the SMU?

Page 107

1 A   No.
2 Q  What happened when you got to the SMU?
3 A   The officer met us at the door, opened the door, and
4    I said, "What room." And he told us what room to go
5    in.
6 Q  And do you remember which one it was in the
7    semicircle of cells?
8 A   It was one of the first three rooms. I don't know
9    exactly which room it was, but it was one of the
10    first three.
11 Q  And what happened after he told you which one it was?
12 A   We went to the room, and we noticed that the baby had
13    already started coming out. It wasn't completely
14    out, but the baby had already started coming out.
15       So the supervisor stayed there, I ran and
16    got the OB kit, came back with the OB kit. We
17    finished helping her deliver the baby, and then the
18    baby was in some distress. I cleaned his mouth and
19    nose out. I suctioned his nose with the bulb syringe
20    and then I put oxygen on him because he was in
21    distress.
22 Q  Okay. When you got into the cell, who was there?
23    Rebecca obviously. Anyone else?
24 A   No.
25 Q  Did the supervisor arrive after you?

Page 108

1 A  Yeah, she was like right -- came in right with me

2    because she stayed with her while I went and got the

3    OB kit.

4 Q  What supervisor was that?

5 A  Margaret Hoover.

6 Q  Did you and Ms. Hoover have any conversation when you

7    arrived at the cell?

8 A  No, we just said there is a baby. I ran and got -- I

9    said: I'm going to run and get the OB kit.

10 Q  And what -- what's contained in the OB kit?

11 A  Everything in there -- I really can't say everything

12    that's in there. I know there was a bulb syringe in

13    there. There was some cloths that we have to lay

14    down for the baby. There is a clamp -- two clamps,

15    which we did apply, and I think there may have been

16    scissors or something in there to cut the cord with.

17    But I did not cut the cord, I just clamped it off.

18 Q  When you say you helped her finish delivering, what

19    did you do to help her?

20 A  Nothing. I just got the baby out to make sure the

21    baby didn't get hurt.

22 Q  So you went hands-on?

23 A  Yes.

24 Q  And the baby was still coming out of the birth canal?

25 A  Yes.

Page 109

1 Q  Did you see any blood in the room on the sheets?

2 A  Any time someone has a baby there is blood.

3 Q  Right. Did you observe the blood in this birth?

4 A  There was blood. There was also meconium, and the

5    baby was covered in both.

6 Q  And was the bed sheet covered in both?

7 A  Not covered, but there was some on the sheets. No

8    more than any other birth would have been.

9 Q  And prior to this delivery, how many other deliveries

10    had you personally witnessed, either as a nurse or

11    just as a --

12 A  My grandkids.

13 Q  Okay. Your own kids, I take it?

14 A  Oh, yeah.

15 Q  Any as a medical professional?

16 A  I never worked in an OB department, no.

17 Q  And after you were done suctioning the baby, what

18    happened next?

19 A  I applied oxygen.

20 Q  Okay. And what happened next?

21 A  By the time we applied oxygen and clamped her off,

22    911 came and got her, they took over.

23 Q  Were you present when she delivered the placenta?

24 A  I don't know if she did that in front of us or if

25    they did that at the hospital or the ambulance. I'm

Page 110

1    not sure. Once 911 came in, we kind of moved back

2    and let them take over.

3 Q  Okay.

4 A  All I asked them was did I do right by clamping. And

5    they said yes, don't worry about it, we will cut, so

6    that's --

7 Q  Had you ever received any training on what to do for

8    a delivery?

9 A  No, because we don't want deliveries in the jail.

10    Call 911, that's your delivery.

11 Q  Got it.

12    You described some observations about the

13    baby in distress when you got there?

14 A  Yes.

15 Q  Did you make any observations about Rebecca's

16    condition when you got there?

17 A  She was upset, screaming. She just was screaming.

18 Q  Was she screaming anything in particular or screaming

19    in pain?

20 A  Not in pain. No, it wasn't pain that she was

21    screaming. She was saying: The baby is coming out,

22    the baby is out. I told you guys I was in labor. I

23    told you and you didn't believe me.

24 Q  Anything else that you observed about it?

25 A  Her screams were just screams of anger.

Page 111

1 Q  Did you observe anything else about her when you were

2    in the cell for the delivery?

3 A  She was retching like she was going to throw up.

4 Q  Anything else?

5 A  When I asked her what happened, she said she had been

6    throwing up since she had came upstairs.

7 Q  Any other conversation that you had with her in the

8    cell?

9 A  No.

10 Q  Any other observations that you made about her while

11    you were in the cell or that you recall now?

12 A  Nothing other than I asked her to calm down because

13    she was screaming and hollering; and I was trying to

14    explain to her that she wasn't helping herself or the

15    baby, that she needed to calm down.

16 Q  Was there anyone who was assigned as the infirmary

17    nurse who reported to the cell where she delivered?

18 A  There was -- Morgan came and the supervisor was in

19    there, and there was another nurse working that

20    night. I don't know. As I said before, I was

21    working in booking, so --

22 Q  Was it your understanding that Morgan Bevenue was

23    assigned as the infirmary nurse that night?

24    MR. KNOTT: Objection; foundation.

25    THE WITNESS: It wasn't my observation.

Case 2:17-cv-01112-JPS  Filed 08/31/18  Page 31 of 63  Document 187-2

Page 112

1  BY MS. KLEINHAUS:
2  Q   Okay.  Did you know who was working as the infirmary
3      nurse that night?
4  A   No, I did not.
5  Q   As you sit here today, with having had time to review
6      the records, do you know who was the infirmary nurse
7      that night?
8  A   No, because I didn't review anything that pertained
9      to that.  I only reviewed my charting and, no, I
10     don't know.
11 Q   Okay.
12 A   Had it not been an emergency, I would not have been
13     up there.  But a team player, I came to help --
14 Q   Okay.
15 A   -- the team.
16 Q   Got it.
17            (Exhibit No. 1 was marked for
18     identification.)
19 BY MS. KLEINHAUS:
20 Q   I'm handing you what's been marked as Exhibit 1.  Are
21     you familiar with this document?  Have you seen this
22     before?
23            MR. KNOTT:  Object to the use of the
24     document.  It doesn't have her signature.  It's
25     incomplete.

Page 113

1  BY MS. KLEINHAUS:
2  Q   Ms. Exum, have you seen this document before?
3  A   Uh-uh.
4  Q   Can you answer out loud, please?
5  A   No, I did not.  Let me see.
6  Q   Without telling me the content of any conversation,
7      did you ever have a conversation with your attorney
8      about this document?
9  A   I don't think we discussed this document.  We just
10     discussed my charting and if I remembered my
11     charting.
12 Q   Okay.  You can put Exhibit 1 to the side.
13 A   (Witness complies.)
14            (Deposition Exhibit No. 2 was marked for
15     identification.)
16 BY MS. KLEINHAUS:
17 Q   I'm going to show you what we will mark as Exhibit 2.
18            MS. KLEINHAUS:  I'm sorry, I don't have an
19     extra copy, Mike, but it's a -- I don't know if you
20     guys can share.
21            MR. RUSSART:  Thank you, Doug.
22 BY MS. KLEINHAUS:
23 Q   Ms. Exum, are you familiar with Exhibit 2?
24 A   Yeah, it's a policy.
25 Q   And during that time that you worked at Milwaukee

Page 114

1      County Jail, did you receive a copy of this policy?
2  A   We didn't just necessarily receive copies, everything
3      was online, so you could go online and look at it if
4      you needed to.
5  Q   I got you, but is there some ways that the
6      policies -- if not a hard copy, was an electronic
7      copy provided to you?
8  A   Yes.  You could look online and look up any policy
9      that you wanted to.
10 Q   I get what you're saying, you could go and look it up
11     if you wanted to.  My question is a little different.
12     Was it ever given to you.  Were you ever told:  Read
13     this policy about infirmary care?
14 A   They didn't give it to you in your hand, but they
15     said you need to review all policies and procedures,
16     yes, ma'am.
17 Q   I see.  And how did you go about doing that?  Was
18     there like an intranet where you log in, or what was
19     the process?
20 A   There was a section that had policies and procedures
21     in it.
22 Q   Did you ever have to sign off that you had reviewed
23     particular policies?
24 A   Yeah, we had to sign off.
25 Q   Got it.

Page 115

1            I just have a few questions about this
2      policy.  If you could turn with me to the second page
3      of it, the second bullet point.  There is a line that
4      says:  The frequency of physician and nursing rounds
5      in the infirmary is specified based on the categories
6      of care provided.
7            I just wanted to clarify, were you -- what
8      were you taught about the number -- the frequency of
9      rounds in the infirmary?
10           MR. KNOTT:  Object to the form of the
11     question.  Foundation.
12 BY MS. KLEINHAUS:
13 Q   Okay.  That's fair.  Let me try it again.  I will
14     rephrase.
15           Do you understand what this provision of
16     the policy is talking about?
17 A   Rounds were determined by a doctor who said:  I want
18     this patient to have vitals every hour, two hours,
19     four hours, eight hours.  Just like it would be
20     anyplace else, any hospital.  The doctor determines
21     how many times this patient gets vitals, how many
22     times this patient gets assessed in an eight-hour
23     shift.  That's not a nursing duty, that's an order
24     that's received when we admit them in.
25 Q   Okay.  And when you say "admit them in," you mean

Page 116

1  admit them into the infirmary?
2  A  Right. Or if they are going up on the unit, there is
3     still orders written by a doctor that says: I need
4     this person checked this many times.
5  Q  Gotcha. So the person in the role of infirmary
6     nurse, when someone is admitted into the infirmary,
7     does that person have a responsibility to call the
8     doctor at that point and ask how often am I supposed
9     to be doing rounds?
10 A  No, because the doctor gives the orders to the
11    booking nurse.
12 Q  Okay. And so where in the medical chart would that
13    order on rounds, where would we look to find that?
14 A  On the medical administration record or either the
15    treatment record.
16 Q  Is there a specific section of the record where it
17    would be?
18 A  Probably at the end of the meds.
19 Q  At the end of the meds?
20 A  Yeah.
21 Q  Okay. Okay. Turn with me, if you would, to the
22    third page of this policy.
23 A  (Witness complies.)
24 Q  It discusses here under part A5 various
25    classifications for the infirmary assignments; do you

Page 117

1  see that?
2  A  Yes.
3  Q  Were these classifications that you used in the
4     infirmary while you were at the Milwaukee County
5     Jail?
6  A  Yes.
7  Q  And if I wanted to find out from the medical record
8     what -- strike that, please.
9        Would these classifications be in the
10    medical record?
11 A  The doctor may refer to them in his notes, and this
12    is more -- I think you may not understand what this
13    is talking about. This is more of how the doctor
14    would classify the patients and this is how they
15    decided who gets discharged back upstairs, who stays
16    in the infirmary and who leaves. Level 1s, level 2s,
17    and level 3s. And this is the doctor's information:
18    Okay, I'm making this first person a level 1. Well,
19    no, first there is an observation patient who is just
20    there maybe 24 hours or so just to be observed.
21       Then there was level 1, level 2, and level
22    3. Those numbers were more so for the doctors so
23    that they could know: Okay, maybe I'm an on-call
24    doctor and I haven't been here, but maybe Dr. Buono
25    put this patient in SMU and made them a level 1. If

Page 118

1  I don't know that, I may go over there and kick them
2  out.
3        So this level 1, level 2, level 3 and
4  observation were more so for the doctor so they can
5  decide who is going upstairs next, who can't go, who
6  has to stay in SMU. That's what this was for. This
7  was -- it didn't determine our nursing care. Level
8  1, level 2, level 3 and observation determined who
9  gets kicked out first, who has to stay, and who can't
10 leave.
11 Q  Got it. That's super helpful. I appreciate it.
12       MR. RUSSART: Object to the commentary
13 after the answer.
14 BY MS. KLEINHAUS:
15 Q  Turn with me to page 4. There is a section here
16    labeled No. 6. And the last two sentences of that
17    section say, "Patients in the infirmary are to be
18    within sight and sound of healthcare staff at all
19    times. Healthcare staff are to be present at all
20    times in the infirmary."
21       Was it your experience as an infirmary
22 nurse that the -- that the patients were always
23 within sight and sound of the healthcare staff?
24       MR. KNOTT: I need to object to the use of
25 "infirmary" interchangeably and "SMU"

Page 119

1  interchangeably. And this policy is specific to one
2  of those two types of units, so I think we need to be
3  specific at this point and not be loose with that
4  language.
5        So I object to use of the -- to the
6  reference to this policy without further
7  specification of what we're talking about. As you
8  know, the place where Ms. Terry was was not the
9  infirmary.
10       THE WITNESS: It wasn't the infirmary, it
11 was SMU.
12       MS. KLEINHAUS: Thank you for your
13 testimony.
14 BY MS. KLEINHAUS:
15 Q  Ms. Exum, in your experience, when you were assigned
16    to the -- let's do it both ways -- to the infirmary
17    at Milwaukee County Jail, was there healthcare staff
18    within sight and sound of the patients at all times?
19       MR. RUSSART: Objection; foundation. You
20 haven't established there was an infirmary at the
21 Milwaukee County Jail.
22       MR. KNOTT: Right. It's a problem that's
23 developed throughout the deposition because we used
24 the terms interchangeably.
25       MS. KLEINHAUS: I understand your

Case 2:17-cv-01112-JPS  Filed 08/31/18  Page 33 of 63  Document 167-2

Page 120

1 objection.
2     MR. KNOTT: At this point, with the use of
3 the policy, I just ask you to be specific as to the
4 year so that we know what we're -- what nomenclature
5 we're using.
6     THE WITNESS: Yeah, this is --
7 BY MS. KLEINHAUS:
8 Q Go ahead.
9 A Ms. Terry was in SMU. She was not in infirmary.
10 Because infirmary needed a nurse 24 hours a day. And
11 because of -- she was in SMU, she was not in
12 infirmary, so this policy here does not really relate
13 to the situation that we're dealing with because we
14 did not have infirmary at that time. It was SMU,
15 special medical unit.
16 Q I got you. So is there an Armor policy that was ever
17 provided to you which would explain what to do in the
18 SMU?
19 A What do you mean what to do? What are you talking
20 about, what to do.
21 Q I think what you just told us is that this exhibit is
22 the policy that explains what to do in an infirmary.
23 Did I understand that right?
24 A Yes.
25 Q Was there a policy from Armor that explained what to

Page 121

1 do in SMU? Like an equivalent to this but for the
2 SMU. Did that exist?
3     MR. KNOTT: Foundation.
4     MR. RUSSART: Join.
5     THE WITNESS: Not sure.
6 BY MS. KLEINHAUS:
7 Q Okay. Do you know whether there was a distinction
8 made between a special needs unit and a special
9 medical unit?
10 A There is a difference between the two.
11 Q Okay. Can you tell me what the special needs unit
12 is?
13 A That's the unit that patients with mental health
14 issues that are at the point that they need more care
15 than they would on a general population, someone who
16 was having some type of psych crisis would be housed
17 in the special needs unit. That is our psych unit.
18 Q Got it. Can you turn in this exhibit to page 7,
19 please?
20 A (Witness complies.)
21 Q There is a section on page 7 marked "Obstetrics
22 observation." Do you see that?
23 A Uh-huh.
24 Q Was there any requirement to do any obstetrics
25 observation in the SMU?

Page 122

1 A Was there a requirement? Is that what you said?
2 Q Yeah. Let me rephrase and make it simpler. This
3 describes obstetrics observation for an infirmary.
4 Were you aware of an obstetrics observation policy
5 for the SMU?
6 A Well, again, this goes back to the doctor. This is
7 not something that a nurse would do on her own. This
8 stuff would be ordered from the doctor.
9 Q Okay. Got it.
10 A How often you do vitals; if they want you to listen
11 to fetal heart tones.
12 Q Was there anything at Milwaukee County Jail, either
13 in booking or the clinic or SMU, was there anything
14 there that you could have used to check fetal heart
15 tones?
16 A Yes, the OB practitioner had the ultrasound fetal
17 heart tone thing that we used, she showed us how to
18 use it, we used it on the females, the ones that were
19 having problems we used it, yes.
20 Q Could you use that in the SMU?
21 A Yes, it's kept in the clinic in the OB practitioner's
22 office.
23 Q Okay. Got it. You can put this exhibit to the side.
24     (Deposition Exhibit No. 3 was marked for
25 identification.)

Page 123

1 BY MS. KLEINHAUS:
2 Q I'm showing you what has been marked as Exhibit 3.
3 Are you familiar with this type of document?
4 A Yes.
5 Q And what is it?
6 A Assignment sheet.
7 Q Let's look at -- the first page relates to March --
8 the first three pages relate to March 9th of 2014.
9 And it looks like to me on that first page you're
10 assigned as the charge nurse. Do you see that part?
11 A Correct, uh-huh.
12 Q And that would have been for first shift on the 9th;
13 is that right?
14 A Correct.
15 Q Turn with me, please, to the -- excuse me -- the
16 fourth page, which relates to March 10th of 2014.
17     MR. RUSSART: Is there a Bates number on
18 that?
19     MS. KLEINHAUS: Yeah, it's Armor 46.
20     MR. RUSSART: Thank you.
21 BY MS. KLEINHAUS:
22 Q Looking at -- I'm sorry, excuse me, please.
23     Looking at the fourth page, which is marked
24 Armor 46, you were assigned as booking nurse No. 2;
25 is that correct?

Page 124

1   A   Correct.

2   Q   And is it your recollection that it was Nurse Burton

3       who was the other booking nurse?

4   A   Yes.

5   Q   Okay. And do you see anyone -- anyone's name here?

6       I know you mentioned someone by the name of Cheryl

7       earlier. Do any of these last names ring a bell

8       for --

9   A   Cheryl was on night shift. This is day shift.

10   Q   She was on night shift the night before?

11   A   Right.

12   Q   Okay. So can you turn back with me to the second and

13       third pages of this exhibit and see if any of these

14       names ring a bell as Cheryl's last name?

15   A   Well, she would have -- I don't know Cheryl's last

16       name, but she would have to be the other nurse that's

17       listed here.

18   Q   I'm sorry, I thought you knew it at one time and you

19       forgot it. You're saying you never knew it in the

20       first place?

21   A   No, I don't know Cheryl's last name.

22   Q   Got it.

23       MR. RUSSART: I will represent to you that

24       Ms. Ruehs' first name was Cheryl.

25       MS. KLEINHAUS: Thank you.

Page 125

1   BY MS. KLEINHAUS:

2   Q   Looking at page 4, Armor -- also labeled Armor 46, do

3       you recognize the name next to "SMU nurse"? It looks

4       like Goudy?

5   A   Yes.

6   Q   Do you know who that person is?

7   A   I know who Goudy is, but do I know about Goudy? No.

8       I know who she is.

9   Q   Okay.

10   A   We had a nurse named Goudy. Yes, I do know the name

11       "Goudy."

12   Q   Okay. Did you have any encounters with her or

13       conversations with her with regard to Rebecca Terry?

14   A   I wouldn't have had to have conversations with her.

15       I was not working upstairs the night before.

16   Q   Well, this -- maybe I'm reading this wrong, but this

17       to me is the first shift on March 10th, isn't it?

18   A   Correct, but my assignment the night before was

19       booking.

20   Q   I got you now. Turn back with me to page 3 here,

21       which is marked as Armor 45, so my mistake. Now I

22       think I'm in the right spot.

23       So is it correct to say that during your

24       shift Nurse Bevenue was assigned as the SMU nurse?

25   A   Yeah, her name is there.

Page 126

1   Q   She was also assigned as the charge nurse?

2   A   Yes.

3   Q   Did you have any conversation with her that evening

4       about Ms. Terry?

5   A   I don't know. I may have given report to the

6       supervisor.

7   Q   Okay. And you may have spoken with Ms. Bevenue,

8       you're just not sure; is that fair to say?

9   A   Right.

10   Q   She is also assigned to special needs; do you see

11       that?

12   A   Yes.

13   Q   Would it be unusual for the same nurse to be assigned

14       as charge nurse, SMU nurse, and special needs nurse?

15   A   Not on night shift, no.

16   Q   Okay. Would it be typical on night shift for the

17       same nurse to have all of those roles?

18       MR. RUSSART: Foundation.

19       MR. KNOTT: Join.

20       THE WITNESS: Possible, yes.

21   BY MS. KLEINHAUS:

22   Q   Okay. Did it happen often?

23       MR. RUSSART: Foundation.

24       MR. KNOTT: Join.

25       THE WITNESS: I couldn't say. I'm not

Page 127

1   night shift normally, so I don't know if they -- that

2   may have been their normal schedule. By me not being

3   night shift, and when I did pick up it was booking,

4   so I don't know what the upstairs nurses did.

5   BY MS. KLEINHAUS:

6   Q   Why was it that when you would pick up a night shift

7       you wouldn't pick up something upstairs, you would

8       pick up something in booking?

9   A   Because the night nurses knew what they had to do

10       upstairs. So if one of us picked up a shift, we

11       don't know night shift routine, so they would leave

12       us in intake, because intake is the same no matter

13       what shift it is.

14   Q   Okay. Got it. You can put Exhibit 3 to the side.

15       (Deposition Exhibit No. 4 was marked for

16       identification.)

17   BY MS. KLEINHAUS:

18   Q   Drawing your attention to Exhibit 4, do you recognize

19       Exhibit 4? Have you seen this document before?

20   A   Yes.

21   Q   What is it?

22   A   This is the charting that occurred after the patient

23       went out to have her baby -- went out with the baby.

24   Q   Okay. Turning your attention to the first page of

25       this exhibit, about halfway down it says "SOAP note."

Page 128

1   Do you see that part?
2 A   Uh-huh.
3 Q   Would the time entry there be provided by the
4    software or would someone enter that?
5 A   That's probably the software.
6 Q   Okay. And how about the date, would that -- do you
7    know what I mean if I say it populates, like it fills
8    it in for you?
9 A   Uh-huh.
10 Q   Would the date have been populated by the software or
11    would you have filled that in?
12 A   The software.
13 Q   And the next portion says "time in." What does "time
14    in" mean? What is that for?
15 A   What time the note was initiated in the system, the
16    software.
17 Q   Okay. And would that section, "time in," would that
18    populate or would you have to fill that in?
19 A   No, that's populated.
20 Q   Under "topic"; do you see that part?
21 A   Uh-huh.
22 Q   Are the options in topic like a drop-down menu?
23 A   Yes, uh-huh.
24 Q   And here the topic that's chosen is "interfacility
25    transfer." Do you see that?

Page 129

1 A   Yes.
2 Q   Why was that the topic for this entry?
3 A   Because any time someone leaves the jail, that's an
4    interfacility transfer.
5 Q   I see. The next one is "staff name," and that's your
6    name; right?
7 A   Uh-huh.
8 Q   And would that populate based on your log-in
9    credentials or would you have to fill that in?
10 A   I think it goes by my log-in.
11 Q   Okay. I understand that under "subjective" here
12    there isn't anything, but what types of things are
13    supposed to go in that category?
14         MR. RUSSART: Object to the form.
15 BY MS. KLEINHAUS:
16 Q   Are you familiar with the SOAP system for
17    note-taking?
18 A   Oh, yeah, I am.
19 Q   What is the subjective piece of the SOAP system?
20 A   The subjective piece is what the patient tells us,
21    the objective piece is what you observe, the
22    assessment is what you assess, and the plan is what
23    happened afterwards. I'm very much familiar with
24    SOAP.
25 Q   I know that it is probably a daily part of your job.

Page 130

1         So if you look under plan, it says -- tell
2    me if I have got this right. The patient was
3    prescreened as an in-but-out but was on the to-do
4    list; is that right?
5 A   Correct.
6 Q   And "IBO" stands for in but out?
7 A   Yes.
8 Q   What does it mean for a patient to be prescreened as
9    an in-but-out?
10 A   That means when they come in to intake they are
11    prescreened. And then if they say -- like I told you
12    before, if they say -- if we don't accept them, they
13    remained on our to-do list, but they are listed as an
14    in-but-out.
15 Q   And whose to-do list is it?
16 A   The nursing to-do list.
17 Q   In booking?
18 A   Booking, yes.
19 Q   All right. So this was a note that you made about
20    the intake the following day; is that right?
21 A   This note was made --
22 Q   I'm sorry, "the following day" is a confusing way to
23    say it. Several hours after she had gone to the
24    hospital; right?
25 A   Correct.

Page 131

1 Q   Okay. Turn with me, please, to the second page.
2 A   (Witness complies.)
3 Q   There is a general note there. The time marked is
4    7:30; do you see that?
5 A   Yes.
6 Q   And this is a note by Ms. Hoover; correct?
7 A   Correct.
8 Q   And, again, this is a note being made several hours
9    after Ms. Terry had already been transferred out;
10    correct?
11 A   Correct.
12 Q   In the note section there, at the bottom, am I
13    correct in saying that portion is not populated by
14    the software but somebody writes that in; correct?
15 A   Where are you at?
16 Q   I'm sorry, if you go down to the notes section.
17 A   Right there where she says "writer notified"?
18 Q   Yes.
19 A   No, that's not populated. That's her charting.
20 Q   Okay. As you're going through the process as the
21    intake screening nurse, for example if you're taking
22    someone's vitals, are you putting that into the
23    computer as you're doing it, like as you go, or are
24    you making a note and going back later to add it?
25 A   No, you're making a note because vitals are done in

Page 132

1   preintake, and that is put into the system right
2   around under the preintake, because the charting
3   doesn't happen until they get on the general booking
4   side and the full assessment is done.
5 Q   I think I didn't totally understand all of that, so
6   let me see if I can break it down.
7     When someone is in the preintake, when
8   you're trying to decide whether to accept them at the
9   jail or not, you would take vitals at that time?
10 A   Yes.
11 Q   And would you enter that information into the --
12 A   The preintake booking screening, there is a section
13   for vitals, yes.
14 Q   On the computer; right?
15 A   Yes.
16 Q   And then if they are accepted, they come over into
17   general booking, the rest of the questionnaire and
18   assessment that you do also is immediately entered
19   into the system?
20 A   Yes.
21 Q   Is there any point in the booking process, whether
22   it's preintake or general booking, where you would be
23   writing down a note to yourself by hand about
24   someone's condition or their vitals?
25 A   Yes.

Page 133

1 Q   When would that be?
2 A   Depending on the person, for her it was -- I couldn't
3   really accept her until I got that hospital
4   information, so I'm in the process of calling a
5   doctor, waiting for the response from the hospital,
6   calling the doctor back, still haven't got the
7   response from the hospital. Yes, there was some time
8   lapse on that situation because of the fact that she
9   didn't bring hospital paperwork back that we needed.
10 Q   And during that time frame where you're making those
11   calls, were you taking notes?
12 A   Yes.
13 Q   Where were you taking notes?
14 A   Scratch paper. That's not nothing you enter.
15 Q   Okay. And then did you hold onto that -- to your
16   scratch paper?
17 A   Yeah, to the end of the shift.
18 Q   And then what happens at the end of the shift?
19 A   It goes into a pile of papers that get shredded.
20 Q   Okay. Looking again at page 2 of this exhibit, the
21   last quarter of the page, there is a SOAP note from
22   you; do you see that?
23 A   Uh-huh.
24 Q   It says "time in 1:30."
25 A   Uh-huh.

