## Rebecca Terry v. County of Milwaukee, et al.

17CV1112

Transcript of the Video Deposition of:

# Gina Strehlow

April 4, 2018





**EXHIBIT C**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF WISCONSIN
    ------------------------------------------------------------
 3
    REBECCA TERRY,
 4
                         Plaintiff,
 5
                 vs.              Case No. 17-cv-01112
 6
    COUNTY OF MILWAUKEE, et al.,
 7
                         Defendants.
 8
    ------------------------------------------------------------
 9

10            Videotaped Deposition of GINA STREHLOW

11                  Wednesday, April 4, 2018

12
                            9:08 a.m.
13
                               at
14
                       Hinshaw & Culbertson
15                  100 East Wisconsin Avenue
                       Milwaukee, Wisconsin
16

17

18

19

20

21

22

23

24          Reported by Dawn M. Lahti, RPR/CRR

25
```

Page 68

1 want. But we take these people and bring them all
2 into this one place, and she had a baby that was
3 alive. I mean that's a great thing.
4 Q You don't really know whether there was anything
5 the nursing staff could have done differently to
6 make sure she got to the hospital, do you?
7 MR. RUSSART: Object to the form.
8 Argumentative.
9 Go ahead.
10 MR. ARNOLD: Join.
11 THE WITNESS: Nurses don't take people to
12 the hospital, so I don't -- like, I couldn't have
13 put her in my car or taken her. It says that she
14 called 911. I mean that's all a nurse could do.
15 BY MR. RAUSCHER:
16 Q She called 911 after she had a baby, right?
17 A I don't know.
18 Q So what I'm -- do you have any idea whether the
19 nursing staff could have done anything differently
20 to make sure that Ms. Terry got to the hospital
21 before she had her baby?
22 A I -- I don't -- I wasn't there. I don't know the
23 details. I don't know, you know, what correctional
24 staff was there, what leadership was there. I
25 don't know any of that.

Page 69

1 I know that if a nurse saw a person
2 actively in labor, she would recommend that she
3 went to the hospital, and that's the extent of what
4 a nurse can do.
5 Q You don't know whether that happened here, right?
6 A I don't. Correct.
7 Q So you don't really know whether the nursing staff
8 could have done more to get Ms. Terry to the
9 hospital?
10 A I'm sorry. I don't know what you're asking me.
11 Because I don't feel like -- I feel like you're
12 asking me if they could have done something
13 different, and I don't know exactly what they did,
14 so I can't say whether they should have done better
15 or worse.
16 Q I'm trying to follow up because a few questions ago
17 I think you answered a question saying I don't
18 think the nurses could have done anything
19 differently to prevent this.
20 A Um-hum.
21 Q Do you really have a basis to know that?
22 A I'm saying to prevent a baby being born.
23 Q Oh, okay. You're not saying to prevent that the
24 nurses couldn't have done anything differently --
25 A No.

Page 70

1 Q -- baby born --
2 A I'm sorry.
3 Q -- at the jail?
4 A Correct. I'm sorry. I didn't -- I meant like a
5 nurse couldn't have said, close your legs, and the
6 baby wouldn't have been born. That's what I was
7 referring to. Just like a heart attack. You can't
8 make a heart attack not happen.
9 Q You're not making an analogy between the
10 predictability of heart attacks and the
11 predictability of pregnant women giving birth,
12 right?
13 A I don't know what you're asking me.
14 Q You made an analogy. You said you can't prevent --
15 you don't know when you're going to have a heart
16 attack. You don't know when someone is going to
17 give birth. They're not really the same, are they?
18 A As far as predictability of time it's going to
19 happen, I feel that they are similar, yes.
20 Q Do you know Brian Wenzel?
21 A I don't believe I do. The name sounds familiar,
22 but I have no idea who that is.
23 Q Did the nursing staff rely on correctional officers
24 to help them provide medical care to inmates at the
25 jail?

Page 71

1 MR. ARNOLD: Object to form and
2 foundation.
3 MR. RUSSART: Join.
4 THE WITNESS: What do you mean by
5 "provide medical care"?
6 BY MR. RAUSCHER:
7 Q Did you as the director of nursing provide medical
8 care to inmates at the Milwaukee County Jail?
9 A I did.
10 Q And what did you do to provide medical care to
11 inmates at the jail?
12 MR. RUSSART: Vague. Overbroad.
13 THE WITNESS: Are you talking about like
14 in booking? Are you talking about if somebody has
