| User Date /Time | Time Stamp | User ID | POD | Log Text: |
|---|---|---|---|---|

**BKG**

3/9/14 4:45 pm — 3/9/14 4:45 pm — MXHHM — BKG
Inmate TERRY, REBECCA L — 405115309 Status
I Inmate added new to facility. Escorted by: Count:12
Loc — Money $ 0.00 — Comments — InmateMove — New to FAC

3/9/14 9:11 pm — 3/9/14 9:13 pm — MXHHM — BKG
Inmate TERRY, REBECCA L — 405115309 Status
IBO TERRY, REBECCA L Bkg Nbr: 405115309 Inmate is In But Out Escorted by: Smith, J, Poetz G Count:4
Loc — Money $ 0.00 — Comments HOSPITAL — InmateMove — IN BUT OUT

3/13/14 4:16 pm — 3/13/14 4:16 pm — BTCCB — BKG
Inmate TERRY, REBECCA L — 405115309 Status
I Returned Inmate to Home POD. Escorted by: Count:
Loc — Money $ 0.00 — Comments — InmateMove — RETURN

3/13/14 4:16 pm — 3/13/14 4:18 pm — BTCCB — BKG
Inmate TERRY, REBECCA L — 405115309 Status
O Inmate in transit. Escorted by: Count:
Loc — Money $ 0.00 — Comments — InmateMove — INTRNSPOD

**BKG – Count: 4**

**CLASS**

3/14/14 1:38 pm — 3/14/14 1:39 pm — AYFAF — CLAS
Inmate TERRY, REBECCA L — 405115309 Status
PER NURSE Exam, Carolyn INMATE TERRY, REBECCA L FOR GP, LB UNTIL MEDICAL CLEARED. — Bkg Nbr: 405115309 IS CLEARED
Loc — Money $ 0.00 — Comments — Misc — Misc

**CLASS – Count: 1**

**CLC**

3/18/14 8:22 am — 3/18/14 8:59 am — MGPMP — CLC
Inmate TERRY, REBECCA L — 405115309 Status
CO Thomas, Shirley in with 02 inmates for doctor Organ 487305209 and TERRY, REBECCA L — Bkg Nbr: 405115309
Loc — Money $ 0.00 — Comments — Misc — Misc

**CLC – Count: 1**

8/14/2017

Case 3:17-cv-01112-JPG Filed 08/04/17 Page 1 of 50 Document 16-7

EXHIBIT G

# Milwaukee County Office of the Sheriff
## Log Activity System

**SMU**

| User Date /Time | | Time Stamp | | User ID | POD | Log Text: | | |
|---|---|---|---|---|---|---|---|---|
| 3/10/14 | 1:33 am | 3/10/14 | 1:38 am | BTWBW | SMU | 3D workers in to clean | Misc | Misc |
| 3/10/14 | 1:38 am | 3/10/14 | 1:38 am | BTWBW | SMU | 3D crew out | Misc | Misc |
| 3/10/14 | 1:57 am | 3/10/14 | 1:57 am | BTWBW | SMU | Scheduled Inspection completed.No inmates in obvious physical distress. | Inspection | Scheduled |
| 3/10/14 | 2:27 am | 3/10/14 | 2:28 am | BTWBW | SMU | Scheduled Inspection completed.No inmates in obvious physical distress. | Inspection | Scheduled |
| 3/10/14 | 2:57 am | 3/10/14 | 2:57 am | BTWBW | SMU | Scheduled Inspection completed.No inmates in obvious physical distress. | Inspection | Scheduled |
| 3/10/14 | 3:11 am | 3/10/14 | 3:11 am | BTWBW | SMU | Break begins Wenzel, Brian | Break | Begin |
| 3/10/14 | 3:27 am | 3/10/14 | 3:27 am | DLSSDL | SMU | Scheduled Inspection completed.No inmates in obvious physical distress. | Inspection | Scheduled |
| 3/10/14 | 3:41 am | 3/10/14 | 3:43 am | BTWBW | SMU | Break ends,Wenzel, Brian | Break | End |
| 3/10/14 | 3:57 am | 3/10/14 | 3:57 am | BTWBW | SMU | Scheduled Inspection completed.No inmates in obvious physical distress. | Inspection | Scheduled |
| 3/10/14 | 4:27 am | 3/10/14 | 4:28 am | BTWBW | SMU | Scheduled Inspection completed.No inmates in obvious physical distress. | Inspection | Scheduled |
| 3/10/14 | 4:40 am | 3/10/14 | 4:41 am | BTWBW | SMU | Lt Montano Tour complete all counts in order | SGT | Tour |

**SMU – Count: 11**

1

## ASSIST WITH JAIL HEALTH CARE PROGRAM

Task #10

## WI State Statute 302.38

" If a prisoner needs medical or hospital care or is intoxicated by alcohol the sheriff or other keeper of the jail shall provide appropriate care or treatment and may transfer the prisoner to a hospital or to an approved treatment facility under s.51.45(2)(b) and (c), making provision for the security of the prisoner."

## Learning Objectives

- Identify the main purposes of intake health screening
- Know the basic guidelines for responding to inmate needs and requests for medical care
- Know the legal requirements regarding maintenance of health care records
- Know the basic guidelines when responding to medical emergencies, including diabetes, epilepsy, chronic respiratory diseases and heart conditions, and drug and alcohol issues

## Section 302.38 (5)

The sheriff or keeper of a jail is not required " to provide or arrange for the provision of appropriate care or treatment if the prisoner refuses appropriate care or treatment."

---

Case Law

ESTELLE
V.
GAMBLE

U.S. Supreme Court (1976)

---

## Deliberate Indifference

" ... deliberate indifference to serious medical needs
of prisoners constitutes the 'unnecessary and
wanton infliction of pain'...proscribed by the
Eighth Amendment. This is true whether the
indifference is manifested by prison doctors in
their response to the prisoner's needs or by prison
guards in intentionally denying access to medical
care or intentionally interfering with the treatment
once prescribed."

---

## Estelle v. Gamble

This case set the basic standard for
provision of health care in correctional
institutions, by establishing the term:

**DELIBERATE
INDIFFERENCE**

---

## 4 Basic Categories

- Deliberate failure to take proper actions to
  become aware of possibly serious medical
  needs, including during intake screening

- Deliberate failure to take appropriate
  actions or seek medical help upon noticing
  that an inmate seems to be apparently
  seriously ill or injured

---

9

## INMATE REQUESTS FOR HEALTH CARE

KEY POINT:

Never ignore an inmate's request to be seen during sick call, or take it upon yourself to determine that any request is invalid or that the inmate need not be seen.

