## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

REBECCA TERRY,

       Plaintiff,

v.

COUNTY OF MILWAUKEE, RICHARD
SCHMIDT, in his official capacity, OFFICER
BRIAN WENZEL, JANE AND JOHN DOE,
UNKNOWN EMPLOYEES OF MILWAUKEE
COUNTY JAIL, JANE AND JOHN DOE,
UNKNOWN JAIL SUPERVISORS, ARMOR      Case No.: 17-cv-1112-JPS
CORRECTIONAL HEALTH SERVICES,
CAROLYN EXUM, MORGAN BEVENUE,
MARGARET HOOVER, JANE AND JOHN
DOE, UNKNOWN EMPLOYEES OF ARMOR
CORRECTIONAL HEALTH SERVICES,
JANE AND JOHN DOE, UNKNOWN
ARMOR HEALTHCARE SUPERVISORS,

       Defendants.

---

## COUNTY DEFENDANTS' PROPOSED FINDINGS OF FACT

Defendants Milwaukee County, Richard Schmidt, Officer Brian Wenzel, Carolyn Exum, R.N.,

Morgan Bevenue, R.N., and Margaret Hoover, R.N., (collectively, "the County Defendants"), by their

attorneys, Leib Knott Gaynor LLC, submit the following proposed findings of facts in conjunction

with their motion for summary judgment and supporting papers.

### <u>STIPULATED FACTS</u>

The County Defendants submit as follows pursuant to Civil L.R. 56(b)(1)(B), requiring

that the parties provide a statement setting forth any material facts to which all parties have

stipulated:

1.      Defendant Correctional Officer Brian Wenzel was a correctional officer employed

at the Milwaukee County Criminal Justice Facility, which is commonly referred to as Milwaukee

County Jail (hereinafter "MCJ"). Officer Wenzel was acting under color of law and within the scope of his employment at all times relevant to this matter. See ECF Doc. No. 129, ¶ 8.

2.      Defendants Carolyn Exum and Morgan Bevenue were nurses employed by Milwaukee County, working at the MCJ, and acting under color of law and within the scope of their employment at all times relevant to this matter. See ECF Doc. No. 129, ¶¶ 12-1).

3.      Defendant Margaret Hoover was a nurse employed by Milwaukee County, working at the MCJ, and acting under color of law and within the scope of her employment at all times relevant to this matter. Nurse Hoover was a nursing shift supervisor. See ECF Doc. No. 129, ¶ 14.[1]

4.      Plaintiff has stipulated to dismissal of any individual capacity claims against Defendant David A. Clarke, Jr. See ECF Doc. No. 103 at 19. The Court dismissed Sheriff Clarke from this matter and substituted the acting Milwaukee County Sheriff, Richard R. Schmidt, for claims against him in his official capacity only. See ECF Doc. No. 127 at 29. Sheriff Schmidt was substituted by operation of Fed. R. Civ. P. 25(d). There are no counts pending against Sheriff Schmidt in his individual capacity.

## PROPOSED FINDINGS OF FACT

1.      Plaintiff was arrested on June 18, 2010 on a felony charge for failing to appear for a required event. See Felony Charge June 2010, MKE County 155 (Exhibit 1).[2]

2.      She was arrested on May 17, 2011 on two counts of felony failure to appear for a required event. See Felony Charge May 2011, MKE County 156 (Exhibit 2).

---

[1] On Monday, August 27, 2018, Plaintiff informed the County Defendants that she was dismissing all claims against Nurse Hoover including claims made under Counts I, II, and III of the Amended Complaint.

[2] All exhibits supporting these proposed findings are attached to Knott Declaration in Support of Motion for Summary Judgment, filed herewith.

3.      Plaintiff was arrested by the Cudahy Police Department on August 1, 2013 on charges of felony possession of cocaine with intent to deliver and disorderly conduct (use of a dangerous weapon). <u>See</u> Felony Charge Aug. 2013, MKE Co 157 (Exhibit 3).

4.      She was taken to the MCJ, where she reported being approximately 8 weeks pregnant and using heroin daily. <u>See</u> Aug. 2013 Milwaukee County Jail medical records at Armor 606 (Exhibit 4).

5.      Plaintiff was again arrested by the Cudahy Police Department on October 18, 2013, on charges of felony bail jumping and possession of drug paraphernalia. <u>See</u> Felony Charge Oct. 2013 at MKE County 157-158 (Exhibit 5).

6.      She was arrested by the Milwaukee County Sheriff's Department on November 15, 2013, on a felony failure to appear charge. <u>See</u> Felony Charge Nov. 2013, MKE County 158 (Exhibit 6).

7.      On September 12, 2013, an Order of Commitment was entered against Plaintiff. <u>See</u> Franklin Order (Exhibit 7). The Order commanded law enforcement to arrest her after she failed to appear for a scheduled hearing on a retail theft charge and directed that she be kept in custody at the House of Correction for seven (7) days. <u>Id.</u>

8.      A bench warrant for Plaintiff's arrest was issued by Judge Clare Fiorenza, Circuit Court Judge for Milwaukee County, on February 28, 2014, after Plaintiff refused two mandatory drug tests and failed to appear in Court on prior charges. <u>See</u> Court Record, Milwaukee County Case No. 2013 CF 3503 (Exhibit 46). On Sunday, March 9, 2014, at approximately 4:00 a.m., Plaintiff was taken into custody at the Park Motel in Franklin, Wisconsin by the Franklin Police Department for Possession of Drug Paraphernalia, Possession of Marijuana, Possession of Heroin, Possession of Cocaine, Prostitution, Battery to an Unborn Child, Felony Bail Jumping, and on a

warrant from the Milwaukee County Sheriff's Department arising out of alleged possession with intent to deliver drugs.  <u>See</u> Franklin Police Department Incident Report at FPD 14 (Exhibit 8).

