# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

REBECCA TERRY,

    Plaintiff,

v.

COUNTY OF MILWAUKEE, RICHARD
SCHMIDT in his official capacity, OFFICER
BRIAN WENZEL, JANE AND JOHN DOE,
UNKNOWN EMPLOYEES OF MILWAUKEE
COUNTY JAIL, JANE AND JOHN DOE,
UNKNOWN JAIL SUPERVISORS, ARMOR     Case No.:  17-cv-1112-JPS
CORRECTIONAL HEALTH SERVICES,
CAROLYN EXUM, MORGAN BEVENUE,
MARGARET HOOVER, JANE AND JOHN
DOE, UNKNOWN EMPLOYEES OF ARMOR
CORRECTIONAL HEALTH SERVICES,
JANE AND JOHN DOE, UNKNOWN
ARMOR HEALTHCARE SUPERVISORS,

    Defendants.

---

## COUNTY DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

   Defendants Milwaukee County, Acting Sheriff Richard Schmidt, Officer Brian Wenzel,

Carolyn Exum, R.N., Morgan Bevenue, R.N., and Margaret Hoover, R.N., (collectively, "the

County Defendants"), by their attorneys, submit the following brief in support of their motion for

summary judgment pursuant to Fed. R. Civ. P. 56.

## I.  INTRODUCTION

   As more fully set forth herein, Plaintiff Rebecca Terry purports to set forth claims of federal

civil rights violations arising out of the birth of her child in Milwaukee County Jail and subsequent

restraint.[1] Specifically, Plaintiff asserts the following claims as against the County Defendants:

---

[1] Defendant Armor Correctional Health Services, Inc., is represented by separate counsel.

1. deliberate indifference/denial of medical care in violation of the Eighth Amendment against all of the County Defendants;

2. supervisor liability against Nurse Hoover;

3. failure to intervene against Officer Wenzel and Nurses Exum, Bevenue, and Hoover;

4. a derivative <u>Monell</u> claim against Milwaukee County; and

5. a derivative claim for indemnification of Sheriff Schmidt and Officer Wenzel against Milwaukee County.

On Monday, August 27, 2018, Plaintiff informed the County Defendants that she is dismissing her claims against Nurse Hoover. This includes claims made under Counts I, II, and III of the Amended Complaint. As set forth below and developed in discovery, Plaintiff's claims against the remaining County Defendants fail for multiple reasons.

Plaintiff gave birth in the Special Medical Unit ("SMU") of the Milwaukee County Jail approximately four (4) hours after she was seen and evaluated at Froedtert Hospital. Following examination at Froedtert, she was declared "not in labor" and discharged in stable condition. <u>See</u> County Defendants' Proposed Findings of Fact (hereinafter "PF") 29, 32, 36, 67. The board-certified obstetrician at Froedtert Hospital was aware Plaintiff had been brought to that facility in custody to "rule out labor" after reporting intermittent abdominal cramping. <u>See</u> PF 33. Her physician concluded, after diagnostic testing, monitoring, and a series of examinations, that Plaintiff was not in labor and was "cleared to be transferred to the jail." <u>See</u> PF 36. The physician made no recommendation for the heightened monitoring that might be expected if labor was in progress or delivery imminent. <u>See</u> PF 54, 67-68. To the contrary, the Froedtert obstetrician estimated Plaintiff's due date was **<u>more than a week in the future</u>** and educated her on the signs

of early and false labor.  <u>See</u> PF 34-35.  She was instructed to stay hydrated and contact her doctor if she began to experience regular contractions.  <u>See</u> PF 39.

The change experienced by Plaintiff on arriving in her cell was entirely unexpected and without warning.  She testified her symptoms did not change from the time of discharge from Froedtert Hospital to after her arrival in the SMU.  <u>See</u> PF 83-85. Plaintiff testified she felt ten contractions total and delivered the baby on her third push while undergoing the simultaneous onset of both labor and symptoms of heroin withdrawal.  <u>See</u> PF 86-88.  It is undisputed none of the Jail nurses were aware of the change in her condition or had the opportunity to intervene.  <u>See</u> PF 74-75.  As such, Nurses Exum and Bevenue cannot have acted unreasonably as a matter of law.

Plaintiff also alleges she was constitutionally harmed by the correctional officer on duty in the SMU that evening.  Upon Plaintiff's arrival in the SMU, Officer Wenzel was informed that she had been taken to Froedtert Hospital for assessment and was medically cleared for admission to the Jail.  <u>See</u> PF 96.  He saw and heard nothing to suggest she had gone into labor until he heard a faint cry and found the child was born.  <u>See</u> PF 98-99, 103.  Two security staff personnel support his testimony.  <u>See</u> PF 104-108.  While Plaintiff alleges he ignored her complaints, there is no competent evidence Officer Wenzel was aware as a lay person that the Froedtert discharge diagnosis of a few hours earlier – "not in labor" and "stable" – was in error.  <u>See</u> PF 36, 52, 60, 67.

Attempting to bootstrap on the unexpected circumstance of childbirth in the Jail, Plaintiff also claims Milwaukee County policies are unconstitutional.  Paradoxically, Plaintiff cites Nurse Exum's diligent effort to gain more information about Plaintiff's condition from the Froedtert Labor & Delivery Department as evidence that the Jail's policy was to not get such information.  Similarly, she alleges the County's training of correctional officers on medical emergencies was

deficient while claiming, inconsistently, that Officer Wenzel ignored her out of indifference rather than a lack of training.  See ECF Doc. No. 129, ¶ 39.  Plaintiff ultimately fails to demonstrate an unconstitutional County policy existed that was a moving force behind the circumstances of her child's birth.

Finally, Plaintiff claims she was unconstitutionally restrained in the hospital after giving birth while being observed for heroin withdrawal.  Id., Count IV.  She acknowledges that she was in custody at all times pertinent and identifies no impediment to her healthcare or injury created by this security measure during a routine hospital stay.  Further, the secure restraint used was reasonable under the circumstances given Plaintiff's charges, her recent heroin usage and state of withdrawal, and the fact that her paramour and others attempted to visit and contact her while she was in the hospital.  See PF 8, 14-17, 148-150.

## II.      RELEVANT FACTS

Plaintiff was arrested by the Franklin Police Department at a motel on Sunday, March 9, 2014, at approximately 4:00 a.m.  See PF 8.  Plaintiff was aware at the time of her arrest that she was wanted on a Milwaukee County arrest warrant as well as an Order for Commitment issued by a municipal judge commanding that law enforcement take her into custody.  See PF 7-8.   Among the charges were possession of marijuana, possession of heroin, possession of cocaine, and felony bail jumping.  See PF 8.

Plaintiff initially provided the arresting officers two false names.  See PF 9.  She told the arresting officer she was pregnant and due in two days.  See PF 10.  She initially denied using heroin but admitted to it after the officer observed "an extreme amount of track marks on her hands, forearms and inner elbow."  Id.  She told the officer she had been using heroin daily for approximately three weeks.  Id.

Plaintiff denied having any medical issues at the time of her arrest.  See PF 11.  She was transported by the Franklin Police Department to the Milwaukee County Jail ("Jail").  See PF 18.  Plaintiff was assessed for admission to the Jail by Registered Nurse Margie Burton at 6:28 p.m. on March 9, 2014.  See PF 20.  She informed the nurse she was pregnant and due on March 11.  Id.  Plaintiff informed Nurse Burton this was her 13th pregnancy and that she had been using heroin IV daily on and off for four years.  She also admitted to using heroin daily over the last year.  See PF 21.

Nurse Burton's assessment was: "PREGNANT; OPIATE ABUSE; NO PRENATAL CARE."  See PF 23.  By her own admission, Plaintiff did not tell Nurse Burton that she was experiencing contractions.  See PF 25-26.  She merely told Nurse Burton she was "experiencing pressure" which she described as "constant."  See PF 25.  Plaintiff told Nurse Burton she was due "that day," meaning March 9, 2014.  See PF 28.  Nurse Burton consulted with the nurse practitioner on duty and received authority to refer Plaintiff to Froedtert Hospital for medical clearance.  See PF 24.

Plaintiff was transported by correctional personnel from MCJ to Froedtert Hospital for medical assessment and, if necessary, in-patient treatment.  See PF 29.  She does not remember communicating with the Sheriff's Department personnel who transported her to Froedtert Hospital.  See PF 30.  She did not tell the transporting personnel that she was uncomfortable due to restraints.  Id.  Plaintiff testified the abdominal pressure remained constant from the time she left the Jail on March 9, 2014 through the time she was assessed at Froedtert.  See PF 41.  She remembers being sleepy on her arrival there.  See PF 31.

Froedtert Hospital Labor & Delivery Department records reflect that Plaintiff's "chief complaint" was "r/o [rule out] labor."  See PF 33.  She described experiencing "tightening" in her

lower abdomen to the staff at Froedtert, "but not tightening like a contraction."  See PF 31. Plaintiff was monitored by physicians and nurses in the Labor & Delivery Department from approximately 9:55 p.m. in the evening of March 9, 2014, to approximately 1:02 a.m. on March 10, 2014.  See PF 32.  The obstetrics staff performed serial examinations that revealed her cervical effacement and dilatation did not change over time, *i.e.*, she was not in labor or progressing toward delivery.  See PF 36, 37.

Plaintiff reported to the obstetrical staff at Froedtert that she had an ultrasound at another hospital during her 8th week of pregnancy in August 2013.  See PF 34.  Froedtert staff contacted that hospital and were informed that the ultrasound at that facility estimated her due date as March 18, 2014.  Id.  An ultrasound performed at Froedtert on March 10, 2014 concluded her status was "consistent with" an estimated due date of March 18, 2014.  See PF 35.  Two obstetric specialists – obstetrics resident Dr. Lindsay A. Dickerhoff and Dr. Raj Narayan – approved an "Assessment/Plan" for Plaintiff that concluded she "is not currently in labr (sic)."  See PF 36.  The specialists advised, "Patient cleared to be transferred to jail."  Id.

Plaintiff does not recall speaking to the escorting officers during her transport from Froedtert Hospital to the Jail on March 10, 2014.  See PF 42.  She does not recall telling them she was uncomfortable due to restraints.  Id.  Plaintiff does not believe she was experiencing contractions on discharge from Froedtert Hospital and return to the Jail.  See PF 43.  She only recalled "feeling sore."  See PF 44.  Her sensation of abdominal pressure remained constant from the time she left the Jail initially on March 9, 2014, through the period she was assessed at Froedtert and her return to the Jail.  See PF 41.

Plaintiff does not recall her re-admission to the Jail from the time of her arrival until she was transferred with a correctional officer from the booking area to the Special Medical Unit.  See

PF 45.  She does not recall the substance of her conversation with the booking nurse, Nurse Carolyn Exum.  See PF 46.  Nurse Exum interviewed and assessed Plaintiff on her return from Froedtert Hospital at approximately 1:15 a.m.  See PF 48.  Nurse Exum's assessment took about 20 minutes and included checking her vitals.  See PF 49.  Nurse Exum assessed Plaintiff to make sure she was not having contractions.  See PF 50.  Plaintiff told Nurse Exum she was experiencing "pressure at the bottom of her stomach" but "denied contractions at present."  See PF 53.  Nurse Exum's assessment was that Plaintiff was "at risk for early labor r/t [related to] hx [history] of heroin abuse."  See PF 51.

Nurse Exum called the on-call physician, Dr. Gina Bouno, at approximately 1:15 a.m. to discuss Plaintiff.  See PF 54.  She informed Dr. Buono that Plaintiff had been medically-cleared by Froedtert Hospital but that the clearing physicians there had provided "generic orders" that did not specifically address Plaintiff's heroin use.  Id.  Dr. Buono authorized Nurse Exum to admit Plaintiff to the Jail and house her in the SMU.  See PF 55.  Placement in the SMU was consistent with Jail protocol, which provided that pregnant females who are more than 32 or 36 weeks into their pregnancy are housed in the SMU.  See PF 56.

