# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

REBECCA TERRY,

       Plaintiff,

v.

COUNTY OF MILWAUKEE, RICHARD
SCHMIDT in his official capacity, OFFICER
BRIAN WENZEL, JANE AND JOHN DOE,
UNKNOWN EMPLOYEES OF MILWAUKEE
COUNTY JAIL, JANE AND JOHN DOE,
UNKNOWN JAIL SUPERVISORS, ARMOR
CORRECTIONAL HEALTH SERVICES,
CAROLYN EXUM, MORGAN BEVENUE,
MARGARET HOOVER, JANE AND JOHN DOE,
UNKNOWN EMPLOYEES OF ARMOR
CORRECTIONAL HEALTH SERVICES, JANE
AND JOHN DOE, UNKNOWN ARMOR
HEALTHCARE SUPERVISORS,

       Defendants.

Case No.:  17-cv-1112-JPS

---

## INDEX OF UNPUBLISHED AUTHORITIES FOR
## COUNTY DEFENDANTS' BRIEF IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

---

Collins v. Alevizos, 2010 U.S. Dist. LEXIS 2757 (N.D. In. 2010)

Harper v. Dart, 2015 U.S. Dist. LEXIS 142871 (N.D. Ill. Oct. 21, 2015)

Harris v. Clarke, 2008 U.S. Dist. LEXIS 109602 (E.D. Wis. 2008)

Johnson v. Cook Cnty., 526 F. App'x 692 (7th Cir. 2013)

Karow v. Estate of Heyde, 2017 U.S. Dist. LEXIS 47546 (W.D. Wis. 2017)

McWilliams v. Cook Cty., 2018 U.S. Dist. LEXIS 140276 (N.D. Ill. Aug. 20, 2018)

Miranda v. Cnty. of Lake, __ F.3d __, 2018 U.S. App. LEXIS 22229 (7th Cir. Aug, 10, 2018)

<u>Robertson v. Jackson</u>, 2014 U.S. Dist. LEXIS 4504 (N.D. In. 2014)

<u>Smego v. Jumper</u>, 707 F. App'x 411 (7th Cir. 2017)


    Dated this 31st day of August, 2018.

**LEIB KNOTT GAYNOR LLC**

By: */s/ Douglas S. Knott*
      Douglas S. Knott, State Bar No. 1001600
      Cory J. Brewer, State Bar No. 1105913
      Attorneys for County Defendants
      219 N. Milwaukee Street, Suite 710
      Milwaukee, WI 53202
      Telephone: (414) 276-2102
      Fax (414) 276-2140
      Email dknott@lkglaw.net
            cbrewer@lkglaw.net

 Positive

As of: August 31, 2018 6:34 PM Z

# *Collins v. Alevizos*

United States District Court for the Northern District of Indiana, Hammond Division

January 13, 2010, Decided; January 13, 2010, Filed

Civil Action No. 3:07-CV-394 JVB

**Reporter**

2010 U.S. Dist. LEXIS 2757 *; 2010 WL 148318

WILLIAM L. COLLINS, Plaintiff, v. JUDGE THOMAS J. ALEVIZOS, et al., Defendants.

**Subsequent History:** Affirmed by *Collins v. Alevizos, 2010 U.S. App. LEXIS 25176 (7th Cir. Ind., Dec. 9, 2010)*

**Prior History:** *Collins v. Alevizos, 2008 U.S. Dist. LEXIS 38275 (N.D. Ind., May 8, 2008)*

## Core Terms

jail, deliberately, indifferent, glaucoma, medical treatment, medical needs, summary judgment, surgery, inmate, summary judgment motion, medical attention, genuine issue, transported, genuine issue of material fact, appointment, non-moving, decisions, sending, intake, fill

**Counsel:** **[*1]** William L Collins, Plaintiff, Pro se, Westville, IN.

For Judge Thomas J Alevizos, Circuit Court # 4 Judge, Ronald Fargo, Michigan City Police Officer, Allen Schutz, Michigan City Police Officer, Christopher Froehlke, Michigan City Police Officer, Sherry Kozlowski, Nurse of LaPorte County Jail, Captain Richard Brull, Warden of LaPorte County Jail, Defendants: Elizabeth A Flynn, LEAD ATTORNEY, Braje Nelson & Janes LLP, Michigan City, IN.

**Judges:** Joseph S. Van Bokkelen, United States District Judge.

**Opinion by:** Joseph S. Van Bokkelen

## Opinion

**OPINION AND ORDER**

Plaintiff William Collins filed suit against six defendants, four of whom have been dismissed, for actions stemming from his arrest and subsequent detention at the LaPorte County Jail. Plaintiff's surviving claims are those against Defendants Sherry Kozlowski and Richard Buell, in their individual capacities, for allegedly violating his *Fourteenth Amendment* right to medical treatment. Defendants moved for summary judgment and to strike Plaintiff's response to Defendants' motion for summary judgment. For the reasons stated below, the Court grants Defendants' Motion for Summary Judgment and denies Defendants' Motion to Strike.

### A. Factual and Procedural Background

On **[*2]** January 28, 2006, Plaintiff William Collins was detained and subsequently arrested by Officer Robert Fargo as a suspect in the robbery of Judge Thomas Alevizos. Fargo transported Plaintiff to Maxine's Restaurant, where Judge Alevizos and two other police officers, Allen Shultz and Christopher Frohelke, were located. Plaintiff alleges that Judge Alevizos poked him in his left eye while he was handcuffed and removed from the police car for identification. Although Plaintiff suffered from glaucoma in both eyes for about six years before this altercation and had surgery on his left eye, he maintains that this incident, and his subsequent treatment by Defendants Sherry Kozlowski and Richard Buell caused him to lose his sight in his left eye.

Plaintiff was transported to LaPorte County Jail where he was booked on charges of robbery and criminal mischief. At intake, Plaintiff did not have visible signs of injury and did not request medical treatment. (Defs.' Ex. E). Plaintiff reported that he suffered from glaucoma and was taking several medications including: Depakote, Seraquil, Paxil, Trazadone, and eye drops. (Defs.' Ex. F). Because of this, the intake officer filled out a medical referral. **[*3]** (*Id.*).

Three weeks later, on February 14, 2006, Nurse Burddick, one of two nurses employed to treat prisoners at the LaPorte County Jail, evaluated Plaintiff and noted that he had glaucoma. Plaintiff verbally requested aspirin and medical treatment for headaches caused by his glaucoma from Defendant Kozlowski, the other nurse responsible for treating LaPorte County Jail inmates, and was told to fill out a request form. (Compl. P 11). Plaintiff filed two inmate request forms seeking medical attention for his eye, the second of which was dated February 19, 2006. (Compl. P 12). Defendant Kozlowski responded to Plaintiff's request on February 21, 2006, indicating that he would be worked into the next available appointment and that information about his medications was needed. (Defs.' Ex. L). Plaintiff was initially noncompliant with Defendant Kozlowski's request, but eventually informed her that he previously received treatment for his glaucoma at Wishard Hospital. (Kozlowski Aff. P 10). The jail physician examined Plaintiff the next day, and determined that he needed to be seen by an ophthalmologist or that his medical records from Wishard Hospital were required. (Kozlowski Aff. P 13). **[*4]** Defendant Kozlowski requested Plaintiff's medical files from the hospital on February 23, 2006. (*Id.* at P 14).

Between March 3, 2006, and March 15, 2006, Dr. Benjamin Mannix, an ophthalmologist, treated Plaintiff four times. (Buell Aff. P 19). Plaintiff was given all medication prescribed by Dr. Mannix. (*Id.*). About two days after his last appointment, Dr. Mannix's office notified the jail that Plaintiff needed to be seen by a specialist for his glaucoma condition. (*Id.* at P 20). Dr. Mannix sent a letter to a Dr. Gerber requesting that he examine Plaintiff. (Pl.'s Ex. R). In this letter, Dr. Mannix indicated that he contemplated sending Plaintiff back to Wishard Hospital, but chose to refer him to Dr. Gerber instead because the jail did not have transportation to the hospital available. (*Id.*).

Dr. Gerber did not treat Plaintiff, but on March 28, 2006, Dr. Karen Briggs, a glaucoma specialist, examined Plaintiff and determined that he needed surgery to treat his left eye. (Buell Aff *P* 22). Dr. Briggs's office scheduled the surgery for April 26, 2006, and Dr. Briggs performed the surgery on that date. Plaintiff was subsequently transported to Dr. Briggs's office in Dyer, Indiana, at least **[*5]** seven times for follow up visits. (*Id.* at PP 21-25). Throughout Plaintiffs time at the LaPorte County Jail, Defendants Kozlowski and Buell, followed the recommendations and directions of Plaintiff's physicians. (Kozlowski Aff. P 26, Buell Aff. P 14).

On June 1, 2006, Plaintiff filed a grievance with the LaPorte County Jail. (Defs.' Ex. M). In his grievance, Plaintiff alleged that he told the officer in charge of his booking that he needed medical attention for his eye, and that he was denied such treatment for three weeks. (*Id.*). Defendant Captain Buell, the LaPorte County Jail Commander, responded to Plaintiff's grievance on June 6, 2006, stating that Plaintiff did not have a valid complaint because the jail's medical procedures were followed and Plaintiff was transported to all required doctor appointments. (*Id.*).

Following the denial of his grievance, Plaintiff filed his *pro se* Complaint, pursuant to *42 U.S.C. § 1983*, against Defendants Judge Thomas Alevizos, Officer Ronald Fargo, Officer Allen Schutz, Officer Christopher Froehlke, Sherry Kozlowski, and Captain Richard Buell in this Court on August 24, 2007. Plaintiff's claims against Defendant Alevizos for assault and against Defendants **[*6]** Fargo, Schutz, and Froehlke for failing to protect him from and conspiring to cover up the alleged assault were dismissed on May 8, 2008. On the same day, the Court granted Plaintiff leave to proceed against Defendants Kozlowski and Buell in their individual capacities for monetary and punitive damages for the denial of medical treatment in violation of the *Fourteenth Amendment to the United States Constitution.* (DE 9).

Defendants moved for summary judgment on May 25, 2009, to which Plaintiff responded on October 5, 2009. Defendants replied on October 20, 2009, and filed a Motion to Strike Plaintiff's Response and supporting documentation pursuant to *Federal Rule of Civil Procedure 56*. Defendants urge that Plaintiff's Response, affidavit, and attached exhibits A and B should be stricken because they are vague and incomplete. Defendants further maintain their motion should be granted because the documents fail to comply with the procedural requirements of *Federal Rule of Civil Procedure 56(e)* and Northern District of Indiana Local Rule 56.1. However, because the Court only considers facts that are admissible in evidence when making its decisions, Defendants Motion to Strike (DE 100) **[*7]** is denied as moot.

## B. Summary Judgment Standard

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. *Rule 56(c)* further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Id. at 323*. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving **[*8]** party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund, 791 F.2d 548, 558 (7th Cir. 1986)*.

*Rule 56(e)* specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. More specifically, Local Rule 56.1 provides that, in opposing a motion for summary judgment, the non-moving party shall file a "Statement of Genuine Issues" "setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated." N.D. Ind. L.R. 56.1. Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

In viewing the facts **[*9]** presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc., 45 F.3d 231, 234 (7th Cir. 1995)*. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

## C. *Section 1983* Standard

*Section 1983* is not a source of substantive rights. Instead, it provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterrey v. Del Monte Dunes at Monterrey, Ltd., 526 U.S. 687, 749 n.9, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999)* (quoting *Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979))*. To prevail on a claim under *Section 1983*, a plaintiff must show that "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *J.H. ex rel. Higgin v. Johnson, 346 F.3d 788, 791 (7th Cir. 2003)* **[*10]** (citing *Reed v. City of Chi., 77 F.3d 1049, 1051 (7th Cir. 1996))*. A Plaintiff must show that the defendant was personally involved in depriving him of his constitutional rights. *See Walker v. Taylorville Corr. Ctr., 129 F.3d 410, 413 (7th Cir. 1997)*.

The parties do not dispute that Defendants acted under color of state law. Therefore, the Court must determine only if there is a genuine issue of material fact as to whether Defendants deprived the Plaintiff of a right secured by the *due process clause of the Fourteenth Amendment*--that is, a right to medical treatment.

## D. Discussion

Plaintiff was a pretrial detainee at the time of the events giving rise to his claim. Although the *Eighth Amendment* applies only to convicted prisoners, the *due process clause of the Fourteenth Amendment* extends the same standard for medical treatment to pretrial detainees. *Williams v. Rodriguez, 509 F.3d 392, 401 (7th Cir. 2007)*. Under this standard, the plaintiff bears the burden of proof to show that the defendant was deliberately indifferent to his or her serious medical needs. *Id*.

A medical condition is deemed to be objectively serious if it is "one that has been diagnosed by a physician as mandating treatment **[*11]** or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder, 546 F.3d 516, 522*

*(7th Cir. 2008)*. Deliberate indifference is "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks." *Collins v. Seeman, 462 F.3d 757, 762 (7th Cir. 2006)* (quoting *Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992))*. To show that a defendant was deliberately indifferent, a plaintiff must demonstrate that the official "acted with a sufficiently culpable state of mind." *Hayes, 546 F.3d at 522* (quoting *Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994))*. This means that the official must know of the risk to the inmate's health and disregard it. *Id.* Furthermore, negligent conduct does not give rise to culpability under the deliberately indifferent standard. *See Pierson v. Hartley, 391 F.3d 898, 902 (7th Cir. 2004)* ("Negligence on the part of an official does not violate the Constitution, and it is not enough that he or she should have known of a risk. Instead, deliberate indifference requires evidence that an official actually knew of a substantial risk of serious harm and consciously disregarded it nonetheless."). Additionally, **[*12]** a defendant with knowledge of a risk need not "take perfect action or even reasonable action[,] . . . his action must be reckless before *§ 1983* liability can be found." *Collins, 462 F.3d at 762* (quoting *Cavalieri v. Shepard, 321 F.3d 616, 622 (7th Cir. 2003))*. Medical malpractice, without more, does not state a claim of deliberate indifference. *Walker v. Peters, 233 F.3d 494, 499 (7th Cir. 2000)*.

In their Motion for Summary Judgment, Defendants urge to dismiss Plaintiff's claim that Defendants denied him adequate medical treatment for three reasons. First, Defendants contend that Plaintiff cannot prove that they were deliberately indifferent to Plaintiff's medical needs. Second, they argue that Plaintiff is unable to demonstrate that the actions of either Defendant were the cause of his injuries. Finally, Defendants maintain that they are entitled to qualified immunity.

### (1) Defendant Kozlowski

Plaintiff claims that Defendant Kozlowski was deliberately indifferent to his medical needs. First, Plaintiff maintains that Kozlowski did not respond to his request for medical attention and aspirin, and instead told him to fill out a request slip. Next, Plaintiff claims that he did not receive **[*13]** the medical attention and eye drops he needed from a doctor until about three weeks after his incarceration, that this delay resulted in increased pressure in his eye thereby making surgery necessary, and that this could have been prevented had Kozlowski timely reviewed his medical file.

Despite these contentions, Plaintiff's proffered evidence does not show that Kozlowski was deliberately indifferent to his medical needs. Plaintiff made an oral request to Defendant Kozlowski for aspirin, and was instructed to fill out a request slip. (Compl. P 11). Plaintiff subsequently filled out at least two request slips for medical attention. (Compl. P 12). Kozlowski replied to the request dated February 19, 2006, two days later and indicated that the Plaintiff would be seen at the next available appointment. The Plaintiff was seen by the jail physician on the following day and was subsequently referred to a specialist. While Plaintiff's previous requests for medical treatment may have been overlooked negligently, he has not provided evidence that Defendant Kozlowski deliberately ignored these requests. Furthermore, the jail physician, not Kozlowski, is responsible for making decisions about the **[*14]** medical treatment of inmates. (Kozlowski Aff. PP 18, 21).

Plaintiff further alleges that Kozlowski should have been aware of his eye condition at the time of his intake because of his booking photo. Although Plaintiff claims that he requested medical treatment at the time of his intake and that he did not receive this treatment until three weeks later, the record indicates that Plaintiff did not have visible signs of injury that required immediate medical attention, nor did he request such attention. Instead, the intake officer referred Plaintiff to the jail nurses for non-emergency medical care relating to his glaucoma condition. (Defs.' Ex. E, F).

Kozlowski maintains that she did not become aware that Plaintiff was suffering from glaucoma until February 14, 2006, after the other jail nurse evaluated him, and that she was never made aware of the alleged injury that occurred from Plaintiff's encounter with Judge Alevizos. (Kozlowski Aff. PP 9, 26). Plaintiff suggests that Kozlowski could have obtained information regarding his glaucoma from his medical files; however, the record shows that Plaintiff was initially noncompliant with Kozlowski's request for his medical information. As a **[*15]** result, Kozlowski did not receive Plaintiff's medical file from Wishard Hospital until after the jail physician examined him. (*Id.* at PP 10, 14). Although Kozlowski may have been negligent in not obtaining Plaintiff's medical files earlier, this is not sufficient to demonstrate that Kozlowski was deliberately indifferent to Plaintiff's medical needs. The Plaintiff has not provided any evidence indicating that Defendant Kozlowski knew that the Plaintiff was at risk of serious injury if he did not receive prompt medical attention or that Kozlowski acted with a total disregard for his safety. As such,

summary judgment for Defendant Kozlowski is appropriate because Plaintiff has not raised a genuine issue of material fact as to whether she was deliberately indifferent to his medical needs.

### (2) Defendant Buell

Plaintiff's claim that Defendant Buell was deliberately indifferent to his medical needs is twofold. First, he asserts that Buell had the authority to make medical decisions and failed to approve his surgery in a timely manner. Second, Plaintiff maintains that Buell violated his *Fourteenth Amendment* rights by not sending him to Wishard Hospital, where he was previously treated for glaucoma. **[*16]** Both of these arguments fail, as Plaintiff has fallen short of producing evidence showing Defendant Buell was in fact deliberately indifferent to his medical needs.

Plaintiff alleges that Defendant Buell had medical decision-making authority to schedule his surgery, but he does not provide any evidence to support this claim. Plaintiff provides copies of several LaPorte County Jail medical policies; however, none of these indicate that the jail commander has the ability to dictate what type of medical treatment an inmate receives or when such treatment is provided. Additionally, Defendant Buell stated in his affidavit that he is not responsible for scheduling inmates' medical appointments and that it was Dr. Briggs' office, not he, who chose the date for Plaintiff's surgery. (Buell Aff. PP 7, 24, 27). Without providing evidence to contradict these statements, Plaintiff has failed to raise a genuine issue of material fact as to whether the Defendant was deliberately indifferent to his medical needs.

Plaintiff's argument that Defendant Buell was deliberately indifferent to his medical needs by not sending him to the hospital where he previously received treatment is also flawed. In support **[*17]** of his proposition, Plaintiff points to a letter written by Dr. Mannix to Dr. Gerber, requesting him to examine Plaintiff. (Pl.'s Ex. R). In this letter, Dr. Mannix indicated that he originally thought about sending Plaintiff to the hospital in Indianapolis (Wishard Hospital), where he was previously treated for his glaucoma, but because the jail did not have the necessary transportation arrangements available, he decided to refer Plaintiff to him instead.

Although this letter demonstrates that Dr. Mannix considered sending Plaintiff to Wishard Hospital, it does not indicate that Dr. Mannix recommended this option to Defendant Buell. Instead, the record shows that on March 17, 2006, Dr. Mannix suggested that a glaucoma specialist examine Plaintiff, and that such specialist saw Plaintiff on March 28, 2006. (Defs.' Ex. G, H). This supports Defendant's assertion that he followed the medical doctor's recommendations regarding Plaintiff's care. (Buell Aff. P 14).

Furthermore, while Plaintiff was entitled to medical care as a pretrial detainee, he was not entitled to the best possible care, nor was he entitled to demand specific care. *Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997)*. Instead, **[*18]** Plaintiff was entitled to "reasonable measures to meet a substantial risk of serious harm to [him]." *Id.* Because Plaintiff was transported to see the required medical professionals and obtained the treatment, including surgery, necessary for his condition, Plaintiff received the medical care to which he was entitled. Moreover, when an inmate is under the supervision of medical personnel, non-medical officials typically cannot be held liable for decisions made relating to the inmate's medical care. *Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2005)*.

Plaintiff has not provided evidence demonstrating that Defendant Buell was responsible for making decisions concerning his medical treatment. Nor has he shown that Defendant Buell knew that there was a substantial risk of harm to Plaintiff if he did not receive treatment from Wishard Hospital, and yet decided not to send him there with a conscious disregard for this potential harm. Because Plaintiff has not met his burden of proof to raise a genuine issue of material fact indicating that Defendant Buell was deliberately indifferent to his medical needs, summary judgment for Defendant Buell is proper.

As Plaintiff has not provided sufficient **[*19]** evidence demonstrating a genuine issue of material fact relating to his claim, the Court need not address the Defendants' final two arguments.

### E. Conclusion

The Defendants' motion for summary judgment (DE 91) is GRANTED and Defendants' motion to strike Plaintiff's response (DE 100) is DENIED as moot.

SO ORDERED on January 13, 2010.

/s/ Joseph S. Van Bokkelen

Joseph S. Van Bokkelen

United States District Judge

**End of Document**

 Neutral

As of: August 31, 2018 8:04 PM Z

# *Harper v. Dart*

United States District Court for the Northern District of Illinois, Eastern Division

October 21, 2015, Decided; October 21, 2015, Filed

No. 14 C 01237

**Reporter**

2015 U.S. Dist. LEXIS 142871 *; 2015 WL 6407577

DARRYL HARPER, Plaintiff, v. THOMAS DART, et al., Defendants.

**Prior History:** *Harper v. Dart, 2015 U.S. Dist. LEXIS 81575 (N.D. Ill., June 24, 2015)*

## Core Terms

municipal, allegations, deprivation, shackling, widespread practice, motion to dismiss, medical care, facilities, inaccessible, disability, bed, factual allegations, detainees, assigned, custom, great difficulty, accommodate, showering, amend, Jail, wheelchair-bound, Infirmary, toileting

**Counsel: [*1]** For Darryl Harper, Plaintiff: Patrick William Morrissey, LEAD ATTORNEY, Thomas G. Morrissey, Ltd., Chicago, IL; Thomas Gerard Morrissey, Thomas G. Morrissey, Chicago, IL.

For Thomas Dart, Sheriff of Cook County, Defendant: Helen Catherine Gibbons, Michael L. Gallagher, LEAD ATTORNEYS, Cook County States Attorney's Office Daley Ctr., Chicago, IL; Michael Jude Sorich, LEAD ATTORNEY, Cook County State's Attorney, Chicago, IL.

For Cook County, Illinois, Defendant: Sandra A. Navarro, LEAD ATTORNEY, Cook County State's Attorney's Office, Chicago, IL; Thomas E. Cargie, LEAD ATTORNEY, Cook County State's Attorney's Office (69W), Chicago, IL.

**Judges:** Honorable Edmond E. Chang, United States District Judge.

**Opinion by:** Edmond E. Chang

## Opinion

**MEMORANDUM OPINION AND ORDER**

Darryl Harper is a detainee at the Cook County Jail. He is disabled, wheelchair-bound, and suffers from several chronic illnesses. Harper complained to correctional officers, asking for handicap-accessible housing and adequate medical care. He says his complaints were ignored. Furthermore, Harper alleges that during his stay at Stroger Hospital, which is the primary hospital for the Jail, he was shackled to his hospital bed per a Sheriff's Department policy. **[*2]** Based on these allegations, Harper sued Sheriff Dart, in his official capacity only, and Cook County under *42 U.S.C. § 1983*; the American with Disabilities Act, *42 U.S.C. § 12132*; and the Rehabilitation Act, *29 U.S.C. § 794*.[1]

Cook County answered, R. 83, but Dart moved to dismiss, R. 84, Mot. Dismiss. Dart argues that Harper has failed to adequately plead any of his claims. The Court agrees in part. Dart's motion to dismiss is granted (though without prejudice, at least for now) as to Harper's *§ 1983* claims for inadequate facilities and medical care, and as to his ADA and Rehabilitation Act claims. But the motion is denied as to Harper's *§ 1983* claim based on Dart's shackling policy.

### I. Background

In considering the motion to dismiss, Harper's factual allegations must be accepted as true. Harper entered the Cook County Jail on March 12, 2013. R. 82, Second Am. Compl. ¶ 5. He must use a wheelchair and he suffers from several chronic medical conditions. *Id.* ¶ 6. Since the time of Harper's intake, correctional staff has been aware that Harper requires special housing to accommodate **[*3]** his physical limitations and need for regular medical care. *Id.* ¶ 7. Harper repeatedly

---

[1] The Court has subject-matter jurisdiction over these federal claims under *28 U.S.C. § 1331*. Citations to the record are "R." followed by the docket number then the page or paragraph number.

requested accessible living conditions. *Id.* ¶ 8. His requests were ignored and he was assigned to an inaccessible cell. *Id.* For most of Harper's incarceration, he has been assigned to the third floor of Cermak Infirmary. *Id.* ¶ 11. The cell's layout causes Harper "great difficulty" with showering, toileting, and getting into bed. *Id.* ¶ 9. Harper also alleges that he has been injured by deficiencies in the quality of the infirmary's medical care; the deficiencies are supposedly the subject of *United States v. Cook County*, 10 C 2946. *Id.* ¶ 12. Per Harper, the infirmary's inadequate medical care required him to be admitted to Stroger Hospital on several occasions. *Id.* ¶ 13. While at the Hospital, he was, at all times, shackled to his bed per Dart's explicit policy. *Id.* ¶ 14. Requests to remove the shackles were ignored. *Id.* ¶ 15.

## II. Standard

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7, 570 F.3d 811, 820 (7th Cir. 2009). Rule 8(a)(2)* applies to most claims, requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. This short and plain statement must "give the defendant **[*4]** fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (alteration in original) (internal quotation marks and citation omitted). And it must "contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 570*). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555*. Factual allegations, but not legal conclusions, are assumed to be true. *Iqbal, 556 U.S. at 678-79*.

## III. Analysis

Relying on Harper's complaint and the parties' briefs, the Court construes Harper as making four claims against Dart and Cook County:

> (1) a *Monell* claim alleging a widespread practice of providing constitutionally inadequate medical care,
>
> (2) a *Monell* claim based on Dart's express policy of

shackling detainees in the hospital,

> (3) a *Monell* claim alleging a widespread practice of assigning wheelchair-bound inmates to constitutionally inadequate, inaccessible housing; and
>
> (4) claims under the ADA and the Rehabilitation Act (which follow the same analysis, so the Court treats them as one claim for now) also alleging inaccessible facilities.

The Court addresses each in turn.

### A. *Section 1983* Claims

Harper brings three claims under *42 U.S.C. § 1983*. *Section 1983* provides **[*5]** that "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights ... secured by the Constitution ... shall be liable to the party injured." To hold a municipality liable, not only must a plaintiff prove the deprivation of an underlying substantive right (*§ 1983* does not supply the substantive right, and instead is only the cause of action to vindicate the right), the plaintiff must show that the deprivation was caused by the municipality's policy or custom, or by a final policymaker for whom the municipality is responsible. Here, Harper's *§ 1983* claims are against Dart in his official capacity as Cook County's Sheriff. R. 99, Minute Entry ("Plaintiff confirmed that there is no claim against Dart in his individual capacity."). Official capacity claims against municipal officials are, in effect, claims against the municipal body itself. *Walker v. Sheahan, 526 F.3d 973, 977 (7th Cir. 2008)* ("Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself.") (citing *Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991)*). Municipalities, like individuals, are suable "persons" under *§ 1983*. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)* ("We held in *Monell* ... **[*6]** that municipalities and other local governmental bodies are "persons' within the meaning of *§ 1983*.") (citing *Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*). Claims against municipalities are often called *Monell* claims. To make out a *Monell* claim—that is to show that a municipal "person" caused a deprivation of the plaintiff's constitutional rights—a plaintiff must allege "that an official policy or custom not only caused the constitutional violation, but was the moving force behind

it." *Estate of Sims ex rel. Sims v. Cnty. of Bureau, 506 F.3d 509, 514 (7th Cir. 2007)* (internal quotation marks omitted). That showing, practically speaking, breaks down into three parts.

First, the plaintiff must allege that he or she has suffered the deprivation of a constitutional right. *See 42 U.S.C. § 1983.* (*Section 1983* is only a vehicle to vindicate rights found elsewhere, most often in the United States Constitution; it provides no substantive rights itself.) Second, the plaintiff must allege that the municipality's "official policy or custom," the one the plaintiff believes caused harm, actually exists. *Estate of Sims, 506 F.3d at 514.* There are three ways to do this: one can allege "(1) an express policy, (2) a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or (3) [] the actions of an individual who possesses the **[*7]** authority to make final policy decisions on behalf of the municipality or corporation." *Rice ex rel. Rice v. Corr. Med. Servs., 675 F.3d 650, 675 (7th Cir. 2012).* The express-policy and individual-action routes are self-explanatory. But to go the widespread-practice route, a plaintiff must allege that the relevant official (in this case Dart) was "deliberately indifferent to the known or obvious consequences" of the alleged widespread practice. *Thomas v. Cook County Sheriff's Dept., 604 F.3d 293, 303 (7th Cir. 2009)* (quoting *Gable v. City of Chicago, 296 F.3d 531, 537 (7th Cir. 2002)).* In order for a plaintiff to prevail on a deliberate-indifference claim in this context, the relevant official "must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.* There can be no liability under the widespread practice theory unless the plaintiff shows (and at the pleading stage, adequately alleges) that the official knew of the practice or that it was "so pervasive" that he must have known. *See Phelan v. Cook County, 463 F.3d 773, 790 (7th Cir. 2006).* Finally, once the plaintiff has alleged a deprivation and a custom or a policy, the plaintiff must allege causation: the plaintiff must connect the policy or custom to the constitutional deprivation by alleging that the former was the "moving force" behind the latter. *Estate of Sims, 506 F.3d at 514.*

## 1. Inadequate Medical Care

Dart's motion to dismiss **[*8]** is granted as to Harper's *Monell* claim alleging a widespread practice based on "structural problems in the administration of healthcare at the jail" including inadequate staffing, "assigning the sickest prisoners to the third floor of Cermak Infirmary,"

and the failure to provide "life essential wound care." Second Am. Compl. ¶¶ 11-13; R. 91, Harper's Resp. Br. at 6. The underlying substantive right arises from the *Due Process Clause of the Fourteenth Amendment*, which bans deliberate indifference to the serious medical needs of pretrial detainees. *Pittman v. Cnty. of Madison, 746 F.3d 766, 775 (7th Cir. 2014).* To succeed on a *Monell* claim based on a widespread practice, Harper must allege that the conditions were so persistent and widespread that Dart must have known about them. *Latuszkin v. City of Chicago, 250 F.3d 502, 505 (7th Cir. 2001); Thomas v. Sheahan, 499 F. Supp. 2d 1062, 1094 (N.D. Ill. 2007).*

The Second Amended Complaint falls well short of adequately alleging a widespread-practice claim. Aside from alleging that it was Dart's "widespread practice . . . to assign some of the Jail's sickest prisoners to the third floor of the Cermak Infirmary" and citing—by name only—another case involving the same issues (the prison-institution litigation brought by the United States Justice Department in *United States v. Cook County*), Harper provides no *factual* allegations (as distinct from statements of bare conclusions) **[*9]** to support this claim. Second Am. Compl. ¶ 12. To be sure, it might have been appropriate for Harper to rely on specific factual allegations in the Justice Department complaint, but Harper makes no effort to actually point to any. Only when the specific factual allegations are known can the Court possibly evaluate whether a claim has been stated as a matter of substance (that is, deliberate indifference to serious medical needs) or, more importantly here, as a matter of stating a *Monell* claim. In an adversarial system of litigation, it is not up to the Court to sift through the referenced-lawsuit's filings, of which there are hundreds, looking for factual allegations to support Harper's attempt to plead a claim on this issue.

## 2. Shackling Claim

Dart's motion to dismiss is denied as to Harper's claim challenging Dart's "explicit policy" of shackling wheelchair-bound detainees in Stroger Hospital. Second Am. Compl. ¶¶ 13-16; Harper's Resp. Br. at 7. To state a claim for unlawful restraint (again, under the *Due Process Clause of the Fourteenth Amendment*), Harper must allege that the use of bodily restraints is not rationally related to a legitimate non-punitive government purpose or that their use appears excessive and objectively **[*10]** unreasonable in relation to the purpose they serve. *Davis v. Wessel, 792 F.3d 793, 800*

(7th Cir. 2015); *see also* *May v. Sheahan, 226 F.3d 876, 884 (7th Cir. 2000)*.[2] Harper alleges that, per an official policy, he was shackled to his hospital bed despite the presence of two armed guards. Second Am. Compl. ¶ 14; Harper's Resp. Br. at 7. This was excessive, he argues, because he is wheelchair-bound and his chronic health conditions make him less dangerous. *Id.* at 11. Those allegations state a claim. Harper's allegations are very close to, if not more serious than those in *May*, which reversed the grant of a motion to dismiss a claim based on the same policy. *226 F.3d at 884*. At this stage of the litigation, the inquiry is limited to the facts in the Second Amended Complaint, which of course does not set forth any facts that would justify always shackling every prisoner to a hospital bed at all times, even though armed guards are present. This claim survives.

### 3. Inaccessible Facilities

Dart's motion to dismiss is granted as to Harper's claim that Dart was deliberately indifferent to a widespread practice at the jail of assigning wheelchair-bound detainees to inaccessible housing. Second Am. Compl. ¶¶ 9-11; Harper's Resp. Br. at 4. This practice, per Harper, deprived him of his constitutional right to "the minimal civilized measure of life's necessities" by "caus[ing] him great difficulty when toileting, showering, and transferring to his assigned bed." Second Am. Compl. ¶ 9. The Second Amended Complaint does not describe what is meant by "great difficulty."

It is of course true that "facilities to wash and use the toilet," among other things, "are among the minimal civilized measure of life's necessities that must be afforded prisoners." *Jaros. v. Ill. Dep't of Corr., 684 F.3d 667, 670-71 (7th Cir. 2012)*. But experiencing "great difficulty" which is how Harper characterizes the use of the facilitites) accessing or using these necessities is not the same as not having them; difficulty is not deprivation, and deprivation is what violates the Constitution. *Id. at 671*. In **[*12]** *Jaros*, the Seventh Circuit distinguished between a disabled inmate's constitutional claim and his claim under the ADA and the Rehabilitation Act. When rejecting the *constitutional* claim for access to showers, the Seventh Circuit went so far as to point out the number of times the inmate showered per month (four times), and that the presence of grab bars would not have made a difference to the amount of pain he experienced because he experienced the same severe pain all the time. *Id.* In the Second Amended Complaint, Harper does not explain what is meant by "great difficulty," which really is just a bare conclusion rather than a *factual* allegation entitled to the presumption of truth. It might very well be that Harper could allege facts to state a claim, and (as discussed below) he may seek leave to amend the complaint again (the dismissal is, for now, without prejudice), but the Second Amended Complaint does not state a claim.

### B. Statutory Claims

Although a much closer question, Dart's motion to dismiss is also granted on the claim that Dart violated Harper's rights under the ADA and the Rehabilitation Act by denying him equal access to washing facilities, toilets, and bedding. Second **[*13]** Am. Compl. ¶ 9. To state a claim under the Rehabilitation Act,[3] Harper "need only allege that (1) he is a qualified person (2) with a disability and (3) [Dart] denied him access to a program or activity because of his disability." *Jaros, 684 F.3d at 671-72* (citing *29 U.S.C. § 705(2)(B))*. One can "deny access" by failing to reasonably accommodate a plaintiff's disability. *Id.* ("Refusing to make reasonable accommodations is tantamount to denying access; although the Rehabilitation Act does not expressly require accommodation, the Supreme Court has located a duty to accommodate in the statute generally.") (internal quotation marks omitted).

---

[2] Restraint claims by pretrial detainees, like Harper's, have traditionally been evaluated under this standard, which originated in *Bell v. Wolfish, 441 U.S. 520, 561, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)* and *Youngberg v. Romeo, 457 U.S. 307, 324, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982)*. But there is an argument that *Kingsley v. Hendrickson, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015)*, which adopted an objective standard for excessive force claims brought by pretrial detainees, *id. at 2470*, may be a better fit. *See* *Davis, 792 F.3d at 801* ("There was great debate between the parties as to whether *Kingsley* **[*11]** ... controls this [restraint] case."). The parties here have not raised that possibility but should consider whether to do so at the summary judgment stage.

---

[3] Dart concedes that the analysis under both Acts is materially identical. R. 84, Dart's Br. at 4, n.1 (citing *Jaros, 684 F.3d at 671*). And the two Acts also provide the same relief. *Id. at 671-72*. The only material difference is that the Rehabilitation Act requires the plaintiff to prove that the defendant accepts federal funds. R. 84, Dart's Br. at 4, n.1 (citing *Id. at 671*). Dart rightly concedes this point. *Id.* So, for simplicity's sake, this Court will, as the Seventh Circuit has done, "dispense with the ADA" analysis and focus on the Rehabilitation Act. *Id. at 671-72*.

Harper comes close, but fails, to state a claim under the ADA and the Rehabilitation **[*14]** Act. It is true that Harper adequately alleges that he is a qualified, disabled person by alleging that he is wheelchair bound. *See* *Wagoner v. Lemmon, 778 F.3d 586, 592 (7th Cir. 2015)* ("Wagoner's paraplegia qualifies as a disability."); *see also* *Jaros, 684 F.3d at 671-72* (prisoner-plaintiff with hip problem qualified due to mobility impairment). But Harper fails to adequately allege *facts* as to a denial of equal access. As in his parallel constitutional claim, all Harper has alleged is "great difficulty" showering, toileting, and getting into bed. Those two words alone do not explain how Harper was denied equal access and are therefore not enough to allow a plausible inference that the failure to give Harper different accommodations denied him access equal to that of other prisoners. To be sure, it would not have taken much to adequately allege a failure to provide equal access. *See Jaros, 684 F.3d at 671-72* (reversing order granting motion to dismiss where prisoner explained how inaccessible facilities affected his access to meal and shower facilities). But once again Harper's allegations are just conclusions without facts, which are not enough. As discussed next, the dismissal of the ADA and Rehabilitation Act claims is also without prejudice, but it is up to Harper to seek leave **[*15]** to amend.

## C. Leave to Amend

Harper's *§ 1983* claims for inadequate medical care and inaccessible facilities, as well as his ADA and Rehabilitation Act claims, are dismissed without prejudice. If Harper wishes to re-plead them, he must file a motion seeking leave to do so. Given the discovery schedule, this motion will be due on or before November 17, 2015. Also, because the Rule 16(b) deadline to amend the pleadings has passed, R. 21 ("any amendments to pleadings ... shall be filed on or before 08/04/2014"), Harper will need to satisfy the "good cause" standard in Rule 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). He must therefore explain why—this late in the game—he deserves a fourth chance at pleading these claims. Perhaps the parties have engaged in enough discovery so that the claims have been made more specific, so leave to amend would be appropriate (and perhaps would be uncontested, at least in part), but Harper must take the initiative to propose a Third Amended Complaint and to explain why leave is justified.

## IV. Conclusion

Dart's motion to dismiss, R. 84, is granted as to Harper's *§ 1983* claims for inadequate medical care and inaccessible facilities and as to Harper's **[*16]** statutory claims. The motion is denied as to Harper's shackling claim.

/s/ Edmond E. Chang

Honorable Edmond E. Chang

United States District Judge

DATE: October 21, 2015


# *Harris v. Clarke*

United States District Court for the Eastern District of Wisconsin

November 10, 2008, Decided; November 10, 2008, Filed

Case No. 06-C-0230

**Reporter**

2008 U.S. Dist. LEXIS 109602 *; 2008 WL 4866683

MARY A. HARRIS, Personally and as Special Administrator of the Estate of Edward Harris, deceased, Plaintiff, v. DAVID A. CLARKE, JR., MILWAUKEE COUNTY, ROY TROUTMAN, M.D., GAIL SZCZEPANIAK, R.N., WILLIAM BROWN, ROBERT DICKERSON, CATHERINE TRIMBOLI, ANN DUNN, and SUE SINGER, Defendants.

**Prior History:** *Harris v. Clarke, 2007 U.S. Dist. LEXIS 44895 (E.D. Wis., June 19, 2007)*

## Core Terms

Jail, medications, infirmary, psychiatric, special needs, staff, rounds, inmate, visited, floor, insulin, mental health, blood, medical care, cell, evaluated, nursing, proposed findings of fact, deliberate indifference, nurse practitioner, sheriff's deputy, nursing staff, bed, clinical, trained, vital signs, decompensation, deliberately, psychiatrist

**Counsel:** **[*1]** For Mary A Harris, Peronsally and as Special Administrator of the Estate of Edward Harris, deceased, Plaintiff: Erin M Patterson,Timothy L Baldwin, LEAD ATTORNEYS, Christopher L Strohbehn, Gimbel Reilly Guerin & Brown, Milwaukee, WI.

For Milwaukee County, David A Clarke, Jr, Defendants: Charles H Bohl, Nathan A Fishbach, LEAD ATTORNEYS, Sarah Thomas Pagels, Steven F Stanaszak, Whyte Hirschboeck Dudek SC, Milwaukee, WI.

For Roy Troutman, MD, Gail Szczepaniak, RN, William Brown, Robert Dickerson, Catherine Trimboli, Ann Dunn, Sue Singer, Defendants: Charles H Bohl, Sarah Thomas Pagels, Whyte Hirschboeck Dudek SC, Milwaukee, WI.

**Judges:** Hon. Rudolph T. Randa, Chief Judge.

**Opinion by:** Rudolph T. Randa

## Opinion

### DECISION AND ORDER

Edward Harris ("Edward") [1] was a pretrial detainee at the Milwaukee County Jail ("Jail") in Milwaukee County ("County"), Wisconsin from September 29, 2004, until October 14, 2004, when he died of a pulmonary embolism -- blood clot relating to the lungs. His widow, Plaintiff Mary A. Harris ("Harris"), personally and as special administrator of the Estate of Edward Harris, deceased, brings the action against Defendants David A. Clarke, Jr. ("Clarke"), the County, Roy Troutman, M.D. ("Troutman"), **[*2]** Gail Szczepaniak, RN ("Szczepaniak"), William Brown ("Brown"), Robert Dickerson ("Dickerson"), Catherine Trimboli ("Trimboli"), Ann Dunn ("Dunn"), and Sue Singer ("Singer") (collectively the "Defendants"). Harris has sued the Defendants in their individual and official capacities.

The amended complaint alleges a *Fourteenth Amendment* claim of deliberate indifference under *42 U.S.C. § 1983* against all the Defendants (first claim); and negligence claims against Clarke (second claim); Defendant Monica Pope-Wright ("Pope-Wright") (third

---

[1] Because Edward and the Plaintiff have the same surname, the Court departs from its usual practice of referring to individuals by their surname. Rather, the Court has referred to Edward by his given name and the Plaintiff by her surname.

Other persons involved in this action also have a surname in common. The Court has referred to one person by the surname and any others having that surname by their given name.

In some instances, the information before the Court includes an incomplete name. Therefore, the Court has referred to the individual by the name provided.

No disrespect is intended by any of these reference devices.

claim), [2] Troutman (sixth claim); Szczepaniak **[*3]** (seventh claim); Brown (eighth claim); Dickerson (ninth claim); Trimboli (tenth claim); Dunn (eleventh claim); and, Singer (twelfth claim). Harris also alleges a claim for loss of society and companionship (fourth claim) and negligent infliction of emotional distress (fifth claim) against all the Defendants.

The Court has subject matter jurisdiction over Harris's *§ 1983* claims pursuant to *28 U.S.C. § 1331*. Supplemental jurisdiction over Harris's state law claims is afforded by *28 U.S.C. § 1367*. Venue is this district is proper under *28 U.S.C. § 1441*.

Presently before the Court are the Defendants' motions for summary judgment dismissing the action and to exclude the testimony of Basil Jackson, M.D., J.D. ("Jackson").

Harris opposes both motions. The briefing of the motions is complete and they are addressed herein.

## MOTION TO EXCLUDE **[*4]** EXPERT TESTIMONY OF JACKSON

Pursuant to *Rules 702* and *104(a) of the Federal Rules of Evidence, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, and *Rules 16(c)(2)(D)* and *26(a)(2) of the Federal Rules of Civil Procedure*, the Defendants seek an order excluding the expert testimony and opinions of Jackson on the issues of the cause of death and medical care provided to Edward and Harris's allegations of deliberate indifference to Edward's medical needs by the County Sheriff's Department ("Sheriff's Department"). The Defendants argue that Jackson is not qualified to offer most of the opinions expressed in his reports. Specifically, they maintain that he is not qualified to opine on the medical care provided to Edward by the Sheriff's Department, its officers, and medical staff following Edward's arrest and the cause of Edward's death. By Jackson's own admission, he is not qualified to render an opinion on the latter.

Harris disagrees and maintains that Jackson is more

than qualified to provide the expert opinions set forth in his reports and that his opinions meet the requirements of *Rule 702*.

*Rule 702* has been amended to reflect the Supreme Court's decision in *Daubert.* **[*5]** See *Fed. R. Evid. 702*, 2000 advisory committee note. Expert testimony is admissible if offered by "a witness qualified as an expert by knowledge, skill, experience, training, or education," and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Fed. R. Evid. 702*. *See United States v. Conn, 297 F.3d 548, 555 (7th Cir. 2002)*. The trial court's basic "gatekeeping" obligation applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge." *Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)*.

The proponent of the expert testimony "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *Fed. R. Evid. 702* advisory committee's note, 2000 Amendments P 1 (interpreting *Fed. R. Evid. 104(a)*). *Daubert* held that the trial courts must function as a "gatekeeper" to ensure that the offered expert testimony is both relevant and reliable. *509 U.S. at 589*. The court of appeals for this **[*6]** circuit has interpreted *Daubert* to require trial courts to employ a two-step methodology when determining the admissibility of proffered expert testimony. *Deimer v. Cincinnati Sub-Zero Prods., Inc., 58 F.3d 341, 344 (7th Cir. 1995)*. First, the district court must determine whether the testimony has been subjected to the scientific method; in other words, it must exclude testimony based on "subjective belief or unsupported speculation." *Id.* (quoting *Porter v. Whitehall Lab., Inc., 9 F.3d 607, 614 (7th Cir. 1993))*. Second, the trial court must determine whether the testimony has a sufficient nexus with the facts of the case and with the relevant inquiry that it will actually assist the trier of fact in understanding the evidence and performing its function as fact-finder. *Id.; see Daubert, 509 U.S. at 591-92*.

*Daubert* sets forth a nonexclusive list of factors or guideposts that a court should consider for this analysis: (1) whether the theory can be and has been verified by the scientific method through testing; (2) whether the theory has been subjected to peer review; (3) the known or potential rate of error; and (4) the general acceptance

---

[2] On March 20, 2006, this Court entered an order pursuant to the stipulation of the parties dismissing Pope-Wright from this action on the merits, with prejudice and without costs to either party. However, the Court's order did not mention the third claim for negligence against Pope-Wright. The Court now expressly dismisses the third claim related to Pope-Wright.

of the theory in the scientific community. *Cummins v. Lyle Indus., 93 F.3d 362, 368 (7th Cir. 1996)*. **[*7]** It is incumbent upon the trial court to carefully consider these factors before admitting any expert scientific evidence. The *Daubert* test is a flexible one and there is no requirement that an expert's testimony satisfy each of the listed factors. *United States v. Vitek Supply Corp., 144 F.3d 476, 485 (7th Cir. 1998)*.

While Jackson vacillated in his criticisms of aspects of the individual treatment of Edward, ultimately he finds no fault with the care provided by any individual. Rather he believes that Edward should have been cared for in a clinical psychiatric facility and not in the County Jail.

Jackson is a licensed psychiatrist in Wisconsin. Jackson has practiced psychiatry for more than 50 years and is board certified in psychiatry, child psychiatry, and forensic psychiatry. He has a long list of professional experience which includes founding the mental health department at St. Francis Hospital in Milwaukee, Wisconsin and serving as its medical director. He also founded the mental health department at the former Lutheran Hospital serving as its chief of psychiatry, and founded the Wisconsin School of Professional Psychology. He has served as an associate clinical professor of psychiatry **[*8]** at the Medical College of Wisconsin and, its predecessor, the Marquette School of Medicine. From 1991 to 1996 he was a psychiatric consultant to the Milwaukee County Sheriff's Department, and served the Milwaukee County Circuit Court in that capacity. He currently sees patients in clinics in the Milwaukee area, Fond du Lac, and Juneau, Wisconsin. Jackson is qualified by education and experience as a psychiatric expert.

At his June 1, 2007, deposition, Jackson admitted that he is not a pulmonologist or a forensic pathologist and considers neither area as part of his expertise. Additionally, Jackson had not been to the infirmary or the Special Needs Unit ("Special Needs") at the Jail, has never toured the Jail complex and has no specialized training in the care of incarcerated individuals. Jackson's reports state that his opinions are based on his review of Edward's medical, jail, and police records and a personal interview of Harris.

While Jackson has expertise in psychiatry, he is not a pulmonologist or a forensic pathologist and therefore is not qualified to render an opinion on the development of the pulmonary embolism or the cause of Edward's death.

Harris argues that even though Jackson **[*9]** has not visited the Special Needs or the infirmary, where Edward was confined, his review of the Jail and medical records, which disclose the treatment afforded Edward provide an appropriate basis for an expert opinion and render it admissible. *See Walker v. Soo Line R.R. Co., 208 F.3d 581, 588 (7th Cir. 2000)*.

The Defendants respond that Jackson made no efforts to determine the care being given to Edward and that he has essentially ignored or failed to obtain the facts necessary to determine the level of care that Edward was receiving. Ergo the fundamental flaw of Jackson's opinions is that they are not based on the facts of this case.

Opinions must be grounded in the scientific method, which requires that the judge determine whether the evidence is genuinely scientific, as distinct from unscientific speculation offered by a genuine scientist. *See Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996)*. "An 'opinion has a significance proportioned to the sources that sustain it.' An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Huey v. United Parcel Serv., Inc., 165 F.3d 1084, 1087 (7th Cir. 1999)* (quoting *Mid-State Fertilizer Co. v. Exchange Nat'l Bank, 877 F.2d 1333, 1339 (7th Cir. 1989)* **[*10]** (internal citation omitted)).

Jackson's written reports dated February 27, 2007, and January 3, 2008, identify his observations and concerns regarding the quality of care provided to Edward. They outline actions which he states should have been taken to provide Edward with a reasonable degree of medical care. (Defs.' Master Ex. List P 6, Ex. 6B 2.) Jackson's January 3, 2008, report states that, in his medical and psychiatric opinion, hospitalization in a secure psychiatric facility, with appropriate medical care, was indicated from the time Edward was admitted to Jail. (Defs.' Master Ex. List P 6, Ex. 6C 4.)

Jackson opined that the most important details of Edward's history should have been obtained immediately from Bell Therapy ("Bell"), which had been providing psychiatric treatment for Edward, immediately upon incarceration on September 24, [3] and yet they were not received until October 2, over a week later, and were not stamped received by Troutman until October 5. Jackson stated that in a clinical psychiatric facility they would have been requested on admission and reviewed immediately. (Defs.' Master Ex. List P 6,

_____

[3] This date is in error. Edward was not in the **[*11]** custody of the jail until September 29, 2004.

Ex. 6B 2, 6C 2-3.)

At his deposition, Jackson was asked to state his understanding of how the Jail obtained a history regarding Edward. (Defs.' Master Ex. List P 6, Ex. 6 46.) He testified:

> Well they did an initial assessment. Of course, they did not get any information from him. They . . . At least one person talked to his wife. Froedert [Hospital] got more information from his wife. Then they requested the previous medical records from Bell, which did not come for quite a while, maybe a week, then apparently [it] was a week later that Dr. Troutman got them. So that gives me a lot of concern.

(Defs.' Master Ex. List P 6, Ex. 6, 46.) Further questioning resulted in Jackson also stating that he understood that Troutman and his staff had contacted Bell on September 29th to get an oral history. (Defs.' Master Ex. List P 6, Ex. 6, 46-47.) [4] Jackson's initial position that the records were not obtained for "quite a while perhaps a week," is not grounded in the facts. The record establishes that a seven-page fax from Bell reflecting Edward's medical record was received by the Jail on September 29, 2004.

Jackson opined that on September 24, 2007, [5] a neuropsychiatric check every six hours was inadequate in view of Edward's current state and the available history. He indicated that in a psychiatric facility even the healthiest patient is routinely checked more than this. He stated that a minimum of 15 minute checks should have been ordered in the interest of Edward's safety and, at times, continuous observation. (Defs.' Master Ex. List P 6, Ex. 6C 2; see also Ex. 6B 2.) When asked what he meant by monitoring, Jackson testified: "Observing and doing what is called for on the basis of your observation." (Defs.' Master Ex. List P 6, Ex. 6, 56.) When asked whether monitoring meant taking vital signs every 15 minutes, Jackson responded: "No. I mean just being sensitive to the total phenomenological status of the individual. Whether that means touching, whether it means just eyeballing, whatever is required." (Defs.' Master Ex. List P 6, Ex. 6, 57.)

Jackson's opinion does not take into account, that the record establishes Special Needs, where Edward [*13] was confined between September 30, and October 7, 2004, and briefly on October 12, 2004, after returning from Froedert, is a horseshoe-shaped unit that contains 19 single inmate cells with glass doors. The unit is designed so that two or three deputies can view each inmate from the central control section through glass. Deputies are at the control center 24 hours a day, seven days a week. Troutman and Dunn could "eyeball" the inmates in Special Needs frequently. (See Defs.' PFOF P 286, Pl.'s Resp. Defs.' PFOF P 286.) Jackson's opinion regarding the deficiencies in the staff's ability to observe Edward during his initial confinement does not fit with the facts of this case.

Despite Jackson's opinion about the need for constant monitoring, he also did not know the last time that Edward was seen by Jail staff prior to his death. (Defs.' Master Ex. List P 6, Ex. 6, 76-77.) The record establishes that Nurse Ed Finch ("Finch") observed Edward about ten minutes before his death.

Jackson also opined that permitting Edward to lie on a cold floor was the opposite of adequate psychiatric care and would not have been permitted in a clinical psychiatric facility and would have never been permitted [*14] even if it meant that Edward had to be restrained in his bed. (Defs.' Master Ex. List P 6, Ex. 6C 3; see also Ex. 6B 3.) However, when Jackson was asked how many times the Jail staff used restraints on Edward, he responded: "I'm not sure." (Defs.' Master Ex. List P 6, Ex. 6, 62.) Jackson also did not know how frequently Edward was laying on the floor, or for how long a period. (Defs.' Master Ex. List P 6, Ex. 6, 63, 76-77.) When asked how he knew that the floor in the Special Needs or the infirmary was cold, Jackson responded that he had been to the Jail and that he doubted that one floor was much different than another. (Defs.' Master Ex. List P 6, Ex. 6, 77.)

Jackson's opinions about the type of care provided at the Jail are not sufficiently linked to the facts of this case to be reliable. Therefore, the Defendants' motion to exclude Jackson's opinions related to the care rendered to Edward at the Jail and the cause of Edward's death are excluded from the record in this matter. His opinion that a clinical psychiatric setting would have afforded better treatment for Edward would not aid the trier of fact in this case.

The Defendants' motion to exclude the testimony of Jackson does not [*15] address his opinions regarding Harris. Those opinions are based on two interviews that

---

[4] This "fact" is not in the proposed findings of fact submitted [*12] by the parties in conjunction with the Defendants' summary judgment motion.

[5] Jackson's date is incorrect. The correct date is September 29, 2004.

Jackson had with her on February 23, and December 20, 2007. Jackson interviewed her in an attempt to evaluate any impact which she may have experienced following Edward's death. (Defs.' Master Ex. List P 6, Ex. 6C, 10.) Those opinions are not excluded under this Court's ruling.

## SUMMARY JUDGMENT MOTION

In deciding the Defendants' motion for summary judgment, the Court applies the following standards. When considering a motion for summary judgment, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham, 30 F.3d 879, 883 (7th Cir. 1994)* **[*16]** (quoting *Anderson, 477 U.S. at 248*; also citing *Celotex Corp., 477 U.S. at 324*; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *United States v. Rode Corp., 996 F.2d 174, 178 (7th Cir. 1993))*.

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson, 477 U.S. at 248*. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial -- (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law -- is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 587*.

Failure to respond to a summary judgment motion does not automatically result in judgment against the non-moving party. *See Cunningham, 30 F.3d at 883*. "A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence **[*17]** of a material factual dispute always rests with the movant." *Id.* (citations omitted).

## RELEVANT FACTS

6

### The Parties

Harris is a resident of Wisconsin. Clarke, a resident of the County, has been employed by Sheriff's Department at all times relevant to the complaint. The County is a body corporate organized pursuant *Wis. Stat. § 59.01*.

Troutman, a resident of the County, has a B.S. in Zoology from Fort Valley State in Fort Valley, Georgia, and obtained his medical degree in 1979 from the Medical College of Wisconsin ("Medical College"), which is located in Milwaukee, Wisconsin. Troutman then completed an internship and psychiatry residency at the Medical College and served as an Assistant Clinical Professor at the Medical College's Department of Psychiatry and Behavioral Medicine. Troutman is not board certified.

Troutman also worked as a general psychiatrist **[*18]** at the County Mental Health Complex's Metro North Community Health Clinic from July 1983 until August 1999, and at the County Health Services from September 1999 through August 2001. Troutman is licensed by the State of Wisconsin and had that license in 2001.

From November 2001 to August 2006, Troutman was employed at the County Jail ("Jail"). In 2001, when Troutman began working at the Jail, he had about two hours of on-the-job training. Troutman's regular schedule at the Jail was ten hours a day, Monday through Thursday. Prior to 2001, Troutman had worked on loan to the Jail from the County Behavioral Health Complex ("Behavioral Health"). Troutman is currently retired.

At his February 1, 2008, deposition, Troutman testified

---

6 Unless otherwise stated, the relevant facts are based on the Defendants' proposed findings of fact ("Defs.' POF"), Harris's additional proposed findings of fact ("Pl.'s POF"), and the Defendants' Supplemental Proposed Findings of Fact, to the extent they are undisputed. Citations to quoted excerpts are included even if they are undisputed.

that the only time he would act to transfer an inmate to Behavioral Health or another mental health facility is upon the inmate's release from custody. Troutman stated that Special Needs "is the mental hospital." (Defs.' Master Ex. List P 13, Ex. 13 61.) Troutman testified that there never was an occasion where he would deem an inmate under his care so mentally ill that he was not appropriately housed in Special Needs. Troutman testified that he believes that one **[*19]** should not send "people who have committed crimes to a hospital with people who have not done that." (Defs.' Master Ex. List P 13, Ex. 13 133.)

Szczepaniak, a Washington County, Wisconsin resident, is a registered nurse in Wisconsin who has been practicing for 30 years. She was employed at the Jail as a staff nurse from April of 2004 to March of 2006. She is currently employed at Behavioral Health.

Brown is a resident of the County, who served as a correctional officer at the County House of Correction ("House of Correction") from June of 1991 through January of 1998. Brown was certified to become a law enforcement officer with the State of Wisconsin on January 9, 1998, and he was first employed by the Sheriff's Department in January of 1998. In March of 2000, Brown was certified as a deputy for the Patrol Division by the Sheriff's Department. Brown was employed as deputy sheriff on September 29, 2004.

Dickerson, who was employed by Racine County, Wisconsin ("Racine") as a correctional officer from 1999 to 2000, was first employed by the County as a deputy sheriff and a correctional officer from January of 2000 through 2003. Dickerson worked in Special Needs between January of 2000 through **[*20]** 2003. Dickerson was employed as a deputy sheriff with the Sheriff's Department Patrol Division ("Patrol Division") from 2003 until 2004 or 2005, and was employed in that capacity on September 29, 2004. Dickerson is currently employed as a canine patrol officer with the Everest Metropolitan Police Department.

Trimboli was employed as a correctional officer at the House of Correction from 1994 to 1996. She began her employment as a deputy sheriff with the Sheriff's Department in 1996. Trimboli has been assigned to the Patrol Division from 2002 through at least July 15, 2008, [7] and was so employed on September 29, 2004, when she was working an alcohol grant squad [8] on Interstate Highway 94 in the County.

Dunn is a psychiatric nurse practitioner who was employed as a nurse practitioner at the Jail from October 2003 through **[*21]** August 2006, and at all times relevant to this complaint. Dunn's regular schedule at the Jail, was 7:30 a.m. through 4:00 p.m., Monday through Friday. Dunn is currently employed as a nurse practitioner at Behavioral Health's central walk-in clinic.

Singer, a resident of Waukesha County, Wisconsin, is currently retired. From 1973 to 1995, Singer was employed as a nurse at Doyne Hospital in Wauwatosa, Wisconsin ("Wauwatosa") and from December of 1995 until January of 2005, she was employed by the County as a registered nurse at the Jail. From 1995 to 2002, she worked as a staff nurse and from 2002 until sometime in 2004, she worked as the nurse educator. [9] Singer worked as acting director of nursing from July or August in 2004 until Pope-Wright was hired. Singer was also a member of the Quality Assurance Improvement Committee. As nurse educator, she was responsible for overseeing the training of nurses employed at the Jail, including training the nurses on Jail policies and procedures.

## Edward's Medical and Psychiatric History

Edward's psychological problems began during 1977. He was formally diagnosed as paranoid-schizophrenic in 1985. He was treated as an inpatient several times

---

[7] July 15, 2008, is the date that the Defendants filed their motion for summary judgment and supporting documents.

[8] Alcohol grant squads are funded grants from the State of Wisconsin. (Defs.' Master Ex. List, P 12, Ex.12 (Trimboli Dep. 7)). The primary goal of the squads is to get impaired drivers off the freeway. (Id.) Officers in the squads make traffic stops alone. (Id.)

[9] Paragraph 44 of the Defendants' proposed findings of fact states that from 2002 to 2005, Singer was the nurse educator at the Jail. That statement, which Harris did not dispute, conflicts with the Defendants' **[*22]** response to paragraph 96 of Harris's additional proposed findings of fact which states that Singer worked as a nurse educator until December 2004, when Pope-Wright took the position. Review of page seven of Singer's deposition, cited in support of both the Defendants' contentions, discloses that Singer testified that she was acting director of nursing, not the nurse educator, from July or August 2004 until Pope-Wright began her employment and that Singer could not recall Pope-Wright's start date. The Court has modified the factual statement to be consistent with the cited factual information.

when he did not take his psychotropic medications and engaged in dangerous behavior: twice in 1980; once in 1981 at Kenosha Memorial Hospital; twice in 1985; once in 1992 at Mendota Mental Health Institute; and in 1995 when he was placed under protective services pursuant to *Chapter 51 of the Wisconsin Statutes.*

In October 1999, Edward caused two consecutive motor vehicle accidents. He was committed for **[*23]** evaluation and found guilty but not mentally competent and placed on a *Wis. Stat. § 971.17* [10] restriction to comply with all medications as prescribed. Through the Wisconsin Department of Health and Family Services, he was placed on the conditional release program and also put on probation.

As of January 10, 2003, Edward was assessed by Bell as a part of their provisional treatment plan. At that time his diagnosis was Axis I: [11] Schizophrenic, paranoid 295.30, [12] Alcohol Dependence in remission, Axis II: Deferred, Axis III: History of Hypertension, Axis IX: Outsiders interfering with his personal life, and Axis V: 60. [13] It was further noted that Edward lacked insight into his mental illness causing him to discontinue his

medications when he was not under some type of commitment.

According to a September 2004, medication chart from Bell, psychiatrist Dr. Roerich [14] ("Roerich") prescribed Fluphenazine [15] 25 mg IM (intramuscular) every three weeks for Edward. It was administered to Edward on September 7, and September 28, 2004. Edward was due to receive the next dose on October 19, 2004.

During Edward's 27-year history of psychotic episodes prior to September 29, 2004, he had attempted suicide by self-immolation and had at least six contacts with law enforcement agencies.

Edward was **[*26]** provided medical care at the Jail from September 30, 2004, to October 7, 2004. He received medical care at Froedtert Memorial Hospital ("Froedert") from October 7, through October 12, 2004. After being discharged from Froedert on October 12, 2004, until his death in October 14, 2004, due to a pulmonary embolism, Edward received medical care at the Jail.

**Events of Thursday,** [16] September 29, 2004

At 22:10, Edward, who was driving a red General Motors Corporation pickup truck, led Racine County Deputy Sheriffs on a chase through the Mitchell interchange, driving erratically and reaching speeds of nearly 100 miles per hour. As Edward entered the County, County Deputy Sheriffs joined the pursuit to

---

[10] *Wisconsin Statute § 971.17* governs the procedures for commitment and release of persons found not guilty of crimes by reason of mental disease or defect.

[11] Psychiatric diagnoses are analyzed using the multiaxial approach of the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision, ("*DSM-IV-TR*") (4th ed. 2000). There are five axes in the DSM-IV multiaxial classification: Axis I assesses **[*24]** clinical disorders and other conditions that may be a focus of clinical attention; Axis II assesses personality disorders and mental retardation; Axis III assesses general medical conditions that may be relevant to the management of the patient's mental disorder; Axis IV assesses psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders; and Axis V is a numerical score that reflects the clinician's judgment regarding the individual's overall level of functioning, termed the Global Assessment of Functioning ("GAF"). *DSM-IV-TR* 27-33.

[12] The number 295.30 is the *DSM-IV-TR* code for a type of Schizophrenia in which there is the presence of prominent delusions or auditory hallucinations in the context of a relative preservation of cognitive function and affect and the following characteristics are not prominent: disorganized speech, flat or inappropriate affect, or disorganized or catatonic behavior. *DSM-IV-TR* 313. Catatonia is the phase of schizophrenia in which a patient is unresponsive, marked by the tendency to assume or remain in a fixed posture and the inability to move

or talk. *Taber's Cyclopedic Medical Dictionary* 357 (20th **[*25]** ed. 2005).

The *DSM-IV* is the most widely used psychiatric reference book in the world, according to its publisher, the American Psychiatric Association.

[13] A GAF of 60 represents symptoms that present moderate difficulty in social, occupational, or school functioning. *DSM-IV* 34.

[14] Dr. Roerich's given name is not included in the proposed finding of fact (Defs. PFOF P 49) or in the cited exhibit.

[15] Fluphenazine is an antipsychotic medication used to treat schizophrenia and psychotic symptoms such as hallucinations, delusions, and hostility. *http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682172.html* (last visited October 20, 2008). A brand name for the drug is Prolixin Decanoate. *See id.*

[16] Because the days of the week for the relevant dates in 2004 provide some helpful context for the events, the Court has added them to the relevant facts.

follow what they believed was an intoxicated driver.

During the pursuit in the County, Edward was observed operating his motor vehicle at a high rate of speed, speeding up and slamming on his brakes, and driving in more than one travel lane. When Edward sped through the Zoo interchange, a moving road block was established. Edward struck one of **[*27]** the squad cars during the pursuit.

During the process of taking Edward into custody, he refused commands to exit his vehicle. He also resisted attempts to place him in handcuffs. After Trimboli gave Edward angle kicks to his abdomen and Brown used O.C. spray (O.C. is the abbreviation for oleoresin capsicum - the active ingredient in cayenne pepper -- O.C. spray is commonly referred to as mace), Edward was decentralized and taken into custody.

Brown did not observe any sort of odor of intoxicants or drugs on Edward at the time of his arrest. Trimboli did not observe a smell of alcohol on Edward and he did not appear to be impaired. Dickerson did not recall whether Edward appeared intoxicated when he was arrested.

The incident report, MCTY0067, which is part of Edward's Jail medical record includes details regarding the arrest including that Edward was forced to the ground, pressure points were used to gain compliance, several focused strikes were made to Edward's arm area, and O.C. spray was used. (Defs.' Resp. Pl.'s Add'l PFOF P 22.)

Brown was not and is not aware of Edward's past contacts with the law. Trimboli did not run a "NCIS" or a "CIB" check on Edward because that was not required **[*28]** since she was not the arresting officer. (Defs.' Resp. Pl.'s Add'l PFOF P 23.) Dickerson did not run a "CIB" check or a background check on Edward. (Defs.' Resp. Pl.'s Add'l PFOF P 23.) [17]

At 22:40, Wauwatosa Rescue Squad # 3 arrived at the scene to flush the O.C. spray from Edward's eyes. Edward refused all emergency medical services and the

unit was cleared at 22:50.

At the time of the arrest, Trimboli did not observe that Edward was a danger to himself or others. At the time of Edward's arrest, Brown did not believe that Edward was a danger to himself or others. Brown conveyed Edward to Jail.

Following the arrest, Trimboli, Brown, and Dickerson completed "Use of Force" summary reports which were approved **[*29]** by their supervising officers.

At 23:20, Szczepaniak attempted to perform an initial medical screening on Edward at the Jail. She noted he was alert, moved all extremities, and was not complaining of any discomfort, but he was agitated and arguing with deputies. Edward had mild abrasions on his forehead and right middle finger. Szczepaniak performed a minor physical examination of Edward during booking. (Defs.' Master Ex. List P 10, Ex. 10 (Szczepaniak Dep.) 10.) The booking room is a large open room. As a result because of privacy concerns, minor physicals are performed. (Defs.' Master Ex. List P 10, Ex. 10 10.) Edward refused to answer questions. Edward was to be kept in an open waiting area until he was further evaluated by medical personnel. [18]

At some time during the arrest and the booking process, Brown identified Edward as an "emotionally disturbed person," but **[*30]** he did not relay that information to Szczepaniak during the booking process. Brown testified at his May 8, 2008, deposition that an emotionally disturbed person is someone that does not have the capacity to function in a normal setting.

At his deposition, Brown testified that in the booking room, he related the medical issues to Szczepaniak, informing her that Edward had been sprayed with O.C. spray, Brown had used strong side knee strikes into Edward's lower abdominal area, and Edward had refused O.C. aftercare from the Wauwatosa Fire Department. Brown testified that he did not provide Szczepaniak with copies of the use of force report because arresting officers are not required to by their agency. Szczpaniak's notes do not record that Brown conveyed the information about the use to force to her.

---

[17] Harris's proposed additional finding of fact paragraph 24 regarding the Racine County Sheriff's Department obtaining information regarding Harris's history, citing MCTY 1469, is contested by the Defendants. The underlying document is not a part of the parties' summary judgment submissions. The proposed fact has not been included in the relevant facts because it is contested and is not supported by the documentary evidence submitted on summary judgment. *See Civil L.R. 56.2(a)* (E.D. Wis.).

---

[18] There is a factual dispute between the parties regarding whether Edward was to be kept in the open waiting area until he was seen by a psychiatrist and an adult nurse practitioner or whether he was to be seen by a psychiatric nurse practitioner, not a psychiatrist. (*Compare* Defs' PFOF P 62; Pl's Resp. Defs.' PFOF P 62.)

Clarke testified that arresting officers who use force must report it to the booking nurse if there is a medical reason to do so but it is not necessary in all circumstances. Clarke testified that he "wouldn't always expect the deputy's going to tell them, . . . I used a compliance hold. But if he's unconscious I would." (Patterson Aff. P 9, Ex. 9 (Clarke Dep.) 49.)

### Events of Friday, September [*31] 30, 2004

At 00:02 Steve Stetka ("Stetka") of the Racine Sheriff's Department Unit/Station 5055 sent a fax transmission to the Jail indicating that day Edward had not taken his medications. The listed medications and dosages are: Ecotrin [19] 500 mg, one per day; Furosemide 20 mg, [20] one per day; Diovan 320 mg, [21] one per day; Coreg 25 mg, [22] one twice a day; Norvasc 10 mg, [23] one per day; and, Zocor 80 mg, [24] one per day at bedtime.

At 01:30 and 03:15, additional attempts were made to complete Edward's health screening. He continued not to answer health questions.

Between 04:00 and 04:45, Edward returned from booking and was kept in an open waiting area while the staff attempted to obtain answers [*34] to the medical screening questions.

Szczepaniak was able to perform a neurological assessment, and evaluated Edward in at least 14 different areas. She noted that Harris had abrasions on his forehead, elbows, and hands. Szczepaniak completed a MD Order Sheet-Booking for Edward and ordered a lower bunk for him due to his age. She also ordered nursing to check Edward's vital signs three times per day and to refer any increased readings to a nurse practitioner, and to check his neurological status every six hours for the next 24 hours. She directed that Edward was to receive care for his wounds every day.

Szczepaniak noted that Captain Paradise ("Paradise")

---

smoothly.
*http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697015.html#why* (last visited October 20, 2008).

Hydrochlorothiazide, a 'water pill,' is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease. It causes the kidneys to get rid of unneeded water and salt from the body into the urine. *http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html* (last visited October 20, 2008).

[22] Coreg is brand name for carvedilol which is used to treat heart failure (condition in which the heart cannot pump enough blood to all parts of the body) and high blood pressure. It also is used to treat people whose hearts cannot pump blood well as a result of a heart attack. Carvedilol is often used in combination with other medications. Carvedilol is in a class of medications called beta-blockers. It works by relaxing the blood vessels to allow blood to flow through the body more easily. *http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697042.html* (last visited October 20, 2008).

[23] Amlodipine is used alone or in combination with other medications to treat [*33] high blood pressure and chest pain (angina). Amlodipine is in a class of medications called calcium channel blockers. It lowers blood pressure by relaxing the blood vessels so the heart does not have to pump as hard. It controls chest pain by increasing the supply of blood to the heart. If taken regularly, amlodipine controls chest pain, but it does not stop chest pain once it starts. *http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html* (last visited October 20, 2008).

---

[19] A brand name for Aspirin.

[20] Furosemide, a 'water pill,' is used to reduce the swelling and fluid retention caused by various medical problems, including heart or liver disease. It is also used to treat high blood pressure. It causes the kidneys to get rid of unneeded water and salt from the body into the urine. *http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html* (last visited October 20, 2008).

[21] Diovan contains hydrochlorothiazide and valsartan. Valsartan is used alone or in combination with other medications to treat high blood pressure. Valsartan is also used to treat heart failure in people who cannot take angiotensin-converting enzyme (ACE) inhibitors. Valsartan is in a class of medications called angiotensin II receptor antagonists. It works [*32] by blocking the action of certain chemicals that tighten the blood vessels, so blood flows more

had spoken to Harris and learned that Edward was schizophrenic, non-complaint with medication, had a history of myocardial infarction (heart attack) and that his physicians were Roerich and Shah, a cardiologist. Both doctors were with Aurora Health Care.

Szczepaniak assigned Edward to Special Needs. She also referred him to an adult nurse practitioner for a medical history evaluation and to a psychiatric nurse practitioner for further evaluation. M. Grebner, M.D., ("Grebner"), the Jail medical director since 2002, approved the orders. **[*35]** 25 Grebner serves as the responsible health authority and, in that capacity, is responsible for reviewing and approving health care policies for the County, including mental health policies. By his ethical code, Grebner is prohibited from divulging treatment details regarding a particular inmate to the Sheriff.

Special Needs is a horseshoe-shaped unit that contains 19 single inmate cells with glass doors. Each cell contains a bed, sink, toilet, and a glass door. Special Needs inmates have access to a dayroom, to the library, and to visitors.

Special Needs is designed so that two or three deputies can view each inmate from the central control section through glass. Deputies are at the control center 24 hours a day, seven days a week. The psychiatrist and the nurse practitioner can "eyeball" the inmates in Special Needs frequently. 26 (Defs.' PFOF P 286, Pl.'s

Resp. Defs.' PFOF P 286.)

At 04:20, Edward was transferred to Special Needs. At 04:45, Szczepaniak called Harris because Edward's family would not be able to contact the nurses or Edward. Szczepaniak verified Edward's prescriptions and his current treating doctors so that she could contact them to obtain more accurate and detailed information regarding Edward's health.

Some time after arriving in Special Needs, Edward was evaluated by Troutman and Dunn. During Troutman's evaluation, he noted that Edward was "standing partially undressed in the cell," was having "auditory hallucinations," and was "thought blocking." (Pl.'s Add'l PFOF P 29, Defs.' Resp. Harris's Add'l PFOF P 29.)

The Inmate Psychiatric Assessment Progress Note completed by Troutman documents that he had obtained Edward's medical history from Harris over the telephone. **[*37]** The history includes the facts that Edward had poor compliance with his medications, he refused food and did not sleep when decompensated, and he had auditory hallucinations. Edward's known medical problems were hypertension and myocardial infarction in 2003. Edward was also undergoing an evaluation for diabetes.

Troutman ordered that Edward be medicated with Benadryl 50 mg 27 IM (intramuscular) stat (at once), Lorazepam 2mg 28 IM stat, Haldol 10 mg 29 IM stat.

---

24 Zocar is a brand name for simvastatin which is used together with lifestyle changes (diet, weight-loss, exercise) to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in the blood. Simvastatin is in a class of medications called HMG-CoA reductase inhibitors (statins). It works by slowing the production of cholesterol in the body. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030 (last visited October 20, 2008).

25 At his deposition, Grebner compared the treatment afforded by Special Needs to that provided other facilities. The parties disagree on the content of his testimony. (Compare Defs.' PFOF P 289, Pl's Resp. Defs.' PFOF P 289.)

26 There is a factual dispute between the parties regarding whether Troutman and Dunn's **[*36]** offices were also in Special Needs. Although Harris did not respond to paragraph 283 of the Defendants' proposed findings of fact which states that Troutman and Dunn's offices were in Special Needs, paragraph 56 of her additional proposed findings of fact which states that "there were no medical personnel assigned in or to Special Needs" is in apparent conflict with the former

statement.

27 Benadryl is a brand name for diphenhydramine which is used to relieve red, irritated, itchy, watery eyes; sneezing; and runny nose caused by hay fever, allergies, or the common cold. Diphenhydramine is also used to relieve cough caused by minor throat or airway irritation. Diphenhydramine is also used to prevent and treat motion sickness, and to treat insomnia (difficulty falling asleep or staying asleep). Diphenhydramine is also used to control abnormal movements in people who have early stage parkinsonian syndrome **[*38]** (a disorder of the nervous system that causes difficulties with movement, muscle control, and balance) or who are experiencing movement problems as a side effect of a medication. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682539.html (last visited October 20, 2008).

28 Lorazepam is used to relieve anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html (last visited October 20, 2008).

29 Haldol is a brand name for haloperidol which is used to treat

Troutman also referred Edward for hypertension evaluation by a nurse practitioner. At about 07:30, Virginia Rechlicz RN ("Rechlicz") "was in with" Edward's medications. (Defs.' PFOF P 74; Pl.'s Resp. Defs.' PFOF P 74.)

At 09:19, the Jail received a seven-page fax from Bell with relevant psychiatric records regarding Edward's medical and psychiatric problems. [30] The last page indicated that Edward had received 25 mg (1 ml) IM Fluphenazine Dec on September 7 and September 28, 2004, and was due for another dose on October 19, 2004.

At 09:51, in accord with Troutman's orders, Sergeants Coughlin and Wilcox, [31] and Deputy K. Jones ("Jones") placed Edward in a "Ripp Restraint Bed." (Defs.' PFOF P 76; Pl.'s Resp. Defs.' PFOF P 76.) At 10:12, Edward was given his injections. At 10:30, Edward was monitored for restraints and his vital signs, except for his temperature which he refused, were checked. At 12:15, Rechlicz checked on Edward, and at 12:30, Edward was monitored for restraints.

At 13:25, Rechlicz noted that Troutman ordered that the restraints be removed. [32] The restraints were removed from Edward. (Defs.' Master Ex. List PP 29 & 30, Ex. 29 (Jail Health Records) MCTY 0022, Ex. 30 MCTY 0656.) At 15:23, Nurse Tezra Jones ("Tezra") passed out medications. No refusals are noted. At 16:33, Edward was taken to booking. He came back from court at 17:12. At 19:50, Nurse Myra Lathrop ("Lathrop") and Pat Walton LPN ("Walton") distributed [*40] medications.

**Events of Saturday, October 1, 2004**

Edward's blood pressure and temperature were taken at 01:00. Dunn performed a special management assessment noting that Edward's psychiatric symptoms were evident. She noted that he was psychotic, decompensating, and might require Chapter 51 proceedings. [33] Housing in Special Needs was still an appropriate choice.

While Dunn completed a Special Management Assessment form for Edward on October 1, 2004, there is no evidence that Dunn personally performed all aspects of that assessment on Edward. She testified that the form "was used to document report[s] that Dr. Troutman and/or I received from the deputies regarding the inmates condition on the evening and night shift. It was not a form used to document our personal observation [*41] of the inmate at that point in time." (Pl.'s Add'l PFOF P 33, Defs.' Resp. Harris's Add'l PFOF P 33.) Dunn checked the box that indicated that Edward was "Danger to Self or Others/Chapter 51." (Pl.'s Add'l PFOF P 34, Defs.' Resp. Harris's Add'l PFOF P 34.)

At 08:00, Dunn talked to Harris to determine that Edward's current medications were: Diovan 320 mg QD (daily), Zocar 80 mg QHS (at bedtime), Norvasc 10 mg [34] QD, Ecotrin / QD, Coreg 25 mg BID (twice a day), Lasix 20 mg [35] QD. Because Edward was on such high doses of non-formulary drugs, a doctor was called to review and convert them. Grebner reviewed Edward's chart, converted his medications, and ordered the following medications for 14 days for Edward: Aspirin 325 mg daily; Atenolol 150 mg [36] daily; Verapamil SR [37]

---

psychotic disorders and symptoms such as hallucinations, delusions, and hostility and to control muscular tics of the face, neck, hands, and shoulders. It is also used to treat severe behavioral problems in children and in hyperactive children (short-term use). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682180.html (last visited October 20, 2008).

[30] There is a factual dispute between the parties regarding [*39] when the faxed Bell medical records were received by Troutman. (See Defs.' PFOF P 75; Pl.'s Resp. Defs.' PFOF P 75.)

[31] The cited underlying factual material does not include the given names of Coughlin or Wilcox. (See Defs.' Master Ex. List, P 30, Ex. 30 (Redacted Jail Logs) MCTY 0655.)

[32] There is a factual dispute regarding whether Edward was checked hourly while he was in restraints as required by Milwaukee County Jail Policies and Procedures. (Compare Pl's Add'l PFOF P 30, Defs.' Resp. Pl's Add'l PFOF P 30.)

---

[33] Chapter 51 of the Wisconsin Statutes is the Mental Health Act. **Section 51.20 of the Wisconsin Statutes** provides for the involuntary commitment of an individual for mental health treatment.

[34] Norvasc is a brand name for amlodipine, which is used alone or in combination with other medications to treat high blood pressure and chest pain (angina). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html [*42] (last visited October 20, 2008).

[35] Lasix is a brand name of furosemide, a water pill. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html (last visited October 20, 2008).

[36] Atenolol is used alone or in combination with other medications to treat high blood pressure. It also is used to prevent angina (chest pain) and treat heart attacks. Atenolol is

(slow release) 240 mg daily; Enalapril 20 mg [38] daily; Mevacor 80 mg [39] QHS; Hydrochlorothiazide 25 mg daily. Edward was to be taken to the Critical Care Center if his blood pressure or lipids increased.

At about 13:45, Edward barricaded the door to sub-pod C while Deputy Irving ("Irving") [40] was in the sub-pod. Additional deputies under Coughlin's supervision escorted Edward to his cell and locked him in until he was stable. No force was used. At 15:39 and 19:55, Finch distributed medications and noted that there were no refusals.

**Events of Sunday, October 2, 2004**

At 00:40, a neurological assessment was performed to evaluate Edward in at least 14 different ways. At 01:11,

_____

in a class of medications called beta blockers. It works by slowing the heart rate and relaxing the blood vessels so the heart does not have to pump as hard. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684031.html (last visited October 20, 2008).

[37] Verapamil is used to treat irregular heartbeats (arrhythmias) and high blood pressure. It relaxes your blood vessels so your heart does not have to pump as hard. It also increases the supply of blood and oxygen to the heart to control chest pain (angina). If taken regularly, verapamil controls chest pain, but it does not stop chest pain once it starts. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684030.html (last visited October 20, 2008).

[38] Enalapril is used alone or in combination with other medications to treat high blood pressure. It is also used in combination with other [*43] medications to treat heart failure. Enalapril is in a class of medications called angiotensin-converting enzyme (ACE) inhibitors. It works by decreasing certain chemicals that tighten the blood vessels, so blood flows more smoothly and the heart can pump blood more efficiently. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a686022.html (last visited October 20, 2008).

[39] Lovastatin is used together with lifestyle changes (diet, weight-loss, exercise) to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in the blood. Lovastatin is in a class of medications called HMG-CoA reductase inhibitors (statins). It works by slowing the production of cholesterol in the body. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688006.html (last visited October 20, 2008).

[40] The cited underlying factual material does not include Irving's full [*44] name.

Edward's blood pressure was checked.

A fax from Bell with Edward's records from 2003 was sent to Troutman.

At 07:40, Terza attempted to give Edward his medications, but he refused them and his breakfast. At 07:40, Edward refused a neurological assessment and, as a result, his vital signs could not be taken.

At 11:20, Nurse Jan Bergstrom was on the pod to distribute medications. Edward was listed as refusing them. At 11:30, Harris refused a neurological assessment and, as a result, his vital signs could not be taken.

At 15:25, LPN Jayna Cave ("Cave") distributed medications. Edward was not listed as a refusal. At 17:30, Cave attempted to give Edward his medications. He refused.

Some time during the evening, Cave performed a neurological assessment of Edward, evaluating him in at least 14 different ways.

**Events of Monday, October 3, 2004**

At about 00:50 to 1:05, Russ Menhofter ("Menhofter") attempted to take Edward's vitals. Edward refused the blood pressure check believing he was at home and gave "a weird and threatening look." (Defs.' PFOF P 102; [*45] Pl.'s Resp. Defs.' PFOF P 102.) [41] At 02:04, supervisory rounds were performed by J. Callen, RN ("Callen"). [42] At 06:38, Terza attempted to give Edward his medications. He was listed as a refusal. At 11:32, Terza distributed medications, Edward was not listed as a refusal. At 15:32 and 19:17, Cave distributed medications. No refusals are noted.

**Events of Tuesday, October 4, 2004**

Edward was charged with a felony count of fleeing or eluding an officer and a misdemeanor charge of resisting or obstructing.

At 07:20, Rechlicz distributed medications. Troutman was at the Jail at about 11:00 and performed a special

_____

[41] Harris maintains that the correct date for this event is October 2, 2004.

[42] Harris maintains that the correct date for this event is October 2, 2004.

management assessment on Edward. He determined that Edward was not interacting well with his peers or authority, was withdrawn with psychiatric symptoms, and could not adequately care for himself. Troutman checked the boxes that indicated Edward was not adequately adjusting to Special Needs, did not understand his legal situation, did not understand his mental health problems, had evident psychiatric problems, was "withdrawn and anxious" **[*46]** and was a "Danger to Self or Others/Chapter 51." (Pl.'s Add'l PFOF P 35, Defs.' Resp. Harris's Add'l PFOF P 35.) Special Needs was still the appropriate housing for Edward.

Walton distributed medications at 15:34 and there were no refusals. At 19:30, Nursing Supervisor Stephen Ellison ("Ellison") toured the Jail. At 20:06, Walton passed out medications. Edward was listed as a refusal.

**Events of Wednesday, October 5, 2004**

At 07:40, Nurse Dorothy ("Dorothy") [43] distributed medications. No refusals were noted. Troutman completed a special management assessment of Edward and noted that he was not adjusting to the pod, was withdrawn, and was manifesting psychiatric symptoms and decompensating. Edward was psychotic. Troutman checked the boxes on the Special Needs Assessment form that indicated Edward was not interacting well with peers or authority, did not understand his legal situation, did not understand his mental health problems, could not care for himself, and was "Danger to Self or Others/Chapter 51." In his progress notes, Troutman observed that Edward was "catatonic" and "mute." (Pl.'s Add'l PFOF P 37, Defs.' Resp. Harris's Add'l PFOF P 37.) Troutman date-stamped the Bell report "October **[*47]** 5, 2004" and reviewed it. Troutman noted that the historical information he was relying upon was from the Bell medical records.

When asked, at his deposition, whether Edward's condition on October 5, 2004, was better or worse than it was on September 30, 2004, Troutman testified that it "hadn't changed." (Defs.' Master Ex. List P 13, Ex. 13 59.)

At 10:25, Troutman ordered a shot for Edward. "Benadryl 25 mg IM stat, Haldol 10 mg IM stat." (Defs'

_____

[43] The cited underlying factual material does not include Dorothy's full name.

Master Ex. List P 29, Ex. 29 MCTY 0007.) At 10:40, Sergeant Wilcour ("Wilcour") attempted to speak to Edward without success.

At 11:08, Nurse Dorothy administered a Prolixin Decanoid shot to Edward. The Benadryl and Haldol were also ordered and given to Edward. At 11:09, a public defender saw Edward. At 11:20, Edward was returned to his cell without further incident.

The criminal action against Edward, Milwaukee County Case No. 04-CF-5596, was called for an initial appearance before Court Commissioner Grace Flynn ("Commissioner Flynn"). Edward did not personally attend the hearing. In requesting a competency evaluation under _Wis. Stat. § 971.14_, public defender Craig Johnson **[*48]** ("Johnson") informed Commissioner Flynn that Edward "was not able to respond to me in a coherent fashion and [was] causing difficulties for the bailiffs in terms of deputies trying to transport him and . . . they essentially picked him up and moved him physically even to get him outside his cell in the special needs to an area where you can attempt to have a discussion with him and it seemed he was unable to move on his own power." (Defs.' Master Ex. List P 23, Ex. 23 (Tr. Initial Appearance Milwaukee County Case No. 04-CF-5596) 2.) Commissioner Flynn ordered that Edward be evaluated regarding his competency to stand trial, and stated that the competency examination could take place outside the Jail. The Commissioner remanded Edward to the Sheriff for examination by a doctor. The court clerk noted that the doctor's report was to be "returned" to the court on October 19, 2004. (Defs.' PFOF P 122, Pl.'s Resp. Defs.' PFOF P 122.)

At 15:06, Nurse Charles Fitzgerald ("Fitzgerald") passed out medications. There were no refusals. At 17:10, Edward refused his dinner. At 19:38, LPN Blanca Orozco ("Orozco") distributed medications. Edward refused his medications.

**Events of Thursday, October 6, [*49] 2004**

At 06:20, Edward was observed unresponsive and laying on the floor in a fetal position with his pants around his knees. Nursing staff and a sergeant were called to check Edward and to help him back to bed. Nurse Mary Hampel ("Hampel") evaluated Edward, taking his vital signs and clearing him medically. He would not lie down, but "remained in a sitting position on the side of the bed and off floor." (Defs.' PFOF P 126, Pl.'s Resp. Defs.' PFOF P 126.) She noted that he appeared to be eating poorly, and advised the deputies

to provide milk and fruit since Edward apparently would eat those foods. At 06:30, two trays of old uneaten food were removed from Edward's cell.

Dunn performed a special management assessment on Edward noting that he was still not adjusting to the pod or complying with his medications. Edward was withdrawn/anxious, had physical problems, and was psychotic. On the Special Management Assessment form, Dunn checked the boxes indicating that Edward was not interacting well with peers or authority, did not understand his legal situation, did not understand his mental health problems, could not care for himself, continued to decompensate, and was "Danger to Self or Others/Chapter **[*50]** 51." She noted that he was still appropriate to Special Needs. In her progress notes, Dunn wrote that Harris was sitting on the toilet and was mute.

Edward's medications were ordered as follows: "Give Prolixin Dec 50 mg IM today 10:40 a.m. AD. Then Prolixin Dec 50 mg IM Q 2 w[ee]ks x 30 d[ays], Prolixin 10 mg PO QHS x 7 days, then D/C." (Defs. PFOF P 127.) The Prolixin shot was given. [44] Dunn noted that she had made telephone contract with Harris regarding Edward's condition.

At 07:35, Nurse Dorothy Greer ("Greer") distributed medications. There was no notation regarding any refusals.

At 10:35, Dunn checked on Edward and gave him an additional Prolixin Decanoid shot. [45]

At 16:10, Cave distributed medications. There were no refusals. But, at 19:39, when Cave again distributed medications, Edward refused his.

Sometime on October 6, 2004, Dunn thought that Edward was in a crisis situation.

**Events of Friday, October 7, 2004**

At 02:10, Margaret Hoover RN ("Hoover") and Juanita Mesa ("Mesa") **[*51]** were in Special Needs to take Edward's vital signs. At 02:30, Hoover was called to the pod by a deputy because Edward was laying on the

floor and disoriented. Hoover referred Edward to an adult nurse practitioner for evaluation of his psychiatric, hypertensive, and behavioral problems. Edward had an extremely high at-rest heart beat of 135, blood oxygen concentration of 87%, and swollen ankles. After this assessment was taken, appropriate measures were taken to facilitate Edward's transfer to Froedert for a more intensive medical evaluation.

At 03:05, Hoover returned to visually check Edward. At 05:30, Hoover checked on Edward. He was sitting on the floor of the cell and was uncooperative in her efforts to take his vital signs. Edward's feet were cold with edema. [46]

At 07:45, Greer was in the pod for medications. At 08:20, she attempted to give Edward his medications. Edward was sitting on the floor and refusing to talk. His head was down and he was staring. His skin was dry and warm and his feet had bilateral edema. Greer informed **[*52]** the nurse practitioner of her observations. The nurse practitioner said that she would speak to Grebner about having Edward evaluated at Froedert. Harris refused the Prolixin.

Dunn performed a special management assessment of Edward. He still had not adjusted to the pod, could not care for himself, and was not complying with his medications. On the Special Management Assessment form, Dunn checked the boxes indicating that Edward was not interacting well with peers or authority, did not understand his legal situation, did not understand his mental health problems, continued to decompensate, and was "Danger to Self or Others/Chapter 51." He had both physical and psychiatric problems and was psychotic even though he received Prolixin Decanoid 25 mg IM on September 28 and Prolixin Decanoid 50 mg on October 6, 2008. [47]

---

[46] Edema is a local or generalized condition in which the body tissues contain an excessive amount of tissue fluid. *Taber's Cyclopedic Medical Dictionary* 665.

[47] This statement, based upon paragraph 140 of the Defendants' proposed findings of fact which is undisputed, is not consistent with the prior statements indicating that Edward was also given a Prolixin Decanoid shot on October 5, by Nurse Dorothy and that he was given two Prolixin Decanoid shots on October 6, 2004. However, Harris has not objected to paragraphs 116, 127, and **[*53]** 130 of the Defendants' proposed findings of facts. Therefore, pursuant to Civil Local Rule 56.2(e), the Court must conclude that there is no genuine material issue as to those proposed findings of fact.

---

[44] This statement is based on paragraph 127 of the Defendants' proposed findings of fact which is undisputed.

[45] This statement is based on paragraph 130 of the Defendants' proposed finding of fact which is undisputed.

At 09:17, Edward was transported to Froedert, and a report was given to the emergency room staff. They were informed that the chief complaints were that Edward was non-compliant with medications and had hypoxia. [48]

At 13:15, Jail RN Spruill ("Spruill") received a telephone call from Coughlin indicating that Edward had been admitted to Froedert for treatment and that his psychiatric condition would be assessed. Coughlin indicated that he informed Harris of the same and gave Froedert the phone numbers where several of Edward's family members could be reached.

At 13:30, Froedert's Lisa Looney, RN, ("Looney") completed and signed the patient history profile noting that Edward had heart problems, high blood pressure and cholesterol, diabetes, and paranoid schizophrenia. His speech was clear, but she was unable to complete the examination [*54] because he was uncooperative. She noted that there were no signs of abuse or neglect.

Spruill called Froedert RN Lisa ("Lisa") [49] for an update and Lisa advised her to call back when the assessment was complete. Spruill called Froedert at 15:45 and again spoke to Lisa who advised her that Edward was on telemetry with an initial diagnosis of rhabdomyopathy and that more labs and tests were needed.

At 15:45, Lisa described Edward as incoherent.

In response to a phone call from Harris's sister, Carolyn Jones ("Carolyn") to Clarke's secretary, the secretary requested that Singer call Carolyn. Spruill noted that, at the request of Clarke's office, Singer had called Carolyn, informing her that at the time Edward was stable. Spruill called Harris to reassure her that Edward was stable.

Charles E. Cady, M.D., ("Cady"), was the admitting physician at Froedert. The impressions from a chest x-ray was taken in the emergency department, at 15:53, were: 1. no acute cardiopulmonary disease, 2. Significant subcutaneous air, lateral hemithorax and at the base of the neck, bilaterally. No definite rib fractures or pneumothorax [50] [*55] was identified. The Froedert

records indicate that Edward was not responding to people and that the records provided by the Jail were reviewed.

A CT (computerized tomography) scan of the thorax without contrast disclosed: 1. Minimally displaced right anterior third rib fracture, 2. Extensive subcutaneous emphysema along the neck and chest, 3. minimal mediastinal emphysema, and 4. multiple calcified granulomata and apical paraseptal emphysema. No pneumothorax was noted.

Several diagnostic tests were performed and reviewed. The initial clinical impression was rhabdomyolosis [51] and schizophrenia. At Froedert, Drs. Amandeep Singh Gill ("Gill") and Nagendra Prasad Reddy ("Reddy") evaluated Edward and entered orders for his care. At 17:00, Edward was given a new bag of .45% NaCl (sodium chloride) solution 1000 ml with sodium bicarbonate 100mEq ("sodium chloride solution"). At 17:26, Edward was given two units of insulin. At 21:37, Edward was given two units of insulin and 40 mg of Lovenox (enoxaparin) [52] by injection.

At 22:30, Edward arrived at 4NW room number three. He was uncooperative and yelling. Shackles were on Edward's left leg and arm and a deputy sheriff was in the room. Medication was applied to an ulceration on Edward's left heel.

**Froedert Hospital - Saturday, October 8, 2004**

At 00:20, Edward was unresponsive to questions and

cavity. *Taber's Cyclopedic Medical Dictionary* 1699.

[51] Rhabdomyolysis is the breakdown of muscle fibers resulting in [*56] the release of muscle fiber contents (myoglobin) into the bloodstream. Some of these are harmful to the kidney and frequently result in kidney damage. *http://www.nlm.nih.gov/medlineplus/ency/article/000473.htm* (last visited October 20, 2008).

[52] Enoxaparin is used to prevent blood clots in the leg in patients who are on bedrest or who are having hip replacement, knee replacement, or stomach surgery. It is used in combination with aspirin to prevent complications from angina (chest pain) and heart attacks. It is also used in combination with warfarin to treat blood clots in the leg. Enoxaparin is in a class of medications called low molecular weight heparins. It works by stopping the formation of substances that cause clots. *http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601210.html* (last visited October 20, 2008).

---

[48] Hypoxia is defined as an oxygen deficiency in the body tissues or a decreased concentration of oxygen in inspired air. *Taber's Cyclopedic Medical Dictionary* 1057.

[49] The cited underlying factual material does not include Lisa's full name.

[50] Pneumothorax is the collection of air or gas in the pleural

still shackled on his left arm and leg. Soft restraints [*57] were placed on Edward's right side. He was actively pulling at the intravenous lines. A deputy sheriff remained in the room. At 02:11, a new bag of sodium chloride solution was delivered to Edward. At 04:40, Edward stated he was not in pain. The handcuffs and soft restraints were intact.

At 06:21, a new bag of sodium chloride solution was delivered to Edward. At 07:00, the insulin units were held per doctor's orders due to NPO (nothing by mouth) status. At 12:02, the insulin units were also held. An EEG (electroencephalogram) was normal with no epileptiform discharges. At 14:50 a CT scan of the head without contrast was performed. There was no indication of acute intracranial process. At 15:53, a 100-mg injection of thiamine [53] was given to Edward.

At 17:30, Edward refused dinner. No insulin was administered because dinner was refused. Edward's restraints were intact and a deputy sheriff was present. At 18:02, Edward refused insulin and food. At 21:14, Edward refused insulin.

## Froedert Hospital - Sunday, October 9, 2008

At 02:00, a 1-mg injection of Lorazepam was administered to Edward. It was noted that he was agitated. At 06:30, it was noted that Edward was upset that the deputy sheriff was at the door preventing people from entering and leaving Edward's room. Edward stated that he would not eat breakfast, so his insulin was held. At 07:00, insulin was held. Edward stated he would not be eating. At 09:00, a 100-mg injection of thiamine was administered. At 12:07, 1 unit of insulin was given to Edward. At 13:30, it was noted that Edward was still refusing to eat. Edward denied experiencing any pain. His restraints were in place and a deputy sheriff was present. At 14:00, Edward refused one 10-mg tablet of amiodipine (Norvasc). At 17:22, insulin was held. Edward's fingerstick read 120. At that time, Edward [*59] refused the 25-mg tablet of carvedilol (Coreg). At 20:30, insulin was held. Edward refused to eat.

## Froedert Hospital - Monday, October 10, 2004

At 07:22, insulin was held. Edward's fingerstick was 122. At 07:34, Edward was given a 25-mg tablet of Coreg. At 09:00 Edward was given a 100-mg injection of thiamine. At that time, he refused to take the 10-mg tablet of Norvasc. At 13:00, Edward was given two units of insulin. His fingerstick was 180. He was essentially unchanged from prior documentation.

At 17:00, Edward refused the 25-mg tablet of Coreg. At about 17:17, his insulin was held. At 18:00, Edward's soft restraints and shackles to the bed were checked. Edward was refusing dinner but denied pain. At 21:00, insulin was refused. Edward refused to have a fingerstick. At 22:00, nursing staff noticed Edward was "tightly gripping foley and yelling at the top of his lungs." (Defs.' PFOF P 181.) Ativan [54] was given and mitts were applied. At 22:10, a .1-mg tablet of clonidine [55] was given to Edward. At 22:12 a 1 mg injection of Lorazepam was given to Edward.

## Froedert Hospital - Tuesday, October 11, 2004

Spruill from the Jail spoke with RN Melissa ("Melissa") [56] at Froedert who stated that Edward was stable and would not elaborate further because she was still assessing him. At 02:25, a 1-mg injection of Lorazepam was given to Edward. At 03:15, the restraints and shackles were checked and the mitts were removed from Edward because he was cooperative. A deputy sheriff was present in the room and emotional support was provided for Edward.

---

[53] Thiamine is involved in numerous body functions, including: nervous system and muscle functioning; flow of electrolytes in and out of nerve and muscle cells (through ion channels); multiple enzyme processes (via the coenzyme thiamin pyrophosphate); carbohydrate metabolism; and production of hydrochloric acid (which is necessary for proper digestion). Because there is very little thiamin stored in the body, depletion can occur as quickly [*58] as within 14 days. http://www.nlm.nih.gov/medlineplus/druginfo/natural/patient-thiamin.html (last visited October 20, 2008).

[54] Ativan is a brand name for lorazepam, which is used to relieve anxiety. *See* n. 28. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html#brand-names [*60] (last visited October 20, 2008).

[55] Clonidine is used to treat high blood pressure. It works by decreasing the heart rate and relaxing the blood vessels so that blood can flow more easily through the body. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html (last visited October 20, 2008).

[56] The cited underlying factual material does not include Melissa's full name.

At 07:52, one unit of insulin and a 25-mg tablet of Coreg were given to Edward. At 09:00, Edward refused the 10-mg tablet of Norvasc. At 11:00, a 100-mg injection of thiamine was given intravenously. A new bag of .9% NaCl was hung. At 11:54, Edward was alert and talkative, but not responsive to questions. He was incontinent of stool. A deputy **[*61]** sheriff was at Edward's bedside. Edward's blood pressure was 200/103 and he was refusing Norvasc. The doctor was notified and would continue to monitor Edward's condition.

At 12:20, Edward's insulin was held. Edward's fingerstick was 116.

Notes from Bell's Clinical Coordinator, Alicia Mandolini, M.A., ("Mandolini") indicate that Troutman returned her telephone call and informed her that Edward had been transferred to a medical hospital due to changes in his physical status.

At 12:21, Edward refused 40-mEq tablet of potassium chloride SA. At 13:45, potassium chloride 20 mg mEq, lidocaine 10 mg in D5W 250 ml bag was delivered intravenously to Edward. At 14:00, the rate of .9% NaCl 1000 ml was changed to 75 ml /hr and 100-mg thiamine was added. At 15:34, potassium chloride 20 mg mEq, lidocaine [57] 10 mg in a D5W 250 ml bag was administered intravenously to Edward.

At 06:08, Gill dictated the discharge summary noting the results of the CT scans of the head and thorax and that the electroencephalogram results were pending. The hospital course had been: **[*62]** 1. Elevated creatine kinase secondary to rhabdomyolysis after subcu emphysema secondary to rib fracture; 2. Schizophrenia; All psych meds were held due to the possibility of neuroleptic malignancy syndrome; [58] and, 3. Relatively

---

[57] Lidocaine is an local anesthetic. *See generally* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682701.html (last visited October 20, 2008).

[58] Neuroleptic malignant syndrome is a life-threatening, neurological disorder most often caused by an adverse reaction to neuroleptic or antipsychotic drugs. Symptoms include high fever, sweating, unstable blood pressure, stupor, muscular rigidity, and autonomic dysfunction. In most cases, the disorder develops within the first 2 weeks of treatment with the drug; however, the disorder may develop any time during the therapy period. http://www.ninds.nih.gov/disorders/neuroleptic_syndrome/neuroleptic_syndrome.htm (last visited October 20, 2008).

---

new rib fracture without pain. The discharge diagnosis was: 1. Right rib fracture; 2. Schizophrenia; 3. Congestive heart failure; 4. Hypertension; and, 5. Diabetes mellitus. Edward was to be on a diabetic diet.

At 17:00, Dr. Marsh Wright ("Wright") wrote that Harris said she would approve an NGT (nasogastric tube) if doctors felt it was necessary to give Edward fluids, food or medications. At 17:27, Edward refused the 25-mg **[*63]** tablet of Coreg. At 17:28, he refused insulin. At 18:21, a 1-mg injection of Lorazepam was given to Edward. At 18:45, Edward was alert but talking "nonsensically." (Defs.' PFOF P 201.) He was refusing all oral medications. A deputy sheriff was in the room. Edward's appetite was good. He ate all his dinner. Monitoring continued. At 21:31, Edward refused insulin. His fingerstick was 224. Froedert caseworker Rita L. Beckman ("Beckman") noted that "per MD, patient is waiting for psych consult for increasing paranoia. Patient is planned to return to Milwaukee House of Corrections when medically stable. Awaiting psych input." (Defs.' PFOF P 203.)

## Froedert Hospital - Wednesday, October 12, 2004

At 00:52, Edward was given a 1-mg injection of Lorazepam. At 02:15, Edward was alert, confused and restless. Soft restraints were in place and a deputy sheriff was at his bedside. Edward's heart rate was irregular and "tacky." (Defs.' PFOF P 205.) Emotional support was provided.

At 07:03, Edward was given two units of insulin. His fingerstick was 189. Edward was given a 25-mg tablet of Coreg. Another dose of Coreg was due at 17:00.

Beckman noted that Edward would return to the Jail that day with follow-up **[*64]** by psychiatry in Jail. She phoned the House of Correction Behavioral Psych Unit to assure that treatment was available. Froedert was to call the Jail doctor with its report.

At 09:00, Edward was given a 100-mg injection of thiamine. At that time, Edward refused the 10-mg tablet of Norvasc.

At 11:30, Edward was alert, talking out loud, and not making sense. His wrist restraints and shackles were checked. A small one cm skin breakdown on his heel was noted. The doctor was notified. Edward's heart rate was irregular, breath sounds were down bilaterally, and pedal pulses were down. The pressure ulcer on his right side of undetermined etiology was improved.

At 11:55, labs were drawn. At 12:00, the hematology report was generated with several readings above or below normal. It was noted that Edward had a slight hemolysis. [59] At 12:00, Edward was given one unit of insulin. His fingerstick was 149. Insulin was due to be administered again at 17:00.

At 12:15, Replicare dressing was placed on Edward's left heel. A physical assessment flow sheet documenting Edward's progress from October 7, through October [*65] 12, 2004, shows that several neuromuscular, cardiovascular, and respiratory signs remained abnormal through October 12, 2004.

At 14:40, Diana Schick, R.N. ("Schick") completed and signed the discharge summary stating "All Expected Outcomes Met." The discharge diagnosis was right rib fracture, schizophrenia, DM (diabetes mellitus), CHF (congestive heart failure), increased CK (creatine kinase) secondary to rib fracture. No incisions or wounds were noted. No other pertinent findings or pain management needs were noted. Edward's speech was impaired and garbled and he was rambling nonsense. Edward was to follow-up with the Jail psychiatry unit and his personal physician.

During Edward's stay at Froedert, he fluctuated from a catatonic state to an agitated state. Edward remained at Froedert until he began to eat on October 12, 2004. He was then immediately discharged to the Jail.

Gill had examined Edward and noted that the rhabdomyolysis had improved due to intravenous hydration. The psychosis had still not improved. Edward was afebrile, his pulse was 106, blood pressure was 157/97, rate was 22, oxygen saturation was 97%. The plan was: "Discharge to jail in care of jail psychiatrist. Check [*66] BNP [beta-natriuretic peptide] and CK prior to discharge to ensure normalizing trend (Required am blood draw.)" (Defs.' PFOF P 218.)

Edward was discharged from Froedert at 15:00 by Schick. His medications on discharge were Zocar 80 mg QHS, Diovan 320 mg QD, Norvasc 10 mg QD, Coreg 25 mg BID, Lasix 20 mg QD, Prolixin Decanoid 25 mg Q3weeks. His temperature was 97 degrees, pulse 82, rate 20, and blood pressure 162/88. His speech was garbled and nonsense.

At 15:30, it was noted that Edward was discharged to the Jail with two deputy sheriffs who were given the discharge papers. Edward was uttering paranoid objections during the removal of the intravenous lines and Foley catheter. A report was given to the Jail nursing staff.

At 18:01, Edwards returned from the hospital and was placed in Special Needs at Paradise's direction. It was possible that Edward would be housed in the infirmary, but the Jail was awaiting instructions from Troutman and Grebner. "Discharge meds per medical director review. J Rezlaff." (Defs.' PFOF P 221.) At 18:09, it was noted that Troutman ordered a shot for Edward. "Ativan 2mg IM x 1" and "Zydis 10mg [60] PO x 1" were ordered and given. (Defs.' PFOF P 222.) At 18:15, [*67] an injection was administered to Edward without incident. It was noted that Paradise had directed that Edward was to be monitored closely and that if he calmed down, he was to be moved to the infirmary. The medications as ordered were given by Joanne Rezlaff, R.N., ("Rezlaff"). At 19:25, Rezlaff brought Edward his oral medications. At 20:44, Walton was on the pod for medication distribution. There is no notation that Edward refused any medications.

At 21:10, Edward was moved from Special Needs to the infirmary, cell 11. The infirmary is down the hall from Special Needs. [*68] The infirmary has 11 individual cells, a dayroom, and a deputy control center. Edward was sedated and calm, but still confused. Edward was sitting in the corner of his cell talking to himself.

At 21:12, Lathrop noted that Edward had numerous diagnoses including a rib fracture, paranoid schizophrenia, congestive heart failure, myocardial infraction in 2003, hypertension, hypercholesterolemia, and diabetes mellitus. Edward was sitting on the floor of the infirmary yelling. A mattress was placed on the floor but Edward would not lie on it. Grebner was aware that Edward was in the infirmary for "sub-acute d/t fx rib." (Defs.' PFOF P 226.) At 21:20, nursing supervisory

---

[59] Hemolysis is the destruction of red blood cells. *Taber's Cyclopedic Medical Dictionary* 969.

[60] Zydis is a brand name for olanzapine which is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions). It is also used to treat bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Olanzapine is in a class of medications called atypical antipsychotics. It works by changing the activity of certain natural substances in the brain. *http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html* (last visited October 20, 2008).

rounds were performed by Joe R. Piccoine RN ("Piccione"). Rounds in the infirmary were performed at 22:45, 23:15, 23:45.

**Events of Thursday, October 13, 2004**

"Medical visit plus meds." (Defs.' PFOF P 229.) Grebner saw Edward for the first time since his arrest and booking. Grebner noted that Edward "appears preoccupied with internal stimuli." (Pl.'s Add'l PFOF P 51, Defs.' Resp. Harris's Add'l PFOF P 51.) Grebner discontinued the Zocor, Norvasc, Prolixin Decanoid, and ordered 14 day prescriptions of Mevacor 80 mg QHS, Verapamil **[*69]** SR 240 mg, Atenolol 150 mg daily, and Enalapril 20 mg daily. "FS BID." Grebner referred Edward to a nurse practitioner for a history of increased blood sugar at Froedert. Grebner also indicated that Edward's blood pressure should be monitored and "refer/hx HD [heart disease]/ [Froedert]." (Defs.' PFOF P 229.) Grebner also ordered 325-mg of aspirin daily for 14 days. Grebner's notes of his examination list Edward's multiple chronic problems and his history of medical noncompliance. Grebner noted numerous areas of superficial skin breakdown that were likely due to Edward's long contact with the floor, nutritional deficits, and underlying chronic diseases. Grebner noted that, at Froedert, Edward was found to have elevated creatine phosphokinase but that neuroleptic malignant syndrome was considered unlikely. Grebner indicated in the long run psychiatric placement would be more reasonable than jail. (Defs.' Master List P 29, Ex. 29 MCTY 0012.)

Troutman received a phone call from Dr. Aaron Dall ("Dall") of Froedert regarding Edward's diagnosis of rib fracture, subcutaneous emphysema, and elevated creatine phosphokinase. Troutman examined Edward. [61] Troutman noted that he had prescribed Zydis **[*70]** because of the questionable diagnosis of neuroleptic malignant syndrome. He ordered "Zydis 10 mg / p.o. stat then / p.o. BID" for 14 days. (Defs.' PFOF P 230.) The order was noted by Janise Johnson RN ("Johnson").

At 00:15, rounds were performed in the infirmary. Five minutes later Edward's bed was moved from cell 11 and

placed in the hallway outside the infirmary per Pamela Bottonia RN ("Bottonia"). Between 00:45 and 4:15 rounds were conducted at 30-minute intervals.

At 04:00, Bottonia took Edward's vital signs noting that he had multiple pressure sores on the left ankle and right elbow, gurgly breathing, and was not taking fluids. Bottonia noted that Grebner would be addressing those issues and evaluating Edward regarding his diabetes. Bottonia washed the pressure sores with Betadine and covered them with a dressing. Edward was incontinent of stool, so his diaper **[*71]** was changed. Bottonia noted that Edward had congestive heart failure and noted that the doctor would address its status. Bottonia's plan was to raise the issue with the doctor the following day. (Defs.' Master Ex. List P 1, Ex. 1 12.)

At 04:48, Sergeant Micheal J. Renolski ("Renolski") toured the infirmary. At that time, Bottonia and RN Menhoster ("Menhoster") [62] checked Edward's vital signs, applied Depends, and cleaned his wounds. At 05:00, Bottonia noted that the supervisor was aware of the situation and the need of a bed since it was difficult to change Edward while he was on the floor. She took Edward's vital signs and noted that his lungs were gurgly. Bottonia was so concerned about Edward's condition that she stayed two hours past the time her shift ended to care for him.

At 05:15, 05:45, 06:00, 06:30, and 07:00 rounds were performed in the infirmary. At 07:00, medical staff members assisted Edward from the floor and placed him in a chair. Edward now required one-on-one care and was fed by staff who encouraged fluid intake. It was noted that Edward was evaluated by a psychiatric doctor and by Grebner in the infirmary. **[*72]** Troutman prescribed Zydis 10 mg twice daily. The morning dose of Zydis was given. Grebner assessed Edward's lungs and edema. Lathrop noted that Edward spoke to people who were not there, and he was verbally and physically abusive to staff, gripping them tightly.

Rounds in the infirmary were made at 07:12, 07:28, and 07:50. Tony Rubio ("Rubio"), Barb Stehlow ("Stehlow"), Lathrop, and Dyzon Numan ("Numan") assisted in placing Edward in a wheelchair. [63] At 08:23, Troutman

---

[61] The Defendants' proposed finding of fact, which is undisputed, includes a statement that Troutman prescribed Ativan on October 13, 2004. (Defs.' PFOF P 230; Pl.'s Resp. PFOF P 230.) However, the underlying cited material indicates that the drug was prescribed on October 12, 2004. (Defs.' Master List P 29, Ex. 29 MCTY 0068.)

[62] The cited underlying record does not provide Menhoster's full name.

[63] There is a factual dispute regarding the time that Edward was placed in the wheelchair. (Compare Defs.' PFOF P 238; Pl.'s Resp. PFOF P 238.) The Defendants assert that 08:01 is the correct time whereas Harris maintains 07:35 is the correct

came to the infirmary to see Edward. At 08:35 and 09:00, rounds were performed in the infirmary. At 09:30, Edward was dozing in his wheelchair in the day area waiting for staff to shower him. It was noted that he was incontinent of bowel and bladder. A clean diaper was applied. At 09:35 and 10:00, rounds were performed in the infirmary.

At 10:00, Edward **[*73]** was taken from the infirmary to court. He returned to the infirmary at 10:19. At 10:42, Edward was seen by Robert Rawski, M.D. ("Rawski"), a board certified general and forensic psychiatrist. At 10:47, 11:08, 11:40, and 12:00 rounds were performed in the infirmary. A supervisory tour was performed at 12:30. At 12:30, it was noted that Edward was unable to eat because he had no teeth and that Jail staff was unable to verbally or tactilely arouse Edward.

Infirmary rounds were performed at 12:33 and 13:03. At 13:10, staff assisted Edward with a shower. It was noted that Edward was more alert but still incontinent of bowel and bladder. Edward was given a carton of Resource to increase hydration. He was given a second carton of Resource that ended up on the floor. It was noted that Edward constantly talked to himself saying "God Damm." Rounds of the infirmary were performed at 13:30, 14:20, and 14:45.

At 14:56, Edward was taken to "CIV," returning to the infirmary at 15:12. At 15:45, Edward was in the dayroom sleeping soundly. His vitals were fingerstick 264, blood was 106/72, "68, 14, and 98%." (Defs.' PFOF P 248.) Edward did not respond when his vital signs were taken by D. Roehm, RN ("Roehm"). **[*74]** Rounds were conducted at 15:25, 16:12, 16:45, and 17:15.

At 17:20, staff attempted, unsuccessfully, to feed Edward dinner. He would not swallow when food was placed in his mouth and kept yelling. It was noted that staff would offer him Resource later. Rounds of the infirmary were conducted at 17:48, 18:20, 18:53, 19:19, 19:32, 20:05, and 20:20.

At 20:30, Roehm placed Edward back in his bed. She noted he refused Resource and medical attempts twice and continued yelling but he did not attempt to climb out of bed. At 21:05, 21:25, 21:49, 22:12, 22:18, 22:45, and 23:15, rounds were performed in the infirmary. At 23:24, deputies assisted the nursing staff in getting Edward into bed. Rounds were made at 23:45.

### Events of Friday, October 14, 2004

Medications ordered were "Lasix 20 mg po qd x 14 days, Resource TID Prn x 30 days." (Defs.' PFOF P 254.) At 00:15 and 00:45, rounds were made in the infirmary. At 01:00, Edward was repositioned in bed. Between 01:15, 01:45, 02:15, 02:45, rounds were performed in the infirmary. At 03:08, Mesa performed a supervisory round. At 03:15, 03:45, 04:15, and 04:45 rounds were performed in the infirmary.

At 04:50, Sharon Penister, RN, ("Penister") visited Edward. **[*75]** At 05:00 it was noted that Edward had slept for half an hour and was talking to himself while in bed. He remained dry. At 05:15, 05:45, 05:55, 06:40, 07:00, and 07:30 rounds were made in the infirmary. At 07:53, Edward required care for his incontinence. His buttocks were checked for sores and Lathrop, John RN ("John") [64] and "Med. Tech." Greg Rubia ("Rubia") lifted Edward into a wheelchair and fed him by hand. Edward's food and fluid intake were monitored and encouraged. Medications were given. At 08:00 rounds were performed in the infirmary.

At 08:18, Edward's vital signs were taken and he finished his breakfast. Grebner reviewed Edward's status and ordered a blended diet that could be supplemented with Resource. Edward's medications were given to him in the morning. He refused the Mevacor.

Beginning at 08:30 through 12:30, rounds of the infirmary were made every 30 minutes on the hour and half hour. At 12:15, it was noted that a lunch tray was kept available for Edward. At 12:30, Lathrop noted that Edward had been asleep in a chair since breakfast and she was unable to wake him. She notified Troutman of Edward's increased **[*76]** sedation and Troutman placed a 24-hour hold on the Zydis. It is noted that Edward's medications would be evaluated. At 12:48, Lathrop attempted to feed Edward but he would not wake up.

At 13:00, 13:30, 13:58, 14:30, 14:59, 15:30, and 16:00 rounds were performed in the infirmary. At 16:00, Finch took Edward's vital signs and noted that he was awake and had small emesis. He also noted that Edward had numerous skin tears on both arms.

---

time. Regardless, either time advocated by the parties would have Edward in the wheelchair before Troutman saw him on October 13, 2004.

---

[64] The cited underlying record does not include John's full name.

At 16:28, rounds were performed. At 16:30, Finch checked on Edward. At 16:55, rounds were performed. At 17:00, Finch noted that Edward was alert but he was refusing food.

Rounds were performed at 17:26, 17:59, 18:07, 18:30, 19:00, and 19:26. At 20:00, Finch noted that Edward continued to be up in the wheelchair. Edward was quiet for a while and then verbal and swearing. At 20:05, Piccione performed supervisory nursing rounds. At 20:06 and 20:30 rounds of the infirmary were made.

At 20:35, Edward was assisted from the wheelchair to the bed by Piccione, Sergeant Richard Graeber ("Graeber"), and Finch. Edward was alert but confused. Edward was placed on his side with a wedge pillow behind his back. At about 20:45, Finch observed Edward partially sitting up. Ten **[*77]** minutes later, Finch noted that Edward appeared unconscious.

Master control was notified to send medical assistance and additional deputies. Graeber, deputies Robert Camury ("Camury"), Todd Rosenstein ("Rosenstein"), Gotschalk [65] ("Gotschalk"), Pamela Moats ("Moats"), Brandon Rios ("Rios"), Brian Morgan ("Morgan"), and Piccione and Paradise responded within minutes. Finch, Piccione, Nurse Dyson Nann ("Nann") and Rosenstein began CPR and used an AED defibrillator machine until the arrival of the Milwaukee Fire Department ("Fire Department"). At 21:03, Fire Department Engine # 20 arrived and took over CPR. At 21:05, Fire Department Med # 7 arrived. At 21:06, Edward was pronounced dead at Froedert.

At 21:30, Detective Theodore Robinson ("Robinson") arrived on the scene to investigate. Rios had taken control of the entry door and was keeping a record of all persons on the scene.

**Rawski's Report**

On October 19, 2004, as ordered by Court Commissioner Flynn, Rawski filed his report with Milwaukee County Circuit Court Judge Jeffrey A. Cohen ("Cohen") regarding his October 13, 2004, evaluation of Edward. Rawski concluded:

> I believe **[*78]** to a reasonable degree of medical certainty that the defendant, Edward . . . , is suffering from a severe exacerbation of

> **Undifferentiated Schizophrenia.** Consistent with past decompensations, [Edward] has become catatonic, paranoid, agitated and mute. He has also become hostile and aggressive, requiring admission of medications against his will to prevent dangerous behavior.

(Defs.' Master Ex. List, P 21, Ex. 21 2.) Rawski opined that there is "ample documentation that this current episode is consistent with past episodes and that appropriate treatment, when instituted, does result in an improvement to the degree that he would likely become competent to stand trial." (Defs.' Master Ex. List, P 21, Ex. 21 3.)

The Jail could not have transferred Edward to another mental health treatment facility until a court order was issued requiring the transfer. A court will not order the transfer until they receive a psychiatrist's evaluation. Rawski performed his initial evaluation pursuant to the court order.

Rawski had no concerns regarding whether the Jail staff could provide appropriate medical and psychiatric care to Edward from the time of Rawski's examination of Edward to the time that the **[*79]** court would make a decision on treatment. [66]

Rawski's report indicates that Edward had continued to decompensate and "that he had been receiving treatment in the . . . Jail and for a brief time at Froedert . . . for nearly two weeks without much improvement." (Defs.' Master Ex. List P 21, Ex. 213.) When Rawski evaluated Edward he was "slumped over" in a wheelchair, did not respond to verbal stimulation, and required one-on-one supervision. (Pl.'s Add'l PFOF P 58, Defs.' Resp. Harris's Add'l PFOF P 58.) Rawski's report reflects that the Jail staff expressed concern to him about Edward's level of decompensation and "his length of stay prior to hospitalization." (Pl.'s Add'l PFOF P 61, Defs.' Resp. Harris's Add'l PFOF P 61.) They "asked that [he] do his part to expedite communication about [his] opinion in this matter." (Pl.'s Add'l PFOF P 61, Defs.' Resp. Harris's Add'l PFOF P 61.)

At his deposition, Rawski testified that he was so concerned about Edward's condition that he expedited his competency report. **[*80]** He also testified that at the time of his evaluation, Edward met the criteria for

---

[65] The underlying cited record does not include Gotschalk's full name.

[66] The parties dispute whether Rawski had any concerns about Edward's treatment or condition when Rawski saw him on October 13, 2004. (*Compare* Defs.' PFOF P 295; Pl.'s Resp. PFOF P 295.)

involuntary commitment under Chapter 51 of the Wisconsin Statutes. When asked whether he had any concerns on why Edward had presumably not improved for the 13 or 14 days he had been at the Jail and Froedert, Rawski testified "I attribute it to a severe episode that had yet to be sufficiently treated." (Defs.' Master Ex. List P 8, Ex. 8 50.)

Troutman was asked whether he disagreed with Rawski's statement that Edward had been receiving treatment in the Jail and for a brief time at Froedert for nearly two weeks "without much improvement" and Troutman answered "no." (Defs.' Master Ex. List P 13, Ex. 13 119.) Troutman was asked whether he disagreed with Rawski's recommendation that Edward be transferred to one of the state psychiatric institutes for the purposes of restoring his competency to stand trial and Troutman said "no." (Defs.' Master Ex. List P 13, Ex. 13 122.)

**Post-Death Investigation**

The **[*81]** State of Wisconsin Department of Health and Family Services Original Certificate of Death for Edward, signed on October 28, 2004, lists the cause of death as natural. The immediate cause of death was a pulmonary embolism.

On October 29, 2004, the County Medical Examiner's Autopsy Report ("Autopsy Report") was completed and signed by Jeffery M. Jentzen M.D. ("Jentzen"). It listed the cause of death as pulmonary embolism. Other significant conditions noted were congestive heart failure and arteriosclerotic heart disease. The contusions noted in the report were on the right hand "second metacarpophalangeal," a healing superficial abrasion on the upper left arm, and superficial dried abrasions on the left-hand fifth finger.

The matter was investigated by Jon N. Reddin ("Reddin"), Country Deputy District Attorney. After speaking with Jentzen, examining Jail reports, and conducting additional interviews, Reddin concluded that Edward died of natural causes and was given prompt medical attention.

Mandolini, Clinical Coordinator for Bell, wrote a letter dated October 25, 2004, to Michael Kalonic ("Kalonic") [67] praising Troutman for his courteous, responsive, and professional manner in which he **[*82]** interacted with Edward.

Troutman testified that treating a paranoid schizophrenic like Edward was a time-consuming process and that best treatment is one that is done slowly, deliberately and without drastic medication changes for fear of additional adverse results.

**Dr. Kenneth I. Robbins**

Kenneth I. Robbins, M.D., ("Robbins") is a board certified psychiatrist and doctor of internal medicine, who serves as a Clinical Associate Professor of Psychiatry at the University of Wisconsin-Madison and the Medical College. Robbins found no evidence to suggest that Edward was treated with deliberate indifference during his incarceration. Robbins is of the opinion that Edward received appropriate psychiatric care in the Jail and was promptly transferred to Froedert when psychiatric problems endangered his health.

**Dr. Daniel Spitz**

Daniel J. Spitz, M.D., ("Spitz") is a licensed forensic pathologist, who evaluated the records regarding Edward. In Spitz's opinion, Edward died very rapidly of natural causes, secondary to a pulmonary embolism due to lower extremity deep vein thrombosis, [68] all asymptomatic during **[*83]** his incarceration. It is Spitz's opinion that Edward's pulmonary embolism was a very sudden and unforeseeable event and that there is no evidence that the medical care or treatment that Edward received from the Jail staff contributed to his death.

**Dr. Daniel J. Kennedy**

Daniel J. Kennedy, Ph.D., ("Kennedy") is a professor of criminal justice at the University of Detroit, Michigan. He holds a Ph.D. in Educational Psychology and a M.A. and a B.A. in Sociology from Wayne State University. In Kennedy's opinion, none of the Jail staff, including the named defendants acted with deliberate indifference to Edward during his stay in the Jail.

---

[67] Kalonic was the Jail Administrator. (*See* Defs.' Master Ex. List P 13, Ex. 13 (Troutman Dep.) 18.)

[68] A thrombosis is the formation or presence of a blood clot within the vascular system. *Taber's Cyclopedic Medical Dictionary* 2182.

**Jackson**

Harris named Jackson as a medical witness in her expert disclosure filed with this Court on March 1, 2007. Harris submitted Jackson's report dated February 27, 2007, to the Court. Jackson filed a second report on January 15, 2008.

Jackson's report states that he has been hired to discuss the cause of death and the medical care received by Edward at the Jail. Jackson is a licensed psychiatrist in Wisconsin. Jackson also opined **[*84]** that Harris has reactive depression, anxiety, and insomnia as the result of the loss of her husband and her struggle to understand why he was not provided adequate care.

**Lynne Thaxton**

Harris named Lynne Thaxton, RN ("Thaxton"), as a nursing expert in her witness disclosure filed March 1, 2007. Thaxton filed a report. Thaxton filed a second report dated November 25, 2007, on January 15, 2008. Thaxton is a registered nurse in Wisconsin and South Carolina. Thaxton was deposed on May 17, 2007, and on March 20, 2008. Thaxton testified that her opinions were limited to the nursing care given to Edward at the Jail. Thaxton has never had a case involving an incarcerated individual and has never been to the Jail.

At her first deposition, Thaxton testified that her only concern was the open areas on Edward's left foot and ankle, which she believed were caused by the restraints used at Froedert. At her second deposition, Thaxton testified that she was concerned that Edward was not forced to take his medications while incarcerated.

Thaxton opined that the Jail nursing staff failed to notify the physician that Edward had refused three consecutive doses of medications as required by County Correctional **[*85]** Health Care Policy Bates stamped MCTY 1347 and the nursing standard of practice. (Defs.' Master Ex. List P 11, Ex. 11D 1.) She also opined that the nurse practitioner failed to evaluate Edward for hypertension, contrary to Troutman's orders and the nursing standard of practice. (Defs.' Master Ex. List P 11, Ex. 11D 2.) Thaxton also opined that the Jail nursing staff violated the nursing standard of practice and County Correctional Health Care Policy Bates stamped MCTY 1329 and MCTY 1405 on September 30, 2004, by not properly monitoring his condition while Edward was in restraints. (Defs.' Master Ex. List P 11, Ex. 11D 2.) She also noted that there was no

documentation in the record regarding the need for restraint or that a physician's order for the need for restraints had been obtained. (Defs.' Master Ex. List P 11, Ex. 11D 2.)

Thaxton also noted that on October 7, 2004, at 02:30 when the nurse found that Edward had a heart rate of 135 at rest, the finding should have been reported to the physician immediately. (Defs.' Master Ex. List P 11, Ex. 11D 2.) However, the nurse deferred reporting the finding until 08:20 and Edward was not sent to the hospital until 09:30 -- a delay of seven **[*86]** hours contrary to the standard of nursing care.

**Harris**

Harris testified that she did not have any physical illnesses as a result of her grief over Edward's death. She missed two weeks of work following the news of his death and was paid for that missed time. She did not witness the alleged harm to her husband. Rather, Harris heard about it later from her family friend. [69]

**Grebner**

Consistent with his October 13, 2004, progress note that stated in the long run psychiatric placement would be more reasonable than jail, Grebner testified that Edward "was not going to learn anything from being in jail. It was not going to modify his behavior in the future. So as far as I am concerned, it would be a -- it would be necessary to have him not on the streets." " (Defs.' Master Ex. List P 5, Ex. 5 (Grebner Dep.) 33.) Grebner further stated that "So my feeling was, there's not much point, and it's very expensive to keep somebody in jail. Better to say this is a mental health problem. He should be in a mental health setting. It's a philosophical vent is what it is." (Defs.' Master Ex. List P 5, Ex. **[*87]** 5 33-34.) Grebner also testified that the jail does not "control how the [C]ounty chooses to fund mental health. So we do the best that we can in what we can control, and this is provide the best available service in the [J]ail." (Defs.' Master Ex. List P 5, Ex. 5 40.) Grebner made Clarke aware of the difficulties the Jail had with attempting transfers to Behavioral Health that resulted in the Jail becoming the "de facto provider of mental health services." (Pl.'s Add'l PFOF P 66, Defs.' Resp. Harris's Add'l PFOF P 66.) Grebner summarized Clarke's

---

[69] The Defendants object to Harris's additional proposed findings of fact paragraphs one through seven.

response as stating that "one plays with the hand that one is dealt. That we don't control how the [C]ounty chooses to fund mental health. So we do the best that we can in what we control, and that is provide the best available service in the [J]ail." (Defs.' Master Ex. List P 5, Ex. 5 33-34.) Grebner did not have a conversation with Clarke that was specific to Edward.

Grebner testified that the Jail developed new policies and procedures in part due to a consent decree entered into in a class action lawsuit filed on behalf of inmates, *Christensen v. Sullivan,* Milwaukee County Case No. 96-C-1835 ("*Christensen action*"). Grebner has both anecdotal **[\*88]** and personal knowledge of the type of care that would be given to a patient at Behavioral Health in 2004, in part because many of their staff and the Jail staff transfer between the two entities.

## Training

The County implemented new health policies and procedures, in part the *Christensen* action and resulting consent decree, including mental health policies and procedures. Johnson and Szczepaniak testified that they had not been trained on the health policies and procedures that relate to mental health. There is factual dispute between the parties regarding whether Singer, the nurse educator from 2002 through July or August 2004, trained the nursing staff on the health policies or procedures that relate to mental health. (*Compare* Pl.'s Add'l PFOF PP 98-99, Defs.' Resp. Harris's Add'l PFOF P 98-99.)

Janice Rose ("Rose") was the nurse educator at the Milwaukee House of Correction from 2000 through 2004, and at the Jail from 2003 through 2004. She testified that she did not train the nursing staff on the health policies or procedures that relate to mental health.

## *ANALYSIS*

Brown, Dickerson, Trimboli (the "Officer Defendants"), Clarke, and the County assert Harris's claims against them should **[\*89]** be dismissed because she cannot prove deliberate indifference or even negligence on the part of the Officer Defendants. Second, they maintain that, assuming the Officer Defendants' conduct was in fact negligent, they have immunity for any alleged improper conduct. Third, they contend that there is no evidence that the Officer Defendants, or Milwaukee County failed to establish appropriate policies or

procedures or that the Officer Defendants were insufficiently trained. Troutman, Dunn, Szczepaniak, and Singer (the "Medical Defendants") maintain that Harris cannot prove deliberate indifference against them. In addition, they contend that assuming that they were negligent, they are immune from liability.

Harris maintains that Brown, Dickerson, and Trimboli were deliberately indifferent to Edward during the traffic pursuit, stop and arrest because they made no effort to ascertain whether they were dealing with an emotionally disturbed person for the purpose of determining that he needed hospitalization, and that they ignored his medical needs when they transported him to the Jail booking room, and failed to convey his treatment to Szczepaniak. She also maintains that Clarke has personal **[\*90]** liability because Clarke failed to act on information about Edward to ensure that he received constitutionally adequate medical care. She also asserts that the Defendants are not entitled to immunity. Harris also contends that Milwaukee County was deliberately indifferent to Edward's medical and mental health needs because members of the Jail staff were not adequately trained and that Clarke is liable as a supervisor because he failed to take any steps to make certain that adequate policies and procedures were developed and implemented. Harris also maintains that Singer has supervisory liability because she breached her supervisory duty to ensure that the Jail staff was adequately trained. With respect to the medical personnel, Harris maintains that they were deliberately indifferent to Edward's medical and mental health needs. She also asserts that they not entitled to immunity.

## Deliberate Indifference to Medical Needs

Although the *Eighth Amendment* only applies to convicted prisoners, that the same standard applies to pretrial detainees under the *Fourteenth Amendment's due process clause. Williams v. Rodriguez, 509 F.3d 392, 401 (7th Cir. 2007).* Under this standard, "plaintiff has the **[\*91]** burden of showing that (1) the harm to the plaintiff was objectively serious; and (2) that the official was deliberately indifferent to [his] health or safety." *Id.* (quoting *Cavalieri v. Shepard, 321 F.3d 616, 620 (7th Cir. 2003)).* [70]

---

[70] As noted in *Williams, 509 F.3d at 403,* the **Fourteenth Amendment** protections only apply to a pretrial detainee's confinement conditions after he received a judicial

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward, 251 F.3d 588, 593 (7th Cir. 2001)* (citation omitted). A prison official acts with deliberate indifference **[*92]** when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. Prison officials act with deliberate indifference when they act "intentionally or in a criminally reckless manner." *Tesch v. County of Green Lake, 157 F.3d 465, 474 (7th Cir. 1998)*. Neither negligence nor even gross negligence is a sufficient basis for liability. *See Salazar v. City of Chi., 940 F.2d 233, 238 (7th Cir. 1991)*. A finding of deliberate indifference requires evidence "that the official was aware of the risk and consciously disregarded it nonetheless." *Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001)* (citation omitted).

A difference of opinion among physicians cannot support a finding of deliberate indifference. *Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006)* (citing *Garvin v. Armstrong, 236 F.3d 896 (7th Cir. 2001)*; *Estate of Cole v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996))*. Deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate **[*93]** that the person responsible did not base the decision on such a judgment. *Collignon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir. 1999)*; *Fromm, 94 F.3d at 261-62*.

*Brown, Dickerson, and Trimboli*

With respect to Harris's deliberate indifference claim against Brown, Dickerson, and Trimboli because they did not know or obtain the history of Edward's mental health problems and previous law enforcement encounters which resulted in either involuntary

confinement or judicial findings of not guilty by reason of mental disease or defect, the record establishes that the officers believed that they were pursuing an intoxicated driver. Moreover, while Trimboli indicates that she did not run a background check on Edward because she was not the arresting officer, Harris has produced no evidence indicating that the officers were required to run a background check as a part of the arrest process.

Dickerson does not recall whether Edward appeared intoxicated at the time of his arrest. Despite construing the facts and reasonable inferences from those facts in the light most favorable to Harris, Dickerson's participation in the pursuit and his presence at the scene of the arrest are, as a matter of law, **[*94]** insufficient to provide a basis upon which a reasonable jury could find that he was aware that Edward had a mental health problem or other serious medical need or that he was deliberately indifferent to any such need. There is no evidence that Dickerson had any other involvement in the circumstances surrounding Harris's claim. Therefore, Harris's *Fourteenth Amendment* claim against Dickerson is dismissed.

Harris's claim against Trimboli is analogous to her claim against Dickerson. As with Dickerson, Trimboli participated in the chase and arrest of Edward. At the time of his arrest, she did not smell alcohol on Edward. However, Trimboli also did not believe that Edward was a danger to himself or others. While she administered angle kicks to Edward's abdomen because he resisted arrest, Harris has presented no evidence that Trimboli knew or should have known that Edward had a serious medical need. Indeed, while a relatively new rib fracture without pain was diagnosed at Froedert on October 11, 2004, there is no evidence indicating when the rib was fractured. Edward also refused emergency medical services which were available at the scene of his arrest. Viewed in the light most favorable **[*95]** to Harris, the evidence does not provide a basis upon which a reasonable jury could find that Trimboli was deliberately indifferent to a serious medical need of Edward. She did not convey Edward to the Jail and had no further involvement with Edward. Therefore, Harris's *Fourteenth Amendment* claim against Trimboli is dismissed.

With respect to Brown, he participated in the pursuit of Edward, was present at the scene of the arrest when Trimboli used the abdominal kicks, he also conveyed Edward to the Jail for booking. Upon Edward's arrest, Brown did not detect the use of drugs or the odor of intoxicants and at the time of Edward's arrest, Brown did not believe that Edward was a danger to himself or

---

determination of probable cause. Claims regarding pretrial conditions of confinement for pretrial detainees who have not yet had a judicial determination are instead governed by the **Fourth Amendment** and its objectively reasonableness standard. *Id.; see also Sides v. City of Champaign, 496 F.3d 820, 828 (7th Cir. 2007)*. However, no **Fourth Amendment** violation is alleged; therefore, the Court has evaluated Harris's **§ 1983** claims under the **Fourteenth Amendment** as plead.

others. Brown conveyed Edward to the Jail and during that process concluded that Edward was an emotionally disturbed person. It is undisputed that Brown did not tell that to Szczepaniak during the booking process. However, Brown testified that to him the term meant that the person does not have the capacity to function in a normal setting. Based on the information known to Brown and his usage of the term emotionally disturbed, no reasonable jury could conclude that he should have known that [*96] Edward had an objectively serious mental health need.

With respect to the use of force during the arrest, there is a factual dispute regarding whether Brown told Szcezpaniak about the use of force during Edward's arrest. Regardless of that dispute, Brown's knowledge that force had been used against Edward is not tantamount to knowledge that he had a serious medical need. Brown also knew that at the scene, medical care had been offered to Edward and that he had refused. There is insufficient evidence upon which a jury could find that Brown was aware of the risk to Edward and consciously disregarded it nonetheless. *Chapman, 241 F.3d at 845*.

*Szczepaniak*

Harris asserts that Szczepaniak ignored Edward's medical and mental health needs because she did not obtain an adequate psychiatric history for Edward, she failed to ensure that Edward was immediately provided with intensive psychiatric care, and she failed to obtain or request information from Brown regarding Edward's mental and physical condition when Brown brought Edward to the Jail for booking.

The issue as to Szczepaniak is whether Harris has produced sufficient evidence upon which a jury could reasonably find that she was deliberately [*97] indifferent to Edward's medical and mental health based on her involvement in the booking process on September 29, and 30, 2004. Her recognition of the serious nature of his needs is not contested.

A underlying theme of Harris's claim against the Medical Defendants is that they should have placed him in a facility where he could have received intensive psychiatric care. However, the Court is mindful that in most cases managing correctional facilities is not a job for the federal courts. *See Scarver v. Litscher, 434 F.3d 972, 976-77 (7th Cir. 2006)* (officials at the Wisconsin Secure Program Facility did not unconstitutionally

subject homicidal schizophrenic inmate to cruel and unusual punishment, absent evidence that they knew the conditions of confinement, i.e.; heat, constant illumination, and lack of sound, were making his mental illness worse.") The court of appeals has admonished that "The Constitution rarely requires 'the best.' That would imply the micro-management of American government by the federal courts. The *Eighth Amendment* forbids cruel and unusual punishments; it does not require the most intelligent, progressive, humane, or efficacious prison administration." *Anderson v. Romero, 72 F.3d 518, 524 (7th Cir. 1995)*.

The [*98] record discloses that upon Edward's arrival at the Jail on September 29, Szczepaniak's attempts to obtain a medical history from Edward were impaired by his lack of communication. However, she conducted an initial medical screening to ascertain his physical condition. The minor physical examination was performed due to privacy concerns. She identified Edward's need for placement in Special Needs and made arrangements for him to be seen by an adult nurse practitioner for a medical history evaluation and by a psychiatric nurse practitioner for further evaluation. Szczepaniak also learned of Edward's psychiatric history as related by Harris to Paradise. By 09:19 on September 30, the Jail had received Edward's treatment records from Bell. While Harris suggests that Szczepaniak should have done more to obtain an adequate psychiatric history for Edward, obtained immediate psychiatric treatment for him, and obtained information from Brown, a difference of opinion about medical care does not constitute an *Eighth Amendment* violation. *Norfleet, 439 F.3d at 396*. Harris is seeking a specific treatment for Edward and that is not provided for by the *Eighth Amendment. See Forbes v. Edgar, 112 F.3d 262, 266-67 (7th Cir. 1997)*. [*99] Because the record does not provide a basis upon which a jury could reasonably conclude that Szczepaniak was deliberately indifferent to Edward's medical needs, Harris's *Fourteenth Amendment* claim against her is dismissed.

*Troutman*

Harris maintains that Troutman ignored Edward's medical and mental health needs because he failed to ensure that an adequate psychiatric history for Edward was obtained; he did not review the Bell's records until October 5, 2004; despite Edward's deteriorating condition, he did not properly modify Edward's medications; and he failed to adequately attend to Edward and to ensure that Jail mental staff members

adequately attended to Edward. Harris maintains that despite his knowledge that Edward had been laying on the floor of his cell for extended periods of time, Troutman took no action to see that this did not occur. She also maintains that despite his knowledge of Edward's decompensation, severe catatonia, and the fact that he and Jail staff identified him as a danger to himself and others, Troutman failed to ensure that Edward was provided with constitutionally adequate health care -- intensive psychiatric care that would have aborted his decompensation [*100] and restored Edward to some modicum of competency.

Harris disagrees with various aspects of Troutman's treatment of Edward. However, disagreement with the treatment provided does not establish an *Eighth Amendment* violation. *Norfleet, 439 F.3d at 396*. Troutman indicates that treatment of a paranoid schizophrenic like Edward is a time-consuming process and that the best treatment is done slowly, deliberately and without drastic medication changes for fear of additional adverse results.

Construing the evidence in the light most favorable to Harris, Troutman did not review Edward's medical records until October 5, 2004. However, the record also suggests that the medical records were not forwarded to Troutman until October 3, 2004. Even if the records were available to Troutman on September 30, 2004 and he did not review them until October 5, 2004, Troutman may have been negligent, but more than negligence is required to violate the *Eighth Amendment. See Salazar, 940 F.2d at 238*.

Harris's contention that Troutman did not properly modify Edward's medications reflects her disagreement with the treatment provided. However, the medical records reflect that on October 5, 2004, Troutman ordered [*101] psychiatric medications for Edward. Edward was at Froedert from late on October 7, through about 15:00 on October 12, 2004. Thereafter, on October 13, 2004, Troutman changed Edward's psychiatric medication because of the concern that Edward had neuroleptic malignancy syndrome. Deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment. *Fromm, 94 F.3d at 261-62*.

The medical records indicate frequent contacts by Troutman and other medical staff with Edward on the days that he was at the Jail. Troutman saw Edward on Thursday September 30. According to Troutman's schedule, he was not at the Jail from October 1, through October 3, 2004. Dunn worked on Friday, October 1, and she evaluated Edward and spoke with him. On October 2 and October 3, Edward was seen by members of the nursing staff. On October 4 and October 5, Troutman performed a special management assessment of Edward, and Edward was seen by members of the nursing [*102] staff. On October 5, Troutman ordered medications for Edward. On October 6, 2004, Dunn performed a special management assessment of Edward, ordered medication, and opined that he was in a crisis situation. On October 6, nursing staff also saw Edward. On October 7, 2004, nursing staff made multiple observations of Edward. Dunn also performed a special management assessment of Edward. Based on Edward's medical status, he was transferred to Froedert where he remained until the afternoon of October 12, 2004, when he was discharged from the hospital and returned to the Jail.

Upon Edward's return to Special Needs, Troutman ordered a shot for Edward. About three hours later, Edward was moved to the infirmary, where he remained until he died on October 14. On October 13, Troutman examined Edward, and Edward was seen multiple times by the nursing staff. On Friday, October 14, Edward was frequently seen and assisted by the nursing staff. Grebner reviewed Edward's medical status and ordered a change in his diet. Troutman was also notified of Edward's sedation and ordered a 24-hour hold on Edward's psychiatric medication.

The records also reveal that Troutman monitored Edward's medical condition [*103] and adjusted his medication as needed. Troutman testified that as far as he is concerned Special Needs is the hospital and he serves as the treating doctor for those inmates.

Harris also states that although Troutman knew that Edward had been laying on the floor of his cell for extended periods of time, Troutman took no action to see that this did not occur. Actions were taken by Jail medical staff to reposition Edward on a mattress when he was found sitting on the infirmary floor on October 12. He was also moved from the floor to a chair on October 13. In addition to the extent restraints could have been used to prevent Edward from laying on the floor, an inmate has both an *Eighth Amendment* right to be restrained so that he would not injure himself and a *Fourteenth Amendment* right to be free from restraint.

See *Sanville v. McCaughtry, 266 F.3d 724, 736 (7th Cir. 2001)*.

Harris also maintains that despite Troutman's knowledge of Edward's decompensation, severe catatonia, and the identification of him as a danger to himself and others, Troutman failed to ensure that Edward was provided with constitutionally adequate health care -- intensive psychiatric care that would have aborted his **[*104]** decompensation and restored Edward to some modicum of competency. Troutman's constitutional obligation was adequate treatment for Edward's mental health condition. A plaintiff does not have a constitutional right to the treatment of his choosing. *Anderson, 72 F.3d at 524*. The evidence and the reasonable inferences from that evidence do not provide a basis for a reasonable jury to conclude that Troutman was deliberately indifferent to Edward's serious medical and mental health needs.

In addressing the adequacy of the medical care provided, Harris relies on four decisions of other courts of appeal. (*See* Pl.'s Resp. Br. 9.) Two of the decisions, *Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976)* [71] and *Tolbert v. Eyman, 434 F.2d 625, 626 (9th Cir. 1970)*, [72] predate the Supreme Court's November 30, 1976 decision in *Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*. To the extent these decisions remain relevant in light of the subsequent case law development, *Westlake, 537 F.2d at 860 n.5*, states:

> We distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment. *See Fitzke v. Shappell, [468 F.2d 1072,] at 1076 n. 4 [(6th Cir. 1972)]*. **[*105]** *See also Jones v. Lockhart, [484 F.2d 1192,] 1194 (8th Cir. 1973)*; *Corby v. Conboy, [457 F.2d 251,] at 254 [(2d Cir. 1972)]*. Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment,

federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law. *See e.g., Pinon v. Wisconsin, 368 F.Supp. 608 (E.D.Wis.1973)*. *But cf. Fitzke v. Shappell, supra at 1076-77 n. 7*. Of course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all. *See Tolbert v. Eyman, 434 F.2d 625, 626 (9th Cir. 1970)*.

Edward certainly received treatment in this case -- the dispute is over its adequacy.

*Hathaway v. Coughlin, 37 F.3d 63, 69 (2nd Cir. 1994)*, held a jury could infer deliberate indifference where an inmate was kept waiting for two years before being evaluated for surgery to abate chronic pain in his hips and, for one year during that time, the doctor failed to inform the inmate that there were broken pins in his hip or to discuss the option of surgery. The circumstances presented by Edward's treatment are not analogous to those of *Hathaway* -- non-disclosure is not an issue and, although Harris believes Edward could have received better medical treatment in a different facility, Edward received reasonably prompt and diligent medical treatment.

Harris also cites *Comstock v. McCrary, 273 F.3d 693, 708 n.5 (6th Cir. 2002)*, for the proposition that "a prison doctor's medical response to an inmate's serious need may constitute deliberate indifference just as readily as the intentional denial or delay of treatment." (quoting *Estelle, 429 U.S. at 104-05*). **[*107]** The court held that the prison psychiatrist's defense hinged whether his actions constituted "an inadvertent failure to provide adequate medical care," *Estelle, 429 U.S. at 105*, "or a reasonable response to a known risk to the inmate's health and safety. *Farmer* [v. *Brennan,] 511 U.S. [825,] at 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 [(1994)]*, both of which would entitle him to qualified immunity." *Comstock, 273 F.3d at 707*.

In this case, despite construing the evidence in the light most favorable to Harris, the Court concludes that Troutman provided a reasonable response to the known risks to Edward's health and safety.

*Dunn*

Harris's contentions with respect to Dunn are similar to those regarding Troutman. She maintains that Dunn failed to ensure that an adequate psychiatric history of Edward was obtained, and that she timely obtained and

---

[71] *Westlake, 537 F.2d at 861*, held that a pretrial detainee stated a **Fourteenth Amendment** claim based on allegations that jail authorities denied him medical treatment for a bleeding ulcer.

[72] *Tolbert, 434 F.2d at 625*, held **[*106]** that the allegation in a state prisoner's complaint that a prison physician had scoffed at the prisoner's complaint of eye trouble did not establish for purposes of a motion to dismiss that the prisoner had been given an eye examination.

reviewed Edward's mental health records, and that despite the fact that the medications were not improving Edward's condition she did not properly modify those medications to abort the decompensation. She also maintains that despite Dunn's knowledge that Edward had been lying on the floor of his cell, Dunn took no actions to ensure that this did not occur. She also claims that despite **[*108]** Dunn's knowledge of Edward's decompensation, severe catatonia, and the fact that she and others at the Jail had identified him as a danger to himself and others, Dunn failed to ensure that Edward was provided with constitutionally adequate medical care.

The record establishes that Edward's medical records from Bell were obtained by September 30, 2004, and were available to Dunn. Dunn spoke with Harris on October 1, 2004. Dunn evaluated Edward's condition on October 6, 2004, and ordered Prolixin for him which was administered. On October 6, 2004, Greer, a nurse, informed the nurse practitioner, presumably Dunn, of Edward's medical condition. The nurse practitioner told Greer that she would speak to Grebner about having Edward evaluated at Froedert. Dunn also contacted Harris that day regarding Edward's condition. On October 6, 2004, Dunn felt that Edward was in crisis. Dunn again evaluated Edward again on October 7, 2004. Edward was hospitalized at Froedert between October 7, until the evening of October 12, 2004. The record suggests that Dunn helped trigger Edward's transfer to Froedert for treatment and stabilization.

There is no evidence of contact between Dunn and Edward while he **[*109]** was in the infirmary. However, the record for that time period demonstrates that Edward received frequent medical attention from Troutman, the psychiatrist, and from other medical personnel.

Harris also asserts that although Dunn knew Edward was lying on the floor, she took no actions to prevent this from occurring. The medical records reflect that on October 6, 2004, Edward was lying on the floor at 06:20. However, Dunn was not working at that time. On October 7, 2004, Edward was sitting on the floor while Dunn was working. After talking with Greer about Edward's medical condition, the nurse practitioner talked to Grebner about having Edward transferred to Froedert. According to the medical records, within an hour, Edward was transported to Froedert. The evidence and the reasonable inferences from that evidence do not support Harris's contention that Dunn did not intervene when Edward laid on the floor. Despite

viewing the evidence and the reasonable inferences from it in the light most favorable to Harris, a reasonable jury could not find that Dunn was deliberately indifferent to Edward's serious medical and mental health needs.

*Singer*

Harris also contends that Singer and the Jail nursing **[*110]** staff ignored Edward's medical and mental health needs. Harris relies, in part, upon the contact between Edward's sister, Jones, and Clark. She asserts that, after being informed of the situation, Singer failed to ensure that Edward was either provided additional treatment at the Jail or transferred to a psychiatric facility for constitutionally adequate mental health care.

The evidence relating to Carolyn is limited. The only evidence is that at the request of Clarke's secretary, on October 7, 2004, Singer called Carolyn informing her that Edward was stable. Harris has not presented evidence of the information, if any, conveyed by Carolyn. Additionally, from October 7, through the evening of October 12, 2004, Edward was being treated at Froedert. Upon Edward's return to Special Needs and, then, upon his transfer to the infirmary, the evidence documents frequent nursing contact and care, including one-on-one care. The evidence indicates that as Edward's medical needs increased, he received increased nursing attention. On October 14, 2004, nurse supervisors checked on Edward twice during the early morning hours. He was lifted into a wheelchair and fed. His food and fluid intake were **[*111]** encouraged. Frequent rounds were made. Lathrop advised Troutman of Edward's increased sedation prompting Troutman to order a 24-hour hiatus on that medication. Finch, a nurse, checked on Edward at 16:00, 16:30, 20:00, and assisted him to bed at 20:35. Finch also observed Edward at 20:45, and found him unconscious ten minutes later. Finch alerted others for assistance.

Harris also asserts that the repeated negligent acts of the Jail nursing staff illustrate a pattern of negligent conduct on the part of the Jail medical staff. She asserts that Edward was not seen by a Jail physician until the day before he died, Jail staff failed to notify a physician that Edward had repeatedly refused medication, failed to evaluate Edward for hypertension, failed to obtain a physician's order to place Edward in a restraint bed, failed to properly monitor him, and failed to notify a physician of Edward's extremely rapid heartbeat and distress on October 7, 2004.

In support of this contention, Harris cites *French v. Owens, 777 F.2d 1250, 1254 (7th Cir. 1985)*, which involved an appeal from a court order requiring extensive reforms at the reformatory at Pendleton, Indiana. The court found that the medical **[*112]** neglect of prisoners violated the *Eighth Amendment*. The district court found the facility was "severely understaffed." *Id.* There was a single physician to handle 190 requests for medical care each day. *Id.* There was only one full-time physician who spoke little English. *Id.* Inmates in need of medical help got between one and ten minutes each for evaluation and treatment. *Id.* The court also noted that there were numerous instances of neglect, misdiagnosis and maltreatment, indicating that one patient had tuberculosis that went undiagnosed, another had a broken back that went untreated, and a third had an abscessed rectum that went unattended for six months. *Id. French* did not involve the treatment of a single patient.

Harris also relies upon *Wellman v. Faulkner, 715 F.2d 269, 272 (7th Cir. 1983)*. That action involved repeated instances of negligent medical care together with general systemic deficiencies. Two of the three physicians were recent immigrants whose English language skills were insufficient to allow them to communicate effectively with the prisoners, and the position of staff psychiatrist had been unfilled for two years -- with the consequence that there was no one qualified **[*113]** to evaluate and treat psychiatric emergencies or to follow patients who needed to be maintained on long-term psychotropic medications. *Id. at 272-73*. There were also many instances of medical maltreatment involving the denial of medical treatment of an inmate's stomach problems for two years, an inmate's abscess for five years, and an inmate's dental problem for two years. *Id. at 273*. This was also combined with the failure to treat an inmate complaining of chest pains, until nine hours after the inmate had alerted prison personnel to his chest pain. There were also ongoing an severe problems in the stocking of needed medical supplies. *Id. at 274*. The circumstances of this case are not analogous to those of *Wellman*.

Despite construing the facts and reasonable inferences from those facts, in the light most favorable to Harris, this Court concludes that a reasonable jury could not find that Singer was deliberately indifferent to Edward's medical needs. Therefore, Harris's *Fourteenth Amendment* claim against Singer is dismissed.

*Clarke*

Harris's claims include the contention that Clarke played a personal role in Edward's incarceration. As jail commander, Clarke presumably was not involved **[*114]** in Edward's medical treatment at the jail. *See Duncan v. Duckworth, 644 F.2d 653, 656 (7th Cir. 1981)* (prison superintendent not personally involved in day-to-day operation of the institutional hospital, and not responsible for treatment decisions). The evidence in the record shows that Carolyn contacted Clarke's secretary to inquire about Edward's medical status. Construing this evidence in a light most favorable to Harris, that evidence is insufficient to support the inference upon which the jury could reasonably find that Clarke was personally involved with Edward's medical treatment.

Supervisory liability will be found only if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it. That is, to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct. Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. In other words, they must act either knowingly or with deliberate, reckless indifference. *Chavez v. Ill. State Police, 251 F.3d 612, 651 (7th Cir. 2001)* **[*115]** (citations and quotation marks omitted). There is no evidence that Clarke was personably involved in the medical care afforded to Edward from September 29, through October 14, 2004. Therefore, Harris's *Fourteenth Amendment* claim against Clarke in his individual capacity are dismissed.

*Qualified Immunity*

All the individual defendants contend that they are entitled to qualified immunity. However, because each of the individual defendants are entitled to summary judgment on Harris's *Fourteenth Amendment* claim, it is not necessary to address their qualified immunity argument. *See Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 597 (7th Cir. 1997)*.

*Municipal Liability & Failure to Train*

Harris's *Fourteenth Amendment* claims against the County and Clarke, as a policymaker, rely upon *Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d*

*611 (1978)* and *City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)*. However, the government as an entity is responsible "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell, 436 U.S. at 694*. There [*116] must be a direct causal link between the alleged unconstitutional deprivation and the municipal policy or custom at issue. *City of Canton, 489 U.S. at 385*. There are limited circumstances when "failure to train" may be a basis for municipal liability under *§ 1983*. *Id. at 388*.

However, a failure to train theory or a failure to institute a municipal policy requires a finding that the individual officers are liable on the underlying substantive claim. *Tesch, 157 F.3d at 477*. Since this Court has found that the individual defendants did not inflict a constitutional injury on Edward, the County and Clarke cannot be held liable to Harris. *See id.* Therefore, neither the County nor Clarke have any *Monell* liability under *Section 1983*, and such claims against them are dismissed.

*Supplemental Claims*

Harris also asserts state law negligence claims against Clarke, Troutman, Szczepaniak, Brown, Dickerson, Trimboli, Dunn, and Singer; and claims for loss of society and companionship and for negligent infliction of emotional distress. The Defendants assert that such claims may be subject to dismissal based on immunity pursuant to Wisconsin law, relying upon *Wis. Stat. § 893.80(4)*. Harris opposes the contention [*117] maintaining that *Wis. Stat. § 302.38* and *Wis. Admin. Code. DOC § 350.09* created a ministerial duty to provide appropriate care and treatment to prisoners. In their reply brief, the Defendants also argue that Harris cannot prove her claim for emotional distress.

Generally, when a court resolves all federal claims before trial, it should dismiss supplemental claims without prejudice. *Redwood v. Dobson, 476 F.3d 462, 467 (7th Cir. 2007)*. In the exercise of its discretion, this Court declines to exercise jurisdiction over Harris's state law claims and they are dismissed without prejudice.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Harris's third claim against Pope-Harris for negligence is **DISMISSED;**

The Defendants' motion for summary judgment (Docket No. 112) is granted as to the *Fourteenth Amendment* claims arising out Edward's confinement as a pretrial detainee from September 29, 2004, until October 14, 2004, and those claims are **DISMISSED** with prejudice;

Harris's supplemental state law negligence claims against Clarke, Troutman, Szczepaniak, Brown, Dickerson, Trimboli, Dunn, and Singer, and her claims for loss of society and companionship and for negligent infliction [*118] of emotional distress are **DISMISSED** without prejudice;

The Defendants' motion to exclude Jackson's testimony (Docket No. 114) is **GRANTED;**

This action is **DISMISSED;**

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of November, 2008.

**BY THE COURT**

*/s/ Rudolph T. Randa*

**Hon. Rudolph T. Randa**

**Chief Judge**

---

**End of Document**

# *Johnson v. Cook County*

United States Court of Appeals for the Seventh Circuit

April 1, 2013, Argued; May 15, 2013, Decided

No. 12-2431

**Reporter**
526 Fed. Appx. 692 *; 2013 U.S. App. LEXIS 9763 **; 2013 WL 2005236

EDWARD JOHNSON, Plaintiff-Appellant, v. COOK COUNTY and ALPHONSO HILL, Defendants-Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 1:11-cv-03203. Robert W. Gettleman, Judge.

*Johnson v. Cook County, 2011 U.S. Dist. LEXIS 137872 (N.D. Ill., Nov. 29, 2011)*

**Disposition:** AFFIRMED.

## Core Terms

sexual assault, Jail, respondeat superior, district court, amended complaint, moving force, supervision, inmates, detainees, constitutional violation, allegations, state-law, Counts

## Case Summary

### Procedural Posture

Plaintiff detainee sued defendants, a county and an employee, pursuant to *42 U.S.C.S. § 1983*, alleging *Fourth Amendment*, due process, and Monell custom or policy claims. The detainee also asserted state-law claims. The United States District Court for the Northern District of Illinois, Eastern Division, granted the county's motion to dismiss and denied the detainee's requests to file amended complaints. The detainee appealed.

### Overview

The employee summoned the detainee to the health services dispensary in a jail, conducted a prostate exam, and sexually assaulted him while they were alone together. The appellate court determined that the detainee's 42 U.S.C.S. § Monell claim against the county failed because (1) under the "widespread policy or practice" prong, he failed to allege causation since the county's alleged practice of allowing medical personnel to be alone with inmates for medical procedures was not the moving force behind turning a routine medical procedure into a constitutional violation, the lack of supervision could not be considered the moving force behind the sexual assault, the county's alleged history of suppressing complaints could not be the moving force behind the sexual assault, and (2) under the single-incident theory, nothing about the risk of sexual assault was "patently obvious" or "predictable." The detainee's Illinois state-law claims premised under the respondeat superior theory of liability failed because Illinois law did not extend the doctrine of respondeat superior to a sexual assault claim.

### Outcome

The appellate court affirmed the dismissal of the detainee's suit against the county.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN1*[⬇] **Standards of Review, De Novo Review**

An appellate court reviews de novo the dismissal of a

complaint pursuant to a *Fed. R. Civ. P. 12(b)(6)* motion, construing all allegations in the light most favorable to the plaintiff, accepting all well-pleaded facts as true, and drawing all reasonable inferences in favor of the plaintiff. In doing so, the court considers the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

*HN2*[ ] **Scope, Government Actions**

A municipality, such as a county, may be liable for a *42 U.S.C.S. § 1983* violation: (1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority."

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

*HN3*[ ] **Scope, Government Actions**

In the context of a *42 U.S.C.S. § 1983* Monell claim, a plaintiff must demonstrate that the deliberate action attributable to the municipality itself is the "moving force" behind the deprivation of his constitutional rights.

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

Civil Rights Law > Protection of Rights > Prisoner Rights > Safety

*HN4*[ ] **Scope, Government Actions**

In the context of a *42 U.S.C.S. § 1983* Monell claim based upon a sexual assault, federal common law does not historically recognize a privilege between patients and physicians, but many states do. Patients can expect to be alone with medical personnel at some point in time during examinations, though the court expresses no opinion as to the proper overall medical procedures in a

jail. Nevertheless, the fact that two individuals might be alone does not provide the moving force, or catalyst, for a sexual assault to occur—two people can be alone in many situations and contexts without a sexual assault occurring. The court's inquiry is whether an official's acts or omissions were the cause—not merely a contributing factor.

Civil Rights Law > ... > Section 1983 Actions > Elements > Causal Relationship

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

*HN5*[ ] **Elements, Causal Relationship**

In the context of a *42 U.S.C.S. § 1983* Monell claim, there must be a causal connection, or affirmative link between the conduct complained of and the party sued.

Civil Rights Law > ... > Section 1983 Actions > Elements > Causal Relationship

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

*HN6*[ ] **Elements, Causal Relationship**

In the context of a *42 U.S.C.S. § 1983* Monell claim, it must be proven that the deficiency in the investigation actually caused the state actor's conduct.

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

Civil Rights Law > Protection of Rights > Prisoner Rights > Safety

*HN7*[ ] **Scope, Government Actions**

In the context of a *42 U.S.C.S. § 1983* Monell claim, in a narrow range of circumstances, a pattern of indifference might not be necessary to show deliberate indifference.

Torts > ... > Employers > Scope of Employment > Application of State Law

Torts > ... > Employers > Scope of

Employment > Factors

HN8[⬇] **Scope of Employment, Application of State Law**

Under respondeat superior, an employer may be held liable for the negligent, willful, malicious or even criminal acts of its employees, when those acts are committed within the scope of the employee's employment. Illinois law requires three factors to be satisfied for the doctrine to apply: (1) the conduct is of the kind the employee is employed to perform; (2) the conduct occurs substantially within the authorized time and space limits; and (3) the conduct is actuated, at least in part, by a purpose to serve the employer.

Torts > ... > Employers > Activities & Conditions > Criminal Acts

Torts > ... > Employers > Scope of Employment > General Overview

HN9[⬇] **Activities & Conditions, Criminal Acts**

Under Illinois law, sexual assault by its very nature precludes a conclusion that it occurred within the employee's scope of employment under the doctrine of respondeat superior.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > General Overview

HN10[⬇] **Preliminary Considerations, Federal & State Interrelationships**

A federal court is reluctant to expand the law of a state in a manner that, while perhaps logical, is not clearly in line with the state's existing thinking on the subject.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

HN11[⬇] **Standards of Review, Abuse of Discretion**

A district court does not abuse its discretion when it

denies leave to amend if it is certain from the face of the complaint that any amendment would be futile.

**Counsel:** Fro EDWARD JOHNSON, Plaintiff - Appellant, Jared S. Kosoglad, Attorney, JARED S. KOSOGLAD, P.C., Chicago, IL.

For COOK COUNTY, ILLINOIS, Defendant - Appellee: Anthony E. Zecchin, Attorney, OFFICE OF THE COOK COUNTY STATE'S ATTORNEY, Chicago, IL.

**Judges:** Before WILLIAM J. BAUER, Circuit Judge, MICHAEL S. KANNE, Circuit Judge, JOHN DANIEL TINDER, Circuit Judge.

# Opinion

**[*693] ORDER**

Edward Johnson was sexually assaulted by Alphonso Hill, a Cook County, Illinois employee, while detained as an inmate at the Cook County Jail. He brought suit against Hill, individually, and Cook County, Illinois, alleging *Fourth Amendment*, *Due Process*, and *Monell* custom or policy claims, *see Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*, pursuant to *42 U.S.C. § 1983*, as well as various Illinois state-law claims. Cook County filed a *Rule 12(b)(6)* motion to dismiss Johnson's amended complaint, which the district court granted. Johnson sought leave to file his second and third amended complaints, but the district court denied his requests and entered judgment in **[**2]** favor of Cook County pursuant to *Federal Rule of Civil Procedure 54(b)*. Johnson contends that the district court erred in dismissing his amended complaint, and, in the alternative, that he should have been granted leave to amend. Hill is not a party to this appeal. Finding no errors, we affirm the dismissal of Johnson's suit against Cook County.

The facts provided are taken from Johnson's second and third amended complaints, unless otherwise specified, and are considered true for purposes of this appeal. *See Palka v. Shelton, 623 F.3d 447, 451-52 (7th Cir. 2010)*. Johnson was a detainee at the Cook County Jail. Hill was a medical technician employed by Cermak Health Services and Cook County at the Cook County Jail. On May 13, 2010, Hill summoned Johnson to the Cermak Health Services dispensary in Division II of the jail for a routine monitoring of Johnson's blood sugar

level. While Johnson and Hill were alone together, Hill ordered Johnson to submit to a prostate exam. Hill conducted the examination and then sexually assaulted Johnson. Johnson reported the assault, and Hill was indicted on various criminal counts related to the assault.

Johnson filed suit in federal court against Hill, **[**3]** individually, and Cook County, Illinois, on May 13, 2011. He filed an amended complaint a month later on June 13. The amended complaint included seven counts, with Counts III through VII against Cook County. Count III was a *Monell* claim, in which Johnson alleged a failure to properly supervise detainees. Counts IV through VII were pursuant to a theory of respondeat superior under Illinois law and included intentional infliction of emotion distress (Count IV); assault and battery (Count V); indemnification **[*694]** pursuant to *745 Ill. Comp. Stat. 10/2-302* (Count VI), and a general, catch-all respondeat superior claim (Count VII). Attached to the amended complaint was a 2008 letter from the Department of Justice to then-Cook County Board President Todd H. Stroger and Cook County Sheriff Thomas Dart, as well as the Agreed Order in *United States v. Cook County*, et al., in Case No. 10 C 2946, which the parties entered into on May 26, 2010. The 2008 letter was ninety-seven pages long and discussed certain conditions at the Cook County Jail that seemingly violated the constitutional rights of inmates. The Agreed Order was a means by which the parties were to rectify documented constitutional rights **[**4]** violations of the Cook County Jail inmates.

Cook County filed a Rule 12(b)(6) motion to dismiss the amended complaint, which the district court granted on November 29, 2011, dismissing all claims against Cook County. The court held that the *Monell* claim was insufficiently pleaded because Johnson failed to allege the required causation element—that Cook County's conduct was the "moving force" behind the injury complained of, see *Bd. of the Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)*. The court held alternatively that the *Monell* claim failed because it "allege[d] only a single instance of wrongdoing, but [did] not fall within the 'narrow range of circumstances' where the Supreme Court has allowed a 'single-incident' theory of *Monell* [to] be sufficient." The court held that Counts IV through VII were insufficiently pleaded because Illinois law precludes an employer from being held liable under a theory of respondeat superior when an employee commits an act of sexual assault.

Johnson sought leave to file a second amended complaint. In an attempt to rectify the deficiencies of the *Monell* claim in his amended complaint, Johnson incorporated the Agreed Order into the complaint, **[**5]** claiming that "Cook County policymakers were aware of the widespread practice at Cook County Jail of failing to provide constitutionally adequate supervision to detainees but failed to take timely remedial action." With respect to the respondeat superior state-law claims, Johnson additionally alleged that Hill had "apparent authority to act as a medical technician and perform a prostate exam" and "actual authority to attack inmates and encouragement from Defendant Cook County[.]"

Johnson's request was denied in an order dated April 3, 2012. The district court again concluded that Johnson's *Monell* claim failed because he could not demonstrate that Cook County's failure to supervise was the "moving force" behind the sexual assault, even if it could be considered a "partial cause." The court also concluded that Johnson's respondeat superior claims failed because, despite Hill's "novel legal interpretations" of actual and apparent authority, Illinois caselaw was clear that sexual assault is never within the scope of one's employment, so respondeat superior is inapplicable.

Johnson sought leave to file a third amended complaint, which did not include any state-law claims; the district court **[**6]** denied that request on May 17, 2012. This appeal followed.

*HN1*[⬆] We review *de novo* the dismissal of a complaint pursuant to a Rule 12(b)(6) motion, construing all allegations in the light most favorable to Johnson, accepting all well-pleaded facts as true, and drawing all reasonable inferences in favor of Johnson. See *Mann v. Vogel, 707 F.3d 872, 877 (7th Cir. 2013)*. In doing so, we consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and **[*695]** information that is subject to proper judicial notice." *Geinosky v. City of Chi., 675 F.3d 743, 745 n.1 (7th Cir. 2012)*.

We first look to see whether Johnson adequately pleaded a *Section 1983* cause of action under *Monell*. See *Monell, 436 U.S. at 690*. *HN2*[⬆] A municipality, such as Cook County, may be liable for a *Section 1983* violation: "(1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a 'wide-spread practice' that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a 'custom or

usage' with the force of law; or (3) through an allegation that the constitutional injury was caused **[**7]** by a person with 'final decision policymaking authority.'" *Calhoun v. Ramsey, 408 F.3d 375, 379 (7th Cir. 2005)* (citing *McTigue v. City of Chi., 60 F.3d 381, 382 (7th Cir. 1995))*.

Johnson alleges that Cook County committed three violations under the "widespread policy or practice" prong by:

(1) Fostering an atmosphere and creating a serious risk of sexual assault to detainees at the Cook County Jail through a widespread practice of allowing medical personnel to be alone with persons in custody;

(2) Knowingly failing to ensure that the jail was adequately staffed to provide the supervision over those in custody to prevent the risk to those in custody, in violation of accepted practices, court orders, and administrative procedures, despite knowing that such understaffing greatly increases the chances that detainees will be subject to brutality and sexual violence; and

(3) Encouraging the suppression of complaints of misconduct to cover up inadequacies in the supervision and treatment of detainees, thus maintaining an atmosphere and climate where inmates are subjected to an unreasonable risk of violence and sexual violence.

The district court concluded that Johnson failed to allege the causation **[**8]** element of a *Monell* claim, and we agree. Even taking into consideration the Agreed Order from Case No. 10 C 2946, *HN3*[⬆] Johnson must demonstrate that the "*deliberate* action attributable to the municipality itself is the 'moving force'" behind the deprivation of his constitutional rights. *Bryan Cnty., 520 U.S. at 399* (citing *Monell, 436 U.S. at 694*). Johnson claims that the Agreed Order essentially proves that "supervision at the jail was a casual factor in the death and abuse of dozens of residents," but even if that were to some extent true, we simply do not see how the allegations can be considered the "moving force" behind the sexual assault that occurred here.

Looking to the first allegation, *HN4*[⬆] federal common law does not historically recognize a privilege between patients and physicians, but many states do. *Compare Nw. Mem'l Hosp. v. Ashcroft, 362 F.3d 923, 926 (7th Cir. 2004)* (noting that there is no federal common law physician-patient privilege), *with People v. Manos, 202 Ill. 2d 563, 782 N.E.2d 237, 240-43, 245, 270 Ill. Dec. 43 (Ill. 2002)* ("The primary purpose of the physician-patient

privilege is to encourage free disclosure between a doctor and a patient and to protect the patient from embarrassment and invasion **[**9]** of privacy that disclosure would entail."). Patients can expect to be alone with medical personnel at some point in time during examinations, though we express no opinion here as to the proper overall medical procedures in a jail. Nevertheless, the fact that two individuals might be alone, as Johnson alleges happened here, does not provide the moving force, or catalyst, for a sexual **[*696]** assault to occur—two people can be alone in many situations and contexts without a sexual assault occurring. If we agreed with Johnson's contention, any time a municipality allowed a prisoner to be alone with anyone, that would create an automatic ground for a constitutional violation claim if inappropriate conduct occurred. We decline to establish such a benchmark. Hill and Johnson being alone in a room together might have been a contributing factor to the sexual assault, but it is not enough to show that a widespread practice or policy was a *factor* in the constitutional violation; it must have been the *moving force*. *Estate of Sims v. Cnty. of Bureau, 506 F.3d 509, 514 (7th Cir. 2007)*; *see LaMarca v. Turner, 995 F.2d 1526, 1538 (10th Cir. 1993)* (stating that "our inquiry [is] whether an official's acts **[**10]** or omissions were the cause—not merely a contributing factor"). Accordingly, we do not believe that Cook County's alleged practice of allowing medical personnel—medical technicians or licensed physicians—to be alone with inmates for medical procedures was the moving force behind turning a routine medical procedure into a constitutional violation.

The second allegation, which is similar to the first, albeit phrased differently, fails for the same reason. Johnson says "[i]t is patently obvious that understaffing the jail would lead to increased abuse," and it is true that the Agreed Order discussed a lack of supervision as being a cause of prisoner abuse at the jail, but the abuse discussed in the order relates to the use of force by security personnel, inmate on inmate attacks, a lack of adequate health services and medical care, and inadequate sanitation and environmental conditions. The sexual assault that occurred here is outside the realm of the types of abuse discussed. Johnson contends that "[p]eople who had no training or expertise were performing complex procedures and technical assessments," but the lack of oversight would be the direct cause, or moving force, of inadequate **[**11]** medical care—not a sexual assault. Again, we do not believe that the lack of supervision in this particular case can be considered the moving force behind the sexual assault. *See Parrish v. Ball, 594 F.3d 993, 1000*

*(8th Cir. 2010)* (concluding that the county employee's intentional sexual assault of the plaintiff at the jail "was too remote a consequence of such a failure [to train] to meet the rigorous causation standard [under *Monell*] necessary to hold the county liable.").

Nor can Johnson establish a constitutional violation under the third allegation. Even if Cook County had a history of suppressing complaints—which it vigorously contests—that cannot be the moving force behind the sexual assault that occurred here. The link between the cause alleged and the harm that occurred is much too attenuated. *See Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983)* (stating that **HN5**[⬆] there must be "a causal connection, or affirmative link" between the conduct complained of and the party sued).

We are not convinced that any set of facts could support Johnson's allegation that Hill sexually assaulted Johnson as a direct result of a "widespread custom or policy." Nor could inadequate investigations **[**12]** of his complaints after the sexual assault have *caused* the constitutional violation alleged. *Vukadinovich v. McCarthy, 901 F.2d 1439, 1444 (7th Cir. 1990)* (**HN6**[⬆] "It must be proven that the deficiency in the investigation actually caused the [state actor's] conduct.").

Alternatively, Johnson contends that Cook County is liable under the single-incident theory because the sexual assault was a "highly predictable consequence" of a governmental policy. *See Connick v. [*697] Thompson, U.S. , 131 S. Ct. 1350, 1360-61, 179 L. Ed. 2d 417 (2011)* (explaining that, **HN7**[⬆] "'in a narrow range of circumstances,' a pattern of indifference might not be necessary to show deliberate indifference.'" (quoting *Bryan Cnty., 520 U.S. at 409*)). However, we do not think the risk of sexual assault from any policy alleged here is the same as a city arming its police force with firearms and deploying the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. *Cf. City of Canton v. Harris, 489 U.S. 378, 390 n.10, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)*. Nothing about the risk of sexual assault here was "patently obvious" or "predictable." *See Connick, 131 S. Ct. at 1361*.

In short, **[**13]** the district court properly dismissed Johnson's *Section 1983 Monell* claims against Cook County.

We move to the sufficiency of Johnson's Illinois state-law claims premised under the respondeat superior

theory of liability. **HN8**[⬆] Under respondeat superior, an employer may be held liable for the "negligent, willful, malicious or even criminal acts of its employees, when those acts are committed within the scope of [the employee's] employment." *Adames v. Sheahan, 233 Ill. 2d 276, 909 N.E.2d 742, 755, 330 Ill. Dec. 720 (Ill. 2009)*. Illinois law requires three factors to be satisfied for the doctrine to apply: (1) the conduct is of the kind the employee is employed to perform; (2) the conduct occurs substantially within the authorized time and space limits; and (3) the conduct is actuated, at least in part, by a purpose to serve the employer. *Id.*; *see Doe v. City of Chi., 360 F.3d 667, 670 (7th Cir. 2004)*.

Johnson contends all three factors are satisfied, but Illinois courts have explicitly declared, **HN9**[⬆] "[S]exual assault *by its very nature* precludes a conclusion that it occurred within the employee's scope of employment under the doctrine of *respondeat superior*." *Doe v. Lawrence Hall Youth Servs., 2012 IL App (1st) 103758, 966 N.E.2d 52, 62, 358 Ill. Dec. 867 (Ill. App. Ct. 1st Dist. 2012)* **[**14]** (citing *Stern v. Ritz Carlton Chi., 299 Ill. App. 3d 674, 702 N.E.2d 194, 198, 234 Ill. Dec. 28 (Ill. App. Ct. 1st Dist. 1998)*; *Deloney v. Bd. of Educ., 281 Ill. App. 3d 775, 666 N.E.2d 792, 798 n.5, 217 Ill. Dec. 123 (Ill. App. Ct. 1st Dist. 1996))*. We are mindful of Johnson's distinction between the facts of this case and the other cases in Illinois that have dealt with sexual assault and respondeat superior, as well as his reliance on *Mary M. v. City of Los Angeles, 54 Cal. 3d 202, 285 Cal. Rptr. 99, 814 P.2d 1341, 1347-52 (Cal. 1991)* (holding that the city could be liable under respondeat superior for a police officer who committed a sexual assault while on duty in California), and *West v. Waymire, 114 F.3d 646, 649 (7th Cir. 1997)* (interpreting *Indiana* law as allowing for respondeat superior to be employed in a case involving a police officer's sexual assault of a child). But as we stated in *Holtz v. J.J.B Hilliard W.L. Lyons, Inc., 185 F.3d 732, 750 (7th Cir. 1999)*, **HN10**[⬆] "As a federal court, we are reluctant to expand the law of a state in a manner that, while perhaps logical, is not *clearly* in line with the state's existing thinking on the subject." (emphasis added). Johnson's counsel conceded at oral argument that we would be the first court interpreting Illinois law to extend the doctrine of **[**15]** respondeat superior to a sexual assault claim. We decline to do so.

We briefly note that Johnson's arguments regarding Hill's "actual" and "apparent" authority under Illinois law are completely inapplicable to this case, as the cases he cites in support address whether an independent contractor can be considered an employee of an

employer for purposes **[\*698]** of tort liability. *See Petrovich v. Share Health Plan of Ill., Inc., 188 Ill. 2d 17, 719 N.E.2d 756, 765-66, 241 Ill. Dec. 627 (Ill. 1999)* (discussing whether a health maintenance organization (HMO) could be held liable for a physician's negligence even though the physician was an independent contractor). There is no debate here as to whether Hill was employed by Cook County. No further discussion on the issue is necessary.

In accordance with established Illinois precedent, we hold that the district court properly dismissed Johnson's Illinois state-law claims against Cook County.

Finally, with respect to Johnson's claim that the district court should have permitted him to amend his complaint, we believe the district court did not abuse its discretion. As our discussion above demonstrates, Johnson is unable to cure the deficiencies in his complaints, so any additional attempt **[\*\*16]** would be "futile." *See Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n, 377 F.3d 682, 687 (7th Cir. 2004)* (explaining that *HN11*[↑] a district court does not abuse its discretion when it denies leave to amend if "it is certain from the face of the complaint that any amendment would be futile").

AFFIRMED.

---

**End of Document**

 Neutral

As of: August 31, 2018 6:34 PM Z

## *Karow v. Estate of Heyde*

United States District Court for the Western District of Wisconsin

March 30, 2017, Decided; March 30, 2017, Filed

14-cv-395-jdp

**Reporter**

2017 U.S. Dist. LEXIS 47546 *; 2017 WL 1194740

THADDEUS JASON KAROW, Plaintiff, v. THE ESTATE OF KATHRYN R. HEYDE, PATRICIA HAZUGA, DR. JOAN HANNULA, JEFFREY PUGH, REED RICHARDSON, LAUREN NELSON-BOBB, EMILY BOWE, ANDREW HAND, DEREK RAISANEN, ROSE SEICHTER, PETER WALTER, MICHAEL SNIDER, JAMES CLARK, SCOTT RUEHRDANZ, SHAWN KIEFFER, WARREN DOHMS, JR., SANDRA COOPER, ERIC SPECKHART, MICHAEL KASTEN, RORY TABER, JR. and JAMES LAUNDERVILLE, Defendants.

**Prior History:** [Karow v. Heyde, 2014 U.S. Dist. LEXIS 87628 (W.D. Wis., June 27, 2014)](#)

## Core Terms

pain, shackles, inmate, deliberate indifference, knee, bed, summary judgment, therapy, prison, diagnostic test, judicial notice, physical restraint, recruiting, infection, policies, physical therapist, medical condition, deliberately, indifferent, requires, days, medical care, left knee, leg irons, conditions-of-confinement, Defendants', appointment, deprivation, quadriceps, parties

**Counsel: [\*1]** Thaddeus Jason Karow, Plaintiff, Pro se, Stanley, WI.

For The Estate of Kathryn R. Heyde, Patricia Sherreiks, Doctor Hannula, Warden Pugh, Lauren Nelson-Bobb, Sgt. Bowe, C.O. II Hand, C.O. II Raisanen, C.O. II Seichter, Sgt. Walter, C.O. II Snider, Sgt. Clark, C.O. Reuhrbranz, C.O. II Kieffer, Reed Richardson, Defendants: Christopher John Blythe, LEAD ATTORNEY, Theresa Movroydis Anzivino, Wisconsin Department of Justice, Madison, WI.

**Judges:** JAMES D. PETERSON, District Judge.

**Opinion by:** JAMES D. PETERSON

## Opinion

OPINION & ORDER

Pro se plaintiff Thaddeus Jason Karow, an inmate at the Stanley Correctional Institution (SCI), brings this action under *42 U.S.C. § 1983*, asserting *Eighth Amendment* claims against prison officials. Karow contends that defendants failed to provide adequate medical care for his knee and inappropriately shackled him to his bed while he was being treated at a hospital.

Three motions are before the court: (1) Karow's motion for the court's assistance in recruiting counsel; (2) Karow's motion for the court to take judicial notice; and (3) defendants' motion for summary judgment. I will deny the first, grant the second in part, and grant the third. Undisputed facts show that defendants were not deliberately indifferent to Karow's **[\*2]** medical condition or the conditions of his confinement, so defendants are entitled to summary judgment. The grant of summary judgment disposes of all of Karow's claims, so I will dismiss the case.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

### A. Medical care

Karow suffered from pain in his leg, which turned out to be a Methicillin-resistant Staphylococcus aureus (MRSA) infection in his left knee. He asserts denial of medical care claims against defendants Kathryn Heyde, Patricia Scherreiks, Joan Hannula, and Lauren Nelson-Bobb (Medical Defendants). According to Karow, the Medical Defendants failed to diagnose his MRSA infection for five days as his condition deteriorated.

On April 24, 2010, Karow went to the Health Services

Unit (HSU) at SCI and saw defendant Kathryn Heyde, a nurse.[1] Although Karow indicated that he had some knee pain, he also directed Heyde to his rectus femoris (one of the four quadriceps) as the source of his pain. Dkt. 59, ¶ 26 and Dkt. 117, ¶ 26. As a nurse, Heyde had no authority to order diagnostic tests. Dkt. 64, ¶ 12. But she examined Karow's knee, took his medical history and vital signs, and performed a physical examination. Dkt. [*3] 59, ¶ 26; Dkt. 117, ¶ 26; Dkt. 64, ¶ 12. She also issued him various items to alleviate his pain, including a heat bag, some muscle rub, and an extra pillow. She also issued him a low bunk restriction. Heyde noted that Karow already had ibuprofen from a different medical condition, but Karow told Heyde that ibuprofen was not effective in treating his pain and asked for stronger pain medication. Dkt. 78, ¶ 2. Heyde had no authority to prescribe pain medication, but she referred Karow to a doctor. Dkt. 59, ¶ 26; Dkt. 61-1, at 9; Dkt. 64, ¶ 13; Dkt. 78-4, at 2; Dkt. 117, ¶ 26. Heyde also told Karow that if his condition did not improve, then he should return to HSU.

Later the same day, Karow returned to HSU and saw a different nurse, defendant Patricia Scherreiks.[2] This time, Karow informed the nurse that his pain was "centered in the knee." Dkt. 59, ¶ 27 and Dkt. 117, ¶ 27. Karow also indicated that his pain was "tolerable" and that the pain was not "bad" when he was sitting. Dkt. 59, ¶ 27 and Dkt. 117, ¶ 27. Scherreiks consulted with a doctor who was on call and relayed to the doctor Karow's symptoms and her observations. Dkt. 66, ¶ 11. After this consultation, Scherreiks advised Karow [*4] to apply ice to his knee four times a day, to continue taking ibuprofen, and to take Tylenol 325 mg, as prescribed by the on-call doctor. She also gave him crutches. Although Heyde had already referred Karow to a doctor, Scherreiks scheduled an appointment with a doctor to take place in two days.

Two days later, April 26, 2010, Karow showed up for his scheduled appointment to see a doctor at HSU, defendant Joan Hannula. Karow told Hannula that he had been experiencing "tightness and swelling in the left thigh to knee." Dkt. 59, ¶ 29 and Dkt. 117, ¶ 29. Karow denied having a fever, joint pain, or "any history of injury to the area in pain." Dkt. 59, ¶ 29 and Dkt. 117, ¶ 29. Karrow also added that "he thought he might have a strain." Dkt. 64, ¶ 17. Hannula reviewed Karow's medical history and performed a physical examination. Hannula believed that a quadriceps strain caused Karow's pain, and she recommended massage, heat, and quadriceps stretches. Hannula also prescribed Vicodin to address Karow's pain and discomfort.

The next day, April 27, 2010, Karow returned to HSU and saw Hannula again. Karow indicated that he continued to have tightness in his left quadriceps. Hannula referred Karow [*5] to a physical therapist to assess whether electro-stimulation therapy would address Karow's pain. Hannula also prescribed Karow Cyclobenzaprine, a muscle relaxant.

The parties dispute whether Karow saw a physical therapist. According to Karow, he saw a physical therapist, defendant Lauren Nelson-Bobb, on the same day Hannula recommended that he see a physical therapist. Karow alleges that after he informed Nelson-Bobb about his pain, Nelson-Bobb performed electro-stimulation therapy on his left knee and that this therapy caused him "excruciating pain." Dkt. 116, ¶ 21. Nelson-Bobb does not recall treating Karow, Dkt. 62, ¶ 8, and the parties have not produced any record of her treating Karow. Nelson-Bobb points to her time sheet from April 27, 2010, Dkt. 62-1, at 2, which does not show that she saw Karow. Nelson-Bobb also states that she would not have been at SCI at 6:30 p.m. on April 27, 2010, the time Karow claims to have seen Nelson-Bobb. Nelson-Bobb also states that she does not perform electro-stimulation therapy. Dkt. 62, ¶ 14.

Two days later, April 29, 2010, Karow returned to HSU and saw Scherreiks again. Scherreiks observed that Karow's knee had swollen and that his pain had [*6] worsened. Scherreiks then consulted with Hannula, who again examined Karow. Apparently at this point, Hannula recognized that Karow had a serious problem: she had Karow sent to an emergency room at Ministry Our Lady of Victory Hospital. From there Karow was transferred to St. Joseph's Hospital, where he was hospitalized for seven days, from April 29, 2010, to May 6, 2010. At St. Joseph's Hospital, Karow received a variety of medical treatment, including surgery to drain an abscess in his left knee. Dkt. 61-1, at 6-7, 19-22.

---

[1] Heyde has passed away, and her estate appears on her behalf. Dkt. 79, at 1. Her estate relies on Heyde's notes that she included in Karow's file. Her notes, though hearsay, are admissible because they are statements made for medical diagnosis and contained in business records. *See Fed. R. Evid. 803(4), (6).*

[2] Scherreiks is her former last name, and her current last name is Hazuaga. Dkt. 66. The parties continue to refer to her by her former last name, so I will do so as well for clarity.

## B. Restraints at St. Joseph's Hospital

At St. Joseph's Hospital, Karow was shackled to his hospital bed: his right wrist was shackled to a metal bar at his right side, and both of his ankles were shackled to the lower edge of his bed, forcing him to lie on his back, facing up, whenever he was in bed. The prison security staff removed his shackles during medical procedures. He was allowed to use the lavatory, and his restraints were removed there, although he still had to wear leg irons. He was transported to and from his medical appointments in a wheelchair, but it is unclear whether he was restrained on the wheelchair. But whenever he was in bed, which was most of **[*7]** the seven-day hospital stay, he was in the three-point restraint.

Karow challenges the constitutionality of the restraints, and asserts claims against 17 defendants: nine security officers (Security Defendants), who refused to remove the shackles that bound him to his hospital bed or to remove leg irons when he used the lavatory; six security supervisors (Supervisor Defendants), who supervised and directed the Security Defendants; and two wardens of SCI, one former and one current warden (Wardens), who implemented and enforced the policy on physical restraints.[3]

The manner in which Karow was restrained at the hospital was determined by his security classification under the Wisconsin Department of Corrections and SCI policies. Under these policies, an inmate's security classification depends on a number of nonexclusive factors:

1. Nature of offense and length of sentence;
2. History of escapes;
3. History of assaultive/disruptive behavior;
4. Pending criminal charges;
5. Security threat group affiliation;
6. Hospital staffing requirements;
7. Availability of on-site hospital security;
8. Availability of local law enforcement response;
9. Institution proximity and response time to hospital;

10. Inmate **[*8]** medical condition; and

11. Public perception/notoriety of crimes committed/media interest.

Dkt. 60-4, at 3.

In Karow's case, he was classified as a "medium" security inmate. According to Karow, he has no history of attempted escape. But other factors tip the other way. Karow is serving a sentence of life imprisonment plus 20 years for murder, burglary, and armed robbery. When he was a 14-year-old, he murdered an 80-year-old woman by stabbing her several times in the head and back with her kitchen knife. He then took the victim's car for a joyride. Dkt. 59, ¶ 2 and Dkt. 60-3, at 1. During his incarceration, Karow had at least 51 conduct reports: 15 for disobeying orders; 12 for failure to follow institution policy; 10 for possessing contraband; 9 for disruptive conduct; 3 for damaging or altering property; 1 for fighting; and 1 for making threats.

Under SCI policies, a medium security inmate who stays at a hospital must be "restrained to the hospital bed at all times except when the [inmate] leaves his bed for medical procedures." Dkt. 59, ¶ 45; *see also* Dkt. 60-4, at 4. Partial removal of restraints requires a security supervisor's approval. Complete removal requires a security supervisor's **[*9]** approval and a medical professional's determination that the proposed removal is medically necessary.

ANALYSIS

## A. Karow's motion for the court's assistance in recruiting counsel

Karow moves for the court's assistance in recruiting counsel. Dkt. 82. I will deny this motion.

Litigants in civil cases do not have a constitutional right to counsel, and I do not have the authority to appoint counsel to represent a pro se plaintiff in a civil matter. Rather, I can only assist in recruiting counsel who may be willing to serve without compensation. *See 28 U.S.C. § 1915(e)(1)*; *Pruitt v. Mote, 503 F.3d 647, 653-54, 656 (7th Cir. 2007)* (en banc) ("*Section 1915(e)(1)* thus codifies the court's discretionary authority to recruit a lawyer to represent an indigent civil litigant pro bono publico; it 'does not authorize the federal courts to make coercive appointments of counsel.'" (quoting *Mallard v. U.S. Dist. Court for S. Dist. of Iowa, 490 U.S. 296, 310, 109 S. Ct. 1814, 104 L. Ed. 2d 318 (1989))*).

Before assisting in recruiting counsel, this court generally requires a pro se litigant to satisfy two

---

[3] The Security Defendants are Emily Bowe, James Clark, Andrew Hand, Shawn Kieffer, Derek Raisanen, Scott Ruehrdanz, Rose Seichter, Michael Snider, and Peter Walter. The Supervisor Defendants are Sandra Cooper, Warren Dohms, Michael Kasten, James Launderville, Eric Speckhard, and Rory Taber. The Wardens are Jeffrey Pugh, a former warden of SCI, and Reed Richardson, the current warden of SCI.

requirements. First, the pro se litigant must show that he has made reasonable attempts to recruit counsel on his own. *See* Jackson v. Cty. of McLean, 953 F.2d 1070, 1072-73 (7th Cir. 1992) ("[T]he district judge must first determine if the indigent has made reasonable efforts to retain counsel and was unsuccessful or that the indigent was effectively precluded from making such efforts"). **[*10]** The court requires the pro se litigant to provide the names and addresses of at least three attorneys who declined to represent him. Karow has satisfied this requirement in his prior motion for counsel. Dkt. 44, at 3.

Second, once the pro se litigant has shown that he made some reasonable attempts to recruit counsel, the court "must examine whether the difficulty of the case—factually and legally—exceeds" his abilities to litigate his claims. Perez v. Fenoglio, 792 F.3d 768, 784 (7th Cir. 2015) (internal citation and quotation marks omitted). Assessing the litigant's abilities is a "practical" inquiry, Santiago v. Walls, 599 F.3d 749, 762 (7th Cir. 2010), and no fixed requirement exists, Pruitt, 503 F.3d at 655. But courts generally consider the litigant's "literacy, communication skills, educational level, and litigation experience" in light of the complexities of the case. Id. "The question is not whether a lawyer would present the case more effectively than the pro se plaintiff" but instead whether the pro se litigant can "coherently present [his case] to the judge or jury himself." Id.

Here, the complexities of this case do not exceed Karow's abilities to litigate his claims. Karow does not need an expert witness to show that he had a serious medical condition because defendants concede that Karow's condition **[*11]** was serious. Dkt. 58, at 11.

Karow argues that he needs an attorney to prove defendants' deliberate indifference. An attorney could obtain an expert's testimony on accepted professional standards. But given a large number of pro se litigants seeking counsel, the court cannot recruit counsel for every pro se plaintiff who asserts a deliberate indifference claim. And, as discussed below, Karow cannot prevail on his theory that the Medical Defendants should have used diagnostic tests to identify his MRSA infection sooner: that decision is "a classic example of a matter for medical judgment," which is insufficient to show deliberate indifference. Harper v. Santos, 847 F.3d 923, 928 (7th Cir. 2017) (per curiam) (quoting Estelle v. Gamble, 429 U.S. 97, 107, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). An expert would, at most, "reiterate[] the standard for medical malpractice," Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 663 (7th Cir. 2016), so that testimony would be futile. Besides, the facts here are so one-sided that it is difficult to see how an expert would help Karow on any other theory.

Karow also argues that without counsel, he could not obtain unredacted copies of prison policies he sought in his motion to compel. This, too, is not a reason for recruiting him counsel. I granted Karow's motion to compel and directed defendants to produce the requested prison policies subject **[*12]** to redactions. Dkt. 79, at 4. I also explained that if Karow continued to believe that he needed the unredacted portions, then he should explain why. *Id.* Karow has not done that here: he does not provide any reason why he needs the redacted portions of the policies. Not only that, defendants have submitted unredacted copies of the policies under seal for *in camera* review, along with a declaration of a security director who highlighted the security concerns for producing the unredacted copies. I conclude that the redacted portions of the policies do raise security concerns, so it is appropriate to withhold them from Karow himself. But I also conclude that they are not relevant to Karow's claims, so I would not have ordered defendants to produce the unredacted portions, even if Karow had had counsel.

I must also consider Karow's ability to litigate his claims. Karow has completed only a High School Equivalency Diploma. On the other hand, Karow has previous experience litigating without an attorney.[4] Karow has done a capable job of litigating this case so far. His summary judgment submissions—his affidavit, briefs, and proposed findings of fact—show that he can present his side of the facts **[*13]** and that he can conduct the essential legal research.

Accordingly, I will deny Karow's motion for the court's assistance in recruiting counsel.

## B. Karow's motion for judicial notice

Karow also asks the court to take judicial notice of several facts. I will grant his motion in part.

Federal Rule of Evidence 201 allows the court to take judicial notice at "any stage in a proceeding," including

---

[4] He has litigated Case No. 13-cv-798 before me. He also has two prior cases in the Eastern District of Wisconsin. Case Nos. 01-cv-679 and 99-cv-357. He has one case currently pending in the Eastern District. Case No. 17-cv-76.

the summary judgment stage. *Ochana v. Flores, 199 F. Supp. 2d 817, 831 (N.D. Ill. 2002)* (collecting cases). Under *Rule 201*, the court "must take judicial notice if a party requests it and the court is supplied with the necessary information." But *Rule 201* limits the scope of judicial notice to facts that are not subject to "reasonable dispute." *Fed. R. Evid. 201*. A fact is not subject to reasonable dispute if it "is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." *Fed. R. Evid. 201*; *accord Ennenga v. Starns, 677 F.3d 766, 774 (7th Cir. 2012)*.

Here, Karow asks that I take judicial notice of five facts:

> 1. Extra strength Mapap brand is used for temporary relief of minor aches and pains due to headache, muscle aches, backache, minor pain of arthritis, the common cold, toothache, premenstrual and menstrual cramps, and the temporary reduction **[\*14]** of fever.
> 2. Perrigo brand muscle rub is used for temporary relief of minor aches and pains associated with muscles, joints, simple backache, arthritis, strains, bruises, and sprains.
>
> 3. A cold pack, otherwise known as cold compress, is a bag, cloth, or sheet that is soaked with water or filled with something cold and applied to the body to relieve *minor* pain and inflammation.
> 4. That methicillin-restraint Staphylcoccus aureus (MRSA) is a disease that is potentially fatal if left undiagnosed or untreated.
> 5. Using mechanical restraints, such as metal leg irons and metal handcuffs, to restrain a person to a stationary, unmovable object creates an unreasonable risk of serious harm to the person being so restrained.

Dkt. 107, at 2-3 (emphasis added). I will take judicial notice of the first two facts: Karow has submitted photographs of labels on the two medicines that support his proposed findings. Dkt. 107-1 and Dkt. 107-2. I will also accept as true the fourth because there is no genuine dispute that MRSA is a serious condition, as defendants concede in their summary judgment brief. Dkt. 58, at 11.

I will deny his motion as to the other facts. As for the third fact, he relies on the Webster **[\*15]** College Dictionary's definition, but he altered the definition of a cold-pack to refer only to *minor* pain. As for the fifth, it is not a judicially noticeable fact. It is, rather, the central

legal issue in the case, which I will decide on the basis of the evidentiary submissions of the parties, viewed in light of cases applying the *Eighth Amendment*.

Accordingly, I will accept as true the first, second, and fourth proposed facts. I will consider them in addition to Karow's proposed findings of fact and his other summary judgment submissions.

## C. Defendants' motion for summary judgment

Defendants move for summary judgment on all of Karow's claims. A court must grant summary judgment when no genuine issue of a material fact exists and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Although the court must view the evidence in a light most favorable to the nonmoving party, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Asserted facts must be supported by admissible evidence, and a genuine issue of a material fact "arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for **[\*16]** that party." *Springer v. Durflinger, 518 F.3d 479, 483 (7th Cir. 2008)*. Inferences that rely on speculation or conjecture do not suffice. *Stephens v. Erickson, 569 F.3d 779, 786 (7th Cir. 2009)*.

Karow asserts four sets of claims:

> 1. deliberate-indifference claims against the Medical Defendants for denying Karow adequate medical care;
> 2. conditions-of-confinement claims against the Security Defendants for inappropriately shackling Karow "around the clock" during his stay at St. Joseph's Hospital;
> 3. conditions-of-confinement claims against the Supervisor Defendants for directing Security Defendants to shackle Karow "around the clock" during his stay at St. Joseph's Hospital; and
> 4. official-capacity claims against the Wardens for implementing and enforcing unconstitutional shackling policy.

I consider each set of claims in turn.

## 1. Deliberate-indifference claims for inadequate medical care

The Constitution does not entitle inmates to "comfortable prisons," but "inhumane" prison conditions violate the *Eighth Amendment's* prohibition against cruel and unusual punishment. *Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)* (quoting *Rhodes v. Chapman, 452 U.S. 337, 349, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981))*. Conditions-of-confinement claims have many variations, including a deliberate-indifference claim for denial of medical care. *See Rasho v. Elyea, 850 F.3d 318, 2017 WL 892500, at *4 (7th Cir. 2017)*. A deliberate-indifference claim for denial of medical care requires a plaintiff to prove two elements: (1) the **[*17]** plaintiff "suffered from an objectively serious medical condition"; and (2) the defendant was "deliberately indifferent to that condition." *Id.* The Medical Defendants concede that Karow's MRSA infection was a serious condition, so the remaining question is whether the Medical Defendants were deliberately indifferent.

Deliberate indifference requires that a defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer, 511 U.S. at 837*. A plaintiff need not show that a defendant "literally ignored" the risk, *Conley v. Birch, 796 F.3d 742, 748 (7th Cir. 2015)* (citation omitted), and the fact that a plaintiff received "some" medical treatment does not preclude a deliberate indifference claim. *See Petties v. Carter, 836 F.3d 722, 729 (7th Cir. 2016)* (en banc). On the other hand, medical malpractice is not deliberate indifference. *McGee v. Adams, 721 F.3d 474, 481 (7th Cir. 2013)*. As the Seventh Circuit has explained,

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor **[*18]** is entitled to summary judgment.

*Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir. 2016)* (quoting *Zaya v. Sood, 836 F.3d 800, 805-06, 2016 WL 4621045, at *3 (7th Cir. 2016))*.

The Seventh Circuit recently provided guidance on several non-exclusive ways in which a plaintiff could show deliberate indifference to a serious medical condition. One way is to show that a medical professional's chosen treatment "departs radically from accepted professional practice," such that the defendant did not base the treatment decision on any professional judgment at all. *Diggs v. Ghosh, No. 16-1175, 850 F.3d 905, 2017 U.S. App. LEXIS 4371, 2017 WL 957201, at *3 (7th Cir. Mar. 13, 2017)* (quoting *Zaya, 836 F.3d at 805*). Another is to show that the defendant chose "easier and less efficacious treatment." *Petties, 836 F.3d at 730*; *Rasho, 850 F.3d 318, 2017 WL 892500, at *5*. Yet another is to show "inexplicable delay" in providing medical treatment. *Petties, 836 F.3d at 730*.

Here, Karow's case has elements of each method of proof, but mainly he pursues the first way: he contends that the Medical Defendants' decisions departed so radically from the accepted professional standards that they did not base their treatment decisions on professional judgment.

### a. Nurses Heyde and Scherreiks

Karow contends that Heyde and Scherreiks completely disregarded Karow's complaints about pain, but this is completely refuted by the evidence. When Karow visited these defendants at HSU, they each examined him, attempted to manage his pain, and referred him to a doctor. As for Heyde, **[*19]** although she could not prescribe medication, she did what she could as a nurse: conducting a physical examination, referring him to a doctor, telling him to visit HSU again if there was no improvement, issuing various items she thought would alleviate his pain, such as a heat bag and an extra pillow, and ensuring that he had some pain medication. As for Scherreiks, the second nurse who saw Karow, she consulted with the on-call doctor, and based on that consultation, advised Karow, among other things, to take Tylenol 325 mg and gave him crutches. She also scheduled an appointment with a doctor to take place at HSU in two days. In light of these facts, no reasonable jury could find, as Karow alleges, that Heyde and Scherreiks flat-out ignored Karow's complaints about pain.[5]

Karow also insists that Heyde and Scherreiks should

---

[5] And any reasonable jury would find that Karow's characterization of "disabling pain," Dkt. 113, at 12-13, is exaggerated. Even though he argues that his pain "escalat[ed]" between his first visit (one with Heyde) and his visit (one with Scherreiks) on the same day, it is undisputed that during his second visit at HSU, he told Scherreiks that even his escalated pain was "tolerable" and that the pain was not "bad" when sitting. Dkt. 59, ¶ 27 and Dkt. 117, ¶ 27.

have conducted diagnostic tests to ascertain his problem. But the parties agree that nurses at SCI could not order diagnostic tests and that these defendants instead arranged Karow to see a doctor who could order diagnostic tests. Besides, even if nurses could order diagnostic tests, whether they should have used certain diagnostic techniques is "a classic example [*20] of a matter for medical judgment," which is not deliberate indifference. *Harper, 847 F.3d at 928* (quoting *Estelle, 429 U.S. at 107*).

### b. Doctor Hannula

Claims against Hannula fail for similar reasons. Karow had three separate encounters with Hannula within the span of four days: on April 26, April 27, and April 29, 2010. Karow contends that Hannula "ignored" his pain and should have performed diagnostic tests to detect his MRSA infection. Dkt. 75, at 17-19 and Dkt. 113, at 15-16.

But Hannula did not ignore Karow's pain. She did, in fact, examine Karow, exercised her professional judgment, and diagnosed Karow's problem. She just didn't get it right—at least not as fast as Karow thinks she should have. Hannula initially thought that the source of Karow's pain was his quadriceps based on his complaints about pain and his medical record. She prescribed him Vicodin and Cyclobenzaprine, recommended massage, heat, and quadriceps stretches, and referred him to a physical therapist to see if a therapy that would help. And during her last encounter with Karow on April 29, she observed signs of infection and concluded that he needed treatment at an outside facility. She transferred him right away to an emergency room. Karow argues that Hannula [*21] should have conducted diagnostic tests to identify his MRSA infection earlier. But again, this is a prototypical medical determination that falls short of being a cruel and unusual punishment. *Harper, 847 F.3d at 928* (quoting *Estelle, 429 U.S. at 107*).[6]

Hannula initially misdiagnosed Karow by concluding that he had a problem with his quadriceps, as opposed to a MRSA infection. But no reasonable jury could find that Hannula ignored Karow's pain or that she was otherwise deliberately indifferent to his serious medical need.

### c. Anderson and Nelson-Bobb

Anderson and Nelson-Bobb argue that they had no personal involvement in treating Karow. As for Anderson, while her summary judgment motion was pending, Karow amended his complaint to substitute Anderson with Scherreiks. Dkt. 79, at 2. I granted Karow's motion to amend, so Anderson is dismissed. *Id.*

As for Nelson-Bobb, the parties dispute whether she saw Karow at all. Karow initially did not identify the physical therapist who attempted to treat him, but he instead proceeded against Jane Doe and later identified Nelson-Bobb as the Jane Doe in his amended complaint. Dkt. 16, ¶ 1 and Dkt. 47, ¶¶ 95. Nelson-Bobb states that she would not have been at SCI on April 27, 2010, at 6:30 p.m., [*22] when Karow alleges to have seen her. This calls into question whether Nelson-Bobb was the physical therapist who saw Karow and what basis Karow had to name Nelson-Bobb as the therapist who saw him. But for purposes of summary judgment, I will assume that Nelson-Bobb was the one who saw Karow and adopt his version of the facts.

Karow contends that Nelson-Bobb is at fault for three reasons: (1) she ignored Karow's pain because she did not examine Karow's knee by using diagnostic tests before administering the electro-stimulation therapy; (2) she failed to refer Karow to a doctor after learning that the electro-stimulation therapy did not help him; and (3) she failed to document her treatment.[7] Karow fails to establish a viable claim against Nelson-Bobb under any of these bases.

The first two arguments lack merit because Karow was already being examined by Hannula. It is undisputed that a physical therapist at SCI does not examine a patient and that diagnosing a medical condition is a doctor's responsibility; Nelson-Bobb's role was limited to what a doctor had directed her to do, and she was not

---

[6] Karow appears to have had some oral altercation with Hannula. When Hannula recommended electric-stimulation therapy for Karow, he asked her how such therapy would be helpful. Hannula responded that Karow could either accept the treatment or refuse it and go back to his housing unit. Dkt. 47, ¶¶ 76-77. The fact that Hannula's words may have been unkind does not establish deliberate indifference. *See Harper, 847 F.3d at 928* (holding that a nurse laughing at a patient did not establish deliberate indifference).

[7] Karow is not claiming that Nelson-Bobb intentionally caused Karow pain by physical therapy. Dkt. 75, at 21 ("Nelson-Bobb was deliberately indifferent to the plaintiff's severe pain, not for the electro-stimulation therapy, but for ignoring the plaintiff's serious condition after the failed treatment.").

required to use diagnostic tests to identify the underlying problem. And Nelson-Bobb did not [*23] fail to refer Karow to a physician because he was already seeing one.

As for the third argument, that Nelson-Bobb failed to document her treatment, Karow relies on the Wisconsin Statutes. Dkt. 75, at 20 (citing *Wis. Stat. § 448.56(5)*). According to Karow, Nelson-Bobb had a statutory duty to maintain patient records. *Id.* But he has not shown how failure to keep records could constitute deliberate indifference under the *Eighth Amendment*. In any event, "a violation of state law is not a ground for a federal civil rights suit." *Guajardo-Palma v. Martinson, 622 F.3d 801, 806 (7th Cir. 2010)*.

### 2. Claims for unconstitutional restraints

Karow also challenges the constitutionality of the physical restraints on him at St. Joseph's Hospital. There, his right wrist and both of his ankles were shackled to his hospital bed. But he was free from his restraints at times: when he used the lavatory, he was unshackled, even though had leg irons; he was free from restraints during the medical procedures; and while being transported to medical appointments, he was in a wheelchair. So he was not quite shackled "around the clock" to his bed, as he initially alleged. Dkt. 47, ¶ 155.[8] The parties agree that Karow was not free from restraints until May 6, 2010, the day he left St. Joseph's Hospital.

Physical restrictions [*24] on one's liberty are an inevitable consequence of imprisonment. But the use of overly restrictive and unnecessary security measures, including physical restraints, can violate the *Eighth Amendment's* prohibition against cruel and unusual punishment. *Hope v. Pelzer, 536 U.S. 730, 737, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)*. A conditions-of-confinement claim challenging physical restraints is subject to the familiar deliberate-indifference analysis. *See Gruenberg v. Gempeler, 697 F.3d 573, 579 (7th Cir. 2012)*.[9]

---

[8] For the purposes of this opinion, I will presume that Karow's restraints were made out of metal that could cause him pain.

[9] There is some authority that suggests that physical restraints cases should be analyzed under the excessive force framework. *Young v. Martin, 801 F.3d 172, 177 (3d Cir. 2015)*. But the Seventh Circuit has assessed the constitutionality of physical restraints under the conditions-of-confinement

First, a plaintiff must show that the physical restraints are severe enough to amount to the deprivation of "the minimal civilized measure of life's necessities." *Gruenberg, 697 F.3d at 579 (7th Cir. 2012)* (quoting *Townsend v. Fuchs, 522 F.3d 765, 773 (7th Cir.2008))*. Examples of such extreme deprivation include: exposing the inmate to substantial risks of bodily harm without justification, inflicting unnecessary pain, causing unnecessary humiliation, or offending contemporary standards of human decency.[10] And "[t]he whole is sometimes greater than the sum of the parts: the cumulative effect of the indignities, deprivations, and constraints to which inmates are subjected determines whether they are receiving cruel and unusual punishment." *Bruscino v. Carlson, 854 F.2d 162, 166 (7th Cir. 1988)*. But in all cases, the deprivation caused by the physical restraints must be extreme to violate the *Eighth Amendment. See Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)* ("extreme deprivations are required to make out a conditions-of-confinement [*25] claim"); *Cunningham v. Eyman, 17 F. App'x 449, 453 (7th Cir. 2001)* (reasoning that shackling an inmate for 16 hours, four to five hours of which were spent in soiled clothing, is not so "extreme" as to satisfy the high threshold of the *Eighth Amendment*).

But the analysis does not end with the extent of restraint: the court must assess the challenged use of physical restraints "against the background of an extraordinary history of inmate violence and with proper regard for the limited competence of federal judges to micromanage prisons." *Bruscino, 854 F.2d at 165* (citation omitted). As the Seventh Circuit has explained, conditions of confinement "'reasonably related to a legitimate and non-punitive government goal,' are not unconstitutional." *Board. v. Farnham, 394 F.3d 469, 477 (7th Cir. 2005)* (quoting *Antonelli v. Sheahan, 81 F.3d*

---

framework. *See, e.g., Gruenberg, 697 F.3d at 579*; *Payette v. Hoenisch, 284 F. App'x 348, 352 (7th Cir. 2008)*; *Bruscino v. Carlson, 854 F.2d 162, 166 (7th Cir. 1988)*. And Karow pursues conditions-of-confinement claims.

[10] *Hope, 536 U.S. at 738* (shackling an inmate to a post for seven hours in the hot June Alabama sun, giving water only twice, with no bathroom break violates the **Eighth Amendment**); *Spain v. Procunier, 600 F.2d 189, 197 (9th Cir. 1979)* (chains around an inmate's neck was cruel and unusual because there was "no justification at all for requiring the prisoners to bear the visible burdens of neck chains during all visits to family, friends, and counsel"); *Villegas v. Metro. Gov't of Nashville, 709 F.3d 563, 574 (6th Cir. 2013)* (shackling a pregnant woman during labor when she posed no flight risk violates "contemporary standards of human decency.").

1422, 1427-28 (7th Cir. 1996)). And when it comes to security matters, courts must give prison administrators "wide-ranging deference in the adoption and execution of policies and practices." United States v. Tokash, 282 F.3d 962, 972 (7th Cir. 2002); see also Scarver v. Litscher, 434 F.3d 972, 976 (7th Cir. 2006).

A plaintiff must also establish that a defendant was "deliberately indifferent." Gruenberg, 697 F.3d at 579. As noted above, deliberate indifference means that the defendant both knew and disregarded the underlying deprivation. See Farmer, 511 U.S. at 837. For example, shackling an inmate for seven days without medical treatment, even after being alerted to the inmate's medical need by the hospital, could show [*26] that the defendant was deliberately indifferent. See Payette v. Hoenisch, 284 F. App'x 348, 352 (7th Cir. 2008) (citing Farmer, 511 U.S. at 837). Likewise, ignoring an inmate's complaints that a particular restraint caused him unnecessary pain could show deliberate indifference. See Stewart v. Special Adm'r of Estate of Mesrobian, 559 F. App'x 543, 548 (7th Cir. 2014) (holding that allegations that a security box placed over handcuffs caused pain for an inmate with carpal tunnel syndrome and bursitis stated an Eighth Amendment claim).

With these principles in mind, I now turn to Karow's claims.

**a. Security Defendants**

Karow contends that the Security Defendants violated his Eighth Amendment rights in two ways: (1) the shackles caused him pain, soreness, loss of appetite, difficulties sleeping, difficulties eating due to limited movement, and discomfort; and (2) by not releasing him from the shackles, the Security Defendants denied him personal hygiene. Dkt. 75, at 23 and Dkt. 113, at 20. Both theories fail.

To be clear, if the Security Defendants had placed shackles on Karow in a way that exacerbated his MRSA infection, interfered with his medical treatment, or caused unnecessary pain in his left knee that had just undergone surgery, Karow would have a much stronger claim. But that is not the case here. Such facts are conspicuously absent in his proposed findings of fact or declaration. [*27] So it is undisputed that his shackles did not interfere with his recovery from surgery.[11] And

even if he had adduced his own testimony to show that the shackles affected his left knee, no reasonable jury could believe it. While at St. Joseph's Hospital, the hospital staff visited Karow at least three times per day to monitor the condition in his left knee. The staff gathered various information from Karow, including whether he experienced pain. Karow never complained to the medical staff that the shackles caused him pain during his entire seven-day stay at the hospital. Not once.[12]

Karow's complaint is, then, based on pain, discomfort, and other effects of the shackles that did not affect his medical condition in his left knee. Those effects fall short of being so serious to be constitutional violations. The Security Defendants' failure to make him comfortable is not a cruel and unusual punishment. Hines v. Sheahan, 845 F. Supp. 1265, 1269 (N.D. Ill. 1994). The fact that Karow was a patient at a hospital makes little difference, so long as his recovery was unimpeded. See, e.g., Flores v. Sheriff of Cook Cty., No. 10-cv-8040, 2014 U.S. Dist. LEXIS 34863, 2014 WL 1031494, at *5 (N.D. Ill. Mar. 18, 2014) (being shackled to the bed and using a bed pan and urine collection device in place of a bathroom is not a constitutional [*28] violation).

Besides, the fact that he was receiving constant medical supervision shows that the Security Defendants were not deliberately indifferent. See May v. Trancoso, 412 F. App'x 899, 904 (7th Cir. 2011) (concluding that a corrections officer did not act with deliberate indifference to state prisoner's shoulder injury by leaving prisoner handcuffed despite his complaints of pain, where the prisoner received medical treatment before and after the cuffing). This constant monitoring of Karow's medical needs is the "antithesis of deliberate indifference." Harper, 847 F.3d at 927.

Yet another reason to grant summary judgment is that the use of shackles had a legitimate and non-punitive purpose. Although Karow posed a limited flight risk

---

[11] The only reference to knee pain is to the one caused by bending his knees while using the lavatory. Dkt. 78, ¶ 26 and

Dkt. 116, ¶ 43. Karow suggests that wearing leg irons while using the lavatory caused knee pain because the leg irons forced him to bend his knees. But people bend their knees while seating on toilets, so if Karow bent his knees, it is not because of his leg irons.

[12] The same is true for loss of appetite or difficulties sleeping. Karow denied having these symptoms to the hospital staff. Accordingly, his allegations that the shackles caused him pain, loss of appetite, and difficulties sleeping are blatantly contradicted by the record.

immediately after surgery, the possibility of escape is just one way that an inmate could pose a security threat. Other security concerns were apparent here: Karow had a history of violence and more than 50 disciplinary incidents during his incarceration; he was surrounded by civilians, including other patients at the hospital and the medical professionals who treated him; and the hospital was more than 30 minutes away from the prison, so the distance would have caused significant delay in response by the prison staff. Defendants **[*29]** had legitimate interests in securing an unruly inmate with a history of violence to prevent any incident involving the civilians at the hospital. Perhaps there might have been more comfortable options, such as special plastic handcuffs, as Karow argues. But minor discomforts do not amount to constitutional violations when the restraints are substantially justified by legitimate security concerns.

Karow's second theory is that the conditions of his confinement violated the *Eighth Amendment* because he was denied personal hygiene. Karow has not alleged any fact in his complaint that would put defendants on notice of this denial-of-hygiene theory; he raises it for the first time at the summary judgment stage, which is not the appropriate time. *See Anderson v. Donahoe, 699 F.3d 989, 997 (7th Cir. 2012)* ("[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" (quoting *Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002)*).

Even if I were to allow Karow to raise his eleventh-hour theory and treat his brief as an amendment to his complaint, his new theory runs into another problem: a temporary restriction on access to personal hygiene would not violate the *Eighth Amendment*. *See Harris v. Fleming, 839 F.2d 1232, 1236 (7th Cir. 1988)*; *Hardaway v. Meyerhoff, 734 F.3d 740, 744 (7th Cir. 2013)* (reasoning that limiting access to showers only once per week does not violate the **[*30]** *Eighth Amendment*). And Karow does not indicate that he was denied all access to hygiene for one week; he instead alleges only that the Security Defendants denied his "repeated requests" that he be allowed to brush his teeth or to bathe. Dkt. 75, at 23. Karow has failed to allege any hygiene-related deprivation that might plausibly violate the Constitution.

**b. Supervisor Defendants and Wardens**

According to Karow, the Supervisor Defendants directed the Security Defendants and enforced the unconstitutional shackling policy; the Wardens drafted and implemented the shackling policy. But because there is no underlying constitutional violation, the policy cannot be unconstitutional either. I will grant summary judgment as to these defendants as well.

CONCLUSION

For the foregoing reasons, I will deny Karow's motion for recruitment of counsel, grant his motion for judicial notice in part, and grant defendants' motion for summary judgment. No claim remains, and I will direct the clerk of court to enter judgment in favor of defendants and close the case.

ORDER

IT IS ORDERED that:

    1. Plaintiff's Thaddeus Jason Karow's motion for the court's assistance in recruiting counsel, Dkt. 82, is DENIED.

    2. Plaintiff's motion for **[*31]** the court to take judicial notice, Dkt. 107, is GRANTED in part and DENIED in part.

    3. Defendants' motion for summary judgment, Dkt. 57, is GRANTED.

    4. The clerk of court is directed to enter judgment in favor of defendants and close the case.

Entered March 30, 2017.

BY THE COURT:

/s/ JAMES D. PETERSON

District Judge

 Neutral

As of: August 31, 2018 6:35 PM Z

# *McWilliams v. Cook Cty.*

United States District Court for the Northern District of Illinois, Eastern Division

August 20, 2018, Decided; August 20, 2018, Filed

15 C 53

**Reporter**

2018 U.S. Dist. LEXIS 140276 *; 2018 WL 3970145

RAHIM McWILLIAMS, Plaintiff, vs. COOK COUNTY, TOM DART, RICKY L. COOPER, LOWELL L. DAHMEN, WILLIAM M. CROOK, GERARD J. MEYER, JASON B. CIANCIARULO, and DR. NAGIB M. ALI, Defendants.

**Prior History:** *McWilliams v. Cook County, 845 F.3d 244, 2017 U.S. App. LEXIS 232 (7th Cir. Ill., Jan. 5, 2017)*

## Core Terms

alleges, Jail, deliberate indifference, medical treatment, detainees', amended complaint, conditions of confinement, Amendment's, conditions, willful, quotation, hallway, marks, deliberately, indifferent, medical care, motion to dismiss, flooded, inmates, wanton conduct, survive, shoes, Immunity, parties, argues, wanton, statute of limitations, hazardous condition, pretrial detainee, state law claim

**Counsel:** **[*1]** For Rahim McWilliams, Plaintiff: Matthew Eric Marrone, PRO HAC VICE, McAndrews Held & Malloy, Chicago, IL; Paul W. McAndrews, McAndrews, Held & Malloy, Ltd., Chicago, IL.

For Cook County, Tom Dart, Sheriff of Cook County, Defendants: Danielle Mikhail, Megan Kelly McGrath, LEAD ATTORNEYS, Cook County State's Attorney Office, Chicago, IL; David Lee Bonner, LEAD ATTORNEY, Anthony E. Zecchin, Cook County State's Attorney's Office, Chicago, IL.

For Nagib M. Ali, Dr., William M. Crook, Sergeant, Gerald J. Meyer, Sergeant, Jason B. Cianciarulo, Sergeant, Defendants: Danielle Mikhail, LEAD ATTORNEY, Cook County State's Attorney Office, Chicago, IL; David Lee Bonner, LEAD ATTORNEY, Cook County State's Attorney's Office, Chicago, IL.

For Lowell L. Dahmen, Lieutenant, Defendant: Danielle Mikhail, LEAD ATTORNEY, Cook County State's Attorney Office, Chicago, IL.

For Service List: Illinois Department of Corrections, Chicago, IL.

**Judges:** Gary Feinerman, United States District Judge.

**Opinion by:** Gary Feinerman

# Opinion

### MEMORANDUM OPINION AND ORDER

Rahim McWilliams brings federal and state law claims arising from injuries he allegedly sustained while detained at Cook County Jail. Doc. 73. The case was reassigned to the undersigned judge's **[*2]** calendar earlier this year. Doc. 83. Seven of the eight defendants move under *Civil Rule 12(b)(6)* to dismiss the claims against them. Doc. 79. The motion is granted in part and denied in part.

### Background

In resolving a *Rule 12(b)(6)* motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC, 815 F.3d 1082, 1087 (7th Cir. 2016)*. The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in McWilliams's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am., 714 F.3d 1017, 1020 (7th Cir. 2013)* (internal quotation marks omitted). The facts are set forth as favorably to McWilliams as those materials allow. *See Pierce v. Zoetis, Inc., 818 F.3d 274, 277 (7th Cir. 2016)*. In setting forth those facts at the pleading

stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A., 610 F.3d 382, 384 (7th Cir. 2010)*.

## A. Factual Background

On January 30, 2013, while a pre-sentencing detainee at Cook County Jail, McWilliams was forced to walk through a basement hallway flooded with "several inches" of water to get to a court appearance. Doc. 73 at ¶¶ 1, 48, 51, 53, 58. "[W]orkers" were "attempting unsuccessfully **[*3]** to clear the water from the walkway." *Id.* at ¶ 57. In response to detainees' complaints that traversing the hallway would be dangerous, jail personnel threatened to revoke "basic privileges" if they refused to proceed. *Id.* at ¶¶ 55-56. McWilliams's hands were cuffed behind his back, and he was wearing jail-issued slip-on shoes "with a flat sole devoid of grip, particularly under such conditions." *Id.* at ¶¶ 58-59.

As he "attempt[ed] to walk up a gradual incline in the hallway that had standing water of several inches," McWilliams slipped and fell backward, hitting his right hand, right shoulder, and head. *Id.* at ¶¶ 60-62. He "could not stand up by himself," so an officer pulled him up. *Id.* at ¶ 63. McWilliams told the officer that he was in pain and "seeing stars" and needed medical attention, but the officer told him to continue to his court hearing and that treatment would be considered later. *Id.* at ¶¶ 64-65.

By the time McWilliams arrived at a holding area to await his hearing, his right hand was swollen and numb, and he had a knot on his head. *Id.* at ¶¶ 66-68. Worried that he had broken his hand, McWilliams raised his concerns with another officer, who told him that he needed to **[*4]** attend his hearing before receiving medical treatment. *Id.* at ¶ 69. McWilliams then was required to wait with his injured hand and soaked uniform for up to ninety minutes before his hearing. *Id.* at ¶ 70. His repeated requests for help and to speak with a supervisor were met with the same answer: court first, medical treatment later. *Id.* at ¶ 72. After his hearing, he had to wait for a shift change before being taken to Cermak Hospital. *Id.* at ¶ 76.

At Cermak, Defendant Dr. Nagib M. Ali diagnosed McWilliams with a broken hand and told him that he would grant a "medical hold" preventing his transfer to another facility "until his injuries were properly treated." *Id.* at ¶ 79. Ali "stated that proper treatment was unavailable at [Cermak] because of limited resources,

so [he] fashioned ... a hand-made, plaster cast ... without setting the bone" and told McWilliams that he needed to see a specialist. *Id.* at ¶¶ 80-81.

Two days later, McWilliams was transferred to Stateville Correctional Center. *Id.* at ¶ 82. There, officers and nurses had to recast his plaster cast every two to three days. *Id.* at ¶ 83. One-and-a-half to two months after his injury, and after a second transfer, McWilliams was **[*5]** finally sent to a specialist, who determined that "too much time had passed since the injury, and that it was too late to fix it without re-breaking and re-setting the hand, which would require complex surgery that the prison would not approve." *Id.* at ¶¶ 84-88.

During this time frame, McWilliams filed four grievances, including one with Cook County Jail the day of his injury. *Id.* at ¶¶ 34-47. He also sent a letter to the Jail in February 2013, forwarding a second grievance he had submitted to Stateville. *Id.* at ¶¶ 36-37.

## B. Procedural Background

On January 5, 2015, McWilliams filed his original complaint *pro se*, along with an application to proceed *in forma pauperis*. Docs. 1, 3. He named as defendants the "Department of Cook County Jail," "N.R.C. Stateville CC," and "Illinois Department of Correction." Doc. 1 at 1. In the "title" and "place of employment" fields for "Department of Cook County Jail," he listed "Doctor & correctional officers" and "Health care unit & division one & five." *Id.* at 2. On January 27, 2015, McWilliams filed an amended complaint, naming the same defendants but expanding on the "title" and "place of employment" fields for "Department of Cook County Jail" to include "Director/Doctor/Correctional **[*6]** officers" employed by "Department of Cook County Jail/Cermack healthcare/Cook County Jail." Doc. 4 at 3.

The court denied McWilliams's *in forma pauperis* application, Doc. 5 (Der-Yeghiayan, J.), and also his renewed application, Doc. 9 (Der-Yeghiayan, J.). The Seventh Circuit vacated and remanded. *McWilliams v. Cook Cnty., 845 F.3d 244 (7th Cir. 2017)*. On remand, the court granted McWilliams's *in forma pauperis* application and recruited counsel, who has discharged his obligations admirably. Doc. 40 (Der-Yeghiayan, J.). On April 28, 2017, McWilliams filed his second amended complaint, naming as defendants "Cook County, Thomas J. Dart (the Sheriff of Cook County) and John Doe Nos. 1-22, employees and officials of Cook County Sheriff's Department, Cermak Health Services, the Illinois Department of Corrections, and/or

Wexford Health Services, Inc." Doc. 56.

After conducting discovery to identify the John Does, McWilliams filed his third amended complaint, which is the operative complaint here. Doc. 73. That complaint again names Cook County and Dart as defendants, and it adds Commander Ricky L. Cooper, Lieutenant Lowell L. Dahmen, Sergeant William M. Crook, Sergeant Gerard J. Meyer, Sergeant Jason B. Cianciarulo, and Ali. The complaint asserts **[*7]** claims under *42 U.S.C. § 1983* and state law based on the alleged conditions of McWilliams's confinement, his alleged injury, and the alleged failure to provide adequate medical care.

### Discussion

Cook County, Dart, Ali, Meyer, Cianciarulo, Crook, and Dahmen (but not Cooper) move to dismiss the claims against them. Docs. 79, 94. The motion asserts five grounds for dismissal. First, Defendants contend that the *§ 1983* claims against the defendants not named until the third amended complaint are barred on limitations grounds. Doc. 79 at 3-6. Second, Defendants argue that McWilliams fails to plead sufficient facts to maintain a *§ 1983* claim based on the flooded hallway. *Id.* at 7-8. Third, Defendants contend that the *Illinois Tort Immunity Act ("TIA"), 745 ILCS 10/1-101 et seq.*, shields them from liability on the state law claims. Doc. 79 at 8-9. Fourth, Dart argues that certain claims against him should be dismissed because the complaint fails to allege facts sufficient to establish that he was personally involved and because he is not responsible for detainees' medical treatment. *Id.* at 9-11. Fifth, Ali argues that McWilliams fails to state a plausible claim against him for providing inadequate medical treatment. *Id.* at 11-13.

### I. Statute of Limitations for the *§ 1983* Claims

Defendants **[*8]** first contend that the *§ 1983* claims against the six individual defendants not named until the third amended complaint are time-barred. Doc. 79 at 3-6. "When a defendant charges noncompliance with the statute of limitations, dismissal under *Rule 12(b)(6)* is irregular, for the statute of limitations is an affirmative defense." *Chi. Bldg. Design, P.C. v. Mongolian House, Inc., 770 F.3d 610, 613 (7th Cir. 2014)* (brackets and internal quotation marks omitted). Because "complaints need not anticipate and attempt to plead around defenses," *United States v. N. Tr. Co., 372 F.3d 886, 888 (7th Cir. 2004)*, dismissal on limitations grounds is

appropriate only when it is clear from the face of the complaint that the claim is time-barred, *see Chi. Bldg. Design, 770 F.3d at 614*.

A two-year statute of limitations governs the *§ 1983* claims. *See Woods v. Ill. Dep't of Children & Family Servs., 710 F.3d 762, 768 (7th Cir. 2013)*. Defendants concede that McWilliams filed the original and first amended complaints within the limitations period. Doc. 94 at 3. Defendants argue, however, that the *§ 1983* claims against the defendants newly named in the operative complaint are time-barred because they were first named more than four years after McWilliams's alleged injury. Doc. 79 at 3.

The limitations issue turns on whether the claims against those defendants relate back to the initial complaint, or even to the first amended complaint, under *Rule 15(c)(1)(C)*. The Rule provides that an amended complaint relates **[*9]** back to the date of an earlier complaint when

> the amendment changes the party or the naming of the party against whom a claim is asserted, if *Rule 15(c)(1)(B)* is satisfied and if, within the period provided by *Rule 4(m)* for serving the summons and complaint, the party to be brought in by amendment:
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

*Fed. R. Civ. P. 15(c)(1)(C)*. Defendants do not argue that the new defendants suffered prejudice within the meaning of *Rule 15(c)(1)(C)(i)*, so only *Rule 15(c)(1)(C)(ii)* is at issue.

For some time, the Seventh Circuit adhered to the so-called John Doe rule, which provided that "'relation back' on grounds of mistake concerning the identity of the proper party does not apply where the plaintiff simply lacks knowledge of the proper defendant." *Hall v. Norfolk S. Ry. Co., 469 F.3d 590, 596 (7th Cir. 2006)* (some internal quotation marks omitted). The landscape changed with *Krupski v. Costa Crociere S.p.A., 560 U.S. 538, 130 S. Ct. 2485, 177 L. Ed. 2d 48 (2010)*, which held that "relation back under *Rule 15(c)(1)(C)* depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading." *Id. at 541*.

As the Seventh Circuit later explained, *Krupski* **[*10]**

> changed what we and other courts had understood ... to be the proper standard for deciding whether an amended complaint relates back to the date of the filing of the original complaint. We had thought the focus should be on what the plaintiff knew or should have known ... .
>
> ... The only two inquiries that the district court is now permitted to make in deciding whether an amended complaint relates back to the date of the original one are, first, whether the defendant who is sought to be added by the amendment knew or should have known that the plaintiff, had it not been for a mistake, would have sued him instead or in addition to suing the named defendant; and second, whether, even if so, the delay in the plaintiff's discovering his mistake impaired the new defendant's ability to defend himself.

*Joseph v. Elan Motorsports Techs. Racing Corp., 638 F.3d 555, 559-60 (7th Cir. 2011)*.

The key question here is whether the John Doe rule survived *Krupski*. The Seventh Circuit has not expressly addressed this question, and courts in this District have reached opposite conclusions. *See Cheatham v. City of Chicago, 2016 U.S. Dist. LEXIS 147292, 2016 WL 6217091, at *3 (N.D. Ill. Oct. 25, 2016)* ("Courts in this district disagree on whether lack of knowledge of a defendant's identity counts as a mistake post-*Krupski*.") (citing cases); *White v. City of Chicago, 2016 U.S. Dist. LEXIS 107438, 2016 WL 4270152, at *17 (N.D. Ill. Aug. 15, 2016)* (citing cases). The undersigned judge previously concluded **[*11]** that the John Doe rule did not survive *Krupski, see Clair v. Cook Cnty., 2017 U.S. Dist. LEXIS 56355, 2017 WL 1355879, at *3-4 (N.D. Ill. Apr. 13, 2017)*, and adheres to that view here. *Accord, e.g., Bagley v. City of Chicago, 2018 U.S. Dist. LEXIS 123754, 2018 WL 3545450, at *3 (N.D. Ill. July 24, 2018)* (holding that the John Doe rule did not survive *Krupski*); *Hawks v. Gade, 2018 U.S. Dist. LEXIS 80587, 2018 WL 2193197, at *4 (N.D. Ill. May 14, 2018)* (same); *Haroon v. Talbott, 2017 U.S. Dist. LEXIS 158522, 2017 WL 4280980, at *6 (N.D. Ill. Sept. 27, 2017)* (same).

Under *Krupski* and *Joseph*, the court must limit its inquiry under *Rule 15(c)(1)(C)(ii)* to what the new defendants knew or should have known. *See Krupski, 560 U.S. at 553-54* ("[T]he question under *Rule 15(c)(1)(C)(ii)* is what the prospective defendant reasonably should have understood about the plaintiff's intent in filing the original complaint against the first defendant."); *Joseph, 638 F.3d at 559-60* (limiting analysis under *Rule 15(c)(1)(C)(ii)* to "whether the defendant who is sought to be added by the amendment knew or should have known that the plaintiff, had it not been for a mistake, would have sued him instead or in addition to suing the named defendant"). McWilliams argues that his grievances, original complaint, and first amended complaint all provided enough detail about the events, and the jail and Cermak officials involved, that the newly added defendants knew or should have known that he intended in the complaint and first amended complaint to sue them. Doc. 93 at 9-10. Because nothing in the pleadings compels a contrary conclusion, the court cannot resolve the *Rule 15(c)(1)(C)(ii)* issue in the new defendants' favor on a *Rule 12(b)(6)* motion. **[*12]** *See Hawks, 2018 U.S. Dist. LEXIS 80587, 2018 WL 2193197, at *4-5* (denying a motion to dismiss on this ground, and noting that evidence "of what the newly added defendants knew about a plaintiff's lawsuit before they were added ... is rarely before the Court on a motion to dismiss"); *Clair, 2017 U.S. Dist. LEXIS 56355, 2017 WL 1355879, at *4* (similar); *Klinger v. City of Chicago, 2017 U.S. Dist. LEXIS 26653, 2017 WL 736895, at *6 (N.D. Ill. Feb. 24, 2017)* (holding that the defendant "is not entitled to dismissal of the complaint at this stage of the proceedings on the basis of the statute of limitations having run" because what the defendant "knew or should have known ... cannot in any event be answered on the pleadings"); *Ryan v. City of Chicago, 2016 U.S. Dist. LEXIS 154357, 2016 WL 6582570, at *2 (N.D. Ill. Nov. 7, 2016)* ("Because these developments require the Court to consider what the Unknown Officers knew concerning Ryan's suit, the Court denies the City's motion [to dismiss] at this time and awaits ... a more developed record before making a determination on the statute of limitations issues raised here.").

## II. *Section 1983* Conditions of Confinement Claim

McWilliams alleges under *§ 1983* that Defendants were deliberately indifferent to a dangerous condition of confinement—the flooded hallway—in violation of the *Fourteenth Amendment's Due Process Clause*. Doc. 73 at ¶¶ 111-21. Defendants argue that this claim should be dismissed because the alleged condition was not sufficiently dangerous to give rise to a constitutional violation. Doc. 79 at 7-8. They further **[*13]** argue that they cannot have been deliberately indifferent because "workers" were "on the site attempting to resolve the flood issues" at the time of McWilliams's injury. *Ibid.*

Because McWilliams was a pre-sentencing detainee and not an inmate, his conditions of confinement claim arises under the *Fourteenth Amendment's Due Process Clause* rather than the *Eighth Amendment's Cruel and Unusual Punishment Clause*, which under Seventh Circuit law applies only to prisoners who have been convicted and sentenced. *See Lewis v. Downey, 581 F.3d 467, 474 (7th Cir. 2009)* (holding that a pre-sentencing detainee's "*Eighth Amendment* rights had not yet vested," making "his status ... analogous to that of a pretrial detainee"). That distinction had long been of little consequence, as the Seventh Circuit for quite some time "typically assessed pretrial detainees' [due process] claims under the *Eighth Amendment's* standards, reasoning that pretrial detainees are entitled to at least that much protection." *Miranda v. Cnty. of Lake, ___ F.3d ___, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at *9 (7th Cir. 2018).*

The Supreme Court disturbed that state of affairs in *Kingsley v. Hendrickson, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015)*, which held that the due process standard for excessive force claims by pretrial detainees is less demanding than the *Eighth Amendment* standard for excessive force claims by convicted inmates. *See id. at 2475*. The Seventh Circuit recently held in *Miranda* that *Kingsley*'s logic applies as well to medical treatment claims. *Miranda, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at *11* ("[M]edical-care claims brought **[*14]** by pretrial detainees under the *Fourteenth Amendment* are subject only to the objective unreasonableness inquiry identified in *Kingsley*."). In turn, *Miranda*'s logic reaches the broader genus of conditions of confinement claims, of which medical treatment claims are merely a species. *See Wilson v. Seiter, 501 U.S. 294, 303, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)* ("[W]e see no significant distinction between claims alleging inadequate medical care and those alleging inadequate 'conditions of confinement.' Indeed, the medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates."); *Miranda, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at *9-10* (finding persuasive a Second Circuit case extending *Kingsley* to conditions of confinement cases, and citing *Wilson* for the proposition that "medical care is a condition of confinement"); *2018 U.S. App. LEXIS 22229, [WL] at *11* ("[T]he Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees.... We see nothing in the logic the Supreme Court used in *Kingsley* that would support this kind of dissection of the different types of claims that arise under the *Fourteenth Amendment's Due Process Clause*.").

Under *Kingsley* and *Miranda*, then, a plaintiff states **[*15]** a *Fourteenth Amendment* conditions of confinement claim by alleging that (1) the defendant "acted purposefully, knowingly, or perhaps even recklessly" and (2) the defendant's conduct was objectively unreasonable. *See Miranda, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at *12*. Unlike in the *Eighth Amendment* context, deliberate indifference—the defendant's subjective awareness that her conduct was unreasonable—is not required. *See 2018 U.S. App. LEXIS 22229, [WL] at *9-12*.

*Miranda* had not yet been decided when the parties briefed this motion, so they did so on the understanding that McWilliams needed to allege deliberate indifference to proceed with his conditions of confinement claim. Doc. 79 at 7-8; Doc. 93 at 11-13; Doc. 94 at 4. As shown below, McWilliams states a claim even under the *Eighth Amendment's* deliberate indifference standard, so it necessarily follows that he also states a claim under the *Fourteenth Amendment's* less demanding objective unreasonableness standard. *See Miranda, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at *9*.

## A. Hazardous Condition

The Constitution protects detainees from hazardous conditions of confinement. *See Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*; *Pyles v. Fahim, 771 F.3d 403, 408-09 (7th Cir. 2014)*. To state such a claim, McWilliams must allege that Defendants exposed him to "a... condition that presented an objectively, sufficiently serious risk of harm." *Pyles, 771 F.3d at 409*. "Sufficiently serious" in this context means that the condition posed "a substantial risk of serious harm." *Farmer, 511 U.S. at 834*. "Prisons **[*16]** are not required to provide a maximally safe environment, but they must address easily preventable, observed hazards that pose a significant risk of severe harm to inmates." *Anderson v. Morrison, 835 F.3d 681, 683 (7th Cir. 2016)* (internal quotation marks and citation omitted).

Defendants correctly observe that "slippery surfaces and shower floors in prisons, *without more*, cannot constitute a hazardous condition of confinement." *Pyles, 771 F.3d at 405, 410* (emphasis added) (holding that stairs located near showers that became "dangerously

slick from water tracked by the inmates' shower shoes" were not sufficiently serious under the *Eighth Amendment*). But McWilliams has alleged more. A hallway flooded with "several inches of water" and used to access the courthouse, Doc. 73 at ¶¶ 51, 58, is a far cry from a wet staircase used to access the showers. Add to the flood the facts that McWilliams's shoes were not suited for the terrain, that his hands were cuffed behind his back, and that the hallway contained a gradual incline, *id.* at ¶¶ 58-60, and this case looks much like *Anderson*, where the Seventh Circuit held that a prisoner stated an *Eighth Amendment* claim by alleging that he was forced "to walk handcuffed and unaided down stairs needlessly strewn with easily removable milk, food, and garbage." **[*17]** *835 F.3d at 683* (distinguishing *Pyles* on the ground that the stairs there "were unavoidably wet" because "the water on inmates' shower shoes inevitably tracked onto the exit stairway").

To be sure, this case differs from *Anderson* in one respect: There, the substances that made the stairs dangerous were "easily removable," and the defendants had simply failed to remove them. *Ibid.* Here, by contrast, workers "attempt[ed] unsuccessfully" to drain the hallway, Doc. 73 at ¶ 57, and Defendants suggest that there was no viable alternative route because "the normal pathway to the courthouse" had been condemned, Doc. 94 at 4; Doc. 73 at ¶¶ 49-51. Nonetheless, McWilliams adequately alleges that the dangerous condition was "easily preventable," *Anderson, 835 F.3d at 683*, for even if the water could not have been drained, "several" of the detainees "complained of the dangerous conditions" and "suggested a different route." Doc. 73 at ¶¶ 54-55. McWilliams also alleges that Defendants could have mitigated the danger by "providing [the detainees] with better shoes for the conditions or allowing them to keep their hands in front[] for additional stability." *Id.* at ¶ 116. Thus, with his allegations deemed true and all reasonable inferences **[*18]** drawn in his favor, McWilliams alleges a sufficiently serious condition for his conditions of confinement claim.

## B. Subjective Component

To state a viable claim under the deliberate indifference standard—and if he does that, he certainly can meet the less demanding due process standard—McWilliams also must allege that Defendants "acted with a sufficiently culpable state of mind." *Pyles, 771 F.3d at 409*. One way to do so is by "asserting that the [defendant] knew about the hazardous condition and turned a blind eye to it." *Ibid.* (internal quotation marks omitted).

Defendants incorrectly argue that their attempt to drain the hallway precludes a finding of deliberate indifference. Properly understood, the hazardous condition underlying McWilliams's claim is not the mere fact of the flood, but rather that he was forced to walk through it in tractionless shoes, on an incline, with his hands cuffed behind his back. The alleged deliberate indifference occurred when, faced with detainees' concerns about the danger and suggestions of a different route, Defendants ordered them to continue through the hallway or lose basic privileges. Doc. 73 at ¶¶ 53-58, 116. It is accordingly not enough that workers were attempting **[*19]** to drain the water. If it were, then an official who ordered prisoners into a burning building would not be deliberately indifferent so long as firefighters were fighting the fire.

In sum, McWilliams has stated a *§ 1983* conditions of confinement claim.

## III. Immunity for State Law Claims

Immunity under the TIA operates as an affirmative defense, so Defendants "bear the burden of properly raising and proving their immunity under the Act." *Salvi v. Vill. of Lake Zurich, 2016 IL App (2d) 150249, 408 Ill. Dec. 889, 66 N.E.3d 894, 908 (Ill. App. 2016)*. *Section 2-202 of the TIA* provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." *745 ILCS 10/2-202*; see *Munizza v. City of Chicago, 222 Ill. App. 3d 50, 583 N.E.2d 561, 565, 164 Ill. Dec. 645 (Ill. App. 1991)* (noting that immunity does not extend to "(1) [a] public employee's acts based on corrupt or malicious motives or (2) [a] public employee's willful and wanton acts"); *Oleszczak ex rel. C.O. v. Ill. Dep't of Children & Family Servs., 2018 U.S. Dist. LEXIS 117786, 2018 WL 3428102, at *8 (N.D. Ill. July 16, 2018)*. *Section 4-105 of the TIA* provides immunity from liability "for injury proximately caused by the failure of [a public] employee to furnish or obtain medical care for a prisoner in his custody," but it too contains an exception for willful and wanton conduct. *745 ILCS 10/4-105* ("[T]his Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of **[*20]** immediate medical care and, through willful and wanton

conduct, fails to take reasonable action to summon medical care.").

The TIA defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." *745 ILCS 10/1-210*. As a general rule, "[w]hether conduct is willful and wanton is a factual question." *Carter v. Simpson, 328 F.3d 948, 951 (7th Cir. 2003)*; *see also Chelios v. Heavener, 520 F.3d 678, 693 (7th Cir. 2008)*. Still, a claim that depends on the alleged conduct's being willful and wanton may be dismissed if the pleadings make clear that the conduct was not willful and wanton. *See Doe v. Calumet City, 161 Ill. 2d 374, 641 N.E.2d 498, 506, 204 Ill. Dec. 274 (Ill. 1994)* (holding that allegations of willful and wanton conduct against defendants who did "nothing more than follow[] the orders of their superior officer" did not survive a motion to dismiss), *overruled in other part by Ries v. City of Chicago, 242 Ill. 2d 205, 950 N.E.2d 631, 351 Ill. Dec. 135 (Ill. 2011)*.

Defendants argue that the TIA immunizes them from liability on the state law claims because McWilliams "does not provide any facts to support that Defendants acted willfully and wantonly." Doc. 79 at 8-9. That argument is incorrect. The gravamen of this suit is that Defendants, disregarding complaints about the danger, forcibly marched **[*21]** McWilliams through a flooded hallway and up an incline, with his hands cuffed behind his back and while he was wearing tractionless shoes, and that when he fell and suffered injuries, they ignored his need for medical care, failing even to have his broken hand set. At this stage of the case, the court must credit those allegations, which implicate the TIA's willful and wanton conduct exception. *See Payne ex rel. Hicks v. Churchich, 161 F.3d 1030, 1045-46 (7th Cir. 1998)* (holding that allegations "that the Sheriff knew that conditions in the city jail created a substantial risk of self-harm to [the plaintiff] and that the Sheriff nevertheless ordered his Deputy to place the prisoner there" satisfied the TIA's willful and wanton standard); *Doe, 641 N.E.2d at 505-06* (holding that the plaintiffs stated a claim for willful and wanton conduct by alleging that the defendant police officer was "in control at the scene," "was aware" of facts establishing that the plaintiffs were in danger, and "should have acted under these circumstances to protect [the plaintiffs], but did not because of fear of liability for property damage") (internal quotation marks omitted); *see also Pittman ex rel. Hamilton v. Cnty. of Madison, 746 F.3d 766, 781 (7th Cir. 2014)* ("The willful and wanton standard is

remarkably similar to the deliberate indifference standard.") (internal quotation **[*22]** marks omitted).

## IV. Dart

Dart argues that certain claims against him should be dismissed because McWilliams fails to plead sufficient facts to support an inference that he was personally responsible for McWilliams's injuries, Doc. 79 at 9-10, and because Dart is not responsible for detainees' medical treatment, which is provided by Cermak and not Cook County Jail, *id.* at 10.

## A. *Section 1983* Claims

*Section 1983* creates a cause of action based on personal liability and predicated upon fault; thus, "to be liable under *§ 1983*, an individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Vill. of Oak Park, 430 F.3d 805, 810 (7th Cir. 2005)* (internal quotation marks omitted). The mere fact that Dart holds a supervisory position is insufficient to establish liability, as the *respondeat superior* doctrine does not apply to *§ 1983* claims. *See Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001)*. "Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable." *Chavez v. Ill. State Police, 251 F.3d 612, 651 (7th Cir. 2001)* (brackets and internal quotation marks omitted). To be held liable under *§ 1983*, "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Ibid.* (internal **[*23]** quotation marks omitted); *see also Sides v. City of Champaign, 496 F.3d 820, 827 (7th Cir. 2007)* (similar). Some causal connection or affirmative link between the complained-of action and the official sued is necessary for *§ 1983* recovery. *See Hildebrandt v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003)*.

The complaint makes no specific allegations about Dart's knowledge or conduct; it alleges only that Dart, as the Cook County Sheriff, "is responsible for the Cook County Department of Corrections and the County's jail facilities." Doc. 73 at ¶ 31. In his brief opposing dismissal, McWilliams argues that "[i]t is inconceivable that the Sheriff who operates the facility is completely unaware of the general conditions of the jail." Doc. 79 at 14. Maybe so, but the key question here is Dart's involvement in the alleged conditions and events: the

flooded hallway, McWilliams's injury, and his subsequent medical treatment. *See Hildebrandt, 347 F.3d at 1039*. General allegations that Dart is responsible for jail facilities and not "completely unaware" of jail conditions are insufficient to plausibly suggest that he was personally involved in, or even aware of, the alleged circumstances giving rise to McWilliams's claims. *See Sanville, 266 F.3d at 740* (holding that the plaintiff failed to state a *§ 1983* claim against a warden and deputy warden because none of her allegations "suggest[ed] **[*24]** that the wardens were personally responsible for any deprivation" or that "they 'turned a blind eye' to any particular conduct of the remaining defendants"); *Zimmerman v. Tribble, 226 F.3d 568, 574 (7th Cir. 2000)* ("Although Zimmerman alleges that Hanks and Cohn oversaw others or established wrongful policies, there are no allegations that either of them was personally involved in the constitutional wrongdoing. Therefore, the claims against them were properly dismissed.").

The cases McWilliams cites are not to the contrary. In *Despenza v. Sheriff of Cook County, 2014 U.S. Dist. LEXIS 38171, 2014 WL 1246298 (N.D. Ill. Mar. 24, 2014)*, the plaintiff alleged that "Dart was personally involved in the formulation and implementation of policies involving wheelchair detainees and that he failed to implement such policies," directly resulting in the alleged constitutional deprivation. *2014 U.S. Dist. LEXIS 38171, [WL] at *1*. Here, by contrast, McWilliams relies on vague allegations that Dart was generally responsible for jail conditions, offering no specific link between Dart and his injury. Doc. 93 at 13-15. And while the court in *Crockwell v. Dart, 2013 U.S. Dist. LEXIS 179523, 2013 WL 6796788 (N.D. Ill. Dec. 23, 2013)*, relied on allegations about Dart's general knowledge of jail conditions in denying a motion to dismiss, it did so only because that knowledge mapped onto the plaintiff's claim of deliberate indifference to "systemic conditions" that caused his injury. *2013 U.S. Dist. LEXIS 179523, [WL] at *3*; *see* **[*25]** *also ibid.* ("[Plaintiff] also alleges that Dart learned from [earlier] litigation about the need for handicap-accessible toilets in Division 2."); *Smith v. Clinton Cnty. Sheriff, 2016 U.S. Dist. LEXIS 146152, 2016 WL 6143041, at *3 (S.D. Ill. Oct. 21, 2016)* ("Personal involvement of senior jail officials may be inferred where the plaintiff alleges potentially systemic, as opposed to clearly localized, constitutional violations.") (internal quotation marks omitted). This case, by contrast, does not present a systemic conditions claim. Finally, McWilliams cites *Armstrong v. Squadrito, 152 F.3d 564 (7th Cir. 1998)*, for the proposition that individual liability may flow from a

deliberately indifferent policy. Doc. 93 at 14-15. But he nowhere alleges that his injury resulted from "a deliberately indifferent policy" that Dart "personally devised," *152 F.3d at 581*, so *Armstrong* is of no help to him.

Thus, McWilliams has failed to state an individual capacity *§ 1983* conditions of confinement claim against Dart.

**B. Dart's Responsibility for Medical Treatment**

In response to McWilliams's state law claim alleging that Defendants breached their duty to provide him with "adequate medical care," Doc. 73 at ¶¶ 144-54, Dart argues that he was not responsible for medical treatment, Doc. 79 at 11. Again citing *Despenza* and *Smith*, McWilliams counters that Dart is responsible because **[*26]** "[c]aring for the[] wellbeing of inmates is a primary concern for the Sheriff." Doc. 93 at 15.

Although McWilliams brings this claim under state law, the parties treat it as subject to the deliberate indifference standard. The complaint alleges "deliberate indifference," Doc. 73 at ¶¶ 144-54, and the parties' briefs cite only *§ 1983* cases, Doc. 79 at 11; Doc. 93 at 15; Doc. 94 at 5. By embracing the proposition that the state law claim requires showing deliberate indifference, McWilliams has forfeited any argument to the contrary. *See G & S Holdings LLC v. Cont'l Cas. Co., 697 F.3d 534, 538 (7th Cir. 2012)* ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted).

Under federal law, deliberate indifference is a subjective standard that requires a sufficiently culpable state of mind, "something akin to criminal recklessness." *Norfleet v. Webster, 439 F.3d 392, 397 (7th Cir. 2006)*. The standard is satisfied only if the defendant had "subjective knowledge of the risk to [the plaintiff's] health and ... disregard[ed] that risk." *Thomas v. Cook Cnty. Sheriff's Dep't, 604 F.3d 293, 301 (7th Cir. 2010)*. Given this standard, the parties' dispute about whether detainees' medical **[*27]** care falls within Dart's purview is beside the point. McWilliams's barebones allegations that the "Cook County Health Defendants" "were aware" of McWilliams's injury and "showed a deliberate indifference" to his medical needs, Doc. 73 at ¶¶ 146, 152, do not plausibly suggest that Dart had personal,

subjective knowledge of the relevant events. Thus, McWilliams fails to state an individual capacity claim against Dart as to the state law medical treatment claim.


**V. Ali**

Finally, Ali contends that McWilliams fails to allege facts sufficient to support a claim against him for providing inadequate medical treatment. Doc. 79 at 11-13. As with McWilliams's conditions of confinement claim, his medical treatment claim arises under the *Fourteenth Amendment's Due Process Clause* and is subject to an objective reasonableness standard rather than the *Eighth Amendment's* deliberate indifference standard. *See Miranda, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at \*9-12*. Here, too, if McWilliams succeeds in alleging deliberate indifference, he necessarily states a claim under the *Fourteenth Amendment's* lower standard.

A detainee bringing a *§ 1983* medical treatment claim "must meet both an objective and a subjective component." *Pittman, 746 F.3d at 775-76*; *see Miranda, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at \*12* (noting that the objective unreasonableness inquiry still involves a state-of-mind component). First, "the harm that **[\*28]** befell the [detainee] must be objectively, sufficiently serious and a substantial risk to his or her health or safety." *Collins v. Seeman, 462 F.3d 757, 760 (7th Cir. 2006)*. Second, the detainee must allege that the defendants acted with "a legally requisite state of mind ... with respect to [their] physical acts." *Miranda, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at \*12* (quoting *Kingsley, 135 S. Ct. at 2472*) (characterizing the intent inquiry as whether the defendants "acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [the plaintiff's] case"). Ali contests only the second, subjective element. Doc. 79 at 11-13.

The deliberate indifference standard—which, as noted, is more than sufficient to satisfy the subjective element—requires "something akin to criminal recklessness" as to the risk of harm. *Norfleet, 439 F.3d at 397*; *see Miranda, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at \*9* ("The 'deliberate indifference' standard ... asks whether the official actually believed there was a significant risk of harm."). Neither medical malpractice, nor negligence, nor even gross negligence suffices. *See Johnson v. Doughty, 433 F.3d 1001, 1012-13 (7th Cir. 2006)*. For medical treatment to be deliberately indifferent, it must have been "so

inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." **[\*29]** *Collignon v. Milwaukee Cnty., 163 F.3d 982, 989 (7th Cir. 1998)*. Put another way, the treatment must have been "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet, 439 F.3d at 396*. If a "need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the obdurate refusal to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition." *Pyles, 771 F.3d at 412* (internal quotation marks omitted).

McWilliams adequately alleges that Ali was deliberately indifferent. The complaint alleges that Ali diagnosed McWilliams with a broken hand and told him that "proper treatment was unavailable at [Cermak Hospital] because of limited resources," that he needed to see a specialist, and that he would be granted a "medical hold" preventing his transfer to another facility until his injuries were treated. Doc. 73 at ¶¶ 79-81. Thus, McWilliams has alleged specific facts demonstrating that Ali knew he had a medical condition requiring specialized expertise. The complaint further alleges that Ali failed to implement the very course of treatment he thought necessary: Ali "fashioned ... a hand-made, plaster cast **[\*30]** ... without setting the bone," McWilliams was transferred to another facility two days later despite Ali's promise to ensure that he would not be, and he was not sent to a specialist until some two months after his injury. *Id.* at ¶¶ 80, 82-87. By the time McWilliams saw a specialist, so much time had passed that proper treatment would require "complex surgery" involving "re-breaking and re-setting the hand." *Id.* at ¶ 88. These facts raise the plausible inference that, contrary to his own professional judgment, Ali never actually referred McWilliams to a specialist or issued a medical hold. *See Petties v. Carter, 836 F.3d 722, 733 (7th Cir. 2016)* (en banc) (holding that evidence that the defendant refused to order the treatment recommended by a specialist could support a finding of deliberate indifference). That is enough to survive a motion to dismiss.


**Conclusion**

The motion to dismiss is granted in part and denied in part. The *§ 1983* claims and the state law medical treatment claim against Dart in his individual capacity

are dismissed with prejudice. Because Dart raised similar arguments in his motion to dismiss the second amended complaint, Doc. 65 at 7-10, it is safe to assume that McWilliams put forth his best effort in the operative complaint, **[*31]** and there accordingly would be no point in giving him another chance to replead. *See* *Agnew v. NCAA, 683 F.3d 328, 333-34, 347-48 (7th Cir. 2012)* (affirming the district court's denial of leave to file a second amended complaint, even though the claims had not previously been dismissed, because the plaintiffs "already had the opportunity to amend their complaint after being exposed to the [defendant's] arguments" via an earlier motion to dismiss); *Promote Innovation LLC v. Roche Diagnostics Corp., 793 F. Supp. 2d 1090, 1097 (S.D. Ind. 2011)* (denying leave to file a third amended complaint where the plaintiffs had twice been granted leave to amend "in the face of motions to dismiss," even though the earlier complaints had not been dismissed).

The remaining claims survive. Those include all claims against the defendants other than Dart. They also include the official capacity claims against Dart and the individual capacity state law conditions of confinement claim against Dart; Defendants' motion to dismiss does not address those claims against Dart, thus forfeiting any argument for their dismissal, at least for purposes of this motion. *See* *G & S Holdings, 697 F.3d at 538*. Defendants shall answer the surviving portions of the operative complaint by September 10, 2018.

August 20, 2018

/s/ Gary Feinerman

United States District Judge

✚ Positive
As of: August 31, 2018 6:31 PM Z

# *Miranda v. Cty. of Lake*

United States Court of Appeals for the Seventh Circuit

December 6, 2017, Argued; August 10, 2018, Decided

No. 17-1603

## Reporter

2018 U.S. App. LEXIS 22229 *; 2018 WL 3796482

ALFREDO MIRANDA, Administrator of Estate of Lyvita Gomes, Plaintiff-Appellant, v. COUNTY OF LAKE, et al., Defendants-Appellees.

**Prior History: [*1]** Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 12 C 4439 — Sharon Johnson Coleman, Judge.

*Gomes v. County of Lake, 178 F. Supp. 3d 687, 2016 U.S. Dist. LEXIS 45497 (N.D. Ill., Apr. 4, 2016)*

## Core Terms

Jail, detainees, suicide, Sheriff, deliberate indifference, pretrial detainee, staff, eat, medical care, days, district court, dehydration, defendants', records, rights, expert testimony, medical staff, state of mind, deliberately, notification, Starvation, monitoring, causation, consular, inaction, notified, punished, training, inmate, drink

## Case Summary

### Overview

HOLDINGS: [1]-In an action arising out of a detainee's death in county jail, the jail officials were properly dismissed because they were entitled to rely on the medical providers' professional judgments; [2]-The county sheriff was properly granted summary judgment on the estate's Monell claim because it had not shown that the sheriff was deliberately indifferent in enacting the jail's hunger-strike policy; [3]-Because it was not clearly established who, beyond the booking officer, had a duty to inform the detainee of her consular rights, the county defendants were entitled to qualified immunity on the estates' Vienna Convention claim; [4]-The estate was entitled to a new trial against the medical providers on its due process claim because the evidence was enough to support an inference that the delay in sending the detainee to the hospital resulted in her death, or at least lessened her chance of survival.

### Outcome

Judgment in favor of medical providers reversed and case remanded for new trial of estate's claim against them, as it related to detainee's death. Grant of summary judgment to county defendants affirmed.

## LexisNexis® Headnotes

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

### *HN1*[⬇] **Prisoner Rights, Medical Treatment**

When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention. Courts will not find a jail official to have acted with deliberate indifference if she reasonably relied on the judgment of medical personnel. On the other hand, if jail officials had reason to know that their medical staff were failing to treat or inadequately treating an inmate, liability is possible.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

### *HN2*[⬇] **Local Officials, Customs & Policies**

An Illinois sheriff has final policymaking authority over jail operations. He is thus a proper party for a claim under Monell, targeted at policies and customs that deprive inmates of their federal rights. Monell liability is possible even if no individual official is found

deliberately indifferent.

Civil Rights Law > ... > Immunity From
Liability > Local Officials > Customs & Policies

*HN3*[🔽] **Local Officials, Customs & Policies**

A single incident can be enough for Monell liability
where a constitutional violation was highly foreseeable.

International Law > Foreign & International
Immunity > Consuls & Diplomats

*HN4*[🔽] **Foreign & International Immunity, Consuls
& Diplomats**

The Vienna Convention on Consular Relations, art. 36,
Apr. 24, *1963, 21 U.S.T. 77, 596 U.N.T.S. 261*,
guarantees a foreign national the right to have her home
country's consular office notified when she is detained.

Civil
Procedure > ... > Pleadings > Complaints > Require
ments for Complaint

*HN5*[🔽] **Complaints, Requirements for Complaint**

Complaints need not plead legal theories.

International Law > Foreign & International
Immunity > Consuls & Diplomats

*HN6*[🔽] **Foreign & International Immunity, Consuls
& Diplomats**

The Vienna Convention on Consular Relations, art. 36,
Apr. 24, *1963, 21 U.S.T. 77, 596 U.N.T.S. 261*, charges
competent authorities with notifying foreign nationals.
The term competent authorities includes booking
officers.

Civil Rights Law > Protection of Rights > Immunity
From Liability > Local Officials

*HN7*[🔽] **Immunity From Liability, Local Officials**

A failure-to-train claim is actionable only if the failure
amounted to deliberate indifference to the rights of
others. Deliberate indifference exists where the
defendant (1) failed to provide adequate training in light
of foreseeable consequences; or (2) failed to act in
response to repeated complaints of constitutional
violations by its officers. In essence, the defendant must
have actual or constructive notice of a problem.

Civil Rights Law > Protection of Rights > Immunity
From Liability > Local Officials

*HN8*[🔽] **Immunity From Liability, Local Officials**

A failure to train is required to reflect a conscious choice
among alternatives.

Torts > Procedural Matters > Multiple
Defendants > Joint & Several Liability

*HN9*[🔽] **Multiple Defendants, Joint & Several
Liability**

Under the single recovery rule, defendants are jointly
and severally liable for the full amount of compensatory
damages that result from an indivisible harm; a plaintiff
can recover only once for those damages.

Civil Procedure > Appeals > Standards of
Review > De Novo Review

*HN10*[🔽] **Standards of Review, De Novo Review**

The appellate court considers the district court's
decision to grant judgment as a matter of law de novo.

Civil Rights Law > ... > Section 1983
Actions > Elements > Color of State Law

Civil Rights Law > Protection of Rights > Immunity
From Liability > Defenses

Civil Rights Law > ... > Immunity From
Liability > Local Officials > Individual Capacity

*HN11*[🔽] **Elements, Color of State Law**

Medical providers employed by a private company that

contracted with a county to provide detainees' medical care are considered state actors amenable to suit under *42 U.S.C.S. § 1983*. They are not, however, entitled to qualified immunity.

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN12*[⬇] **Prisoner Rights, Medical Treatment**

To recover on its due process claim, the plaintiff has to present verifying medical evidence that the delay in medical care caused some degree of harm. The plaintiff does not, however, bear the burden of proving that but for the medical defendants' inaction, the plaintiff would definitely have lived. It would be enough for the plaintiff to show that the resulting harm was a diminished chance of survival. While expert testimony could be used as verifying medical evidence, medical records alone could suffice.

Evidence > ... > Scientific Evidence > Bodily Evidence > Autopsies

*HN13*[⬇] **Bodily Evidence, Autopsies**

Under Illinois law, autopsy reports are prima facie evidence of their findings and conclusions, including cause of death. *725 ILCS 5/115-5.1*.

Torts > Malpractice & Professional Liability > Healthcare Providers

*HN14*[⬇] **Malpractice & Professional Liability, Healthcare Providers**

For malpractice claims under *740 ILCS 180/1*, the plaintiff has to show that the physicians' negligent failure to comply with the standard of care proximately caused the plaintiff's injury. In Illinois, proximate cause must be established by expert testimony to a reasonable degree of medical certainty. An expert's opinion on the connection between a delay in treatment and injury must be factually supported in order to be submitted to the jury. The proximate-cause inquiry encompasses

both cause-in-fact and legal cause. For there to be legal cause, a reasonable person must have been able to foresee that the plaintiff's injury would result from his conduct. For cause-in-fact, the plaintiff must show that but for the defendant's conduct, the injury would not have occurred. Again, the injury can be the decedent's lost chance at survival.

Torts > Malpractice & Professional Liability > Healthcare Providers

*HN15*[⬇] **Malpractice & Professional Liability, Healthcare Providers**

An expert's testimony in a malpractice case cannot be based on sheer, unsubstantiated speculation.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN16*[⬇] **Standards of Review, Abuse of Discretion**

The appellate court's review of the district court's decision to bar all reference to a theory of recovery is for abuse of discretion.

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN17*[⬇] **Prisoner Rights, Medical Treatment**

Competent persons have a due-process right to refuse lifesaving hydration and nutrition. But this right does not extend to incarcerated persons who have been deemed incompetent. For these detainees, jails have a duty to prevent the prisoner from giving way to the unusual psychological strain caused by incarceration.

Civil Rights Law > Protection of Rights > Prisoner Rights > Safety

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of

Protection

**HN18**[⤓] **Prisoner Rights, Safety**

A jail or prison official's failure to protect an inmate from self-harm as one way of establishing deliberate indifference to a serious medical need. The obligation to intervene covers self-destructive behaviors up to and including suicide. The duty applies when suicide takes the form of starving oneself to death.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Trials > Jury Trials > Jury Instructions

**HN19**[⤓] **Standards of Review, De Novo Review**

The appellate court evaluates jury instructions anew when deciding if they accurately state the law.

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

**HN20**[⤓] **Prisoner Rights, Medical Treatment**

Deliberate indifference to a prisoner's serious medical need violates the *Eighth Amendment's* protection against cruel and unusual punishment. The deliberate indifference standard requires a showing that the defendant had a sufficiently culpable state of mind and asks whether the official actually believed there was a significant risk of harm. This subjective standard is closely linked to the language of the *Eighth Amendment*, which prohibits the infliction of cruel and unusual punishments. The United States Supreme Court has interpreted this to ban only the unnecessary and wanton infliction of pain. The Supreme Court has applied the deliberate-indifference standard not just to medical-care problems, but also to other types of claims.

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Constitutional Law > ... > Fundamental

Rights > Procedural Due Process > Scope of Protection

**HN21**[⤓] **Prisoner Rights, Medical Treatment**

Pretrial detainees stand in a different position than a convicted prisoner: they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence. Thus, the punishment model is inappropriate for them. Pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically. Under the *Due Process Clause*, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. Yet they also are protected from certain abusive conditions. The difference is that the claims of state detainees being held on probable cause arise under the *Fourteenth Amendment's Due Process Clause.*

Civil Rights Law > Protection of Rights > Prisoner Rights > Safety

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

**HN22**[⤓] **Prisoner Rights, Safety**

The appropriate standard for a pretrial detainee's excessive force claim is solely an objective one. The *Due Process Clause* protects a pretrial detainee from the use of excessive force that amounts to punishment. Such punishment can consist of actions taken with an expressed intent to punish. But in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose.

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

**HN23**[⤓] **Fundamental Rights, Cruel & Unusual Punishment**

The *Eighth Amendment* and Due Process analyses are not coextensive. The language of the two Clauses differs, and the nature of the claims often differs. Different constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody.


Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN24*[⬇] **Fundamental Rights, Cruel & Unusual Punishment**

The language of the *Eighth* and *Fourteenth Amendments* differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically.


Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN25*[⬇] **Prisoner Rights, Medical Treatment**

Medical-care claims brought by pretrial detainees under the *Fourteenth Amendment* are subject only to the objective unreasonableness inquiry identified in Kingsley.

**Judges:** Before WOOD, Chief Judge, and EASTERBROOK and HAMILTON, Circuit Judges.

**Opinion by:** WOOD

# Opinion

WOOD, *Chief Judge.* In the fall of 2011, Lyvita Gomes failed to show up for jury duty. This minor infraction triggered a series of events that led to her untimely death in the early days of 2012. She wound up in the county jail, where she refused to eat and drink. The medical providers who worked at the Jail did little other than monitoring as she wasted away in her cell. By the time she was sent to the hospital, it was too late to save her.

Alfredo Miranda, the administrator of Gomes's estate, brought an action under *42 U.S.C. § 1983* and assorted statelaw theories against Lake County, the Jail officials (the "County defendants"), and Correct Care Solutions (CCS, the Jail's contract medical provider) and its employees (the "medical defendants"). The district court dismissed the County defendants at summary judgment. The medical defendants proceeded to trial, but halfway through the proceeding the court granted judgment as a matter of law under *Federal Rule of Civil Procedure 50(a)* for them on some claims. The Estate prevailed **[*2]** to a modest degree on another claim, and part of the case resulted in a mistrial. Our principal ruling in response to the Estate's appeal is that the *Rule 50(a)* judgment was premature, and so further proceedings are necessary.


I

A

On October 12, 2011, an officer arrested Gomes, a 52-year-old Indian national, for failing to appear for jury duty. (In hindsight, this was the County's first misstep: as a non-citi-zen, Gomes was categorically ineligible to serve as a juror. *705 ILCS 305/2(a)(4)*.) Gomes pulled away from the officer as he attempted to arrest her. That action earned her a second charge of resisting arrest. The officers took Gomes to Lake County Jail, where she made statements that landed her on suicide watch the next day. But she did not stay at the Jail long. On October 14, Gomes was transferred to the custody of the federal Immigration and Customs Enforcement (ICE) service, which released her within a few days.

Roughly two months later, on December 14, after failing to appear in court on the resisting-arrest charge, Gomes found herself back in the Lake County Jail. Though officials initially placed her in the general population, it quickly became apparent that her physical and mental health were deteriorating, **[*3]** and so she was moved.

On December 16, CCS's Director of Mental Health, Jennifer Bibbiano (a social worker), performed a mental health evaluation on Gomes. Bibbiano documented that Gomes had ingested no food or water since arriving at the Jail two days earlier. As a result, Gomes was transferred the next day to the Jail's medical pod for

closer monitoring. On December 18, staff placed Gomes on suicide watch and the hunger strike protocol. At that point, after she had gone four days without food or water, staff weighed her for the first time and recorded a weight of 146 pounds. Over the next ten days, this number plummeted; by December 28, Gomes weighed only 128 pounds.

During this period, social workers and physicians continued to assess Gomes daily. Defendant Dr. Rozel Elazegui, an internist, saw Gomes on December 22 and 27. In several progress notes, the CCS staff reported various symptoms of dehydration, such as skin tenting. Gomes's refusal to eat or drink and her unresponsiveness often prevented the medical staff from recording her vital signs and collecting any blood or urine samples. For most of this time, Gomes lay in bed and refused to speak.

As Gomes's physical condition worsened, **[*4]** concerns about her mental state grew. When Gomes appeared in court on December 20, the judge ordered a mental fitness examination. On December 22, Gomes was identified as needing an urgent psychiatric visit. That prompted a visit two days later from psychiatrist Hargurmukh Singh, who first met Gomes then and diagnosed her with a "psychotic disorder not otherwise specified." He prescribed no medication. After seeing Gomes again on December 27, Dr. Singh concluded that her psychosis rendered her unable to understand the risks of not eating and unable to participate in her treatment plan. But his only advice to Dr. Elazegui, who wanted to perform an involuntary blood draw for monitoring purposes, was that Elazegui could do so if push came to shove.

Around this time the officials in charge of Lake County Jail entered the picture. On December 26, Wayne Hunter, the Jail's acting chief, was first notified by email that Gomes was in the Jail and was refusing medical treatment and tests. Hunter received assurances that CCS staff were monitoring Gomes's condition and that they would provide him with any updates. Two days later, Hunter personally went down to Gomes's cell in a futile attempt to **[*5]** persuade her to eat. On December 27, Scott Fitch, the liaison between the correctional and medical staff, learned about Gomes. He too asked for updates. Fitch called Gomes's public defender, entreating her to visit and encourage her client to eat. Sheriff Mark Curran did not hear about Gomes until December 29, the day she left the Jail. That same day, Jail officials went to court to get Gomes formally released from custody.

Also on December 29, Dr. Young Kim, another CCS internist, returned to work from a vacation. Dr. Kim was surprised to learn that Gomes had remained in the Jail while continuing to refuse all food and drink. (A few stray comments in Gomes's medical records suggest that she may have rubbed water on her body and perhaps taken a few sips of water from her sink. But the record as a whole implies little to no water intake.) Dr. Kim immediately called an ambulance to take Gomes to the hospital for evaluation and treatment of her dehydration and psychosis. Unfortunately, this intervention came too late. On January 3, 2012, five days after arriving at the hospital, Gomes died. The autopsy opined that she died of "Complications of Starvation and Dehydration." The manner of **[*6]** death was suicide.

B

The Estate filed this action against Lake County, Sheriff Curran, Hunter, Fitch, CCS, Dr. Elazegui, Dr. Singh, Bibbiano, and two more social workers, Ruth Muuru and Edith Jones. It raised due process claims under *42 U.S.C. § 1983*, state statutory and common law tort claims, violations of international treaty obligations, and claims under the *Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.* Only the claims against the medical defendants went to trial.

But the jury never had the opportunity to resolve some of those claims. At the close of the Estate's presentation of evidence, the court entered judgment as a matter of law under *Rule 50(a)* for social workers Muuru and Jones on all claims against them. The court also concluded that the Estate had failed to present enough evidence to reach the jury on the question whether the medical defendants caused Gomes's death; it therefore granted them judgment as a matter of law on that part of the case. The only question remaining for the jury was the Estate's due process claim for inadequate medical care, limited to the pain and suffering Gomes experienced while in the Jail. The jury failed to reach a unanimous verdict regarding the conduct of Dr. Elazegui and Dr. Singh **[*7]** but it held social worker Bibbiano liable. It awarded the Estate $119,000 in compensatory damages, which Bibbiano has paid in full.

The Estate does not challenge the jury verdict, but it takes issue with four aspects of the proceedings below: first, the district court's dismissal of the County defendants; second, the judgment as a matter of law on causation of death; third, the court's ruling barring the Estate from pursuing one of its theories of recovery under the *Due Process Clause*; and fourth, the court's

instruction on the applicable legal standard. While we find no merit in its first point, we conclude on the latter three that the Estate is entitled to the opportunity to try its full case against the medical defendants before a jury.

## II

### A

We start with the Estate's attempt to revive some of the claims against the County defendants. It first challenges the district court's conclusion that the Jail's chief, Hunter, and liaison, Fitch, were not deliberately indifferent to Gomes's inadequate medical care in violation of her due process rights. We need not delve into the nuances of the standard for such a claim, because the Estate faces an insurmountable hurdle independent of that standard. We have long **[\*8]** recognized the fact that correctional institutions (like most entities in a modern economy) engage in the division of labor. See *Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2005)* (citation omitted). *HN1*[⬆] When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention. *E.g., Rice ex rel. Rice v. Corr. Med. Servs., 675 F.3d 650, 676, 678-79 (7th Cir. 2012)*; see also *Rasho v. Elyea, 856 F.3d 469, 478-79 (7th Cir. 2017)* (holding that medical professionals were not liable when sued in their capacity as "prison administrators and policymakers, not treaters"). We will not find a jail official to have acted with deliberate indifference if she reasonably relied on the judgment of medical personnel. *E.g., Greeno, 414 F.3d at 655-56*; *Estate of Perry v. Wenzel, 872 F.3d 439, 458-59 (7th Cir. 2017)*. On the other hand, if jail officials had reason to know that their medical staff were failing to treat or inadequately treating an inmate, liability is possible. *King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012)*; *Rice, 675 F.3d at 676*.

Nothing in this record justifies a finding of personal liability against the County defendants. Hunter and Fitch received assurances that CCS staff were regularly monitoring Gomes. They requested periodic updates on her condition. The medical providers informed Hunter and Fitch that Gomes was stable and promised to send her to the hospital if necessary. Knowing that the CCS employees were on the case, Hunter and Fitch **[\*9]** were entitled to rely on their professional judgments. See *Arnett v. Webster, 658 F.3d 742, 756 (7th Cir. 2011)* ("This is not a case where [the plaintiff] was being completely ignored by medical staff."). The fact that they expressed concern about Gomes's condition and tried directly and indirectly to get her to eat does not make them culpable.

Because we find that Fitch and Hunter's reasonable reliance on their medical providers shields them from liability under *section 1983*, we need not consider the County defendants' alternative arguments for dismissal.

### B

While the Estate has apparently abandoned its claim that Sheriff Curran is individually liable for Gomes's inadequate medical care, it is still trying to pursue an official-capacity claim about the Jail's allegedly deficient hunger-strike policy. As *HN2*[⬆] an Illinois sheriff, Curran has final policymaking authority over jail operations. *DeGenova v. Sheriff of DuPage Cnty., 209 F.3d 973, 976 (7th Cir. 2000)*. He is thus a proper party for a claim under *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*, targeted at policies and customs that deprive inmates of their federal rights. *Id. Monell* liability is possible even if no individual official is found deliberately indifferent. *Glisson v. Ind. Dep't of Corr., 849 F.3d 372, 379 (7th Cir. 2017)* (en banc).

The focus of the Estate's *Monell* claim is Lake County Jail's hunger-strike policy. That policy required four things: (1) the immediate **[\*10]** notification of medical staff when an inmate begins a hunger strike; (2) documentation of meal refusals and immediate notification of a command officer after an inmate's third consecutive meal refusal; (3) the command's investigation and communication with medical staff as needed; and (4) a conference including the health services administrator and the chief or deputy chief of corrections about the best course of action. The Estate finds the policy lacking in some respects, including the timing of notification and consultation, follow-up procedures if the hunger strike continues, methods to review past suicidality, and guidance on what to look for and how to document an inmate's condition on suicide watch.

The Estate's concerns may be valid, but it has not shown that the Sheriff was deliberately indifferent in enacting this policy. Though hunger strikes may be common in jails, as *amici* suggest, Gomes went longer without food and water than anyone else in the Jail's experience. This does not give the Sheriff a free pass, since *HN3*[⬆] a single incident can be enough for liability where a constitutional violation was highly

foreseeable. *Woodward v. Corr. Med. Servs. of Ill., Inc., 368 F.3d 917, 929 (7th Cir. 2004)* (rejecting the notion of a "'one free suicide' pass"). **[\*11]** But this is not a case in which the Jail knew that hunger strikes were a risk yet did nothing. It had a system in place, and that system included a series of reasonable measures.

The Estate presented no evidence that would allow a trier of fact to conclude that some feature in the Jail's policy caused Gomes's death. Once Jail staff learned about her refusal to eat or drink, they stayed in regular communication with CCS's medical personnel. See *Belbachir v. Cnty. of McHenry, 726 F.3d 975, 983 (7th Cir. 2013)*. It is unclear whether anyone connected the dots between Gomes's suicidal statements in October and her condition in December, but that is irrelevant because staff identified Gomes as actively suicidal almost from the start of her second detention. There is no reason to think that additional guidance in the hunger-strike policy would have made a difference in Gomes's deterioration. Summary judgment was appropriate on this *Monell* claim.

C

We can be brief with the Estate's complaint that the County defendants failed to comply with their international treaty obligations. *HN4*[⬆️] Article 36 of the Vienna Convention guarantees a foreign national the right to have her home country's consular office notified when she is detained. *Vienna Convention on Consular Relations, art. 36, Apr. 24, 1963, 21 U.S.T. 77* **[\*12]** ; *Sandoval v. United States, 574 F.3d 847, 850 (7th Cir. 2009)*. When Gomes, an Indian national, was detained in October, ICE officials informed her of her Article 36 rights. No one repeated this advice when Gomes was taken back into custody in December. Still, we think summary judgment is appropriate, though for reasons different from those mentioned by the district court.

The district court was concerned that the Estate failed to mention *section 1983* when raising this claim, see *Jogi v. Voges, 480 F.3d 822, 825 (7th Cir. 2007) (Jogi II)*, but *HN5*[⬆️] "complaints need not plead legal theories," and so that alone does not support dismissal, see *id. at 826*. Another strike against the Estate, according to the district court, was the lack of evidence connecting Gomes's death with the failure to notify. Indeed, when given the opportunity to speak with the Indian consulate in October, Gomes chose not to do so. Nonetheless, we have yet to explore the question whether a plaintiff is required to show actual harm in order to recover for an Article 36 violation, or if this is more in the nature of a failure to receive required *Miranda* warnings.

We need not wrestle with that issue now, however, because our case is easily resolved on the more straightforward ground of qualified immunity. The County **[\*13]** officials are immune from suit if it was not clearly established in 2011 that their conduct violated the Vienna Convention. See *Pearson v. Callahan, 555 U.S. 223, 245, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. *HN6*[⬆️] Article 36 charges "competent authorities" with notifying foreign nationals. The term "competent authorities" includes booking officers. *Mordi v. Zeigler, 770 F.3d 1161, 1166-1167 (7th Cir. 2014)*. Consistent with this precedent, the Jail's written policy places the notification obligation exclusively with booking officers. But the Estate did not sue the officer who booked Gomes. And, as we acknowledged in 2014, the boundaries of who else might qualify as a competent authority have "yet to be fixed." *Mordi, 770 F.3d at 1167*. Because it was not clearly established who, beyond the booking officer, had a duty to inform Gomes of her consular rights, the County defendants are entitled to qualified immunity.

D

The Estate also seeks to reinstate a *Monell* claim based on the County's alleged failure to train Jail staff to notify detainees of their consular rights. *HN7*[⬆️] A failure-to-train claim is actionable only if the failure amounted to deliberate indifference to the rights of others. *City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)*. Deliberate indifference exists where the defendant (1) failed "to provide adequate training in light of foreseeable consequences"; or (2) failed "to act in response **[\*14]** to repeated complaints of constitutional violations by its officers." *Sornberger v. City of Knoxville, 434 F.3d 1006, 1029-30 (7th Cir. 2006)*. In essence, the defendant must have actual or constructive notice of a problem. See *Robles v. City of Fort Wayne, 113 F.3d 732, 735 (7th Cir. 1997)*.

Here, Sheriff Curran had neither. The Estate points to no evidence indicating that detainees repeatedly complained about the absence of consular notification. The parties try to paint the problem as rampant or nonexistent, but the record does not support either extreme.

Sheriff Curran did not fail to act in the face of foreseeable violations. Lake County Jail has had a policy about consular notification since at least October 2005. In addition to requiring booking officers to inform detainees, the policy specified that all officers who work at the booking desk "shall receive appropriate training," including a video, handouts, and a training session.

Sheriff Curran testified that he knew about this policy and was never notified that it was not being followed. Thus, at most, Sheriff Curran was negligent in failing to ensure that the Jail's training protocol was being implemented. This is not enough to establish that he was deliberately indifferent to detainees' rights. See *Rice, 675 F.3d at 675* (*HN8*[⬆]) requiring that "the failure to train reflect[] a conscious **[*15]** choice among alternatives"). The Sheriff did not display deliberate indifference, and so we need not consider the County defendants' alternative arguments.

**III**

We turn now to the Estate's claims against Drs. Elazegui and Singh, which the district court partially blocked on the ground that there was not enough evidence of causation to reach the jury. Though the Estate assigns error to the court's ruling on a motion *in limine* and its jury instruction, we need reach these decisions only if we reverse on causation. This is because neither ruling prejudiced the Estate on the claim that did go to the jury. *HN9*[⬆]] Under the single recovery rule, defendants are jointly and severally liable for the full amount of compensatory damages that result from an indivisible harm; a plaintiff can recover only once for those damages. *Janusz v. City of Chi., 832 F.3d 770, 774, 777 (7th Cir. 2016)*; *Minix v. Canarecci, 597 F.3d 824, 829-30 (7th Cir. 2010)*. The Estate has already been fully compensated for Gomes's suffering at the Jail, since Bibbiano paid the assessed $119,000. It has not, however, received any compensation for Gomes's death. We thus turn to the question whether that issue too should have gone to the jury.

**A**

The court granted judgment as a matter of law on the Estate's constitutional and state-law wrongful death claims **[*16]** against Drs. Elazegui and Singh because it thought that no rational jury could conclude that their actions caused Gomes's death. It identified two evidentiary gaps: first, the lack of expert testimony explaining what the notation of "Complications of Starvation and Dehydration" in the autopsy report meant and how those complications related to Gomes's death; and second, the lack of expert testimony about what took place during the five days between Gomes's transfer to the hospital and her death. *HN10*[⬆]] We consider this decision *de novo. Holder v. Ill. Dep't of Corr., 751 F.3d 486, 490 (7th Cir. 2014)*.

We start with the Estate's claim under the *Fourteenth*

*Amendment's Due Process clause* for inadequate medical care.[1] Although *HN11*[⬆]] Dr. Elazegui and Dr. Singh were employed by a private company that contracted with Lake County to provide detainees' medical care, they are considered state actors amenable to suit under *section 1983. West v. Atkins, 487 U.S. 42, 54-56, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)*. They are not, however, entitled to qualified immunity. *Petties v. Carter, 836 F.3d 722, 734 (7th Cir. 2016)* (*en banc*). Moreover, they concede both that Gomes's medical condition was objectively serious and that the evidence would have permitted the jury to conclude the doctors acted with deliberate indifference. Our focus is thus exclusively on causation.

*HN12*[⬆]] To recover on its due process claim, the Estate had to present "verifying medical evidence **[*17]** that the delay" in medical care "caused some degree of harm." *Williams v. Liefer, 491 F.3d 710, 715 (7th Cir. 2007)* (citation omitted). It did not, however, bear the burden of proving that but for the medical defendants' inaction, Gomes would definitely have lived. It would have been enough for the Estate to show that the resulting harm was a diminished chance of survival. See *Murrey v. United States, 73 F.3d 1448, 1453-54 (7th Cir. 1996)*; *Holton v. Mem'l Hosp., 176 Ill. 2d 95, 119, 679 N.E.2d 1202, 223 Ill. Dec. 429 (1997)* (recognizing the lost chance doctrine in Illinois). While expert testimony could be used as "verifying medical evidence," medical records alone could suffice. *Grieveson v. Anderson, 538 F.3d 763, 779 (7th Cir. 2008)*; *Williams, 491 F.3d at 715*.

The record contains ample evidence from which a jury could infer that Drs. Elazegui and Singh's inaction diminished Gomes's chances of survival. First, it shows that she died from starvation and dehydration. *HN13*[⬆]] Under Illinois law, autopsy reports are *prima facie* evidence of their findings and conclusions, including cause of death. *725 ILCS 5/115-5.1*. The report here did not mince words about Gomes's cause of death—"Complications of Starvation and Dehydration"—or her manner of death—"suicide." The coroner implicitly ruled out the possibility that Gomes died from any hospital-

---

[1] We do so because this was the claim that supports the district court's subject-matter jurisdiction under *28 U.S.C. §§ 1331* and *1343*; the Estate relied on the court's supplemental jurisdiction, *28 U.S.C. § 1367*, for its state-law theories. It is possible that the alienage branch of diversity jurisdiction may also have existed, see *28 U.S.C. § 1332(a)(2)*, but this was not explored.

based illnesses or other causes. The report is clear: not eating or drinking caused her death. (Hospital records underscore this conclusion. On the **[*18]** day she arrived at the hospital, Gomes was already experiencing acute liver and renal failure. For present purposes, however, we disregard these records, because they were excluded from trial at the request of the medical defendants, and the Estate has not challenged that exclusion on appeal.)

Moreover, the Estate's expert witnesses testified that the doctors' failure to transfer Gomes to the hospital sooner allowed her deterioration to reach a dangerous point. Psychiatry expert Dr. James Gilligan repeatedly testified that Dr. Singh contributed to Gomes's death by failing to initiate her transfer from the Jail to the hospital. Furthermore, Dr. Singh (a psychiatrist, recall) knew that Gomes was clinically incompetent, but he took no steps to treat her even though she was endangering her life. Dr. Gilligan concluded that Dr. Singh's "failure to act ... contributed to [Gomes's] death." Internal medicine expert Dr. Jack Raba testified that Gomes's pulse on December 25 was an "ominous sign," raising the possibility of cardiovascular problems, electrolyte or metabolic imbalances, or renal failure. He added that Gomes's blood pressure clearly indicated dehydration. Dr. Raba said it was "impossible **[*19]** not to consider that Gomes was starting to show signs of organ failure. These "absolute signs" signaled that Gomes urgently needed to be admitted to a hospital for bloodwork and possibly forced feeding and medication. Dr. Raba concluded that Dr. Elazegui's failure to intervene "contributed to [Gomes's] ultimate demise and death."

The prison doctors' testimony lent support to Dr. Raba's expert opinion on causation. When Dr. Elazegui spoke with Gomes on December 22, he informed her that starvation risked organ failure and death. He asked to be informed when her weight loss hit 18%, since that number indicates an increased risk of organ failure. Dr. Kim's testimony was also rel-evant to the causation question. When he returned from vacation, he was concerned that Gomes could go into respiratory failure or cardiac arrest at any minute (and unlike the others, he promptly acted on this concern).

Taken together, this evidence was enough to support an inference on the jury's part that the delay in sending Gomes to the hospital resulted in her death, or at least lessened her chance of survival.

Our analysis applies with equal force to the Estate's state malpractice claims. See *740 ILCS 180/1.* **HN14**[⬆️]

Under this theory, **[*20]** the Estate had to show that the physicians' negligent failure to comply with the standard of care proximately caused Gomes's injury. See *Sullivan v. Edward Hosp., 209 Ill. 2d 100, 112, 806 N.E.2d 645, 282 Ill. Dec. 348 (2004)*. In Illinois, proximate cause "must be established by expert testimony to a reasonable degree of medical certainty." *Morisch v. United States, 653* **F.3d** *522, 531 (7th Cir. 2011)* (citation omitted). An expert's opinion on the connection between a delay in treatment and injury must be factually supported in order to be submitted to the jury. *Wiedenbeck v. Searle, 385 Ill. App. 3d 289, 293-94, 895 N.E.2d 1067, 324 Ill. Dec. 352 (2008)*.

The proximate-cause inquiry encompasses both cause-in-fact and legal cause. *Palay v. United States, 349* **F.3d** *418, 432 (7th Cir. 2003)*. For there to be legal cause, a reasonable person must have been able to foresee that the plaintiff's injury would result from his conduct. *Id.* For cause-in-fact, the plaintiff must show that but for the defendant's conduct, the injury would not have occurred. *Id.* Again, the injury can be the decedent's lost chance at survival. *Holton, 176 Ill. 2d at 119*.

A jury would have been permitted to find legal cause here. By their own admission, Drs. Elazegui and Singh knew that if Gomes continued to refuse food and fluids, she could die. They warned her as much. The record also contained support for cause-in-fact. The experts opined that the medical defendants' inaction contributed to Gomes's death. This was not impermissibly conclusory **[*21]** for an expert opinion. See *FED. R. EVID. 705*; see also *Wilson v. Clark, 84 Ill. 2d 186, 196, 417 N.E.2d 1322, 49 Ill. Dec. 308 (1981)* (adopting *Federal Rule of Evidence 705* for Illinois). The medical defendants are right that **HN15**[⬆️] an expert's testimony in a malpractice case cannot be based on "sheer, unsubstantiated speculation." *Wiedenbeck, 385 Ill. App. 3d at 293*. But the opinions here suffered from no such flaw, and the defendants were free to cross-examine the experts about what led them to draw their conclusions. *Wilson, 84 Ill. 2d at 194*. Based on Drs. Raba and Gilligan's expert testimony, a jury could have found that the defendants' inaction more likely than not contributed to Gomes's decreased chance of survival and her ultimate death. The Estate is entitled to a new trial in which it can present these arguments to a jury.

B

Since the Estate is entitled to a new trial against the medical defendants, we will also say a few words about its challenge to the district court's decision to bar all

reference to the theory that the medical defendants violated the *Due Process Clause* by failing to protect Gomes from harming herself. *HN16*[⬆️] Our review is for abuse of discretion. *Perry v. City of Chi., 733 F.3d 248, 252 (7th Cir. 2013)*.[2]

The Supreme Court has declared that *HN17*[⬆️] "competent persons" have a due-process "right to refuse lifesaving hydration and nutrition." *Washington v. Glucksberg, 521 U.S. 702, 723, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)* (quoting *Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 279, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990))*. But this right does not extend to incarcerated persons who have been deemed incompetent. [*22] *Freeman v. Berge, 441 F.3d 543, 546 (7th Cir. 2006)*. For these detainees, jails have a duty "to prevent the prisoner from giving way" to the "unusual psychological strain" caused by incarceration. *Id. at 547*.

We repeatedly have recognized *HN18*[⬆️] a jail or prison official's failure to protect an inmate from self-harm as one way of establishing deliberate indifference to a serious medical need. *E.g., Estate of Miller, ex rel. Bertram v. Tobiasz, 680 F.3d 984, 989-90 (7th Cir. 2012)*; *Collins v. Seeman, 462 F.3d 757, 760-61 (7th Cir. 2006)*. The obligation to intervene covers self-destructive behaviors up to and including suicide. *Rice, 675 F.3d at 665*; *Cavalieri v. Shepard, 321 F.3d 616, 620-22 (7th Cir. 2003)*. The duty applies "when suicide takes the form of starving oneself to death." *Freeman, 441 F.3d at 547*; accord *Rodriguez v. Briley, 403 F.3d 952, 953 (7th Cir. 2005)*.

In barring this theory, the court reasoned that the Estate had not presented evidence that Gomes's suicidal ideation and mental illness were "so acute" that the defendants should have known about them and protected her from herself. See Seventh Circuit Pattern Civil Jury Instruction 7.19 (rev. 2017) (an element of a failure-to-protect-from-self-harm claim is that the defendant was aware or strongly suspected a strong likelihood of serious self-harm). The court attached particular weight to testimony from Gomes's family members and the administrator that she was a devout

Catholic who had no history of mental illness and would not have committed suicide.

In the past, we have [*23] taken into account jail officials' knowledge of a decedent's mental health history or warnings from family members, as that information pertains to the defendants' subjective awareness of a problem. *E.g., Payne for Hicks v. Churchich, 161 F.3d 1030, 1042 (7th Cir. 1998)*. But that is not the use to which the court put the testimony of Gomes's family. It jumped from the fact that Gomes was a Catholic to an assumption that the defendants were aware of her religious affiliation, but there is no evidence that they knew any such thing. Furthermore, mental illness and suicide regrettably afflict devout members of all religious groups. While a jury could consider testimony from Gomes's family when assessing this theory of recovery, it was not the court's role to accept the family opinion as an undisputed fact.

And in any event, the trial record was filled with evidence supporting a finding that the medical defendants knew that Gomes was at great risk of death by starvation and dehydration, and that she was unable to think rationally. On December 27, Dr. Singh deemed her not competent and concluded that she did not understand the risks of refusing to eat. Before then, CCS staff documented Gomes's suicidal ideation and placed her on suicide watch. Dr. Elazegui [*24] had warned Gomes that if she continued to refuse nutrition, she could die. The defendants' records reveal that they were aware that Gomes was at serious risk of causing her own death. The district court abused its discretion by prohibiting the Estate from pursuing this line of argument. At the next trial, the Estate must be allowed to argue this theory of recovery to the jury.

C

Finally, we consider whether the district court properly instructed the jury on intent. *HN19*[⬆️] We evaluate the jury instructions anew when deciding if they accurately state the law. *Sanchez v. City of Chi., 880 F.3d 349, 355 (7th Cir. 2018)*.

The Supreme Court first recognized an incarcerated person's right to receive adequate medical treatment in *Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*, which concerned a convicted prisoner. In that case, the Court concluded that *HN20*[⬆️] deliberate indifference to a prisoner's serious medical need violates the *Eighth Amendment's* protection against cruel and unusual punishment. *Id. at 104-05*. The "deliberate indifference" standard requires a showing

---

[2] Once again, it is worth recalling that a person may recover only once for a given set of injuries. At this stage, however, no one has had any occasion to consider whether state law and federal law overlap so much that the elements supporting each theory are the same, or that full relief could be recovered under either. Reconciliation of those theories is something better done by the district court on remand.

that the defendant had a "sufficiently culpable state of mind" and asks whether the official actually believed there was a significant risk of harm. *Pittman ex rel. Hamilton v. Cnty. of Madison, 746 F.3d 766, 775-76 (7th Cir. 2014)*.

This subjective standard is closely linked to the language of the *Eighth Amendment*, which prohibits the infliction of "cruel and unusual *punishments* [*25] ." The Supreme Court has interpreted this to ban only the "unnecessary and wanton infliction of pain." *Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. The Court has applied the deliberate-indifference standard not just to medical-care problems, but also to other types of claims. See *Farmer, 511 U.S. at 837* (failure-to-protect); *Wilson v. Seiter, 501 U.S. 294, 303, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)* (conditions of confinement).

*HN21*[⬆] Pretrial detainees stand in a different position: they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence. Thus, the punishment model is inappropriate for them. *Kingsley v. Hendrickson, 135 S. Ct. 2466, 2475, 192 L. Ed. 2d 416 (2015)* ("[P]retrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" (citations omitted)); *Bell v. Wolfish, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)* ("For under the *Due Process Clause*, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). Yet they also are protected from certain abusive conditions. The difference is that the claims of state detainees being held on probable cause arise under the *Fourteenth Amendment's Due Process Clause*. *Collins v. Al-Shami, 851 F.3d 727, 731 (7th Cir. 2017)*.

That said, we have typically assessed pretrial detainees' medical care (and other) claims under the *Eighth Amendment's* standards, reasoning that pretrial detainees are entitled to at least that much protection. *E.g., Minix, 597 F.3d at 831*; *Board v. Farnham, 394 F.3d 469, 477-78 (7th Cir. 2005)*. In conducting this borrowing exercise, we have grafted [*26] the *Eighth Amendment's* deliberate indifference requirement onto the pretrial detainee situation. *Cavalieri, 321 F.3d at 620*. Missing from this picture has been any attention to the difference that exists between the Eighth and the *Fourteenth Amendment* standards.

The Supreme Court recently disapproved the uncritical extension of *Eighth Amendment* jurisprudence to the

pretrial setting in *Kingsley v. Hendrickson, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015)*. There the Court held that a pretrial detainee bringing an excessive force claim did not need to prove that the defendant was *subjectively* aware that the amount of force being used was unreasonable. *Id. at 2472-73*. Rather, the plaintiff needed only to show that the defendant's conduct was *objectively* unreasonable. *Id. Kingsley*, it is worth emphasizing, was a *Fourteenth Amendment* Due Process case. Indeed, the Court took pains to reiterate the basic principles that apply to pretrial detainees:

> Several considerations have led us to conclude that *HN22*[⬆] the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one. For one thing, it is consistent with our precedent. We have said that "the *Due Process Clause* protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham [v. Connor, 490 U.S. 386,] 395, n. 10, 109 S. Ct. 1865, 104 L. Ed. 2d 443 [1989]*. And in *Bell [v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)]*, we explained that such "punishment" can cosist of actions taken with an "expressed [*27] intent to punish." *441 U.S., at 538*. But the *Bell* Court went on to explain that, in the absence of an expressed intent to punish, *a pretrial detainee can nevertheless prevail by showing that the actions are not "rationally related to a legitimate nonpunitive governmental purpose"* or that the actions "appear excessive in relation to that purpose." *Id., at 561*.

*135 S. Ct. at 2473* (emphasis added).

Though *Kingsley*'s direct holding spoke only of excessive force claims, two of our sister circuits have held that its logic is not so constrained. The Ninth Circuit first extended *Kingsley*'s objective inquiry to detainees' *Fourteenth-Amendment* failure-to-protect claims. *Castro v. Cnty. of L.A., 833 F.3d 1060, 1070-71 (9th Cir. 2016)* (en banc), *cert. denied*, 137 S. Ct. 831, 197 L. Ed. 2d 69 (2017). Since then, that court has applied the *Kingsley* holding more broadly to a medical-need claim brought by a pretrial detainee. *Gordon v. Cnty. of Orange, 888 F.3d 1118, 1120, 1122-25 (9th Cir. 2018)*. The Second Circuit followed suit, applying the objective standard to detainees' Fourteenth-Amendment complaints about their conditions of confinement; in the process it overruled a decision applying a subjective test to a medical-care claim. *Darnell v. Pineiro, 849 F.3d 17, 34-35 (2d Cir. 2017)* (overruling *Caiozzo v. Koreman, 581 F.3d 63 (2d Cir. 2009)*); see *Wilson, 501 U.S. at 303*

(medical care is a condition of confinement). Later, the Second Circuit expressly applied an objective standard to a claim of deliberate indifference to a serious medical condition. [*28] *Bruno v. City of Schenectady, 727 Fed. Appx. 717, 2018 WL 1357377, at \*2-\*3 (2d Cir. 2018)* (unpublished) (asking "whether a 'reasonable person' would appreciate the risk to which the detainee was subjected"). Other courts of appeals have contemplated the same reading of *Kingsley. Richmond v. Huq, 885 F.3d 928, 938 n.3 (6th Cir. 2018)* (not applying *Kingsley*, which neither party raised, but recognizing the "shift in *Fourteenth Amendment* deliberate indifference jurisprudence [that] calls into serious doubt whether [the plaintiff] need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them").

The Eighth, Eleventh, and Fifth Circuits have chosen to confine *Kingsley* to its facts—that is, to *Fourteenth-Amendment* claims based on excessive-force allegations in a pretrial setting. *E.g., Whitney v. City of St. Louis, 887 F.3d 857, 860 n.4 (8th Cir. 2018)*; *Nam Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1279 n.2 (11th Cir. 2017)*; *Alderson v. Concordia Corr. Facility, 848 F.3d 415, 419 n.4 (5th Cir. 2017)* (following circuit precedent and concluding that the issue was not directly raised). It is worth noting, however, that a concurring judge in *Alderson* advocated reconsideration of the subjective standard to detainees' other claims in light of *Kingsley. Id. at 424-25* (Graves, J., specially concurring in part).

Some circuits have continued to analyze inadequate medical treatment claims under the deliberate indifference standard without grappling with the potential implications of *Kingsley. E.g. Duff v. Potter, 665 F. App'x 242, 244-45 (4th Cir. 2016)* (applying the objective [*29] reasonableness standard to a detainee's excessive-force claim but not his medical-need claim, which it affirmed on forfeiture grounds).

We have not yet expressly weighed in on the debate. Since *Kingsley*, we have continued to duplicate the *Eighth Amendment* inquiry for claims of deficient medical treatment. *E.g., Phillips v. Sheriff of Cook Cnty., 828 F.3d 541, 554 n.31 (7th Cir. 2016)*. But we have acknowledged that *Kingsley* has "called into question" our case law treating the "protections afforded by" the *Eighth* and *Fourteenth Amendments* as "'functionally indistinguishable' in the context of a claim about inadequate medical care." *Smego v. Jumper, 707 F. App'x 411, 412 (7th Cir. 2017)*; accord *Collins, 851 F.3d*

*at 731*.

Because the answer may make a difference in the retrial of Gomes's claims, we think it appropriate to address the proper standard at this time. We begin with the fact that the Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees. In this respect, *Kingsley* does not stand alone. See, *e.g., Manuel v. City of Joliet, 137 S. Ct. 911, 197 L. Ed. 2d 312 (2017)* (allowing *Fourth Amendment* challenges to pretrial detention even beyond the start of legal process). The Court has cautioned that **HN23**[↑] the *Eighth Amendment* and Due Process analyses are not coextensive. See *Kingsley, 135 S. Ct. at 2475* ("The language of the two Clauses differs, and the nature of the claims often differs."); *Currie v. Chhabra, 728 F.3d 626, 630 (7th Cir. 2013)* ("[D]ifferent constitutional provisions, and thus different [*30] standards, govern depending on the relationship between the state and the person in the state's custody."). We see nothing in the logic the Supreme Court used in *Kingsley* that would support this kind of dissection of the different types of claims that arise under the *Fourteenth Amendment's Due Process Clause*. To the contrary, the Court said that **HN24**[↑] "[t]he language of the [*Eighth* and *Fourteenth Amendments*] differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *135 S. Ct. at 2475* (citations omitted). We thus conclude, along with the Ninth and Second Circuits, that **HN25**[↑] medical-care claims brought by pretrial detainees under the *Fourteenth Amendment* are subject only to the objective unreasonableness inquiry identified in *Kingsley*.

Although the defendants failed to mention *Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981)*, overruled in part on other grounds by *Daniels v. Williams, 474 U.S. 327, 330-31, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)*, and thus have forfeited any argument based on that case, we see nothing in *Parratt* that points in the opposite direction. There the Supreme Court held that plaintiffs may not bring claims under the *Due Process Clause* where state law provides an adequate remedy. *451 U.S. at 543-44*. Though the Estate has brought state malpractice claims in addition to its due-process claim, the availability [*31] of parallel and even overlapping forms of recovery does not doom its constitutional claim. See *Zinermon v. Burch, 494 U.S. 113, 124, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990)*; *Armstrong v. Daily, 786 F.3d 529, 539 (7th Cir. 2015)*. *Parratt* applies only to certain procedural-due-process

claims. The violation of which the Estate complains derives from the substantive aspect of the *Due Process Clause*. See *Youngberg v. Romeo, 457 U.S. 307, 315-16, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982)*; see also *City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983)*; *Collignon v. Milwaukee Cnty., 163 F.3d 982, 988 (7th Cir. 1998)*. In this situation, there is no amount of process that would justify a decision to sit by and leave serious medical needs unattended. *Parratt* is thus beside the point.

We also see no conflict between this application of *Kingsley* and the Supreme Court's later decision in *Daniels v. Williams, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)*. *Daniels* overruled part of *Parratt* and held (or underscored) that negligent conduct does not offend the *Due Process Clause*. *Id. at 330-31*. The defendants here worry that an objective-reasonableness standard will impermissibly constitutionalize medical malpractice claims, because it would allow mere negligence to suffice for liability. A careful look at *Kingsley*, however, shows that this is not the case; the state-of-mind requirement for constitutional cases remains higher.

Here is what the Court had to say about this problem in *Kingsley*:

> We consider a legally requisite state of mind. In a case like this one, there are, in a sense, two separate stateof-mind questions. The first concerns **[*32]** the defendant's state of mind with respect to his physical acts—*i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was "excessive." Here, as to the first question, there is no dispute. As to the second, whether to interpret the defendant's physical acts in the world as involving force that was "excessive," there is a dispute. We conclude with respect to that question that the relevant standard is objective not subjective. Thus, the defendant's state of mind is not a matter that a plaintiff is required to prove.

*135 S. Ct. at 2472*. As applicable here, the first of those inquiries asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of Gomes's case. See *id. at 2472, 2474* (discussing purposeful or knowing conduct and leaving open the possibility that recklessness would also

suffice). The courts of appeals that have applied *Kingsley* to detainees' claims in contexts other than excessive force have taken that step, while continuing to recognize that it will not be enough to show **[*33]** negligence or gross negligence. *Gordon, 888 F.3d at 1125* (under *Kingsley*, a detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard" (quoting *Castro, 833 F.3d at 1071*)); accord *Darnell, 849 F.3d at 36* & n.16. As *Kingsley* instructs, the second step is the objective one.

The allegations here easily fit the mold of *Gordon*, *Darnell*, and *Castro*. A properly instructed jury could find that Drs. Elazegui and Singh made the decision to continue observing Gomes in the jail, rather than transporting her to the hospital, with purposeful, knowing, or reckless disregard of the consequences. (The jury could also reject such a conclusion.) It would be a different matter if, for example, the medical defendants had forgotten that Gomes was in the jail, or mixed up her chart with that of another detainee, or if Dr. Elazegui forgot to take over coverage for Dr. Kim when he went on vacation. Such negligence would be insufficient to support liability under the *Fourteenth Amendment*, even though it might support state-law liability. Here, there is evidence that Drs. Elazegui and Singh deliberately chose a "wait and see" monitoring plan, knowing that Gomes was neither eating nor drinking nor competent to care for herself. See *Glisson, 849 F.3d at 380, 382* (recognizing inaction **[*34]** as a choice). Because the Estate does not claim merely negligent conduct, a jury must decide whether the doctors' deliberate failure to act was objectively reasonable.

## IV

Any death is a great loss, but one as preventable as Gomes's is especially disturbing. On this record, a jury could have found that the intentional and knowing inaction of Drs. Elazegui and Singh caused Gomes's death. We therefore REVERSE and REMAND for new trial of the Estate's claim against them, as it relates to Gomes's death. We AFFIRM the district court's grant of summary judgment to the County defendants.

---

**End of Document**



# Robertson v. Jackson

United States District Court for the Northern District of Indiana, South Bend Division

January 9, 2014, Decided; January 9, 2014, Filed

CAUSE NO. 3:13-CV-1336 RM

**Reporter**

2014 U.S. Dist. LEXIS 4504 *; 2014 WL 129328

DONNELL ROBERTSON, Plaintiff, v. DR. JACKSON, DR. LIAW, and MRS. BOYAN, Defendants.

**Subsequent History:** Summary judgment granted by, Motion denied by *Robertson v. Jackson, 2015 U.S. Dist. LEXIS 33360 (N.D. Ind., Mar. 17, 2015)*

## Core Terms

medical treatment, ears, pro se, medication, alleges, prison, deliberate indifference, medical professional, leave to proceed, medical needs, retaliating, transferred, pleaded, ORDERS

**Counsel:** **[*1]** Donnell Robertson, Plaintiff, Pro se, Westville, IN.

**Judges:** Jon E. DeGuilio, United States District Judge.

**Opinion by:** Jon E. DeGuilio

## Opinion

OPINION AND ORDER

Donnell Robertson, a *pro se* prisoner, filed a complaint against two doctors and a nurse at the Westville Correctional Facility alleging that he is being denied medical treatment for his ears and back. "A document filed *pro se* is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers . . .." *Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)*. Nevertheless, pursuant to *28 U.S.C. § 1915A*, this court must review the complaint and dismiss it if the action is frivolous or malicious, fails to state a claim, or seeks monetary relief against a defendant who is immune from such relief. "In order to state a claim under [*42 U.S.C.] § 1983* a plaintiff must allege: (1) that defendants deprived him of a federal constitutional right; and (2) that the defendants acted under color of state law." *Savory v. Lyons, 469 F.3d 667, 670 (7th Cir. 2006)*.

Though prisoners are "not entitled to demand specific care [nor] entitled to the best care possible" *Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir.1997)*, **[*2]** the *Eighth Amendment* requires that they receive adequate treatment. *See Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. However, "[f]or a medical professional to be liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter, 541 F.3d 688, 697 (7th Cir. 2008)* (quotation marks and citations omitted). A "disagreement with medical professionals [does not] state a cognizable *Eighth Amendment* Claim under the deliberate indifference standard of *Estelle v. Gamble [429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)]*." *Ciarpaglini v. Saini, 352 F.3d 328, 331 (7th Cir. 2003)*.

Here, Mr. Robertson alleges that he has been frequently seen and treated by a doctor at an ear clinic who has performed surgery and prescribed him medication. He also alleges that he has been regularly seen by the two defendant doctors at the prison, but that they have refused to permit him to have that — or any other — medication for his ears or back. Giving Mr. Robertson the benefit of the inferences to **[*3]** which he is entitled that the pleading stage of this proceeding, he has alleged more than a mere disagreement with these two doctors and has sufficiently alleged that they have been deliberately indifferent to his serious medical needs.

The nurse, however, is different. If the two defendant prison doctors are preventing Mr. Robertson from obtaining medication as alleged; it is they — not the nurse — who is denying him medical treatment. Nurses

are expected to follow orders given by the doctors for whom they work. Nothing in this complaint indicates that it was unreasonable for the nurse to have relied on the standard division of labor in this instance. *See Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2005)*. As such, Mr. Robertson has not stated a claim against the nurse and she will be dismissed.

Additionally, Mr. Robertson alleges that the defendants are retaliating against him. Though the factual basis for this claim it sketchy, it appears that he is alleging that the doctors are denying him medical treatment because he has complained that they are denying him medical treatment. This is circular and does not state a claim for retaliation. *See Gomez v. Randle, 680 F.3d 859, 866 (7th Cir. 2012)*. **[*4]** Therefore this claim will be dismissed.

Finally, Mr. Robertson has sent the court a letter asking to be transferred to the Pendleton Correctional Facility for medical treatment. Though he has stated a claim for a denial of medical treatment, even if he prevails on this claim he is not entitled to be transferred because the State is empowered to confine him in any prison. *Meachum v. Fano, 427 U.S. 215, 224-25, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976)*. Therefore this request will be denied.

For the foregoing reasons, the court:

(1) GRANTS Donnell Robertson leave to proceed against Dr. Jackson and Dr. Liaw for compensatory and punitive damages for denying him medical treatment for his ears and back in violation of the *Eighth Amendment*;

(2) GRANTS Donnell Robertson leave to proceed against Dr. Jackson and Dr. Liaw for injunctive relief for medical treatment for his ears and back;

(3) DISMISSES all other claims;

(4) DISMISSES Nurse Boyan;

(5) DENIES the request [Doc. No. 5] for transfer;

(6) DIRECTS the clerk to transmit the summons and USM-285 for Dr. Jackson and Dr. Liaw to the United States Marshals Service along with a copy of the complaint and this order;

(7) DIRECTS the United States Marshals Service, pursuant to *28 U.S.C. § 1915(d)*, **[*5]** to effect service of process on Dr. Jackson and Dr. Liaw; and

(8) ORDERS, pursuant to *42 U.S.C. § 1997e(g)(2)*, that

Dr. Jackson and Dr. Liaw respond, as provided for in the Federal Rules of Civil Procedure and N.D. IND. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

SO ORDERED.

ENTERED: January 9, 2014

/s/ Jon E. DeGuilio

Judge,

United States District Court

---

**End of Document**

 Positive

As of: August 31, 2018 8:30 PM Z

# *Smego v. Jumper*

United States Court of Appeals for the Seventh Circuit

December 21, 2017, Submitted[*]; December 29, 2017, Decided

No. 16-4273

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. See FED. R. APP. P. 34(a)(2)(C).

**Reporter**
707 Fed. Appx. 411 *; 2017 U.S. App. LEXIS 26999 **; 2017 WL 6728831

RICHARD M. SMEGO, Plaintiff-Appellant, v. SHAN JUMPER, et al., Defendants-Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** Appeal from the United States District Court for the Central District of Illinois. No. 13-3068. Colin S. Bruce, Judge.

**Disposition:** AFFIRMED.

# Core Terms

sexual, detainee's, licenses, summary judgment, roommates

**Counsel:** Richard M. Smego, Plaintiff - Appellant, Pro se, Rushville, IL.

For Shan Jumper, Sharlene Caraway, Aimee Wilczynski, Cody Bond, Shelly Ganz, Defendants - Appellees: Craig L. Unrath, Attorney, Jessica R. Sarff, Attorney, Heyl, Royster, Voelker & Allen, Peoria, IL.

**Judges:** Before DIANE P. WOOD, Chief Judge, JOEL M. FLAUM, Circuit Judge, DIANE S. SYKES, Circuit Judge.

# Opinion

 **[*411] ORDER**

Richard Smego, a civil detainee, brought this suit under *42 U.S.C. § 1983* against various clinicians at the Treatment and Detention Facility in Rushville, Illinois. As relevant to this appeal, he alleged that the defendants violated the *Fourteenth Amendment* by failing to provide adequate mental-health treatment and forcing him to share a cell with other detainees. The district court entered summary judgment for the defendants, ruling that a reasonable jury could not find for Smego on either claim. We agree with that assessment and thus affirm.

Over twenty years ago, Smego abducted and sexually assaulted a 14-year-old boy at gunpoint, leading to convictions for aggravated criminal sexual abuse,

aggravated kidnapping, and sexual violence. He **[**2]** was released from prison in 2002, but his parole was revoked three years later when he was arrested for another sexual assault of a minor. The state then petitioned for Smego to be adjudicated a "sexually violent person" under the *Illinois Sexually Violent Persons Commitment Act, 725 ILCS 207/1-99*. The Act authorizes civil detention when a court finds that a sex offender has a mental disorder that makes it "substantially probable" he will engage in future acts of sexual violence. See *725 ILCS 207/5(f)*, *207/40*. Smego agreed to be committed based on his criminal history and the opinions of two psychologists who diagnosed him with paraphilia, *i.e.*, abnormal sexual desire, involving attraction to non-consenting adolescents. See *In re Commitment of Smego, 2017 IL App (2d) 160335, 418 Ill. Dec. 372, 90 N.E.3d 530, 2017 WL 4988665 (Ill. Ct. App. Nov. 2, 2017)* (upholding denial of petition for conditional release).

 **[*412]** Smego, a frequent litigant,[1] asserts that the defendants exhibited deliberate indifference to his welfare by (1) failing to provide adequate treatment for his paraphilia and posttraumatic stress disorder, and (2) assigning him roommates he perceives as physically and sexually aggressive. (It is unlikely that the eight defendants participating in this appeal had comparable degrees of responsibility for the actions **[**3]** or omissions Smego complains about, but the parties discuss the defendants' potential liability as a group, making no effort to distinguish them as individuals.)

Because Smego is a civil detainee—not a prisoner—his claims derive from the *Fourteenth Amendment's* guarantee of due process, not the *Eighth Amendment's* right to be free from cruel and unusual punishment. See *Hughes v. Farris, 809 F.3d 330, 334 (7th Cir. 2015)*. In prior cases we have said that the protections afforded by these constitutional amendments are "functionally

---

[1] See, *e.g.*, *Smego v. Payne, 854 F.3d 387 (7th Cir. 2017)* (upholding jury verdict in favor of clinicians accused of retaliation and deliberate indifference); *Smego v. Hankins, 681 F. App'x 506 (7th Cir. 2017)* (upholding entry of summary judgment for grievance officers accused of retaliation*); Smego v. Scott, 695 F. App'x 971 (7th Cir. 2017)* (upholding entry of summary judgment in suit arising from temporary air-conditioning outage); *Smego v. Mitchell, 645 F. App'x 523 (7th Cir. 2016)* (upholding jury verdict against dentist accused of deliberate indifference).

indistinguishable" in the context of a claim about inadequate medical care. See *Smego v. Mitchell, 723 F.3d 752, 756 (7th Cir. 2013)*; *Brown v. Budz, 398 F.3d 904, 910 (7th Cir. 2005)*. But these cases have been called into question by *Kingsley v. Hendrickson, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015)*, which applied a purely objective standard to a detainee's excessive-force claim without regard to any subjective component. See *Collins v. Al-Shami, 851 F.3d 727, 731 (7th Cir. 2017)*. We have not decided whether the reasoning in *Kinglsey* extends beyond claims of excessive force. See *Collins, 851 F.3d at 731*; but see *Darnell v. Pineiro, 849 F.3d 17, 36 (2d Cir. 2017)* (applying objective-reasonableness standard to detainee's conditions-of-confinement claim); *Castro v. County of Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016)* (en banc) (same with failure-to-protect claim). But we need not resolve this issue now, because even under the less demanding objective-reasonableness standard, Smego would not prevail.

In this court Smego raises three challenges to the grant of summary judgment for the defendants [**4] on his claim that his mental-health treatment is constitutionally inadequate. First, he maintains that some of the defendants were not licensed under the *Illinois Sex Offender Evaluation and Treatment Provider Act, 225 ILCS 109/1-999*. The Act, which took effect in 2014, requires that those who provide sex-offender treatment to civil detainees have a license to do so. A detainee's allegation that his treatment providers lack such licenses, we held in *Hughes v. Dimas, 837 F.3d 807 (7th Cir. 2016)*, may in some circumstances state a claim under the *Fourteenth Amendment*. Because some of the defendants participated in Smego's treatment before they obtained licenses under the SOETP Act, he maintains that his sex-offender treatment was unconstitutional.

As the district court properly found, the record belies any concern about the defendants' qualifications. The very documents Smego introduced to prove this claim show that most of the defendants obtained licenses under the SOETP Act within a few months of its taking effect in July 2014. [*413] See Ill. Pub. Act 98-612 (delaying effective date of the Act to July 1, 2014). Those same documents also reveal that several of the defendants obtained other relevant licenses long before Smego's arrival at Rushville; for example, defendant [**5] Shan Jumper, the facility's executive clinical director, has been a licensed clinical psychologist for over 17 years. Given this record, a reasonable jury could not accept Smego's contention that the defendants are unqualified to provide sex-offender treatment.

Related to this last challenge, Smego also suggests that his progress in sex-offender treatment has been delayed by frequent turnover among the clinical staff. He explains that each time his primary therapist changes he is "forced to discard the work he had already done as now worthless, effectively resetting his treatment back to the beginning." But he cites nothing other than his lay opinion to support the notion that these staffing changes have impaired his treatment. And he does not explain what, if anything, the named defendants could have done to mitigate this alleged problem. A reasonable jury could not find for Smego based on his mere dissatisfaction with his treatment. *Cf. Ortiz v. Webster, 655 F.3d 731, 738 (7th Cir. 2011)* (recognizing that even difference of opinion between *physicians* would rarely establish malpractice).

In a challenge to the adequacy of his care addressing his PTSD, Smego faults the defendants for not offering him group therapy. No one on the clinical [**6] staff at Rushville has diagnosed him with PTSD, but a psychologist retained to testify on his behalf in another case diagnosed him in 2012 with that condition. Smego seems to think that the defendants should have taken the initiative to enroll him in a PTSD-specific therapy group. Yet, as the district court noted, Smego submitted no evidence that group therapy is necessary to treat PTSD, and until this litigation began Smego never sought treatment for this condition from his doctor or psychiatrist. On this record, we do not see how a reasonable jury could find the defendants even negligent, a level of culpability that is "categorically beneath the threshold of constitutional due process." *Kingsley, 135 S. Ct. at 2472* (quoting *County of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998))*.

Smego also challenges the grant of summary judgment on his claim that the defendants assigned him a series of roommates who, he says, were known troublemakers. This claim fares no better. To begin, it is unclear from the record whether any of the defendants had any personal involvement in the assignments. But even assuming that some of them were involved in that process, a jury could not find for Smego. Aside from one bizarre incident in which Smego says that a roommate dropped a mechanical [**7] pencil on his leg, he does not allege that any of his roommates actually injured him. Smego's subjective fear of harm that never materialized does not itself give rise to a constitutional

claim. See *Calhoun v. DeTalla, 319 F.3d 936, 939 (7th Cir. 2003)* ("[N]ot every psychological discomfort a prisoner endures amounts to a constitutional violation"); *Babcock v. White, 102 F.3d 267, 272 (7th Cir. 1996)*. Moreover, Smego was moved to a new cell on several occasions when he reported feeling threatened by a roommate, negating any inference that prison officials were indifferent to his concerns.

We have considered Smego's remaining arguments, and none merits discussion.

AFFIRMED.