## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

REBECCA TERRY,

                        Plaintiff,

v.                                              Case No. 17-CV-1112

COUNTY OF MILWAUKEE, *et al.*,

                        Defendants.

## DECLARATION OF BRIAN WENZEL

STATE OF WISCONSIN      )
                        ) ss:
MILWAUKEE COUNTY        )

I, Brian Wenzel, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am an adult resident of the State of Wisconsin and County of Milwaukee.

2.      From February 18, 2013 to the present I have been continuously employed by the Milwaukee County Sheriff's Office as a Correctional Officer assigned to the Milwaukee County Jail.

3.      Beginning in February 2013 I completed six weeks of correctional officer training at the Milwaukee County Sheriff's Officer Training Academy. This was followed by a probationary period of one year during which I received additional on the job training under the supervision of training officer David Seel.

4.      I received extensive training regarding the jail's legal duty under state statutes, administrative code and constitutional case law to provide adequate health care to jail inmates. A copy of a portion of my training materials, entitled "Jail Health Care," is attached as Exhibit 1.

5.      I was consistently trained that my job duties included the responsibility to respond to inmate needs/requests for medical care.  Attached as Exhibit 2 is a power point slide presentation given during my training, discussing *Estelle v. Gamble*, a United States Supreme Court case that sets the standard for health care in correctional institutions.  The presentation described four basic concepts of "deliberate indifference," which is a violation of the officer's duty to provide adequate health care:

     a.  Deliberate failure to take proper actions to become aware of possibly serious medical needs, including during intake screening;

     b.  Deliberate failure to take appropriate action or seek medical help upon noticing that an inmate seems to be apparently seriously ill or injured;

     c.  Deliberate failure to take appropriate actions based on an inmate's request for medical help for an apparently serious illness or injury; and

     d.  Deliberately ignoring or interfering with a prescribed medical order regarding care or treatment.

The slide entitled "Responding to Requests for Medical Care" contains my handwritten note ("Refer") directly above the following text:

- NEVER ignore an inmate complaint

6.      Exhibit 3 is a "Jail Health Care Student Study Review Worksheet," which was completed in my handwriting during training.  It contains the following question, to which I responded by selecting Answer C:

- Question 4

If an inmate has properly submitted a sick call request but an officer does not feel that the inmate imminently needs to be seen by a health care provider, the officer should:

_____ A.        Advise the inmate to wait until he or she has left jail custody to seek care for the health care problem or concern.

_____ B.        Inform the inmate that the sick call request is denied

__X_ C.        Honor the inmate's sick call request anyway

_____ D.        Complete a state form entitled INMATE HEALTH CARE NON-REFERRAL

Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of June, 2018.

_/s/ Brian Wenzel_____
Brian Wenzel

3

**1**

# JAIL HEALTH CARE

## A Training Guide for Jail Officers



## Wisconsin Department of Justice
## Law Enforcement Standards Board

## December, 2010

### Effective May, 2011

# JAIL HEALTH CARE

## Table of Contents

**HEALTH CARE IN THE JAIL SETTING: INTRODUCTION / LEGAL DUTY OF CARE** ....................................................................... 1
  **Legal Duty to Ensure Adequate Health Care in the Jail** ...................... 1
    State Statutory Requirements ......................................................... 2
    Administrative Code Requirements ................................................. 3
    Constitutional Laws and Major Case Law
      Regarding Inmate Health Care ................................................. 4
  **Duties of the Jail Officer in Regard to Inmate
  Health Care** ................................................................................... 6

**SCREENING FOR INMATE HEALTH CARE NEEDS UPON
ADMISSION TO CUSTODY** ................................................................. 7

**RESPONDING TO INMATE NEEDS / REQUESTS FOR MEDICAL
OR HEALTH CARE** ............................................................................... 9
  **Inmate Requests for Health Care** ......................................................... 9
  **Responding to Non-Emergency Medical or Health Care Needs** ....... 11
  **Responding to Emergency Medical or Health Care Needs** .............. 13

**CONTROL AND DELIVERY OF MEDICATIONS /
MEDICAL ORDERS** .......................................................................... 17
  **Control and Administer / Deliver Medications** .................................... 17
    Verification of Prescribed Medications .......................................... 18
    Storage and Control of Medications .............................................. 20
    Administration / Delivery of Medications to Inmates ..................... 21
    Tricks / Problems with Giving Medication
      to Inmates ............................................................................... 24
    Documentation of Medication Administration / Delivery .............. 26
    Return of Unused Medications to Inmates .................................... 28
  **Follow Other Medical Orders** ............................................................. 29
    Specific Medical Orders ................................................................ 29
    Standing Medical Orders ............................................................... 31
    Document that Medical Orders Were Followed ............................. 32

**HELP PROVIDE HEALTH CARE TO INMATES** ..................................... 34
  **Identification of and Response to Inmates with Possible
  Communicable or Contagious Diseases** ............................................ 35
    General Indicators of Possible Communicable Diseases ............ 37
    Standard Precautions to Prevent Spread of
      Communicable Diseases ......................................................... 38
    Further General Health Care Guidelines for Possible Cases
      Of Communicable or Contagious Diseases ............................. 41
    Guidelines for Handling Possible HIV and AIDS Cases .............. 43

Case 2:17-cv-01112-JPS Filed 09/04/18 Page 7 of 116 Document 175-12
MKE COUNTY 7302

Guidelines for Handling Possible Hepatitis Cases ...................... 45
Guidelines for Handling Possible Tuberculosis Cases................ 47
Guidelines for Handling Possible MRSA Cases .......................... 49
**Identification of and Response to Inmates with Possible**
**Chronic Diseases** ................................................................. **51**
Guidelines for Care of Diabetic Inmates...................................... 51
Guidelines for Care of Inmates with Epilepsy.............................. 54
Guidelines for Care of Inmates with Chronic
Respiratory Diseases ............................................... 57
Guidelines for Care of Inmates with Chronic Heart Disease ....... 60
**Identification of Response to Inmates with Possible Alcohol or**
**Drug-Related Problems** ......................................................... **61**
General Indications of Possible Alcohol or Other
Drug Abuse................................................................ 62
Response to Inmates with Possible Alcohol or
Drug Abuse Problems ............................................... 64
Respond to Non-Emergency Situations............................ 64
Respond to Emergency Situations ................................... 66
Response to Methamphetamine Users ........................................ 68
Document and Debrief........................................................... 75

**MAINTENANCE OF HEALTH CARE RECORDS**
**AND DOCUMENTATION** ....................................................... **76**
**Legal Requirements Regarding Health Care Record-Keeping.......... 76**
**Types of Health Care Records in Jail Settings................................... 79**
**General Guidelines for Effective Record-Keeping............................. 80**
**Routing and Filing of Medical Records.............................................. 81**

**MANAGING STRESS.............................................................................. 82**
**Common Sources of Stress ................................................................. 82**
**Some Guidelines for Effective Stress Management ......................... 84**

05/11

# *ACKNOWLEDGEMENTS*

Grateful appreciation for hard work on preparation of the curriculum for Wisconsin's basic jail officer training program is extended to the members of the Department of Justice's *Jail Officer Training Advisory Committee*. Members (as of spring, 2006), include:

| | |
|---|---|
| Todd Ashworth, Assistant Superintendent | Milwaukee County House of Correction, retired |
| Barbara Barrington-Tillman, Jail Administrator | Rock County Sheriff's Department |
| Randy Bellisle, Deputy | Dane County Sheriff's Department |
| Steve Borroughs, Jail Administrator | Shawano County Sheriff's Department |
| Steve Coronado, Jail Administrator | Juneau County Sheriff's Department |
| Doris Daggett, Jail Administrator | LaCrosse County Sheriff's Department |
| Karen Humphrey, Jail Administrator | St. Croix County Sheriff's Department |
| Barb Jascor, Corrections Instructor | Mid-State Technical College |
| Peter Jaskulski, Training Academy Director | Milwaukee County Sheriff's Department |
| Jim Kroncke | Outagamie County Sheriff's Department, retired |
| Charlie Law, Chief Deputy | Douglas County Sheriff's Department |
| Bob Lee | Wisconsin Sheriffs & Deputy Sheriffs Assn. |
| Scott Morris, Detention Facilities Specialist | WI Department of Corrections |
| Elizabeth Paape, Associate Dean | Northeast WI Technical College |
| Eric Runaas, Sheriff | Rock County Sheriff's Department |
| Mike Schmitz, Jail Administrator | Walworth County Sheriff's Department |
| Dennis Smith, Sheriff | Dunn County Sheriff's Department |
| Phil Steffen, Lieutenant | Brown County Sheriff's Department |
| Kenneth Wilcox | Milwaukee County Sheriff's Department, retired |

### Former Members:

Arden Geisler
Tim Leatherbury
Greg Lieberg
Tom Luther
Lee Robarge

Case 2:17-cv-01112-JPS Filed 09/04/18 Page 9 of 116 Document 175-12

# HEALTH CARE IN THE JAIL SETTING: INTRODUCTION / LEGAL DUTY OF CARE

Provision of adequate health care services to jail inmates is an important element of jail operations. Provision of an adequate level of such care is important for several reasons:

- Health care is important to inmates. When they are incarcerated, inmates cannot take care of their own health care needs. They must depend on their keepers to respond to their needs, ranging from obtaining an over-the-counter pain reliever for a headache to responding to an emergency medical situation. The failure of jail staff members to be aware of inmate medical or health care needs or to adequately respond to such needs is a significant source of inmate frustration and complaints or grievances;

  Provision of adequate health care is, for that reason, a key element of a positive overall jail climate. When inmates feel that jail staff members are aware of their health care needs and are willing and capable to provide an adequate level of care, the jail climate is usually better. There are fewer complaints, and a generally-better attitude overall.

- As a jail staff member, you have a legal duty of care to ensure provision of an adequate level of health care to inmates. This is required both in Wisconsin statutes, Wisconsin Administrative Code, and in constitutional law. That is, the U.S. Supreme Court has determined that failure to provide a certain level of health care to inmates can - depending on the circumstances - be a violation of the constitutional rights of such inmates.

There have been many lawsuits based on allegations of failure to provide adequate medical and health care in the jail setting. Thus, health care is a key issue in regard to potential liability in the jail setting.

## LEGAL DUTY TO ENSURE ADEQUATE HEALTH CARE IN THE JAIL

As noted, there is a legal duty to provide an adequate level of medical and health care in the jail setting. This duty is specified in state statutes, Administrative Code, and constitutional case law.

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 10 of 116   Document 175-12
MKE County R305

## STATE STATUTORY REQUIREMENTS

The key statutory requirement is contained in s.302.38, Wis. Stats.. Section 302.38 indicates as follows:

> "If a prisoner needs medical or hospital care or is intoxicated or incapacitated by alcohol the sheriff or other keeper of the jail shall provide appropriate care or treatment and may transfer the prisoner to a hospital or to an approved treatment facility under s.51.45(2)(b) and (c), making provision for the security of the prisoner."

This section essentially makes clear that the sheriff has the responsibility to be sure that inmates receive needed medical care, including hospital care if necessary.

The reference to "approved treatment facility under s.51.45(2)(b) or (c)" has to do with either private or public treatment facilities for alcoholics or intoxicated persons.

This section of statutes also addresses the issue of payment for an inmate's medical care costs.

Section 302.38(5) indicates that the sheriff or keeper of a jail is not required "to provide or arrange for the provision of appropriate care or treatment if the prisoner refuses appropriate care or treatment." A jail inmate has the right to refuse medical care or treatment. As this section indicates, the sheriff is not obligated to provide care or treatment if an inmate refuses to accept such care or treatment. Another section of statute - s.302.84, Wis. Stats. - specifies the procedures to be followed if an inmate refuses appropriate care or treatment. You will learn about this later in this task module.

In **ADMIT AND RELEASE INMATES**, you learned about s.302.388, Wis. Stats., which requires preparation and submission of a HEALTH TRANSFER SUMMARY form when an inmate is being transferred from one county jail to another jail, jail to prison, or prison to jail. As an officer, you may have certain responsibilities in regard to such forms.

Another section of state statutes authorizes the state Department of Corrections to establish "program standards" for county jails and houses of correction. S.302.365(1)(a), Wis. Stats., gives the Department of Corrections the authority to require each jail to develop a written policy and procedures manual which must minimally cover certain issues, including:

> "Policies and procedures for screening prisoners for medical illnesses or disabilities, mental illnesses, developmental disabilities and alcohol or other drug abuse problems. The rules shall establish functional objectives for screening but may not require jails or houses of correction to use only one particular method to meet the objectives. The policies and procedures shall include the use of outside resources, such as county mental health staff or hospital resources, and shall include agreements with these resources, as appropriate, to ensure adequate services to prisoners identified as needing services."

Case 2:17-cv-01112-JPS   Filed 09/04/18   MKE County   Page 11 of 116   Document 175-12

This section of law simply says that each jail must have policies and procedures on the issues listed. It is up to each jail to develop these policies and procedures, to conform to their particular needs and situations.

More specific subjects which must be included in particular policies and procedures are listed in the chapter of Wisconsin Administrative Code dealing with adult jails. This chapter is known as DOC 350, and it is one of the chapters of administrative rules established by the state Department of Corrections. The Department of Corrections, through its jail inspection unit, is authorized to enforce the provisions of DOC 350. The specific requirements for policies and procedures on health care issues, as required in DOC 350, are discussed below.

S.302.365(1)(b) contains a further statutory requirement. In regard to crisis intervention services, this subsection requires the sheriff or other keeper of a jail or house of correction to:

*"...ensure that the jail or house of correction has available emergency services for crisis intervention for prisoners with medical illnesses or disabilities, mental illnesses, developmental disabilities or alcohol or other drug abuse problems."*

The statute is not specific as to what these "emergency services for crisis intervention" are to be. That is up to the sheriff or keeper of the jail.

## ADMINISTRATIVE CODE REQUIREMENTS

As noted, the Administrative Code, under DOC 350, contains several requirements relating to inmate health care. Several basic requirements are contained in DOC 350.09, "Health Care." This section contains the following provisions:

(1). *The sheriff shall provide or secure necessary medical treatment and emergency dental care for inmates in custody;*

(2). *No prescription medications or treatments may be administered unless prescribed by a physician.*

(3). *Medical records shall be kept separate from other records and shall be maintained in a confidential manner in accordance with ss.146.81 to 146.83, Stats., and any other applicable state or federal laws.*

(4). *Any medications kept at the jail shall be stored in a locked drug cabinet that is not accessible to inmates.*

(5). *If an inmate dies or becomes acutely ill while in custody, the next of kin shall be notified as soon as possible.*

(6). *Inmates shall be served nutritionally balanced meals. Menus shall be kept*

Case 2:17-cv-01112-JPS   Filed 06/05/19   Page 12 of 116   Document 175-12

# STATE STATUTORY REQUIREMENTS

The key statutory requirement is contained in s.302.38, <u>Wis. Stats.</u>. Section 302.38 indicates as follows:

> *"If a prisoner needs medical or hospital care or is intoxicated or incapacitated by alcohol the sheriff or other keeper of the jail shall provide appropriate care or treatment and may transfer the prisoner to a hospital or to an approved treatment facility under s.51.45(2)(b) and (c), making provision for the security of the prisoner."*

This section essentially makes clear that the sheriff has the responsibility to be sure that inmates receive needed medical care, including hospital care if necessary.

The reference to "approved treatment facility under s.51.45(2)(b) or (c)" has to do with either private or public treatment facilities for alcoholics or intoxicated persons.

This section of statutes also addresses the issue of payment for an inmate's medical care costs.

Section 302.38(5) indicates that the sheriff or keeper of a jail is not required "to provide or arrange for the provision of appropriate care or treatment if the prisoner refuses appropriate care or treatment." A jail inmate has the right to refuse medical care or treatment. As this section indicates, the sheriff is not obligated to provide care or treatment if an inmate refuses to accept such care or treatment. Another section of statute - s.302.84, <u>Wis. Stats.</u> - specifies the procedures to be followed if an inmate refuses appropriate care or treatment. You will learn about this later in this task module.

In **ADMIT AND RELEASE INMATES**, you learned about s.302.388, <u>Wis. Stats.</u>, which requires preparation and submission of a HEALTH TRANSFER SUMMARY form when an inmate is being transferred from one county jail to another jail, jail to prison, or prison to jail. As an officer, you may have certain responsibilities in regard to such forms.

Another section of state statutes authorizes the state Department of Corrections to establish "program standards" for county jails and houses of correction. S.302.365(1)(a), <u>Wis. Stats.</u>, gives the Department of Corrections the authority to require each jail to develop a written policy and procedures manual which must minimally cover certain issues, including:

> *"Policies and procedures for screening prisoners for medical illnesses or disabilities, mental illnesses, developmental disabilities and alcohol or other drug abuse problems. The rules shall establish functional objectives for screening but may not require jails or houses of correction to use only one particular method to meet the objectives. The policies and procedures shall include the use of outside resources, such as county mental health staff or hospital resources, and shall include agreements with these resources, as appropriate, to ensure adequate services to prisoners identified as needing services."*

MKE/County R 308

This section of law simply says that each jail must have policies and procedures on the issues listed. It is up to each jail to develop these policies and procedures, to conform to their particular needs and situations.

More specific subjects which must be included in particular policies and procedures are listed in the chapter of Wisconsin Administrative Code dealing with adult jails. This chapter is known as DOC 350, and it is one of the chapters of administrative rules established by the state Department of Corrections. The Department of Corrections, through its jail inspection unit, is authorized to enforce the provisions of DOC 350. The specific requirements for policies and procedures on health care issues, as required in DOC 350, are discussed below.

S.302.365(1)(b) contains a further statutory requirement. In regard to crisis intervention services, this subsection requires the sheriff or other keeper of a jail or house of correction to:

> "...ensure that the jail or house of correction has available emergency services for crisis intervention for prisoners with medical illnesses or disabilities, mental illnesses, developmental disabilities or alcohol or other drug abuse problems."

The statute is not specific as to what these "emergency services for crisis intervention" are to be. That is up to the sheriff or keeper of the jail.

## ADMINISTRATIVE CODE REQUIREMENTS

As noted, the Administrative Code, under DOC 350, contains several requirements relating to inmate health care. Several basic requirements are contained in DOC 350.09, "Health Care." This section contains the following provisions:

(1). *The sheriff shall provide or secure necessary medical treatment and emergency dental care for inmates in custody;*

(2). *No prescription medications or treatments may be administered unless prescribed by a physician.*

(3). *Medical records shall be kept separate from other records and shall be maintained in a confidential manner in accordance with ss.146.81 to 146.83, Stats., and any other applicable state or federal laws.*

(4). *Any medications kept at the jail shall be stored in a locked drug cabinet that is not accessible to inmates.*

(5). *If an inmate dies or becomes acutely ill while in custody, the next of kin shall be notified as soon as possible.*

(6). *Inmates shall be served nutritionally balanced meals. Menus shall be kept*

- 3 -                                                                05/11

Case 2:17-cv-01112-JPS   Filed 09/06/19   MKE County Page 14 of 116   Document 175-12

> *for 90 days for review. An inmate shall be provided with a special diet if ordered by a physician.*

Provisions (2), (3) and (4) above will be discussed in more detail later.

Provision (1) is similar to the statutory requirement in s.302.38, <u>Wis. Stats.</u>, in that it indicates that the sheriff is responsible for securing necessary medical care for inmates.

DOC 350 also contains - as noted above - information on specific issues to be covered in each jail's policies and procedures manual. In regard to medical and health care, those issues are:

- ✓ DOC 350.17, "Inmate Health Screening and Care";

- ✓ DOC 350.20, "Control and Administration of Medications"; and

- ✓ DOC 350.21, "Communicable Disease Control".

Each of these sections of DOC 350 will be covered in detail in the relevant portion of this or other task modules.

Another chapter of Wisconsin Administrative Code, DOC 346, contains further specific requirements regarding health care for juvenile inmates who are being held for secure detention, either in the juvenile portion of a county jail or a secure juvenile detention facility.

## CONSTITUTIONAL LAW AND MAJOR CASE LAW REGARDING INMATE HEALTH CARE

There have been a number of major court decisions regarding provision of health care to inmates of jails and prisons. The most important of such decisions occurred in the United States Supreme Court's ruling in the 1976 case of <u>Estelle v. Gamble</u> (97 S. Ct. at 291). The ruling in this case set the basic standard for provision of health care in correctional institutions. In discussion of the case, the Supreme Court concluded as follows:

> *"...deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'...proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying access to medical care or intentionally interfering with the treatment once prescribed."*

Essentially, the Court's decision established the standard of "deliberate indifference." In regard to health care, this means that it could be a violation of an inmate's constitutional rights if an officer (or a health care provider) <u>deliberately</u> does something or fails to do something which results in failure to provide adequate care for an inmate's <u>serious</u>

MKE/County 1390

medical care need. The Court determined that such deliberate indifference would be a violation of the Eighth Amendment, which prohibits "cruel and unusual punishment" of citizens.

The key words in the Estelle decision are "**deliberate** indifference" and "**serious** medical needs.**" This wording indicates that a constitutional violation might occur if a jail staff member or health care provider does something or fails to take some action deliberately - that is, on purpose - rather than merely accidentally or negligently. The wording also indicates that the inmate's medical care problem or need must be serious. That is, an officer's or health care provider's indifference to a small, relatively insignificant medical need of an inmate would not meet the test for a constitutional violation.

In any situation, it is the facts in a particular case which determine whether an action taken or not taken was deliberate or a medical care need was serious. There is no absolute standard which applies to every situation.

On the basis of the standard established in the Estelle decision and subsequent decisions of state and federal courts since 1976, it is possible to list four basic categories of deliberate actions (or failures to act) on the part of a line officer in a jail, any of which could amount to "deliberate indifference to serious medical needs of prisoners." These include:

1. Deliberate failure to take proper actions to become aware of possibly serious inmate medical needs or problems, whether at intake or at other times. This includes intake screening;

2. Deliberate failure to take appropriate actions or seek medical help upon noticing that an inmate seems to be apparently seriously ill or injured;

3. Deliberate failure to take appropriate actions or seek medical help based on an inmate's request for medical help for an apparently serious illness or injury. This could include a request to be seen during sick call, to be taken to a hospital, etc.; and

4. Deliberately ignoring or interfering with a medical order or directive regarding care or treatment of an inmate. This includes an order regarding medication.

Each of these issues will be discussed in this task module.

Remember that the "deliberate indifference" standard is a fairly high standard; it requires that you consciously, purposefully do something or fail to do something. As an officer, you may well do something or not do something negligently rather than deliberately. That is, you may simply forget to do something, like deliver a medication to an inmate. It is possible to make honest, unintentional mistakes or omissions. There can still be possible liability for a negligent action. However, such negligence is generally not considered a constitutional violation. It is a lesser level of liability.

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 16 of 116   Document 175-12

# DUTIES OF THE JAIL OFFICER IN REGARD TO INMATE HEALTH CARE

Based on all of the above standards regarding provision of health care to inmates (Wisconsin statutes, Administrative Code, and major case law), the following specific tasks may be identified in regard to a line officer's duties as to provision of adequate health care to inmates:

- Conduct a screening for inmate health care needs upon admission to custody;

- Respond to inmate needs / requests for medical or health care;

- Control and administer or deliver medications / Follow other medical orders;

- Provide health care (emergency and non-emergency) to inmates;

- Maintain health care records, as appropriate.

