Rebecca Terry vs County of Milwaukee, et al.

17-CV-1112

Transcript of the Testimony of:

# ELIZABETH FREUCK

August 21, 2018





**EXHIBIT 47**

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WISCONSIN
2     --------------------------------------------------------

3     REBECCA TERRY,

4                    Plaintiff,

5        -vs-                            Case No. 17-CV-1112

6     COUNTY OF MILWAUKEE, et al.

7                    Defendants.

8     --------------------------------------------------------

9

10

11              Deposition of ELIZABETH FREUCK

12                Tuesday, August 21st, 2018

13                     10:34 a.m.

14                        at

15              LEIB, KNOTT & GAYNOR, LLC
          219 North Milwaukee Street, Suite 710
16                Milwaukee, Wisconsin

17

18

19         Reported by:  Wendy L. Hanneman, RPR

20

21

22

23

24

25

Page 2

```
 1            Deposition of ELIZABETH FREUCK, a witness
 2   in the above-entitled action, taken at the instance of
 3   the Plaintiff, pursuant to the Federal Rules of Civil
 4   Procedure, pursuant to notice, before WENDY L. HANNEMAN,
 5   Registered Professional Reporter and Notary Public in
 6   and for the State of Wisconsin, at LEIB, KNOTT & GAYNOR,
 7   LLC, 219 North Milwaukee Street, Suite 710, Milwaukee,
 8   Wisconsin, on the 21st day of August, 2018, commencing
 9   at 10:34 a.m. and concluding at 12:28 p.m.
10
11   A P P E A R A N C E S :
12      LOEVY & LOEVY, by
            Mr. Scott R. Rauscher
13          311 North Aberdeen Street, 3rd Floor
            Chicago, Illinois 60607
14          Appeared on behalf of the Plaintiff.
15
        LEIB, KNOTT GAYNOR LLC, by
16         Mr. Douglas S. Knott
           219 North Milwaukee Street, Suite 710
17         Milwaukee, Wisconsin 53202
           Appeared on behalf of Defendants, County of
18         Milwaukee, David A. Clarke, Jr., Officer
           Brian Wenzel, Carolyn Exum, Morgan Bevenue,
19         and Margaret Hoover.
20
        HINSHAW & CULBERTSON LLP, by
21         Ms. Mollie T. Kugler
           100 East Wisconsin Avenue, Suite 2600
22         Milwaukee, Wisconsin 53202
           Appeared on behalf of Defendant, Armor
23         Correctional Health Services.
24
25
```

Page 3

```
 1                I N D E X
 2   EXAMINATION                           PAGE
 3   MR. RAUSCHER                         4, 82
 4   MR. KNOTT                               64
 5
 6              E X H I B I T S
 7   NO.        DESCRIPTION        PAGE IDENTIFIED
 8   Exh. 1   Hospital watch log            36
 9   Exh. 2   Investigative summary         59
10   Exh. 3   Supplemental report
              dated 5/7/16                  59
11
12      (Exhibits were retained by the court reporter.
13       Originals attached to original transcript and
14          copies to copy transcripts.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                TRANSCRIPT OF PROCEEDINGS
 2            ELIZABETH FREUCK, called as a witness
 3   herein, having been first duly sworn on oath, was
 4   examined and testified as follows:
 5            E X A M I N A T I O N
 6   BY MR. RAUSCHER:
 7   Q   Can you say and spell your name, please?
 8   A   My name is Elizabeth Freuck, E-L-I-Z-A-B-E-T-H,
 9       last name F-R-E-U-C-K.
10   Q   Who do you work for?
11   A   Milwaukee County Sheriff's Office.
12   Q   How long have you worked for the Milwaukee County
13       Sheriff's Office?
14   A   Um, 22 1/2 years.  And with the County of Milwaukee
15       30 years.
16            MR. KNOTT:  What was that?  I didn't hear
17       that.
18            THE WITNESS:  I worked for Milwaukee
19       County for 30 years, in addition to the Sheriff's
20       Department.
21   BY MR. RAUSCHER:
22   Q   So Sheriff's Office for the last 22, and then the
23       County for eight years before that?
24   A   Correct.
25   Q   What are your current job responsibilities?
```

Page 5

```
 1   A   My job title is deputy sheriff.  I'm currently
 2       assigned to the Courts Division.  So, but my job
 3       responsibilities engulf the vast majority of
 4       things, basically, to, you know, protect the
 5       citizens of Milwaukee County.
 6   Q   Are you in a supervisory role now?
 7   A   No.
 8   Q   What are your main day-to-day responsibilities?
 9   A   Um, well, I work -- I'm primarily assigned in
10       Branch 16 of the courthouse, which is family court.
11       So I'm in the courtroom while it's in session.  And
12       it's family court, so there's not a lot of, um, in
13       custody.  But I monitor the safety and security of
14       both the citizens and the court staff within that
15       area of the building.
16   Q   Okay.  How long have you been assigned to the
17       Courts Division?
18   A   I want to say about five years.
19   Q   Can you actually briefly walk through at a sort of
20       high level your various jobs over the years in the
21       Milwaukee County Sheriff's Office?
22   A   When I graduated and left the academy, I was
23       assigned to the jail, where I was a total of 13
24       years.  After that, I was assigned to the Airport
25       Division.  So I worked out of the airport, um,
```

Page 6

```
 1        which entailed both patrolling and securing the
 2        area of the airport, as well as the -- the
 3        surrounding roads around the airport.
 4    Q   And can you just put years around those, to the
 5        best of your ability?
 6    A   The years?
 7    Q   Yeah.
 8    A   Um, sure, let me think for just a moment, please.
 9    Q   Sure.
10    A   Let's see.  About '09 to late 2013, I want to say.
11    Q   That was the Airport Division?
12    A   Yes.
13    Q   And then it was about '96 to 2009 was the jail?
14    A   Yes.
15    Q   For your first stint there?
16    A   Yes.
17    Q   And what did you go do after the Airport Division
18        around 2013?
19    A   That's when I was assigned to courts.
20    Q   And you've been in court since?
21    A   Yes.
22    Q   Did you ever work for Armor?
23    A   No.
24    Q   Do you know what Armor is?
25    A   Yes.
```

Page 7

```
 1    Q   What is Armor?
 2    A   It's a med -- it's who does the medical at the
 3        Milwaukee County Jail.
 4    Q   Do you have any medical training?
 5    A   I don't, other than first responder with the
 6        Sheriff's Department.
 7    Q   When did you get first responder training?
 8    A   First in the academy, and then every two years we
 9        generally have some sort of first responder
10        training and CPR.
11    Q   You've referred to the academy a couple times.  Can
12        you just explain what the academy is?
13    A   Well, at the time I went through it, it was over at
14        Kosciuszko Park.  Now we have our own training
15        academy.  Basically, it is where I was certified to
16        become a law enforcement officer.  So classroom, as
17        well as hands-on scenario type things to become
18        certified.  Firearms training, EVOC, which is
19        emergency vehicle training, among various other
20        things.
21    Q   Did you say it was about a month -- oh, among other
22        things?
23    A   No, among other things.  I'm sorry.
24    Q   How long was academy?
25    A   When I went through it, it was ten weeks long to
```

Page 8

```
 1        become a certified law enforcement officer.  And
 2        then we had an additional three weeks after that of
 3        jailer training.
 4    Q   Were you working for the Sheriff's Department when
 5        you went through the academy?
 6    A   I was employed by the Sheriff's Department, yes.
 7    Q   What did you do for the County for the first eight
 8        years?
 9    A   Um, I worked at the Milwaukee Mental Health
10        Complex.  Um, my title was as a psychiatric care
11        worker, and I worked with the children's units,
12        known as the Childhood Adolescent Treatment Center.
13    Q   Childhood Adolescent Treatment Center?
14    A   Mm-hmm.  I was a certified CNA.
15    Q   You were a certified -- what's a certified CNA?
16    A   Certified nursing assistant.
17    Q   Did you have to go to school to get --
18    A   No, it was training we got through the County.
19    Q   Did you go to college?
20    A   I did.
21    Q   Where did you go to college?
22    A   UWM, Milwaukee.
23    Q   University of Wisconsin-Milwaukee?
24    A   I'm sorry?
25    Q   Is it University of Wisconsin-Milwaukee?
```

Page 9

```
 1    A   Yes.  I'm sorry.
 2    Q   That's okay.  Did you graduate?
 3    A   No.
 4    Q   How long did you go for?
 5    A   A long time.  Um, I graduated high school in '83,
 6        so the fall of '83, um, probably a good six to
 7        seven years.
 8    Q   To '89 or '90 or so?
 9    A   Ah, probably more like '89, yeah.
10    Q   Did you come close to graduating?
11    A   Um, no.
12    Q   Were you going full time?
13    A   For most of the time, yes.  Not always.  I was
14        indecisive with selecting my major, which is why I
15        wasn't close to graduating.
16    Q   Okay.  Did you take any nursing or health care
17        classes during that time?
18    A   No.
19    Q   Were you pre-med or anything like that?
20    A   No.
21    Q   When you were assigned to the courts -- is it
22        Courts Division?
23    A   Yes.
24    Q   When you were assigned to the Courts Division
25        around 2013, were you also at times assigned out to
```

Page 10

```
 1       do other things?
 2    A  Um, well, we're always can be -- we're always
 3       assigned to -- the Courts Division generally when I
 4       first came out there, we manned the hospital
 5       watches.
 6              Other than that, we can get mandatory in
 7       the summertime like for events at the lakefront or
 8       runs throughout Milwaukee, and events at different
 9       parks and things like that.
10    Q  You say when you were first out at the Courts
11       Division, you manned the hospital watches?
12    A  Well, always, I mean, the courts was assigned --
13       assigned people to do the hospital watches.
14    Q  It was part of your -- part of your normal
15       assignment in the Courts Division was hospital
16       watches, or no?
17    A  It wasn't part of the normal assignment.  Um, but,
18       um, like when I was assigned in the jail, we had
19       deputies in the jail, and then the deputies in the
20       jail were assigned to do it.
21              After we no longer had deputies in the
22       jail, it became the responsibility of the Courts
23       Division to assign people, except on short notice
24       some patrol, because they were the only division
25       open.
```

Page 11

```
 1    Q  So maybe "normal" wasn't a good choice of words by
 2       me.  It was a typical part of the job; is that
 3       right?
 4    A  Um, that every once in a while it was known you
 5       could be called out to work a hospital watch, yes.
 6    Q  And at some point did that stop becoming part of
 7       the job in the Courts Division?
 8    A  Not really, no.
 9    Q  Is it still part of the job today?
10    A  Yes.
11    Q  Do you still go on hospital watches today?
12    A  On occasion.
13    Q  Are there -- is there anyone else other than
14       deputies in the Courts Division who handle hospital
15       watches?
16    A  No, there are -- when -- when people go out to the
17       hospital from the jail -- I'm not sure I understand
18       your question, I guess.  The correctional officers
19       usually will take them out to the hospital.
20    Q  And then you'll take over --
21    A  And then when it becomes a watch as opposed to just
22       a run, considering -- thinking that they'll be
23       going to the ER and coming back, if it becomes a
24       watch, if they get admitted, then it'll -- the
25       deputies will take over.
```

Page 12

```
 1    Q  Okay.  So let's make sure we get the terminology
 2       straight.  What's a hospital run?
 3    A  When the medical staff determines, or does not
 4       accept someone into the jail and they have to be
 5       taken out to the hospital for medical clearance.
 6    Q  When you say "the medical staff", do you mean the
 7       medical staff at the jail?
 8    A  Correct.
 9    Q  Does that include if somebody's in the jail already
10       and then needs to go to the hospital?
11    A  Yes.
12    Q  Is that a run, also?
13    A  Yes.
14    Q  So it could be someone coming in and the medical
15       staff saying you're not healthy enough to be here,
16       or it could be somebody who's already there who
17       needs to go out?
18    A  Correct.
19    Q  And is the run --
20    A  And --
21    Q  Go ahead.
22    A  I'm sorry, if somebody's just coming into the jail,
23       only if it's our department will our staff take
24       them out.  If it's, say, West Allis's, and the
25       medical staff doesn't accept them, then it's
```

Page 13

```
 1       medical staff's -- or it's West Allis's
 2       responsibility to take them and get them cleared.
 3    Q  When you say "our department", you mean the
 4       Sheriff's Department?
 5    A  Yes.  I'm sorry.
 6    Q  So you mean only if the sheriff department arrested
 7       that person?
 8    A  If they're coming in.
 9    Q  Right.
10    A  So we -- or we had to have accepted -- the medical
11       staff had to already approve them, or accepted them
12       to come into the jail.  Then it would be our
13       responsibility to do the run.  But if they just
14       come in and they haven't been accepted by the
15       medical staff into the jail yet, then it would be
16       whatever arresting agency's responsibility to take
17       them to get them medically cleared.
18    Q  And if the person -- so let's take that situation
19       where someone was arrested by a different agency,
20       they came to the jail, but they were not accepted.
21    A  Mm-hmm.
22    Q  They're sent out to the hospital.  If they're
23       admitted, is it still that agency's responsibility?
24    A  Yes.
25    Q  So you don't -- you a deputy for the sheriff
```

Page 14

1       wouldn't take over the hospital watch?
2  A  No.
3  Q  Okay. And at some point can a hospital run become
4       a hospital watch?
5  A  Yes.
6  Q  What is a hospital watch?
7  A  That's when a person would get admitted into the
8       hospital while -- if they're under arrest or in
9       custody. And other departments have them, too. I
10      don't know if they call them the same.
11  Q  But for Sheriff's Department, a hospital watch is
12      when --
13  A  Correct.
14  Q  -- someone is admitted to the hospital?
15  A  Yes.
16  Q  How many hospital watches have you participated in
17      as a sheriff's deputy?
18  A  Um, I can only give you a guess, but I would say,
19      over my years, probably in the low one hundreds.
20  Q  What are your -- well, have the -- have your
21      primary responsibilities in conducting hospital
22      watches changed over the years?
23  A  Um, there have been some policy changes over the
24      years, but, um, generally it's been the same.
25  Q  What are your general responsibilities in doing a

Page 15

1       hospital watch?
2  A  Um, basically, the primary responsibility is to
3      keep both the patient, as well as the medical staff
4      and the hospital, secure and safe.
5  Q  And are there certain things you always or you
6      typically do to keep the patient and the hospital
7      staff safe?
8  A  Um, typically, um, policy tells us that we should
9      have two-point restraints on inmates while they are
10      at the hospital. Usually it's, um, one wrist and
11      the opposite ankle.
12  Q  Did the restraint policy change at all over the
13      years?
14  A  Um, I believe it -- I want to say I believe it did.
15      Um, I don't think when I first started doing them
16      when I was in the jail, that it was opposite. It
17      was always two-point restraint. Um, but there were
18      several reports over the country of -- of inmates
19      either hurting themselves, or in an attempt to
20      escape, um, if they were both on the same side,
21      rolling over off of the bed and, like I said,
22      getting hurt or using it as a way to try to get
23      out.
24  Q  Would the -- so is the opposite -- having opposite
25      wrist and ankle more restrictive, or more effective

Page 16

1       restraints?
2  A  I'd say more effective. I wouldn't say more
3      restrictive, because it's still a two-point
4      restraint. And there's -- it's, um -- there's a
5      cuff around the wrist or the ankle, but then
6      there's a chain, and there's movement within that,
7      where they can move around and still roll to one
8      side or the other, so they're not like, you know,
9      tight.
10  Q  You still have some movement?
11  A  Yes, you have movement with that.
12  Q  Is it tight around the wrist and the ankle?
13         MR. KNOTT: Object to form, it's vague,
14      overly broad.
15         MS. KUGLER: Join.
16         MR. RAUSCHER: I'll tell you, it's their
17      job to object, and there's nothing wrong with doing
18      that. Unless they instruct you not to answer, you
19      should answer. But I should also tell you, if you
20      don't understand one of my questions, just tell me
21      and I'll try to rephrase it.
22         THE WITNESS: Okay.
23  BY MR. RAUSCHER:
24  Q  Is it -- are we too far past the question for you
25      to remember what I asked?

Page 17

1  A  I don't think so. You asked about tightness.
2  Q  Yes.
3  A  What was the question?
4  Q  Are the -- so let me back up a step. What's
5      attached to the wrist and ankle?
6  A  A cuff.
7  Q  Is the cuff supposed to be tightly attached to the
8      wrist and the ankle?
9         MR. KNOTT: Object to the form, it's just
10      vague. You can answer if you're able.
11         THE WITNESS: Um, not -- I wouldn't say
12      -- it depends what you mean by "tight". It
13      shouldn't be to the point where you can slide it
14      off the hand, basically. Sometimes people might
15      have, you know, real thin hands, which sometimes,
16      you know, or if they complain -- I mean, typically
17      a lot of times, whether they're in the hospital or
18      not in the hospital, inmates will complain about
19      cuffs being too tight. But there are various ways
20      to work with that as well.
21  BY MR. RAUSCHER:
22  Q  What are some of the ways to work with that?
23  A  Um, normally you would check it. Um, if you can
24      fit two fingers under between the wrist and the
25      cuff, then it's considered not too tight.

