June 25, 2018

Attorney Douglas S. Knott
218 N. Milwaukee St., Suite 710
Milwaukee, WI 53202

Dear Mr. Knott:

This letter is in reference to :  Rebecca Terry v. Milwaukee County, et al.
                                          USDC 17-cv 1112

I have been requested to review the care and treatment provided to Ms. Rebecca Terry before and after the birth of her child in the Milwaukee County Jail on March 10, 2018, and to address issues relevant to the matter within my expertise as a board-certified obstetrician and gynecologist. Specifically, I have been requested to review and comment on care provided at the Milwaukee County Jail in March 2014, as well as the prenatal care Ms. Terry received, the assessment and treatment she received at Froedtert Hospital, and postpartum care at Aurora Sinai Hospital and the Milwaukee County Jail. I have also been requested to review and comment on any allegations that may be made by Ms. Terry, her treating healthcare providers, or her retained experts to the extent such allegations fall within the scope of my professional expertise.

I am currently a practicing obstetrician and gynecologist at Aurora West Allis Medical Center's Women's Pavilion, located at 8905 West Lincoln Avenue, Suite 515, West Allis, Wisconsin 53227. A full copy of my *Curriculum Vitae* is attached to this Affidavit as Exhibit A and incorporated herein by reference. I received my undergraduate degree from the University College Galway in Galway, Ireland, in 1968 followed by a medical degree from National University of Ireland in Galway in 1973. I completed an internship at St. Joseph's Hospital (1973-1974) in Milwaukee and completed Residency Training in Obstetrics and Gynecology at that same institution from 1974 through 1977.

I am board certified in obstetrics and gynecology (1977) by the American Board of Obstetrics and Gynecology and certified by the American Institute of Ultrasound in Medicine and the International Society for Clinical Densitometry. In addition to my practice at Aurora West Allis Medical Center, I am an Associate Clinical Professor at the Medical College of Wisconsin and the University of Wisconsin-Milwaukee. I have 40 years of experience in gynecology and obstetrics.

My fee schedule for expert work is as follows: $400.00 per hour for document review; $600 per hour (minimum 2 hours) for depositions, $2,500 per half day $5,000.00 per full day of trial testimony.

A list of cases in which I have testified by deposition or at trial as an expert in the last four (4) years is attached as Exhibit B.

I received the following records in connection with this matter and will base my testimony upon the facts and opinions set forth in the following, as well as my professional training and experience:

1. Summons and Complaint.

2. Wenzel Incident Report.

3. Milwaukee Co. Sheriff's Office Correctional Health Services Report (Mke Co. 81-114).

4. Aurora Sinai Medical Records – March 10, 2014 to March 13, 2014 (Aurora HC Post-Partum 071-286).

5. Froedtert Hospital Records – March 9, 2014 to March 10, 2014 (Terry 296-389).

6. Deposition transcript of Rebecca Terry.

I may receive additional medical records as they become available and as discovery progresses.

I may use medical records, x-rays, CT scans, MRI's, other diagnostic media, models, notes, reports, summaries, books, literature, policies and protocols, medical illustrations, drawings, diagrams, charts, posters, photographs, videos, animation, physical objects, and multi-media to demonstrate my opinions to the court and jury. No such demonstrative exhibits have been prepared at this time.

I expect to address any topics relevant to this matter within the scope of my professional expertise and training, including, but not limited to, the following:

1. The significance of Ms. Terry's gynecological and obstetric history, including her experience with pregnancy, labor and delivery. Specifically, she presented with a history of multiple pregnancies and abortions with associated dilation and curettage procedures. Patients experiencing such procedures may have injuries of tissues of the cervix, causing

it to open rapidly and contributing to precipitate delivery and birth. Alternatively, injury to the tissues may cause the cervix to not progress normally.

2. The significance and effects of drug abuse on pregnancy, labor and delivery, including the potential for street drugs to trigger premature labor or anesthetize the patient such that she does not experience labor as other mothers do.

