# REPORT ON SETTLEMENT AGREEMENT IN THE CHRISTENSEN CASE

## MILWAUKEE COUNTY JAIL AND THE HOUSE OF CORRECTIONS

### July-August 2013

## Introduction

This review was conducted between July 29 and August 5, 2013. Since the last review, approximately one year ago, the parties reached agreement with regard to the minimal staffing requirements that were developed by the court monitor. In addition, the sheriff let a contract for health services to a private vendor. The vendor was tasked with hiring all of the vacant positions within the agreed upon minimal staffing. Around May 13, the vendor put in place key leadership positions, including the program administrator and the medical director. The chief psychiatrist had been hired approximately a month and a half earlier. This report will describe the changes brought about by the vendor. However, since the review was conducted less than three months after the vendor's leadership team came onsite, many of the clinical problems identified are a reflection of the problems with the system they inherited. The program administrator, as well as the medical director are committed to remain in place at least through the end of this year or longer while the permanent administrator and medical director are recruited. This monitor views this report as a baseline of the care provided at the time of the takeover whereas the next report will demonstrate the extent to which the new leadership team has been effective in implementing improvements. It is anticipated that the next monitoring visit will take place in either late November or early December of this year. I will use the same format as used in the previous report in that for each major paragraph of the agreement, there will be a compliance status as well as findings that describe the basis for the compliance status and finally, where indicated, specific recommendations.

## I.  HEALTH SERVICES PROGRAM STRUCTURE

**Compliance Status:** Partial compliance.

**Findings**

### A.    Program Administrator

As indicated in the introductory paragraph, since May 13, the vendor has placed in the position of program administrator an individual with both appropriate credentials and experience. The monitor is favorably impressed with the multiple areas to which the administrator is focusing his attention. Probably the most critical focus of his attention is staffing, which we will discuss in detail in the appropriate section. I reviewed a set of corporate policies that dealt with both administrative structure as well as program operations. Although the policies were generally reasonable, they have not yet been customized to the reality of the Milwaukee County Jail and House of Corrections. An

**EXHIBIT 52**

example of the need for the customization can be found in the policy on the booking screen and health assessment. The corporate policy describes a process in which a screen is completed by a nurse and a health assessment follows within 14 days. Given the level of illness entering an urban jail, both the prior program leadership and the vendor's program leadership believe that it is in the best interest of patient care to utilize a system in which the booking nurses are provided fairly detailed definitions of differing acuity levels. The acuity levels correspond to defined timelines within which the patient is to receive assessment by an advanced level provider. The policy will describe the definitions for each acuity level, which will determine the urgency of health assessment by an advanced level practitioner. This is consistent with the revision to the NCCHC standards of 2008. Therefore, the corporate policy must be customized to both reflect this reality and to provide the specifics of how these acuity levels are defined. There are many other operational policies which also must be similarly customized. As I have indicated to the leadership team, in my experience, these policies and procedures must be written for primarily a nursing audience, so that nurses who work regularly at the jail and also those who are brought in from a registry have clear direction as to what specific tasks they must accomplish, whether it be for the booking process, urgent care, sick call or providing services in the infirmary. Although much remains to be done, I believe the leadership team is quite capable of ultimately achieving the goals.

**Recommendations:**

1. Customize medical operations policies and procedures beginning with the booking and health assessment policies. I would be happy to review drafts prior to implementation.
2. Continue to aggressively pursue filling the vacant positions.

## B. Medical Director

I spent a substantial amount of time with the new Medical Director and believe that related to his background credentials and experience, he is an appropriate candidate who can successfully accomplish the requirements. As with the Program Administrator, I enjoyed working with him and am optimistic about the ultimate outcome. He will also be intimately involved with the customization of the medical operations policies and procedures and we had several discussions with him about some specifics. In addition, we reviewed many records together and shared an understanding of which records demonstrated appropriate performance, along with which records needed specific improvements in performance. He has begun making rounds in the infirmary and he has begun to see referrals from the staff. I am concerned, as I have indicated to him, that some of the nurse practitioners may be so accustomed to handling complex cases in the absence of a physician resource that one of his challenges is to encourage more referrals. The Medical Director is now determining all patients who are sent offsite for scheduled services. He is also to be notified of any unscheduled send outs, and this is happening to some extent.

