# REPORT ON SETTLEMENT AGREEMENT IN THE CHRISTENSEN CASE

## MILWAUKEE COUNTY JAIL AND THE HOUSE OF CORRECTIONS

December 2-6, 2013

## Introduction

Since the last review, in July and August of this year, there has been some progress and some setbacks. This is not surprising in this monitor's experience in reviewing these programs. On the positive side, we continue to be impressed with the role played by the Chief Psychiatrist in responding to basic clinical needs. However, since our last visit, both one psychiatrist and one clinical psychiatric nurse practitioner have departed, leaving the current psychiatrist, who devotes most of her time to the downtown jail, as the only mental health prescriber. This problem has precluded her from performing some of her administrative responsibilities, particularly with regard to promulgating policies that address both enforced medications as well as the use of restraints. In addition, at the time of our last visit, the chief of mental health services was beginning employment that week. We have been impressed with how quickly she has come up to speed and has begun expanding the program, particularly through the provision of non-pharmacologic treatment strategies. This is precisely what this agreement anticipates and requires. These plans to add both expanded group therapy and individual therapy should begin to take hold in 2014.

We are also pleased to report that the program administrator now has made a longer term commitment to this program. We have appreciated his efforts to achieve compliance and the constructive role that he has played. With regard to the Medical Director, he anticipates being able to return to warmer weather by the middle of the coming year. A physician has recently been hired who could become his successor as Medical Director of Milwaukee County Jail. We had the opportunity to meet her briefly and were impressed with the discussion that we had. Although the last report was primarily a baseline that described services prior to any impact of the Armor team, for this particular review we were pleased to see some improvement in the timeliness of health assessments by the nurse practitioners as well as some improvements in the professional performance. In my experience, the record of achievements by the Armor team in their brief stay at Milwaukee County Jail is certainly better than some programs that I have reviewed but not as good as some others. Let me be clear that overall I am impressed with the leadership team and remain optimistic about the ability of this team to ultimately bring the program into substantial compliance. In my experience, substantial compliance is never achieved at the rate which all would desire it to occur, but this team is clearly making progress. The remainder of this report will provide the details behind the evaluation.

EXHIBIT 53

# I. HEALTH SERVICES PROGRAM STRUCTURE

**Compliance Status:** Partial compliance.

**Findings**

## A. Program Administrator

As indicated previously, my view is that the current Program Administrator has both the skills as well as the energy to lead this program towards substantial compliance. He faces many challenges which will be spelled out in specific sections. One area that has proved particularly challenging is his ability to provide the monitor with the percentage of required shifts by discipline, by shift and by facility over the last three months. His challenge is because the shifts are covered both by County civil service employees as well as Armor employees. Merging these two databases has proven more arduous than was anticipated, certainly by this monitor. On the other hand, this must be done because it gets at one of the fundamental problems that was identified when the program was entirely civil service under the Sheriff's leadership. Certain shifts at certain facilities within specific disciplines were understaffed, causing other disciplines to be pulled to do the work where staffing was short and this of course compromised the adequacy of services provided. The Program Administrator under Armor has much greater flexibility as well as a revised staffing plan agreed upon by the parties. Because of the additional staff and the flexibility to use agency nurses, overtime, etc., their ability to meet the needs of the staffing requirements should yield success. We are expecting this document, both this month and in future quarters. Secondly, I began to review some of the revisions to the corporate policies and identified some shortcomings, both with regard to a discrepancy between what was being done at Milwaukee County Jail versus what the policy required, as well as some additional discrepancies. The Program Administrator has agreed to electronically forward these policies to me and will receive my comments as they are reviewed. One of the areas of discrepancy is that the leadership of the program is committed to performing health assessments based on the acuity and complexity of patient problems as they enter the jail. The Medical Director did not, prior to my arrival, have the time for the training and implementation. The policy we reviewed had not yet been changed to include the plan to perform these assessments based on acuity nor did it include the guidelines for nurses that define which patients need to be seen on Day 1, Day 2, Day 3 or as long as Day 7. We expect that this training and implementation will occur within the next two to three months. There is a plan to implement a new medical records' software which should go forward after the beginning of the year and possibly be in place by March. This will also facilitate the implementation of several policies.

**Recommendations:**

1. Continue the revision of medical operations policies and provide them to the monitor electronically as they become ready.
2. Proceed as soon as possible with the implementation of the new electronic medical record.

