IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

-----------------------------------------------------

REBECCA TERRY,

    Plaintiff,

    vs.    Case No. 17-cv-01112

COUNTY OF MILWAUKEE, et al.,

    Defendants.

-----------------------------------------------------

Videotaped Deposition of GINA STREHLOW
Wednesday, April 4, 2018

9:08 a.m.

at

Hinshaw & Culbertson
100 East Wisconsin Avenue
Milwaukee, Wisconsin

Reported by Dawn M. Lahti, RPR/CRR

---

1        Videotaped Deposition of GINA STREHLOW, a
2  witness in the above-entitled action, taken at the
3  instance of the Plaintiff, pursuant to the Federal
4  Rules of Civil Procedure, before Dawn M. Lahti,
5  RPR, Certified Realtime Reporter, and Notary
6  Public, State of Wisconsin, at 100 East Wisconsin
7  Avenue, Milwaukee, Wisconsin, on the 4th day of
8  April, 2018 commencing at 9:08 a.m. and concluding
9  at 12:25 p.m.
10  A P P E A R A N C E S :
11      LOEVY & LOEVY, by
        Mr. Scott R. Rauscher
12      311 North Aberdeen, Third Floor
        Chicago, Illinois 60607
13      Appeared on behalf of Plaintiff.
14      LEIB KNOTT GAYNOR, by
        Mr. Randal N. Arnold
15      219 North Milwaukee Street, Suite 710
        Milwaukee, Wisconsin 53202
16      Appeared on behalf of County of
        Milwaukee.
17
      HINSHAW & CULBERTSON, by
18      Mr. Michael Russart
        100 East Wisconsin Avenue, Suite 2600
19      Milwaukee, Wisconsin 53202
        Appeared on behalf of Armor
20      Correctional Healthcare and Gina
        Strehlow.
21
22
23
24
25

---

1         E X A M I N A T I O N
2  BY MR. RAUSCHER        5
3
4
5
6
7
8
9
10          E X H I B I T S
11  EXHIBIT         PAGE IDENTIFIED
12  Exh. 1  Correctional Health Services Report   46
      Exh. 2  Infirmary Care       76
13  Exh. 3  Bates MKE County 990     85
      Exh. 4  Incident Report      86
14  Exh. 5  Armor/Milwaukee County Jail Health   108
        Services Policy and Procedure
15  Exh. 6  Armor's Response to Plaintiff's First  113
        Set of Interrogatories
16  Exh. 7  Receiving Screening Policy    115
      Exh. 8  Patient and Staff Safety Policy   125
17  Exh. 9  Medical Housing Unit Policy   129
      Exh. 10  Continuous Quality Improvement   136
18        Program Policy
      Exh. 11  Detention Services Bureau, Special  143
19        Medical Unit IM 8 Policy
20
      (Original exhibits attached to original transcript.
21  Copies of exhibits attached to copies of transcript.)
22
23
24
25

---

1      TRANSCRIPT OF PROCEEDINGS
2      VIDEO OPERATOR:  Good morning.  We are on
3  the record.  This is the videotaped deposition of
4  Gina Strehlow in the matter of Rebecca Terry vs.
5  County of Milwaukee, et al.  This deposition is
6  taking place at 100 East Wisconsin Avenue,
7  Milwaukee, Wisconsin on April 4th, 2018 at
8  9:08 a.m.
9      My name is Caleb Myszka.  I'm the
10  videographer with U.S. Legal Support located at 740
11  North Plankinton, Milwaukee, Wisconsin.  Video and
12  audio recording will be taking place unless all
13  counsel have agreed to go off the record.
14      Will all present please identify
15  themselves beginning with the witness.
16      THE WITNESS:  Gina Strehlow.
17      MR. RUSSART:  Attorney Michael Russart
18  for Ms. Strehlow and Armor Correctional.
19      MR. RAUSCHER:  Scott Rauscher for
20  plaintiff Rebecca Terry.
21      MR. ARNOLD:  Attorney Randal Arnold for
22  the Milwaukee County defendants.
23      VIDEO OPERATOR:  The certified court
24  reporter is Dawn Lahti.
25      Please swear in the witness.

**EXHIBIT 54**

a26c2730-afd3-4f17-8dbc-96811324307d

1    GINA STREHLOW, called as a witness
2  herein, having been first duly sworn on oath, was
3  examined and testified as follows:
4                   EXAMINATION
5  BY MR. RAUSCHER:
6  Q   Can you please say and spell your name.
7  A   Yes. Gina Strehlow, G-I-N-A, S-T-R-E-H-L-O-W.
8  Q   Who do you work for?
9  A   I currently work for Aloria Health.
10 Q   Can you spell that?
11 A   Yes. A-L-O-R-I-A; Health, H-E-A-L-T-H.
12 Q   How long have you worked for Aloria Health?
13 A   Since July of last year.
14 Q   July 2017?
15 A   Yes.
16 Q   What do you do for Aloria Health?
17 A   I'm currently the director of admissions.
18 Q   What kind of company is Aloria Health?
19 A   Aloria Health is an eating disorder treatment
20     facility.
21 Q   Is it a correctional healthcare company?
22 A   It is not.
23 Q   What was your job immediately prior to Aloria --
24     working for Aloria Health?
25 A   I was an agency nurse, so I worked as a nurse

1      through an agency.
2  Q   How long were you an agency nurse for?
3  A   I've been an agency nurse since 2005.
4  Q   Did you work for Armor Correctional Healthcare at
5      some point?
6  A   I did.
7  Q   When did you work for Armor?
8  A   For Armor I worked in May of 2013 through
9      February 2016.
10 Q   Was that through the agency that you just --
11 A   It was not.
12 Q   -- talked about, or was that different?
13 A   It was different.
14 Q   Where did you go to college?
15 A   For nursing?
16 Q   For undergrad.
17 A   Cardinal Stritch University.
18 Q   When did you graduate?
19 A   2004.
20 Q   What was your degree in?
21 A   Associate degree of nursing.
22 Q   Did you do any -- did you get any degrees beyond
23     your associate's in nursing?
24 A   I did not.
25 Q   Did you do any education beyond getting your

1      associate's degree in nursing?
2  A   I did some education towards my bachelor's in
3      business.
4  Q   And where did you do that?
5  A   Mount Mary College.
6  Q   When -- when was that?
7  A   That would be in 2015.
8  Q   What was your first job after you got your
9      associate's degree in nursing in 2004?
10 A   Emergency room nurse.
11 Q   And where were you an emergency room nurse for?
12 A   At the time it was Columbia Hospital.
13 Q   Where is Columbia Hospital?
14 A   Milwaukee, Wisconsin.
15 Q   How long did you work at Columbia Hospital for?
16 A   From the time I graduated until -- I don't recall
17     the exact year. I would say 2009.
18 Q   Okay. Did you have any supervisory
19     responsibilities at Columbia Hospital?
20 A   I did.
21 Q   Can you tell me about your supervisory
22     responsibilities at Columbia Hospital?
23 A   Yes. I was a charge nurse.
24 Q   And what does a charge nurse do at Columbia
25     Hospital? I'm sorry. Let me rephrase that.

1      What did you do as a charge nurse at
2  Columbia Hospital?
3  A   I was responsible for staffing. I was responsible
4      for the function of the flow of the emergency
5      department.
6  Q   How long were you the charge nurse for?
7  A   Three months after I started as a new grad. So
8      from then until the end of my career there.
9  Q   Okay. Sometime in 2004 through 2009, whenever you
10     left?
11 A   Correct.
12 Q   When you say you were responsible for staffing,
13     were you hiring and firing people?
14 A   I was not. I was responsible for daily operation.
15 Q   And what did you -- can you tell me more about what
16     you mean when you say you were responsible for
17     daily operation?
18 A   If someone called in, I was responsible to replace
19     them.
20 Q   Were you responsible for deciding who would work,
21     how many people would work, those sorts of
22     decisions?
23 A   Yes.
24 Q   Did you set schedules for people?
25 A   I did.

1  Q   And were you also treating patients?
2  A   Yes.
3  Q   Do you have any nursing licenses?
4  A   I do.
5  Q   And can you tell me which license or licenses you
6      have?
7  A   I have a nursing license for Wisconsin, a nursing
8      license for Florida, a nursing license for
9      Illinois, a registered nurse.
10 Q   RN?
11 A   Yes.
12 Q   Any other license?
13 A   No.
14 Q   Do you have any certificates or special --
15     specialties?
16 A   Yes.  I am a sexual assault nurse examiner.  I am a
17     CCHP, a certified correctional healthcare provider.
18     I am BLS, basic life support certified; ACLS,
19     advanced cardiac life support.
20 Q   Is that it?
21 A   That I can recall, yes.
22 Q   When did you become -- get the CCHP accreditation?
23 A   2014.
24 Q   Do you remember when in 2014?
25 A   I do not.

1  Q   Who gave you the CCHP accreditation?
2  A   The National Council of Correctional Healthcare
3      Providers.
4  Q   What did you do to get that accreditation?
5  A   I took a test.
6  Q   Did you just take it once?
7  A   Absolutely.
8  Q   Passed the first time?
9  A   Absolutely.
10 Q   Were you required to have a CCHP as part of your
11     job at Armor?
12 A   I was not.
13 Q   Where did you go to work when you left Columbia
14     Hospital in 2009?
15 A   I went to work for Alliance Services which is the
16     agency that I spoke of.
17 Q   Did you say Allied?
18 A   Alliance, A-L-L-I-A-N-C-E, Services, Incorporated.
19 Q   And how long did you work for Alliance Services,
20     Incorporated?
21 A   From 2005.  Actually, I'm still currently
22     technically employed.  I just keep all my
23     certifications and things up there, so we could say
24     until current.
25 Q   Can you explain to me how that works?  I guess did

1      you -- have you consistently gotten jobs through
2      Alliance, or do you just sort of stay active
3      through them?
4  A   I stay active through them.
5  Q   And what does it mean to stay active through
6      Alliance?
7  A   If I want to work a shift that is available, then I
8      can work it.
9  Q   Was your job at Columbia Hospital through Alliance?
10 A   It was not.
11 Q   Were you also getting jobs from Alliance on the
12     side while you were working at Columbia Hospital?
13 A   Yes.
14 Q   Where did you work -- how often from 2004 to 2009
15     to the best that you can recall did you get jobs
16     from Alliance?
17 A   I never got a job from Alliance, but I was staffed
18     at a location through Alliance several times.
19 Q   What's the distinction or is there a distinction
20     between getting a job from them or being staffed at
21     a location through them?
22 A   Yes.  I got a job at Columbia, so I was an employee
23     at Columbia.  I worked at Aurora, so I was staffing
24     there.
25 Q   Okay.  How often did you work at Aurora while you

1      were an employee of Columbia Health (sic)?
2  A   I don't recall exactly.  It was just a supplement
3      for open shifts.
4  Q   Were you working full time at Columbia?
5  A   Absolutely.
6  Q   Did you have a set schedule?
7  A   Essentially, yes.
8  Q   What was that schedule?
9  A   I don't recall.
10 Q   Was it days or nights or weekends?
11 A   It varied.  When I initially started, I was PM
12     shift which was 3:00 p.m. to 11:00 p.m.
13 Q   Why did you leave Columbia?
14 A   I left Columbia to work full-time agency.
15 Q   Why did you decide to make that move?
16 A   Because there's more money in agency.
17 Q   How long did you work full-time agency?
18 A   Until I accepted a job at Milwaukee County.
19 Q   When did you accept a job at Milwaukee County?
20 A   I believe it was February of 2013.
21 Q   Where did you work between 2009 and February 2013?
22 A   Various locations in southeastern Milwaukee through
23     the agency wherever availability was.
24 Q   And was that something where you could go to a
25     different location every day, or did you get placed

1    for certain chunks of time?

2  A  Both.

3  Q  Was there any primary locations you worked at

4    during that time?

5  A  I would have assignments that I would be somewhere

6    for 10 to 13 weeks, but I also picked up additional

7    shifts in the emergency department, which was not

8    an assignment.

9  Q  Okay.  What were the assignments?  I don't need you

10    to necessarily list every single place; but when

11    you say 10 to 13 weeks, what kind of work were you

12    doing during that time?

13  A  10 to 13 weeks, I was a triage nurse at a primary

14    care office.  I've been a triage nurse at a call

15    center, emergency department nurse, pediatric

16    clinic nurse.  I worked in an ortho department.  I

17    worked in an OB department, wherever -- since I'm

18    an emergency room nurse, I can work wherever.

19  Q  Did you have supervisory roles in any of those

20    jobs?

21  A  Just about every one of them.

22  Q  And what sort of things were you doing as a

23    supervisor in those jobs?

24  A  If it was in the emergency department, I was a

25    charge nurse.  If it was a clinic, I typically

1    trained new staff coming in.

2  Q  What type of training did you give to new staff?

3  A  Oftentimes I was filling a position which is why

4    they were using agency, so I would -- I would train

5    them to take the position that I was working.

6  Q  When you said you went to Milwaukee County in

7    February 2013 --

8  A  Um-hum.

9  Q  -- who did you go to work for in February 2013?

10  A  Milwaukee County jail.

11  Q  Were you employed by Milwaukee County at the time?

12  A  I was.

13  Q  Why did you decide to leave Alliance Health

14    Services and go to Milwaukee County in

15    February 2013?

16  A  Most interestingly, it was because of working in

17    the jail was very intriguing to me.

18  Q  Why was it intriguing for you to work at the jail?

19  A  Because at that point, I had only taken care of

20    people in custody through the ER.

21  Q  And did you want to take care of more people in

22    custody?

23  A  Absolutely.

24  Q  And why was that of particular interest for you?

25  A  Because I had taken care of in my opinion just

1    about every other kind of person, and I thought I

2    could do well by them.

3  Q  When you started at Milwaukee County Jail in

4    February 2013, what was your job?

5  A  Staff nurse.

6  Q  When you started, did you have any opinion as to

7    the quality of care that inmates were receiving at

8    the Milwaukee County Jail?

9         MR. RUSSART:  Objection.  Foundation.

10         You can answer if you can comment on

11    that.

12         THE WITNESS:  Can you repeat the

13    question?

14  BY MR. RAUSCHER:

15  Q  When you started at the Milwaukee County Jail in

16    February 2013, did you have an opinion as to the

17    quality of care that inmates were receiving?

18         MR. ARNOLD:  Join in the objection.

19         MR. RUSSART:  Same objection.

20         THE WITNESS:  Prior to getting the -- are

21    you saying the day I started, before I started, my

22    first day?

23  BY MR. RAUSCHER:

24  Q  Okay.  Let me -- let's -- why don't we break it

25    down.

1        Before you started at the Milwaukee

2    County Jail, did you have any opinion as to the

3    quality of care that inmates at the jail received?

4         MR. RUSSART:  Same objection.

5    Foundation.

6         THE WITNESS:  I did not.

7  BY MR. RAUSCHER:

8  Q  On the day that you started at the Milwaukee County

9    Jail in February 2013, did you have any opinion as

10    to the quality of care that inmates were receiving?

11         MR. RUSSART:  Foundation.

12         MR. ARNOLD:  Join.

13         THE WITNESS:  I didn't.  I didn't have

14    enough information to make an opinion at that

15    point.

16  BY MR. RAUSCHER:

17  Q  What was your job as a staff nurse at the Milwaukee

18    County Jail?

19  A  A staff nurse, you mean --

20  Q  I'm sorry, did you say your first job was a staff

21    nurse?

22  A  Yeah.

23  Q  What were your responsibilities as a staff nurse at

24    the Milwaukee County Jail?

25  A  At the Milwaukee County Jail the staff nurse is

1    responsible for different areas of the jail, namely
2    booking, the clinic, SMU, special needs,
3    occasionally a MED-PASS.  Charge nurse.
4  Q  How long were you a staff nurse for Milwaukee
5    County Jail?
6  A  How long did I work for Milwaukee County Jail or
7    Milwaukee County?
8  Q  Fair enough.  How long were you a staff nurse at
9    the jail?
10  A  I was a staff nurse at the jail from February of
11    2013 through -- I left the jail I think November of
12    2016 I want to say.  Maybe '15.  I don't recall.
13  Q  Were you a staff nurse the whole time?
14  A  I was not.
15  Q  So I just want to know how long were you a staff
16    nurse for?
17  A  I was a staff nurse from February until December of
18    2013.
19  Q  And at some point in that time, did you stop
20    working for Milwaukee County and start working for
21    someone else but still at the jail?
22  A  Not before December.
23  Q  I'm sorry.  I think you already did answer that.
24    When did you start working for Armor?
25  A  December of 2013.

