UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

REBECCA TERRY,

    Plaintiff,

v.

COUNTY OF MILWAUKEE, DAVID A. CLARKE, JR., in his personal and official capacities, OFFICER BRIAN WENZEL, JANE AND JOHN DOE, UNKNOWN EMPLOYEES OF MILWAUKEE COUNTY JAIL, JANE AND JOHN DOE, UNKNOWN JAIL SUPERVISORS, ARMOR CORRECTIONAL HEALTH SERVICES, CAROLYN EXUM, MORGAN BEVENUE, MARGARET HOOVER,

    Defendants.

Case No.: 17-cv-1112-JPS

**REPLY BRIEF IN SUPPORT OF DEFENDANT ARMOR CORRECTIONAL HEALTH SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT**

# INTRODUCTION[1]

The facts underlying this case are undisputed: Ms. Terry arrived at MCJ around 6:00 pm on March 9, 2014; a medical decision was made to send her for medical clearance at Froedtert because she was in late stage pregnancy, had received no prenatal care and complained of feeling contractions; she returned to MCJ around 1:00 am on March 10, 2014; after the MCJ nurse (Ms. Exum) obtained information from a Froedtert OB nurse about the medical treatment provided to Ms. Terry, including assurance she was not in active labor, the MCJ Medical Director (Dr. Buono)

---

[1] Though colorful, the Court must ignore Ms. Terry's introduction section. For summary judgment, the Court is bound by the record evidence, facts, and legal argument. It cannot consider hyperbolic argument akin to an opening or closing trial statement. Just as the Court will not consider the fact that Ms. Terry was a heroin addict who sought no prenatal care and was arrested two days before her baby was due, it will not consider Ms. Terry's attempt to smear Armor with reference to the consent decree or legal issues in other jurisdictions.

determined Ms. Terry should be booked into MCJ and housed in the Special Medical Unit (SMU), where the highest level of inmate is observation is provided. Without notice to the medical staff, Ms. Terry delivered her baby in the SMU three hours later. Based on these undisputed facts, no reasonable jury could determine Armor is liable for Ms. Terry's alleged constitutional injury based on either of the two *Monell* policy theories set forth by Ms. Terry, or that the MCJ medical staff violated Ms. Terry's constitutional rights by objectively unreasonable conduct.

Ms. Terry's *Monell* claim against Armor now focuses on two broad theories: (1) a widespread practice of admitting inmates into the jail without receiving adequate paperwork/information from hospitals about the patient; and (2) failure to develop a nursing protocol for inmates in late term pregnancy and labor. (ECF No. 129, pp. 12-14; ECF No. 180, p. 18 [dropping the failure to train theory].)

Despite Ms. Terry's arguments to the contrary, her *Monell* claims against Armor fail as a matter of law for several reasons. First, it is appropriate for the Court to dismiss Ms. Terry's Amended Complaint because her new *Monell* theories exceed the scope of amendment previously authorized by the Court and are improperly pled. Second, the undisputed material facts provide no basis for a reasonable jury to conclude Ms. Terry can prove her *Monell* claims against Armor. She cannot establish Armor had notice of the alleged widespread practice or notice of a policy gap, nor can she establish either theory was the moving force behind her alleged constitutional injury. Third, she cannot establish the underlying constitutional injury required for a successful *Monell* claim.

Therefore, this is the stage at which the Court must dismiss Ms. Terry's claims against Armor – a narrow part of the broader litigation – because she has insufficient evidence to establish her *Monell* claim against it under either of the two remaining theories.

302578407v1 1003420

## PROCEDURAL HISTORY

Ms. Terry pled the following for her *Monell* claim in her Amended Complaint: (1) Armor and Milwaukee County had a widespread practice of sending inmates to the hospital for medical evaluation and then admitting the inmates to the jail without receiving adequate information from the hospital about the patient; and (2) Armor also failed to develop an observation policy or nursing protocol for inmates in the late stages of pregnancy or in labor, such as a policy requiring nurses to check on laboring inmates frequently. (ECF No. 129, ¶¶ 62, 67.)

## ARGUMENT

### I. MS. TERRY FAILS TO STATE A *MONELL* CLAIM AGAINST ARMOR.

As Ms. Terry notes, Armor argued in its opening brief the *Monell* claim against it should be dismissed on the pleadings and based on the evidence. Armor will focus its reply brief on the undisputed evidence comprising the summary judgment record.

