UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

_____

REBECCA TERRY,

               Plaintiff,

v.

COUNTY OF MILWAUKEE, DAVID A.
CLARKE, JR., in his personal and official
capacities, OFFICER BRIAN WENZEL, JANE
AND JOHN DOE, UNKNOWN EMPLOYEES
OF MILWAUKEE COUNTY JAIL, JANE AND
JOHN DOE, UNKNOWN JAIL
SUPERVISORS, ARMOR CORRECTIONAL
HEALTH SERVICES, CAROLYN EXUM,
MORGAN BEVENUE, MARGARET
HOOVER, JANE AND JOHN DOE,
UNKNOWN EMPLOYEES OF ARMOR
CORRECTIONAL HEALTH SERVICES,
JANE AND JOHN DOE, UNKNOWN ARMOR
HEALTHCARE SUPERVISORS,

               Defendants.

Case No.:  17-cv-1112-JPS

---

**INDEX OF UNPUBLISHED CASES FOR DEFENDANT ARMOR CORRECTIONAL
HEALTH SERVICES' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT**

---

*White v. Watson*,
     No. 16-CV-560-JPG-DGW, 2018 U.S. Dist. LEXIS 153931 (S.D. Ill. Sept. 10, 2018)

*Colbert v. Willingham*,
     No. 13-CV-2397, 2016 U.S. Dist. LEXIS 7924 (N.D. Ill. Jan. 19, 2016)

*Thomas v. City of Markham, Ill.*,
     No. 16 CV 08107, 2017 WL 4340182, 2017 U.S. Dist. LEXIS 160635 (N.D. Ill. Sept. 29, 2017)

302603733v1 1003420

Dated this 1st day of October, 2018.

_/s/ Paige L. McCreary_
_____
Michael P. Russart
State Bar No. 1023128
Mollie T. Kugler
State Bar No. 1093318
Paige L. McCreary
State Bar No. 1114252
Attorneys for Defendant Armor Correctional
Health Services
**HINSHAW & CULBERTSON LLP**
100 E. Wisconsin Avenue
Suite 2600
Milwaukee, WI 53202
Phone No.  414-276-6464
Fax No.  414-276-9220
E-mail Address(es):
mrussart@hinshawlaw.com
mkugler@hinshawlaw.com
pmccreary@hinshawlaw.com

2


# *White v. Watson*

United States District Court for the Southern District of Illinois

September 10, 2018, Decided; September 10, 2018, Filed

Case No. 16-cv-560-JPG-DGW

**Reporter**
2018 U.S. Dist. LEXIS 153931 *; 2018 WL 4326998

DWAYNE WHITE, Administrator of the Estate of
Bradley C. Scarpi, Deceased, Plaintiff, v. ST CLAIR
COUNTY SHERIFF RICHARD WATSON, ST. CLAIR
COUNTY, OFFICER MARK J. HARRIS, OFFICER
RODNEY WILSON, OFFICER CHRISTOPHER
LANZANTE, OFFICER DANTE S. BEATTIE, OFFICER
NICHOLE LIEBIG, OFFICER JON KNYFF and
OFFICER JAMES WAGENER, Defendants.

**Prior History:** *White v. Watson, 2016 U.S. Dist. LEXIS
149111 (S.D. Ill., Oct. 26, 2016)*

## Core Terms

jail, suicide, cellblock, motion to exclude, policies,
issues, expert testimony, defendants', complied,
standard of care, segregation, confusing, detainees,
offers, cell, booking process, prevention, scientific,
witnesses', responded, training, accepts, parties,
credibility of witnesses, deliberate indifference, expert
opinion, principles, unhelpful, adequacy, reliable

**Counsel: [\*1]** For Dwayne White, as Administrator of
the Estate of Bradley C. Scarpi, Plaintiff: Amy E.
Breihan, Mae C. Quinn, MacArthur Justice Center, St.
Louis, MO; David M. Shapiro, Locke E. Bowman, Sheila
A Bedi, Vanessa del Valle, Roderick and Solange
MacArthur Justice Center, Northwestern Univ. Sch. of
Law, Chicago, IL; LaToya M. Berry, Law Offices of
LaToya M. Berry, Belleville, IL.

For Richard Watson, St. Clair County Sheriff, St. Clair
County, Mark J. Harris, Officer, Rodney Wilson, Officer,
Christopher Lanzante, Officer, Defendants: Katherine A.
Melzer, Thomas R. Ysursa, LEAD ATTORNEYS,
Garrett P. Hoerner, Becker, Hoerner, Thompson &
Ysursa, P.C., Belleville, IL.

For Jon Knyff, Defendant: Katherine A. Melzer, Thomas
R. Ysursa, LEAD ATTORNEYS, Becker, Hoerner,
Thompson & Ysursa, P.C., Belleville, IL.

**Judges:** J. PHIL GILBERT, DISTRICT JUDGE.

**Opinion by:** J. PHIL GILBERT

## Opinion

**MEMORANDUM AND ORDER**

This matter comes before the Court on the parties'
various motions to exclude or limit certain expert
testimony offered by the opposing side under *Federal
Rule of Evidence 702* and *Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786,
125 L. Ed. 2d 469 (1993)*:

- The plaintiff's motion to exclude or limit the
testimony of Tracey Reed, the defendants' expert
on jail industry standards and practices (Doc. 87).
The defendants have responded **[\*2]** to the motion
(Doc. 100).
- The defendants' motion to exclude the testimony
of Philip J. Stanley, the plaintiff's expert in the field
of corrections (Doc. 88). The plaintiff has
responded (Doc. 104);
- The defendants' motion to exclude the testimony
of Keith R. Curry, Ph.D., the plaintiff's expert on the
standards of care for inmates suffering from mental
illness in a correctional setting (Doc. 89). The
plaintiff has responded (Doc. 105); and
- The plaintiff's motion to exclude certain opinions of
Michael R. Jarvis, M.D., Ph.D., the defendants'
psychiatric expert (Doc. 98). The defendants have
responded to the motion (Doc. 106).

In light of the Court's May 2, 2018, ruling on the
defendants' summary judgment motion (Doc. 113),
which eliminated certain defendants and theories from
the case, the Court directed the parties to submit briefs
on whether any expert opinions at issue in the pending

*Daubert* motions have been rendered moot. The parties have submitted their respective positions on that question (Docs. 118 & 121).

## I. Background

The Court reviews the facts briefly here; a fuller recitation of the facts (construed in the plaintiff's favor under the summary judgment standard) is set forth **[*3]** in the Court's May 2, 2018, order (Doc. 113).

The plaintiff's decedent, Bradley C. Scarpi, was detained in the St. Clair County Jail ("Jail") from April 14, 2014, to May 23, 2014, when he committed suicide. Scarpi suffered from mental illness—including generalized anxiety disorder and depression—and drug addiction. Defendant Richard Watson is the St. Clair County sheriff under whose authority the Jail was maintained.

On April 14, 2014, Scarpi was arrested and booked into the Jail. No mental health issues were revealed by the initial mental health screening, so Scarpi was placed in general population without a referral for further evaluation. A trained health care professional conducted a routine, more in-depth evaluation twelve days later and identified no mental health problem. In actuality, Scarpi was extremely upset by the recent deaths of his mother and sister and by problems he was having in the jail.

On May 23, 2014, Scarpi asked defendant Officer Mark J. Harris to change his housing assignment because he was being threatened by other nearby detainees. After talking with him, Sergeant Brian Cunningham reassigned Scarpi to another cell block but changed that assignment to the E-Max **[*4]** cell block when he learned Scarpi has potential enemies there too. E-Max cell block was one of the segregation cell blocks with small cells that housed only one person at a time and with extreme restrictions. Harris and defendant Officer Rodney Wilson took Scarpi to his new cell in E-Max cell block. Defendant Jail Officer Jon Knyff unlocked Scarpi's new cell, and Wilson and Harris placed Scarpi in that cell. Jail policy required officers to conduct "health and well-being checks" in the E-Max cell block at least every thirty minutes.

Later that evening, on one of his cell checks, defendant Officer Christopher Lanzante found Scarpi hanging from his cell bars and summoned help. Scarpi was alive, and he was taken to the hospital, but he died later that evening.

Detainee witnesses in the E-Max cell block say that Scarpi told Harris, Wilson, Knyff and Lanzante that he was going to kill himself and that the officers did nothing to protect him. Harris, Wilson, Knyff and Lanzante deny that Scarpi said anything about suicide and assert that they had no reason to believe Scarpi posed a suicide risk. The Jail's Quiet Room/Suicide Watch Policy and Procedure ("Quiet Room policy") required employees **[*5]** to place a potentially suicidal detainee in a suicide-proof room called the "Quiet Room" for observation, notify medical staff, and make a psychological referral. Jail staff did not always scrupulously observe the Quiet Room policy.

The Jail conducted an investigation of Scarpi's suicide, but it was not thorough. It found that Jail staff did not violate any policies leading to Scarpi's suicide.

