# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

REBECCA TERRY,

                    Plaintiff,

v.

COUNTY OF MILWAUKEE,
RICHARD R. SCHMIDT, OFFICER
BRIAN WENZEL, UNKNOWN
EMPLOYEES OF MILWAUKEE
COUNTY JAIL, UNKNOWN JAIL
SUPERVISORS, ARMOR
CORRECTIONAL HEALTH
SERVICES INC., CAROLYN EXUM,
MORGAN BEVENUE, and
MARGARET HOOVER,

                    Defendants.

Case No. 17-CV-1112-JPS

**ORDER**

## 1.    INTRODUCTION

Plaintiff Rebecca Terry ("Terry"), brings this action pursuant to 42 U.S.C. § 1983, alleging that her constitutional rights were violated when she was ignored while she gave birth in a cell at the Milwaukee County Jail ("MCJ"). *See* (Docket #129). Terry brings claims of denial of medical care in violation of her Fourteenth Amendment right against Milwaukee County (the "County"), Officer Brian Wenzel ("Wenzel"), Carolyn Exum, R.N. ("Exum"), and Morgan Bevenue, R.N. ("Bevenue"), (collectively, the "County Defendants").[1]

---

[1]The parties have stipulated to dismiss all claims against Nurse Margaret Hoover. (Docket #186). Hoover was the only named defendant attached to Terry's claim for supervisor liability. Therefore, that claim is also dismissed. Additionally,

Terry asserts *Monell* claims related to her labor and delivery in the jail against the County Defendants, acting Sheriff Richard Schmidt in his official capacity ("Schmidt"), and Armor Correctional Services ("Armor"), a private corporation that provides healthcare services to inmates at the MCJ.[2] She also asserts a *Monell* claim against the County Defendants regarding their use of restraints in transporting and monitoring hospitalized inmates. Under *Monell,* a municipal or corporate entity can be liable under Section 1983 for constitutional violations if those violations are brought about by (1) the entity's express policy; (2) a widespread, though unwritten, custom or practice, or (3) a decision by an agent with "final policymaking authority." *Darchak v. City of Chicago Bd. of Educ.*, 590 F.3d 622, 629 (7th Cir. 2009). Both the County Defendants and Armor filed motions for summary judgment. (Docket #162 and #169).[3]

---

Terry's failure to intervene claims are waived because Terry failed to address them in her omnibus summary judgment response. (*See* Docket #194 at 14).

Terry also has yet to name the Unknown Employees of the Milwaukee County Jail and the Unknown Jail Supervisors. She will have ten days following this order to name them, otherwise they will be dismissed without further notice.

[2]To the extent that Terry sues Schmidt in his official capacity, any liability on his part will be imposed on the County. *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). Thus, claims against Schmidt are duplicative, and will be dismissed. The County Defendants argue that Terry's claims against Schmidt in his individual capacity should be dismissed; however, Terry has only named Schmidt as a defendant in his official capacity. (Docket #129).

[3]Armor and the County Defendants moved to seal certain documents filed in support of their motions for summary judgment. (Docket #160, #168, and #196). Terry also moved to file certain exhibits in support of her response to the motion for summary judgment under seal. (Docket #185). In light of the sensitive information contained in those documents, as well as the protective order in place, (Docket #45), those motions will be granted.

2. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

3. **RELEVANT FACTS**

3.1 **Night of March 9-10, 2014**

On the afternoon of March 9, 2014, Terry was arrested and taken to the MCJ. Terry was 32 years old and nine months pregnant with her third child. Terry was screened by Nurse Maggie Burton at around 6:28 p.m. Terry informed Burton that she was a daily heroin user and that she was due to deliver that day. Terry also stated that she felt pressure and

tightening,[4] and that she felt a pain sensation that she was familiar with from her other two births, which she associated with the baby dropping right before labor.

Burton arranged for the MCJ to send Terry to Froedtert Hospital ("Froedtert"), where she was monitored for labor. Terry's records from Froedtert reveal that she was 80 percent effaced and 2 centimeters dilated, and experienced "intermittent" contractions, some of which she slept through. The hospital records also indicate that Terry was a daily heroin user and had tested positive for opiates that day. After conducting an ultrasound, Froedtert estimated that she was likely due around March 18, 2014.

When Terry did not show any change in dilation or rate of contractions, Froedtert concluded that Terry was "not currently in labr" (sic) and released Terry back to the MCJ, where she was to receive continued prenatal care. (Docket #174-11 at 21–23). Terry recalls the doctor telling her that she was in the early stages of labor, and it was unclear how fast labor would progress. The County Defendants deny that this was communicated to them, though they admit that two correctional officers were with Terry at Froedtert. Terry was restrained at the hospital, with one wrist restraint and one leg iron. She was also transported to, and held at, the hospital in leg irons, wrist restraints, and a belly chain.

Terry returned to the MCJ around 1:00 am with incomplete discharge paperwork from Froedtert Hospital. Specifically, the discharge paperwork did not contain information detailing the tests that the Froedtert

---

[4]The parties dispute whether she specified that she felt this tightening in her lower abdomen; in any case, this is not material as Terry was sent to the hospital to rule out labor.

medical staff had performed, what they recommended for a treatment plan, or details about Terry's condition.

When Terry returned to the MCJ, Exum evaluated her for admittance back to the jail. Exum knew that Terry was nine months pregnant, an opiate user, and had just returned from Froedtert to rule out labor. Based on Terry's late stage pregnancy and opiate history, Exum also knew that Terry was at risk of early labor. Terry told Exum that the hospital said she was in labor but sent her back to jail anyway. Terry denied feeling contractions but stated that she was experiencing pressure at the bottom of her stomach. Exum checked for contractions but did not detect any.

Exum contacted Dr. Gina Buono, who was the on-call physician that night, to discuss Terry. Exum told Dr. Buono that Froedtert had medically cleared Terry for admittance to the jail. Exum also explained that there were no specific discharge orders. Dr. Buono instructed Exum to contact Froedtert to receive an oral report and request Terry's discharge paperwork. Exum called Froedtert and spoke with an unidentified person, who confirmed that Froedtert had ruled out labor for Terry, but did not provide information regarding a treatment plan (particularly with regard to the impending opiate withdrawal).[5] Exum requested Terry's discharge papers by fax, then called Dr. Buono back.

Based on Exum's report, Dr. Buono approved Terry's admittance to the MCJ, and placed her in the Special Medical Unit ("SMU"), where she

---

[5]Terry correctly objects to this statement as hearsay, and it will not be relied on to support the truth of the matter asserted, i.e., that Terry was not in labor. However, the Court may consider Exum's testimony insofar as it relates to the fact that she called Froedtert. *See U.S. v. Eberhart*, 434 F.3d 935, 939 (7th Cir. 2006) (statements may come in as "an explanation of why the investigation proceeded as it did," so long as jury instructions were properly limited).

could be closely monitored by medical staff. Exum also received approval to begin the paperwork for the MCJ's opiate protocol for heroin-addicted mothers. (Docket #174-13 at 101:11–102:9). Meanwhile, Dr. Buono instructed Exum to procure Terry's discharge documents. Exum conducted a standard, 20-minute medical examination of Terry, which included taking her vitals. When Terry was admitted to the SMU at approximately 1:30 a.m. on March 10, neither Dr. Buono nor Froedtert's medical staff had ordered additional nursing assessments.