Page 134

1 Q   But the note itself is dated 7/12?
2 A   Yes.
3 Q   Can you tell me what "time in" means in that context?
4 A   That's the time that I entered the note. This note
5   was entered because I couldn't find my earlier note,
6   so the 1:30 stands for the time that I started this
7   note or this assessment, and then I had to enter it
8   at 7:00 because when I went back to look for the note
9   I couldn't find it.
10 Q   I see.
11 A   So then I had to put a late entry in, so that's why
12   there is a difference in the time.
13 Q   So if I'm understanding you right, when she came back
14   from the hospital, you started to make a note. But
15   later after the delivery, you couldn't find that
16   note --
17 A   Right.
18 Q   -- so you created it --
19 A   Yes.
20 Q   -- again?
21 A   Yes.
22 Q   Okay. And the time in, 1:30, was that an
23   approximation of about when you remembered her coming
24   back?
25 A   No, the 1:30 was the time when I was done with her

Page 135

1   assessment and started the note. That's what time
2   that was.
3 Q   I see.
4 A   At 1:30 I was done with her assessment.
5 Q   How did you --
6 A   I was just waiting for her paperwork to come.
7 Q   Okay. Sorry, I didn't mean to interrupt.
8     How did you know when you were making the
9   note at 7:15 that you were done with her assessment
10   at 1:30?
11 A   Because I still had my scratch paper.
12 Q   And you had written down on the scratch paper when
13   you were done?
14 A   Uh-huh.
15 Q   Okay. Turn with me, please, to the third page.
16   There is a note there under "subjective." Do you see
17   that part?
18 A   Yes.
19 Q   "The patient returned from the hospital with officer
20   at 1:05 a.m. Vitals stable at present."
21     You made this portion of the note at 7:12
22   as well; correct?
23 A   Correct.
24 Q   And what was the 1:05 based on?
25 A   That's what time she came back from the hospital.

Page 136

1 Q Okay. Do you know --

2 A "Hospital with officer at 1:05."

3 Q Okay. Do you know when you were entering this note

4    how you got 1:05?

5 A Because that's what time is on her paperwork when she

6    got back.

7 Q I see. So there was like correctional paperwork

8    about when she returned to the jail?

9 A There is -- there is not just correctional paperwork.

10    We do a preintake. In prebook we do a little short

11    questionnaire. That questionnaire time is 1:05. So

12    that's why I know what time that was that she got

13    back.

14 Q Okay. Got it.

15      Looking at the next line, I think it reads,

16    "Patient was complaining of some pressure at the

17    bottom of her stomach"; is that right?

18 A Correct.

19 Q "Patient denied contractions at present"?

20 A Correct.

21 Q In the objective portion it lists a call with Buono

22    at 1:15?

23 A Uh-huh.

24 Q Do you have an independent recollection in your

25    memory of that phone call, or is your testimony about

Page 137

1    that phone call based on having seen this charting?

2 A No, I remember the phone call vividly because she

3    told me to make sure the hospital gets us that

4    paperwork, because if not, she will have to go back,

5    and that's what I told them. If we don't get

6    paperwork, I'm going to have to send her back out

7    there.

8 Q And was that something unusual for you, not to have

9    paperwork and have to send someone back?

10 A No. I mean, usually if we tell them we're going to

11    send them back, they will get us the paperwork,

12    because they don't want us to send them back.

13 Q So is there any particular reason that it created

14    such a vivid memory for you?

15 A Because I remember not having paperwork.

16 Q Okay. Were you --

17 A I remember we didn't have paperwork on her. I

18    remember that very well. I remember calling the

19    hospital talking to the nurse.

20 Q Under "assessment" it says, "Risk for labor related

21    to opiate abuse"; is that correct?

22 A Correct.

23 Q And so you were concerned, based on the history of

24    opiate abuse, that she might go or be in labor; is

25    that right?

Page 138

1 A Not be in labor, but she could at any time start

2    labor because of that, yes.

3 Q And you knew that she had gone to the hospital for

4    labor pains earlier in the evening; right?

5 A Correct. Well, I don't know if she went for labor

6    pains. Correct that, scatch that. I wouldn't say

7    she went because of labor pains. I think she went to

8    the hospital because of how far along she was and

9    because she was confessing that she hadn't had

10    prenatal care and she also says she had been doing

11    drugs.

12 Q Okay.

13 A So that -- she went to get cleared, medically

14    cleared.

15 Q What's your source of information for the reason that

16    she was sent to the hospital?

17 A The report that the second shift nurse gave me.

18 Q Okay. So an oral report that she gave you. Like

19    aloud she told you?

20 A Not aloud. It's written. The report is on the

21    24-hour board, and then we also discuss it, but it's

22    not like out loud. You know, it's in a room. That's

23    closed off, and we give each other report.

24 Q Sure. I didn't mean that it wasn't confidential,

25    though.

Page 139

1 A Oh, okay.

2 Q I just meant if I wanted to see what the report was

3    from the shift before to you, is there a document I

4    could look at to see what --

5 A The 24-hour board.

6 Q The 24-hour board from --

7 A Booking, correct.

8 Q All right. Going to the "plan" section -- and I'm

9    sorry if some of this is repetitive, but I promise

10    we're making our way through.

11      Where it says, "1:20 writer placed call to

12    FMLH and was transferred from the ED to L&D." 1:20,

13    would that have been -- what would that number --

14    that time have been based on?

15 A That's the time I made the call.

16 Q Would that have been based on some scratch paper or

17    other document or --

18 A Yeah, that was based on what I wrote on my paper.

19 Q Okay. And do you have a recollection of everything

20    that was included on the scratch paper?

21 A What do you mean, "a recollection of everything that

22    was included on the scratch paper"?

23 Q Well, for example, this time frame, you're saying

24    1:20 is from the scratch paper. I'm just asking you:

25    Do you know everything that was on -- could you tell

Page 140

1    me everything that was on the scratch paper?
2 A   Could I tell you now everything that was on the
3    scratch paper?
4 Q   Correct.
5 A   No. No.
6 Q   Okay.
7 A   When I made this note and I had the scratch paper
8    next to me, yes.
9 Q   Okay. Is it fair to say you believe that you would
10   have gotten this time --
11 A   Correct.
12 Q   -- from the scratch paper?
13 A   Yes.
14 Q   Without having it in front of you today, years later,
15   you can't be sure; is that fair?
16        MR. RUSSART: Object to the form. Can't be
17   sure of what?
18 BY MS. KLEINHAUS:
19 Q   Go ahead.
20 A   It's not -- no, it's not fair to say that, but I
21   charted according to my notes. I'm not going to say
22   it was scratch paper. It was notes that I put on a
23   piece of paper so that when I got ready to chart I
24   would have my times in front of me.
25 Q   Okay. Just to make sure that I understand the

Page 141

1    abbreviations here, "ED" would be emergency
2    department?
3 A   Yes.
4 Q   And "L&D" is labor and delivery; is that right?
5 A   Correct.
6 Q   Okay. Going down below where it starts with vital
7    signs and the time entry is 7:09; do you see that
8    part?
9 A   Uh-huh.
10 Q   This isn't a SOAP note, it's a vital signs note, I
11   take it. Do you know whether you made this note?
12 A   I don't know if I made this note or not.
13 Q   Do you know who took Ms. Terry's vital signs at
14   approximately 4:53 a.m.?
15 A   It wasn't me.
16 Q   How do you know?
17 A   Because I wasn't taking vitals, I was helping with
18   the baby.
19 Q   Okay.
20 A   This was during the time when we were in there
21   getting her out. 4:53 is when she -- when we were
22   calling 911 and stuff. So I wasn't assisting her, I
23   was assisting with the baby, so I know for a fact I
24   did not take these vitals at 4:53.
25 Q   Did you observe anyone take her vitals?

Page 142

1 A   Yeah, her vitals were taken. I don't know who did
2    it. I was concerned about the baby.
3 Q   How do you know that her vitals were taken?
4 A   Because someone was doing it. There was a nurse in
5    the room doing vitals on her. Who it was, I don't
6    know, I wasn't watching that. I had a baby in my
7    arms that was purple, nose was flaring, he was in
8    distress. So for me to look up and try to figure out
9    who was doing vitals, I did not do that. I do know
10   they were done.
11 Q   So the baby was still connected to Ms. Terry via the
12   umbilical cord; correct?
13 A   Correct.
14 Q   So you were within range of the umbilical cord to Ms.
15   Terry; is that correct?
16 A   I was at the bottom of the bed where the baby was.
17 Q   Okay. And your testimony is that there is someone at
18   the top of the bed; is that right?
19 A   Correct.
20 Q   Taking vitals?
21 A   Correct. There were three nurses in the room.
22 Q   Can you describe what those nurses looked like?
23 A   I can tell you who the nurses was. I can't describe
24   them.
25 Q   Okay. Tell me who they were.

Page 143

1 A   Margaret Hoover, the supervisor, was in the room.
2 Q   Okay.
3 A   And Morgan.
4 Q   Okay. And so is it fair to say that either Margaret
5    Hoover or Bevenue took the vitals?
6 A   It's fair to say that, yes.
7 Q   And the pulse was 51. Do you see that here?
8        Let's turn down to the next page. There is
9    a note from you that -- it's a SOAP note entered at
10   6:20 a.m. Do you see that part, where the page is
11   marked MKE County 102.
12 A   Yes.
13 Q   It says, "Time in 5:45." What is the significance of
14   that as the time in?
15 A   That's what time I started the note.
16 Q   Okay. And it's 6:20 when you finished the note?
17 A   Yeah.
18 Q   And is the time stamp at the top usually when the
19   note is finished?
20 A   I think it must be, yeah.
21 Q   Okay. Can you see that time stamp when you finish a
22   note?
23 A   Can I -- what do you mean can I see it?
24 Q   Like if you finished a SOAP note, would it show you
25   this is the time?

Page 144

1  A  No, uh-uh, uh-uh. You can look at the computer at
2     the bottom where the clock is. You can look at the
3     computer and see the note.
4  Q  Right.
5  A  Yes.
6  Q  But the way this is laid out here, where it shows
7     you --
8  A  No, it's not sitting up there saying this is what
9     time it is. No, it's not saying that.
10  Q  Okay. I gotcha.
11     All right. Looking under subjective, where
12     it says, "Writer was in booking when nurse CR
13     answered call from SMU officer."
14     Is CR the nurse that we identified earlier
15     as Cheryl someone?
16  A  Uh-huh.
17  Q  Okay. And where it says "at 4:46," do you know where
18     you got that time?
19  A  I must have looked at the clock.
20  Q  At the time that you were sent up for the medical
21     emergency?
22  A  Right.
23  Q  Okay. And it says, "Patient had delivered the baby";
24     correct?
25  A  That's what I was told.

Page 145

1  Q  Okay. But your --
2  A  That's what the officer told her.
3  Q  Okay.
4  A  I said, "Call from SMU officer who stated --
5  Q  Uh-huh.
6  A  -- patient had delivered the baby." That is not me
7     saying that. That's the officer saying.
8  Q  I understand.
9  A  Okay.
10  Q  Your testimony today is when you got there, the baby
11     was not all the way out of the birth canal; correct?
12  A  No, the baby was not all the way out the birth canal.
13  Q  Okay. A little further down it says, "writer asked
14     the lieutenant in booking to call a medical emergency
15     for SMU. At 4:47 nurse CR called supervisor."
16     Would that be Supervisor Hoover?
17  A  Yes.
18  Q  Was there any other supervisor on staff that night
19     besides Ms. Hoover?
20  A  No.
21  Q  Okay. Under "objective," a couple lines down, it
22     says, "Assessment revealed a responsive mother."
23     What does "responsive mother" mean in this
24     context?
25  A  She was not unresponsive. She was awake. Able to

Page 146

1     talk.
2  Q  Got it.
3  A  So she was responsive.
4  Q  Okay. Moving a couple lines down, it says, "Baby
5     moved to mother's stomach area and 02 applied via NC
6     at 2 liters."
7     Can you tell me what that means? Is that
8     oxygen being applied to the baby?
9  A  Oxygen, uh-huh.
10  Q  And the mom; right?
11  A  No, that's the baby.
12  Q  Okay.
13  A  Mom didn't need oxygen, she was screaming.
14  Q  She had just given birth; right?
15  A  Yeah, but she didn't need oxygen. People need --
16     when people need oxygen they can't talk. There is a
17     break in that sentence. There was no breaks in her
18     sentences. She was -- she was okay. The baby was my
19     concern.
20  Q  I hear that. You made that clear.
21     So where it says, "Mom and baby via NC at 2
22     liters," what does that mean?
23  A  I don't know why it says "mom" there. I must have
24     been typing too fast. Because mom was not on oxygen,
25     baby was.

Page 147

1  Q  So that's just an error in the record?
2  A  Typo.
3  Q  Okay. So moving -- why don't we just start from
4     "baby moved to mother's stomach area."
5  A  Uh-huh.
6  Q  All the way through to "blow bye" and tell me what
7     that means.
8     So it says, "Baby moved to mother's stomach
9     area and 02 applied via NC at 2L. Mom and baby via
10     NC at 2L blow bye." What does that mean?
11  A  I don't know what "blow bye" means. That's a typo.
12     I don't know what that is.
13  Q  Okay. What about the rest of this? Do you know what
14     that means?
15  A  Yeah. Mom and baby were both covered with extra
16     sheets. Mom started to complain about pain --
17  Q  I'm actually on the sentence before that, so the one
18     that starts with "baby moved to mother's stomach
19     area." Starting with "and" all the way to the end of
20     "blow bye," can you tell me what that means?
21  A  I don't know what "blow bye" means.
22  Q  Okay. Let's break it up a little bit more then. "O2
23     applied via NC." What does that mean?
24  A  Nasal cannula.
25  Q  "At 2L." What does that mean?

Page 148

1 A   2 liters.

2 Q   "Mom and baby via NC," what does that mean?

3 A   Via nasal cannula.  That's just repeating that right

4    there, so I think -- that's why I think that was just

5    a typo.

6 Q   Okay.  I got you now.

7        And it says here, "Ms. Terry was

8    complaining of pain from the afterbirth"; correct?

9 A   Yes.

10 Q   And you said there was no doctor to remove the

11    afterbirth; correct?

12 A   No, there was no doctor there.

13 Q   And do you recall telling her that?

14 A   Yeah, she asked me to pull out the afterbirth, and I

15    told her no.

16 Q   Looking under the assessment; do you see that part?

17 A   Uh-huh.

18 Q   Can you read it for us and tell me what it means?

19 A   The baby had risk for impaired air exchange related

20    to possible aspiration of meconium.  He was covered

21    with meconium.  He was having respiratory distress,

22    his nose was flaring, his color was changed.  That's

23    what that means.

24 Q   Were you worried about the baby?

25 A   Yes, I was.

Page 149

1 Q   Were you worried about whether the baby was going to

2    survive?

3 A   Yes, very much.

4 Q   Where it says "risk for volume deficit related to

5    bleeding," what does that mean?

6 A   That's related to the mother.

7 Q   What does it mean?

8 A   That means that any woman that has a child, you have

9    blood.  And any time you have blood, then you have a

10    risk for deficit.

11 Q   And that was a concern for Ms. Terry; correct?

12 A   Yeah, that was a concern for Ms. Terry, but she was

13    not in distress.

14 Q   And how was it that you determined that she was not

15    in distress?

16 A   Because she wasn't -- color wasn't changing, she

17    wasn't having any nose flaring, she wasn't having any

18    difficulty breathing.  Her -- she did not have

19    anything as an outward sign that would tell me:  This

20    lady is in trouble.  Had I seen that, I would have

21    popped an IV in her and gave her some fluids.  We do

22    have that capability.  I did not see that.  She was

23    sitting up.  I kept having to tell her to lay back

24    down.

25 Q   And were you surprised when you got the call that

Page 150

1    there was a medical emergency and she had delivered

2    in the SMU?

3 A   Yeah, I was, because the hospital said she wasn't in

4    labor.  So, yes, I was surprised.

5 Q   Okay.  Were you concerned about how that had

6    happened?

7 A   Yeah, I asked her what happened.  She said:  I have

8    been throwing up.  I have been hollering and throwing

9    up.

10 Q   Okay.  Did you have any conversation with Ms. Hoover

11    or Ms. Bevenue about how it had happened that the

12    patient had given birth in the SMU?

13 A   No, because they were right there listening to the

14    story with me.

15 Q   Did you ask anyone the last time someone had checked

16    on her?

17 A   No, I did not.

18 Q   Did you ask any correctional staff the last time they

19    had checked on her?

20 A   No, I did not.

21 Q   Why didn't you ask?

22 A   That's not my job.  I'm not their supervisor.  I am a

23    nurse with an assignment in booking, it's not my

24    business what happens upstairs.  I came up to help my

25    peers because they were out on another emergency at

Page 151

1    the time that this one was called, so I was just

2    coming up as a team player.  It is not for me to go

3    jump in people's faces and say:  What time you saw

4    her, what did you do.  That was not my role.

5 Q   Were you concerned that there had been a medical

6    emergency?

7 A   I was concerned there was a medical emergency.  If I

8    wasn't, I wouldn't have come up.  Yes, I was

9    concerned.

10 Q   Were you worried about it happening again?

11 A   What do you mean?  What's happening again?

12 Q   Someone giving birth in the SMU alone.

13        MR. RUSSART:  Object to the form of the

14    question.

15        MR. KNOTT:  Form.

16        THE WITNESS:  Our goal at the jail is not

17    to have people have babies in the jail.  That is not

18    a goal that any nurse wants to have, is someone

19    having a baby in a jail.  We don't have the equipment

20    or the things we need to take care of a newborn baby.

21    So that is not anything that none of us wants to

22    happen.  We see people all the time on floors that

23    are in labor and we get them out of there and we get

24    them to the hospital on time.

Page 152

BY MS. KLEINHAUS:

Q   And you -- the reason that you don't want it to happen is that you all don't have any of the capabilities to do a delivery at the SMU; right?

A   We have the equipment.

MR. KNOTT:  Form.

THE WITNESS:  We can do the delivery.  We have an OB kit.  An officer on the street can do a delivery, they have OB kits.  You can do a delivery in a place that you don't desire to do one, but we have no desire to do a delivery in a jail.  It's just not the place to have a baby.

BY MS. KLEINHAUS:

Q   So did you ever have any conversation with anyone ever about how this happened?  Why it happened?

A   Yeah, we were debriefed.  We were debriefed.

Q   Okay.

A   The next day.

Q   Who had a -- who was present for the debrief?

A   The supervisor and me.

Q   Okay.  And was that Ms. Hoover?

A   No, it was actually the district at that time, actually, talked to us.

Q   And who --

A   I'm sure Morgan got talked to too.  They may have

Page 153

even talked to Cheryl, I don't know.  But yes, I was talked to.  We were -- the whole staff was debriefed.

Q   Who was the director that debriefed you?

A   I think at that time it wasn't -- I don't think it was Gina, I think it was the one before Gina.  I think the director was the lady that was between Monica and Gina at that time, and I don't remember her name.

MR. KNOTT:  Excuse me, when you get a chance, it's been another hour and a half.

MS. KLEINHAUS:  Sure.  Let me just finish this section.

BY MS. KLEINHAUS:

Q   So what -- so it could have -- it was the person before Ms. Strehlow in that position?

A   Uh-huh.

Q   Okay.  And was the debrief one-on-one?

A   No, it was kind of like a group one.  It was kind of shift to shift.  Each shift got debriefed about the situation that happened and how, you know, we never want someone to have a baby in the jail.  That's not our goal.

Q   Did anyone explain what should have happened differently?

A   No, because there was -- I mean, we did everything we

Page 154

could for Ms. Terry, so I don't think anybody had any regrets about what happened.  We have no control of what time the baby came out, and I don't think any of us felt like we did anything wrong that night.  So there was no, "oh, I wish I would have did this." No, I did everything in my power to help her that night.  I don't think I did anything that warranted me to say to myself, "oh, I should have did this differently."  No.

Anyone that comes to a jail that's not having contractions and we sent them to the hospital to get them cleared and the hospital is saying they are not in labor, they would have gotten sent up to SMU.

Q   So outside -- even going beyond yourself, do you believe there is anything that anybody at the jail, correctional or medical staff, could have done differently to prevent her delivering at the jail?

MR. RUSSART:  Objection; foundation.

MR. KNOTT:  Foundation, speculation.

THE WITNESS:  No.

MR. KNOTT:  Let's take a break.

(Discussion held off the record.)

BY MS. KLEINHAUS:

Q   Going back to the last exhibit we were working with,

Page 155

which I think is 4, if you can turn with me to the page that's marked MKE County 103.

A   (Witness complies.)

Q   About a third of the way down that page, there is a note about vitals; do you see that?

A   Uh-huh.

Q   It says it was entered at 3:50?

A   Uh-huh, yes.

Q   Are you able to tell from this note who made this entry?

A   If you go to the next page, where it says "staff name."

Q   Yup.

A   That's me.

Q   Okay.  And so did you do --

MR. KNOTT:  You're looking at a different entry.

THE WITNESS:  No, this is all one entry. This is the beginning of it.

BY MS. KLEINHAUS:

Q   Okay.  So it starts with a vital note and then goes into a SOAP note; is that right?

A   That's correct.  The top part is the vitals, and then the second part is the SOAP note.

Q   Okay.

Page 156

1 A   That's all one.

2 Q   All one note. And so this is a note that you made at

3    3:50 a.m.?

4 A   Uh-huh.

5 Q   Is that right?

6 A   Correct.

7 Q   And this is when you took --

8 A   Well, actually, I made it at 3:40. I think it ended

9    at 3:50.

10 Q   I see. And where did you take -- where did you take

11    Ms. Terry's vitals?

12 A   In booking.

13 Q   Okay. And this was after she had left booking

14    presumably -- right? -- to go to SMU?

15 A   This note was done after she was gone upstairs to

16    SMU, yes, you are correct. This was the note I did

17    on her after I had did all of her assessments, talked

18    to Froedtert, to Buono. These vitals were pertaining

19    to 105, when she first got back.

20 Q   How can you tell that these vitals are pertaining to

21    1:05?

22 A   Because that's what time she got back, and we did

23    vitals in prebook when she got back at 1:05.

24    Remember I told you her preassessment, we do vitals

25    in prebook.

Page 157

1 Q   Is there anything written here in this vitals note

2    that indicates that these vitals were taken at 1:05?

3 A   No. But when I said what time she got back, then

4    that's what time her vitals were taken, when she got

5    back into the facility in prebook.

6 Q   So why is the time entered here as 3:50?

7 A   Because that's what time -- by the time I called the

8    hospital and called Buono, that's the time I was able

9    to sit down and do the note.

10 Q   And is there anything in the note that would allow us

11    to know now looking back that you had actually taken

12    the vitals at 1:05 and were just entering them at

13    3:50?

14 A   Well, yeah, if you look in the "plan" section, it

15    talked about what happened and where I was when it

16    happened. So if you know she was in booking, then

17    you would know this pertains to booking. And

18    subjective, "Patient returned from hospital with

19    papers -- generic papers. No assessment of heroin

20    abuse or baby was done. Call placed to Buono about

21    patient coming back and hospital not doing anything

22    about heroin abuse. Vitals done. See vital screen."

23    So yes, that would tell you that those

24    vitals were from when she first got there.

25 Q   We had seen a similar note on the pages marked MKE

Page 158

1    County 100 and 101 about calling the hospital and

2    asking for discharge papers.

3      Do you recall that section? Do you see

4    where I mean where it's marked MKE County 101 under

5    "plan," it's referring to a call to the hospital for

6    discharge papers; right?

7 A   Right. And that's a note, if you look on the page

8    before that, page MKE 100, that note started there.

9    And the reason that note was put in at 7:12 in the

10    morning was because I couldn't find the one -- when I

11    looked in the system I couldn't find the one I did at

12    3:00-something.

13 Q   I see.

14 A   So I redid the note because I couldn't find that

15    note.

16 Q   So when you redid the note at 7:12, you then put the

17    time in as 1:30; is that right?

18 A   Right, because that's what time I -- that's what time

19    I did -- I was with her from 1:05 to 1:30.

20 Q   And then turning back to where we were before for the

21    vitals, why there is the time in 3:50? This was

22    also --

23 A   Where is it at?

24 Q   I'm sorry, on MKE County 103 where it says "Time," it

25    says 3:50.

Page 159

1 A   Because that's a populated time by the chart, and I

2    did not change it to 1:30.

3 Q   Okay. And then if you look below that where it goes

4    into the SOAP note on that same page and turn with me

5    to the next page, where it says "Time in 3:40"?

6 A   Uh-huh.

7 Q   Why is that 3:40 instead of 1:30?

8 A   Because I did not change it.

9 Q   Okay. But it's your testimony that the last time

10    that you took her vitals and the last time you would

11    have taken them would have been 1:30; is that right?

12 A   Right, when she was in booking.

13 Q   Okay.

14 A   All these notation that you're looking at occurred in

15    booking at 1:30. These are late entries that were

16    entered because of her special circumstance, because

17    I didn't have the correct paperwork to initiate

18    anything with her because the hospital didn't send

19    it. So until I talked to the doctor and got the

20    order, I didn't initiate anything in the charting

21    system, but I did it at 3:00-something, but when I went

22    in to chart the baby I couldn't find my note.

23 Q   Okay.

24 A   So that's why there was another note entered.

25 Q   Okay. And when you took her vitals at what you're

Case 2:17-cv-01112-JPS   Filed 08/31/18   Page 43 of 63   Document 167-2

Page 160

1  now saying was 1:30, her pulse was 85; right?
2  A  Yes.
3  Q  And how did you take her pulse? Did you do that
4  manually?
5  A  I listened to her heart.
6  Q  Listened to her heart?
7  A  Yes, with a stethoscope.
8  Q  For a full minute?
9  A  No.
10 Q  Did you --
11 A  You don't do a full minute.
12 Q  Did you do the multiplying trick?
13 A  Yes, ma'am.
14 Q  And so how long were you listening and then what
15 multiplying trick did you do?
16 A  We do 15 minutes -- we also have a pulse ox machine
17 which measures her oxygen. If you look right here it
18 says 98 percent room air. I listened to her heart, I
19 got 84 or 86, probably. The machine said 85, so
20 that's what I wrote down.
21 Q  The reason it's an odd number is because it came from
22 the machine?
23 A  Yes, ma'am.
24 Q  Okay. Okay. Looking below that on page MKE County
25 104, there is an entry at 3:29; do you see that part?