15 a cut finger? Are you talking about a heart
16 attack?
17 I don't know what -- in what
18 instance do you mean like provide medical care? If
19 there was a medical need, I provided care for it.
20 BY MR. RAUSCHER:
21 Q And did you rely on correctional officers at all to
22 help you provide that care?
23 MR. RUSSART: Object to the form and
24 foundation.
25 MR. ARNOLD: Join.

Page 116

1    always a medical director.
2 Q  If you look at paragraph two where it says two on
3    the second page, which is Bates stamped Armor 231,
4    do you see a reference to an intake referral log at
5    the end of that paragraph?
6 A  Yes.
7 Q  And that's -- this is referring to something that
8    should be completed when inmates are returned from
9    an emergency room; is that right?
10 A  I'm not familiar with that form.  I don't recall an
11    intake referral log.
12 Q  Okay.  Are you familiar with what the policy was
13    when you were the director of nursing for admitting
14    patients back to the jail after they had been
15    referred to an emergency department?
16 A  Yes.
17 Q  And what was the policy in place?
18 A  For -- I mean like the entire policy or like steps
19    or -- what are you looking for?
20 Q  Yeah, both.
21 A  So you're saying if somebody came to jail, they
22    were refused and they were sent to the emergency
23    department or they were coming right from the
24    emergency department?
25 Q  So why don't we start -- it could be either, I

Page 117

1    guess.  Why don't we start.  We can look at this
2    paragraph, paragraph two.
3         The last sentence says "When inmates
4    are referred to an emergency department, their
5    admission on return to the facility is predicated
6    upon receipt of written documentation of treatment
7    and necessary follow-up recommendations."
8         Is that -- was that Armor's policy
9    when you were the director of nursing?
10 A  That is ideally what is supposed to happen when
11    somebody returns from the hospital, yes.
12 Q  Was that followed?
13 A  Was -- so when people come back from the hospital,
14    sometimes their paperwork -- since the COs are
15    transporting, they don't know what paperwork is
16    there, so the person arrives back at the facility
17    and the paperwork that describes follow-up care and
18    whatnot may not be there.
19         So they would still be accepted
20    back, but then we would get that paperwork.
21 Q  How quickly would you get the paperwork?
22 A  It varies.
23 Q  How often did it happen that inmates came back from
24    emergency departments without the correct
25    paperwork?

Page 118

1 A  All the time, so we had to figure out a way how we
2    were going to handle these people because we can't
3    just send them back to the hospital to get
4    paperwork.
5 Q  Was it -- was that circumstance -- with people
6    being sent back from the hospital without their
7    correct paperwork, was that something that happened
8    all the time throughout your time at the jail?
9 A  People being sent back to the hospital just to get
10    paperwork?
11 Q  No, no, no.  Was it common for people who went to
12    the hospital to be sent back to the jail without
13    the correct paperwork throughout your time working
14    at the jail?
15 A  Yes.
16 Q  Do you know why Armor had a policy -- a written
17    policy that said admission of inmates on return to
18    the facility is predicated upon receipt of written
19    documentation of treatment and necessary follow-up
20    recommendations?
21 A  Do I know why they wrote that policy?
22 Q  Yes.
23 A  I do not.
24 Q  Were you aware of that policy when you were the
25    director of nursing?

Page 119

1 A  I was.
2 Q  Was anybody ever reprimanded that you know of for
3    not following that policy?
4 A  Staff you mean?
5 Q  Anybody.
6 A  I don't recall anybody being reprimanded for not
7    following that policy.
8 Q  Do you recall ever receiving training on that
9    policy?
10 A  On the receiving screening policy?  No.
11 Q  Did you ever talk to the health service -- health
12    services administrator about the issue of people
13    being returned to the jail from the hospital
14    without necessary paperwork?
15 A  Yes.
16 Q  Tell me about those conversations.
17 A  So when I said one of the biggest jobs of me as a
18    director of nursing is the community outreach,
19    that's one of the -- going to the emergency
20    departments, going to the clinics, so we could