*To do either of these things could be "deliberate indifference" to an inmate's medical care needs.*

## Evaluate and Act

- Contact jail medical staff
- Give inmate a sick call slip
- Contact supervisor, if appropriate
- If above options aren't available, then convey inmate to a medical facility
- DOCUMENT ALL NOTIFICATIONS AND ACTIONS TAKEN !!

## Detection of Non-Emergency Medical Needs

- Your personal observation
- Other inmate's observation
- Information from an outside source
- Hearing complaints, but no request for medical care

## TRUISM

IF YOU DIDN'T WRITE IT DOWN,
AND IT WOULD'VE MADE YOU LOOK GOOD,
IT DIDN'T HAPPEN !!!

## Emergency Situations

- Injuries resulting from disturbances
- Injuries resulting from suicide attempts
- Alcohol and drug-related reactions
- Medical Emergencies   (Diabetes, Seizures)

## Emergency Situations

- Injuries resulting from disturbances
- Injuries resulting from suicide attempts
- Alcohol and drug-related reactions
- Medical Emergencies   (Diabetes, Seizures)
- Mental illness emergencies
- Fire and other disasters

## Emergency Situations

- Injuries resulting from disturbances
- Injuries resulting from suicide attempts
- Alcohol and drug-related reactions
- Medical Emergencies   (Diabetes, Seizures)
- Mental illness emergencies

## Initial Medical Assessment

- Determine the level of consciousness

14

**RESPONDING TO MEDICAL EMERGENCIES**

**3 Questions to Ask During a Diabetic Emergency**

1) Have you eaten today?

2) Did you eat anything you weren't supposed to eat?

3) Have you taken your insulin today?

**DIABETES**

Two types of diabetic emergencies:

- Diabetic Coma   (Hyperglycemia)
      Too much sugar, not enough insulin

- Insulin Shock   (Hypoglycemia)
      Too much insulin, not enough sugar

**EPILEPSY (Seizures)**

- Epilepsy is a symptom of a disorder in the brain that is characterized by attacks of unconsciousness
- These attacks (seizures) can occur from a number of causes, including an inherited condition, an old brain injury with a scar, a head injury, brain tumor, severe fever, or alcohol or drug withdrawal

18

## 2 Types of Seizures  (cont.)

### More Severe

-- formerly called "grand mal"
-- now known as tonic-clonic seizures
-- characterized by attacks of violent convulsions that usually last for one to several minutes

## Common Occurrences During a Typical Seizure

- Person suddenly becomes rigid as all muscles tense, then falls to the ground and begins convulsing

## 2 Types of Seizures

### Less Severe

-- formerly called "petit mal"
-- characterized by a blank stare or brief fluttering of the eyelids; subject may not know that (s)he had a seizure

## Common Occurrences During a Typical Seizure

- Person suddenly becomes rigid as all muscles tense, then falls to the ground and begins convulsing
- Person may have an "aura," which is a warning sign (smell, sound, visual sensation)

19

Common Occurrences During a Typical Seizure

- Person suddenly becomes rigid as all muscles tense, then falls to the ground and begins convulsing
- Person may have an "aura," which is a warning sign (smell, sound, visual sensation)
- Breathing usually stops during the initial muscle-tensing period, lasting as long as 30 seconds

Common Occurrences During a Typical Seizure

- Face may become bluish at height of seizure

Common Occurrences During a Typical Seizure

- Person suddenly becomes rigid as all muscles tense, then falls to the ground and begins convulsing
- Person may have an "aura," which is a warning sign (smell, sound, visual sensation)
- Breathing usually stops during the initial muscle-tensing period, lasting as long as 30 seconds

Common Occurrences During a Typical Seizure

- Face may become bluish at height of seizure
- Person may bite his / her tongue

20

## Common Occurrences During a Typical Seizure

- Face may become bluish at height of seizure
- Person may bite his / her tongue
- Person may lose control of bladder / bowel functions

## Common Seizure Medications

- Dilantin
- Tegretol
- Mysoline

## Common Occurrences During a Typical Seizure

- Face may become bluish at height of seizure
- Person may bite his / her tongue
- Person may lose control of bladder / bowel functions
- After the seizure, person will likely sleep very deeply

## Responding to a Seizure

- Remove other inmates from the area

### Responding to a Seizure

- Remove other inmates from the area
- Do not try to restrain or revive the inmate

### Responding to a Seizure

- Remove other inmates from the area
- Do not try to restrain or revive the inmate
- Clear the immediate area of any objects that may cause harm to the inmate
- Protect the inmate's head by placing something soft and thin under it

### Responding to a Seizure

- Remove other inmates from the area
- Do not try to restrain or revive the inmate
- Clear the immediate area of any objects that may cause harm to the inmate

### Responding to a Seizure
(cont.)

- Do NOT force anything into the inmate's mouth

22

### Responding to a Seizure
(cont.)

- Do NOT force anything into the inmate's mouth
- If possible, turn the inmate's head to one side to allow for fluid drainage

### Document the Following

1. Length of the seizure

### Responding to a Seizure
(cont.)

- Do NOT force anything into the inmate's mouth
- If possible, turn the inmate's head to one side to allow for fluid drainage
- If no medical staff is on duty, you may have to activate EMS -- follow your agency's procedures

### Document the Following

1. Length of the seizure
2. Types of movements during convulsions

Case 2:17-cv-01112-JPS   Filed 03/14/19   Page 12 of 50   Document 167-7   MKE County  1288

**Document the Following**

1. Length of the seizure
2. Types of movements during convulsions
3. Color of inmate's skin (lack of oxygen)

**Document the Following**

1. Length of the seizure
2. Types of movements during convulsions
3. Color of inmate's skin (lack of oxygen)
4. Any loss of bladder / bowel control
5. Anything notable about inmate's breathing

**Document the Following**

1. Length of the seizure
2. Types of movements during convulsions
3. Color of inmate's skin (lack of oxygen)
4. Any loss of bladder / bowel control

**Document the Following**

1. Length of the seizure
2. Types of movements during convulsions
3. Color of inmate's skin (lack of oxygen)
4. Any loss of bladder / bowel control
5. Anything notable about inmate's breathing
6. Any injuries sustained

24

## RESPIRATORY EMERGENCIES

Asthma

A *chronic* disease characterized by acute attacks of difficulty breathing

Signs & Symptoms

-- Labored breathing

-- Whistling or wheezing on exhalation

-- Bluish-colored skin

-- Apprehension due to inability to breathe well

---

Responding to Respiratory Emergencies

• Notify Medical Staff or activate EMS

• Ask the inmate how you can help

• Help the inmate assume a comfortable position (usually sitting up)

• Loosen tight clothing

• Assist the inmate in using prescribed inhalers (refer to your agency's procedures)