9.      Plaintiff initially provided the arresting officers two (2) false names.  <u>Id.</u> at FPD 19. She stated she did so "because she knew she had a bench warrant for her arrest" and because she "did not want to have her baby in jail."  <u>Id.</u>

10.      Plaintiff reported to the arresting officer she was nine (9) months pregnant and due in two (2) days.  <u>Id.</u> at FPD 24.  She initially denied using heroin, but admitted she had relapsed and been using daily for approximately three (3) weeks after the officer observed "an extreme amount of track marks on her hands, forearms and inner elbow."  <u>Id.</u>

11.      Plaintiff denied having any medical issues at the time of her arrest.  <u>Id.</u> at FPD 19.

12.      The arresting officer noted Plaintiff's "eyelids were droopy, her speech was slow, and she appeared to have recent track marks on the back of her hands. I later observed that her pupils were also constricted. This appearance is consistent with someone who has recently used heroin."  <u>Id.</u> at FPD 18.

13.      In addition to the Order of Commitment, Milwaukee County had issued a warrant for Plaintiff's arrest prior.  <u>See</u> Terry Dep. at 75:1-76:5 (Exhibit 9).  She was aware at the time of her arrest that she was wanted on a warrant and moved to a hotel "believing it would be harder for police to find me."  <u>Id.</u>

14.      Plaintiff was arrested along with Corey Tolliver, whom she stated was the father of her child.  <u>See</u> Franklin Police Department Incident Report at FPD 24 (Exhibit 8); Terry Dep. at 96:9-18 (Exhibit 9).  Tolliver and Plaintiff lived together intermittently.  <u>Id.</u> at FPD 25.

15.       Tolliver was a drug dealer.  <u>See</u> Felony Charge Aug. 2013, MKE Co 157 (Exhibit 3); Terry Dep. at 96:14-15 (Exhibit 9).

16.     He owned a car that was registered in a third-party's name. <u>See</u> Franklin Police Department Incident Report at FPD 24 (Exhibit 8); Terry Dep. at 96:16-19 (Exhibit 9).

17.     Tolliver was released on his own recognizance at the Franklin Police Department on March 9, 2014.  <u>See</u> Terry Dep. at 96:24-97:6 (Exhibit 9).

18.     Plaintiff was transported by the Franklin Police Department to the MCJ on March 9, 2014, at approximately 2:15 p.m.  <u>See</u> Franklin Police Department Incident Report at FPD 15 (Exhibit 8).

19.     On March 13, 2014, Assistant District Attorney Hannah R. Kolberg informed Franklin police that she would charge Plaintiff with Felony Bail Jumping. <u>Id.</u> at FPD 27.

**<u>Initial Screening at MCJ</u>**

20.     Plaintiff was assessed for admission to the MCJ by Registered Nurse Margie Burton at 6:28 p.m. on March 9, 2014.  <u>See</u> Mar. 9, 2014 Milwaukee County Jail medical records at MKE County 109 (Exhibit 10).  She informed the nurse she was pregnant and due on March 11.  <u>Id.</u>

21.     Plaintiff informed Nurse Burton this was her 13th pregnancy and she had been using heroin intravenously daily on and off for four (4) years.  She admitted to using heroin daily over the last year.  <u>Id.</u>

22.     Plaintiff informed Nurse Burton she "has a history of mood disorder and anxiety" but had not taken psychotropic medications in over a year.  <u>Id.</u>

23.     Nurse Burton's assessment was: "PREGNANT; OPIATE ABUSE; NO PRENATAL CARE." <u>Id.</u>

24.     Nurse Burton consulted with the nurse practitioner on duty and received authority to refer Plaintiff to Froedtert Hospital for medical clearance.  She consulted with her supervisor to

make the supervisor aware of the referral. She also created chart entries to trigger assessments by the medical and mental health staffs if Plaintiff were to return. Id.

26. Plaintiff testified she told Nurse Burton she was "experiencing pressure" which she described as "constant." See Terry Dep. at 98:3-12, 99:11-15 (Exhibit 9).

26. Plaintiff did not tell Nurse Burton she was experiencing contractions. Id. at 100:3-6.

27. Plaintiff testified the experience of constant pressure did not change at any time before she arrived at Froedtert Hospital. Id. at 102:6-12.

28. Plaintiff testified she told Nurse Burton she was due "that day," meaning March 9, 2014. Id. at 99:4-10.

**Medical Clearance at Froedtert Hospital**

29. Plaintiff was transported by correctional personnel from MCJ to Froedtert Hospital for medical assessment and, if necessary, treatment. See Mar. 9, 2014 Milwaukee County Jail medical records at MKE County 109 (Exhibit 10).

30. Plaintiff did not remember communicating with the personnel who transported her to the hospital. See Terry Dep. at 104:20-105:2 (Exhibit 9).

31. Plaintiff testified that she remembered being sleepy on her arrival at the hospital. She described experiencing "tightening" in her lower abdomen to the staff at Froedtert, "but not tightening like a contraction." Id. at 101:14-24; at 106:1-3.

32. She was assessed for medical clearance to the Jail by physicians and nurses in the Labor & Delivery Department from approximately 9:55 p.m. on March 9, 2014, to approximately 1:02 a.m. on March 10, 2014. See Froedtert Hospital medical records at Terry 305 (Exhibit 11).

33. Her chief complaint, per Froedtert records, was "r/o [rule out] labor." Id. at 317.

34. Staff at Froedtert contacted an outside facility where Plaintiff had obtained an ultrasound during her 8th week of pregnancy on August 8, 2013. Id. at Terry 318. The outside facility reported her estimated due date at March 18, 2014. Id. at Terry 318, 320.

35. An ultrasound obtained at Froedtert on March 10, 2014 concluded her status was "consistent with" an estimated due date of March 18, 2014. Id. at 318.

36. Two obstetric specialists – Dr. Lindsay A. Dickerhoff and Dr. Raj Narayan – approved an "Assessment/Plan" for Plaintiff that noted she "is not currently in labr (sic)" and concluded, "Patient cleared to be transferred to jail." Id. at Terry 318.