Dr. Buono instructed Nurse Exum to contact the Froedtert Labor & Delivery Department to get the Discharge Summary, a signed report by the physician in charge that would summarize the assessment and findings at that facility, as well as potentially provide directions for future care and treatment.  See PF 57.  Nurse Exum called the Labor & Delivery Department at approximately 1:20 a.m.  See PF 59.  She spoke with a nurse and asked if the Jail could receive a copy of the doctor's Discharge Summary.  The Froedtert nurse informed Nurse Exum that she would page the physician to request that he complete the document.  Id.  Nurse Exum provided the Jail's fax number so that the orders could be expedited.  Id.

Plaintiff was admitted to the SMU at approximately 1:45 a.m. See PF 82. By her own admission, the sensation of pain she was experiencing at the time of arrival at the SMU had not changed from what she had described to the obstetric specialists at Froedtert prior to her discharge from the hospital. See PF 83. Plaintiff testified that after her arrival in the SMU she began to experience a "progressive change" in her symptoms. See PF 84-85. She simultaneously began to experience both symptoms of heroin withdrawal and labor. See PF 86. Plaintiff testified she experienced ten (10) contractions before her baby was born. See PF 87. She testified she was able to deliver her baby with three (3) voluntary pushes. See PF 88.

Correctional Officer Wenzel was conducting a security round at approximately 4:44 a.m. when he heard a faint cry and heard Plaintiff ask for help. See PF 98. Officer Wenzel immediately telephoned Master Control at the Jail so that officers in Master Control could simultaneously contact security and medical staff to declare a medical emergency. See PF 100. Three to four officers and medical personnel, including Nurse Exum, arrived at the SMU within 30 seconds to one minute of Officer Wenzel's call. See PF 101. Additional personnel, including Nurses Hoover and Bevenue, arrived at the cell within minutes. See PF 109-110.

Plaintiff was transported from the Jail to Aurora Sinai Hospital by emergency medical personnel associated with the Milwaukee Fire Department. See PF 115. She has no recollection of being restrained by security during her transport from the Jail to Aurora Sinai Hospital. See PF 117. She remained at the hospital from March 10, 2014 to March 13, 2014, so that she could receive "detoxification" and monitoring for opioid withdrawal at the recommendation of Dr. Hertzl Spiro, a psychiatrist. See PF 121-122. Plaintiff concedes she "received all the care [she] felt she needed" at Aurora Sinai. See PF 119.

Plaintiff did not suffer additional pain or physical injury from childbirth beyond that she would have experienced if she had given birth in a hospital. There are no Sinai records indicating she suffered a postpartum complication other than her experience of withdrawal. See PF 127. Plaintiff was assessed by a psychiatrist for opiate withdrawal, but did not relate any flashbacks or nightmares resulting from the incident in the Jail. See PF 129. As of the date of this filing, Plaintiff has provided no expert opinions, medical records, or other documents suggesting she suffered a physical or psychological injury as a result of her experience.[2]

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment should be entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists when the evidence requires a fact finder to resolve the parties' differing versions of the truth at trial. Id. at 249. Further, a factual dispute is genuine only if a reasonable jury could find for either party. Stokes v. Bd. of Educ. of Chicago, 599 F.3d 617, 619 (7th Cir. 2010); Kuhn v. Goodlow, 678 F.3d 552, 555 (7th Cir. 2012). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." Id. at 247-48 (emphasis in original).

---

[2] Plaintiff's refusal to properly disclose medical information, including identification of treating mental health providers, was the subject of motions filed on June 20 and 21, 2018. See ECF Doc. Nos. 135-137. Defendants served discovery in January 2018 designed to elicit any diagnoses Plaintiff may claim, as well as the source of the diagnoses and treatment. They have yet to receive a medical record confirming that Plaintiff was diagnosed with Post Traumatic Stress Disorder, as she claims, as a result of the March 10, 2014, incident.

The Supreme Court has explained:

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Thus, the burden on the party moving for summary judgment is not to show the "absence of a genuine issue of material fact," but rather to show "that there is an absence of evidence to support the non-moving party's case." Id. at 325.

Once a motion for summary judgment has been made and properly supported, the non-movant has the burden of setting forth specific facts showing the existence of a genuine issue of material fact for trial. Id. Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts"; she must present "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the non-movant must present definite, competent evidence in rebuttal. Salvadori v. Franklin Sch. Dist., 293 F.3d 989, 996 (7th Cir. 2002).

A reviewing court should construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in their favor. Anderson, 477 U.S. at 255; Draper v. Martin, 664 F.3d 1110, 1113 (7th Cir. 2011). Only reasonable inferences, not all conceivable inferences, will be drawn. Adikes v. S.H. Kress & Co., 388 U.S. 144 (1980). However, "before a non-movant can benefit from a favorable view of the evidence, it must show that there is some genuine evidentiary dispute." SMS Demag Aktiengesellschaft v. Material Scis. Corp., 565 F.3d 365, 368 (7th Cir. 2009).

## IV.    ARGUMENT

The Court granted Plaintiff an opportunity to re-craft her allegations by amended pleading after substantial discovery.  See ECF Doc. No. 127 at 28.  Despite that opportunity, her Amended Complaint remains deficient in its allegations and unsupported by the evidence.  See ECF Doc. No. Doc. 129.  Plaintiff misrepresents indisputable evidence when she alleges Froedtert physicians told her and County deputies "that Plaintiff was in labor" when she was cleared by the hospital for admission to the Jail.  See ECF Doc. No. 129, ¶ 22.  The allegation is a misrepresentation of objective medical fact and demonstrably false.  As Plaintiff knows, Froedtert obstetricians declared she was "not in labr (sic)" and was stable for admission to the Jail.  See PF 31-37.  Nurse Exum called the Froedtert obstetrics nurse to confirm Plaintiff was not in labor.  See PF 59-60.  Plaintiff's persistence in misrepresenting her condition on discharge from Froedtert is astounding.

The Amended Complaint makes a similarly baseless and indefensible allegation that Plaintiff told the Jail's booking nurse that Froedtert had concluded she was in labor.  See ECF Doc. No. 129, ¶ 24.  Plaintiff testified under oath that she could not recall having a conversation with the booking nurse.  See PF 44-45.

The patently false assertion in the Amended Complaint that Plaintiff was found to be in labor on her discharge from Froedtert belies the central flaw in her claims.  Plaintiff cannot assert individual indifference or systemic flaws where the Jail was diligent in having her assessed by eminently qualified specialists at the Froedtert Labor & Delivery Department and that Department found she had no immediate medical need.  See PF 24, 29-39.  Setting aside baseless hyperbole in the pleading, as the Court must, the evidence demonstrates Plaintiff's childbirth occurred mere hours after she was assessed and medically cleared by well-qualified specialists, the Jail appropriately relied upon the advice of those specialists, the onset of her labor was precipitous and

indistinguishable from her symptoms of heroin withdrawal, and no Jail personnel were aware of her change in condition before her child was delivered. As such, there is no basis for either individual or <u>Monell</u> liability as a matter of law. The County Defendants will address each of the Amended Complaint's counts and purported causes of action, as best they can be discerned, and request summary judgment in their favor for the following reasons.

## A.  <u>Count I – Deliberate Indifference</u>

Plaintiff's narrative in her initial Complaint was that she was in labor on initial presentation to the Jail, experiencing contractions, taken to Froedtert Hospital where they confirmed labor and impending delivery, then returned to the Jail and maliciously ignored by the nursing staff. <u>See</u> ECF Doc. No. 1, *passim*. As noted above, that narrative is indisputably false. By her own admission, Plaintiff did not believe she was experiencing contractions before being taken to Froedtert, did not tell Froedtert staff she was experiencing contractions, and does not believe she was experiencing contractions either while at Froedtert or during her return to the Jail. <u>See</u> 26, 27, 31,41, 43.

The gravamen of her amended claim against Defendants Carolyn Exum, R.N., Morgan Bevenue, R.N., and Margaret Hoover, R.N. (collectively the "Nurse Defendants"), is subtler. Plaintiff now claims they failed to obtain adequate information from Froedtert regarding its assessment of her condition before Nurse Exum and Dr. Buono accepted her back to the Jail. <u>See</u> ECF Doc. No. 129, ¶¶ 24-25, 62-63. She selectively includes information from Froedtert's discharge report that she claims the Nurse Defendants "failed" to obtain despite Nurse Exum's immediate call to Froedtert to obtain precisely that report. <u>Id.</u> at 62-63; PF 59. However, the discharge report was not prepared by the Froedtert physicians until two hours after Plaintiff gave birth. <u>See</u> PF 65.

While accusing Nurse Exum of not obtaining the discharge report, Plaintiff ignores the more salient point that the report concluded Plaintiff was "stable" and cleared for discharge to the Jail because her physicians deemed that she was not in labor and had no immediate medical needs. See PF 38-38, 67. It is not clear what Plaintiff believes should have been done after she was discharged in stable condition with no further recommendations for care by the Froedtert obstetricians. Her physicians had determined she was medically fit for admission to the Jail and this determination was not undermined because her paperwork was incomplete. Regardless, neither Nurse Exum nor Nurse Bevenue acted unreasonably as a matter of law.

### 1. Nurse Exum and Nurse Bevenue Acted Reasonably

In the Amended Complaint filed June 14, 2018, Plaintiff alleged the claims against the individual Defendants as "Deliberate Indifference – Denial of Medical Care." See ECF Doc. No. 129, ¶ 56, *et seq.* The Seventh Circuit held on August 10, 2018 that the Eighth Amendment subjective deliberate indifference standard is not applicable to pretrial detainees and that a detainee alleging denial of medical treatment under the Fourteenth Amendment must instead show a defendant "acted purposefully, knowingly, or perhaps even recklessly" and that the defendant's conduct was objectively unreasonable. Miranda v. Cnty. of Lake, __ F.3d __, 2018 U.S. App. LEXIS 22229, at *30, *32 (7th Cir. Aug, 10, 2018); McWilliams v. Cook Cty., 2018 U.S. Dist. LEXIS 140276, at *13-14 (N.D. Ill. Aug. 20, 2018). It is clear that summary judgment is appropriate for Nurse Exum and Nurse Bevenue on Count I under the Miranda standard. [3]

---

[3] The County Defendants address the claims here under Miranda but believe they are entitled to summary judgment under the subjective deliberate indifference standard as well. Board v. Farnham, 394 F.3d 469, 479-80 (7th Cir. 2005) (describing Eighth Amendment deliberate indifference standard).

### a. Plaintiff did not have a serious medical need when she returned to the Jail on March 10, 2018

Plaintiff's claim against the Nurse Carolyn Exum and Nurse Morgan Bevenue is premised on the objectively false and indefensible assertion that the Froedtert obstetricians concluded she was in labor and that Plaintiff informed the nurses that she was having contractions on her return to the Jail after medical clearance. See ECF Doc. No. 129, ¶ 22, 24. The bare allegations of the Amended Complaint are unsupported by the medical record and Plaintiff's own testimony.[4] See PF 44-45, 59-60. They should be ignored. See Scott v. Harris, 550 U.S. 372, 380-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Nurse Exum was the booking nurse who assessed Plaintiff on her return to the Jail after discharge and clearance from Froedtert's Labor & Delivery Department. See PF 47-48. She assessed Plaintiff at approximately 1:15 a.m., confirming that she was not having contractions at that time. See PF 50, 53. She called the Froedtert obstetrics nurse to request the physician's discharge report and was told that the physicians had concluded she was not in labor and was stable for discharge to the Jail. See PF 59-60. There is simply no basis in the medical record to support Plaintiff's allegation that Nurse Exum "acted purposefully, knowingly, or perhaps even recklessly" to a woman "in labor." See ECF Doc. No. 129, ¶ 22.

Plaintiff's own account of her symptoms contradicts her pleading and is unreliable. Nurse Exum observed that Plaintiff "definitely had been using something" and Plaintiff admitted she had been binging on heroin. See PF 61, 62. Although she alleges in the Amended Complaint that she

---

[4] It should be noted that Plaintiff gave her deposition testimony on June 1, 2018, a full two weeks before her contradictory Amended Complaint was filed.

informed the booking nurse (Nurse Exum) that she was in labor, Plaintiff testified that she does not remember arriving at the Jail, being booked, **or her conversation with Nurse Exum**. See PF 45, 46. Thus, Plaintiff has admitted that she cannot remember informing Nurse Exum she was in labor, one of the central allegations of her case and the basis for the claim that Nurse Exum unconstitutionally denied her medical treatment. See ECF Doc. No. 129, ¶¶ 22, 24.