Each of these issues is discussed in this text.

# SCREENING FOR INMATE HEALTH CARE NEEDS UPON ADMISSION TO CUSTODY

An important aspect of the overall health care program in the jail is screening of inmates for medical/health care problems and needs upon admission to custody.

The main purposes of intake health screening include:

- To identify inmates who perhaps ought not be accepted into jail custody until they have been medically evaluated and cleared for admission;

- To identify inmates who can be safely admitted to jail custody, but who should then be referred to the jail medical staff for evaluation;

- To identify medical and health care problems of inmates which you should know about in order to best ensure that their health care needs are met;

- To identify and respond to potential health care problems which could affect the welfare of other inmates and jail staff members. An example is contagious or communicable diseases; and

- To identify inmates needing medications, so that they can properly receive such medications, or other treatments.

Intake health care screening is usually a routine part of the overall admissions process. Screening is accomplished by (1) observing inmates and (2) asking a series of questions of each new inmate, and documenting the results on a standard screening form. The results of the screening are then used to determine proper follow-up actions, or dispositions, as necessary, in order to ensure adequate health care for inmates. Such actions might include isolation of an inmate with a possible communicable disease, referral of an inmate to a medical or mental health professional, transportation of an inmate to a hospital for evaluation, etc.

Thus, intake health screening is the first opportunity for jail staff to learn about an inmate's medical and health care needs and possible problems, and to then take appropriate actions to ensure proper care of inmates.

By conducting such screening, jail staff meet part of their "duty of care" to take proper actions to become aware of possibly serious medical needs or problems of inmates.

As noted, Wisconsin law, under s.302.365, <u>Wis. Stats.</u>, requires that each jail develop policies and procedures on certain issues. Wisconsin Administrative Code, under DOC 350, then specifies what is to minimally be included in each of the required policy subjects. Inmate health screening and care is one of those policy subjects. According to DOC 350.18, each jail's policy manual is to contain policies and procedures which

Case 2:17-cv-01112-JPS   Filed 09/04/19   Page 18 of 116   Document 175-12
MKE County 1393

include information on the following:

1.   *Health screening form which is developed in conjunction with health care professionals and which is used at booking to obtain information relating to each inmate's medical and dental condition, medical illnesses or disabilities, mental illnesses, developmental disabilities, alcohol or other drug abuse problems and suicide risk.*

2.   *Procedures for the documentation of health screening results, referrals made or health care provided and maintenance of documents in an inmate's confidential medical file.*

You must know and follow the specific policies and procedures of your jail in regard to these issues.

More detailed information and guidelines on conducting effective intake health screening is covered in a separate task module: **ADMIT AND RELEASE INMATES** .

# RESPONDING TO INMATE NEEDS / REQUESTS FOR MEDICAL OR HEALTH CARE

The next important element in an effective jail health care program is a consistent system for identifying and responding to the needs of inmates for medical and health care. This involves:

- Responding to inmate requests for health care;

- Being aware of non-emergency medical or health care needs, and responding to these; and

- Being aware of emergency medical or health care needs, and responding to these.

## INMATE REQUESTS FOR HEALTH CARE

Every jail should have a procedure in place by which inmates can request medical/health care. This may range from a request for a simple non-prescription medication, like aspirin, to a request to be seen during next sick call to a request for immediate medical attention.

DOC 350.18 requires that each jail have policies and procedures regarding these issues. Specifically, it is required that each jail's policies on inmate health screening and care includes the following:

1.  *Names, addresses and telephone numbers of health care providers or agencies who have agreed to provide emergency and other health care services for special needs inmates;*

2.  *Procedures for the referral of an inmate to jail health care staff or to other agencies which provide health care;*

3.  *Designation of staff who have the authority to make health care decisions, including emergency medical and dental care;*

4.  *Non-emergency health care, including use of an inmate's personal physician;*

5.  *Schedule of inmate access to routine medical care;*

6.  *Procedure for processing inmate medical requests, including written dispositions;*

7.  Documentation in an inmate's medical file of any referral and identification of the services provided, including emergency services.

Your task is to know and follow your jail's policies and procedures in regard to all of the above.

It is very important for you to be familiar with your policies and procedures regarding inmate requests to be seen by jail medical staff during sick call.

Usually, jail policies require that inmate requests to be seen during sick call must be in writing. There are at least two good reasons why this is good practice:

✓ Requiring that a request be in writing means that there will be a record of the request. If requests are saved (as they should be), it makes it more difficult for an inmate to later claim that he or she requested to be seen at sick call, but was denied or ignored. That is, it eliminates the necessity for jail staff to have to try to recall whether or not an inmate requested health care; and

✓ From an operational perspective, it makes your job easier if requests are in writing because you do not need to remember what inmates said or verbally requested.

However, even if your jail policy indicates that requests are to be in writing, some inmates may not be able to read or write English or may not be able to read or write in any language. Such inmates cannot be denied access to medical care just because they cannot write. In such a case, it may be necessary for you or someone else to write out the inmate's request, to be passed on as appropriate. Another option is to have a request form printed in other languages, such as Spanish, for inmates who cannot read or write English.

When an inmate requests to be seen during sick call, it may be appropriate to verbally ask him or her the reason for the request. The purpose of doing so is not to invade the inmate's privacy or medical confidentiality, but simply to try to determine if the inmate may have a problem that seems to require immediate attention, rather than waiting for the next scheduled sick call. This may be particularly important if the next sick call is several days away, or if you have any reason to believe that an inmate may have an illness or injury which may require timely attention. If an inmate declines to answer your question, that should NEVER result in a decision to disallow his or her request to be seen during sick call.

Whether or not an inmate answers your question, if you have reason to believe that the inmate should be seen by a medical professional prior to the next scheduled sick call, you should refer the inmate for such care, on your own. This may involve transporting the inmate to a hospital or emergency clinic, or it may involve simply contacting a medical or mental health professional to let them know your concerns. Or, it may simply involve adding the inmate's name to the next sick call list. If you do so, be sure to note the reason for this action - that is, the reason you felt the inmate should be seen.

MKE County P336

When you receive requests from inmates to be seen during sick call, route such requests properly, according to your policies and procedures.

**NEVER** ignore an inmate's request to be seen during sick call, or take it upon yourself to determine that any request is invalid or that the inmate need not be seen. To do so could be construed as "deliberate indifference" to an inmate's medical care needs. You may think that an inmate is not really sick or injured, or that he/she has ulterior motives for wanting to see the doctor or nurse. You may be correct, but that is beside the point. If you ignore a request by an inmate to be seen during sick call, you are essentially making a medical decision which, legally, you are not qualified to make. That leaves you wide open to potential legal liability, based on the standard in the *Estelle v. Gamble* ruling.

Even if an inmate requests to be seen during sick call *every time* that there is sick call, do not ignore his or her requests. Simply follow the standard procedure for routing inmate requests, each and every time.

In addition to requests to be seen during sick call, inmates may request other forms of health care. Some include:

- A request for a non-prescription medication, such as aspirin or other pain reliever, antacid, cold or cough medicine, and so on;

- A request to see their personal physician or dentist;

- A request to see a medical specialist for evaluation or treatment.

Know and follow your jail's policies and procedures for handling and disposition of such requests.

Remember that DOC 350.18 specifically requires that there be policies addressing "use of an inmate's personal physician." Some jails require that a jail medical staff member is authorized to determine whether or not an inmate may see his or her own personal physician.

Again, it is very important that you, as a line officer, not simply ignore an inmate's request for these or other forms of health care. Instead, follow procedures for referral of requests, and do not take it upon yourself to determine that any request is invalid or unworthy or unnecessary.


# RESPONDING TO NON-EMERGENCY MEDICAL OR HEALTH CARE NEEDS

Remember that another of the ways which you could be "deliberately indifferent" to serious medical needs of inmates is to be aware of a possibly-serious non-emergency medical or health care need of an inmate, but not respond adequately to that need. If

you become aware that an inmate seems to be seriously ill or injured, your "duty of care" is to take some sort of action to try to ensure that the inmate receives adequate care.

There are several ways in which you might become aware of an inmate's possibly-serious illness or injury. Some include:

- ✓ Your own observation of the inmate;

- ✓ Other inmates informing you or another staff member about an inmate;

- ✓ Information from an outside source, such as a family member or friend of an inmate, a probation officer, attorney, social worker, medical or mental health care professional, and so on; or

- ✓ Hearing complaints from an inmate, although the inmate does not necessarily specifically request to see a doctor or nurse.

In determining whether an inmate may have an injury or illness that is possibly-serious, you are NOT expected to make a medical evaluation or diagnosis. Instead, you are simply expected to use your common sense and good judgment, as a non-medical professional. You do not have to conclude that an injury or illness is serious, only that it might be serious, and therefore warrants professional evaluation.

When you become aware that an inmate may be seriously ill or injured but it does not seem to be an emergency situation, your task is to take some sort of action to secure professional care for the inmate. You will do that based on your jail's policies and procedures. Your action may include:

- Contacting the jail doctor or nurse, if readily available, to convey your concerns about the inmate;

- Placing the inmate on the list for next sick call, if that is to occur fairly soon;

- Contacting a supervisor to convey your concerns and/or seek advice;

- If jail medical staff is not available and will not be available in the near future, it may be prudent to convey the inmate to a hospital or emergency clinic for evaluation.

Again, your actions depend on the policies and procedures of your facility, availability of in-house health care staff, and so on.

The most important thing is that you DO NOT simply ignore a situation in which an inmate may be seriously ill or injured, but it is not an apparent emergency situation. You may, for example, feel that an inmate is "faking it" for some reason - such as a desire to see a nurse or to be transferred to a hospital, etc. - or you may feel that an inmate is not as sick as he or she claims to be. But if you choose not to take proper actions for such reasons, you not only leave yourself open to the possibility of liability but also take the

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 23 of 116   Document 175-12

chance that an inmate's medical condition will worsen, based on your failure to act properly.

**ALWAYS document your actions in such cases.** It is critically important that there is a record of the actions you took to ensure care for an inmate who may have a possibly-serious illness or injury. Follow your policies and procedures regarding such documentation. Your jail may have a particular form for documenting such actions. Or, your procedure may be to simply make a notation in a log book or incident book. Be sure to document the following:

- ✓ Reason for your concern, including any observations you made;

- ✓ Any information which you received about an inmate, from the inmate or others;

- ✓ Specific actions taken, including telephone inquiries or referrals;

- ✓ Any actions taken which you know about, such as a sick call referral, transport of an inmate to a medical facility, etc.

Specifically, if you make a telephone call or talk to someone about an inmate's condition, document the response of that person. For example, if you are concerned about an inmate and you call the jail physician to describe the inmate's condition, document what the physician said in response to your concern. Even if the physician indicated that no action seemed warranted, document that response.

Remember that your documentation is your way of proving that you did the right thing. It is your justification of actions taken or not taken. This is true whether the documentation is a simple log book entry or a formal report.

## RESPONDING TO EMERGENCY MEDICAL OR HEALTH CARE NEEDS

In properly responding to apparent emergency medical situations in a jail, you will act as a "first responder," according to the steps in the *First Responder Philosophy*. Remember that, as a "first responder," you will respond to any emergency situation - whether a disturbance emergency, fire emergency, medical emergency, or miscellaneous emergency - according to the same basic sequence of steps. These include the following:

1. Arrive
2. Assess
3. Alarm
4. Evaluate
5. Enter
6. Stabilize
7. Initial medical assessment
8. Long-term monitoring
9. Communication

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 24 of 116   Document 175-12

10. Documentation / debriefing

A medical emergency in a jail setting can include a variety of situations related to an inmate's medical, dental, or mental health problems or conditions. Some include:

- Serious injuries resulting from a fight or other disturbance;

- Injuries resulting from a suicide attempt (hanging attempt, cutting, overdose of medications or other substances, etc.);

- Alcohol/drug-related reaction (overdose, withdrawal, etc.);

- Incident associated with a particular medical condition which an inmate has, such as a diabetic emergency, respiratory emergency (episode of breathing difficulty), heart attack, seizure - possibly associated with epilepsy, and so on;

- Psychotic episode, associated with either mental illness or as a result of alcohol or drugs;

- Serious pain associated with an inmate's dental condition.

The steps you will take as a first responder in response to a medical emergency are, as noted, basically the same as for any type of emergency. Your specific procedures will be based on your jail's policies and procedures, particularly in regard to the issue of activation of the emergency medical system, when that is appropriate.

Remember that DOC 350.18 requires each jail to have information in policies and procedures regarding two key issues related to emergency medical care:

- *Names, addresses and telephone numbers of health care providers or agencies who have agreed to provide emergency and other health care services to special needs inmates;* and

- *Designation of staff that have the authority to make health care decisions, including emergency medical and dental care.*

This essentially means that you must know, in advance of actually responding to an emergency, your jail's procedures as to who to contact for assistance, how to do so, and - if appropriate - who on staff is authorized to make decisions as to the need for emergency medical or dental care.

In most jails, it is the dispatcher who has responsibility for contacting emergency medical care providers. Your job may simply be to contact the dispatcher to so request. However, in some jails a supervisor must make the decision as to whether or not to request the dispatcher to contact emergency medical services.

The first six steps of the **First Responder Philosophy** are basically the same for any type of correctional emergency. The final four steps, while also similar for any type of emergency, may be somewhat unique in regard to medical emergencies, in the following

ways:

*Step #7: Initial Medical Assessment*

In this step, you will do five things:

      a.     <u>Determine the level of consciousness of the injured or ill person</u>. You will learn how to do this during cardio-pulmonary resuscitation (CPR) training;

      b.     <u>Check ABC's (airway, breathing, and circulation)</u>. You will also learn how to do this in CPR training;

      c.     <u>Perform a body check of the person for severe bleeding and/or gross deformities, such as broken bones</u>. This involves observation and running your hands (with gloves on) over the person's body;

      d.     <u>Provide treatment to your level of training. (Activate the emergency medical system if appropriate.)</u> The level of training in which you will be qualified to provide treatment after being certified in this course is cardio-pulmonary resuscitation (CPR). You may be qualified to provide additional treatment as a result of other training (examples: First Responder training, Emergency Medical Technician, etc.)

             Regardless of your level of training, you will - as noted - activate the emergency medical system (EMS) if appropriate, following the policies and procedures of your jail for doing so;

      e.     <u>Continue to monitor the subject</u>. Do not leave an ill or injured inmate alone. Stay close to him or her and continue to watch closely so as to be aware of any changes in his or her condition. Try to reassure the inmate, and calm him or her as best you can.

*Step #8: Long-Term Monitoring*

In this step, you will try to determine if an inmate who is the subject of a medical emergency has any "special needs" which require additional care or supervision. For example, you may need to continue to observe an injured or ill inmate, for an extended period of time, for indications that his or her condition is changing (for better or worse).

*Step #9: Communication*

In any correctional emergency situation, it is critically important to communicate with other jail staff members as well as outside people who provide assistance, in order to ensure that proper steps are taken. It is crucial that key actors, including supervisors, are aware of any emergency situation and are apprised of steps being taken to deal with that situation.

In regard to medical emergencies, communication may involve such issues as the nature of the medical emergency situation encountered; the need for emergency medical system assistance, any equipment or supplies needed, the need for additional jail staff assistance, and so on. Additionally, there must be communication as to when the medical emergency system is apparently over. Typically, part of such communication will be via portable radio with the communications center (dispatcher).

### Step #10: Documentation / Debriefing

Following a medical emergency, part of your job is to write an accurate and thorough report on the incident, detailing your approach to the situation, intervention procedures, and follow-thru procedures. Your report should detail each step you took in response to the medical emergency, including your initial medical assessment (step #7 above) and any treatment which you provided to the injured or ill inmate.

If relevant, your report on a medical emergency should also include any follow-up investigative and/or background information. For example, information on an inmate's medical condition or problem which was related to the emergency should be included. As an example, if an inmate underwent a diabetic emergency, such as insulin shock or diabetic coma, it would be important to include in your report the fact that he or she was or was not a known diabetic, whether the inmate had received required medication prior to the incident, whether the inmate had eaten properly prior to the incident, and so on.

The purpose of including such information is to provide a complete picture of the incident, so that a reader of the report - whether a jail supervisor or a medical health professional - can fully understand what occurred.

Remember again that your report is your version of an event and your response to that situation. It is your way to articulate your justification of actions which you took in response to a specific correctional emergency situation.

In addition to documentation, debriefing is also important following a medical emergency situation. Debriefing should include discussion among jail staff members to talk about and evaluate the response to the incident. This is NOT to attach blame to anyone but instead to determine if the response was appropriate and to determine if an improved response can be made in future such incidents.

Depending on the incident, there may also be a formal debriefing planned and conducted by jail administrative staff, which includes line staff members involved in the incident and possibly medical health professionals.

These are the key tasks of a jail officer in acting as a first responder in a particular type of correctional emergency: intervention in a medical emergency.

# CONTROL AND DELIVERY OF MEDICATIONS / MEDICAL ORDERS

As a line officer, an important part of your job in the overall jail health care program is to follow medical orders for the care and treatment of inmates. The most common category of such orders is for medication. In this sub-section, you will learn basic information about how to fulfill your role in regard to (1) control and administration or delivery of medications (prescribed and non-prescribed) and (2) following of other types of medical orders, in addition to medications.

## CONTROL AND ADMINISTER / DELIVER MEDICATIONS

Proper control and administration/delivery of both prescription and non-prescription medications is a very important element of jail health care. As a line officer, you may or may not have much of a role in this regard - depending on the procedures in your particular jail.

This issue is specifically addressed in DOC 350, the chapter of Wisconsin Administrative Code dealing with adult jails. According to provisions of DOC 350.20, the policies and procedures manual of each jail is to contain information on the following issues regarding control and administration of medications:

1.  *Determination by appropriate personnel that all medications brought in by inmates or other persons for an inmate are necessary.*

2.  *Inventory and secure storage of all medications brought into the jail.*

3.  *Designation of staff who are authorized to administer or who are authorized to deliver medication to inmates.*

4.  *Administration or delivery of prescription and nonprescription medications to inmates.*

5.  *Documentation of all medication administered or delivered to an inmate, including, who prescribed the medication, who administered or delivered the medications and the date and time of administration or delivery. All refusals of recommended or prescribed medications by an inmate must be documented.*

6.  *Return of an inmate's medication inventoried at admission.*

7.  *Inventory or disposal of unused medications upon the inmate's release or transfer.*

Additionally, there is another requirement on medication contained in DOC 350.09(2):

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 28 of 116   Document 175-12

In regard to medical emergencies, communication may involve such issues as the nature of the medical emergency situation encountered; the need for emergency medical system assistance, any equipment or supplies needed, the need for additional jail staff assistance, and so on. Additionally, there must be communication as to when the medical emergency system is apparently over. Typically, part of such communication will be via portable radio with the communications center (dispatcher).

## Step #10: Documentation / Debriefing

Following a medical emergency, part of your job is to write an accurate and thorough report on the incident, detailing your approach to the situation, intervention procedures, and follow-thru procedures. Your report should detail each step you took in response to the medical emergency, including your initial medical assessment (step #7 above) and any treatment which you provided to the injured or ill inmate.

If relevant, your report on a medical emergency should also include any follow-up investigative and/or background information. For example, information on an inmate's medical condition or problem which was related to the emergency should be included. As an example, if an inmate underwent a diabetic emergency, such as insulin shock or diabetic coma, it would be important to include in your report the fact that he or she was or was not a known diabetic, whether the inmate had received required medication prior to the incident, whether the inmate had eaten properly prior to the incident, and so on.

The purpose of including such information is to provide a complete picture of the incident, so that a reader of the report - whether a jail supervisor or a medical health professional - can fully understand what occurred.

Remember again that your report is your version of an event and your response to that situation. It is your way to articulate your justification of actions which you took in response to a specific correctional emergency situation.

In addition to documentation, debriefing is also important following a medical emergency situation. Debriefing should include discussion among jail staff members to talk about and evaluate the response to the incident. This is NOT to attach blame to anyone but instead to determine if the response was appropriate and to determine if an improved response can be made in future such incidents.

Depending on the incident, there may also be a formal debriefing planned and conducted by jail administrative staff, which includes line staff members involved in the incident and possibly medical health professionals.

These are the key tasks of a jail officer in acting as a first responder in a particular type of correctional emergency: intervention in a medical emergency.

# CONTROL AND DELIVERY OF MEDICATIONS / MEDICAL ORDERS

As a line officer, an important part of your job in the overall jail health care program is to follow medical orders for the care and treatment of inmates. The most common category of such orders is for medication. In this sub-section, you will learn basic information about how to fulfill your role in regard to (1) control and administration or delivery of medications (prescribed and non-prescribed) and (2) following of other types of medical orders, in addition to medications.

## CONTROL AND ADMINISTER / DELIVER MEDICATIONS

Proper control and administration/delivery of both prescription and non-prescription medications is a very important element of jail health care. As a line officer, you may or may not have much of a role in this regard - depending on the procedures in your particular jail.

This issue is specifically addressed in DOC 350, the chapter of Wisconsin Administrative Code dealing with adult jails. According to provisions of DOC 350.20, the policies and procedures manual of each jail is to contain information on the following issues regarding control and administration of medications:

1. *Determination by appropriate personnel that all medications brought in by inmates or other persons for an inmate are necessary.*

2. *Inventory and secure storage of all medications brought into the jail.*

3. *Designation of staff who are authorized to administer or who are authorized to deliver medication to inmates.*

4. *Administration or delivery of prescription and nonprescription medications to inmates.*

5. *Documentation of all medication administered or delivered to an inmate, including, who prescribed the medication, who administered or delivered the medications and the date and time of administration or delivery. All refusals of recommended or prescribed medications by an inmate must be documented.*

6. *Return of an inmate's medication inventoried at admission.*

7. *Inventory or disposal of unused medications upon the inmate's release or transfer.*

Additionally, there is another requirement on medication contained in DOC 350.09(2):

> *"No prescription medications or treatments may be administered unless prescribed by a physician. If a nurse or physician is not available, jail staff may deliver prescribed doses of oral medication at prescribed times."*

Following is information on your possible role as a line officer in the key specific tasks noted in these two sections of DOC 350.

### Verification of Prescribed Medications

When an inmate or some other person brings a prescribed medication into the jail, someone must determine whether the inmate should receive that medication. This is the first item under DOC 350.20, as listed above. One of the factors which enter into this decision is whether or not the prescription is valid for that inmate - that is, whether it is a legitimate, current prescription for the particular inmate. Verifying the legitimacy and/or necessity of a prescription medication may be part of your role, or it may be strictly the role of jail medical staff.

If such verification is part of your role, your jail's policies and procedures should contain directions as to how to accomplish that. Know and follow those policies and procedures. Additionally, here are some general guidelines for verification of prescription medications:

1. **Check to see that the medication is in a prescription medication container.** When inmates bring medication into the jail, sometimes it is in a regular prescription container and sometimes not. It is not uncommon for inmates to bring in a container of some kind that includes two or more different types of pills or capsules, mixed together. The inmate may or may not know what each of the medications is.

   If medication is not in a prescription container, you should probably not proceed further with any verification procedure. Instead, the best course of action is probably to store the medications securely and leave it to the jail nurse or other medical care professional to sort it out.