**Page 18**

```
1              Um, if they continue -- if they -- if
2    somebody continues to complain about it, you can do
3    things such as if they're in the hospital, like put
4    a washcloth in between the cuff, because sometimes
5    it's just the metal, you know, to make it soft --
6    softer, type of thing.
7  Q  Did the -- well, what's -- you said there was a
8    chain, also, somewhere?
9  A  Um, the cuff then is attached to a chain, which is
10   usually attached to the bed.
11 Q  And is that for both the ankle and the wrist?
12 A  Yes.
13 Q  About how long are the chains?
14 A  Um, I would -- I've seen some longer and some
15   shorter.  So, I mean, I would estimate at about
16   three to five feet.
17 Q  Each -- each chain, the wrist and ankle?
18 A  Yes.
19 Q  Okay.  Was the restraint policy applied to pregnant
20   women the same way it was applied to everybody
21   else?
22 A  Yes.  Until there was a new policy that came out.
23 Q  And when was the new policy, if you know?
24 A  When?
25 Q  Do you know when the new policy came out?
```

**Page 19**

```
1  A  Um, I want to say it came out in January or early
2    February of 2017.
3  Q  How were you informed of the new policy?
4  A  Via e-mail.
5  Q  What is the new policy for restraining pregnant
6    women?
7  A  Um, that if a woman is in the process of
8    childbirth, or is recovering from childbirth, they
9    are not to be restrained.
10 Q  Have you done any hospital watches for women in the
11   process of childbirth, or recovery from childbirth,
12   since the policy changed?
13 A  Yes.
14 Q  And have you applied restraints to any of those
15   women?
16 A  No.
17 Q  Have you seen restraints applied to any of those
18   women?
19 A  No.
20 Q  Have there been any safety issues that have arisen
21   from the lack of restraints?
22 A  No.
23           MS. KUGLER:  Objection.
24           MR. KNOTT:  Object to the form.
25
```

**Page 20**

```
1  BY MR. RAUSCHER:
2  Q  Did you do any hospital watches for women who were
3    in labor or recovering before the new policy, so
4    under the old policy?
5  A  Yes.
6  Q  And did you ever have a woman not in restraints
7    before the policy changed?
8  A  Yes.
9           MR. KNOTT:  Object to the form, it's
10   vague.
11           MS. KUGLER:  Join.
12           MR. KNOTT:  Go ahead.
13           THE WITNESS:  I said yes.
14 BY MR. RAUSCHER:
15 Q  Can you explain when that happened?
16 A  Um, in May of 2015, um, I had -- was watching a
17   female inmate who was, from the reports I was
18   given, she had given birth at Mt. Sinai, and then
19   was having uncontrollable seizures, where she was
20   unresponsive.
21           Um, so they moved her to the neonatal unit
22   at St. Luke's Hospital, which was kind of in the
23   basement.  Um, it's set up as a big room, and all
24   the rooms are like around in a square with glass
25   doors.  Um, she was in the next to the end room in
```

**Page 21**

```
1  the corner.  And, um, on my watch, she had just --
2  was -- from the reports I was given, she was just
3  coming out of her -- she was starting to be
4  responsive and alert.
5           Um, they took out the catheter.  She had a
6  catheter in because she was not aware of her
7  surroundings and whatnot, um, earlier in that day
8  during my shifts.  And she had to go to the
9  bathroom.  She had gotten lunch and she had to go
10 to the bathroom she said.
11          Um, she appeared to me, from the time I was
12 there, to be very shaky and unstable.  I was
13 concerned about her ability to get up, since she
14 had been in bed for several days, and not even
15 conscious, as far as knowing what her surroundings
16 were.
17          Um, she had to go to the bathroom.  The
18 bathroom wasn't -- most hospital rooms have a
19 bathroom within the room, but it's a separate room.
20 This bath -- this bathroom was a pull-out toilet
21 underneath the sink right next to the bed, in the
22 ICU room.  Um, so I called the nurse, I let her
23 know that the inmate needed to go to the bathroom.
24 And I didn't have radio contact in this room,
25 because it was in the basement at St. Luke's.
```

Page 22

1          So she -- the nurse and I helped her to get
2    up. I undid her restraints so she could get up.
3    Um, she went to the bathroom, it wasn't an issue.
4    But as she was getting back into bed, she reached
5    towards my waist and stated, "Give me your gun."
6 Q  And then what happened after she did that?
7 A  Um, basically I twisted away from her, which did
8    cause her to fall, due to her unstable --
9    unstableness. I secured her. Um, got her back
10    into the bed and secured -- restrained her at that
11    point.
12 Q  Was she in a physical condition where she could
13    have had any reasonable chance of taking your gun?
14          MS. KUGLER: Objection, form.
15          MR. KNOTT: Object to the form, calls for
16    speculation.
17          THE WITNESS: Still answer?
18          MR. RAUSCHER: Yes.
19          THE WITNESS: Okay, I don't believe she
20    had any ability to locate my firearm.
21 BY MR. RAUSCHER:
22 Q  You didn't -- were you scared that she would get
23    your gun?
24 A  It's hard to remember in that circumstance.
25    Because, like I said, I twisted away, she fell to

Page 23

1    the ground. It happened really fast. And I was
2    able to get her hands behind her back and -- and
3    secure them.
4          So I don't really think I felt like she was
5    ever going to get my firearm. And if she had -- if
6    I did, I wouldn't have let her up. I felt because
7    of her condition, that even if she did attempt
8    something, there -- she wouldn't have been suc -- I
9    believed at the time that she wouldn't have been
10    successful.
11 Q  Did she actually make a move for your gun, or did
12    she just say, "Give me your gun"?
13 A  She definitely reached for it. She never got it
14    out of the holster or anything like that.
15 Q  Did she touch you?
16 A  She touched me, yeah. But I was trying to help her
17    into bed at the time, so we were right next to each
18    other.
19 Q  You were already touching when she --
20 A  Yeah.
21 Q  Do you remember that woman's name?
22 A  Um, I should. Last name Williams. First name
23    starts with an S.
24 Q  Do you know --
25          MR. KNOTT: I actually have --

Page 24

1          MR. RAUSCHER: You have the report?
2          MR. KNOTT: Her report, yeah. So we can
3    mark it as an exhibit, you can take a second to
4    look at it. I think you produced a document on
5    this.
6          MR. RAUSCHER: I'm sure that we did.
7          MR. KNOTT: So why don't we take a
8    minute.
9          (Off-the-record discussion held.)
10 BY MR. RAUSCHER:
11 Q  How many hospital watches overall do you think
12    you've conducted for women who were pregnant?
13 A  I'd say probably 80 percent of the ones I've done.
14    So --
15 Q  So 80 percent?
16 A  -- when I'm saying around a hundred, yeah.
17 Q  And are you counting in that group people who you
18    saw just after they had already given birth, so in
19    recovery?
20 A  Yeah, I'm referring to that they're not -- lots of
21    times if I went, they had given birth already and I
22    was watching them until they got discharged.
23 Q  Other than the one who you just mentioned, the one
24    incident for the inmate who you just mentioned, did
25    you have any other safety issues that arose from

Page 25

1    pregnant women or women recovering from giving
2    birth?
3          MR. KNOTT: Object to the form of the
4    question, it's vague.
5          MS. KUGLER: Join.
6          MR. KNOTT: Foundation, overly broad.
7          THE WITNESS: I -- I personally didn't
8    have any issues other than that one.
9 BY MR. RAUSCHER:
10 Q  And did you ever observe any other safety issues?
11          MR. KNOTT: Object to the form of the
12    question. Same.
13          THE WITNESS: Could you clarify?
14 BY MR. RAUSCHER:
15 Q  Did you ever observe any safety issues with
16    pregnant women or women recovering from labor, so
17    any threats that they made, any attempt at escapes,
18    anything like that?
19          MR. KNOTT: Same.
20          THE WITNESS: No threats or anything. A
21    lot of times, you know, wanting to -- to contact
22    family is the main thing. Um, there's a phone in
23    the room, but they're not allowed to use it. Um,
24    trying to contact family, let them know where they
25    were, which is -- part of the hospital watch is to

**Page 26**

1   not have family show up, because you don't know
2   what they're going to have on them or how they're
3   going to react.
4   BY MR. RAUSCHER:
5   Q   And other than the one incident we just discussed,
6      did you ever participate in a hospital watch for a
7      pregnant woman, or a woman recovering from giving
8      birth, who was not restrained?
9   A   Since the policy.
10   Q   Okay.
11   A   I don't recall that happening before the policy
12      change.
13   Q   Okay. How many of the 80 or so hospital watches
14      for pregnant women or women recovering from labor
15      happened before the policy change?
16          MR. KNOTT: Object to the form of the
17      question, I'm not sure that's what she estimated
18      for 80 to a hundred. I may have misheard that.
19   BY MR. RAUSCHER:
20   Q   So let's clarify -- let me clarify that. Did you
21      estimate you participated in 80 or so hospital
22      watches for women?
23   A   As a guess, yeah, approximate guess.
24   Q   Was that your best estimate?
25   A   Yes.

**Page 27**

1   Q   And how many of those 80 or so were before the
2      policy was changed?
3   A   I would say, if we're saying 80, probably like 96.
4      I mean, 76, sorry. I think I've only done about
5      three or four since.
6   Q   Okay. Of those 76 or so, the only time that you
7      had someone who was not restrained was the one
8      incident you already discussed today; is that
9      right?
10   A   Correct.
11   Q   Were you given an explanation as to why the policy
12      unrestraining pregnant women was changed?
13   A   Um, not really. The new policy came out, there was
14      rumors, but I wasn't told anything officially.
15   Q   What were the rumors that you heard?
16          MR. KNOTT: Form.
17          MS. KUGLER: Join.
18          THE WITNESS: That someone, a female
19      inmate, was suing the County.
20   BY MR. RAUSCHER:
21   Q   And was it changed because of the lawsuit, that was
22      the rumor?
23   A   That was the rumor.
24   Q   Do you remember who told you that?
25   A   No. Fellow deputies. Or I work -- as part of my

**Page 28**

1   court duties, I sometimes am assigned to work the
2   visiting lobby of the jail. So I've -- I have --
3   there are also COs that come in and out of there
4   that might have said something to that effect. I'm
5   not sure who is the one or two, three people that
6   said something.
7   Q   Did you have any concerns about the new policy?
8          MR. KNOTT: Object to the form.
9          MS. KUGLER: Join.
10          THE WITNESS: Some.
11   BY MR. RAUSCHER:
12   Q   What were your concerns about the new restraining
13      policy?
14   A   While I believe you need to use your best judgment,
15      and that's what we were always trained, that there
16      are policies, but you have to use your best
17      judgment on each individual scenario, um, that
18      there are definite concerns about the safety, both
19      of the hospital staff, of the deputy or the person
20      who's watching them, as well as the inmate
21      themselves, if -- if there is any attempt at
22      escape.
23          Or, you know, you have people that use
24      drugs, it's a hospital, there's concerns getting
25      ahold of medications as well, things like that.

**Page 29**

1   Suicidal inmates who might get ahold of things that
2   they shouldn't have.
3   Q   And was -- did you have a concern that not
4      restraining women in labor, or who were recovering
5      from giving birth, would let those -- would it
6      increase the chance of escape or suicide or
7      something like that?
8          MR. KNOTT: Object to the form of the
9      question. It's vague, overly broad.
10          MS. KUGLER: Join.
11          THE WITNESS: I believe that it could
12      cause an increase, yes.
13   Q   Were there any particular risks that you thought
14      were increased by not restraining pregnant women or
15      women recovering from giving birth?
16          MR. KNOTT: Object to the form, it's
17      vague and overly broad.
18          THE WITNESS: I'm sorry, could you repeat
19      that?
20          MR. RAUSCHER: Sure.
21   Q   Were there any particular concerns, any risks that
22      you thought were increasing because of the new
23      policy that called to not restrain pregnant women
24      or women recovering from giving birth?
25          MR. KNOTT: Foundation, form.

Case 2:17-cv-01112-JPS    Filed 09/04/18    Page 9 of 34    Document 175-17

```
 1              THE WITNESS:  Well, as just having that
 2    particular incident, you know, about a year or so
 3    before that, and -- and going through a
 4    disciplinary process because of that policy while
 5    this -- during the time the policy was being
 6    changed, um, yes, it brought concerns.
 7  BY MR. RAUSCHER:
 8  Q   And tell me about the dis -- disciplinary process
 9      that you went through after the woman told you to
10      give her your gun?
11              MR. KNOTT:  Object to the form.
12              THE WITNESS:  Um, basically I got a
13    notice saying that I was under investigation.  Um,
14    I was interviewed through our Internal Affairs
15    Division, after which I received a letter from my
16    supervisors giving me a period of suspension.  Um,
17    I served the suspension, after which I filed an
18    appeal, which was unsuccessful.  And that's about
19    it.
20  BY MR. RAUSCHER:
21  Q   Did you think it was fair that you were suspended?
22  A   Yes.  Not necessarily the amount of days I was
23      given without pay, but yes, because I did violate
24      the policy.
25  Q   Did you exercise your best judgment when you
```

```
 1      removed the restraints to allow that woman to go to
 2      the bathroom?
 3  A   I thought I was, yes.
 4  Q   How is it that you violated the policy, although
 5      you used your best judgment?
 6              MR. KNOTT:  Object to the form.
 7              MS. KUGLER:  Join.
 8              MR. KNOTT:  Calls for speculation.
 9              THE WITNESS:  The policy says they're
10    supposed to be restrained at all times.
11  BY MR. RAUSCHER:
12  Q   No matter what?
13              MR. KNOTT:  Object to the form of the
14    question.
15              THE WITNESS:  Yes.
16  BY MR. RAUSCHER:
17  Q   It doesn't leave room for you to exercise your
18      judgment, right?
19              MR. KNOTT:  Object to the form of the
20    question, calls for speculation, vague and overly
21    broad.
22              THE WITNESS:  As I stated when we went
23    through the academy, we were told as far as
24    policies go, we are to follow them, but use our
25    best judgment, so.
```

```
 1  BY MR. RAUSCHER:
 2  Q   That was a general thing for policies in general,
 3      not for this restraint policy, correct?
 4  A   Correct.
 5  Q   And the restraint policy doesn't actually leave
 6      room for you to exercise your judgment, does it?
 7              MR. KNOTT:  Object to the form of the
 8    question.
 9              MS. KUGLER:  Join.
10              MR. KNOTT:  Calls for speculation.  Are
11    you asking for her opinion, or are you asking for
12    somebody else's opinion?
13              MR. RAUSCHER:  You can answer.
14              MR. KNOTT:  It's multiple.
15              THE WITNESS:  Um, I'm sorry, can you
16    repeat the question?
17              MR. RAUSCHER:  Can you read the question
18    back, please?
19      (Question read back by the court reporter.)
20              THE WITNESS:  I would say most of the
21    policies, as you would say, would not leave room
22    for you to -- but we're told we should exercise our
23    best judgment.  But most policies are very
24    straightforward.
25
```

```
 1  BY MR. RAUSCHER:
 2  Q   And is the restraint policy one of those policies
 3      that's straightforward and it does not leave room
 4      for you to exercise your judgment?
 5              MR. KNOTT:  Object, misstates her
 6    testimony, it's also multiple, and you won't
 7    specify if you're asking for her opinion or
 8    somebody else's.
 9              MS. KUGLER:  Join.
10              THE WITNESS:  Like I said, we can use --
11    we were told in the academy to use our best
12    judgment.  In my particular estimate, or my
13    particular issue where I had somebody try to do
14    something, I was using my best judgment and I got
15    disciplined for doing so.
16  BY MR. RAUSCHER:
17  Q   After going through that discipline process, do you
18      believe the restraint policy that existed at the
19      time in 2015 allowed room for you to use your best
20      judgment?
21              MR. KNOTT:  Object, calls for
22    speculation, vague as to circumstance.
23              THE WITNESS:  I feel like you're asking
24    me the same question, and so my answer would be the
25    same in that, um, we were told we can use our best
```

Page 34

1    judgment, yet I guess that's -- to those
2    supervising us, that determines that after the
3    fact, in some instances.
4    BY MR. RAUSCHER:
5    Q    So I think what I'm trying to understand is why if
6         you believed the policies allowed you to use your
7         best judgment, and you did use your best judgment,
8         you also think it was fair for getting disciplined
9         and suspended for choosing not to restrain a woman
10        while she was going to the bathroom?
11             MR. KNOTT:  Object to the form of the
12        question, it's argumentative.  I think it embeds
13        the prior problems, which is speculation as to
14        other's opinions, and it's vague as to
15        circumstance, but answer if you're able.
16             MS. KUGLER:  Join.
17             THE WITNESS:  I guess I felt that, um, to
18        an extent that's true, because I did fight it.  Um,
19        like I said, a big reason I fought it was the
20        amount of time I was given, which was ten days.  If
21        I had -- plus I had no prior IA cases where I was
22        the subject.
23             Um, so by my past reviews, um, I thought
24        that was a harsh amount.  Um, but policies still
25        are there for a reason, so, you know, that's why I

Page 35

1    said I can -- I wouldn't have fought it if it had
2    been, you know, a day or two.
3    BY MR. RAUSCHER:
4    Q    Did you make a determination each of the 76 or so
5         times when you were on a hospital watch with a
6         woman who was pregnant or recovering from giving
7         labor, as to whether restraints should be applied?
8             MR. KNOTT:  Object, overly broad, vague.
9             THE WITNESS:  I -- I'm trying to
10        understand what you're asking, I guess.
11    BY MR. RAUSCHER:
12    Q    What I'm asking is, you did about 76 hospital
13        watches for women who were either in labor or
14        recovering; is that right?
15    A    Yes.
16    Q    And for each of those, did you make -- did you make
17        your own independent determination whether the
18        woman should be shackled, or did you just apply the
19        policy?
20             MR. KNOTT:  Object to the form, it's
21        vague and overly broad.  Vague as to time, and
22        multiple.
23             THE WITNESS:  In general, I follow the
24        policy, unless I felt there were extenuating
25        circumstances, like two days of seizures that the

Page 36

1    particular person had when I didn't follow policy.
2    But by a general rule, I followed the policy.
3    BY MR. RAUSCHER:
4    Q    You weren't going into a hospital watch and saying
5         does this woman present a security risk or is she
6         suicidal or anything like that, as a general
7         matter, correct?
8    A    Correct.
9             MR. KNOTT:  Object to the form of the
10        question, it's vague, overly broad, multiple.
11             THE WITNESS:  Yes.
12             MR. RAUSCHER:  Mark this as Exhibit 1,
13        please.
14             (Exh. 1 marked for identification.)
15    BY MR. RAUSCHER:
16    Q    Do you recognize this document, which is
17        Bates-stamped MKE County 180 to 192?
18    A    I do.
19    Q    Can you tell me what it is?
20    A    It's a hospital watch log.  Copies of a hospital
21        watch log.
22    Q    Is this something that is prepared as a standard
23        part of your job on hospital watches?
24    A    Yes.
25    Q    Have you reviewed this document before?