3. The natural course of labor and delivery, including explanation of the terms "antepartum," "intrapartum," "postpartum," and "precipitous delivery."

4. Precipitous births may occur with as few as three (3) pushes and are often unattended by medical personnel.

5. Ms. Terry was appropriately sent for assessment at Froedtert Hospital on March 9, 2014. There is no evidence that she was in labor while at the Jail prior to being assessed at Froedtert Hospital.

6. Ms. Terry's chief complaint at Froedtert Hospital was to be cleared for admission to the Jail. She did not self-report signs or symptoms consistent with the onset or experience of labor.

7. I will discuss the process of assessment, diagnostic testing and findings at Froedtert Hospital.

8. Patients with a significant history of prior pregnancies, such as Ms. Terry, often present with early effacement and opening of the cervix. Ms. Terry was noted to 80% effaced with 2 cm dilation. That status did not change or progress during the time she was monitored at Froedtert Hospital.

9. Ms. Terry was not in labor at the time of her discharge from Froedtert Hospital. She was stable and appropriate for discharge from the hospital and, per the Froedtert Hospital physicians, admission to the Jail.

10. Ms. Terry was not in labor at the time of her arrival at the Milwaukee County Jail at approximately 1:05 on March 10, 2014.

11. Ms. Terry reported some pressure at the bottom of her stomach upon her return to the Jail. She was asked and denied having contractions at that time.

12. As an experienced mother, I would expect that Ms. Terry would be familiar with the onset of labor, the recognition of contractions, and signs of impending delivery.

13. The booking nurse called the on-call doctor, who authorized admission of Ms. Terry to the Jail and housing in the Special Medical Unit. She also instructed the Jail nurse to contact Froedtert to discuss whether she was appropriate for methadone treatment. Per the Jail records, the booking nurse did contact the Froedtert labor and delivery department to discuss their assessment of Ms. Terry and to obtain additional documentation.

14. Based on my review of the Froedtert Hospital and Jail records, there is no reason to believe the course of events would have changed had the Froedtert sent additional documentation with Ms. Terry. The Froedtert staff concluded she was not in labor and was stable for admission to the Jail.

15. There is no evidence in the record to suggest that the Froedtert staff felt that heightened monitoring of Ms. Terry was necessary. Similarly, there is no evidence in the record to suggest that the on-call Jail doctor recommended heightened monitoring of Ms. Terry.

16. Based on her own description, as well as the recorded notes of the booking nurse, Ms. Terry was not in labor before arriving at her cell in the Special Medical Unit. Specifically, she reported no significant changes in her symptoms from the time of

discharge from Froedtert Hospital until after she was in the Special Medical Unit for a period of time.

17. Ms. Terry is unable to report or estimate how long after arrival at the cell she began to experience a change in her symptoms.

18. There is no evidence that any nurse was made aware of a change in her condition from the time of her discharge in stable condition from Froedtert Hospital to the time she delivered.

19. Ms. Terry experienced a precipitous delivery that provided relatively little time for healthcare provider intervention.

20. I will discuss the potential anesthetic effect of Ms. Terry's drug use and its impact on her perception of labor pain. Ms. Terry was in a relaxed and sedated condition and appears to not have appreciated the signs and symptoms of labor as other laboring mothers would.

21. Ms. Terry successfully delivered her baby without assistance.

22. The Jail staff and EMS services appropriately responded to the event after the delivery was noted.

23. The EMS reported the onset of the event was 10 minutes before the EMS was called.

24. Ms. Terry did not suffer additional physical injury as a result of the circumstance of the birth.

25. Ms. Terry suffered a second-degree perineal tear, which is a common result of vaginal delivery and occurs commonly during deliveries at hospitals that are attended by obstetric specialists. Published literature suggests perineal tears occur during 53% to 79% of vaginal births.

26. It is unlikely that any intervention by an obstetric specialist at a hospital would have prevented Ms. Terry's perineal tear.