**Recommendations:**

1. The Medical Director should develop some criteria for the nurse practitioners which if present, require a mandatory referral to him. The definition for the

2

required referrals should include both disease complexity as well as poor disease control.

2. A regularly scheduled clinical discussion with the nurse practitioners from each site would be advantageous to the development of trust as well as facilitating referrals.

## C.   Physician HOC

This position remains vacant, although recruiting efforts are clearly underway. There is a physician working 20 hours per week at the HOC who will be transferred to the downtown jail when the full-time HOC position is filled. As I indicated to the Medical Director, especially at the House of Corrections, there has been an absence of physician input and leadership for many years. Thus this physician will need to actively assert his/her clinical leadership.

Recommendation:

1. Fill the HOC physician position.

## D.   Psychiatrist

Since about six weeks prior to the vendor leadership team arriving onsite, a psychiatrist was hired to work as the Chief Psychiatrist for both facilities. She also is both well credentialed and experienced, and has begun to provide the type of clinical psychiatric leadership so sorely missing. She is extremely busy seeing a variety of sicker patients, especially at the downtown jail, and has also begun to work closely with the social workers, the psychiatric nurse and the psychiatric nurse practitioner.

Recommendation:

1. Work on mental health policies that address use of therapeutic restraints as well as both emergency and nonemergency use of enforced medications.

## E.   Nursing Director

The Nursing Director is still in place; however, her responsibilities are focused primarily on achieving NCCHC accreditation as well as the quality improvement program. My understanding is that hiring of nursing staff is being accomplished by the vendor's leadership team. One of the vacant positions is the Associate Director of Nursing, which is being actively recruited by the vendor's leadership team.

Recommendation:

1. I would encourage the program to send the person or persons responsible for leading the accreditation effort to the Fall NCCHC conference for training based on the NCCHC standards.

## F.   Nurse Practitioners

The budget provides for 12 advanced practice nurse practitioners and this number includes the psychiatric nurse practitioners. The current number of filled positions is 7.8, leaving 4.2 vacancies. At least one of the vacancies is a psychiatric

3

nurse practitioner, and it is my understanding that there are recruiting efforts to fill these positions. In our review of records, we found among the medical nurse practitioners both clinical performance issues as well as policy compliance issues. This is to be expected in the absence of leadership review and feedback to these clinicians. This is one of the challenges we discussed with the Medical Director and I believe he will prove up to the challenge.

**Recommendation:**

1. Fill the remaining 4.2 nurse practitioner positions, including both medical nurse practitioners as well as psychiatric nurse practitioners.

### G.    Staffing

As a result of the recent review of staffing needs and the agreement among the parties, the current minimal number of staffing required is 131.5 positions, reflecting both leadership and line staff for all health services. The number of vacancies is 18.6 positions, which yields a vacancy rate of about 14.1%. This is an improvement over the vacancy rate of a year ago, which was about 21%. The vendor clearly warrants credit for their successful recruitment. Key positions that yet remain to be filled are one physician position at the House of Corrections, a total of 4.2 nurse practitioner positions, an Associate Director of Nursing position, a quality assurance RN position, an infection control RN position and a staff development RN position. Also to be filled is a half-time RN supervisor, a part-time registered nurse and 5.4 LPN positions of a total of 26 LPN positions. Also vacant is a medical records supervisor, one psychiatrist and a mental health psych nurse. Given the early success of the vendor as a result of their recruiting efforts, I am optimistic about the vacancies being filled.

**Recommendation:**

1. Fill the remaining vacant positions.

## II.    MEDICAL SERVICES

**Compliance Status:** Partial compliance.

**Findings**

### A.    Intake Screening

#### 1.    Triage

With the introduction of an adequate number of registered nurses and licensed practical nurses, intake screens are being performed by registered nurses. The exception for prescreens being performed by registered nurses only occurs when there is an exceedingly heavy intake during a shift and an LPN assists with performing some of the prescreens. Nonetheless, the screen itself is performed by a registered nurse. From our review, given the desire and plan to utilize the new option (since 2008) to meet NCCHC standards, the intake screen should be comprehensive for everybody and this includes performing vital signs