## B. Medical Director

Although the current Medical Director is transitional and expects to be departing by mid-year, he has provided clinical leadership which has been missing for quite some time. His presence is felt in all clinical areas, particularly the infirmary, intake processing, chronic disease management and infection control problems. Especially in the infirmary, where he has been making regular and in some instances daily rounds of the sickest patients, the care provided has significantly improved. We reviewed records of patients quite ill in the infirmary whom he saw daily who previously had not been seen by an advanced level clinician for weeks at a time. He is also reviewing all requests for offsite services and this is happening quite consistently. Although he has identified a potential successor, the determination will be made after the physician has worked in the jail for several months. That physician literally has started on a part-time basis, but will begin full-time the first of the year.

### Recommendations:

1. Send me the acuity definitions to be utilized by the nurses in booking for scheduling the urgency of the history and physical exams.
2. Implement both the training and the policy for this process.
3. Send me electronically the criteria you are utilizing for mandatory referrals from the nurse practitioners to the Medical Director based on disease complexity or poor disease control.
4. Develop a clinical discussion series with the nurse practitioners, both at the House of Corrections and the jail, and e-mail me the topics to be covered each month.

## C. Physician HOC

There continues to be a part-time physician working at the House of Corrections 20 hours per week. It is not clear to the monitor the extent to which he interacts with the nurse practitioners at the House of Corrections. Historically, the interaction has not been constructively received and this may remain a challenge to improving the quality of the professional performance.

### Recommendation:

1. Continue to recruit for the full-time House of Corrections physician position.

## D. Psychiatrist

I continue to be impressed by the clinical acumen as well as dedication of the Chief Psychiatrist. She is utilized by the mental health team as the go to clinician with problematic patients. It is also my sense that she works quite well with the mental health director. Because of the recent departure of both the near full-time psychiatrist at the House of Corrections as well as the psychiatric nurse practitioner at the jail, she has been focusing exclusively on seeing patients. Therefore, the development of policies, particularly with regard to therapeutic restraints as well as the use of enforced medications, has temporarily been put on hold. I was able to observe a meeting of the mental health leadership staff as well as the Program Administrator, counsel for the

3

parties and community stakeholders. In my view, it was a very productive meeting and the Chief Psychiatrist participated in a very constructive manner. It is my hope that these meetings do become regularized as was discussed.

**Recommendation:**

1. Have the director of Mental Health services research other facilities' policies in these two areas and help develop an initial draft, for which the Chief Psychiatrist will provide critical input.

## E. Nursing Director

The Nursing Director position became vacant in mid-November and a candidate whom I met has been identified to take the position within the next few weeks. This nurse has worked as a supervisor and therefore should have a shorter learning period in this new job. I was able to spend some time with her and am optimistic that she brings the experience and the energy needed for this role. I also met a candidate to become the Associate Director of Nursing, which is currently vacant. These two nurses should greatly add to the leadership team.

**Recommendation:**

1. Have well-respected Nursing Directors from other sites spend some time with these candidates or send them to spend a day with high performing nursing directors in other sites.

## F. Nurse Practitioners

Of the 12 advanced nurse practitioners, there are currently 7.6 positions filled, leaving 4.4 vacancies. At least one or one and a half of these vacancies includes psychiatric nurse practitioners. There are ongoing efforts to fill these positions. Since many of these positions are filled by females, and since the downtown jail is located in an area that is not considered safe in the evenings, Armor and the County should develop a strategy that gives candidates confidence that their safety is a serious consideration and commitment by the County. Of the 7.6 currently employed, we were impressed that the practitioners were now performing more assessments as opposed to merely reviewing records. Their assessments are also an opportunity for educating our patients. I am unaware of any patient who has ever been educated by their clinician performing a record review but not communicating with them. We also felt the quality of the practitioner professional performance has in some instances improved.

**Recommendation:**

1. Fill the remaining 4.4 nurse practitioner positions, including both medical nurse practitioners as well as psychiatric nurse practitioners.