1  Q  When you were a staff nurse and you said you were
2    responsible for certain areas of the jail, booking,
3    clinic, SMU, special needs and occasionally
4    MED-PASS and charge nurse, I believe you said --
5  A  Is that --
6  Q  -- is that right? I want to make sure I get that
7    right.
8  A  The word -- I was -- I wasn't response -- I guess
9    I'm not sure what your question is.
10  Q  I want to know what you would do on a day-to-day
11    basis as a staff nurse.
12  A  Okay.  So as a staff nurse, I was assigned to
13    certain areas.  So I worked in those areas as a
14    staff nurse.  I wasn't responsible for -- I mean I
15    just want to make it clear that I was working
16    there.  I wasn't --
17  Q  You weren't in charge of it?
18  A  Correct.
19  Q  I wasn't trying to suggest anything.  I was just --
20  A  That's fine.
21  Q  -- trying to get an understanding.
22  A  Yeah, for sure.  I just wanted to make sure I was
23    clear because I was --
24    MR. RUSSART:  Object to the comment about
25    not trying to suggest anything.  I think every

1    question suggests something, so go ahead.
2  BY MR. RAUSCHER:
3  Q  What did you do in the booking area as a staff
4    nurse?
5  A  That's where clients came in, and we booked them
6    in.
7  Q  When you say "clients," are you talking about
8    people who have been arrested?
9  A  Correct.
10  Q  And what did you do to book them in, you as the
11    staff nurse?
12  A  I performed two different types of assessments when
13    they first came into jail.
14  Q  What were those two assessments that you performed
15    when people first came into jail?
16  A  I forget exactly what the name of them were, but
17    there was an initial brief assessment and then a
18    second, more thorough assessment after they were
19    searched and booked in.
20  Q  What is the SMU?
21  A  Special medical unit.
22  Q  In February 2013, did Milwaukee County Jail have an
23    infirmary?
24  A  No.
25  Q  Did it ever have an infirmary while you worked

1    there?
2  A  Not while I worked there, no.
3  Q  What was the SMU for?
4  A  The SMU was, as it states, for special medical
5    cases.  It was a place that when a doctor wanted to
6    place an order for a different type of monitoring,
7    they went there.
8  Q  Was it for high-risk inmates?
9    MR. RUSSART:  Object to the form.
10    MR. RAUSCHER:  Yeah.  Let me rephrase
11    that.
12  BY MR. RAUSCHER:
13  Q  Was it for inmates with high-risk medical needs?
14    MR. RUSSART:  Object to the form.
15    THE WITNESS:  The special medical unit
16    was a very broad classification that several
17    different types of clients would fall into.
18  BY MR. RAUSCHER:
19  Q  Did you call the inmates clients when you worked in
20    the jail?
21  A  No, I called them patients, but I call my people
22    now clients.  So I apologize for that.  We call
23    them patients.
24  Q  Okay.  What kind of patients were typically in the
25    SMU while you worked at the Milwaukee County Jail?

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 5 of 37   Document 175-24

a26c2730-afd3-4f17-8dbc-96811324307d

1    MR. RUSSART: Objection to the form.
2    THE WITNESS: Patients -- are you asking
3    me like a specific example or --
4    BY MR. RAUSCHER:
5    Q   What -- give me some examples, please.
6    A   So the type of patients that were in the special
7        medical units were people who were identified by
8        the provider as somebody who needed to have more
9        than -- more than a MED-PASS interaction with a
10       nurse.
11   Q   What is a MED-PASS interaction with a nurse?
12   A   MED-PASS is when an LPN takes a cart to a unit and
13       gives them the medications that are ordered.
14   Q   How frequently did MED-PASSes happen while you
15       worked at the Milwaukee County Jail?
16   A   When I started at the jail, they were four times a
17       day, and at some point they kind of veered more
18       towards two times a day, of course with an
19       exception if needed.
20   Q   Do you have any sense of when they started veering
21       toward two times a day?
22   A   I would say probably -- I can't recall exactly when
23       it was. I know it was a goal, and I know that it
24       happened before I left because it was something
25       that was talked about for a long time to make sure

1        that it was the way it was supposed to be.
2    Q   Why was it a goal to move from four MED-PASSes a
3        day to two MED-PASSes a day?
4    A   Because it served the patients better.
5    Q   How did it serve the patients better to have two
6        MED-PASSes instead of four?
7    A   Because the -- they were more available to -- they
8        were more available to, A, get the medicine; but
9        more importantly, they were able to dose
10       medications appropriately being -- because we want
11       people to be able to do something in jail that
12       they're going to be able to do on the outside, and
13       it's way more realistic for people to take
14       medications two times a day as opposed to four
15       times a day.
16   Q   So when the MED-PASS was four times a day, does
17       that mean anybody taking medicine got medicine four
18       times a day?
19   A   No.
20   Q   What did it -- so what was the practical difference
21       for patients when it changed from four times a day
22       to two times a day?
23       MR. RUSSART: Object. Foundation.
24       THE WITNESS: I'm sorry. I'm not exactly
25   sure what you're asking me.

1    BY MR. RAUSCHER:
2    Q   How did it help the inmates to change from having
3        four MED-PASSes a day to two MED-PASSes a day?
4        MR. RUSSART: Other than what she's just
5    testified to? Are you asking her to repeat that?
6        MR. RAUSCHER: You can answer.
7        MR. RUSSART: Object to the form of the
8    question as it's repetitive as to what she just
9    asked.
10       MR. RAUSCHER: Are you instructing her
11   not to answer?
12       MR. RUSSART: No.
13       MR. RAUSCHER: You can answer.
14       THE WITNESS: So two times a day is
15   better because of the fact that when they go out on
16   the outside, more times -- more often than not
17   people are compliant with medications, taking them
18   twice a day, and our goal is to not only oftentimes
19   initiate care but to implement care that they're
20   going to be able to do on the outside because we're
21   not going to make this great plan of care and then
22   have them go on the outside where they can't follow
23   through on that same plan of care.
24   BY MR. RAUSCHER:
25   Q   Did patients get the same amount of medicine, more

1    medicine, less medicine when the MED-PASS frequency
2    changed?
3        MR. RUSSART: Objection. Form and
4    foundation. Vague.
5        THE WITNESS: Again, so you're saying --
6    I guess I don't understand what you're asking me.
7    BY MR. RAUSCHER:
8    Q   What I'm trying to understand, is there a practical
9        difference to a patient when they -- one, there was
10       four MED-PASSes and then at some point it changed,
11       so let's say day two is when they start two
12       MED-PASSes a day?
13       MR. RUSSART: She just answered that
14   question twice. You can answer it again.
15       THE WITNESS: So I think you're -- I
16   think you're misunderstanding.
17       MR. RAUSCHER: I think I am.
18       THE WITNESS: Yeah. So when Milwaukee
19   County was in charge of the jail, there were
20   medications four times a day.
21       When new -- when Armor came in,
22   studies have shown and their research and the -- it
23   would be better for clients to have something that
24   they're going to do in jail that's going to also
25   work for them on the outside.

a26c2730-afd3-4f17-8dbc-96811324307d

1    It doesn't change the amount of
2  medications or treatment that they're getting.
3  What it does is it improves -- for instance,
4  there's medications that's going to -- that they're
5  going to be able to take that are more affordable.
6    In jail we can be giving them
7  whatever we want because we're paying for it. But
8  if we're doing that -- we send them off and then
9  they go to the pharmacy to fill their medications
10 and it's $500, that doesn't make sense.
11   So we want to find a medication
12 regimen that, A, is cost effective; and, B, really
13 that they're going to continue to do because if
14 they can't afford the medication or they can't -- I
15 mean, oftentimes people struggle. I mean I
16 struggle taking medication every day, taking it
17 four times a day, so we want to build them a better
18 care plan.
19 BY MR. RAUSCHER:
20 Q   Were pregnant women automatically placed in the SMU
21 while you worked at the Milwaukee County Jail?
22 A   **I mean that's a very broad statement, so I'm going**
23 **to say no. I mean there could be people who arrive**
24 **who aren't pregnant or who don't know that they're**
25 **pregnant. There could be somebody who's extremely**

1  **pregnant. So that's not a yes or no question. I'm**
2  **sorry.**
3  Q   So at some point -- is there a point in a woman's
4  pregnancy where she is placed in the SMU
5  automatically while you worked at the Milwaukee
6  County Jail?
7  A   **It's physician ordered based essentially. They --**
8  **we report to the doctor the facts that we have, and**
9  **then the doctor makes that decision.**
10 Q   Was it common in your experience for pregnant women
11 at some late stage in their pregnancy to be placed
12 in the SMU?
13 A   **Yes.**
14 Q   And why were pregnant women in the late stages of
15 their pregnancy placed in the SMU?
16    MR. RUSSART: Objection. Foundation and
17 form.
18    THE WITNESS: I'm sorry. I'm sorry. I
19 didn't -- as soon as I hear that, could you just
20 repeat the question for me?
21 BY MR. RAUSCHER:
22 Q   In your experience why were women in the late
23 stages of their pregnancy placed in the SMU?
24    MR. RUSSART: Objection. Foundation.
25 Form.

1    MR. ARNOLD: Join.
2    THE WITNESS: So -- I mean typically
3  because -- I mean they were placed there because
4  the doctor ordered them to be, and we followed the
5  doctor's orders.
6    I mean I -- is that what you're --
7  I'm not sure what you're asking. I mean we put
8  them there in the late terms because that's what
9  the doctor ordered us to do.
10 BY MR. RAUSCHER:
11 Q   As a nurse, did you have any understanding of why
12 the doctor would order late term pregnant women to
13 be placed in the SMU?
14 A   **As a nurse, I would -- I would say because**
15 **oftentimes when people are later in their terms of**
16 **pregnancy, they have different types of assessments**
17 **that are required.**
18 Q   What do you mean they have different types of
19 assessments that are required?
20 A   **More frequently than just that MED-PASS nurse**
21 **coming through.**
22 Q   They need to be seen by medical professionals more
23 frequently, correct?
24 A   **Yeah. If they do and it's ordered, then it's --**
25 **they're closer to the staff.**

1  Q   So if a doctor orders a pregnant woman to be placed
2  in SMU in your experience, that's because the woman
3  needs more attention for medical care than she
4  would get outside the SMU?
5  A   **No.**
6    MR. RUSSART: Object.
7    THE WITNESS: Sorry.
8    MR. RUSSART: Objection. Form.
9    But go ahead.
10   THE WITNESS: No. I mean it's --
11 every -- it's so hard to speak in that blanket
12 because every person is so different.
13   The doctor makes an order based on
14 the picture that they're given. So based on the
15 history, prenatal care, any other -- other
16 involving factors. So it's -- term of pregnancy
17 isn't necessarily the number one -- it isn't the
18 number one deciding factor on why somebody would go
19 to the special medical unit.
20 BY MR. RAUSCHER:
21 Q   Is it fair to say that if a pregnant woman is put
22 into the SMU regardless of where she is in her
23 pregnancy, it is because she needs additional
24 medical attention?
25 A   **No.**

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 7 of 37   Document 175-24

a26c2730-afd3-4f17-8dbc-96811324307d

1   Q   Why -- why else would someone be put in the SMU if
2       it's not because they need additional medical
3       attention?
4   A   **Because they want them to be away from other --**
5       **other inmates, because they have a mental health**
6       **issue, because if they have other -- like if**
7       **they're using drugs and they need to be monitored**
8       **for that, if we're worried about withdrawal, if**
9       **they're a diabetic and we have to watch for the**
10      **sugars. I mean there could be lots of things that**
11      **would make them go to the SMU.**
12          **I mean -- and the doctor is not the**
13      **only one who orders people to SMU. Corrections can**
14      **do it as well.**
15  Q   Could you do it either as a staff nurse or as the
16      director of nursing?
17  A   **Put somebody in the SMU? I can make that**
18      **recommendation, yes.**
19  Q   How often did you make that recommendation as a
20      staff nurse?
21  A   **On my own --**
22          MR. RUSSART: Objection. Form. Vague.
23          Are you talking about under any
24      circumstances? We just got off a series of
25      questions talking about pregnant women.

1           But you can answer because he's not
2       going to answer my concerns, so ...
3           THE WITNESS: I'm sorry, what was the
4       question again?
5           MR. RAUSCHER: Could you read it back,
6       please. That's okay. I'll ask it again.
7   BY MR. RAUSCHER:
8   Q   As a staff nurse, how often did you recommend that
9       inmates be placed in the SMU?
10  A   **Never.**
11  Q   Earlier you said you stopped being a staff nurse I
12      think in December of '13; is that right?
13  A   **Yes.**
14  Q   What was your next job in the Milwaukee County Jail
15      after a staff nurse?
16  A   **Nurse educator.**
17  Q   How long were you a nurse educator for?
18  A   **A month and a half.**
19  Q   What did you do as the nurse educator for the
20      Milwaukee County Jail?
21          MR. RUSSART: Object to the form.
22          THE WITNESS: In the month and a half I
23      began to go through staff education records.
24  BY MR. RAUSCHER:
25  Q   Did you conduct any training?

1   A   **Yes.**
2   Q   Did you conduct any training during the month and a
3       half when you were a nurse educator?
4   A   **Yes.**
5   Q   And what type of training did you conduct during
6       that month and a half?
7   A   **At that point it was on-site immediate education.**
8   Q   What do you mean by on-site immediate education?
9   A   **I mean if something came up that there was a**
10      **question about or something that came up that was**
11      **problematic or something that came up that people**
12      **were inquiring about, I educated them, guided them,**
13      **found the answers for them.**
14  Q   Was nurse educator a new position when you started
15      in that role?
16  A   **For me?**
17  Q   For the jail.
18  A   **No, I believe there was a nurse educator prior to**
19      **me.**
20  Q   Do you know who the nurse educator was prior to
21      you?
22  A   **I think -- I'm not positive of her name, no, but**
23      **there was one prior to me.**
24  Q   Did you apply to become the nurse educator?
25  A   **I applied to become the nurse educator after I was**

1       asked to do it, yes.
2   Q   Who asked you to do that job?
3   A   **At that point it was Wade Daley.**
4   Q   Who was Wade Daley?
5   A   **Wade Daley was the acting health service**
6       **administrator at the time.**
7   Q   Did Wade Daley explain to you what you would be
8       doing as the nurse educator?
9   A   **No.**
10  Q   Did you already have an understanding of what the
11      nurse educator did when you took the job?
12  A   **I had an assumption of what the nurse educator did,**
13      **yes.**
14  Q   Did you ever deal with the previous nurse educator?
15  A   **Not anything officially, in passing.**
16  Q   I think you said you started going through training
17      records in the month and a half when you were a
18      nurse educator.
19  A   **Um-hum.**
20  Q   What training records were you going through?
21  A   **I was going through a file cabinet that had**
22      **people's names on it with papers in it which was**
23      **the records.**
24  Q   Whose records were you looking at?
25  A   **I believe I was looking at the medical assistant,**

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 8 of 37   Document 175-24

1      **LPN and RN license -- or records for people who**
2      **were currently employed.  They were not very**
3      **organized, so I spent a lot of time looking at**
4      **those records.**
5    Q  Did someone ask you to look at the records, or did
6      you just do that on your own?
7    A  **I just did it on my own.**
8    Q  Were you also looking at training -- for training
9      records of correctional officers?
10   A  **No.**
11   Q  Did you receive any training when you started at
12     the Milwaukee County Jail?
13   A  **Yes.**
14   Q  What training did you receive when you started at
15     the jail?
16   A  **I received orientation.  I received on-site,**
17     **hands-on training with another peer.**
18   Q  Is that it?
19   A  **As far as formalized training, yes.**
20   Q  How long did your orientation last?
21   A  **I want to say three weeks.**
22   Q  Was that specific to your job as a nurse, or was
23     that given to any new employee at the jail?
24   A  **I don't know what other people have.  I only know**
25     **what I did as a nurse.**

1    Q  Was it three weeks full-time orientation?
2    A  **Yes.**
3    Q  Were you with other people at the time?
4          MR. RUSSART:  Object to the form.
5    BY MR. RAUSCHER:
6    Q  Was it like a class or classes of orientation, or
7      were these just three weeks on your own and getting
8      trained?
9    A  **A combination.**
10   Q  Were the other people who were in the class portion
11     of it medical professionals?
12   A  **Yes.**
13   Q  Were there any correctional officers or
14     correctional officer trainees in any of your
15     orientation classes?
16   A  **No.**
17   Q  Who conducted the orientation?
18   A  **Lisa -- oh, I don't recall who -- are you talking**
19     **about in the -- when I very first started?**
20   Q  Yeah.
21   A  **I believe it was Lisa Krueger.**
22   Q  Who is Lisa Krueger?
23   A  **She was an educator when I very first started at**
24     **the jail.**
25   Q  Did you have additional orientations at some point?

1    A  **Yes.**
2    Q  And when did you have further orientations?
3    A  **When Armor came into the jail.**
4    Q  When did you have -- how many orientations did you
5     have when Armor came into the jail?
6    A  **I don't know exactly how many we had.  It was --**
7     **you signed up, and it was an introduction to Armor**
8     **coming into the jail along with beliefs, policies,**
9     **procedures, things like that.**
10   Q  Was it one meeting, more than one meeting?
11   A  **No.  It was like two weeks or six sessions or**
12     **something like that.  It was more than just one**
13     **meeting, yes.**
14   Q  Was that a full-time training program, or was it
15     done around your job?
16   A  **It was full time that we went to it, but we also**
17     **still worked.**
18   Q  Did you get paid to attend those training sessions?
19   A  **Yes.**
20   Q  Did they happen during your normal work hours?
21   A  **Well, not for my normal work hours at that time,**
22     **no.**
23   Q  Were these in-person meetings --
24   A  **Yes.**
25   Q  -- that were conducted?  And were they led by

1     people from Armor?
2    A  **Yes.**
3    Q  Who led the meetings that you attended?
4    A  **Several of the Armor leadership.  I'm not recalling**
5     **most of their names now unfortunately, but I know**
6     **it was -- the clinical leader was the one who did**
7     **most of the education, and then Armor's educators.**
8    Q  You said the clinical leader?
9    A  **Yeah.  She's the person that developed the policies**
10     **and procedures.**
11   Q  Did she work at the Milwaukee County Jail?
12   A  **She did not.**
13   Q  When you say she developed the policies and
14     procedures, what policies and procedures are you
15     referring to?
16   A  **Armor's policies and procedures.**
17   Q  Did she develop the policies and procedures that
18     were used at the Milwaukee County Jail?
19   A  **I don't know.**
20         MR. RUSSART:  Foundation.
21         Go ahead.
22         THE WITNESS:  I don't know if she did.  I
23     know that she -- later as the director of nursing,
24     I know that we worked together with policies and
25     procedures.