First, however, Armor draws the Court's attention to an argument ignored by Ms. Terry in her response brief, namely that Ms. Terry's new *Monell* theories exceed the scope of amendment authorized by the Court. To reiterate, Ms. Terry originally alleged she was ignored and suffered a "complete lack of medical care," and when the Court dismissed her original *Monell* claim against Armor, it afforded her the opportunity to craft an amended complaint "<u>curing the deficiencies the Court ha[d] identified</u>." (ECF No. 1, ¶ 46; ECF No. 127, p. 28) (emphasis added.) However, because Ms. Terry added new allegations that are not consistent with her previous allegations, Ms. Terry's amended *Monell* claims exceed the scope of the Court's order in numerous ways: (1) the admittance documentation theory directly contradicts and is not derivative of the prior "complete lack of medical care" claim because transferring inmates for outside medical treatment or consultation is medical care and demonstrates Armor's exercise of medical judgment; and (2) the theory Armor failed to develop a specific type of policy, namely a nursing protocol regarding

inmates in late pregnancy and labor, is outside the scope of the original, albeit broad, *Monell* claim against Armor.[2] Because Ms. Terry's amended *Monell* claim is neither consistent with or a narrower version of her original claim against Armor, it must be dismissed for failing to cure the original complaint's deficiencies and exceeding the scope of the Court's order.

## II. THE SEVENTH CIRCUIT'S DECISION IN *MIRANDA* DOES NOT ALTER THE ANALYSIS FOR ARMOR'S MOTION.

The parties agree *Miranda v. County of Lake*, an August 2018 decision by the Seventh Circuit, governs the standard for medical care claims of pretrial detainees like Ms. Terry. *See* Case No. 17-1603, 2018 U.S. App. LEXIS 22229 (7th Cir. Aug. 10, 2018). However, nothing in this case alters the analysis for Armor's motion for summary judgment on Ms. Terry's *Monell* claim against it. As the Northern District of Illinois explained in *White v. Watson*, decided September 10, 2018, "*Miranda* did not suggest any change to the application of the deliberate indifference standard to a pretrial detainee's claim under *Monell*." Case No. 16-CV-560-JPG-DGW, 2018 U.S. Dist. LEXIS 153931 (S.D. Ill. Sept. 10, 2018) (*citing Miranda*, 2018 U.S. Dist. LEXIS 22229, at *13-14). Moreover, as discussed below, *Miranda* does not affect Armor's argument Ms. Terry cannot establish the underlying constitutional deprivation for her *Monell* claim because the medical staff actions were objectively reasonable.

## III. MS. TERRY'S *MONELL* CLAIM AGAINST ARMOR MUST BE DISMISSED BECAUSE IT IS NOT SUPPORTED BY EVIDENCE.

Both of Ms. Terry's *Monell* theories against Armor fail due to Ms. Terry's failure to produce sufficient evidence from which a reasonable jury could find the required elements of every *Monell* claim: notice, causation, and constitutional deprivation. *See Gaughan v. Crawford*, No. 05-C-4664, 2008 U.S. Dist. LEXIS 107910, at *5 (N.D. Ill. July 24, 2008) (*citing Monell v. Dep't of Social*

---

[2] Armor has explained why this is not a typical amendment of claims under Fed. R. Civ. P. 15(a)(2) and incorporates that argument herein. (See ECF No. 163, p. 12, n.6.)

*Servs. of New York*, 436 U.S. 658, 690–95 (1978)) (setting forth the *Monell* claim elements: "(1) the deprivation of a constitutional right; (2) that action was taken pursuant to a custom, policy or practice of the local government unit; and (3) that such action was the cause of the deprivation.").

First, Ms. Terry's theories and supporting legal arguments fail because they are based on flawed analysis of two of these basic elements: notice and causation. For that reason, the basic tenets of these elements must be revisited here.

To state a widespread practice *Monell* claim, Ms. Terry must allege and establish facts tending to show the alleged activity was so persistent and widespread the responsible policymakers should have known about the behavior and the practice was "so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *See Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001); *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005). As the Court previously held, "Only if Defendants consciously ignored a need for action can it be said that they adopted a *de facto* policy of violating inmates' constitutional rights. Put differently, Defendants must have had notice of an ongoing problem such that allowing the problem to endure was akin to a conscious choice among alternatives." (ECF No. 127, p. 10.)[3] In *Canton*, a Supreme Court decision cited by this Court for support of the prior statement, the court declared a *Monell* defendant like Armor has the requisite notice if an act or omission with respect to its policies was "so likely to result in the violation of constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *see also Woodward v. Corr. Med. Services of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2014) ("evidence of a single violation of federal rights can trigger municipal liability if the violation was a highly predictable consequence of the municipality's failure to act").

---

[3] *Citing City of Canton v. Harris*, 489 U.S. 378, 388-389 (1989); *Calhoun*, 408 F.3d at 380; *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985).