## II. Procedural History

The Court's May 2, 2018, order (Doc. 113) found there was sufficient evidence for a reasonable jury to find that Harris, Wilson, Knyff and Lanzante were deliberately indifferent to the risk Scarpi would commit suicide in violation of the *Fourteenth Amendment* (Count I)[1] and that they were liable under the *Illinois Wrongful Death Act, 740 ILCS 180/1* (Count IV). It rejected the plaintiff's claims that Watson, in his official capacity as sheriff, was liable for deliberate indifference to Scarpi's suicide risk based certain Jail policies: the booking procedures, the Quiet Room policy, understaffing of the Jail, the failure to automatically screen detainees placed in segregation conditions, and the post-suicide investigation. However, it found a genuine issue of material fact regarding whether Watson was deliberately **[*6]** indifferent to a known, widespread practice of disregarding the Quiet Room policy (Count II).[2] It further found it could not dismiss the *Americans*

_____

[1] Since that ruling, the Seventh Circuit Court of Appeals has suggested the appropriate standard in failure to protect claims brought by pretrial detainees under the **Fourteenth Amendment** might be objective unreasonableness rather that deliberate indifference. *Miranda v. County of Lake, No. 17-1603, ___ F.3d ___, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at *9-12 (7th Cir. Aug. 10, 2018)* (objective unreasonableness standard applies to pretrial detainee's **Fourteenth Amendment** medical care claim).

[2] *Miranda* did not suggest any change to the application of the deliberate indifference standard to a pretrial detainee's claim under *Monell v. Department of Social Services of New York,*

With Disabilities Act ("ADA"), 42 U.S.C. § 12132, claim (Count III), the *respondeat superior* claim against Watson for wrongful death (Count V) and the claim against St. Clair County for indemnification (Count VI).

## III. Analysis

The pending motions seek to exclude testimony based on *Federal Rule of Evidence 702*, *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, and its progeny. In *Daubert*, the Supreme Court held that *Federal Rule of Evidence 702* did not incorporate the "general acceptance" test set forth in *Frye v. United States, 293 F. 1013, 54 App. D.C. 46 (D.C. Cir. 1923)*. Instead, the Court held that *Rule 702* required district judges to be gatekeepers for proposed scientific evidence. *Daubert, 509 U.S. at 589*; *see also General Elec. v. Joiner, 522 U.S. 136, 142, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)*. For scientific evidence to be admissible, the Court found, a district court must find it both relevant and reliable; it must be scientific knowledge grounded "in the methods and procedures of science" and consist of more than "subjective belief or unsupported speculation." *Daubert, 509 U.S. at 589-90*.

*Rule 702* was amended in 2000 in response to *Daubert, United States v. Conn, 297 F.3d 548, 555 (7th Cir. 2002)*, and again in 2011. In its current form, it reads as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)** the expert's **[*7]** scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

---

436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Miranda, 2018 U.S. App. LEXIS 22229, 2018 WL 3796482, at *5 (citing City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).

Fed. R. Evid. 702

*Daubert* was a case involving scientific opinion testimony, but the same principles apply when the subject of the opinion is not purely scientific but involves some other kind of specialized knowledge. *See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-49, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* (tire failure opinion based on visual or tactile inspection). Indeed, with respect to all types of opinion testimony described in *Rule 702*, the rule:

"establishes a standard of evidentiary reliability." *[Daubert], 509 U.S., at 590, 113 S. Ct. 2786*. It "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Id., at 592, 113 S. Ct. 2786*. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . , the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *509 U.S., at 592, 113 S. Ct. 2786*.

*Kumho Tire, 526 U.S. at 149*; *accord Manpower, Inc. v. Insurance Co. of Pa., 732 F.3d 796, 806 (7th Cir. 2013)*.

The defendants contend that, after the Court's **[*8]** summary judgment ruling, the experts offered for trial will not be helpful to the jury—and may, in fact, confuse the jury—because their testimony is not relevant to the issues remaining for trial. The plaintiff, who takes a more holistic view of relevance than the defendants, insists that his experts are needed to explain the larger picture of why Scarpi was suicidal and how placement in segregation increased his risk for suicide. Before delving farther into the arguments of the parties, it is critical to note that this case is not about the adequacies of the Jail's general treatment of a class of suicidal or potentially suicidal inmates; it is about whether the conduct of the particular defendants in this case caused or contributed to Scarpi's death by their deliberate indifference (or objective unreasonableness) or, in the case of the wrongful death count, by their negligence. With the exception of the alleged widespread practice of disregarding the Quiet Room policy, the Jail's policies are not in issue, although they may be relevant to whether the individual defendants were deliberately indifferent or unreasonable.

The Court has already found in its summary judgment ruling that **[*9]** the plaintiff has failed to present evidence from which a reasonable jury could conclude

that the Jail's booking process was the product of deliberate indifference or that any inadequacy of the booking process caused Scarpi's death in light of the fact that he was seen by a medical professional twelve days later. Thus, any inadequacy in the booking process about which an expert might testify is irrelevant, and such testimony will not be allowed.

Similarly, the Court found there was no evidence from which a reasonable jury could conclude that the Jail's suicide prevention policy—the Quiet Room policy—was deficient; it was effective when it was implemented. Thus, the adequacy of the Jail's suicide prevention policy is no longer an issue, and any expert testimony about that subject is irrelevant.

The same goes for the Jail's alleged understaffing, the absence of screening on placement in segregation, and post-suicide investigations. These jail policies are no long in issue, and expert testimony about them is not relevant.

Likewise, events post-dating Scarpi's suicide could not have had any role in causing his suicide. The Court made that abundantly clear in its summary judgment order, but **[*10]** the plaintiff persists in his chronologically-challenged position that events post-dating Scarpi's suicide could somehow have affected the defendants' state of mind or could provide evidence of a "widespread practice" of ignoring the Quiet Room policy about which jail management should have known before that tragic event. They could not, so expert testimony about events after May 23, 2014, is not relevant and will not be allowed.

Notwithstanding the Court's summary judgment order eliminating multiple issues from the trial of this case, the plaintiff asks the Court to allow expert testimony about each of Scarpi's interactions with Jail officials from the moment he arrived at the jail to the point of his placement in E-Max cell block and about how those interactions did not satisfy accepted jail standards. He believes an understanding of these interactions is relevant because it will shed light on the likelihood that Scarpi actually voiced his suicidal thoughts to Harris, Wilson, Knyff and Lanzante when he was finally in E-Max cell block, a question the jury will be asked to decide. In order for this logic to hold, there would have to be some basis for concluding Scarpi would be more **[*11]** likely to *articulate* his suicidal thoughts, as opposed to merely *experience* them, to the degree they were caused by his Jail interactions as opposed to other factors. No expert testimony supports such a view, nor

does common sense. The plaintiff asks the Court to draw a connection that is simply not there. Furthermore, the danger of unfair prejudice from hearing the many ways the plaintiff believes the Jail was deficient—but not liable, because summary judgment removed that question for the most part—would substantially outweigh the probative value of such evidence under Federal Rule of Civil Procedure 403. Consequently, the Court declines to allow expert testimony on the entirety of Scarpi's 2014 stay at the Jail.

These limitations do not mean, however, that expert testimony will be completely excluded from trial. There is still room for an expert to educate a jury about the general standards, expectations, and decision-making processes of those working in or running a jail. For example, the jury will be asked to decide whether defendants Harris, Wilson, Knyff and Lanzante were deliberately indifferent (or objectively unreasonable) (Count I) or negligent (Count IV) with respect to Scarpi's risk of suicide. It will also **[*12]** be asked to determine under the ADA whether they responded reasonably if there was an obvious need for suicide prevention measures (Count III). Given that most jurors are unlikely to be familiar with work in a jail setting, it would be helpful for a jury to understand the conditions in which a correctional officer works and the range of reasonable correctional officer behavior in a given situation. An expert may offer relevant testimony about such subjects.

With these parameters in mind, the Court makes the following rulings on the admissibility of expert testimony:

A. Plaintiff's Expert Witnesses

1. Phillip J. Stanley

The plaintiff tenders Stanley to offer expert opinions in the field of corrections, specifically, jail operations. The Court finds Stanley is qualified as an expert in that field.

Many of Stanley's opinions, however, have been rendered irrelevant, and therefore unhelpful and potentially confusing to a jury, by the Court's summary judgment order removing numerous issues from this case. Most of Stanley's opinions are addressed to the Jail's operational policies related to the booking process, placement in segregation, suicide prevention and detection, jail conditions, and investigation **[*13]** of jail deaths, all of which are no longer in issue. He does not offer any opinion touching on the alleged widespread practice of ignoring the Quiet Room policy, the only jail practice remaining in issue in this case. Stanley also offers opinions that various jail officers who are no

longer—or never were—defendants in this case did not perform within the applicable professional standards. Because all of the foregoing opinions concern policies and individuals no longer at issue in this case, they would not be helpful to a jury and could be potentially confusing.

Stanley does, however, offer relevant opinions about whether the conduct of Lanzante, Harris and Wilson in responding to Scarpi's alleged suicide threats and the conduct of Lanzante in conducting safety and wellness checks in the E-Max cell block comported with the standard of care he will testify is applicable in the particular jail setting. The Court will therefore allow Stanley to testify about his view of the applicable standard, but it will not allow him to bolster or cast doubt on the credibility of witnesses testifying about what actually happened in the E-Max cell block (*i.e.*, whether Scarpi actually announced he was **[\*14]** going to kill himself), which is the province of the jury. *See United States v. Scheffer, 523 U.S. 303, 313, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)* (noting that determining the weight and credibility of witness testimony is a task that belongs to the jury). Stanley will be allowed to express an opinion on whether, if the jury accepts the plaintiff's fact witnesses' testimony, the individual defendants complied with generally acceptable jail standards. The defendants may, of course, cross-examine Stanley on whether the standards he offers as appropriate actually are the proper standards and whether, if the jury accepts the defendants' testimony, they complied with the standards Stanley offers or any other arguably appropriate standard.