The SMU is located on the second floor of the MCJ, upstairs from Exum's booking station, and across the hall from the clinic. The SMU consists of 11 cells arranged in a semi-circle, with an officer's work station at one end of the semi-circle. Cells 1-3 have two doors, whereas Cells 4-11 only have one door. Despite having two doors, it is possible to hear inmates when standing outside of Cells 1-3. Additionally, each cell door has a window, so an officer standing outside of the cell can see inmate activity inside of the cell. Each cell is also equipped with a call apparatus that activates a red light outside the cell door. This red light notifies the correctional officer on duty to call the nurse in the clinic.

During the night shift, from 11:00 p.m. to 6:00 a.m., the SMU is staffed with one nurse, who sits in the clinic across the hall from the SMU, and one correctional officer, who sits at a work station at the end of the semi-circle of cells. It is the SMU nurse's responsibility to know the medical conditions of the inmates in the SMU, based on information provided from the booking nurse. The SMU nurse working the night shift typically performs at least two rounds to check on inmates in the SMU (at around 11:00 p.m. and 6:00 a.m.). When Terry arrived at the SMU around 1:45 a.m., Bevenue, the nurse on duty that night, had already performed her initial

round. Terry believes that Bevenue may have entered the SMU after Terry was admitted.

Wenzel was the correctional officer on duty at the SMU that night. He worked in the SMU alone, and was the only person responsible for periodically checking the inside of the cells of the SMU. Armor and the County do not require officers to have any special medical training in order to work at the SMU.

Terry was the sixth inmate assigned to the SMU that night. She was placed in Cell 3, which was located directly across from Wenzel's desk. Lieutenant Crystalina Montano ("Montano"), the supervisor on duty, informed Wenzel that Terry was nine months pregnant and had just returned from Froedtert Hospital because she was not in active labor. Wenzel also learned that Terry was a heroin user and might experience withdrawal.

Soon after Terry arrived in the SMU, she began to experience contractions. She screamed in pain, called for help, and activated the emergency light, with no response from either Wenzel or Bevenue. She pounded on the window of her cell door at least three times. All parties agree that her water broke, and that at some point she took off her pants and underpants. As her contractions became more frequent and painful, she lay down on the bed and tried to breath though them.

Part of Wenzel's job was to make rounds approximately every thirty minutes, which entailed walking past the 11 cells in the SMU and peering through the window of each cell. He was supposed to log each of these checks on his computer. It generally takes between one and two minutes to perform each inspection of the SMU. Many of Wenzel's entries from that night show that he completed his inspections within a one-minute time-

frame. The computer log shows that Wenzel ostensibly performed checks at 1:57 a.m., 2:27 a.m., 2:57 a.m., 3:11 a.m.,[6] 3:41 a.m., 3:57 a.m., and 4:27 a.m. During Wenzel's break, another officer conducted a check at 3:27 a.m. At 4:40 a.m., Montano entered the SMU on a supervisory round.

At some point between 4:41 a.m. and 4:46 a.m., Terry delivered the baby, which was blue and appeared to have difficulty breathing. Terry reached into the baby's throat and cleared mucus from the air passage. At approximately 4:46 a.m., Wenzel made an emergency call, requesting medical assistance for Terry.[7] Nurses Exum, Hoover, and Bevenue responded to the call, and Terry and the baby were transferred to Aurora Sinai Hospital ("Aurora") shortly thereafter. Terry has no recollection of being restrained while she was transported to Aurora.

In contrast to this series of events, the County Defendants claim that no official knew that Terry was in labor, and that she gave no indication to any person that she was going into labor. According to the County Defendants, Bevenue and Wenzel performed their rounds dutifully and neither heard nor saw a single out-of-the-ordinary thing until 4:46 a.m., when the faint cry of a baby (and a previously unnoticed red light) drew Wenzel's attention to the fact that Terry had (silently) given birth in her jail cell. These facts are, clearly, in dispute.

---

[6]Wenzel states that this was when he logged himself out for a break, and that he did not perform an inspection at this time. (*See* Docket #174-21 at 158:20-21).

[7]Terry and Wenzel each state that the baby was already born by the time Wenzel made the emergency call. Exum, on the other hand, remembers that the baby was still in the birthing canal when she arrived on the scene. Exum also remembers that *she* was the one to clear the baby's airways. In any event, it is undisputed that the baby was born in Terry's jail cell and initially had trouble breathing.

Terry stayed in the hospital from March 10 to March 13, 2014 for post-partum care and medical monitoring of her drug withdrawal. During this time, she was restrained by her right wrist and left ankle. The wrist restraint was removed at one point to allow Terry to hold her baby. The wrist restraint was also switched to allow Terry to use a different arm for the IV.

### 3.2 Armor and the County's Policies and Procedures

Armor and the County have several policies that are relevant to Terry's *Monell* claims.

Armor's Receiving Screening Policy, J-E-02, revised May 3, 2013 predicates a hospitalized inmate's readmission to the MCJ on receipt of written documentation of treatment and follow-up recommendations. (Docket #182-30 at 2). It was nevertheless common for patients to return to jail from the hospital without adequate documentation about their condition. Armor and MCJ were aware of this ongoing issue. Dr. Buono described this as a recurrent problem not only with Armor and at MCJ, but at the Wisconsin Department of Corrections as well. (Docket #174-14 at 62:17–64:24). She also described the measures that she takes to encourage physicians to fill out the appropriate paperwork for inmates returning to jail. *Id.* at 65:4–22. There is evidence that, in the absence of paperwork, the MCJ staff were tasked with "hunting" down the hospital paperwork and calling physicians in order to get appropriate orders. *Id.* at 65:1–66:3, 72:1–10.

Armor's Pregnancy Management Policy, J-G-07, revised June 12, 2009, states that "[p]regnant patients who are on opiates other than methadone and at risk for withdrawal will be protected from experiencing withdrawal through aggressive medical management including specialty

consultation." (Docket #190-1 at 3). The policy delineates various pregnancy management and prenatal care practices, and notes that "[d]elivery will be at the hospital designated by the provider of prenatal services to the extent possible in accordance with facility operating procedures." *Id.*

Exum was trained by Armor and the County to call 911 if she thought someone was in labor. (Docket #174-13 at 42:2–10; 43:7–14). Dr. Buono stated that patients in labor should be in the hospital, and that she would not put a patient in labor in the SMU. (Docket #174-14 at 36:15–19). Wenzel was not trained in how to respond to pregnant inmates' needs, though he did understand that if an inmate "verbalize[s that] they are in any sort of distress, you let somebody obviously higher trained than you come in and assist them." (Docket #174-21 at 45:1–7; *see also id.* at 95:21–22 ("When there is an emergency, we were trained to call master control.")).