Page 161

1  A  Uh-huh.
2  Q  And what is the name of -- we have talked about SOAP
3  notes and vitals. What is this type of note?
4  A  That's the prescreening note.
5  Q  Okay.
6  A  It says right there "prescreening."
7  Q  Okay. And is this the type of note you were
8  describing where the doctor would tell you how often
9  this person needs rounds?
10 A  No, a prescreening note is when -- if you read this
11 note, it talks about health transfer summary. That
12 should have been her hospital paperwork and I have
13 "no" there because we didn't receive any.
14 Q  So can you tell me the name of the note that should
15 have included how frequently rounds were going to
16 happen in the SMU?
17 A  We don't necessarily put that in a note. I mean, I
18 can put it in a note, but it's not like mandatory
19 that I put how often she have rounds done. That goes
20 into the orders. That's a part of orders, that's not
21 a part of charting.
22 Q  Okay. And orders are part of the medical record as
23 well; correct?
24 A  Correct.
25 Q  Would you -- as the person in the screening role --

Page 162

1  would you be the one to enter the doctor's order for
2  rounds into the system on behalf of the doctor?
3  A  If I'm the one that talked to the doctor. Whoever
4  talks to the doctor gets orders. That's who enters
5  them.
6  Q  Got it. And at any point did you -- after the
7  delivery did you call the hospital where Ms. Terry
8  was sent?
9       MR. RUSSART: Object to the form. Sent at
10 which time?
11 BY MS. KLEINHAUS:
12 Q  Do you have that question in mind? Did you ever call
13 the hospital -- after she gave birth, did you ever
14 call the hospital?
15 A  No, because I didn't know what hospital they was
16 taking her too.
17 Q  Okay. Okay. You can put that exhibit to the side.
18 A  It looks like the hospital was called, but I don't
19 know if this was me.
20 Q  Okay.
21 A  It says here the hospital was called, but I don't
22 know if that was me because that wasn't my
23 assignment.
24 Q  Okay. You can put that to the side.
25       During the time frame that you were an

Page 163

1  employee of Milwaukee County, did you ever receive
2  any kind of discipline related to your performance?
3  A  No.
4  Q  Were you ever disciplined for refusal to provide
5  medication to inmates?
6  A  I wasn't disciplined for that, no.
7  Q  Okay. Were you ever counseled about that?
8  A  Not really. I went on a pod that wasn't safe not too
9  long after I started, and the rule is if the pod is
10 not safe you don't go on the pod and pass meds. So
11 you wait until the pod is under control, and then you
12 go pass meds. So I came out of the pod because it
13 wasn't safe and I called the sergeant, and I
14 explained to him what was going on, and I came back
15 downstairs.
16 Q  Okay.
17 A  So I was not disciplined about it. The supervisor
18 talked to me about it, and I explained to her what
19 happened, and that was the end of that.
20 Q  So you didn't understand that experience -- that
21 wasn't discipline; correct?
22 A  No, because it -- I did nothing wrong. I did what I
23 was supposed to do. If you looked at our policy, it
24 says at any time you feel unsafe you may leave.
25 Q  Okay. And were you ever given any discipline related

Page 164

1  to attendance?
2  A   Yes.
3  Q   Okay.  And how many occasions did you receive
4      discipline for that?
5  A   I think once or twice.
6  Q   Did you ever receive discipline for anything else
7      besides attendance?
8  A   No.
9  Q   Were you ever disciplined in connection with Ms.
10     Terry's delivery?
11 A   No.
12 Q   Okay.  Are you familiar with the Shansky decree?
13     Have you heard of that?
14 A   Yes.
15 Q   How did you become familiar with that?
16 A   We were told about it all the time, part of being a
17     County nurse in the jail.
18 Q   What were you told about it?
19 A   That the County was under rule called the Shansky
20     decree, that certain things had to be done certain
21     ways because of this decree and that we had someone
22     who was court ordered monitoring the jail because of
23     this Shansky decree.
24 Q   Did you ever observe anyone at the jail conducting it
25     in the monitoring?

Page 165

1  A   Yeah, the court monitor would come.  The guy who they
2      had monitoring us, yeah, he came, talked to us, asks
3      us how things was going.
4  Q   Okay.  Were you ever told about any changes that
5      would be made as a result of the decree?
6  A   No.
7  Q   Earlier you mentioned that after Ms. Terry's delivery
8      you participated in a debrief about that event.  Who
9      was present for the debrief?
10 A   Everybody on that shift.
11 Q   Okay.
12 A   We did -- we did morning report.  If you worked
13     upstairs, everybody in report was in the back room.
14     So if I sit here and try to tell you everybody that
15     was there, I couldn't.
16 Q   Okay.  So it would have been at least the five nurses
17     assigned that night; right?
18 A   No, not -- no.  It didn't happen at night, because
19     there was nobody there that night except the
20     supervisor and the nurses.  This happened the next
21     day.  Over the next day or two they just met with
22     each shift to make sure everybody was okay with what
23     happened.  That is a -- an eventful thing that
24     happens, and you don't want that to happen.
25 Q   Right.  So what was said during the debrief?

Page 166

1  A   Just making sure everybody was okay.  That if anybody
2      needed to go to EOP or -- you know, EAP, employment
3      assistance.  If anybody needed to go there, if
4      anybody was feeling stressed about it.  They just
5      wanted to make sure everybody was okay with what
6      happened and that they thought we did a good job.
7      The baby was alive, the mother was alive, they both
8      were safe on their way to the hospital, so ...
9  Q   And who was it that was conducting the debriefing?
10     Like who was the one that called the meeting and was
11     doing the talking?
12 A   It might have been Mr. Perry and the DOM.
13 Q   And they told you they were happy because the mother
14     and the baby both survived?
15 A   Correct.
16 Q   Other than checking on the emotional well-being of
17     the healthcare providers, was anything else discussed
18     at that debriefing?
19         MR. RUSSART:  Object to the form of the
20     question.
21         THE WITNESS:  No.
22 BY MS. KLEINHAUS:
23 Q   Okay.  All right.  This next portion I would like to
24     do under the confidential label.  It relates to other
25     inmates' healthcare, so we put that as confidential

Page 167

1      in the deposition.
2         (CONFIDENTIAL TESTIMONY)
3  BY MS. KLEINHAUS:
4  Q   Did you have any involvement in the care of Cory
5      Kleser, who's a diabetic, at the jail in 2009?  Do
6      you have any recollection of Mr. Kleser?
7  A   I think I may have done a sick call on him.  When and
8      how or why, I couldn't tell you.
9  Q   Were you aware that he made a complaint about not
10     getting his insulin?
11 A   Uh-uh, no.
12 Q   Were you aware of anyone -- any healthcare provider
13     at Milwaukee County Jail ever getting disciplined for
14     failure to provide adequate care?
15         MR. KNOTT:  Foundation, speculation.
16         THE WITNESS:  No.
17 BY MS. KLEINHAUS:
18 Q   Were you familiar with a Mr. Cowser who committed
19     suicide at the jail in 2011?
20 A   Am I familiar with him?  He was my sister's
21     brother-in-law -- nephew-in-law.
22 Q   I'm sorry to hear that.  Were you involved in his
23     medical care at the jail at all?
24 A   Not really.  And actually, when he died, we were all
25     out of town.

Page 168

1  Q   Okay.  What about a Mr. Heytens, H-e-y-t-e-n-s.  He
2      also committed suicide at the jail in 2011.  Were you
3      part of his medical care at all?
4  A   Don't remember.
5  Q   Okay.  What about inmate Kwame Moore in October of
6      2014.  Were you involved in his care at all?
7  A   What --
8  Q   He complained that as a result of not receiving
9      medical care he had testicular torsion.  Do you
10     recall that?
11 A   Oh, yeah, I recall that only because it was in report
12     the next day.  I think I may have been involved in
13     sending him out to the hospital the next day.
14 Q   When something was in report the next day, what does
15     that mean?  What were you told about it?
16 A   There is a 24-hour board that we write everything
17     down that happens.  Night shift had wrote down what
18     had happened during the night, so he was followed up
19     that next morning.  I think I had sick call, and I
20     went up to see him, and I called a practitioner up or
21     either I brought him down to the clinic, I'm not sure
22     how it went.  But either he came down or either the
23     practitioner came up and we ended up sending him out
24     to the hospital.
25 Q   Okay.  And were you part of diagnosing to determine

Page 169

1      what was problem was?
2  A   Nurses don't diagnose.
3  Q   Fair enough.
4          Were you aware of what his complaints were?
5  A   When I went up and saw him, he told me what his
6      complaints was.  And like I said, I called
7      downstairs, I can't recall who I talked to, if it was
8      a doctor or practitioner, but he was seen that
9      morning when I called and they sent him to the
10     hospital.
11 Q   And what was it that he was complaining of about his
12     medical care?
13 A   He wasn't complaining about his medical care, he was
14     complaining he had pain in his scrotum, so that's
15     what I went up to assess.
16 Q   At any point did you determine how long he had been
17     making that complaint without receiving care?
18 A   No.
19         MR. RUSSART:  Object the form of the
20     question; foundation.
21 BY MS. KLEINHAUS:
22 Q   Are you familiar with Terill Thomas's death in
23     Milwaukee County Jail?
24 A   When did that happen?
25 Q   April 2016.

Page 170

1  A   I was no longer there.
2  Q   Do you have any familiarity with it?
3  A   No.
4  Q   Okay.  Are you aware of the indictment of Armor
5      Correctional in connection with that death?
6  A   No.
7  Q   And do you have any familiarity with the delivery by
8      Shadé Swayzer at the jail?
9  A   No, I was out of town from 2015 to 2017, so anything
10     that happened during that time I know nothing about
11     it.
12 Q   Okay.  Do you know whether that happened during that
13     time or not?
14 A   Hmm, I said if there is anything that happened
15     between '15 and '17, I have no knowledge of it,
16     because I was outside of town.
17 Q   Right.  I was just asking if you knew when that
18     happened, the Swayzer delivery.
19 A   No, I didn't.  That's why I said, if it was between
20     '15 and '17, I don't know.
21         (End of confidential portion)
22 BY MS. KLEINHAUS:
23 Q   Okay.  I think we're getting to the end here of what
24     I have to ask you.  Your counsel may have questions
25     for you.  Give me just one minute to see if there is

Page 171

1      anything else that I want to ask right now.
2          When you close out of a screen in the
3      medical record, for example, if you want to close out
4      of the vitals screen, do you have to -- what do you
5      have to do?  Do you click like "I approve" or "I
6      submit"?  What do you have to do to get out of that
7      screen?
8  A   Either submit or save.  I'm not sure which one it is.
9      I'm sure it's one, though.
10 Q   Does it require you to review your work for accuracy
11     before you get out?
12 A   No.
13 Q   Was anyone assigned to review the medical records
14     that you made to ensure their accuracy?
15 A   Clarify.
16 Q   What part of it is not making sense and I will try
17     to rephrase.
18 A   Someone reviewing my records to make sure they are
19     accurate?  Who would know that?  I'm the one that's
20     doing it.
21 Q   Is anyone assigned to review your records for any
22     purpose?
23 A   I'm not understanding, because if I'm the person
24     doing the assessing and I'm the one doing the
25     charting, then no one else would know what I did or

Page 172

1   didn't do to say whether it's accurate or not.

2 Q   Does anyone ever review, a supervisor or anyone else,

3     whether to check for accuracy or any other purpose?

4 A   They did chart reviews.

5 Q   Who did that?

6 A   Supervisors.

7 Q   Okay. How often did the supervisor do chart reviews?

8 A   I don't know.

9 Q   I'm sorry, we're off the confidentiality.

10 A   I don't know.

11 Q   Did anyone ever talk to you about your charting?

12 A   No.

13 Q   Why do you believe that they were reviewing your

14     charts?

15 A   Not my charts, they reviewed everybody's charts.

16     Everybody's charts got reviewed. It wasn't personal

17     to me.

18 Q   Yes, I understand. What makes you believe that they

19     reviewed anybody or everybody's charts?

20 A   Because they said they did it.

21 Q   Who was tasked with doing that?

22 A   The supervisors.

23 Q   Okay.

24 A   And I think the quality nurse did it too.

25 Q   I apologize if I asked this before, who is the

Page 173

1   quality nurse in --

2 A   I don't know her name. I can't remember her name.

3     MS. KLEINHAUS: Okay. Okay. That's all I

4     have for you right now. The other attorneys may have

5     questions for you. Thank you.

6     MR. RUSSART: I'm the other attorney, and I

7     don't have any questions for you.

8     E X A M I N A T I O N

9 BY MR. KNOTT:

10 Q   I just have one clarification.

11     Ms. Exum, counsel showed you Exhibit 1,

12     which is Defendants' Exum and Hoover's Supplemental

13     Response to Plaintiff's First Set of Interrogatories.

14     And the document she gave you consists of three

15     pages, and there are no signatures.

16     If I represent to you that there are a

17     fourth and fifth page to that document and show you

18     on the screen the fourth and fifth pages -- you can

19     look at it.

20 A   That's my signature.

21 Q   And I show that on page 5 there is a signature of

22     March 5, '18. Does that refresh your recollection --

23 A   Yes.

24 Q   -- as to reviewing --

25 A   Yes.

Page 174

1 Q   -- Exhibit 1?

2 A   That's correct, that's the one you had me sign.

3     MS. KLEINHAUS: Okay. Are you through?

4     MR. KNOTT: Yeah.

5     E X A M I N A T I O N

6 BY MS. KLEINHAUS:

7 Q   Did you review the first three pages there before you

8     signed?

9 A   I think I skimmed through the whole thing to see

10     where my name was involved with it, because I wanted

11     to know where my name was.

12     Yes, I did look through it.

13 Q   You looked through it?

14 A   Uh-huh.

15 Q   Did you check it for accuracy?

16 A   Yes, as much as I remember.

17 Q   Did you add anything to it?

18 A   No.

19     MS. KLEINHAUS: I don't have anything else.

20     THE WITNESS: Add or delete, neither one.

21     MS. KLEINHAUS: Got it.

22     (Whereupon, the proceedings concluded at

23     3:47 p.m.)

24

25

Page 175

1 STATE OF WISCONSIN )

2 MILWAUKEE COUNTY )   )SS

3

4     I, Carla J. Van Roo, Registered

5 Professional Reporter and Notary Public in and for

6 the state of Wisconsin, do hereby certify that I have

7 carefully compared the foregoing pages with my

8 stenographic notes, and that the same is a true and

9 correct transcript.

10     I further certify that I am not a relative

11 or employee or attorney or counsel of any of the

12 parties, or a relative or employee of such attorney

13 or counsel, or financially interested directly or

14 indirectly in said action.

15     Dated at Milwaukee, Wisconsin, on this

16 _____ day of _____, 2018.

17

18           _____

19           Carla J. Van Roo

           Registered Professional Reporter

20           Certified Realtime Reporter

           Notary Public

21

22 My commission expires May 15, 2019

23

24

25

**WORD INDEX**

**< 0 >**
**02** 146:5 147:9
**05** 13:7

**< 1 >**
**1** 3:8 112:17, 20
113:12 117:18, 21, 25
118:3, 8 173:11 174:1
**1:00** 76:11 79:17, 18
**1:05** 135:20, 24 136:2, 4,
11 156:21, 23 157:2, 12
158:19
**1:15** 136:22
**1:20** 139:11, 12, 24
**1:30** 133:24 134:6, 22,
25 135:4, 10 158:17, 19
159:2, 7, 11, 15 160:1
**10** 9:14 30:21 69:18
94:21
**10:00** 1:13 2:8
**10:30** 26:7
**10:45** 26:7
**100** 1:15 2:20 63:13
158:1, 8
**101** 158:1, 4
**102** 143:11
**103** 155:2 158:24
**104** 160:25
**105** 156:19
**10th** 73:25 76:10, 13, 19
87:5 97:25 100:1
123:16 125:17
**11:00** 26:4
**11:15** 26:4
**112** 3:8
**113** 3:9
**12** 134:1
**12:00** 79:17
**123** 3:10
**127** 3:11
**12-hour** 23:9
**13** 21:24
**14** 11:11
**15** 8:15 160:16 170:15,
20 175:22
**167-Line** 3:13
**17** 8:15 170:15, 20
**170** 3:13
**173** 3:3
**174** 3:4
**17-CV-01112** 1:2
**18** 173:22
**19** 1:12 2:8
**1s** 117:16

**< 2 >**
**2** 3:9 113:14, 17, 23
117:21 118:3, 8 123:24
133:20 146:6, 21 148:1
**2:30** 26:4

**2:45** 26:4
**20** 3:13 88:2, 3 105:5
**2000** 9:2, 7, 13
**2005** 9:11, 13 14:20
15:2, 16 18:21 19:12
24:14 25:12 28:12
**2008** 27:12
**2009** 167:5
**2011** 167:19 168:2
**2012** 45:19
**2013** 11:11 22:4, 13, 15,
15 27:19 28:7 42:11
**2014** 21:24 22:4, 22
27:19 28:7 53:16
73:17, 19, 22 74:1
75:22 76:10 99:21
100:1 123:8, 16 168:6
**2015** 21:6 22:6 28:12
170:9
**2016** 169:25
**2017** 170:9
**2018** 1:12 2:8 175:16
**2019** 175:22
**219** 2:17
**24** 117:20 120:10
**24-hour** 138:21 139:5, 6
168:16
**2600** 2:20
**2L** 147:9, 10, 25
**2s** 117:16

**< 3 >**
**3** 3:10 70:1 117:22
118:3, 8 122:24 123:2
125:20 127:14
**3:00-something** 158:12
159:21
**3:15** 14:25
**3:29** 160:25
**3:40** 156:8 159:5, 7
**3:47** 2:9 174:23
**3:50** 155:7 156:3, 9
157:6, 13 158:21, 25
**30** 88:3 94:12
**30-minute** 77:12
**311** 2:13
**32** 91:10, 13
**36** 91:11, 13
**3s** 117:17

**< 4 >**
**4** 3:3, 11, 13 118:15
125:2 127:15, 18, 19
155:1
**4:46,** 144:17
**4:47** 145:15
**4:53** 141:14, 21, 24
**45** 125:21
**46** 123:19, 24 125:2

**< 5 >**
**5** 173:21, 22

**5:45** 143:13
**51** 12:23 143:7
**53202** 2:17, 21

**< 6 >**
**6** 118:16
**6:20** 143:10, 16
**6:45** 14:25
**60** 10:14
**60607** 2:14

**< 7 >**
**7** 121:18, 21 134:1
**7:00** 134:8
**7:09** 141:7
**7:12** 135:21 158:9, 16
**7:15** 26:7 135:9
**7:30** 131:4
**710** 2:17

**< 8 >**
**84** 160:19
**85** 160:1, 19
**86** 160:19

**< 9 >**
**911** 43:14 57:15 83:6
109:22 110:1, 10 141:22
**98** 160:18
**9th** 73:25 76:22 87:4
123:8, 12

**< A >**
**a.m** 1:13 2:8 135:20
143:10
**a.m.** 141:14 156:3
**A5** 116:24
**abbreviations** 141:1
**abdomen** 80:17, 22
**abdominal** 88:15
**Aberdeen** 2:13
**abilities** 75:3, 16
**ability** 6:4
**able** 89:11 145:25
155:9 157:8
**above-entitled** 2:2
**abuse** 98:3, 13 103:15
137:21, 24 157:20, 22
**accept** 21:3 55:4 56:22,
24 57:3 90:20 104:11
130:12 132:8 133:3
**accepted** 58:7, 7, 8, 9, 20,
20 87:10 90:22 132:16
**accepting** 55:13
**access** 56:7
**accompanied** 80:9
**accuracy** 171:10, 14
172:3 174:15
**accurate** 6:4 87:14, 15
171:19 172:1
**act** 68:24
**action** 2:2 175:14

**active** 60:25 61:19
**actively** 82:11, 13
**actual** 54:9 87:9
**add** 15:13 131:24
174:17, 20
**adding** 15:13
**additional** 42:19
**adequate** 167:14
**administration** 116:14
**admit** 115:24, 25 116:1
**admits** 65:4
**admitted** 89:15 116:6
**advertised** 10:9
**affiliated** 4:19
**aforementioned** 2:7
**afterbirth** 148:8, 11, 14
**agency** 9:16
**agenda** 50:15
**ago** 66:14 78:14
**ahead** 15:8 18:7 19:2
28:14 29:20, 24 30:3
39:6, 17 59:5 90:20
104:13 120:8 140:19
**air** 148:19 160:18
**al** 1:2
**alive** 70:12 166:7, 7
**allow** 157:10
**allowed** 15:10 94:7
**aloud** 138:19, 20
**ambulance** 57:13, 14, 19
109:25
**amount** 87:24
**anger** 110:25
**annually** 24:8
**answer** 5:20 6:1 7:11
12:1, 10 15:11 16:11
25:20 28:15 30:3, 7
36:16 89:1 93:23 94:9,
23 113:4 118:13
**answered** 144:13
**Answers** 3:8 12:5
**anticipating** 101:15
**antsy** 89:11, 21 98:2
**Anybody** 48:19 53:20
67:22 93:8 103:9
106:25 154:1, 16 166:1,
3, 4 172:19
**anyone's** 47:2 124:5
**anyplace** 115:20
**Apart** 42:18
**apologize** 26:2 172:25
**appearance** 4:21
**appearances** 4:13
**Appeared** 2:14, 18, 21
**application** 9:20 10:6
**applications** 97:4, 7
**applied** 10:2, 4 109:19,
21 146:5, 8 147:9, 23
**apply** 21:15 96:19, 24
108:15
**appointment** 47:7 63:2
**appreciate** 118:11

**Gramann Reporting, Ltd. | U.S. Legal Support**                    *(800) 899-7222*

**approve** 171:*5*

**approximately** 141:*14*

**approximation** 134:*23*

**April** 8:*15* 169:*25*

**area** 13:*16* 18:*13* 19:*24* 22:*5* 25:*2, 7, 7, 14, 23* 26:*13, 22* 33:*1* 34:*8, 8* 35:*22* 53:*4, 5, 7* 54:*22* 55:*8, 9* 62:*8* 66:*1* 79:*24* 80:*5, 10, 15* 84:*11* 85:*20* 86:*11* 87:*19, 24* 92:*3* 104:*2, 20, 21* 106:*17* 146:*5* 147:*4, 9, 19*

**areas** 24:*9, 10* 50:*19*

**Armor** 2:*21* 3:*9* 4:*17* 21:*18, 23* 22:*1, 4, 8, 12* 23:*10, 19* 42:*11, 19, 25* 43:*6, 7, 16, 17, 21, 23* 44:*10* 45:*5, 8, 25* 46:*5* 47:*16* 49:*15, 18* 50:*1* 51:*23, 24* 52:*5, 6* 96:*17, 20, 21, 25* 97:*18, 21* 120:*16, 25* 123:*19, 24* 125:*2, 2, 21* 170:*4*

**arms** 142:*7*

**ARNOLD** 2:*16* 4:*18, 18, 23* 5:*1, 4, 7* 86:*16*

**arrive** 107:*25*

**arrived** 87:*18* 108:*7*

**Aside** 70:*15*

**asked** 11:*19* 12:*18, 20* 26:*2* 30:*4* 47:*5* 54:*5* 80:*16* 81:*9* 88:*18* 90:*6* 103:*3* 110:*4* 111:*5, 12* 145:*13* 148:*14* 150:*7* 172:*25*

**asking** 30:*12, 14* 139:*24* 158:*2* 170:*17*

**asks** 36:*22* 165:*2*

**aspiration** 148:*20*

**Assess** 34:*4* 56:*13* 129:*22* 169:*15*

**assessed** 47:*6* 62:*3* 115:*22*

**assessing** 61:*20* 171:*24*

**assessment** 19:*21* 33:*5, 24* 56:*3, 6, 7* 61:*12* 71:*8* 86:*13, 15, 21* 88:*2, 5, 10* 89:*13* 92:*20* 100:*25* 101:*13, 19, 19* 103:*2, 9* 104:*16, 21, 22* 105:*5* 129:*22* 132:*4, 18* 134:*7* 135:*1, 4, 9* 137:*20* 145:*22* 148:*16* 157:*19*

**assessments** 19:*25* 20:*23* 35:*15, 22* 36:*1* 43:*6* 55:*12* 102:*15* 156:*17*

**assign** 40:*12* 50:*10*

**assigned** 16:*25* 17:*11, 23* 18:*3* 20:*2* 21:*6*

**approximately** 25:*13, 17, 23* 27:*20* 28:*6* 29:*9* 35:*18, 21* 38:*22* 49:*21* 50:*12* 52:*17, 20* 53:*13* 54:*12* 55:*15* 63:*19* 64:*18* 76:*13* 92:*24* 93:*1* 96:*2, 5* 111:*16, 23* 119:*15* 123:*10, 24* 125:*24* 126:*1, 10, 13* 165:*17* 171:*13, 21*

**Assignment** 3:*10* 17:*21* 26:*12* 28:*23* 29:*1* 76:*25* 123:*6* 125:*18* 150:*23* 162:*23*

**assignments** 26:*25* 47:*23* 48:*3* 116:*25*

**assistance** 166:*3*

**assisted** 19:*24*

**assisting** 141:*22, 23*

**Associate's** 8:*23*

**assume** 5:*21* 52:*20* 87:*22*

**assuming** 55:*17* 93:*15*

**assumption** 93:*19*

**assumptions** 93:*21*

**attend** 26:*18*

**attendance** 164:*1, 7*

**attention** 75:*21* 127:*18, 24*

**attorney** 4:*10* 6:*9* 113:*7* 173:*6* 175:*11, 12*

**attorneys** 173:*4*

**audio** 56:*15*

**audit** 50:*23*

**audited** 51:*6*

**audits** 51:*4*

**automatically** 87:*11* 96:*21*

**available** 54:*3* 64:*21* 80:*4*

**Avenue** 1:*15* 2:*20*

**awake** 145:*25*

**aware** 46:*16, 22* 47:*10, 12* 48:*2, 22* 50:*23* 63:*4* 69:*13, 14* 70:*16* 95:*15, 17* 122:*4* 167:*9, 12* 169:*4* 170:*4*

**< B >**

**babies** 151:*17*

**baby** 82:*5* 83:*17* 105:*17* 106:*14* 107:*12, 14, 17, 18* 108:*8, 14, 20, 21, 24* 109:*2, 5, 17* 110:*13, 21, 22* 111:*15* 127:*23, 23* 141:*18, 23* 142:*2, 6, 11, 16* 144:*23* 145:*6, 10, 12* 146:*4, 8, 11, 18, 21, 25* 147:*4, 8, 9, 15, 18* 148:*2, 19, 24* 149:*1* 151:*19, 20* 152:*12* 153:*21* 154:*3* 157:*20* 159:*22* 166:*7, 14*