21    educate them on the importance of receiving
22    paperwork because they don't realize that there is
23    nurses at the jail.
24         They don't realize that we are that
25    person's provider, so they need to know the

Page 120

1 importance of returning that paperwork, so we have
2 met with facilities to try to improve that so they
3 understand why we need that paperwork.
4 Q When did you start meeting with facilities to
5 improve that issue?
6 A I don't recall what date or what dates. We had
7 meetings. It was during my time as director of
8 nursing.
9 Q When did you start having conversations with the
10 health services administrator about that issue?
11 A As soon as people started coming that I noticed
12 without paperwork.
13 Q And that started happening immediately when you
14 were the director of nursing?
15 A Shortly after, yes. I was a staff nurse first, so
16 I recalled it.
17 Q Before March 2014?
18 A Yes.
19 Q You had conversations with the health service
20 administrator before March 2014 about that issue?
21 A March of 2014. Again, that was right when I
22 started as a director of nursing, so I don't know
23 how much conversation I had about that. I know
24 that we had trouble getting paperwork as a staff
25 nurse, and that is something that as a director of

Page 121

1 nursing, I tried to improve.
2 Q Was it a widely known issue at the jail that there
3 was trouble getting the correct paperwork from
4 hospitals?
5 A Yes.
6 Q And that was always the case when you were a nurse
7 at the jail?
8 A Yes.
9 Q Why is it important for the jail to get the correct
10 paperwork before an inmate is returned from the
11 hospital?
12 A To be honest, getting the paperwork isn't nearly as
13 important as getting the information. So the nurse
14 receives a person; and if the paperwork doesn't
15 come, then they call where the patient was and says
16 what happened, what's going on, gets a report, and
17 then we'll document that report.
18     And if the report given from one
19 medical professional to her or him is acceptable,
20 is within our means, then we accept that person and
21 then spend energy getting -- like we'll have the
22 health unit coordinator or somebody following up to
23 get that paperwork.
24     The reason for getting the paperwork
25 is to get the information that we are supposed to

Page 122

1 have from whatever care or treatment or reason that
2 they were sent out.
3 Q Because continuity of care is important?
4 A Yes.
5 Q Is that why?
6 A Is that why --
7 Q Is that why it's important to get the paperwork?
8 A It's important to get the paperwork for
9 documentation that a report -- to confirm that the
10 plan of care that we continue because I speak to a
11 nurse who tells me to do something and I do that
12 something, then that paperwork collaborates what
13 the continuity of care is.
14 Q Have you ever heard anyone say that if something's
15 not written down, it didn't happen in the medical
16 profession?
17 A I have.
18 Q What does that mean?
19 A That means if something is not written down, it
20 didn't happen. But if I have -- if I document it,
21 then that's what happened.
22 Q But it's better to have the written documentation
23 from the hospital in the first place, right?
24 A I don't feel like that's always the case because I
25 think a report is what's number one because a

Page 123

1 report is what happens and the documentation is --
2 I'm going to go off what a medical provider says to
3 me more than what a piece of paper says to me,
4 especially in this day and age with electronic
5 records and auto populating and whatnot.
6 Q So if a medical provider told you you're supposed
7 to do X and then you got the report and it actually
8 didn't say that, you'd go with what the person told
9 you?
10 A No, I would call and confirm, you told me this, and
11 your paperwork says this.
12 Q If patients were sent with written paperwork from
13 hospitals, did you go and call the hospital anyway
14 to confirm that the written paperwork was correct?
15 A The -- when people were sent back, typically a
16 doc-to-doc was done. So the doctor spoke to our
17 medical director or the doctor or the provider on
18 call and they had a conversation about them being
19 cleared or not cleared or whatever needs to happen.
20 Q And was that conversation done before the patient
21 was admitted back into the jail?
22 A Yes.
23 Q Always?
24 A I don't -- I don't know if it was always done. I
25 know that that was what was supposed to happen.