---

## Respiratory Emergencies (cont.)

Emphysema

A serious, *non-reversible* lung disease, most often the result of **long-term, heavy smoking**

Signs & Symptoms

-- Difficulty breathing, use of accessory muscles

-- Pursing of lips to puff air out

-- Barrel-like chest

-- Possible dry, hacking cough

-- Shortness of breath after minimal exertion

---

## HEART-RELATED EMERGENCIES

Angina Pectoris

Heart condition characterized by sudden attacks that include chest pain, shortness of breath, and possible nausea and sweating

Angina patients are commonly prescribed Nitroglycerine, given in tablet or spray form

25

MKE County 1288

## HEART-RELATED EMERGENCIES (cont.)

Myocardial Infarction

Literally, " death of the heart muscle"

Commonly known as "heart attack"

Symptoms are sudden chest pain (pressure), possibly radiating to the left arm, jaw, or back; profuse sweating; and possible nausea

## Responding to Heart-Related Emergencies

- Contact medical staff or activate EMS
- Help the inmate assume a comfortable position
- Loosen tight clothing
- Calm and reassure the inmate
- Be prepared to begin CPR, if needed

## HEART-RELATED EMERGENCIES (cont.)

Congestive Heart Failure (CHF)

Heart no longer pumps properly, resulting in damage to the heart and fluid buildup in lungs and tissues

Characterized by wet breath sounds

## HIV / AIDS: GENERAL INFORMATION

- AIDS develops as the result of infection with the HIV virus.
- The HIV virus is spread by contact with blood or bodily fluids of a person who is infected with the virus.
- A person does not have AIDS as soon as he or she has been infected.

26

## DRUGS



## Alcohol / Drug Reactions  (cont.)

Inmates who have abused alcohol and drugs may also have other medical problems

Inmates abusing drugs may exhibit signs of behavioral or psychological problems

Example: PCP (Angel Dust) -- may cause user to experience delusions that others want to hurt or kill him/her, and will display extreme fear / aggression

## ALCOHOL / DRUG REACTIONS

Alcohol is the most widely abused drug in the United States

Other common drugs of abuse are marijuana, cocaine, heroin, hallucinogens, and prescription drugs (Valium, Oxycodone, Oxycontin, etc.)

## Indicators of Possible Alcohol and Drug Abuse

- Confusion or disorientation
- Inability to stand or walk normally
- Unusual restlessness
- Slurred speech
- Lethargy   (slow, sleepy behavior)
- Breathing that is very rapid and/or shallow
- Severe agitation or aggressiveness
- Pupils that are very dilated or pinpoint

30

## Indicators of Possible Alcohol and Drug Abuse (cont.)

- Feeling of being very hot or very cold
- Sudden collapse
- Track or needle marks
- Tremors
- Excessive irritability
- Hallucinations
- Delusions
- Strange or bizarre behavior

## ALCOHOL WITHDRAWAL

- Alcohol withdrawal is the most serious type of drug withdrawal, as it is potentially fatal

- Signs and symptoms of withdrawal may begin as early as *seven to eight* hours after the last drink, and include:

| | |
|---|---|
| Tremors | Disorientation |
| Profuse sweating | Hallucinations |
| Delusions | |

## Alcohol and Drug Abuse

A newly accepted inmate that is believed to be under the influence of alcohol and/or drugs should be monitored at intervals of at least every **15** minutes

## Delirium Tremens (DTs)

- Profound confusion or disorientation
- Delusions
- Vivid hallucinations
- Shaking
- Feeling of severe agitation and fright
- Rapid pulse and breathing
- Pale skin
- Sweating
- High fever (along with possible seizures)
- Vomiting
- Curling into a fetal position

31

## Delirium Tremens

- If you witness an inmate experiencing these symptoms, consider it a medical emergency

- This final stage of alcohol withdrawal is potentially life-threatening, thus requiring immediate medical attention

## Methamphetamine Users

- Powerful addictive stimulant drug that affects the central nervous system
- Made using over the counter cold medication
- Can be smoked, sniffed, orally ingested and injected
- Meth. has a much longer time of action in the body. It takes 12 hrs to remove 50% of it from the body (cocaine takes 1 hour to remove 50%)

## DT'S



## Methamphetamine short term effects

- Increased attention and decreased fatigue
- Increased activity
- Decreased appetite
- Euphoria
- Increased respiration
- Hyperthermia

32

MKE County 1295

## Methamphetamine
what the inmate can expect
during withdrawal

- Sleep a lot for a few days
- Encourage them to eat and drink
- Bodies will ache fro sleeplessness and muscle stiffness
- Experience mood swings feelings of paranoia and delusions







33

 

 

34



## TRAUMA RULES

- Stabilize the scene
    - Don't get tunnel vision

- Follow universal precautions



## Types of Bleeding

- Arterial--spurting

- Venous--steady

- Capillary--oozing

## Bleeding Treatment

- Direct pressure
- Elevate area-if no major injury is suspected
- No Tourniquets-response time is quick

- *ALWAYS WASH HANDS AFTER TREATMENT-EVEN IF GLOVES WERE WORN*



*THE*
*END*

QUESTIONS

36

MKE County 1299

# RESPONDING TO INMATE NEEDS / REQUESTS FOR MEDICAL OR HEALTH CARE

The next important element in an effective jail health care program is a consistent system for identifying and responding to the needs of inmates for medical and health care. This involves:

- Responding to inmate requests for health care;

- Being aware of non-emergency medical or health care needs, and responding to these; and

- Being aware of emergency medical or health care needs, and responding to these.

## INMATE REQUESTS FOR HEALTH CARE

Every jail should have a procedure in place by which inmates can request medical/health care. This may range from a request for a simple non-prescription medication, like aspirin, to a request to be seen during next sick call to a request for immediate medical attention.

DOC 350.18 requires that each jail have policies and procedures regarding these issues. Specifically, it is required that each jail's policies on inmate health screening and care includes the following:

1. *Names, addresses and telephone numbers of health care providers or agencies who have agreed to provide emergency and other health care services for special needs inmates;*

2. *Procedures for the referral of an inmate to jail health care staff or to other agencies which provide health care;*

3. *Designation of staff who have the authority to make health care decisions, including emergency medical and dental care;*

4. *Non-emergency health care, including use of an inmate's personal physician;*

5. *Schedule of inmate access to routine medical care;*

6. *Procedure for processing inmate medical requests, including written dispositions;*

MKE County 1315

7.    *Documentation in an inmate's medical file of any referral and identification of the services provided, including emergency services.*

Your task is to know and follow your jail's policies and procedures in regard to all of the above.

It is very important for you to be familiar with your policies and procedures regarding inmate requests to be seen by jail medical staff during sick call.