37. Dr. Dickerhoff performed cervical examinations at least one (1) hour apart and noted no change in Plaintiff's effacement, dilatation, or station, indicating she was not in labor. Id. at Terry 318.

38. Froedtert RN Brianna Barth documented, "Printed discharge instructions and provided copy to pt [patient]" at 1:01 a.m. Id. at Terry 313. Plaintiff does not dispute having received printed discharge instructions from the hospital. See Terry Dep. at 130:12-19 (Exhibit 9). Barth documented having "reviewed" the Antepartum Discharge Instructions with Plaintiff. See Froedtert Hospital medical records at Terry 306 (Exhibit 11).

39. Discharge instructions provided to Plaintiff included directions to stay hydrated "call your doctor immediately" if she experienced "regular contractions occurring every 5 minute(s) for at least [60 minutes/1 hour(s)]. Id. at Terry 305-306, 311.

40. Plaintiff was monitored and assessed until 1:02 a.m., at which time she was given an opportunity to ask further questions. She denied having any concerns. Id. at Terry 313.

41.     The abdominal pressure reported by Plaintiff remained constant from the time she left the Jail on March 9, 2014 through the time she was assessed at Froedtert.  See Terry Dep. at 135:7-10 (Exhibit 9).

**Return to Jail and Admission to Special Medical Unit**

42.     Plaintiff does not recall speaking to the officers escorting her during her transport from Froedtert Hospital to the Jail on March 10, 2014.  Id. at 136:15-17.

43.     She does not believe she was experiencing contractions on discharge from Froedtert Hospital or during her return to the Jail.  Id. at 138:19-22.

44.     Plaintiff testified she was "feeling sore" and "I remember being sleepy, but that was about it."  Id. at 106:1-11, 138:19-22.

45.     She does not recall her re-admission to the Jail from the time of her arrival until she was transferred with a correctional officer from the booking area to the Special Medical Unit.  Id. at 143:14-144:7.

46.     Plaintiff does not recall the substance of her conversation with the booking nurse, Nurse Carolyn Exum.  Id. at 144:14-23.

47.     Nurse Exum was assigned to the booking area in the early morning of March 10, 2014.  See Mar. 10, 2014 Milwaukee County Jail medical records at MKE County at 100-101 (Exhibit 12).

48.     She interviewed and assessed Plaintiff on her return from Froedtert Hospital at approximately 1:15 a.m.  Id. at MKE County 100-101, 104-105.

49.     Nurse Exum's assessment took about 20 minutes and involved checking Plaintiff's height, weight, and vitals.  See Exum Dep. at 104:22-105:5 (Exhibit 13).

50.     Nurse Exum assessed Plaintiff to ensure she was not having contractions.  Id. at 80:22-81:1, 104:22-25.

51.     Nurse Exum's assessment of Plaintiff was that she was "at risk for early labor r/t [related to] hx [history] of heroin abuse."  See Mar. 10, 2014 Milwaukee County Jail medical records at MKE County at 104 (Exhibit 12).

52.     Nurse Exum checked Plaintiff's vitals at 1:30 a.m. and found that they were stable. Id. at MKE County 100-101, 103; Exum Dep. at 134:4-135:20; 156:22-157:22 (Exhibit 13).

53.     Plaintiff told Nurse Exum she was experiencing "pressure at the bottom of her stomach" but "denied contractions at present."  Id. at MKE County 101; Exum Dep. at 88:14-20 (Exhibit 13).

54.     Nurse Exum called the on-call physician, Dr. Gina Bouno, at approximately 1:15 a.m. to discuss Plaintiff.  She informed Dr. Buono that Plaintiff had been medically-cleared by Froedtert Hospital but that the physicians there had provided "generic orders" that did not specifically address Plaintiff's heroin use and status.  Id. at MKE County 101, 104.

55.     Dr. Buono authorized Nurse Exum to admit Plaintiff to the Jail and house her in the Special Medical Unit ("SMU").  See Exum Dep. at 86:8-15, 90:25-91:4 (Exhibit 13); Buono Dep. at 75:15-17 (Exhibit 14).

56.     Jail protocol states pregnant women who are more than 32 weeks into their pregnancy are to be housed in the SMU.  Id. at 91:5-22; Buono Dep. at 75:14-22 (Exhibit 14).

57.     Dr. Buono instructed Nurse Exum to contact the Froedtert Labor & Delivery Department to get the Discharge Summary, which would provide a summary of the hospital's assessment and directions for future care.  See Mar. 10, 2014 Milwaukee County Jail medical records at MKE County at 101 (Exhibit 12); Exum Dep. at 58:23-59:8 (Exhibit 13).

58.     Dr. Buono was not an employee of Milwaukee County.  Rather, she was employed by Armor Correctional Healthcare as its Medical Director.  See Buono Dep. at 12:21-13:4 (Exhibit 14).

59.     Nurse Exum called the Labor & Delivery Department at approximately 1:20 a.m. She spoke with a nurse and asked if the Jail could receive a copy of the doctor's Discharge Summary.  The Froedtert nurse informed Exum that she would page the physician to request that he complete the discharge orders.  Nurse Exum provided the Jail's fax number so that the orders could be expedited.  See Mar. 10, 2014 Milwaukee County Jail medical records at MKE County at 101 (Exhibit 12).

60.     Nurse Exum asked the hospital nurse whether the providers there had concluded Plaintiff was in labor.  The Froedtert nurse replied "they believed she was not in labor."  See Exum Dep. at 90:16-24 (Exhibit 13)

61.     Nurse Exum observed Plaintiff was unclear when answering questions, appeared to be intoxicated, and "definitely had been using something."  Id. at 88:22-89:19.

62.     Plaintiff reported to Nurse Exum that she had been on a heroin binge.  Id. at 97:25-98:11.

63.     Nurse Exum called the nursing supervisor and charge nurse to report the admission. See Mar. 10, 2014 Milwaukee County Jail medical records at MKE County at 104 (Exhibit 12).

64.     Plaintiff was admitted to the SMU pursuant to Dr. Buono's authorization for observation.  Id.; Exum Dep. at 90:16-24 (Exhibit 13).