Critically, Plaintiff admitted in her deposition the sensation of lower abdomen pain that she was experiencing when she was admitted to the Jail on March 10 was precisely the same as she had described to the Froedtert obstetricians before they cleared her. See PF 83-84. By her own admission, her symptoms did not change from the time she was cleared by the Froedtert specialists through the time she was assessed by Nurse Exum. Id. In fact, Plaintiff admitted there was no change in her symptoms from the time she was at the Jail initially on March 9 until after she was admitted to the SMU on March 10. See PF 41, 83-84. Plaintiff's condition at the time of her interaction with Nurse Exum was unchanged from the time she was medically cleared by Froedtert.

Having undertaken to obtain an outside professional's assessment, it was reasonable and appropriate for Nurse Exum to rely on the Froedtert physicians' professional assessment that Plaintiff "stable" and "not in labor", which was confirmed for her in a call directly to the Labor & Delivery nurse who cared for Plaintiff. See PF 36, 60, 67; see Hartbarger v. Blackford County Dep't. of Public Welfare, 733 F. Supp. 300 (N.D. In. 1990) ("knowledge of her advanced stage of pregnancy is insufficient by itself to put a reasonable jail commander on notice that an inmate has a serious medical condition" where plaintiff was seven months pregnant). It was reasonable to conduct her own assessment of Plaintiff, who informed Nurse Exum that she was not experiencing contractions following her return to the Jail. As she did not have any serious medical need during

her time at Froedtert and upon her return to the Jail, Plaintiff's denial of medical treatment claim against Nurse Exum fails as a matter of law and must be dismissed.

**b. Nurse Exum was not unreasonable in admitting Plaintiff to the SMU prior to obtaining more medical information**

Plaintiff asserts Nurse Exum acted unreasonably by failing to obtain additional medical information from Froedtert about her cervical dilation and effacement. See ECF Doc. No. 129, ¶¶ 26, 63. This claim is meritless for a number of reasons. First, it is indisputable that Nurse Exam acted reasonably. She contacted the on-call physician, Dr. Bouno, at approximately 1:15 a.m. to discuss Plaintiff minutes after she returned to the Jail. See PF 54. She informed Dr. Buono that Plaintiff had been medically-cleared by Froedtert Hospital but the clearing physicians there had provided "generic orders" that did not specifically address Plaintiff's heroin use and status. Id. Dr. Buono authorized Nurse Exum to admit Plaintiff to the Jail and house her in the SMU. See PF 55. It cannot be considered unreasonable to contact the Jail's Medical Director for guidance, provide a full report, and to do as ordered. See Robertson v. Jackson, 2014 U.S. Dist. LEXIS 4504, at *3 (N.D. Ind. 2014) ("Nurses are expected to follow orders given by the doctors for whom they work. Nothing in this complaint indicates that it was unreasonable for the nurse to have relied on the standard division of labor in this instance.").

Dr. Buono instructed Nurse Exum to contact the Froedtert Labor & Delivery Department to get the Discharge Summary. See PF 57. Nurse Exum followed that direction and called the Labor & Delivery Department at approximately 1:20 a.m. See PF 59. She spoke with a nurse and asked if the Jail could receive a copy of the doctor's Discharge Summary. Id. The Froedtert nurse informed Nurse Exum that she would page the physician to request that he complete the discharge orders. Id. Nurse Exum provided the Jail's fax number so that the orders could be expedited. Id. None of this conduct was unreasonable or reckless. To the contrary, it was entirely reasonable for

Nurse Exum – and any other nurse in her position – to diligently carry out Dr. Buono's orders. Dr. Buono was fully advised of Plaintiff's circumstance, including the generic orders, and did not specify heightened attention to Plaintiff or more frequent assessments than typically would be done. Nurse Exum attempted to expedite the receipt of information from Froedtert. Thus, it was appropriate for Nurse Exum to rely on the Froedtert obstetrician's and Dr. Buono's guidance.

Plaintiff asserts that it violates the Constitution for a nurse to rely on "generic orders" from a medical specialist and directions from a Medical Director rather than more specific information. See ECF Doc. No. 129, ¶ 63. In doing so, it appears she is arguing Nurse Exum was negligent rather than unreasonable or reckless. If there is a decision finding the difference between "generic" and "specific" orders to be of constitutional significance, the County Defendants are unaware of it. See County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998) ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process").

It is also worth noting that the Discharge Summary which Plaintiff contends should have been obtained as a condition for admission was signed by the Froedtert attending physician, Dr. Narayan, at 6:52 a.m. on March 10, 2014. See PF 67. Plaintiff's child was born around 4:44 a.m. on March 10, 2014. See PF 98. No action or inaction by Nurse Exum caused the Froedtert physician to delay completion of the requested paperwork until after the birth of Plaintiff's child. Nurse Exum documented at 7:19 a.m. that she was still waiting to receive the Froedtert discharge orders. See PF 66.

In addition, any delay in receiving the requested information from Froedtert cannot be deemed causal of a constitutional harm. When completed, the Discharge Summary had no particular recommendations for observation or monitoring of Plaintiff. See PF 68. The Froedtert obstetricians were not concerned enough to keep Plaintiff in their delivery unit. In fact, they

discharged her, concluding she was definitively not in labor. <u>See</u> PF 37. There is no reason to believe the outcome would have been different had the Discharge Summary been completed hours earlier and carried by Plaintiff to the Jail as she alleges was constitutionally necessary.

### c. There is no evidence Nurse Morgan Bevenue was aware of a serious medical need or acted unreasonably

Nurse Bevenue was the nurse assigned to the housing units on third shift of March 9-10, 2014. <u>See</u> PF 76. Her routine was to perform a round to check inmates in the SMU at the beginning of her shift around 11:00 p.m. and the end of her shift around 6:00 a.m. <u>See</u> PF 77. Nurse Bevenue would make additional visits to the SMU if a physician had ordered more frequent assessments of an inmate or if medication distributions were required. <u>See</u> PF 78. Dr. Buono did not order additional nursing assessments for Plaintiff despite knowing Plaintiff's circumstances. <u>See</u> PF 80. Nurse Bevenue performed her initial SMU check before Plaintiff arrived there, and Plaintiff gave birth before Nurse Bevenue returned. <u>See</u> PF 79, 109.

Nurse Bevenue may have been informed by Nurse Exum that Plaintiff was admitted to the SMU. <u>See</u> Knott Decl., Bevenue Dep. at 83:12-18 (Exhibit 17). If she had been so informed, she would have been informed that Plaintiff had been discharged from Froedtert in stable condition and deemed not in labor. <u>See</u> PF 37, 60. Absent additional directions from Dr. Buono, there was no reason for Nurse Bevenue to change her routine.

Further, Plaintiff admitted her symptoms did not change from the time she was cleared and discharged from Froedtert until after she was admitted to the SMU. <u>See</u> PF 41, 43, 53, 85-88; <u>see also</u> ECF Doc. No. 129, ¶ 37 ("Soon after entering her cell, Plaintiff began experiencing more labor pains, much more intensely and closer together than before."). When her symptoms changed, Plaintiff contends Officer Wenzel refused to alert anyone of that fact. <u>See</u> ECF Doc. No. 129, ¶ 39. Accordingly, there is no evidence Nurse Bevenue was aware of facts (or could reasonably

have been aware of facts) suggesting Plaintiff's condition had changed at any time from her admission to the SMU to the time the medical emergency was called. See PF 75. As such, Nurse Bevenue could not have known Plaintiff had any alleged serious medical need.

Nurse Bevenue's actions were also reasonable under the circumstances. She received no order from Dr. Buono to perform additional checks on Plaintiff. As discussed above, even had Nurse Bevenue been informed that Plaintiff was admitted to the SMU, she would have been told Plaintiff had been discharged from Froedtert in stable condition and deemed not in labor. In the absence of any facts which could have raised a heightened concern regarding Plaintiff's condition, Nurse Bevenue's actions were reasonable. In addition, there are no facts of record showing Nurse Bevenue acted purposefully or knowingly to deny Plaintiff medical treatment as required by the Seventh Circuit in Miranda.

## 2. Plaintiff's Claim against Officer Wenzel Fails

Plaintiff's claim for denial of medical treatment under Count I against Officer Wenzel fares no better. Officer Wenzel's understanding of Plaintiff's condition was premised on the professional assessments communicated to him after she returned from Froedtert. He cannot be held liable for deferring to those medical assessments. When Officer Wenzel became aware the assessment of Froedtert physicians regarding Plaintiff's condition was either incorrect or could no longer be relied upon, he took immediate action. His response based on this objectively obvious change in Plaintiff's condition, *i.e.*, his observation that she had given birth – precludes a finding of that he acted unreasonably to deny Plaintiff medical treatment.

### a. Officer Wenzel was not aware of a change in Plaintiff's medical condition and so had a serious medical need

Officer Wenzel explained his account of the events in a written report and in his deposition testimony. He was on duty during the third-shift (2200-0630 hours) in the SMU. See ECF Doc.

No. 129; ¶ 36; PF 89.  Jail logs demonstrate he arrived in the SMU at 10:19 p.m.  See PF 90.  When he arrived in the SMU there were five (5) inmates housed in the unit, which is a locked unit consisting of 11 cells.  See PF 91.  Plaintiff became the sixth inmate assigned to the SMU, arriving by security escort at approximately 1:45 a.m.  See PF 95.

Officer Wenzel was informed soon after Plaintiff's arrival in the SMU that she had been taken to Froedtert Hospital that evening for assessment of potential labor pains and that she was medically cleared by Froedtert physicians for admission to the Jail.  See PF 96.  Officer Wenzel conducted five (5) security tours, looking in each occupied cell in the SMU, between 1:45 a.m. and 4:45 a.m.  See PF 93.  Correctional Officer Decorie Smith came to the SMU to provide a break for Officer Wenzel and remained in the SMU from 3:11 a.m. to 3:41 a.m.  See PF 104.  Officer Smith conducted an inspection of the cells at 3:27 a.m., noting in the log that the inspection was completed and "No inmates in obvious physical distress."  See PF 105.

Lieutenant Crystalina Montano was a supervisor on duty the night of March 9-10, 2014. See PF 106.  Lt. Montano entered the SMU shortly prior to 4:41 a.m. to perform a supervisory round.  See PF 107.  Lt. Montano recalls asking Officer Wenzel if "the pregnant girl" had come back to the Jail from the hospital.  See PF 108.  Officer Wenzel responded, "Yes, she's in Cell 3." Id.  Lt. Montano then looked in Cell 3 and noted Plaintiff appeared to be sleeping.  Id.

At approximately 4:44 a.m., Officer Wenzel was conducting a security round when he heard a faint cry and heard Plaintiff ask for help.  See PF 98.  Officer Wenzel immediately telephoned Master Control at the Jail so that officers in Master Control could simultaneously contact security and medical staff to declare a medical emergency.  See PF 100.  Emergency and security personnel – including Nurses Exum, Hoover, and Bevenue – responded, and Plaintiff was ultimately transported to Aurora Sinai Hospital for further assessment.  See PF 101, 110, 115.

Officer Wenzel testified that he was unaware before 4:44 a.m. that Plaintiff had gone into labor and delivered.  See PF 103.  Prior to that time, he had heard only rustling noises in her cell, which he described as "like moving of sheets."  See PF 99.  There is no evidence or testimony to contradict Officer Wenzel's testimony as to his own awareness of Plaintiff's change in condition. Nor is there competent evidence to dispute the testimony of Officer Smith and Lt. Montano, both of whom toured the SMU and looked in Plaintiff's cell during the "more than three hours" that Plaintiff alleges she was "in labor, alone in her cell screaming for help."  See ECF Doc. No. 129, ¶ 45.  Neither Officer Smith or Lt. Montano observed facts suggesting Plaintiff had an immediate need for assistance.  See PF 105, 108.