2. **If the medication is in a prescription container, check to see that there is a regular prescription label attached to the container.** A prescription label should, according to Wisconsin requirements, minimally contain the following information:

   - ✓ Name of the patient;
   - ✓ Name and address of issuing pharmacy;
   - ✓ Prescribing physician's name;
   - ✓ Date the prescription was filled;
   - ✓ Number of the prescription;
   - ✓ Name of the drug;

- 18 -                                                      **05/11**
Case 2:17-cv-01112-JPS   Filed 06/06/18   Page 31 of 116   Document 175-12

✓ Any directions and/or cautionary statements about taking the medications, such as dosage, or a "take as directed" statement (except for an item which is a controlled substance).

Additionally, many labels contain certain items of information which are not required by state law but are commonly included anyway. For example:

✓ The telephone number of the issuing pharmacy;
✓ The initials of the pharmacist;
✓ Information on number of allowed refills of the prescription.

3. *If there is a proper prescription label, and if you as a line officer have responsibility for checking to verify the legitimacy of a prescription, follow these general guidelines*:

a. Check the date on the label to see that it is valid and relatively current;

b. Call the pharmacy which issued the prescription. Its name and (most likely) its telephone number will be on the label. Refer to the prescription number on the label and ask if the medication was, in fact, prescribed for the particular inmate and if the prescription is still valid.

c. At the same time, try to verify that the tablets or capsules in the bottle actually are what they are supposed to be. Describe the tablets or capsules, and ask if that description matches the prescription. If available, you may wish to use a Physician's Desk Reference (PDR) as a guide. This publication contains color pictures of most types of brand-name medications. You can match the tablets or capsules against such pictures to give you an initial indication as to the identity of a medication. There are also other such publications which may be in use at your jail.

d. If you cannot reach the issuing pharmacy, another option may be to contact the physician who prescribed the medication. His or her name should be on the prescription label. However, if the physician is at home rather than in his or her office, he or she will not have access to records.

e. If the pharmacist or physician verifies the legitimacy of the prescription, try to find out any additional information about the medication, such as:

✓ Are there any special instructions for storage or administration of the medication?

✓ Are there any side effects or other problems associated with its use?

✓ Is there any information on the inmate's medical condition which jail staff ought to be aware of? (This is a question you might ask of a physician.)

Case 2:17-cv-01112-JPS   Filed 09/04/19   Page 32 of 116   Document 175-12

MKE County 1327

4. ***Document that you made any such telephone calls to verify a prescription.*** At a minimum, include the following information in your documentation:

   ✓ Date and time of call(s);
   ✓ Name(s) and title(s) or affiliation(s) of person(s) spoken to;
   ✓ Results of call - that is, information received or not received;
   ✓ Your name or initials.

5. ***Follow your jail's policies and procedures as to what to do if a prescription has been verified or not verified.*** If it <u>has</u> been verified, your job may be to start a medication document and arrange for delivery of the medication to the inmate at the times indicated on the prescription label. Or, your policies may direct you to simply pass along the information to jail medical staff, who will then have responsibility for starting documentation and/or deciding if the inmate is to receive the medication.

   If it <u>has not</u> been verified - either because you could not reach the pharmacist or physician or because the prescription was not verified by one of such parties - you should not deliver any of the medication to the inmate, unless specifically directed to do so by a member of the jail medical staff. Most likely, you will simply securely store the medication in a locked cabinet or drawer, and make jail medical staff aware of the situation, following your specific procedures for doing so.

   With most medications, an inmate will not be harmed by missing a day's dosage.

   However, if an inmate insists that he or she must have a dosage of a medication that day, you may need to contact a member of jail medical staff for immediate advice. If no member of jail medical staff is available, it may be advisable to call either the inmate's personal physician or a hospital emergency room to seek advice as to whether the inmate will be harmed by withholding of a dosage for that day.

## Storage and Control of Medications

All medications should be securely stored, as required in item #2 of DOC 350.20. This is to ensure that inmates or other unauthorized persons do not have access to such medications.

Medications should be stored in a locked cabinet or drawer, and never left on an open shelf or desktop. The keys to such secure storage areas should be carefully controlled. Only persons who need access should carry keys to secure cabinets or drawers where medications are stored.

Inmate workers must <u>never</u> be allowed access to such secure areas.

Non-prescription medications should also be securely controlled. Such medications can be dangerous. Even such things as aspirin, cold tablets and laxatives can be lethal when taken in large doses. They can also be used by inmates as items for gambling or trade. However, if allowed by your jail's procedures, it is acceptable for you, as an officer, to carry aspirin or similar pain relievers to give to inmates upon request, as long as inmates do not have direct access to the medication.

In some cases, an inmate may be allowed to keep specific quantities of certain medications with him or her, in a living area, rather than securely storing all of the medication. This should be done on the orders or with the approval of jail medical staff, in each case. Examples might be an asthma inhaler, or nitroglycerine tablets which an inmate might have to take immediately for angina pectoris pain. However, the jail physician should approve the number of nitroglycerine tablets which any inmate may keep with him or her.

## Administration / Delivery of Medications to Inmates

As noted, DOC 350.20 requires each jail's policies and procedures manual to contain information on two issues:

- *Designation of staff who are authorized to administer or who are authorized to deliver medication to inmates;*

- *Administration or delivery of prescription and nonprescription medications to inmates.*

There is a difference between "administration" and "delivery" of medications. These terms are defined in Wisconsin statutes. Under s.450.01(1) and (5), <u>Wis. Stats.</u>, the following definitions can be found:

> *"'Administer' means the direct application of a prescribed drug or device, whether by injection, ingestion or any other means, to the body of a patient or research subject by*
> *(a)    A practitioner or his or her authorized agent; or*
> *(b)    The patient or research subject at the direction of the practitioner.*
>
> *'Deliver' or 'delivery' means the actual, constructive or attempted transfer of a drug or device from one person to another."*

These terms may be a bit confusing in regard to their application to the duties and responsibilities of a line officer working in a jail. As a line officer, your role would primarily be to "deliver" medications to inmates, rather than to "administer" them - unless <u>all</u> medications are administered or delivered by medical staff in your jail. Delivery of medications means that you can do one of several things:

Case 2:17-cv-01112-JPS    Filed 09/04/18    Page 34 of 116    Document 175-12

- Give an inmate an individual unit dose which has been prepared by a nurse, doctor, physician's assistant or pharmacist. For example, such a medical professional may place two tablets in a small envelope and write the inmate's name on that envelope. This is known as a unit dose;

- Or, take a prescription container which is specifically labeled for a particular inmate to that inmate and direct him or her to take a specific number of tablets or capsules from that container and ingest them. (However, this is NOT an option with an inmate whom you know or suspect to be seriously mentally disordered and/or suicidal, since you cannot control whether or not the inmate will take more tablets or capsules than he or she should, to possibly use in a suicide attempt);

- Or, take the correct number of tablets or capsules from a prescription container which has a specific person's name on it and give those tablets or capsules to that specific person.

If a physician or nurse specifically authorizes you to do so, you may be involved in "administration" of a medication rather than simply delivery of that medication, as "administration" is defined above. But you clearly can only do so with the direct authorization of a medical professional, and are then acting as that person's "authorized agent."

Because the terms "administration" and "delivery" both refer to acts which you, as an officer, might perform, they will be used together in this subsection.

Unless you are a pharmacist or a medical professional, you clearly cannot legally remove prescription medications from a stock container—that is, a bottle which does not contain a label with a specific person's name on it—in order to deliver those medications to an inmate.

Your key role is to know and follow your jail's policies and procedures regarding who is authorized to administer and/or deliver medications to inmates (as indicated in DOC 350.20). As noted, line officers may or may not be involved in these tasks.

If you do have any such responsibilities for medication administration/delivery, follow these general rules:

- Follow the label directions explicitly. Be certain about the dosage or the timing of the dosage before delivering any medication;

- Be sure the correct inmate gets the correct medication at the correct time; and

- Try to be sure that the inmate actually swallows the medication.

You cannot ensure, or guarantee, that an inmate will actually swallow medications that you give to him or her. Some inmates are very good at hiding their medications, or not swallowing them, despite your best efforts. (Some common inmate tricks, in this regard,

are listed below.) Your duty of care is to do the best you can to try to be sure they swallow their medications. You will do this by being careful to follow established procedures each and every time you deliver medications, and never taking shortcuts.

Follow these general guidelines for delivery of tablets or capsules to inmates:

1.  Correctly identify the inmate who is to receive the medication;

2.  Direct the inmate to get a full glass of water and approach;

3.  Take the medication from the container or envelope and hand it to the inmate;

4.  Watch while the inmate puts the medication into his or her mouth and swallows it. Require the inmate to wash it down with a full glass of water. Watch for swallowing movements;

5.  Require the inmate to show you the empty glass;

6.  Require the inmate to show his or her hands to you with fingers spread far apart to indicate that he/she has not "palmed" the medication;

7.  Tell the inmate to say something to you to be doubly sure that he or she has swallowed the medication;

8.  If there is any reason to suspect that the inmate has not swallowed the tablet or capsule, check his/her mouth by looking into it, preferably with a flashlight. Do not place your fingers into the inmate's mouth. Direct the inmate to move his/her tongue and pull the lips away from the teeth in order to fully check his or her mouth;

9.  Document the medication delivery.


Follow these guidelines for delivery of liquid medications to inmates:

1.  Carefully pour the correct amount of the medication from the prescription bottle into a medication cup;

2.  Hand the cup to the correct inmate;

3.  Watch while the inmate puts the medication into his/her mouth and swallows it. Watch for swallowing movements;

4.  Ask the inmate to say something to you to be sure that he or she has swallowed the medication;

5.  Allow the inmate to drink some water, if he or she wishes to do so;

6.    Document the medication administration/delivery.

Follow the above procedural guidelines for prescribed and non-prescribed medications, including such items as aspirin and cold tablets. Remember that non-prescription medications can be dangerous, or can be used as contraband.

Sometimes, an inmate will have a prescription for medication which is to be given "PRN" or "as needed" or "upon request" rather than at routine, established intervals. In such a case, follow the same procedural guidelines for medication administration/delivery as noted above, and document that the medication was given.

However, be sure that the inmate does not get more than the allowed daily dosage, if that exists. For example, the prescription label may read, *"Take two tablets for pain, as needed, every four hours. Do not exceed twelve tablets a day."* Be sure that any such noted dosages are not exceeded.

<u>Tricks / Problems with Giving Medications to Inmates</u>

As noted, you cannot *guarantee* that inmates will actually swallow the medications that you deliver to them. Your job is to follow uniform procedures all the time. However, it is helpful to be aware of some of the more common ways that some inmates have tried to avoid actually taking their medications, so that they can use the medications in some other way, such as trading or selling them, saving them up to get "high" or to use in a suicide attempt, and so on.

Following are some of the common inmate tricks or "games" in regard to not taking pills (tablets or capsules):

- ✓ Stowing pills between their cheek and tongue;

- ✓ Hiding pills under the tongue;

- ✓ Trying to keep a pill on the roof of the mouth (NOTE: Some pills get sticky when wet and will adhere quite well to the roof of the mouth);

- ✓ Putting a pill in the hole where a tooth is missing (especially if the pill is white);

- ✓ Leaving a pill in their hand, but pretending to put in their mouth;

- ✓ Taking the pill in an apparent normal manner, but then regurgitating it. Some inmates are good at half-swallowing pills, getting them down to their mid-neck area, and then coughing it back up later;

- ✓ Hiding pills in rolls of body fat, particularly if inmate is obese;

✓ "Accidentally" dropping a pill for someone else to pick up. Typically, this is pre-arranged with another inmate who is receiving the medication "drop";

✓ Using distraction tactics during medication delivery, such as trying to converse with jail staff or using other inmates to distract staff;

✓ Asking for more pills than prescribed, or more frequent doses than prescribed.

These are just *some* methods used by inmates. You may or may not be aware that they are attempting these "tricks," and some inmates will be successful in not taking their medications despite your best efforts. That is why you are not expected to "guarantee" that they take their meds. But if you are as careful as you can be to <u>try</u> to be sure that they take their medications, by following standard procedures as listed above and/or any specific procedures indicated in your jail's policies and procedures and/or per your in-house training, you will be fulfilling your duty of care.


A medication may be something other than a tablet, capsule or liquid form. For example, it may be a suppository or a topical (skin) application. If so, follow these basic guidelines:

## Suppositories

There are different kinds of suppositories for different purposes.  Rectal suppositories are used to treat such problems as constipation, breathing difficulty, nausea, or hemorrhoids. Vaginal suppositories are used to treat infections. Some are prescribed items, others are not.

It is <u>usually</u> okay to allow an inmate to keep two or three of certain kinds of suppositories in his or her cell for use as directed, if so approved by jail medical staff through standing or specific orders.

Generally, an inmate can insert a suppository himself or herself. However, someone should be sure that he or she understands the directions for doing so. With many suppositories, it is important to insert them slowly and then lie down to rest for 15-20 minutes after inserting it. If a woman needs vaginal suppositories, the applicator should be left in the cell with her.

If available, you might offer an inmate a finger cot to use in inserting a suppository. However, be sure to get the cot back.


## Applications

Sometimes an inmate will have an ointment, cream or lotion to apply to his or her skin. This may or may not be a prescribed item. There are several basic guidelines for use of these:

- Usually, you can allow an inmate to keep ointments or lotions in his or her cell or

room, provided you are satisfied that the inmate knows how often to apply it and how to do so. Specifically, be sure the inmate understands that he or she should apply a thin coat of an ointment, rather than a thick coat.

Some jails do not allow inmates to keep metal tubes in cells. In such cases, they are usually allowed to keep a small amount of the ointment in a medication cup. However, if an inmate seems to have a mental or emotional disorder, or is generally irresponsible, then you may not be able to leave the ointment or lotion with him or her. Instead, take the medication to the inmate's cell and watch as he/she applies the correct amount.

- In some cases, however, it may not be safe to leave an ointment, cream or lotion with an inmate because the substance is potentially too dangerous. Some such substances can burn skin if used improperly. Jail medical staff should provide any such warnings.

- If you ever have to help an inmate apply an ointment or lotion, to a hard-to-reach body part, wear disposable gloves while doing so. Wash your hands thoroughly immediately after removing the gloves.

### Documentation of Medication Administration / Delivery

As noted above, DOC 350.20(5) requires that each jail's policies and procedures include information on the following:

*"Documentation of all medication administered or delivered to an inmate, including, who prescribed the medication, who administered or delivered the medications and the date or time of administration or delivery. All refusals of recommended or prescribed medications by an inmate must be documented."*

Documentation of administration or delivery of medications - including both prescription and non-prescription medications - is critically important for several reasons:

- ✓ It eliminates confusion over whether or not the medication was actually given. This minimizes the possibility that a particular dosage will be given more than once. This is particularly important if a medication is to be given around a shift change time when there might be confusion over whether the medication is to be administered by the outgoing or incoming shift.

- ✓ It helps protect against a claim by an inmate that he or she never received certain medication, or that he/she received too much or too little. Similarly, if the inmate refuses medication and later claims that he or she should have received it but did not, the log sheet should indicate that the medication was offered but refused. (Note that DOC 350.20 requires the documentation of any such refusal.)

✓ Such a record could be very important in an emergency situation. A medical professional may need to review a medication log to find out if an inmate received his or her proper medication for a particular condition. This review could provide a physician or other health care provider with information regarding the cause or cure of the problem.

Each jail will have its own method and forms for logging medication administration or delivery. Be familiar with the forms and procedures in your jail. Remember that DOC 350.20 specifically requires that certain minimal information must be included in the documentation of the administration or delivery of any prescribed medication. This includes:

✓ Name of person who administered or delivered the medication;

✓ Date and time of each administration or delivery; and
✓ Any refusals by an inmate to take a dosage of a prescribed or recommended medication.

If an inmate does refuse any dosage of medication, or all dosages of medication, then it is very important to be sure that someone from jail medical staff is made aware of that - in whatever way your policies and procedures direct. This is because state law, under s.302.384, Wis. Stats., indicates that certain things are to occur if an inmate refuses care. The statute is as follows:

*"A sheriff, jailer, keeper of any prison, jail or house of correction and the arresting officer are immune from civil liability for any acts or omissions that occur as the result of a good faith effort to allow a prisoner to refuse appropriate care or treatment if all of the following occur:*
*(1) A sheriff, jailer, keeper or officer arranges for a health care professional, as defined in s.154.01(3), to observe the prisoner.*
*(2) The health care professional informs the prisoner of the availability of appropriate care or treatment.*
*(3) The health care professional indicates on records kept by a sheriff, jailer, keeper or officer that appropriate care or treatment was offered and that the prisoner refused that care or treatment."*

In other words, if an inmate refuses to accept a prescribed or recommended medication (or other form of treatment), there should be a procedure for jail staff to inform a health care professional of such refusal, so that the health care professional can then observe the inmate and talk with him or her to let the inmate know that treatment is available and perhaps persuade him or her to accept such treatment. Then, the prisoner's further refusal to accept the medication or other treatment must be properly documented.

"Health care professionals," as defined in s.154.01(3), Wis. Stats., includes physicians, physician's assistants, registered nurses, licensed practical nurses, and others (physical therapists and podiatrists, for example). It also includes psychologists.

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 40 of 116   Document 175-12
MKE/County/3335

Sometimes, you will not be able to administer or deliver a medication at the time it was scheduled to be given. For example, you may know that a certain inmate is scheduled to receive a dosage of a prescribed medication at 6:00 p.m., but for one reason or another you cannot get the medication to him or her until 7:00 or later. Or, you may simply forget to deliver it at the scheduled time. If that happens, document on the medication log the exact time that the medication was actually given. It is good practice to also include a brief explanation as to why it was not given at the scheduled time (example: "backed-up bookings").

Never give a medication at a certain time and then document that it was given at a different time.

It is important to also document the administration or delivery of non-prescription medications. This includes things such as aspirin, laxatives and cold tablets. There are medical and legal reasons why such documentation is important:

- From a medical standpoint, it is important that there be a record of such medication so that an inmate does not receive more than the allowed daily dosage. For example, standing medical orders might indicate that an inmate may receive up to eight (8) aspirin a day for pain. If there is no record, there is no way to know how many aspirin the inmate received over the course of the day.

- From a legal standpoint, such documentation could be important if there is a lawsuit alleging failure to provide adequate health care, or even in a wrongful death lawsuit. There have, for example, been instances in which jail inmates have attempted suicide by overdosing on aspirin or other pain relievers.

Follow your jail's procedures for documentation of delivery of non-prescription medications. Your jail may have a specific form for such documentation, or it may be documented on a cellblock check sheet, or so on.

In any case, it is important to include the following in your documentation of delivery of non-prescription medications:

- ✓ Inmate's name;

- ✓ Medication received and dosage;

- ✓ Date and exact time of each administration/delivery; and

- ✓ Name of person administering or delivering the medication.

**Return of Unused Medications to Inmates**

Remember that DOC 350.20(6) and (7) require that jail policies and procedures address the following issues:

Case 2:17-cv-01112-JPS   Filed 09/04/19   Page 41 of 116   Document 175-12
MKE County 1336

- ✓ "Return of an inmate's medications inventoried at admission.

- ✓ Inventory or disposal of unused medications upon the inmate's release or transfer."

Your job is to know and follow your jail's procedures in regard to these issues. You may or may not have a role in this regard.

If an inmate brought in any medication with him or her at the time of admission, either that medication was inventoried and stored with the inmate's property, or it was determined that the inmate could receive that supply of medication while in custody. Many jails have the former as their policy. If medications were inventoried and stored, then the inmate should receive them back upon his or her release, since the medications are the inmate's property.

The second issue addressed in DOC 350.20 regards what to do with unused medications when an inmate leaves jail custody. This generally refers to prescription medications that have been ordered for a particular inmate, rather than medications which are an inmate's personal property. Your jail's procedures should address what is to be done with such medications. Usually, jail medical staff handle this. However, your procedures may indicate that line officers are to assist in inventory or disposal in some way. Again, know and follow your policies and procedures on this issue.

## FOLLOW OTHER MEDICAL ORDERS

In addition to medical orders regarding medication for inmates, you will receive medical orders regarding other forms of treatment for inmates. Again, your job is to follow such orders carefully, according to the policies and procedures of your facility.

There are two basic types of medical orders which you should know about: "specific" orders; and "standing" orders, which may also be known as "treatment protocols."

### Specific Medical Orders

Specific medical orders are those which apply to specific inmates. There are different types of specific orders that you may be asked to follow. The most common types include:

- *Orders Regarding Inmate Observation*

  A medical professional may order jail staff members to observe an inmate for certain signs, symptoms or behaviors and to document the results of such observations. For example, if an inmate has had a head injury, a physician or nurse may direct staff to observe the inmate for indications of dizziness or swelling or facial discoloration or possible loss of consciousness, and so on.

Usually, the order will be to observe for fairly specific signs, symptoms or behaviors.

Sometimes, such an order may be accompanied by an order about what to do if you observe a particular thing. For example, a doctor or nurse might order that he or she is to be called if you observe an inmate displaying certain signs or symptoms. Or, you might be ordered to give a particular treatment under certain conditions. For example, you might be ordered to apply ice to a swollen limb if you observe such swelling.

- Orders Regarding Miscellaneous Treatments

  You may receive orders for various types of treatments. For example:

  ✓ To apply ice packs, heat or bandages;

  ✓ To be sure that an inmate gets adequate bed rest;

  ✓ To be sure that an inmate who has complained of constipation drinks a lot of water;

  ✓ To isolate an inmate from other inmates in order to prevent the spread of possible communicable or contagious disease.

- Orders Regarding Tests

  If you are trained and qualified to do so, and if permitted by your policies, you may be ordered to perform certain tests or take certain measurements. Examples of such orders might include:

  ✓ To take an inmate's vital signs (pulse, temperature, respiration) at particular intervals, and to document these;

  ✓ To collect a urine sample from an inmate, and to store it properly;

  ✓ To weigh an inmate at specified intervals, and record the results;

  ✓ To perform a "one-touch" or blood sugar test on a diabetic inmate.

- Orders Regarding Diets

  Dietary orders are common in jails. It is required in DOC 350.18(10) that each jail's procedures address the issue of "provision of special diet if ordered by a physician." Follow any such orders carefully, being sure that the inmate receives the proper dietary items at the correct time. Examples of such orders include:

✓ To provide an inmate with an overall special diet. The most common special diets in jails are those for diabetics, inmates with high blood pressure, inmates with dental problems, those with food allergies, and so on;

✓ To provide special dietary items but not an overall special diet. For example, you may be ordered to provide between-meal snacks for a diabetic inmate;

✓ To observe dietary intake in cases of suspected serious depression or eating disorders problems.

For dietary orders, your job is usually not to prepare the food. But your job may involve being sure that kitchen staff receives the orders and being sure that the orders are followed.

Document that special dietary items were actually given. Also, document any problems or irregularities involved with providing inmates with prescribed diets. Also, document each time an inmate skips or refuses a meal.

These are examples of common types of specific medical orders that you may receive from the jail medical staff. Your job is to:

• Follow all such orders;

• Document that they were followed. Or, if they were not followed for some reason, document that fact and the reason;

• Document the outcome of ordered treatments, if there is a specific order to that effect.

Sometimes you may feel that a particular medical order regarding a specific inmate is inappropriate or unnecessary. However, you **DO NOT** have the authority to disobey or disregard a medical order. Remember that *deliberately ignoring or interfering with a medical order or directive regarding care or treatment of an inmate* was listed as one of the four categories of deliberate actions (or failures to act) which could amount to "deliberate indifference" to serious medical needs of prisoners. Remember that such deliberate indifference can be a violation of an inmate's constitutional rights, under the Eighth Amendment.