Page 37

1    A    Um, I saw it since the hospital watch on one
2         occasion, since between then and today.
3    Q    And when was that occasion?
4    A    About a week and a half ago.
5    Q    Was that to prepare for your deposition today?
6    A    Um, yes.
7    Q    And what did you do to prepare for your deposition
8         today?  And I don't want to know about substantive
9         conversations you had with your attorney, but I
10        want to know if you met with anybody, if you looked
11        at documents?
12    A    Um, I came to this location, actually, this room,
13        and I met with the attorney, um, who basically
14        explained the reason of my subpoena.
15    Q    Did you meet with Mr. Knott?
16    A    Yes.
17    Q    Did you look at any documents, other than this one?
18    A    Um, one other sheet, which was this.
19    Q    Can I take a look at that for a second?  Thank you.
20    A    Mm-hmm.
21    Q    What's the purpose of these log sheets that we've
22        marked as Exhibit 1?
23    A    Basically to keep a record of, um -- there's
24        logbooks basically throughout the jail, is their
25        way of being able to keep records before we were

Page 38

```
1    all computerized, which we are now, or they are
2    now.
3  Q  So they don't make these handwritten logbooks?
4  A  They do on occasion, but only if the computer
5    system is down, then they're to refer back to using
6    logbooks.
7  Q  Were you trained on how to make logbooks?
8  A  Logbook entries?
9  Q  Yeah.
10 A  Yes.
11 Q  What did that training consist of?
12 A  Um, basically when -- once you graduated from the
13    academy and we were in the jail, because they used
14    them, it was more hands-on, you had a trainer and
15    they went through your daily, you know, what was
16    expected of you.
17 Q  Take a look at the first page of this, MKE County
18    180.
19 A  Okay.
20 Q  About four rows up from the bottom, it looks like
21    -- well, let me just ask you.  Can you tell what it
22    says on the left-hand side, over like far left?  Is
23    that 6127?
24 A  All I can clearly see is the 27.
25 Q  Okay.  Is that your handwriting over there?
```

Page 39

```
1  A  No.
2  Q  And what about underneath, I see something "wrist"?
3  A  It looks like "wrist", but, um, no, that's not my
4    handwriting.
5  Q  Okay.  Is the handwriting on -- well, is any part
6    of the handwriting on this first page yours?
7  A  What do you mean on the first page?
8  Q  The page we're on.
9  A  Oh, on this page, yes.  On starting the column
10    over, um, starting with Monday, March 10th, at --
11    to the bottom of the page.  Other than that stuff
12    in the left -- left, which I'm guessing is the
13    page, prior Page 64, part of it, but I'm not sure.
14 Q  Okay.  And four rows up it says -- is that a delta
15    sign?  What's the -- it says something "restrained
16    by left wrist and right ankle"?
17 A  Yeah, that's a common symbol we use for "inmate".
18 Q  Okay, so this is saying inmate restrained by left
19    wrist and right ankle?
20 A  Yes.
21 Q  And you wrote that?
22 A  I did.
23 Q  And what's the purpose of writing that down?
24 A  Um, like I said, just basic record keeping and so
25    everybody is on the same page as far as what's
```

Page 40

```
1    going on.
2  Q  Is it --
3  A  And I was just debriefed by the people -- I was
4    just coming on and replacing the people before me,
5    so it's to say the condition I found the inmate in.
6  Q  Okay.  Do you know if part of the reason -- well,
7    did someone instruct you to write down how the
8    inmate is restrained?  I don't mean specifically
9    for Rebecca Terry, but I mean generally, were you
10    ever instructed on that?
11 A  No, not that I can recall.  It was just common
12    practice when you look at, you know, previous ones,
13    and, I mean, once you do it, everybody pretty much
14    follows that.
15 Q  Okay, that's something you did typically as part of
16    hospital watch, but no one specifically ever told
17    you to do that?
18 A  Correct.  If they did, I don't remember.
19 Q  And can you turn to the second page, please?  Is
20    everything on this page your handwriting?
21 A  No.
22 Q  Can you tell me which parts are and are not your
23    handwriting?
24 A  Um, it is except for the entry made at 1308 hours.
25 Q  And that's Lieutenant Briggs?
```

Page 41

```
1  A  Yes.
2  Q  Who's Lieutenant Briggs?
3  A  He's a lieutenant in the jail.
4  Q  And do you recall him coming in to do an
5    inspection?
6  A  Specifically at this point, no.  It was four and a
7    half years ago.
8  Q  Do you have any independent recollection of meeting
9    Rebecca Terry or being in the hospital with her?
10 A  I don't remember her specifically.
11 Q  Okay.
12 A  If that's what you're asking.
13 Q  Yeah, I'm asking, other than looking at your
14    documents, do you have any memory of meeting with
15    her, being in the hospital, or anything else about
16    her?
17 A  No.
18 Q  Is it common that a lieutenant comes and does
19    inspections during hospital watch?
20 A  Generally once a shift, yes.
21 Q  Do you know what the purpose of those inspections
22    are?
23 A  Um, I would say to make sure that everybody is safe
24    and secure.
25 Q  Do you know why Lieutenant Briggs wrote down,
```

**Page 42**

1      "Inmate was secured by right ankle and wrist"?
2  A  Um, I think, again, that's customary for them to
3      put down how the person was restrained.
4  Q  Do you know why --
5  A  On any hospital watch.
6  Q  Do you know why that's customary?
7  A  Because they're -- per policy, they're supposed to
8      be restrained.
9  Q  They want to make sure that the policy is being
10     complied with?
11  A  That would be my assumption.
12  Q  And then if you look above that, there's a bunch of
13     rows that say 10-49, and it looks like your
14     initials, and 793; is that right?
15  A  Yes.
16  Q  Can you tell me what those mean?
17  A  We have to call in to dispatch every --
18     approximately every 30 minutes, um, and we call in
19     10-49, it's letting them know everything's good,
20     everything's okay.  And then just my initials and
21     my badge number, 793.
22  Q  Looking down toward the bottom, there's an entry at
23     1504.
24  A  Mm-hmm.
25  Q  It says, "Baby brought into room, wrists are

**Page 43**

1      removed while holding baby.  Out at left wrist
2      restrained," with the right crossed out before
3      left; do you see that?
4  A  Yes.
5  Q  Can you tell me what that means?
6  A  Um, by -- by looking at the entry, her baby was
7     brought into the room.  Um, because of that, her
8     wrist was removed so she could hold the baby.  I
9     don't know what she was asked to do, if she was
10     just holding the baby, or if she was asked to do
11     something with the baby.  But, um, that her left
12     wrist was removed for a period of time while she
13     had the baby in her arms.
14  Q  Was it common to remove a wrist restraint when a
15     woman was holding her baby?
16         MR. KNOTT:  Form, it's vague, overly
17     broad, calls for speculation.  You can answer.
18         THE WITNESS:  Again, I would say it's
19     specific to the situation.  But, um, you don't want
20     the child getting hurt, or the -- or her, you know,
21     depending what she's doing with the child.
22  BY MR. KNOTT:
23  Q  Was it common in your experience conducting
24     hospital watch to take a wrist restraint off while
25     a woman holds her baby?

**Page 44**

1  A  Um --
2         MR. KNOTT:  You're asking about her
3     personal practice?
4         MR. RAUSCHER:  Yes.
5         THE WITNESS:  It wasn't -- it wasn't very
6     common practice, so I don't know if I can put it in
7     to common practice.  Um, I won't say -- I can't say
8     I always did that.
9  BY MR. RAUSCHER:
10  Q  Sometimes you did, sometimes you didn't?
11  A  I believe it was based on circumstances, yes.
12  Q  What circumstances would you typically take a wrist
13     restraint off while a woman was holding her baby?
14  A  Um, I mean, if you're just -- if you're just
15     holding the child, you could, you know, have him
16     cradled in your other hand and -- and, you know,
17     using it, but you don't want the baby to fall or
18     anything like that.
19     So if a nurse, medical staff was around or
20     present, um, I mean, I'm present as well, where I
21     try to assist in situations like that and stay
22     close.  But, um, if I felt that either one of them
23     could be in danger by it being there, that's when I
24     would remove it.
25  Q  Other than thinking that a baby or a mother might

**Page 45**

1      be in danger, are there any other reasons you would
2      have removed a wrist restraint to allow a mother to
3      hold her baby?
4         MR. KNOTT:  Speculation, foundation.
5         MS. KUGLER:  Join.
6         THE WITNESS:  Um, I'm trying to -- I
7     don't -- can you repeat?
8         MR. RAUSCHER:  Yeah, can you read the
9     question back, please?
10     (Question read back by the court reporter.)
11         THE WITNESS:  I think that would --
12     that's the general rule of practice that I follow
13     -- would follow.
14  BY MR. RAUSCHER:
15  Q  Removing it if there's a danger, or if you perceive
16     a danger --
17  A  If I perceive there could be a danger, yes.
18  Q  How often do you think you removed a restraint to
19     allow a mother to hold her baby, before the policy
20     was changed?
21  A  Oh, I really can't say.  I don't know.
22  Q  Do you think it was half of the hospital watches?
23  A  No, most --
24         MR. KNOTT:  Foundation, speculation.
25         THE WITNESS:  Most of the hospital

**Page 46**

1    watches I did, um, babies aren't always in the room
2    with them, so.
3               MR. RAUSCHER:  Okay.
4               THE WITNESS:  I would say it would be
5    substantially less than that.
6  BY MR. RAUSCHER:
7  Q   Of the hospital watches where there were babies
8    brought into the room, how common -- well, how many
9    do you think there were -- how many hospital
10   watches do you think you conducted where babies
11   were brought into the room?
12  A   I really don't even want to guess.
13  Q   Do you think it was single digits?
14           MR. KNOTT:  Foundation, speculation,
15   asked and answered.
16           THE WITNESS:  Maybe.
17  BY MR. RAUSCHER:
18  Q   I'm just trying to see if we can narrow down the
19   range.
20  A   Maybe more than ten, but I -- like I said, it's
21   purely a guess.
22  Q   Do you remember if Rebecca Terry or anybody else
23   ever asked you to remove the restraints?
24  A   I remember being asked by several different people
25   when I'm doing hospital watches to remove

**Page 47**

1    restraints, yes.
2  Q   Are you talking about several different people
3   during Rebecca Terry's, or several people in your
4   career?
5  A   Several -- several people in my career.
6  Q   Were any of those involving pregnant women or women
7   recovering from labor?
8           MR. KNOTT:  Foundation.
9           THE WITNESS:  Just due to the -- that the
10   majority of my hospital watches were pregnant
11   females, or females recovering from childbirth, I
12   would say yes.  But it's, you know, I don't
13   remember specifics.
14  BY MR. RAUSCHER:
15  Q   Do you remember if they were inmates versus medical
16   professionals?
17  A   Oh, inmates.  And occasionally a medical
18   professional, um.
19  Q   Did you -- if an inmate asked you to remove
20   restraints and she was either pregnant or
21   recovering from giving birth, did you honor that
22   request?
23           MR. KNOTT:  Object to the form.  Vague,
24   overly broad, calls for speculation.
25           MS. KUGLER:  Join.

**Page 48**

1           THE WITNESS:  Like I believe -- like I
2   believe I said earlier, you know, what's the reason
3   for it.  You know, check it if they say it's too
4   tight, possibility of loosening it, but not
5   removing it for anything like that, no.
6  BY MR. RAUSCHER:
7  Q   Oh, right, you said earlier that you've only done
8   it once, right, for the woman that we talked about?
9   You only removed restraints once for a pregnant
10   woman or someone recovering from labor, and that
11   was the one who said, "Give me your gun"; is that
12   right?
13           MR. KNOTT:  I'm going to object.  I don't
14   remember the testimony that way, but.
15           THE WITNESS:  No, I don't believe I said
16   that.
17  BY MR. RAUSCHER:
18  Q   Okay, how many other times do you remember removing
19   restraints from a pregnant woman or a woman
20   recovering from birth?
21  A   Like I said, I don't really remember specifics.  I
22   would say on rare occasions when the baby is
23   brought in, um, but that's rare.  And then, ah,
24   sometimes when medical staff asks for specific
25   tests, like an X-ray, and you can't have it with

**Page 49**

1    the X-ray.
2           MR. RAUSCHER:  Do you mind if I take a
3   quick break?
4           MR. KNOTT:  Sure.
5           (Short recess taken.)
6  BY MR. RAUSCHER:
7  Q   What was your normal shift in 2014?
8  A   Um, well, I was assigned to courts, so normal shift
9   starts at 7:30 in the morning and ends at about
10   4:30, approximately, whenever the courts go down,
11   which can go up to five o'clock.
12  Q   Was that the same shift when you were doing
13   hospital watch?
14  A   Um, well, a hospital watch is normally, or has been
15   six to two, two to ten, and ten to six.  If there's
16   -- if there's a new hospital watch, um, like, for
17   instance, it shows me on that Monday --
18  Q   Mm-hmm.
19  A   -- 7:30, because I didn't know about it, and I --
20   it says I went to roll call and then I was assigned
21   to a hospital watch, where I believe on respective
22   days I knew about it ahead of time so I was at the
23   hospital at an earlier hour.
24  Q   And when you say you went to roll call and were
25   assigned, you're looking at the entry that says,

**Page 50**

```
 1        "Roll call, assigned to hospital watch"; is that
 2        right?
 3   A    Correct.
 4   Q    Was it your standard practice to write down when
 5        you were assigned to hospital watch at roll call?
 6   A    Um, most instances you know about it ahead of time,
 7        but I made a point of entering it, because I was
 8        not there at the normal start time for a hospital
 9        watch.
10   Q    Got it.  And then you said there were other days
11        where you think you knew about it in advance.  Can
12        you tell me what you're talking about?
13   A    Um, like we will get told by our supervisor the day
14        before that there's a hospital watch going and
15        you're going to be working there on this shift.
16   Q    So when you were assigned at roll call on Monday,
17        March 10th, were you -- Monday, March 10th, 2014,
18        were you told you're going to be at this hospital
19        watch until it's over?
20   A    No, basically I showed up for roll call prepared to
21        work at a court from -- and I was told that I was
22        needed to work at this hospital watch.  So then I
23        proceeded out there.  I -- it's still always under
24        the assumption that you're -- you're done when your
25        shift ends.
```

**Page 51**

```
 1   Q    And then is there -- is there an assumption that
 2        you continue the next day and the next day, if that
 3        person is still in the hospital, or not really?
 4   A    Not necessarily.  Um, I notice I was, um, looking
 5        at the logs, on day shift for a number of days.
 6        But normally it's a different person each shift,
 7        unless my courtroom could have been down, because
 8        my judge might have been on vacation or something,
 9        so I was available to be moved around more.
10   Q    You just, you don't know that, you're just thinking
11        of reasons?
12   A    Yes, I don't know that.
13   Q    Can you tell me, looking through this packet which
14        has been marked as Exhibit 1, which pages and which
15        parts are your handwriting?
16   A    Um, so on the top page, which is labeled "65" at
17        the top, or stamped "MKE County 180" at the bottom,
18        my handwriting starts with the, "Monday,
19        March 10th, 2014, first shift, 0730 to 1530 hours."
20            Then the following page, which is marked as
21        "68" by the logbook, and the "MKE County 181" at
22        the bottom, my handwriting is the entire page
23        except for the one entry at 1308.  Logbook Page 69,
24        or MKE County 182, I don't see my handwriting at
25        all.  The next page I have is labeled Logbook "70",
```