27. Given Ms. Terry's precipitous delivery and her medical history, it is unlikely that significant interventions, such as an epidural pain block, would have been utilized had she been admitted to a hospital at the onset of her intrapartum period.

28. It is speculative to assume that Ms. Terry suffered additional pain as a result of the circumstance of her birth in the Jail.

29. The Aurora Sinai Hospital nursing note indicates Ms. Terry was drowsy and difficult to arouse at 8:05 a.m. She elected to bottle feed the baby at that time.

30. Ms. Terry was unable to give a complete history upon her admission to Aurora Sinai due to "maternal exhaustion." The examining physician noted she was in "no apparent distress." She was given Lidocaine and the perineal laceration was repaired.

31. Ms. Terry's baby did not suffer any injury or complication as a result of the circumstance of his birth. While Ms. Terry reports that the child suffered a potential injury of a mucus membrane, there is no medical record confirming that report. The baby was reported to be grunting with mild subcostal retractions, increased tone and tremulousness. Those symptoms are not attributable to the circumstance of the child's delivery. The Aurora Sinai Hospital record indicates that the baby was taken to the Neonatal Intensive Care Unit for treatment of suspected opioid withdrawal.

32. Ms. Terry's laboratory results indicate are unremarkable.

33. Ms. Terry began to experience nausea and vomiting in the late morning. She was noted to be going through withdrawals at 2:15 p.m. She was given anti-nausea medications (Zofran, rectal Phenergan, Clompazine, Clonidine, and Percocet) to treat withdrawal. An IV was started at 4:44 p.m.

34. A psychiatrist, Dr. Herzl Spiro, assessed Ms. Terry at 11:10 p.m. He noted her history of multiple dilations and curettage procedures. He noted that she had been through agonizing withdrawals in the past and "would appreciate being detoxified here in the hospital in a safe manner." He noted her mood was "somewhat down," primarily due to legal concerns, i.e., her arrest and financial concerns. Dr. Spiro noted she "is about to go through withdrawal from heroin addiction." He noted she received opiates to manage her pain through delivery and "feels prepared to go through the withdrawal." Her stressors were noted to be "severe with the financial worries." Dr. Spiro recommended detoxification in the hospital for 72 hours.

35. Dr. Spiro noted at 7:01 p.m. on March 11, 2014 that Ms. Terry "is beginning the withdrawal."

36. I have provided care to patients who are in custody and restrained at the time of my interactions and treatment.

37. Ms. Terry was not restrained at any time in her intrapartum period (i.e., her labor and delivery).

38. There is no evidence in the hospital record of Ms. Terry being restrained at Froedtert Hospital during her assessment there. If she was restrained, there is no evidence that the restraint impacted her ability to receive assessment, care and treatment.

39. Ms. Terry's care and safety was not compromised at any time as the result of her restraint at Aurora Sinai Hospital in the postpartum period.

40. Ms. Terry appears to have received routine postpartum assessment and monitoring at Aurora Sinai Hospital from March 10, 2014 to March 13, 2014. There is no evidence of a complication of her delivery.

41. In my experience a mother who experienced an uncomplicated delivery like Ms. Terry would typically be discharged from the hospital within 24-48 hours of delivery.

42. The primary reason for Ms. Terry's extended hospitalization from March 10, 2014 to March 13, 2014, appears to be so that she could receive monitoring for her withdrawal.

43. There is no evidence in the medical record that Ms. Terry was diagnosed with Post-Traumatic Stress Disorder during her hospitalization at Aurora Sinai.

I hold my opinions to a reasonable degree of medical certainty.

I may review and discuss the pleadings, discovery responses, expert reports, expert depositions, other depositions, medical records including the prenatal records, labor and delivery records, newborn records and any other records provided during the course of discovery to date or in the future.

This letter is prepared by myself with the assistance of counsel.

Sincerely yours,

*[signature]*

James D. Dolan, M.D.