4

and, where indicated, a fingerstick for diabetics and a peak flow measurement for patients with lung disease. These items were sometimes not evident in the screens we reviewed, although frequently they were. The other related part of the intent of this revision to the standards is that individuals with positive screens are to be seen by an advanced level clinician by the third day of the admission. This also is not being consistently accomplished. In fact, frequently it was not accomplished. The philosophy behind this change is that if someone has a completely negative comprehensive screen, the physical exam is not likely to add much value. However, individuals with positive screens should be seen earlier in the admission process so that their problems can be adequately addressed. In order to effectively implement this process, a program should utilize an acuity scale that provides detailed direction to the nurses performing the booking screen so that they can schedule the follow-up with the advanced level provider and time it based on the acuity scale guidance. The Medical Director is committed to developing such a scale and then training the nurses as well as the nurse practitioners on the requirements for implementing such a process. Additionally, there has been no organized approach to providing feedback to either the nurses or nurse practitioners regarding their performance. Thus, it is not surprising that in records we reviewed, performance issues with regard to the quality of the work were identified.

**Recommendations:**
1. Develop the acuity scale and send a draft to the monitor for review.
2. After the acuity scale is finalized, begin training both nursing staff and nurse practitioners in the implementation.
3. After implementation, begin performing systematic reviews of the performance of each nurse as well as each nurse practitioner, including constructive feedback with regard to how they may improve their performance.

## 2.   Referrals

This section is a continuation of what was described under the section on intake screening. We observed a series of deficiencies with regard to performance of this process by the nurse practitioners which create liability, both for the patients and the County. An example was a patient with type 1 diabetes who, it was determined, did not need to be seen by the nurse practitioner because he had had a prior exam less than a year before the current intake. The policy that allows not repeating a history and physical, first of all, should be limited to a six-month duration. Second, it should not be applied to patients with very serious and/or complex diseases. To repeat a physical exam on a healthy patient in less than a year would provide relatively little, if any, value. On the other hand, getting a much more detailed interval history and performing a relevant physical exam related to the patient's problems as well as the patient's interval history is crucial, regardless of when the patient was last seen. The reasoning behind allowing the avoidance of certain examinations is related to the probability of yield. Patients with complex diseases or difficult to control diseases must be seen independent of the prior admission. In addition, there were several

5

records in which the nurse practitioners took credit for performing an IPA (independent physical assessment) as if they had also performed the first chronic disease visit for that patient. The problem with that approach is that an initial chronic disease visit must include a substantial amount of disease related history which is not available when one performs a history and physical which is not formatted to prompt initial chronic disease baseline history. One could use an initial chronic disease form, such as for hypertension or diabetes, and get credit for a history and physical but never the reverse. We also found instances in which significant positive findings identified during the intake screen were not elaborated on during the conduct of the IPA. A well-designed electronic record should take the positives from the screen and put them on the IPA screen with text space next to each positive so that the practitioner is forced to elaborate on the details of the relevant positive history before performing the physical exam. We also found records where diagnostic and/or therapeutic interventions along with assessments were not appropriate. In some records, the subjective portion of the IPA appeared to be less than minimal. None of these findings are surprising, given the absence of clinical leadership, resulting in an absence of organized and constructive review and feedback to the practitioners.

**Recommendations:**
1. Implement the recommendations under the section Intake Screening.
2. Redo the chronic care program so that critical subjective data is captured at the initial chronic disease visit.
3. Change the policy of not completing a physical exam if a patient had been in less than a year to a standard of less than six months and exempt patients whose problems are significant or complex from the ability to skip the physical exam.
4. Review the corporate guidelines, particularly with regard to diabetes and the treatment of type 1 diabetics, so that it is consistent with the guidance provided by the "Up To Date" medical database.
5. Per the discussions we had during our visit, make available to all of the clinicians the Up To Date database.

## B.    TB Screening

**Compliance Status:** Partial compliance.

### Findings

During our visit, I was pleased to witness the Medical Director e-mail exchanges with an official from the state Department of Health. Her recommendations in her July 30 e-mail should be implemented and I clearly understand that you have every intention of doing so. As a general rule, where there may be significant public health issues, it is always helpful to communicate with the Department of Health and where possible, utilize their resources. In summarizing her recommendations, they include, when utilizing a QuantiFERON test, drawing it on the same day that the positive skin test is read, utilizing the no charge sputum testing service at the state lab of hygiene, and her suggestion with regard to use of chest x-rays only when a person with prior

6

disease/infection has a known exposure to someone with active disease or has symptoms. These changes should simplify your process.