## G. Staffing

As indicated previously, the total number of positions between the two facilities and agreed upon by the parties is 131.5 positions. The current number of vacancies is

4

23.5, which calculates to a vacancy rate of approximately 18%. This is up from the previous 14%. We appreciate that these numbers are dynamic and we believe for some of the positions there is an explanation related to potential LPN or RN or nurse practitioner perceptions that if they are assigned an evening or midnight shift their safety will be jeopardized. Other than psychiatrist, which is probably not related to perception of patient safety, the biggest numbers of vacancies are with AR&Ps, which are 4.4, RNs, which are 3.7, and LPNs, which are 5.4. Both parking and employee safety should be addressed by the County.

**Recommendation:**

1. Provide the percentage of mandatory shifts filled for September, October and November by discipline, by shift and by facility, as well as the totals, and begin to provide that each quarter to the monitor.
2. In order to address the problem areas, program leadership from Armor should present a proposal to the County Board that addresses employee safety and parking costs.
3. Continue to aggressively recruit for these positions.

## II. MEDICAL SERVICES

**Compliance Status:** Partial compliance.

**Findings**

### A. Intake Screening

#### 1. Triage

Registered nurses are performing the intake screens. The performance appears to be reasonably well done, excepting the limitations of the electronic record software. However, the Medical Director has not yet provided the nurses with the acuity scale which enables them to determine how quickly to schedule the independent health assessment. We were informed that there are plans to provide this at the beginning of next year. This may coincide with the implementation of the new electronic health record. The current electronic health record does not easily accommodate triaging by acuity and then scheduling on that basis. In the review we performed, the vast majority of the patients whose records we selected were patients with chronic problems who entered during the month of October. There were a few whose health assessment was delayed; however, the majority were performed timely. When the screen is performed, the nurse is able to recommend medical housing or infirmary if needed. We reviewed a few cases in which patients were likely to be going into withdrawal from illicit substances. When this happens, patients may be clustered in medical pods so that it is easier for nurses to perform their withdrawal monitoring. In two out of two cases we reviewed where that history was identified of likely withdrawal, the referral to the medical pod did not take place and not all of the required screens were performed.

**Recommendations:**

1. We again ask that the acuity scale be developed and a draft sent to the monitor for review.
2. After the acuity scale is finalized, begin training nursing staff and nurse practitioners in the implementation.
3. After implementation, begin performing systematic reviews of the performance of each nurse as well as each practitioner, including constructive feedback with regard to how they may improve their performance.

### 2.    Referrals

We did find some improvement here. There were far fewer health assessments skipped by the nurse practitioners because they had had an assessment as recently as a year ago. We had indicated previously that six months should be the cutoff and anyone who has been out more than six months must have an assessment. However, we also indicated that any patient whose medical complexity warranted, regardless of the length of time they were out, should have an interval history and a health assessment. We did find a few complex patients whose health assessments were not performed because they had been in less than six months earlier.

Another improvement was that nurse practitioners did not try and take credit for an initial chronic disease visit when purely performing an independent physical assessment. We tended to find both the independent physical assessment and the initial chronic disease visit, which of course contains the required disease specific history. It is clear that the Medical Director has been able to have a positive impact on the performance of the nurse practitioners. Armor is to be commended for making available to all of the clinicians the medical database "Up To Date." We were informed that the nurse practitioners have been regularly using this.

**Recommendations:**

1. Implement a formal review of the performance of the independent physical assessments by the nurse practitioners, with constructive feedback to them and a discussion of the cases.
2. Insure that all patients with complex problems have an interval history as well as a targeted physical exam as part of the independent health assessment.

## B.    TB Screening

**Compliance Status:** Partial compliance.

**Findings**

Because the electronic medical record software lacks the TB symptom questions on the intake screen, the Medical Director created a screening sheet which includes both TB symptoms as well as risk factors for having had contact with active cases of tuberculosis. This form is being regularly filled out by the booking nurses. However, in the month we reviewed, there was such a paucity of positive answers, even to the risk

6

factors, such as homelessness, substance abuse, etc., that questions have to be raised about the validity of the data collected. For the grey area cases, either QuantiFERON can be used or the TB skin test. However, given the shortage of the material used for the TB skin test, it may be appropriate to utilize the QuantiFERON. Hopefully, with the implementation of the new EMR, the required questions will be in the software and no longer have to be filled out on paper.

**Recommendations:**

1. Review the data with regard to the TB questions being asked as well as risk factors, and determine by review of the data and by observing the nurses filling out these forms whether it is likely the data is valid. If not, develop a change to the process.
2. Integrate into your quality improvement program the monitoring of the TB program.