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 9 of 37   Document 175-24

a26c2730-afd3-4f17-8dbc-96811324307d

BY MR. RAUSCHER:

1  Q  You worked together with her?

3  A  Um-hum.

4  Q  Do you remember her name?

5  A  I don't remember her name right now.

6  Q  Do you know where she worked?

7  A  She worked at Armor and out of Florida.

8  Q  Was it the same person in that role throughout your
9     tenure as director of nursing?

10  A  No. I think that she left while I was the director
11     of nursing.

12  Q  Do you know when she left?

13  A  No idea.

14  Q  Do you know who took over her job as the clinical
15     leader?

16  A  I don't.

17  Q  Did you work with another clinical leader after
18     her?

19  A  No.

20  Q  Do you know what year your orientation from Armor
21     was?

22  A  2013.

23  Q  Did you have any paperwork from that orientation?

24  A  Like at --

25  Q  Do you personally have any?

1  A  I do not.

2  Q  Did you complete any paperwork during the
3     orientation?

4  A  I signed in. I don't -- I signed in saying I
5     attended orientation, yes.

6  Q  Were there any tests?

7  A  Not that I recall.

8  Q  Did you have to review any policies and procedures?

9  A  Yes.

10  Q  Did you have to sign anything acknowledging that
11     you had reviewed the policies and procedures?

12  A  During the orientation, our signing in is all that
13     we did when we came in.

14  Q  Do you have any specific recollection of any
15     lessons or discussions about any particular Armor
16     policies or procedures from that orientation?

17  A  No.

18  Q  After your job as nurse educator at the Milwaukee
19     County Jail, what was the next job you had at the
20     jail?

21  A  I was the director of nursing.

22  Q  When did you start as the director of nursing for
23     the jail?

24  A  February 2014.

25  Q  And were you the director of nursing from

1     February 2014 until you left?

2  A  Yes.

3  Q  Did you have to apply for the job as director of
4     nursing?

5  A  Yes, after I was asked to do it.

6  Q  Who asked you to do that job?

7  A  Wade -- well, Wade Daley initially did, yes.

8  Q  Did someone else after Wade Daley also ask you?

9  A  Yes.

10  Q  And who was that?

11  A  James Hatcher.

12  Q  Who's James Hatcher?

13  A  James Hatcher was Wade Daley's boss. I believe he
14     was a regional manager.

15  Q  Who did James Hatcher work for at the time?

16  A  Armor.

17  Q  Did Wade Daley work for Armor as well?

18  A  Yes.

19  Q  Did you apply to Armor to be the director of
20     nursing or to Milwaukee County?

21  A  Armor.

22  Q  Do you know who hired you to be the director of
23     nursing?

24  A  Yes.

25  Q  And who was that?

1  A  James Hatcher.

2  Q  When you became director of nursing, were you still
3     working for Milwaukee County as opposed to Armor?

4  A  No.

5  Q  Did you have to interview to become the director of
6     nursing?

7  A  No.

8  Q  Was the director of nursing a promotion over your
9     previous job as nurse educator?

10  A  Yes.

11  Q  What were your responsibilities as the director of
12     nursing?

13  A  My responsibilities were to manage staff hiring and
14     filling positions. My role was also to manage the
15     hybrid staffing model of half county employees and
16     half Armor employees to manage policies and
17     procedures, to discipline as necessary, to staff as
18     necessary, to maintain a relationship with the
19     correctional staff.

20        I also did a lot of community
21     outreach and worked closely with area mental health
22     providers and hospitals to open relationships and
23     maintain relationships.

24  Q  Were you still doing any of the jobs that you did
25     as a staff nurse?

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 10 of 37   Document 175-24

a26c2730-afd3-4f17-8dbc-96811324307d

1  **A  Yes.**

2  Q  And what responsibilities carried over from staff

3  nurse to director of nursing?

4  **A  In my opinion, all of them because I would still**

5  **staff.**

6  Q  You would still do booking and --

7  **A  Absolutely.**

8  Q  -- see patients?

9  **A  Absolutely.**

10  Q  See inmates?

11  **A  Absolutely.**

12  Q  How much of your job was administrative as director

13  of nursing versus doing the day-to-day nursing work

14  of seeing the patients?

15  **A  I incorporated it all, so it would be hard for me**

16  **to give a percentage. I mean I rounded on**

17  **patients. I was in booking, if needed. On one day**

18  **I could be a staff nurse the whole day and another**

19  **day I could be in meetings all day.**

20  Q  By the time you became director of nursing in

21  February 2014, did you have an opinion as to the

22  quality of care that patients at the Milwaukee

23  County Jail received?

24  **A  I did.**

25  Q  And what was your opinion as to the quality of care

1  they were receiving by the time you became director

2  of nursing?

3  **A  I was ecstatic that I was able to bring my**

4  **knowledge and my team to the patients there. I had**

5  **never had any idea of what jail nursing was, and I**

6  **was happy to be a part of it.**

7  Q  Did you think patients received good care at the

8  jail?

9  **A  I did.**

10  Q  Had you ever seen any patients who received bad

11  care at the jail as of February 2014?

12       MR. ARNOLD: Objection. Foundation.

13       MR. RUSSART: Form.

14       THE WITNESS: What kind of bad care;

15  medical care are you talking about?

16  BY MR. RAUSCHER:

17  Q  Yes, medical care.

18  **A  I -- I mean I can only speak to what I know and**

19  **what I saw, and I know that I only saw good care**

20  **because if -- I wouldn't feel comfortable working**

21  **with bad care.**

22  Q  Did you ever see any correctional officers ignore

23  patients who were requesting medical care?

24  **A  I -- I mean I don't know that I would see that**

25  **because if -- if I or one of my staff is in an**

1  **area, they would ask the medical people for medical**

2  **care. So if they asked a correctional officer for**

3  **medical care, that means that a medical staff**

4  **person likely wasn't there. So, no, I haven't**

5  **seen -- I haven't directly seen it because I**

6  **wouldn't.**

7  Q  Did you ever receive complaints that patients were

8  asking COs for healthcare and being ignored?

9  **A  Yes.**

10  Q  How frequently did you receive those types of

11  complaints as director of nursing?

12  **A  Inmates/patients fill out a pink and white which is**

13  **requesting medical care, and oftentimes they would**

14  **complain on there that nobody's taking care of**

15  **their needs. They would say the correctional**

16  **officers, the nurses, the LPNs, me, anybody could**

17  **be listed on there.**

18  Q  Was there a process when you were -- when you were

19  a director of nursing, was there a process in place

20  for the medical staff to receive the pink and

21  whites?

22  **A  Yes.**

23  Q  And can you tell me what that process was?

24  **A  How the medical staff received the pink and white?**

25  Q  Yes.

1  **A  On each unit there's a box that they -- the inmates**

2  **or patients put their pink and white in.**

3  Q  And how do they get to the nursing staff?

4  **A  The nursing staff picks them up.**

5  Q  And how often was the nursing staff supposed to

6  pick them up while you were director of nursing?

7  **A  Every time that they were in the unit for a**

8  **MED-PASS.**

9  Q  So either four times a day or twice a day depending

10  on when --

11  **A  Exactly.**

12  Q  Did COs ever conduct MED-PASS at the jail?

13  **A  Not that I'm aware.**

14  Q  Did the COs have any responsibility for providing

15  medical care at the jail while you worked there?

16  **A  No.**

17       MR. ARNOLD: Objection. Foundation.

18  BY MR. RAUSCHER:

19  Q  Did you ever conduct any training for correctional

20  officers?

21  **A  No.**

22  Q  Did Armor ever conduct any training for

23  correctional officers?

24       MR. RUSSART: Foundation.

25       THE WITNESS: I don't recall.

BY MR. RAUSCHER:

Q   You're not aware of any?

A   **I'm not aware of any, but I -- no, not that I know of.  I'm not aware of any.**

Q   Did you have any understanding one way or the other about whether Armor was responsible for training correctional officers?

MR. RUSSART:  Objection.  Form.  Foundation.

MR. ARNOLD:  Join.

THE WITNESS:  I have -- I have no idea if they were responsible for that.

BY MR. RAUSCHER:

Q   You understand that Rebecca Terry gave birth to a baby in a cell at the Milwaukee County Jail in 2014, right?

A   **That is -- I don't know who that person is.  I recall hearing about that.**

Q   What do you recall hearing about that?

A   **I recall getting called and looking at that piece of paper and seeing that I was informed of what happened.**

Q   So do you have any independent recollection beyond looking -- well, let me -- let's try that a different way.

A   **Um-hum.**

Q   Why don't we go ahead and mark this as Exhibit 1.

(Exhibit 1 was marked for identification.)

MR. RAUSCHER:  You know what, though, let's use the Bates stamped version.

Mike, this is the same document that you showed me today, but it's Bates stamped Armor 499.  Why don't we use that one.

MR. RUSSART:  Do you mind just -- no, would you mind asking her if what she looked at is the same as 499?

MR. RAUSCHER:  Sure, that's fine.

MR. RUSSART:  Thank you.

BY MR. RAUSCHER:

Q   I'm going to hand you a document that your counsel handed me this morning.  It appears to me to be the same document that you just referred to other than if you look on the bottom right-hand corner, the one we've marked as Exhibit 1 has something we call a Bates stamp, and the one you have has a handwritten 65 on it.  Do those -- are those the same documents?

A   **They appear to be.**

Q   When you said you reviewed that document, what did

you mean by that?

A   **I mean somebody handed me this and said I saw my name on here.**

Q   Did you review it at any time before you were preparing for your deposition today?

A   **I don't recall.  I mean -- I'm sorry, I don't know what you're asking me.**

Q   Did you review this document while preparing for your deposition?

A   **Yes.**

Q   Do you recall ever seeing it before you reviewed it when you were preparing for your deposition?

A   **I don't recall, no.**

Q   Would this be the type of document you typically would have seen as the director of nursing?

A   **Yes, if I was reviewing a chart.**

Q   Do you have any recollection of reviewing Rebecca Terry's chart?

A   **I don't have recollection of reviewing her chart, no.**

Q   What did you do to prepare for your deposition today?  I'm sorry.  What did you do to prepare for today's deposition?

A   **I didn't do anything to prepare for today's deposition.**

Q   Did you -- you reviewed this document, right?

A   **Yes.**

Q   Did you do anything else?

A   **No.**

Q   Did you meet with anybody?

A   **I met with Mike.**

Q   Yeah.  I'm including him.  I'm not asking you what you talked about with him.

A   **Yeah.**

Q   How long did you meet with Mike?

MR. RUSSART:  She's not going to answer that.  That's work product.

MR. RAUSCHER:  She's not going to answer how long you met?

MR. RUSSART:  That's correct.

BY MR. RAUSCHER:

Q   When did you meet with Mike?

MR. RUSSART:  She's not going to answer that either.  That's work product.

MR. RAUSCHER:  Are you going to follow your attorney's instruction to not answer those questions?

THE WITNESS:  I am.

BY MR. RAUSCHER:

Q   Did you review any documents other than the

1   one that's in front of you?
2   A   I didn't.
3   Q   Do you remember being notified that Rebecca Terry
4       had given birth to a baby in the Milwaukee County
5       Jail in March of 2014?
6   A   I remember being notified, yes.
7   Q   Who notified you?
8   A   Well, I know because I'm looking at this that it
9       was Margaret Hoover.
10  Q   How do you know from looking at this that it was
11      Margaret Hoover?
12  A   Because this is a document from the old charting
13      system at Milwaukee County, and the staff name says
14      Margaret Hoover, which populates when somebody
15      completes a form.
16  Q   That's an automatic field; is that right?
17  A   Correct.
18  Q   So she would have had to log in to fill this form
19      out?
20  A   I believe so.
21  Q   Were you working on March 10th at 5:15 in the
22      morning -- March 10th, 2014 at 5:15 in the morning?
23  A   I don't recall, but that is not typically the hours
24      that I would be working.
25  Q   What were your typical hours in March of 2014?

1   A   Day shift hours.  Maybe -- typically 10-hour days,
2       8, 9:00 in the morning, 7 in the morning sometimes.
3   Q   And then you worked 10 hours from whenever you
4       started?
5   A   10, 12, yes.
6   Q   How many days a week were you working in March 2014
7       for Armor?
8   A   I was in the building at least five days a week,
9       more if necessary.
10  Q   Do you know why you were called to be informed
11      about Rebecca Terry giving birth in her cell if you
12      weren't on site?
13  A   Do I know why -- well, I don't know that -- I don't
14      know that I was called.
15  Q   Okay.  How else do you think you might have been
16      told?
17  A   Email.
18  Q   What was your email at the time?
19  A   My email address?
20  Q   Yeah.
21  A   I -- I'm not positive.  I would assume it would
22      have been my Armor email.
23  Q   You had an Armor email?
24  A   I did.
25  Q   Did you have a Milwaukee County email also?

1   A   I did.
2   Q   Did you have them both in March of 2014?
3   A   I don't recall.  I don't remember if it was -- I'm
4       pretty sure that we had both of them.
5   Q   Did you communicate about patients over email?
6   A   Yes.
7   Q   Did you take any emails with you when you left
8       Armor?
9   A   No.
10  Q   So you think -- is it fair to say you think there
11      are two possible ways you were notified either by
12      email or by telephone?
13  A   That's correct.
14  Q   Do you know why you were notified?
15  A   Why I was notified of what?
16  Q   That Rebecca Terry had given birth in her cell at
17      the jail.
18  A   Yes.
19  Q   Why were you notified that Rebecca Terry had given
20      birth in her cell at the jail?
21  A   Because that's not typically what happens.
22  Q   And were you as the director of nursing supposed to
23      be nursing when anything atypical happens?
24  A   Yes.
25  Q   Was there a policy -- a written policy in place

1       telling people when they should call the director
2       of nursing?
3   A   I don't recall.
4   Q   Did it seem like a problem to you that Rebecca
5       Terry had given birth to a baby in the jail cell?
6           MR. RUSSART:  Object to the form.
7           MR. ARNOLD:  Join.
8           THE WITNESS:  I'm not sure what you mean
9       by "problem."
10  BY MR. RAUSCHER:
11  Q   Did it seem okay to you that she had given birth to
12      a baby in the jail cell?
13          MR. RUSSART:  Object to the form.
14          MR. ARNOLD:  Join.
15          THE WITNESS:  I would prefer as most
16      medical professionals would that it would not be
17      ideal to have a baby in the jail cell if that's
18      what you're asking.
19  BY MR. RAUSCHER:
20  Q   Did it cause you concern when you found out that
21      she had given birth to a baby in the jail cell?
22          MR. RUSSART:  Object to the form.
23          MR. ARNOLD:  Join.
24          THE WITNESS:  Concern -- I mean I -- that
25      is not what I would have wanted to happen.  That is

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 13 of 37   Document 175-24

1    not what I'm sure the nurse that was working would
2    want to happen. I'm sure that's not what the
3    doctor would want to happen. So, yeah, it's
4    concerning that it did happen, yes. She -- we
5    would like her to have her hospital -- her baby in
6    a hospital.
7  BY MR. RAUSCHER:
8  Q  Did you do anything to address your concern about
9    what had happened?
10        MR. RUSSART: Object to the form.
11        MR. ARNOLD: Join.
12        THE WITNESS: I did not personally do
13    anything about that concern, no.
14  BY MR. RAUSCHER:
15  Q  Did you ever talk to anybody about what happened to
16    Ms. Terry?
17  A  **I have not -- are you talking about like my staff**
18    **or --**
19  Q  Anybody at all other than your attorney.
20  A  **I don't recall having any specific conversations**
21    **about this case, no.**
22  Q  Did anybody other than -- leaving aside
23    Mr. Russart, did anybody ever come to you and say
24    what happened here?
25  A  **I -- I don't recall specific details of**

1    **conversations as this was -- I recall being new in**
2    **my position, and I recall my supervisors having**
3    **conversations about it. I just don't specifically**
4    **remember my involvement or my depth of involvement**
5    **with this case.**
6  Q  Which supervisors do you recall having
7    conversations about what happened to Ms. Terry?
8  A  **I don't recall who if -- who was still there. I**
9    **know that there was a lot of changeover at that**
10    **time. So by seeing this piece of paper, at that**
11    **point Rusty Perry was the health service**
12    **administrator, so he would have had conversations**
13    **with his team.**
14  Q  Who is on Mr. Perry's team?
15  A  **The Armor administration looks like Dr. Buono and**
16    **Dr. Gable.**
17  Q  Do you know that they had conversations, or you're
18    just assuming that they did?
19  A  **I'm assuming they did because I did not have direct**
20    **involvement in this case. And a birth in the jail**
21    **is something that would be looked at.**
22  Q  Do you know if it is something that was looked at,
23    or do you just -- are you saying as a medical
24    professional, it should have been looked at?
25        MR. RUSSART: Objection to the form.