The purpose for the notice requirement is to establish "sufficient culpability on the part of the governmental entity." (ECF No. 127, p. 11.) Thus, a widespread practice *Monell* claim requires "a recognizable practice to which Defendants were deliberately indifferent." (Id., p. 14.) Successful *Monell* widespread practice theories "hold together because they focus on some logically related incidents or series of acts which the government should have noticed as a unified whole." (Id., p. 16.) "[A]llegations of general past misconduct or allegations of dissimilar incidents are not sufficient to allege a pervasive practice and a defendant's deliberate indifference to its consequences." (Id., p. 17.)[4]

Thus, the notice required for *Monell* is notice some kind of change was necessary to avoid constitutional violations. As explained herein, Ms. Terry has set forth no evidence Armor had notice of a policy gap or that some kind of policy change was necessary to avoid constitutional violations.

*Monell* also requires specific causation, that is, that an official policy or custom "not only caused the constitutional violation, but was 'the moving force' behind it." *Estate of Sims v. Cty. of Bureau*, 506 F.3d 509, 514-15 (7th Cir. 2007); *see also Arlotta v. Bradley Ctr.*, 349 F.3d 517, 522 (7th Cir. 2003). But-for causation is not sufficient. *See Wilson v. Cook Cnty.*, 742 F.3d 775, 784 (7th Cir. 2014). As this Court explained, the challenged practice "must be closely related to the ultimate injury" the plaintiff suffered, and there must be a "direct causal link" between a custom and the alleged constitutional violations. (ECF No. 127, p. 11.)[5] "The Seventh Circuit has said that the 'moving force' is the 'catalyst' for the injury in question, not merely a 'contributing factor.'" (Id.)[6]

---

[4] *Citing Thomas v. City of Markham, Ill.*, Case No. 16 CV 08107, 2017 WL 4340182, at *4, 2017 U.S. Dist. LEXIS 160635, at *9-10 (N.D. Ill. Sept. 29, 2017).
[5] *Citing Canton*, 489 U.S. at 391; *Sims*, 506 F.3d at 515.
[6] *Citing Johnson v. Cook Cnty.*, 526 F. App'x 692, 696 (7th Cir. 2013); *Thomas v. Cook Cnty. Sherrif's Dep't*, 604 F.3d 293, 303 (7th Cit. 2010).

302578407v1 1003420

Policy changes that "might" have had an effect on the plaintiff's situation do not satisfy the causation requirement. (Id.)[7]

The purpose of the "moving force" causation requirement is to prevent *Monell* liability from "collapsing into" *respondeat superior* liability. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997); *City of Springfield, Mass. v. Kibbe*, 480 U.S. 257, 267-68 (1987) ("In some sense, of course, almost any injury inflicted by a municipal agent or employee ultimately can be traced to some municipal policy. Finding § 1983's causation requirement satisfied by such a remote connection, however, would eviscerate *Monell*'s distinction, based on the language and history of § 1983, between vicarious liability and liability predicated on the municipality's own constitutional violations.").

While Ms. Terry acknowledges the requisite causation is "moving force," she argues injuries may have multiple proximate causes. (ECF No. 180, p. 25.) However, this proposition is wholly inconsistent with the "moving force" causation requirement. Not finding a Section 1983 *Monell* case to support her argument, Ms. Terry cites to one wrongful discharge case. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011). Nothing in that case allows this court to deviate from the required "moving force" causation standard enforced by the Seventh Circuit.

Furthermore, Ms. Terry argues causation is "a prototypical jury question," (ECF No. 180, p. 26) citing *Gayton v. McCoy*. *See* 593 F.3d 610, 624 (7th Cir. 2010). Yet, the portion of the *Gayton* opinion to which Ms. Terry cites relates to whether expert testimony is needed for Section 1983 claims against individual medical providers based on the provision of medical care, not *Monell* claims. *Id*. There is no serious dispute causation is an appropriate summary judgment issue for *Monell* claims.

---

[7] *Citing Thomas*, 604 F.3d at 303.

7

Second, Ms. Terry is unable to establish constitutional deprivation, the third basic element of her *Monell* claim. An otherwise sufficient *Monell* claim fails if the plaintiff's constitutional rights were not violated or deprived. As set forth below, Ms. Terry cannot establish the constitutional deprivation underlying her *Monell* claim because MCJ medical staff did not act "purposefully, knowingly, or perhaps even recklessly" and their actions were objectively reasonable.

    **1.    No evidence establishes the elements of Ms. Terry's discharge paperwork *Monell* claim against Armor.**

        a.    **There is no evidence admitting inmates into MCJ without adequate information was highly predictable to result in constitutional violations.**

There is no evidence of a widespread practice of allowing inmates back into MCJ without proper discharge paperwork when doing so would be "highly predictable" or "so likely" to result in the violation of constitutional rights. *Woodward*, 368 F.3d at 929; *Canton*, 489 U.S. at 390.