In sum, the Court will grant the vast majority of the motion to exclude Stanley's testimony (Doc.88) as unhelpful and potentially confusing, but it will allow him to testify only on the very narrow scope of issues set forth above, which the Court finds satisfies the standards first set forth in *Daubert* and reflected in *Federal Rule of Evidence 702*.

## 2. Keith R. Curry, Ph.D.

The plaintiff tenders Dr. Curry, a clinical psychologist, to offer expert opinions on the standard of care for individual suffering from mental illness in a correctional setting.

The Court finds **[\*15]** Dr. Curry is qualified as an expert on this issue. The defendants take issue with the fact that he has not practiced psychology in an adult prison setting for more than two decades. However, the Court finds that, regardless of his lack of recent practice in the relevant area, he is qualified through knowledge, skill, experience, training and education .

As with Stanley, however, many of his opinions have been rendered irrelevant, and therefore unhelpful and potentially confusing to a jury, by the Court's summary judgment order removing numerous issues from this case. Most of Dr. Curry's opinions are addressed to the alleged inadequacies of the Jail's official policies— placement in solitary confinement without mental health pre-screening, lack of enhanced monitoring and medical/mental health treatment for those placed in solitary confinement, safe cell design in solitary confinement units—issues that are no longer in this case. He offers no opinion relevant to the assertion that the Jail had a widespread policy of not enforcing the Quiet Room policy, the only Jail policy issue remaining in this case.

The only opinion he offers that is relevant to an issue at trial is his opinion that, **[\*16]** in the circumstances presented in the E-Max cell block, Lanzante did not satisfy generally accepted jail standards for mental health services in conducting his safety and wellness checks. The Court will not allow Dr. Curry to bolster or cast doubt on the credibility of witnesses who may testify about what happened in the E-Max cell block leading to Scarpi's suicide, although he may be allowed to express an opinion on whether, if the jury accepts the plaintiff's witnesses' testimony, Lanzante complied with generally acceptable jail standards. The defendants may, of course, cross-examine Dr. Curry on the standards he offers as appropriate and on whether, if the jury accepts Lanzante's testimony, he complied with that or any other arguably appropriate standard.

In sum, the Court will grant the vast majority of the motion to exclude Dr. Curry's testimony (Doc. 89) as unhelpful and potentially confusing, but it will allow him to testify only on the very narrow scope of issues set forth above, which the Court finds satisfies the standards first set forth in *Daubert* and reflected in *Federal Rule of Evidence 702*.

## B. Defendants' Expert Witnesses

### 1. Tracey Reed

The defendants tender Reed to offer expert opinions on jail industry **[\*17]** standards and practices.

The Court finds Reed is qualified as an expert on this issue based on her knowledge, skill, experience, training and education in the field of corrections. The plaintiff takes issue with whether Reed's experience as

a jail consultant in Kentucky gives her any specialized knowledge of standards applicable to Illinois jails beyond generalized knowledge of the subject. However, the Court finds Reed has sufficient experience in training correctional employees and auditing jails for compliance with relevant standards of specific jurisdictions and general corrections principles to make her opinion on relevant issues helpful to the jury.

Reed runs into the same problems as Dr. Curry and Stanley: the vast majority of her opinions concern issues that are now irrelevant to the case because they have been eliminated on summary judgment. Thus, her opinions about the booking process, the adequacy of emergency care provided to Scarpi, the Jail's suicide prevention policies, the decision to house Scarpi in segregation, pre-segregation screening, the post-incident investigation.

In contrast, Reed has offered a relevant opinion that correctional officers'—specifically, Lanzante's—care **[*18]** of Scarpi while he was in E-Max cell block, including the performance of health and wellness checks, complied with the applicable standard of care. As with the plaintiff's experts, the Court will not allow Reed to bolster or cast doubt on the credibility of witnesses who may testify about what happened in the E-Max cell block leading to Scarpi's suicide, although she may be allowed to express an opinion on whether, if the jury accepts Lanzante's testimony, he complied with generally acceptable jail standards. The plaintiff may, of course, cross-examine Reed on the standards she offers as appropriate and on whether, if the jury accepts the plaintiff's witnesses' testimony, Lanzante complied with that or any other arguably appropriate standard. The Court will further not allow Reed to testify to other matters a jury is capable of understanding perfectly well without expert testimony (*e.g.*, limitations on what video surveillance can show).

The Court is not concerned with Reed's opinion that Lanzante's behavior complied with "legal mandates." Unlike *Sanders v. City of Chicago Heights, No. 13 C 0221, 2016 U.S. Dist. LEXIS 110551, 2016 WL 4417257, at *7 (N.D. Ill. Aug. 19, 2016)*, cited by the plaintiff, the "legal mandate" is not outcome determinative but instead is offered only to describe a standard of care set forth **[*19]** in a law and an opinion about whether Lanzante complied with that standard. Reed may not, however, testify that compliance with that "legal mandate" resolves any claim in this case; that ultimate legal conclusion is for counsel to argue and for the jury to decide.

In sum, the Court will grant the vast majority of the motion to exclude Reed's testimony (Doc. 87) as unhelpful and potentially confusing, but it will allow her to testify only on the very narrow scope of issues set forth above, which the Court finds satisfies the standards first set forth in *Daubert* and reflected in *Federal Rule of Evidence 702*.

### 2. Michael R. Jarvis, M.D., Ph.D.

The defendants tenders Dr. Jarvis, a psychiatrist, to offer expert opinions on the psychiatric and medical evaluation and treatment provided to Scarpi while he was in the Jail. Dr. Jarvis opines from a medical perspective on the adequacy of the form used in the booking process to identify a need for further mental health evaluation, the adequacy of the medical and psychiatric care provided to Scarpi by the Jail, the significance of the risk factors for suicide, and the Jail's suicide assessment and prevention policies. While this testimony might be useful in different case—say, **[*20]** one that calls into question the Jail's booking, evaluation and treatment policies or a doctor's response to the presence of risk factors—it is no longer helpful in this case. It will not help a jury to determine the range of reasonable conduct expected from a correctional officer not trained in, or expected to make, policy or to perform medical or psychiatric evaluations. In light of the issues remaining in this case, Dr. Jarvis's testimony is simply no longer relevant.

In sum, the experts qualified to opine on the standard of care governing a correctional officer's treatment of an inmate in segregation may testify as to the standard of care. They may be examined and cross-examined about hypothetical sets of facts where, as the plaintiff contends, Scarpi told an individual defendant he would kill himself and where, as the defendants contend, Scarpi did not tell any individual defendant he would kill himself. They may not express an opinion on which alternate set of facts is true or on the credibility of any witness to support either set of facts, nor may they express opinions on other matters a jury is clearly qualified to determine itself (*e.g.*, the limitations of video surveillance). **[*21]**

The foregoing rulings are subject, of course, to the opposing parties' opening the door to admission of otherwise barred evidence. The Court cautions all parties that they must refrain from trying to shoehorn in the prohibited opinions in the guise of supporting the limited scope of the opinions allowed.

**IV. Conclusion**

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** the plaintiff's motion to exclude or limit the testimony of Tracey Reed (Doc. 87);

- **GRANTS in part** and **DENIES in part** the defendants' motion to exclude the testimony of Philip J. Stanley (Doc. 88);

- **GRANTS in part** and **DENIES in part** the defendants' motion to exclude the testimony of Keith R. Curry, Ph.D. (Doc. 89); and

- **GRANTS** the plaintiff's motion to exclude certain opinions of Michael R. Jarvis, M.D., Ph.D. (Doc. 98).

**IT IS SO ORDERED**.

**DATED: September 10, 2018**

/s/ J. Phil Gilbert

**J. PHIL GILBERT**

**DISTRICT JUDGE**

---

**End of Document**



Neutral
As of: October 1, 2018 4:01 PM Z

# *Colbert v. Willingham*

United States District Court for the Northern District of Illinois, Eastern Division

January 19, 2016, Decided; January 19, 2016, Filed

Case No. 13-cv-2397

**Reporter**

2016 U.S. Dist. LEXIS 7924 *

CHRISTOPHER COLBERT and JAI CRUTCHER, Plaintiffs, v. RUSSELL WILLINGHAM, et al., Defendants.

**Prior History:** *Colbert v. Willingham, 2015 U.S. Dist. LEXIS 67561 (N.D. Ill., May 26, 2015)*

## Core Terms

arrest, supervised release, terms, mandatory, firearm, summary judgment, amend, knowingly, parole, says, violating, parties', unlawful search, false arrest, interrogatory, ammunition, reasonable suspicion, unreasonable force, amended complaint, manifest error, police officer, Detention, locked

## Case Summary

**Overview**

HOLDINGS: [1]-As to plaintiff A's false arrest claim, the court applied the correct standard in assessing whether the officer had reasonable suspicion to believe that he knowingly had a firearm in his residence; [2]-He waived the argument by failing to raise it during summary judgment briefing; [3]-He waived his argument that violating the terms of his supervised release was an arrestable offense; [4]-Plaintiff B had not provided sufficient evidence to show that defendants impliedly consented to the litigation of his unreasonable force and unlawful search claims; [5]-He unsuccessfully argued that the parties have been litigating the claims all along; [6]-The case fell squarely within the holding of the Whitaker decision; [7]-The district court did not commit a manifest error in failing to sua sponte grant him leave to amend his complaint to add new claims at the summary judgment stage.