The County's restraint policy in March 2014 required all inmates who went to the hospital to be restrained at two points, regardless of their criminal history or individualized circumstances. (Docket #174-27 at 3–4).[8] The policy, MMHS 13.7, required that "[i]nmates in the hospital will be restrained by a handcuff and a leg iron attached to the side rail of the bed." *Id.* at 3. If an inmate was moved from the bed, they needed to be shackled at both ankles and placed in a belly chain. *Id.* This provision also required a second officer to be present "any time an inmate is removed from the bed until the inmate is re-secured to their hospital bed." *Id.*

---

[8]Different versions of the policies have been submitted; the one referenced by the Court is the one that was in use at the time that the events of this case took place.

## 4.     ANALYSIS

The County Defendants assert that Exum and Bevenue acted reasonably as a matter of law, and that Wenzel did not know that Terry was in labor until after she gave birth. The County Defendants also argue that Terry did not adequately plead or support her *Monell* claims, and that she fails to show that any unconstitutional policy was the cause of her giving birth, unattended, in the MCJ. Finally, the County argues that its use of restraints was constitutional.  Armor also contends that the *Monell* claims pled in Terry's amended complaint are deficient and unsupported by the evidence.

For the reasons stated below, the claim against Exum will be dismissed, and the claims against Wenzel and Bevenue will move forward. Whether Wenzel and Bevenue knew, or should have known, about Terry's labor, and whether they purposefully, knowingly, or recklessly ignored that she was in labor, are fact intensive issues subject to genuine dispute. Further, neither of these defendants are entitled to qualified immunity.

The Court will also dismiss the two *Monell* claims[9] related to Armor and the County's intake paperwork policy and their lack of policy for late term pregnant or laboring inmates. The *Monell* claim against the County regarding the use of restraints may go forward.

### 4.1     Constitutional Violations

In the past, courts assessed pretrial detainee medical care claims under the Eighth Amendment's deliberate indifference standard, "reasoning that pretrial detainees are entitled to at least [as] much

---

[9]Though Terry initially advanced a *Monell* claim regarding the MCJ's failure to adequately train staff, she does not intend to pursue this theory any further and has agreed to its dismissal. (Docket #180 at 18).

protection" as convicted prisoners. *Miranda v. Cty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). The Eighth Amendment's "deliberate indifference" standard requires (1) a substantial risk of serious harm that (2) the government official subjectively knew of and deliberately ignored. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Recently, however, the Seventh Circuit clarified that the subjective intent component of the deliberate indifference standard does not apply to Fourteenth Amendment medical claims brought by pretrial detainees. *Miranda*, 900 F.3d at 352. Rather, "medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*." *Id.*

In establishing this standard, the Seventh Circuit extended the holding in *Kingsley v. Hendrickson*, which concluded that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one," because pretrial detainees are not meant to be punished. 135 S. Ct. 2466, 2473 (2015); *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). *Kingsley* held that a plaintiff bringing an excessive force claim need only show that the defendant took a purposeful, knowing, or reckless action and that action resulted in objectively unreasonable force. 135 S. Ct. at 2472. *Kingsley* lists the following as examples of "purposeful, knowing, or possibly reckless" actions: "the swing of a fist that hits a face, a push that leads to a fall, or the shot of a taser that leads to the stunning of its recipient." *Id.* In other words, a person acts purposefully, knowingly, or recklessly when their actions put into motion a series of consequential events—i.e., when they act volitionally. In requiring this first prong, the Supreme Court makes clear

that it intends to foreclose liability for accidents. *Id. Kingsley* then asks whether these actions were objectively reasonable under the circumstances, without regard to what the actor believed. *Id.*

In extending *Kingsley* to a pretrial detainee's claim of medical mistreatment, the Court of Appeals balanced two competing considerations. First, consistent with *Kingsley*, pretrial detainees should be afforded the benefit of objectively reasonable conduct by their custodians. *Miranda*, 900 F.3d at 351–52. Second, consistent with longstanding precedent concerning constitutional claims of medical misconduct, the jail officials' failure to properly recognize or treat the plaintiff's illness must have been the result of something more than negligence, or even gross negligence. *Id.* at 353–54.

In fashioning a legal standard that accommodates these competing concerns, the Seventh Circuit created a doctrine that is difficult to apply. The Court of Appeals held that the standard for medical care under the Fourteenth Amendment consists of two questions. First, did the medical defendants act "purposefully, knowingly, or perhaps even recklessly when they considered the consequences" of their actions? *Id.* at 353. Second, if so, was their conduct objectively reasonable, without consideration for their subjective intent? *Id.*

These elements are not clearly aligned with *Kingsley*. In *Kingsley*, the Supreme Court stated that the intent element is intended to foreclose accidents. 135 S. Ct. at 2472. *Miranda*'s intent element initially appears to correlate with this threshold question in *Kingsley* as to whether the defendant's conduct was volitional. But asking whether the defendant acted purposefully, knowingly, or recklessly with respect to "the consequences of [his actions]" goes well beyond asking whether he

performed volitional acts. *Miranda*, 900 F.3d at 353. For instance, it is indisputable that a doctor who performs a surgical removal of a limb engaged in volitional acts to bring about that removal—he did not cut off the patient's leg by accident. It is a far different question to ask whether he performed those acts with purposeful, knowing, or reckless indifference to the consequences of the removal—i.e., future infection, removing the wrong leg, permanent handicap or disfigurement, or other medical problems. When read this way, *Kingsley*'s first element, which is intended to exclude those claims where the harm caused was a complete accident, *see* 135 S. Ct. at 2472, does not align with the first element set forth in *Miranda*. This is to say, *Miranda*'s volitional element probes the defendant's appreciation of the consequences of his actions, while *Kingsley*'s does not.

On the other hand, the examples in *Kingsley* that illustrate intentional conduct consist entirely of the defendant acting in ways that result in harm. One does not purposefully, knowingly, or recklessly punch/push/tase someone without knowing, on some level, that there is a high risk that the subject is going to get hit/pushed/stunned. Thus, despite the Supreme Court's assertion to the contrary, perhaps the first element in *Kingsley* is intended to probe the defendant's appreciation of the consequences of his action. If that is the case, then the subjective element in *Kingsley* is less at odds with *Miranda*, but no easier to apply in the medical context, for the reasons discussed below.

After determining whether the defendant acted purposefully, knowingly, or recklessly with regard to the consequences of his actions, *Miranda* then instructs courts to consider whether the medical defendant's actions were objectively reasonable under the circumstances. 900 F.3d at 353–54. In assessing this element, says the Court of Appeals, one should not

consider the defendant's subjective intent or knowledge as to the risk of harm his actions created. This is consistent with *Kingsley*, as should be clear from the discussion above. But this second element is in tension with the first, and with the longstanding principle that constitutional claims cannot be premised on medical negligence. If we must assess a jail doctor's conduct objectively, how can we ask whether the doctor was "reckless" with respect to the consequences of his actions? Whether or not he was reckless (or acted with knowledge or intent) should not matter when considering the objective reasonableness of his conduct. Thus, the objective inquiry sought in the second *Miranda* element is undermined by the intent-based inquiry of the first.

What is more, asking whether the jail doctor's conduct is objectively reasonable is equivalent to asking whether they were negligent—that is, whether they failed to demonstrate ordinary, reasonable care in the face of a risk of harm. To say that a plaintiff must prove that the doctor was at least reckless with respect to the risk of harm raises the bar set in *Kingsley*. In essence, *Miranda*'s attempt to harmonize *Kingsley* with the negligence-is-not-enough principle has created an entirely new standard of constitutional liability: reckless indifference.