**back** 17:*2* 21:*11, 12* 27:*12, 14* 34:*5* 55:*3, 22* 58:*25* 59:*6, 17* 62:*22* 63:*1, 2* 66:*13* 72:*17* 75:*24, 25* 76:*3, 5* 77:*16, 25* 79:*3, 11, 20, 23, 23* 80:*8, 10, 15* 81:*10, 11, 23* 82:*25* 83:*7, 16, 18, 20* 84:*11, 25* 85:*15, 17* 86:*17* 87:*10* 90:*11, 12, 19* 94:*17* 96:*15* 97:*25* 100:*10* 101:*2* 103:*25* 105:*21* 107:*16* 110:*1* 115:*22* 122:*6* 124:*12* 125:*20* 131:*24* 133:*6, 9* 134:*8, 13, 24* 135:*25* 136:*6, 13* 137:*4, 6, 9, 11, 12* 149:*23* 154:*25* 156:*19, 22, 23* 157:*3, 5, 11, 21* 158:*20* 163:*14* 165:*13*

**background** 97:*5, 6, 8*

**bad** 67:*3*

**based** 21:*3* 35:*3* 115:*5* 129:*8* 135:*24* 137:*1, 23* 139:*14, 16, 18*

**basically** 11:*19* 20:*6* 43:*11*

**basis** 32:*13*

**Bates** 123:*17*

**bed** 28:*3* 109:*6* 142:*16, 18*

**began** 13:*3, 10* 14:*20* 15:*1* 16:*13* 19:*11* 25:*12*

**beginning** 26:*8* 33:*24* 34:*21* 35:*9* 49:*6* 79:*16* 155:*19*

**behalf** 2:*14, 18, 21* 162:*2*

**behavior** 68:*23*

**belief** 101:*21*

**believe** 22:*12* 89:*7* 90:*13* 92:*6* 93:*16* 110:*23* 140:*9* 154:*16* 172:*13, 18*

**believed** 89:*20* 90:*21*

**bell** 124:*7, 14*

**bench** 54:*23, 24, 25* 55:*3* 85:*25*

**benefits** 97:*12, 13, 14*

**best** 6:*21, 23* 73:*24*

**better** 32:*17*

**Bevenue** 74:*15, 17* 111:*22* 125:*24* 126:*7* 143:*5* 150:*11*

**beyond** 154:*15*

**binge** 89:*5, 15* 98:*7*

**birth** 92:*19, 21* 95:*10, 13* 108:*24* 109:*3, 8* 145:*11, 12* 146:*14* 150:*12* 151:*12* 162:*13*

**bit** 5:*19* 19:*9* 25:*1* 147:*22*

**bleeding,** 149:*5*

**blood** 109:*1, 2, 3, 4* 149:*9, 9*

**blow** 147:*6, 10, 11, 20, 21*

**board** 72:*13, 14, 19, 22* 73:*2, 5* 77:*17, 20, 22* 138:*21* 139:*5, 6* 168:*16*

**boards** 78:*3*

**Bob** 77:*19*

**book** 33:*25, 25*

**booking** 20:*16, 18* 54:*11, 15, 17, 19, 21, 22* 55:*6, 11* 62:*8* 63:*17, 19* 64:*14, 19* 66:*22* 69:*12* 72:*10* 77:*2, 4* 84:*11* 85:*19* 86:*2, 11, 12* 87:*18, 19, 24* 88:*5* 92:*2* 93:*9* 95:*23* 96:*7* 101:*3* 102:*12, 13, 13* 104:*20* 105:*9, 20, 22* 106:*5, 17* 111:*21* 116:*11* 122:*13* 123:*24* 124:*3* 125:*19* 127:*3, 8* 130:*17, 18* 132:*3, 12, 17, 21, 22* 139:*7* 144:*12* 145:*14* 150:*23* 156:*12, 13* 157:*16, 17* 159:*12, 15*

**books** 49:*9*

**bottom** 58:*7* 88:*17, 20* 131:*12* 136:*17* 142:*16* 144:*2*

**boxed-off** 55:*1*

**Braxton-Hicks** 82:*14*

**break** 30:*20* 46:*9, 11, 15* 53:*1* 96:*10, 13, 16* 132:*6* 146:*17* 147:*22* 154:*22*

**breaks** 146:*17*

**breathing** 70:*12* 149:*18*

**bring** 44:*14* 50:*11* 54:*23* 58:*24* 85:*7* 104:*9* 133:*9*

**broad** 59:*2* 60:*13* 82:*20*

**brother-in-law** 167:*21*

**brought** 32:*22* 57:*5* 168:*21*

**building** 43:*3*

**bulb** 107:*19* 108:*12*

**bullet** 115:*3*

**bunk** 67:*6*

**Buono** 53:*19* 91:*4* 101:*14, 22, 23* 117:*24* 136:*21* 156:*18* 157:*8, 20*

**burnt** 9:*25*

**Burton** 77:*7, 9* 78:*23* 124:*2*

**business** 150:*24*

**busy** 96:*7*

**button** 36:*20, 21* 63:*10*

**bye** 147:*6, 10, 11, 21*

**bye,** 147:*20*

**< C >**

**call** 14:6, *14, 15, 17*
*18:10* 19:*20, 23* 34:6
36:*15, 16, 17, 19, 20*
37:*4, 5, 8, 8* 42:8 43:*14*
44:*3, 4, 13* 49:6 52:*21,
24* 53:6, *11, 12, 15, 17*
54:*5, 7* 56:*21* 57:*1, 14,
19* 58:*1* 59:*16* 61:*2, 8,
13* 62:*2* 63:*8, 10, 14, 25*
64:*19, 20, 21* 71:*25*
72:*5, 6, 10* 77:*25* 79:*4*
80:*19* 81:*15* 83:6
84:*15* 86:6 90:*11* 93:*7,
12* 96:*4* 104:*20* 105:*20,
21, 23* 106:*1* 110:*10*
116:*7* 136:*21, 25* 137:*1,
2* 139:*11, 15* 144:*13*
145:*4, 14* 149:*25*
157:*20* 158:5 162:*7, 12,
14* 167:*7* 168:*19*
**called** 4:2 6:*8, 9* 11:*5*
12:*24* 14:6 19:*22*
23:*23* 58:5 62:*19*
81:*14* 85:*20* 90:6, *19*
93:*15* 95:*11, 24* 100:*10*
102:*2, 21* 105:*17, 19*
145:*15* 151:*1* 157:*7, 8*
162:*18, 21* 163:*13*
164:*19* 166:*10* 168:*20*
169:6, *9*
**calling** 14:*1, 10* 59:*16*
90:*23* 133:*4, 6* 137:*18*
141:*22* 158:*1*
**Call-ins** 40:*2*
**calls** 40:5 133:*11*
**calm** 111:*12, 15*
**canal** 108:*24* 145:*11, 12*
**cannula** 147:*24* 148:*3*
**capabilities** 152:*4*
**capability** 149:*22*
**capacity** 4:*25*
**car** 57:*19*
**Care** 3:*9* 7:*22* 36:*11*
42:*11* 43:*25* 44:*4, 9, 10,
23* 45:*19* 46:*16* 47:*11*
63:*17, 21* 71:*9* 90:*8, 10,
16* 98:*18* 114:*13* 115:6
118:*7* 121:*14* 138:*10*
151:*20* 167:*4, 14, 23*
168:*3, 6, 9* 169:*12, 13, 17*
**carefully** 175:*7*
**Carla** 1:*16* 2:*4* 175:*4,
18*
**CAROLYN** 1:*11* 2:*1*
4:*2*
**carts** 54:*6*
**Case** 1:*2* 12:*13, 21, 21*
66:*1* 78:*11, 19*
**categories** 115:*5*
**category** 129:*13*
**cause** 68:*24*
**caused** 8:*20*

**cell** 63:*15* 70:*1* 107:*22*
108:*7* 111:*2, 8, 11, 17*
**cells** 34:*8, 11* 36:*15*
71:*16* 107:*7*
**Center** 7:*19, 21, 23*
**Ceridian** 43:*18*
**certain** 62:*15* 91:*8, 9*
102:*4, 5* 164:*20, 20*
**Certified** 2:*5* 175:*19*
**certify** 7:*12* 175:6, *10*
**chance** 153:*10*
**change** 10:*1* 17:*2* 22:*9*
28:*10, 13* 31:*2* 48:*12*
88:*11* 97:*13, 17* 159:*2, 8*
**changed** 17:*5* 19:*13*
30:*18* 52:*25* 54:*13*
97:*14* 148:*22*
**changes** 21:6 97:*11, 22*
165:*4*
**changing** 149:*16*
**channel** 37:*15, 15*
**channels** 37:*17*
**Chapter** 12:*23*
**characteristics** 56:*18*
**charge** 13:*16* 17:6, *10*
19:*10, 20, 23* 20:8
24:*15* 37:5, *23* 38:*1, 5,
10* 45:*12* 105:*9* 123:*10*
126:*1, 14*
**chart** 33:6, *7* 64:*8, 9*
65:*7* 78:*9* 116:*12*
140:*23* 159:*1, 22* 172:*4,
7*
**charted** 13:*13* 140:*21*
**charting** 13:*13, 22*
35:*14* 36:*2* 78:*8, 11, 13,
15* 89:*22* 102:*16* 112:*9*
113:*10, 11* 127:*22*
131:*19* 132:*2* 137:*1*
159:*20* 161:*21* 171:*25*
172:*11*
**charts** 172:*14, 15, 15, 16,
19*
**Check** 33:*24* 34:*17, 21*
35:*2, 12* 55:*20* 69:*25*
70:*4* 97:*18* 122:*14*
172:*3* 174:*15*
**checked** 35:*11* 47:5
69:*21, 23* 70:5 80:*17*
116:*4* 150:*15, 19*
**checking** 35:6 70:6, *9,
10, 11* 80:*22, 23* 166:*16*
**checks** 97:*5, 7, 8*
**Cheryl** 106:*3, 4, 11*
124:6, *9, 24* 144:*15*
153:*1*
**Cheryl's** 106:*7, 8*
124:*14, 15, 21*
**Chicago** 2:*14*
**child** 149:*8*
**choose** 69:*22*
**chosen** 128:*24*

**chunks** 54:*14*
**circumstance** 159:*16*
**circumstances** 40:*10*
60:*21* 61:*7, 23*
**city** 9:*17*
**clamp** 108:*14*
**clamped** 108:*17* 109:*21*
**clamping** 110:*4*
**clamps** 108:*14*
**clarification** 173:*10*
**clarify** 16:*8* 30:*13*
52:*19* 88:*24* 94:*17*
115:*7* 171:*15*
**Clark** 51:*22, 25*
**classifications** 116:*25*
117:*3, 9*
**classify** 117:*14*
**cleaned** 107:*18*
**clear** 61:*20* 89:*4, 6*
93:*24* 146:*20*
**clearance** 57:*22* 77:*20*
**cleared** 12:*19, 20* 57:6,
*8, 11* 60:*16* 138:*13, 14*
154:*12*
**cleared,** 57:*7*
**clearly** 94:*18*
**click** 171:*5*
**client** 73:*14*
**clinic** 13:*17, 17* 17:6
18:*11, 12* 19:*10, 24, 25*
20:6 25:*7, 9* 27:*23*
32:*7, 10, 14, 17, 20, 22*
33:*1, 7* 36:*17* 37:5, 6, *8*
38:*9, 14* 53:*4, 5, 7* 99:6,
*8, 11* 101:*1, 5, 7* 102:*9*
122:*13, 21* 168:*21*
**Clinical** 102:*3*
**clipboard** 72:*23*
**clock** 14:*2, 19*
**close** 171:*2, 3*
**closed** 20:6 138:*23*
**cloths** 108:*13*
**color** 148:*22* 149:*16*
**come** 9:*23* 12:*21* 14:*14,
16, 17* 19:*22* 20:*24*
21:*1* 33:*1, 5* 40:*12*
55:*22* 66:*13* 74:*17*
79:*23* 84:*11* 90:*11*
91:*12* 94:*7* 98:*16*
100:*14* 130:*10* 132:*16*
135:6 151:*8* 165:*1*
**comes** 35:*17* 62:*22*
63:*1* 79:*22* 103:*4*
154:*10*
**coming** 70:6 72:*7*
75:*25* 77:*16* 79:*3* 83:*3*
93:*8* 107:*13, 14* 108:*24*
110:*21* 134:*23* 151:*2*
157:*21*
**commencing** 2:*8*
**commentary** 118:*12*
**commission** 175:*22*

**commitment** 13:*1*
**committed** 167:*18* 168:*2*
**commonly** 103:*18*
**communicate** 37:*1* 44:*2*
70:*25* 71:*1, 1* 72:*15*
**communicated** 49:*5*
**communicating** 36:*12*
37:*20* 53:*13*
**communication** 70:*17*
**compared** 175:*7*
**complain** 147:*16*
**complained** 168:*8*
**complaining** 88:*15*
91:*24* 136:*16* 148:*8*
169:*11, 13, 14*
**complaint** 43:*24* 45:*15*
167:*9* 169:*17*
**complaints** 169:*4, 6*
**complete** 36:*24* 88:*5*
**completed** 49:*8*
**completely** 107:*13*
**complications** 68:*5, 7*
**complies** 113:*13* 116:*23*
121:*20* 131:*2* 155:*3*
**Comprehensive** 7:*18, 21,
22*
**computer** 33:*4* 35:*24,
25* 42:*14, 23* 43:*4*
49:*10* 56:*8, 11* 58:*3*
80:*4* 131:*23* 132:*14*
144:*1, 3*
**concern** 69:*20* 146:*19*
149:*11, 12*
**concerned** 103:*5* 137:*23*
142:*2* 150:*5* 151:*5, 7, 9*
**concluded** 174:*22*
**concluding** 2:*9*
**condition** 35:*3, 10*
68:*22, 24* 69:*23* 70:*2*
110:*16* 132:*24*
**conditions** 5:*24* 14:*10*
**conducting** 164:*24* 166:*9*
**confessing** 138:*9*
**CONFIDENTIAL** 1:*10*
3:*13* 138:*24* 166:*24, 25*
167:*2* 170:*21*
**confidentiality** 172:*9*
**confusing** 130:*22*
**connected** 86:*3* 142:*11*
**connection** 164:*9* 170:*5*
**considered** 15:*20*
**consist** 13:*12* 43:*10*
51:*2* 92:*8*
**consisted** 86:*21*
**consistent** 31:*3, 5, 14, 24*
**consists** 104:*22* 173:*14*
**contained** 108:*10*
**CONTAINS** 1:*10*
**content** 113:6
**contents** 85:*4*
**context** 7:*9* 134:*3*
145:*24*
**contract** 22:*13*

**contractions** 42:*10* 61:*1, 2, 6, 6, 19, 19* 80:*24, 25* 88:*19* 104:*25* 136:*19* 154:*11*
**contractor** 47:*16*
**control** 154:*2* 163:*11*
**controversy** 11:*15* 12:*16*
**conversation** 59:*24* 60:*3, 8* 78:*23* 81:*2, 12* 86:*10* 92:*1, 8, 18* 99:*24* 101:*4, 6, 9, 14* 104:*1* 106:*24* 108:*6* 111:*7* 113:*6, 7* 126:*3* 150:*10* 152:*14*
**conversations** 125:*13, 14*
**cooperative** 89:*1, 4*
**coordinator** 19:*18*
**copies** 3:*13* 49:*17* 114:*2*
**copy** 46:*6* 56:*9, 10* 58:*14* 73:*5* 113:*19* 114:*1, 6, 7*
**cord** 108:*16, 17* 142:*12, 14*
**corners** 55:*1*
**correct** 32:*15* 42:*17* 52:*22* 56:*23* 60:*7* 61:*22* 79:*13* 84:*14, 17* 85:*1* 91:*22, 24, 25* 104:*3, 6* 123:*11, 14, 25* 124:*1* 125:*18, 23* 130:*5, 25* 131:*6, 7, 10, 11, 13, 14* 135:*22, 23* 136:*18, 20* 137:*21, 22* 138:*5, 6* 139:*7* 140:*4, 11* 141:*5* 142:*12, 13, 15, 19, 21* 144:*24* 145:*11* 148:*8, 11* 149:*11* 155:*23* 156:*6, 16* 159:*17* 161:*23, 24* 163:*21* 166:*15* 174:*2* 175:*9*
**Correction** 100:*7, 8*
**Correctional** 2:*21* 3:*11* 21:*19* 35:*18* 36:*13* 37:*1, 16, 19* 38:*8* 44:*22, 25* 45:*1* 54:*1, 20* 60:*8* 63:*12, 13* 65:*10, 13, 19* 67:*13, 18* 68:*6, 16* 69:*2, 8, 25* 70:*10, 18, 25* 74:*3* 84:*18* 85:*5* 88:*6* 94:*20* 136:*7, 9* 150:*18* 154:*17* 170:*5*
**Corrections** 43:*2*
**correctly** 61:*18* 106:*10, 17*
**Cory** 167:*4*
**cost** 24:*24, 25*
**counsel** 3:*13* 4:*13* 46:*24* 170:*24* 173:*11* 175:*11, 13*
**counseled** 163:*7*
**Count** 26:*12* 29:*7* 42:*9*
**counter** 86:*7*
**COUNTY** 1:*2* 2:*18* 3:*11* 4:*15* 5:*3, 6* 8:*18*

9:*9, 20* 10:*3* 13:*3, 4, 7, 10* 15:*1* 16:*14, 23* 18:*22* 19:*5* 20:*13, 22* 21:*4, 13, 23, 25* 22:*10, 16* 24:*13* 25:*6, 17* 26:*16* 27:*9, 13* 28:*12* 30:*19* 37:*23* 39:*12, 22* 40:*13* 42:*1* 46:*18* 47:*17, 19* 48:*21* 49:*12, 18, 21, 25* 51:*22* 52:*10, 17* 53:*17, 18* 62:*18* 73:*10* 74:*18* 75:*8, 22* 97:*6, 13, 19, 21* 114:*1* 117:*4* 119:*17, 21* 122:*12* 143:*11* 155:*2* 158:*1, 4, 24* 160:*24* 163:*1* 164:*17, 19* 167:*13* 169:*23* 175:*2*
**couple** 9:*16* 27:*14* 50:*10* 145:*21* 146:*4*
**course** 47:*13* 60:*20*
**COURT** 1:*1* 5:*14* 12:*8, 21* 94:*16* 164:*22* 165:*1*
**cover** 26:*22*
**covered** 50:*18* 109:*5, 6, 7* 147:*15* 148:*20*
**covering** 56:*21*
**COWS** 102:*2, 10, 24* 103:*8, 9*
**Cowser** 167:*18*
**CR** 144:*12, 14* 145:*15*
**created** 64:*23* 134:*18* 137:*13*
**creating** 65:*3*
**credentials** 129:*9*
**criminal** 11:*23*
**crisis** 121:*16*
**cross** 94:*14*
**CRR** 1:*16*
**Culbertson** 1:*15* 2:*18*
**curious** 62:*16*
**current** 7:*17*
**cut** 108:*16, 17* 110:*5*

**< D >**
**daily** 129:*25*
**Daley** 52:*1*
**database** 58:*21* 102:*18, 25*
**date** 6:*20* 128:*6, 10*
**dated** 134:*1* 175:*15*
**day** 10:*5* 11:*20* 12:*20* 14:*22, 23, 23* 19:*13, 16, 18* 22:*17* 28:*24* 53:*8, 10* 55:*16* 79:*8* 100:*3, 12, 14, 21* 102:*8* 120:*10* 124:*9* 130:*20, 22* 152:*18* 165:*21, 21* 168:*12, 13, 14* 175:*16*
**days** 13:*18* 27:*14* 42:*24* 78:*14*
**deal** 44:*25* 96:*2*

**dealing** 48:*3* 103:*13* 120:*13*
**death** 169:*22* 170:*5*
**debrief** 152:*19* 153:*17* 165:*8, 9, 25*
**debriefed** 152:*16, 16* 153:*2, 3, 19*
**debriefing** 166:*9, 18*
**decide** 55:*4* 56:*24* 59:*19* 158:*5* 132:*8*
**decided** 11:*6* 12:*22* 47:*8* 55:*13* 117:*15*
**decides** 57:*3, 12* 62:*4* 63:*23* 64:*4*
**decision** 57:*2, 18* 64:*2, 5* 99:*10*
**decrease** 48:*24*
**decree** 164:*12, 20, 21, 23* 165:*5*
**Defendants** 1:*2* 4:*15* 5:*3, 6* 173:*12*
**deficit** 149:*4, 10*
**definitely** 89:*9, 18*
**degree** 8:*23*
**delete** 174:*20*
**deliver** 107:*17*
**delivered** 109:*23* 111:*17* 144:*23* 145:*6* 150:*1*
**deliveries** 109:*9* 110:*9*
**delivering** 108:*18* 154:*18*
**delivery** 109:*9* 110:*8, 10* 111:*2* 134:*15* 141:*4* 152:*4, 7, 9, 9, 11* 162:*7* 164:*10* 165:*7* 170:*7, 18*
**Delta** 8:*9, 10, 14, 17, 18*
**demeanor** 88:*23*
**demotion** 24:*20*
**denied** 136:*19*
**dental** 97:*15*
**department** 109:*16* 141:*2*
**depended** 100:*7, 10*
**depending** 17:*5, 18* 133:*2*
**depends** 28:*23, 25* 55:*19*
**deposed** 5:*10*
**deposit** 97:*20*
**Deposition** 1:*11* 2:*1* 5:*12, 20* 6:*7* 7:*8, 10* 78:*4, 7, 17* 113:*14* 119:*23* 122:*24* 127:*15* 167:*1*
**depositions** 94:*12*
**deputy** 60:*9*
**describe** 36:*19* 44:*12* 54:*18* 85:*9* 142:*22, 23*
**described** 24:*12* 29:*4* 62:*21* 71:*14* 85:*11* 110:*12*
**describes** 122:*3*
**describing** 98:*19* 161:*8*

**description** 47:*25* 86:*8*
**desire** 152:*10, 11*
**desk** 13:*16* 17:*6, 10* 19:*10, 20* 36:*4* 38:*5, 6* 45:*12*
**detect** 80:*25*
**determine** 35:*2, 10* 118:*7* 168:*25* 169:*16*
**determined** 83:*13* 115:*17* 118:*8* 149:*14*
**determines** 115:*20*
**developed** 119:*23*
**diabetic** 167:*5*
**diagnose** 169:*2*
**diagnosing** 168:*25*
**dialysis** 9:*14*
**died** 167:*24*
**diet** 47:*6, 9*
**difference** 121:*10* 134:*12*
**different** 4:*25* 13:*23, 24* 14:*12* 17:*7* 18:*14* 22:*18* 24:*14* 37:*15* 55:*9* 66:*4* 71:*21* 73:*11* 83:*1, 2* 87:*16* 97:*14* 114:*11* 155:*16*
**differently** 153:*24* 154:*9, 18*
**difficult** 5:*25*
**difficulty** 149:*18*
**dilated** 81:*19* 89:*18* 90:*3*
**direct** 97:*20*
**directly** 175:*13*
**director** 16:*16* 48:*5, 16* 51:*20, 21, 25* 52:*14* 153:*3, 6*
**discharge** 59:*6, 11, 20* 62:*20* 76:*6* 83:*10* 84:*7, 12* 90:*7* 158:*2, 6*
**discharged** 76:*8* 117:*15*
**discipline** 163:*2, 21, 25* 164:*4, 6*
**disciplined** 163:*4, 6, 17* 164:*9* 167:*13*
**discrepancies** 11:*1*
**discuss** 138:*21*
**discussed** 113:*9, 10* 166:*17*
**discusses** 116:*24*
**discussing** 53:*24*
**discussion** 77:*9* 154:*23*
**diseases** 13:*24*
**distinction** 121:*7*
**distress** 61:*11, 12, 13, 21* 63:*7* 107:*18, 21* 110:*13* 142:*8* 148:*21* 149:*13, 15*
**DISTRICT** 1:*1, 2* 152:*22*
**divide** 55:*18*
**doctor** 14:*1, 5, 11* 34:*6* 47:*7* 53:*4, 6, 7* 56:*21* 57:*2, 3* 59:*16, 17* 61:*2,*

*3, 8, 13, 14* 62:*2, 4, 15*
63:*25* 64:*2, 3* 65:*4, 8*
71:*20* 77:*23* 79:*4*
80:*20* 81:*14, 15* 84:*8*
86:*14* 90:*12, 19, 20, 22,*
*25* 91:*3, 5* 92:*14*
101:*17, 25* 102:*7*
104:*12, 12* 115:*17, 20*
116:*3, 8, 10* 117:*11, 13,*
*24* 118:*4* 122:*6, 8*
133:*5, 6* 148:*10, 12*
159:*19* 161:*8* 162:*2, 3,*
*4* 169:*8*
**doctors** 19:*25* 20:*6*
32:*20* 117:*22*
**doctor's** 117:*17* 162:*1*
**document** 35:*6* 89:*20,*
*23* 112:*21, 24* 113:*2, 8,*
*9* 123:*3* 127:*19* 139:*3,*
*17* 173:*14, 17*
**documented** 64:*5*
**documents** 58:*23* 78:*6,*
*16* 84:*19*
**doing** 9:*23* 10:*14* 17:*6*
18:*10* 24:*10* 33:*11*
35:*22* 37:*7* 44:*23, 24*
47:*21* 48:*6* 55:*24, 25*
71:*8* 76:*17* 89:*16, 16*
99:*18* 114:*17* 116:*9*
131:*23* 138:*10* 142:*4, 5,*
*9* 157:*21* 166:*11*
171:*20, 24, 24* 172:*21*
**DOM** 166:*12*
**door** 20:*23* 36:*21* 95:*2,*
*4* 107:*3, 3*
**Doug** 4:*14* 113:*21*
**DOUGLAS** 2:*16*
**downstairs** 163:*15* 169:*7*
**Dr** 53:*19* 91:*4* 117:*24*
**Drawing** 127:*18*
**drop** 82:*5*
**drop-down** 128:*22*
**drug** 98:*3, 8, 12*
**drugs** 98:*18* 101:*12*
103:*4* 138:*11*
**due** 34:*1* 79:*8*
**duly** 4:*3*
**duties** 20:*20, 21* 21:*6*
26:*17* 28:*9, 13* 33:*10,*
*19* 48:*2*
**duty** 115:*23*

**< E >**
**EAP** 166:*2*
**earlier** 10:*16* 24:*12*
29:*5* 32:*2* 38:*8, 22*
53:*24* 79:*10* 85:*11*
90:*13* 124:*7* 134:*5*
138:*4* 144:*14* 165:*7*
**early** 22:*19* 82:*14, 15,*
*24* 83:*7*
**easier** 12:*2*