Usually, jail policies require that inmate requests to be seen during sick call must be in writing. There are at least two good reasons why this is good practice:

✓  Requiring that a request be in writing means that there will be a record of the request. If requests are saved (as they should be), it makes it more difficult for an inmate to later claim that he or she requested to be seen at sick call, but was denied or ignored. That is, it eliminates the necessity for jail staff to have to try to recall whether or not an inmate requested health care; and

✓  From an operational perspective, it makes your job easier if requests are in writing because you do not need to remember what inmates said or verbally requested.

However, even if your jail policy indicates that requests are to be in writing, some inmates may not be able to read or write English or may not be able to read or write in any language. Such inmates cannot be denied access to medical care just because they cannot write. In such a case, it may be necessary for you or someone else to write out the inmate's request, to be passed on as appropriate. Another option is to have a request form printed in other languages, such as Spanish, for inmates who cannot read or write English.

When an inmate requests to be seen during sick call, it may be appropriate to verbally ask him or her the reason for the request. The purpose of doing so is not to invade the inmate's privacy or medical confidentiality, but simply to try to determine if the inmate may have a problem that seems to require immediate attention, rather than waiting for the next scheduled sick call. This may be particularly important if the next sick call is several days away, or if you have any reason to believe that an inmate may have an illness or injury which may require timely attention. If an inmate declines to answer your question, that should NEVER result in a decision to disallow his or her request to be seen during sick call.

Whether or not an inmate answers your question, if you have reason to believe that the inmate should be seen by a medical professional prior to the next scheduled sick call, you should refer the inmate for such care, on your own. This may involve transporting the inmate to a hospital or emergency clinic, or it may involve simply contacting a medical or mental health professional to let them know your concerns. Or, it may simply involve adding the inmate's name to the next sick call list. If you do so, be sure to note the reason for this action - that is, the reason you felt the inmate should be seen.

Case 2:17-cv-01112-JPS   Filed 03/14/19   Page 24 of 50   Document 167-7
MKE County 1318

When you receive requests from inmates to be seen during sick call, route such requests properly, according to your policies and procedures.

**NEVER** ignore an inmate's request to be seen during sick call, or take it upon yourself to determine that any request is invalid or that the inmate need not be seen. To do so could be construed as "deliberate indifference" to an inmate's medical care needs. You may think that an inmate is not really sick or injured, or that he/she has ulterior motives for wanting to see the doctor or nurse. You may be correct, but that is beside the point. If you ignore a request by an inmate to be seen during sick call, you are essentially making a medical decision which, legally, you are not qualified to make. That leaves you wide open to potential legal liability, based on the standard in the *Estelle v. Gamble* ruling.

Even if an inmate requests to be seen during sick call *every time* that there is sick call, do not ignore his or her requests. Simply follow the standard procedure for routing inmate requests, each and every time.

In addition to requests to be seen during sick call, inmates may request other forms of health care. Some include:

- A request for a non-prescription medication, such as aspirin or other pain reliever, antacid, cold or cough medicine, and so on;

- A request to see their personal physician or dentist;

- A request to see a medical specialist for evaluation or treatment.

Know and follow your jail's policies and procedures for handling and disposition of such requests.

Remember that DOC 350.18 specifically requires that there be policies addressing "use of an inmate's personal physician." Some jails require that a jail medical staff member is authorized to determine whether or not an inmate may see his or her own personal physician.

Again, it is very important that you, as a line officer, not simply ignore an inmate's request for these or other forms of health care. Instead, follow procedures for referral of requests, and do not take it upon yourself to determine that any request is invalid or unworthy or unnecessary.


# RESPONDING TO NON-EMERGENCY MEDICAL OR HEALTH CARE NEEDS

Remember that another of the ways which you could be "deliberately indifferent" to serious medical needs of inmates is to be aware of a possibly-serious non-emergency medical or health care need of an inmate, but not respond adequately to that need. If

Case 2:17-cv-01112-JPS   Filed 03/14/19   Page 25 of 50   Document 167-7
MKE County 1349

- **Document all of your observations and actions carefully**. Follow your jail's procedures for doing so. Remember: your documentation is your way of proving that you took proper actions. Your documentation is your written justification for actions taken or not taken.

- **Refer inmates to jail health care providers whenever you think necessary**. Follow your jail's policies and procedures for doing so.

  Remember: in terms of provision of health care, part of your "duty of care" is not only to be aware of obvious indications of possibly-serious health care problems of inmates, but also to do something to get care for an inmate once you notice any such indication. This applies whether or not the inmate requests such care.

  Remember that your failure to take proper action for a possibly-serious situation which has come to your attention could amount to "deliberate indifference" to an inmate's rights.

  At the very least, if you notice and are concerned about a problem related to an inmate's alcohol or drug use, contact the jail nurse, physician, etc., to describe the situation and to seek advice. Document that you made any such contact.

Respond to Emergency Situations

In addition to non-emergency situations related to use or abuse of alcohol or drugs by inmates, you are also likely to encounter potential or actual emergencies. In dealing with such emergencies, you will respond according to the steps in the **FIRST RESPONDER PHILOSOPHY**. Your response to these types of emergencies will be the same as for any other type of medical emergency.

There are several things to keep in mind about responding to medical emergencies related to an inmate's use of alcohol and/or drugs:

- **Alcohol withdrawal is potentially a very serious medical emergency. A person can die as a result of alcohol withdrawal**. Therefore, it is a situation that you need to be aware of and for which you need to try to ensure provision of medical intervention.

  Alcohol withdrawal may occur with long-time, heavy-use drinkers when they stop drinking. As noted, it is to your advantage to try to learn, during intake screening, that an inmate may be a long-time, heavy-use drinker. If you know that, then you are aware of the possibility that he or she may undergo withdrawal while in the jail.

  The signs and symptoms of withdrawal may begin as early as seven to eight hours

Case 2:17-cv-01112-JPS   Filed 03/18/19   Page 26 of 50   Document 167-7
MKE County 1372

## MEMO BOOK

✓ Make notes of observations made at the scene
✓ Write neatly- your book may be subpoenaed for court (civil and/or criminal)
✓ Document EVERY day for the rest of your career. Even if you are not working, note day/date and how you were carried for the day

---

## DO NOT ERASE

## DO NOT TEAR PAGES OUT

## DO NOT USE WHITE OUT

## DO NOT LEAVE BLANK SECTIONS

*Black pen Always*

*OK to put in late entry at the end of the day*

---

## HEADERS

*Tuesday March 11, 2008*

*Patrol Division*

0700- Begin Tour of Duty- Roll Call- Capt. Smith, Sgt. Jones

0720- Patrol Sector 2

0730- P.I. Accident- I94 W/B at 92nd St.

   2 car minor P.I.