65.     The Froedtert Labor & Delivery Department Discharge Summary was signed by the Attending Physician, Dr. Narayan, at 6:52 a.m. on March 10, 2014.  See Froedtert Hospital medical records at Terry 316 (Exhibit 11).

66.     Nurse Exum documented at 7:19 a.m. that she was still waiting to receive the Froedtert discharge orders.  See Mar. 10, 2014 Milwaukee County Jail medical records at MKE County at 101 (Exhibit 12).

67.     The Discharge Summary, which was signed by Dr. Narayan at 6:52 a.m., states "Estimated Date of Delivery: 3/18/14" and "Discharge condition: stable."  See Froedtert Hospital medical records at Terry 316 (Exhibit 11).

68.     The Discharge Summary signed by Dr. Narayan states, "Will get prenatal care through the jail."  Id.  No Froedtert healthcare provider made a recommendation that Jail medical staff implement a particular therapy or treatment, nor did Froedtert providers recommend that the Jail provide heightened scrutiny or observation for Plaintiff.  Id. at Terry 316-318.

69.     Nurse Margaret Hoover was the shift supervisor on duty.  See Hoover Dep. at 14:9-19 (Exhibit 15).  Her shift began at 10:00 p.m. on March 9, 2014 and ended at 8:00 a.m. on March 10, 2014.  Id. at 15:15-16:1.

70.     A shift supervisor at the MCJ provides "on-site supervision" of the nurses "under direction" of Jail healthcare administrators.  See Shift Supervisor Job Description, MKE County 13946 (Exhibit 16).  His or her responsibilities are limited to supervising nurses on "a particular shift."  Id.  A nurse supervisor does not have authority to develop, author, or change healthcare policies at the Jail.  Id.

71.     As a shift supervisor, Nurse Hoover did not have authority to make policy changes. Id.

72.     She was not asked to and did not see Plaintiff on March 10 until a medical emergency was called at 4:45 a.m., at which time she immediately responded to the SMU to assist. See Hoover Dep. at 36:19-37:1 (Exhibit 15).

73.     Nurse Hoover informed Jail medical administrators about the incident after it occurred.  See Mar. 10, 2014 Milwaukee County Jail medical records at MKE County at 100 (Exhibit 12).

74.     Nurse Exum was assigned to the intake area of the Jail on March 10, 2014.  See Exum Dep. at 92:24-25 (Exhibit 13).

75.     She was not aware of any change in Plaintiff's condition until the medical emergency was called at approximately 4:45 a.m.  Id. at 95:8-11.

76.     Nurse Morgan Bevenue was the nurse on the third shift of March 9-10, 2014.  See Bevenue Dep. at 15:6-8, 16:13-21 (Exhibit 17).

77.     Her routine was to perform a round to check inmates in the SMU at the beginning of her shift around 11:00 p.m. and near the end of her shift around 6:00 a.m.  Id. at 16:22-25, 20:19-21:1.

78.     Nurse Bevenue would make additional visits to the SMU if a physician had ordered more frequent assessments of an inmate in the SMU or if medication distributions were required. Id. at 26:8-27:3, 83:19-84:7.

79.     Nurse Bevenue performed her initial SMU check before Plaintiff arrived there.  Id. at 16:13-25, 83:19-84:14; Milwaukee County Jail Wenzel Incident Report at MKE County 11-14 (Exhibit 18).

80.     Dr. Buono did not order additional nursing assessments for Plaintiff.  See Mar. 10, 2014 Milwaukee County Jail medical records at MKE County at 100-101 (Exhibit 12); Buono Dep. at 66:4-67:12 (Exhibit 14).

81.     Nurse Bevenue was not aware Plaintiff's condition had changed from her admission to the SMU to the time a medical emergency was later called.  See Bevenue Dep. at 15:12-19

(Exhibit 17); Bevenue Supplemental Response to Plaintiff's First Set of Interrogatories, No. 2 (Exhibit 19).

### Special Medical Unit 1:45 a.m. to 4:45 a.m.

82.     Plaintiff was escorted to the SMU and arrived at approximately 1:45 a.m.  <u>See</u> Milwaukee County Jail Wenzel Incident Report at MKE County 12 (Exhibit 18).

83.     The sensation of pain Plaintiff experienced at the time of arrival at the SMU had not changed from what she had described to the obstetric specialists at Froedtert prior to her discharge from the hospital.  <u>See</u> Terry Dep. at 147:23-150:20 (Exhibit 9).

84.     Plaintiff testified that after her arrival in the SMU she began to experience a "progressive change" in her symptoms.  <u>Id.</u> at 152:4-13.

85.     The change in her symptoms of labor was not sudden, but gradual.  <u>Id.</u> at 152:11-13.

86.     Plaintiff began to experience the onset of withdrawal symptoms and the progression of labor at the same time.  <u>Id.</u> at 152:4-154:8.

87.     She testified she experienced only ten (10) contractions before her baby was born.  <u>Id.</u> at 165:6-17.

88.     Plaintiff testified she was able to deliver her baby with three (3) voluntary pushes.  <u>Id.</u> at 164:22-24.

89.     Correctional Officer Brian Wenzel was on duty third-shift (2200-0630 hours) in the SMU.  <u>See</u> ECF Doc. No. 129, ¶ 36; Milwaukee County Jail Wenzel Incident Report at MKE County 12 (Exhibit 18).

90.     He arrived in the SMU at 10:19 p.m.  <u>See</u> Milwaukee County Jail Special Medical Unit (SMU) Jail Log at MKE County 999 (Exhibit 20).

91.     When Officer Wenzel arrived in the SMU there were five (5) inmates housed in the unit, which is a locked unit consisting of 11 cells.  See Wenzel Dep. at 51:1-8, 39:6-9 (Exhibit 21).

92.     Officer Wenzel performed security checks on each cell approximately each half hour, completing 11 security checks between 10:19 p.m. and 4:28 a.m.  See Milwaukee County Jail Special Medical Unit (SMU) Jail Log at MKE County 999-1000 (Exhibit 20); Wenzel Dep. at 60:1-7 (Exhibit 21).