### b. Officer Wenzel appropriately deferred to medical professionals' assessment of Plaintiff.

Plaintiff alleges she was "in labor" from her initial arrival at the Jail before being sent to Froedtert for assessment.  See ECF Doc. No. 129, ¶ 19.  She contends – contrary to the indisputable documentary evidence – that the Froedtert obstetricians confirmed that she was "in labor" before discharging her.  Id., ¶ 22; PF 37, 60.  Plaintiff alleges she informed Nurse Exum that she was "in labor" (despite her testimony that she does not recall speaking to the booking nurse).  See ECF Doc. No. 129, ¶ 24; PF 45-46. In short, Plaintiff contends she told every healthcare professional she encountered on March 9-10, 2014 that she was in labor and each healthcare professional determined – after assessing her – that she was not in labor.  Rather, each determined she was stable for admission to the SMU with no risk of imminent delivery.

In order for Officer Wenzel to have been objectively aware of Plaintiff's alleged serious medical need, he would have to conclude that every healthcare professional she had encountered was wrong.  The Constitution imposes no such obligation.  Officer Wenzel is a correctional officer,

not a trained healthcare professional. He is entitled to rely upon the input and opinions of the professionals. As stated by the Seventh Circuit,

> [T]he [non-medical] officers present in the County facility [who allegedly failed to help an arrestee suffering a serious adverse health issue in their presence] were entitled to summary judgment. These officers were not medical professionals. Therefore, they were entitled to rely upon the nurses' professional judgment without subjecting themselves to § 1983 liability. See Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2005) ("If a prisoner is under the care of medical experts … a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.") (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (internal quotation marks omitted)); see also Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants … can rely on the expertise of medical personnel.").

Estate of Perry v. Wenzel, 872 F.3d 439, 458 (7th Cir. 2017). "[T]he law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010). A layperson's failure to tell the medical staff how to do its job cannot be the source of constitutional liability. Burks v. Raemisch, 555 F.3d 592, 596 (7th Cir. 2009).

In the instant matter, Officer Wenzel acted reasonably when he deferred to the trained medical opinions of multiple healthcare providers – including specialists at Froedtert Hospital – that Plaintiff was not in labor and that the birth of her child was days away. Therefore, he was not objectively aware that Plaintiff had a serious medical need until he heard a baby crying and Plaintiff ask for help at 4:44 a.m. See PF 98-99, 103. Once he became aware of her need for assistance, he immediately sought help. See PF 100-102. Thus, it cannot be said he acted unreasonably to deny Plaintiff medical treatment.

### B.  Count II – Supervisor Liability against Nurse Hoover

Count II of the Amended Complaint asserted a claim for supervisory liability against Nurse Margaret Hoover.  As stated above, on Monday, August 27, 2018, Plaintiff informed the County Defendants that she was dismissing all claims against Nurse Hoover.

### C.  Count III – Failure to Intervene

Plaintiff asserts Defendants Wenzel, Exum, and Bevenue failed to intervene to prevent her alleged injury.  Liability for failure to intervene arises only where a state actor had reason to know that a constitutional violation was "be[ing] committed by [another state actor]; and [he or she] had a realistic opportunity to intervene to prevent the harm from occurring." Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994).  The Amended Complaint lacks any non-conclusory allegations of fact supporting either of these elements against any of the individual Defendants identified in Count III.  Nor can Plaintiff prove her bare allegations.  She was cleared for admission to the Jail by appropriately-trained specialists.  See PF 32, 36.  By her own admission, her condition did not change until after she was in her cell in the SMU.  See PF 82-85.  There is no basis for suggesting any Defendant was in a position to know that another Defendant was unconstitutionally denying Plaintiff medical treatment.

As such, Plaintiff's failure to intervene claim under Count III should be dismissed for the reasons set forth above and on the basis of the undisputed facts.

### D.  Claims Against Sheriff Schmidt Must Be Dismissed

Former Sheriff David Clarke was named in the initial Complaint as a Defendant in both his individual and official capacities.  See ECF Doc. No. 1, *passim*.  Plaintiff agreed to dismiss her claims against Sheriff Clarke in his individual capacity and this Court ordered that Sheriff Richard Schmidt be substituted in place of Sheriff Clarke for any official capacity claims alleged.  See ECF Doc. No. 127 at 29.  Sheriff Clarke was dismissed from the litigation by the Court's Order dated

June 4, 2018.  <u>See</u> ECF Doc. No. 127 at 29.  In re-pleading, Plaintiff appears to assert individual capacity claims against Sheriff Schmidt despite the Court's dismissal of those claims.  <u>See</u> ECF Doc. No. 129, ¶ 7.  Sheriff Schmidt has not been served, and to the extent that allegations are made against him in his personal capacity, they are contrary to the Court's order and should be dismissed.

### E.  <u>The Individual Defendants Are Entitled to Qualified Immunity</u>

Even if the Court finds the issue of whether there was a Constitutional violation too close to call, the Individual Defendants are nevertheless entitled to qualified immunity, which "protects [officials] from facing suit, not merely liability."  <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001) *overruled on other grounds by* <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009).  As stated by the Supreme Court, police officers should be protected by qualified immunity unless "existing precedent [has] placed the statutory or constitutional question beyond debate" and "every" officer would have known that his actions were violative of the Constitution.  <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011) (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).

A government official is entitled to qualified immunity if a reasonable official could have believed that their conduct was lawful in light of clearly established law and the information the official possessed at the time.  <u>Anderson</u>, 483 U.S. at 641.  Qualified immunity gives officials "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  <u>Hunter v. Bryant</u>, 502 U.S. 224, 229 (1991) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 343, 341 (1986)).

The <u>al-Kidd</u> Court reiterated the two-step test to determine whether a law enforcement officer is entitled to qualified immunity that requires courts to decide: "(1) [whether] the official violated a statutory or constitutional right, and (2) [whether] the right was 'clearly established' at the time of the challenged conduct." 563 U.S. at 735.  For a right to be 'clearly established', "**every**

'reasonable official would have understood that what he is doing violates that right.'" Id. at 741. (emphasis added). Thus, an official is entitled to qualified immunity if their actions were those that a reasonable official would have taken. This Court should ask if the actions of the Individual Defendants were reasonable in light of the clearly established law and the information known to them at the time, not whether another reasonable, or more reasonable, interpretation of the events can be constructed after the fact. Humphrey v. Staszak, 148 F.3d 719, 725 (7th Cir. 1998) (citing Hunter, 502 U.S. at 228).

The claimed violations here not only fail as discussed above, but at minimum, the Individual Defendants' actions were not so egregious that it could be said that "every" reasonable official would have known it was constitutionally prohibited.

### 1. Correctional Officer Wenzel is entitled to qualified immunity

Plaintiff's experience is hardly a classic presentation for labor and delivery. If – as she contends – Plaintiff was in labor from the beginning, her signs and symptoms of labor were misleading enough that obstetricians at Froedtert Hospital could not detect her true condition. She was assessed **for several hours** and discharged for admission to the Jail in stable condition and "not in labr (sic)." See PF 36, 60.

Plaintiff has limited recollection of arriving back at the Jail. Her memory is blank from the time of her arrival at the Jail until she was escorted by a correctional officer to the SMU. See PF 45. She recalls, "I remember being sleepy, but that was about it." See PF 44. She does not remember speaking to Nurse Exum, the booking nurse who in fact spent 20 minutes with Plaintiff on her return. See PF 46, 49. Nurse Exum corroborates that Plaintiff was unfocused, like she "definitely had been using something." See PF 61. Plaintiff confirmed she had been binging on heroin prior to her arrest. See PF 62.

Officer Wenzel was informed Plaintiff had been taken to Froedtert Hospital for assessment of potential labor pains, but that she was cleared from Froedtert as not in labor.  See PF 96.  He was also told that she was a heroin user and may be experiencing withdrawals.  See PF 97.  A defense expert, Dr. Dolan, will testify that Plaintiff was likely experiencing an anesthetic effect from her drug use.  See Knott Decl., Dolan Disclosure, ¶ 20 (Exhibit 51).

Plaintiff was present in the SMU for approximately three (3) hours before she gave birth. See PF 82, 98.  Officer Wenzel was present during approximately 2.5 of those hours.  See PF 89-90, 95, 104.  When Plaintiff actually experienced contractions, she described her signs of labor as coinciding with the onset of withdrawal.  See PF 86.  She then gave birth relatively rapidly – ten contractions total and three pushes.  See PF 87-88.

Plaintiff's labor and delivery was undeniably unique and a medical anomaly regardless of the version of events provided.  As stated by the Supreme Court in Hunter, qualified immunity provides an official with "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" 502 U.S. at 229 (quoting Malley, 475 U.S. at 343, 341).  If events occurred as Plaintiff alleges, her presentation caused "mistaken judgments" by highly-trained medical professionals who had access to diagnostic testing and monitored her for hours.  As a lay person, Officer Wenzel is entitled to at least the same latitude in perceiving Plaintiff's circumstances.  If he merely made a mistake in his appreciation of events, Officer Wenzel should be granted qualified immunity due the unique circumstances presented in this case.  See, e.g., Maltby v. Winston, 36 F.3d 548, 557-58 (7th Cir. 1994) (affirming qualified immunity where officers fail to appreciate circumstance accurately, resulting in mistaken judgment); Egolf v. Witmer, 526 F.3d 104, 111-12 (3rd Cir. 2008) (affirming qualified immunity

where officers face "unique, surprising, confusing and charged" factual scenario even if mistaken in appreciation of the facts).

As discussed above, courts have repeatedly held that lay correctional officials may reasonably rely on the opinions of trained medical staff. Here, medical providers both inside and outside the Jail repeatedly determined Plaintiff was not in labor prior to her arrival on the SMU. Plaintiff has admitted that her condition did not change until after she was brought to the SMU and that she delivered after only ten contractions and three pushes. Her symptoms of labor were indistinguishable from heroin withdrawal. As such, it was reasonable for Officer Wenzel to rely on the determination that Plaintiff was not in labor and he should be granted qualified immunity.

## 2. **Nurses Exum and Bevenue Are Entitled to Qualified Immunity**

Nurse Exum is clearly entitled to qualified immunity. Research by Defense Counsel has found no case law suggesting it is clearly established that a jail nurse needs to obtain written evidence of a pregnant woman's dilation and effacement before following the jail medical director's order to admit the woman to the facility. Rather, courts have found that claims such as those made by Plaintiff amount to a mere difference of opinion as to medical care which do not rise to the level of a constitutional violation as a matter of law. See, Harris v. Clarke, 2008 U.S. Dist. LEXIS 109602, at *98 (E.D. Wis. 2008) (denial of medical treatment claim dismissed where plaintiff argued nurse should have obtained additional information regarding his medical history); Collins v. Alevizos, 2010 U.S. Dist. LEXIS 2757, at *14-15 (N.D. In. 2010) (failure to obtain additional medical information merely negligent and did not violate the plaintiff's rights). As courts of this Circuit have ruled that Nurse Exum's conduct as alleged by Plaintiff amounts to mere negligence, it cannot be said that her rights were "clearly established." Further, it was entirely reasonable for Nurse Exum to rely on the findings of trained obstetricians who determined Plaintiff

was not in labor, conduct her own evaluation which was consistent with the one conducted at Froedtert Hospital minutes before, and follow the orders of Dr. Buono to admit Plaintiff to the SMU while attempting to obtain the Discharge Summary from the hospital. As such, Nurse Exum is entitled to qualified immunity and the claims against her should be dismissed.

Nurse Bevenue is likewise entitled to qualified immunity. She conducted her routine inspection of inmates on the SMU prior to Plaintiff's arrival. There is no authority holding that a pregnant detainee has a clearly established right to additional nursing rounds where multiple medical providers determined she was stable and was not in labor. Neither Dr. Buono nor the specialists at Froedtert ordered any additional rounds or assessment. In the absence of orders from Dr. Buono or new information alerting her to a change in Plaintiff's condition, Nurse Bevenue acted reasonably when she did not conduct further observation of Plaintiff. Thus, Nurse Bevenue is entitled to qualified immunity and the claims against her should be dismissed.

### F. Plaintiff's *Monell* Claims Against Milwaukee County Fail

Granted the opportunity to re-plead her Monell claim against Milwaukee County after extensive discovery, Plaintiff remains unable to support the bare allegations of her Amended Complaint. She asserts that the County (1) failed to train correctional officers "on how to respond to inmate medical emergencies" (ECF Doc. No. 129, ¶ 64); (2) had a custom "of sending inmates to the hospital for medical evaluation and then admitting the inmates to the jail without receiving adequate information from the hospital about the patient" (Id., ¶ 62); (3) failed to develop a policy requiring observation of laboring detainees; and (4) maintained an unconstitutional policy of shackling women during prenatal and post-partum care (Id., ¶¶ 86, 88).