If you believe that a medical order is inappropriate or unnecessary, rather than simply disobeying or disregarding it, you have several options:

✓ Talk to someone about it, to convey your feelings and seek advice. This may be your supervisor, or perhaps a member of the jail medical staff. Explain your reasons for your opinion. They may or may not agree with you, but in any case they should indicate what steps to take - that is, whether or not to follow the order as given, etc.;

Case 2:17-cv-01112-JPS   Filed 12/06/18   Page 44 of 116   Document 175-12

✓ Document your opinion or feelings. You may do this instead of talking to a supervisor or medical staff member, or in addition to it.

Know and follow your jail's policies and procedures in this regard. If you are not sure about such procedures, ask your supervisor. But in any case, NEVER simply take it upon yourself to determine that a specific medical order should be ignored or altered.

## Standing Medical Orders

Standing medical orders—often referred to as "treatment protocols"—are different from specific medical orders. They give directives about the care or treatment of any inmate with a particular condition or problem. They are devised in advance, and cover all similar situations. Having such orders relieves jail staff members of the burden of having to contact jail medical staff for many common problems which occur.

Such orders, or protocols, may be posted in one or several control areas in the jail, or may be contained in a policy manual or other document.

Examples of such orders, or protocols, include:

*Inmates complaining of pain may be given two Tylenol or ibuprofen tablets every four hours, not to exceed eight tablets a day.*

*Inmates complaining of constipation may be given 2 Dulcolax tablets at bedtime and again at breakfast. Have them drink at least 8 glasses of water per day.*

*Inmates with head lice are to shower daily, and wash their hair with provided shampoo at each shower, and comb nits daily.*

As these examples indicate, such orders often involve non-prescription medications or other relatively simple forms of treatment.

Follow standing orders, or treatment protocols, carefully.

Always document that a particular medication or treatment covered by such an order, or protocol, was given. If that is not done, there is no way of knowing that the order, or protocol, was followed.

## Document that Medical Orders Were Followed

For both specific medical orders and standing medical orders (or treatment protocols), document that the orders were followed. Do this in whatever format your jail policies indicate. If there is no specific form or record, at the very least be sure to make a notation in the incident book or logbook.

As with other aspects of the jail health care program, such documentation is important

for both medical and legal reasons.

- From a medical perspective, your documentation will provide the medical staff with information on the inmate's condition and whether or not ordered treatments were actually given.

- Also from a medical perspective, documentation helps jail staff properly follow standing orders, or treatment protocols. For example, many protocols indicate maximum dosages of non-prescription items, such as aspirin. Documentation is a record of such dosages, so that the maximums are not exceeded.

- From a legal perspective, such documentation could be important if there is a lawsuit alleging failure to provide adequate health care. Courts will assume that unless something is written, it did not happen.

If you cannot follow a medical order for any reason, then—as noted in regard to medication—simply document that the order was not followed according to directions, and give a brief reason for that.

NEVER falsify documentation by indicating that an order was followed when it really was not followed, or that something was done at a particular time when, in fact, it was done later than that. It is always better to be honest, even if you forgot to do something that you were supposed to do. Always consider that any documentation can be used in court, and the worst thing that can happen to you is to be caught in a lie.

05/11
Case 2:17-cv-01112-JPS Filed 09/06/19 MKE County P3941 46 of 116 Document 175-12

# HELP PROVIDE HEALTH CARE TO INMATES

Depending on the size and nature of your jail facility, you may have a lot of responsibility or relatively little responsibility for being sure that inmates receive proper health care.

Since you are not a medical or mental health professional, you will never be involved in making clinical decisions regarding inmate health care. That is, you will never actually diagnose an inmate's condition or problem; nor will you make a determination as to a proper treatment for an ill inmate.

However, as you have learned, you may have responsibility for doing some or all of the following:

- ✓ Initial screening of inmates to determine possible medical or health care problems of inmates;

- ✓ Responding to inmate requests for health care and/or referring inmates to health care providers on your own;

- ✓ Following medical orders, including administration/delivery of medications;

- ✓ Responding to non-emergency or emergency health care situations, and providing basic treatment or care to your level of training;

- ✓ Documenting actions and maintaining basic health care records.

In order to do these tasks properly, you need to have basic knowledge about several common inmate health care conditions, or situations, as well as basic guidelines for properly responding to inmates with such conditions or situations. These include:

- Communicable or contagious diseases;

- Chronic diseases; and

- Alcohol/drug-related problems.

The overall goals of knowing about these conditions, or situations, and for knowing guidelines for properly responding to inmates with any of these, include:

- ✓ To best ensure proper and adequate health care for the inmate(s) with such conditions;

- ✓ To ensure your safety and well-being and that of other jail staff members;

05/11

✓ To ensure the safety and well-being of other inmates in the jail;

✓ To prevent larger health care problems, such as outbreak of disease, from occurring.

The following subsections are intended to provide basic information and guidelines regarding each of the three common health care conditions, or situations, listed above.

## IDENTIFICATION OF AND RESPONSE TO POSSIBLE COMMUNICABLE OR CONTAGIOUS DISEASE CONDITIONS

Both you and other jail staff members and inmates are at risk for the spread of communicable or contagious diseases—meaning diseases that can be spread from one person to another. Such diseases range from simple colds and flu to more serious things like tuberculosis and AIDS.

Your job in regard to communicable or contagious diseases is to:

✓ Identify possible indicators of a problem or condition;

✓ Refer inmates for medical evaluation when appropriate;

✓ Take measures designed to prevent spread of the disease;

✓ Follow medical orders regarding care and treatment of inmates.

Additionally, your tasks in regard to care of inmates with communicable or contagious diseases in addressed in state jail standards. State Administrative Code, under DOC 350.21, specifically indicates that each jail's policies and procedures are to contain information on the following aspects of communicable disease control:

1. *Provision of treatment and supervision of inmates during isolation or quarantine under s.143.05(6)(b), Stats.*

2. *Documentation of the need for isolation or quarantine under s.143.05(6)(b), Stats., in the inmate's confidential medical file.*

3. *Provision of laboratory screening for inmates who may have been exposed to a communicable disease if ordered by medical personnel.*

   NOTE: S.143.05(6)(b), Wis. Stats., referenced in DOC 350.21, authorizes the removal of a jail inmate to *"a hospital or other place of safety, there to be provided for and securely kept"* if the inmate has a disease *"which the local health officer or director*

Case 2:17-cv-01112-JPS   Filed 09/04/19   Page 48 of 116   Document 175-12

> *of health at the institution deems dangerous to the health of other residents or the neighborhood."* Upon recovery from the disease, the inmate is to be returned to jail custody.

Your task is to know and follow your jail's policies and procedures on each of the issues listed in DOC 350.21.

There are a number of possible communicable or contagious diseases which can be spread in a jail setting. You do not need to know detailed information about each of them, but you should be able to refer to a reference source when you want or need specific information.

Following is general information about communicable diseases in general:

## Methods of Transmission

The most common methods of transmission of such diseases include:

- *Direct Contact*: This involves person-to-person transmission of pathogens through touching, biting, kissing or sexual intercourse. Spread of airborne droplets is also a form of direct contact, but only if the person spreading the droplets is within three feet of the other person. Sneezing, coughing, spitting, talking or singing can transmit droplets into the eyes, nose or mouth of another.

- *Indirect Contact*: This may include contact with contaminated objects such as soiled dressings or clothing from an infected person. It may also include touching contaminated objects such as door handles, eating utensils, and other objects. Blood, serum, water and food can also be vehicles for indirect contact. For example, food can be contaminated by E.coli if food handlers do not practice appropriate handwashing techniques. Spread of disease by insects and rodents also are in this category.

- *Airborne Transmission*: This generally involves inhalation of droplets that remain in the air long enough to spread from an infected person when he or she sneezes or coughs, or of dust contaminated with infecting agents.

## Incubation Period

When a person is infected with a disease, the disease does not become evident right away. There is an "incubation period," which is the time between initial contact with the infectious organism and the first appearance of symptoms associated with the disease. This period varies according to the disease. It can be days or weeks, or even years.

## Contagious Period

A person who has a communicable disease cannot transmit it to another person at any time that he or she has the disease. Instead, there is only a certain period of time when this can happen. That is known as the "contagious period" or "period of communicability." This period of time varies with the disease. With some diseases, the contagious period is not known.

Because contagious periods vary, a doctor may order isolation of an inmate, or other measures, for a certain period of time. This means that even if an inmate is diagnosed as having a certain disease, it may be safe for him or her to be in general population because he or she is not contagious or because the method of transmission makes it unlikely that it will be transmitted.

## Immunity

Not everyone who is exposed to a communicable disease and infected with those disease bacteria will actually develop the disease. A person can be immune to a particular disease, either naturally or after being injected with an immunizing agent. An example is the vaccine for Hepatitis B.

Sometimes a person can be immune to a particular disease but still be able to transmit it to another person.

Because you work in a setting where diseases can be spread, you and your family members should have inoculations against the more serious communicable diseases.

## General Indicators of Possible Communicable Disease

Even though you do not need to know the specific signs and symptoms of every possible communicable or contagious disease, you should be alert to the following common signs and symptoms of a number of diseases. These usually appear in combination. They include:

- ✓ Fever
- ✓ Chills
- ✓ Headache
- ✓ Rash
- ✓ Cough, especially when phlegm is coughed up
- ✓ Diarrhea and/or cramps
- ✓ Sore throat

✓ Sudden joint swelling or pain (commonly along with fever)

✓ Weakness

✓ Itching

## Standard Precautions to Prevent Spread of Communicable Diseases

There are certain precautions to take in order to try to prevent infection of yourself or others in the jail setting. These are known as "standard precautions" or sometimes as "universal precautions." Standard precautions are used in the jail setting to prevent spread of infection to both inmates and correctional staff. All inmates should be considered potentially-contagious (whether or not they display any symptoms) and standard precautions should be used whenever there is the possibility of exposure to blood or body fluids. Some examples: following any cell searches, body searches, handling trash and dirty linens.

Standard precautions include the following:

- ***Before coming to work, cover any cuts or scratches on your skin, as much as possible.*** Use band-aids or similar items. This is to prevent the likelihood of blood or body fluids entering your body, when the skin is broken in any way.

- ***Wear disposable gloves any time you deliberately come into contact with an inmate and/or with blood or body fluids. If other protective items are available, use them also.*** Do this even during procedures such as cell extractions or other possible use of force procedures, in which there is the possibility of bleeding. ALWAYS wear gloves when cleaning up any blood spills or body fluids such as urine, feces, vomit, etc.

  Consider that any body fluids may contain a virus or bacteria. This includes - in addition to those listed - any of the following: semen, vaginal secretions, brain or spinal fluid, joint fluid, and so on. Also, make the same assumption about any bodily tissues.

  Follow these guidelines:

  ✓ Always carry at least one pair of disposable gloves with you to use in such occasions.

  ✓ Before putting on gloves, check to make sure that they do not have any holes, cracks or tears.

  ✓ Remove disposable gloves properly in order to minimize the chances of contamination with a substance which might harbor a virus or bacteria.

✓ Do not simply pull gloves off your hands. Instead, remove gloves by grasping the cuffs and pulling them inside out.

✓ Change gloves between handling of different people, if possible.

✓ Dispose of gloves in identifiable medical-waste containers.

A small number of people are allergic to a substance sometimes present in latex gloves, and/or to the powder used with such gloves. If latex gloves are used in your facility, and you develop such symptoms as shortness of breath, reddening of skin, or other allergic reactions, seek medical attention. If you have a latex allergy, your employer will have to supply you with disposable gloves that do not contain latex.

In addition to gloves, your jail may have available other items for protection against contamination by blood or body fluids. Sometimes known as "personal protection equipment" (PPE's), these can include gowns, facial masks, eyewear, and possibly footwear. If these are available in your facility, use them.

- **Wash your hands with soap and warm water, in running water, after coming into contact with blood or body fluids, even if you wore gloves. Also, wash your hands after personal contact with inmates**. Be scrupulous about hand-washing. Do not take shortcuts with this, since proper hand-washing is one of the best ways to prevent the spread of disease.

It is the soap and rubbing action that helps dislodge and remove germs, not necessarily the temperature of the water or the brand of soap. Friction is important. Scrub your wrists, tops of hands, between fingers, under and around rings, palms, and fingernails for 30 seconds. Rinse well. Dry your hands with a paper towel, as that helps remove germs that may be left after rinsing. Turn the faucet on and off with a paper towel so that your hands stay clean.

Do not assume that hand-washing is unnecessary just because you wore gloves.

Your facility may have sanitizing solutions for you to use instead of actual soap and water, at least in some locations in the jail. These solutions are usually quite effective at killing germs. If such sanitizing agents are available, use them scrupulously.

- **Be very careful in disposing of needles and syringes used by inmates.** These should be disposed of immediately after use. Place them in a hard container, so that the needle cannot penetrate the container. A common term for this is a "sharps container" or similar term.

DO NOT bend, break or recap needles before disposing of them, since blood or other fluids can spurt out as the needle is being bent or broken. Instead, dispense such items directly into a sharps container.

- **Follow proper procedures for cleaning up and disinfecting areas where blood or other body fluids have spilled.** Many jails have a special kit for cleaning up blood or body fluids spills. These contain cloths, disposal bags, disinfectant solutions, and so on. If you have these, know where they are located and use them when necessary.

  If your jail does not have any such kit, then use whatever materials you have to clean up spills. If you do not have a specific disinfectant, then use common household bleach in 1:10 bleach: water solution.

  ALWAYS wear disposable gloves when cleaning up spills.

  Place all infected items, including towels or cloths used in clean-up, in a leak-resistant container identified as medical waste. Keep your gloves on when doing so.

- **If you have to give an inmate artificial ventilation or CPR, either use a ventilator mask or a bag-mask resuscitator.** This may be a matter of jail policy.

- **Dispose of potentially-contaminated items in proper containers.** Infected items should be placed in special leak-resistant bags or containers that are either red in color or are otherwise specially-tagged or labeled.

  Know where these items are located in your jail, in advance of a situation requiring their possible use.

- **Be sure that inmates do not share razors or toothbrushes, etc.** Such items can be contaminated with blood. The best practice is to use disposable plastic razors, issued to specific inmates and labeled with the name of the inmate to whom it was issued.

- **In the case of an exposure to blood or body fluids, wash the area. Seek medical attention.** This may happen as the result of a needle stick, human bite, being splashed with blood or body fluids (particularly into an open wound), etc. Wash the area immediately with soap and warm water, and contact your supervisor so you can seek immediate medical attention.

  However, do not panic. Exposure does not always equal disease. A medical professional will determine if the exposure puts you at risk and will determine what steps, if any, need to be taken next.

  NOTE: As indicated below, in the section entitled "Guidelines for Handling Possible HIV and AIDS Cases," you have the right, under Wisconsin law, to receive results of a blood test for HIV from a person who has significantly exposed you to HIV.

**Further General Health Care Guidelines for Possible Cases of Communicable or Contagious Diseases**

In addition to knowing and following the standard precautions listed above, there are several other general guidelines to follow in order to most effectively identify and control communicable or contagious diseases in the jail setting. These include the following:

- **Screen inmates carefully.** During intake health screening, try to learn any information you can which might indicate that a newly-admitted inmate has or may have a possible communicable or contagious disease. You will learn this both through your observations of the inmate's health condition, and through asking basic screening questions as well as follow-up questions.

  Document information carefully on your health screening form.

- **If you suspect that an inmate has a communicable disease, isolate him or her and keep the inmate in isolation until a member of jail medical staff authorizes placement of the inmate in general population.** Know and follow your jail's procedures in this regard.

  The best practice is to place the inmate in a single cell or room, if you have that option. Do not remove the inmate from the cell or room or transfer him or her to general population until the doctor or nurse has examined the inmate and cleared him/her for removal from isolation.

  Do this in all cases where you either observe signs and symptoms of possible disease, or if the inmate tells you that he or she has a communicable disease. Isolate the inmate even if you think that he or she is withholding vital medical information about his or her condition, or says nothing.

- **Contact jail medical staff to report the situation.** Do this in all cases, unless a doctor or nurse is scheduled to visit the jail the next day. In that case, follow your jail's procedure to ensure that the inmate is seen at that time.

  However, if the inmate seems seriously ill, contact medical staff immediately or follow your jail's procedures for activation of the emergency medical system, as appropriate.

  Document all your actions in this regard. Remember to document all telephone referrals, and the results of such contacts.

- ***Follow all medical orders on management or handling of the inmate.*** These may include specific orders pertaining to a particular inmate and standing orders, or treatment protocols, pertaining to general handling of all inmates with possible or diagnosed communicable or contagious diseases.

- ***Follow general guidelines for managing, or caring for, inmates with suspected or diagnosed cases of communicable or contagious disease.*** These include the following:

  ✓ Keep the inmate comfortable - neither too hot nor too cold;

  ✓ Be sure that the inmate keeps himself clean and follow basic sanitary measures. Direct the inmate to wash his or her hands frequently, using soap and hot water. Be sure the inmate changes clothes at required intervals.

  ✓ If the inmate sneezes or coughs or has a runny nose, be sure that he or she uses tissues. Then dispose of them either by flushing them down the toilet or placing them in a plastic bag.

  ✓ Do not allow the inmate to share his or her towel, washcloth, toothbrush, razor, etc., with anyone else. This is a universal precaution.

  ✓ Ask jail medical staff about any special care needed for clothes, bedding, pillows or mattresses.

  ✓ Refer to your jail's policies on cleaning areas of the jail where inmates have been housed. This might involve use of specific disinfectants.

  ✓ If an inmate has lice, he or she will usually be required to shower with a medicated lotion or shampoo. If so, be sure that the inmate knows how to use it properly. If necessary, monitor the inmate's use of it. In some places, head lice and pubic lice are seen on many inmates. These can spread quickly. (NOTE: However, if you know or suspect that a female inmate is pregnant, and she has been ordered to use a medicated lotion or shampoo for lice, contact the nurse or doctor. Many such lotions or shampoos are not to be used by pregnant women.)

  Check for lice during routine searches of inmates. Head lice are difficult to see but you may be able to see small, silvery eggs - called nits - attached to individual hairs. Use a flashlight to see them. The indication of body lice is tiny bite marks on the body, usually around the waist and between the shoulders. Body lice like

warm areas, such as underarms, the inner sides of elbows, upper thighs, waists, and so on. Pubic lice (crabs) are also hard to see, but sometimes they appear as tiny moving freckles.

Also, suspect that an inmate may have lice if he or she itches and scratches a lot, particularly on the head and pubic area.

If you think an inmate may have lice, do not let him or her share such articles as combs or brushes or towels with anyone else.

✓ Remember to always wear disposable gloves when coming into contact with an inmate with a possible disease and with his or her property or objects that he or she has touched or used.

- **Be alert to emergency situations involving communicable diseases.** Some diseases can result in medical emergencies. A person can become very ill very quickly because of an infection. As in any medical emergency, follow the steps in the **First Responder Philosophy** when responding. Activate your emergency medical system if you notice <u>any</u> of the following signs and symptoms in an inmate who has a possible communicable disease:

✓ Fever <u>and</u> headache, confusion or stupor;
✓ Respiratory distress, such as rapid breathing or great difficulty breathing;
✓ Extreme weakness (which may be due to fever);
✓ Uncontrollable vomiting;
✓ Very swollen joints.

In general, if an inmate's condition deteriorates rapidly, you should consider it a medical emergency and proceed appropriately.

## Guidelines for Handling Possible HIV and AIDS Cases

A person may be infected with HIV (human immunodeficiency virus). HIV damages the body's immune system, making that system defenseless against serious, potentially life-threatening, diseases. This can lead to development of **A**cquired **I**mmune **D**eficiency **S**yndrome (AIDS), which is the later stage of HIV infection.

Scientists do not have complete information on the causes or cure for AIDS, and extensive research has been done in recent years and is still being done. Here is some general information on what is known:

- AIDS develops as the result of infection with the HIV virus. The virus causes the body's natural immune system to break down, so that diseases cannot be fought off naturally. People who have AIDS are vulnerable to serious illnesses which would not

be a threat to a person whose immune system was functioning normally.

Most people infected with the HIV virus have no major symptoms and feel well, until the disease develops.

- The HIV virus is spread by contact with the blood or bodily fluids of another person who is infected with the virus. Such bodily fluids include semen, vaginal secretions, and breast milk. This can happen either by direct contact with a person's blood (particularly in an open cut or wound), through sexual contact, or through sharing of a needle which has been contaminated with the blood of an infected person. It could be spread by sharing a razor or toothbrush with an infected person.

  HIV is not spread by casual contact such as shaking hands, coughing or sneezing, sharing bathrooms, eating utensils, or drinking from a water fountain. Nor is it spread through feces, urine, saliva or tears, or insect bites.

- A person does not have AIDS as soon as he or she has been infected with HIV. A person can be HIV-positive for many years with no signs of the disease, or only mild to moderate symptoms. But unless a person gets treatment, HIV will eventually wear down their immune system to the point that they develop more serious "opportunistic infections." Such infections are one of the criteria for AIDS, according to the federal Centers for Disease Control. There have been cases of people who have lived with HIV for more than twenty years and have not progressed to AIDS.

- The only way a person can learn if he or she has HIV infection is through testing of blood or, in some cases, other body fluids. There is a rapid test often used to detect HIV in the blood. It works by showing if a person's body has produced antibodies to HIV. If there is a positive result, then a more extensive confirmatory test is done.

- A person who has been infected with HIV remains contagious for his or her entire life, even after HIV tests no longer detect the virus in a person who previously tested positive.

- There are several effective medications that are used to treat HIV infection. Early treatment with antiviral or related medications can slow the progression of HIV disease and the development of AIDS. Usually, people who are HIV-positive take a combination of two or more HIV drugs to slow or prevent progression of disease. No medication (currently) rids HIV from the body, so most infected people have to take HIV medications for their whole lives.

  There is currently no definite cure for AIDS, although drugs have been successful in treating many of the illnesses of many AIDS victims.

In the jail setting, you may or may not know that an inmate is HIV-positive or has AIDS. Therefore, the best practice is to assume that all inmates are HIV-positive, and to treat every inmate as if he or she is infected. This means using the same precautions in every situation. In order to minimize the chances of HIV-infection to you or others, the most important thing is to scrupulously follow the standard precautions which were listed above. These precautions are designed to minimize exposure to blood or body fluids, which are the method of transmission of the HIV-virus.

Also, be alert to indicators that inmates may be having sexual relations with each other, even if that is consensual. Non-consensual sex, of course, is sexual assault, and preventing sexual assaults is part of your legal "duty to protect" inmates. Do everything you can to prevent inmates from having such sexual relations.

Remember to ALWAYS wear disposable gloves when coming into contact with blood or body fluids of ANY person, and to ALWAYS wash your hands with soap and warm water after properly removing the gloves.

As you have learned, you should always refer an inmate who seems to be seriously ill to jail medical staff. It is possible that you may observe certain signs or symptoms in an inmate which may indicate that the inmate has AIDS or a disease related to HIV-infection. Such signs or symptoms may include the following:

- ✓ Constant tiredness
- ✓ Fever
- ✓ Loss of appetite or weight
- ✓ Persistent diarrhea
- ✓ Night sweats
- ✓ Swollen lymph glands - usually in the neck, armpits or groin
- ✓ Possibly, white spots or white coating or unusual blemishes in the mouth
- ✓ Purplish blotches or bumps or rashes on the skin.