**Page 52**

```
 1        or "MKE County 183".  Again, I don't see my
 2        handwriting at all.
 3   Q    Okay.
 4   A    The next page I have is Logbook Page 71, and
 5        stamped "MKE County 184".  I started writing with
 6        the line, "Tuesday, March 11th, 2014, first shift,
 7        0600 to 1400 hours," through the end of the page.
 8            The next page, which is Logbook Page 72,
 9        and stamped "MKE County 1" -- I can't really read
10        that over the writing.  Um, it's my writing from
11        the top of the page, um, up and to and through the
12        1605 entry, with the exception of the entry made at
13        1312.
14   Q    And that's an inspection by, is it Whitinger?
15   A    Yes.
16   Q    Okay.
17   A    Then the next page, Logbook Page 73, MKE County
18        186, not my handwriting at all.  Logbook Page 74,
19        stamped "MKE County 187", not my writing at all.
20        Logbook Page 75, stamped "MKE County 188", my
21        handwriting first starts where it says, after the
22        vertical slashes, it says, "Wednesday, March 12th,
23        2014, 0600 to 1400 hours," in parentheses, all the
24        way down to the end of the page.
25
```

**Page 53**

```
 1            And then Logbook Page 76, stamped "MKE
 2        County 189", um, it's my handwriting except for the
 3        bottom line where it says, "Lieutenant Andrykowski
 4        removed book per Squad 303."
 5            Then a new -- it looks like a new logbook
 6        was started, and it says Logbook Page 18 at the
 7        top.  At the bottom it's stamped "MKE County 190".
 8        The second line of writing is mine, where it has a
 9        little triangle symbol, which we use the shorthand
10        for the word "inmate".  And it has the inmate's
11        name, sex, race and date of birth.  And then it's
12        not my writing until I wrote in, "Continued from
13        other log," and then 1300 hours, the entry is 1300
14        hours through 1654 hours is my writing on that
15        page.
16   Q    Okay.
17   A    Then going on to page, Logbook Page 19, stamped
18        "MKE County 191", my writing starts after the
19        vertical slash marks.  It says, "Thursday,
20        March 13th, 2014, first shift, 0600 to 1400 hours,"
21        through the end of the page is my writing.
22            And then continuing, Logbook Page 20,
23        stamped "MKE County 192".  It's my writing the
24        entire page, with the exception of the entry made
25        at 1252 hours, which is another supervisor's entry.
```

Page 54

```
1    Q    And what's the supervisor there?
2    A    Lieutenant Hein.
3    Q    Are the entries that you made in the logbook you
4         just identified as your handwriting, are they all
5         accurate?
6    A    What do you mean by that?
7    Q    Are they accurate reflections of the scene as it
8         existed at the time?
9              MR. KNOTT:  Form.
10             MS. KUGLER:  Join.
11             THE WITNESS:  If I understand your
12        question.
13   BY MR. RAUSCHER:
14   Q    Let me try to -- so, for example, where you
15        described at various places how Rebecca Terry was
16        restrained and at what times, were those all
17        accurate entries?
18   A    I would say so.
19   Q    And the same for everything else you wrote,
20        accurate description as to what you observed at the
21        time --
22   A    Yes.
23   Q    -- what you were doing at the time?
24             MR. KNOTT:  Object to form.
25             THE WITNESS:  (Witness nods head.)
```

Page 55

```
1    BY MR. RAUSCHER:
2    Q    Is that a "yes"?
3    A    Yes.
4    Q    Was it your practice to review any information
5         about inmates before hospital watches began?
6    A    If I have the opportunity, I like to know what the
7         inmate is in custody for.
8    Q    And is it -- did you typically have the opportunity
9         to do that?
10   A    Um, it really depended on the situation.  Ones
11        where I was given advanced notice at work, yes.
12   Q    So, for example, like Rebecca Terry's where you
13        were just told at roll call, does that mean you
14        would not have reviewed her criminal history --
15             MR. KNOTT:  Object to form.
16   BY MR. RAUSCHER:
17   Q    -- or anything like that before you went to watch?
18   A    I --
19             MR. KNOTT:  Form, speculation.
20             THE WITNESS:  I likely would have asked a
21        supervisor to give me any information they had, but
22        that would be about it.
23   BY MR. RAUSCHER:
24   Q    Do you remember if you had that kind of
25        conversation before you saw Rebecca Terry?
```

Page 56

```
1    A    I don't remember.
2    Q    Do you remember if you ever learned anything about
3         her criminal history or why she was incarcerated?
4    A    Over -- if I didn't learn it before I got there, I
5         learned it when I got there, because we keep their
6         arrest report in what we call a hospital watch kit
7         in the room.
8    Q    And do you always read the hospital watch kit?
9    A    Yes.
10   Q    Do you remember anything about Ms. Terry's hospital
11        watch kit?
12   A    Specifically, I don't remember.
13   Q    What is typically in a hospital watch kit?
14   A    Um, the restraints.  The -- an extra radio and a
15        charger to keep the radio charged so you can
16        communicate with dispatch and communications.  Um,
17        the logbook.  And then, um, generally the person's
18        ADR, their booking photo, um, criminal history is
19        almost always there.
20   Q    Do you remember sometimes when criminal history was
21        not in the kit?
22   A    Um, extremely rare, but I do remember one incident,
23        yes, like that.
24   Q    What's the incident, do you remember, where there
25        wasn't criminal history in a kit?
```

Page 57

```
1    A    I don't remember the specifics.  I just remember it
2         happening.
3    Q    Did something happen with that inmate, or do you
4         just remember that there wasn't that information?
5    A    I just remember it wasn't there, because I do look
6         for it.
7    Q    Okay.  Did you ever learn anything about Rebecca
8         Terry's birth?  Let me rephrase that question.
9              Did you ever learn anything about the birth
10        of Rebecca Terry's baby?
11   A    I'm sure I was debriefed at the time.  I don't
12        remember specifics.
13   Q    Do you remember where Rebecca Terry gave birth?
14   A    I don't.
15   Q    Do you know if she gave birth in a hospital, or the
16        jail, or somewhere else?
17   A    Um, I believe I was told afterwards that the baby
18        was born at the jail.
19   Q    You mean after the hospital watch had concluded, or
20        after --
21   A    After I was out on the watch.
22   Q    You mean while you were at the watch?
23   A    Yes.
24   Q    Who do you think told you that the baby was born at
25        the jail?
```

Case 2:17-cv-01112-JPS    Filed 09/04/18    Page 16 of 34    Document 175-17

**Page 58**

1  A  One of the other deputies that I was relieving.
2  Q  Do you remember which deputy told you?
3  A  I don't offhand.
4  Q  Do you remember which of the other -- well, do you
5     remember which other deputies it could have been?
6  A  It could have been any deputy that was relieving
7     me.
8  Q  Any deputy identified in one of the logs?
9  A  Yeah.
10  Q  Do you remember what that person told you about the
11    birth?
12  A  I don't.
13  Q  Did you ever talk to Ms. Terry about her giving
14    birth in the jail?
15  A  Not that I recall.
16  Q  Do you recall any conversations with Ms. Terry?
17  A  I don't remember specific conversations with her.
18    It was four and a half years ago.
19  Q  Other than your attorney, have you talked with
20    anybody else about what happened to Ms. Terry?
21  A  No.
22  Q  Have you talked to anybody other than your attorney
23    about your deposition today?
24  A  Um, I just mentioned to my court clerk that I had
25    to go to a deposition, but no specifics.  And my

**Page 59**

1    supervisors knew about it, because they were told
2    through our IA area.
3  Q  But you didn't talk to the supervisors about the
4    substance of?
5  A  Oh, no.
6  Q  Have you talked to anybody else about this case?
7  A  No.
8  Q  Let's mark these as Exhibit 2 and 3.  We'll do 2 as
9    Terry 21508 through 510.  And 3 actually is not --
10    doesn't have a Bates number on it.  It's the
11    supplemental report dated 5/7/2016.
12        (Exh. 2-3 marked for identification.)
13  BY MR. RAUSCHER:
14  Q  Have you seen those two documents before?
15  A  Um, yes.
16  Q  When did you see them?
17  A  Um, well, I wrote the one labeled number three.
18  Q  The incident report?
19  A  Yes.  So I saw that on many occasions when I wrote
20    it and after.  Um, the pieces of paper listed as
21    item Exhibit Number 2, I saw when I appealed.  I
22    think it was -- might have been in the file when I
23    first was disciplined, but I know it was in the
24    file for sure when I was fighting the -- my
25    suspension.

**Page 60**

1  Q  Exhibit 2, the front page talks about a struggle
2    for your gun with Inmate Bernard; is that right?
3  A  Um --
4  Q  I'm asking if it's right that it says that, not if
5    you agree with that.
6  A  Right.
7        MR. KNOTT:  Where are you focusing on,
8    Scott?
9        MR. RAUSCHER:  I'm sorry, I gave her my
10    copy.
11        MR. KNOTT:  There's copies there.
12  BY MR. RAUSCHER:
13  Q  If you look at the end of the second full
14    paragraph, the last sentence is, "It is alleged
15    that deputy allowed a hospitalized inmate under her
16    watch to be entirely unrestrained, resulting in a
17    struggle for the deputy's firearm."  Do you see
18    that?
19  A  Yes, I see that.
20  Q  Is that accurate, was there a struggle for your
21    firearm?
22  A  Depends what you mean by "a struggle", I suppose.
23  Q  Do you agree with that characterization?
24        MR. KNOTT:  I'm going to object to the
25    question as vague.  I think she's saying she

**Page 61**

1    doesn't understand the question, but.
2        THE WITNESS:  Um, I don't know -- it's --
3    like I said, it's each individual's viewpoint.  As
4    far as my viewpoint, I don't know -- I don't feel
5    it was a struggle.  I mean, although she fell to
6    the floor, so, you know.  But I think that was her
7    condition in part as well.
8  BY MR. RAUSCHER:
9  Q  Is it fair to say you do not believe there was a
10    struggle for your gun with Inmate Bernard?
11        MR. KNOTT:  Object to the form, asked and
12    answered.
13        MS. KUGLER:  Join.
14        MR. KNOTT:  It's vague.
15        THE WITNESS:  I don't know if I can say
16    there was a struggle for the firearm.  Once I
17    twisted away from her and she fell to the floor, I
18    had to, in order to secure her, I needed to get her
19    hands behind her back, and that -- she -- she kind
20    of pulled away from me.  So I guess that would be
21    considered a struggle.
22  BY MR. RAUSCHER:
23  Q  So there might have been a struggle when you were
24    trying to handcuff her after she was on the ground?
25  A  Correct.

1　Q　But not a struggle for her to get your gun?
2　　　　MR. KNOTT: Object to form, asked and
3　answered.
4　　　　THE WITNESS: She reached for it, I
5　twisted, she fell.
6　BY MR. RAUSCHER:
7　Q　But that wasn't a struggle?
8　　　　MR. KNOTT: Object to the form.
9　　　　THE WITNESS: I don't believe it was a
10　struggle, no.
11　BY MR. RAUSCHER:
12　Q　Is there anything else in Exhibit 2 or Exhibit 3
13　that you don't agree with?
14　　　　MR. KNOTT: Object, vague. Overly broad.
15　　　　THE WITNESS: It depends on the
16　questions. Because, like I said, I think
17　everything is due to interpretation.
18　BY MR. RAUSCHER:
19　Q　I just want your opinion. Are there things you
20　don't agree with? We can focus on Exhibit 2.
21　　　　MR. KNOTT: Same, it's vague, overly
22　broad.
23　　　　THE WITNESS: I -- without being more
24　specific, I really can't answer that, because I
25　don't want something to come up later that maybe

1　I'm not seeing.
2　BY MR. RAUSCHER:
3　Q　During the internal investigation that's referred
4　to in this Exhibit 2 --
5　A　Okay.
6　Q　-- did you ever tell anybody that your belief was
7　that you had discretion to use your best judgment
8　in applying or not applying policies?
9　A　Um, when I had the -- I believe when I had the
10　interview with the Internal Affairs area, I said
11　that I felt I used, under the circumstances, I was
12　using my best judgment.
13　Q　And who did you say that to?
14　A　Ah, Lieutenant Hodel.
15　Q　That's the person who interviewed you?
16　A　Correct.
17　Q　And what did Lieutenant Hodel say when you told him
18　that you had exercised your best judgment?
19　A　He was interviewing me, so he was just asking
20　questions. He didn't necessarily respond.
21　Q　Do you remember one way or the other whether he
22　responded?
23　A　I don't remember him responding to what I said.
24　Q　Do you remember if anybody has -- anybody from the
25　Sheriff's Office or Internal Affairs has ever

1　responded to your point that you were exercising
2　your best judgment?
3　A　Not that I can recall.
4　Q　Just to make sure we have an accurate record. The
5　inmate is identified in this Exhibit 2 as, I
6　believe it was Shutia Bernard?
7　A　Yes, once I read that, I know I said it incorrectly
8　prior.
9　Q　That's okay. We're talking about the same inmate
10　that you were talking about at the beginning of
11　this deposition?
12　A　We are.
13　Q　I don't think I have any other questions.
14　　　　E X A M I N A T I O N
15　BY MR. KNOTT:
16　Q　I'm going to ask some clarification questions.
17　First of all, Deputy, reviewing the Exhibit 2, does
18　that refresh your recollection as to whether this
19　incident happened in 2015 versus 2016?
20　A　Yes. I was trying to work backwards off of when I
21　was suspended, and trying to figure out the date.
22　Q　Okay. So when you said earlier that it occurred in
23　May of 2015, you know now that it occurred in May
24　of 2016?
25　A　Yes, I do.

1　Q　And Counsel asked you whether you had ever told
2　anyone that you were exercising your judgment. If
3　you look at the last page of Exhibit 2, the first
4　full paragraph, does that indicate that you told
5　Lieutenant Hodel that you were exercising your
6　judgment?
7　A　Um, I believe I said it at one point more formal
8　than that, however, yeah, when I said that -- when
9　I said "I guess" at the end, that was a nervous
10　kind of thing that I typically might do, so yes.
11　Q　And, Deputy, that paragraph also indicates that the
12　policy at issue is with regard to restraint of an
13　inmate while out of bed, correct?
14　A　Can you ask that again? I'm sorry.
15　Q　That same sentence indicates that the policy
16　provision that they were questioning you about
17　pertains to the restraint of an inmate while out of
18　bed on hospital watch?
19　A　Correct, the entire time she was in the bed, she
20　was restrained.
21　Q　Can you tell me how she was restrained when you
22　arrived to take over that shift?
23　A　Um, just by both ankles, because she had IVs in
24　both arms.
25　Q　Looking at Exhibit 3 and the final sentences, or

Page 66

1    the final lines in Exhibit 3, Page 1, it says, "I
2    secured the inmate's legs to the bed with ankle
3    restraints after which I removed her right wrist
4    and then her left wrist from the handcuffs one at a
5    time, and secured them to the bed frame using soft
6    restraints already attached to the bed."  Is
7    that --
8  A  Yes.
9  Q  Tell me what you did there.
10  A  Um, well, I had to use my handcuffs that were on my
11    belt when I restrained her when she was on the
12    floor.  So afterwards I assisted her in rising, um,
13    and helped her back into the bed.
14        Once I did that, um, the restraints that --
15    where she was already restrained by her ankles, I
16    reattached those.  But because of the incident that
17    just happened, there were some soft restraints that
18    were at the side that were used for -- because of
19    her seizures.
20  Q  Okay.
21  A  That I had used to restrain her hands, because,
22    like I said, I had no radio contact in order to
23    notify my supervisors.  I had to step -- there was
24    a phone on the wall that was outside the room like
25    on the other side of the hall.

Page 67

1  Q  Referring to the soft restraints that were present
2    due to seizures, are those restraints that were
3    applied by the Sheriff's Office?
4  A  No, they were hospital staff's.
5  Q  Okay.  And Counsel asked you whether there was a
6    struggle.  About halfway through your description
7    on Page -- the large paragraph on Page 1 of
8    Exhibit 3, it says, "The inmate suddenly lunged at
9    me, grabbing at my holstered firearm on my left
10    side, shouting, quote, "Give me the gun," closed
11    quotes, over and over again, approximately eight to
12    twelve times."
13  A  Mm-hmm.
14  Q  Did I read that accurately, with the exception of
15    the inmate's name?
16  A  You did.
17  Q  And is that an accurate account of what occurred?
18  A  Yes.
19  Q  And did the inmate actually reach and have ahold of
20    your belt?
21  A  Um, as I said, it all happened so quickly.  It --
22    it says she shouted eight to twelve -- excuse me,
23    eight to twelve times, which she did.  But that
24    wasn't -- I wouldn't consider that a struggle, that
25    was just her talking.