**Recommendations:**
1. Modify your TB control policy to coincide with the Department of Public Health recommendations.
2. Provide training to the staff regarding any changes to your TB control policies and procedures and the basis for those changes.
3. Implement the revised policy.
4. Begin to have your QI program monitor compliance.
5. Recruit an infection control nurse.

## C.   Physical Examinations

**Compliance Status:** Partial compliance.

**Findings**

This area has been addressed under II.A.2 Referrals. Under the new policy, when a patient has a completely negative screen, a physical examination is not required. Therefore, the policy requires physicals to be done on fewer patients but to be performed much earlier on those who have problems. Additionally, as indicated in the section on referrals, the use of a year is not appropriate when deciding if the requirement of a physical assessment may be waived. Six months can be used, but only for patients who do not have significant problems. Since you are only going to be doing physical exams on patients with problems, this particular part of the policy may be eliminated.

**Recommendations:**
1. See recommendations under II.A.2, Referrals to advanced level providers.

## D.   Sick Call

**Compliance Status:** Partial compliance.

**Findings**

### 1.   Nurse sick call

Although sick call services are to some extent being provided, the system is by and large broken. There are sick call boxes in each housing unit which are unmarked and therefore are likely to attract paper deposits other than sick call requests. In addition, there is no mechanism to determine whether seven days a week the slips were picked up from each box in each housing unit. In fact, in one of the housing units we entered, when the Health Service Administrator opened the box, it was predominantly filled with trash and at the bottom was a grievance submission from April 2012. Not only is the front end of the process broken, but also there is no log maintained based on the triage of the slips and therefore no vehicle to facilitate clinical performance improvement. Previously, we had commented on the poor quality found in the documentation and the rarity with which the formatted protocols were utilized. In this instance, not surprising, not

7

much has changed. Rather than elaborate on the deficiencies, I will describe in the recommendations what should be implemented.

## 2. Advanced level provider sick call

From my last report, it appeared that the timeliness goal of practitioner visits occurring within five days of the referral was occurring 95% of the time. The problem is when the collection process is broken and the nurse sick call process results in poorly documented encounters, it is obvious that the practitioner part of the process will also be improved if the earlier aspects are addressed. Once again, we found opportunities for improvement with regard to the documentation by the practitioners of subjective data and also, at times, of objective data; sometimes with the appropriateness of the assessment and other times with the appropriateness of the plan. Again, this is not surprising, given the absence of an organized program to facilitate clinical performance enhancement.

## Recommendations:

1. Insure that an appropriately labeled lock box only used for health service requests is available in each housing unit.
2. Implement a system that enables the administrator to have confidence that each housing unit has its slips picked up and then triaged by the charge nurse on a daily basis.
3. Implement a sick call log which documents the date, the name and identification data for the patient, the presenting complaint and the date that the patient was seen for a face-to-face assessment. In addition, it would be helpful to know if the patient was referred as a result of the assessment to an advanced level provider.
4. Implement a clinical performance enhancement review of the services performed by each registered nurse. This program should require relatively frequent review with feedback discussing specific records with each clinical nurse until the supervising nurse finds the performance meets the appropriate threshold. When that is achieved, less frequent review, possibly as infrequently as quarterly, can be performed.
5. Implement a similar program with the physicians reviewing the work of the nurse practitioners in an analogous way, in that more frequent reviews with feedback at the beginning and then less frequent after the performance has met an appropriate threshold.
6. Begin running monthly reports that track the time from receipt of sick call requests to nurse face-to-face assessment as well as monthly reports tracking the timeframe between nurse referral to advanced level clinician and that encounter being documented.
7. When nurses see patients cell side, this cannot be characterized as an assessment; rather, it is a face-to-face triage. The timeframe for an assessment has not been met when a face-to-face triage occurs; therefore, if there is a referral to an advanced level provider, that referral must take place literally within one or two days at most.