## C.    Physical Examinations

**Compliance Status:** Partial compliance.

**Findings**

This area is covered under IIA2, Referrals. This is duplicative and therefore will not be repeated.

## D.    Sick Call

**Compliance Status:** Partial compliance.

**Findings**

### 1.    Nurse sick call

Again, we found problems with both the process of sick call access as well as nursing professional performance. The program has still not fully implemented a set of procedures that can provide the supervisors with confidence that every day, sick call slips are collected at least once daily from each housing unit and that they are logged into a logbook, which also lists the presenting complaint as well as the date being seen. In a discussion with several nurses, we suggested that the sick call requests that most require the tracking of timeliness of face-to-face assessments are those sick call requests that contain a symptom. This would include the dental symptom of pain. One possibility is keeping a separate log for medical symptoms, including dental pain, and a separate log for miscellaneous requests. The medical symptom log should contain the presenting complaint and should be used for teaching purposes, with topics by respective organ systems. Finally, we found significant professional performance issues, most especially with the adequacy of the history, the completeness of the objective data collected, the appropriateness of the assessment and the appropriateness of the plan. In general, when the history is inadequate, the other areas are much less likely to be adequate.

### 2.    Advanced level provider sick call

7

Although we did not identify many professional performance issues, when the nursing sick call process is broken, both process wise and professional performance wise, it is not clear at all that the appropriate cases are always referred in an appropriate timeline to the nurse practitioners. Unless the front end of access to care is fixed, the back end, meaning the nurse practitioner encounters, will be hobbled.

**Recommendations:**

1. For symptom complaints, create a separate log which includes the nature of the presenting symptoms.
2. Develop a system that allows the Director of Nursing to have confidence that each housing unit has its slips picked up and then triaged by the nurse on a daily basis.
3. Implement a sick call log for requests with symptoms that contains the date, the name and identification data for the patient along with the presenting complaint and the date that the patient was seen for a face-to-face assessment. It would also be helpful to know on the same log, after the face-to-face assessment occurred, whether the patient was referred on to an advanced level provider.
4. Implement a clinical performance enhancement review of the services performed by each registered nurse. At the beginning of these reviews, they should be performed relatively frequently until the performance has reached a threshold, in which case the frequency can be reduced to quarterly.
5. Implement a similar program, with the physicians reviewing and providing feedback to the nurse practitioners. This also should be conducted frequency wise analogously to what was recommended for the nurses.
6. When nurses see patients cell-side, this cannot be characterized as an assessment; rather, it is a face-to-face triage. The timeline for a required assessment has not been met when a face-to-face triage occurs; therefore, if there is a referral to an advanced level provider without a nurse face-to-face assessment, that referral must take place literally within two days of the receipt of the request.

## E.    Chronic Care

**Compliance Status:** Partial compliance.

**Findings**

Although our record review this time showed some improvements in the quality of the chronic disease assessments, and the performance of initial chronic disease visits, some problems persist. Examples of some of these problems include incorrectly assessing the degree of chronic disease control based on the published definitions of control contained in the chronic disease guidelines. In addition, patients with complex diseases who are followed closely in the infirmary are not monitored within the chronic disease program after they are discharged from the infirmary. Also, the recommendation to clarify the chronic disease policy and especially the approach to patients with type 1 diabetes has as yet to be submitted to the monitor. The latter

8

impacts on the focus of the clinicians in terms of working with their patients to bring their diseases into good control as expeditiously as is clinically appropriate.

**Recommendations:**

1. Update the chronic disease guidelines with reference to both type 1 diabetes and with regard to the overall approach of working with patients to achieve good control as expeditiously as is clinically appropriate.
2. Insure that complex patients admitted to the infirmary from booking are enrolled into the chronic care program and are followed up with chronic care visits after discharge from the infirmary.
3. Reemphasize in training the definitions of disease control.
4. Implement professional performance enhancement reviews with the nurse practitioners so as to provide feedback with regard to their clinical performance.