1        MR. ARNOLD: Join.
2        THE WITNESS: I can't speak to whether it
3    was or not because I don't know any of those
4    details, so I know that I personally did not do
5    any -- actually, it's not that I -- I don't recall
6    doing anything with this case or with the -- a
7    birth in the jail.
8  BY MR. RAUSCHER:
9  Q  Why do you think it was looked at by Armor?
10  A  **I think that a birth in the jail is something -- a**
11    **birth in the jail, death in the jail, an event that**
12    **happens in the jail that is out of the norm is**
13    **looked at.**
14  Q  In your experience, were reports typically
15    generated after events such as the ones you just
16    described?
17  A  **Typically.**
18  Q  Did those reports have a specific name?
19  A  **I don't know if it was called an incident report**
20    **but something of the sort of an incident report.**
21  Q  Major incident report maybe, something like that?
22  A  **I don't know.**
23  Q  What did an incident report look like?
24  A  **For Armor?**
25  Q  For Armor.

1  A  **I just don't recall a lot of the details of the**
2    **policies and forms and things like that. I know**
3    **that when a situation happens, collectively the**
4    **staff that's involved, the leaders have a**
5    **conversation about what happened, why it happened,**
6    **is there anything that we can do better, is there**
7    **anything that we're going to change with our**
8    **policies and procedures to fix it.**
9  Q  How many times do you remember that sort of review
10    happening while you were the director of nursing?
11  A  **A review or an incident report are you asking**
12    **about?**
13  Q  Are they different?
14  A  **Yes. Absolutely.**
15  Q  What's a review?
16  A  **So if I am in a situation and I see something that**
17    **could -- is not going well, is needing improvement,**
18    **then we have a conversation about it.**
19    **As the director of nursing, I am**
20    **very impromptu with I don't wait for a meeting, I**
21    **don't wait for -- you know, have a conversation,**
22    **call a meeting with correctional staff and my**
23    **leaders to get things done.**
24    **I wasn't really involved as much in**
25    **this time because, as I said, I was new in this**

1  position, but I -- oftentimes I mean I -- every
2  day, all day in every aspect I feel like there's
3  room for improvement, so I'm always trying to
4  address those issues.
5  Q  And so those sort of day-to-day interactions you'd
6  call a review?
7  A  A review, a look back, a training point.  I mean
8  just like when I said I was at the educator, if
9  something came up, we educated at that time.  We
10 didn't wait until a staff meeting to do it.  Or I
11 don't I should say.
12 Q  Were there certain things that came up more
13 frequently than others during reviews when you were
14 the director of nursing?
15 A  No.
16 Q  Were there any -- were there any common issues that
17 you saw that you addressed through this review
18 process as the director of nursing?
19 A  I mean -- I guess I don't know what you mean by
20 common -- you mean common topics?
21 Q  Yeah, things that would come up fairly often.
22 A  No.  I just think that it's -- it was a
23 different -- with Armor and learning Armor's
24 policies and procedures, coming in and training
25 specific to Armor's policies and procedures was

1  something that -- with any time I think two
2  companies merging, Milwaukee County had their
3  policies and procedures and Armor had their
4  policies and procedures.  So getting all of us to
5  be on the same page was something that happened all
6  the time.
7  Q  Can you just give me some examples of --
8  A  Yes.  Booking.  Armor's policy and procedure is to
9  have somebody evaluated by an RN within five
10 minutes of walking in the door, having an
11 assessment done, getting vitals, booking times, how
12 soon we take action.
13     Armor's policies are very -- more
14 specific, and the County's policies were different.
15 I'm not as familiar with -- I'm not familiar with
16 either of them much more because it's so long ago,
17 but I'm way more familiar with the Armor policies
18 than the County policies.
19     So just getting everybody to be on
20 the same page with the Armor policies is something
21 that we did most of our educating on.  That was the
22 most common topic.
23     MR. RUSSART:  We've been at it for a
24 little more than an hour.  Do you mind if we take a
25 break?

1      MR. RAUSCHER:  Yeah.  Not at all.
2      MR. RUSSART:  Thanks.
3      MR. RAUSCHER:  How long do you want?
4      MR. RUSSART:  Less than 10 minutes.
5      VIDEO OPERATOR:  We are going off the
6  record at 10:17 a.m.
7      (Recess taken from 10:17 a.m. to 10:23
8  a.m.)
9      VIDEO OPERATOR:  We are back on the
10 record at 10:24 a.m.  This is the beginning of DVD
11 2 of the video deposition of Gina Strehlow.
12 BY MR. RAUSCHER:
13 Q  How many incident reports did you see while you
14 were the director of nursing?
15 A  I don't recall.
16 Q  Do you think it was more than five?
17 A  I don't recall how many there were.
18 Q  Do you recall seeing any?
19 A  I mean I -- yes.
20 Q  What do you recall about any of the incident
21 reports that you saw as director of nursing for
22 Armor?
23 A  What do I recall about them?
24 Q  Yes.
25 A  I -- I really don't recall -- I don't even recall

1  the incident report system.  I don't recall if it
2  was papers, electronic.  I don't recall any of
3  that.  It's been quite some time.
4  Q  Do you recall the content of any of the incident
5  reports that you saw?
6  A  Not specifically.  I know what is typically in an
7  incident report, but I don't -- I don't recall any
8  specific incident reports at all while I was there
9  as director of nursing.
10 Q  What is typically in an incident report?
11 A  The name of the people involved, times, dates, the
12 events that happened, the events leading up to what
13 happened, description of what happened and the
14 resolution or how the situation is going to be
15 handled.
16 Q  And when were incident reports typically prepared?
17 A  Typically at the time of an incident.
18 Q  And what types of incidents would have resulted in
19 incident reports being prepared?
20 A  That's really dependent on who is present at the
21 time of the incident, so I can't really speak to
22 what all incident reports say or do.  I know that
23 incidents -- if somebody believes an incident
24 report needs to be filled out, that's what they do
25 as a reporting tool.

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 15 of 37   Document 175-24

a26c2730-afd3-4f17-8dbc-96811324307d

1  Q  Did you ever initiate an incident report?

2  **A  I'm sure I did.**

3  Q  Why are you sure that you did?

4  **A  Because incident reports are tools to document**

5  **improvement in any type of area or field.**

6  Q  How many incident reports do you think you

7  initiated?

8  **A  I don't recall.**

9  Q  Do you think it was more than five?

10 **A  I don't recall.**

11 Q  Do you recall any of the subjects?

12 **A  I don't.**

13 Q  Why didn't you ask Margaret Hoover what happened

14 with Rebecca Terry?

15 **A  I don't know that I didn't.**

16 Q  You just don't know either way whether you talked

17 to anybody about it?

18 **A  I don't -- correct.**

19 Q  Did you have a practice at the time of following up

20 when incidents such as this one happened?

21       MR. RUSSART:  Object to the form.

22 Foundation.

23       THE WITNESS:  I typically did have a

24 practice; but, again, being that I was in that

25 position, oftentimes I was at -- I was working

---

1  closely with somebody, so somebody may have handled

2  it instead of me at that point because I wasn't

3  100 percent independent at this point in my

4  opinion.

5  BY MR. RAUSCHER:

6  Q  Who were you working closely with at the time?

7  **A  It would have been my medical director.  It would**

8  **have been the doctor on site, the acting HSA.**

9  Q  Who was the medical director at the time?

10 **A  The medical director was Dr. Buono with supervision**

11 **of Dr. Gable because I believe she was newer at**

12 **that time as well to the facility.**

13 Q  Dr. Buono was the director, and Dr. Gable

14 supervised Dr. Buono; is that right?

15 **A  Dr. Buono was the medical director of the Milwaukee**

16 **County Jail, I believe, and then Dr. Gable was a**

17 **medical director at Armor which in turn would make**

18 **her his supervisor -- his -- her supervisor.**

19 Q  Before Rebecca Terry gave birth in her cell at the

20 jail, had you ever seen any other incidents that

21 gave you any concern while you were a nurse at the

22 jail or the director of nursing?

23       MR. RUSSART:  Object to the form.

24 Foundation.  Vague.  Overbroad.

25       THE WITNESS:  I don't know what you're

---

1  asking me.  Have I ever seen anything concerning at

2  the jail before March 10, 2014?

3  BY MR. RAUSCHER:

4  Q  Not anything at all, but any medical-related

5  incidents.

6       MR. RUSSART:  Same objections.

7       THE WITNESS:  Absolutely.

8  BY MR. RAUSCHER:

9  Q  And did any of those incidents give you concern

10 about the performance of the COs or the medical

11 staff?

12       MR. RUSSART:  Same objections.

13 Overbroad.  Vague.

14       MR. ARNOLD:  Join.

15       THE WITNESS:  I can't speak to the COs in

16 the -- in the jail because I -- they're not there

17 to provide medical.  It's -- medical.  It's there

18 to provide medical.  I don't know what the

19 relationship was between the nurse and the COs

20 prior to me getting there, so I don't know any of

21 that.

22       And as every medical facility, I

23 absolutely see that there should be room for

24 improvement anywhere, so, yes, which is why we -- I

25 believe which is why Armor came in to do policies

---

1  and procedures which is why I enforce policies and

2  procedures because I think we all can use

3  improvement.

4  BY MR. RAUSCHER:

5  Q  Do you know anything about the criminal indictment

6  against Armor?

7  **A  I know from the news that there are some criminal**

8  **indictments up against Armor.  I don't know about**

9  **this case or other cases.**

10 Q  Did you ever see anybody doctor records when you

11 worked for Armor?

12 **A  Talk to records?**

13 Q  Sorry.  I said doctor records.

14 **A  Doctor records?**

15 Q  Alter records, create false records?

16 **A  I did not.  I mean they're electronic, though, so**

17 **it's -- I don't watch other people do charting.**

18 Q  After an incident like what happened with Ms. Terry

19 where she gave birth in the cell at the jail, what

20 was your typical practice to follow up on those

21 incidents?

22 **A  So as I said earlier, if something abnormal that**

23 **doesn't typically happen in a shift happens, you**

24 **notify your supervisor, and that supervisor and the**

25 **leaders have a discussion as to what happened, what**

---

1    could we have done better, where did we fall short;
2    if so, how are we going to fix it.
3  Q   Did you have those types of conversations
4    periodically as the director of nursing?
5  A   Yes.
6  Q   How frequently do you think you had those
7    conversations?
8  A   Well, very frequently from little things that we
9    can improve to bigger things that we can improve.
10 Q   And what were some of the bigger things?
11 A   Just things as far as how can we get better --
12   nobody wants to take inmates in their facilities,
13   so it's hard to get follow-up care.  It's hard to
14   get developing relationships.
15        That was one of our biggest issues
16   is getting our people out to get care that they
17   need because nobody wants somebody sitting in
18   orange in their waiting room.  That was one of the
19   big issues.
20        Another big issue was the dynamic
21   between the Columbia -- or the County and Armor
22   staff.  You know, they're two different people
23   trying to merge into one policy and procedure.  So
24   things based on that were like our biggest
25   struggles.

1  Q   I was trying to ask a different question.
2  A   Oh, I'm sorry.
3  Q   No, I'll try it a different way.  What types of
4    incidents over the years as you were director of
5    nursing generated the types of discussions where
6    you would say let's figure out what happened here,
7    what went wrong, what can we do better?
8  A   Gotcha.  So I -- I'm sure you are aware that the
9    jail is under a consent decree and Dr. Shansky and
10   I worked very closely to talk about issues that
11   were going on in the jail.
12        While I was the director of nursing,
13   we -- we didn't have -- I mean there was no deaths
14   in the jail.  There was no -- I mean I -- I don't
15   like that this person gave birth in the jail, but
16   this isn't a big incident.
17        So there -- I didn't have a lot of
18   these incidents.  I was able to maintain more of
19   improvement because I was very, very active in the
20   jail.  I took very, very serious concern of my
21   patients.
22        I mean I was in the SMU every single
23   day, every single shift.  I was in special needs
24   every single day, every single shift.  I was in 4D,
25   which is discipline every -- I mean, I was very,

1    very out there in hopes that -- to prevent these
2    things.
3        So I didn't have -- I mean bad
4    incidents happen when I was there.  So I didn't
5    have any sentinel event I think is what you're
6    referring to.
7  Q   Did you say this wasn't a big incident?
8  A   This wasn't -- this wasn't a -- it was unfortunate.
9    It was not how -- I mean, but there -- there isn't a
10   lot that in my opinion the nurses could have done
11   to change this person having a baby here.
12 Q   What is the basis for your opinion that the nurses
13   could not have changed the fact that Ms. Terry had
14   a baby alone in a jail cell?
15 A   Because people have babies -- it just happens.
16   Like, it's not -- it's like a heart attack.  I mean
17   it's unfortunate if somebody has a heart attack in
18   jail, but you can't say that today at 2:00 p.m. I'm
19   going to have a heart attack.
20        So somebody had a baby.  And after
21   she had the baby, it would be my assumption that
22   she went to -- I don't even know if this -- I know
23   that the baby did not die because that would have
24   been an incident or a sentinel event.
25        So it's not ideal.  It's not what we

1    want.  But we take these people and bring them all
2    into this one place, and she had a baby that was
3    alive.  I mean that's a great thing.
4  Q   You don't really know whether there was anything
5    the nursing staff could have done differently to
6    make sure she got to the hospital, do you?
7        MR. RUSSART:  Object to the form.
8    Argumentative.
9        Go ahead.
10        MR. ARNOLD:  Join.
11        THE WITNESS:  Nurses don't take people to
12   the hospital, so I don't -- like, I couldn't have
13   put her in my car or taken her.  It says that she
14   called 911.  I mean that's all a nurse could do.
15 BY MR. RAUSCHER:
16 Q   She called 911 after she had a baby, right?
17 A   I don't know.
18 Q   So what I'm -- do you have any idea whether the
19   nursing staff could have done anything differently
20   to make sure that Ms. Terry got to the hospital
21   before she had her baby?
22 A   I -- I don't -- I wasn't there.  I don't know the
23   details.  I don't know, you know, what correctional
24   staff was there, what leadership was there.  I
25   don't know any of that.

1      I know that if a nurse saw a person

2   actively in labor, she would recommend that she

3   went to the hospital, and that's the extent of what

4   a nurse can do.

5  Q  You don't know whether that happened here, right?

6  A  I don't. Correct.

7  Q  So you don't really know whether the nursing staff

8   could have done more to get Ms. Terry to the

9   hospital?

10  A  I'm sorry. I don't know what you're asking me.

11   Because I don't feel like -- I feel like you're

12   asking me if they could have done something

13   different, and I don't know exactly what they did,

14   so I can't say whether they should have done better

15   or worse.

16  Q  I'm trying to follow up because a few questions ago

17   I think you answered a question saying I don't

18   think the nurses could have done anything

19   differently to prevent this.

20  A  Um-hum.

21  Q  Do you really have a basis to know that?

22  A  I'm saying to prevent a baby being born.

23  Q  Oh, okay. You're not saying to prevent that the

24   nurses couldn't have done anything differently --

25  A  No.

1  Q  -- baby born --

2  A  I'm sorry.

3  Q  -- at the jail?

4  A  Correct. I'm sorry. I didn't -- I meant like a

5   nurse couldn't have said, close your legs, and the

6   baby wouldn't have been born. That's what I was

7   referring to. Just like a heart attack. You can't

8   make a heart attack not happen.

9  Q  You're not making an analogy between the

10   predictability of heart attacks and the

11   predictability of pregnant women giving birth,

12   right?

13  A  I don't know what you're asking me.

14  Q  You made an analogy. You said you can't prevent --

15   you don't know when you're going to have a heart

16   attack. You don't know when someone is going to

17   give birth. They're not really the same, are they?

18  A  As far as predictability of time it's going to

19   happen, I feel that they are similar, yes.

20  Q  Do you know Brian Wenzel?

21  A  I don't believe I do. The name sounds familiar,

22   but I have no idea who that is.

23  Q  Did the nursing staff rely on correctional officers

24   to help them provide medical care to inmates at the

25   jail?

1      MR. ARNOLD: Object to form and

2   foundation.

3      MR. RUSSART: Join.

4      THE WITNESS: What do you mean by

5   "provide medical care"?

6  BY MR. RAUSCHER:

7  Q  Did you as the director of nursing provide medical

8   care to inmates at the Milwaukee County Jail?

9  A  I did.

10  Q  And what did you do to provide medical care to

11   inmates at the jail?

12      MR. RUSSART: Vague. Overbroad.

13      THE WITNESS: Are you talking about like

14   in booking? Are you talking about if somebody has

15   a cut finger? Are you talking about a heart

16   attack?

17      I don't know what -- in what

18   instance do you mean like provide medical care? If

19   there was a medical need, I provided care for it.

20  BY MR. RAUSCHER:

21  Q  And did you rely on correctional officers at all to

22   help you provide that care?

23      MR. RUSSART: Object to the form and

24   foundation.

25      MR. ARNOLD: Join.

1      THE WITNESS: I did not have officers

2   give medications. I did not have officers do any

3   medical care, no.

4  BY MR. RAUSCHER:

5  Q  Did you rely on officers to tell you when care

6   might be needed?

7  A  That I -- at times officers would -- since they

8   were with them, they would say, hey, just so you

9   know, this person said this to me or said that to

10   me.

11      As far as if there's a medical

12   emergency and nursing was not -- or medical staff

13   was not in the room, yes, officers would activate

14   or call medical emergency.

15  Q  Could inmates see the medical staff without filling

16   out the pink and white form that you talked about

17   earlier?

18  A  Yes.

19  Q  And how would they go about seeing medical staff

20   without filling out the pink and white form?

21  A  They could see them during a MED-PASS. Staff was

22   rounding -- if they were in segregation, they would

23   be rounded by staff so they could ask for help at

24   that time, or they could ask the correctional

25   officer, or they could ask a lieutenant or captain

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 18 of 37   Document 175-24

a26c2730-afd3-4f17-8dbc-96811324307d

1    or whoever was around.