First, while there is evidence the practice was common, the significance of this evidence is overblown, and there is evidence Armor was taking steps to address the practice. The flaw in Ms. Terry's attempt to focus on this practice as the lynchpin of her first *Monell* theory against Armor is highlighted by Ms. Strehlow's testimony on the issue:

> To be honest, getting the paperwork isn't nearly as important as getting the information. So the nurse receives a person; and if the paperwork doesn't come, then they call where the patient was and says what happened, what's going on, gets a report, and then we'll document that report. And if the report given from one medical professional to her or him is acceptable, is within our means, then we accept that person and then spend energy getting – … following up to get that paperwork. The reason for getting the paperwork is to get the information that we are supposed to have from whatever care or treatment or reason they were sent out.

(ARPFOF 15; ARTSOF 103.)[8] Thus, the undisputed evidence is Armor and MCJ medical staff took steps to ensure they received adequate information about discharged patients returning to MCJ even

---

[8] Throughout this brief, Armor's Reply to Plaintiff's Response to Armor's Proposed Findings of Fact – the documents filed with this reply brief – are abbreviated ARPFOF and Armor's Response to Ms. Terry's Statement of Facts are abbreviated ARTSOF.

when they returned without proper discharge paperwork. (Id.) It is also undisputed Armor undertook efforts to address the paperwork issue, including meetings and tours with hospital representatives (including Froedtert) to educate them about MCJ's need for proper medical records. (ARPFOF 15.)

Second, even if the Court accepts a common practice existed, there is no evidence the prior practice of obtaining oral reports in lieu of the preferred paperwork previously resulted in or was likely to result in constitutional injury to constitute the required *Monell* notice.[9] Ms. Terry argues notice is satisfied merely by evidence of prior instances of allowing inmates into the facility without discharge paperwork, referencing *Daniel* and *Davis*, cases wherein the Seventh Circuit stated that if notice of prior bad acts is shown, the plaintiff is not required to show the prior bad acts actually caused any prior injuries. *See Daniel v. Cook Cnty.*, 833 F.3d 728, 735 (7th Cir. 2016); *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006). Critically, however, these cases are distinguishable because of the type of problems involved – prior <u>bad</u> acts. *Daniels* involved "systemic and gross" deficiencies "with health care scheduling and record-keeping" and *Davis* involved "lack of" or "several days' delay" in providing methadone treatment. *Daniel*, 833 F.3d at 735; *Davis*, 452 F.3d at 692-94. Ms. Terry also references the *Woodward* case, which holds "evidence of a single violation of federal rights can trigger municipal liability if the violation was a highly predictable consequence of the municipality's failure to act." *Woodward*, 368 F.3d at 929. Even more explicitly than in *Daniel* and *Davis*, the *Woodward* case requires a constitutional violation be a "highly predictable consequence" of the problem at hand, and Ms. Terry, like the *Woodward* plaintiff, is alleging hers was a single federal rights violation.

---

[9] Ms. Terry reiterates her reference to the Shansky reports to prove Armor had notice of the practice. However, even if the Shansky reports provided notice of the practice, or even the common practice, they do not provide notice the practice had resulted in or it was "highly predictable" to result in constitutional injury, which *Monell* notice requires.

9

There is simply no blanket rule that notice of any practice, including one which had not previously caused constitutional injuries or one that would not reasonably be expected to cause constitutional injuries, is sufficient under *Monell*. Rather, *Monell* requires notice that a particular act or omission with respect to its policies was "highly predictable" to result in constitutional violations. *Woodward*, 368 F.3d at 929; *see also Canton*, 489 U.S. at 390 (requiring the act or omission with respect to the policies be "so likely to result in the violation of constitutional rights"). Not every practice meets this notice requirement – only prior bad acts do.[10] Here, there is no evidence Armor had notice the practice of booking inmates who returned without hospital discharge paperwork, when oral reports were obtained from the hospital treating providers in lieu of the paperwork, was highly predictable to result in constitutional violations. The *Monell* theory fails based on lack of notice.

Ms. Terry's assertion that it was highly predictable constitutional injury would result from not following the discharge paperwork policy is really a pretext for a criticism of Dr. Buono's treatment plan. It is undisputed Ms. Exum called Froedtert to get discharge information, Ms. Exum and Dr. Buono relied on it, and Dr. Buono developed a treatment plan which included relying on the eyes and ears of the correctional officers to observe Ms. Terry every thirty minutes and notify medical staff if her condition changed. Her criticism of the failure to follow the discharge paperwork policy is fundamentally a claim Dr. Buono should not have relied on correctional officers. Instead, according to Ms. Terry, medical staff should have checked on her every thirty minutes, an implicit assertion correctional officers were inadequate to monitor Ms. Terry. Following this logic, it was not highly predictable to Armor that – in relation to their discharge paperwork – a

---

[10] Ms. Terry's argument presupposes that taking an inmate in without full discharge paperwork is a bad act. This has not been established. Although Armor had a policy of requiring discharge paperwork before admittance, the existence of a policy does not establish that not doing the conduct the policy requires is a bad act. The policy was a best practice. Here, Dr. Buono and Ms. Exum chose not to implement the policy – the best practice – based on the circumstances with which they were faced. No reasonable jury could decide deliberate indifference based on these undisputed facts.

correctional officer would not be an adequate source of information to medical staff about any change in Ms. Terry's condition.