**Outcome**

Motion denied.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

Evidence > Burdens of Proof > Allocation

**HN1[****]** Relief From Judgments, Altering & Amending Judgments

To prevail on a *Fed. R. Civ. P. 59(e)* motion to amend judgment, a party must clearly establish that (1) the court committed a manifest error of law or fact, or (2) newly discovered evidence precluded entry of judgment.

Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

Evidence > Burdens of Proof > Allocation

**HN2[****]** Relief From Judgments, Altering & Amending Judgments

*Fed. R. Civ. P. 59(e)* enables a court to correct its own errors and thus avoid unnecessary appellate procedures. However, a motion to reconsider pursuant to *Rule 59(e)* should be granted only in rare circumstances. A party moving for reconsideration pursuant to *Rule 59(e)* bears the heavy burden of establishing that the court should reverse its prior judgment.

Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

*HN3*[⬇] **Relief From Judgments, Altering & Amending Judgments**

A *Fed. R. Civ. P. 59(e)* motion is not an appropriate vehicle for re-litigating arguments that the district court previously rejected, or for arguing issues or presenting evidence that could have been raised during the pendency of the motion presently under reconsideration.

Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

*HN4*[⬇] **Relief From Judgments, Altering & Amending Judgments**

Arguments that could have been made earlier but are instead raised for the first time in a *Fed. R. Civ. P. 59(e)* motion are waived.

Civil Procedure > ... > Summary Judgment > Opposing Materials > Memoranda in Opposition

*HN5*[⬇] **Opposing Materials, Memoranda in Opposition**

To the extent that a plaintiff fails to effectively dispute facts properly set forth and supported by a defendant, those facts are deemed admitted for the purposes of a summary judgment motion.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Sentencing > Sentencing Alternatives > Probation

*HN6*[⬇] **Search & Seizure, Scope of Protection**

*730 ILCS 110/11* provides that police officers may arrest on view any probationer found by them violating any of the conditions of his or her probation. Probation is defined as a sentence or disposition of conditional and revocable release under the supervision of a probation officer, *730 ILCS 5/5-1-18*, such as those on supervised release. It is firmly established that the *Fourth Amendment* permits an officer to make an arrest when he or she has probable cause to believe that an

individual has committed or is committing an act which constitutes an offense under state law, regardless of whether the state law authorizes an arrest for that particular offense.

Civil Procedure > Pleading & Practice > Pleadings > Amendment of Pleadings

*HN7*[⬇] **Pleadings, Amendment of Pleadings**

The constructive amendment doctrine says that it is not necessary to amend pleadings to conform to the issues being litigated in a case, i.e., there is no need for a plaintiff to formally memorialize changes to a complaint when the opposing party has impliedly consented to those changes through its discovery actions.

Civil Procedure > Pleading & Practice > Pleadings > Amendment of Pleadings

Civil Procedure > Judgments > Summary Judgment

*HN8*[⬇] **Pleadings, Amendment of Pleadings**

A plaintiff cannot amend his complaint at the summary judgment stage to add new legal claims with new factual bases.

Civil Procedure > Pleading & Practice > Pleadings > Amendment of Pleadings

*HN9*[⬇] **Pleadings, Amendment of Pleadings**

A district court has discretion in deciding whether amending is appropriate.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

*HN10*[⬇] **Amendment of Pleadings, Leave of Court**

The well-settled rule is that a party may amend its complaint once as a matter of right, twice or more only at the district court's discretion. A district court has broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants,

or where the amendment would be futile.

**Counsel:** [*1] For Christopher Colbert, Jai Crutcher, Plaintiffs: Joel A. Flaxman, Kenneth N Flaxman, Kenneth N. Flaxman, P.C., Chicago, IL.

For City of Chicago, Defendant: Jill Russell, LEAD ATTORNEY, City of Chicago Department of Law, Federal Civil Rights Litigation Division, Chicago, IL; Jason Michael Marx, City of Chicago, Department of Law, Chicago, IL.

For Russell Willingham, #3664, Defendant: Jill Russell, LEAD ATTORNEY, City of Chicago Department of Law, Federal Civil Rights Litigation Division, Chicago, IL; Jason Michael Marx, Kathryn M. Doi, City of Chicago, Department of Law, Chicago, IL.

For Jack Tweedle, #12919, Darryl Johnson, #4787, Louis Hopkins, #2487, Defendants: Lyle Kevin Henretty, LEAD ATTORNEY, Illinois Attorney General's Office, Chicago, IL.

**Judges:** Robert M. Dow, Jr., United States District Judge.

**Opinion by:** Robert M. Dow, Jr.

# Opinion

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiffs' *Rule 59* motion to alter or amend judgment [106]. For the reasons set forth below, Plaintiffs' motion [106] is denied.

## I. Background

On May 26, 2015, the Court granted Defendants' motions for summary judgment and entered judgment in favor of Defendants. [See 104, 105.] On June 23, 2015, Plaintiffs moved the court to alter or amend [*2] that judgment, arguing that the Court committed manifest errors of law by granting summary judgment against Plaintiff Crutcher on his false arrest claim and against Plaintiff Colbert on his unlawful search and unreasonable force claims.

The Court set forth the facts of this case in detail in its order on the parties' cross motions for summary judgment. [104]; *Colbert v. Willingham, 2015 U.S. Dist. LEXIS 67561, 2015 WL 3397035, at *1-3 (N.D. Ill. May 26, 2015)*. To briefly recap the facts relevant to this motion, in March 2011, Plaintiff Crutcher was released from prison on mandatory supervised release and began living in Plaintiff Colbert's basement. Soon thereafter, Chicago Police Officers received information from a cooperating individual who claimed to have seen Mr. Crutcher in Mr. Colbert's home with two firearms. Defendant Officer Willingham ran a name check on Mr. Crutcher, which revealed that he was on parole for the use of a firearm. Based on this information, Officer Willingham coordinated a parole check of Mr. Crutcher's residence to ensure that he was in compliance with the terms of his supervised release.

At 6:30 a.m. on March 31, 2011—less than one month after Mr. Crutcher was released from prison—parole officers arrived at Mr. Colbert's home to conduct a compliance check. [*3] Mr. Crutcher consented to the search of his residence per the terms of his supervised release.

At some point during the search, Plaintiff Colbert arrived home. The agents informed Mr. Colbert that they were conducting a search of the premises, and they put Mr. Colbert in handcuffs while they continued their search. Mr. Colbert alleges that the officers caused damage to his home during the search by "pull[ing] out insulation, put[ting] holes in the walls, rip[ing] the couch open to search its contents, and track[ing] dog feces throughout the house." [74, ¶ 13.] Mr. Colbert did not provide any evidence of the pre-search condition of his home (absent his own testimony), and he was "unable to provide any description of any of the officers who allegedly damaged his property." [73, at 7.]

During the search, the officers encountered a locked bedroom on the main floor. Police found a 12-gauge shotgun in the closet along with approximately 100 rounds of ammunition. The police also found a box for a 40-caliber semi-automatic handgun, although they did not recover the handgun itself. Mr. Colbert admitted ownership of both firearms. After finding the firearm and ammunition, the officers formally arrested both Plaintiffs. The officers [*4] arrested Mr. Crutcher for Unlawful Use of a Weapon/Felon in Possession of a Firearm, pursuant to *720 ILCS 5/24-1.1(a)*, and Violation of Parole, pursuant to *730 ILCS 5/3-3-9*. Mr. Colbert was released from custody on the same day of his arrest, and the criminal case against Mr. Colbert was later dismissed.

## II. Legal Standard

**HN1**[⬆] To prevail on a *Rule 59(e)* motion to amend judgment, a party must "clearly establish" that (1) the court committed a manifest error of law or fact, or (2) newly discovered evidence precluded entry of judgment. *Harrington v. City of Chicago, 433 F.3d 542, 546 (7th Cir. 2006)*; *Bordelon v. Chicago Sch. Reform Bd. of Trs., 233 F.3d 524, 529 (7th Cir. 2000)* (same); see also *Oto v. Metropolitan Life Ins., 224 F.3d 601, 606 (7th Cir. 2000)* (describing a manifest error of law as the "disregard, misapplication, or failure to recognize controlling precedent").

**HN2**[⬆] *Rule 59(e)* "enables the court to correct its own errors and thus avoid unnecessary appellate procedures." *Moro v. Shell Oil Co., 91 F.3d 872, 876 (7th Cir. 1996)*. However, a motion to reconsider pursuant to *Rule 59(e)* should be granted only in rare circumstances. *Scott v. Bender, 948 F. Supp. 2d 859, 865 (N.D. Ill. 2013)*. A party moving for reconsideration pursuant to *Rule 59(e)* bears the heavy burden of establishing that the court should reverse its prior judgment. See *Caisse Nationale de Credit Agricole v. CBI Indus., Inc., 90 F.3d 1264, 1270 (7th Cir. 1996)*.