Doctrinal concerns with *Miranda* aside, the Court is left to apply the law to the case before it. Thus, a pretrial detainee's Fourteenth Amendment right to medical care is violated if: (1) there was an objectively serious medical need; (2) the defendant made a volitional act with regard to the plaintiff's medical need; (3) that act was objectively unreasonable under the circumstances in terms of treating or assessing the patient's serious medical need; and (4) the defendant "acted purposefully, knowingly, or perhaps even recklessly" with respect to the risk of harm. *Miranda*, 900 F.3d at 353–

54. Even with the rule articulated above, is difficult to envision a world in which a defendant acted reasonably under the circumstances, but also acted purposefully, knowingly, or recklessly with regard to a high risk of harm. In any application, the Court will be ultimately applying a recklessness test. The "objective" prong functions primarily as a gatekeeper for the intent prong.[10]

With regard to whether an inmate has a "serious medical need," the Court of Appeals continues to find Eighth Amendment precedent to be instructive on this issue. "An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quotation marks omitted) (citing *Haynes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008)). The medical condition "need not be life-threatening to be serious." *Id*. While

---

[10]For example, a jury could find that an officer was purposeful, knowing, or reckless with regard to a risk if he perceived signs that indicated a serious medical need (for example, cries for help, a red alarm light flashing) and ignored them. In ignoring those signs, a jury would necessarily find that the officer was acting objectively unreasonably under the circumstances, since he knew or should have known that the inmate was calling for help, and a reasonable official in his situation would have responded. By contrast, if the officer did *not* perceive any distress calls, a jury could find that he did not act with purposeful, knowing, or reckless disregard for a serious risk—and therefore, whether he acted reasonably or unreasonably wouldn't matter for the purposes of determining liability.

In any case, the scenarios in which an officer acts reasonably but *also* with purposeful, knowing, or reckless disregard for the health of an inmate are extremely unlikely. One far-fetched example of this application might be if a jail riot occurred and an official had a choice between evacuating the jail to save himself or risking his life to ensure medical care to an ailing inmate. If the official abandoned the ailing inmate, a jury could find that this was objectively reasonable under the circumstances of the jail riot, even though the official did so knowing of the high risk of harm to the inmate. Obviously, this does not make leaving the inmate the morally correct option, but it might save the officer from legal liability.

Defendants dispute whether Terry was actually in labor at various points, they do not dispute that labor is a "serious medical need" that requires medical assistance.

Thus, the issues here are whether (1) the defendants made a volitional act with regard to Terry's labor; (2) whether the act was objectively unreasonable under the circumstances in terms of treating or assessing her labor; and (3) whether the defendants acted purposefully, knowingly, or recklessly with respect to the risk of harm. The claims against each individual will be assessed in turn, followed by a discussion of qualified immunity.

### 4.1.1    Nurse Exum

Construing the facts in Terry's favor and accepting that she was, during the booking process, in the early stages of labor, the Court will consider whether Exum's actions towards Terry were objectively reasonable under the circumstances, and whether she was willful, knowing, or reckless with respect to the risk of Terry's labor.[11]  *Miranda*, 900 F.3d at 353–54; *Kingsley*, 135 S. Ct. at 2472–73.

The Court notes that the only evidence that Exum knew Terry was in active labor is Terry's assertion that she told Exum that she was in labor, which is diluted by the fact that Terry acknowledges that she does not remember her conversation with Exum. *See Gates v. Caterpillar, Inc.*, 513 F.3d

---

[11]The Court acknowledges that labor is a multi-stage and variously defined experience that changes from person to person. It seems that Terry was in the early stages of labor (i.e., intermittent contractions, partial effacement, minor dilation) up until she was placed in the SMU, at which point she went into active labor (i.e., increased contractions in a narrow interval, complete effacement, increased dilation). That Terry was on opiates for part of this process may have affected her own experience of the contractions, as well as Exum's ability to detect them.

680, 688 n.5 (7th Cir. 2008) ("[a]s a general rule, a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony in the absence of newly-discovered evidence or the unmistakable need to clarify prior ambiguous statements."); *see also* (Docket #174-9 at 143:21–22, 144:14–24).

Nevertheless, construing the facts in Terry's favor, no reasonable jury could conclude that Exum acted unreasonably, let alone recklessly, purposefully, or knowingly indifferently to Terry's complaints of labor, or Terry's risk of early labor due to opiate withdrawal. In response to Terry's complaints, Exum contacted her supervisor twice, followed up with the hospital to receive an oral report, requested the discharge papers via fax, felt for contractions, confirmed with Terry that she (Terry) did not feel contractions, recorded Terry's status for the SMU's night shift nurse, and received approval to begin the MCJ's opiate protocol for pregnant women who are addicted to opiates. It is also worth noting that the SMU is located on the floor above booking, where Exum was stationed, and Exum did not see Terry until after Terry gave birth. There is no evidence in the record that Exum heard Terry's screams from one floor below, or that Wenzel and Bevenue told Exum that Terry was calling for help. Therefore, Exum did not act unreasonably under the circumstances, nor could she be found reckless with regard to the risk of Terry's labor.

### 4.1.2    Nurse Bevenue

Bevenue's liability is also contingent on whether she engaged in a volitional act with regard to Terry's labor; whether that act was objectively unreasonable under the circumstances; and whether she acted purposefully, knowingly, or recklessly with respect to the risk of labor.

There are two possible volitional acts here: first, that Bevenue chose not to check on Terry in the SMU despite the fact that she would have known, from Exum's notes, that Terry was nine months pregnant and a habitual opiate user—and therefore at risk of early labor; or, second, that she heard Terry scream and cry and decided not to investigate. A reasonable jury could find that either act was objectively unreasonable under the circumstances. Moreover, a "properly instructed jury could find that [Bevenue] made the decision" not to check on Terry in the SMU, or investigate any cries for help "with purposeful, knowing, or reckless disregard of the consequences." *Miranda*, 900 F.3d at 354. The few facts we have regarding Bevenue's involvement in Terry's care, including whether she could hear Terry from her workstation at the clinic, are disputed; therefore, this is an issue for the jury. *See Estate of Perry v. Wenzel*, 872 F.3d 439, 449–50, 458 (7th Cir. 2017) (summary judgment inappropriate where a reasonable jury could find that a 10-minute delay in medical attention by a nurse who observed an inmate in obvious distress but failed to immediately act was objectively unreasonable).

### 4.1.3    Officer Wenzel

Terry's evidence, if true, shows that Wenzel decided to ignore her as she went into labor and delivered her baby in her jail cell.

Wenzel sat directly across from Terry in the SMU, could see into her cell when he conducted rounds, and could hear her from inside her cell. He also had a view of the red flashing light over her door. Terry explains that shortly after entering the SMU, she began to experience painful contractions, that she screamed, called for help, and banged on the door at least three times, but Wenzel ignored her. She also activated the red light outside of her door to indicate an urgent situation. At some point, Terry's

water broke, and she took off her pants. Sometime later, she gave birth to a baby who had trouble breathing.