**East** 1:*15* 2:*20*
**EASTERN** 1:*2*
**ED** 139:*12* 141:*1*
**education** 8:*22* 43:*3*
**educator** 13:*23* 49:*25*
**effect** 22:*4*
**eight** 13:*15* 16:*22* 29:*8*
31:*11* 40:*22* 42:*1, 5*
115:*19*
**eight-hour** 115:*22*
**eight-week** 20:*14*
**either** 22:*4* 24:*8* 27:*23*
44:*13, 14* 46:*5* 47:*16*
49:*17* 52:*24* 54:*1*
61:*18* 64:*21* 75:*15*
82:*13* 86:*11* 93:*3*
99:*25* 109:*10* 116:*14*
122:*12* 143:*4* 168:*21,*
*22, 22* 171:*8*
**electronic** 43:*19* 46:*6*
73:*5* 114:*6*
**eleven** 30:*25* 31:*2*
34:*12* 40:*15*
**emergencies** 95:*15* 96:*3,*
*5*
**emergency** 38:*16* 69:*14,*
*15* 95:*4, 11, 12, 22, 25*
96:*1* 105:*18, 24, 25*
106:*13* 112:*12* 141:*1*
144:*21* 145:*14* 150:*1,*
*25* 151:*6, 7*
**emotional** 166:*16*
**employed** 40:*11* 52:*24*
**employee** 13:*4* 21:*18*
22:*5* 49:*13* 96:*21*
163:*1* 175:*11, 12*
**employees** 15:*20* 21:*23,*
*25* 22:*1*
**employer** 49:*8* 97:*1, 17*
**employment** 7:*17* 166:*2*
**encounter** 75:*23* 106:*25*
**encountered** 79:*19* 98:*1*
101:*3* 103:*14, 20* 105:*15*
**encounters** 125:*12*
**ended** 11:*7* 156:*8*
168:*23*
**enforcement** 60:*10*
98:*15*
**ensure** 171:*14*
**enter** 60:*16* 102:*20*
128:*4* 132:*11* 133:*14*
134:*7* 162:*1*
**entered** 132:*18* 134:*4, 5*
143:*9* 155:*7* 157:*6*
159:*16, 24*
**entering** 64:*24* 136:*3*
157:*12*
**enters** 162:*4*
**entire** 28:*21*
**entitled** 7:*8* 30:*5, 6*
**entries** 159:*15*

**entry** 128:*3* 129:*2*
134:*11* 141:*7* 155:*10,*
*17, 18* 160:*25*
**envelope** 57:*24* 58:*11*
84:*23, 25* 85:*6*
**EOP** 166:*2*
**equipment** 151:*19* 152:*5*
**equipped** 37:*10, 12*
**equivalent** 106:*18, 19*
121:*1*
**era** 30:*20*
**error** 147:*1*
**escort** 95:*5*
**established** 119:*20*
**et** 1:*2*
**evaluation** 23:*24*
**evaluations** 23:*11, 20*
**evening** 126:*3* 138:*4*
**event** 165:*8*
**eventful** 165:*23*
**events** 73:*16* 75:*21*
**Everybody** 16:*5, 5*
20:*23* 66:*7* 70:*11*
103:*3, 3* 165:*10, 13, 14,*
*22* 166:*1, 5*
**everybody's** 172:*15, 16,*
*19*
**exactly** 48:*8* 83:*24*
107:*9*
**EXAMINATION** 3:*2*
**examined** 4:*3*
**example** 17:*10* 24:*15*
45:*18* 48:*23* 56:*19*
62:*8* 63:*6* 65:*17* 66:*23*
67:*8* 68:*25* 71:*9* 87:*3*
88:*6* 131:*21* 139:*23*
171:*3*
**exams** 19:*25*
**exchange** 148:*19*
**excuse** 15:*14* 76:*21*
94:*11* 123:*15, 22* 153:*9*
**Exh** 3:*8, 9, 10, 11*
**EXHIBIT** 3:*7* 112:*17,*
*20* 113:*12, 14, 17, 23*
120:*21* 121:*18* 122:*23,*
*24* 123:*2* 124:*13*
127:*14, 15, 18, 19, 25*
133:*20* 154:*25* 162:*17*
173:*11* 174:*1*
**Exhibits** 3:*13*
**exist** 70:*17* 121:*2*
**expect** 58:*24* 59:*6*
62:*22*
**expectation** 100:*18*
**expectations** 23:*24, 25*
**expected** 49:*8* 57:*10*
60:*6*
**experience** 40:*15* 62:*7*
84:*10* 87:*14* 101:*16*
118:*21* 119:*15* 163:*20*
**experienced** 37:*24*
**experiencing** 101:*15*
**expires** 175:*22*

**explain** 30:*9* 59:*17*
70:*24* 111:*14* 120:*17*
153:*23*
**explained** 120:*25*
163:*14, 18*
**explains** 58:*19* 120:*22*
**extensive** 97:*6*
**extra** 76:*16* 113:*19*
147:*15*
**extreme** 67:*9, 14*
**EXUM** 1:*11* 2:*1* 4:*2, 7*
*5:10* 7:*15* 46:*23* 94:*9*
96:*16* 113:*2, 23* 119:*15*
173:*11, 12*

**< F >**
**faces** 151:*3*
**facility** 8:*7, 8* 157:*5*
**facing** 102:*19*
**fact** 92:*13* 99:*3* 133:*8*
141:*23*
**failed** 46:*17* 47:*11*
**failure** 167:*14*
**fair** 5:*22, 23* 38:*17*
44:*6* 65:*18* 82:*8* 93:*15,*
*18* 95:*1* 97:*1* 115:*13*
126:*8* 140:*9, 15, 20*
143:*4, 6* 169:*3*
**familiar** 52:*1* 62:*11, 16*
73:*14* 74:*3, 4* 102:*17*
112:*21* 113:*23* 123:*3*
129:*16, 23* 164:*12, 15*
167:*18, 20* 169:*22*
**familiarity** 73:*18* 170:*2,*
*7*
**far** 14:*1* 35:*15* 47:*24*
52:*15* 81:*19* 82:*10*
91:*18* 138:*8*
**fast** 146:*24*
**fax** 81:*15*
**faxing** 84:*9*
**Federal** 2:*3*
**feel** 163:*24*
**feeling** 80:*17* 166:*4*
**Felicia** 22:*23* 23:*1*
**felt** 154:*4*
**female** 42:*4* 84:*3, 4*
99:*3, 13, 17*
**females** 54:*25* 56:*2*
91:*7, 11* 99:*5* 122:*18*
**fetal** 122:*11, 14, 16*
**fewer** 38:*22*
**fifth** 173:*17, 18*
**figure** 102:*19* 142:*8*
**file** 4:*22*
**filed** 3:*13*
**files** 50:*24* 51:*5*
**fill** 14:*4* 58:*6, 8* 97:*3*
128:*18* 129:*9*
**filled** 44:*15* 87:*3, 4, 5,*
*12* 104:*7* 128:*11*
**filling** 87:*1*

**fills** 128:7
**final** 57:2
**financially** 175:13
**find** 59:8 64:17 65:13
70:23 80:20 81:18
95:21 102:11 104:4
116:13 117:7 134:5, 9,
15 158:10, 11, 14 159:22
**finding** 95:9
**finish** 55:11, 23 86:13,
15 108:18 143:21
153:11
**finished** 88:9 105:13
107:17 143:16, 19, 24
**finishing** 86:21
**first** 4:3 10:2 11:8
13:3, 8 14:20 16:24
17:25 18:21 20:13, 14,
21 21:25 23:1, 7 24:13
25:12, 23 27:8, 10 29:4,
5, 9, 16 30:18, 23 38:23
40:16 41:14 53:8, 9
54:23 74:17, 23 75:6,
11, 23 88:16, 16 96:4
104:1 106:18, 19 107:8,
10 117:18, 19 118:9
123:7, 8, 9, 12 124:20,
24 125:17 127:24
156:19 157:24 173:13
174:7
**five** 31:22 41:3, 6
87:16 165:16
**flaring** 142:7 148:22
149:17
**floated** 9:17
**floating** 66:20
**Floor** 2:13 18:9 19:19
25:9 33:1 106:18, 19,
20, 21
**floors** 18:8 102:14
151:22
**fluctuated** 100:6
**fluctuations** 48:22
**fluids** 149:21
**FMLA** 40:5
**FMLH** 139:12
**Focusing** 27:19 43:23
**follow** 76:9 85:10 102:8
**followed** 168:18
**following** 130:20, 22
**follows** 4:4
**foregoing** 175:7
**forgot** 6:20 52:8 124:19
**form** 11:21 15:24
25:19 29:11, 25 33:21
34:19 39:14, 25 44:15
51:14 53:25 58:3, 5, 6,
19 59:1 62:21 67:21
68:9 69:3 75:3, 15
76:8 77:22 82:17 87:6
90:11, 14 101:13 102:2,
4, 10 103:2 115:10
129:14 140:16 151:13,

15 152:6 162:9 166:19
169:19
**formal** 24:7
**format** 50:7 97:4
**forms** 54:9 85:16
**found** 59:8 62:4 81:17
102:10
**found,** 61:14
**Foundation** 15:7, 8 18:4,
18, 19, 24 21:9 28:14
29:10, 17, 18 30:24
31:4, 9, 20 34:18 39:9,
14 40:7, 18, 25 41:9
45:22 46:2 59:3 82:19
84:20 97:2 111:24
115:11 119:19 121:3
126:18, 23 154:19, 20
167:15 169:20
**four** 18:8 39:7 115:19
**fourth** 123:16, 23
173:17, 18
**frame** 15:15 20:9 70:3
96:17 133:10 139:23
162:25
**frequency** 41:23 115:4,
8
**frequently** 69:21, 24
103:20 161:15
**friends** 74:25
**Froedtert** 156:18
**front** 54:25 66:12, 15
109:24 140:14, 24
**full** 10:10 22:17 52:15
56:6 66:22 104:21, 22
132:4 160:8, 11
**fully** 29:15 30:17, 22
31:8, 19 32:2, 5
**further** 119:6 145:13
175:10

**< G >**
**GAYNOR** 2:14
**general** 54:21 55:11
66:21 72:17 86:12
87:19 91:12 93:20
103:9 104:19 121:15
131:3 132:3, 17, 22
**generally** 30:21
**generated** 58:2
**generic** 76:8 85:12
157:19
**geography** 85:22
**getting** 9:24 10:15 72:6
91:15 141:21 167:10,
13 170:23
**Gina** 48:17, 17 153:5, 5,
7
**give** 6:4 47:8 54:4
57:24 64:22 82:4, 25
91:5 93:8 101:18, 20
102:4 114:14 138:23
170:25

**given** 24:22 42:2 49:13,
15 57:21, 23 58:11, 14
63:4, 16 79:2, 5 92:19,
21 95:10 100:9 114:12
126:5 146:14 150:12
163:25
**gives** 44:17 101:17, 17
116:10
**giving** 95:12 151:12
**go** 11:2 12:20 15:8
18:7 19:2, 15 21:12
23:24 24:2, 4, 4, 5, 8
27:13 28:14, 21 29:20,
24 30:3 34:7 36:1
38:12 39:6, 17 42:24
45:17 46:12 50:12
55:20, 22 59:5 62:1
63:1 67:2, 4, 4, 5, 23
68:2, 3 71:16 73:1
90:20 91:1, 6 94:17
95:8, 24 96:11, 15 99:4,
11, 15 100:25 101:11
104:12 105:10, 25
107:4 114:3, 10, 17
118:1, 5 120:8 129:13
131:16, 23 137:4, 24
140:19 151:2 155:11
156:14 163:10, 12
166:2, 3
**goal** 17:21 151:16, 18
153:22
**goes** 44:15 122:6
129:10 133:19 155:21
159:3 161:19
**going** 12:23 14:14, 15,
17 15:24 16:15 22:1
23:17 30:6, 7, 21 35:12
40:2, 6 51:6 55:4
57:12 64:4 65:24
66:16, 24 67:1, 9 73:16
86:21 91:14 95:22
97:25 100:22 101:11,
16 102:8 108:9 111:3
113:17 116:2 118:5
131:20, 24 137:6, 10
139:8 140:21 141:6
149:1 154:15, 25
161:15 163:14 165:3
**Good** 4:7, 8 166:6
**Gotcha** 116:5 144:10
**gotten** 140:10 154:13
**Goudy** 125:4, 7, 7, 10, 11
**graduated** 9:2
**grandfathered** 96:22
**grandkids** 109:12
**great** 5:8
**grievance** 44:8, 15, 21
46:5 47:3 53:25 54:9
**grievances** 44:9, 22
45:6, 9, 17, 19 46:1, 6,
15, 16, 19, 22 47:10
53:24
**group** 153:18

**guess** 15:23 32:19
76:11 82:24 83:6
**gunshot** 66:5 77:19
**guy** 10:25 11:4 51:23
66:14 165:1
**guys** 110:22 113:20
**GYN** 99:19, 20

**< H >**
**half** 26:6 96:10 153:10
**halfway** 127:25
**hallucinations** 56:15
**hand** 114:14 132:23
**handbook** 49:13
**handing** 112:20
**handled** 47:24
**hands-on** 108:22
**happen** 21:21 27:4
41:18 56:19 66:11
71:10 95:19 126:22
132:3 151:22 152:3
161:16 165:18, 24
169:24
**happened** 25:25 60:4,
10 69:14 76:3 77:14
80:15 81:13 86:9
95:16 96:19 103:18
104:17 105:6 106:24
107:2, 11 109:18, 20
111:5 129:23 150:6, 7,
11 152:15, 15 153:20,
23 154:2 157:15, 16
163:19 165:20, 23
166:6 168:18 170:10,
12, 14, 18
**happened,** 54:8
**happening** 19:19
151:10, 11
**happens** 57:4 72:10
133:18 150:24 165:24
168:17
**happy** 166:13
**hard** 56:9, 10 114:6
**Haven** 8:13
**head** 12:10 52:5 104:23
**Health** 3:11 11:5 12:14,
17, 18 21:19 39:19
42:11 57:9 88:23
97:15 121:13 161:17
**healthcare** 22:8 23:10,
19 96:17 118:18, 19, 23
119:17 166:17, 25
167:12
**hear** 37:19 39:19, 20
86:16 146:20 167:22
**heard** 74:4 82:9 164:13
**heart** 80:17 122:11, 14,
17 160:5, 6, 18
**Height** 104:23
**held** 2:7 154:23
**help** 8:21 95:4 96:8
108:19 112:13 150:24

154:6
**helped** 108:18
**helpful** 19:16 118:11
**helping** 12:8 107:17
111:14 141:17
**her,** 86:14
**heroin** 98:9 157:19, 22
**Hey** 66:14 69:17 85:6
**Heytens** 168:1
**H-e-y-t-e-n-s** 168:1
**high** 67:7, 9
**highest** 8:22
**Hinshaw** 1:15 2:18
**HIPAA** 65:15 68:18, 19
69:9 70:15, 16 71:3, 5
**hired** 10:2, 5 16:19
**history** 98:4 103:15
137:23
**Hmm** 170:14
**hold** 133:15
**hollering** 111:13 150:8
**home** 9:15, 24 10:14
82:12, 16, 25 83:5
**homicidal** 56:14
**Hoover** 22:23 23:4
75:6 93:2 108:5, 6
131:6 143:1, 5 145:16,
19 150:10 152:21
**Hoover's** 173:12
**hospice** 8:7, 9
**hospital** 9:17 55:5
57:11, 12, 25, 25 58:1,
10, 17, 24 59:7, 9, 10, 12,
18, 25 60:4, 10, 19, 23
62:2, 23 66:13 68:3
69:11 75:24, 25 76:4
77:11, 19, 23 79:3, 6, 12,
23 80:20 81:3, 4, 13, 15,
21, 22 82:2, 6, 9, 12
83:7, 10, 13, 22 84:6, 19,
19, 22, 25 85:20 86:9,
10 87:20 90:14 91:23
92:11, 14, 16 101:2, 7
103:25 104:5, 11
109:25 115:20 130:24
133:3, 5, 7, 9 134:14
135:19, 25 136:2 137:3,
19 138:3, 8, 16 150:3
151:24 154:11, 12
157:8, 18, 21 158:1, 5
159:18 161:12 162:7,
13, 14, 15, 18, 21 166:8
168:13, 24 169:10
**hospitals** 99:12, 13
**hour** 26:6 46:9 66:14
96:9 115:18 153:10
**hours** 10:15 26:3 76:16
115:18, 19, 19 117:20
120:10 130:23 131:8
**House** 43:2 92:14
100:6, 8
**housed** 48:23, 25 121:16

**housing** 34:8 38:20
63:24 73:10 91:1, 12
**hub** 19:24
**huge** 48:24, 24
**Huh** 105:3
**hung** 14:15
**hurt** 108:21
**hypothetical** 65:21 68:9
**hypothetically** 65:16

**< I >**
**IBO** 130:6
**idea** 105:12
**identification** 112:18
113:15 122:25 127:16
**IDENTIFIED** 3:7
144:14
**identifiers** 46:24
**illicit** 103:4
**Illinois** 2:14
**immediately** 8:16 14:1,
11 132:18
**impact** 68:22
**impair** 6:3
**impaired** 148:19
**improvement** 49:22
50:1, 5, 19, 25
**improving** 50:20
**in,** 115:25 128:17
**in-but-out** 130:3, 9, 14
**include** 64:15
**included** 64:11 77:21
139:20, 22 161:15
**includes** 5:5
**including** 87:19
**Incomplete** 65:21
112:25
**increase** 24:24 48:24
**independent** 47:16
93:11 94:24 136:24
**indicates** 157:2
**indictment** 170:4
**indirectly** 175:14
**individual** 5:6
**infectious** 13:23
**Infirmary** 3:9 13:19
18:16, 23 19:5 26:18,
19 27:20 28:6, 13, 18
32:3, 4, 10 33:3, 10, 19
34:15 35:5, 21 36:4, 10,
12 37:2 38:9, 11, 13, 14
41:11 63:5, 24 64:17,
18, 24 65:1, 10, 11, 14, 17
66:2 69:24 71:8, 9, 11,
18, 23 92:2, 24 93:4
95:6, 8 111:16, 23
112:2, 6 114:13 115:5,
9 116:1, 5, 6, 25 117:4,
16 118:17, 20, 21, 25
119:9, 10, 16, 20 120:9,
10, 12, 14, 22 122:3
**infirmity** 25:2

**inform** 57:5 65:24
66:25 68:6 105:8
**information** 6:4 49:1, 3,
4, 7 57:21, 23, 24 58:23
59:11 63:4, 16, 20
64:15 65:6 66:6 69:1,
7 71:23 72:12 77:21
84:12, 14 98:3, 12
102:20, 22 104:5
106:10 117:17 132:11
133:4 138:15
**informed** 51:5 63:8
68:12 102:7
**informing** 63:11
**informs** 63:14
**infusion** 32:25
**initial** 41:25 56:12
**initially** 76:5
**initiate** 159:17, 20
**initiated** 128:15
**initiatives** 50:5
**injuries** 21:2
**injury** 56:16, 19 69:12
**inmate** 36:7 43:24
45:14 46:17 57:4
58:14, 16 60:15, 19, 23
61:9 63:5, 23 64:4
99:11 168:5
**inmates** 42:3 43:8
48:23, 25 53:25 54:4
63:16, 20 77:10 163:5
166:25
**inmate's** 11:9, 13 57:12
**inpatient** 8:6 11:6
**input** 50:6, 11
**inside** 25:13, 18 36:5
71:10 86:1
**instance** 2:2
**instruct** 7:10
**instructions** 77:25
**insulin** 167:10
**insurance** 97:15
**intake** 11:3, 20, 21
12:14 13:14, 18, 18
17:8, 10 18:10 20:17,
18, 18, 21 21:7 24:15
54:15, 17 55:12, 15
56:7 58:19 62:11, 13
71:24 72:9 77:2, 17
87:1, 7, 9 90:9 92:25
95:20, 21 127:12, 12
130:10, 20 131:21
**interacted** 73:22
**interacting** 74:5
**interactions** 73:25
78:20 94:20
**interchangeably** 118:25
119:1, 24
**intercom** 36:22
**interested** 9:22 175:13
**interfacility** 128:24
129:4

**Interrogatories** 3:8
173:13
**interrupt** 135:7
**interview** 10:11
**interviewing** 10:13
**intoxicated** 89:7
**intranet** 114:18
**investigates** 44:16
**involuntary** 12:25
**involved** 167:22 168:6,
12 174:10
**involvement** 167:4
**issue** 11:15 12:16 24:1,
3, 11
**issues** 11:5 12:17 47:24
48:3 121:14
**items** 14:9
**its** 22:13 98:20
**IV** 32:25 149:21

**< J >**
**Jackson** 22:23 23:2, 4
**Jail** 8:18 9:10, 20, 23
10:3, 25 11:2 13:4, 10
14:20 15:1 16:14, 24
18:22 19:5 20:13, 22,
24 21:4, 13 22:8, 13
23:10, 19 24:13, 17, 20,
23 25:6, 12, 17 26:17
27:22 28:12 30:19
37:23 38:18, 20 39:12,
23 40:13, 17 42:1, 11
46:18 47:19 48:22
49:12, 21 52:11, 18, 21,
21 53:17, 18 54:12
58:25 60:16 62:18
63:17 73:11 74:18
75:8, 23 76:19, 21
79:11 82:18, 25 83:3, 5,
21 85:13, 18, 23 96:18
110:9 114:1 117:5
119:17, 21 122:12
129:3 132:9 136:8
151:16, 17, 19 152:11
153:21 154:10, 16, 18
164:17, 22, 24 167:5, 13,
19, 23 168:2 169:23
170:8
**January** 8:15
**job** 10:7, 12 16:20
23:11, 20, 23, 24 24:9
26:17 47:25 48:2 51:3
96:20, 24, 25 129:25
150:22 166:6
**John** 77:18
**Join** 18:25 31:10, 21
39:15 40:1, 19 68:10
69:4 121:4 126:19, 24
**Jones** 77:18
**jump** 94:13 151:3
**June** 9:2

**< K >**

**keep** 59:*19* 61:*3, 15*
89:*13* 90:*23* 96:*25*
97:*9* 104:*13*
**keeps** 72:*20*
**kept** 45:*9, 20* 46:*1* 55:*8*
85:*19* 90:*18* 122:*21*
149:*23*
**kick** 96:*8* 118:*1*
**kicked** 118:*9*
**kids** 109:*13*
**kind** 9:*24* 24:*7, 19*
28:*23* 35:*11* 50:*23*
64:*23* 110:*1* 153:*18, 18*
163:*2*
**kit** 42:*8* 107:*16, 16*
108:*3, 9, 10* 152:*8*
**kits** 152:*9*
**KLEINHAUS** 2:*13* 3:*3,
4* 4:*6, 10, 21, 24* 5:*2, 5,
8, 9* 7:*1, 12, 14* 12:*7, 12*
15:*9, 21* 16:*4, 10* 18:*6,
20* 19:*1* 20:*7, 12* 21:*10*
23:*18* 26:*1* 28:*17*
29:*13, 19, 23* 30:*1, 2, 12,
16* 31:*1, 6, 13, 23* 33:*15,
18* 34:*2* 35:*1* 36:*3*
39:*5, 10, 16* 40:*4, 9, 21*
41:*2, 10* 45:*24* 46:*4, 11,
14* 47:*1* 51:*16* 59:*4*
60:*14* 61:*5, 16* 66:*8*
68:*1, 14* 69:*6* 70:*22*
82:*21* 85:*3* 86:*20* 94:*1,
5, 11, 19* 96:*11, 14*
97:*10* 112:*1, 19* 113:*1,
16, 18, 22* 115:*12*
118:*14* 119:*12, 14, 25*
120:*7* 121:*6* 123:*1, 19,
21* 124:*25* 125:*1*
126:*21* 127:*5, 17*
129:*15* 140:*18* 152:*1,
13* 153:*11, 13* 154:*24*
155:*20* 162:*11* 166:*22*
167:*3, 17* 169:*21*
170:*22* 173:*3* 174:*3, 6,
19, 21*
**Kleser** 167:*5, 6*
**knew** 81:*22* 91:*14, 17,
20, 23* 92:*21* 124:*18, 19*
127:*9* 138:*3* 170:*17*
**knocks** 39:*7*
**KNOTT** 2:*14, 16* 3:*3*
4:*14, 14, 25* 6:*13, 15, 21*
7:*2, 4, 6* 12:*4, 9* 15:*8,
15, 18, 24* 16:*8* 18:*4, 19,
25* 20:*10* 25:*19* 29:*10,
18, 21* 30:*11* 31:*10, 21*
33:*14, 17, 21* 34:*18*
39:*4, 9, 15* 40:*1, 7, 18,
24* 45:*22* 46:*2, 8, 23*
59:*1* 60:*11, 13* 61:*10*
65:*21* 68:*9* 69:*4* 82:*17,
20* 84:*20* 93:*23* 94:*3, 9,
16* 96:*9* 111:*24* 112:*23*

115:*10* 118:*24* 119:*22*
120:*2* 121:*3* 126:*19, 24*
151:*15* 152:*6* 153:*9*
154:*20, 22* 155:*16*
167:*15* 173:*9* 174:*4*
**Knott's** 4:*19*
**know** 12:*23* 14:*13* 16:*1,
2* 22:*14* 24:*7* 25:*3*
26:*20* 27:*8* 30:*8* 35:*8*
36:*7, 10* 43:*5* 45:*2, 4,
14, 16, 19, 25* 46:*7*
47:*14, 22, 22, 23* 48:*1,
18* 50:*15* 51:*3, 4* 52:*8,
15* 53:*1, 19, 21, 22, 24*
54:*7, 13* 59:*23* 62:*12*
65:*13, 23* 66:*2* 68:*11*
69:*10, 16, 22* 70:*13, 15*
72:*16* 74:*11, 13, 15, 17*
75:*7* 76:*1* 81:*16, 24*
83:*3, 12, 14, 24, 25*
84:*24* 85:*1* 86:*14* 88:*7,
7, 9, 11* 91:*10* 92:*4*
93:*3, 6, 10, 21* 100:*21*
101:*7* 106:*4, 8, 9, 12, 13*
107:*8* 108:*12* 109:*24*
111:*20* 112:*2, 6, 10*
113:*19* 117:*23* 118:*1*
119:*8* 120:*4* 121:*7*
124:*6, 15, 21* 125:*6, 7, 7,
8, 10* 126:*5* 127:*1, 4, 11*
128:*7* 129:*25* 135:*8*
136:*1, 3, 12* 138:*5, 22*
139:*25* 141:*11, 12, 13,
16, 23* 142:*1, 3, 6, 9*
144:*17* 146:*23* 147:*11,
12, 13, 21* 153:*1, 20*
157:*11, 16, 17* 162:*15,
19, 22* 166:*2* 170:*10, 12,
20* 171:*19, 25* 172:*8, 10*
173:*2* 174:*11*
**knowledge** 28:*9* 73:*21,
24* 170:*15*
**known** 49:*2*
**knows** 68:*12*
**Kwame** 168:*5*

**< L >**
**label** 166:*24*
**labeled** 118:*16* 125:*2*
**labor** 14:*17* 42:*9* 43:*12,
13* 67:*17, 20, 23, 24*
68:*2, 3* 79:*7* 81:*8, 9, 10,
22, 23* 82:*3, 6, 11, 14, 15,
24* 83:*5, 8, 13, 15, 18, 19,
20, 23* 86:*9* 90:*22*
91:*24* 92:*10, 12* 99:*5*
110:*22* 137:*20, 24*
138:*1, 2, 4, 5, 7* 141:*4*
150:*4* 151:*23* 154:*13*
**laboring** 82:*12, 13*
**lady** 149:*20* 153:*6*
**laid** 144:*6*