   Johnson/James m/w 01/01/01

   James/Terry f/w 01/01/01

   See accident report #

---

## Scope of Documentation

The scope of documentation varies from division to division. Divisional supervisors should determine the scope by reviewing the memo books and providing feedback and guidance to the Deputies and C.O.'s

---

## For instance...

- Patrol- weather, citations accidents, tows, motorist assists, etc.
- Airport- Post assignments, Alerts, SIDA Badge checks, etc.
- Detention- suicide watches, disciplines, medical referrals, etc.
- Courts- High security trials, high security prisoner appearances
- All citizen complaints and the referrals that are made

---

This list is not all-inclusive. Individual entries regarding issues that arise during a tour of duty would supplement this information.

Supervisors will denote in the employee's agency-issued memorandum book the date and reviewing officer's identifying data.

## Conceptual Bases of the POSC® System

- The Control Theory
- First Responder Philosophy
- Disturbance Resolution Model

23

Control Theory

___

## The Control Theory

- Explains the purpose of control and distinguishes proper police action from behavior that might otherwise be criminal.

- Two key principles
  - POSC® is a system of verbalization skills coupled with physical alternatives; and
  - The purpose of POSC® is control.

24

## POSC®: A system of Verbalization Skills Coupled with Physical Alternatives

- You've got to be nice..until it's time not to be nice 

- Verbalization skills are psycho-motor skills

- Keep it P.G. ("parental guidance")

25

Remember it's not personal it's just business

Psycho motor skills. repeated phrase that comes out naturally

clean mouth.

use your psycho motor skills ALL THE TIME

MKE County 2132

*4 types.*

## Types of Correctional Emergencies

**Disturbance emergencies**
**Medical emergencies**
**Fire emergencies**
**Miscellaneous emergencies**



32

---



## 10 Steps of the First Responder Philosophy

1. Arrive
2. Assess
3. Alarm
4. Evaluate
5. Enter
6. Stabilize

33

---

## First Responder Philosophy

7. **Initial medical assessment ( 5 steps)**
   - Determine the level of consciousness
   - Check Airway,Breathing,Circulation — *write out all the way for testing* 
   - Perform a body check
   - Treat to your level of training
   - Continue to monitor the subject
8. **Long term monitoring**
9. **Communication**
10. **Documentation/Debriefing**

34

## Arrive ①

■ Become aware of the emergency:
  ◆ Officer initiated
  ◆ Dispatch initiated
  ◆ Inmate initiated
  ◆ Other source
    *Someone from outside calling in*

35

---

## Assess ②

■ Determine "type" of emergency:
  ◆ Disturbance
  ◆ Medical
  ◆ Fire
  ◆ Miscellaneous

36

---

## Alarm ③

■ Notify the control center and request back up if deemed appropriate
■ Alarm my be given:
  ◆ Verbally
  ◆ Via radio
  ◆ Phone
  ◆ Panic button, etc.

37

**Evaluate** 4

- Is this a set-up?

- Tactical Evaluation

38

---

**Enter** 5

- When appropriate to do so based on:
  - Training and experience
  - Policy and procedure
  - Past practice
  - Safety and efficiency

39

Dont go in just because you're the first one there.

---

**Stabilize** 6

- Subjects

- Scene

40

realize what wave of help you are if the subjects are contained then you are responsible for the scene.

**7**

## Initial Medical Assessment

- Determine level of consciousness
- Check Airway,Breathing,Circulation
- Perform a body check
- Treat to your level of training
- Continue to monitor the subject

41

**8**

## Long-term Monitoring

- Does subject have any "special needs"
  - Medical concerns
  - Mental health concerns
  - Security concerns

42

**9**

## Communication

- Communicate with staff members and others to ensure the most appropriate response to the situation:
  - What did you have?
  - What type of assistance is needed?
  - Who is bringing any required equipment?
  - Do you have enough assistance on scene?
  - When is the emergency over?

43

must keep m.c. in the loop

# *Principles of Subject Control*

## A Training Guide for Jail and Detention Officers



**Wisconsin Department of Justice
Law Enforcement Standards Board
June, 2012**

The Law Enforcement Standards Board approved revisions to this textbook on June 5, 2012.

**Training Academy effective date is May 1, 2013.**

All law enforcement basic preparatory training courses that begin on or after May 1st, 2013 must incorporate this updated textbook and any related updates to the curriculum. Courses beginning before that date may elect to use these updated materials.

# THE FIRST RESPONDER PHILOSOPHY

## The Proper Way to Respond to Correctional Emergencies

| ACTIVITY | RESPONSE CUES |
|---|---|
| 1. ARRIVE at the scene. | Become aware of the emergency. |
| 2. ASSESS the situation. | Determine the type of emergency. |
| 3. ALARM is given. | Notify dispatcher or control center / get back-up responding, if needed. |
| 4. EVALUATE the situation. | Determine if this is a set-up. |
| 5. ENTER the emergency site. | Do so when you have sufficient back-up and it is appropriate to enter. |
| 6. STABILIZE the subject and scene. | Restrain subject(s), if appropriate. |
| 7. INITIAL MEDICAL ASSESSMENT | Remember that you need to stabilize the subject before proceeding to this step. |

   a. Determine level of consciousness (yes/semi-conscious/no).
   b. Check ABC's (check airway, breathing, circulation).
   c. Perform a body check for severe bleeding, gross deformities, etc.
   d. Treat to your level of training; activate emergency medical system (EMS), if appropriate.
   e. Continue to monitor the subject (stay close; watch closely).

| | |
|---|---|
| 8. LONG-TERM MONITORING | Determine if the subject has "special" needs which require additional care/supervision. |
| 9. COMMUNICATION | Determine: What do you have? What type of assistance is needed? Who is responding? Who is bringing in the emergency equipment? When do you have enough assistance on the scene? When is the emergency over? Etc. |
| 10. DOCUMENT/DEBRIEF | Prepare detailed report(s) on what led up to the situation, what occurred during the emergency, and how staff followed up after the emergency, as well as the findings of any investigation which follow the emergency. Remember: if staff members do not discuss and evaluate their responses, they will keep making the same mistakes. |

Here is a more detailed explanation of each step.

**Arrive**

In this step, you become aware of the emergency situation, by arriving on the scene. Your arrival may be initiated by you or another officer, information from an inmate or inmates, or other source.

**Assess**

In this step, you determine the type of emergency that you are dealing with—whether a disturbance, medical, fire or miscellaneous emergency.

**Alarm**

In this step, you notify the control center in the facility and request back-up to respond, if needed. An alarm may be given orally or via radio, phone, panic button, etc., depending upon the situation.

**Evaluate**

In this step, you evaluate the situation to determine if it is a set-up, or ruse, and consider other information to decide how best to respond. You do this based upon factors considered within a tactical evaluation, as described later.