93.     Officer Wenzel performed six (6) security tours before Plaintiff arrived in the SMU and five (5) tours between her arrival at 1:45 a.m. and a medical emergency being called at 4:44 a.m.  Id.

94.     An inmate cleaning crew entered the SMU to clean the cell that was later assigned to Plaintiff at approximately 1:33 a.m.  Id. at 999; Wenzel Dep. at 116:10-23 (Exhibit 21).

95.     Plaintiff was escorted onto the SMU at approximately 1:45 a.m. by Correctional Officer Amika Avery and placed in Cell 3.  See Milwaukee County Jail Wenzel Incident Report at MKE County 12 (Exhibit 18).

96.     Officer Wenzel was informed soon after Plaintiff's arrival on the SMU that she had been taken to Froedtert Hospital that evening for assessment of potential labor pains and she was medically cleared for admission to the Jail.  Id.; Ex. 19: Wenzel Dep. at 56:6-57:1 (Exhibit 21).

97.     Officer Wenzel was informed Plaintiff was a heroin user as well and may experience withdrawal.  See Wenzel Dep. at 66:4-11 (Exhibit 21).

98.     At approximately 4:44 a.m., Officer Wenzel was conducting a security round when he heard a faint cry and heard Plaintiff ask for help.  Id. at 101:9-15.

99.     Prior to 4:44 a.m., Officer Wenzel had heard only rustling noises from Plaintiff's cell, which he described as "like moving of sheets."  Id. at 101:16-24.

100.     Officer Wenzel – consistent with his training – immediately telephoned Master Control at the Jail so that officers there could simultaneously contact security and medical staff to declare a medical emergency.  Id. at 94:7-97:5.

101.     Three to four officers and medical personnel, including Nurse Exum, arrived at the SMU within 30 seconds to one minute of Officer Wenzel's call.  Id.

102.     Officer Wenzel then controlled entry onto the SMU and documented the arrival of additional personnel as was his responsibility as the officer assigned to the area.  Id. at 98:15-21.

103.     Officer Wenzel was unaware before 4:44 a.m. that Plaintiff had gone into labor and delivered.  See Milwaukee County Jail Wenzel Incident Report at MKE County 12 (Exhibit 18); Wenzel Dep. at 101:4-8 (Exhibit 21).

104.     Correctional Officer Decorie Smith entered the SMU at approximately 3:11 a.m. to provide Officer Wenzel with a break.  See Milwaukee County Jail Special Medical Unit (SMU) Jail Log at MKE County 999 (Exhibit 20); Smith Decl., ¶ 5 (Exhibit 22).  Officer Smith remained in the SMU from approximately 3:11 a.m. to 3:41 a.m.  Id.

105.     Officer Smith conducted at least one security round while in the SMU.  Officer Smith believes he would recall if Plaintiff would have asked for help or he observed anything to suggest she was in labor or needed medical attention.  Officer Smith has no such recollection.  See Smith Decl., ¶ 5 (Exhibit 22).

106.     Lieutenant Crystalina Montano was a supervisor on duty at the Jail the night of March 9-10, 2014.  See Milwaukee County Jail Wenzel Incident Report at MKE County 13 (Exhibit 18); Montano Dep. at 52:22-53:2 (Exhibit 23).

107. Lieutenant Montano entered the SMU shortly prior to 4:41 a.m. to perform a supervisory round.  See Milwaukee County Jail Special Medical Unit (SMU) Jail Log at MKE County 1000 (Exhibit 20)

108. Lt. Montano asked Officer Wenzel if "the pregnant girl" had come back to the Jail from the hospital.  Officer Wenzel responded, "Yes, she's in Cell 3."  Lt. Montano then looked in Cell 3 and noted Plaintiff appeared to be sleeping.  See Montano Dep. at 45:4-16 (Exhibit 23).

**Emergency Event Response**

109. Jail records indicate Nurse Bevenue was involved in handing out medications to inmates on another floor at 4:42 a.m.  See Mar. 10, 2014 5FC Milwaukee County Jail Log, MKE Co. 993 (Exhibit 24).  She responded to the medical emergency alert in the SMU, arriving in the SMU at 4:52 a.m. See Milwaukee County Jail Wenzel Incident Report at MKE County 12 (Exhibit 18).

110. Nurses Exum and Hoover responded to the medical emergency alert, arriving at the SMU at 4:46 a.m.  Id.

111. When Lt. Montano responded to the medical emergency at 4:44 a.m., she asked Plaintiff why she had not asked for help.   See Montano Dep. at 35:1-16 (Exhibit 23).  Plaintiff responded, "Ah, I don't know."  Id.

112. Emergency responders from the Milwaukee Fire Department arrived at approximately 4:52 a.m.  See Milwaukee County Jail Wenzel Incident Report at MKE County 12 (Exhibit 18); EMS Report at Terry 187 (Exhibit 25).

113. EMS personnel cut the umbilical cord.  See Mar. 10, 2014 Milwaukee County Jail medical records at MKE County at 103 (Exhibit 12).

114.     Vital signs obtained by Jail nursing staff at 4:53 a.m. indicate Plaintiff was stable. Id. at 101-103.

115.     Plaintiff and her child were covered in clean, dry blankets and transported by EMS medical personnel associated with the Milwaukee Fire Department to Aurora Sinai Hospital.  Id. at 103; EMS Report at Terry 187 (Exhibit 25).

116.     Plaintiff floated in and out of consciousness during transport to Aurora Sinai Hospital.  See Terry Dep. at 175:7-11 (Exhibit 9).

117.     She has no recollection of being restrained by security during her transport from the Jail to Aurora Sinai Hospital.  Id. at 175:25-176:11.

118.     There is no evidence Plaintiff was denied healthcare as a result of restraints during her transport to Aurora Sinai Hospital.  Id.