Plaintiff's Monell claims are plead with even less specificity in the Amended Complaint than the claims the Court previously dismissed under Rule 12(c). See ECF Doc. No. 127. She has

not even attempted to identify similar events suggesting the existence of widespread County practices. Not only do her <u>Monell</u> allegations fail on insufficiency of pleading, they are baseless and cannot be proven as a matter of law. Finally, none of the alleged County policies was a relevant cause of Plaintiff's alleged harms.

In order to hold a governmental entity such as Milwaukee County liable under the seminal case of <u>Monell v. Dep't. of Social Services</u>, 436 U.S. 658, 691 (1978), Plaintiff must prove three things: (1) an underlying constitutional violation; (2) the identity of the officials or governmental bodies with final policymaking authority; and (3) proof that those individuals "have, through their decisions, 'caused the deprivation of rights at issue by policies which affirmatively command that it occur or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.'" <u>Simmons v. City of Phila.</u>, 947 F.2d 1042, 1062 (3d Cir. 1991), *cert. denied*, 503 U.S. 985 (1992) (<u>quoting</u> <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701 (1989)).

### 1. No Constitutional Violation Occurred

First, absent a constitutional violation in the first instance – of which there was none here – the derivative issue of a deficient custom, practice or policy is irrelevant. <u>See</u> <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 123 (1992) (holding that a city may be liable for a policy or custom of failing to train its employees only "if a city employee violates another's constitutional rights."); <u>Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite besides the point.").

### 2. No Constitutionally Deficient Custom, Practice or Policy

Even if Plaintiff could show that her rights were violated, in order to sustain her derivative <u>Monell</u> claim against Milwaukee County, she must additionally prove the violation was as a result

of a municipal policy or practice.  See Monell, 436 U.S. at 691.  A plaintiff must establish that the policy in question was the "moving force" behind (*i.e.*, the proximate cause of) the constitutional tort.  City of Canton v. Harris, 489 U.S. 378, 388 (1989).  The challenged governmental practice "must be closely related to the ultimate injury." Id. at 391; Estate of Sims v. Cty. of Barbeau, 506 F.3d 509, 515 (7th Cir. 2009) ("direct causal link" between a custom and the alleged constitutional violations required).  A "moving force" is the "catalyst" for the alleged injury, not merely a "contributing factor." Johnson v. Cook Cnty., 526 F. App'x 692, 696 (7th Cir. 2013); Thomas v. Cook Cnty. Sheriff's Dep't., 604 F.3d 293, 303 (7th Cir. 2010).

To prove an official policy, custom, or practice within the meaning of Monell, a plaintiff "must show more than the deficiencies specific to his own experience, of course." Daniel v. Cook Cty., 833 F.3d 728, 734 (7th Cir. 2016).  In her Amended Complaint, Plaintiff describes only her own experience, but nevertheless alleges that widespread problems exists.  She alleges no facts that suggest her conclusory argument is plausible.  See Hoskin v. City of Milwaukee, 994 F. Supp. 2d 972, 976 (E.D. Wis. 2014) (Stadtmueller, J.) (noting Monell claims are subject to Twombly and Iqbal pleading standards, and "boilerplate allegations" or legal conclusions are insufficient to survive a motion to dismiss).  To support her Monell claim, Plaintiff must plead facts and "introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." Phelan v. Cook Cnty., 463 F.3d 773, 789 (7th Cir. 2008).  She has neither pled sufficient facts to state a claim, nor can she introduce evidence demonstrating the required pervasiveness and acquiescence in any alleged policy, custom, or practice.

Plaintiff must also prove the policymakers of Milwaukee County acted with "deliberate indifference to the rights of persons with whom [correctional officers] came into contact." City of

Canton, 489 U.S. at 388. Proof of deliberate indifference requires more than "[a] showing of simple or even heightened negligence." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 407 (1997). Rather, deliberate indifference may be found only when the alleged indifference may be considered a municipal policy or custom. City of Canton, 489 U.S. at 389. This may occur where: (1) the need for more or different training is and the lack of training is likely to result on a constitutional violation or (2) where there exists a prior pattern of constitutional violations which makes "the need for further training … plainly obvious…" Id. at 390, n.10. The purpose of requiring that Plaintiff show that there was a pattern of prior, similar instances is to prove that the County was on notice of a deficiency and failed to act. Id. at 389; City of Okla. City v. Tuttle, 471 U.S. 808, 823 (1985).

### a. Plaintiff's claim for failing to train correctional officers on medical emergencies should be dismissed

Ruling on the adequacy of her initial Complaint, this Court noted "Terry provides no support for the idea that her childbirth was a specific type of recurring situation that would predictably give rise to a constitutional violation absent some specific training." See ECF Doc. No. 127 at 13. Failing to heed the Court's advice, she provides no factual allegations in the Amended Complaint of a recurring circumstance involving childbirth in the Jail. Even with the benefit of extensive discovery, Plaintiff cannot present a prior pattern of incidents which could have placed the County on notice of the need for additional training. Having granted her the opportunity to plead her claim twice, the Court should dismiss Plaintiff's Monell claim for alleged inadequate training with prejudice. Gill v. City of Milwaukee, 850 F.3d 335 (7th Cir. 2017) ("At the pleading stage, then, a plaintiff pursuing this theory must allege facts that permit the reasonable inference that the practice is so widespread so as to constitute a governmental custom.").

### i. No reasonable jury could infer that the County had a policy of not training correctional officers

The Supreme Court has noted a logical inconsistency in suggesting a municipality has deliberately chosen a policy of "inadequate training" as is required to sustain <u>Monell</u> liability. The Court stated:

> The word "policy" generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training," unless evidence be adduced which proves that the inadequacies resulted from conscious choice -- that is, proof that the policymakers deliberately chose a training program which would prove inadequate.

<u>Tuttle</u>, 471 U.S. at 823. Here, Plaintiff cannot prove the County intentionally chose to implement an inadequate training program. Plaintiff fails to cite any evidence of a prior, similar occurrence – a birth within the Jail – which was mishandled. As expressed by the Supreme Court in <u>Tuttle</u>, Plaintiff is required to come forward with sufficient evidence by which a jury infer a conscious decision to train inadequately by Milwaukee County. There is no evidence of record of any such decision.

Further, every correctional officer that has testified in this case has stated the County does provide training on how a correctional officer should respond to a medical emergency. <u>See</u> PF 158-167. Having been told by every correctional officer of the training provided, Plaintiff lacks any good faith basis for alleging that the officers "received no training on when to call for medical assistance." <u>See</u> ECF Doc. No. 129, ¶ 64.

Officer Wenzel produced his training materials during discovery. He completed six (6) weeks of correctional officer training at the Milwaukee County Sheriff's Officer Training Academy before working at the Jail. <u>See</u> PF 158. The Academy training was followed by a probationary period of one year during which he received additional on the job training under the supervision of a training officer. <u>Id.</u> The Academy training included the Jail's legal duty under

state statutes, administrative code, and constitutional law to provide adequate health care to jail inmates.  See PF 159.  Officer Wenzel was consistently trained that his job duties include the responsibility to respond to inmate needs/requests for medical care.  See PF 160.  Officer Wenzel produced a Power Point slide presentation discussing Estelle v. Gamble as setting the standard for health care in correctional institutions.  See PF 161.  The presentation described basic concepts of "deliberate indifference" arising out of inadequate health care, including a failure to take appropriate action or seek medical help upon noticing that an inmate seems to be apparently seriously ill or injured.  Id.  During his time at the Academy, Officer Wenzel handwrote on a slide titled, "Responding to Requests for Medical Care" the following: "NEVER ignore an inmate complaint."  See PF 162.

In addition, Officer Wenzel was required to complete a "Jail Health Care Student Study Review Worksheet" while at the Academy.  See PF 163.  The worksheet included the following question: "If an inmate has properly submitted a sick call request but an officer does not feel that the inmate imminently needs to be seen by a health care provider, the officer should…" Id.  Officer Wenzel selected "Honor the inmate's sick call request anyway."  Id.  Having received these materials well in advance of her Amended Complaint, there is simply no basis for Plaintiff's allegation that Officer Wenzel received "no" training, and no reasonable jury could conclude that the County's training was constitutionally inadequate.

### ii.    Plaintiff cannot demonstrate a failure to train was the moving force behind her alleged injury

Plaintiff must produce sufficient evidence for a reasonable jury to conclude that a failure to train correctional officers was "the moving force" behind her constitutional injury.  Brown, 520 U.S. at 404 (holding plaintiff must establish that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal

action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."). Plaintiff cannot meet her burden as a matter of law.

Plaintiff alleges Officer Wenzel, stationed "at his post, just yards from Plaintiff's cell," purposely ignored her with full knowledge that she was having a medical emergency. See ECF Doc. No. 129, ¶ 39. Plaintiff fully undermines her Monell claim by making this allegation. If, as she asserts, Officer Wenzel ignored her and was indifferent to her pleas, then no amount of training could change the outcome and the County's conduct was not the "moving force" behind her alleged injury as a matter of law. Tuttle, 471 U.S. at 817; see also Gayton v. McCoy, 593 F.3d 610, 622 (7th Cir. 2010) (holding Monell claim fails where plaintiff alleges policies adequate to protect plaintiff were in place, but individual actors failed to follow them). As such, Plaintiff's Monell claim must be dismissed.

> **b. Plaintiff's claim the County had a widespread practice of sending inmates to the hospital and then admitting the inmates to the Jail without adequate information from the hospital should be dismissed**

Plaintiff alleges the County had "a widespread practice" of sending inmates to the hospital for medical evaluation and then admitting the inmates to the jail without receiving adequate information from the hospital about the patient." See ECF Doc. No. 129, ¶¶ 62, 68. This claim also fails as a matter of law on several grounds.

> **i. There Were No Prior, Similar Constitutional Violations**

Plaintiff alleges the County failed to gather adequate written information on inmates that were (1) sent to the hospital for assessment; and (2) cleared by the hospital for admission to the Jail. See ECF No. 129, ¶ 62. It stretches credibility to argue that a policy of County-wide indifference to inmate healthcare needs arises from the County's decision to send inmates to area

hospitals for specialist assessment and possible hospitalization. It stretches credibility even further to suggest the policy of **inadequate care** pertains to inmates that have been declared **medically stable and cleared for admission** to the Jail. The premise of the allegation is such that, by definition, a reasonable jury could not find the County deliberately indifferent to inmate healthcare needs.

Plaintiff cites the reports of a medical monitor, Dr. Shansky, as support for a conclusion that the County was indifferent to a widespread problem resulting in inmate harm. See ECF No. 129, ¶¶ 28-29. This is a substantial misrepresentation of the actual reports. In fact, Dr. Shansky did not describe a persistent practice that resulted in harm to inmates. See Knott Decl., Shansky July-August 2013 Report at 10 (Exhibit 52). Dr. Shansky did not document harm to a single inmate. Id. Rather, he recommended the healthcare staff keep a jail log and stated, "Leadership should insure that the urgent care logs are conscientiously maintained." Id. Dr. Shansky made recommendations for additional documentation, but did not suggest that any inmates have been harmed due to failure to maintain the log. Id.; Harper v. Dart, 2015 U.S. Dist. LEXIS 142871, at *8-9 (N.D. Ill. 2015) (noting plaintiff seeking to assert Monell claim based on Justice Department complaint must "rely on specific factual allegations in the [] complaint").

The Shansky report actually documents the County's commitment to improvement; it does not suggest that a pervasive pattern of harm to inmates has occurred, or that County policymakers tolerated a recurring problem to the point that a conscious policy decision to allow inmates harm should be inferred. There were **no** prior instances identified in the reports where failure to obtain information on inmates readmitted from the hospital resulted in any harm. As such, the Shansky report cannot, as a matter of law, have provided the County the required notice of the need for additional policies or practices.