However, these symptoms can also indicate various possible diseases.

If you notice any such signs or symptoms, follow your procedures for notification of medical staff.

Finally, you should be aware that there is a state law that gives you certain rights if you know or suspect that you have been exposed to HIV in your job. This is s.252.15, "Restrictions on Use of a Test for HIV." The statute indicates that people in specified job categories, including jail officers, may receive results of blood tests for HIV on people who may have significantly exposed them to the HIV virus, whether or not the person who exposed them gives informed consent to such blood testing. This would, of course, include an inmate. The statute specifies conditions that must be met for such testing to occur, and includes the definition of a "significant exposure."

## Guidelines for Handling Possible Hepatitis Cases

Hepatitis is a communicable disease spread by a virus. It can spread rapidly throughout a jail, so you must take precautions if you notice possible indications of the disease.

The hepatitis virus lives in the bloodstream, and damages the liver and other internal organs. The virus is usually spread either through stool (bowel movements), saliva, or through infected needles used in injections.

There are three most common types of hepatitis (hepatitis A, B and C), and two less-common types (hepatitis D and E). Hepatitis A, formerly known as infectious hepatitis, is a disease caused by the hepatitis A virus (HAV). It is most common in children. This virus is found in the feces of people with hepatitis A, and is spread by direct contact, usually due to inappropriate hand-washing, or by consuming food or drink that has been handled by the infected individual. Most people recover from this without complications after a few weeks, although a small percentage of people infected with HAV will have prolonged or relapsing symptoms over a six-to-nine month period. Once you have had hepatitis A, you cannot get it again.

Hepatitis B, also called serum hepatitis, is caused by the hepatitis B virus (HBV) and is spread when blood or body fluids from an infected person enters the body of a person who is not immune. It is spread by direct contact with blood, serum, semen, vaginal fluids and in some cases by saliva. It is a highly contagious virus. Long-term effects of exposure to hepatitis B without vaccination can lead to death from chronic liver disease in 15 to 25% of chronically-infected people. Prevention is best-achieved with the hepatitis B vaccine series.

Hepatitis C is a liver disease that is caused by spread of the hepatitis C virus, known as HCV. HCV is found in blood and certain other body fluids. Like hepatitis B, it is spread when blood or body fluids from an infected person enters another person's body, through sharing of infected needles, or through needlestick or "sharps" exposures. It can be spread via blood or blood product transfusions or through tattooing with contaminated ink or needles. It can also be spread from an infected mother to her baby during birth, though this is rare. It is not spread by sneezing, coughing, via eating utensils, or other casual contact, nor is it spread by food or water. The hepatitis C virus can live outside the body for up to seven days. Approximately 80-90% of people who are affected do not have symptoms. A high percentage (up to 70%) of chronically infected persons will have chronic liver disease. People who have hepatitis C need to be vaccinated for hepatitis A and B to prevent the potential for serious liver problems. Treatment is now available for people who fit certain criteria.

In the jail setting, staff members and inmates have less of a chance of acquiring hepatitis A and B than they do of acquiring hepatitis C. There is a vaccine available to prevent hepatitis B, but not one for hepatitis C. The hepatitis B vaccine makes a person immune to acquiring the disease. The chances of getting hepatitis C occur primarily through needlesticks or other sharps exposures. There is a test available for hepatitis C.

Hepatitis D and E are less-common forms of the disease. Hepatitis D often occurs as a

*inmate and refer him or her to jail medical staff.* Key indicators include:

- ✓ Fever
- ✓ Fatigue
- ✓ Loss of appetite, weight loss
- ✓ Night sweats
- ✓ Shortness of breath
- ✓ Chronic cough
- ✓ Possibly coughing up bloody phlegm
- ✓ Possible chest pain

Isolation is important so that the bacteria cannot be spread as easily to other inmates. If your jail has a specially-ventilated cell or room to be used for this purpose, be sure to place the inmate in that cell or room. Such a cell or room—sometimes referred to as a "negative pressure" room—is designed so that the air does not circulate to other areas of the jail, where other inmates live.

Once an inmate has been isolated, jail medical staff will likely administer a skin test to him or her to see if tuberculosis is present. The inmate will likely remain in isolation until the test results are read. Usually, this takes about 48 hours.

Remember that only a person with active tuberculosis can spread the disease. A person with latent tuberculosis can be housed in general population. However, until that distinction has been medically determined, it is best to isolate an inmate.

- **Follow standard precautions (as listed above).**

- **If an inmate is on medication for tuberculosis, be sure that he or she gets the medication as ordered.** The most common medication is called INH. The person usually takes a pill a day for nine months. It is very important that the inmate takes all of his or her medication, at the times indicated.

- ***Try to be sure that an inmate who has or may have tuberculosis gets adequate nourishment and rest.*** This will help his or her body better fight off the effects of the disease.

- ***Try to be sure that an inmate with this disease (or any inmate) coughs and sneezes into tissues, rather than into the air.*** Dispose of used tissues carefully, to guard against the possible spread of other diseases.

- ***It is highly recommended that you protect yourself by getting an annual tuberculosis skin test.*** This test does not indicate that you actually have active tuberculosis - only that you have been infected with the bacteria. If the skin test is

Case 2:17-cv-01112-JPS   Filed 09/04/19   Page 60 of 116   Document 175-12

positive, you would require further tests, such as an X-ray, to determine if the disease is active. If the skin test is positive and it is determined that you do not have active tuberculosis, medication can be started to substantially decrease the possibility of the disease becoming active in the future.

## Guidelines for Handling Possible MRSA Cases

A specific communicable disease that has been problematic in some correctional institutions is MRSA. MRSA stands for *Methicillin Resistant Staphylococcus Aureus.* For that reason, it is important to know a few basic facts and guidelines about MRSA.

*Staphylococcus aureus*, generally referred to as "staph," is a common type of bacteria that is found on the skin and in the nose of healthy people. Staph may cause minor skin infections such as boils or more serious infections such as blood poisoning or pneumonia. Certain staph infections that have become resistant to the first-line antibiotics used to treat staph are called MRSA.

MRSA infections are more difficult to treat, but they do respond to antibiotic therapy.

MRSA is usually spread through direct physical contact with an infected person. It is also sometimes transmitted through contact with contaminated surfaces or objects. It is not spread by coughing, unless the infected person has pneumonia. In a jail or prison, MRSA outbreaks have generally been linked to the following:

- ✓ Poor inmate hygiene, particularly not washing hands after going to the bathroom or at other times;
- ✓ Sharing of contaminated personal items;
- ✓ Participation in unsanitary tattooing practices.

The most common indicator of possible MRSA infection is a skin infection. Swabbing or aspirating pus from such an infection is the way that a health care professional gets a sample to detect presence of MRSA.

Following are basic guidelines to prevent and control spread of MRSA:

- *During intake health screening, observe inmates for open sores or wounds, particularly sores or wounds that seem to be draining with pus, etc.* If you notice that, be sure to document your observations in the appropriate space on the screening form.

- *Wash your own hands thoroughly with soap and warm water following contact with inmates, and throughout the day, including before and after meals.* Remember to use paper towels to turn a faucet on and off. Remember to dry your hands thoroughly.

- *Encourage inmates to wash their hands often, and thoroughly, particularly*

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 61 of 116   Document 175-12

*after using the bathroom.*

- **Be sure to use disposable gloves when coming into contact with blood or body fluids, and—if possible—when touching inmates in any situation.**

- **Never touch another person's wounds, infected skin or dirty bandages without gloves. Encourage inmates to not do such touching.**

- **Discourage inmates from sharing personal items, such as towels, toilet articles, razors, etc.**

- **Clean off recreational equipment used by inmates with a disinfectant solution.** If inmates use weight equipment such as weight benches, require them to wear shirts and pants so that their bare skin has minimal contact with the equipment.

- **Do not allow inmates to tattoo themselves while in jail, or allow others to do so.**

- **If you observe inmates with have draining sores or wounds, of if an inmate complains of "boils" or "sores" or insect or spider bites, refer them to health care providers for evaluation.**

- **If your jail uses inmates to assist in food service in any way, including delivering meals, such inmates should be checked for skin infections.** Additionally, such inmates should be advised to report any skin infections that they develop.

- **If you develop a skin infection or boil, seek medical evaluation.**

Additionally, it is important to conduct regular sanitation inspections of the entire jail, including inmate living areas, to try to ensure that adequate cleanliness is maintained.

# IDENTIFICATION OF AND RESPONSE TO INMATES WITH POSSIBLE CHRONIC DISEASES

You will encounter inmates who may have chronic diseases - meaning diseases which a person always has. The most common chronic diseases in jails include diabetes; epilepsy; and respiratory diseases such as asthma, bronchitis and emphysema. Heart disease is a less-common chronic disease in the jail setting.

Your role in regard to inmates with such diseases is to:

✓ Try to identify inmates who have any such diseases;

✓ Refer inmates for proper medical evaluation and care;

Case 2:17-cv-01112-JPS   Filed 09/04/19   Page 62 of 116   Document 175-12

✓ Follow general guidelines for care of inmates; and

✓ Follow medical orders for care of inmates, including both specific orders and standing orders, or treatment protocols.

**Guidelines for Care of Diabetic Inmates**

Diabetes is a disease in which the body cannot make normal use of sugar, starch and other food because it does not produce an adequate amount of a hormone called insulin. Without adequate insulin, sugar builds up in the body rather than being absorbed. This can cause severe complications, even death.

Diabetes is controlled by one or more of several therapies: diet, oral medications, and injection of insulin. Control of the disease can be affected by the amount and type of food eaten, the type of insulin used, exercise, and any infections which occur.

If there is a serious insulin imbalance, a diabetic emergency can result. There are two such possible types of emergency:

- *Diabetic coma* can occur if there is not enough insulin compared to the amount of sugar in the body. Too much food or drink, not taking insulin, or an infection can bring on a diabetic coma.

- *Insulin shock* can occur if there is too much insulin compared to the amount of sugar in the body. It can result from not enough food as well. This is also sometimes known as "insulin reaction."

It is important to understand that just because a diabetic takes his or her insulin, he or she can still have a medical problem. The person must constantly balance the right amounts of sugar and food, and must get adequate exercise as well. A big problem is that some diabetics compound their problem through alcohol abuse, which raises the body's sugar level very quickly and destroys the balance achieved through insulin injections.

Follow these general guidelines for identifying and responding to diabetic inmates:

- **Screen new inmates carefully to learn if an inmate is a diabetic.** During intake health screening, try to learn any information you can which might indicate that a newly-admitted inmate has diabetes. Most health screening forms have a specific question to this effect.

  If an inmate indicates that he or she is diabetic, ask follow-up questions to get as much information as possible about the inmate's condition and medical treatment, and document such information on the screening form.

Also, be alert for inmates wearing Med-Alert tags, on bracelets or necklaces, which indicate a diabetic condition. Or, an inmate may carry a Med-Alert card in a wallet or purse.

- *Refer all diabetics to jail medical staff for further evaluation.*

- *Follow all medical orders regarding care of diabetic inmates. These may include dietary orders for special meals and/or snacks at certain intervals.*

- *If an inmate is to give himself/herself insulin injections, monitor this and follow security precautions.* Most diabetics give themselves injections, and are good at doing it. But if the person is mentally retarded or severely depressed or otherwise troubled or disabled, you may need to help the inmate or at least watch to be sure that he or she is doing it correctly - if there is a specific medical order to that effect.

  Never leave the needle and syringe in the cell with an inmate. Instead, give the inmate the materials he or she needs for each injection, and collect them immediately afterwards.

  Follow standard precautions in regard to disposal of needles and syringes.

  Document all such medication administrations/deliveries.

- *Watch for indications of diabetic emergencies with diabetic inmates.* As noted, diabetic inmates may experience insulin shock or diabetic coma. Although these diabetic emergencies have somewhat different signs and symptoms, following is a list of general indicators of any diabetic emergency:

  | - | <u>Skin:</u> | Either pale and moist, or red and dry; |
  | - | <u>Behavior:</u> | Drowsy, disoriented, or nervous and confused |
  | - | <u>Breath:</u> | Possibly fruity, sweet acetone odor |
  | - | <u>Breathing:</u> | Deep & rapid gulping, or somewhat shallow |
  | - | <u>Vomiting:</u> | Possible (in diabetic coma) |
  | - | <u>Hunger:</u> | May be present |
  | - | <u>Thirst:</u> | Present |
  | - | <u>Convulsions:</u> | Possibly in later stages (of insulin shock) |

- <u>General Appearance:</u>        Ranging from very weak to extremely ill

If you notice any such indications, you will respond per the steps in the ***First Responder Philosophy*** for handling medical emergencies. Specifically, do the following:

- ***If a diabetic inmate appears ill, ask him or her these questions***:

    *Have you eaten today?*

    *Did you eat anything you were not supposed to eat?*

    *Have you taken your insulin today?*

Convey this information to medical staff. If a member of jail medical staff is on-duty, they should decide how to handle the situation.

- ***If jail medical staff is not on-duty, handle as follows***:

    ✓ If inmate is conscious, give a quick-acting sugar to him or her - either candy, fruit juice with extra sugar, soda, and so on.

    ✓ If EMS personnel are not going to arrive very quickly, it is a good idea to then give the inmate a longer-acting sugar, such as a sandwich or crackers, because the quick-acting sugar will wear off.

    ✓ If inmate is unconscious, consider the situation a medical emergency and activate the emergency medical system (EMS) immediately.

    ✓ Before EMS personnel arrive, put a tablespoon of sugar or honey or corn syrup under the tongue of an inmate who is conscious but seems to behaving difficulty comprehending things. <u>Do not put anything into the mouth of an unconscious person</u>; the person could choke.

## Guidelines for Care of Inmates with Epilepsy

Epilepsy is not strictly a disease but a symptom of a disorder of the brain. It is characterized by attacks of unconsciousness which occur when the normal electronic discharge from the brain cells gets out of control. This disorder can occur from a number of causes, such as an inherited condition, an old brain injury with a scar, a head injury, brain tumor, a severe fever, alcohol or drug withdrawal, or other condition which results in a blockage of blood flow to the brain.

An epileptic attack is known as a "seizure." These are generally divided into two types:

- *Less severe seizures*, formerly known as "petit mal" seizures. There are usually no convulsions during such a seizure. Instead, there are just a few moments of unconsciousness accompanied perhaps by a brief fluttering of the eyelids or a blank stare. Often, the person does not know that he or she had the seizure;

- *More severe seizures*, known as tonic-clonic seizures. They used to be known as "grand mal" (French for "very bad") seizures. These are characterized by attacks of violent convulsions which usually last for a minute or a few minutes, but sometimes - rarely - up to 20 minutes. During a typical seizure, the person suddenly becomes rigid as the muscles tense, and he or she falls in the direction in which he/she is leaning. This is followed by jerking, convulsive movements. Here are some other things that commonly happen during such seizures:

  ✓ Person may have an "aura," which is a warning sign of an impending seizure. It may be a particular smell, sound, or visual sensation;

  ✓ Breathing usually stops during the initial muscle-tensing period, which can last up to 30 seconds. Breathing then becomes labored as if the victim is suffering from an airway obstruction;

  ✓ Face may become bluish at height of seizure;

  ✓ Person may bite his/her tongue;

  ✓ Person may lose control of bladder and bowel functions;

  ✓ Person may vomit during or after a seizure;

  ✓ After the seizure, person may sleep very deeply.

Many people with diagnosed epilepsy are on medications to help prevent seizures. These are often known as "anti-convulsant" or "anti-seizure" medications. Some of the more common brand names of such medications include: Dilantin, Tegretol, and Mysoline.

Follow these general guidelines for identifying and responding to inmates with epilepsy, as well as those with seizures for any reason:

- **Screen new inmates for possible epilepsy, or history of seizures for any reason.** Try to learn any information you can during intake health screening regarding the fact that an inmate may suffer from epilepsy, including whether or not he or she is under medical treatment to prevent seizures. Also, look for any Med-Alert tags or cards which may indicate that an inmate has epilepsy or suffers from seizures for other reason.

  As usual, document all such information and refer inmates to jail medical staff

according to your procedures.

Such screening is important so that if an inmate has a seizure, there will be information as to the cause of the seizure and any care guidelines for that inmate.

- **Be sure that an inmate with epilepsy receives required medication.** Anti-convulsant medications need to be administered as directed in order to be effective.

- **If possible, assign an epileptic inmate to a housing area where he or she can be observed closely.** If the inmate is in a cellblock or dorm with other inmates, ask them to keep an eye on him or her ("peer watch").

  If the inmate is in a housing area with double bunks, <u>be sure that he or she is assigned to a lower bunk.</u>

- **If an inmate has a tonic-clonic seizure, follow these basic guidelines:**

  ✓ Keep calm. If you have never seen a seizure before, it can be a frightening experience.

  ✓ Keep other inmates away. If an inmate has a seizure in a cellblock or other living area, lock the other inmates in their individual cells or rooms while you are attending to the victim, if possible. Ideally, there should be another officer present to supervise other inmates while you are attending to the victim. Some inmates have been known to fake seizures as part of an escape attempt. Naturally, you do not want to get caught in such a ruse.

  ✓ Do not try to restrain the inmate or revive him or her. You cannot do either.

  ✓ Clear the area around the inmate of all sharp, hard objects which could hurt him or her.

  ✓ Protect the inmate's head by placing something soft and thin under it. A piece of clothing or a folded towel is best. However, a pillow or similar thick object is bad because it could cut off the inmate's airway and cause him/her to choke.

  ✓ Help the inmate turn onto his side, so that if he vomits he will not choke on the vomitus.

  ✓ Do not force anything in the inmate's mouth or between the teeth. Keep your hands out of the inmate's mouth. A myth about seizures is that the victim will swallow his or her tongue. This cannot happen. The tongue is attached and cannot be swallowed. It used to be thought that a gag or tongue depressor should be placed in the mouth. This is not necessary.

✓ Do not administer oxygen, or pour any liquids into the inmate's mouth. The inmate may appear to stop breathing, and his/her face may turn blue. Do not worry. This is just temporary.

✓ If possible, turn the inmate's head to one side to allow saliva to drain from his/her mouth.

✓ Activate your emergency medical services system (EMS) if necessary, as dictated by your jail policies and procedures. Generally, this is not necessary unless a seizure does not stop after four (4) minutes or if the inmate is seriously injured during a seizure. However, know and follow your procedures.

✓ Observe the seizure, if you can, and document the following information, which could be helpful to medical staff:
  - length of the seizure;
  - type of movements during the convulsions;
  - color of inmate's skin;
  - whether there was loss of bladder and bowel control;
  - anything notable about the inmate's breathing during the seizure; and
  - any injuries sustained.

✓ Following the seizure, the inmate may feel confused, disoriented or embarrassed. Be sensitive to his or her feelings.

✓ After the seizure, allow the inmate to rest. He or she will probably sleep deeply. DO NOT bother to wake the inmate for the next meal if it is soon after the seizure, because he or she needs sleep more than food.

✓ Document all actions taken.

Jail medical staff should be made aware of every instance in which an inmate suffered a seizure - whether or not the inmate was known to have epilepsy.


**Guidelines for Care of Inmates with Chronic Respiratory Diseases**

Inmates with chronic respiratory, or lung, diseases may experience episodes of serious breathing difficulty. You must try to be aware of inmates having such diseases, and must know what to do for them when they experience episodes of breathing difficulty.

The most common diseases which you are likely to encounter in the jail setting include asthma, emphysema and chronic bronchitis. An inmate with one of these diseases may experience a condition called dyspnea (disp-nee-uh), which is mainly characterized by shortness of breath.

Follow these general guidelines for identifying and responding to inmates with chronic respiratory diseases:

- **Screen new inmates carefully to learn if they have a respiratory disease.** As always, get as much information as you can and document information thoroughly and accurately on the screening form.

- **Be alert at all times to indications that an inmate have a serious respiratory disease.** Even if an inmate does not tell you - during screening or other time - that he or she has a problem, there are some general indicators to look for which can clue you in that he or she might have a respiratory disease. These include:

    - ✓ Persistent cough, often in which phlegm is coughed up;

    - ✓ Blue or very pale skin color - particularly around the mouth and fingernails;

    - ✓ Obvious distress because of inability to breathe adequately;

    - ✓ Bulging neck veins;

    - ✓ Noisy breathing.

- **Refer inmates with chronic respiratory diseases to jail medical staff for evaluation.** Never assume that an inmate is faking an episode of breathing difficulty, and therefore does not need to be seen by medical staff. That is a decision which you are not qualified to make.

- **Be sure the inmate receives required medication.** For some inmates, particularly those with asthma, an inhaler might be required. Generally, the inmate should be allowed to keep this in his or her cell or room.

Follow these general guidelines for identifying and responding to inmates with particular chronic respiratory diseases:

### Asthma

This is a chronic disease which is usually inherited. The main signs and symptoms of an asthma attack are:
- ✓ Labored breathing;

- ✓ Whistling or wheezing on exhalation;

- ✓ Bluish-colored skin;

- ✓ Apprehension because of inability to breathe well.

If an inmate has an apparently-serious asthma attack, do the following:

- **Ask how you can help.** The person has been through this before, and will be able to tell you.

- **Help the inmate assume a comfortable position.** (He or she may or may not wish to sit up.)

- **Calm and reassure the inmate.** He or she may feel quite anxious and scared.

- **Loosen tight clothing.**

- **If the inmate has prescribed medication for an attack, be sure that he or she takes it as prescribed.** This may be pills, syrup, or an inhaler. Most jails allow inmates to keep an asthma inhaler with them in their cells or rooms. Know and follow your jail's policy on this issue.

- **If the inmate is in distress and says that he cannot breathe and that his asthma inhaler or other medication is not helping, DO NOT ignore the inmate or minimize the situation. Seek medical advice immediately.** Just because the inmate is able to talk does not mean that it is not a medical emergency. A person can die from a serious asthma attack, so it is always potentially a serious situation— one that requires medical assessment.


## _Emphysema_

Emphysema is a serious, non-reversible lung disease in which the victims are almost always long-time, heavy smokers, and are usually older individuals. The main signs and symptoms are:

- ✓ Difficult breathing, in which person uses the accessory muscles in the neck and shoulder to breathe;

- ✓ Pursing of lips to puff air out;

- ✓ Barrel-like chest;

- ✓ Possible dry, hacking cough, because of inability to cough up sputum. But if person can cough up sputum, it will be thick and green or yellow in color;

- ✓ Shortness of breath following moderate or even minimum exertion.


If an inmate with emphysema has a serious episode of breathing difficulty, do the following:

- **Give basically the same treatment as listed above for an inmate with asthma.**

- *If the episode seems severe, activate the emergency medical system (EMS).*

## Chronic Bronchitis

The symptoms of this chronic lung disease are basically the same as those of emphysema. However, the victim will not necessarily be a heavy smoker.

Be sure to notify jail medical staff every time that an inmate with bronchitis enters jail, if you know that information. The nurse or doctor can then be sure the inmate receives any necessary medication.

If an inmate with this disease has a serious episode of breathing difficulty, then follow the same care guidelines which apply to an inmate with emphysema (as listed above).