Page 68

1    Um, but she did reach towards the left side
2    of my belt, um, I felt her hands on me, they
3    weren't on my firearm.  Um, but I believe she did
4    touch my belt, but she didn't have ahold of it.
5  Q  Okay.  Deputy, let me refer you to Exhibit 3, about
6    two sentences after what I just read.  It says, "I
7    felt her tugging on my belt with her hands as I
8    pulled away in attempt to release her grip."  Is
9    that an accurate statement?
10  A  Mm-hmm.
11  Q  Yes?
12  A  Yes.
13  Q  And the belt is your firearm belt, true?
14  A  True.  And other things it holds.
15  Q  Right.
16  A  Not just for firearms.
17  Q  And you would not characterize this as a struggle,
18    but it is accurate to say that an inmate suddenly
19    lunged at you, reached, and successfully grabbed
20    your firearm belt, and yelled eight to twelve
21    times, "Give me the gun," and you both fell to the
22    floor.  Is that an accurate recitement of what
23    occurred?
24        MR. RAUSCHER:  Object to form.
25        THE WITNESS:  Um, I don't believe I fell

Page 69

1    to the floor.  I believe she fell to the floor and
2    I kind of went to handcuff her right behind her.
3  BY MR. KNOTT:
4  Q  And is it fair to say that the reason you don't
5    believe there was a struggle, is because you felt
6    that you had her under control at all times?
7  A  Um, it depends what you mean by that.
8  Q  Okay.  Fair enough.  Mean by "struggle", correct,
9    that's what you're asking?
10  A  When -- when I think of struggle, I think of a
11    physical altercation between two or more
12    individuals.
13        Um, she -- yes, she did reach towards and
14    grab my belt.  At no point in time did she get my
15    fire -- like I said, I twisted and she went down.
16    It all happened in about two seconds.  That's where
17    I guess I'm not --
18  Q  And Counsel asked you if you were scared.  Deputy,
19    did you have a heightened concern for your safety,
20    an inmate's safety, and the hospital staff's safety
21    when this event occurred?
22  A  Um, I -- at the moment it happened, yes, although
23    she was -- because of her state, she was very easy
24    to keep under control and get back in the bed and
25    to restrain.

Page 70

```
1   Q   And her state being impacted by seizures that she
2       had had?
3   A   Yeah, I felt she was in a weakened state, which I
4       believe she was, still believe she was.
5   Q   That's something you personally observed?
6   A   Yes.
7   Q   She was -- she did not give birth at the same
8       hospital where this occurred, true?
9   A   That is -- according to my briefing in the logbook,
10      correct.
11  Q   Do you know how long prior to this incident
12      occurring she had given birth?
13  A   I was told she -- I was told she came right from
14      the other hospital, and I want to say it was, um,
15      two to three days.
16  Q   Is it your understanding that she was transferred
17      due to ongoing seizures after her birth, after
18      giving birth?
19  A   That's why I was told she was transferred to
20      St. Luke's, yes.
21  Q   There was also -- at the moment that this incident
22      occurred, there was also a nurse in physical
23      contact with the inmate, true?
24  A   The -- yes, the inmate was on her -- she was
25      sitting against the bed and the inmate -- or the
```

Page 71

```
1       nurse was on her right side and I was on her left
2       side.
3   Q   Did the nurse express concern for her safety after
4       the event?
5           MR. RAUSCHER:  Object to form.
6           THE WITNESS:  Um, no.  She -- in fact,
7       the comment I remember I heard her saying was to
8       the effect of, "That was kind of like watching an
9       episode of cops."
10          MR. KNOTT:  Okay.
11          THE WITNESS:  But never expressed
12      concern.
13  BY MR. KNOTT:
14  Q   After the inmate fell to the floor, you ordered her
15      to stop resisting, correct?
16  A   I did.
17  Q   And in your description in Exhibit 3, about
18      three-quarters of the way through, it says, "As I
19      ordered the inmate to stop resisting, she continued
20      to struggle.  And in her attempt to rise up off the
21      floor, turned away from me towards her right side."
22  A   She had --
23  Q   Is that --
24  A   Oh, sorry.
25  Q   -- an accurate statement of what occurred?
```

Page 72

```
1   A   Yes.
2   Q   And did the inmate continue to resist after you had
3       ordered her to stop resisting?
4   A   Yes.
5   Q   And did she attempt to rise up off the floor after
6       she had fallen to the floor?
7   A   No.  Not until I assisted her.
8   Q   All right.  In your report you document that the
9       inmate had a scratch on the bridge of her nose as a
10      result of this incident, correct?
11  A   I noticed after she was back in the bed, that there
12      was a scratch there.
13  Q   And you're not sure whether it was a result of the
14      incident or not; is that what you're saying?
15  A   I'm not saying that.  I believe it probably was, I
16      don't -- because I don't recall it being there
17      prior.  So I brought it to the attention of the
18      medical staff to make sure she was all right.
19  Q   And, Deputy, I believe you testified earlier that
20      when performing a hospital watch, you would
21      routinely have access to and review an inmate's
22      criminal record and their arrest record; is that
23      fair?
24  A   It's fair.
25  Q   And you believe in Ms. Terry's circumstance that
```

Page 73

```
1       you would have asked your supervisor for that
2       information at the beginning of your watch or soon
3       thereafter?
4   A   Um, well, at -- while I was still at the courts on
5       that first day.
6   Q   And --
7   A   One that's being assigned to the hospital watch.
8   Q   That was your routine habit and custom to either
9       read or ask for arrest records or information about
10      their criminal history?
11  A   Yes.
12  Q   And why would you do that?
13  A   Um, like I said, the main objective of a hospital
14      watch is to keep the inmate, the staff of the
15      hospital, as well as the deputy safe, myself.
16  Q   And how would that information assist you in
17      performing that task?
18  A   Um, basically to kind of give me an idea of the
19      person, or what they have been capable of possibly
20      doing.
21  Q   Is it because you're attempting to perform an
22      individual determination of the security risk that
23      that individual presents?
24  A   That's a big part of it, yes.
25  Q   And what type of criminal history, what type of
```

Page 74

1   incidents in a criminal history are of concern to
2   you as a deputy performing a hospital watch, in
3   terms of the security risk?
4   A   The main things are any type of violent criminal
5   activity, where the person is known to get violent
6   with other individuals.  And then also bail jumping
7   charges as well, because it means that they have
8   not been reliable in coming to their court dates,
9   or, you know, maybe purposely missed them or didn't
10  care about the court system.
11  Q   Counsel asked you whether you performed an
12  individual determination of the risk presented by
13  the 80 to a hundred women that you observed at a
14  hospital watch.  Do you remember those questions?
15  A   Can you repeat the question?
16  Q   Counsel asked you whether you performed an
17  individual determination when -- for the 80 to a
18  hundred women that you observed on a hospital
19  watch.  Do you remember those questions generally?
20  A   Yes.
21  Q   And do you remember each and every of those 80 to
22  100 women that you watched, and the incidents or
23  events during those watches?
24  A   No.
25  Q   You testified that on occasion, there would be

Page 75

1   something like they wanted to perform an X-ray.
2   Tell me what you would do in that circumstance?
3           MR. RAUSCHER:  Object to form.
4           THE WITNESS:  Um, like if they needed an
5   X-ray, a lot of times, in -- in my experience, they
6   have asked for a cuff to be removed or a restraint
7   to be removed, because that was the area they were
8   needing to get an X-ray of.  Then we would attempt
9   to -- we would generally then remove that, but then
10  we would try to, if we could, restrain them
11  someplace else.
12  BY MR. KNOTT:
13  Q   And when you were making that determination that
14  you would remove the wrist restraint, were you
15  making an individual determination of the potential
16  risk of that inmate escaping or harming staff?
17  A   Again, you always have to take that into account.
18  I mean, that's why, if you can, you want to
19  restrain them in another area.  If you're removing
20  one area, why not put another one on, so.
21  Q   So one of the things you're balancing in that
22  circumstance is the risk presented by that
23  individual inmate, true?
24  A   True.
25  Q   And in your experience, you would, if asked, do

Page 76

1   something like remove a restraint so that a medical
2   provider could have access to the inmate, fair?
3   A   Yes.
4   Q   Do you remember any specific instances of doing
5   that?
6   A   Um, I do remember doing it.  I couldn't tell you
7   like the name of the inmate or when, or.
8   Q   And if an inmate were to ask you to remove a
9   restraint, what would you do?
10  A   I'd -- first I'd be like, "Why do you want it
11  removed?"
12  Q   And if they told you that it was too tight, what
13  would you do?
14  A   I would -- like I mentioned previously, I would
15  check, usually use a finger rule, being able to get
16  our fingers in between the person's wrist and the
17  cuff, um, to see if there was, you know, the person
18  had mobility.  And then if we felt it was too
19  tight, we would loosen it up.
20          A lot of times that happens when like me, I
21  would come onto a hospital watch, and I'm replacing
22  somebody else, that's the most time you get that
23  kind of question.  But if -- if they continue to
24  complain, we can do things such as, like I said,
25  put a towel in between the cuff and the wrist.

Page 77

1   Q   So that was an option that was available to you
2   that wasn't directed by a written policy, fair?
3   True?
4   A   Yes.
5   Q   Is it fair to say that if a health care provider
6   approached you and asked you to remove a restraint,
7   you would then make an individual determination on
8   whether that's a safe practice?
9   A   Yes.
10  Q   Is it fair to say that if an inmate asked you to
11  remove a restraint, you would then make an
12  individual determination on whether that is a safe
13  and prudent thing to do?
14  A   Can you say that again?
15  Q   If an inmate asked you to remove a restraint, would
16  you then make an individual determination --
17  A   Yes.
18  Q   -- on whether it was a safe and prudent thing to
19  do?
20  A   Yes.
21  Q   You indicated in response to Counsel's questions
22  that one of your concerns would be if the inmate
23  wanted to use a telephone.  Why is that a concern?
24  A   Um, because when an inmate is out of the secure
25  confines of the jail, it's considered -- at a

1    hospital, it's considered an unsecure environment.
2    If family knew they were there, they could try and
3    break that person out of jail, so to speak. Even
4    though they're at a hospital, they're still in
5    custody.
6            They could also bring any -- there's no --
7    like a jail, they have to go through security, and
8    they're not allowed to bring any kind of weapons.
9    And in a hospital, there's no such practice that
10   they perform those. So they could technically
11   bring anything into the jail, including firearms,
12   knives.
13 Q As a deputy performing a hospital watch, would it
14   be a concern to you if a person who was arrested at
15   the same time as the person you're watching
16   presented at the hospital and asked to see the
17   inmate you're watching?
18           MR. RAUSCHER: Object to form.
19           THE WITNESS: I'm a little confused by
20   that question.
21 BY MR. KNOTT:
22 Q Yeah. As a deputy performing watches at the
23   hospital --
24 A Okay.
25 Q -- would it be a concern to you if a person who was

1    arrested at the same time as the inmate you're
2    watching, presented at the front desk and asked to
3    see the inmate you're watching?
4  A Yes.
5  Q Why would that be a concern?
6  A Well, again, it's an unsecure environment. If the
7    person is -- you know, if the person was with the
8    other person at the time of whatever incident
9    occurred, they're potentially involved in that as
10   well, which adds added danger.
11           In the past, if there's usually any kind of
12   knowledge of a family member or a friend finding
13   out of an inmate that's on a hospital watch while
14   they're there, we typically would move the inmate
15   to a different room to try to avoid any such
16   contact.
17 Q Counsel showed you Exhibit 1, which is your
18   hospital log. And it indicates on March 10th that
19   you removed Ms. Terry's restraint on her wrist when
20   the baby was brought into the room. Is that an
21   accurate account of your log at 1504 on March 10?
22 A Yes.
23 Q And you felt that it was within your discretion in
24   applying the policy to remove the wrist so that she
25   could hold the baby?

1  A Yes, and her leg was still restrained.
2  Q And I think you indicated that in doing so, you
3    would be evaluating the risk and the safety risk to
4    the baby as well as to the patient; is that fair?
5  A Yes, that's fair.
6  Q And that would be on an individual, case-by-case
7    basis when a baby is brought into the room, fair?
8  A Fair.
9  Q Deputy, returning to the incident from May of 2016
10   at St. Luke's Hospital. That inmate had a
11   significant documented arrest history that included
12   resisting or obstructing an officer, battery, and
13   battery to law enforcement, true?
14 A True.
15 Q And it's true, isn't it, Deputy, that the
16   supervisors at the jail and -- and the Sheriff's
17   Department, felt that given her significant arrest
18   history and resisting and battery of law
19   enforcement, that you exercised poor judgment in
20   allowing her to move without restraint?
21           MR. RAUSCHER: Object to foundation.
22           THE WITNESS: I --
23 BY MR. KNOTT:
24 Q That was something that was told to you, wasn't it?
25 A If I remember correctly, yes.

1  Q Looking at Exhibit 2, the second page, Deputy, it
2    says that you acknowledged, "There was nothing
3    preventing her from applying a belly chain
4    restraint system with one-hand restrained, along
5    with shackles, while Inmate Bernard was off the
6    bed." Is that something you discussed with the
7    supervisors?
8  A It's something they asked me.
9  Q And to kind of wrap this up, Deputy, you exercised
10   your judgment in that circumstance, correct?
11 A Correct.
12 Q And your supervisors didn't disagree that you had
13   the right to exercise discretion, they just
14   disagreed with your judgment in that exercise of
15   discretion; is that fair?
16           MR. RAUSCHER: Object to foundation.
17           THE WITNESS: Fair.
18 BY MR. KNOTT:
19 Q And that's because of what they viewed as a
20   significant criminal history for the inmate in
21   question, correct?
22 A Correct.
23 Q All right. Those are the questions I have. Thank
24   you.
25

Page 82

1          E X A M I N A T I O N
2 BY MR. RAUSCHER:
3 Q   Who told you you exercised poor judgment with
4     respect to Inmate Bernard?
5 A   Um, I -- I don't know I was specifically told that
6     I exercised poor judgment. I was asked the
7     questions, um, as it was brought up in the report
8     asking me if there was anything that kept me from
9     applying the restraint.
10 Q  Those questions are about the policy, not your
11    judgment, right?
12       MR. KNOTT: Object, speculation. I don't
13    know what you're asking.
14       THE WITNESS: That particular one is,
15    yeah, I guess it's about the policy.
16 BY MR. RAUSCHER:
17 Q  Do you see a single question in this report about
18    your judgment, other than when you said it at the
19    end, that you were exercising your judgment?
20 A  No, that was the only spot.
21 Q  So no one really told you that you improperly
22    exercised your judgment, right?
23 A  Um, I guess I don't understand.
24 Q  Nobody told you you didn't properly exercise your
25    judgment with respect to Inmate Bernard, did they?

Page 83

1 A   Um, to be honest, I don't recall exactly the exact
2     words that were said.
3 Q   You were told you violated the policy with
4     restraints?
5 A   Yes.
6 Q   When you took the wrist restraint off Rebecca Terry
7     to let her hold her baby, did she try to escape?
8 A   No.
9 Q   Did she ever try to escape?
10 A  No.
11 Q  Did you ever make any determination as to whether
12    Rebecca Terry presented a danger to herself, to
13    other inmates, or to you?
14       MR. KNOTT: I object, it's overly broad.
15       THE WITNESS: I'm sorry, are you done
16    with the --
17       MR. KNOTT: Yeah, go ahead.
18       THE WITNESS: Um, don't recall, but that
19    doesn't mean there weren't any.
20 BY MR. RAUSCHER:
21 Q  If you thought there was a danger, you would have
22    written it in your logbook, right?
23 A  Yes.
24 Q  And you didn't write it in your logbook?
25 A  No, but it depends what you mean by "danger" from

Page 84

1     what you -- your question. Can you repeat his
2     question to me?
3       (Question read back by the court reporter.)
4       THE WITNESS: I guess if, like I said,
5    that doesn't mean they didn't exist. What I mean
6    by that is if it was a significant, like if she
7    tried something, yes. But I don't recall, say, for
8    instance, if she tried to get ahold of an outside
9    family member, I don't know if that happened or
10    not, because it has happened, but I don't know if
11    happened specifically with her.
12 BY MR. RAUSCHER:
13 Q  And would you have written it down if she had tried
14    to get in touch with an outside family member?
15 A  If she just asked, no. If she made an actual
16    attempt attempt, yes.
17 Q  You mean if she just said to you, "Can I talk to
18    someone in my family?", you wouldn't have --
19 A  "Can I use the phone? Why not?" I'd just say no,
20    and security reasons.
21 Q  Right, can I use the phone is not a security risk,
22    right?
23 A  Correct.
24 Q  Okay. You would apply restraints to -- before the
25    restraint policy was changed with respect to

Page 85

1     pregnant women, you applied restraints to pregnant
2     women, to women in labor, to women recovering from
3     labor, without regard for their criminal history,
4     correct?
5       MR. KNOTT: Objection to the form of the
6    question, it's vague, it's overly broad, it's
7    multiple.
8       THE WITNESS: It's a general practice,
9    yes.
10 BY MR. RAUSCHER:
11 Q  You aren't going through one by one and saying,
12    well, this person has a particularly serious
13    criminal history, this person doesn't, and then
14    making decisions based on that?
15 A  No.
16 Q  You were not doing that, right?
17 A  I was not doing that.
18 Q  You were asked a question by Mr. Knott, looking --
19    I think it was at Exhibit 3, where there was a
20    reference to a policy requiring the inmates to be
21    restrained outside of their hospital beds. Do you
22    remember that?
23 A  Whenever they're outside the jail, they're supposed
24    to have two-point restraints.
25 Q  Right, they're supposed to be restrained in their