8



## E. Chronic Care

**Compliance Status:** Partial compliance.

**Findings**

I reviewed the chronic care guidelines and program statement. The guidelines need to be updated, particularly with regard to the approach to the patients with type 1 diabetes. In addition, although there is reference to the use of disease control, I believe the program would be improved if there was greater emphasis on the strategy of working with the patient to successfully implement a philosophy of each patient achieving good disease control as rapidly as is clinically appropriate. In addition, the Medical Director and I reviewed some chronic disease forms developed for the NCCHC. Those can be used to inform the screens in the soon-to-be implemented medical record software. As alluded to in the section on physical examination, in the records we reviewed it was common to find nurse practitioners performing an IPA (physical exam) on newly admitted patients with chronic disease and also simultaneously opening up the chronic disease encounter form but only writing into that "see IPA." As indicated previously, the IPA form does not contain any specific elements that should be required of a chronic disease specific history for an initial chronic disease visit. Thus, when you use the IPA form and not a chronic disease initial visit form, the history is consistently inadequate. This was reviewed with the Medical Director and part of his plan is to retrain the nurse practitioners with regard to these issues. We found cases where a patient came in with a history of a chronic disease and yet there was no chronic disease visit for more than three months, until the patient suffered a consequence of the inadequate monitoring. That incident (a seizure) resulted in a follow-up chronic disease visit. Additionally, we found that the chronic disease follow-up visits also are sometimes lacking relevant subjective or objective data. The final piece is there should be a clear link between the urgency of the follow-up visit and the degree to which the disease is controlled, with good controlled diseases allowing for a lengthier period of time before the follow-up visit must occur.

**Recommendations:**

1. Update the chronic disease clinical guidelines.
2. Insure that for an initial chronic disease visit, there is sufficient disease specific history obtained as well as relevant physical examination and appropriate tests ordered.
3. Reemphasize the link between degree of control and the urgency with which the follow-up visit occurs.
4. Retrain the practitioner group with regard to appropriate data collection on both the initial visit and follow-up visits with regard to disease specific obligations.
5. When the training has been completed, implement a quality improvement program looking at both compliance with the guidelines with regard to diagnostic and/or therapeutic or immunization interventions as well as the quality of professional performance, with feedback to the clinicians to facilitate improved performance.

9

## F.   Urgent/Emergent Care

**Compliance Status:** Partial compliance.

**Findings**

Although we reviewed a fairly complete urgent/emergent log that was well maintained at the House of Corrections, the same was not true at the Jail. The urgent care log should contain the date and time of the contact with Medical, the identifying information of the inmate, the presenting complaint and ultimately the disposition, whether it was handled onsite and the patient returned to the housing unit or whether the patient had to be sent offsite emergently. These logs should be used by both the Medical Director and nursing leadership to review selected cases based on the data presented. In addition, this log creates the opportunity to utilize selected cases for a clinician or nurse clinical performance enhancement program, discussing cases and providing feedback to the nurses and/or clinicians. Some of the types of deficiencies that we found included absence of relevant vital signs, inadequate history, lack of documentation with regard to the authorization of the send out, lack of a nursing note on return and occasionally, lack of a follow-up visit with a clinician. Finally, in most of the notes, there was no discussion of the content of the services provided offsite indicating that the receiving nurse or clinician had in fact seen the required emergency room report or discharge summary.

**Recommendations:**

1. Leadership should insure that the urgent care logs are conscientiously maintained.
2. Utilize the urgent care logs to facilitate clinician and nurse clinical performance enhancement.
3. Insure that the required offsite service paperwork returns to the program and that a clinician reviews the findings and plan during the follow-up visit after the return.
4. Insure that nurses document the person who authorized the offsite send out.
5. Insure that there is a nursing note on return documenting the status of the patient upon return, any relevant findings and/or recommendations from the offsite service.

## G.   Specialty Services

**Compliance status:** Partial compliance.

**Findings**

We were assured that the Medical Director is now reviewing and authorizing all scheduled offsite services, both consultations and procedures. We emphasized with him that where a recommended consult or procedure is not approved, the Medical Director must recommend an alternative plan of care for the clinician to order. There should be no cases in which the recommended service is not either approved or supplanted by a recommendation for a specific alternative plan of care. With regard to our record review, we found the following types of problems. For many records, there was neither paperwork on return nor notes in the electronic record that documented the findings from the offsite service report. In addition, although patients returned from the offsite

service, there was, in some instances, the absence of a follow-up visit where a clinician documents the findings and plan.