## F.    Urgent/Emergent Care

**Compliance Status:** Partial compliance.

**Findings**

In our review of records, we were particularly concerned that nurses called to assess patients who presented with chest pain were not contacting advanced level clinicians for their input and assessments. This must be a standard requirement for all instances where a patient presents with chest pain. A nurse should not accept the clinical responsibility for making a definitive determination that the patient is not suffering a coronary event when responding to such problems. Given the availability of advanced level clinicians, it is counterproductive for both the patients and the County to incur such liability. In addition, patients who present with shortness of breath and are thought to potentially be suffering from an asthma attack must have their peak expiratory flow rate measured both before and after treatment in order to determine the effectiveness of the treatment. Reassessing after emergent interventions are a basic requirement with regard to not only emergent treatment of shortness of breath but similarly the emergent treatment of elevated blood pressures and elevated blood sugars. There needs to be some training for nursing staff about the emergent approach to these chronic diseases and the requirement for reassessing the response within a relatively short period of time. We were encouraged by the fact that clinician follow up assessments of the patients sent out for unscheduled offsite services was both timely and appropriate.

**Recommendations:**

1. Insure, especially at the jail, that an urgent care log is conscientiously maintained which contains fields for patient identifiers, date and time, presenting complaint, where the assessment occurred and the disposition.
2. Implement a training program for nursing staff that addresses the assessment, treatment and reassessment of patients who present with shortness of breath, elevated blood sugars and elevated blood pressures.

3. As part of the quality improvement program, review the presence of both a nurse note on return from unscheduled offsite services as well as the presence of the required offsite service paperwork from the emergency rooms.

## G.   Specialty Services

**Compliance status:** Partial compliance.

**Findings**

One problem that does persist will only be solved by the implementation of the new electronic medical record, and that is the inability of the current software to accept scanned documents. Therefore, this requires that when offsite service paperwork is returned to the facility, it must be maintained in a paper record. We observed some improvements in terms of follow up onsite, most especially at the downtown jail; however, even when documents were reviewed after patients returned from offsite services at the House of Corrections, there did not appear to be any encounter with the patient in which there was a discussion of the findings and the plan. The clinician's review of the paperwork without seeing the patient and discussing the findings and the plan has absolutely no educational benefit for the patients.

**Recommendations:**

1. The Medical Director should reemphasize with the clinicians that after all scheduled offsite services, they must review the paperwork, and during an encounter with the patient, document their discussion of any findings and future plan.
2. The quality improvement program should monitor the follow up aspect of the program.
3. The monitoring of this follow up should include insuring that offsite service reports are available timely, both for procedures as well as consultations and that they are reviewed and discussed with the patients.

## H.   Infirmary

**Compliance Status:** Substantial compliance.

**Findings**

There is now an infirmary log which allows review of both present and prior records of patients that are currently or have previously been housed in the infirmary. In addition, the Medical Director has consistently performed rounds in the infirmary and has assigned patients' acuity status. In our review, he has several times reviewed and reassessed patients more frequently than the policy required. In addition, nursing assessments have been performed consistent with policy requirements.

**Recommendation:**

1. The QI program should begin to review the infirmary care, both for consistency with policy requirements as well as nurse and clinician professional performance.

10

## I.   Medication Distribution

**Compliance Status:** Substantial compliance.

**Findings**

We reviewed medication administration, both at the jail and at the House of Corrections. The assessment of compliance status was substantial compliance because in both locations, nurses demonstrated good rapport with the patients. Custody assisted in the process, although in neither area did they perform the mouth checks. However, the nurses did consistently perform the mouth checks in order to determine whether any contraband was potentially present. In one instance, an inmate was allowed to swallow his pills without the use of water. Both the nurses and the inmates should be reminded that in order for the inmates to participate in the medication program they have to present themselves to the nurses with an undamaged identification band, they must bring a cup of water and use it to ingest the medications and they must cooperate with a mouth check after ingestion. This reinforcement of the rules would benefit both the detainees as well as the staff. In all instances, the nurses documented the administration as they administered, and in general, the process was performed in a professional manner.

**Recommendations:**

1. The quality improvement program should insure that each nurse's performance with regard to medication administration is reviewed with feedback to the nurse at least semiannually.
2. Both nurses and the detainees as well as the officers should be reminded of the rules that are required of detainees accepting medications.

## J.   Women's Health

**Compliance Status:** Partial compliance, near substantial compliance.

**Findings**

Patients are followed regularly by the family health nurse practitioner who sees patients both at the jail and at the House of Corrections. Although I have seen the Hollister form, I have not seen how it is being used within the electronic record. I am hopeful that it is part of the new software to be implemented as soon as possible. The follow up by the family health nurse practitioner was appropriate.