2  Q   And did you expect as the director of nursing that

3      if a correctional officer was asked for help, he or

4      she would tell the medical staff about the

5      patient's need?

6  A   If an -- you're saying if a patient asked a CO for

7      help?

8  Q   If an inmate said to a CO, I need help with a

9      medical need, would you expect that the CO would

10     then tell the medical staff?

11 A   I would expect that, yes.

12 Q   Would you expect the CO to make any independent

13     determination as to whether the need was legitimate

14     before going to the medical staff?

15 A   That's a really hard question to answer because of

16     different situations.  I guess it would depend on

17     what they're asking.

18 Q   So for some medical needs, you would expect the CO

19     to say -- to make some initial determination

20     whether they should even tell the nursing staff,

21     and for others you wouldn't; is that fair?

22 A   No, not whether they should tell them what route

23     they should -- for instance, I need a bandaid, I

24     need stuff for my lips.  Those are not emergent

25     medical issues.

1          So at the next MED-PASS, I believe

2      that they could say, hey, by the way, he asked for

3      this or asked for this.  They have a daybook that

4      they keep things in that they -- you know, when the

5      nursing come in they talk to.

6              If there is something that they felt

7      was out of their scope or -- I don't know -- I

8      don't know their training.  I don't know what they

9      have.  But if they felt something that they

10     couldn't handle, then they would notify us.

11 Q   You don't know what training they had, is that what

12     you said?

13 A   Yes, I don't know what training they had.  I didn't

14     do their training.

15 Q   Was there a policy in place when you were the

16     director of nursing for how people who were in the

17     SMU could see medical staff?

18 A   I would assume so.  I don't know specifically what

19     policy description you're talking about.

20 Q   I'm just asking you if there was one.

21         MR. RUSSART:  Foundation.

22         MR. ARNOLD:  Join.

23         THE WITNESS:  I'm sorry, can you ask me

24     again?

25

1  BY MR. RAUSCHER:

2  Q   Was there a policy in place when you were the

3      director of nursing as to how people who were in

4      the SMU could see the medical staff?

5  A   I don't -- I don't recall.

6  Q   Was there a nurse in the SMU at all times?

7  A   No.

8  Q   How frequently would a nurse be in the SMU?

9  A   Well, it would really depend on who's in there,

10     what orders they have, what the requirement from

11     the provider are regarding those -- those people in

12     there.

13 Q   Were nurses required to conduct inspections of the

14     SMU?

15 A   What do you mean by "inspections"?

16 Q   Were they required to walk around periodically to

17     make sure everyone was okay?

18 A   If it was ordered.

19 Q   If it was ordered for a specific patient?

20 A   Depending on how -- what the orders were.  I mean

21     they have -- they have -- patients -- each patient

22     may have different orders as to how often they are

23     to be evaluated.

24 Q   Understood.  So every patient in the SMU has a

25     chart, right?

1  A   Yes.

2  Q   And they have certain orders from a doctor in that

3      chart?

4  A   Correct.

5  Q   The nurses were expected to follow those orders?

6  A   Yes.

7  Q   So if the order said go check on this person every

8      half hour, the nurse would do that?

9  A   Yes.

10 Q   What I'm asking is separate from that, from whether

11     there's an individual order that says go inspect

12     this, go check out this person over a certain time,

13     was there a general policy that nurses had to go

14     around the SMU every half hour, every hour, every

15     whatever the time period is to check on inmates?

16 A   I can't speak to a general policy because I'm not

17     aware of what policy -- the SMU policy was.  I --

18     typically a nurse does an assessment each shift.

19 Q   Okay.  Each like eight, 10-hour shift?

20 A   Each eight-hour shift.

21 Q   Each eight-hour shift.  Okay.

22         (Exhibit 2 was marked for

23     identification.)

24 BY MR. RAUSCHER:

25 Q   This is a document with a title Infirmary Care, and

1   the first Bates number is Armor 00264.
2   A   Um-hum.
3   Q   Have you ever seen this document before?
4   A   I don't recall that I -- I mean that this is the
5       exact document that I have seen before.
6   Q   Does it look familiar to you?
7   A   It looks familiar.
8   Q   Did Armor have an infirmary care policy while you
9       were working at the jail?
10  A   I don't know if -- Armor is a nationwide company,
11      so it probably did, but the Milwaukee County Jail
12      did not have an infirmary, so it would be hard to
13      have an infirmary policy or something that
14      applies -- I mean it was a special medical unit.
15  Q   Is there a distinction in your mind between an
16      infirmary and a special medical unit?
17  A   Yes.
18  Q   What is the distinction?
19  A   The number one distinction is that an infirmary has
20      nursing care 24/7.  A special medical unit does
21      not.
22  Q   So if the SMU would have had nursing care 24/7, it
23      would have been an infirmary?
24          MR. RUSSART:  Foundation.
25          THE WITNESS:  I'm going to say no because

1   there's other details of infirmary.  I can't speak
2   to an infirmary because I don't work with an
3   infirmary.  I work with a special medical unit.
4   BY MR. RAUSCHER:
5   Q   Do you see the front of this at the top it says
6       Armor Correctional Health Services, Inc. and
7       Milwaukee Central Jail Facility Health Services
8       Policies and Procedures?
9   A   Um-hum.
10  Q   Does that mean that this was a Milwaukee County --
11      an Armor policy at the Milwaukee County Jail?
12          MR. RUSSART:  Foundation.
13          MR. ARNOLD:  Join.
14          THE WITNESS:  You're asking if this was a
15      policy?
16  BY MR. RAUSCHER:
17  Q   Did you work at the Milwaukee central jail
18      facility?
19  A   Yes.
20  Q   Was this a policy for the Milwaukee central jail
21      facility?
22  A   It may have been.
23  Q   You don't know either way?
24  A   I don't know either way.
25  Q   Was part of your job as the director of nursing to

1   be familiar with the policies of Armor?
2   A   It was.
3   Q   Were you familiar with them at the time?
4   A   I was.
5   Q   Were there any patients who required 24-hour care
6       while you were the director of nursing at the jail?
7   A   Not that I'm aware of.  24-hour nursing care?
8   Q   24-hour supervised nursing care.
9   A   No.
10  Q   Have you ever in your career as a nurse worked with
11      patients who required 24-hour supervised nursing
12      care?
13  A   Yes.
14  Q   What types of conditions did those patients have?
15          MR. RUSSART:  Foundation.  Form.
16          THE WITNESS:  Typically those types of
17      patients were patients that were in the intensive
18      care unit at hospitals.
19  BY MR. RAUSCHER:
20  Q   Do you know Milwaukee's -- the jail and Armor's
21      plans was to deal with patients who needed 24-hour
22      supervised care?
23  A   I don't.
24  Q   Was there ever an infirmary when you were working
25      at the jail?

1           MR. RUSSART:  Asked and answered.
2           THE WITNESS:  No.
3   BY MR. RAUSCHER:
4   Q   Do you know why the first bullet point in this
5       policy refers to patients being cared for in the
6       infirmary?
7           MR. RUSSART:  I don't understand that
8       question.
9           THE WITNESS:  Yeah, I don't understand
10      what you're asking me.
11  BY MR. RAUSCHER:
12  Q   You see the first bullet point of this under
13      policy?  It says "Patients who require 24-hour
14      supervised nursing care and cannot be adequately
15      cared for in housing units will be managed in the
16      infirmary."
17  A   Yes.
18  Q   Do you see that?
19  A   Yeah.
20  Q   Do you know why there is a reference to an
21      infirmary if the jail never had an infirmary?
22  A   I do.  So as I said, Armor is a nationwide company,
23      and they brought their policies and procedures.
24      This is a policy and procedure that they had
25      written, and it's their policy and procedure.  We

1   did not use this policy.  We have site-specific
2   policies, and we did not have an infirmary, so this
3   is not applicable to the care that I am aware of
4   giving.
5   Q   Where are the site-specific policies kept?
6   A   In general?
7   Q   Are they different than these -- than this one?
8   A   Yes.
9   Q   And are they different just because you didn't use
10   this one, or are they -- are there separate
11   policies that are not this that don't look like
12   this?
13   A   So site -- we developed site-specific policies that
14   were -- so Milwaukee County Jail was one facility,
15   and the House of Correction was another facility.
16   They have the same policies and procedures, but at
17   each location there's different things that happen
18   at each site.  So each site-specific procedure was
19   developed based on the location, the capabilities,
20   the abilities.
21       For instance, Armor also had a flood
22   policy.  That's not applicable.  We had a site
23   specific for tornadoes because that's more
24   applicable here.
25   Q   Do you know who created this policy?

1   A   No.
2   Q   What did the site-specific policies look like?
3   A   Very similar form.
4   Q   Was there anything different about the form?
5   A   Yeah.  It said site-specific policy or --
6   Q   Where it --
7   A   -- site-specific procedure.
8   Q   Where on this would it say site-specific procedure?
9   A   I don't recall the exact format of it.
10   Q   Who wrote the site-specific procedures?
11   A   On-site, the leadership did.
12   Q   Were you part of the leadership?
13   A   Yes.
14   Q   What site-specific policies do you -- did you write
15   for the Milwaukee County Jail?
16   A   I don't remember what site-specific procedures that
17   I wrote particularly.  I know that the infirmary
18   and the SMU was a conversation that had to be had
19   because Milwaukee County Jail does not have an
20   infirmary.
21   Q   Were you part of the conversations about infirmary
22   and SMU?
23   A   I was not.
24   Q   Who was part of those conversations?
25   A   I don't know.  That happened when I was a staff

1   nurse.
2   Q   Was that a conversation between Armor and the jail?
3   A   I don't know.
4   Q   How do you know there were conversations?
5   A   Because we never referred to our SMU as an
6   infirmary.  It's labeled SMU.  It's -- all the
7   documents say SMU.  It's always been an SMU.
8   Q   When people are in the SMU, did the nursing staff
9   rely on the correctional officers to tell them when
10   someone was in need of receiving care?
11   A   Nursing did an assessment, did an evaluation and
12   determined a plan of care.  If something came up
13   between the times that the nurse was in for the
14   assessment or MED-PASS and something came up, the
15   patient would tell the correctional officer, and
16   the correctional officer would tell the nurse.
17   Q   Did the correctional officers -- were the
18   correctional officers supposed to do inspections in
19   the SMU?
20   A   I don't know.
21   Q   Did you ever know that?
22   A   I don't know what the rules are.  I don't know
23   if -- I can't speak to that.
24   Q   Did you ever have a conversation with any
25   correctional officers as to whether they conducted

1   inspections of the SMU?
2   A   I have seen them do inspections of the SMU.  I
3   don't know what the frequency is or the rules or
4   anything about that.
5   Q   What did you see them do when they did inspections
6   in the SMU?
7   A   Walk to the doors and talk to the clients or
8   patients.
9   Q   How big is the SMU?
10   A   I believe it's 11 beds.
11   Q   Are they each -- each bed in individual cells?
12   A   Yes.
13   Q   Can you see the whole room from any given place?
14   A   No.
15   Q   Could you hear somebody yelling from anywhere in
16   the room?
17   A   I would assume so, yes.
18   Q   You've been in the SMU a bunch of times, right?
19   A   I have.
20   Q   Have you ever heard anybody yell in the SMU?
21   A   Yes.
22   Q   Could you hear it pretty clearly?
23   A   Could I hear it clearly if somebody is yelling
24   loudly, yes.
25       MR. RAUSCHER:  Can we mark this as

Pages 81 to 84

1  Exhibit 3, please.
2      (Exhibit 3 was marked for
3  identification.)
4  BY MR. RAUSCHER:
5  Q  This documents is Bates labeled MKE County 990.
6      Have you ever seen this document before?
7  A  I have not.
8  Q  Do you see the pod name for Rebecca Terry in the
9      bottom right-hand corner?
10 A  Um-hum.
11 Q  Do you see it says infirmary?
12 A  I do.
13 Q  Do you know where in the building that's referring
14     to?
15 A  I'm going to -- I don't -- I'm assuming it's the
16     SMU.
17 Q  Did people use those two terms interchangeably when
18     you worked at the jail?
19 A  They did not.
20 Q  Did people ever refer to it as an infirmary in your
21     presence?
22 A  No.
23 Q  Why are you making the assumption that infirmary
24     means SMU on here?
25 A  Because the person that you're talking about,

1  Rebecca Terry, is listed here as full name, and you
2  said she was in the SMU.
3      (Exhibit 4 was marked for
4  identification.)
5      MR. RAUSCHER:  Mark this as Exhibit 4,
6  please.
7  BY MR. RAUSCHER:
8  Q  Let me know when you've had a chance to look at
9      this.
10 A  I mean like look at it like I'm having a test or --
11 Q  No, just look it over.  I'll ask you questions.  If
12     you want more time to look at it, you can take as
13     long as you want.
14 A  Okay.  Okay.
15 Q  So the first question I have is, do you recognize
16     this document?
17 A  I do not.
18 Q  We were talking about incident reports earlier.
19         Is this the type of document you
20     were referring to when you talked about incident
21     reports?
22 A  This is the type of document, yes.
23 Q  In this one it looks like it's filled out by Brian
24     Wenzel, the correctional officer involved.  Do you
25     see that?

1  A  I do.
2  Q  Is that who typically fills out the type of
3      incident reports that you were talking about?
4  A  For the sheriff's department, yes.  For Armor, if
5      we had an incident report, we have our own thing.
6  Q  So you were -- when you were talking about incident
7      reports earlier, were you talking about the Armor
8      thing or this type of thing?
9  A  I was speaking in general about incident reports.
10 Q  Would you expect based on your experience that
11     Armor would create its own incident report for
12     someone being born in a jail cell?
13 A  I would assume that an incident report of some sort
14     would be completed by Armor, yes.
15 Q  As a nurse, have you assisted in labor and
16     delivery?
17 A  I have.
18 Q  In your experience, are women who are giving birth
19     typically silent?
20 A  Sometimes.
21 Q  Is it more frequent, less frequent?
22 A  What stage of birth are we speaking here?
23 Q  Is it -- in your experience are women typically
24     silent through the entire time period of giving
25     birth?

1  A  In my experience as a mother of two, I did not make
2      a sound when I gave birth.  In that same
3      experience, people have been yelling.  So I
4      can't -- I mean it's --
5  Q  It depends on the person?
6  A  Correct.
7  Q  In your experience as a nurse, does it depend on
8      whether the woman has gotten any medicine, an
9      epidural or anything like that?
10 A  In my experience, no.
11 Q  Did you ever review Armor's contract with the
12     jail -- I'm sorry, Armor's contract to provide
13     services at the jail?
14 A  Several, several years ago, yes.  I mean briefly
15     reviewed it I have, yes.
16 Q  Why did you review it?
17 A  Because I was curious.
18 Q  Did you review it while you were the director of
19     nursing?
20 A  No.
21 Q  In what capacity did you review it?
22 A  I reviewed it when I was a county nurse, and they
23     were talking about an outside agency coming in and
24     providing medical care.  It was kind of passed
25     around.

1  Q   You mentioned the consent decree.

2  A   Um-hum.

3  Q   Can you tell me what your understanding is of the

4      consent decree that Milwaukee County Jail is under?

5  A   Yes.  It is my understanding that -- I guess now

6      it's probably 15, 16 years ago now, there was a

7      lawsuit brought by a family to the Milwaukee County

8      Jail.

9          The Milwaukee County Jail's medical

10      service was deemed not sufficient, so Dr. Shansky

11      was put in place to monitor the medical care at the

12      Milwaukee County Jail to have it improve.  And once

13      his evaluations state that it is where he believes

14      it should be, then the consent decree would be

15      lifted.

16  Q   And you referenced talking to Dr. Shansky earlier.

17      How frequently did you talk to Dr. Shansky?

18  A   Several times a year, several times in between.  He

19      was on site I think it was every three months.  And

20      then any questions or guidance or advice, we would

21      reach out to him.

22  Q   While you were -- well, did you talk to Dr. Shansky

23      before you became the director of nursing?

24  A   I did.

25  Q   How frequently did you talk to Dr. Shansky before

1      you became the director of nursing?

2  A   I think one time.

3  Q   Do you remember what you talked to him about that

4      time?

5  A   He was doing a walk-through or something, and it

6      was just a nonrelevant -- it was more of a, hey,

7      how are you kind of conversation.

8  Q   As director of nursing, did you have more

9      substantive conversations with him?

10  A   Absolutely.

11  Q   What -- what kind of conversations did you have --

12      let me strike that.

13          What did you talk about with

14      Dr. Shansky while you were the director of nursing?

15  A   Medical care at the Milwaukee County Jail and the

16      House of Correction.

17  Q   Did you ever work at the House of Correction?

18  A   I did.

19  Q   How -- was that the same time period that you

20      worked for the county jail?

21  A   Yeah.

22  Q   Were you the director of nursing at the House of

23      Correction also?

24  A   Yes.

25  Q   How long were you the director of nursing at the

1      House of Correction?

2  A   When I started at the Milwaukee County Jail as the

3      director of nursing, I was also director of nursing

4      at the House of Correction.  And then at some point

5      I got an assistant director of nursing, and then at

6      some point she took at as director of nursing.

7  Q   At the House of Correction?

8  A   Correct.

9  Q   And then you stayed on at the jail?

10  A   Correct.

11  Q   Did you ever have to fire anybody as the director

12      of nursing?

13  A   Yes.

14  Q   How many people did you fire as the director of

15      nursing?