Ms. Terry's notice argument fails because she has set forth no evidence Armor had notice some kind of policy change was necessary to avoid constitutional violations.

b. **There is no evidence the alleged unconstitutional policy was the moving force behind Ms. Terry's alleged constitutional injury.**

In addition, there is no evidence the discharge paperwork policy was the moving force behind Ms. Terry's alleged constitutional injury.

No reasonable jury could conclude Armor's practice of obtaining an oral report from the hospital's treating staff while waiting to obtain discharge paperwork was the moving force behind Ms. Terry's injury. Again, Ms. Terry's claim is nothing more than pretext for her assertion Dr. Buono's treatment plan was deficient. However, Armor cannot be responsible for Dr. Buono's treatment plan on a *respondeat superior* basis, nor can her treatment plan be tied to Armor's policies. *See* ***City of Springfield, Mass. v. Kibbe***, 480 U.S. 257, 267-68 (1987) (requiring moving force causation to prevent *respondeat superior* liability, noting, "[i]n some sense, of course, almost any injury inflicted by a municipal agent or employee ultimately can be traced to some municipal policy."). Relatedly, Ms. Terry's argument that Ms. Terry should have been checked by medical staff every thirty minutes is a proposed alternative course of treatment. However, it is well-settled an inmate does not get her choice of medical treatment. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Furthermore, Ms. Terry's arguments are focused on negligence, which does not establish *Monell* deliberate indifference.[11]

Ms. Terry's use of her experts' reports is unavailing. Notably, her experts do not opine no reasonable practitioner would have made the decision Dr. Buono made and Ms. Exum executed to

---

[11] Negligence, or even gross negligence, does not suffice under *Miranda* either. *See Miranda*, 2018 U.S. Dist. LEXIS 22229, at *32-33.

11

place Ms. Terry in the SMU, the most highly observable medical unit. Again, their criticism is of Dr. Buono's treatment plan, which is immaterial because Ms. Terry did not sue Dr. Buono. However, even if Dr. Buono could have made a better plan, that a medical provider made the wrong decision does not establish a *Monell* policy claim against his or her employer.[12]

Ms. Terry argues Armor and MCJ did not get accurate or complete information from Froedtert when Ms. Terry returned and was admitted into MCJ (specifically, that Dr. Buono did not know Ms. Terry was having contractions at Froedtert). However, this argument is based on a flawed factual premise regarding what Dr. Buono knew of Ms. Terry's condition both at Froedtert and MCJ, and her resulting conclusions. It is undisputed Dr. Buono concluded Ms. Terry was not in active labor when she returned to MCJ based on all the information she had, including what the Froedtert OB nurse told Ms. Exum, who told her, that Ms. Terry was not in active labor, and that Ms. Terry denied she was having contractions and Ms. Exum felt no contractions when she examined Ms. Terry upon her return. (ARPFOF 16, 48; ARTSOF 21, 25, 49, 94, 96-97, 105.)[13]

Importantly, Ms. Terry's arguments ignore the undisputed fact her discharge paperwork had not been drafted when she was sent back to MCJ. Asserting that if the discharge paperwork had been required, the result for Ms. Terry would have been regular checks by medical staff ignores the undisputed fact that the paperwork was not created until after she delivered. (ARPFOF 30; ARTSOF 25; ECF No. 177, ¶ 65.) Ms. Terry refuses to acknowledge that had Dr. Buono declined to

---

[12] It is worth noting the absurdity of Ms. Farah's opinion outlining the breadth of the instructions she opines MCJ needed to receive from Froedtert to properly admit Ms. Terry. (ECF No. 180, p. 23.) She first posits MCJ should have received information on the signs and symptoms of progressing labor and when Ms. Terry should return, such as for more regular and intense contractions and if her water broke. Yet, this case does not involve a claim that medical staff could not determine Ms. Terry was in labor and needed to go back to the hospital; it involves a claim Wenzel, the correctional officer assigned to observe Ms. Terry from feet outside her cell door, ignored her screams about labor and delivery for hours. She then posits MCJ should have received information on where Ms. Terry should be housed at MCJ and who should be looking after her. However, there is no evidence Froedtert staff would have any knowledge of the MCJ housing or staff observation options. Ms. Rhea's opinions have no relevance to the merits of Ms. Terry's discharge paperwork *Monell* theory.

[13] Dr. Buono explained active labor is determined based on the number of contractions per period of time. (ARPFOF 16.)