**HN3**[⬆] A *Rule 59(e)* motion is not an appropriate vehicle for re-litigating arguments that the district court previously rejected, or for arguing issues or presenting evidence that could have been raised during the pendency of the motion presently under reconsideration. [*5] *Id.;* see also *Sigsworth v. City of Aurora, 487 F.3d 506, 512 (7th Cir. 2007)*; *Moro, 91 F.3d at 876*; *Quaker Alloy Casting Co. v. Gulfco Indus., Inc., 123 F.R.D. 282, 288 (N.D. Ill. 1988)* (noting that a court's ruling is not a "mere first draft[], subject to revision and reconsideration at a litigant's pleasure").

### III. Analysis

### A. Plaintiff Crutcher

Plaintiff Crutcher presents two objections to the Court's granting of summary judgment on his false arrest claim. First, Plaintiff Crutcher says that the Court erred by misstating the terms of Plaintiff's supervised release. Second, Plaintiff Crutcher says that the Court erred by assuming that violating the terms of supervised release is an arrestable offense. The Court addresses each argument in turn.

### 1. The Terms of Plaintiff Crutcher's Mandatory

### Supervised Release

Defendants arrested and charged Plaintiff Crutcher with violating the terms of his mandatory supervised release, based on the fact that he knowingly lived in a residence with a firearm. Plaintiff Crutcher sued for false arrest, arguing that Defendants lacked reasonable suspicion to make that arrest because the firearm was located in locked room to which he did not have a key. In ruling on Plaintiff Crutcher's false arrest claim, the Court assessed whether, under the totality of the circumstances, the arresting officer had reasonable suspicion[1] to [*6] believe that Mr. Crutcher had committed or was committing an arrestable offense. The Court concluded that Officer Willingham did have reasonable suspicion to believe that Mr. Crutcher knowingly resided in a home with a firearm, thereby violating the terms of his mandatory supervised release. Plaintiff Crutcher asks the Court to reconsider that decision, arguing that the terms of his mandatory supervised release only prevented him from *possessing* a firearm, not knowingly having a firearm in his residence.

The terms of Mr. Crutcher's mandatory supervised release—derived from Illinois statute *730 ILCS 5/3-3-7*—were presented to him in a form entitled "Parole or Mandatory Supervised Release Agreement," which he was required to sign. [See 106, at 11.] That form lists 16 numbered "Rules of Conduct Governing Parolees or Mandatory Supervised Releasees." [*Id.*] The second rule on that list says, "You shall refrain from possessing a firearm [*7] or other dangerous weapon." [*Id.*] The final rule on that list says, "You shall also comply with any additional conditions the Prison Review Board has or may set as a condition of your parole or mandatory supervised release including, but not limited to * * *," and then there are a series of eight check boxes listing supplemental agreements that can be incorporated into the terms of a person's supervised release. In Mr. Crutcher's case, two boxes were checked: (1) Electronic Detention, and (2) Anger Management Counseling. [*Id.*] Relevant here, the "Electronic Detention Program Agreement" is a separate form (which Mr. Crutcher also signed), listing a number of additional "Terms and

---

[1] [See 75, at 5-6 ("The parties also agree that, because Crutcher was a parolee, the law of the Seventh Circuit is that the legality of this arrest turns on whether a reasonable police officer could have believed that there was 'reasonable suspicion,' *Knox v. Smith, 342 F.3d 651, 657 (7th Cir. 2007)*, that Crutcher was subject to arrest.").]

Conditions of the Electronic Detention Program" that were incorporated into the terms of Mr. Crutcher's mandatory supervised release. [See 106, at 13-14.] By signing the Electronic Detention Program Agreement, Mr. Crutcher agreed that he "w[ould] not use or knowingly have under [his] control or in [his] residence any firearms, ammunition, or explosive devices." [106, at 13.]

Because the Electronic Monitoring Agreement was expressly incorporated into the terms of Plaintiff Crutcher's Mandatory Supervised Release Agreement, **[*8]** a violation of the terms of either agreement constitutes a violation of the terms of Mr. Crutcher's mandatory supervised release. Thus, the Court applied the correct standard in assessing whether Officer Willingham had reasonable suspicion to believe that Plaintiff Crutcher knowingly had a firearm in his residence.

In addition, Plaintiff Crutcher waived this argument by failing to raise it during summary judgment briefing. See _General Auto Service Station v. City of Chicago, 526 F.3d 991, 1006 (7th Cir. 2008)_ (**HN4**[⬆]) "Arguments that could have been made earlier but are instead raised for the first time in a _Rule 59_ motion are waived."). Specifically, Plaintiff Crutcher directly addressed this issue in his reply brief: "Defendant Willingham points to the terms of Crutcher's parole agreement, in which Crutcher agreed to the following: 'I will not use or knowingly have under my control or in my residence any firearms, ammunition, or explosive devices.'" [97, at 2.] Plaintiff Crutcher then went on to argue that Defendant Willingham ignored the word "knowingly" in that sentence—Plaintiff _did not_ argue that this requirement came from some non-binding agreement. Instead, Plaintiff Crutcher effectively conceded that this standard was a term of his parole agreement (and one that he agreed, **[*9]** in writing, to follow).

And to add a final nail in the coffin of Plaintiff's argument, Defendant Willingham stated in his Rule 56.1 statement of undisputed facts that Plaintiff Crutcher's "[Mandatory Supervised Release] Agreement * * * specified that Crutcher would not knowingly have under his control or in his residence any firearms or ammunition." [70, ¶ 3.] In response, Plaintiff Crutcher disputed this statement, but _only_ to clarify his interpretation of the provision, not its applicability:

As set forth in ECF #70-3, City Exhibit C, Crutcher agreed that "I will not use or knowingly have under my control or in my residence any firearms,

ammunition, or explosive devices . . ." Plaintiff contends that the plain, ordinary meaning of this provision is that Crutcher would not knowingly have any firearm in his control in his residence.

[72, at 2.] In other words, Plaintiff Crutcher did not object to the fact that this term was incorporated in the terms of his mandatory supervised release—to the contrary, he adopted it. This fact was therefore deemed admitted. See, _e.g._, _Cracco v. Vitran Exp., Inc., 559 F.3d 625, 632 (7th Cir. 2009)_ (citing _Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003)_); _Nehan v. Tootsie Roll Industries, Inc., 54 F. Supp. 3d 957, 960-61 (N.D. Ill. 2014)_ (**HN5**[⬆]) "To the extent that [plaintiff] fails to effectively dispute facts properly set forth and supported by [defendant], **[*10]** those facts are deemed admitted for the purposes of this motion."); _Smith v. Rosebud Farmstand, 2014 U.S. Dist. LEXIS 169237, 2014 WL 6886869, at *2 (N.D. Ill. Dec. 8, 2014)_ ("To the extent that Plaintiff's responses are improper, Defendants' fact statements will be admitted.").

## 2. Whether Violating the Terms of Release is an Arrestable Offense

Plaintiff Crutcher also says that even if knowingly having a firearm in his residence constitutes a violation of the terms of his mandatory supervised release, that is not an arrestable offense. Plaintiff Crutcher now argues that Illinois law, _730 ILCS 5/3-14-2(c)_ does not authorize a police officer to make an arrest, as opposed to a detention pending issuance of a parole violation warrant, for a violation of mandatory supervised release.[2]

In Plaintiff Crutcher's summary judgment briefs, despite directly addressing the issue of whether Officer Willingham "could lawfully have arrested [P]laintiff

---

[2] But see **HN6**[⬆] _730 ILCS 110/11_ ("[P]olice officers * * * may * * * arrest on view any probationer found by them violating any of the conditions of his or her probation * * *."). Probation is defined as "a sentence or disposition of conditional and revocable release under the supervision of a probation officer," _730 ILCS 5/5-1-18_, such as those on supervised release. See _Tebbens v. Mushol, 692 F.3d 807, 817 (7th Cir. 2012)_; see also _id. at 817-18_ ("[I]t is firmly established that the **_Fourth Amendment_** permits an officer to make an arrest when he or she has probable cause to believe that an individual has committed or is committing an act which constitutes an offense **[*11]** under state law, _regardless_ of whether the state law authorizes an arrest for that particular offense.").

Crutcher for having violated the terms of his mandatory supervised release," [75, at 10], Plaintiff Crutcher never argued that violating the terms of one's mandatory supervised release is not an arrestable offense. To be clear, this issue was front-and-center in the parties' summary judgment briefing, where Defendant Willingham's leading argument was that "[b]ecause the shotgun was in Crutcher's residence, Officer Willingham had probable cause to arrest him for a parole violation." [71, at 5; see also *id.* at 6 ("Crutcher could then be arrested for violating the terms of his parole.").] By failing to raise this argument during summary judgment briefing, Plaintiff Crutcher waived his right to raise this issue here. See *General Auto Service Station v. City of Chicago, 526 F.3d 991, 1006 (7th Cir. 2008)* ("Arguments that could have been made earlier but are instead raised for the first time in a *Rule 59* motion are waived.").