Wenzel maintains that he performed his rounds diligently, twice an hour, and neither saw nor heard anything troubling from Terry until 4:46 a.m., when the baby was already born. There is at least one report from a fellow inmate who heard some screaming that night, and there are no working security cameras to corroborate either account. This is an issue of fact for the jury. A reasonable jury could find that Wenzel did not check on Terry, or that he did check on Terry but unreasonably overlooked (or ignored) the fact that she was about to deliver, and in fact did deliver, a baby in a jail cell. These facts could also support a reasonable jury's conclusion that Wenzel acted purposefully, knowingly, or recklessly towards Terry's serious medical need.

Defendants argue that Wenzel was entitled to rely on the information he received from medical professionals (albeit indirectly, from Montano) that Terry was not in labor. *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("[I]f a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). The Supreme Court's guidance regarding the status of pretrial detainees in *Kingsley* does not disturb this rule. However, even if Wenzel did rely on the information received from medical professionals, he could not simply ignore Terry when she tried to communicate to him that her labor was progressing. "Once an official is alerted of such a risk, the refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Arnett*, 658 F.3d at 756.

## 4.2 Qualified Immunity

As explained above, there is evidence to support a reasonable jury's conclusion that Wenzel and Bevenue violated Terry's Fourteenth Amendment right because they acted unreasonably under the circumstances and purposefully, knowingly, or recklessly ignored that Terry was in labor, causing her to give birth alone in a filthy cell. The cases against them will move forward unless qualified immunity applies.

Qualified immunity shields officials from the civil consequences of their constitutional violations when the law did not put the officials on clear notice that their conduct would be unlawful. *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that the doctrine protects officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). "Put simply," says the Supreme Court, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The test for qualified immunity is (1) whether the defendants' alleged actions violated the plaintiff's constitutional rights; and (2) "whether the implicated right was clearly established at the time." *Jones v. Wilhelm*, 425 F.3d 455, 461 (7th Cir. 2005). Once the defense is raised, the plaintiff bears the burden to defeat it. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015).

To overcome an assertion of qualified immunity, Terry must first proffer facts which, if believed, amount to an actual violation of her constitutional rights. *Katz*, 533 U.S. at 201. As the discussion above shows, Terry has done this. Next, Terry must show that the violation of her

constitutional rights was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling v. Pollard*, 528 Fed. App'x 653, 656 (7th Cir. 2013). A right is clearly established if "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, a right is clearly established if it would be obvious to a reasonable state actor that "what they are doing violates the Constitution, or if a closely analogous case establishes that the conduct is unconstitutional." *Siebert v. Severino*, 256 F.3d 648, 654–55 (7th Cir. 2001). Factually identical precedent is not necessary; the guiding question is whether the official would have had "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "In determining whether a defendant's alleged actions violated a clearly established right, courts may properly take into account any information the defendant ought reasonably to have obtained." *Jones*, 425 F.3d at 461.

This District has noted that the right to medical care for inmates has been clearly established since *Estelle v. Gamble*, 429 U.S. 97 (1976). *Doe v. Gustavus*, 294 F. Supp. 2d 1003, 1012 (E.D. Wis. 2003). In *Gustavus*, this Court denied summary judgment and qualified immunity under facts very similar to this: where correctional facility staff allegedly ignored a pregnant detainee's cries for help as she went into labor, and the detainee was forced to give birth, unassisted, in her cell. *Id.* The *Gustavus* court, applying the deliberate indifference standard, held that qualified immunity did not apply because the right to be free from deliberately indifferent medical care is clearly defined, and no reasonable medical officer could find otherwise. *Id.*; *see also Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) ("Deliberately to

ignore a request for medical assistance has long been held to be a form of cruel and unusual punishment.").

Additionally, the "objectively unreasonable" standard for pretrial detainees that was announced in *Miranda* is not entirely new. It is well-established in this circuit that arrestees awaiting their probable cause hearings have a right to medical care that is protected under the Fourth Amendment's "objectively unreasonable" standard. *Currie v. Chhabra*, 728 F.3d 626, 629–30 (7th Cir. 2013); *Ortiz v. City of Chicago*, 656 F.3d 523 (7th Cir. 2011). In *Ortiz*, the Seventh Circuit denied qualified immunity despite uncertainty over whether the "deliberately indifferent" or "objectively unreasonable" standard governed medical care claims for arrestees because it was clear that the Fourth Amendment protected arrestees at the time of the plaintiff's death. *Id.* at 538. The Court of Appeals further held that qualified immunity was inappropriate because defendants' conduct would not have been entitled to qualified immunity under the deliberate indifference standard anyway. *Id.* at 538–39.

Thus, *Miranda* does not change the qualified immunity standard. The defendants may argue that they believed they were held to the deliberate indifference standard and did not realize that they would be subject to the objectively unreasonable standard of care. This is, in effect, an argument that defendants were unaware that they had to act a modicum more humanely towards Terry. Such a miserable contention is not persuasive. *Id.; see also Currie*, 728 F.3d at 632–33 (striking down defendants' argument that they "had no way of knowing that the Fourth Amendment, rather than some more forgiving constitutional provision, would govern this particular arrestee's medical care."). Although mistakes of fact may sometimes give rise to qualified immunity, *Pearson v. Callahan*, 555 U.S. 223,

231 (2009), it was well established at the time that the Fourteenth Amendment protected pretrial detainees. *Wolfish*, 441 U.S. at 523. Moreover, Terry's arguments, "if credited by a jury, satisf[y] the deliberate indifference standard because she argues that the defendants were subjectively aware that she had a serious medical condition. . .and failed to respond." *Ortiz*, 656 F.3d at 538. Therefore, even if the Court applied the old standard, qualified immunity would not be appropriate. As discussed below, Wenzel and Bevenue knew, without a doubt, that detainees had a constitutional right to medical care, and they also knew that they were not allowed to ignore serious medical risks. That was true under the deliberate indifference standard, and it remains true under the new standard. *See Estate of Williams v. City of Milwaukee*, 16-CV-659-JPS, at 8 (E.D. Wis. Nov. 15, 2018).

### 4.2.1    Qualified Immunity as to Wenzel

As discussed above, Wenzel's liability for a Fourteenth Amendment violation rests on whether he purposefully, knowingly, or recklessly ignored that Terry was in labor. Qualified immunity would apply unless Wenzel had "fair warning" that ignoring Terry's cries for help was unconstitutional. *Hope*, 536 U.S. at 740. An official has "fair warning" when the violation is "so obvious that a reasonable [correctional officer] would know that what they are doing violates the Constitution," or if a closely analogous case establishes that ignoring a pregnant inmate's cries for help while she goes into labor is unconstitutional. *Siebert*, 256 F.3d at 654–55.

Despite a lack of specialized medical training, Wenzel was trained on the constitutional standard of healthcare for jail inmates, including the concept of deliberate indifference. He attended a PowerPoint presentation that discussed *Estelle v. Gamble* and was informed that "deliberate

indifference" could arise from a failure to take appropriate action upon noticing an inmate's serious medical concern. Wenzel's training materials show that he completed a worksheet where he correctly acknowledged that officers should never ignore an inmate's complaint, even if they personally do not believe it is urgent.