**language** 119:*4*
**lapse** 133:*8*
**late** 102:*7* 103:*21*
134:*11* 159:*15*
**law** 60:*9* 98:*14*
**lawsuit** 10:*19, 21*
**lawyer** 11:*17*
**lay** 108:*13* 149:*23*
**learn** 21:*25* 64:*17* 81:*6*
**learning** 13:*23*
**leave** 91:*12* 118:*10*
127:*11* 163:*24*
**leaves** 72:*25* 117:*16*
129:*3*
**leaving** 100:*20*
**left** 21:*5* 22:*5* 72:*17*
87:*22, 23* 92:*2* 156:*13*
**LEIB** 2:*14*
**lets** 35:*20*
**letter** 6:*8*
**level** 8:*22* 117:*16, 16, 17,
18, 21, 21, 21, 25* 118:*3, 3,
3, 7, 8, 8*
**lieutenant** 44:*14* 105:*9*
145:*14*
**lieutenants** 54:*2*
**life** 14:*12*
**light** 36:*16, 19, 20, 20, 21*
63:*8, 10, 15*
**lights** 36:*15*
**Line** 3:*13* 115:*3* 136:*15*
**lines** 145:*21* 146:*4*
**list** 62:*13* 130:*4, 13, 15,
16*
**listed** 124:*17* 130:*13*
**listen** 122:*10*
**listened** 80:*17* 160:*5, 6,
18*
**listening** 150:*13* 160:*14*
**listless** 89:*11, 21, 25*
98:*2*
**lists** 136:*21*
**liters** 146:*6* 148:*1*
**liters,** 146:*22*
**little** 5:*19* 19:*9* 25:*1*
27:*23* 28:*3* 36:*20*
39:*21* 46:*8* 114:*11*
136:*10* 145:*13* 147:*22*
**living** 24:*24, 25*
**LLC** 2:*14*
**LLP** 1:*15* 2:*18*
**located** 8:*12* 25:*5* 38:*4*
52:*10* 72:*19*
**location** 2:*7*
**LOEVY** 2:*11, 11*
**log** 35:*11* 62:*11, 13*
114:*18*
**log-in** 129:*8, 10*
**long** 8:*2, 14* 105:*12*
160:*14* 163:*9* 169:*16*
**longer** 23:*6* 73:*3* 170:*1*
**look** 35:*9* 45:*17, 18*
89:*22* 102:*12* 114:*3, 8,*

8, 10* 116:*13* 123:*7*
130:*1* 134:*8* 139:*4*
142:*8* 144:*1, 2* 157:*14*
158:*7* 159:*3* 160:*17*
173:*19* 174:*12*
**looked** 17:*18* 78:*8, 11,
12* 142:*22* 144:*19*
158:*11* 163:*23* 174:*13*
**looking** 10:*1* 16:*22*
56:*13* 86:*24* 123:*22, 23*
125:*2* 133:*20* 136:*15*
144:*11* 148:*16* 155:*16*
157:*11* 159:*14* 160:*24*
**looks** 44:*16* 74:*11*
123:*9* 125:*3* 162:*18*
**loose** 119:*3*
**loss** 47:*9*
**lost** 47:*4*
**lot** 8:*20* 48:*7* 97:*14*
**loud** 12:*10* 113:*4*
138:*22*
**lower** 67:*5*
**LPNs** 13:*20*
**lunch** 96:*13*
**lungs** 80:*18*

**< M >**
**ma'am** 9:*21* 17:*2* 61:*25*
114:*16* 160:*13, 23*
**machine** 81:*7* 83:*17*
160:*16, 19, 22*
**maintained** 73:*5*
**making** 48:*2* 93:*19*
117:*18* 131:*24, 25*
133:*10* 135:*8* 139:*10*
166:*1* 169:*17* 171:*16*
**males** 54:*24*
**Man** 48:*7*
**management** 9:*15, 24*
**mandatory** 161:*18*
**manic** 68:*25*
**manually** 160:*4*
**March** 1:*12* 2:*8* 73:*16,
19, 22, 25* 75:*22* 76:*10,
19, 22* 87:*4, 5* 94:*21*
97:*25* 99:*21* 100:*1*
123:*7, 8, 16* 125:*17*
173:*22*
**Margaret** 22:*23* 93:*2*
108:*5* 143:*1, 4*
**Margie** 77:*7, 9*
**mark** 35:*12* 94:*17*
113:*17*
**marked** 112:*17, 20*
113:*14* 121:*21* 122:*24*
123:*2, 23* 125:*21*
127:*15* 131:*3* 143:*17*
155:*2* 157:*25* 158:*4*
**MATC** 82:*5* 9:*4*
**matter** 11:*10, 23* 12:*16*
27:*1* 47:*3* 127:*12*
**mean** 14:*13* 15:*19, 20*
20:*25* 26:*20, 21* 27:*15*

28:2, *25*  30:*14*  35:*14*
44:*18*  60:*17*  62:*25*
69:*10*  70:*20*  74:*7*
77:*13*  85:*4*  91:*9*  95:*19*
97:*17*  98:*13*  99:*18*
104:*15*  106:*21*  115:*25*
120:*19*  128:*7*, *14*  130:*8*
135:*7*  137:*10*  138:*24*
139:*21*  143:*23*  145:*23*
146:*22*  147:*10*, *23*, *25*
148:*2*  149:*5*, *7*  151:*11*
153:*25*  158:*4*  161:*17*
168:*15*

**meaning**  24:*3*, *23*
**means**  130:*10*  134:*3*
146:*7*  147:*7*, *11*, *14*, *20*,
*21*  148:*18*, *23*  149:*8*
**meant**  139:*2*
**measures**  160:*17*
**meconium**  109:*4*  148:*20*,
*21*
**med**  13:*14*, *20*, *21*  33:*25*
39:*1*  54:*6*
**medical**  5:*24*  14:*12*
18:*22*  19:*6*  21:*3*  27:*23*
28:*1*, *2*, *20*  32:*4*  35:*10*
36:*17*  42:*16*, *18*  43:*15*,
*19*, *25*  44:*2*, *9*, *9*, *9*, *23*
45:*19*  46:*16*  50:*23*
54:*19*  57:*22*  63:*7*, *14*,
*17*, *20*  64:*9*  65:*7*, *10*, *24*
66:*25*  67:*12*, *17*  68:*22*
69:*7*, *13*, *15*, *20*, *23*  70:*4*,
*9*, *18*, *24*  71:*13*  73:*10*,
*12*  78:*9*  81:*3*  85:*13*
95:*15*, *22*  96:*3*, *5*  98:*14*
102:*11*  105:*23*  106:*13*
109:*15*  116:*12*, *14*
117:*7*, *10*  120:*15*  121:*9*
144:*20*  145:*14*  150:*1*
151:*5*, *7*  154:*17*  161:*22*
167:*23*  168:*3*, *9*  169:*12*,
*13*  171:*3*, *13*
**medically**  57:*8*  60:*16*
138:*13*
**medication**  5:*25*  68:*23*
163:*5*
**medications**  55:*8*  102:*4*
**medicine**  69:*22*
**meds**  34:*1*  116:*18*, *19*
163:*10*, *12*
**meet**  6:*9*, *17*  40:*16*, *23*
41:*4*, *7*
**meeting**  22:*2*  23:*25*
50:*8*, *10*, *11*  166:*10*
**meetings**  7:*9*  50:*13*, *16*,
*21*
**memory**  6:*4*, *22*, *23*
74:*5*, *8*  78:*20*  79:*14*
136:*25*  137:*14*
**memos**  49:*6*
**mental**  11:*4*  12:*14*, *17*,
*18*  57:*9*  77:*20*  121:*13*

**mentioned**  10:*16*  11:*8*
12:*13*  32:*2*  38:*22*
43:*15*  70:*15*  124:*6*
165:*7*
**menu**  128:*22*
**merit**  24:*22*
**met**  6:*15*  7:*2*  79:*3*
107:*3*  165:*21*
**Methadone**  7:*24*, *25*
99:*6*, *7*, *8*, *11*  101:*5*, *6*, *9*
102:*9*
**methods**  36:*12*
**MICHAEL**  2:*20*
**middle**  42:*13*, *15*
**Mike**  4:*16*  113:*19*
**MILWAUKEE**  1:*2*, *16*
2:*17*, *17*, *18*, *21*  3:*11*
4:*15*  5:*3*  8:*18*  9:*9*, *18*,
*19*  10:*3*  13:*3*, *4*, *10*
15:*1*  16:*14*, *23*  18:*22*
19:*5*  20:*13*, *22*  21:*4*, *13*
22:*5*  24:*13*  25:*5*, *17*
26:*16*  27:*9*  28:*11*, *12*
30:*19*  37:*23*  39:*11*, *22*
40:*13*  42:*1*  46:*18*
47:*17*, *19*  48:*21*  49:*12*,
*21*  52:*10*, *17*  53:*17*, *18*
62:*18*  73:*10*  75:*22*
97:*18*  113:*25*  117:*4*
119:*17*, *21*  122:*12*
163:*1*  167:*13*  169:*23*
175:*2*, *15*
**mind**  29:*7*  74:*10*
162:*12*
**minute**  160:*8*, *11*  170:*25*
**minutes**  87:*16*  88:*2*, *3*
105:*5*  160:*16*
**miscommunication**  94:*4*
**Mississippi**  8:*6*, *13*, *20*
21:*12*, *16*
**mistake**  125:*21*
**misunderstanding**  85:*22*
100:*13*
**misunderstood**  94:*18*
**MKE**  143:*11*  155:*2*
157:*25*  158:*4*, *8*, *24*
160:*24*
**mom**  8:*21*  39:*19*
146:*10*, *13*, *21*, *23*, *24*
147:*9*, *15*, *16*  148:*2*
**Monica**  16:*18*, *21*  153:*7*
**monitor**  83:*17*  165:*1*
**monitoring**  104:*24*
164:*22*, *25*  165:*2*
**month**  41:*19*, *23*
**months**  9:*14*  10:*4*
27:*13*, *14*
**Moore**  168:*5*
**Morgan**  111:*18*, *21*
143:*3*  152:*25*
**morning**  4:*7*, *8*  14:*19*
18:*1*  76:*12*  99:*16*

100:*19*  158:*10*  165:*12*
168:*19*  169:*9*
**mother**  145:*22*, *23*
149:*6*  166:*7*, *13*
**mother's**  146:*5*  147:*4*, *8*,
*18*
**mouth**  107:*18*
**move**  8:*20*  89:*12*
**moved**  110:*1*  146:*5*
147:*4*, *8*, *18*
**Moving**  31:*7*, *18*  66:*9*
146:*4*  147:*3*
**multiplying**  160:*12*, *15*


**< N >**
**name**  4:*9*  7:*20*  8:*8*
11:*13*  16:*15*  23:*1*
43:*22*  47:*2*  48:*18*, *18*
50:*3*  72:*24*  73:*3*  74:*4*
83:*24*  106:*7*, *8*  124:*5*, *6*,
*14*, *16*, *21*, *24*  125:*3*, *10*,
*25*  129:*6*  153:*8*  155:*12*
161:*2*, *14*  173:*2*, *2*
174:*10*, *11*
**name,**  129:*5*
**named**  125:*10*
**names**  22:*24*  53:*19*, *21*
62:*14*  124:*7*, *14*
**narcotics**  26:*12*
**Nasal**  147:*24*  148:*3*
**NC**  146:*5*, *21*  147:*9*, *10*,
*23*
**NC,**  148:*2*
**necessarily**  114:*2*  161:*17*
**necessary**  57:*22*
**need**  16:*1*  34:*5*  35:*10*
36:*1*, *23*  54:*6*, *7*  57:*6*
63:*1*, *9*  84:*16*  89:*13*
95:*24*  103:*5*  114:*15*
116:*3*  118:*24*  119:*2*
121:*14*  146:*13*, *15*, *15*,
*16*  151:*20*
**needed**  8:*21*  19:*20*, *22*
34:*22*, *23*  35:*2*  36:*10*,
*11*, *17*  43:*25*  44:*5*  76:*6*,
*9*  111:*15*  114:*4*  120:*10*
133:*9*  166:*2*, *3*
**needs**  18:*13*, *14*  32:*21*,
*25*  40:*17*, *23*  41:*7*  95:*4*
105:*10*  121:*8*, *11*, *17*
126:*10*, *14*  161:*9*
**negative**  75:*16*
**negligent**  81:*25*  82:*1*, *6*
**neither**  174:*20*
**nephew-in-law**  167:*21*
**never**  9:*25*  82:*9*  90:*13*
96:*24*  109:*16*  124:*19*
153:*20*
**new**  34:*4*  42:*14*  96:*25*
**newborn**  151:*20*
**night**  14:*18*  20:*3*  26:*21*,
*24*  27:*1*  74:*24*  75:*14*
76:*14*, *20*  79:*16*  83:*9*

84:*16*  93:*2*  94:*22*, *25*
96:*5*  99:*15*  111:*20*, *23*
112:*3*, *7*  124:*9*, *10*, *10*
125:*15*, *18*  126:*15*, *16*
127:*1*, *3*, *6*, *9*, *11*  145:*18*
154:*4*, *7*  165:*17*, *18*, *19*
168:*17*, *18*
**nights**  26:*6*
**nighttime**  20:*5*  32:*20*
**nomenclature**  120:*4*
**non-emergency**  57:*16*, *17*
**normal**  127:*2*
**normally**  127:*1*
**North**  2:*13*, *17*  8:*9*, *10*,
*14*, *17*, *18*
**nose**  107:*19*, *19*  142:*7*
148:*22*  149:*17*
**Notary**  175:*5*, *20*
**notation**  159:*14*
**note**  90:*2*  127:*25*
128:*15*  130:*19*, *21*
131:*3*, *6*, *8*, *12*, *24*, *25*
132:*23*  133:*21*  134:*1*, *4*,
*4*, *5*, *7*, *8*, *14*, *16*  135:*1*, *9*,
*16*, *21*  136:*3*  140:*7*
141:*10*, *10*, *11*, *12*  143:*9*,
*9*, *15*, *16*, *19*, *22*, *24*  144:*3*
155:*5*, *9*, *21*, *22*, *24*
156:*2*, *2*, *15*, *16*  157:*1*, *9*,
*10*, *25*  158:*7*, *8*, *9*, *14*, *15*,
*16*  159:*4*, *22*, *24*  161:*3*,
*4*, *7*, *10*, *11*, *14*, *17*, *18*
**noted**  2:*7*
**notes**  80:*12*  117:*11*
131:*16*  133:*11*, *13*
140:*21*, *22*  161:*3*  175:*8*
**note-taking**  129:*17*
**notice**  97:*22*
**noticed**  107:*12*
**noticing**  98:*1*
**notified**  131:*17*
**NP**  47:*7*  99:*3*
**number**  48:*23*, *24*  67:*7*,
*10*  115:*8*  123:*17*
139:*13*  160:*21*
**numbers**  86:*6*  117:*22*
**nurse**  10:*10*  13:*21*  18:*8*,
*11*, *12*  19:*9*, *22*, *23*  20:*8*,
*16*, *18*, *21*  21:*7*  25:*13*,
*17*, *23*  26:*11*, *17*, *19*
27:*20*, *20*  28:*7*, *13*, *19*
29:*2*  32:*3*, *10*  33:*3*, *11*,
*19*, *22*  34:*15*, *20*  35:*5*, *8*,
*16*, *21*  36:*4*, *10*, *12*  37:*2*,
*5*, *6*, *8*, *23*, *24*, *25*  38:*1*, *9*,
*10*, *11*, *13*  39:*19*  41:*11*
42:*4*  49:*21*  50:*2*  53:*3*,
*12*  54:*11*, *15*  55:*22*, *24*,
*25*  56:*7*, *23*  57:*14*
59:*24*  60:*2*, *18*  62:*5*, *9*
63:*25*  64:*1*, *1*, *3*, *14*, *17*,
*19*  65:*4*  66:*11*  69:*17*,
*24*  70:*6*, *9*  71:*8*, *18*, *23*,

*24* 72:9, *20* 74:15, *17*
*75:4, 16* 77:4, *8, 10*
78:24 80:*1, 4, 12* 83:*14,
15, 23* 87:*1* 90:6, *21*
92:2, *11, 24* 93:*1, 4, 4*
95:*21, 25* 99:*17, 18, 24*
100:*4* 105:22, *24* 106:5
109:*10* 111:*17, 19, 23*
112:*3, 6* 116:6, *11*
118:22 120:*10* 122:7
123:*10, 24* 124:2, *3, 16*
125:*3, 10, 24, 24* 126:*1,
13, 14, 14, 14, 17* 131:21
137:*19* 138:*17* 142:*4*
144:*12, 14* 145:*15*
150:*23* 151:*18* 164:*17*
172:*24* 173:*1*

**nurses** 16:2 17:*23* 18:*3,
9, 10* 19:*18, 19* 29:*8, 15*
33:*23, 23* 37:*10* 38:22
39:*7, 13, 23* 40:*11, 15*
49:*3* 50:*11* 54:9 55:*1,
7, 15, 17, 20* 63:*19* 66:*4*
71:*16* 96:*4, 6, 8* 127:*4,
9* 142:*21, 22, 23* 165:*16,
20* 169:2

**nurse's** 51:*3*

**nursing** 9:*3, 15, 24*
10:*14* 15:2, *20* 16:*16*
29:*5* 39:*18* 40:*17, 23*
41:*7* 44:*18, 20* 47:20
48:*16* 49:*4* 51:*10, 12,
19, 20, 21* 52:*14* 54:*3*
62:*6* 115:*4, 23* 118:7
130:*16*

**nursing's** 48:*5*

**< O >**

**O2** 147:22

**oath** 4:*3* 5:*14* 10:*17, 24*

**OB** 42:*8* 76:9 85:*10*
99:*19, 20* 107:*16, 16*
108:*3, 9, 10* 109:*16*
122:*16, 21* 152:8, *9*

**Object** 7:*4, 6* 15:*24*
16:*9* 25:*19* 29:*11, 25*
30:*5* 33:*21* 39:*25*
51:*14* 59:*1* 60:*11*
67:*21* 69:*3* 82:*17*
112:*23* 115:*10* 118:*12,
24* 119:*5* 129:*14*
140:*16* 151:*13* 162:9
166:*19* 169:*19*

**objected** 30:*1*

**Objection** 18:*4, 18, 24*
20:*4* 30:*14, 24* 31:*4, 9,
20* 35:*23* 39:*4, 14*
40:*24* 60:*24* 97:*2*
111:*24* 119:*19* 120:*1*
154:*19*

**objections** 15:*10*

**objective** 129:*21* 136:*21*

**objective,** 145:*21*

---

**observation** 111:*25*
117:*19* 118:*4, 8* 121:22,
*25* 122:*3, 4*

**observations** 88:22
110:*12, 15* 111:*10*

**observe** 32:22 88:*25*
109:*3* 111:*1* 129:*21*
141:*25* 164:*24*

**observed** 51:*8* 90:*3*
110:*24* 117:20

**Obstetrics** 121:*21, 24*
122:*3, 4*

**obtain** 53:*25* 58:24
84:*19*

**obtained** 9:*19*

**obtaining** 59:9

**obvious** 12:*17* 61:*12, 21*

**obviously** 8:*19* 12:*5*
107:*23*

**occasions** 5:*17* 10:*17,
23* 28:*18* 164:*3*

**occurred** 69:*12* 127:22
159:*14*

**o'clock** 76:*11* 79:*18*

**October** 168:*5*

**odd** 160:*21*

**offense** 30:*14*

**offered** 16:*19*

**Office** 3:*11* 4:20 38:*6,
7* 45:*11* 52:*13* 122:22

**officer** 35:*16, 18* 36:*13,
15, 22* 37:*1* 38:*8* 54:*1*
58:*12* 60:*8* 63:*12*
65:*10, 13, 19, 23, 23*
66:*1, 10, 14, 20, 20, 25*
67:*13* 68:*6, 12, 16* 69:*2,
8, 25* 70:*7, 10* 74:*3, 6*
86:*1* 94:*21, 22* 107:*3*
135:*19* 136:*2* 144:*13*
145:*2, 4, 7* 152:*8*

**officers** 12:*18* 19:22
54:*10, 23* 57:*5, 10, 13,
21, 23* 58:24 59:*10*
66:*3, 16, 22* 69:*10* 70:*3,
18, 25* 80:*11, 13*

**officer's** 57:*17*

**Oh** 7:*5* 13:7 15:*14*
46:21 109:*14* 129:*18*
139:*1* 154:*5, 8* 168:*11*

**Okay** 4:24 5:*5, 8, 14, 19*
6:*6, 11* 7:*2, 12* 8:*16, 19*
9:*12* 10:6, *9* 11:*8*
12:*25* 13:6 14:9, *23*
15:*5* 16:*16, 22* 17:20,
*23* 18:21 19:*4, 9* 21:*4*
22:*3* 25:*1, 5* 26:*2*
28:*25* 30:*9, 10, 17* 31:*7,
14* 32:*2, 13* 34:*15* 36:*4*
38:*2, 4* 40:*10* 43:*23*
44:21 45:*2, 17* 46:22
47:*4, 14, 15* 48:*2, 5*
52:*5* 53:*20, 22, 23*
54:*11, 14* 58:*23* 64:*3*

---

65:9 66:*9, 18* 68:*4*
69:*7, 20* 71:*5, 13* 72:9
73:*8, 21* 74:*5, 21* 75:21
78:*23* 80:*7* 82:22 84:*3*
85:9 86:*8* 88:*21* 90:*2,
16* 91:*23* 93:*15, 22*
95:*21* 98:*12* 99:*10, 24*
100:*4, 13, 17, 24* 101:*10*
102:*24* 103:*17* 104:22
105:*6* 106:*2, 15, 17, 24*
107:22 109:*13, 20*
110:*3* 112:*2, 11, 14*
113:*12* 115:*13, 25*
116:*12, 21, 21* 117:*18,
23* 121:*7, 11* 122:*9, 23*
124:*5, 12* 125:*9, 12*
126:*7, 16, 22* 127:*14, 24*
128:*6, 17* 129:*11* 131:*1,
20* 133:*15, 20* 134:22
135:*7, 15* 136:*1, 3, 14*
137:*16* 138:*12, 18*
139:*1, 19* 140:*6, 9, 25*
141:*6, 19* 142:*17, 25*
143:*2, 4, 16, 21* 144:*10,
17, 23* 145:*1, 3, 9, 13, 21*
146:*4, 12, 18* 147:*3, 13,
22* 148:*6* 150:*5, 10*
152:*17, 21* 153:*17*
155:*15, 21, 25* 156:*13*
159:*3, 9, 13, 23, 25*
160:*24, 24* 161:*5, 7, 22*
162:*17, 17, 20, 24* 163:*7,
16, 25* 164:*3, 12* 165:*4,
11, 16, 22* 166:*1, 5, 23*
168:*1, 5, 25* 170:*4, 12,
23* 172:*7, 23* 173:*3, 3*
174:*3*

**on-call** 117:*23*

**Once** 6:*18* 17:*19* 41:*19,
23* 86:*14* 104:*12* 110:*1*
164:*5*

**one-on-one** 153:*17*

**ones** 22:*18* 122:*18*

**online** 49:*18* 114:*3, 3, 8*

**open** 32:*14, 17, 19, 23*
95:*2*

**opened** 27:*14* 107:*3*

**opening** 95:*3*

**opiate** 98:*25* 99:*4*
101:*4, 24* 102:*1, 3*
103:*15* 137:*21, 24*

**opiates** 101:*13* 103:*10,
21*

**opinion** 75:*3, 15*

**opposed** 12:*10*

**option** 69:*19*

**options** 128:22

**oral** 138:*18*

**order** 96:20 101:*17, 23*
103:*1* 115:*23* 116:*13*
159:20 162:*1*

**ordered** 122:8 164:22

---

**orders** 34:6 71:20 78:*1*
91:*15* 101:*24* 116:*3, 10*
161:20, *20, 22* 162:*4*

**organized** 45:*14*

**orientation** 13:9 41:*25*

**original** 3:*13*

**outpatient** 7:*24*

**outside** 7:9 74:*25*
75:*19* 88:*5* 154:*15*
170:*16*

**outward** 149:*19*

**overlap** 26:*6, 8* 77:*3, 12*
78:*25*

**overly** 59:*1* 60:*13* 82:20

**overtime** 27:2

**ox** 160:*16*

**oxygen** 107:20 109:*19,
24* 146:*8, 9, 13, 15, 16, 24*
160:*17*

**< P >**

**p.m** 2:9 174:*23*

**page** 2:*7* 3:2, *7, 13, 13*
115:2 116:22 118:*15*
121:*18, 21* 123:*7, 9, 16,
23* 125:*2, 20* 127:24
131:*1* 133:*20, 21*
135:*15* 143:*8, 10* 155:*2,
4, 11* 158:*7, 8* 159:*4, 5*
160:*24* 173:*17, 21*

**pages** 123:*8* 124:*13*
157:*25* 173:*15, 18*
174:7 175:7

**pain** 56:*17, 19* 88:*15*
110:*19, 20, 20* 147:*16*
148:*8* 169:*14*

**pains** 91:*24* 138:*4, 6, 7*

**Pam** 99:22, *23, 25*

**paper** 49:*19* 133:*14, 16*
135:*11, 12* 139:*16, 18,
20, 22, 24* 140:*1, 3, 7, 12,
22, 23*

**papers** 59:*21* 62:20
83:*10* 133:*19* 157:*19,
19* 158:*2, 6*

**paperwork** 55:*12* 76:*6,
6* 80:*18, 21* 81:*16*
84:*23* 85:*1, 4, 8, 9, 11,
12* 90:*7, 24* 92:*13, 16*
101:*8* 104:*13* 133:9
135:*6* 136:*5, 7, 9* 137:*4,
6, 9, 11, 15, 17* 159:*17*
161:*12*

**part** 22:*19* 25:24 50:*21,
24* 53:9 55:*23* 56:*3*
85:*12, 23* 92:20 101:*19*
102:*12, 13, 15* 103:*2*
116:24 123:*10* 128:*1,
20* 129:*25* 135:*17*
141:*8* 143:*10* 148:*16*
155:*23, 24* 160:*25*
161:*20, 21, 22* 164:*16*