**Enter**

In this step, you enter the site of the emergency—but only when you have sufficient back-up and it is appropriate to do so. Your decision as to when it is safe to enter the site of an emergency will be based on your training and experience, policies and procedures of your facility, and past practices. Remember that proper police action always balances safety and efficiency.

**Stabilize**

You must stabilize both the scene and any subjects (inmates) to ensure safety of all persons and security of the facility. Stabilization must be accomplished before proceeding to the next steps in the First Responder Philosophy. You can stabilize a subject through your presence alone, or through presence and verbalization, if he or she complies with your verbal directions. If verbal directions do not work, the subject can be stabilized physically, either prone on the ground or against a vertical surface, such as a wall.

Stabilizing a subject means getting the person in a position where you can apply restraints, such as handcuffs or placement in a restraint chair. Once the subject has been stabilized, you decide whether it is necessary to apply restraints. The purpose of applying restraints is to maintain control—that is, to prevent the person from being able to harm you, himself or herself, or anyone else. That decision is based upon

Case 2:17-cv-01112-JPS   Filed 08/31/18   Page 36 of 50   Document 167-7

your tactical evaluation, including your knowledge of the particular subject(s) involved as well as your agency policies. Stabilization and restraint use are discussed in more detail in a later section of this text.

You must also stabilize the scene. This means that you keep people away from the scene unless they have business there and follow any applicable procedures for preserving evidence to facilitate investigation.

**Initial Medical Assessment**

In this step, you conduct a basic assessment to determine if a subject has any medical problems needing attention. This assessment includes at least the following:

- determining the subject's level of consciousness
- checking ABC's (airway, breathing and circulation)
- performing a body check for severe bleeding, broken bones, obvious contusions, or any gross (significant) deformities

Based on your assessment, provide treatment to your level of training. That may include first aid, cardio-pulmonary resuscitation (CPR), EMT skills, etc.

If it appears that the subject requires emergency medical or psychiatric care, based on your assessment or the subject's request, activate the emergency medical system, as directed by your agency's policies and procedures.

Continue to monitor subjects for as long as necessary, based on your assessment of his or her medical, mental health and/or security needs.

These steps are discussed in more detail in a later section of this text.

**Long-Term Monitoring**

In this step, you determine if any subject has "special needs" that require additional care or supervision. These may include medical concerns, mental health concerns, and/or security concerns.

**Communication**

In this step, you communicate with staff members and others as needed to ensure the most appropriate response to the correctional emergency situation, and to obtain information to assist both during and after the situation. Some of the common information that must be communicated includes answers to these questions:

- What did you have?
- What type of assistance is needed?
- Who is responding?
- Who is bringing any required emergency equipment?

- When do you have enough assistance on the scene?
- When is the emergency over?

You may communicate with any or all of the following: subjects, witnesses to an incident, fellow officers, the facility control center, responding officers from outside the agency (such as law enforcement officers), supervisors, and other responding professionals.

### Document/Debrief

In this final step, you document an incident by preparing a detailed report on what led up to the correctional emergency, what occurred during the emergency, and how you and other officers followed up after the emergency. Additionally, your report may contain information on any findings of a follow-up investigation. Document information according to your facility's policies and procedures, in any of the following formats: a daybook, shift log, living area log, specialized forms, incident report, offense report, memorandum, and so on.

Written documentation of use of force incidents is discussed in detail in a later section of this text.

In this step, you also debrief. Debriefing is a procedure in which people involved in an emergency situation talk about the incident to assess what happened during it and to learn what, if anything, can be done to improve future performance in similar situations. The purpose of debriefing is not to assign blame for anything that went wrong during an incident. Mistakes may happen during an incident, but blame is less important than making positive changes based on what was learned. Remember: If officers do not discuss and evaluate their response, they are more likely to keep making the same mistakes.

There are different levels of debriefing—some more formal than others. They include:

- individual officers
- subjects involved in an incident
- witnesses to an incident
- other officers present at an incident
- responding officers
- other responding professionals
- supervisors
- command staff

The primary purpose of debriefing at all levels is to improve future performance. As a result of debriefing, revisions may be made to written policies and procedures, training, documentation requirements, and/or supervision of employees.

The First Responder Philosophy is a useful tool because it gives you a sound framework to know and follow when you become aware of and respond to any kind of

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

REBECCA TERRY,

                    Plaintiff,

                                                    Case No. 17-CV-1112

v.

COUNTY OF MILWAUKEE, et al.,

                    Defendants.

---

## DEFENDANTS MILWAUKEE COUNTY, CLARKE, WENZEL, EXUM, BEVENUE AND HOOVER'S <u>THIRD SUPPLEMENTAL</u> RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

---

Defendants Milwaukee County, David A. Clarke, Jr., Brian Wenzel, Carolyn Exum, Morgan Bevenue and Margaret Hoover provide this second supplemental response to *Plaintiff's First Set of Requests for Production to County Defendants*:

### <u>RESPONSES TO REQUESTS FOR PRODUCTION</u>

<u>**REQUEST NO. 1.**</u>     All Documents, including any physical evidence, which relate to, support and/or rebut any of the allegations or claims in Plaintiff's Complaint, including documents the County may rely upon to support any Answer, Affirmative Defense, or Responses to Interrogatories.

<u>**RESPONSE:**</u>  *Object to the request as vague, multiple and overly broad. Further object to the request as premature inasmuch as discovery is not completed.  Further object on grounds that Plaintiff has withheld and prevented Defendants' access to documents believed to be relevant and responsive, including pertinent medical records. Subject to the objections, Defendants submit that the following may be responsive:*

1.    *Housing, booking, and inmate classification documents concerning Rebecca Terry, see documents Bates stamped as MKE County 1 – MKE County 193;*

2.    *Froedtert Hospital medical records for Rebecca Terry and infant child (not in defendants' possession);*

3.    *Aurora Health Care & Aurora Sinai Medical Center records for Rebecca Terry and infant child (not in defendants' possession).*

4.    *Documents produced herewith.*

**SUPPLEMENTAL RESPONSE DATED 2/28/18**: *Please see Froedtert Hospital medical records produced by Plaintiff (TERRY 000296-000389).*

**REQUEST NO. 2.** All Documents obtained via third party subpoena in this litigation.

**RESPONSE:** *Defendants will endeavor to cooperate in sharing such records, as required by the Rules of Civil Procedure.*

**REQUEST NO. 3.** All documents relating to Plaintiff, including but not limited to any Documents related to medical care that Plaintiff received while in the custody of the Milwaukee County Jail, including any documents obtained from third parties.