**Plaintiff's Post-Delivery Treatment at Aurora Sinai Hospital**

119.     Plaintiff admits she was able to receive all the care she felt was necessary at Aurora Sinai Hospital.  Id. at 175:4-6.

120.     She was hospitalized for monitoring at Aurora Sinai Hospital from March 10, 2014 to March 13, 2014.  See Mar. 10-14, 2014 Aurora Sinai Medical Center medical records, at Terry 102 (Exhibit 26).

121.     The primary reason for Plaintiff's hospitalization from March 10, 2014 to March 13, 2014 was so she could be monitored for opioid withdrawal at the recommendation of psychiatrist Dr. Hertzl Spiro.  Id. at Terry 111, 123-26.  Plaintiff began experiencing nausea and vomiting that her psychiatrist attributed to withdrawal almost immediately after the delivery of her son.  Id. at Terry 75 (noting nausea at 5:45 a.m. on March 10, 2014), Terry 256 (noting vomiting by 8:10 a.m.).  The psychiatrist solicited Terry's interest in foregoing discharge to the Jail to

receive treatment for withdrawal. He advised her that the process typically took 72 hours to complete and recommended it be administered safely in the hospital. Terry agreed to remain at Aurora Sinai to receive treatment for withdrawal before returning to the Jail. Id. at Terry 125-26.

122. Dr. Spiro recommended that Plaintiff remain at Aurora Sinai Hospital for 72 hours for "detoxification" and monitoring of her drug withdrawal. Id. at Terry 123-26.

123. Dr. Spiro interviewed Plaintiff at least twice while she was in the hospital, but did not record any complaint of emotional injury arising out of the circumstance of giving birth in the Jail. Id. at Terry 110, 123-26.

124. Dr. Luther Gaston wrote in a Discharge Summary that "[t]he patient was stable and afebrile in her post-partum course" but that her "post-partum course was complicated by opiate withdrawal." Id. at Terry 103.

125. On March 13, 2014, Dr. Gaston endorsed a medical resident's "Postpartum Progress Note" in which he recorded Dr. Spiro's recommendation of a 72-hour hospital stay after which Plaintiff would be discharged. Id. at Terry 116. Dr. Gaston's postpartum recommendation was "follow up in 6 weeks." Id.

126. Aurora Sinai records indicate repeatedly that "pain is well controlled." Id. at Terry 110, 112, 114-116.

127. There are no records indicating Plaintiff suffered a postpartum complication other than her experience of heroin withdrawal. Id. at Terry 71-286.

128. Plaintiff's discharge instructions from Aurora Sinai indicated she should schedule an appointment with both her psychiatrist, Dr. Spiro, and an obstetrician – Dr. Siddiqui – within six (6) weeks. Id. at Terry 104, 181. No other postpartum visits or medical treatment are recommended. Id.

129.    There is no evidence in the medical record that Plaintiff was diagnosed with Post-Traumatic Stress Disorder during her hospitalization at Aurora Sinai.  Id. at Terry 71-286.

**Security Restraints at Aurora Sinai**

130.    The policy of the Milwaukee County Sheriff's Office on security of detained persons receiving medical care at a private hospital is set forth in Policy OP 13.  See Detention Bureau – Hospital Watch / Run OP 13 Rev. Date Jan. 1, 2008, MKE County 194-198 (Exhibit 27).

131.    OP 13.2 provides that the Jail Shift Commander "will determine whether a hospital watch is necessary" or, alternatively, whether a request should be made to a judge to modify the inmate's bail to allow the inmate's release on personal recognizance.  Id. at 195.

132.    Factors the Shift Commander may consider in making that determination are the potential for flight to avoid prosecution; the inmate's criminal record; the seriousness of the current charges; the inmate's physical, mental and medical conditions; and holds from other jurisdictions.  Id.

133.    If it is determined the inmate should stay in custody, the first obligation of a Wisconsin Sheriff is to "[t]ake the charge and custody of the jail maintained by the county and the persons in jail, and keep the persons in the jail personally or by a deputy or jailer."  Wis. Stat. § 59.27(1).

134.    OP 13, as implemented by the MCJ administration, required inmates be restrained by a handcuff and leg iron attached to the side rail of the bed at most times, subject to exceptions where authorized.  See Detention Bureau – Hospital Watch / Run OP 13 Rev. Date Jan. 1, 2008, MKE County 196-197 (Exhibit 27); Bailey Dep. at 134:8-137:9 (Exhibit 28). OP 13.7 does not address pregnant women specifically.

135.    On May 3, 2000, a Milwaukee County Sheriff's Deputy on a hospital watch was confronted by an inmate with a 3-to-5-inch piece of broken glass after allowing the inmate to use the restroom unrestrained.  The inmate subsequently broke a hole through a hospital restroom wall and escaped into the ceiling, where he was later located and apprehended.  See Investigative Summary, May 3, 2000 Incident, Terry 21547-50 (Exhibit 29).

136.    On April 17, 2008, Sheriff's Deputies were called when an unrestrained and naked detainee was reported to have escaped the custody of the Milwaukee Police Department while at Froedtert Hospital.  See April 17, 2008 Incident Report, Terry 21600-21602 (Exhibit 30).

137.    On October 9, 2009, a Sheriff's Department detainee who apparently overdosed and attempted suicide tried to escape from custody at St. Luke's Hospital after a restraint was removed so that he could use the restroom.  See Oct. 9, 2009 Incident Report, Terry 21603-07 (Exhibit 31)

138.    On January 8, 2011, an inmate escaped custody at St. Joseph Hospital after she was transported with a complaint of labor pains and cut off her GPS bracelet to evade detection.  See Jan. 8, 2011 Incident Report, Terry 21594-99 (Exhibit 32).

139.    On May 1, 2013, an unrestrained inmate held on narcotics charges assaulted a deputy assigned to watch him at a hospital and fled down several flights of stairs and out of the facility.  See May 1, 2013 Investigative Brief, Terry 21516-23 (Exhibit 33).