Plaintiff conveniently fails to note Dr. Shansky's next report in December 2013 wherein he wrote, "We were encouraged by the fact that clinician follow up assessments of the patients sent out for unscheduled offsite services was both timely and appropriate." See Knott Decl., Shansky December 2013 Report at 9 (Exhibit 53). Thus, Dr. Shansky had no objection to the Jail's practices mere months prior to Plaintiff's incarceration.

Plaintiff also alleged that, "As provider of healthcare services to detainees at the Milwaukee County Jail, Armor was responsible for the creation, implementation, oversight, and supervision of policies, practices and procedures regarding the provision of medical care to detainees in Milwaukee County Jail custody." See ECF Doc. No. 129, ¶ 61. Armor had implemented policies and procedures for screening detainees and referring them to outside facilities, including recommendations for steps to take upon return to the Jail of a detainee that was sent to an Emergency Department at a local hospital for assessment or treatment. See PF 145-155. Plaintiff has not alleged a problem that was so pervasive that the County was on notice of a specific failure in implementation of the Armor policy. She has not alleged and – again – has **no** evidence that the County was aware in March 2014 of a systemic problem in the Jail's screening procedures resulting in harm in inmates.

Plaintiff also cites in the Amended Complaint the testimony of the Jail's former Medical Director, Dr. Buono, and former Director of Nursing, Gina Strehlow, as evidence that the failure to obtain adequate from hospitals was an accepted policy of the County. See ECF Doc. No. 129, ¶ 30. However, both Dr. Buono and Nurse Strehlow testified regarding their personal efforts to improve on communication with the hospitals. See Knott Decl., Buono Dep. at 64:4-66:3, 91:21-94:6 (Exhibit 14); Knott Decl., Strehlow Dep. at 116:2-125 (Exhibit 54). Dr. Buono, for example, testified to that she invited representatives from Aurora and Froedtert to tour the SMU in order to

improve their understanding of the facilities. See Knott Decl., Buono Dep. at 64:4-66:3 (Exhibit 14). Efforts by Jail administrators to improve on communication does not demonstrate indifference. Rather, it demonstrates a conscious decision to ensure inmate safety. Further, there is no evidence from the testimony of Dr. Buono or Nurse Strehlow of any prior instances where a delay in receiving documentation from a hospital resulted in inmate harm.

**ii.  Plaintiff cannot prove lack of adequate information was the moving force behind her alleged injury**

The crux of Plaintiff's claim is that her child would not have been born in the Jail if the medical staff had insisted on receiving the Discharge Summary from the Froedtert Labor & Delivery Department before admitting her to the Jail. The argument assumes the Froedtert obstetricians believed she was in labor or sought to convey critical recommendations regarding Plaintiff's future care. Neither is true.

The Discharge Summary was signed by the Froedtert obstetrician, Dr. Narayan, over two hours after Plaintiff had given birth. See PF 65, 98. In the Summary, Dr. Narayan estimates Plaintiff's due date as March 18, 2014 – more than a week in the future. See PF 67. As for a plan, he states, "Will get prenatal care through the jail." See PF 68. Neither Dr. Narayan or any other Froedtert healthcare providers made a recommendation that Jail providers implement a particular therapy or treatment, nor did Froedtert providers recommend that the Jail provide heightened scrutiny or observation for Plaintiff. Id. There is no reason to think Dr. Narayan's documentation would have changed an outcome in this case where no additional observation of Plaintiff was recommended.

Further, Nurse Exum's diligence rendered any lack of written documentation moot. She contacted Dr. Buono to discuss Plaintiff and the fact that Froedtert's discharge instructions were "generic." See PF 54. In communicating with Dr. Buono, Nurse Exum obtained the physician

guidance Plaintiff claims was lacking. Dr. Buono agreed to admit Plaintiff to the Jail and house her in the SMU. See PF 55. At Dr. Buono's instruction, she then contacted the Froedtert Labor & Delivery Department to discuss Plaintiff's discharge. See PF 57, 59. The Froedtert nurse agreed to expedite the formal Discharge Summary and fax it to the Jail when completed. See PF 59. There is no reason to believe the Froedtert nurse withheld information critical to Plaintiff's care. The fact that she provided no additional guidance and merely promised to expedite the Discharge Summary demonstrates what Nurse Exum and Dr. Buono already knew: that Froedtert believed Plaintiff was not in labor, that she was stable, and that she was appropriate for admission to the Jail. Thus, no reasonable jury could conclude under these circumstances that a County policy was the moving force behind Plaintiff's childbirth experience and Plaintiff's Monell claim fails as a matter of law.

### c. Plaintiff's Monell Claim for Failure to Develop a Policy for Observation of Laboring Detainees Fails

Plaintiff also claims that the County failed to failed to develop a policy requiring observation of laboring detainees which resulted in her alleged harm. However, this claim fails for the same reasons as her prior Monell claims. Initially, Plaintiff was not in labor when she was returned to the Jail. Froedtert obstetricians had observed her for hours and determined she was not progressing towards labor and was expected to deliver more than a week later. See PF 37, 60, 67. Nurse Exum conducted her own assessment of Plaintiff and found she was not having contractions. See PF 50. Plaintiff told Exum she was not having contractions. See PF 53. Plaintiff admits that her condition had not changed from her assessment at Froedtert, where it was determined by trained specialists that she was not in labor, until after she was placed in the SMU. See PF 83-85.

Further, Plaintiff is wrong when she asserts there was no policy addressing observation of pregnant women. Armor has a contract to provide medical services at the Jail. See ECF Doc. No.

129, ¶ 11.  Armor has established policies that address management of pregnant inmates.  <u>See</u> PF 154, 156.  The protocols provide that the physician's treatment plan "will be documented by the physician to include frequency of clinician and nursing encounters."  <u>See</u> PF 156, Armor Policy No. J-G-03.1 "Medical Housing Unit," at Armor 273 (Exhibit 41).  The policy further provides that "[v]ital signs and nursing assessments will be documented as ordered by the clinician."  <u>See</u> PF 156, Armor Policy No. J-G-03.1 "Medical Housing Unit," at Armor 274 (Exhibit 41).

In Plaintiff's case, she was housed in the SMU and Dr. Buono had been timely consulted in the middle of the night.  She provided directions based on the information available to all of the staff at the time, <i>i.e.</i>, obstetricians at Froedtert had determined she was not in labor.  Dr. Narayan had estimated her due date as more than a week away.  <u>See</u> PF 67.  There was no reason for anyone to believe that a treatment plan required more frequent assessments or that existing policies would not be adequate.  It was Plaintiff's sudden change in condition and rapid delivery that prevented further execution of those policies.

As discussed above, Plaintiff can point to no prior instances where an inmate gave birth in the Jail.  Therefore, there was nothing that would have placed the County on notice that a policy requiring increased observation over and above that ordered by the admitting physicians was necessary.  In the absence of notice, the County could not have exhibited the deliberate indifference required for a <u>Monell</u> claim.

Finally, there is no evidence that additional observation would have prevented Plaintiff from delivering in the Jail.  Officer Wenzel conducted five rounds of observation on the SMU from the time of Plaintiff's arrival at 1:45 a.m. and the medical emergency being called at 4:44 a.m.  <u>See</u> PF 93.  Plaintiff has alleged Officer Wenzel ignored her during these five rounds out of indifference.  <u>See</u> ECF No. 129, ¶ 39.  As such, no requirement for additional observation of

Plaintiff due to the late stage of her pregnancy would have prevented her from delivering there. In addition to the five rounds conducted by Officer Wenzel, Plaintiff was observed by Officer Decorie Smith sometime between 3:11 a.m. to 3:41 a.m. and by Lieutenant Crystalina Montano around 4:41 a.m. Neither noted Plaintiff having any distress or heard anything amiss despite the fact that Officer Wenzel heard faint crying and Plaintiff call for help approximately three minutes after Lt. Montano's observation at 4:44 a.m. See PF 98, 104-108.

In short, whether an official policy was implemented by Milwaukee County, Plaintiff was observed seven (7) times in three hours, an average of one observation every 26 minutes. Thus, there is no evidence that any policy requiring observation above and beyond that which Plaintiff received could have prevented her from delivering in the Jail. The lack of such a policy cannot have been the "moving force" in Plaintiff's alleged constitutional violations and her Monell claim fails as a matter of law.

### d. Plaintiff's *Monell* Claim Related to Shackling Fails

Plaintiff alleges the County violated her liberty interest in bodily integrity as protected by the Fourteenth Amendment by restraining her at certain times, exposing her to "unreasonable risks of harm", and constituting deliberate indifference and unreasonable use of force. See ECF Doc. No. 129, ¶ 86. She makes a conclusory allegation – unsubstantiated in any medical record or her own testimony – that she suffered "emotional distress and anguish, as well as physical pain and suffering," as a result of the security restraints. Id. at 89.

Importantly, Plaintiff does not allege that she was restrained while in active labor or while delivering the baby. See PF 168. She complains that she was restrained during transport to and from Froedtert Hospital for assessment and during her post-delivery stay at Aurora Sinai Hospital. See PF 168; ECF Doc. No. 129, ¶¶ 20-23. Per the obstetricians who assessed her she was not in

labor during either transport and she was stable with no medical needs at those times.  See PF 36-37, 67.  There is no evidence Plaintiff complained about her restraints to any one at any time, nor is there evidence a healthcare provider was denied access to her at any time.  See PF 29-30, 42-44.

Plaintiff's recollection of her experience does not support a claim that she was unconstitutionally punished by restraints in a manner that would "shock the conscience."  Davis v. Wessel, 792 F.3d 793, 801-02 (7th Cir. 2015), quoting County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998).  She does not recall speaking to the officers at all during transport to and from Froedtert Hospital.  See PF 30, 42.  Of those transfers, she recalls "being sleepy, but that was about it." See PF 30-31, 44.  Asked if she was restrained during another one of her transfers, she initially testified, "I don't remember," then recalled a routine gurney restraint "like a seatbelt." See PF 116-18.  She did not testify to a recollection of being restrained by handcuffs, in pain, or asking for their removal.  Id.

Plaintiff alleges she was shackled "throughout her one week of post-partum care." See ECF Doc. No. 129, ¶ 52. The allegation is wrong for a number of reasons.  First, she was hospitalized for 72 hours (from March 10 to March 13), not "one week." See PF 120.  Second, the primary purpose of her hospitalization was not "post-partum care."  It was so she could be monitored for "detoxification" and opioid withdrawal.[5]  See PF 120-22.  She required no post-partum therapy or treatment after the date of her delivery.  See PF 124.

---

[5] Plaintiff began experiencing nausea and vomiting that her psychiatrist attributed to withdrawal almost immediately after the delivery of her son.  See PF 121.  The psychiatrist solicited Terry's interest in foregoing discharge to the Jail to receive treatment for withdrawal.  He advised her that the process typically took 72 hours to complete and recommended it be administered safely in the hospital. Terry agreed to remain at Aurora Sinai to receive treatment for withdrawal before returning to the Jail.  See id.

Plaintiff's healthcare providers at Aurora Sinai did not indicate that the restraints used to secure her interfered with her treatment, were unnecessary, or potentially harmful to Plaintiff. <u>See</u> PF 153. Plaintiff concedes she was able to receive all the care she felt was necessary during her post-delivery hospitalization. <u>See</u> PF 119. The hospital watch log maintained by deputies demonstrates nurses were able to perform assessments and administer treatment. <u>See</u> PF 146, 152. An officer who provided security removed her wrist restraint on at least one occasion so that Plaintiff could hold the baby. <u>See</u> PF 145. The officers would have accommodated requests necessary to facilitate the assessment, and doing so would not have violated any policy for restraining detainees and inmates in such contexts. <u>See</u> PF 170. There is no record of such a request being made by any provider responsible for Plaintiff's health care at Aurora Sinai. <u>See</u> PF 153.