## Guidelines for Care of Inmates with Chronic Heart Disease

You probably will not have to deal with many inmates with serious heart problems, but because heart problems are so potentially serious and often fatal, you must try to identify inmates with any such diseases, be alert to possible medical problems, and ensure provision of adequate care, both routinely and in the event of an emergency.

Follow these basic guidelines for identifying and responding to inmates with such diseases:

- **Screen new inmates carefully.** During intake health screening, try to learn any information which might indicate that an inmate has a history of heart problems, including whether he or she is currently under treatment, taking medication, and so on. Document all information accurately and thoroughly on the screening form.

- **Refer inmates with any history of heart disease to jail medical staff for medical evaluation.** This would probably not be necessary if the inmate is only in jail for a short time, however. Know and follow your jail's policies and procedures.

- **Follow all medical orders on care and treatment of inmates with heart disease.**

- **Be alert to and respond to problems associated with heart disease.** Some

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 71 of 116   Document 175-12
MKE County 1386

inmates may have a disease known as angina pectoris, which is a chronic condition in which the victim may experience severe pain when the heart receives too little oxygen for its needs for more than several seconds. Usually, the pain occurs during periods of physical or emotional stress. This does not lead to permanent damage to the heart, or to death.

A medication called nitroglycerine is usually prescribed for angina patients. The person places a nitroglycerine tablet under his or her tongue, and this helps relieve the pain because it helps dilate the blood vessels leading to the heart. Because the person must take the tablets as soon as he or she feels pain, an inmate with angina should be allowed to keep a small quantity of the pills in his or her cell. Follow your jail's policies and procedures on this.

If an inmate with a history of angina pectoris has an apparent angina attack (chest pain, shortness of breath, possible nausea and/or sweating), have him or her rest, and - if necessary - assist to take the medication. If the inmate's pain remains steady or worsens after 10 minutes, and the nitroglycerine does not help relieve the pain, consider it a medical emergency and act accordingly. Activate the emergency medical system (EMS).

If an inmate has severe and persistent chest pain under any other circumstances, consider that it could be a heart attack or other serious heart-related problem and activate the emergency medical system (EMS). While waiting for the arrival of emergency medical personnel, provide care and treatment to your level of training. This could include cardio-pulmonary resuscitation (CPR), if necessary and appropriate, and/or use of a defibrillator.

## IDENTIFICATION OF AND RESPONSE TO INMATES WITH POSSIBLE ALCOHOL OR DRUG-RELATED PROBLEMS

Abuse of alcohol and other drugs is widespread. Alcohol is still the most widely-abused drug. Other drugs which are widely-abused in the United States include:

- marijuana;

- barbiturates and other depressants;

- cocaine, including various forms of the drug, such as "crack";

- amphetamines;

- methamphetamines;

- heroin;

- hallucinogens;

inmates may have a disease known as angina pectoris, which is a chronic condition in which the victim may experience severe pain when the heart receives too little oxygen for its needs for more than several seconds. Usually, the pain occurs during periods of physical or emotional stress. This does not lead to permanent damage to the heart, or to death.

A medication called nitroglycerine is usually prescribed for angina patients. The person places a nitroglycerine tablet under his or her tongue, and this helps relieve the pain because it helps dilate the blood vessels leading to the heart. Because the person must take the tablets as soon as he or she feels pain, an inmate with angina should be allowed to keep a small quantity of the pills in his or her cell. Follow your jail's policies and procedures on this.

If an inmate with a history of angina pectoris has an apparent angina attack (chest pain, shortness of breath, possible nausea and/or sweating), have him or her rest, and - if necessary - assist to take the medication. If the inmate's pain remains steady or worsens after 10 minutes, and the nitroglycerine does not help relieve the pain, consider it a medical emergency and act accordingly. Activate the emergency medical system (EMS).

If an inmate has severe and persistent chest pain under any other circumstances, consider that it could be a heart attack or other serious heart-related problem and activate the emergency medical system (EMS). While waiting for the arrival of emergency medical personnel, provide care and treatment to your level of training. This could include cardio-pulmonary resuscitation (CPR), if necessary and appropriate, and/or use of a defibrillator.

## IDENTIFICATION OF AND RESPONSE TO INMATES WITH POSSIBLE ALCOHOL OR DRUG-RELATED PROBLEMS

Abuse of alcohol and other drugs is widespread. Alcohol is still the most widely-abused drug. Other drugs which are widely-abused in the United States include:

- marijuana;

- barbiturates and other depressants;

- cocaine, including various forms of the drug, such as "crack";

- amphetamines;

- methamphetamines;

- heroin;

- hallucinogens;

Case 2:17-cv-01112-JPS   Filed 06/09/17   Page 72 of 116   Document 175-12

- designer drugs, such as Ecstasy;

- prescription medications, especially minor tranquilizers such as Valium, Librium, etc.

With inmates who have used or abused alcohol or other drugs, you may encounter some or all of the following:

✓ <u>Medical problems</u>, ranging from someone who is sick for a short period of time because he or she drank too much, to serious and possibly life-threatening medical emergencies;

✓ <u>Psychological or behavioral problems</u>, ranging from mild confusion or depression to extremely bizarre and dangerous behavior. For example, someone who has taken PCP, or "angel dust," may behave like someone who is extremely mentally ill, with extreme fear or anxiety or aggressiveness. The person may have delusions and/or hallucinations.

When you encounter inmates with possible alcohol or drug problems, your role is to:

- *Identify indications of possible alcohol or drug use or abuse*;

- *Provide necessary and appropriate health care, to your level of training*;

- *Refer inmates to professional help when appropriate*. You are not expected to diagnose medical situations, and you are not expected to be able to tell the specific drug used by an inmate. That is the job of a medical professional. However, your task is to follow your policies and procedures to try to ensure that inmates are seen by medical professionals, when you think that seems appropriate;

- *Document all of your observations and actions, thoroughly and accurately*.

You will deal with both non-emergency and emergency situations related to an inmate's use or abuse of alcohol or drugs. These may include both medical and psychological situations. In emergency situations, you will respond as a "first responder," according to the steps in the **First Responder Philosophy** which you learned about.


## General Indications of Possible Alcohol or Other Drug Abuse

When working in the jail, you will at some time likely encounter inmates who display general indications of possible alcohol or drug use or abuse. This may happen when an inmate is admitted to custody, or at some other time. Part of your job is to be aware of such general indications.

Some of the more common signs or symptoms which you might notice include the following:

Case 2:17-cv-01112-JPS Filed 09/06/19 Page 73 of 116 Document 175-12

- ✓ Confusion or disorientation;
- ✓ Inability to stand or walk normally;
- ✓ Unusual restlessness;
- ✓ Slurred speech;
- ✓ Lethargy (slow, sleepy, uninspired behavior);
- ✓ Breathing which is very rapid and/or shallow;
- ✓ Severe agitation or aggressiveness;
- ✓ Eye pupils which are either very dilated (very wide open) or pinpoint;
- ✓ Feeling of being very hot or very cold;
- ✓ Sudden collapse;
- ✓ Track or needle marks on arms or legs;
- ✓ Tremors ("shakes");
- ✓ Excessive irritability;
- ✓ Hallucinations (seeing things that are not there, or hearing voices);
- ✓ Delusions (ideas or thoughts which are not based in reality);
- ✓ Strange or bizarre behavior.

These are general indications to look for. They could indicate alcohol or other drug use or abuse, or they could indicate some other medical or mental health problem, such as: diabetic emergency, head injury or similar trauma, shock, or mental or emotional distress or disorder. Again, your job is not to diagnose an inmate's problem or condition. Instead, your job is simply to be aware of these general conditions, and to follow procedures to try to ensure provision of a proper level of care to inmates.

### Intake Health Screening

The first way you try to become aware of an inmate's possible use or abuse of alcohol or drugs is during intake health screening. As you have learned, intake health screening is a formal procedure during which you try to learn basic facts about an inmate's medical or health status, and document information on a written screening form. Commonly, jail health screening forms have a space to document your observations and/or responses to questions asked of an inmate, regarding possible alcohol and/or drug problems.

Some items of information which you would document on an intake health screening form based on your observation of a new inmate's condition include:

- ✓ Whether or not he or she seems intoxicated, or "high";

- ✓ Whether you can smell the odor of alcohol on the inmate's breath or clothing;

- ✓ Whether he or she has track or needle marks on arms, legs, or other body areas;

- ✓ Whether he or she has any apparent drug paraphernalia;

- ✓ Whether he or she displays any of the general indications of possible alcohol or

drug use, as listed above.

Some items of information which you would document on a health screening form based upon your <u>asking questions</u> of a new inmate include:

✓ How much he or she has had to drink, and when the last drink was taken;

✓ What he or she drank (beer, wine, whiskey, etc.);

✓ Whether he or she took drugs, either alone or in combination with alcohol, and - if so - what they were, how much, and when they were taken. (**NOTE:** This question may or may not be allowable in a particular jail, inasmuch as it could impact criminal charges against the inmate. Seek advice on this issue.);

✓ Whether he or she is currently under medical treatment for an alcohol or drug-related problem, and - if so - by whom (that is, name of physician or other treatment provider);

✓ Whether he or she has previously experienced alcohol or drug withdrawal, and - if so - under what circumstances and of what nature. This is important information because you need to be prepared to take appropriate actions if an inmate goes into withdrawal again while incarcerated.

Remember that many people who enter jail have taken both alcohol and drugs - usually illegal or illicit drugs. It is important to try to get information that is as accurate and thorough as possible from the inmate because that information could be very important in regard to knowing about and providing care for the inmate's condition. It may be information that a medical or mental health professional will want or need. For example, a newly-admitted inmate may, during screening, tell you that he or she has taken both alcohol and certain drugs. If the inmate subsequently experiences a serious medical problem, a medical professional will want to know what substances the inmate took prior to admission.

Remember also that when you ask an inmate questions about these issues, it is important to assure him or her that the reason you are asking the questions is simply to provide him or her with adequate health care while in jail.

Document all information accurately and thoroughly on the intake health screening form. Write down what the inmate said, in response to your questions. If you feel that an inmate is not providing full information, or is lying, it is appropriate to note your observation about that. However, NEVER write down an answer different from what the inmate has given you just because you do not believe the inmate.

**Response to Inmates with Possible Alcohol or Drug Abuse Problems**

When you encounter inmates who display one or several of the general indications of

possible alcohol or other drug abuse (as listed above), you will initially need to try to determine whether the situation represents a correctional emergency or not.

Respond to Non-Emergency Situations

There are a number of situations that are not apparent emergencies. In such cases, you have a number of options for proper action. <u>Some</u> include:

- ***If you accept an inmate who seems to be intoxicated (drunk) or has taken drugs, or both, but does not seem to be a direct medical risk, then it is good practice to place the inmate in a housing area where you and other staff members can watch him or her and check on the inmate frequently***. It is best to physically check on the inmate as often as possible, at the intervals specified in your policies and procedures, but <u>at least every 15 minutes</u>.

  Check the inmate's level of consciousness now and again.

- ***When an inmate sobers up, continue to monitor him or her for indications of medical or psychological problems***. A very high-risk time for suicide in jail is when an intoxicated inmate begins to sober up. Depression often sets in at that time.

  Sometimes you can be very helpful just by talking to an inmate for a few minutes and telling him where he is, why he is there, and what will happen next. Doing that may help relieve the inmate's anxiety and fear - particularly if he or she has never been in jail before.

- ***Monitor the inmate for any other indications of medical or psychological problems or concerns***. Sometimes an inmate may seem okay at admission and for a period of time after admission. But sometimes an inmate who has consumed alcohol or taken drugs or both may display signs or symptoms, which may be of concern, hours or even days after admission. This may include indications of severe intoxication, as the alcohol or drugs build up in the person's bloodstream.

  Or, there may be indications of withdrawal. For example, with a person who has been a long-time, heavy-use drinker, serious alcohol withdrawal may start from eight hours to longer after the person took his or her last drink.

  Your job is to observe inmates for indications of possible problems, to document your observations carefully, and refer the inmate to jail medical care providers when appropriate.

  If an apparent medical emergency situation develops, however, you must then respond to the situation as an emergency.

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 76 of 116   Document 175-12

- **Document all of your observations and actions carefully**. Follow your jail's procedures for doing so. Remember: your documentation is your way of proving that you took proper actions. Your documentation is your written justification for actions taken or not taken.

- **Refer inmates to jail health care providers whenever you think necessary**. Follow your jail's policies and procedures for doing so.

  Remember: in terms of provision of health care, part of your "duty of care" is not only to be aware of obvious indications of possibly-serious health care problems of inmates, but also to do something to get care for an inmate once you notice any such indication. This applies whether or not the inmate requests such care.

  Remember that your failure to take proper action for a possibly-serious situation which has come to your attention could amount to "deliberate indifference" to an inmate's rights.

  At the very least, if you notice and are concerned about a problem related to an inmate's alcohol or drug use, contact the jail nurse, physician, etc., to describe the situation and to seek advice. Document that you made any such contact.

Respond to Emergency Situations

In addition to non-emergency situations related to use or abuse of alcohol or drugs by inmates, you are also likely to encounter potential or actual emergencies. In dealing with such emergencies, you will respond according to the steps in the **FIRST RESPONDER PHILOSOPHY**. Your response to these types of emergencies will be the same as for any other type of medical emergency.

There are several things to keep in mind about responding to medical emergencies related to an inmate's use of alcohol and/or drugs:

- **Alcohol withdrawal is potentially a very serious medical emergency. A person can die as a result of alcohol withdrawal**. Therefore, it is a situation that you need to be aware of and for which you need to try to ensure provision of medical intervention.

  Alcohol withdrawal may occur with long-time, heavy-use drinkers when they stop drinking. As noted, it is to your advantage to try to learn, during intake screening, that an inmate may be a long-time, heavy-use drinker. If you know that, then you are aware of the possibility that he or she may undergo withdrawal while in the jail.

  The signs and symptoms of withdrawal may begin as early as seven to eight hours

MKE County 1372

after a person has taken his or her last drink. The signs and symptoms will become more severe as more time passes. As they become more severe, the greater the danger that the person's life is in jeopardy.

Initial signs and symptoms may include tremors ("shakes"), profuse sweating, disorientation, and delusions and/or hallucinations. Later (within seven to 48 hours after the person's last drink), he or she may have seizures.

Later (between 12 and 48 hours after the person's last drink), he or she may experience auditory hallucinations - that is, hearing voices. Often, these voices will be taunting or persecuting.

The final stages of alcohol withdrawal, which may occur within 72 to 96 hours after the person's last drink, may involve delirium tremens, sometimes known as "DT's". This is a very serious medical condition. **If you see a person having delirium tremens, always consider it a medical emergency and get the inmate to an appropriate medical facility. Jail is not an appropriate place for him or her. This is a potentially life-threatening medical emergency.** Delirium tremens are characterized by some or all of the following:

- ✓ Profound confusion and disorientation;

- ✓ Delusions;

- ✓ Vivid hallucinations, in which the person claims to see various figures - usually animals or snakes or bugs - in various postures around him or her, or feels things crawling on his/her skin;

- ✓ Shaking;

- ✓ Feeling of severe agitation and fright;

- ✓ Rapid pulse and breathing;

- ✓ Pale skin;

- ✓ Sweating;

- ✓ High fever, along with possible seizures or convulsions;

- ✓ Vomiting;

- ✓ Curling into a fetal-type position.

If you encounter an inmate in this condition, call an ambulance. Stay with the inmate until the ambulance arrives.

- *Keep in mind that use of alcohol or drugs, or alcohol and drugs in*

Case 2:17-cv-01112-JPS   Filed 09/06/18   Page 78 of 116   Document 175-12

**combination, can cause severe respiratory and cardio-vascular problems.** A person may develop severe breathing difficulty, exhibit a decreased level of consciousness, or even become unconscious, have seizures or convulsions, or may even have a heart attack. These medical problems may occur several hours after the person enters custody, as the alcohol or drugs build up in the bloodstream.

These problems are particularly of concern with an individual who has consumed alcohol and also taken drugs which are central nervous system depressants, such as barbiturates. This combination can cause the person's entire system to slow down in a very serious and potentially life-threatening manner.

If an inmate begins to exhibit the above signs and symptoms, consider it a medical emergency and immediately contact jail medical staff if on-duty, or call the emergency medical technicians, ambulance, etc.

Before emergency medical help arrives, monitor the inmate for deterioration of his or her condition. Help the inmate get comfortable, and try to assure him or her that he/she will be okay.

If the inmate becomes unconscious, monitor pulse and breathing and be prepared to give CPR if necessary.

- **Be aware that some drugs may cause an inmate to behave in strange or even bizarre ways, and that some such inmates may become dangerous or even violent.** For example, a person who has taken LSD, which is a hallucinogenic drug, may experience a "bad trip," in which he or she may experience extreme anxiety or confusion, a feeling of loss of control, and possible breathing problems. If you encounter an inmate experiencing this, here are some basic guidelines:

  - ✓ Stay calm yourself, and try to reassure the inmate that what he or she is experiencing is the result of drugs and that he/she is not going crazy;

  - ✓ Keep the inmate in a quiet place, away from bright lights or loud music;

  - ✓ Try to talk with the inmate - in a quiet, calm voice - about things that are not threatening;

  - ✓ Contact drug abuse specialists for specific advice.

A person who has taken PCP, also known as "angel dust," may behave in a very bizarre way. Among other symptoms, the person may experience vivid hallucinations and delusions - often, the delusion that others are out to hurt or kill him or her. These hallucinations and delusions may cause the inmate to attack you or others without warning; he or she is likely to be very strong and violent. Therefore, do not stay alone with such a person in a room or cell. Always be prepared for the possibility of sudden, unprovoked attack from someone who has used PCP. Anticipating that possibility, maintain safe distance and proxemics - as you learned in POSC®

Case 2:17-cv-01112-JPS    Filed 06/04 County Page 79 of 116    Document 175-12

training.

Try not to make hostile or threatening gestures with such a person, because he or she is likely to interpret such gestures as a major threat to personal safety, and respond accordingly.

Also, be aware of the possibility of suicidal behavior from someone who has used PCP.

Another drug that can cause a person to behave in a bizarre manner, and even violently, is Ecstasy.


## Response to Methamphetamine Users

Methamphetamine is a particular drug that has become a major problem in society in general in recent years, and has certainly caused significant problems in many county jails. For that reason, it is important to focus specifically on this drug and on basic guidelines regarding care of inmates who have used it.


### Methamphetamine: An Overview

Methamphetamine is a powerful addictive stimulant drug that affects the central nervous system. (Some of the key effects of the drug are listed below.) It is a derivative of amphetamines, which were originally intended for use in nasal decongestants and bronchial inhalers and for other limited medical uses, including obesity.

Methamphetamine is easily produced in clandestine laboratories, using inexpensive over-the-counter ingredients. Thus, its production has become a significant law enforcement problem in many states. It comes in a powder form that resembles granulated crystals, and also comes in a rock form.

It can be smoked, sniffed, orally ingested and injected. In its smoked form, it is known by such street terms as "ice," "crystal," "glass," and "crank." In the Midwest, including Minnesota and Wisconsin, sniffing, or snorting, is the preferred method of using the drug.

Methamphetamine is classified as a psychostimulant. Amphetamines and cocaine are also in this category. Although cocaine and methamphetamine are both psychostimulants, there are key differences between the two. For example, cocaine is quickly removed and metabolized—50% of the drug is removed from the body within an hour—whereas methamphetamine has a much longer time of action in the body. It takes twelve hours for 50% of methamphetamine to be removed from the body. Thus, there are more prolonged stimulant effects from methamphetamine.

**05/11**
Case 2:17-cv-01112-JPS Filed 09/06/19 Page 80 of 116 Document 175-12

<u>Effects of Methamphetamine</u>

Like other stimulants, methamphetamine use increases energy and alertness. People who smoke or inject it report experiencing a brief, intense sensation, or rush. Oral ingestion or snorting results in a longer-lasting high, rather than a rush, that can last up to twelve hours or so. Both the rush and the high are due to the release of high levels of dopamine into certain areas of the brain that regulate feelings of pleasure. Dopamine is a neurotransmitter, meaning a chemical that sends signals to parts of the brain.
In general, short-term effects of methamphetamine use may include:

- ✓ Increased attention and decreased fatigue;
- ✓ Increased activity;
- ✓ Decreased appetite;
- ✓ Euphoria (great feeling of happiness) and "rush";
- ✓ Increased respiration; and
- ✓ Hyperthermia (elevated body temperature).

Long-term effects of methamphetamine use may include:

- ✓ Dependence and addiction psychosis, which can include any or all of the following:
  - paranoia
  - hallucinations
  - mood disturbances, including depression
  - repetitive motor activity
- ✓ Stroke;
- ✓ Weight loss.

Chronic, long-term use of methamphetamine can result in addiction, which—as noted above—can include serious psychotic disturbances, including hallucinations and delusions. The paranoia which many experience can result in aggression as well as suicidal and/or homicidal thoughts.

Chronic users typically do not eat well or take care of their personal hygiene. They may go for days with little or no sleep, and inadequate nutrition.

Another effect of methamphetamine use by those who smoke it, in particular, is a condition known as "meth mouth." Long-time users may lose their teeth abnormally fast. This may be due to jaw clenching, poor personal hygiene, as well as a crystalline residue left on the teeth by smoking the drug. Also, the sudafed ingredients in methamphetamine dry the mouth out, contributing to dental problems.

Long-term use also results in a compromised immune system, so that users are more prone to infections of different kinds.

Although there is no physical result of withdrawal from methamphetamine, as there is for alcohol withdrawal, there are several symptoms that are common when a chronic user stops taking the drug. These include depression, anxiety, fatigue, paranoia, aggression

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 81 of 116   Document 175-12
MKE County 1376

and an intense craving for the drug. However, methamphetamine users frequently use other illicit drugs as well, so withdrawal may not strictly be from methamphetamine.

<u>Guidelines for Care of Inmates</u>

Follow these guidelines for identification and care of inmates who may be methamphetamine users:

- ***Try to identify users during intake health screening.*** An inmate may, in response to a question about drug use, admit to using methamphetamine. Or, you may notice other indicators, such as those listed above. A new prisoner who is unkempt, has not used good personal hygiene, and is behaving strangely may be a drug-user, may be mentally ill, or have some other problem or condition. Further evaluation may be necessary.
  Keep in mind that many people who have used methamphetamine will also have used other drugs, including alcohol and/or illicit drugs. Thus, if a person admits to having taken methamphetamine, at least ask him or her what else they've taken. This is important information because a person is likely to experience serious medical problems from alcohol overdose or, in the case of long-term alcohol users, from withdrawal.

- ***If you know that an inmate has used methamphetamine, tell him or her what to expect.*** Do this either at admission or as soon thereafter as feasible. For example, let the inmate know that:

  - ✓ They will probably sleep a lot for a few days;
  - ✓ They will be encouraged to eat and drink;
  - ✓ Their bodies will probably ache from sleeplessness and muscle stiffness;
  - ✓ They may experience mood swings, and may experience feelings of paranoia and delusions.