Page 86

```
1       bed and out of bed?
2   A   Correct.
3   Q   That's not saying that policy only applied to
4       inmates out of the beds?
5   A   That's true.
6   Q   That's all I have.
7               MR. KNOTT:  That's it.
8               MR. RAUSCHER:  Thank you.
9               THE WITNESS:  No problem.
10              (Deposition concluded at 12:28 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 87

```
1   STATE OF WISCONSIN  )
                        )  SS:
2   COUNTY OF MILWAUKEE  )
3           I, Wendy L. Hanneman, Registered
4   Professional Reporter and Notary Public in and for the
5   State of Wisconsin, do hereby certify that the
6   deposition of ELIZABETH FREUCK was reported by me and
7   reduced to writing under my personal direction.
8           I further certify that said deposition was
9   taken at LEIB, KNOTT & GAYNOR, LLC, 219 North Milwaukee
10  Street, Suite 710, Milwaukee, Wisconsin, on the 21st day
11  of August, 2018, commencing at 10:34 a.m. and concluding
12  at 12:28 p.m.
13          I further certify that I am not a relative
14  or employee or attorney or counsel of any of the
15  parties, or a relative or employee of such attorney or
16  counsel, or financially interested directly or
17  indirectly in this action.
18          In witness whereof, I have hereunto set my
19  hand and affixed my seal of office at Milwaukee,
20  Wisconsin, this 27th day of August, 2018.
21
22              Wendy L. Hanneman - Notary Public
                In and for the State of Wisconsin
23
            My Commission Expires:  October 9, 2021.
24
25
```

**Exhibits**

**exh 1** 3:8 36:12,14 37:22 51:14 79:17

**exh 2** 3:9 59:8,21 60:1 62:12,20 63:4 64:5,17 65:3 81:1

**exh 3** 3:10 62:12 65:25 66:1 67:8 68:5 71:17 85:19

**0**

**0600** 52:8,24 53:20

**0730** 51:19

**09** 6:10

**1**

**1** 36:12,14 37:22 51:14 52:10 66:1 67:7 79:17

**1/2** 4:14

**10** 79:21

**10-49** 42:13,19

**100** 74:22

**10th** 39:10 50:17 51:19 79:18

**11th** 52:7

**1252** 53:25

**12:28** 86:10

**12th** 52:23

**13** 5:23

**1300** 53:13

**1308** 40:24 51:23

**1312** 52:14

**13th** 53:20

**1400** 52:8,24 53:20

**1504** 42:23 79:21

**1530** 51:19

**16** 5:10

**1605** 52:13

**1654** 53:14

**18** 53:6

**180** 36:17 38:18 51:17

**181** 51:21

**182** 51:24

**183** 52:2

**184** 52:6

**186** 52:19

**187** 52:20

**188** 52:21

**189** 53:2

**19** 53:17

**190** 53:7

**191** 53:18

**192** 36:17 53:23

**2**

**2** 59:8,21 60:1 62:12, 20 63:4 64:5,17 65:3 81:1

**2-3** 59:12

**20** 53:22

**2009** 6:13

**2013** 6:10,18 9:25

**2014** 49:7 50:17 51:19 52:7,24 53:20

**2015** 20:16 33:19 64:19,23

**2016** 64:19,24 80:9

**2017** 19:2

**21508** 59:9

**22** 4:14,22

**27** 38:24

**3**

**3** 59:8,9 62:12 65:25

**66:1** 67:8 68:5 71:17 85:19

**30** 4:15,19 42:18

**303** 53:4

**4**

**4:30** 49:10

**5**

**5/7/2016** 59:11

**510** 59:9

**6**

**6127** 38:23

**64** 39:13

**65** 51:16

**68** 51:21

**69** 51:23

**7**

**70** 51:25

**71** 52:5

**72** 52:9

**73** 52:18

**74** 52:19

**75** 52:21

**76** 27:4,6 35:4,12 53:1

**793** 42:14,21

**7:30** 49:9,19

**8**

**80** 24:13,15 26:13, 18,21 27:1,3 74:13, 17,21

**83** 9:5,6

**89** 9:8,9

**9**

**90** 9:8

**96** 6:13 27:3

**A**

**ability** 6:5 21:13 22:20

**academy** 5:22 7:8, 11,12,15,24 8:5 31:23 33:11 38:13

**accept** 12:4,25

**accepted** 13:10,11, 14,20

**access** 72:21 76:2

**account** 67:17 75:17 79:21

**accurate** 54:5,7,17, 20 60:20 64:4 67:17 68:9,18,22 71:25 79:21

**accurately** 67:14

**acknowledged** 81:2

**activity** 74:5

**actual** 84:15

**added** 79:10

**addition** 4:19

**additional** 8:2

**adds** 79:10

**admitted** 11:24 13:23 14:7,14

**Adolescent** 8:12,13

**ADR** 56:18

**advance** 50:11

**advanced** 55:11

**Affairs** 30:14 63:10, 25

**agency** 13:19

**agency's** 13:16,23

**agree** 60:5,23 62:13, 20

**ahead** 12:21 20:12 49:22 50:6 83:17

**ahold** 28:25 29:1 67:19 68:4 84:8

**airport** 5:24,25 6:2, 3,11,17

**alert** 21:4

**alleged** 60:14

**Allis's** 12:24 13:1

**allowed** 25:23 33:19 34:6 60:15 78:8

**allowing** 80:20

**altercation** 69:11

**amount** 30:22 34:20,24

**Andrykowski** 53:3

**ankle** 15:11,25 16:5, 12 17:5,8 18:11,17 39:16,19 42:1 66:2

**ankles** 65:23 66:15

**appeal** 30:18

**appealed** 59:21

**appeared** 21:11

**applied** 18:19,20 19:14,17 35:7 67:3 85:1 86:3

**apply** 35:18 84:24

**applying** 63:8 79:24 81:3 82:9

**approached** 77:6

**approve** 13:11

**approximate** 26:23

**approximately** 42:18 49:10 67:11

**area** 5:15 6:2 59:2 63:10 75:7,19,20

**argumentative** 34:12

**arisen** 19:20

**Armor** 6:22,24 7:1

**arms** 43:13 65:24

**arose** 24:25

**arrest** 14:8 56:6
72:22 73:9 80:11,17

**arrested** 13:6,19
78:14 79:1

**arresting** 13:16

**arrived** 65:22

**asks** 48:24

**assign** 10:23

**assigned** 5:2,9,16,
23,24 6:19 9:21,24,
25 10:3,12,13,18,20
28:1 49:8,20,25
50:1,5,16 73:7

**assignment** 10:15,
17

**assist** 44:21 73:16

**assistant** 8:16

**assisted** 66:12 72:7

**assumption** 42:11
50:24 51:1

**attached** 17:5,7
18:9,10 66:6

**attempt** 15:19 23:7
25:17 28:21 68:8
71:20 72:5 75:8
84:16

**attempting** 73:21

**attention** 72:17

**attorney** 37:9,13
58:19,22

**avoid** 79:15

**aware** 21:6

---

**B**

**babies** 46:1,7,10

**baby** 42:25 43:1,6,8,
10,11,13,15,25
44:13,17,25 45:3,19
48:22 57:10,17,24

---

**back** 11:23 17:4
22:4,9 23:2 32:18,19
38:5 45:9,10 61:19
66:13 69:24 72:11
84:3

**backwards** 64:20

**badge** 42:21

**bail** 74:6

**balancing** 75:21

**based** 44:11 85:14

**basement** 20:23
21:25

**basic** 39:24

**basically** 5:4 7:15
15:2 17:14 22:7
30:12 37:13,23,24
38:12 50:20 73:18

**basis** 80:7

**Bates** 59:10

**Bates-stamped**
36:17

**bath** 21:20

**bathroom** 21:9,10,
17,18,19,20,23 22:3
31:2 34:10

**battery** 80:12,13,18

**bed** 15:21 18:10
21:14,21 22:4,10
23:17 65:13,18,19
66:2,5,6,13 69:24
70:25 72:11 81:6
86:1

**beds** 85:21 86:4

**began** 55:5

**beginning** 64:10
73:2

**belief** 63:6

**believed** 23:9 34:6

**belly** 81:3

**belt** 66:11 67:20
68:2,4,7,13,20 69:14

---

**Bernard** 60:2 61:10
64:6 81:5 82:4,25

**big** 20:23 34:19
73:24

**birth** 20:18 24:18,21
25:2 26:8 29:5,15,24
47:21 48:20 53:11
57:8,9,13,15 58:11,
14 70:7,12,17,18

**book** 53:4

**booking** 56:18

**born** 57:18,24

**bottom** 38:20 39:11
42:22 51:17,22 53:3,
7

**Branch** 5:10

**break** 49:3 78:3

**bridge** 72:9

**briefing** 70:9

**briefly** 5:19

**Briggs** 40:25 41:2,
25

**bring** 78:6,8,11

**broad** 16:14 25:6
29:9,17 31:21 35:8,
21 36:10 43:17
47:24 62:14,22
83:14 85:6

**brought** 30:6 42:25
43:7 46:8,11 48:23
72:17 79:20 80:7
82:7

**building** 5:15

**bunch** 42:12

---

**C**

**call** 14:10 42:17,18
49:20,24 50:1,5,16,
20 55:13 56:6

**called** 4:2 11:5
21:22 29:23

**calls** 22:15 31:8,20
32:10 33:21 43:17
47:24

---

**capable** 73:19

**care** 8:10 9:16 74:10
77:5

**career** 47:4,5

**case** 59:6

**case-by-case** 80:6

**cases** 34:21

**catheter** 21:5,6

**Center** 8:12,13

**certified** 7:15,18
8:1,14,15,16

**chain** 16:6 18:8,9,17
81:3

**chains** 18:13

**chance** 22:13 29:6

**change** 15:12
26:12,15

**changed** 14:22
19:12 20:7 27:2,12,
21 30:6 45:20 84:25

**characterization**
60:23

**characterize** 68:17

**charged** 56:15

**charger** 56:15

**charges** 74:7

**check** 17:23 48:3
76:15

**child** 43:20,21 44:15

**childbirth** 19:8,11
47:11

**Childhood** 8:12,13

**children's** 8:11

**choice** 11:1

**choosing** 34:9

**circumstance**
22:24 33:22 34:15
72:25 75:2,2 81:10

**circumstances**
35:25 44:11,12
63:11

---

**citizens** 5:5,14

**clarification** 64:16

**clarify** 25:13 26:20

**classes** 9:17

**classroom** 7:16

**clearance** 12:5

**cleared** 13:2,17

**clerk** 58:24

**close** 9:10,15 44:22

**closed** 67:10

**CNA** 8:14,15

**college** 8:19,21

**column** 39:9

**comment** 71:7

**common** 39:17
40:11 41:18 43:14,
23 44:6,7 46:8

**communicate**
56:16

**communications**
56:16

**complain** 17:16,18
18:2 76:24

**Complex** 8:10

**complied** 42:10

**computer** 38:4

**computerized** 38:1

**concern** 29:3 69:19
71:3,12 74:1 77:23
78:14,25 79:5

**concerned** 21:13

**concerns** 28:7,12,
18,24 29:21 30:6
77:22

**concluded** 57:19
86:10

**condition** 22:12
23:7 40:5 61:7

**conducted** 24:12
46:10

Case 2:17-cv-01112-JPS    Filed 09/04/18    Page 26 of 34    Document 175-17

**conducting** 14:21 43:23

**confines** 77:25

**confused** 78:19

**conscious** 21:15

**considered** 17:25 61:21 77:25 78:1

**consist** 38:11

**contact** 21:24 25:21,24 66:22 70:23 79:16

**continue** 18:1 51:2 72:2 76:23

**continued** 53:12 71:19

**continues** 18:2

**continuing** 53:22

**control** 69:6,24

**conversation** 55:25

**conversations** 37:9 58:16,17

**copies** 36:20 60:11

**cops** 71:9

**copy** 60:10

**corner** 21:1

**correct** 4:24 12:8,18 14:13 27:10 32:3,4 36:7,8 40:18 50:3 61:25 63:16 65:13, 19 69:8 70:10 71:15 72:10 81:10,11,21, 22 84:23 85:4 86:2

**correctional** 11:18

**correctly** 80:25

**COS** 28:3

**Counsel** 65:1 67:5 69:18 74:11,16 79:17

**Counsel's** 77:21

**counting** 24:17

**country** 15:18

**County** 4:11,12,14, 19,23 5:5,21 7:3 8:7, 18 27:19 36:17 38:17 51:17,21,24 52:2,6,10,18,20,21 53:2,7,18,23

**couple** 7:11

**court** 5:10,12,14 6:20 28:1 32:19 45:10 50:21 58:24 74:8,10 84:3

**courthouse** 5:10

**courtroom** 5:11 51:7

**courts** 5:2,17 6:19 9:21,22,24 10:3,10, 12,15,22 11:7,14 49:8,10 73:4

**CPR** 7:10

**cradled** 44:16

**criminal** 55:14 56:3, 18,20,25 72:22 73:10,25 74:1,4 81:20 85:3,13

**crossed** 43:2

**cuff** 16:5 17:6,7,25 18:4,9 75:6 76:17,25

**cuffs** 17:19

**current** 4:25

**custody** 5:13 14:9 55:7 78:5

**custom** 73:8

**customary** 42:2,6

---

**D**

**daily** 38:15

**danger** 44:23 45:1, 15,16,17 79:10 83:12,21,25

**date** 53:11 64:21

**dated** 59:11

**dates** 74:8

**day** 21:7 35:2 50:13

51:2,5 73:5

**day-to-day** 5:8

**days** 21:14 30:22 34:20 35:25 49:22 50:10 51:5 70:15

**debriefed** 40:3 57:11

**decisions** 85:14

**definite** 28:18

**delta** 39:14

**department** 4:20 7:6 8:4,6 12:23 13:3, 4,6 14:11 80:17

**departments** 14:9

**depended** 55:10

**depending** 43:21

**depends** 17:12 60:22 62:15 69:7 83:25

**deposition** 37:5,7 58:23,25 64:11 86:10

**deputies** 10:19,21 11:14,25 27:25 58:1, 5

**deputy** 5:1 13:25 14:17 28:19 58:2,6,8 60:15 64:17 65:11 68:5 69:18 72:19 73:15 74:2 78:13,22 80:9,15 81:1,9

**deputy's** 60:17

**description** 54:20 67:6 71:17

**desk** 79:2

**determination** 35:4,17 73:22 74:12, 17 75:13,15 77:7,12, 16 83:11

**determines** 12:3 34:2

**digits** 46:13

**directed** 77:2

**dis** 30:8

**disagree** 81:12

**disagreed** 81:14

**discharged** 24:22

**disciplinary** 30:4,8

**discipline** 33:17

**disciplined** 33:15 34:8 59:23

**discretion** 63:7 79:23 81:13,15

**discussed** 26:5 27:8 81:6

**discussion** 24:9

**dispatch** 42:17 56:16

**division** 5:2,17,25 6:11,17 9:22,24 10:3,11,15,23,24 11:7,14 30:15

**document** 24:4 36:16,25 72:8

**documented** 80:11

**documents** 37:11, 17 41:14 59:14

**doors** 20:25

**drugs** 28:24

**due** 22:8 47:9 62:17 67:2 70:17

**duly** 4:3

**duties** 28:1

---

**E**

**E-L-I-Z-A-B-E-T-H** 4:8

**e-mail** 19:4

**earlier** 21:7 48:2,7 49:23 64:22 72:19

**early** 19:1

**easy** 69:23

**effect** 28:4 71:8

**effective** 15:25 16:2

**Elizabeth** 4:2,8

**else's** 32:12 33:8

**embeds** 34:12

**emergency** 7:19

**employed** 8:6

**end** 20:25 52:8,25 53:21 60:13 65:9 82:19

**ends** 49:9 50:25

**enforcement** 7:16 8:1 80:13,19

**engulf** 5:3

**entailed** 6:1

**entering** 50:7

**entire** 51:22 53:24 65:19

**entries** 38:8 54:3,17

**entry** 40:24 42:22 43:6 49:25 51:23 52:13 53:13,24,25

**environment** 78:1 79:6

**episode** 71:9

**ER** 11:23

**escape** 15:20 28:22 29:6 83:7,9

**escapes** 25:17

**escaping** 75:16

**estimate** 18:15 26:21,24 33:12

**estimated** 26:17

**evaluating** 80:3

**event** 69:21 71:4

**events** 10:7,8 74:23

**everything's** 42:19, 20

**EVOC** 7:18

**exact** 83:1

**examined** 4:4

exception 52:13 53:24 67:14