**Recommendations:**

1. Enhance the current authorization process by the Medical Director to include a specific recommended alternative plan of care for those patients for whom the Medical Director does not agree with the recommendation.
2. For all patients who receive a recommended alternative plan of care from the Medical Director, insure that the ordering clinician meets with the patient to explain the new plan.
3. Implement a system to insure that the offsite service reports, both consultations and procedures, are available timely.
4. Insure that when the reports are available, a follow-up clinician visit occurs within which a clinician documents that the findings and plan have been discussed with the patient.
5. Implement a QI program that monitors the elements included in these recommendations.

## H.    Infirmary

**Compliance Status:** Partial compliance.

**Findings**

There is no current infirmary log, making it extremely difficult for both the local QI program as well as the monitor to review performance. There is a new policy based on the utilization of acuity levels that are well defined and which dictate the frequency of both clinician and nursing assessments to be documented in the medical record. The Medical Director is currently making rounds, but this system needs to be reviewed with nursing and the clinicians and implemented along with an infirmary log that contains the date of admission, the identifying information of the patient and the date of discharge. The availability of this log will enhance the ability of the QI program to monitor performance.

**Recommendations:**

1. Provide the training for staff to insure correct implementation of the infirmary policy and procedure.
2. Implement the above described infirmary log.
3. Implement a QI program that assesses compliance with the infirmary policy and procedure.
4. Implement a QI program to facilitate clinical performance improvement for both nursing and clinicians.

## I.    Medication Distribution

**Compliance Status:** Partial compliance.

**Findings**

We reviewed medication administration, both at the House of Corrections and at the downtown jail. We did not review the cart preparation to insure the availability on the

cart of medications to be administered according to the medication administration records. In both facilities, the nursing staff on the units we attended received fairly good cooperation from custody. In one of the units at the downtown jail, custody performed the mouth checks after ingestion to insure that there was no contraband that could be retained. In the other units, nurses were obligated to perform the mouth checks. In the overwhelming majority of instances, nurses did look at the wristband, although in some instances the wristband was damaged and custody should have and usually did make available the housing unit card with the identifying picture on it. I have been informed that with the new soon to be implemented electronic health record, there is an electronic medication administration record in which the medication administration nurses will utilize a wand to scan the bar code on the wristband along with the barcode of the medication, and this will be entered in a laptop on the medication cart. This should facilitate more accurate and more legible documentation. There were instances in which the nurse did not follow up on damaged wristbands, but these were the exception rather than the rule. This process is fairly close to substantial compliance.

**Recommendations:**

1. Your nursing quality improvement program should observe the medication administration by each nurse on some predetermined regular basis.
2. The nurses must be able to clearly see the picture on the armband, and if the armband is damaged, notify custody but also obtain from the housing unit officer a view of the housing unit ID card.

## J.  Women's Health

**Compliance Status:** Partial compliance.

**Findings**

The Medical Director is now serving as the cooperative physician with the women's health nurse practitioners. I was also shown a standard Hollister form which is to be utilized by the nursing practitioners. This is a form developed by the American College of Obstetrics and Gynecology in order to standardize the approach to prenatal care. This section is also close to substantial compliance and could be with the implementation of the standardized prenatal care form.

**Recommendations:**

1. Implement the ACOG form.
2. Create an electronic version of it in the new software.
3. The QI program should begin monitoring the clinical performance of the women's health practitioner.

## K.  Therapeutic Diets

**Compliance Status:** Partial compliance.

**Findings**

We looked at therapeutic diets and talked with the kitchen staff in both the House of Corrections and the downtown jail. In both locations, we learned that there is a diet list which contains the name and type of diet to be provided. However, in both locations,

12

there were a subset of inmates whose type of diet was listed as "other." Also in both locations, the kitchen staff could not find the specific instructions for each patient whose diet was listed as "other." The use of the term "other" is obviously problematic and stems from predetermined fields listed in the CJIS software. There cannot be compliance with a special diet system when some diets are listed as "other," but there is no direction to the kitchen staff as to what should be the content of that diet. At both facilities, if the master menu was specified to be a heart-healthy diet, which is now utilized in many other correctional facilities, 95% of the special diets would not need to be ordered, including diets for low-fat, low-sodium and diabetic diets.

**Recommendations:**

1. Pursue the possibility of converting the master menu to heart-healthy specifications.
2. For a patient on a special diet that is listed in CJIS as "other," there must be specific instructions available to the kitchen staff with regard to the content of that diet.
3. The Medical Director should work with the clinician staff who order the diets to insure that there are no preference diets. Food allergies mostly consist of peanut allergies, shellfish allergies and a few others that are rare. It is almost unheard of to have an onion or tomato allergy.