**Recommendations:**

1. Demonstrate the use of a variation of the American College of Obstetrics and Gynecology prenatal form.
2. Implement the new software.
3. The QI program should monitor the clinical performance of the women's health nurse practitioner on a regular basis.

## K.   Therapeutic Diets

**Compliance Status:** Substantial compliance.

11

**Findings**

The problem we identified during our last visit, in which diets listed as "other" were associated with no guidance to the food service staff with regard to what specifics were to be provided to the detainees, has been corrected at both facilities. For every patient listed as being on an "other" diet, there was a notebook with the patient's name and specific designations with regard to the type of diet to be provided. We were shown a master menu which includes approximately a 2800 calorie per day diet. If the County would contract for a heart healthy diet, the reduction in calories down to 2400 or 2500 for men and 2200 or 2300 for women would probably offset the cost of any of the changes in specific foodstuffs.

**Recommendations:**

1. The Medical Director should continue to work with the clinician staff so that no preference diets are ordered or masked as allergies. It is extremely unusual to find an allergy to either onions or tomatoes, which were listed as allergy diets.

## III.   Mental Health Services

**Compliance Status:** Partial compliance.

**Findings**

This element requires that all mental health positive screens must be evaluated by a psychiatric social worker within 24 hours. From the reports generated by the electronic medical record, this is occurring greater than 98% of the time. All of the 12 psychiatric social worker positions are filled. The problem arises with the availability of prescribing clinicians to see patients based on a referral from the psychiatric social workers. Currently, there is one full-time psychiatrist, the Chief Psychiatrist, Dr. Lothian, and although she sees patients 40 hours a week, those hours are spent at the downtown jail. Patients who need psychiatric services currently have only an extremely delayed access to them. There are one and a half psychiatrist positions vacant at the House of Corrections. There is also a psychiatric nurse practitioner position, at least one and possibly two, that are vacant. So the current situation does provide inadequate access in any timely manner to prescribing clinicians. Thus, in summary, although the nurse screening and psychiatric social worker parts of the intake process are working very well, the referrals on only occur timely at the downtown jail.

### A.   Intake

### B.   Program

There are plans to greatly expand both the individual and group therapy aspects of the mental health program. As we have indicated, we were impressed with our discussion with Dr. Boswell, the director of the program. She has been involved in psychiatric social worker crisis response training and has restructured the assignments of psychiatric social workers at the jail. Each social worker has a task for an entire week, rather than rotating more frequently. Each social worker will be doing individual therapy and for the seven of 12 non-licensed social workers, Dr. Boswell provides the

treatment supervision. By January 1, 2014, they are working on plans to implement a variety of groups, including anger management, drugs and alcohol, a fatherhood group, a reentry group, a domestic violence group, a grief and loss group and a stress management group. These groups will occur at each facility. They are currently arranging the time and location with custody leadership at each facility. There are also plans to implement the practice whereby custody notifies the mental health director when patients are placed in segregation. If the patients are on the mental health caseload, mental health will be obligated to investigate and make a determination as to whether the behavior that required the discipline was related to mental illness inadequately controlled or whether it was due to non-mental illness issues. If it was related to mental illness issues, then treatment rather than segregation is the appropriate response. We also learned that although psychiatric social workers make rounds on both 4D and special needs, they interact with their patients through the door. This is not acceptable and custody must arrange for a professionally appropriate space for these interviews to take place. We are encouraged by the reorganization of the mental health program.

### C. Staffing

As indicated previously, there are 1.5 vacant psychiatrist positions and at least one and possibly two psychiatric nurse practitioner positions. There is also a vacant psychiatric RN position.

### D. Urgent/Emergent and Emergency Psychiatrist Services

The medical staff are on call and the Medical Director provides back up call and the Medical Director may contact the Chief Psychiatrist when necessary. Hopefully filling the vacant positions will expand call responsibilities.

**Recommendations:**

1. Fill the vacant psychiatrist and psychiatric nurse practitioner and full-time psych RN positions.
2. Work with custody to eliminate the lack of appropriate professional access for patients to mental health staff for patients housed in both 4D and special needs.
3. Develop the policies with regard to the use of restraints, the suicide program and the use of enforced medications.
4. Implement a psychiatric social worker clinical performance enhancement program based on record review and feedback with the clinicians.
5. Insure that backup mental health call is available to the medical staff who are responding to mental health issues.