16  A   About three I want to say.

17  Q   Why did you fire them?

18  A   Time and attendance.

19  Q   Time and attendance?

20  A   Lack thereof.

21  Q   Tell me what you mean.

22  A   Yes, they were -- Armor had a point system.  And if

23      you got to a certain amount of points because of

24      being late, leaving early, calling in sick, then if

25      you get to that certain amount of points, you are

1      terminated.

2  Q   Can you tell me what -- what the substance of your

3      conversation was with Dr. Shansky while you were

4      the director of nursing at the jail?

5  A   The medical care at the Milwaukee County Jail about

6      access to care, about more so what has been done in

7      the past and what we're doing to improve the

8      medical care.

9  Q   And what specifically did you talk about?  Can you

10      be any more specific when you say you talked to him

11      about the medical care at the jail?

12  A   Well, I initially spoke to him about the consent

13      decree and what that meant, and his main focus was

14      CQI or continuous quality improvement.  And so we

15      went through each of those topics, and he let me

16      know what he's looking for and what outcomes he's

17      looking for to get the consent decree lifted.

18  Q   What did he tell you he was looking for to get the

19      consent decree lifted?

20  A   There are -- the report that he has has several

21      different topics, and it was anything ranging from

22      booking times to times people are seen by providers

23      to staffing.

24  Q   Did he think there was too little staffing?

25  A   No.  He devised the staffing plan.  He divides the

1      rule for how much staff we're supposed to have.

2    Q    Were there times when he said Armor wasn't

3         following the staffing plan?

4    A    Yes.

5    Q    Because they had too little staffing?

6    A    Correct.

7    Q    Was there ever a time when Dr. Shansky told you he

8         was going to recommend that the consent decree be

9         lifted?

10   A    Yes, actually.  The last review he had before I

11        left and the report reflects that everything having

12        to do with nursing, everything under my scope had

13        obtained the substantial compliance, so it was --

14        we were really close to that.  He thought he would

15        have one more visit after that one and it would be

16        lifted.

17   Q    The whole consent decree?

18   A    Um-hum.

19   Q    When was that report issued?

20   A    I don't know the exact date, but it was the -- it

21        was issued one month before I left.

22   Q    Do you know whether the consent decree was ever

23        lifted?

24   A    I don't know for a fact, but I'm sure it was not

25        because I would assume that would be on the news.

1    Q    What did you talk with -- well, what is CQI?

2    A    Continuous quality improvement.

3    Q    And what is that?

4    A    It's a study of client records, conversations with

5         the patients or inmates and a review of the

6         policies and procedures.

7    Q    How frequently did that review happen when you were

8         the director of nursing?

9    A    Every month we had CQI meetings.

10   Q    Were reports generated from those meetings?

11   A    Yes.

12   Q    How were those reports stored?

13   A    Electronically they were printed for the meeting.

14        We had a CQI coordinator.

15   Q    Did you ever print the reports?

16   A    No.

17   Q    Do you have any sense of how long it would take to

18        print CQI reports?  Meaning is it something you can

19        just pull up pretty easily and print it out?

20   A    In my opinion, yes.

21   Q    Did you discuss specific patients during the CQI

22        meetings?

23   A    No, not specific patients or patients' names or

24        things like that.

25   Q    Did you look at medical records during the CQI

1         meetings?

2    A    No.

3    Q    So what was the overall purpose of having the

4         monthly meetings?

5    A    To let -- it was a -- lab was there, pharmacy was

6         there, corrections was there, medical staff was

7         there to have a conversation about the way things

8         are going; for instance, does the lab times work,

9         are meds coming on time.

10             We reviewed some charts and were

11        finding that this needs to be done or that needs to

12        be done, just an open communication about issues

13        that we may be identifying and how we're trying to

14        improve them.

15   Q    So you might say labs aren't being done on time

16        based on a review of charts, but you wouldn't talk

17        about the specific charts at the meeting; is that

18        right?

19   A    Correct.

20   Q    Would there be a record somewhere showing which

21        charts were reviewed?

22   A    Yes.

23   Q    Would that be part of the CQI record?

24   A    I believe so.

25   Q    Would that be part of the meeting minutes that were

1         printed out?

2    A    Not likely.

3    Q    It would be somewhere else?

4    A    It would be in the -- I would imagine it would be

5         in the CQI reports.  You wouldn't -- like your

6         audit when you do the audits, it would be in that

7         part of it which is not brought to the CQI meeting.

8         The CQI coordinator does the audit and evaluates it

9         and brings it to the CQI meeting.

10   Q    Are the audits stored electronically also?

11   A    I know they were when I was director of nursing.  I

12        don't know about before that.

13   Q    Do you know what type of information is contained

14        in the audits?

15   A    Medical information.  I mean like --

16   Q    Anything like patient charts, patient information?

17   A    No specific patient information is in there.  They

18        would be referred to as medical record numbers.

19   Q    And would it describe whatever particular issue

20        they were looking at for that medical record?

21   A    The audit is a standard form, and it would say are

22        all the notes signed, is it dated properly.  The

23        audit stays the same, and then you just go through

24        each chart to identify whether it was completed or

25        not; and if it was not completed, you implement

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 24 of 37   Document 175-24

1    education to say, hey, just so you know when you
2    write a note, you need to sign it every time.
3    Q    How often were audits like that completed?
4    A    Throughout the month the CQI coordinator did them,
5    so it was at her discretion.
6    Q    Who was the CQI coordinator while you were the
7    director of nursing?
8    A    It was first -- oh, Kerri Cable.
9    Q    Kerri -- do you know how to spell either of those?
10   A    Yes, K-E-R-R-I.  And I believe it was Cable,
11   C-A-B-L-E.
12   Q    Okay.  And --
13   A    And then I think that she was the first one.  And
14   then the second one was Amber Salazwedel,
15   A-M-B-E-R, S-A-L-A-Z-W E-D-E-L.  Both nurses.
16   Q    Did they work at the jail?
17   A    Yes, in the House of Correction, both of them.
18   Q    Did anyone from Armor headquarters attend the CQI
19   meetings?
20   A    Occasionally.  I mean if they were in town, they
21   would.
22   Q    Was anyone from Armor's headquarters on the CQI
23   committee?
24   A    I --
25   Q    Let me ask you first.  Was there a CQI committee?

1    A    I'm not -- when there was no -- when I started, CQI
2    was not very -- there was no CQI, so we developed
3    it.  So then we started inviting people.  There was
4    always an open invitation, and then the CQI
5    coordinator started, you know, reaching out to a
6    medical assistant, an LPN, an RN, a provider to be
7    part of the CQI committee.  It was more local than
8    it was above us.
9    Q    Did anyone give -- well, had you ever been part of
10   a CQI process before you started forming the jail's
11   CQI?
12   A    Yeah, part of a process.
13   Q    And when had you been part of a CQI process before?
14   A    At Columbia.
15   Q    What was your role at Columbia?
16   A    I was the nurse representation.
17   Q    Was there someone who you would say was in charge
18   of starting the CQI program for the jail?
19   A    The CQI coordinator.
20   Q    That was Ms. Cable?
21   A    Kerri Cable, yes.
22   Q    Is having a CQI program important?
23   A    I believe so.
24   Q    Why do you think it's important?
25   A    It's a communication tool.

1    Q    Why does the fact that it's a communication tool
2    mean that it's important?
3    A    Because communication is significant in a facility
4    providing medical care and housing people and staff
5    and morale and all of it.
6    Q    Is there anything specifically that the CQI is
7    important for?
8    A    Improvement.
9    Q    Are there any particular areas when you were the
10   department of -- were there any particular areas
11   when you were the director of nursing that you
12   thought the jail could particularly improve on?
13   A    Yes.  I mean all -- all policies and procedures.
14   If they were -- all followed 100 percent would be
15   spectacular.
16        In every -- since there's no set
17   variables every time, learning how to deal with
18   individual barriers or variables and each time are
19   all education moments, and we use those to try to
20   improve to do the best that we can.
21   Q    Were there any particular areas where you thought
22   the jail could improve more than others?
23   A    The jail --
24   Q    The jail's healthcare program.  Were there any --
25   were there any particular areas where you thought

1    the jail's healthcare program could be improved
2    more than other areas of the healthcare program?
3        MR. RUSSART:  Object to the form and
4    foundation.
5        MR. ARNOLD:  Join.
6        THE WITNESS:  No, not -- I mean there's
7    not one specific area that could have been better.
8        I mean once Armor came in with
9    defined policies and procedures, implementing those
10   is what helped because it made everybody do the
11   same thing.  So it was -- it was -- we had policies
12   to follow.
13        Before Armor came in, I don't even
14   know that I ever saw a policy so ...
15   BY MR. RAUSCHER:
16   Q    Where were the policies kept when Armor came in?
17   A    We had them printed at every -- at the staff
18   station and booking, and then most of them were
19   online.  They're all online, but that's how most of
20   us got to them.
21   Q    Online and available to the public or online at
22   some internal --
23   A    Intranet.
24   Q    So you think Armor made it better at the jail
25   for -- made the jail's healthcare better?

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 25 of 37   Document 175-24

a26c2730-afd3-4f17-8dbc-96811324307d

1    A  I do.
2    Q   Other than implementing policies, are there
3        specific ways in which you think that Armor made
4        the jail's healthcare better than it was before?
5    A   I do.  I -- staffing significantly is the biggest
6        impact because coming in as the director of nursing
7        and managing a hybrid staff county workers and
8        Armor workers, Armor workers had more invested or
9        more at stake maybe than county workers I would
10       say.
11   Q   So you mentioned the hybrid staffing.  What do you
12       mean by that?
13   A   I mean half of the employees were Milwaukee County
14       employees and half of them were Armor employees.
15   Q   So half of the nurses were Milwaukee County Jail --
16       I'm sorry, Milwaukee County employees and half
17       worked for Armor?
18   A   Yeah, and I don't want to say half.  It was -- it
19       started everybody was a county employee, and you
20       can opt to join Armor if you wanted.  And then
21       eventually at one point then you had to either be
22       an Armor employee or Milwaukee County employee.
23   Q   And sometime in the middle, you could be either
24       one?
25   A   Um-hum.

1    Q   How long did the hybrid staffing situation last?
2    A   I don't remember when the date of the changeover
3        was.  I know that when I was the director of
4        nursing, all -- I mean a better portion of my
5        director of nursing, I had both Milwaukee County
6        employees and Armor employees.
7    Q   For most of your time as the director of nursing?
8    A   A better portion of it, yes.
9    Q   What did you mean when you said that Armor
10       employees had more invested?
11   A   They can lose their jobs based on this point
12       system.  They -- if -- Armor is a private company
13       that can write you up, go through a discipline
14       process and eliminate you if they did not feel that
15       you were performing your job appropriately.
16   Q   And the jail employees had more protection from
17       that sort of firing?
18   A   Correct.  Well, I guess I don't know.  I can't
19       speak to it because -- I mean they -- it was a
20       different process.
21   Q   What was the process from the jail?
22   A   Internal affairs, and it was not Armor's decision
23       on whether or not they could keep their jobs or not
24       keep their jobs.  It was somebody who I don't even
25       know who it is.

1    Q   What was the -- what were the pros of going to
2        switch over to Armor?
3            MR. RUSSART:  Objection.  Form.
4    Overbroad.
5            THE WITNESS:  Well, no -- I don't know
6        what -- for me, my personal benefit was that I was
7        able to be an educator, so it was a promotion.  If
8        you wanted a promotion, you had to become an Armor
9        employee.
10           And then for Milwaukee County, I
11       don't know -- I mean I just know that I went to
12       Armor because they're the company that came in.
13       They're the policies they're following, and that's
14       where I grew.
15   BY MR. RAUSCHER:
16   Q   Did you ever recommend that anyone who -- that any
17       healthcare provider who worked for Milwaukee County
18       be fired or disciplined in any way?
19   A   Ever?
20   Q   Ever.
21   A   As the director of nursing or ever?
22   Q   Ever.
23   A   Yes.  There's -- I mean, everywhere I work I feel
24       like there's people who could be eliminated.
25   Q   Do you recall who you recommended should be

1        eliminated?
2    A   No.
3    Q   Did you ever recommend anyone -- when you were the
4        director of nursing, did you ever recommend that
5        anyone who work for the county be disciplined or
6        eliminated and had that -- and then have it not
7        happen?
8    A   I don't recall ever requesting somebody be fired
9        and have it not be -- have it not happen, no.
10   Q   Do you recall ever asking for someone to be
11       disciplined and have it not happen?
12   A   No.
13   Q   Was there a process in place for you to be able to
14       recommend that county employees be disciplined or
15       fired when you were the director of nursing?
16   A   Disciplined, yes, not fired.
17   Q   What was the process for you to recommend
18       discipline for a county employee?
19   A   I would send the message to the administrative
20       assistant who had been a county employee and worked
21       on the whole formatting of it, and then she submits
22       it to somebody, and there's a review.  And I have
23       not enough to speak on that process.
24           I just know that she started
25       whatever it was called for it to be reviewed and

a26c2730-afd3-4f17-8dbc-96811324307d

1  then something happened from there, and they made a
2  decision, and then they let us know.
3  Q  When you were the director of nursing, did you ever
4  use that process?
5  A  Yes.
6  Q  How often did you use that process as the director
7  of nursing?
8  A  I don't recall.
9  Q  Would you only do that for things that you
10 considered major issues?
11     MR. RUSSART:  Object to the form.
12     THE WITNESS:  Like a write-up are you
13 talking about?  Like this process that I'm talking
14 about like for a write-up?
15 BY MR. RAUSCHER:
16 Q  What is the process for -- for a write-up?
17 A  If there was something that I felt -- like for
18 Armor, I would do an education form.  If there's
19 something that I feel like I need to speak to
20 somebody about and I wanted documentation of it, I
21 would use that same education form for a Milwaukee
22 County employee but that's an education form that's
23 not a discipline, that's not -- that's typically
24 how I manage the Milwaukee County employees because
25 that's my way of documenting that I have told them

1  something to follow.
2  Q  That's an education form?
3  A  Yes.
4  Q  And is that a Milwaukee County form or an Armor
5  form?
6  A  Armor.
7     MR. RAUSCHER:  Do you mind if we take
8  another really quick break?
9     MR. RUSSART:  That's fine.
10    VIDEO OPERATOR:  We are going off the
11 record at 11:23 a.m.
12    (Recess taken from 11:23 a.m. to 11:33
13 a.m.)
14    VIDEO OPERATOR:  We are on the record at
15 11:33 a.m.  This is the beginning of DVD 3 of the
16 video deposition of Gina Strehlow.
17 BY MR. RAUSCHER:
18 Q  Can you take a look back at Exhibit 2 which was the
19 infirmary policy?
20 A  I can.
21 Q  Was this policy one of the ones that would have
22 been printed out that you referred to earlier that
23 were available to all the nurses at the jail?
24 A  I don't recall if it was printed because of the --
25 it was called infirmary care.

1  Q  Do you recall who decided which policy or policies
2  should be printed and included in the forms that
3  were out and available to nurses at the jail?
4  A  Typically the HSA.
5  Q  Who is the HSA?
6  A  What was it?
7  Q  What is the HSA?
8  A  Health service administrator.
9  Q  Is that the person who is -- the head person from
10 Armor at the jail for --
11 A  Correct, or acting.
12 Q  Is it fair to say that Rebecca Terry's care
13 wouldn't have been subject to this infirmary
14 policy, Exhibit 2?
15    MR. ARNOLD:  Objection.  Foundation.
16    THE WITNESS:  Milwaukee County didn't
17 have an infirmary.  So if it didn't have an
18 infirmary, then it would be -- this is an infirmary
19 policy which is not what Milwaukee County Jail has.
20 BY MR. RAUSCHER:
21 Q  So is it fair to say that Rebecca Terry's care
22 would not have been subject to this policy?
23 A  Yes.
24 Q  Are you familiar with something called an infirmary
25 log?

1  A  I do not know what that is.
2     (Exhibit 5 was marked for
3  identification.)
4     MR. RAUSCHER:  Can we mark this as
5  Exhibit 5, please.
6  BY MR. RAUSCHER:
7  Q  Are you familiar with this policy?
8  A  I -- I mean I see it's a policy.  I guess I'm not
9  familiar with it.
10 Q  Do you recall ever seeing it before today?
11 A  I don't recall if I've seen this exact policy.  It
12 is -- looks like an Armor and Milwaukee County Jail
13 policy.
14 Q  The form looks the same as the infirmary policy,
15 right?  I mean like the format --
16 A  Yes.
17 Q  It doesn't say Milwaukee County specific or
18 anything like that.  It's different than the
19 infirmary one did.
20 A  Correct.
21 Q  So you --
22    MR. RUSSART:  Object to the form of the
23 question.
24 BY MR. RAUSCHER:
25 Q  You can compare them if you want.  What I'm trying

1    to get at is it doesn't look to me like there's
2    anything here that would say it's any more site
3    specific than the infirmary policy; is that fair?
4  A   That's fair.
5  Q   Are you familiar with any other Armor policies
6    about patients with special health needs?
7  A   I don't recall policies from when I was at Armor.
8  Q   If you look at the third bullet on the first page
9    of this, it says "Special needs are listed on the
10   master problem list."
11           Do you see that?
12 A   Yes.
13 Q   Are you familiar with a master problem list from
14   your time at the Milwaukee County Jail?
15 A   I am not -- I'm not familiar with a master problem
16   list, a separate list or something like that, no.
17 Q   Are you familiar with anything like a master
18   problem list?
19 A   Yes, a diagnosis.
20 Q   What's a -- you mean -- well, what do you mean by a
21   diagnosis?
22 A   Something that somebody's diagnosed with.
23 Q   Is there a master list of all diagnoses given at
24   the jail?
25           MR. RUSSART: Object to the form.