12

have Ms. Terry booked without the discharge paperwork, Ms. Terry had nowhere else to go. Ms. Terry was in custody, and the hospital had discharged her. Allowing her to be booked was the only realistic option for Dr. Buono. And, Ms. Exum contacted the Froedtert OB nurse directly to obtain the discharge instructions, relaying what she learned to Dr. Buono.[14] Ms. Terry has offered no evidence that Ms. Terry could have been sent back to the hospital just to wait for the paperwork.

Ultimately, Ms. Terry's causation argument boils down to either "but for" causation – but for Armor's policy of allowing inmates to be admitted without proper discharge paperwork, Ms. Terry could not have suffered constitutional injury – or contributing factor causation – the failure to formulate a treatment plan so Ms. Terry was checked by medical staff every 30 minutes throughout the night was "another cause of Ms. Terry's injuries (ECF No. 180, p. 25.). However, this Court has recognized neither causation argument survives the rigorous moving force causation standard at the heart of *Monell* claims. (ECF No. 127, p. 11.)

Given an oral report was obtained, no reasonable jury could conclude the alleged discharge paperwork policy was the moving force behind Ms. Terry's alleged unconstitutional injury. Rather, if taken as true, Ms. Terry's claim Wenzel ignored her screams for help during hours of labor and delivery were the moving force behind her alleged unconstitutional injury. For these reasons, there is no evidence the alleged discharge paperwork policy was the moving force behind Ms. Terry's alleged constitutional injury.

---

[14] Even if, as Ms. Terry infers, Ms. Exum was given incorrect information by the Froedtert OB nurse which she then relayed to Dr. Buono, Ms. Terry's claims should be directed against the hospital, not Armor. Moreover, Ms. Terry points to testimony from Ms. Exum that a woman in early labor should not have been sent back to MCJ. However, this too was a decision made by the hospital, and any claim regarding same should be directed against the hospital, not Armor.

13

### 2. No evidence establishes the elements of Ms. Terry's late-term pregnant and laboring inmate *Monell* claim against Armor.

#### a. Ms. Terry is bound to the *Monell* theory alleged in her Amended Complaint, not the one she has pivoted to in her response brief.

Critically, Ms. Terry pled her third *Monell* theory against Armor as a failure to develop a nursing protocol for inmates in late term pregnancy and labor. (ECF No. 129, ¶¶ 67, 68.) Now, however, she pivots in her response brief to a broader claim of failure to develop a nursing protocol for pregnant inmates. (ECF No. 180, pp. 25-28.)[15] Ms. Terry is bound to the *Monell* theory she pled in her Amended Complaint and she cannot attempt to amend her theory at the summary judgment stage. *See Ferguson v. Roberts*, 11 F.3d 696, 706–07 (7th Cir. 1993); *Colbert v. Willingham*, No. 13-CV-2397, 2016 U.S. Dist. LEXIS 7924, at *11-18 (N.D. Ill. Jan. 19, 2016). And, this Court has already explained amorphous *Monell* pleading is not allowed. (ECF No. 127, p. 15.) Even if the Court allowed leniency in an additional amendment late in litigation, a *Monell* theory regarding a generic pregnant inmate policy cannot be sufficiently tied to Ms. Terry, a late stage pregnant inmate who had been at the jail for merely three hours when she delivered.

Ms. Terry also sporadically attempts to pivot the type of *Monell* claim pled. Again, her *Monell* theory is that Armor failed to develop a nursing protocol for inmates in late term pregnancy and labor. Now, however, Ms. Terry inconsistently concedes Armor had a pregnancy policy, arguing instead the policy was not followed. Thus, even Ms. Terry cannot decide if her claim is that Armor failed to have a policy or Armor failed to follow a policy. This kind of amorphous *Monell* claim cannot survive at the summary judgment stage (and would not have properly survived at the pleading stage), as it broaches *respondeat superior* liability. (ECF No. 127, p. 15.)

---

[15] It must be noted that the Court required Ms. Terry to be more specific in crafting its amended *Monell* claims, at which point she asserted a theory focusing on inmates in late term pregnancy and labor. However, she now relapses, attempting to generalize the second remaining theory by focusing on the broader category of all pregnant inmates.

14

302578407v1 1003420

b. **No evidence exists showing Armor had notice that either a new policy or policy change was needed for late-term pregnant and laboring inmates to avoid unconstitutional care.**

The Seventh Circuit explains the rationale behind a policy gap *Monell* theory: "No government has, or could have, policies about virtually everything that might happen." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (internal citations omitted) ("The absence of a policy might thus mean only that the government sees no need to address the point at all, or that it believes that case-by-case decisions are best, or that it wants to accumulate some experience before selecting a regular course of action."). "At times, the absence of a policy might reflect a decision to act unconstitutionally, but the Supreme Court has repeatedly told us to be cautious about drawing that inference." *Id*. At the core, this is the same rationale behind a widespread policy theory as, in both, "what is needed is evidence that there is a true municipal policy at issue, not a random event." *Id*. "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." *Id*.