## B. Plaintiff Colbert

In the second amended complaint, Plaintiff Colbert alleged (1) a false arrest claim against all individual [*12] defendants, (2) a claim that § 8-20-040 of the Municipal Code of the City of Chicago is unconstitutional, and (3) a claim that individual defendants searched his residence in an unreasonable manner, causing damage. Defendants moved for summary judgment on all three claims, and the Court granted Defendants' motion. [See 104, at 22-28.]

In responding to Defendants' motion for summary judgment, Plaintiff Colbert claimed that he actually raised *five* claims in his complaint, not three. Specifically, he argued that he alleged an unreasonable force claim (alleging that Officer Hopkins wrestled him to the ground and took his keys) and an unlawful search claim (alleging that Officer Hopkins took his keys and went into his bedroom without permission). The Court declined to address these claims, holding that Mr. Colbert could not amend his complaint at the summary judgment stage to add, for the first time, two entirely new legal claims with entirely new factual bases. See *Whitaker v. Milwaukee Cnty., Wisc., 772 F.3d 802, 808 (7th Cir. 2014).*

Plaintiff Colbert now argues that the Court erred by ignoring the fact that Plaintiff provided fair notice of these claims to Defendants through factual assertions made in his supplemental interrogatory answers, in his statement of additional [*13] facts, and in his deposition testimony. Plaintiff Colbert relies on the "constructive

amendment" theory discussed in *Torry v. Northrop Grumman Corp., 399 F.3d 876, 879 (7th Cir. 2005)*, arguing that "a complaint should not be limited to the precise facts alleged, but should entitle the plaintiff to prove facts consistent with the complaint." [106, at 8.] In short, *HN7*[↑] the "constructive amendment" doctrine says that it is not necessary to amend pleadings to conform to the issues being litigated in a case—*i.e.*, there is no need for a plaintiff to formally memorialize changes to a complaint when the opposing party has impliedly consented to those changes through its discovery actions.

Here, Plaintiff Colbert has not provided sufficient evidence to show that Defendants impliedly consented to the litigation of his unreasonable force and unlawful search claims. First of all, at the outset of this case, Defendants objected to Plaintiff Colbert's allegations, moving the Court pursuant to *Fed. R. Civ. P. 12(e)* for a more definite statement of Mr. Colbert's claims. The Court granted that motion [15], resulting in the filing of an amended complaint [16]. After Defendants unsuccessfully moved to dismiss Plaintiffs' amended complaint, Plaintiffs amended their complaint a second time [see [*14] 45]. Despite having three opportunities to do so (over the span of approximately one year), Plaintiff Colbert never included in his complaint any mention of the claims at issue here.

In addition, the Court is not persuaded by Plaintiff Colbert's contention that the parties have been litigating these claims all along. First, Plaintiff Colbert says that he provided details about his unlawful search claim in his supplemental interrogatory answers. But Plaintiff does not specify any particular interrogatory answer, and upon review, Plaintiff's answers contradict his argument:

> **Interrogatory 20**: Please state with specificity every act of misconduct by any Defendants for which you are seeking damages for [sic] in this lawsuit * * *.
>
> **Response**: The officers trashed my house and false arrested me. I am unable to identify which officers trashed my house. I believe that I was arrested by two white police officers.

[106, at 19.] Plaintiff plainly states in this response that he is only pursuing claims regarding the unreasonable search of his home and his alleged false arrest. And in these same interrogatory responses, Plaintiff Colbert also describes the incident in which the police officers "took [*15] [his] keys," opened his locked bedroom

door, and recovered the shotgun. [See 106, at 20.] Nowhere in that description does Plaintiff Colbert mention that he was wrestled to the ground, nor are there any factual allegations in that response that would imply the use of excessive force.

Second, Plaintiff Colbert points to four facts that he alleged in his Rule 56.1 statement as proof of his "constructive amendment." [See 74, ¶¶ 17-20 (stating that Officer Hopkins told Colbert, "I need to get into your room"; Colbert refused; Officer Hopkins wrestled Colbert to the ground and forcibly took Colbert's house keys; and Hopkins located a shotgun in a locked case in Colbert's closet).] However, Plaintiff's unilateral assertion of facts at the summary judgment in no way demonstrates that Defendants impliedly consented to the litigation of these claims throughout the litigation, as would be necessary to trigger the constructive amendment doctrine. And Plaintiff's assertion that these factual allegations provided "notice" of the claims is irrelevant—*HN8*[↑] a plaintiff cannot amend his complaint at the summary judgment stage to add new legal claims with new factual bases. See *Whitaker, 772 F.3d at 808*.

Third, Plaintiff Colbert says that "Plaintiffs [*16] explored the circumstances under which Hopkins had entered the locked bedroom at Hopkins' deposition," wherein Officer Hopkins testified that Plaintiff Colbert willingly gave him the key upon request, and that no one made physical contact with Plaintiff Colbert. While these facts could relate to unreasonable force and unlawful search claims, they also relate to Plaintiff's false arrest and unreasonable search claims. Regardless, it takes more than a few lines of deposition testimony to show that the parties were "patently engaged" in litigating these claims. *Torry, 399 F.3d at 879*.

The only allegation in Plaintiffs' second amended complaint relevant to these claims is as follows:

On March 31, 2011, defendants Willingham, Tweedle, Johnson, and Hopkins, hereinafter "searching officer defendants," searched the residence of plaintiff Colbert in an unreasonable manner, causing damage to Colbert's property."

[45, ¶ 6.] This allegation clearly relates to Plaintiff Colbert's unreasonable search claim (*i.e.*, that the officers "trashed [his] house"), which is consistent with the claims as presented in Plaintiff Colbert's interrogatory responses. Any argument that this allegation put Defendants on notice of an entirely [*17] separate unlawful search claim (or an unreasonable

force claim, for that matter) is not persuasive, nor is it borne out by the parties' behavior in the approximately 20-month period between the filing of this lawsuit and the filing of the parties' summary judgment motions. This case falls squarely within the holding of *Whitaker*, and the Court concludes that it did not commit a manifest error in refusing to allow Plaintiff Colbert to add claims in response to Defendants' motion for summary judgment.

Alternatively, Plaintiff Colbert argues that "the Court should have permitted [him] to file an amendment to the complaint * * * and denied summary judgment on this portion of the claim." [106, at 8.] But Plaintiff Colbert did not ask the Court for leave to amend during the summary judgment stage, and merely asserted that he had properly raised the claims in his complaint. [See 75.] In addition, *HN9*[↑] the Court has discretion in deciding whether amending is appropriate. See *Chapman v. First Index, Inc., 796 F.3d 783, 785 (7th Cir. 2015)* ("[A] district judge has discretion to reject an attempt to remake a suit more than four years after it began."). It would have been well within the Court's discretion to deny any request to amend, based on the fact that Plaintiff [*18] Colbert previously had amended his complaint twice and failed to raise the claims in question, even though he has been aware of the underlying facts of these claims from the outset. See, *e.g.*, *United States v. Sanford-Brown, Ltd., 788 F.3d 696, 706 (7th Cir. 2015)* (*HN10*[↑] "The well-settled rule is that a party may amend its complaint once as a matter of right, twice or more only at the district court's discretion."); *id. at 706-07* ("[A] district court has 'broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile.'" (quoting *Arreola v. Godinez, 546 F.3d 788, 796 (7th Cir. 2008))*). And the Court even granted Defendants' *Rule 12(e)* motion for a more definite statement, alerting Plaintiff Colbert of his pleading deficiencies and the importance of setting forth a short and plain statement of his claims. Ultimately, the Court did not commit a manifest error in failing to *sua sponte* grant Plaintiff Colbert leave to amend his complaint to add new claims at the summary judgment stage.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' *Rule 59* motion to alter or amend judgment [106] is denied.

Dated: January 19, 2016

/s/ Robert M. Dow, Jr.

United States District Judge

**End of Document**

 Neutral
As of: October 1, 2018 4:01 PM Z

# *Thomas v. City of Markham*

United States District Court for the Northern District of Illinois, Eastern Division

September 29, 2017, Decided; September 29, 2017, Filed

No. 16 CV 08107

**Reporter**

2017 U.S. Dist. LEXIS 160635 *

LAFAYETTE THOMAS, Plaintiff, v. THE CITY OF MARKHAM, ILLINOIS, Officer WILLIAM BRAZIL, and Officer ZAKIYA LARRY, Defendants.

**Subsequent History:** Motion denied by *Thomas v. City of Markham, 2018 U.S. Dist. LEXIS 45890 (N.D. Ill., Mar. 21, 2018)*

## Core Terms

allegations, excessive force, lawsuits, deliberate indifference, municipal, constitutional violation, fail to train, give rise, discipline, cases, reasonable inference, deliberately, conclusions, indifferent, incidents, custom, use excessive force, plaintiff's claim, misconduct, violations, plausibly, argues, notice, infer

**Counsel:** [*1] For LaFayette Thomas, Plaintiff: Jonathan I. Loevy, LEAD ATTORNEY, Arthur R. Loevy, Julie Marie Goodwin, Loevy & Loevy, Chicago, IL.

For City of Markham, The, Illinois, Defendant: Stephen Richard Miller, LEAD ATTORNEY, Jorge F Rovelo, Melanie Elysia Baker, Nikoleta Lamprinakos, Robbins Schwartz Nicholas Lifton & Taylor LTD, Chicago, IL.