The deliberate indifference training materials that Wenzel saw, as well as the worksheets that he correctly completed, in which he acknowledged that an inmate's call for help should never be ignored, gave Wenzel fair warning that ignoring Terry's cries for help was unconstitutional. This remains true under *Miranda*. The violation becomes more obvious in light of the fact that Wenzel was in the Special *Medical* Unit, the whole point of which is to provide inmates who have medical needs with greater supervision than the general population. It would have been obvious that ignoring a call for help in the SMU could give rise to a constitutional violation. *Siebert*, 256 F.3d at 654–55. The fact that the Fourteenth Amendment now uses an objective rather than subjective test does not gut the caselaw of its advisory effect that officers cannot ignore detainees' serious medical needs.

If the contours of this violation were not obvious enough, there is also an analogous case from this very District that denied qualified immunity to a corrections officer who ignored a pregnant inmate's cries for help as she went into labor. *Gustavus*, 294 F. Supp. 2d at 1012. While a factually analogous case is not necessary to preclude qualified immunity, it definitively put Wenzel on notice that it was a constitutional violation to ignore a pregnant inmate who is going into labor. *Ortiz*, 656 F.3d at 532–34, 538 (declining qualified immunity against officers when there was evidence

that they were on notice of an arrestee's serious medical need and ignored it).

### 4.2.2    Qualified Immunity as to Bevenue

As discussed above, Bevenue's Fourteenth Amendment violation also rests on whether she purposefully, knowingly, or recklessly ignored the fact that Terry was in labor. The facts suggest that Bevenue may have known that Terry was going into labor. Qualified immunity would apply unless Bevenue had "fair warning" that ignoring Terry's cries for help was unconstitutional. *Hope*, 536 U.S. at 740. Bevenue had "fair warning" if the violation was "so obvious that a reasonable [official] would know that what they are doing violates the Constitution, or if a closely analogous case establishes that" ignoring a pregnant inmate's cries for help while she goes into labor is unconstitutional. *Siebert*, 256 F.3d at 654–55.

Bevenue worked as a nurse in a correctional facility, and therefore would be well-acquainted with the contours of an inmate's constitutional right to medical care. Like Wenzel, Bevenue would have had fair warning that she could not ignore cries for help, particularly those from the SMU. *Id. Gustuvus* also instructs, in no uncertain terms, that ignoring a pregnant woman's cries for help as she goes into labor is a constitutional violation. *Gustavus*, 294 F. Supp. 2d at 1012. Therefore, if Bevenue did ignore Terry's cries for help as she went into labor, qualified immunity would not protect Bevenue from suit because "qualified immunity does not insulate state actors from violations of clearly established law." *Id.* at 1011–1012.

### 4.3    *Monell* Claims

A municipal entity can be liable under Section 1983 only when there is a predicate constitutional violation, and that violation is a result of that entity's (1) express policy; (2) widespread custom or practice; or (3) a

decision by an agent of the entity who has "final policymaking authority." *Darchak*, 580 F.3d at 629. As a contractor that provides essential services to state detainees, Armor healthcare may also be liable. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). Terry does not allege that her constitutional deprivations were the result of an express policy or an agent's decision, therefore she proceeds on a "custom or practice" theory of municipal liability for Armor and the County.

In order to bring a *Monell* claim, Terry must provide evidence that would lead to a reasonable inference that the County and Armor were deliberately indifferent to their subordinates' widespread practice of ignoring the serious medical needs of MCJ inmates.[12] *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003); *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 407 (1997). Deliberate indifference is typically proven in *Monell* cases by "a pattern of similar constitutional violations." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). If there is no well-established custom or practice that would put the County or Armor on notice of a *de facto* policy and its constitutional implications, liability may still attach if this act or omission was "so likely to result in the violation of constitutional rights" that there was an "obvious" need to correct it. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

A *de facto* policy of constitutional violations occurs if the defendants had a habit of purposefully ignoring a need for action. *Id.* at 388; *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). Thus, Terry must provide evidence

---

[12]Miranda does not change the *Monell* standard, even when applied to jail inmate medical claims.

that the defendants had notice of an ongoing problem such that allowing the problem to endure was akin to a conscious choice among alternatives. *Canton*, 489 U.S. at 389, *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985). This can be done by "showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995).

In rare scenarios, a municipality "could be liable under § 1983 without proof of a pre-existing pattern of violations" if "the unconstitutional consequences of failing to train [were] patently obvious." *Connick*, 563 U.S. at 64; *Canton*, 489 U.S. at 390 n.10. This single-incident or "obvious need" theory applies only in situations where "a violation of federal rights may be a highly predictable consequence of a failure to equip [officials] with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409. An "obvious need" will be actionable where policymakers "know to a moral certainty" that a constitutional violation will occur but for adequate safeguards. *See Canton*, 489 U.S. at 390 n.10 (describing the obvious need to train armed officers in the use of deadly force when arresting fleeing felons). Finally, under either theory, Terry must provide evidence that the custom at issue directly caused *her* injury, which arose from her traumatic childbirth experience. *Canton*, 489 U.S. at 391; *Brown*, 520 U.S. at 404 (requiring a "direct causal link between the municipal action and the deprivation of federal rights.").

### 4.3.1     Policy of Admitting Inmates who had Recently Returned from the Hospital Without Adequate Hospital Paperwork[13]

Terry asserts that Armor and the County's custom of admitting recently hospitalized inmates without adequate hospital paperwork caused her to give birth, alone, in a filthy cell. Terry contends that this custom amounted to a *de facto* policy of violating inmates' constitutional rights to adequate medical care. *Canton*, 489 U.S. at 390; *Calhoun*, 408 F.2d at 380; *Tuttle*, 471 U.S. at 823.

Armor has a written policy that predicates readmission to jail from the hospital on detailed, individual discharge summaries for inmates. (Docket #182-30 at 2). Nevertheless, there is evidence that Armor and the County were on notice of the practice of admitting inmates back to the MCJ

---

[13]Armor contends that Terry's *Monell* claims must be dismissed because they "exceed the scope" of the Court's previous order, which allowed Terry to amend her complaint to cure her deficiently pled *Monell* claim that the County and Armor had a widespread custom of ignoring inmates' serious medical needs. (Docket #163 at 11–12; Docket #127). Yet Terry has attempted to do just that. An amended pleading is permissible if it relates back to the original pleading, i.e., if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Terry's *Monell* claims all arise out of the events on March 9-10 that led to her giving birth, unattended, in a jail cell.