168:*3, 25* 171:*16*
**participate** 50:*4*
**participated** 165:*8*
**particular** 15:*19* 37:*10*
  45:*18* 76:*17* 110:*18*
  114:*23* 137:*13*
**parties** 175:*12*
**pass** 13:*14, 20, 21*
  163:*10, 12*
**passes** 39:*1*
**patient** 12:*17* 35:*13*
  36:*10, 14* 44:*13* 47:*4*
  57:*3* 58:*14, 16* 59:*25*
  60:*3* 62:*1* 64:*25* 65:*25*
  69:*12* 71:*21, 21* 72:*7,*
  *24, 25* 77:*15* 79:*7*
  80:*13* 82:*18* 83:*20*
  84:*10, 18* 90:*10* 100:*22*
  115:*18, 21, 22* 117:*19,*
  *25* 127:*22* 129:*20*
  130:*2, 8* 135:*19* 136:*16,*
  *19* 144:*23* 145:*6*
  150:*12* 157:*18, 21*
**patient,** 36:*7*
**patients** 14:*4* 28:*4* 34:*4,*
  *17, 21* 35:*6, 13* 55:*2*
  69:*10* 72:*16, 17* 90:*17*
  117:*14* 118:*17, 22*
  119:*18* 121:*13*
**patient's** 71:*15* 73:*3*
**paycheck** 97:*17*
**peers** 150:*25*
**people** 15:*2* 34:*4* 40:*6,*
  *11* 55:*18, 21, 21* 70:*4*
  90:*9* 96:*23* 102:*14*
  146:*15, 16* 151:*17, 22*
**peoples** 62:*14*
**people's** 151:*3*
**percent** 63:*13* 160:*18*
**performance** 23:*11, 21*
  163:*2*
**period** 10:*11* 26:*10*
  27:*19* 28:*7* 29:*21*
  43:*23* 45:*18* 53:*2, 16*
  78:*25* 104:*8*
**periods** 23:*6* 53:*8*
**permitted** 68:*16* 69:*2*
**Perry** 166:*12*
**person** 11:*18* 21:*3*
  27:*21* 28:*19* 32:*6* 36:*8*
  44:*17* 47:*21* 48:*6, 15*
  52:*4, 5, 6* 53:*13* 56:*18*
  58:*9, 19* 59:*17, 21*
  61:*24* 63:*1* 64:*11*
  65:*19, 22* 66:*2, 25*
  67:*13* 70:*1, 5* 73:*4*
  84:*3, 5* 93:*13* 102:*5*
  116:*4, 5, 7* 117:*18*
  125:*6* 133:*2* 153:*14*
  161:*9, 25* 171:*23*
**personal** 172:*16*
**personally** 109:*10*

**personnel** 48:*3*
**person's** 19:*11* 67:*7*
**pertained** 112:*8*
**pertaining** 156:*18, 20*
**pertains** 157:*17*
**phone** 72:*10* 83:*4, 6*
  86:*5, 6* 90:*21* 93:*12*
  100:*9* 136:*25* 137:*1, 2*
**physical** 72:*22*
**physically** 27:*21* 54:*18*
**physician** 53:*11, 11, 12,*
  *14* 115:*4*
**physicians** 52:*17, 20, 24*
  53:*16*
**pick** 83:*4, 5* 127:*3, 6, 7,*
  *8*
**picked** 76:*14, 16* 127:*10*
**picking** 22:*17*
**picks** 36:*22*
**picture** 74:*10*
**piece** 129:*19, 20, 21*
  140:*23*
**pile** 133:*19*
**pink** 14:*2, 3, 4*
**place** 43:*1, 16* 44:*8*
  45:*6* 63:*23* 97:*23*
  119:*8* 124:*20* 152:*10, 12*
**placed** 58:*11* 63:*5*
  65:*11, 14, 16* 66:*23*
  67:*16, 19* 68:*4, 7* 91:*21*
  139:*11* 157:*20*
**placenta** 109:*23*
**places** 97:*14*
**Plaintiff** 1:*2* 2:*3* 4:*11*
  10:*18*
**Plaintiffs** 2:*14*
**Plaintiff's** 173:*13*
**plan** 64:*23, 25* 65:*3, 7*
  99:*11* 129:*22* 130:*1*
  139:*8* 157:*14*
**plan,** 158:*5*
**player** 112:*13* 151:*2*
**Please** 16:*11* 22:*20*
  23:*13* 27:*7* 29:*14*
  33:*17* 41:*5* 51:*11*
  60:*21* 80:*2, 8* 86:*25*
  96:*15* 113:*4* 117:*8*
  121:*19* 123:*15, 22*
  131:*1* 135:*15*
**plug** 17:*14*
**PMs** 27:*13* 79:*1* 87:*7*
**PMs,** 27:*15*
**pod** 67:*5* 72:*18* 163:*8,*
  *9, 10, 11, 12*
**point** 21:*18* 25:*16* 31:*2*
  33:*5* 36:*1* 47:*17* 49:*20*
  59:*13* 74:*7* 79:*10* 82:*5*
  83:*9* 85:*14* 90:*25* 91:*8*
  95:*8* 98:*24* 104:*10*
  115:*3* 116:*8* 119:*3*
  120:*2* 121:*14* 132:*21*
  162:*6* 169:*16*
**Poke** 48:*9*

**policies** 49:*4, 9* 70:*17,*
  *23* 71:*6* 114:*6, 15, 20, 23*
**policy** 3:*9* 91:*10, 11*
  113:*24* 114:*1, 8, 13*
  115:*2, 16* 116:*22* 119:*1,*
  *6* 120:*3, 12, 16, 22, 25*
  122:*4* 163:*23*
**pool** 9:*16*
**Pope-Wright** 16:*18, 21*
**popped** 149:*21*
**populate** 128:*18* 129:*8*
**populated** 128:*10, 19*
  131:*13, 19* 159:*1*
**populates** 128:*7*
**population** 121:*15*
**portion** 23:*14* 86:*18*
  104:*7* 128:*13* 131:*13*
  135:*21* 136:*21* 166:*23*
  170:*21*
**PORTIONS** 1:*10* 53:*10*
**position** 8:*16, 17* 9:*19,*
  *22* 10:*9* 16:*23, 24*
  153:*15*
**positions** 24:*15*
**positive** 75:*15*
**possibility** 101:*5*
**Possible** 126:*20* 148:*20*
**posting** 10:*7*
**potentially** 32:*4*
**power** 154:*6*
**practice** 89:*23* 90:*2*
  93:*10, 17, 20* 94:*25*
**practitioner** 42:*4* 64:*1,*
  *2, 3* 65:*4, 8* 99:*14, 17,*
  *18, 25* 100:*5* 122:*16*
  168:*20, 23* 169:*8*
**practitioners** 53:*3*
**practitioner's** 122:*21*
**preassessment** 156:*24*
**prebook** 59:*14* 66:*19,*
  *21* 79:*21, 23* 80:*5, 10,*
  *11, 12, 15, 19* 85:*21, 25*
  86:*2, 3, 11* 87:*7, 19*
  104:*9, 14, 15* 136:*10*
  156:*23, 25* 157:*5*
**prebooking** 54:*21, 22*
  56:*12, 23* 104:*2*
**pregnancy** 42:*3* 43:*8*
  56:*2* 68:*5, 8* 91:*18*
  98:*25* 103:*8, 22*
**pregnant** 42:*3* 43:*8*
  60:*15, 19, 23* 61:*8, 24*
  68:*4* 91:*7, 12* 98:*17*
  99:*5* 102:*7* 103:*12, 14*
**preintake** 55:*3, 8, 20, 25*
  58:*6* 104:*16* 132:*1, 2, 7,*
  *12, 22* 136:*10*
**prenatal** 98:*18* 138:*10*
**preparation** 7:*7, 10*
  78:*4, 6*
**prepare** 6:*6, 8* 78:*16*
**prescreen** 57:*14* 59:*21,*

**prescreened** 130:*3, 8, 11*
**prescreening** 60:*18*
  62:*5, 8* 161:*4, 6, 10*
**prescribed** 103:*8*
**present** 6:*15* 109:*23*
  118:*19* 135:*20* 136:*19*
  152:*19* 165:*9*
**pressure** 88:*17, 19*
  136:*16*
**presumably** 156:*14*
**prevent** 154:*18*
**previous** 2:*7*
**Prince** 99:*22, 23, 25*
  100:*5, 14*
**print** 58:*10*
**prior** 7:*2* 8:*5, 16, 18*
  73:*18* 95:*9* 103:*13*
  109:*9*
**privacy** 55:*2*
**private** 82:*18*
**privy** 49:*2* 66:*6*
**Probably** 5:*18* 11:*11*
  13:*13* 62:*19* 85:*17, 17*
  88:*1, 3* 90:*8, 10* 116:*18*
  128:*5* 129:*25* 160:*19*
**problem** 119:*22* 169:*1*
**problems** 26:*23* 63:*9*
  102:*5* 122:*19*
**Procedure** 2:*4* 79:*22*
**procedures** 49:*9* 114:*15,*
  *20*
**proceeding** 5:*15*
**proceedings** 174:*22*
**proceeds** 94:*13*
**process** 24:*7* 56:*1, 1*
  114:*19* 131:*20* 132:*21*
  133:*4*
**Professional** 2:*5* 98:*14*
  109:*15* 175:*5, 19*
**program** 7:*24*
**promise** 139:*9*
**promotion** 24:*19*
**property** 85:*15, 17*
**protocol** 101:*18, 25*
  102:*1*
**protocols** 103:*7*
**provide** 7:*23* 46:*17*
  47:*11* 63:*20* 163:*4*
  167:*14*
**provided** 10:*23* 13:*9*
  46:*17* 47:*11* 69:*8*
  114:*7* 115:*6* 120:*17*
  128:*3*
**provider** 167:*12*
**providers** 166:*17*
**providing** 71:*9*
**provision** 115:*15*
**psych** 121:*16, 17*
**public** 39:*19* 175:*5, 20*
**pull** 148:*14*
**pulse** 143:*7* 160:*1, 3, 16*

**Pupils** 89:*18* 90:*3*
**purple** 142:*7*
**purpose** 171:22 172:*3*
**purposes** 5:*20*
**pursuant** 2:*3*
**push** 36:*21* 63:*9*
**put** 11:2*1* 57:24 59:*12* 62:*14* 66:5 67:22 77:*17* 81:7 83:*16* 85:*15* 91:*15* 99:*5, 10* 102:*1, 22* 107:*20* 113:*12* 117:*25* 122:*23* 127:*14* 132:*1* 134:*11* 140:*22* 158:*9, 16* 161:*17, 18, 19* 162:*17, 24* 166:*25*
**putting** 14:2 65:6 131:22

**< Q >**
**qualify** 67:*6*
**quality** 49:22 50:*1, 5, 18, 25* 51:*3* 172:*24* 173:*1*
**quarter** 133:*21*
**quarterly** 24:*8*
**question** 15:*11, 18, 22, 25* 16:*9, 11* 23:*13* 25:*20* 30:*4, 8, 15, 17* 33:*19* 39:*21* 82:22 86:*16* 91:*15* 93:*19* 94:*10* 103:*3* 114:*11* 115:*11* 151:*14* 162:*12* 166:*20* 169:*20*
**questioning** 94:*8*
**questionnaire** 56:*4, 8, 12* 86:22 87:*2* 104:*8* 132:*17* 136:*11, 11*
**questions** 5:2*1* 6:*1* 30:6, *7* 47:*14* 54:*13* 87:*3, 4, 5* 89:2, *3* 94:*6, 8, 13* 105:*1, 4, 7* 115:*1* 170:*24* 173:*5, 7*
**quite** 89:*5*

**< R >**
**radio** 37:*9, 20*
**radios** 37:*11, 13*
**raise** 24:22, *23*
**ran** 106:*16* 107:*15* 108:*8*
**RANDAL** 2:*16* 4:*18*
**range** 142:*14*
**reach** 38:*10* 104:*11*
**reached** 104:*11, 12*
**read** 23:*14* 86:*18* 114:*12* 148:*18* 161:*10*
**reading** 125:*16*
**reads** 136:*15*
**ready** 140:*23*
**really** 10:*13* 47:22 49:*1* 50:22 67:*3, 3* 74:*7* 78:*10, 19* 84:*13* 108:*11*

120:*12* 133:*3* 163:*8* 167:*24*
**Realtime** 2:5 175:*19*
**reason** 21:2, *11* 39:2, *8* 57:22 64:*11* 65:*11* 68:*7, 17* 70:*5, 9* 76:*17, 17* 77:*16* 79:5 91:*5, 20* 137:*13* 138:*15* 152:2 158:*9* 160:*21*
**REBECCA** 1:2 4:*11* 73:*14* 74:*1* 75:22 78:2*1* 98:*1* 100:*2* 103:*25* 107:*23* 125:*13*
**Rebecca's** 110:*15*
**recall** 11:*13* 16:*16* 37:*19* 43:22 47:*13* 48:*15, 19* 79:*14* 97:9 111:*11* 148:*13* 158:*3* 168:*10, 11* 169:*7*
**receive** 8:*24* 24:*19* 42:*7, 19* 43:*7* 49:*7* 71:*23* 83:*9, 11* 98:*12* 105:*21* 106:*1* 114:*1, 2* 161:*13* 163:*1* 164:*3, 6*
**received** 6:8 97:*12* 98:*24* 105:*20* 110:*7* 115:*24*
**receiving** 168:*8* 169:*17*
**recognize** 74:*11* 125:*3* 127:*18*
**recollection** 93:*11* 94:*24* 124:*2* 136:*24* 139:*19, 21* 167:*6* 173:*22*
**record** 4:*9, 13* 23:*14* 43:*19* 46:*12, 13* 59:*14, 15* 85:*13* 86:*18* 96:*12, 13, 15* 102:*11* 116:*14, 15, 16* 117:*7, 10* 147:*1* 154:*23* 161:*22* 171:*3*
**records** 42:*16, 18* 43:*15* 50:*24* 51:8 85:*18* 112:*6* 171:*13, 18, 21*
**redid** 158:*14, 16*
**refer** 19:*6* 25:*2* 117:*11*
**reference** 119:*6*
**referral** 62:*11, 13* 63:*2*
**referrals** 62:*24*
**referring** 158:*5*
**refresh** 173:*22*
**refusal** 163:*4*
**refused** 12:*20* 77:*15, 15, 24*
**regard** 100:*1* 125:*13*
**regarding** 78:*24*
**regardless** 57:*2*
**Registered** 2:*4* 10:*10* 175:*4, 19*
**regrets** 154:*2*
**regular** 13:*3* 63:*24* 67:*5* 87:*16* 91:*1* 93:*10* 102:*14*
**regularly** 27:*10, 17*
**relate** 120:*12* 123:*8*

**related** 11:*8, 15* 42:*2, 15* 43:*7* 44:*8* 103:*8* 137:*20* 148:*19* 149:*4, 6* 163:*2, 25*
**relates** 123:*7, 16* 166:*24*
**relationship** 75:*18*
**relative** 175:*10, 12*
**remain** 22:*4* 24:*16* 28:*20* 31:*14, 24* 32:*3*
**remainder** 22:*14* 24:*16*
**remained** 130:*13*
**remember** 6:*12* 11:*19* 15:*4* 22:*21, 24, 25* 48:*18* 74:*21* 76:*1, 2, 23* 78:*10, 19* 83:*24* 84:*5* 86:*1* 106:*17* 107:*6* 137:*2, 15, 17, 18, 18* 153:*7* 156:*24* 168:*4* 173:*2* 174:*16*
**remembered** 113:*10* 134:*23*
**remove** 148:*10*
**repeat** 23:*12* 33:*15* 82:*23*
**repeating** 148:*3*
**repetitive** 139:*9*
**rephrase** 115:*14* 122:*2* 171:*17*
**Report** 3:*11* 13:*25* 14:*1* 26:*11* 51:*19, 21* 57:25 58:2 62:5 64:*19, 21* 71:25 72:2, *3, 5, 6, 13, 14, 19, 23* 73:*1, 5* 77:*12, 13, 17, 20, 22* 78:*3* 79:2 82:*8* 92:*9, 11* 93:*8, 16* 98:*16, 20* 100:9 126:5 138:*17, 18, 20, 23* 139:2 165:*12, 13* 168:*11, 14*
**Reported** 1:*16* 111:*17*
**Reporter** 2:*5, 6* 12:*8* 23:*15* 86:*19* 94:*16* 175:*5, 19, 19*
**reports** 61:*6, 19*
**represent** 4:*15, 17, 19, 24* 5:2 22:*12* 124:*23* 173:*16*
**request** 44:*4*
**Requested** 23:*14* 86:*18*
**requesting** 62:*1*
**require** 69:*21, 23* 171:*10*
**required** 14:*10* 27:*6* 41:*14, 20* 42:*12* 50:*4* 63:*19*
**requirement** 37:*22* 60:*2* 121:*24* 122:*1*
**respiratory** 148:*21*
**response** 10:*6* 44:*17* 133:*5, 7* 173:*13*
**responsibilities** 17:*4* 19:*11* 24:*9* 28:*10* 85:*5*

**responsibility** 34:*16, 24* 35:*5* 64:*14* 84:*17, 22* 116:*7*
**responsible** 47:*21* 48:*6* 59:*9, 20* 63:*11* 65:*3, 6, 9* 67:*12, 18*
**responsive** 145:*22, 23* 146:*3*
**rest** 86:*22* 132:*17* 147:*13*
**result** 165:*5* 168:*8*
**retain** 49:*17*
**retained** 58:*20*
**retching** 111:*3*
**retire** 22:*18*
**retired** 22:*11* 96:*23*
**returned** 21:*15* 135:*19* 136:*8* 157:*18*
**revealed** 145:*22*
**review** 78:*3, 6, 16* 112:*5, 8* 114:*15* 171:*10, 13, 21* 172:2 174:*7*
**reviewed** 112:*9* 114:*22* 172:*15, 16, 19*
**reviewing** 78:*15* 171:*18* 172:*13* 173:*24*
**reviews** 172:*4, 7*
**right** 5:*6, 25* 7:*15* 12:*14* 18:2 24:*5* 25:*10* 28:*3* 29:*9* 32:*9* 34:*9* 35:*4, 19* 36:*5* 40:*6* 42:*16* 46:*20* 48:*4, 10* 50:*3* 54:*16* 55:*7* 58:*21* 59:*23* 60:*6* 66:*15* 71:*16* 79:*12* 80:*5* 82:*4, 16* 90:*14* 91:*18* 92:*22* 95:*18* 98:*21, 23* 101:2*1, 22* 104:*1* 108:*1, 1* 109:*3* 110:*4* 116:2 119:*22* 120:*23* 123:*13* 124:*11* 125:*22* 126:*9* 129:*6* 130:*2, 4, 19, 20, 24* 131:*17* 132:*1, 14* 134:*13, 17* 136:*17* 137:*25* 138:*4* 139:*8* 141:*4* 142:*18* 144:*4, 11, 22* 146:*10, 14* 148:*3* 150:*13* 152:*4* 155:*22* 156:*5, 14* 158:*6, 7, 17, 18* 159:*11, 12* 160:*1, 17* 161:*6* 165:*17, 25* 166:*23* 170:*17* 171:*1* 173:*4*
**ring** 124:*7, 14*
**Risk** 137:*20* 148:*19* 149:*4, 10*
**Rivershore** 7:*18, 21, 22* 8:*3*
**RN** 7:*18* 8:2 9:*5* 16:*20* 19:*21* 45:*10* 53:*15*
**RNs** 13:*16*

**role** 17:15 20:2, 16
21:7 28:6, 10 47:20, 22
48:5 52:3 77:1 116:5
151:4 161:25
**roles** 29:5 48:7 126:17
**roll** 49:6
**Roo** 1:16 2:4 175:4, 18
**room** 27:24 28:1, 2, 20,
21 32:4 55:6, 7, 10
66:22 69:18 71:13, 15
73:3 86:3 107:4, 4, 9,
12 109:1 138:22 142:5,
21 143:1 160:18 165:13
**rooms** 107:8
**rotate** 17:17, 19
**rotated** 24:12, 14 41:19
**rounds** 34:16 70:12
115:4, 9, 17 116:9, 13
161:9, 15, 19 162:2
**routine** 127:11
**RPR** 1:16
**Ruehs** 124:24
**rule** 17:13 94:12 163:9
164:19
**rules** 2:3
**run** 108:9
**RUSSART** 2:20 4:16,
16 15:7 18:18, 24 20:4
21:9 23:12, 16 28:14
29:11, 17, 25 30:24
31:4, 9, 20 34:19 35:23
39:14, 25 40:19, 25
41:9 51:14 59:3 60:24
67:21 68:10 69:3
70:19 82:19 97:2
113:21 118:12 119:19
121:4 123:17, 20
124:23 126:18, 23
129:14 140:16 151:13
154:19 162:9 166:19
169:19 173:6

**< S >**
**safe** 20:24, 25 56:5
163:8, 10, 13 166:8
**salary** 97:12, 13
**sat** 26:20
**save** 171:8
**saw** 151:3 169:5
**saying** 35:7 44:5 62:3
66:5 72:1 76:7 89:13
92:12 110:21 114:10
124:19 131:13 139:23
144:8, 9 145:7, 7
154:12 160:1
**says** 115:4 116:3
127:25 128:13 130:1
131:17 133:24 137:20
138:10 139:11 143:13
144:12, 17, 23 145:13,
22 146:4, 21, 23 147:8
148:7 149:4 155:7, 11
158:24, 25 159:5

**160**:18 161:6 162:21
163:24
**scanned** 59:13
**scanner** 59:22
**scanning** 59:15, 20
**scatch** 138:6
**schedule** 100:11 127:2
**scissors** 108:16
**Scratch** 133:14, 16
135:11, 12 139:16, 20,
22, 24 140:1, 3, 7, 12, 22
**screaming** 110:17, 17, 18,
18, 21 111:13 146:13
**screams** 110:25, 25
**screen** 102:19 157:22
171:2, 4, 7 173:18
**screening** 20:16 54:11
59:12 66:11 71:24
80:1, 4 86:22 87:2, 9,
10 131:21 132:12
161:25
**scrotum** 169:14
**se** 19:2 47:22 57:23
**search** 104:19
**second** 12:13 25:24
26:3, 4 27:11, 15, 16
31:7, 8, 11 38:23 40:22
41:15 53:9 76:23
78:25 87:8 92:9 96:4
98:19 106:20, 21 115:2,
3 124:12 131:1 138:17
155:24
**section** 114:20 116:16
118:15, 17 121:21
128:17 131:12, 16
132:12 139:8 153:12
157:14 158:3
**see** 14:5 32:24 33:2
34:21 35:18 50:2 61:1
61:8 62:14, 20, 22
66:17 103:7 109:1
113:5 114:17 117:1
121:22 123:10 124:5,
13 126:10 128:1, 20, 25
129:5 131:4 132:6
133:22 134:10 135:3,
16 136:7 139:2, 4
141:7 143:7, 10, 21, 23
144:3 148:16 149:22
151:22 155:5 156:10
157:22 158:3, 13
160:25 168:20 170:25
174:9
**seeing** 10:25 89:8
**seen** 14:18 47:7 65:24
73:21 112:21 113:2
127:19 137:1 149:20
157:25 169:8
**sees** 16:10
**seizure** 14:14 65:18, 22,
24, 25 66:3, 12, 14, 19
**semicircle** 34:13, 16
107:7

**send** 34:5 55:4 57:25
58:10 60:19, 22 61:3,
15 80:21 81:10 82:2
83:7 84:13 100:25
137:6, 9, 11, 12 159:18
**sending** 72:9 82:9
168:13, 23
**sends** 82:12
**sense** 171:16
**sent** 58:17 61:9 64:11
66:12 77:10, 18, 19
79:1, 2, 5 81:11, 23
82:15, 25, 25 83:16, 18,
20 84:24 87:22 91:17
92:10 99:6 138:16
144:20 154:11, 13
162:8, 9 169:9
**sentence** 146:17 147:17
**sentences** 118:16 146:18
**separate** 37:17 73:11
**sergeant** 44:14 95:23
105:8, 20 163:13
**sergeants** 54:2
**series** 105:1, 4, 7
**Services** 3:11 21:19
**set** 17:3, 13 80:16
99:12, 13, 15 100:10
101:8 173:13
**setup** 54:18
**Shadé** 170:8
**shaking** 12:10
**Shansky** 164:12, 19, 23
**share** 113:20
**sheet** 3:10 72:23 73:1
102:24 109:6 123:6
**sheets** 109:1, 7 147:16
**she'll** 37:6
**sheriff** 51:22
**Sheriff's** 3:11
**shift** 14:21, 22, 23, 23
15:19 16:3 17:3, 4, 9,
11, 23, 24, 25 18:1, 3
19:13, 14, 15, 16, 18
20:3 22:17 23:5, 7
25:24 26:3, 4, 5, 9, 18,
19, 21, 24 27:1, 10, 11, 15,
16, 17 28:21, 24 29:4, 5,
9, 16 30:18, 23 31:7, 8,
11, 18, 19 32:3, 5, 11, 15,
18 33:12, 13, 20, 22, 23,
24 34:1, 20, 22 35:9, 19
37:10 38:3, 23, 23
40:16, 22 41:3, 6, 12, 14,
15, 20 49:6 50:11
51:17 53:9 55:15, 16
72:15, 15, 16 74:23, 24
75:11, 13, 14 76:13, 14,
23, 24, 24 77:1, 4, 14
78:25 79:11, 16 87:8
92:9, 24 94:21 95:9, 16
96:2, 4, 5 97:25 98:19,
22 100:3, 5, 12, 14, 21
105:16 115:23 123:12

**124**:9, 9, 10 125:17, 24
126:15, 16 127:1, 3, 6,
10, 11, 13 133:17, 18
138:17 139:3 153:19,
19, 19 165:10, 22 168:17
**shifts** 23:9
**short** 40:3 41:15, 21
62:7 136:10
**short-staffed** 39:12, 18,
24
**shots** 20:1
**show** 87:4 113:17
143:24 173:17, 21
**showed** 122:17 173:11
**showing** 123:2
**shows** 36:21 144:6
**shredded** 133:19
**sick** 14:6 18:10 40:5
44:3, 4, 13 54:5, 7 96:4
167:7 168:19
**side** 6:10 54:24, 24
55:10, 23 56:4, 6
113:12 122:23 127:14
132:4 162:17, 24
**sight** 118:18, 23 119:18
**sign** 114:22, 24 149:19
174:2
**signature** 112:24
173:20, 21
**signatures** 173:15
**signed** 84:8 174:8
**significance** 143:13
**signs** 141:7, 10, 13
**similar** 157:25
**simpler** 122:2
**sister's** 167:20
**sit** 83:12 89:12 112:5
157:9 165:14
**site** 52:10 53:4, 7, 11
**sitting** 89:24 144:8
149:23
**situation** 57:15 66:10
120:13 133:8 153:20
**situations** 14:13
**six** 10:4 13:15 16:22
20:14 42:1, 5, 24
**six-month** 10:11
**skimmed** 174:9
**slightly** 89:18
**slip** 14:2, 3, 4, 6 44:4,
13 54:5, 7
**small** 28:2 54:22 56:3
**smaller** 54:14
**smiling** 103:17
**Smith** 77:19
**SMU** 18:11, 14, 16 25:2,
5, 13, 18 27:20 28:2, 7,
20 29:3 33:3, 11 34:8
35:19 36:5 64:4, 11
66:5, 23 67:2, 4, 6, 13,
16 68:5, 16, 17 69:5, 8
70:10, 13 71:16 72:8,
10, 17, 20, 20, 24, 25 91:1,