**RESPONSE:** *Object to the request as vague, overly broad and unduly burdensome. Neither the individual defendants nor the County Defendants' counsel have access to or know the universe of documents that may "relate" to Plaintiff. Subject to the objection, after reasonable effort, all known documents related to the incident at issue have been or are produced herewith.*

**REQUEST NO. 4.** All Documents related to the shackling of Plaintiff while in the custody of Milwaukee County.

**RESPONSE:** *Object to the request as vague, overly broad and unduly burdensome, including, but not limited to, vagueness as to time. Subject to the objections, see Hospital Watch*

*Logs (MKE County 15-29) and Detention Bureau – Hospital Watch/Run OP 13 (MKE County 194 – 198).*

**REQUEST NO. 5.** The complete personnel files, including information related to discipline, licensure, qualifications, and evaluations, of all Defendants.

**RESPONSE:** *Object to the request as vague, overly broad and not reasonably calculated to the discovery of admissible information. Subject to the objection, see the redacted personnel file for Correctional Officer Wenzel (MKE County 199-232). Defendants Exum, Bevenue and Hoover are no longer employees of Milwaukee County and therefore do not have "personnel files".*

**SUPPLEMENTAL RESPONSE DATED 2/28/18:** *Subject to the above objections, please see the employment files of Margaret Hoover and Carolyn Exum produced herewith (MKE County 454-989). Defendants have undertaken to locate a similar file for Ms. Bevenue but have been unsuccessful.*

**SUPPLEMENTAL RESPONSE DATED 4/16/18:** *By e-mail dated April 3, Plaintiff's counsel asserted, "Defendant Wenzel testified that he has training materials at home. Those documents are responsive to Plaintiff's Request for Production No. 5 in Plaintiff's First Set of Requests for Production and should have been previously produced (before the defendant's deposition)." Object to this request on the grounds that materials given to Wenzel during training and maintained by him in personal files at his home are not responsive to the request for "the complete personnel files, including information related to discipline, licensure, qualifications, and evaluation . . . ." However, because we believe these documents would be*

*discoverable pursuant to a properly framed request, Wenzel's personal files are provided herewith at MKE County 1012-2833, subject to the objection.*

**REQUEST NO. 6.**     Any written or otherwise recorded statements relating to the events described in Plaintiff's Complaint.

**RESPONSE:**  *See Wenzel Incident Report (MKE County 11-14 and 224).*

**REQUEST NO. 7.**     All Documents relating to any investigation of the events on March 9-10, 2014 described in Plaintiff's Complaint, including but not limited to any post-incident review(s).

**RESPONSE:**  *See Wenzel Incident Report (MKE County 11-14 and 224).*

**REQUEST NO. 8.**     All Documents relating to any investigation, administrative review process, or any disciplinary process initiated as a result of the events described in Paragraphs 50 and 56-67 of Plaintiff's Complaint.

**RESPONSE***: See foregoing response No. 7.  No additional documents responsive to the request are known to exist.*

**REQUEST NO. 9.**     All Documents reflecting the work schedules, work assignment location, and work duties, activities, and responsibilities of Defendants on March 9-10, 2014.

**RESPONSE:** *Object to the request as vague, overly broad and not reasonably calculated to the discovery of admissible information.  Subject to the objection, see Milwaukee County Sheriff's Office Correctional Officer schedule March 9, 2014 – March 10, 2014 and the Milwaukee*

*County Sheriff's Office Lieutenant's schedules March 9, 2014 – March 10, 2014, produced herewith (MKE County 233–236 and MKE County 237).*

**REQUEST NO. 10.** All Documents that support or relate to any of your responses to any of Plaintiff's Interrogatories in this case.

**RESPONSE**: *Object to the request as vague and incorporate by reference the objections and responses to the corresponding interrogatories. Subject to the objection, see documents produced with Initial Disclosures (housing, booking, and inmate classification, documents documents Bates stamped as MKE County 1 – MKE County 193); Froedtert Hospital medical records for Rebecca Terry and infant child (not in defendants' possession); Aurora Health Care & Aurora Sinai Medical Center records for Rebecca Terry and infant child (not in defendants' possession); other Terry medical records (infant and plaintiff; not in defendants' possession); documents produced herewith.*

**REQUEST NO. 11.** All Documents reflecting the names, work schedules, work assignment location, and work duties and responsibilities of all health care providers, medical personnel, or other individuals responsible for administering medication or medical care to detainees (including but not limited to doctors and nurses) at Milwaukee County Jail on March 9-10, 2014.

**RESPONSE:** *Object to the request as vague, overly broad and not reasonably calculated to the discovery of admissible information. Subject to the objection, healthcare providers relevant to Ms. Terry's care are referenced in her medical records, previously produced. These defendants*

*do not have medical staff work schedules or job descriptions. See Armor Response to Request No.*

*10, ARMOR 00043-00050.*

**REQUEST NO. 12.** All cell rosters or other Documents reflecting the identities and locations of inmates detained at the Milwaukee County Jail infirmary from March 9, 2014 through April 9, 2014.

**RESPONSE***: Object to the request as overly broad, unduly burdensome, and invading privileges and privacy of third-parties, including, but not limited to, statutorily protected rights of confidentiality. Further object on grounds the request seeks information neither relevant to the matter nor reasonably calculated to lead to the discovery of admissible information. No documents will be produced in response to the request as currently presented.*

**SUPPLEMENTAL RESPONSE DATED 2/28/18***: Subject to the above objections, please see the infirmary cell roster from 3/9/14 to 3/10/14 produced herewith (MKE County 990). This information is produced in compromise of the pending motion, pursuant to the Court's authority, confidential and subject to both protective orders entered by the Court in this matter.*

**REQUEST NO. 13.** All Documents relating to the administration of health care services at Milwaukee County Jail, including but not limited to, complete and unredacted contracts for services, training records of health care providers, evaluations of health care providers, qualifications of health care providers, professional or internal discipline of health care providers, staff listings, staff evaluations, staff training, staff discipline, procedures for obtaining medical services, and documents relating to the provision of medical services (including but not limited to

administration of medication) to Milwaukee County Jail detainees from March 9, 2009-March 9, 2015.

RESPONSE: *Object to the request as vague, overly broad, unduly burdensome and seeking information neither relevant to the matter nor reasonably calculated to lead to the discovery of admissible information. The request is so clearly unreasonable, overbroad and burdensome that it cannot be responded to in its current presentation. Plaintiff has no claim, for instance, related to "the administration of medication" and therefore medication records for every inmate for a six-year period is unreasonable. As plaintiff's counsel is aware, Milwaukee County contracted for health services from May 2013 to date of incident. Records pertaining to staffing, discipline, and evaluations of personnel who were not involved in Terry's care and employed prior to May 2013 are likely irrelevant in the request is impossibly overbroad. Subject to the objections, see Response No. 5 above and Armor contract produced at ARMOR 00063-00089.*

REQUEST NO. 14. All Documents relating to any and all complaints by detainees or any other person alleging inadequate medical care, denial of medical care, or denial of medication at Milwaukee County Jail from March 9, 2009-March 9, 2015.