140.    On November 27, 2014, an inmate escaped custody at Froedtert Hospital after a deputy allowed him to use the restroom unrestrained.  He was recaptured two floors away after a foot chase with the officer.  See Nov. 27, 2014 Investigative Summary, Terry 21512-15 (Exhibit 34).

141.     On October 18, 2015, a deputy was shot and killed at a Minnesota hospital by an inmate who was allowed to obtain the deputy's weapon.  <u>See</u> Article "Deputy killed after hospitalized suspect grabs his gun," Terry 21528-29 (Exhibit 35).

142.     On May 7, 2016, a Milwaukee County Jail detainee who complained of seizures after childbirth and appeared weak and frail attempted to grab a deputy's weapon at St. Luke's Hospital after being freed from restraints.  <u>See</u> Investigative Summary, May 7, 2016 Incident, Terry 21508-11 (Exhibit 36).

143.     On March 10, 2014, at 6:35 a.m., Corrections Lieutenant Steven Haw sent an email to other officers, including the officers supervising Plaintiff, noting the room to which she had been assigned, the officers assigned, and that she had been charged with Possession of THC, Possession of Narcotic Drugs, Possession of Drug Paraphernalia, Felony Bail Jumping, and Possession with Intent to Deliver Cocaine.  <u>See</u> Mar. 10, 2014 Haw e-mail re: Rebecca Terry (Exhibit 37).

144.     A hospital watch by a single female deputy was initiated at 7:50 a.m. when Plaintiff was assigned to her room.  Pursuant to policy, Plaintiff was restrained by her right wrist and left ankle.  <u>See</u> Milwaukee County Jail handwritten log book at MKE County 180 (Exhibit 38).

145.     At 3:04 p.m., the deputy's log indicated the wrist restraint was removed when the baby was brought into the room so that Plaintiff could hold the baby.  The wrist restraint remained off until 3:20 p.m., when the baby was taken out of the room.  <u>Id.</u> at MKE County 181-182. The deputy testified that she removed Plaintiff's wrist restraint for the safety of the baby and mother. <u>See</u> Freuck Dep. at 42:25–44:24 (Exhibit 47).

146.     At 4:44 p.m., a nurse came to the room to start an IV.  The deputy noted the restraints were switched to allow the preferred site for the IV to be used.  See Milwaukee County Jail handwritten log book at MKE County 182 (Exhibit 38).

147.     Plaintiff's charges were entered into the log book at 9:45 p.m. on March 10, 2014. Id. at MKE County 183.

148.     At approximately 6:00 p.m. on March 11, 2014, Plaintiff's boyfriend and father of her child, Cory Tolliver, arrived at the hospital in an attempt to see her.  Id. at MKE County 185-186).  Plaintiff had been arrested on March 9 with Tolliver and Nicole Tirado.  See Franklin Police Department Incident Report at FPD 18 (Exhibit 8).

149.     Tolliver was turned away at the greeter's desk, who denied knowledge of the patient pursuant to the hospital's privacy practice.  The hospital employee called the deputy on duty to report the event, and the deputy called her supervisor to report "a possible breach by the inmate's boyfriend."  See Milwaukee County Jail handwritten log book at MKE County 185-186 (Exhibit 38).

150.     Approximately two hours later, at 8:40 p.m., someone named "Nicole Tolliver" called the room.  Id. MKE County 186.

151.     Plaintiff was moved for security reasons to a different room at Aurora Sinai at 9:00 p.m.  Id.

152.     The hospital watch logs include numerous notations indicating that nursing staff were able to provide care to Plaintiff.  Id. at MKE County 180-192.

153.     Nothing indicates a healthcare provider requested that the restraints be removed and the deputies failed to comply.  Id.

## Policies of Armor Correctional Health Services, Inc.

154.    Armor Correctional Health Services, Inc. (hereinafter "Armor") – who had a contract to provide medical services at the MCJ – set forth Policy No. J-E-02, "Receiving Screening." <u>See</u> Armor Policy J-E-02 "Receiving Screening," at Armor 230-233 (Exhibit 39). This policy included recommendations for steps to take if a detainee is medically unstable.  <u>Id.</u> at Armor 231. Specifically, detainees are to be refused admission to the Jail "if medically unstable." <u>Id.</u>  The policy states, "When patients are referred to a community hospital and returned, their admission to the facility is predicated upon medical stabilization." <u>Id.</u> at 233.

155.    Armor also established its Policy No. J-E-08, titled "Emergency Services." <u>See</u> Armor Policy No. J-E-08 "Emergency Services," at Armor 240-243 (Exhibit 40).  This policy included recommendations for what to do when a detainee returned following being sent to a hospital emergency department for assessment or treatment.  <u>Id.</u> at 242.

156.    Armor also had in place its Policy No. J-E-03, titled "Medical Housing Unit." <u>See</u> Armor Policy No. J-G-03.1 "Medical Housing Unit," at Armor 272-274 (Exhibit 41).  This policy provided that, "Vital signs and nursing assessment will be documented as ordered by the clinician." <u>Id.</u> at 274.

## Training on Medical Emergencies

157.    Correctional Officer Brian Wenzel has been employed by the Milwaukee County Sheriff's Office and assigned to MCJ since February 18, 2013.  <u>See</u> Wenzel Decl., ¶ 2 (Exhibit 42)

158.    Officer Wenzel completed six (6) weeks of correctional officer training at the Milwaukee County Sheriff's Officer Training Academy.  This was followed by a probationary period of one year during which he received additional on the job training under the supervision of a training officer.  <u>Id.</u>, ¶ 3.

159. Officer Wenzel received training regarding the Jail's legal duty under state statutes, administrative codes, and constitutional case law to provide adequate health care to jail inmates. Id., ¶ 4.

160. Officer Wenzel was consistently trained that his job duties include the responsibility to respond to inmate needs and requests for medical care. Id., ¶ 5.

161. Officer Wenzel was trained using a power point slide presentation discussing Estelle v. Gamble as setting the standard for health care in correctional institutions. Id., ¶ 5. The presentation described basic concepts of "deliberate indifference" arising out of inadequate health care, including a failure to take appropriate action or seek medical help upon noticing that an inmate seems to be apparently seriously ill or injured. Id.