There is no medical record that supports Plaintiff's claim she suffered "emotional distress and anguish" from her restraint. <u>See</u> PF 118; ECF Doc. No. 129, ¶ 89. Plaintiff concedes she never complained to any official or medical provider about her experience with restraints. <u>See</u> PF 169. In fact, she never spoke to anyone other than friends about the restraints prior to retaining her counsel. <u>Id.</u> It is simply implausible for Plaintiff to assert a constitutional claim based upon restraints where she was not restrained while in labor, no healthcare was denied to her, she concedes she did not complain contemporaneously in order to allow the officers to respond, and she does not even recall being distressed. <u>See</u> <u>Kingsley v. Hendrickson</u>, 135 S. Ct. 2466, 2472, (2015) (recognizing that the "defendant must possess a purposeful, a knowing, or possibly a reckless state of mind" because "'liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process'") (<u>quoting</u> <u>Lewis</u>, 523 U.S. 833, 849 (1998)); <u>see also</u> <u>Ingraham v. Wright</u>, 430 U.S. 651, 674 (1977) ("There is, of course, a *de minimis* level of

imposition with which the Constitution is not concerned."); <u>Turner v. Miller</u>, 301 F.3d 599, 603 (7th Cir. 2002) ("extreme deprivations are required to make out a conditions-of-confinement claim"). For the reasons discussed below, Count IV of Plaintiff's Amended Complaint should be dismissed.

**i.** **Plaintiff cannot demonstrate the existence of an express County policy or widespread practice**

Plaintiff alleges that the Jail has a "policy of shackling pregnant inmates." <u>See</u> ECF Doc. No. 129, ¶¶ 20, 88. It does not. It has a policy of securing detainees in the Sheriff's custody during transport and a policy of securing detainees while they are hospitalized. <u>See</u> PF 134, 171. Neither policy as written specifically addresses pregnant detainees. <u>Id.</u>

Plaintiff's complaint is, in fact, a claim that the officers and deputies in her case declined to create an exception to the general policies for her circumstance. The Jail Shift Commander is given discretion under the policy to determine whether a hospital watch is necessary. <u>See</u> PF 131. The hospital watch policy, as trained and implemented, is subject to exceptions at the discretion of the officers, including reasonable medical needs. <u>See</u> PF 134, 170. Several officers testified they had previously removed restraints to accommodate medical requests. <u>See</u> PF 170.

There is good reason Plaintiff has not asserted constitutional claims against the individual officers who were charged with maintaining her in custody for failing to make an exception to the policies. Based on her own testimony, such claims would be frivolous. She was not in labor while in transport or during her post-partum treatment for heroin detoxification. <u>See</u> PF 168. The officers were not asked by Plaintiff or her healthcare providers to remove the restraints, and they had no basis to believe an "unreasonable risk of harm" existed.

Regardless of whether Plaintiff's claim is based on the written policies or the failure to make an exception to the general policies in her circumstance, there is no basis for a <u>Monell</u> claim

against the County.  There were no grievances or complaints about the County's policies of using restraints during medical transportation and hospital watches until Plaintiff's counsel began litigating against the County.  See PF 172.  There is no basis for the County to have concluded that constitutional harms were occurring as a result of the written policies or its officers' alleged refusal to make exceptions to the written policies or practices.  See City of Canton, 489 U.S. at 390 (requiring pattern of prior similar instances to establish the government entity's notice of a deficiency in its policies); Tuttle, 471 U.S. at 823.  The County cannot be deemed indifferent to widespread harms where no deficiencies in its policies or resulting injuries were pointed out prior to the event.  See Jackson v. Marion County, 66 F.3d 151, 152 (7th Cir. 1995) (the "usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.")

        ii.      **Plaintiff cannot demonstrate a County policy was the moving force behind her alleged injury**

In addition to demonstrating the existence of a widespread practice that put the County on notice of a deficiency in the application of its transportation and hospital watch policies, Plaintiff must produce sufficient evidence for a reasonable jury to conclude that the deficiency was "the moving force" behind her constitutional injury.  Brown, 520 U.S. at 404.  Here, the hospital watch policy allowed the deputies discretion to accommodate medical needs.  See PF 170.  It was not applied strictly as written to Plaintiff.  See PF 134, 145.  A deputy removed her wrist restraint on at least one occasion so that Plaintiff could hold the baby.  Id.

The restraint policy did not become relevant in the absence of a request from the Plaintiff or a healthcare provider for some exception to it. No officer was required to apply the policy where no risk of harm, claim of discomfort, or request for accommodation was made. A policy (or practice of not varying from the policy) cannot be a moving force of constitutional harm where the plaintiff voiced no preference as to its application. See Smego v. Jumper, 707 F. App'x 411, 413 (7th Cir. 2017) (affirming summary judgment on grounds that no reasonable jury could find defendant officials' conduct met level of culpability necessary for due process claim where plaintiff did not seek treatment until litigation began).

### iii. Plaintiff was not subjected to unconstitutional punishment in violation of a liberty interest.

In Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court addressed the extent to which a pretrial detainee could challenge conditions of confinement adversely affecting "liberty interests" under the Fourteenth Amendment. The Court began by noting that, as a general proposition, the Fourteenth Amendment does not protect an individual's right to freedom of movement if he or she is subject to lawful detention by the state. It does protect, however, a right to be free from conditions **calculated to punish** the individual during pretrial detention:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.

Id. at 535-36. The Court held that "[u]nder such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment…" Id. at 536-37.

In regard to claims predicated solely on restrictions and conditions placed on a detainee's freedom of movement the Court held that as a matter of law:

> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however. Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant . . . restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. . . Loss of freedom of choice and privacy are inherent incidents of [lawful pretrial detention]. **And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishmen**t."

Id. at 537 (emphasis added).

Accordingly, while Bell recognized a due process right of pretrial detainees to be protected from official acts amounting to "punishment," it clearly foresaw and rejected the notion that such claims could be predicated on nothing more than a detainee's "desire to live as comfortably as possible and with as little restraint as possible during confinement." Id. The Court's discussion and holding in Bell made clear that pretrial detainees **do not** have a right to be subjected "[to] as little restraint as possible during confinement," id., at 537, and the fact that a restriction on movement imposed as a condition of confinement may exceed what is subjectively necessary for any particular detainee "does not convert the condition[] or restriction[] . . . into 'punishment.'" Id.

### iv. The restriction of Plaintiff's freedom of movement was not arbitrary or purposeless

In Bell, the Supreme Court formulated a general test for assessing whether a condition of confinement could be considered an unconstitutional infliction of punishment. The Court held that, absent direct evidence of intent use a condition or restriction to "punish" a detainee, the threshold for establishing a violation of due process was exceedingly high. To draw such an

inference, the challenged restriction must fail the Court's familiar, and highly deferential, rational basis analysis, which requires a finding that the action in question did not rationally serve any legitimate government interest:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal -- [which is to say] if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment.

Id. at 539.

Some courts initially misinterpreted Bell as granting them wide-ranging authority to deem any condition of confinement imposed on a pretrial detainee an impermissible infliction of "punishment" if its application to the detainee in question seemed unnecessary or excessive in relation to the legitimate government interest offered for it. The Supreme Court in Block v. Rutherford, 468 U.S. 576, 589 (1984), clarified that the scope of judicial inquiry allowed under Bell is limited. The Court explained that the question under Bell is not whether a court believes a restriction during pretrial confinement is in any manner "excessive" for any given detainee, but whether the restriction is excessive to the point of being "arbitrary or purposeless" in relation to the reason offered for it. Id. at 585 (quoting Bell, 441 U.S. at 539). It is the fact that a restriction is arbitrary or purposeless in relation to a legitimate government interest that permits a court to draw an inference that the policy's application was intended to inflict unconstitutional punishment on detainees.

Here, the use of restraints during transportation of Plaintiff and during her post-delivery hospitalization for detoxification was not arbitrary or purposeless as a matter of law.

### A. Restraining a pretrial detainee's freedom of movement outside a detention facility serves legitimate government interests

The rational basis for a policy of using restraints on lawfully detained persons outside a secure facility should be beyond challenge. Cf. Block, 468 U.S. at 586 (noting the connection between ban on contact visits and internal security of a detention facility "is too obvious to warrant an extended discussion."). The Milwaukee County Sheriff is obligated under state law to "[t]ake the charge and custody of the jail maintained by the county and the persons in jail, and keep the persons in the jail personally or by a deputy or jailer." See PF 133; Wis. Stat. § 59.27(1). Restrictions on freedom of movement are an incident of lawful detention. Bell, 441 U.S. at 546 ("Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."). Those charged with maintaining lawful custody of detained persons are expected to restrict their freedom of movement in order to protect the safety of innocent citizens, security staff and the detainee, and to secure the detainees attendance at mandated legal proceedings. Consistent application of a security policy serves to deter conduct that could compromise security.

The Supreme Court cautioned lower courts to "heed our warning that '[such] considerations are peculiarly within the province and professional expertise of corrections officials…" Bell, 441 U.S. at 540-41, n. 23 (quoting Pell v. Procunier, 417 U.S. 817, 827 (1974)). The Supreme Court also advised that, "'in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters.'" Id. (quoting Pell, 417 at 827).

According Jail officials the deference required, there is an ample basis for County policies generally requiring the restraint of detainees during transport and hospital stays. The following events were within the Jail's institutional experience at the time of events relevant to this matter:

- On May 3, 2000, a Milwaukee County Sheriff's Deputy on a hospital watch was confronted by an inmate with a 3-to-5-inch piece of broken glass after allowing the inmate to use the restroom unrestrained. The inmate subsequently broke a hole through a hospital restroom wall and escaped into the ceiling, where he was later located and apprehended. See PF 135.

- On April 17, 2008, Sheriff's Deputies were called when an unrestrained and naked detainee was reported to have escaped the custody of the Milwaukee Police Department while at Froedtert Hospital. See PF 136.

- On October 9, 2009, a Sheriff's Department detainee who apparently overdosed and attempted suicide tried to escape from custody at St. Luke's Hospital after a restraint was removed so that he could use the restroom. See PF 137.

- On January 8, 2011, an inmate escaped custody at St. Joseph Hospital after she was transported with a complaint of labor pains and cut off her GPS bracelet to evade detection. See PF 138.

- On May 1, 2013, an unrestrained inmate held on narcotics charges assaulted a deputy assigned to watch him at a hospital and fled down several flights of stairs and out of the facility. See PF 139.

The following events occurred after the events at issue in this litigation, but nevertheless demonstrate the continued objective reasonableness of restraint policies:

- On October 18, 2015, a deputy was shot and killed at a Minnesota hospital by an inmate who was allowed to obtain the deputy's weapon. See PF 141.

- On May 7, 2016, a Milwaukee County Jail detainee who complained of seizures after childbirth and appeared weak and frail, yet attempted to grab a deputy's weapon at St. Luke's Hospital after being freed from restraints. See PF 142.

Plaintiff does not contest her lawful detention. Accommodating her need for assessment at the time of her arrest and her monitoring for opiate withdrawal after she gave birth required the County and its officers to effectuate her detention outside the Jail. That movement increased multiple risks and dangers and justifies the application of restraints. Private hospitals are designed

to facilitate patient care, not secure the patients. Patient rooms and treatment areas typically do not lock. Illicit drugs, expensive equipment, and items capable of inflicting quick and grievous injury to officers, health providers, and other patients (whether they be medical implements such as syringes and scalpels or something less obviously dangerous such as a cane or other blunt object) are in no short supply, often readily accessible, and never more than a few steps away. Absent some compelling need for doing so, the notion that a custodial officer could grant a detainee or inmate unrestricted movement without creating or increasing an otherwise unnecessary risk of harm to the officer and an institution's health providers, personnel, and other patients is, at best, fanciful. The use of restraints in such a circumstance is not arbitrary or purposeless as a matter of law. See United States v. Tokash, 282 F.3d 962, 972 (7th Cir. 2002) (holding that when it comes to security matters, courts must give prison administrators "wide-ranging deference in the adoption and execution of policies and practices"); see also Scarver v. Litscher, 434 F.3d 972, 976 (7th Cir. 2006).

### B. The use of restraints was not excessive in relation to the legitimate purposes served

The use of restraints in Plaintiff's circumstance was not excessive as a matter of law. The institutional experience detailed above demonstrates a basis for County officials to anticipate that seemingly harmless, medicated and disabled detainees could, in an instant, become homicidal. See PF 135, 141-42. The burden is on Plaintiff to provide "substantial evidence" demonstrating the County officials' response to those risks were exaggerated or excessive. See Florence v. Bd. of Chosen Freeholders of the County of Burlington, 566 U.S. 318, 322-33 (2012) (holding "courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security.")