- ***Be aware of medical / mental health problems, and take appropriate action.*** The actions you take depend, in general, on the urgency or seriousness of a person's situation. This can be difficult, and you are not expected to make medical assessments. However, in general, follow these guidelines:

  - ➢ If you observe urgent, potentially-life threatening symptoms, consider it a <u>medical emergency situation</u>. The inmate should be taken to an emergency room for evaluation. These symptoms include:
    - ✓ Severe body tremors or twitching
    - ✓ Convulsions, or seizures
    - ✓ Physical collapse
    - ✓ Rapid or labored breathing
    - ✓ Extreme mental confusion or fearful paranoia
    - ✓ Excessive anxiety or panic

05/11

- ✓ Chest pain
- ✓ Profuse sweating for no apparent reason / temperature of 104.F or greater

➢ If you observe serious symptoms, contact your jail nurse or physician immediately to report them and to request evaluation of the inmate. The nurse or doctor will need to check their vital signs, in order to determine appropriate action. These symptoms include:
  - ✓ Excessive energy (difficulty standing still)
  - ✓ Frequent nose bleeds
  - ✓ Restlessness, high agitation
  - ✓ Apparent inability to process information or express thoughts
  - ✓ Stiff arms and legs when walking (like a toy soldier)
  - ✓ Extreme fatigue
  - ✓ Excessively-dilated pupils
  - ✓ Flushed face, or inappropriate sweating
  - ✓ Extremely rapid eye movements
  - ✓ Severe headache or dizziness
  - ✓ Difficulty or absence of urinating
  - ✓ Reported muscle cramping
  - ✓ Reports of kidney pain

➢ If you observe any of the following symptoms, which are neither medical emergencies or necessarily serious enough to require immediate evaluation, contact your jail nurse or physician in a timely manner so that the inmate may be evaluated:
  - ✓ Stale urine odor
  - ✓ Excessive hunger
  - ✓ Skin problems around mouth or fingers from apparent chemical burns
  - ✓ Quivering voice while talking
  - ✓ Repetitive and compulsive activities, such as popping knuckles or picking at things
  - ✓ Reported reduced appetite or lack of appetite
  - ✓ Itching skin (:speed bugs") or scabs or sores on skin from picking (see item below for more on this)
  - ✓ Constipation
  - ✓ Reported insomnia
  - ✓ Dental problems (see item on this below)

In some cases, a person may ingest a large amount of methamphetamine during his or her arrest, to conceal it. That can cause serious medical problems, including those listed above, because of overdose.

Mental health issues are also important. Some of these are listed above. Also, be aware of either homicidal or suicidal thoughts or gestures by inmates. These are not uncommon among people who have taken methamphetamine or other drugs. If you become aware of these thoughts or gestures, follow your policies as to referral of inmates and observation and other measures to take. Delusions and/or

Case 2:17-cv-01112-JPS   Filed 06/16/18   Page 83 of 116   Document 175-12

hallucinations are also seen.

It is a good idea to have an inmate evaluated by medical and/or mental health professionals <u>before</u> he or she is placed in general population.

- **Be aware that during the first four to 24 hours following a methamphetamine binge, a person may go through a period known as "tweaking."** You may observe such symptoms as:
  - ✓ body tremors
  - ✓ jittery reactions characterized by agitation
  - ✓ paranoia
  - ✓ possible hallucinations
  - ✓ extreme frustration
  - ✓ rapid eye movements
  - ✓ pacing / inability to sit calmly
  - ✓ abnormal body movements
  - ✓ quivering voice
  - ✓ return of intense drug cravings

  This phase of intoxication / withdrawal may require medication intervention, often with an anti-anxiety medication. If the symptoms are excessive, then—as noted above—it may be an emergency, requiring a visit to the emergency room. At a minimum, your jail health care providers should be notified.

- **Be aware that many inmates will sleep a lot.** As noted, some users will have gone for days with little or no sleep. After a binge of methamphetamine that has lasted for three to fifteen or more days, an inmate may "crash" and sleep for most of the day for the first several days that he or she is in custody. This will usually occur following the short period of "tweaking" described above.

  Unless there is a reason for them to be up, it is not a problem to let them sleep, so that their bodies can overcome the effects of sleep deprivation. However, they should be awakened for meals and urged to eat, for the sake of their nutritional health.

  During this period, be sure to observe and monitor the inmate to be sure that he is alive and okay.

- **Watch for psychological symptoms that may result from stopping use of the drug.** As noted, there are several mental health effects that develop when a person who has chronically used methamphetamine stops taking the drug. Again, these typically include depression, anxiety, fatigue, paranoia, aggression and an intense craving for the drug. Some may be very irritable as well. If you notice these symptoms in an inmate who is known to have used methamphetamine, refer the inmate to medical and/or mental health care providers, per your policies and

Case 2:17-cv-01112-JPS   Filed 09/06/18   Page 84 of 116   Document 175-12
MKE County P379

procedures. Remember too that the paranoia which some experience can result in suicidal and/or homicidal thoughts.

Depression can be a serious concern. A person who has heavily used methamphetamine may experience a persistent, exaggerated depression at some point, as part of withdrawal. This may occur after he or she has slept for the first several days, or—probably more commonly—after about three to four weeks of incarceration. The extent of the depression depends on dose and duration of the person's drug usage. But it can be severe, and suicidal thoughts and feelings can certainly accompany the depression.

Paranoia is also a serious concern. It is sometimes seen in the intoxication and early withdrawal stages. Paranoia is dangerous because it can lead to aggression (combative or assaultive behavior) with homicidal or suicidal tendencies. Such behavior may well be related to the person taking a mixture of different drugs, including methamphetamine. If you notice an inmate displaying such symptoms, particularly during the "tweaking" period described above, keep these guidelines in mind:

> If possible, keep the inmate in a quiet, subdued place with only moderate stimulation;

> Keep the inmate in touch with reality, as to such things as his name, the date, time of day, etc.;

> Let the inmate know that you're aware of his or her agitation, and distress. Example: *"Joe, I can see that you're upset."*;

> Listen carefully and non-judgmentally, ask clear and simple questions, and tolerate repetitive replies. Try not to be confrontational;

> Remove objects that can be used as weapons.

As with any inmate who is combative or assaultive for any reason, officer safety and safety of other inmates is an issue. Follow POSC® guidelines in this regard.

- ***Be very careful not to allow sharp objects around that inmates can use to dig at their skin.*** Some people who have used methamphetamine experience a sensation of bugs crawling under their skin. This is often known as "speed bugs" or "meth bugs." Some will try to get the bugs out from under their skin, and will use sharp objects to do so, often causing fairly extensive scratching injuries. Thus, be careful to keep such items as ballpoint pens, paper clips, metal pencil eraser tops, or even staples from such inmates.

- ***Try to be sure that inmates are well-clothed, and that they maintain good hygiene.*** Some such inmates will not have taken good care of themselves for a

period of time. Many will not have eaten well. Some may be quite run-down, physically. To the extent possible, do what you can to be sure that they eat their meals, are clean, and take care of themselves. Some may need to be reminded to do these things. In some cases, health care providers may recommend that an inmate—particularly a very thin, run-down person—receives double meals for a time.

- **Be aware that some will have trouble eating because of their dental problems.** As noted, "meth mouth" is a not uncommon condition among methamphetamine users. You may notice that an inmate has bad, discolored or missing teeth; cannot eat solid food easily; grinds his teeth or clenches his jaw; and/or is experiencing pain in his mouth. If so, refer the inmate to health care providers. He or she may need a special diet and other care.

- **Be aware of possible medical complications resulting from methamphetamine use.** You may see these complications at any time, Such complications may include elevated body temperature, flushing, and even convulsions. Some experience heart arrhythmias, which can lead to cardiac arrest. You may see skin abscesses on some people. Elevated body temperature is known as *hyperthermia*. In extreme cases, it may require sedation and rapid cooling methods. Physical exertion or an overheated room can make this condition worse.

- **Be aware that some people can seem stabilized and can then seem to get "flashbacks."** An inmate can seem normal and can then experience "flashbacks," similar to an LSD user, and can behave strangely and even bizarrely. This is not necessarily common, but does occur with some people. If that happens, it is a mental health issue that requires intervention.

## DOCUMENT AND DEBRIEF

Remember that the last step in the **FIRST RESPONDER PHILOSOPHY** is to document and debrief.

Following your response to any medical emergency situation, including one related to alcohol or drug use or abuse, you must document your actions in a detailed report.

Debriefing basically means discussing the emergency situation among jail staff members. Staff members should discuss and evaluate their response to any emergency, so that they can better understand what happened and plan better for future responses to similar emergencies. If such discussion and evaluation do not occur, staff will not learn from possible mistakes and, therefore, are more likely to repeat those mistakes.

Case 2:17-cv-01112-JPS    Filed 09/06/19    Page 86 of 116    Document 175-12

MKE County 1382

# MAINTENANCE OF HEALTH CARE RECORDS AND DOCUMENTATION

An important part of your job in assisting with the jail health care program is proper documentation and record-keeping. Maintenance of complete, accurate health care records is important for several reasons:

- State Administrative Code and statutes require that certain records be maintained;

- Accurate record-keeping helps ensure that inmates receive proper medical and health care. Records provide valuable information to jail medical staff as well as to medical or mental health professionals outside of the jail, when that is necessary;

- As with other jail records and documents, such records may serve to communicate important information to members of the jail administration and staff; and

- Medical records could be very important in the event of a lawsuit, as evidence for the defense. Records should indicate that a medical or health problem either did or did not exist, and what happened as the result of such a problem or situation. Good records are the best way proving that health care was, in fact, provided according to standards and/or jail policies and procedures. Remember that a basic rule of jail operations is: If it is not written, it did not happen.

Health care records include both the records which a medical or mental health care professional completes and maintains, as well as the records and documentation which jail officers complete on certain issues.


## LEGAL REQUIREMENTS REGARDING HEALTH CARE RECORD-KEEPING

State jail standards, under DOC 350, contain several requirements regarding health care record-keeping:

- DOC 350.09(3) contains the following requirement:

    *"Medical records shall be kept separate from other records and shall be maintained in a confidential manner in accordance with ss.146.81 to 146.83, Stats., and any other applicable state or federal laws."*

The other sections of state law noted in this portion of Code - sections 146.81 to 146.83 - are very specific as to requirements on patient health care records,

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 88 of 116   Document 175-12

confidentiality of records, and patient access to records. This basically requires that records classified as "confidential medical records" are to be kept separate from custody records, and are to be confidential - that is, only available to designated people, such as health care professionals.

In practice, medical records are usually kept in a locked filing cabinet in a medical office in the jail.

Policies and procedures should specify who is authorized access to confidential medical records, and who is not authorized to have such access.

Policies should also specify the procedures for access to an inmate's confidential medical records in the event of an emergency medical situation, and in which jail medical personnel are not available to authorize such access.

- DOC 350.11(4)(a) requires the sheriff to *"notify the...regional detention facilities specialist within 48 hours after any of the following events occur:"* and then lists a number of specific events, including the following:

    *"2.      An inmate attempts suicide and is admitted to a hospital, not including an emergency room admission for detention and evaluation under Chapter 51, Stats., or is provided medical treatment for a life-threatening injury incurred as a result of the suicide attempt."*

As indicated, this Code subsection requires the sheriff to ensure that the regional jail inspector is notified of an inmate suicide attempt which results in either hospitalization or provision of medical treatment in jail or elsewhere for a "life-threatening" injury associated with a suicide attempt. The exception to this is if an inmate is brought to a hospital for "emergency detention" under provisions of s.51.15, <u>Wis. Stats.</u>

- DOC 350.18 requires each jail to have policies and procedures regarding inmate health screening and care. There are two relevant subsections, in regard to health care records:

    ✓ DOC 350.18((2) indicates that there are to be *"procedures for the documentation of health screening results, referrals made or health care provided and maintenance of documents in an inmate's confidential medical file."* This means that all key aspects of provision of health care to inmates must be documented and maintained in confidential medical records. This includes all provision of health care by jail medical or mental health care staff.

    However, the intake health screening form completed by officers does not necessarily have to be a confidential medical form. Many jails retain a copy of this form in an inmate's custody file, either in addition to its placement in a confidential medical file or instead of such placement. Know your jail's policies and

procedures on this issue.

✓ DOC 350.18(9) requires that policies and procedures cover the following component: *"Documentation in an inmate's confidential medical file of any referral and identification of the services provided, including emergency services."* Basically, this says that each jail's policies and procedures are to cover the issue of maintenance of confidential medical records on all referrals of inmates to health care providers and health care services delivered by medical/mental health professionals outside of the jail. This includes any emergency medical or mental health referrals and provision of services.

• DOC 350.20 requires each jail to have policies and procedures regarding control and administration of medications (as you have learned). In regard to health care records, DOC 350.20(5) requires that policies to include the following component:

  *"Documentation of all medication administered or delivered to an inmate, including, who prescribed the medication, who administered or delivered the medications and the date and time of administration or delivery. All refusals of recommended or prescribed medications by an inmate must be documented."*

  You learned about such documentation earlier in this task module.

• DOC 350.21 requires each jail to have policies and procedures regarding communicable disease control. In regard to health care records, DOC 350.21(2) requires there to be *"documentation of the need for isolation or quarantine under s.143.05(6)(b), Stats., in the inmate's confidential medical file."*

  In other words, there is to be documentation of the reason(s) that an inmate was placed in isolation or quarantine for suspected or diagnosed communicable or contagious disease, to be maintained in the inmate's confidential medical file.

Wisconsin statutes also contain requirements regarding health care record-keeping. In **ADMIT AND RELEASE INMATES**, you learned that s.302.388, Wis. Stats., requires that a HEALTH TRANSFER SUMMARY form is to be prepared and submitted whenever an inmate is transferred from one county jail to another, from jail to a prison, or from prison to a jail.

As you have learned, s.302.384, Wis. Stats., covers the issue of what to do if an inmate refuses appropriate medical care or treatment. In regard to health care records, s.302.384(3) contains the following requirement:

  *"The health care professional indicates on records kept by a sheriff, jailer, keeper or officer that appropriate care or treatment was offered and that the prisoner refused that care or treatment."*

05/11

In other words, if an inmate refuses appropriate medical care or treatment - which is his or her right - such refusal is to be documented by a medical professional. The documentation is to be maintained, although it is not specified whether or not the documentation must be part of confidential medical records.

## TYPES OF HEALTH CARE RECORDS IN JAIL SETTINGS

As noted, overall health care records in a jail setting include both the medical records which a medical or mental health professional completes and maintains <u>and</u> the records and documents which you as a jail officer complete.

There are a number of records and documents that you may have to complete. The most common include the following:

- ✓ A medical clearance form, if your jail has a policy allowing or requiring medical clearance, of injured or ill inmates brought to your jail before they are admitted to jail custody;

- ✓ Intake health screening form;
- ✓ Medication administration log form;

- ✓ Sick call form, to be completed by inmates when requesting to be seen during sick call;

- ✓ Form for referral of inmates to health care staff by jail staff members;

- ✓ Form to accompany an inmate who is being transported outside of the jail for a visit to a doctor or dentist, on a non-emergency basis;

- ✓ Emergency medical care transfer form;

- ✓ Medical order form, in which you may have to indicate whether a particular medical order was or was not followed;

- ✓ Security check form, particularly if an inmate has been placed in administrative segregation for a medical or health-care related reason - such as the presence of possible communicable or contagious disease;

- ✓ Records pertaining to hospitalized inmates if you are assigned to maintain a hospital security post - including such records as visitation log, incident book, and log of the inmate's movement within the hospital; and

- ✓ A HEALTH TRANSFER SUMMARY form if an inmate is being transferred from jail to prison or from one jail to another jail. If a nurse is not available to complete this form at the time of the transfer, you as an officer may have to complete part

MKE County 1386

of it.

Be familiar with your jail's policies and procedures regarding these or other health care records, and your specific responsibilities in completion of such records or documents.

In addition to specific health care forms and records, you will make notations in the jail log or incident book, or an entry in the jail computer, regarding observations of inmate health care problems or actions taken.

## GENERAL GUIDELINES FOR EFFECTIVE RECORD-KEEPING

In completing any health care form or record in the jail - whether a specific form or a log or incident entry - there are some general guidelines to keep in mind. These include:

- **Be objective.** If you have to write anything in narrative form, simply describe your observations and make your comments as factually and straightforwardly as possible.

  Do not include your opinion, unless you specifically identify it as such.

- **Be thorough.** Include all relevant information, including complete descriptions of what you observed or heard, your reasons for taking certain actions, and so on.

  If you make a referral of an inmate to medical or mental health professionals, be sure to describe in detail the reason for your referral, and all relevant details regarding the referral: exact date and time, method of referral, who you made the referral to, response of the health care professional, and so on. Such details can be very important, both in terms of decision-making on a health care issue as well as in regard to possible legal liability for provision of appropriate health care.

- **Do not offer diagnoses. Instead, just try to describe behavior, or signs and symptoms, which you observed or otherwise became aware of.** Because you are not a medical or mental health care professional, you are not legally qualified to make a diagnosis of an inmate's medical problem or condition. If you appear to be making a diagnosis, you could be legally liable in a lawsuit. Therefore, never write down anything which could be construed to be a diagnosis of an inmate's medical or mental problem.

  For example, do not write down that an inmate has emphysema, just because he or she is a smoker and has a breathing problem, unless the inmate has said that he/she has that condition or unless you know that a physician has made that diagnosis.

05/11
MKE County 1387

Avoid use of medical diagnostic terms unless you are specifically aware that an inmate has been diagnosed or the inmate so indicates such diagnosis.

- **Include specific quotations where appropriate.** Document exactly what an inmate said about a medical or health care problem, to the greatest extent possible.

- **Document actions taken or dispositions made.** For example, if you placed an inmate in administrative segregation for a health care-related reason, document that action.

  If an inmate refused to take a dosage of prescribed medication, be sure to document such refusal on the appropriate form.

  Or, if you are to follow a specific medical order and cannot do so as ordered, for any reason, be sure to document that you were unable to follow that order. Also document the reason for this.

  As noted, if you made a referral of an inmate to a health care provider, be sure to document the details of the referral as well as any follow-up actions you took based on making that referral.


## ROUTING AND FILING OF MEDICAL RECORDS

Jail policies differ as to which medical records on inmates are to be maintained as confidential medical records—those that are not accessible to non-medical personnel—and which records need not be considered confidential medical records.

Certain records, of course, are clearly confidential. These include the records on medical contacts between an inmate and a medical professional during a sick call visit, an office visit, hospitalization records, and so on.
Other records may or may not be confidential, such as intake health screening forms.

Know and follow your jail's policies and procedures as to which records and documents are considered confidential medical records and which are not.

Also be familiar with your jail's policies and procedures as to how specific medical and health care records are to be routed and filed, and follow those policies and procedures.

Be very careful that people who are not supposed to have access to confidential inmate medical records do not have access unless they are properly authorized to have access. This should be covered in policies and procedures. If you are aware that there has been a breach of confidentiality in regard to inmate medical records, document that fact and bring it to the attention of your supervisor.

# MANAGING STRESS

So far, the information in this text has focused on the health care needs of inmates in jails. However, your health is also important. Taking care of yourself and doing what the best you can to become and stay healthy is an important part of being a professional person.

One of the key ways in which you do this is by recognizing some of the common sources of stress in your personal and professional lives, and then doing what you reasonably can to effectively manage that stress.

Feelings of stress can be both good and bad. "Good stress" is managed stress. An example is the stress we feel in competitive sports, which is good because it can enhance performance. The same is true in regard to managed stress in your work situation, which can cause heightened awareness of your surroundings and can cause you to draw on your training and experience more effectively.

"Bad stress" is unmanaged stress. It is stress that has lasted long enough or was of such intensity that your body can no longer manage it, and then certain biological responses occur. These can include both physical and emotional and mental health symptoms.

## COMMON SOURCES OF STRESS

Some of the more common sources of stress in a correctional environment include:

- **General Factors About The Job In General**

  - ✓ Rotating shifts;

  - ✓ Lower pay. In some departments, for example, civilian correctional officers earn less than sworn deputies;

  - ✓ Working in older physical facilities;

  - ✓ Less perceived "prestige" than law enforcement officers have.

- **Factors Related To Working In A Correctional Setting**

  - ✓ Concerns for personal safety. Inmates are always a potential threat to safety of officers;

  - ✓ Working with difficult people. Inmates are often manipulative, hostile,

Case 2:17-cv-01112-JPS   Filed 09/06/19   Page 94 of 116   Document 175-12

argumentative, demanding, and so on;

✓ Being the target of abusive inmate behavior, ranging from verbal abuse, to being the target of thrown urine or feces, to physical assaults, and so on;

✓ Your actions are under scrutiny from a legal liability perspective. Your actions could result in liability for your employer, or even to you personally, and/or inmates may present grievances based on your actions;

✓ Possibility of exposure to communicable or contagious diseases, ranging from cold or flu viruses to more serious diseases such as tuberculosis or blood-borne diseases such as hepatitis or HIV;

✓ You seldom have the satisfaction of "finishing the job." There is no closure or resolution; inmates rarely change significantly.

- **Employment-Related Factors**

  ✓ Conflicts or disagreements with administrators and/or supervisors;

  ✓ Lack of support and/or lack of positive reinforcement from administrators or supervisors;

  ✓ Sometimes, poor supervisors or managers who do not lead by example;

  ✓ Sometimes, supervisors and/or administrators who are unable to make decisions, or whose decisions reflect political expediency rather than "doing the right thing";

  ✓ Conflicts with co-workers, either on your shift or other shifts;

  ✓ Lack of clearly-defined policies and procedures, or other directives, to guide you in your job performance;

  ✓ Lack of adequate training on the job;

  ✓ Lack of opportunities for promotion or advancement;

  ✓ Sometimes, the perception by non-correctional employees - including family members or friends - that you are doing less-important work than law enforcement officers do;

  ✓ High staff turnover;

  ✓ Constant work during a shift, and not enough "down" time;

  ✓ Too much paperwork, including reports;

- ✓ Department politics, in general. In sheriff's departments, election years are often stressful times because of factionalism within the department - that is, different people supporting different candidates. This is particularly true when two or more people from within a department are candidates for the office;

- ✓ Conflicts with representatives of other elements within the criminal or juvenile justice systems: law enforcement, the courts, probation and parole, etc.;

- ✓ Dealing with difficult people during inmate visitation or over the phone, including family members of inmates, friends, attorneys, etc.;

- ✓ Sometimes, being placed in a situation in which you tend to identify too strongly with inmates and their problems, because you do not have sufficient opportunity to identify with your peers. This sometimes happens in jails in which line staff members have a lot of direct contact with inmates, but in which management is not supportive of the concerns of line staff members and/or in which the typical management style is autocratic and punitive.

These are just some of the more common factors which are often sources of stress for jail officers. Naturally, not everyone experiences these factors to the same extent. Some officers experience many of the above stress factors, while others experience few.

Often, the variables are the age and/or layout of the physical plant, the supervision mode of the facility (direct supervision, indirect supervision, etc.), and the particular individuals who work in the jail - particularly administrators and supervisors.


## SOME GUIDELINES FOR EFFECTIVE STRESS MANAGEMENT

It is not possible to completely eliminate stress from our lives, and it is not possible to totally manage the stress that we do experience. Nor is that even desirable. However, the goal should be to do what we reasonably can to proactively and consistently try to most effectively manage the stress that arises both in our personal and professional lives so as to be as productive and happy as we can be, in all aspects of our lives.

One of the best ways to try to manage stress is to develop and live an overall lifestyle that values and promotes wellness. This is not a "cookbook" approach in the sense that there is a set of guidelines which will apply to all people equally. What works for one person will not necessarily work for another person.