excuse 67:22

exercise 30:25 31:17 32:6,22 33:4 81:13,14 82:24

exercised 63:18 80:19 81:9 82:3,6,22

exercising 64:1 65:2,5 82:19

exh 36:14 59:12

exhibit 24:3 36:12 37:22 51:14 59:8,21 60:1 62:12,20 63:4 64:5,17 65:3,25 66:1 67:8 68:5 71:17 79:17 81:1 85:19

exist 84:5

existed 33:18 54:8

expected 38:16

experience 43:23 75:5,25

explain 7:12 20:15

explained 37:14

explanation 27:11

express 71:3

expressed 71:11

extent 34:18

extenuating 35:24

extra 56:14

extremely 56:22

**F**

F-R-E-U-C-K 4:9

fact 34:3 71:6

fair 30:21 34:8 61:9 69:4,8 72:23,24 76:2 77:2,5,10 80:4,5,7,8 81:15,17

fall 9:6 22:8 44:17

fallen 72:6

family 5:10,12 25:22,24 26:1 78:2 79:12 84:9,14,18

fast 23:1

February 19:2

feel 33:23 61:4

feet 18:16

fell 22:25 61:5,17 62:5 68:21,25 69:1 71:14

Fellow 27:25

felt 23:4,6 34:17 35:24 44:22 63:11 68:2,7 69:5 70:3 76:18 79:23 80:17

female 20:17 27:18

females 47:11

fight 34:18

fighting 59:24

figure 64:21

file 59:22,24

filed 30:17

final 65:25 66:1

finding 79:12

finger 76:15

fingers 17:24 76:16

fire 69:15

firearm 22:20 23:5 60:17,21 61:16 67:9 68:3,13,20

firearms 7:18 68:16 78:11

fit 17:24

floor 61:6,17 66:12 68:22 69:1 71:14,21 72:5,6

focus 62:20

focusing 60:7

follow 31:24 35:23 36:1 45:12,13

form 16:13 17:9

19:24 20:9 22:14,15 25:3,11 26:16 27:16 28:8 29:8,16,25 30:11 31:6,13,19 32:7 34:11 35:20 36:9 43:16 47:23 54:9,24 55:15,19 61:11 62:2,8 68:24 71:5 75:3 78:18 85:5

formal 65:7

fought 34:19 35:1

found 40:5

foundation 25:6 29:25 45:4,24 46:14 47:8 80:21 81:16

frame 66:5

Freuck 4:2,8

friend 79:12

front 60:1 79:2

full 9:12 60:13 65:4

**G**

gave 57:13,15 60:9

general 14:25 32:2 35:23 36:2,6 45:12 85:8

generally 7:9 10:3 14:24 40:9,14,20 56:17 74:19 75:9

give 14:18 22:5 23:12 30:10 48:11 55:21 67:10 68:21 70:7 73:18

giving 25:1 26:7 29:5,15,24 30:16 35:6 47:21 58:13 70:18

glass 20:24

good 9:6 11:1 42:19

grab 69:14

grabbed 68:19

grabbing 67:9

graduate 9:2

graduated 5:22 9:5 38:12

graduating 9:10,15

grip 68:8

ground 23:1 61:24

group 24:17

guess 11:18 14:18 26:23 34:1,17 35:10 46:12,21 61:20 65:9 69:17 82:15,23 84:4

guessing 39:12

gun 22:5,13,23 23:11,12 30:10 48:11 60:2 61:10 62:1 67:10 68:21

**H**

habit 73:8

half 37:4 41:7 45:22 58:18

halfway 67:6

hall 66:25

hand 17:14 44:16

handcuff 61:24 69:2

handcuffs 66:4,10

handle 11:14

hands 17:15 23:2 61:19 66:21 68:2,7

hands-on 7:17 38:14

handwriting 38:25 39:4,5,6 40:20,23 51:15,18,22,24 52:3, 19,22 53:2 54:4

handwritten 38:3

happen 57:3

happened 20:15 22:6 23:1 26:15 58:20 64:19 66:17 67:21 69:16,22 84:9, 10,11

graduated 5:22 9:5 38:12

happening 26:11 57:2

hard 22:24

harming 75:16

harsh 34:24

head 54:25

health 8:9 9:16 77:5

healthy 12:15

hear 4:16

heard 27:15 71:7

heightened 69:19

Hein 54:2

held 24:9

helped 22:1 66:13

high 5:20 9:5

history 55:14 56:3, 18,20,25 73:10,25 74:1 80:11,18 81:20 85:3,13

Hodel 63:14,17 65:5

hold 43:8 45:3,19 79:25 83:7

holding 43:1,10,15 44:13,15

holds 43:25 68:14

holster 23:14

holstered 67:9

honest 83:1

honor 47:21

hospital 10:4,11,13, 15 11:5,11,14,17,19 12:2,5,10 13:22 14:1,3,4,6,8,11,14, 16,21 15:1,4,6,10 17:17,18 18:3 19:10 20:2,22 21:18 24:11 25:25 26:6,13,21 28:19,24 35:5,12 36:4,20,23 37:1 40:16 41:9,15,19 42:5 43:24 45:22,25 46:7,9,25 47:10 49:13,14,16,21,23

50:1,5,8,14,18,22 51:3 55:5 56:6,8,10, 13 57:15,19 65:18 67:4 69:20 70:8,14 72:20 73:7,13,15 74:2,14,18 76:21 78:1,4,9,13,16,23 79:13,18 80:10 85:21

**hospitalized** 60:15

**hour** 49:23

**hours** 40:24 51:19 52:8,24 53:13,14,20, 25

**hundred** 24:16 26:18 74:13,18

**hundreds** 14:19

**hurt** 15:22 43:20

**hurting** 15:19

**I**

**IA** 34:21 59:2

**ICU** 21:22

**idea** 73:18

**identification** 36:14 59:12

**identified** 54:4 58:8 64:5

**impacted** 70:1

**improperly** 82:21

**incarcerated** 56:3

**incident** 24:24 26:5 27:8 30:2 56:22,24 59:18 64:19 66:16 70:11,21 72:10,14 79:8 80:9

**incidents** 74:1,22

**include** 12:9

**included** 80:11

**including** 78:11

**incorrectly** 64:7

**increase** 29:6,12

**increased** 29:14

**increasing** 29:22

**indecisive** 9:14

**independent** 35:17 41:8

**individual** 28:17 73:22,23 74:12,17 75:15,23 77:7,12,16 80:6

**individual's** 61:3

**individuals** 69:12 74:6

**information** 55:4, 21 57:4 73:2,9,16

**informed** 19:3

**initials** 42:14,20

**inmate** 20:17 21:23 24:24 27:19 28:20 39:17,18 40:5,8 42:1 47:19 53:10 55:7 57:3 60:2,15 61:10 64:5,9 65:13,17 67:8,19 68:18 70:23, 24,25 71:14,19 72:2, 9 73:14 75:16,23 76:2,7,8 77:10,15, 22,24 78:17 79:1,3, 13,14 80:10 81:5,20 82:4,25

**inmate's** 53:10 66:2 67:15 69:20 72:21

**inmates** 15:9,18 17:18 29:1 47:15,17 55:5 83:13 85:20 86:4

**inspection** 41:5 52:15

**inspections** 41:19, 21

**instance** 49:17 84:8

**instances** 34:3 50:6 76:4

**instruct** 16:18 40:7

**instructed** 40:10

**internal** 30:14 63:3,

10,25

**interpretation** 62:17

**interview** 63:10

**interviewed** 30:14 63:15

**interviewing** 63:19

**investigation** 30:13 63:3

**involved** 79:9

**involving** 47:6

**issue** 22:3 33:13 65:12

**issues** 19:20 24:25 25:8,10,15

**item** 59:21

**IVS** 65:23

**J**

**jail** 5:23 6:13 7:3 10:18,19,20,22 11:17 12:4,7,9,22 13:12,15,20 15:16 28:2 37:24 38:13 41:3 57:16,18,25 58:14 77:25 78:3,7, 11 80:16 85:23

**jailer** 8:3

**January** 19:1

**job** 4:25 5:1,2 11:2, 7,9 16:17 36:23

**jobs** 5:20

**Join** 16:15 20:11 25:5 27:17 28:9 29:10 31:7 32:9 33:9 34:16 45:5 47:25 54:10 61:13

**judge** 51:8

**judgment** 28:14,17 30:25 31:5,18,25 32:6,23 33:4,12,14, 20 34:1,7 63:7,12,18 64:2 65:2,6 80:19 81:10,14 82:3,6,11,

18,19,22,25

**jumping** 74:6

**K**

**keeping** 39:24

**kind** 20:22 55:24 61:19 65:10 69:2 71:8 73:18 76:23 78:8 79:11 81:9

**kit** 56:6,8,11,13,21, 25

**knew** 49:22 50:11 59:1 78:2

**knives** 78:12

**Knott** 4:16 16:13 17:9 19:24 20:9,12 22:15 23:25 24:2,7 25:3,6,11,19 26:16 27:16 28:8 29:8,16, 25 30:11 31:6,8,13, 19 32:7,10,14 33:5, 21 34:11 35:8,20 36:9 37:15 43:16,22 44:2 45:4,24 46:14 47:8,23 48:13 49:4 54:9,24 55:15,19 60:7,11,24 61:11,14 62:2,8,14,21 64:15 69:3 71:10,13 75:12 78:21 80:23 81:18 82:12 83:14,17 85:5, 18 86:7

**knowing** 21:15

**knowledge** 79:12

**Kosciuszko** 7:14

**KUGLER** 16:15 19:23 20:11 22:14 25:5 27:17 28:9 29:10 31:7 32:9 33:9 34:16 45:5 47:25 54:10 61:13

**L**

**labeled** 51:16,25 59:17

**labor** 20:3 25:16

26:14 29:4 35:7,13 47:7 48:10 85:2,3

**lack** 19:21

**lakefront** 10:7

**large** 67:7

**late** 6:10

**law** 7:16 8:1 80:13, 18

**lawsuit** 27:21

**learn** 56:4 57:7,9

**learned** 56:2,5

**leave** 31:17 32:5,21 33:3

**left** 5:22 38:22 39:12,16,18 43:1,3, 11 66:4 67:9 68:1 71:1

**left-hand** 38:22

**leg** 80:1

**legs** 66:2

**letter** 30:15

**letting** 42:19

**level** 5:20

**lieutenant** 40:25 41:2,3,18,25 53:3 54:2 63:14,17 65:5

**lines** 66:1

**listed** 59:20

**lobby** 28:2

**locate** 22:20

**location** 37:12

**log** 36:20,21 37:21 53:13 79:18,21

**logbook** 38:8 51:21, 23,25 52:5,9,18,19, 21 53:1,5,6,17,22 54:3 56:17 70:9 83:22,24

**logbooks** 37:24 38:3,6,7

**logs** 51:5 58:8

**long** 4:12 5:16 7:24, 25 9:4,5 18:13 70:11

**longer** 10:21 18:14

**looked** 37:10

**loosen** 76:19

**loosening** 48:4

**lot** 5:12 17:17 25:21 75:5 76:20

**lots** 24:20

**low** 14:19

**Luke's** 20:22 21:25 70:20 80:10

**lunch** 21:9

**lunged** 67:8 68:19

**M**

**made** 25:17 40:24 50:7 52:13 53:24 54:3 84:15

**main** 5:8 25:22 73:13 74:4

**major** 9:14

**majority** 5:3 47:10

**make** 12:1 18:5 23:11 35:4,16 38:3,7 41:23 42:9 64:4 72:18 77:7,11,16 83:11

**making** 75:13,15 85:14

**mandatory** 10:6

**manned** 10:4,11

**March** 39:10 50:17 51:19 52:7,23 53:20 79:18,21

**mark** 24:3 36:12 59:8

**marked** 36:14 37:22 51:14,20 59:12

**marks** 53:19

**matter** 31:12 36:7

**means** 43:5 74:7

**med** 7:2

**medical** 7:2,4 12:3, 5,6,7,14,25 13:1,10, 15 15:3 44:19 47:15, 17 48:24 72:18 76:1

**medically** 13:17

**medications** 28:25

**meet** 37:15

**meeting** 41:8,14

**member** 79:12 84:9, 14

**memory** 41:14

**Mental** 8:9

**mentioned** 24:23, 24 58:24 76:14

**met** 37:10,13

**metal** 18:5

**Milwaukee** 4:11,12, 14,18 5:5,21 7:3 8:9, 22 10:8

**mind** 49:2

**mine** 53:8

**minute** 24:8

**minutes** 42:18

**misheard** 26:18

**missed** 74:9

**misstates** 33:5

**MKE** 36:17 38:17 51:17,21,24 52:2,6, 10,18,20,21 53:1,7, 18,23

**Mm-hmm** 8:14 13:21 37:20 42:24 49:18 67:13 68:10

**mobility** 76:18

**moment** 6:8 69:22 70:21

**Monday** 39:10 49:17 50:16,17 51:18

**monitor** 5:13

**month** 7:21

**morning** 49:9

**mother** 44:25 45:2, 19

**move** 16:7 23:11 79:14 80:20

**moved** 20:21 51:9

**movement** 16:6,10, 11

**Mt** 20:18

**multiple** 32:14 33:6 35:22 36:10 85:7

**N**

**narrow** 46:18

**necessarily** 30:22 51:4 63:20

**needed** 21:23 50:22 61:18 75:4

**needing** 75:8

**neonatal** 20:21

**nervous** 65:9

**nods** 54:25

**normal** 10:14,17 11:1 49:7,8 50:8

**nose** 72:9

**notice** 10:23 30:13 51:4 55:11

**noticed** 72:11

**notify** 66:23

**number** 42:21 51:5 59:10,17,21

**nurse** 21:22 22:1 44:19 70:22 71:1,3

**nursing** 8:16 9:16

**O**

**oath** 4:3

**object** 16:13,17 17:9 19:24 20:9 22:15 25:3,11 26:16 28:8 29:8,16 30:11 31:6, 13,19 32:7 33:5,21 34:11 35:8,20 36:9 47:23 48:13 54:24 55:15 60:24 61:11 62:2,8,14 68:24 71:5 75:3 78:18 80:21 81:16 82:12 83:14

**Objection** 19:23 22:14 85:5

**objective** 73:13

**observe** 25:10,15

**observed** 54:20 70:5 74:13,18

**obstructing** 80:12

**occasion** 11:12 37:2,3 38:4 74:25

**occasionally** 47:17

**occasions** 48:22 59:19

**occurred** 64:22,23 67:17 68:23 69:21 70:8,22 71:25 79:9

**occurring** 70:12

**off-the-record** 24:9

**offhand** 58:3

**Office** 4:11,13,22 5:21 63:25 67:3

**officer** 7:16 8:1 80:12

**officers** 11:18

**officially** 27:14

**one-hand** 81:4

**ongoing** 70:17

**open** 10:25

**opinion** 32:11,12 33:7 62:19

**opinions** 34:14

**opportunity** 55:6,8

**opposed** 11:21

**opposite** 15:11,16, 24

**option** 77:1

**order** 61:18 66:22

**ordered** 71:14,19 72:3

**other's** 34:14

**overly** 16:14 25:6 29:9,17 31:20 35:8, 21 36:10 43:16 47:24 62:14,21 83:14 85:6

**P**

**p.m.** 86:10

**packet** 51:13

**pages** 51:14

**paper** 59:20

**paragraph** 60:14 65:4,11 67:7

**parentheses** 52:24

**Park** 7:14

**parks** 10:9

**part** 10:14,17 11:2,6, 9 25:25 27:25 36:23 39:5,13 40:6,15 61:7 73:24

**participate** 26:6

**participated** 14:16 26:21

**parts** 40:22 51:15

**past** 16:24 34:23 79:11

**patient** 15:3,6 80:4

**patrol** 10:24

**patrolling** 6:1

**pay** 30:23

**people** 10:13,23 11:16 17:14 24:17 28:5,23 40:3,4 46:24 47:2,3,5

perceive 45:15,17

percent 24:13,15

perform 73:21 75:1 78:10

performed 74:11,16

performing 72:20 73:17 74:2 78:13,22

period 30:16 43:12

person 13:7,18 14:7 28:19 36:1 42:3 51:3,6 58:10 63:15 73:19 74:5 76:17 78:3,14,15,25 79:7,8 85:12,13

person's 56:17 76:16

personal 44:3

personally 25:7 70:5

pertains 65:17

phone 25:22 66:24 84:19,21

photo 56:18

physical 22:12 69:11 70:22

pieces 59:20

places 54:15

point 11:6 14:3 17:13 22:11 41:6 50:7 64:1 65:7 69:14

policies 28:16 31:24 32:2,21,23 33:2 34:6,24 63:8

policy 14:23 15:8,12 18:19,22,23,25 19:3, 5,12 20:3,4,7 26:9, 11,15 27:2,11,13 28:7,13 29:23 30:4, 5,24 31:4,9 32:3,5 33:2,18 35:19,24 36:1,2 42:7,9 45:19 65:12,15 77:2 79:24 82:10,15 83:3 84:25 85:20 86:3

poor 80:19 82:3,6

possibility 48:4

possibly 73:19

potential 75:15

potentially 79:9

practice 40:12 44:3, 6,7 45:12 50:4 55:4 77:8 78:9 85:8

pre-med 9:19

pregnant 18:19 19:5 24:12 25:1,16 26:7,14 27:12 29:14, 23 35:6 47:6,10,20 48:9,19 85:1