## III. Mental Health Services

**Compliance Status:** Partial compliance.

**Findings**

### A. Intake

This requires that all mental health positive screens must be evaluated by a psychiatric social worker within 24 hours. The goal is to identify both inmates at risk of suicide and also those who have a history of acute or chronic mental health problems. The computer data from the TIER software continues to demonstrate a high rate of compliance for those individuals who enter with a positive mental health screen. Currently, all 12 of the psychiatric social worker positions are in fact filled. For those who enter on meds, there has been an improvement with the hiring of a full-time Psychiatric Chief employed mostly at the downtown jail. For individuals who are, within a short period of time, transferred to the House of Corrections, there are still longer waits for an adequate medication evaluation. This is in part due to a vacancy in psychiatric services of a half-time position and partly also due to the fact that the HOC incumbent potentially full-time psychiatrist works strange hours and does not see the number of patients that his compensation would suggest he be seeing. There is currently a psych registered nurse position, who would work at the House of Corrections, that is vacant. The Chief Psychiatrist has plans to reorganize the services with the hiring of the half-time psychiatrist and the full-time psych RN at the House of Corrections. Also, a Mental Health Director has literally just started and she should be involved in facilitating the social work clinical performance enhancement program as

13

well as addressing issues both with community advocacy groups and with community service organizations.

## B. Program

There is a suicide program. There is a crisis intervention program and there is a medication program. Inadequate numbers of professional hours have delayed timeliness of access of some services. In addition, it has probably contributed to the paucity of individual and more importantly, group treatment sessions. There continues to be an additional psychologist position that is vacant that could contribute substantially to the provision of both individual and group therapy.

## C. Staffing

We have already discussed the vacancies of a half-time psychiatrist, a full-time psychiatric RN, a full-time psychiatric nurse practitioner and a full-time psychologist. In some instances, these vacancies have contributed to delays in access and in some instances resulted in an absence or greatly reduced availability of some services.

## D. Urgent/Emergent and Emergency Psychiatrist Services

The mental health calls are taken by the medical staff, including the nurse practitioners and the physician, although the Chief Psychiatrist has been available to the Medical Director for back-up call.

**Recommendations:**

1. Fill both the half-time psychiatrist position as well as the full-time psych RN position.
2. Reassess the productivity of both the full-time HOC psychiatrist and the full-time psychiatric nurse practitioner.
3. Develop, train and implement policies related to the use of restraints, the suicide program and the use of enforced medications.
4. Continue to improve the timeliness with which patients, whether housed at the downtown jail or the House of Corrections, are assessed regarding their treatment needs.
5. Implement a psychiatric social worker clinical performance enhancement program based on record review and discussion with clinicians.
6. Develop and implement a professional clinical enhancement program for both the psychiatric nurse practitioner and the psychiatric registered nurse.
7. Establish a meeting with both community advocates as well as community service providers in order to facilitate the communication and flow of information to the jail staff and from the jail staff.
8. Fill the vacant psychologist position.
9. Increase provision of both individual and group therapy opportunities.
10. A schedule should be set up so that even if medical takes first call, there is an assigned individual seven nights per week and on weekends as identified for back-up mental health call.

14

## IV. Dental Services

**Compliance Status:** Partial compliance.

**Findings**

Dental services are currently available three days per week at the House of Corrections and two days per week at the downtown jail. There is a single dentist who works at the downtown jail for both days, who also works one day at the House of Corrections and there are two other dentists who each work one day per week at the House of Corrections. There are access problems at both facilities, in part related to custody. On some days, as few as 20% of the patients who are scheduled to be seen are presented to the dental unit, even thought virtually all of these inmates are in the facility. On some days, about 80% of the inmates are brought to the dental clinics, both in the downtown jail and in the House of Corrections. Custody in both facilities must insure access for these services. All the people on the list should be brought to the clinic.

A second major problem has been minimal use of restorative procedures regardless of the quality of the dentition. We have discussed this with the dentist and he indicates that at the House of Corrections, a machine that cures restorations is needed and at both facilities, supplies are needed. He has provided to the Health Care Administrator a list of both the supplies and the piece of equipment to be purchased. I have been assured that restorative procedures will be provided in greater numbers in the future.