## IV.  Dental Services

**Compliance Status:** Partial compliance.

**Findings**

We have reviewed the data produced by the dental program at each facility. Although historically there were relatively few restorations performed and dental

services consisted mostly of tooth extractions. However, with the availability of the appropriate equipment, we have begun to see a trend in which the ratio of restorations to extractions is improving. The goal should be at least one restoration for every extraction. Additionally, problems with access to dental remain significant. We are recommending that the health administrator and dental staff at each facility meet with custody leadership to discuss ways to improve access for dental services.

**Recommendations:**

1. Continue to work on increasing the number of restorations as a ratio with extractions.
2. Work with the administrator and custody leadership to improve access for patients on the list.

## V.  Support Services

**Compliance Status:** Partial compliance.

**Findings**

### A.  Medical Records

Although there has been some improvement in the availability of the paper records, in the medical record area the loose filing included documents from two weeks ago. This insures that not infrequently, clinicians will not have available critical information. With the implementation of the new electronic record software, hopefully starting in early 2014, the problem may be mostly solved by documents being scanned into the electronic medical record. In our review of records, we sometimes could not obtain a record because the patient had transferred to another facility or particular documents were not available. Clearly this needs to be fixed.

**Recommendations:**

1. Replace the current electronic medical record software with a system that allows scanned documents and provides for an electronic medication administration record.
2. Eliminate the loose filing to no more than 48 hours from the time the document reaches the medical records office.
3. Clinical documents must be initialed and dated before they are filed and then should be secured in the file in reverse chronology by section.

### B.  Pharmacy

Although significant errors continue to be identified, I have been informed that there has been some decrease in errors. However, it is my perception that the users of the pharmacy remain dissatisfied with the services.

**Recommendations:**

1. Determine whether improved performance by a pharmacy vendor at a reasonable cost may be the appropriate decision for the Milwaukee County Correctional Department services.

## VI.  Miscellaneous

### A.  Physical Plant

**Compliance Status:** Substantial compliance.

**Findings**

This item no longer needs to be reviewed, as the improvements in the booking area remain adequate.

### B.  Quality Improvement Council

**Compliance Status:** Partial compliance.

**Findings**

I was introduced to a newly hired staff member who will begin working full-time as the Quality Improvement Coordinator. I am looking forward to spending some time with her. I reviewed the minutes of the one quality improvement committee meeting that occurred in late September. The meeting was a reasonably good organizational meeting which was primarily informational in nature. It contained no self-monitoring or analysis of the results nor therefore did it contain any improvement strategies based on the data. I have informed the administrator of the availability at the National Commission on Correctional health Care of a video of a training session conducted for NCCHC surveyors with regard to the quality improvement standard. I believe this video would be useful for leadership and line staff at the Milwaukee County Jail. Throughout this report under recommendations I have suggested areas for review by the quality improvement program. I would be happy to provide elaboration if contacted by one of the leadership team who participates in the quality improvement meetings. It is important to note that the minutes of quality improvement council meetings must be directed at staff who have not been able to attend the meeting. Therefore, they should be designed to be educational in nature. I would be happy to answer any questions that might arise regarding the quality improvement council. I would strongly recommend that initially a council meeting occur monthly at each facility, at least until I return for my next review.

**Recommendations:**

1. I would like to see monthly QI minutes from each facility, during which at least a few studies each month at each facility are discussed and the indicators for which a subthreshold performance is recorded result in analysis of the causes of the subthreshold performance and the development of an improvement strategy to mitigate those causes. I would like these monthly minutes sent to me electronically.
2. The QI program can begin to implement aspects of their program which are described under recommendations of several sections in this report.

15

### C. Death Review

I was informed that there have been no deaths since my last report.

### D. Sentinel Event

I have not been informed of any sentinel events.

# Conclusion

Progress is being made, although as is commonly the case, it may be slower than most of us would like. The biggest concern is the loss of staff prescribers with regard to the mental health program and the problem filling vacancies, especially at the downtown jail for LPNs, RNs and nurse practitioners. The County should work with Armor to develop a strategy that mitigates the personal safety and parking concerns. I look forward to returning, probably in the late spring.

Respectfully submitted,

R. Shansky, MD

RS/kh

16