1            THE WITNESS: If somebody has a medical
2    problem, that's a diagnosis that is noted in their
3    chart.
4  BY MR. RAUSCHER:
5  Q   Understood. Is there -- when you were the director
6    of nursing, was there one central place you could
7    look for all of the diagnoses given to inmates at
8    the jail?
9  A   When I was the director of nursing and we started
10   with TIER which was the original charting system,
11   it was hard to determine any of that, and I don't
12   know if -- with TIER, it was hard to determine
13   that. With CorEMR, it was easier to determine.
14 Q   When did Armor start using CorEMR?
15 A   I have no idea. Sometime within my time as
16   director of nursing.
17 Q   You're not familiar with the term "master problem
18   list"?
19 A   No. I can't speak 100 percent knowing what that
20   means.
21 Q   Do you think you know what it means?
22 A   Yes.
23 Q   What do you think it means?
24 A   A diagnosis.
25 Q   Does the list part of that have any significance to

1    you?
2  A   No.
3  Q   Is a diagnosis something on a list?
4  A   I mean if you ask me for a list of diagnosis, it
5    would be.
6  Q   If you look at the next bullet it says "The
7    facility maintains a list of special needs
8    patients."
9            Did the jail maintain a list of
10   special needs patients while you were the director
11   of nursing?
12           MR. RUSSART: Foundation.
13           THE WITNESS: I don't know what the jail
14   did. I mean I can only speak to what we did in
15   Armor and medical.
16 BY MR. RAUSCHER:
17 Q   Did Armor maintain a list of special needs patients
18   while you were the director of nursing at the
19   Milwaukee County Jail?
20 A   We didn't maintain a list. We knew of our special
21   needs patients based on their location where
22   they're housed.
23 Q   Where were special needs patients housed while you
24   were the director of nursing?
25 A   In special needs.

1  Q   What is special needs?
2  A   Special needs is a unit in the jail on the third
3    floor where people with mental health issues reside
4    that are a danger to themselves or to others
5    typically.
6  Q   If you look at the next page, the second paragraph
7    has a list of conditions that would -- that fall
8    under special needs.
9  A   Um-hum.
10 Q   Do you see that?
11 A   I do.
12 Q   Were all of the patients with these types of issues
13   housed in that special needs unit you just
14   mentioned or just mental health patients?
15 A   They were not -- these people were not all listed
16   in the special needs unit of the jail.
17 Q   So how did you know where all of these people were
18   housed and what their needs were without a special
19   needs list?
20 A   Because looking at this list, these people -- some
21   of these people would be housed in the special
22   medical unit.
23 Q   Were some of them just put in regular housing?
24 A   Well, juveniles are kept separate, so I can't speak
25   to this whole list, but there's different housing

a26c2730-afd3-4f17-8dbc-96811324307d

1    for different needs.
2  Q  Okay. Well, for people who were at the jail, so
3    setting aside juveniles, were all the rest of these
4    people put in the special needs unit?
5  **A  No.**
6  Q  Do you know why Armor had a policy requiring the
7    facility to maintain a list of special needs
8    patients?
9  **A  I don't know why they had that.**
10 Q  Did anybody ever tell you that policy existed?
11 **A  No.**
12         MR. RAUSCHER: We'll mark this as
13   Exhibit 6, please.
14         (Exhibit 6 was marked for
15   identification.)
16 BY MR. RAUSCHER:
17 Q  I don't need you to read through the whole thing,
18   but my first question is, have you ever seen this
19   before?
20 **A  I have not.**
21 Q  Can I direct you to the bottom of page 7 continuing
22   on to page 8? If you look at the last sentence
23   that starts on that page, it says "Plaintiff may
24   have had precipitous labor which is expulsion of
25   the fetus within less than three hours of

1    commencement of regular contractions due to
2    abnormally low resistance of birth canal from
3    abnormally strong uterine and abdominal
4    contractions or from the absence of painful
5    sensations. At this time, it is believed the above
6    led to plaintiff's sudden delivery in the cell
7    instead of delivery at the hospital."
8         Do you see that?
9  **A  I do.**
10 Q  Do you have any knowledge one way or the other
11   about whether that is a correct statement?
12 **A  I mean I don't even know what we're talking about**
13   **here. I feel like it's not enough information to**
14   **make a statement. I mean I'm not a labor and**
15   **delivery doctor.**
16 Q  Is it fair to say that you don't know one way or
17   the other whether plaintiff had precipitous labor?
18 **A  That's correct. I mean I don't even know the**
19   **plaintiff.**
20 Q  Okay. You're not serving as an expert in this
21   case, are you?
22 **A  Not that I'm aware.**
23 Q  Are you being paid for your time today?
24 **A  I am not.**
25         (Exhibit 7 was marked for

1    identification.)
2         MR. RAUSCHER: Mark this as 7, please.
3  BY MR. RAUSCHER:
4  Q  Have you seen this document before?
5  **A  I believe I may have. I mean, again, it's a**
6    **policy. It looks familiar. I don't recall**
7    **exactly. I see that it's not signed but ...**
8  Q  Were policies typically signed when they became
9    final?
10 **A  They're supposed to be, yes.**
11 Q  Who was supposed to sign them?
12 **A  The medical director and the health service**
13   **administrator.**
14 Q  Where would the signature go, down at the bottom of
15   the first page?
16 **A  Yeah, where it's labeled.**
17 Q  The medical director, was that always someone who
18   was from Armor headquarters?
19 **A  No.**
20 Q  Was it always someone at the jail?
21 **A  Yes.**
22 Q  Let me ask you this. Was there always a medical
23   director while you were working for Armor?
24 **A  There was not a medical director when I started**
25   **at -- oh, when I worked at Armor, yes, there was**

1    **always a medical director.**
2  Q  If you look at paragraph two where it says two on
3    the second page, which is Bates stamped Armor 231,
4    do you see a reference to an intake referral log at
5    the end of that paragraph?
6  **A  Yes.**
7  Q  And that's -- this is referring to something that
8    should be completed when inmates are returned from
9    an emergency room; is that right?
10 **A  I'm not familiar with that form. I don't recall an**
11   **intake referral log.**
12 Q  Okay. Are you familiar with what the policy was
13   when you were the director of nursing for admitting
14   patients back to the jail after they had been
15   referred to an emergency department?
16 **A  Yes.**
17 Q  And what was the policy in place?
18 **A  For -- I mean like the entire policy or like steps**
19   **or -- what are you looking for?**
20 Q  Yeah, both.
21 **A  So you're saying if somebody came to jail, they**
22   **were refused and they were sent to the emergency**
23   **department or they were coming right from the**
24   **emergency department?**
25 Q  So why don't we start -- it could be either, I

a26c2730-afd3-4f17-8dbc-96811324307d

1    guess. Why don't we start. We can look at this
2    paragraph, paragraph two.
3        The last sentence says "When inmates
4    are referred to an emergency department, their
5    admission on return to the facility is predicated
6    upon receipt of written documentation of treatment
7    and necessary follow-up recommendations."
8        Is that -- was that Armor's policy
9    when you were the director of nursing?
10 **A**   **That is ideally what is supposed to happen when**
11    **somebody returns from the hospital, yes.**
12 Q   Was that followed?
13 **A**   **Was -- so when people come back from the hospital,**
14    **sometimes their paperwork -- since the COs are**
15    **transporting, they don't know what paperwork is**
16    **there, so the person arrives back at the facility**
17    **and the paperwork that describes follow-up care and**
18    **whatnot may not be there.**
19        **So they would still be accepted**
20    **back, but then we would get that paperwork.**
21 Q   How quickly would you get the paperwork?
22 **A**   **It varies.**
23 Q   How often did it happen that inmates came back from
24    emergency departments without the correct
25    paperwork?

1 **A**   **All the time, so we had to figure out a way how we**
2    **were going to handle these people because we can't**
3    **just send them back to the hospital to get**
4    **paperwork.**
5 Q   Was it -- was that circumstance -- with people
6    being sent back from the hospital without their
7    correct paperwork, was that something that happened
8    all the time throughout your time at the jail?
9 **A**   **People being sent back to the hospital just to get**
10    **paperwork?**
11 Q   No, no, no. Was it common for people who went to
12    the hospital to be sent back to the jail without
13    the correct paperwork throughout your time working
14    at the jail?
15 **A**   **Yes.**
16 Q   Do you know why Armor had a policy -- a written
17    policy that said admission of inmates on return to
18    the facility is predicated upon receipt of written
19    documentation of treatment and necessary follow-up
20    recommendations?
21 **A**   **Do I know why they wrote that policy?**
22 Q   Yes.
23 **A**   **I do not.**
24 Q   Were you aware of that policy when you were the
25    director of nursing?

1 **A**   **I was.**
2 Q   Was anybody ever reprimanded that you know of for
3    not following that policy?
4 **A**   **Staff you mean?**
5 Q   Anybody.
6 **A**   **I don't recall anybody being reprimanded for not**
7    **following that policy.**
8 Q   Do you recall ever receiving training on that
9    policy?
10 **A**   **On the receiving screening policy? No.**
11 Q   Did you ever talk to the health service -- health
12    services administrator about the issue of people
13    being returned to the jail from the hospital
14    without necessary paperwork?
15 **A**   **Yes.**
16 Q   Tell me about those conversations.
17 **A**   **So when I said one of the biggest jobs of me as a**
18    **director of nursing is the community outreach,**
19    **that's one of the -- going to the emergency**
20    **departments, going to the clinics, so we could**
21    **educate them on the importance of receiving**
22    **paperwork because they don't realize that there is**
23    **nurses at the jail.**
24        **They don't realize that we are that**
25    **person's provider, so they need to know the**

1    **importance of returning that paperwork, so we have**
2    **met with facilities to try to improve that so they**
3    **understand why we need that paperwork.**
4 Q   When did you start meeting with facilities to
5    improve that issue?
6 **A**   **I don't recall what date or what dates. We had**
7    **meetings. It was during my time as director of**
8    **nursing.**
9 Q   When did you start having conversations with the
10    health services administrator about that issue?
11 **A**   **As soon as people started coming that I noticed**
12    **without paperwork.**
13 Q   And that started happening immediately when you
14    were the director of nursing?
15 **A**   **Shortly after, yes. I was a staff nurse first, so**
16    **I recalled it.**
17 Q   Before March 2014?
18 **A**   **Yes.**
19 Q   You had conversations with the health service
20    administrator before March 2014 about that issue?
21 **A**   **March of 2014. Again, that was right when I**
22    **started as a director of nursing, so I don't know**
23    **how much conversation I had about that. I know**
24    **that we had trouble getting paperwork as a staff**
25    **nurse, and that is something that as a director of**

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 30 of 37   Document 175-24

a26c2730-afd3-4f17-8dbc-96811324307d

1    nursing, I tried to improve.

2    Q    Was it a widely known issue at the jail that there

3         was trouble getting the correct paperwork from

4         hospitals?

5    A    Yes.

6    Q    And that was always the case when you were a nurse

7         at the jail?

8    A    Yes.

9    Q    Why is it important for the jail to get the correct

10        paperwork before an inmate is returned from the

11        hospital?

12   A    To be honest, getting the paperwork isn't nearly as

13        important as getting the information.  So the nurse

14        receives a person; and if the paperwork doesn't

15        come, then they call where the patient was and says

16        what happened, what's going on, gets a report, and

17        then we'll document that report.

18             And if the report given from one

19        medical professional to her or him is acceptable,

20        is within our means, then we accept that person and

21        then spend energy getting -- like we'll have the

22        health unit coordinator or somebody following up to

23        get that paperwork.

24             The reason for getting the paperwork

25        is to get the information that we are supposed to

1    have from whatever care or treatment or reason that

2    they were sent out.

3    Q    Because continuity of care is important?

4    A    Yes.

5    Q    Is that why?

6    A    Is that why --

7    Q    Is that why it's important to get the paperwork?

8    A    It's important to get the paperwork for

9         documentation that a report -- to confirm that the

10        plan of care that we continue because I speak to a

11        nurse who tells me to do something and I do that

12        something, then that paperwork collaborates what

13        the continuity of care is.

14   Q    Have you ever heard anyone say that if something's

15        not written down, it didn't happen in the medical

16        profession?

17   A    I have.

18   Q    What does that mean?

19   A    That means if something is not written down, it

20        didn't happen.  But if I have -- if I document it,

21        then that's what happened.

22   Q    But it's better to have the written documentation

23        from the hospital in the first place, right?

24   A    I don't feel like that's always the case because I

25        think a report is what's number one because a

1    report is what happens and the documentation is --

2    I'm going to go off what a medical provider says to

3    me more than what a piece of paper says to me,

4    especially in this day and age with electronic

5    records and auto populating and whatnot.

6    Q    So if a medical provider told you you're supposed

7         to do X and then you got the report and it actually

8         didn't say that, you'd go with what the person told

9         you?

10   A    No, I would call and confirm, you told me this, and

11        your paperwork says this.

12   Q    If patients were sent with written paperwork from

13        hospitals, did you go and call the hospital anyway

14        to confirm that the written paperwork was correct?

15   A    The -- when people were sent back, typically a

16        doc-to-doc was done.  So the doctor spoke to our

17        medical director or the doctor or the provider on

18        call and they had a conversation about them being

19        cleared or not cleared or whatever needs to happen.

20   Q    And was that conversation done before the patient

21        was admitted back into the jail?

22   A    Yes.

23   Q    Always?

24   A    I don't -- I don't know if it was always done.  I

25        know that that was what was supposed to happen.

1    Q    Are you familiar with an intake referral log?

2    A    No.

3    Q    Would it have violated Armor policy to accept a

4         patient back from the hospital without getting

5         complete information either verbal or the written

6         documentation from the hospital?

7    A    Violate policy?

8    Q    Yes.

9    A    Well, I guess I'm kind of confused on --

10             MR. RUSSART:  Could you repeat the

11        question or read it back?

12             MR. RAUSCHER:  You can read it back.

13             (Record read.)

14             THE WITNESS:  Yeah.

15             MR. RUSSART:  I'm going to object to the

16        form.

17             But go ahead.

18             THE WITNESS:  I mean I would say yes.  I

19        don't -- I guess violate policy is a -- it's so

20        hard to say.  You know, like if -- I can't -- I

21        can't speak to that.  I don't know that it would

22        violate -- I mean according to this policy that I

23        have in front of me, it says here that they're

24        supposed to have written paperwork.  So in this

25        sense in that verbiage, yes, it would violate

1   this -- number two of this policy.
2   BY MR. RAUSCHER:
3   Q   And that happened all the time, right?
4   **A   What happened all the time?**
5   Q   People were accepted back to the jail in violation
6       of this written policy.
7   **A   Without having paperwork from the facility?**
8   Q   Yes.
9   **A   People were admitted back to the jail all the time**
10  **without having proper paperwork on file.**
11              **(Exhibit 8 was marked for**
12  **identification.)**
13              MR. RAUSCHER:  Can we mark this as
14      Exhibit 8, please.
15  BY MR. RAUSCHER:
16  Q   Let me know when you've had a chance to look at it.
17  **A   I've had a chance to look at it.**
18  Q   This is a document -- the title is Patient Staff
19      and Safety.  It looks like an Armor policy; is that
20      correct?
21  **A   That's correct.**
22  Q   Are you familiar with this policy?
23  **A   By reviewing it right now, yes.**
24  Q   Do you know -- well, were you familiar with it when
25      you worked for Armor?