Here, Ms. Terry has no evidence Armor had notice of a gap in its policies for late term pregnant or laboring inmates thereby putting Armor on notice of a recurrent problem to which Armor acquiesced by not implementing a new policy. *See Calhoun*, 408 F.3d at 380.[16] Rather, the undisputed evidence is that Armor had a written policy regarding late-term pregnancy inmates; and, Armor had an unwritten policy regarding laboring inmates – they were sent to the hospital.[17] (ARPFOF 9, 67; ARTSOF 104.)

---

[16] Though not discussed in her response brief, Ms. Terry pled and discusses in her response to Armor's proposed findings of fact evidence of Ms. Swayzer's delivery at MCJ. (ARPFOF 9.) However, this separate occurrence involving Ms. Swayzer is insufficient to establish notice of a pattern for a widespread practice because (1) it is not sufficiently similar to Ms. Terry's situation, (2) one other incident does not establish a pattern, and (3) subsequent incidents do not establish a pattern as concerning Ms. Terry's medical care. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2014); *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).

[17] Ms. Terry's assertion Ms. Strehlow testified there was no pregnancy policy takes her testimony out of context. In fact, she testified pregnant women were not automatically placed in the SMU because it depended on the stage of pregnancy and was based on what the physician ordered. However, she also testified it was common in her experience for late

15

In her response brief, Ms. Terry focuses on Dr. Buono's testimony that labor is unpredictable. While Armor does not dispute the basic premise, it is immaterial. Ms. Terry has no evidence showing Armor's policies for late term pregnant inmates did not adequately address its unpredictable nature. Armor did not book inmates that were not in a stable medical condition, and stable late term pregnant inmates were placed in SMU—the most highly monitored unit in the jail— until they could be evaluated by an advanced practice provider within 48 hours who determined the level of monitoring necessary. While in the SMU they were rounded on every thirty minutes by a correctional officer with training in recognizing and responding to medical emergencies; they were rounded on at least twice by the SMU nurse at the beginning and end of her shift; and Dr. Buono rounded every day during the week and a nurse practitioner rounded every day during the weekend. (ARPFOF 9, 47, 49-56, 67-69.) Ms. Terry cannot establish Armor had notice of and acquiesced in a problem with the existing policies or notice the existing policies were "highly predictable" or "so likely" to result in a constitutional violation. *See Calhoun*, 408 F.3d at 380; *Woodward*, 368 F.3d at 929; *Canton*, 489 U.S. at 390.

Again, this claim is a pretext for Ms. Terry's primary contention, secreted within both of her *Monell* theories, that Ms. Terry should have been checked every thirty minutes by medical staff. This contention, however, is simply a disagreement with Dr. Buono's treatment plan upon booking to MCJ. While cloaked in *Monell* clothing, it is an unfashionable, unsustainable inmate dispute with the method of medical care provided.

---

stage pregnant women to be placed in the SMU. (ARTSOF 106.) Moreover, Ms. Terry's argument that the written policy could not have been followed because of testimony MCJ had no infirmary is a red herring. Plaintiff herself interchanges the terms Special Medical Unit, or SMU, and infirmary in her Amended Complaint. (ECF No. 129, ¶ 34.) Moreover, the written policy refers to either the infirmary or the medical housing unit, which is the SMU. (ECF No. 166-3.) In addition, the 2009 date on the written policy does not establish that Armor never implemented the policy. Rather, it means Armor did not modify the policy that existed when Armor took over healthcare at MCJ. Nurse Rhea's opinion the policy was never implemented, which is based on this flawed factual premise, is therefore irrelevant. Ms. Terry has set forth no evidence to dispute Dr. May's sworn statement the policy was in effect in March 2014. (ARPFOF 67; ARTSOF 35-36.)

Finally, Ms. Terry argues Armor had notice of a deficiency with respect to its pregnancy policy because Armor wrote a pregnant inmate policy (which she purports it failed to follow), showing Armor was aware of the need for a policy. This circular notice argument is illogical. Writing a policy does not prove the entity had notice of a problem highly predictable or likely to result in constitutional deprivations if not addressed. Policies may be written for any number of reasons. The notice required for *Monell* is notice that some kind of change was necessary to avoid constitutional violations. Here, Ms. Terry has set forth no evidence Armor had notice of a policy gap or that some kind of policy change was necessary to avoid constitutional violations.

> c. **There is no evidence the alleged policy gap or policy was the moving force behind Ms. Terry's alleged constitutional deprivation.**

Causation on this *Monell* theory fails for the same reason causation on the first *Monell* theory failed: Ms. Terry's claim Wenzel ignored her screams for help during hours of labor prior to and during delivery is the moving force behind her alleged constitutional injury.