For William Brazil, Officer, Zakiya Larry, Officer, Defendants: Harry N. Arger, LEAD ATTORNEY, Molly E. Thompson, Dykema Gossett PLLc, Chicago, IL.

**Judges:** HON. JORGE L. ALONSO, United States District Judge.

**Opinion by:** JORGE L. ALONSO

## Opinion

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion of Defendant, the City of Markham, Illinois ("Markham"), to dismiss Counts I and II of Plaintiff's Complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. The Motion to Dismiss has been fully briefed by the parties. After considering all arguments raised by both parties, the Court grants Defendant's Motion to Dismiss Counts I and II of Plaintiff's Complaint.

### BACKGROUND

Plaintiff, Lafayette Thomas, filed the instant action in August 2016 against Markham and two of its police officers, Officer William Brazil and Officer Zakiya Larry. Plaintiff alleges that, on March 17, 2016, he was brutally attacked and assaulted [*2] by Officer Brazil during a traffic stop and that Officer Larry watched the attack and did nothing to stop it. Plaintiff alleges he was seriously injured as a result.

Plaintiff asserts claims against the defendant officers and Markham of excessive force (Count I) and a failure to intervene (Count II) pursuant to *42 U.S.C. § 1983*, as well as certain state law claims. Although not explicitly labeled as such, Counts I and II state *Monell* claims against Markham, alleging that the defendant Markham's policies of failing to train and failing to discipline its police officers in regards to excessive force were the moving force behind the defendant officers' actions which violated Plaintiff's *Fourth Amendment* rights.

### LEGAL STANDARD

A *Rule 12(b)(6)* motion "tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff, 696 F.3d 635, 637 (7th Cir. 2012)*. To survive a motion to dismiss for failure to state a claim, a plaintiff's complaint must contain "a short and plain statement of the claim[s] showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. The short and

plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (ellipsis omitted).

Under federal notice-pleading standards, a plaintiff's complaint "must contain sufficient **[*3]** factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 570*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly, 550 U.S. at 556*). "If the allegations give rise to an obvious alternative explanation, then the complaint may stop short of the line between possibility and plausibility of entitlement to relief." *McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011)* (quotations and citations omitted). In ruling on a motion to dismiss, courts must construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts and drawing all reasonable inferences in the plaintiff's favor. *Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008)*. However, "legal conclusions and conclusory allegations merely reciting the elements of the claim" are not entitled to the presumption of truth. *McCauley v. City of Chi., 671 F.3d 611, 616 (7th Cir. 2011)*.

## ANALYSIS

*Section 1983* authorizes a private cause of action against anyone who, while acting under color of law, deprives a party of his/her constitutional rights. *See 42 U.S.C. § 1983*. In the context of *§ 1983* claims, a municipality is not responsible for the alleged misconduct of its employees; rather, a municipality can only be held liable **[*4]** when it has a policy or practice that *causes* a constitutional violation. *Monell v. Dept. of Soc. Servs. of City of N.Y., 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*; see *City of Canton, Ohio v. Harris, 489 U.S. 378, 379, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)* ("[A] city is not liable under *§ 1983* unless a municipal 'policy' or 'custom' is the *moving force* behind the constitutional violation.") (emphasis added). Thus, to state a so-called *Monell* claim against Markham, plaintiff must allege that the constitutional violation was caused by: (1) an express municipal policy; (2) "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom

or usage within the force of law;" or (3) a decision by a municipal agent with final policymaking authority. *McCormick v. City of Chi., 230 F.3d 319, 324 (7th Cir. 2000)*.

Here, Plaintiff chooses the second option. Plaintiff advances his *Monell* claims based on failure-to-act theories, alleging that as a matter of practice, Markham failed to train its officers to refrain from using excessive force and failed to adequately discipline officers who used excessive force. (*See* Pl.'s Compl., ¶¶ 53-54.) The Supreme Court has noted that a "municipality's culpability for a deprivation of rights is at its most tenuous" under such circumstances. *See Connick v. Thompson, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)* (discussing failure-to-train theory).

To ultimately establish liability, **[*5]** a plaintiff must show that a harmful practice actually exists and that the municipality's policymakers were "deliberately indifferent as to the known or obvious consequences" of that practice. *Thomas v. Cook Cty. Sheriff's Dep't, 604 F.3d 293, 303 (7th Cir. 2010)* (citations omitted); see *Sigle v. City of Chi., No. 10 C 04618, 2013 U.S. Dist. LEXIS 59155, 2013 WL 1787579, at *2 (N.D. Ill. 2013)* (finding that plaintiff bringing excessive force claim based on "failure to investigate, supervise, and discipline" must show deliberate indifference. Deliberate indifference "is a stringent standard of fault" and is typically proven by "[a] pattern of similar constitutional violations." *Connick, 563 U.S. at 61-62*. Thus, at the pleading stage, Plaintiff must plead facts that allow this Court to reasonably infer that Markham has a practice of failing to train and discipline its officers in regards to excessive force, that Markham's policymakers were deliberately indifferent to officers using excessive force, and that the practice itself caused Plaintiff's injury. *See Gallagher v. O'Connor, 664 F. App'x 565, 569 (7th Cir. 2016)*; see also *S.J. v. Perspectives Charter Sch., 685 F. Supp. 2d 847, 858 (N.D. Ill. 2010)* (noting plaintiff must plead facts showing deliberate indifference in granting defendant's motion to dismiss *Monell* claim).

Defendant essentially argues Plaintiff fails to adequately allege facts showing a pattern of similar constitutional violations and thus fails to plausibly allege that a widespread practice was in **[*6]** effect and that Markham officials knew and were deliberately indifferent to the rights of Plaintiff. Plaintiff argues he has alleged facts showing Markham officers have repeatedly engaged in a pattern of "citizen abuse" from which a practice can be inferred and that Markham officials had notice of the problem and did nothing. Plaintiff argues

that—at this stage—his allegations are sufficient to state a *Monell* claim. The Court disagrees.

After alleging specific facts about the incident giving rise to his claim, Plaintiff alleges that his injuries were proximately caused by Markham's "policy, practice, and custom of failing to train, supervise and control its officers" as well as its policy and practice of "failing to adequately train and discipline prior instances of similar misconduct". (*See* Pl.'s Compl., ¶¶ 52-54.) Plaintiff then alleges that Officer Brazil has been named as a defendant in four lawsuits in the past five years and that the city has settled these cases for undisclosed sums. (*See id.* at ¶ 55.) Plaintiff also alleges that he spoke with Markham Mayor David Webb days after the incident and that the mayor "uttered an expletive" when told Officer Brazil attacked Plaintiff. **[*7]** (*See id.* at ¶ 56.) Further, Plaintiff alleges that other Markham officers have been been sued in the past for "abusing citizens" and references one lawsuit that alleges excessive force and false arrest. (*See id.* at ¶ 57.) Lastly, Plaintiff alleges that former Markham Deputy Chief Anthony DeBois—who had been responsible "for many years" for responding to citizen complaints against officers—was found to have sexually assaulted a woman in his custody and then lied about it the FBI. (*See id.* at ¶ 58.) Plaintiff pleads that Markham "failed to act to remedy the pattern of abuse" despite "clear notice of a problem" and that Markham's failure caused Plaintiff's injuries. (*See id.* at ¶ 59.)

As an initial matter, several of plaintiff's allegations are either not entitled to the presumption of truth or are irrelevant to Plaintiff's *Monell* claims. First, it is axiomatic that "legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to [the] presumption of truth." *McCauley, 671 F.3d at 616* (citing *Iqbal, 556 U.S. at 678* ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.") (citations omitted)). Thus, paragraphs 52-54 of Plaintiff's **[*8]** complaint offering "boilerplate legal conclusions" that Markham was deliberately indifferent and had harmful policies in place are not sufficient on their own to state *Monell* claims. *See e.g.,* *Falk v. Perez, 973 F. Supp. 2d 850, 864 (N.D. Ill. 2013)* (finding that "bare allegations of a policy or custom" were not sufficient to state a *Monell* claim).[1]

Second, Plaintiff alleges several irrelevant facts. In order to show Markham's practice of failing to train and discipline its officers as well as Markham's deliberate indifference, Plaintiff alleges facts which purportedly show a pattern of "repeated acts of abuse towards its citizens." (*See* Pl.'s Compl., ¶¶ 55-59.) To the extent these allegations do not point to other incidents of Markham officers using *excessive force*, they do not describe incidents that are sufficiently similar to constitute a pattern from which this Court can infer a harmful practice and Markham's deliberate indifference to its consequences.