Armor also contends that these new claims "contradict" Terry's prior statements and are not derivative of the prior claim that she experienced a "complete lack of medical care." (Docket #163 at 12). Terry has not wavered from her allegation that she did not receive medical care when she gave birth, unattended, in a jail cell. Since "even significant changes to a complaint…can relate back so long as the defendant had fair notice of the substance of the new allegations from the outset," the Court finds that these amendments, all of which relate back to Terry's unassisted jail cell birth, gave the defendants adequate notice of the substance of the new allegations and policies at issue, and therefore are not prejudicial. *Supreme Auto Trans., LLC v. Arcelor Mittal UCA, Inc.*, 902 F.3d 735, 741 (7th Cir. 2018) (quotations omitted).

without proper paperwork. (Docket #165 ¶ 15; Docket #174-14 at 62:7–65:4; Docket #175-24 at 117:3–118:15). However, Terry has not provided evidence that this lapse in policy resulted in the constitutional violations of anyone other than herself. *See Connick*, 563 U.S. at 62 (requiring "a pattern of similar constitutional violations."). She claims that her case "shows why Defendants' widespread practice is so problematic," but fails to point to a single other case where the lapse in policy resulted in another person's constitutional rights being violated. (Docket #180 at 21). Additionally, this same evidence also shows that Armor and the County were trying to resolve the issue—and enforce the written policy—through outreach, dialogue with hospitals, and, when patients arrived without adequate paperwork, reaching back out to the hospital to acquire it. Although an unconstitutional policy may be inferred where there is a "series of bad acts" such that the government "was bound to have noticed what was going on," *Jackson*, 66 F.3d at 152, the reverse is not true. That is, the government's notice of a series of policy infractions does not, absent a related series of constitutional violations, point to an unconstitutional policy. *See Connick*, 563 U.S. at 61 (requiring "notice that its program will cause constitutional violations.").

Also, there is no evidence that Armor or the County "encouraged or at least condoned" the practice of admitting inmates without proper paperwork. *Jackson*, 66 F.3d at 152. To the contrary, the evidence demonstrates that Armor and the County were actively trying to enforce their policy requiring discharge paperwork from the hospital and, where discharge paperwork was not immediately available, took to calling the discharging hospital to get necessary information while keeping the inmate under supervision in the SMU. Indeed, when Terry arrived back at the MCJ

without adequate paperwork, Exum raised the issue with Dr. Buono and then called the hospital in order to get the paperwork, which was obtained less than 12 hours later. It is not plainly obvious that a delay of less than 12 hours in discharge paperwork would result in a constitutional violation—presumably, when a person is discharged from a hospital, it is because they no longer have a serious medical need. While there are clearly issues in carrying out the letter of the policy that should not be taken lightly, these enforcement issues do not give rise to a custom of admitting detainees without discharge paperwork "so entrenched and well-known as to carry the force of policy." *Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012); *c.f. Davis v. Carter*, 452 F.3d 686, 688–89, 692–93 (7th Cir. 2006) (finding evidence of a custom of delaying methadone treatment where staff duties were undefined, there were no time limits for implementing treatment, and there was no record of whether inmates were actually brought to the pharmacy to receive treatment).

Thus, while there is evidence of multiple deficiencies in carrying out this policy, there is no evidence that the defendants have acted with "deliberate indifference to the rights of persons" such as Terry, who were admitted back to jail without the appropriate paperwork. *Canton*, 489 U.S. at 388. Rather, the evidence demonstrates the defendants' ongoing efforts, however Sisyphean, to work with hospitals in order to acquire the proper intake paperwork at or shortly after booking. No reasonable jury could find that this amounts to deliberate indifference. Accordingly, this claim must be dismissed.

### 4.3.2   Policy of Failing to Develop a Nursing Protocol for Inmates in Late Term Pregnancy and Labor

Terry also alleges a *Monell* claim based on Armor and the County's failure to establish a nursing protocol for inmates in late term pregnancy and labor. In order to survive summary judgment, Terry must establish that the defendants' "gap" in their policies reflected a decision to act unconstitutionally. *Calhoun*, 408 F.3d at 380. In assessing whether this absence of a policy or protocol gives rise to a decision to violate an inmate's right to medical care, the Court will look for "evidence that there is a true municipal policy at issue, not a random event." *Id.* To be sure, the absence of a policy could mean a variety of things—"that the government sees no need to address the point at all, or that it believes that case-by-case decisions are best, or that it wants to accumulate some experience before selecting a regular course of action." *Id.*

Terry has not provided evidence that the defendants' lack of late term pregnancy and labor policy is tantamount to the defendants' decision to violate the constitutional rights of women in late pregnancy. There is evidence of only one other case of a woman giving birth at the MCJ, which occurred two years after Terry's experience. Perhaps it is obvious that a pregnant woman would, at some point, go into labor in jail and require some form of medical intervention. However, the evidence demonstrates that there *is* a written policy of sending women to external facilities to deliver, and this policy that has not been so woefully deficient as to result in a myriad of women giving birth unassisted in jail. In addition to requiring deliveries to occur at a hospital, Armor's policies describe (albeit perfunctorily) the various other measures of prenatal and medical monitoring that Armor will take throughout the pregnancy. Finally, the

individual defendants' depositions clearly show that the concept of a woman giving birth in jail was unusual and not at all desired by either Armor or the County. (*See* Docket #174-21 at 96:24–97:1, 97:18–22 (explaining that master control asked if Wenzel was kidding because "it seems unlikely that somebody would give birth in a jail. It's something you don't expect to hear. It's something that you don't expect to say."); Docket #174-14 at 88:13–14 ("I don't think it could have been predicted that this would happen"); Docket #174-13 at 151:17–24 ("[T]hat is not a goal that any nurse wants to have, is someone having a baby in a jail. . .We see people all the time on floors that are in labor and we get them out of there and we get them to the hospital on time.")).

The facts of Terry's own case reflect a working policy geared towards ensuring that labor does not occur in jail: upon first arriving at the MCJ and complaining of possible labor, Terry was sent to the hospital for evaluation. Terry has failed to provide evidence that Armor or the County knowingly lacked a policy of handling late pregnant or laboring women that would give rise to a constitutional rights violation. Rather, the evidence in this case suggests that her constitutional violations stemmed from choices made by Bevenue and Wenzel. Therefore, this *Monell* claim fails as well.

### 4.3.3    Fourteenth Amendment Shackling Claim

Terry's final *Monell* claim is that the County is liable for its widespread policy of shackling hospitalized inmates regardless of their medical condition. *See* (Docket #180 at 28; Docket #129 ¶ 20). The County currently has an express written policy that does *not* require the shackling of pregnant inmates except in extraordinary circumstances; however, this policy was not in place when Terry gave birth. Rather, when Terry gave birth, the County's policy required all inmates, regardless of individual

circumstances, to be shackled at two points while hospitalized. (Docket #174-27 at 3–4).

Terry alleges that she was shackled as a matter of course pursuant to the County's restraint policy, which did not take into account her pregnant and post-natal condition, and which violated of her liberty interests and her rights to be free from cruel and unusual punishment.[14] (Docket #129 ¶¶ 20, 88); *Monell*, 436 U.S. at 694–95; *see also May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000) (holding that the Fourteenth Amendment prohibits the "use of bodily restraints in a manner that serves to punish a pre-trial detainee.").