*6, 8, 12, 17* 92:*15* 94:*22*
95:*5, 8* 105:*10, 24*
106:*14, 25* 107:*2*
117:*25* 118:*6, 25*
119:*11* 120:*9, 11, 14, 18*
121:*1, 2, 25* 122:*5, 13,*
*20* 125:*3, 24* 126:*14*
144:*13* 145:*4, 15* 150:*2,*
*12* 151:*12* 152:*4*
154:*14* 156:*14, 16*
161:*16*
**SMU,** 25:*2*
**SMUs** 106:*22*
**SOAP** 127:*25* 129:*16,*
*19, 24* 133:*21* 141:*10*
143:*9, 24* 155:*22, 24*
159:*4* 161:*2*
**social** 75:*18*
**socially** 74:*25*
**software** 87:*12* 128:*4, 5,*
*10, 12, 16* 131:*14*
**somebody** 14:*16, 18*
43:*11* 79:*22* 82:*2* 83:*7*
131:*14*
**someone's** 35:*9* 68:*23*
90:*3* 131:*22* 132:*24*
**somewhat** 89:*4*
**soon** 96:*10*
**sorry** 12:*1* 15:*14* 22:*19*
27:*6* 29:*7, 14* 32:*13, 17*
33:*14* 36:*24* 39:*6* 41:*4*
51:*10* 64:*20* 76:*21*
80:*1, 8* 85:*22* 86:*24*
94:*3* 100:*13* 102:*17*
106:*9* 113:*18* 123:*22*
124:*18* 130:*22* 131:*16*
135:*7* 139:*9* 158:*24*
167:*22* 172:*9*
**sort** 12:*11* 24:*22* 30:*12*
34:*13*
**sound** 118:*18, 23* 119:*18*
**sounds** 62:*17*
**source** 98:*13* 138:*15*
**South** 8:*13*
**spanning** 21:*5*
**special** 18:*12, 14, 22*
19:*6* 47:*9* 73:*11*
120:*15* 121:*8, 8, 11, 17*
126:*10, 14* 159:*16*
**specific** 10:*7* 39:*21*
47:*6* 50:*2* 68:*12* 77:*24*
102:*20* 103:*11* 116:*16*
119:*1, 3* 120:*3*
**specifically** 25:*23* 51:*5, 8*
**specification** 119:*7*
**specified** 115:*5*
**speculation** 84:*20*
154:*20* 167:*15*
**spend** 13:*17, 18, 19, 22*
**spent** 13:*15* 20:*17* 42:*4,*
*5*
**spoke** 19:*9* 91:*3*

**spoken** 126:*7*
**spot** 27:*14* 125:*22*
**SS** 175:*1*
**stable** 34:*7* 135:*20*
**staff** 9:*25* 15:*2, 18, 20*
16:*2* 29:*2* 37:*16, 20*
42:*25* 44:*2, 23, 23* 49:*3*
54:*3, 19, 20* 63:*13*
65:*25* 66:*25* 67:*12, 17,*
*18* 70:*18, 24* 81:*3*
84:*18* 85:*6* 88:*6*
100:*21* 118:*18, 19, 23*
119:*17* 129:*5* 145:*18*
150:*18* 153:*2* 154:*17*
155:*11*
**staffed** 29:*15* 30:*17, 22*
31:*8, 19* 32:*3, 5* 62:*7*
**staffing** 17:*18* 28:*24*
41:*16, 21*
**stage** 82:*14, 15, 24*
**stages** 103:*21*
**stamp** 87:*11, 14* 143:*18,*
*21*
**stand** 55:*1*
**standardly** 67:*4, 5*
**stands** 130:*6* 134:*6*
**start** 16:*5, 23* 19:*16*
27:*10* 30:*21* 33:*13*
74:*19* 102:*3, 24* 103:*1*
138:*1* 147:*3*
**started** 4:*12* 13:*8*
15:*16* 17:*25* 18:*21*
20:*15* 21:*5* 22:*13*
24:*13* 27:*9* 48:*9* 49:*12*
74:*21* 75:*9* 90:*8*
101:*12, 24* 107:*13, 14*
134:*6, 14* 135:*1* 143:*15*
147:*16* 158:*8* 163:*9*
**starting** 20:*22* 147:*19*
**starts** 141:*6* 147:*18*
155:*21*
**State** 2:*6* 175:*1, 6*
**stated** 145:*4*
**STATES** 1:*1*
**stay** 23:*8* 29:*3* 32:*25*
35:*22* 41:*14* 89:*14*
96:*23* 118:*6, 9*
**stayed** 80:*19* 107:*15*
108:*2*
**stays** 73:*2* 117:*15*
**stenographic** 175:*8*
**step** 104:*17*
**steps** 103:*24*
**stethoscope** 160:*7*
**stomach** 136:*17* 146:*5*
147:*4, 8, 18*
**stored** 45:*9*
**story** 6:*10* 83:*1, 2*
150:*14*
**straight** 25:*8*
**Street** 2:*17* 152:*8*
**Strehlow** 48:*17, 19*

*153:15*
**stressed** 166:*4*
**strike** 22:*19* 27:*6* 29:*14*
41:*4* 51:*10* 60:*21* 80:*1,*
*8* 86:*24* 117:*8*
**stroke** 57:*12*
**study** 9:*3*
**stuff** 20:*1* 27:*24* 28:*5*
42:*10* 97:*16* 122:*8*
141:*22*
**subject** 11:*16* 47:*3*
**subjective** 129:*11, 19, 20*
135:*16* 144:*11* 157:*18*
**subjects** 50:*18*
**submit** 50:*8* 171:*6, 8*
**substitute** 99:*4*
**suctioned** 107:*19*
**suctioning** 109:*17*
**sued** 10:*21*
**sufficient** 40:*16, 23* 41:*4,*
*7*
**suicidal** 56:*14*
**suicide** 167:*19* 168:*2*
**Suite** 2:*17, 20*
**summary** 59:*6, 11* 84:*8*
161:*11*
**super** 118:*11*
**supervise** 75:*11*
**supervising** 37:*24* 93:*1,*
*4*
**supervision** 9:*15*
**supervisor** 7:*18* 8:*2*
16:*13* 22:*9, 10, 14* 23:*4*
24:*1, 2* 38:*1, 3, 4* 44:*16,*
*19, 20* 47:*20* 51:*15*
62:*6, 6* 64:*22* 75:*6, 13*
92:*5* 95:*24* 96:*6*
107:*15, 25* 108:*4*
111:*18* 126:*6* 143:*1*
145:*15, 16, 18* 150:*22*
152:*20* 163:*17* 165:*20*
172:*2, 7*
**supervisor,** 44:*18*
**supervisors** 17:*14* 22:*16,*
*21* 23:*5, 8* 45:*10, 10*
49:*2* 51:*12, 19* 172:*6, 22*
**Supplemental** 173:*12*
**suppose** 14:*24*
**supposed** 33:*11* 116:*8*
129:*13* 163:*23*
**Sure** 10:*16* 11:*12, 19*
12:*1, 4, 9* 20:*24, 25*
25:*22, 24* 33:*25* 37:*18*
47:*8* 50:*17* 52:*10, 20*
56:*5* 63:*12, 18* 66:*9*
69:*25* 70:*11* 77:*8*
78:*10* 79:*9* 81:*20* 85:*4*
87:*15* 88:*13, 25* 91:*13*
92:*5, 25* 102:*9* 103:*24*
104:*24* 108:*20* 110:*1*
125:*1* 126:*8* 137:*3*
138:*24* 140:*15, 17, 25*
152:*25* 153:*11* 165:*22*

*166:1, 5* 168:*21* 171:*8,*
*9, 18*
**surprised** 149:*25* 150:*4*
**survive** 149:*2*
**survived** 166:*14*
**suspect** 14:*16*
**Swayzer** 170:*8, 18*
**switch** 43:*15*
**switched** 21:*22, 22* 23:*8*
**sworn** 4:*3*
**symptoms** 67:*14* 102:*6*
**syringe** 107:*19* 108:*12*
**system** 42:*14, 23* 43:*4,*
*16, 19, 21* 44:*8, 12, 22*
45:*2, 5, 8* 46:*5* 59:*12*
63:*8* 102:*3* 128:*15*
129:*16, 19* 132:*1, 19*
158:*11* 159:*21* 162:*2*
**systems** 13:*13*

**< T >**
**tab** 102:*20*
**tactile** 56:*15*
**take** 9:*12* 12:*2, 18* 43:*1*
46:*9, 11* 56:*5* 57:*6, 11*
67:*8* 73:*2* 86:*14* 88:*12*
96:*10* 104:*19* 105:*10,*
*21* 109:*13* 110:*2* 132:*9*
141:*11, 24, 25* 151:*20*
154:*22* 156:*10, 10* 160:*3*
**taken** 142:*1, 3* 157:*2, 4,*
*11* 159:*11*
**takes** 88:*2* 105:*5*
**talk** 25:*1* 64:*1* 73:*16*
83:*22* 94:*25* 101:*25*
146:*1, 16* 172:*11*
**talked** 83:*14, 25* 84:*6*
88:*16* 92:*4, 4, 5, 6* 93:*3,*
*6* 96:*16* 152:*23, 25*
153:*1, 2* 156:*17* 157:*15*
159:*19* 161:*2* 162:*3*
163:*18* 165:*2* 169:*7*
**talking** 8:*19* 25:*3, 8*
29:*22* 36:*8* 46:*15, 19*
61:*24* 62:*13, 15* 82:*17,*
*18* 94:*24* 106:*12*
115:*16* 117:*13* 119:*7*
120:*19* 137:*19* 166:*11*
**talks** 161:*11* 162:*4*
**tasked** 17:*21*
**taught** 14:*10* 43:*13*
61:*8* 68:*19* 71:*6* 115:*8*
**team** 112:*13, 15* 151:*2*
**telephone** 37:*3* 86:*5*
**telephoned** 38:*9*
**Tell** 9:*19* 19:*10* 24:*9*
26:*3* 28:*25* 30:*19*
36:*17* 46:*22* 47:*2* 48:*7*
50:*8* 62:*25* 66:*13, 16*
68:*16* 69:*2* 76:*3* 77:*13,*
*14, 21* 87:*2* 89:*10*
90:*25* 98:*6, 8* 100:*18*
101:*23* 121:*11* 130:*1*

**Gramann Reporting, Ltd. | U.S. Legal Support**        **(800) 899-7222**

134:*3*  137:*10*  139:*25*
140:2  142:*23*, *25*  146:7
147:*6*, *20*  148:*18*
149:*19*, *23*  155:9
156:*20*  157:*23*  161:*8*,
*14*  165:*14*  167:*8*
**telling**  12:5  65:9  67:*12*,
*18*  113:6  148:*13*
**tells**  59:7  65:*18*  71:*3*
95:*23*  129:*20*
**ten**  13:*18*  30:*25*  31:2,
*12*  40:*15*, *22*  78:*14*
87:*16*
**tenure**  19:*4*
**Terill**  169:*22*
**term**  62:*11*, *17*, *17*
**terms**  39:*12*  71:5  97:*11*
119:*24*
**TERRY**  1:2  4:*11*
73:*14*  74:*1*  75:22, *23*
78:*21*, *24*  79:*11*  80:7
81:*2*, *12*, *19*  85:*19*
87:*18*  91:*1*, 5  92:*1*, 2,
*19*  95:5, 9  98:*1*, *13*
100:2, *11*  101:2, *15*
103:*13*  105:*15*  119:8
120:9  125:*13*  126:*4*
131:9  142:*11*, *15*  148:7
149:*11*, *12*  154:*1*  162:7
**Terry's**  82:8  85:*13*
86:*8*  141:*13*  156:*11*
164:*10*  165:7
**testicular**  168:9
**testified**  4:4  5:*14*  10:*16*
11:*10*  90:*13*
**testify**  11:*3*, 5
**testifying**  11:7, *24*
**TESTIMONY**  3:*13*
10:*23*  11:*16*  119:*13*
136:*25*  142:*17*  145:*10*
159:9  167:2
**Thank**  19:*17*  113:*21*
119:*12*  123:*20*  124:*25*
173:5
**themself**  14:*15*
**THERESA**  2:*13*  4:*10*
**thing**  12:*11*  14:7, *8*
19:7  28:*3*  30:*12*  71:2
103:*11*  105:6  122:*17*
165:*23*  174:9
**things**  13:*24*  43:6  55:9
69:*10*  88:*4*  89:6
129:*12*  151:*20*  164:*20*
165:*3*
**think**  9:*16*  11:*17*  14:*25*
16:*15*  17:*13*  21:22, *23*
22:*10*, *10*, *16*  23:7, 9
25:*21*  29:*4*  34:*12*
37:*17*  42:*13*  43:*11*
47:*12*  49:*18*  50:2
51:22, *22*, *23*, *25*  53:22
59:*13*  61:*12*  70:*11*
73:7  76:*16*  77:7  78:*8*,

*11*  80:*3*  81:*20*, *20*  82:6
85:*15*  87:*15*  90:*8*, *18*
92:*12*  93:*23*  94:*3*
96:22  97:*3*, 5, 7  98:9
99:22, *22*  104:*10*
108:*15*  113:9  117:*12*
119:2  120:*21*  125:22
129:*10*  132:5  136:*15*
138:7  143:*20*  148:*4*, *4*
153:*4*, *4*, 5, 6  154:*1*, *3*, 7
155:*1*  156:*8*  164:5
167:7  168:*12*, *19*
170:*23*  172:*24*  174:9
**Third**  2:*13*  26:5, *18*, *19*,
*21*  27:*11*, *17*  31:*18*, *19*
32:*11*, *14*, *18*  33:*13*, *20*,
*22*  38:*23*  41:*3*, 6, *11*, *20*
76:*24*, *24*  77:*1*  78:*25*
79:*10*  98:*22*  116:*22*
124:*13*  135:*15*  155:*4*
**Thomas's**  169:*22*
**thought**  30:*4*  42:9
43:*25*  124:*18*  166:*6*
**threatening**  14:*12*
**three**  18:9  27:*13*  31:22
41:*3*, 6  55:*1*, *16*  107:*8*,
*10*  123:*8*  142:*21*
173:*14*  174:7
**throw**  111:*3*
**throwing**  111:6  150:*8*, *8*
**Thursday**  6:*24*, *24*  7:5
**time**  10:2, *10*  11:2
14:*24*  15:*15*  16:*17*
17:*16*  18:*19*  19:*4*  20:9
21:*4*  22:*3*, *17*  23:6
24:*17*, *20*  25:*16*, 22, *25*
26:9, *16*  27:*19*  28:*11*
29:*21*  30:*18*  31:*3*, *15*,
*24*  32:*21*  35:*16*  37:22
39:*20*  40:*13*  42:*4*, 5
43:*23*  44:*21*  45:*18*
48:*12*, *21*  49:*20*  51:*13*
52:*15*, *18*, *25*  53:*1*
54:*13*  55:*20*  70:*3*
78:*12*  79:*15*  87:*3*, 6, 7,
*8*, *11*, *14*, *17*, *18*, *24*  88:*14*
89:*8*  94:*14*  96:*17*
97:*11*  100:*15*  104:*8*
105:*2*, *15*  109:*2*, *21*
112:5  113:*25*  120:*14*
124:*18*  128:*3*, *13*, *13*, *15*,
*17*  129:*3*  131:*3*  132:9
133:7, *10*, *24*  134:*3*, *4*, 6,
*12*, *22*, *25*  135:*1*, *25*
136:5, *11*, *12*  138:*1*
139:*14*, *15*, *23*  140:*10*
141:7, *20*  143:*13*, *14*, *15*,
*18*, *21*, *25*  144:9, *18*, *20*
149:9  150:*15*, *18*  151:*1*,
*3*, *22*, *24*  152:22  153:*4*,
7  154:*3*  156:22  157:*3*,
*4*, 6, 7, 7, *8*  158:*17*, *18*, *18*,
*21*  159:*1*, 5, 9, *10*

162:*10*, *25*  163:*24*
164:*16*  170:*10*, *13*
**Time,**  158:*24*
**times**  6:*17*  37:*21*  39:*11*,
*23*  60:*15*, *18*  69:*16*
115:*21*, *22*  116:*4*
118:*19*, *20*  119:*18*
140:*24*
**title**  51:*24*  52:*8*
**titles**  52:*8*
**today**  47:*14*  73:*16*  78:*4*,
7  83:*12*  112:5  140:*14*
145:*10*
**today's**  5:*20*  6:6
**to-do**  130:*3*, *13*, *15*, *16*
**toe**  104:*23*
**told**  4:9  11:*21*  17:*25*
22:2  27:*8*  58:*16*  68:*15*
81:*8*, 9, *21*  86:2  88:*17*
90:*20*  98:5, *17*  101:22
107:*4*, *11*  110:22, *23*
114:*12*  120:*21*  130:*11*
137:*3*, 5  138:*19*  144:*25*
145:2  148:*15*  156:*24*
164:*16*, *18*  165:*4*
166:*13*  168:*15*  169:5
**tone**  122:*17*
**tones**  122:*11*, *15*
**top**  142:*18*  143:*18*
155:*23*
**topic**  128:*20*, 22, *24*
129:2
**torsion**  168:9
**total**  87:*23*  88:*1*, *3*
**totally**  17:7  132:5
**tower**  66:*20*
**town**  167:*25*  170:9, *16*
**train**  42:*24*
**trained**  20:*13*, *15*  68:*15*
99:*3*
**training**  13:9, *15*  16:22
17:*1*  20:*14*  42:*2*, 7, *12*,
*13*, *15*, *18*, *19*  43:*1*, *4*, 7
60:22  70:*15*, *16*, *20*, *21*
71:*3*  98:*24*  110:7
**transcript**  3:*13*  175:9
**transfer**  128:*25*  129:*4*
161:*11*
**transferred**  131:9
139:*12*
**transition**  46:*10*  97:22
**transport**  57:*18*
**treat**  102:6
**treated**  56:*16*
**Treatment**  7:*18*, *21*, *23*
33:*25*  34:*1*  64:*23*  65:*3*,
7  116:*15*
**treatments**  27:*24*  28:*4*,
*22*  103:7
**trial**  94:*14*
**trick**  160:*12*, *15*
**trigger**  103:*11*

**trouble**  89:*24*  149:*20*
**true**  175:*8*
**Try**  12:9  17:*17*, *17*, *18*
21:*12*  115:*13*  142:*8*
165:*14*  171:*16*
**trying**  11:*17*  15:*13*
70:*23*  90:*23*  104:*4*, *10*
111:*13*  132:*8*
**turn**  94:6, *15*  115:2
116:*21*  118:*15*  121:*18*
123:*15*  124:*12*  125:*20*
131:*1*  135:*15*  143:*8*
155:*1*  159:*4*
**Turning**  75:*21*  127:*24*
158:*20*
**twenty**  15:5, *6*  16:6, *6*,
*12*
**twice**  5:*18*  164:5
**two**  10:*17*  17:*12*  18:9,
*10*  22:*24*  55:*16*, *17*, *18*,
*21*  62:9  108:*14*  115:*18*
118:*16*  119:2  121:*10*
165:*21*
**type**  7:22  69:*1*  71:2
121:*16*  123:*3*  161:*3*, 7
**types**  14:9  119:2
129:*12*
**typical**  126:*16*
**typically**  100:*4*
**typing**  146:*24*
**Typo**  147:2, *11*  148:5

**< U >**
**Uh-huh**  8:*1*, *11*  9:*8*
11:*25*  15:*17*  18:2  23:*3*
25:*11*  29:6  36:*25*
48:*11*  55:*14*  64:*10*
67:*11*  71:*17*  86:*4*
87:*21*  106:6  121:*23*
123:*11*  128:*2*, 9, *21*, *23*
129:7  133:*23*, *25*
135:*14*  136:*23*  141:9
144:*16*  145:5  146:9
147:5  148:*17*  153:*16*
155:6, *8*  156:*4*  159:6
161:*1*  174:*14*
**uh-huh,**  12:7
**Uh-uh**  10:*13*, *20*  27:5
67:*15*  76:*18*  113:*3*
144:*1*, *1*  167:*11*
**ultrasound**  122:*16*
**umbilical**  142:*12*, *14*
**understand**  15:22  30:*8*,
*11*  66:9  82:22  91:*17*
103:*24*  106:*10*  115:*15*
117:*12*  119:*25*  120:*23*
129:*11*  132:5  140:*25*
145:*8*  163:*20*  172:*18*
**understanding**  61:*18*
70:*8*  111:22  134:*13*
171:*23*
**understood**  5:22  89:2

**unit** 18:22 19:6 35:16, 17 38:20 63:24 73:10, 12 116:2 120:15 121:8, 9, 11, 13, 17, 17
**UNITED** 1:1
**units** 119:2
**unresponsive** 145:25
**unsafe** 163:24
**unusual** 84:10, 13 126:13 137:8
**upset** 110:17
**upstairs** 32:21 34:6, 7 67:5 88:12 96:7 105:24 106:16 111:6 117:15 118:5 125:15 127:4, 7, 10 150:24 156:15 165:13
**urine** 56:2
**use** 46:24 47:2 98:25 112:23 118:24 119:5 120:2 122:18, 20
**Usually** 59:10 60:1 64:13 79:22 137:10 143:18

**< V >**
**vague** 15:25 16:9 18:5, 19, 24 20:4, 10 23:16 28:14 29:10 35:23 59:1 60:11, 24 61:10 65:21 68:9 70:19 82:20
**Van** 1:16 2:4 175:4, 18
**various** 116:24
**versus** 14:2, 19 17:10 54:20 63:24 83:5 91:1
**violate** 69:9
**violation** 65:15 68:18, 20 69:17
**visual** 56:15
**vital** 141:6, 10, 13 155:21 157:22
**Vitals** 56:2 58:9 71:10, 18 80:16 104:23 115:18, 21 122:10 131:22, 25 132:9, 13, 24 135:20 141:17, 24, 25 142:1, 3, 5, 9, 20 143:5 155:5, 23 156:11, 18, 20, 23, 24 157:1, 2, 4, 12, 22, 24 158:21 159:10, 25 161:3 171:4
**vivid** 137:14
**vividly** 137:2
**volume** 149:4
**voluntary** 11:6 12:22
**vs** 1:2

**< W >**
**Wade** 52:1
**wait** 163:11
**waited** 81:20 105:12
**waiting** 90:11 92:13, 15

133:5 135:6
**waits** 105:10
**wall** 72:2
**want** 14:5 16:1 21:23 25:1 57:18 82:22 94:6, 15 103:24 110:9 115:17 122:10 137:12 152:2 153:21 165:24 171:1, 3
**wanted** 24:4 45:17 85:16 96:22 102:18, 19, 24 114:9, 11 115:7 117:7 139:2 166:5 174:10
**wants** 151:18, 21
**warrant** 14:18
**warranted** 154:7
**watch** 61:4, 15
**watched** 34:23
**watching** 142:6
**way** 24:4 43:5 59:15 87:2 94:14 106:25 130:22 139:10 144:6 145:11, 12 147:6, 19 155:4 166:8
**ways** 114:5 119:16 164:21
**week** 10:15 13:15, 17, 18, 19, 21, 22 17:12, 19, 22 20:17 78:14 79:8
**weeks** 13:15 16:22 17:12, 16 42:2, 5 91:11, 13
**weigh** 11:22
**weight** 11:1, 9, 16, 20, 20, 22 47:4, 9 104:23
**welcome** 94:5
**well** 5:3, 6 6:3 35:24 64:12 94:5 95:2 117:18 122:6 124:15 125:16 135:22 137:18 138:5 139:23 156:8 157:14 161:23
**well-being** 166:16
**went** 51:25 72:16, 17 77:23 85:17 88:9 91:8 100:6 105:13, 25 107:12 108:2, 22 127:23, 23 134:8 138:5, 7, 7, 13 159:21 163:8 168:20, 22 169:5, 15
**Wenzel** 74:3, 6 94:21
**we're** 4:9 55:4 59:14 73:16 89:14 119:7 120:4, 5, 13 137:10 139:10 170:23 172:9
**WISCONSIN** 1:2, 15, 16 2:6, 17, 20, 21 175:1, 6, 15
**wish** 154:5
**withdrawal** 66:24 67:1, 9, 14 101:4, 15, 16, 18 102:3

**withdrawals** 67:2, 3, 6 101:11 103:6
**withdrawing** 102:5 103:10
**witness** 2:1 4:2, 19 6:23 7:5, 11 15:17 16:1 20:5, 11 23:17 25:21 28:16 29:12 30:25 31:5, 11, 22 33:22 34:20 35:24 40:2, 8, 20 41:1 45:23 46:3 51:15 60:12, 25 61:11 65:22 67:22 68:11 69:5 70:20 84:21 97:3 111:25 113:13 116:23 119:10 120:6 121:5, 20 126:20, 25 131:2 151:16 152:7 154:21 155:3, 18 166:21 167:16 174:20
**witnessed** 66:3, 4 109:10
**woman** 67:16 68:4 103:14 149:8
**women** 103:20
**word** 19:5 72:1
**words** 19:6 83:19
**work** 7:9 8:14 9:12, 16 17:12 25:13, 18 27:1, 17 41:11, 15, 20 48:21 49:8 52:21 55:18 74:23 75:1, 19 76:13 94:12 171:10
**worked** 8:6 16:2 17:5 25:16 26:16 28:11, 11, 18 37:23 40:13 52:18 53:3 55:19 76:19, 21 109:16 113:25 165:12
**worker** 26:24
**working** 7:15 9:9 10:14 13:3, 10 14:20, 21 15:1 16:13 17:25 18:21 21:12 24:17, 20, 23 25:12 27:9, 9, 10 30:19 31:3, 17, 25 32:20 33:4 37:7 39:11, 22 47:19 49:20 50:19 53:17 77:4 90:18 92:25 96:7 105:22 111:19, 21 112:2 125:15 154:25
**worried** 148:24 149:1 151:10
**worry** 110:5
**wound** 66:5 77:19
**write** 54:7 168:16
**writer** 131:17 139:11 144:12 145:13
**writes** 35:16 131:14
**writing** 50:9 56:10 132:23
**written** 50:15 56:8 57:21 63:16 72:12

116:3 135:12 138:20 157:1
**wrong** 11:18 72:7 125:16 154:4 163:22
**wrote** 139:18 160:20 168:17

**< Y >**
**Yeah** 10:8 13:7, 7 14:8 36:25 41:6 47:2 50:6 52:6 57:9, 15 63:8 64:6 68:21 72:4, 6 74:8 76:11, 12 78:10 79:1 84:4 87:6 89:9 93:5 96:11 97:20 101:17 106:14, 19 108:1 109:14 113:24 114:24 116:20 120:6 122:2 123:19 125:25 129:18 133:17 139:18 142:1 143:17, 20 146:15 147:15 148:14 149:12 150:3, 7 152:16 157:14 165:1, 2 168:11 174:4
**year** 8:4 9:9 11:9 22:15 120:4
**years** 9:16 30:22 140:14
**Yup** 155:13