RESPONSE: *Object to the request as vague, overly broad, unduly burdensome and seeking information neither relevant to the matter nor reasonably calculated to lead to the discovery of admissible information. The request is so clearly unreasonable, overbroad and burdensome that it cannot be responded to in its current presentation. Subject to the objections, and placing reasonable limitations on the request, see Armor response to Plaintiff's Request for Production No. 13. Milwaukee County contracted for health services from May 2013 through the date of the relevant incident. Per Armor's response to the same request, there were no medical*

*grievances pertaining to medical care provided to female inmates from May 2013 through March*

*2014. See Response No. 5 above and Armor contract produced at ARMOR 00063-00089.*

**REQUEST NO. 15.** All Documents relating to the Reports on Settlement Agreement in the Christensen Case Milwaukee authored by Dr. Ronald Shansky as a result of the consent decree in *Christensen, et al. vs. Sullivan, et al.*, No. 96-cv-001835. This Request includes the Reports and any Documents and Communications related to the Reports.

**RESPONSE**: *Object to the request as vague, overly broad, unduly burdensome and seeking information neither relevant to the matter nor reasonably calculated to lead to the discovery of admissible information. Further object on grounds the documents requested are public record and equally available to plaintiffs as to defendants. Subject to the objection, to defendants' knowledge, no Shansky report relates to an issue in this case. Please see Dr. Shansky's reports produced herewith as MKE County 238 – MKE County 415.*

**REQUEST NO. 16.** All Documents comprising Communications of any kind relating to the shackling of Plaintiff by Defendants, including but not limited to memos, letters, faxes, e-mails, reports, etc. This Requests (sic.) includes, but is not limited to: (a) all Communications between the Defendants and County employees relating to the allegations in Plaintiff's Complaint; and (b) all Communications with any witnesses to the events described in the complaint.

**RESPONSE:** *Object to the request as vague, overly broad and unduly burdensome, including, but not limited to, vagueness as to time. Subject to the objections, see Hospital Watch Logs (MKE County 15-29) and Detention Bureau – Hospital Watch/Run OP 13 (MKE County 194 – 198).*

**REQUEST NO. 17.** Documents sufficient to identify any Milwaukee County employee who came in contact with Plaintiff at the Milwaukee County Jail on March 9, 2014.

**RESPONSE:** *Defendants believe these materials have been provided. See Interrogatory Response No. 5 and MKE County 1 – MKE County 193.*

**REQUEST NO. 18.** Documents sufficient to identify: any Milwaukee County employee who ordered Plaintiff's transfer to or from any facility or institution for medical care, any Correctional Officers who accompanied Plaintiff when she was transported for medical care, including any transport officers, any Correctional Officers who conducted "hospital watch" or otherwise monitored her person, her location, or her medical care while in Milwaukee County custody.

**RESPONSE:** *Defendants believe these materials have been provided. See Interrogatory Response No. 5, MKE County 1 – MKE County 193 generally, and MKE County 15-27 and 176 specifically.*

**REQUEST NO. 19.** All Documents reflecting the identities of any Milwaukee County employee—including correctional officers, Sheriff's deputies, bailiffs, administrators, nurses, doctors, supervisors, or civilian employees—who conducted, observed, authorized, or supervised the shackling of Plaintiff.

**RESPONSE:** *Defendants believe these materials have been provided. See Interrogatory Response No. 5, MKE County 1 – MKE County 193 generally, and MKE County 15-27 and 176 specifically.*

**REQUEST NO. 20.** All County orders, policies, manuals, procedural guides, training guidelines or materials, rules, or practices, relating in any way to the following subjects from March 9, 2009-March 9, 2015:

      a. Access of inmates to medical treatment;
      b. Provision of medical care to inmates and detainees;
      c. Communication and coordination between jail staff and medical staff;
      d. Access of inmates and detainees to medical care outside of Milwaukee County Jail;
      e. Coordination with hospitals for treatment and care for inmates and detainees; and
      f. Staffing of medical personnel at Milwaukee County Jail.

**RESPONSE:** *Object to the request as multiple, vague, overly broad, unduly burdensome and seeking information neither relevant to the matter nor reasonably calculated to lead to the discovery of admissible information. The request is so clearly unreasonable, overbroad and burdensome that it cannot be responded to as currently presented. Subject to the objections, see Armor response to Plaintiff's Document Production Request No. 11, including identification of relevant policies in the response; Armor Index of Policies (ARMOR 00051-00062); Armor Health Services Agreement (ARMOR 00063-00089); and Detention Bureau – Hospital Watch/Run OP 13 (MKE County 194 – 198).*

**FIRST SUPPLEMENTAL RESPONSE:** *Subject to the above objections, please see pre-10/2014 Table of Contents for the Milwaukee County Jail's Policies & Procedures (MKE County 451 – 453).*

**SUPPLEMENTAL RESPONSE DATED 4/16/18**: *Subject to the above objection, please see the infirmary/SMU policy in effect in March 2014 (MKE County 1007-1011) and the Milwaukee County Jail policies and procedures in effect March 2014 pertaining to logs, records, and reports (MKE County 1001-1006). Discovery is ongoing.*

**REQUEST NO. 21.** All insurance policies or other agreements that may provide any type of coverage to Milwaukee County or any of its employees for any judgment in this case, including but not limited to: (a) all excess or umbrella insurance policies providing any type of coverage to Milwaukee County or its employees; (b) notice letters or any other confirmation that each of the policies produced in response to this request were put on notice of this lawsuit; and (c) any reservation of rights letters or other communications regarding a coverage position received by Milwaukee County or any of its employees concerning this case, whether stating coverage position, a defense position, or both.

**RESPONSE:** *Please see the applicable insurance policy (MKE County 413 – 450).*

Dated this 16[h] day of April, 2018.

**LEIB KNOTT GAYNOR LLC**

By:  *s/ Douglas S. Knott*
      Douglas S. Knott, SBN 1001600
      Cory J. Brewer, SBN 1105913
      Attorneys for Defendants Milwaukee County,
      David A. Clarke, Brian Wenzel, Carolyn Exum
      Morgan Bevenue and Margaret Hoover
      219 N. Milwaukee Street, Suite 710
      Milwaukee, WI 53202
      Telephone: (414) 276-2102
      Fax (414) 276-2140
      Email  dknott@lkglaw.net
              cbrewer@lkglaw.net