162. Officer Wenzel handwrote on a slide titled, "Responding to Requests for Medical Care" the following, "NEVER ignore an inmate complaint." Id.

163. Officer Wenzel was required to complete a "Jail Health Care Student Study Review Worksheet." Id., at Affidavit Exhibit 3. The worksheet included the following question: "If an inmate has properly submitted a sick call request but an officer does not feel that the inmate imminently needs to be seen by a health care provider, the officer should…" Officer Wenzel selected "Honor the inmate's sick call request anyway." Id.

164. Correctional Officer Julie Shanahan responded to the medical emergency which was called in relation to the birth of Plaintiff's child. See Milwaukee County Jail Wenzel Incident Report at MKE County 12 (Exhibit 18). Officer Shanahan testified she was trained on how to respond to medical emergencies, including training on alerting medical of medical needs for inmates. See Shanahan Dep. at 9:15-22, 10:2-9, 11:14-12:6, 24:3-17, 31:11-33:17, 34:1-35:1, 36:3-13, 37:22-38:1, 38:18-39:14, 53:13-23, 55:3-18 (Exhibit 43).

165. Correctional Officer Amika Avery – who escorted Plaintiff to the SMU – testified she was trained on how to respond to medical emergencies and that it is "highly important … to inform medical and let medical decide if medical attention is needed. <u>See</u> Avery Dep. at 23:19-24:6, 25:17-20, 27:1-17, 28:19-22 (Exhibit 44).

166. Correctional Officer Dashyla Elliott also responded to the medical emergency which was called in relation to the birth of Plaintiff's child. <u>See</u> Milwaukee County Jail Wenzel Incident Report at MKE County 12 (Exhibit 18). Officer Elliott testified she was trained at the Academy on Jail health care. <u>See</u> Elliot Dep. at 8:24-9:11, 12:1-8, 15:10-16, 24:21-25:22, 26:10-13, 28:18-29:25, 32:14-16, 33:14-21, 34:8-21, 36:5-7, 36:19-22, 37:8-11 (Exhibit 45).

167. Lieutenant Crystalina Montano testified all officers are trained on what conditions are medical emergencies, including "chest pains, trouble breathing, someone going into labor." <u>See</u> Montano Dep. at 74:18-75:7, 78:3-7, 77:16-24 (Exhibit 23).

**<u>Additional Proposed Findings of Fact</u>**

168. Plaintiff was not shackled while in active labor and delivering the baby in the SMU. <u>See</u> Am. Compl., ECF Doc. No. 129, ¶¶ 34-35, 46; Plaintiff's Second Suppl. Responses to Milwaukee Co. Defendants' First Set of Interrogatories, Response to Interrogatory 6(1) at 8 (Exhibit 48).

169. Plaintiff testified that she did not speak to anyone other than friends about the Defendants' use of restraints until she hired the Loevy firm. <u>See</u> Terry Dep. at 56:23-58:11 (Exhibit 9).

170. The deputy who provided security for Plaintiff's hospital admission on day shift from March 10, 2014 to March 13, 2014, testified in depositions that she has removed restraints to

accommodate requests from healthcare providers and would have considered doing so in Plaintiff's case if asked by a healthcare provider. <u>See</u> Freuck Dep. at 75:25-76:3 (Exhibit 47).

171.     The Milwaukee County Sheriff's Department policy on Inmate Transportation (OP 5) provides for use of restraints during transport of inmates. <u>See</u> Detention Bureau – Inmate Transportation OP 5.7, Rev. Date July 2, 2008 at MKE County 2965-2975 (Exhibit 49). It does not have language specific to pregnant detainees. <u>Id.</u> at OP 5.7.

172.     Retired Inspector Edward Bailey, a 25-year veteran of the Milwaukee County Sheriff's Department and a former member of the command staff with responsibilities for overseeing the Jail, testified that he had never heard of an inmate grievance or family complaint related to the County's use of security restraints during detainee hospital watches. <u>See</u> Bailey Dep. at 4:14-15, 138:25-139:20 (Exhibit 28).

173.     The Milwaukee County Sheriff's Department received no inmate grievances between 2009 and 2015 pertaining to the use of cuffs or restraints during medical transports or hospital watches. <u>See</u> Burmeister Decl. (Exhibit 50).

174.     Inspector Bailey testified that the hospital watch policy allowed for removal of restraints on a case-by-case basis and could be removed based on medical need. <u>See</u> Bailey Dep. at 134:8-138:24 (Exhibit 28).

175.     Plaintiff was asked in an interrogatory request whether she suffered physical injury as a result of Defendants' conduct. She responded, "Plaintiff suffered through a painful, unmedicated, unattended labor and delivery, including a perineal tear." <u>See</u> Plaintiff's Second Suppl. Responses to Milwaukee Co. Defendants' First Set of Interrogatories, Response to Interrogatory 6(4) at 8-9 (Exhibit 48).

176.    Plaintiff was asked in an interrogatory request whether she claims that the placement of restraints interfered with her ability to receive medical care.  She responded, after objections, "Plaintiff's mobility was restrained." <u>See</u> Plaintiff's Second Suppl. Responses to Milwaukee Co. Defendants' First Set of Interrogatories, Response to Interrogatory 6(3) at 8-9 (Exhibit 48).

Respectfully submitted,

**LEIB KNOTT GAYNOR LLC**

Dated: <u>August 31, 2018</u>          By: *<u>/s/ Douglas S. Knott</u>*
                                           Douglas S. Knott, State Bar No. 1001600
                                           Cory J. Brewer, State Bar No. 1105913
                                           Attorneys for County Defendants
                                           219 N. Milwaukee Street, Suite 710
                                           Milwaukee, WI 53202
                                           Telephone: (414) 276-2102
                                           Fax: (414) 276-2140
                                           Email: dknott@lkglaw.net
                                           cbrewer@lkglaw.net