The Court in Florence rejected the premise that corrections officials must articulate a particularized suspicion based on an individual's history, charges or presentation to justify a security measure. 566 U.S. at 330. It acknowledged that every detainee – even those with "less serious offenses" – presents a risk that they will be carrying dangerous contraband. The Court observed that "the seriousness of an offense is a poor predictor of who has contraband" and that "[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals." Id. at 334. The Court concluded that jail officials were justified in applying their search protocol **to every detainee** and were not constitutionally obligated to justify a suspicion or make exceptions to their protocol based on the nature of a particular detainees' charges. Id.

After Florence, government officials are not required to justify restraints on a case-by-case basis based on the individual risk presented by each detainee. The "default" cannot be that restraints during routine transport and hospitalization are unconstitutional until security staff can justify their use. Such an approach would be inconsistent with the Supreme Court's repeated instruction that lower courts defer the management of detention facilities to correctional officials. See Florence, 566 U.S. at 322-33; Block, 468 U.S. at 584-85; Bell, 441 U.S. at 540-41, n. 23. The well-known risks of escape; disruption of the hospital; and threats of violence toward medical staff, officers, and other patients should more than suffice to demonstrate that the County's application of its general policy to Plaintiff was not exaggerated or excessive. This is particularly true where she was not in active labor and no medical services were denied or disrupted.

It bears noting that the hospital watch policy did not require that restraints be used at all times without exception. The policy allowed for removal of restraints in a hospital "on a case-by-case basis" and "normally [] are removed based on medical need." See PF 174. They were removed by a deputy during Plaintiff's first post-partum day when the baby was brought to her

"based on the circumstances" and because she did not want the baby or Plaintiff to get hurt.  See PF 145.  The policy was intended to enhance security, but to not interfere with the detainee's medical services.

If, contrary to the Court's holding in <u>Florence</u>, an individualized justification for the use of restraints is required, there is ample evidence to demonstrate that Plaintiff posed a flight or security concern worthy of routine restraint.  Among those facts are the following:

- Plaintiff was in June 2010 on a felony charge for failing to appear.  <u>See</u> PF 1.

- Plaintiff was arrested in May 2011 on two counts of felony failure to appear.  <u>See</u> PF 2.

- Plaintiff was arrested in October 2013 on charges that included felony bail jumping.  <u>See</u> PF 3.

- Plaintiff was arrested in November 2013 on a felony failure to appear charge.  <u>See</u> PF 6.

- An Order of Commitment was entered against Plaintiff in September 2013 after she failed to appear for a court hearing.  <u>See</u> PF 7.

- A bench warrant for Plaintiff's arrest was issued on February 28, 2014, after Plaintiff refused two mandatory drug tests and failed to appear in Court on prior charges.  <u>See</u> PF 8.

- Plaintiff's charges at the time of her arrest on March 9, 2014, included felony bail jumping.  <u>See</u> PF 8.

- Plaintiff admitted she provided the arresting officers two (2) false names "because she knew she had a bench warrant for her arrest."  <u>See</u> PF 9.

- Plaintiff admitted she moved to a motel "believing it would be harder for police to find [her]" and arrest her.  <u>See</u> PF 13.

- Plaintiff admitted at the time of her arrest she been using heroin daily and the officer observed "an extreme amount of track marks on her hands, forearms and inner elbow."  <u>See</u> PF 10.

- Prior to her incarceration, Plaintiff had admittedly used heroin for the last four years, used heroin daily over the last year, and was then experiencing withdrawal.  <u>See</u> PF 10, 21, 86, 121.

The foregoing facts demonstrate that Plaintiff had a propensity to ignore legal orders, had sought to evade police with knowledge that a warrant was out for her arrest, and may have been compelled by her long-standing addiction to seek more heroin. The security officers were advised of her charges soon after her arrival at Aurora Sinai Hospital after giving birth. <u>See</u> PF 143, 147. Those charged with maintaining her in custody could reasonably anticipate that she carried some flight risk based on her heavy drug use and history of bail jumping.

A more immediate security concern arose on the second day of her hospitalization when the father of her child presented and asked to see Plaintiff. <u>See</u> PF 148. The man, who Plaintiff admits was a drug dealer, had been arrested along with Plaintiff on March 9, but released on his own recognizance. <u>See</u> PF 15, 17. He owned a vehicle that could have been used to facilitate an escape. <u>See</u> PF 16.

The man presented at the Aurora Sinai Hospital greeter's desk at 6:00 p.m. on March 11, 2014. <u>See</u> PF 148. The greeter denied knowledge of the patient pursuant to the hospital's privacy practice, but called the deputy on duty in Plaintiff's room to report the event. <u>See</u> PF 149. The deputy called her supervisor, as required, to report "a possible breach by the inmate's boyfriend." <u>See</u> PF 149. Approximately two hours later, at 8:40 p.m., a female with the same last name as the man called the Plaintiff's room. <u>See</u> PF 150. Plaintiff was thereafter moved for security reasons to a different room at Aurora Sinai. <u>See</u> PF 151.

The watch log demonstrates a reasonable concern that persons with whom Plaintiff had been arrested had knowledge that she was outside the secure detention of the Jail, had tried on two occasions to communicate with her, and likely had knowledge of the room in which Plaintiff was located. <u>See</u> PF 149-51. Suppose Plaintiff's visitor was not turned away but had been directed to her room. His surprise appearance in her room, having not passed through security checks as

would occur at a secure facility, would raise significant confusion if not a risk of confrontation and disruption of the hospital. Unrestrained, Plaintiff would present a safety risk to the deputy – who is now outnumbered – as well as the medical staff. See Florence, 566 U.S. at 334-35 (observing "Something as simple as an overlooked pen can pose a significant danger. Inmates commit more than 10,000 assaults on correctional officers every year and many more among themselves."). While the above scenario is not certain or even likely to occur, the risks of very bad outcomes are very high if it does. Just as it was prudent to transfer her room location to avoid potential security intrusions by her colleagues, it was reasonable under the circumstance to maintain Plaintiff's restraint while she completed her detoxification.

The fact that the deputies on hospital watch were armed does not affect this Court's analysis. As the Supreme Court pointed out in Block, the Constitution does not require correctional officials forego their judgment as to prudent security measures in order to employ the least restrictive alternative. The Court said, "[W]e rejected in Wolfish the suggestion that the existence of less restrictive means for achievement of security objectives is proof of an exaggerated response to security concerns." Block, 468 U.S. at 581. Plaintiff cannot meet her burden of producing substantial evidence that the restraint policies, as applied to her, were exaggerated or excessive. See Florence, 566 U.S. at 322-33.

### C. No evidence supports a finding that any officer used excessive force.

Plaintiff also alleges the County "used unreasonable force against Plaintiff because of the shackling policy." See ECF Doc. No. 129, ¶ 86. It is undisputed that she did not object to the restraints while they were being placed or advise the custodial officers the restraints were causing her any discomfort, irritation, or pain. See PF 175. Asked specifically in an interrogatory request

to enumerate her physical injuries, she described physical injuries related to her delivery, not the use of restraints.  See PF 175.

To state a claim for excessive force a plaintiff must allege and prove the officer knowingly and purposefully used force against a pretrial detainee and that the use of force was objectively unreasonable under the circumstances.  See Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015).  Under Kingsley, a claim for excessive force requires facts sufficient to show the officer in question subjectively acted with the purpose of using force.  Force, in this context, has traditionally required some showing of physical compulsion by an officer to overcome resistance or objections of the plaintiff.  For example, a person's cooperation with an officer's request to place handcuffs on the individual precludes the need for force to accomplish that objective.  To the extent Kingsley requires proof that an officer knowingly and purposefully used force against a pretrial detainee, the undisputed record fails to support such a finding.

Assuming an officer's un-resisted request that a detainee submit to restraints constitutes a knowing and purposeful use of force against the person, Plaintiff's excessive force claim fails as she does not allege that the restraints caused her harm.  See PF 175.  Although federal courts generally do not require a particular quantum of harm to sustain a claim for excessive force, an exception exists where the force in question consists only of an officer's application of handcuffs or similar restraints to a detained individual.  See Chambers v. Pennycook, 641 F.3d 898, 907 (8th Cir. 2011) (observing that because handcuffing "almost inevitably will result in some irritation, minor injury, or discomfort where the handcuffs are applied[,] [t]o prove that the force applied was excessive in that context . . . a plaintiff must demonstrate something more."); United States v. Rodella, 804 F.3d 1317, 1328-29 (10th Cir. 2015) (holding that there is no "*de minimis* injury requirement for Fourth Amendment excessive force claims in cases which involve more than

handcuffing") (emphasis added); <u>Crumley v. City of St. Paul, Minn.</u>, 324 F.3d 1003, 1008 (8th Cir. 2003) (stating, "for the application of handcuffs to amount to excessive force there must be something beyond allegations of minor injuries"); <u>Rodriguez v. Farrell</u>, 280 F.3d 1341, 1352 (11th Cir. 2002) (stating that "[p]ainful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal"); <u>Foster v. Metropolitan Airports Comm'n</u>, 914 F.2d 1076, 1082 (8th Cir. 1990) ("Foster's allegations of pain as a result of being handcuffed, without some evidence of more permanent injury, are [not] sufficient to support his claim of excessive force.").

### D. No evidence supports Plaintiff's allegation of deliberate indifference to medical needs.

Plaintiff also alleges that the County "was deliberately indifferent to the serious, obvious medical needs of Plaintiff" by virtue of its restraint policies.  <u>See</u> ECF Doc. No. 129, ¶ 86.  The bare allegation of indifference in the Amended Complaint is unsupported by any factual allegations explaining the health care that was denied.  Asked specifically in an interrogatory request to explain whether she claims that the placement of restraints interfered with her ability to receive medical care, she responded, vaguely, "Plaintiff's mobility was restrained." <u>See</u> PF 176.  There is no evidence that a physician or other healthcare provider was denied access to Plaintiff as a result of her restraint.  <u>See</u> PF 118-19, 153.

It is ironic that she makes the claim that the County was indifferent to her health while they were providing security so that she could obtain healthcare at two hospitals.  Plaintiff conceded she was able to receive all the care she felt was necessary at Aurora Sinai Hospital after the birth. <u>See</u> PF 119.  As one court observed, the constant monitoring by healthcare professionals that a detainee receives while on a hospital watch is the "antithesis of deliberate indifference." <u>See</u> <u>Karow v. Estate of Heyde</u>, 2017 U.S. Dist. LEXIS 47546, at *28-29 (W.D. Wis. 2017) (finding no reasonable jury would believe that inmate was denied medical care while being monitored three

times per day by health professionals in an inpatient facility) (quoting Harper v. Santos, 847 F.3d 923, 928 (7th Cir. 2017)).

Plaintiff's claim is undermined, once again, by the fact that she did not mention any concern about the restraints while something could have been done about them. See PF 169. There is no evidence that a County policymaker was subjectively aware of any harm the restraints had caused. Absent a showing that any individual knew the restraints they applied were resulting or could result in objectively serious harm, a defendant is entitled to summary judgment.

The allegation fails for multiple reasons. Plaintiff's claim that she was denied medical care as a result of her restraint is baseless.

## V.    __CONCLUSION__

Based on the foregoing, Defendants Milwaukee County, Acting Sheriff Richard Schmidt, Officer Brian Wenzel, Carolyn Exum, R.N., Morgan Bevenue, R.N., and Margaret Hoover, R.N. respectfully request that this Court enter an Order granting summary judgment in favor of the Defendants and against Plaintiff, *with prejudice*, in accordance with Federal Rule of Civil Procedure 56.


Respectfully submitted,

**LEIB KNOTT GAYNOR LLC**


Dated: <u>August 31, 2018</u>          By:  */s/ Douglas S. Knott*
                                         Douglas S. Knott, State Bar No. 1001600
                                         Cory J. Brewer, State Bar No. 1105913
                                         Attorneys for County Defendants
                                         219 N. Milwaukee Street, Suite 710
                                         Milwaukee, WI 53202
                                         Telephone: (414) 276-2102
                                         Fax: (414) 276-2140
                                         Email: dknott@lkglaw.net
                                                cbrewer@lkglaw.net