Within that frame of reference, however, there are several basic guidelines to keep in mind about an overall lifestyle that values and promotes wellness. These include:

MKE County 1391     05/11

- **Eat a Healthy Diet**. Try to eat regular meals which are nutritious, and well-balanced. Try to avoid unhealthy foods, including too much "junk" food, fried foods, fatty foods, etc. Specifically, always try to eat a good, healthy breakfast. People who routinely skip breakfast often have a difficult time coping with stress. Similarly, try not to eat too much, if anything, before bedtime. In particular, avoid eating a heavy meal two or three hours before you sleep. To do so means that your body has to digest the food while you are sleeping. This often results in less-effective sleep, which means that you are not getting proper rest. When you do not get proper rest, often your ability to cope effectively with stress is lessened.

- **If You Use Alcohol and/or Caffeine, Do So in Moderation.** Use of alcohol in moderation may not be harmful to most people. However, drinking too much, on a regular basis, is unhealthy and causes a variety of problems for many people - not just health problems but also family or relationship problems, work problems, and so on. Therefore, if you drink, do so moderately.

  Similarly, the use of caffeine in moderation is not necessarily unhealthy. But too much caffeine, whether through coffee or caffeinated soft drinks or - to a lesser extent - chocolate can be unhealthy. Too much caffeine can cause an accelerated heart rate and can make a person feel anxious and "jumpy." It can also cause headache, light-headedness, and shortness of breath in some people. Therefore, if you drink caffeinated coffee or soft drinks - particularly at work - do so in moderation. Some doctors recommend no more than the equivalent of two cups of caffeinated coffee per day. Try to avoid getting into a habit of depending on the stimulative effects of caffeine as a substitute for getting adequate rest.

  The same is true for sugar. Try not to depend on the "energy" you get from eating sugar products as a substitute for adequate rest, on any kind of consistent basis.

  Here are the FACTS (acronym) which, in general, contribute to ill health:

      F - fatigue
      A - alcohol
      C - caffeine
      T - tobacco
      S - salt

- **Get Enough Rest**. As noted above, sleep is important as a way of enhancing our ability to cope with stress in our lives. When a person is over-tired or chronically in need of rest, he or she is usually less able to manage stress effectively.

  Try to sleep regular hours as much as possible, and get enough sleep each day. The amount of sleep required varies from person to person.

  Of course, getting adequate sleep can be difficult when you are working varying

shifts. Or when you have family or other responsibilities that require your time when you are off of work. If you work third shift, make sure that your family respects your sleep schedule and your need for quiet during that time.

- **Exercise Regularly.** Physical exercise is very important as a way to stay healthy and manage stress more effectively.

  Aerobic exercise - in which you increase your heart rate for a period of time - helps strengthen your cardiovascular system (heart and lungs), and can lower your blood pressure. Anaerobic exercise, particularly resistance exercise such as weightlifting, is beneficial because it enhances strength, power, muscle tone and flexibility. It makes one feel better.

  Additionally, exercise is important because it causes the release of chemicals known as endorphins, which cause us to feel better overall for a time and enhances our energy level.

  Also, exercise helps a person sleep better.

  The most important goal is to do some form of exercise regularly and consistently, rather than just every once in a while. Exercise need not be overly time-consuming or strenuous. If you do something - particularly aerobic exercise - for twenty minutes three times a week, you will be doing a lot for yourself.

  If you have not exercised previously, it is best to not try to do too much too soon. If you do, you are likely to get discouraged or to hurt yourself, which may then cause you to stop exercising. Start with modest goals, keep at it, and work up to bigger goals. Sometimes, it takes a bit of an attitude adjustment to make regular exercise a priority in your life.

  Prior to starting an exercise program for the first time or after a lengthy period of no exercise, it is a good idea to have your doctor check your heart and blood pressure.

- **Talk About Your Feelings With People You Can Trust.** When we keep our feelings inside and do not talk about them, we usually feel more stressed. This is particularly true of such feelings as anger, depression, anxiety. fear, and so on.

  It is not a sign of weakness to talk about feelings. Instead, it is a basic human need to do so.

  Try to find at least one person whom you can trust and with whom you can talk about your feelings now and again, and be willing to do that. This should be someone who will listen to you, non-judgmentally, without necessarily having "answers" or trying to solve your problems. This should be someone whose

ethical standards you know and respect. It can certainly be a co-worker, supervisor, etc.

- **Try to Create Supportive Intimate and Work Relationships.** People need other people. It is healthy to foster and nurture supportive, ongoing relationships with other people - family members, friends, colleagues at work, and so on. This is a way of reducing our isolation and feelings of loneliness, and of helping achieve a better sense of balance in our lives.

  When we do not have supportive and intimate relationships, too often we feel more lonely and isolated. We are then more subject to the negative effects of stressors. This does not mean that you should not take time out to be alone and to sort things out as necessary. But total isolation is not a normal state; it can cause depression and can intensify problems, allowing you too much time to dwell on them.

- **Learn to Accept Your Feelings. Do Not Judge Them.** Our feelings are real. Constantly judging and criticizing our feelings is not healthy. It is better to try to accept our feelings for what they are, not judge them as good or bad, and so on.

  This is not to say that you should not try to recognize and minimize negative and/or self-defeating feelings. To do so is a worthwhile goal, and can contribute to effective stress management. That is, you can accept counterproductive feelings as real for you, but you can at the same time recognize that they may be counterproductive and can try to minimize their effect on you by trying to do something positive about them.

  In other words, do not be too hard on yourself just because you may be experiencing a variety of feelings, some of which may be uncomfortable or may make you unhappy. Recognize that you are a human being, that human beings have many feelings, and that is okay. However, if you can, try to recognize the negative or self-defeating feelings and do what you can to change their impact on your life.

  If this is beyond your own ability to do, do not hesitate to seek professional assistance. That is not a stigma. Life is often complicated, and it sometimes takes a professional's fresh perspective on our problems to suggest new methods of coping with those problems.

- **Focus on Your Successes, Rather Than Dwelling on Your Shortcomings and Failures.** All of us have strengths and weaknesses. All of us do some things better than others.

  It is not healthy to constantly dwell on your shortcomings or weaknesses or mistakes. To do so fosters feelings of failure, inadequacy, and frustration. It is

better to try to recognize your areas of strength and accomplishment, take pride in these, and focus on them. However, do not ignore your shortcomings, particularly if they affect the quality of your life - personal or professional. Instead, take positive steps to develop those areas which you identify as deficient. If necessary, seek professional assistance in identifying positive steps to take.

- **Try Not to Worry or Obsess About Things Which You Cannot Control.** There are many things in life which we cannot control or affect, either at all or at least very much. As much as possible, it is a worthwhile goal to try not to worry about the things which we cannot control, and to let them go. Try instead to identify and concentrate on those areas of life which are within your control, and to do the best you can in regard to those areas. This will lead to less stress and more of a sense of control overall.

- **Develop and Maintain Interests and Friendships Outside of the Work Environment.** This is an important aspect of trying to lead a well-balanced life. It is sometimes too easy to focus on work and the problems or stresses associated with work.

  Also, law enforcement or correctional officers too often distrust other people who are not "one of us," and therefore they tend to associate only with their "own kind." While that is understandable, it is not healthy. They often tend to dwell on and reinforce common negative concerns. This can be counter-productive.

  It is healthy to develop and maintain a more well-rounded life. This includes having friends other than just the people you work with. It also means developing hobbies or activities which you enjoy, and which enable you to relax and enjoy your life. Interacting with people from other professions gives you fresh insights which broaden your perspective and allow you to relate to society on more "global" terms.

- **Change and Eliminate Stressful Activities Whenever Possible.** Just as it is important to try to develop and maintain healthy, productive activities in your life, it is equally important to try to eliminate or minimize things or activities which cause you unhappiness or distress.

  It is not always easy or even possible to change or eliminate major stressors in our lives. But it is a good idea to try to do so when you can. For example, if you feel stressed because your life is too busy - too many activities - try to cut back on some of your activities. Sometimes, this means learning to say "No" when people ask you to do things, or to take on additional responsibilities. This is hard to do if it is your family, loved ones or close friends. But only you know your limits. Do not expect anyone else to know them. YOU are responsible for taking care of you.

Similarly, if there are people in your life who consistently cause you to feel stress, either avoid them if you can or try to find more effective ways of communicating with and relating to them.

- **Use Department Peer Counseling, Chaplain, Support Groups, and/or Employee Assistance Programs, or Professional Therapists.** At some time, every person experiences life problems or stresses which seem overwhelming or which seem to be very difficult to handle. We are all human.

  At such times, you should take advantage of programs at your department or in the community which are designed to help you cope with difficult times in your life. Such programs may include those listed above: peer counseling, support groups, department chaplain, employee assistance programs, etc. Or, you may choose a professional therapist on your own. It is not shameful or a sign of weakness to do so. In fact, it takes courage to reach out and admit that you need help resolving problems or issues which are troubling you.

  By taking advantage of such programs, you may be able to prevent larger, more serious problems from developing. This may apply to personal problems, relationship problems, alcohol/drug problems, etc.

  Support groups are very helpful to many people. These typically consist of people who are going through, or have gone through, a similar life problem or situation and who get together on a regular basis to offer support to one another. Examples include Alcoholics Anonymous, Narcotics Anonymous, groups for divorced persons, and so on. Among the benefits of such groups is that it helps people know that others are going through or have gone through the same difficult experiences. This helps us know that we are not alone with our life problems - that others have similar problems.

These are some of the key guidelines to keep in mind about an overall lifestyle which values and promotes wellness.

**2**

## Case Law

ESTELLE

V.

GAMBLE

U.S. Supreme Court (1976)

## Deliberate Indifference

" ... deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'...proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying access to medical care or intentionally interfering with the treatment once prescribed."

## Estelle v. Gamble

This case set the basic standard for provision of health care in correctional institutions, by establishing the term:

## DELIBERATE INDIFFERENCE

## 4 Basic Categories

- Deliberate failure to take proper actions to become aware of possibly serious medical needs, including during intake screening

- Deliberate failure to take appropriate actions or seek medical help upon noticing that an inmate seems to be apparently seriously ill or injured

## 4 Basic Categories  (cont.)

- Deliberate failure to take appropriate actions based on an inmate's request for medical help for an apparently serious illness or injury

- Deliberately ignoring or interfering with a prescribed medical order regarding care or treatment

## Duties of The Jail Officer

- Conduct screening for inmate health

Review of

Estelle
v.
Gamble

## Duties of The Jail Officer

- Conduct screening for inmate health
- Respond to inmate needs / requests for medical care

---

### Duties of The Jail Officer

- Conduct screening for inmate health
- Respond to inmate needs / requests for medical care
- Control, administer, and / or deliver medications

---

### Duties of The Jail Officer

- Conduct screening for inmate health
- Respond to inmate needs / requests for medical care
- Control, administer, and / or deliver medications
- Provide health care (emergency and non-emergency)
- Maintain health care records

---

### Duties of The Jail Officer

- Conduct screening for inmate health
- Respond to inmate needs / requests for medical care
- Control, administer, and / or deliver medications
- Provide health care (emergency and non-emergency)

---

### Responding to Requests for Medical Care

- DOC 350.18
- Be familiar with policies and procedures
- Crisis Management Strategies (OIND)
    - Observation
    - Intervention
    - Notification
    - Documentation / Refer
- NEVER ignore an inmate complaint

---

## INMATE REQUESTS FOR HEALTH CARE

KEY POINT:

Never ignore an inmate's request to be seen during sick call, or take it upon yourself to determine that any request is invalid or that the inmate need not be seen.

*To do either of these things could be "deliberate indifference" to an inmate's medical care needs.*

## Evaluate and Act

- Contact jail medical staff
- Give inmate a sick call slip
- Contact supervisor, if appropriate
- If above options aren't available, then convey inmate to a medical facility
- DOCUMENT ALL NOTIFICATIONS AND ACTIONS TAKEN !!

## Detection of Non-Emergency Medical Needs

- Your personal observation
- Other inmate's observation
- Information from an outside source
- Hearing complaints, but no request for medical care

## TRUISM

IF YOU DIDN'T WRITE IT DOWN,
   AND IT WOULD'VE MADE YOU LOOK GOOD,
      IT DIDN'T HAPPEN !!!

Case 2:17-cv-01112-JPS   Filed 06/01/18   Page 106 of 116   Document 175-12   MKE/County Props

## Responding to Emergency Medical Needs

- Review the First Responder Philosophy
- Emergency medical needs arise from a variety of situations:

## Emergency Situations

- Injuries resulting from disturbances
- Injuries resulting from suicide attempts

## Emergency Situations

- Injuries resulting from disturbances

## Emergency Situations

- Injuries resulting from disturbances
- Injuries resulting from suicide attempts
- Alcohol and drug-related reactions

## Emergency Situations

- Injuries resulting from disturbances
- Injuries resulting from suicide attempts
- Alcohol and drug-related reactions
- Medical Emergencies (Diabetes, Seizures)

## Emergency Situations

- Injuries resulting from disturbances
- Injuries resulting from suicide attempts
- Alcohol and drug-related reactions
- Medical Emergencies (Diabetes, Seizures)
- Mental illness emergencies
- Fire and other disasters

## Emergency Situations

- Injuries resulting from disturbances
- Injuries resulting from suicide attempts
- Alcohol and drug-related reactions
- Medical Emergencies (Diabetes, Seizures)
- Mental illness emergencies

## Initial Medical Assessment

- Determine the level of consciousness

## Initial Medical Assessment

- Determine the level of consciousness
- Check ABCs (Airway, Breathing, Circulation)

## Initial Medical Assessment

- Determine the level of consciousness
- Check ABCs (Airway, Breathing, Circulation)
- Perform a body check -- look for:
  Gross deformities
  Severe bleeding
  CONTRABAND
- Treat to level of training

## Initial Medical Assessment

- Determine the level of consciousness
- Check ABCs (Airway, Breathing, Circulation)
- Perform a body check -- look for:
  Gross deformities
  Severe bleeding
  CONTRABAND

## Initial Medical Assessment

- Determine the level of consciousness
- Check ABCs (Airway, Breathing, Circulation)
- Perform a body check -- look for:
  Gross deformities
  Severe bleeding
  CONTRABAND
- Treat to level of training
- Continue to monitor the subject

15

MKE County 1278

## Medical Assessment  (cont.)

- Long-term Monitoring
- Determining if the inmate has special needs
- Communication
- Documentation / Debriefing

## Performing a Body Check

- Head-to-toe evaluation to find gross deformities, severe bleeding, and contraband
- Treat all major bleeding
- Secure HANDS, then head, then legs
- Unconscious subject -- several officers can perform the body check
- Conscious subject -- one officer performs the body check

## Communication

- With your control center
- With your medical staff
- With your supervisors and other officers
- With outside responding agencies  (EMS)

## OF COMMUNICABLE DISEASES METHODS OF TRANSMISSION

- *DIRECT CONTACT*: person-to-person transmission of pathogens;
- *INDIRECT CONTACT*: Contact with contaminated objects, bodily fluids, food, etc.;
- *AIRBORNE TRANSMISSION*: Inhalation of droplets from an infected person, or of contaminated dust.

**3**

Brian
Wernel #18

# JAIL HEALTH CARE

## *Student Study Review Worksheet*

1. According to the U.S. Supreme Court's decision in *Estelle v. Gamble*, jail staff members have a legal duty to not be _____ _____ to the serious medical care needs of inmates. *(Select one answer)*
   - __✓__ A. significantly negligent
   - __X__ B. deliberately indifferent
   - ____ C. conspicuously dismissive
   - ____ D. purposefully oracular

2. What does Wisconsin law under s.302.38 indicate in regard to provision of medical care to county jail inmates? *(Select one answer)*
   - ____ A. The sheriff or other jail keeper must promulgate policies and procedures for care of intoxicated or incapacitated inmates
   - ____ B. The sheriff or other jail keeper has to set up an adequate system for health care, but inmates are only entitled to care if they can pay for it
   - __X__ C. The sheriff or other jail keeper must provide appropriate care or treatment if an inmate needs medical care, and inmates can be charged for care but must receive care even if they cannot pay.

3. What is a jail officer required to do if an inmate refuses to accept a dose of a prescribed medication, according to state law under s.302.384? *(Select all that apply)*
   - ____ A. Let the inmate know that not taking the medication will negatively impact his or her prognosis
   - ____ B. Initiate a forced medication request to a supervisor or health care professional
   - __X__ C. Inform jail medical staff that the inmate has refused medication, according to procedures for doing so
   - ____ D. Place the inmate in administrative confinement until he or she agrees to take the medication or until medical staff can interview him or her

3

12/10

MKE/County 2507

4. If an inmate has properly submitted a sick call request but an officer does not feel that the inmate imminently needs to be seen by a health care provider, the officer should: *(Select one answer)*
    ___ A. Advise the inmate to wait until he or she has left jail custody to seek care for the health care problem or concern
    ___ B. Inform the inmate that the sick call request is denied
    _X_ C. Honor the inmate's sick call request anyway
    ___ D. Complete a state form entitled INMATE HEALTH CARE NON-REFERRAL

5. Why is documentation of medication delivery important? *(Select all that apply)*
    _X_ A. It helps protect against claims by inmates that they did not receive dosages of medication
    _X_ B. It eliminates confusion over whether or not medication was actually given
    _X_ C. It could be important information in the event of a medical emergency
    _X_ D. It ensures that the medical treatment will be effective

6. Washing hands with hot water and soap is considered an important universal precaution (sometimes referred to as "standard precaution"), to try to prevent the spread of communicable disease. Under which of the following circumstances should an officer wash his or her hands? *(Select one answer)*
    ___ A. Only if disposable gloves were not worn during any contact with an inmate
    ___ B. Before removing disposable gloves which were worn during a contact with an inmate
    ___ C. Only if it is known or suspected that an inmate who was the subject of a contact has a blood-borne disease
    _X_ D. Whether or not gloves were worn during any contact with an inmate

7. What is the recommended guideline as to what an officer should do if he or she suspects that an inmate in general population has a communicable or contagious disease? *(Select one answer)*
    ___ A. Keep the inmate in general population and refer the case to medical staff
    _X_ B. Place the inmate in isolation until a member of jail medical staff has examined the inmate and authorized placement of the inmate in general population
    ___ C. Arrange transfer of the inmate to a hospital or emergency clinic for immediate assessment
    ___ D. Place the inmate in isolation for at least three days before placing him or her back in general population, in order to ensure that the contagious period has passed.

Case 2:17-cv-01112-JPS   Filed 06/01/18   Page 113 of 116   Document 175-12
MKE County 2508

8. How is tuberculosis spread from one person to another?

_Through droplets ~~in the~~ in the air ~~mostly communicated~~ communicated by coughing or sneezing_

9. Section 252.15 of Wisconsin law gives jail officers certain rights if they think they have received a significant exposure to the HIV virus while on the job. Which of the following statements best summarizes these rights? *(Select all that apply)*
   ___ A. The officer is entitled to request that the inmate who was the source of the exposure be isolated pending initiation of treatment for HIV.
   ___ B. The officer may bring criminal charges against the inmate who was the source of the exposure.
   _X_ C. The officer is entitled to request and receive the results of a blood test on the person who was the source of the significant exposure
   ___ D. The officer may initiate a writ of testificandum regarding the inmate

10. Which of the following is generally considered to be a common method by which the HIV virus (the virus that causes AIDS) can be spread? *(Select all that apply)*
   _X_ A. Direct contact with the blood of an infected person
   _X_ B. Sexual contact
   _X_ ~~C. Direct contact with the saliva or urine of an infected person~~
   _X_ D. Sharing of a needle contaminated with the blood of an infected person

11. What are the two common types of diabetic emergencies?

   _Diabetic coma_

   _Insulin Shock_

12. What is an appropriate question to ask an inmate who is a known diabetic if he or she seems to be experiencing a diabetic emergency situation? *(Select all that apply)*
   _X_ A. Have you taken your insulin today?
   _x_ B. Have you eaten today?
   _x_ C. Have you eaten anything that you were not supposed to eat?
   ___ D. Have you shared a needle with anyone else?

13. What is the proper recommended <u>primary</u> (first) response by an officer to an inmate who is a known diabetic who seems to be experiencing a diabetic emergency and is conscious, but jail medical staff is not on-duty at the time? *(Select one answer)*
   _X_ A. Give the inmate sugar in some form
   _X_ ~~B. Activate the emergency medical system~~

Case 2:17-cv-01112-JPS   Filed 02/18/20   Page 114 of 116   Document 175-12
MKE/County 2539

___ C. Administer an insulin injection to the inmate
___ D. Contact the designated jail physician for advice

14. What should an officer do if an inmate seems to be undergoing an apparent tonic-clonic (severe) seizure? *(Select all that apply)*
    _X_ A. Protect the person's head by placing something soft and thin under it
    ___ B. Attempt to restrain the inmate from thrashing around
    _X_ C. Help the inmate turn onto his side so that he will not choke if he vomits
    ___ D. Place a tongue depressor into the person's mouth so that she does not swallow her tongue

15. What is the recommended first response by an officer if an inmate is experiencing serious respiratory distress and says that he cannot breathe and that his inhaler or other medication is not helping? *(Select one answer)*
    ___ A. Refer the inmate for the next scheduled sick call
    ___ B. Give the inmate oxygen immediately
    ___ C. Help the inmate assume a comfortable position, which may include sitting up
    _X_ D. Seek medical advice immediately

16. What is an appropriate question for an officer to ask of a new prisoner during intake health screening in regard to the inmate's use of alcohol or other drugs? *(Select all that apply)*
    _X_ A. How much have you had to drink?
    _X_ B. Have you ever used drugs in combination with alcohol?
    _X_ C. Are you currently under treatment for a problem related to alcohol or drug use?
    ___ D. Are you a drug dealer?

17. Why is alcohol withdrawal by an inmate a potentially-serious condition in a jail? *(Select one answer)*
    _X_ A. It can result in death
    ___ B. It can cause a person to become neurotic very quickly
    ___ C. It can result in significant psychological addiction
    ___ D. It can cause neuroleptic dysfunction in the brain stem

18. What is the recommended proper response by jail staff to becoming aware that an inmate seems to be undergoing delirium tremens (DT's)? *(Select one answer)*
    ___ A. Place the inmate in a restraint chair, or other type of restraints if a chair is unavailable, so that he or she cannot harm himself or herself
    _X_ B. Consider the situation a medical emergency, and act accordingly
    ___ C. Initiate an emergency detention under provisions of Chapter 51
    ___ D. Be sure that the inmate gets adequate nutrition and drinks plenty of water

Case 2:17-cv-01112-JPS   Filed 06/01/18   Page 115 of 116   Document 175-12
MKE/County 2540

19. If a jail inmate is known to have used methamphetamines before entering jail custody, someone should tell him or her what to expect as an aftermath of use of the drug. It may be a jail staff member who has that responsibility. If so, what should the inmate be told about what to expect? *(Select all that apply)*
    X  A. They may experience mood swings and/or feelings of delusions and paranoia.
    ___ B. They will likely experience intermittent insomnia
    X  C. They will probably sleep a lot for a few days
    ___ D. They may experience delirium tremens


20. It is required in DOC 350 that health care records on inmates are to be kept separate from other records on inmates and must be maintained in a _____ manner. *(Select one answer)*
    X  A. confidential
    ___ B. legal
    X  C. professional
    ___ D. careful

Case 2:17-cv-01112-JPS   Filed 02/19/19   Page 116 of 116   Document 175-12

MKE County 2541