prepare 37:5,7

prepared 36:22 50:20

present 36:5 44:20 67:1

presented 74:12 75:22 78:16 79:2 83:12

presents 73:23

pretty 40:13

preventing 81:3

previous 40:12

previously 76:14

primarily 5:9

primary 14:21 15:2

prior 34:13,21 39:13 64:8 70:11 72:17

problem 86:9

problems 34:13

proceeded 50:23

PROCEEDINGS 4:1

process 19:7,11 30:4,8 33:17

produced 24:4

professional 47:18

professionals 47:16

properly 82:24

protect 5:4

provider 76:2 77:5

provision 65:16

prudent 77:13,18

psychiatric 8:10

pull-out 21:20

pulled 61:20 68:8

purely 46:21

purpose 37:21 39:23 41:21

purposely 74:9

put 6:4 18:3 42:3 44:6 75:20 76:25

## Q

question 11:18 16:24 17:3 25:4,12 26:17 29:9 31:14,20 32:8,16,17,19 33:24 34:12 36:10 45:9,10 54:12 57:8 60:25 61:1 74:15 76:23 78:20 81:21 82:17 84:1,2,3 85:6,18

questioning 65:16

questions 16:20 62:16 63:20 64:13, 16 74:14,19 77:21 81:23 82:7,10

quick 49:3

quickly 67:21

quote 67:10

quotes 67:11

## R

race 53:11

radio 21:24 56:14,15 66:22

range 46:19

rare 48:22,23 56:22

RAUSCHER 4:6,21 16:16,23 17:21 20:1, 14 22:18,21 24:1,6, 10 25:9,14 26:4,19 27:20 28:11 29:20 30:7,20 31:11,16 32:1,13,17 33:1,16 34:4 35:3,11 36:3, 12,15 44:4,9 45:8,14 46:3,6,17 47:14 48:6,17 49:2,6 54:13 55:1,16,23 59:13 60:9,12 61:8,22 62:6,11,18 63:2 68:24 71:5 75:3 78:18 80:21 81:16 82:2,16 83:20 84:12 85:10 86:8

reach 67:19 68:1 69:13

reached 22:4 23:13 62:4 68:19

react 26:3

read 32:17,19 45:8, 10 52:10 56:8 64:7 67:14 68:6 73:9 84:3

real 17:15

reason 34:19,25 37:14 40:6 48:2 69:4

reasonable 22:13

reasons 45:1 51:11 84:20

reattached 66:16

Rebecca 40:9 41:9 46:22 47:3 54:15 55:12,25 57:7,10,13 83:6,12

recall 26:11 40:11 41:4 58:15,16 64:3 72:16 83:1,18 84:7

received 30:15

recess 49:5

recitement 68:22

recognize 36:16

recollection 41:8 64:18

record 37:23 39:24 64:4 72:22

records 37:25 73:9

recovering 19:8 20:3 25:1,16 26:7,14 29:4,15,24 35:6,14 47:7,11,21 48:10,20 85:2

recovery 19:11 24:19

refer 38:5 68:5

reference 85:20

referred 7:11 63:3

referring 24:20 67:1

reflections 54:7

refresh 64:18

regard 65:12 85:3

release 68:8

reliable 74:8

relieving 58:1,6

remember 16:25 22:24 23:21 27:24 40:18 41:10 46:22, 24 47:13,15 48:14, 18,21 55:24 56:1,2, 10,12,20,22,24 57:1, 4,5,12,13 58:2,4,5, 10,17 63:21,23,24 71:7 74:14,19,21 76:4,6 80:25 85:22

remove 43:14 44:24 46:23,25 47:19 75:9, 14 76:1,8 77:6,11,15 79:24

removed 31:1 43:1, 8,12 45:2,18 48:9 53:4 66:3 75:6,7 76:11 79:19

removing 45:15 48:5,18 75:19

repeat 29:18 32:16 45:7 74:15 84:1

rephrase 16:21 57:8

**replacing** 40:4 76:21

**report** 24:1,2 56:6 59:11,18 72:8 82:7, 17

**reporter** 32:19 45:10 84:3

**reports** 15:18 20:17 21:2

**request** 47:22

**requiring** 85:20

**resist** 72:2

**resisting** 71:15,19 72:3 80:12,18

**respect** 82:4,25 84:25

**respective** 49:21

**respond** 63:20

**responded** 63:22 64:1

**responder** 7:5,7,9

**responding** 63:23

**response** 77:21

**responsibilities** 4:25 5:3,8 14:21,25

**responsibility** 10:22 13:2,13,16,23 15:2

**responsive** 21:4

**restrain** 29:23 34:9 66:21 69:25 75:10, 19

**restrained** 19:9 22:10 26:8 27:7 31:10 39:15,18 40:8 42:3,8 43:2 54:16 65:20,21 66:11,15 80:1 81:4 85:21,25

**restraining** 19:5 28:12 29:4,14

**restraint** 15:12,17 16:4 18:19 32:3,5 33:2,18 43:14,24 44:13 45:2,18 65:12,

17 75:6,14 76:1,9 77:6,11,15 79:19 80:20 81:4 82:9 83:6 84:25

**restraints** 15:9 16:1 19:14,17,21 20:6 22:2 31:1 35:7 46:23 47:1,20 48:9,19 56:14 66:3,6,14,17 67:1,2 83:4 84:24 85:1,24

**restrictive** 15:25 16:3

**result** 72:10,13

**resulting** 60:16

**returning** 80:9

**review** 55:4 72:21

**reviewed** 36:25 55:14

**reviewing** 64:17

**reviews** 34:23

**rise** 71:20 72:5

**rising** 66:12

**risk** 36:5 73:22 74:3, 12 75:16,22 80:3 84:21

**risks** 29:13,21

**roads** 6:3

**role** 5:6

**roll** 16:7 49:20,24 50:1,5,16,20 55:13

**rolling** 15:21

**room** 20:23,25 21:19,22,24 25:23 31:17 32:6,21 33:3, 19 37:12 42:25 43:7 46:1,8,11 56:7 66:24 79:15,20 80:7

**rooms** 20:24 21:18

**routine** 73:8

**routinely** 72:21

**rows** 38:20 39:14 42:13

**rule** 36:2 45:12 76:15

**rumor** 27:22,23

**rumors** 27:14,15

**run** 11:22 12:2,12,19 13:13 14:3

**runs** 10:8

**— S —**

**safe** 15:4,7 41:23 73:15 77:8,12,18

**safety** 5:13 19:20 24:25 25:10,15 28:18 69:19,20 71:3 80:3

**scared** 22:22 69:18

**scenario** 7:17 28:17

**scene** 54:7

**school** 8:17 9:5

**Scott** 60:8

**scratch** 72:9,12

**seconds** 69:16

**secure** 15:4 23:3 41:24 61:18 77:24

**secured** 72:9,10 42:1 66:2,5

**securing** 6:1

**security** 5:13 36:5 73:22 74:3 78:7 84:20,21

**seizures** 20:19 35:25 66:19 67:2 70:1,17

**selecting** 9:14

**sentence** 60:14 65:15

**sentences** 65:25 68:6

**separate** 21:19

**served** 30:17

**session** 5:11

**set** 20:23

**sex** 53:11

**shackled** 35:18

**shackles** 81:5

**shaky** 21:12

**sheet** 37:18

**sheets** 37:21

**sheriff** 5:1 13:6,25

**sheriff's** 4:11,13,19, 22 5:21 7:6 8:4,6 13:4 14:11,17 63:25 67:3 80:16

**shift** 41:20 49:7,8,12 50:15,25 51:5,6,19 52:7 53:20 65:22

**shifts** 21:8

**short** 10:23 49:5

**shorter** 18:15

**shorthand** 53:9

**shouted** 67:22

**shouting** 67:10

**show** 26:1

**showed** 50:20 79:17

**shows** 49:17

**Shutia** 64:6

**side** 15:20 16:8 38:22 66:18,25 67:10 68:1 71:1,2,21

**sign** 39:15

**significant** 80:11, 17 81:20 84:6

**Sinai** 20:18

**single** 46:13 82:17

**sink** 21:21

**sitting** 70:25

**situation** 13:18 43:19 55:10

**situations** 44:21

**slash** 53:19

**slashes** 52:23

**slide** 17:13

**soft** 18:5 66:5,17 67:1

**softer** 18:6

**somebody's** 12:9, 22

**someplace** 75:11

**sort** 5:19 7:9

**speak** 78:3

**specific** 43:19 48:24 58:17 62:24 76:4

**specifically** 40:8,16 41:6,10 56:12 82:5 84:11

**specifics** 47:13 48:21 57:1,12 58:25

**speculation** 22:16 31:8,20 32:10 33:22 34:13 43:17 45:4,24 46:14 47:24 55:19 82:12

**spell** 4:7

**spot** 82:20

**Squad** 53:4

**square** 20:24

**St** 20:22 21:25 70:20 80:10

**staff** 5:14 12:3,6,7, 15,23,25 13:11,15 15:3,7 28:19 44:19 48:24 72:18 73:14 75:16

**staff's** 13:1 67:4 69:20

**stamped** 51:17 52:6,10,20,21 53:1, 7,17,23

**standard** 36:22 50:4

**start** 50:8

**started** 15:15 52:6 53:6

**starting** 21:3 39:9, 10

**starts** 23:23 49:9 51:18 52:22 53:18

**state** 69:23 70:1,3

**stated** 22:5 31:22

**statement** 68:9 71:25

**stay** 44:21

**step** 17:4 66:23

**stint** 6:15

**stop** 11:6 71:15,19 72:3

**straight** 12:2

**straightforward** 32:24 33:3

**struggle** 60:1,17,20, 22 61:5,10,16,21,23 62:1,7,10 67:6,24 68:17 69:5,8,10 71:20

**stuff** 39:11

**subject** 34:22

**subpoena** 37:14

**substance** 59:4

**substantially** 46:5

**substantive** 37:8

**suc** 23:8

**successful** 23:10

**successfully** 68:19

**suddenly** 67:8 68:18

**suicidal** 29:1 36:6

**suicide** 29:6

**suing** 27:19

**summertime** 10:7

**supervising** 34:2

**supervisor** 50:13 54:1 55:21 73:1

**supervisor's** 53:25

**supervisors** 30:16 59:1,3 66:23 80:16 81:7,12

**supervisory** 5:6

**supplemental** 59:11

**suppose** 60:22

**supposed** 17:7 31:10 42:7 85:23,25

**surrounding** 6:3

**surroundings** 21:7, 15

**suspended** 30:21 34:9 64:21

**suspension** 30:16, 17 59:25

**sworn** 4:3

**symbol** 39:17 53:9

**system** 38:5 74:10 81:4

**T**

**taking** 22:13

**talk** 58:13 59:3 84:17

**talked** 48:8 58:19,22 59:6

**talking** 47:2 50:12 64:9,10 67:25

**talks** 60:1

**task** 73:17

**technically** 78:10

**telephone** 77:23

**tells** 15:8

**ten** 7:25 34:20 46:20 49:15

**terminology** 12:1

**terms** 74:3

**Terry** 40:9 41:9 46:22 54:15 55:25 57:13 58:13,16,20 59:9 83:6,12

**Terry's** 47:3 55:12 56:10 57:8,10 72:25 79:19

**testified** 4:4 72:19 74:25

**testimony** 33:6 48:14

**tests** 48:25

**thin** 17:15

**thing** 18:6 25:22 32:2 65:10 77:13,18

**things** 5:4 7:17,20, 22,23 10:1,9 15:5 18:3 28:25 29:1 62:19 68:14 74:4 75:21 76:24

**thinking** 11:22 44:25 51:10

**thought** 29:13,22 31:3 34:23 83:21

**threats** 25:17,20

**three-quarters** 71:18

**Thursday** 53:19

**tight** 16:9,12 17:12, 19,25 48:4 76:12,19

**tightly** 17:7

**tightness** 17:1

**time** 7:13 9:5,12,13, 17 21:11 23:9,17 27:6 30:5 33:19 34:20 35:21 43:12 49:22 50:6,8 54:8, 21,23 57:11 65:19 66:5 69:14 76:22 78:15 79:1,8

**times** 7:11 9:25 17:17 24:21 25:21 31:10 35:5 48:18 54:16 67:12,23 68:21 69:6 75:5 76:20

**title** 5:1 8:10

**today** 11:9,11 27:8 37:2,5,8 58:23

**toilet** 21:20

**told** 27:14,24 30:9 31:23 32:22 33:11, 25 40:16 50:13,18, 21 55:13 57:17,24 58:2,10 59:1 63:17 65:1,4 70:13,19 76:12 80:24 82:3,5, 21,24 83:3

**top** 51:16,17 52:12 53:7

**total** 5:23

**touch** 23:15 68:4 84:14

**touched** 23:16

**touching** 23:19

**towel** 76:25

**trained** 28:15 38:7

**trainer** 38:14

**training** 7:4,7,10,14, 18,19 8:3,18 38:11

**TRANSCRIPT** 4:1

**transferred** 70:16, 19

**Treatment** 8:12,13

**triangle** 53:9

**true** 34:18 68:13,14 70:8,23 75:23,24 77:3 80:13,14,15 86:5

**Tuesday** 52:7

**tugging** 68:7

**turn** 40:19

**turned** 71:21

**twelve** 67:12,22,23 68:20

**twisted** 22:7,25 61:17 62:5 69:15

**two-point** 15:9,17 16:3 85:24

**type** 7:17 18:6 73:25 74:4

**typical** 11:2

**typically** 15:6,8 17:16 40:15 44:12 55:8 56:13 65:10 79:14

**U**

**uncontrollable** 20:19

**underneath** 21:21 39:2

**understand** 11:17 16:20 34:5 35:10 54:11 61:1 82:23

**understanding** 70:16

**undid** 22:2

**unit** 20:21

**units** 8:11

**University** 8:23,25

**unresponsive** 20:20

**unrestrained** 60:16

**unrestraining** 27:12

**unsecure** 78:1 79:6

**unstable** 21:12 22:8

**unstableness** 22:9

**unsuccessful** 30:18

**UWM** 8:22

**V**

**vacation** 51:8

**vague** 16:13 17:10 20:10 25:4 29:9,17 31:20 33:22 34:14 35:8,21 36:10 43:16 47:23 60:25 61:14 62:14,21 85:6

**vast** 5:3

| | | |
|---|---|---|
| **vehicle** 7:19 | **Wednesday** 52:23 | **written** 77:2 83:22 84:13 |
| **versus** 47:15 64:19 | **week** 37:4 | **wrong** 16:17 |
| **vertical** 52:23 53:19 | **weeks** 7:25 8:2 | **wrote** 39:21 41:25 53:12 54:19 59:17, 19 |
| **viewed** 81:19 | **West** 12:24 13:1 | |
| **viewpoint** 61:3,4 | **whatnot** 21:7 | |
| **violate** 30:23 | **Whitinger** 52:15 | **X** |
| **violated** 31:4 83:3 | **Williams** 23:22 | |
| **violent** 74:4,5 | **Wisconsin-milwaukee** 8:23,25 | **X-RAY** 48:25 49:1 75:1,5,8 |
| **visiting** 28:2 | | |
| | **woman** 19:7 20:6 26:7 30:9 31:1 34:9 35:6,18 36:5 43:15, 25 44:13 48:8,10,19 | **Y** |
| **W** | | |
| | **woman's** 23:21 | **year** 30:2 |
| **waist** 22:5 | **women** 18:20 19:6, 10,15,18 20:2 24:12 25:1,16 26:14,22 27:12 29:4,14,15,23, 24 35:13 47:6 74:13, 18,22 85:1,2 | **years** 4:14,15,19,23 5:18,20,24 6:4,6 7:8 8:8 9:7 14:19,22,24 15:13 41:7 58:18 |
| **walk** 5:19 | | |
| **wall** 66:24 | | **yelled** 68:20 |
| **wanted** 75:1 77:23 | | |
| **wanting** 25:21 | | |
| **washcloth** 18:4 | **word** 53:10 | |
| **watch** 11:5,21,24 14:1,4,6,11 15:1 21:1 25:25 26:6 35:5 36:4,20,21 37:1 40:16 41:19 42:5 43:24 49:13,14,16, 21 50:1,5,9,14,19,22 55:17 56:6,8,11,13 57:19,21,22 60:16 65:18 72:20 73:2,7, 14 74:2,14,19 76:21 78:13 79:13 | **words** 11:1 83:2 | |
| | **work** 4:10 5:9 6:22 11:5 17:20,22 27:25 28:1 50:21,22 55:11 64:20 | |
| | **worked** 4:12,18 5:25 8:9,11 | |
| | **worker** 8:11 | |
| **watched** 74:22 | **working** 8:4 50:15 | |
| **watches** 10:5,11,13, 16 11:11,15 14:16, 22 19:10 20:2 24:11 26:13,22 35:13 36:23 45:22 46:1,7, 10,25 47:10 55:5 74:23 78:22 | **wrap** 81:9 | |
| | **wrist** 15:10,25 16:5, 12 17:5,8,24 18:11, 17 39:2,3,16,19 42:1 43:1,8,12,14,24 44:12 45:2 66:3,4 75:14 76:16,25 79:19,24 83:6 | |
| **watching** 20:16 24:22 28:20 71:8 78:15,17 79:2,3 | **wrists** 42:25 | |
| | **write** 40:7 50:4 83:24 | |
| **ways** 17:19,22 | | |
| **weakened** 70:3 | **writing** 39:23 52:6, 11,20 53:8,12,14,18, 21,23 | |
| **weapons** 78:8 | | |