**Recommendations:**

1. Custody is to insure that all people on the list for a morning or an afternoon session must ultimately be brought to the clinic while the dentist is there.
2. With the necessary equipment and supplies in place, begin reporting from each facility the monthly ratio of restorations to extractions.

## V. Support Services

**Compliance Status:** Partial compliance.

**Findings**

### A. Medical Records

As described previously, the currently used medical record software is fraught with a variety of problems and the company that created that system is no longer supporting it. In my discussions with the Health Care Administrator, there is an expectation that the current software will be replaced in the next 3-6 months. The replacement software is one that the Armor Corporation has utilized in other sites it has under contract. I have been assured that the new system will allow scanning of documents from offsite services, including hospital discharge summaries and emergency room reports to be scanned into the system. In addition, it will allow direct flow of laboratory results into the record and additionally, it has an electronic medication

15

administration record. In the records we reviewed, critical offsite service reports were not available. We also went to a large room which contains thousands upon thousands of paper records. The density of the filing must be an obstacle to efficient and timely access. This may continue to be a problem even after the implementation of the new electronic record software.

**Recommendations:**

1. Replace the current electronic medical record with a system that allows scanned documents and provides for an electronic medication administration record.
2. Improve the maintenance of the paper records so they are maintained in a manner that is consistent with industry performance standards.
3. Clinical documents should be initialed before they are filed and then should be secured in the file in reverse chronology by section.

### B. Pharmacy

The same offsite pharmacy continues to provide services. I did not have time to determine whether there has been an improvement in the rate of significant errors.

**Recommendations:**

1. Please provide me with a document that lists the number of significant errors per month and provide this document on a quarterly basis.

## VI. Miscellaneous

### A. Physical Plant

**Compliance Status:** Substantial compliance.

**Findings**

The changes have been made in the booking area and there is adequate privacy for the intake process.

### B. Quality Improvement Council

**Compliance Status:** Partial compliance.

**Findings**

The Director of Nursing has been focused on performing some studies as part of the quality improvement program. Among the studies provided to me are one on the cardiovascular chronic disease clinic and also one on the diabetes chronic disease clinic. There is also a study on infirmary care observation, one on the pulmonary disease chronic care clinic, one on equipment and supplies, one on nurse sick call, one on controlled medications, one on sharps and tool count and a study on drug and alcohol detoxification. In addition, there are plans to perform a patient satisfaction survey. All of these are excellent possibilities. However, as an example, the drug and alcohol detoxification study contained documents that showed that everything was not applicable. The only way that one can easily identify drug and alcohol detoxification

16

cases is either to maintain a log, which is the preferred way, or to attempt to use pharmacy orders for those medications and dosages to see if those provided are consistent with a detoxification regimen. Most of the studies contain some indicators in which the performance was poor and in some, like the infirmary study, most indicators demonstrated poor performance. What needs to be added is an analysis of the causes of the less than threshold performance, and based on those causes, then an improvement strategy to improve performance. This is literally needed for all indicators for which the performance is sub-threshold. The worst performance was probably on nurse sick call, which is consistent with our findings. This clearly is the beginning of a quality improvement program, but much remains to be implemented before a finding of substantial compliance can be achieved.

**Recommendations:**

1. I would like to see initially monthly QI minutes from each facility during which some of these studies, a few each month, are discussed and the indicators for which a sub-threshold performance is recorded and then analysis of the causes of the sub-threshold performance and an improvement strategy to mitigate those causes. I would like these monthly minutes sent to me electronically.
2. The QI program should begin to implement aspects of their program which are listed under recommendations with several sections in this report.

### B.    Death Review

I was informed that there have been no deaths since my last report.

### C.    Sentinel Event

I have not been informed of any sentinel events.

## Conclusion

Although the program has a long way to go, it has at least reached the point where there are no sections in noncompliance. However, the distance from partial compliance to substantial compliance is a lengthy one. I have no doubt that the leadership team that has been assembled is capable of ultimately achieving substantial compliance, but putting in place both the right personnel as well as the right policies and procedures and infrastructure to perform adequate self-monitoring will be the real challenge. I look forward to continuing to work with the program.

Respectfully submitted,

R. Shansky, MD

RS/kh