1   **A   If it was a policy in place, I would believe that I**
2   **would be; but, again, none of these are signed, so**
3   **I assume that this was the policy that was in place**
4   **when I was there judging by the dates and the**
5   **familiarity of the look.**
6   Q   When you say "familiarity of the look," do you mean
7       the form --
8   **A   Format.**
9   Q   -- format as opposed to substance?
10  **A   Correct.**
11  Q   If you look at the second paragraph under
12      Procedures, it says "Medication errors are
13      documented on the medication error reporting form
14      AD-17."
15              Are you familiar with that form?
16  **A   I don't recall specifically that form.**
17  Q   Are you -- it says -- at the beginning it refers to
18      something called the Responsible Health Authority.
19  **A   Yes.**
20  Q   What's the Responsible Health Authority?
21  **A   I don't know exactly the Responsible Health**
22  **Authority in this -- I'm not exactly sure.**
23  Q   If you turn over to the back side of this page,
24      look at bullet point three.
25  **A   Um-hum.**

1   Q   "The medical director and health service
2       administrator will review and analyze any near-miss
3       or adverse clinical events -- clinical event.  An
4       unusual occurrence report AD-001 will be completed
5       and forwarded to the corporate risk management
6       officer."
7               Are you familiar with that policy?
8   **A   I don't know about a corporate risk manager --**
9   **management officer.**
10  Q   You don't know whether there is one?
11  **A   Yeah, I don't know what that is.**
12  Q   Are you familiar with an unusual occurrence report?
13  **A   Yes.  That's the form that I was referring to about**
14  **that -- we called -- that was like our incident**
15  **report.**
16  Q   I got it.  Okay.  Is seeing this jogging your
17      memory --
18  **A   It is.**
19  Q   -- that it was called an unusual occurrence report?
20  **A   Yes.**
21  Q   What is a near-miss or adverse clinical event?
22  **A   A near-miss or adverse clinical event is something**
23  **that could have gone wrong that we could have**
24  **prevented or something that has gone wrong.**
25  Q   Is there a certain level of seriousness that

1       something has to rise to before an unusual
2       occurrence form is filled out?
3   **A   I mean I --**
4   Q   Like, for example, if you missed one -- if someone
5       was supposed to get a Tylenol and they missed a
6       dose, would you fill out an unusual event form for
7       that?
8   **A   I would not personally.**
9   Q   Are you aware of policies or a policy that defines
10      what qualifies as an unusual occurrence to be put
11      on an unusual occurrence report?
12  **A   I am not familiar with the specific policy with --**
13  **defining what should be filled out as for an**
14  **unusual occurrence report.**
15  Q   But in your view what happened to Rebecca Terry
16      would qualify; is that right?
17  **A   For an unusual occurrence?**
18  Q   For either a near-miss or adverse clinical event
19      that would -- should require an unusual occurrence
20      report to be filled out.
21  **A   It --**
22              MR. ARNOLD:  Objection.  Foundation.
23              THE WITNESS:  I mean I would likely fill
24      that out for that situation.  I don't know that --
25      an unusual occurrence is just -- can be any level

a26c2730-afd3-4f17-8dbc-96811324307d

1     of concern. I would fill out an unusual occurrence
2     report, yes.
3  BY MR. RAUSCHER:
4  Q   Did you ever get any training about what a
5     near-miss or adverse clinical event was?
6  A   **Specific training for that, no.**
7  Q   Did anybody ever tell you what constitutes a
8     near-miss or an adverse clinical event?
9  A   **Not that I recall.**
10           **(Exhibit 9 was marked for**
11     **identification.)**
12          MR. RAUSCHER: Can we mark this as No. 9,
13     please.
14  BY MR. RAUSCHER:
15  Q   Let me know when you've had a chance to look at
16     that.
17  A   **I've had a chance to look at it.**
18  Q   The title of this policy is Medical Housing Unit.
19  A   **Um-hum.**
20  Q   Do you see that?
21  A   **I do.**
22  Q   Are you familiar with this policy?
23  A   **Same as the other ones that the format looks**
24     **familiar.**
25  Q   But no specific recollection of this policy?

1  A   **Correct.**
2  Q   Did the Milwaukee County Jail have a medical
3     housing unit while you worked there?
4  A   **We did not have a medical housing unit.**
5  Q   What is a medical housing unit if you have any
6     understanding?
7  A   **Well, a sheltered medical housing or medical**
8     **housing unit is a unit designed for the special**
9     **purpose of housing inmates who may need more**
10     **protective environment but do not require 24-hour**
11     **per day nursing.**
12  Q   That's the second bullet point you're reading from?
13  A   **Yeah.**
14  Q   Did you have any understanding before you read that
15     about what a medical housing unit would be?
16  A   **No. I could assume what it meant, but I don't have**
17     **any formal document or information of it.**
18  Q   Is it your belief that there's a separate SMU
19     policy different than the medical housing unit or
20     the infirmary policy that was site specific to the
21     jail?
22  A   **I don't know if there's a site-specific policy**
23     **called special medical unit.**
24  Q   Is the special medical unit different than the
25     sheltered medical housing unit?

1  A   **In general?**
2  Q   As it's defined here.
3  A   **As it's defined here, it sounds -- this sounds more**
4     **like a special medical unit. It sounds like our --**
5  Q   It sounds like --
6  A   **-- SMU.**
7  Q   I'm sorry, I didn't mean to cut you off.
8           You said this policy sounds like it
9     would apply to the SMU?
10  A   **I mean judging by the second bullet point, yes.**
11  Q   If you look at the last page of this, page 3,
12     paragraph number five on that page which is Armor
13     274, it says "Patients in the MHU will have the
14     opportunity to request sick call on a daily basis."
15           Do you see that?
16  A   **I do.**
17  Q   What does that mean?
18  A   **They can request a pink and white slip which is**
19     **the -- what we use for sick calls.**
20  Q   Every day?
21  A   **They can do it every shift; but, yes, every day.**
22  Q   Was that different than patients in other parts of
23     the jail?
24  A   **No.**
25  Q   So anybody could request a sick call on a daily

1     basis; is that right?
2  A   **That's correct.**
3  Q   Or more frequently, I guess?
4  A   **Yes.**
5  Q   But when you say they can -- I guess what I'm
6     trying to get at is, could they request a form
7     whenever they wanted, or could they request to see
8     somebody whenever they wanted to?
9  A   **They -- they request the form to see somebody. And**
10     **as the other units, the staff -- when the staff is**
11     **there and they have the MED-PASS, they see somebody**
12     **and they can ask for a form from them or from the**
13     **correctional officer.**
14  Q   And is there a specific time for sick call visits?
15  A   **That they occur?**
16  Q   Yes.
17  A   **There's not a specific time. It depends on --**
18     **they're reviewed by a nurse, and then they're**
19     **triaged, and then the staff goes out to visit them**
20     **or has them come to the clinic to be seen.**
21  Q   Is it fair to say, though, you can request a sick
22     call during a MED-PASS, but it's not as though the
23     nurse will stop at every person's cell who says I
24     have a health issue and then immediately treat
25     them?

1  A  In -- if the nurse feels like they need to
2     immediately treat them, yes.  And in the
3     segregation units, staff is there to ask if they
4     need a sick form or a pink and white.
5  Q  And in the SMU, are they asked more frequently
6     whether they need sick forms than they are in other
7     units?
8  A  Typically they don't -- in the SMU they don't fill
9     out sick forms because they -- providers round on
10    them, the medical director rounds on them, and the
11    nurse is in there either getting vitals or doing a
12    procedure, so it's more of like a community living
13    so that they're not as pulled away from everybody.
14 Q  Is there a policy on how correctional officers --
15    let me ask you this.
16        When you were the director of
17    nursing, was a correctional officer supposed to be
18    in the SMU 24/7?
19 A  I don't know Milwaukee County policies, but I'm
20    going to say, yes, there needs to be somebody in
21    there because any time there's -- there's patients
22    or inmates, there needs to be a correctional
23    officer.
24 Q  Was there a policy for how correctional officers
25    were supposed to inform medical staff if an

1     emergency arose in the SMU requiring medical
2     attention?
3  A  Again, I don't know what their policy is, but I
4     know that when emergent medical attention was
5     needed, a medical emergency was called through
6     master control, and we heard it on the radios, and
7     they called us.
8  Q  And you don't know what training, if any, the COs
9     got on how to determine whether something was a
10    medical emergency?
11 A  Yeah, I don't know any of that.
12 Q  Did you ever participate in administrative meetings
13    between the medical staff and the jail?
14 A  I did.
15 Q  And can you tell me about those meetings?
16        MR. RUSSART:  Objection.  Broad.
17        THE WITNESS:  I mean like -- I guess I'm
18    not really sure how -- like the name of meetings
19    or --
20 BY MR. RAUSCHER:
21 Q  What sort of meetings did you attend?
22 A  Well, they attended our CQI meetings.  There was --
23    occasionally there would be -- they'd have a
24    meeting that they'd call us to.  I don't know that
25    I have a list of meetings that I had with them.

1  Q  Did you ever discuss statistics regarding the
2     healthcare at the jail with anyone from the jail
3     side?
4  A  Statistics?
5  Q  How often people were being treated, how many sick
6     calls there were, how much prescriptions were
7     filled, that sort of thing?
8  A  Yeah.  I mean we've had discussions about that.
9  Q  Did you ever have discussions about near-misses or
10    adverse clinical events with people from the jail?
11 A  Yes.
12 Q  And do you remember any specific instances of
13    having those conversations?
14 A  I don't remember any specifics about any of them,
15    no.
16 Q  Were you involved in writing the CQI policy for the
17    jail?
18 A  No.
19 Q  Did you review it?
20 A  I reviewed it.
21        MR. RAUSCHER:  Are we on 10?
22        THE REPORTER:  Yes.
23        (Exhibit 10 was marked for
24    identification.)
25        MR. RAUSCHER:  We'll mark Exhibit 10,

1     please.
2  BY MR. RAUSCHER:
3  Q  Let me know when you've had a chance to review
4     this.
5  A  I mean I -- I -- I've reviewed it.
6  Q  Is this the CQI policy that was in place while you
7     were the director of nursing?
8  A  Judging by the dates and the format, it appears to
9     be.  But, again, it's not signed so ...
10 Q  Does the substance look like the substance of the
11    CQI policy that was in place while you were the
12    director of nursing?
13 A  The substance looks similar, yes.
14 Q  Were the ones that you had printed out that the
15    nurses could look at, were those signed?
16 A  I don't recall if those were signed.  I don't
17    recall.  I know the ones in my office that was signed.
18 Q  If you look at the page marked 213 on the bottom,
19    it's page 3 of 4, paragraph seven, this is the
20    seventh procedure.  You see it says "Approximately
21    five percent or up to 25 charts will be reviewed on
22    a monthly basis by the physician for facilities
23    with less than or equal to 500 inmates."
24        Do you see that?
25 A  I do.

a26c2730-afd3-4f17-8dbc-96811324307d

1  Q   Do you know whether there was a chart review done
2      by the physician at the Milwaukee County Jail while
3      you were the director of nursing?
4  A   I have no idea.
5  Q   Did you ever talk to the physician about a chart
6      review while you were the director of nursing?
7  A   I did not talk to them about chart review, no.
8  Q   Were you a permanent member of the CQI committee
9      while you were the director of nursing?
10 A   I was not.
11 Q   Do you know why not?
12 A   I do not know why not.
13 Q   Was there a different nurse representative who was
14     a permanent member of the CQI committee?
15 A   There was.
16 Q   Who was that?
17 A   The educator, I believe.
18 Q   Who decided who would be on the CQI committee?
19 A   I believe it was Kerri Cable, the CQI coordinator.
20 Q   Were you responsible for providing any training as
21     the director of nursing?
22 A   Providing training to who?
23 Q   To anybody.
24 A   Not that I recall.  I was a resource when we
25     implemented the computer charting, but I didn't do

1      particularly the training.
2  Q   Did you ever have any issues with the performance
3      of Margaret Hoover?
4  A   I mean I don't recall any specific instance or
5      issue with Margaret Hoover.
6  Q   Do you recall her being a good employee, not a good
7      employee, no opinion one way or the other?
8  A   I have no opinion one way or the other.  She worked
9      night shift, and I -- I have no -- no opinion, good
10     or bad, towards her.
11 Q   What about Carolyn Exum?
12 A   Carolyn Exum I worked with more and I -- you're
13     asking me if I had --
14 Q   Do you have an opinion as to -- did you supervise
15     her?
16 A   I did.
17 Q   Do you have an opinion as to whether she was a good
18     employee?
19 A   I do.
20 Q   What is that opinion?
21 A   She was a good employee.
22 Q   Was there a nurse named Bevenue when you were at
23     the jail?
24 A   Yes.
25 Q   Did you interact with her?

1  A   I did.
2  Q   And do you have any opinion as to whether she was a
3      good employee?
4  A   I do.
5  Q   And what's that opinion?
6  A   She was a good employee.
7  Q   Did you ever have any issues with her performance?
8  A   Not that I recall.
9          MR. RAUSCHER:  We're getting really
10     close, I think.  Can we take another quick break?
11         MR. RUSSART:  Sure.
12         MR. RAUSCHER:  We ought to wrap it up
13     soon.
14         VIDEO OPERATOR:  We are going off the
15     record at 12:15 p.m.
16         (Recess taken from 12:15 p.m. to 12:20
17     p.m.)
18         VIDEO OPERATOR:  We are back on the
19     record at 12:20 p.m.
20 BY MR. RAUSCHER:
21 Q   In your experience at the Milwaukee County Jail,
22     did anyone at the jail, either medical staff or
23     anyone else, conduct an independent assessment of
24     someone who has returned from a hospital to make
25     sure that they were medically stable enough to be

1      admitted back into the jail?
2  A   "Independent" meaning they --
3  Q   Independent of the hospital.
4  A   Not that I'm aware of.
5  Q   Are you aware of anybody who has returned from a
6      hospital being refused entry into the jail and sent
7      back to the hospital?
8  A   Absolutely.
9  Q   And what were the circumstances when that happened?
10 A   If somebody returned back and they didn't have the
11     paperwork and an assessment was done and if they
12     were sent out for high blood pressure and they came
13     back and their blood pressure was still high, they
14     would be sent back if they -- unless a report was
15     given or a treatment was given.
16 Q   How often did that happen?
17 A   I mean how frequently?
18 Q   How frequently?
19         MR. ARNOLD:  With respect to blood
20     pressure?
21         MR. RAUSCHER:  Well, specifically with
22     respect to blood pressure.
23         THE WITNESS:  You're asking me how
24     frequently did someone come back from being
25     medically cleared at the hospital did we send them

1      back?
2  BY MR. RAUSCHER:
3  Q   Before you even let them come back into the jail.
4      That's what I'm trying to ask.
5  A   Before they even come the first time?
6  Q   No, no.  So they're in jail.
7  A   Um-hum.
8  Q   They get sent to the hospital.
9  A   Um-hum.
10 Q   They get transported back to the hospital -- I'm
11     sorry, back from the hospital to the jail, do you
12     remember any instances where the jail refused to
13     let them back into the jail and then sent them back
14     to the hospital instead?
15 A   Occasionally, yes.
16 Q   How -- what does occasionally mean?
17 A   I -- I mean I don't have an exact number, so I can
18     just say occasionally.  I mean, not all of the
19     time.
20 Q   Do you remember any specific conditions of anybody
21     where that happened?
22 A   Medical conditions?
23 Q   Yes.
24 A   I mean not -- I can't speak exactly of an example,
25     so I don't -- I mean I can't give you an

1      example/situation where somebody came and I know
2      that they were sent back.
3  Q   You think it happened, but you're not sure when or
4      who it happened to?
5  A   I know it happened.  I cannot give the specifics on
6      when and why it happened.
7  Q   How do you know that it happened?
8  A   Because that's one of the reasons, as I said, I
9      went to meet with the community because we were
10     struggling getting paperwork and getting
11     documentation and getting people cleared as we feel
12     like they needed to be cleared before coming back
13     to our facility.
14 Q   And you know that as a result of not getting
15     assurances that everyone was cleared, occasionally
16     someone got sent back before they were even let
17     into the jail?
18 A   It's not getting assurances that they were cleared.
19     It's a nurse doing an assessment and saying we sent
20     them out for this reason and we don't feel like you
21     did what you need to do to verify that they are
22     eligible to come back.
23         (Exhibit 11 was marked for
24     identification.)
25

1  BY MR. RAUSCHER:
2  Q   I'm going to show you what we marked as Exhibit 11.
3      Are you familiar with this policy?
4  A   I am not.
5  Q   Does it look like the type of -- like a form that
6      you're even familiar with?
7  A   No.
8  Q   Do you know whether this was ever a policy at the
9      Milwaukee County Jail?
10 A   I have no idea.
11 Q   It's title is Detention Services Bureau, Special
12     Medical Unit IM 8.  Do you see that?
13 A   I do.
14 Q   Do you know what that is?
15 A   I do not.
16 Q   You don't know whether that's the SMU at the jail
17     or not?
18 A   I don't know what IM 8 is.  I don't know what
19     Detention Service Bureau is.
20 Q   Okay.  And then do you see the policy it says
21     "Inmates at the Milwaukee County Jail that require
22     ongoing medical care/treatment will be housed in
23     the infirmary with their medical care closely
24     monitored by jail medical staff"?
25 A   I do see that.

1  Q   Underneath that it has a list of things about the
2      special medical unit.
3  A   Um-hum.
4  Q   Do you see all that?
5  A   I do.
6  Q   Do you know what they're talking about when they
7      refer to the infirmary in this?
8  A   No idea.
9  Q   Okay.
10         MR. RAUSCHER:  That is all I have for
11     you.
12         MR. RUSSART:  No questions.
13         MR. ARNOLD:  No questions.
14         MR. RAUSCHER:  Thanks for your time.
15         THE WITNESS:  No problem.  Thank you.
16         VIDEO OPERATOR:  We are going off the
17     record at 12:25 p.m.  This concludes the video
18     deposition of Gina Strehlow.  There was a total of
19     three DVDs.
20         (Deposition concluded at 12:25 p.m.)
21
22
23
24
25

a26c2730-afd3-4f17-8dbc-96811324307d

```
 1        STATE OF WISCONSIN )
                           ) SS:
 2        MILWAUKEE COUNTY  )

 3

 4             I, Dawn M. Lahti, RPR, Certified
 5        Realtime Reporter, and Notary Public in and for the
 6        State of Wisconsin, do hereby certify that the
 7        preceding deposition was recorded by me and reduced
 8        to writing under my personal direction.
 9             I further certify that said
10        deposition was taken at 100 East Wisconsin Avenue,
11        Milwaukee, Wisconsin, on the 4th day of April,
12        2018, commencing at 9:08 a.m.
13             I further certify that I am not a
14        relative or employee or attorney or counsel of any
15        of the parties, or a relative or employee of such
16        attorney or counsel, or financially interested,
17        directly or indirectly, in this action.
18             In witness whereof, I have hereunto
19        set my hand and affixed my seal of office on this
20        9th day of April, 2018.
21
22             _____

               DAWN M. LAHTI, RPR
23             Certified Realtime Reporter
               Notary Public
24
          My commission expires April 17, 2020.
25
```

Case 2:17-cv-01112-JPS   Filed 09/04/18   Page 37 of 37   Document 175-24