**3. MCJ medical staff provided constitutional medical care to Ms. Terry.**

Finally, Ms. Terry's *Monell* claim against Armor fails because Ms. Terry cannot establish her constitutional rights were deprived by an unconstitutional act. Rather, MCJ's medical staff provided objectively reasonable medical care to Ms. Terry.[18]

*Miranda* sets forth a two-part test for Ms. Terry, a pretrial detainee, to prove a claim under the Fourteenth Amendment. First, Ms. Terry must establish the defendant "acted purposefully, knowingly, or perhaps even recklessly." *Miranda*, 2018 U.S. App. LEXIS 22229 at *32. This means "more than negligence but less than subjective intent – something akin to reckless disregard." *Id*. at

---

[18] Ms. Terry has dropped her failure to train *Monell* theory regarding correctional officers. Given same, Ms. Terry's footnote addressing Armor's position its *Monell* liability is contingent upon one of its policies being the moving force behind a constitutional violation by medical staff, rather than a jail correctional officer, is confusing at best. Ms. Terry cites *Awalt v. Marketti* in support of her assertion medical providers may be held liable for constitutional violations by correctional officers when the providers' policies were the moving force behind those violations. However, *Awalt*, which discusses a failure to train *Monell* claim, is therefore distinguishable.

*33 (citations omitted). Second, Ms. Terry must establish the defendant's conduct was objectively unreasonable. *Id*. at *30. Importantly, the Seventh Circuit reiterated in Miranda that even under the objective unreasonableness standard for Ms. Terry, constitutional claims <u>are not reduced to negligence or gross negligence</u>. *See id.* at *32-33.

Here, MCJ medical staff sent Ms. Terry to Froedtert after obtaining her medical history and learning of her high risk pregnancy and abdominal discomfort. (ARPFOF 6-8, 10.) Ms. Terry was monitored and cleared by the specialists in Froedtert's labor and delivery department, and she arrived back at MCJ around 1:00 a.m. on March 10, 2014. (ARPFOF 10, 30-33.) She was examined twice by Ms. Exum, who checked for and asked about contractions. (ARPFOF 12-26, 43-45.) Ms. Exum consulted with the MCJ Medical Director twice and spoke with a Froedtert labor and delivery nurse about Ms. Terry's care. (ARPFOF 28-30, 33.) Ms. Exum received confirmation that Ms. Terry was cleared of labor from the Froedtert nurse. (ARPFOF 30.) They kept Ms. Terry in a visible location in booking, which allowed Ms. Exum to observe if her condition changed. (ARPFOF 41.) After all of this, Ms. Terry was booked into SMU—the most highly monitored unit in the jail—until she could be evaluated by an advanced practice provider within 48 hours to determine the level of monitoring necessary going forward; she was expected to be rounded on every thirty minutes by a correctional officer with training in recognizing and responding to medical emergencies, at least twice by the SMU nurse, at the beginning and end of her shift, and by Dr. Buono every day during the week, and a nurse practitioner every weekend day. (ARPFOF 47, 49-56, 67-69.) Significantly, Ms. Terry admits that after she was cleared of labor at Froedtert, her condition did not change until after 45 minutes in the SMU. (ARPFOF 59.) As soon as MCJ medical staff learned of Ms. Terry's delivery, they engaged in immediate and professionally appropriate treatment. (ARPFOF 57-68.) Within minutes, a medical emergency was called, 911 was contacted and several nurses arrived in Ms. Terry's cell with an OB kit. (ARPFOF 61-63.)

18

The undisputed evidence shows many precautions were taken by MCJ medical staff to account for Ms. Terry's medical condition, and MCJ medical staff provided prompt medical care as soon as they became aware of a change in Ms. Terry's condition. No reasonable jury could conclude MCJ medical staff "acted purposefully, knowingly, or perhaps even recklessly" or that they failed to provide objectively reasonable medical care to Ms. Terry.

## CONCLUSION

For all the above reasons, and those set forth in Armor's opening brief, this Court should grant summary judgment to Armor, dismissing Ms. Terry's claims against it with prejudice.

Dated this 28th day of September, 2018.

/s/ Michael P. Russart
Michael P. Russart
State Bar No. 1023128
Mollie T. Kugler
State Bar No. 1093318
Paige L. McCreary
State Bar No. 1114252
Attorneys for Defendant Armor Correctional Health Services
**HINSHAW & CULBERTSON LLP**
100 E. Wisconsin Avenue
Suite 2600
Milwaukee, WI 53202
Phone No. 414-276-6464
Fax No. 414-276-9220
E-mail Address(es):
mrussart@hinshawlaw.com
mkugler@hinshawlaw.com
pmccreary@hinshawlaw.com

302578407v1 1003420