In *Connick*, a plaintiff brought a *Monell* claim against a district attorney's office after he discovered that prosecutors had committed a *Brady* violation during **[*9]** his criminal trial; the plaintiff alleged the office had a policy of failing to train its attorneys to produce exculpatory evidence to opposing counsel. *563 U.S. at 54*. In an effort to show the defendant had notice of its attorneys' lack of training and was deliberately indifferent to the consequences, the plaintiff argued that four criminal convictions by the office had been overturned due to *Brady* violations in a ten-year period. Plaintiff argued this pattern showed the defendant's deliberate indifference. *Id. at 62*. The Supreme Court found the four reversals did not prove deliberate indifference because the *Brady* violations in those cases were not sufficiently similar to the violation giving rise to the plaintiff's claim. *Id. at 62-63*. Unlike the plaintiff's case, the prior *Brady* violations did not "involve failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind," and thus, "they could not have put [the defendant] on notice that specific training was necessary to avoid this constitutional

claim. (*See* Pl.'s Resp. at 4-5.) *See* *Karney v. City of Naperville, No. 15 C 4608, 2016 U.S. Dist. LEXIS 143655, 2016 WL 6082354, at *12 (N.D. Ill. 2016)* (collecting cases). These cases rely on *McCormick v. City of Chicago*, which held that *Monell* claims do not require a heightened pleading standard. *230 F.3d 319, 323 (7th Cir. 2000)* (relying on *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993))*. *McCormick* predates *Iqbal* and *Twombly*. This Court relies on the Seventh Circuit's decision in *McCauley*, which applied the *Iqbal*/*Twombly* standard to alleging *Monell* claims. While *Monell* does not require heightened pleadings, *McCauley* makes clear that such conclusory allegations, without more, are insufficient to state a *Monell* claim. *671 F.3d at 617* (dismissing *Monell* claim and finding that many of plaintiff's allegations were "conclusions or elements of the cause of action, which may be disregarded on a motion to dismiss.").

---

[1] Plaintiff cites to a string of post-*Iqbal* cases—and this Court is aware of others in the Northern District—which have found that such boilerplate allegations *are* sufficient to state a *Monell*

violation." *Id. at 62-63*.

Courts in the Seventh Circuit have followed suit, finding that allegations of general past misconduct or allegations of dissimilar incidents are not sufficient to allege **[*10]** a pervasive practice and a defendant's deliberate indifference to its consequences. *See, e.g., Strauss v. City of Chi., 760 F.2d 765, 768-69 (7th Cir. 1985)* (finding plaintiff failed to meet *Monell* pleading burden where plaintiff alleged general data on citizen complaints and the city's acquiescence to the misconduct); *Karney, 2016 U.S. Dist. LEXIS 143655, 2016 WL 6082354, at *13* (noting that a prior unlawful search of an apartment was "only marginally similar" to the plaintiff's allegation of an unlawful search of his vehicle in assessing failure-to-train *Monell* claim).

These cases show that many of the prior incidents of "citizen abuse" alleged by Plaintiff are irrelevant. In paragraph 55 of his complaint, Plaintiff mentions four lawsuits involving Defendant Officer Brazil. Only one case—*Longley v. Brazil*, 13-CV-01296—contains allegations of excessive force against Markham officers, including Officer Brazil. The other cases involve very different claims, such as false arrest or false imprisonment. This Court believes these claims are not sufficiently similar to infer either a widespread practice of using *excessive force* or Markham's deliberate indifference to such a practice.[2]

Similarly, the allegations in paragraph 58 concerning former Deputy Chief Anthony DeBois do not help Plaintiff. First, DeBois' **[*11]** wrongdoing—as alleged—does not include excessive force and thus does not add to a pattern from which this Court can infer a harmful practice or Markham's deliberate indifference. *See Connick, 563 U.S. at 62-63*. Second, not only does Plaintiff fail to allege what time period DeBois led Markham's internal affairs division, the facts also show—by way of the news story included in paragraph 58—that DeBois was criminally charged a full *three years* before the events giving rise to Plaintiff's claim. DeBois was long gone by the time Plaintiff was allegedly injured.

---

[2] Tellingly, Plaintiff does not argue that all four cases are sufficiently similar to his to support an inference that Markham has the problematic policy that Plaintiff claims. Instead, he argues that "Defendant cannot parse away Plaintiff's allegations of at least one prior use of excessive force against Defendant Officer Brazil . . . and prior use of excessive force by other Markham officers." (*See* Pl.'s Resp. at 5.)

Thus, when the Court sets aside these allegations, the facts which remain are: (1) the incident giving rise to Plaintiff's claims; (2) two prior lawsuits which allege excessive force violations against Markham officers; and (3) an expletive uttered by the Markham mayor when he was told Officer Brazil attacked Plaintiff. Assuming these allegations are true, they fail to permit the reasonable inference that the alleged practice "is so widespread so as to constitute a governmental custom." *Gill v. City of Milwaukee, 850 F.3d 335, 344 (7th Cir. 2017)*.

The Seventh Circuit has made clear that although "there is no clear consensus as to how frequently [harmful] conduct must occur to impose *Monell* liability," a plaintiff **[*12]** must ultimately show "there is a policy at issue *rather than a random event.*" *Thomas, 604 F.3d at 303.* (emphasis added). The Court finds the Seventh Circuit's decision in *League of Women Voters of Chicago v. City of Chicago* instructive. *757 F.3d 722 (7th Cir. 2014)*. The plaintiff alleged that the City of Chicago had a widespread policy of implementing new ward boundaries prematurely, thereby causing equal protection violations. *Id. at 727-728*. In pleading its claim—which the court treated as a *Monell* claim—the plaintiff alleged at least three separate instances of aldermen acting or refusing to act based on the new boundaries. *Id.* The Seventh Circuit found this was insufficient to state a *Monell* claim, observing that the acts "by individual aldermen is a far reach from proving a policy so permanent and well settled as to constitute custom or usage with the force of law." *Id. at 728* (quotations omitted).

Similarly, here, two prior excessive force lawsuits fail to plausibly show that Markham had the widespread and well-settled policies that Plaintiff claims. The Court notes the gap in time between the incidents leading to these prior lawsuits and to Plaintiff's lawsuit. The incident giving rise to the *Longley* case involving Officer Brazil happened in February **[*13]** 2011, and the incident giving rise to the excessive force suit involving other Markham officers—described in paragraph 57 of the complaint—happened in January 2010. Even if this Court accepts as true the allegations in those lawsuits,[3]

---

[3] Notably, some courts in the Northern District have declined to accept lawsuits or settlements as supporting the existence of a municipality's practice or its deliberate indifference. *See e.g., Slaven v. City of Chi., No. 85 C 7310, 1999 U.S. Dist. LEXIS 17518, 1999 WL 1024563, at *1 (N.D. Ill. 1999)* (ruling plaintiff could not amend his complaint to add *Monell* claim based, in

there remains a five-year gap between those events and the instant incident. This Court cannot reasonably infer a "true municipal policy" was at work here; rather, these incidents appear to be the sort of "random event[s]" that cannot lay the foundation of a *Monell* claim. *Calhoun v. Ramsey, 408 F.3d 375, 380 (7th Cir. 2005)*.

Finally, the Markham mayor's alleged comments—considered along with the prior lawsuits—do not carry the day for Plaintiff. The complaint alleges that when told that Officer Brazil attacked Plaintiff, "the Mayor uttered an expletive that clearly indicated this was not the first time he had heard complaints about Brazil." (*See* Plaintiff's Complaint, ¶ 56.) Plaintiff argues that his interpretation of the mayor's response is a reasonable one. Even if this Court makes the same inference, more would be required to make Plaintiff's *Monell* claims plausible. The Court would be required to infer that Markham's policymakers not only knew of past complaints against Officer Brazil but also **[*14]** failed to take *any* action, thereby showing they were deliberately indifferent to the rights of anyone who may cross Officer Brazil's path. Such an inference cannot reasonably be gleaned from Plaintiff's allegations.

Thus, for the foregoing reasons, Plaintiff fails to plead facts which allow this Court to reasonably infer that Officers Brazil and Larry acted pursuant to an unofficial policy or practice in Markham "so persistent and widespread as to practically have the force of law." *Connick, 563 U.S. at 61*. After Plaintiff's legal conclusions and irrelevant allegations are set aside, Plaintiff cites two lawsuits and an expletive uttered by Markham's mayor. Based on these facts alone, Plaintiff has not "nudged [his] claims across the line from conceivable to plausible." *Twombly, 550 U.S. at 570*. Thus, Plaintiff fails to state *Monell* claims against Markham.[4]

At this time, the Court declines to address Markham's assertion that the viability of Counts III — VII depends on a finding of constitutional violations in Counts I and II. (*See* Def.'s Reply, at 3 n. 1.) Both parties' arguments are underdeveloped in this respect, and as such, the Court refuses to rule on the issue. *See United States v. Olmeda-Garcia, 613 F.3d 721, 723 (7th Cir. 2010)*.

## CONCLUSION

The *Monell* claims asserted against Markham **[*15]** in Counts I and II are dismissed without prejudice. Plaintiff may file an amended complaint consistent with this Opinion by October 27, 2017.

**SO ORDERED**.

**ENTERED: September 29, 2017**

/s/ Jorge L. Alonso

**HON. JORGE L. ALONSO**

**United States District Judge**

---

**End of Document**

---

part, on city's settlement of three lawsuits involving defendant officers and observing that "absent an admission of wrongdoing, a settlement proves nothing").

[4] The Court agrees with the parties that the allegations in Count I form the foundation of Count II, which alleges that Officer Larry's failure to intervene to stop Officer Brazil constitutes a *§ 1983* violation. (*See* Pl.'s Compl., ¶ 64.) Thus, because Plaintiff fails to plausibly allege Markham has an unwritten practice of failing to train and failing to discipline its officers in regards to excessive force, the *Monell* claims in both Counts I and II should be dismissed.