The use of bodily restraints on a pretrial detainee amounts to unconstitutional punishment "if their use is not rationally related to a legitimate non-punitive government purpose." *May*, 226 F.3d at 884 (citing *Wolfish*, 442 U.S. at 561). The use of bodily restraints is also punishment if "they appear excessive in relation to the purpose they allegedly serve." *Id.* While shackling a hospital detainee certainly furthers the legitimate, non-punitive purpose of ensuring security, the Seventh Circuit has observed that "it is hard to see how shackling an AIDS patient to his or her bed around the clock, despite the continuous presence of a guard, is an appropriate policy for carrying out this purpose." *Id.* Indeed, "in the absence of any indication that the detainee poses some sort of security risk," such a policy would be "plainly excessive." *Id.*; *see also Bell v. McAdory*, 820 F.3d 880, 882 (7th Cir. 2016) (States "must treat detainees at least as well as prisoners, and often they must treat detainees better—precisely because

---

[14]Terry has dropped her claim for deliberate indifference regarding the use of restraints. *See* (Docket #180 at 28 n.15).

detainees (whether civil or pretrial criminal) have *not* been convicted and therefore must not be punished.").

The defendants have provided evidence that Terry was a flight risk in light of her criminal record, which consisted entirely of failure to appear charges, minor drug possession, and bail jumping. On the one hand, there was no evidence that Terry was a violent person or a danger to herself or to others. On the other, she had a pattern of being uncooperative with law enforcement efforts. If those were the only facts in this case, the County's use of restraints may have been rationally related to ensuring that she did not attempt to escape during her period of hospitalization.

However, in each instance that Terry was shackled in the hospital, she was also in the company of at least one, sometimes two, armed officials, thereby ensuring that she would be constantly monitored and unlikely to escape. Most importantly, in each instance that she was shackled, she was also either (1) nine months pregnant and lethargic from heroin, or (2) immediately post-partum and going through severe withdrawal. There is no evidence that she was violent during her withdrawal, only that her withdrawal required medical monitoring. It seems unlikely that under those conditions, she would pose any kind of security threat.[15] If the purpose of the restraints was to ensure that Terry remained in MCJ custody,

---

[15]The County Defendants offer seven isolated incidents, spanning an 18-year period, where inmates or pretrial detainees attempted to escape while being hospitalized. The Court does not have data regarding the overall number of inmates who were hospitalized in that time period, and therefore cannot evaluate the statistical significance of these events. However, it is unconvincing that one attempted hospital escape every 2.57 years requires *every* hospitalized MCJ inmate and pretrial detainee, no matter how feeble, be restrained at multiple points *and* monitored by an armed official. At the very least, this evidence does not entitle the County Defendants to judgment as a matter of law.

a reasonable jury could find that they "appear excessive in relation to the purpose they allegedly serve." *May*, 226 F.3d at 884. This is particularly true of the belly restraint, which Terry alleges was used to transport her to the hospital in the first instance.

Neither party disputes the existence of the County restraint policy, (Docket #174-27 at 3–4), as well as the evidence of its practice. The depositions show that MCJ employees restrained all inmates the exact same way, regardless of their individual histories or medical conditions. For example, Kevin Nyklewicz, the deputy inspector at the MCJ, noted that the MCJ's general policy was to "properly secure[] [all inmates] before they leave the jail, which will be the restraints." (Docket #182-35, 18:10–22). He further acknowledged that every inmate, no matter the reason for their hospitalization, would be attached to the hospital bed by a leg iron and wrist cuff unless there was a medical reason identified by a medical professional at the hospital as to why this should not be done. *Id.* at 19:5–17. They would be shackled and cuffed even if they were given an epidural. *Id.* at 22:14–16. He stated that "[t]he shackling policy is to make sure the inmate returns back to the facility from which they came," *id.* at 33:4–6, but acknowledged that no individualized assessment of security threat or flight risk was ever conducted prior to shackling. *Id.* at 38:22–39:16. The shackling policy was enforced even when inmates were under the supervision of armed officials. (Docket #182-36 at 14:25–15:11). Elizabeth Freuck, the deputy sheriff, who estimates that she has served on hospital watches for approximately 80 pregnant inmates, also acknowledges that the "typical" policy was to have a two-point restraint at all times. *Id.* at 15:8–11.

Terry must also establish that the policy was "the moving force" behind her constitutional injury. *Brown*, 520 U.S. at 404–05. Terry was

shackled in at least two places almost the entire time that she was hospitalized, pursuant to MCJ policy. If a jury determines that the restraints caused her constitutional injury, then there is no question that the policy was the moving force behind it.

5.    **CONCLUSION**

Viewing the evidence in the light most favorable to Terry, the Court finds genuine issues of material fact regarding the liability of Wenzel and Bevenue, as well as the constitutionality of the County restraint policy. However, there are no such issues regarding Exum's liability, or the *Monell* claims regarding either the policy for admitting recently hospitalized inmates into jail without adequate discharge paperwork, or the gap in policy for late term pregnant or laboring women.

Accordingly,

**IT IS ORDERED** that Defendant Armor Correctional Health Services, Inc.'s motion for summary judgment (Docket #162) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants Morgan Bevenue, County of Milwaukee, Carolyn Exum, Margaret Hoover, Richard R. Schmidt, and Brian Wenzel's motion for summary judgment (Docket #169) be and the same is hereby **GRANTED** in part and **DENIED** in part;

**IT IS FURTHER ORDERED** that all claims against Defendant Margaret Hoover (Docket #129 at 11–16) be and the same are hereby **DISMISSED** with prejudice pursuant to the parties' stipulation of dismissal (Docket #186) and that, accordingly, Plaintiff's claim for supervisory liability (Docket #129 at 14–16) be and the same is hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that all claims against Defendant Richard R. Schmidt in his official capacity (Docket #129 at 11–14, 17–18) be and the same are hereby **DISMISSED** as duplicative;

**IT IS FURTHER ORDERED** that all claims against Defendant Carolyn Exum (Docket #129 at 11–14, 16) be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Plaintiff's *Monell* claims regarding the policy for handling discharge orders (Docket #129 at 11–14) and the policy for late term pregnant and laboring detainees (Docket #129 at 11–14) be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Plaintiff's *Monell* claim regarding the Milwaukee County Jail's failure to adequately train staff (Docket #129 at 11–14) be and the same is hereby **DISMISSED** pursuant to Plaintiff's agreement (Docket #180 at 18);

**IT IS FURTHER ORDERED** that Plaintiff's claim that the use of restraints constituted deliberate indifference to a serious medical need (Docket #129 at 17) be and the same is hereby **DISMISSED** pursuant to Plaintiff's agreement (Docket #180 at 28 n.15);

**IT IS FURTHER ORDERED** that Plaintiff's failure to intervene claims (Docket #129 at 16) be and the same are hereby **WAIVED**;

**IT IS FURTHER ORDERED** that Defendants Richard R. Schmidt, Carolyn Exum, Margaret Hoover, and Armor Correctional Health Services, Inc. be and the same are hereby **DISMISSED** from this action;

**IT IS FURTHER ORDERED** that Plaintiff has ten (10) days after the issuance of this order to identify the Unknown Employees of Milwaukee County Jail and Unknown Jail Supervisors named in the First Amended

Complaint; failure to do so will result in their dismissal without further notice; and

   **IT IS FURTHER ORDERED** that the parties' motions to seal (Docket #160, #168, #185, and #196) be and the same are hereby **GRANTED**.

   Dated at Milwaukee, Wisconsin, this 11th day of January, 2019.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Court